# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

BRANDON FRESQUEZ,

       Plaintiff,

vs.

BNSF RAILWAY CO.,

       Defendant.

## COMPLAINT
(JURY TRIAL DEMANDED)

## INTRODUCTION

1. In 2007, Congress held four public hearings, which demonstrated that railroads have a financial incentive to discourage employees from reporting safety concerns and that they frequently act on such incentive by disparately applying vague workplace rules against employees who report safety concerns.[1] See, e.g., Impact of Railroad Injury, accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 10th Cong. (Oct. 25, 2007) ("Hearings") (Majority Staff of the Committee on Transportation and Infrastructure). Consequently, Congress amended the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"), adding new prohibitions against railroads,

---

[1] BNSF ensures its supervisors have a personal motive to discourage employees from reporting safety concerns by maintaining an incentive compensation plan whereby it pays its managers a yearly bonus based, in part, on productivity.

providing employees a private right of action in federal court, and relaxing the standards of proof for retaliation claims. See, e.g., The Implementing Recommendations of the 9/11 Comm. Act of 2007, P. L. 110-53, 121 Stat. 444 (Aug. 3, 2007). Courts have recognized these amendments "were intended to 'enhance the oversight measures that improve transparency and accountability of the railroad carriers' and that '[t]he intent of this provision is to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers.'" Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152, 157 (3d Cir. 2013) (quoting H.R. Rep. No. 110–259 at 348 (2007) (Conf. Rep.), 2007 U.S.C.C.A.N. 119, 181).

2. Plaintiff Brandon Fresquez ("Fresquez") has been a victim of the type of retaliation the above-described amendments were intended to address: He is a longtime and loyal employee of Defendant BNSF Railway Co. ("BNSF") who has been terminated for reporting safety concerns. In short, BNSF has done exactly what the FRSA prohibits, and Fresquez has a right to be made whole.

**PARTIES**

3. BNSF is a corporation with its principal place of business in Fort Worth, Texas. BNSF is engaged as a common carrier in interstate commerce and is operating an interstate system of railroads in and through several states, including Colorado.

4. Fresquez is a Colorado resident who worked for BNSF for over a decade.

**JURISDICTION AND VENUE**

5. Pursuant to 28 U.S.C. § 1331, jurisdiction is proper.

6. Venue is proper under 28 U.S.C. § 1391 because Fresquez resides in Colorado, Fresquez reported track defects to the Defendant in Colorado, and the Defendant retaliated

against Fresquez in Colorado.

## FACTUAL ALLEGATIONS

7. For most of his career, Fresquez was employed by BNSF as a track inspector—the employee responsible for visually inspecting the track for defects, reporting the severity of those defects to BNSF, and reducing the speed limit or taking the track out of service as necessary to prevent derailments.

8. Pursuant to the Track Safety Standards ("TSS") issued by the Federal Railroad Administration ("FRA"), major defects necessitate the track being taken out of service until the defect is repaired, intermediate defects necessitate the track's speed limit being reduced until the defect is repaired, and minor defects necessitate no action so long as the defect is repaired within thirty days of when it was reported.

9. On June 4, 2015, Fresquez detected a major defect and notified Assistant Supervisor Cason Cole ("Cole") that the track needed to be taken out of service. Cole responded via text message, "Don't do it." Later that day, Cole warned Fresquez, "If you continue to do this, you know what will happen."

10. In the late spring to early summer of 2015, it became obvious to Fresquez that he was frequently reporting defects of the same nature and at the same location as defects he had previously reported, which led him to believe someone was circumventing the FRA's requirement that minor defects be repaired within thirty days of when they are reported.

11. Fresquez investigated his suspicion and learned from a coworker that Fresquez's supervisor—Ryan Akers ("Akers")—was ordering employees to report defects as having been repaired despite no repairs having been made.

12. Shortly after confirming his suspicions, on June 11, 2015, Fresquez raised his concerns with Akers's supervisor—Mark Carpenter ("Carpenter")—during a team safety meeting. Carpenter immediately stopped the meeting and ordered Fresquez into an adjacent office. Carpenter followed Fresquez into the office, closed the door, and began berating Fresquez, saying that nobody liked Fresquez, that Fresquez wasn't a good track inspector, that it wasn't Fresquez's job to report defects, and that he would disqualify Fresquez from the track inspector position if Fresquez continued to report defects.

13. Wanting no part in Carpenter's and Akers's dangerous, illegal activity, and fearing he would be disqualified if he continued to hold the track inspector position and did not participate in Carpenter's and Akers's illegal activity, Fresquez bid a non-track inspector position.

14. After nearly nine months, however, the non-track inspector position was abolished. Hoping Carpenter and Akers were no longer reporting defects as having been repaired when no repair had been made, Fresquez bid back into his track inspector position.

15. Upon returning, Fresquez found Carpenter and a new supervisor—Michael Paz ("Paz")—were continuing the dangerous and illegal practice described above. While he tried to keep his head down, Fresquez could not ignore the defects he was legally required to report, which led to another supervisor—David Dunn ("Dunn")—telling Fresquez that Carpenter had held a meeting about how to deal with Fresquez. Another supervisor informed Fresquez that it was stated during the meeting that "Carpenter want[ed Fresquez's] head." Fresquez therefore bid another non-track inspector position. After a couple of months, however, Fresquez was bumped from the non-track inspector position by a more senior employee, leaving him little choice but to

4

again bid back into a track inspector position.

16.     On Fresquez's first day back in a track inspector position, May 2, 2016, Paz ordered him not to inspect any track, saying he "wanted to get his house in order" before Fresquez began inspecting the track.

17.     On Fresquez's second day back as a track inspector, May 3, 2016, he reported an intermediate defect, meaning the track's speed limit needed to be reduced until the defect was repaired, and a minor defect, meaning BNSF had thirty days to repair the defect.

18.     That same day, Fresquez noticed certain tracks were authorized for higher speeds than he thought prudent. Fresquez brought the matter to Paz's attention, who scheduled a meeting with him, Fresquez, and Carpenter for May 5, 2016 to address the issue.

19.     On Fresquez's third day back as a track inspector, May 4, 2016, he reported one major defect, meaning a section of track had to be taken out of service until the defect was repaired, two intermediate defects, meaning the speed limit had to be reduced for two sections of track until the defects were repaired, and one minor defect, meaning BNSF had thirty days to repair the defect.

20.     During the morning briefing on Fresquez's fourth day back as a track inspector, May 5, 2016, Paz told Fresquez the meeting with Carpenter to discuss BNSF authorizing trains for higher speeds than Fresquez thought prudent was postponed until the next day. Fresquez told Paz they also needed to discuss BNSF's failure to inspect track as frequently as required. Paz became visibly upset.

21.     After the morning briefing, Fresquez reported one major defect, meaning a section of track had to be taken out of service until the defect was repaired, and one intermediate

defect, meaning the speed limit had to be reduced for a section of track until the defect was repaired.

22. After Fresquez reported the major defect, Paz called Fresquez and tried to convince him to change his report so the defect was a minor defect, which would allow BNSF thirty days to fix the defect until the track was taken out of service instead of having to take the track out of service immediately. Fresquez told Paz that he would "make a call," called the FRA and verified he had properly reported the defect, and returned Paz's call and told him that he had checked with the FRA and the track needed to be taken out of service. Fresquez then confronted Paz about Paz reporting defects as having been repaired when no repair was made, telling him that Paz's actions were dangerous, illegal, and shortsighted—eventually, someone at the FRA was going to realize defects were being reported of the same nature and at the same location as defects that had supposedly been repaired and hard to answer questions would be asked. Paz admitted he was falsifying reports and told Fresquez that they "have to meet in a happy meeting place." Paz then told Fresquez that if Fresquez was not willing to misreport the defects, Paz was going to find a reason to fire him.

23. After the call, Fresquez returned to inspecting track, reporting an intermediate defect that he knew had been previously reported and then reported as repaired even though no repair had been made, meaning the speed limit reduction that had been in place when the defect was initially reported was lifted.

24. Shortly thereafter, Paz called Fresquez and asked him to meet him at one of the defects Fresquez had verified. When Fresquez arrived, he tried to ease the palpable tension by reminding Paz that Fresquez was merely following the FRA's regulations and that he had even

double-checked the classification of the defect he reported with the FRA before taking the track out of service. Paz's response was curt: "Well, I have Mark Carpenter on my side and we don't lose." Fresquez then asked Paz what Paz was going to do when Carpenter left, and Paz told him "I'll make new friends."

25. Paz then looked at the track where the defect Fresquez had reported was located and told Fresquez that he couldn't see any defect and that Fresquez should withdraw his report. Fresquez reminded Paz that not all defects are visible to the naked eye and that the defect had to be measured before his report could be withdrawn, something of which Paz was well aware. Paz retorted: "I don't have to prove it's there; it's your job to prove it is there."

26. Wanting no part in Paz's falsification of reports, Fresquez drove to a group of co-workers and a foreman nearby and discussed the situation. While there, Paz called on the radio and asked Fresquez if he was going to re-measure the defect. Exasperated, Fresquez told Paz that Fresquez didn't see the point to re-measuring the defect if Paz was just going to falsify the report anyway, and the conversation ended.

27. Fresquez was then called to check a major defect. After inspecting it, he returned to where Paz and the defect Fresquez had previously verified were located. When Fresquez arrived, another employee and Paz were measuring the defect, which confirmed the defect's presence. Fresquez asked if they wanted help measuring the defect, and Paz told Fresquez that he didn't want to talk to Fresquez and that Fresquez should go to the office.

28. Shortly after Fresquez returned to the office, he was removed from service for allegedly refusing to re-measure the defect when ordered to do so by Paz. Though Fresquez did

not refuse any order, a hearing was then held and Fresquez was terminated.[2] Fresquez's termination was pursuant to BNSF's companywide practice of retaliating against employees who report safety concerns.

## CAUSES OF ACTION

## VIOLATIONS OF 49 U.S.C. § 20109(a)(1)

29. The FRSA prohibits railroad carriers from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "provid[ing] information, directly caus[ing] information to be provided, or otherwise directly assist[ing] in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security . . . ." 49 U.S.C. § 20109(a)(1).

30. Fresquez engaged in protected activity every time he reported track defects to BNSF; put slow orders on track; took tracks out of service; told Paz and Carpenter that their circumvention of the FRA's regulations was shortsighted, dangerous, and illegal; called the FRA regarding a defect's classification; and refused to reclassify a defect.

31. BNSF knew Fresquez had engaged in protected activity when it took an adverse action against him.

32. BNSF took an adverse action against Fresquez when it terminated him.

---

[2] Pursuant to his union's collective bargaining agreement ("CBA") with BNSF, Fresquez could not be disciplined unless he was first charged with a rule violation and an investigatory hearing was held.

33. Fresquez's protected activity was a contributing factor in BNSF's decision to take the above-referenced adverse actions against him. In fact, the adverse actions against Fresquez resulted directly from his protected activity.

## VIOLATIONS OF 49 U.S.C. § 20109(a)(2)

34. The FRSA prohibits railroad carriers from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "refus[ing] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security[.]" 49 U.S.C. § 20109(a)(2)

35. Fresquez engaged in protected activity every time he reported track defects to BNSF; put slow orders on track; took tracks out of service; told Paz and Carpenter that their circumvention of the FRA's regulations was shortsighted, dangerous, and illegal; called the FRA regarding a defect's classification; and refused to reclassify a defect.

36. BNSF knew Fresquez had engaged in protected activity when it took an adverse action against him.

37. BNSF took an adverse action against Fresquez when it terminated him.

38. Fresquez's protected activity was a contributing factor in BNSF's decision to take the above-referenced adverse actions against him. In fact, the adverse actions against Fresquez resulted directly from his protected activity.

## VIOLATIONS OF 49 U.S.C. § 20109(b)(1)(A)

39. The FRSA prohibits railroad carriers from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "reporting, in good faith, a hazardous safety or security condition[.]"

49 U.S.C. § 20109(b)(1)(A).

40. Fresquez engaged in protected activity every time he reported track defects to BNSF; put slow orders on track; took tracks out of service; told Paz and Carpenter that their circumvention of the FRA's regulations was shortsighted, dangerous, and illegal; called the FRA regarding a defect's classification; and refused to reclassify a defect.

41. BNSF knew Fresquez had engaged in protected activity when it took an adverse action against him.

42. BNSF took an adverse action against Fresquez when it terminated him.

43. Fresquez's protected activity was a contributing factor in BNSF's decision to take the above-referenced adverse actions against him. In fact, the adverse actions against Fresquez resulted directly from his protected activity.

## REQUEST FOR RELIEF

44. Fresquez requests that the Court find BNSF acted in direct violation of the FRSA.

45. Fresquez further requests that the Court order BNSF to:

- reinstate him to the same position he held when he was terminated;

- clear and/or expunge any record of misconduct by him regarding his alleged insubordination;

- pay to him an award for compensatory damages arising from loss of income and benefits in an amount to be determined by the trier of fact;

- pay to him an award for garden-variety emotional distress in an amount in excess of $75,000.00;

- pay to him an award for costs (including litigation and expert costs), disbursements, and attorneys' fees; and

- pay to him an award for $250,000 for punitive damages.

46. Fresquez further requests that the Court order judgment against BNSF for all other relief available under the FRSA and such other relief as the Court deems just and equitable.

Dated: April 5, 2017

**NICHOLS KASTER, PLLP**

s/ Matthew H. Morgan
Matthew H. Morgan (MN# 304657)
    morgan@nka.com
Nicholas D. Thompson (MN #389609)
    nthompson@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878

**ATTORNEYS FOR PLAINTIFF**
**BRANDON FRESQUEZ**
3037 S. Upham St.
Denver, CO 80227