# UNITED STATES DISTRICT COURT
# THE DISTRICT OF COLORADO

| | |
|---|---|
| Brandon Fresquez,<br><br>Plaintiff,<br><br>v.<br><br>BNSF Railway Co.,<br><br>Defendant. | Case No. 1:17-cv-844-WYD-MLC<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50** |

## INTRODUCTION

Plaintiff Brandon Fresquez' supervisors' supervisor—Mark Carpenter—has admitted to violating federal law, namely by not only allowing the supervisors under him to leave tracks with unrepaired defects that are more than thirty days old to remain in service but also instructing them that they were right to so do. The evidence has shown that Carpenter and some of the supervisors under him have also been violating federal law by putting tracks back in service and removing slow orders without first remediating the defects that caused the tracks to be removed from service and the slow orders to be issued, and ordering the employees under them to do the same. Everyone agrees the forgoing is dangerous.

This case is about whether Defendant BNSF Railway Co. retaliated against Fresquez for objecting to and/or refusing to participate in the illegal and dangerous conduct of Carpenter and some of the supervisors under Carpenter. May 29, 2015 was the first time Fresquez engaged in such protected activity, and he did so two more times within the next two weeks.

Carpenter and the two other then-involved supervisors under Carpenter—Ryan Akers and Cason Cole—responded by threatening Fresquez' job. The records show they had also started the process of charging Fresquez with insubordination, which would have inevitably resulted in his

termination. Fresquez had, however, heeded their threats and bid to an out of sight, out of mind position before they could complete the process.

In March of 2016, Fresquez was bumped back into the track inspector position. Fresquez found that the manager under Carpenter who was now in charge of him—Michael Paz—had not only continued the dangerous and illegal conduct that he had reported and in which he had refused to participate in 2015, but also ramped it up. Fresquez therefore bid off the position as soon as possible.

 In May of 2016, Fresquez was again bumped back to the track inspector position. The next three days were rife with Paz ordering Fresquez to not only put productivity ahead of safety but also violate federal law. Fresquez repeatedly reported to Paz that what he was ordering him to do was dangerous and violated federal law, to which Paz responded by threatening Fresquez' job.

Things came to a head on May 5, 2016, when Paz instructed Fresquez to change a track's classification, which is both dangerous and illegal. After calling the Federal Railroad Administration ("FRA") and verifying that what Paz was doing was not only dangerous but also illegal, Fresquez told Paz that he had "called his friends in high places," which could have only referred to the FRA, and that they told him what Paz wanted done was not only dangerous but also illegal. Perceiving that Fresquez had reported his attempted violation of federal law to the FRA, Paz told Fresquez, "I have Carpenter on my side and we don't lose."

Shortly thereafter, Paz called Fresquez to a defect that had been present for years and could not have been repaired with the men and machines on hand even had Paz legitimately wanted to repair it. When Fresquez arrived, he tried to diffuse the tense situation by absolving himself of responsibility by refusing to reclassify the track about which he had called the FRA,

telling Paz that he had called the FRA, that he was merely following its guidance, and that it was therefore the FRA's and not his fault that he could not do as Paz wanted. Paz responded by telling Brandon "trouble follows everywhere you go" and then saying that he could not see the defect at this location.

Fresquez inferred that Paz was going to use his inability to see the defect with his naked eye as a reason to remove the defect from the system, even though the defect had consistently been reported by geometry cars for more than a year. Recognizing that such removal would be dangerous and illegal, Fresquez objected to Paz so doing, telling Paz that the defect could not be removed from the system simply because it could not be seen by the naked eye. Paz responded by asking Fresquez whether he wanted to re-measure the defect.

Paz's request put Fresquez between a rock and a hard place, as he believed that Paz was going to remove the defect from the system regardless of whether it was re-measured and that if he participating in re-measuring it, Paz could attach his name to the defect's dangerous and illegal removal from the system. Fresquez therefore decided the best thing to do would be to leave the scene until cooler heads prevailed, a technique that had worked with Paz in the past. Importantly, Fresquez had more than a reasonable basis for believing that Paz was trying to coax him into participating in dangerous and illegal conduct, including Paz calling him to the defect shortly after he had told Paz that he had called the FRA on him; the defect having been consistently found by geometry cars for more than a year, which means it was inarguably present; the defect's nature preventing Paz from repairing it even had actually wanted to so do; it taking only one employee with a GPS and string line to measure the defect, and not only Paz but also another employee—Jay Herzog—already being present and having both items, which meant

there was no legitimate reason for Paz to call Fresquez to the defect; and Paz's history of deleting and misreporting track defects.

Paz saw Fresquez leaving as an opportunity to get rid of an employee who refused to put productivity ahead of safety, thereby sending a message to every other employee under him. When Herzog tried to call Fresquez and get him to return, Paz therefore said "don't, this is just what I need." And when Fresquez returned and offered to measure the defect, Paz told him that "it was too late."

Paz then called Carpenter, who charged Fresquez with insubordination. The record demonstrates that had Fresquez been an employee who had not objected to BNSF putting productivity ahead of safety and/or reported them for so doing, Carpenter may have charged him with no rule violation or, at worst, charged him with failure to follow instructions, which—unlike insubordination—would have been a non-terminable offense. Given that hearings are more of a procedural than a substantive hurdle to BNSF disciplining employees for workplace rule violations, Carpenter's decision to charge Fresquez with insubordination was—for all intents and purposes—the adverse action.

This is especially true since Carpenter then ensured that Fresquez' hearing was even more unfair than what already had been an unfair hearing. Specifically, Carpenter coached the company witness and hearing officer on what they should say at the hearing, who they should call as witnesses, and what exhibits they should offer. And, to top it all off, Carpenter shared with the purported decision maker—Adam Miller—that Fresquez should be terminated.

Before explaining why the forgoing warrants BNSF's motion being denied, it's worth noting that Fresquez' belief regarding Paz coaxing him to participate in unlawfully removing the at-issue defect from the system was not only reasonable but also, it turns out, correct. In

4

Fresquez' hearing, as well as his deposition, Paz testified that the defect was not present; then, at trial, before lunch, he testified that the defect was present; and then, at trial, after lunch he testified that the defect was present in the morning of May 5, 2016 but that it had been repaired by Herzog before he, Fresquez, and Herzog arrived at the location of the defect. At the same time, Herzog testified that the defect was present and that not only had he never fixed it but also that no one else fixed it either, testimony that was supported by two coworkers who, if anything, have reason not to testify for Fresquez—Jason Snow and Jacob Yancey.

If Paz was trying to coax Fresquez to participate in illegally removing the at-issue defect from the system, Fresquez leaving the scene is protected activity within the FRSA's meaning. The fact that it may also be insubordination is totally beside the point as the FRSA entitles railroad employees a right to refuse illegal and dangerous orders.  Given a reasonable person could, and probably would, conclude that Fresquez' belief was not only reasonable but also correct, BNSF's motion as to liability fails due to Fresquez' May of 2016 protected activity.

Importantly, BNSF's motion fails as a matter of law due to Fresquez' other objections to and reports of dangerous and illegal conduct. Fresquez contends that, regardless of what happened on May 5, 2016, his other protected activity colored Carpenter's and Paz's view of him, which is supported by Carpenter responding to Fresquez' June 4, 2015  protected activated by intending to "put together next steps" in charging Fresquez with insubordination; Carpenter responding to Fresquez' June11, 2015 protected activity by threatening to terminate Fresquez; and Paz, as well as BNSF's corporate culture, of retaliating against employees who refuse to put productivity ahead of safety. A reasonable person could find that such coloring, in turn, played at least some role in Carpenter choosing to charge Fresquez with insubordination, Carpenter

involving himself in the hearing process to try and ensure Fresquez was terminated, and/or Paz lying in Fresquez' hearing to the same.

BNSF argument—that there is no temporal nexus between Fresquez' 2015 protected activity and his 2016 termination—is wrong not only because, as discussed above, it ignores the definition of "contributing factor" but also because it ignores pertinent facts. Namely, BNSF's argument ignores that Carpenter responded to Fresquez' 2015 protected activity by "putting together the next steps" in charging Fresquez with insubordination but Fresquez bid off the territory before Carpenter could carry through on those steps. Indeed, including from the last time he engaged in protected activity in 2015, which was on June 11th, to when he first bid off, from when he was first forced to bump back to when he again bid off, and to when he again forced to bump back, on May 2, 2016, to when he was terminated, three days later, Fresquez was in the track inspector position for less than two months, *i.e.*, for all intents and purposes, Carpenter charged Fresquez with insubordination within two months of Fresquez' 2015 protected activity.

For five reasons, neither does Detlefsen's and Miller's ratification of the termination exonerate BNSF. First, Carpenter charging Fresquez with insubordination is an adverse action regardless of whether he was terminated, and Detlefsen and Miller played no role in the termination decision. Second, a reasonable person could find that the hearing process is a perfunctory means to terminate employees who engage in FRSA-protected activity regardless of their actual responsibility for workplace rules violations, which means that—as discussed above—the termination decision maker was, for all intents and purposes, Carpenter. Third, Carpenter tainted Fresquez' hearing by coaching the company witness and hearing officer on what they should say at the hearing, who they should call as witnesses, and what exhibits they

should offer; Carpenter infected Miller's decision by communicating to Miller that he wanted Fresquez terminated, Paz spoiled Miller's and Detlefesen's ability to reach an unbiased opinion by lying during the hearing. Fourth, the evidence demonstrates that Miller was made aware of Fresquez' protected activity when Fresquez engaged in it. Finally, Fresquez testified to some of his protected activity during his investigatory hearing, which means that Detlefsen and Miller had to be aware of it.

BNSF's arguments on its affirmative defense are equally flawed. Under the FRSA, Fresquez had a right to refuse to participate in Paz illegally removing a track defect from the system, which is BNSF's basis for terminating him. But even putting that aside, BNSF cannot show it would have either charged Fresquez with insubordination or terminated him absent his protected activity, as its own witnesses have admitted the difference between insubordination and failure to follow instructions is subjective.

Finally, BNSF is not entitled to judgment as a matter of law on Fresquez' request for either compensatory or punitive damages. Regarding the former, Fresquez has told the jury about all the ways in which BNSF's retaliation against him affected him, financially and emotionally. Concerning the latter, if ever there was a case for punitive damages, this is it.

BNSF's motion should be denied.

## LEGAL STANDARD

### A.  THE FRSA

Congress has long recognized that railroads put productivity ahead of safety, including by retaliating against employees who report safety concerns, and that such conduct endangers not only the railroads' employees but also the public. *See*, *e.g.*, *Hearings*. Over the years, Congress has tried numerous regulatory fixes, each of which has failed to deter railroads from harassing,

intimidating, and retaliating against employees who report safety concerns. *Id.* After years of deliberation, hearings, and debate, Congress therefore amended the Federal Rail Safety Act of 2007 by *The Implementing Recommendations of the 9/11 Commission Act of 2007,* Pub. L. 110-53, 121 Stat. 444, and the *Rail Safety Improvement Act of 2008*, Pub. L. 110-432, 122 Stat. 4848.

The amendments embody not only Congress's decision to end its reliance on rail industry self-policing and the FRA's lax enforcement of anti-retaliation regulations, as demonstrated by the amendments empowering juries to protect railroad employees and their communities, but also Congress's recognition of the railroad industry's retaliatory culture, as demonstrated by the amendment heavily tilting the scales of justice in favor of employees. *See* 49 U.S.C. § 20109(a)(1)-(2), (d)(2)(A)(i) (incorporating 49 U.S.C. 42121(b)). Specifically, Congress relaxed the standards of proof and causation to make retaliation claims easier to prove in two ways: (1) The FRSA, as amended, prohibits railroads from "discharge[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee if such discrimination is due, in whole or in part" to the employee's protected activity, which includes expansive language that is not found in Title VII or any of the other "traditional" employment-discrimination statutes to which BNSF attempts to liken the FRSA; and (2) the FRSA, as amended, incorporates the burden-shifting framework governing the employee protection provision of the Wendell H. Ford Investment and Reform Act for the 21st Century ("AIR-21"), which is a burden-shifting framework that is much more friendly to plaintiff-employees than is the *McDonnell Douglas* burden-shifting framework that is employed by Title VII and the other "traditional" employment-discrimination statutes to which BNSF attempts to liken the FRSA. *Id.* (emphasis added)

Under the AIR-21 burden-shifting framework, and thus the FRSA, an employee establishes his or her case by demonstrating that his or her safety report "was a contributing factor in the unfavorable personnel action." 49 U.S.C. § 42121(b)(2)(B)(iii). The Tenth Circuit has interpreted "contributing factor" to mean "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *BNSF Ry. Co. v. United States DOL*, 816 F.3d 628, 638-39 (10th Cir. 2016) (emphasis in original). Thus, FRSA plaintiffs need not demonstrate their protected activity was the "but-for" cause of the adverse actions taken against them, a contributing factor being "something less than substantial or motivating one." *Addis v. Dep't of Labor,* 575 F.3d 688, 691 (7th Cir. 2009); *see also BNSF Ry. Co.*, 816 F.3d at 638-39; *Marano v. Dep't of Justice,* 2 F.3d 1137, 1141 (Fed. Cir. 1993)

The Tenth Circuit has recognized that by choosing the "contributing factor" language, Congress specifically "intended to overrule existing case law, which require[d] a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action." *BNSF Ry. Co.*, 816 F.3d at 639. Consequently, the FRSA's burden-shifting framework "is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard," under which plaintiffs must prove animus. *Araujo*, 708 F.3d at 158; *see also BNSF Ry. Co.*, 816 F.3d at 638-39. Indeed, and contrary to what BNSF argues in its brief,[1] FRSA plaintiffs "need not demonstrate the existence of a

---

[1] BNSF argues that Fresquez must prove that discriminatory animus to his protected activity contributed to his termination. (Def. Br. (Dkt. 39) at 2.) Such argument is part of BNSF's subtle strategy to convince federal courts to substitute Congress's intent with an outcome designed to lessen BNSF's liabilities and perpetuate BNSF's ability to discourage its employees from exercising their protections under the FRSA, thereby undermining the highly effective impact of the FRSA. BNSF's strategy has paid dividends with the Seventh and Eighth Circuit, which have been fooled into ignoring the FRSA's plain language and instead accepting an interpretation that allows BNSF to avoid juries, transfers the burden of proof back to the employees, and enables federal district courts to subjectively intervene; however, six circuits—including the Tenth Circuit—have held that plaintiffs are not required to prove that their employers had a "wrongful motive" under the "contributing factor" provisions of the eleven federal statutes that modeled upon the AIR-21. *See Marano v. Dep't of Justice*, 2 F.3d 1137, 1141 (Fed. Cir. 1993) (Whistleblower

retaliatory motive on the part of the employer taking the alleged prohibited personnel action." *Marano v. Dep't of Justice,* 2 F.3d 1137, 1141 (Fed. Cir. 1993); *see also BNSF Ry. Co.*, 816 F.3d at 638-39. The six circuits' opinions are supported by the statutory interpretation of the Department of Labor's Administrative Review Board ("ARB"). *See*, *e.g.*, *Petersen v. Union Pac. R.R. Co.*, ARB No. 13-090, slip. op. at 3 (Nov. 20, 2014) ("We have repeatedly held that neither motive nor animus is required to prove causation under FRSA …"); *see also DeFrancesco v. Union Railroad Co.*, ARB No. 10-114, slip. op. at 6, (Feb. 29, 2012). Because the ARB is responsible for enforcement of all twenty-two federal whistleblower protection statutes, including the FRSA, its interpretations of them are entitled to judicial deference. *See*, *e.g.*, *Chevron U.S.A. Inc v. NRDC*, 467 U.S. 837 (1984).

Once plaintiffs demonstrates that their protected activity contributed in some way to the adverse actions taken against them, the burden of proof then shifts to their railroad-employers to prove "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]." 49 U.S.C. § 42121(b)(2)(B)(iv). "[F]or employers, this is a tough standard, and not by accident." *Araujo*, 708 F.3d at 152. As discussed supra at 35-36, "[t]he "standard is 'tough' because Congress intended for companies . . . to face a difficult time defending themselves, due to a history of whistleblower harassment and retaliation in the industry." *Araujo*, 708 F.3d at 152; *see also BNSF Ry. Co.*, 816 F.3d at 638-39.

---

Protection Act); *Coppinger—Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010) (Sarbanes-Oxley); *Araujo v. N.J. Transit Rail Operations, Inc*., 708 F.3d 152 (3d Cir. 2013) (FRSA); *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121 (10th Cir. 2013 ) (Sarbanes-Oxley); *Halliburton, Inc. v. Administrative Review Bd.,* 771 F.3d 254 (5th Cir. 2014 ) (Sarbanes-Oxley); *Tamosaitis v. URS Inc*., 781 F.3d 468, 482 (9th Cir. 2015 ) (Energy Reorganization Act ) ("The relevant causal connection is not between retaliatory animus and personnel action, but rather between protected activity and personnel action"); *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 638-39 (10th Cir. 2016 ) (FRSA); *Worcester v. Springfield Terminal Ry. Co*., 827 F.3d 179, 183 (1st Cir. 2016 ) (FRSA).

In short, Congress amended the FRSA so that ordinary citizens with common sense and experience will decide whether railroad managers have carried their burden, which is heavy, to show they are honest when they explain why adverse employment actions were not motivated by retaliatory intent or that they would have taken the same steps even if they were motivated by retaliatory intent. *See Hearings*. Because of a corporate culture that has been operating to suppress the law, Congress has put the burden on defendant-railroads to prove the absence of retaliation (and not on plaintiff-employees to prove retaliation). *Id.* Plaintiff-employees must therefore only (1) establish that their protected conduct was a "contributing factor" in the adverse action that followed, and (2) convince the fact-finder that their employers failed to carry their burdens to prove by clear and convincing evidence that they would have taken the same unfavorable personnel action in the absence of the protected activity. *Id.*

## B.  DIRECTED VERDICT

"Motions under Fed. R. Civ. P. 50(a) for judgment as a matter of law test whether there is a 'legally sufficient evidentiary basis for a reasonable jury to find' for the moving party." *Ruyle v. Continental Oil Co.*, 44 F.3d 837, 841 (10th Cir. 1994) (quoting Fed. R. Civ. P. 50).  "A party is entitled to JMOL only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011) (brackets and ellipsis omitted). "Drawing all reasonable inferences in favor of the nonmoving party, we thus will reverse the district court's denial of the motion for JMOL if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion."  *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1261, (10th Cir. 2016).

## ARGUMENT

### A.  THE CONTRIBUTING-FACTOR ELEMENT

"Under the contributing-factor standard, [the court] must decide whether . . . [Fresquez' protected activity] was a factor that tended to affect in any way [BNSF's] decision to terminate him." *BNSF Ry. Co.*, 816 F.3d at 639 (quoting *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013)) (internal quotation marks omitted) (emphasis in *Lockheed Martin*). "Ordinarily, to meet this standard, an employee need only show by preponderant evidence that the fact of, or the content of, the protected disclosure was one of the factors that tended to affect in any way the personnel action." *BNSF Ry. Co.*, 816 F.3d at 639. "In other words, even if the personnel action resulted not simply from the protected activity itself [objecting to Paz's order], but also from the content declared in the protected activity, the two parts are 'inextricably intertwined with the investigation,' meaning the protected activity was a contributing factor to the personnel action." *Id.* "So if the employer would not have taken the adverse action without the protected activity, the employee's protected activity satisfies the contributing-factor standard." *Id.*

Fresquez can establish "that his [protected activity] was a contributing factor in his discharge by direct or circumstantial evidence." *Ray*, 971 F. Supp. 2d at 884 (citing *Araujo*, 708 F.3d at 160) (holding that neither direct evidence nor evidence of motive is required to prove the contributing factor element) (citing, *inter alia*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *DeFrancesco v. Union R.R. Co.*, No. 10-114, 2012 DOL Ad. Rev. Bd. LEXIS 23 (ARB Feb. 29, 2012) ("The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence.")).

### 1.  Fresquez has an Abundance of Circumstantial Evidence That His Protected Activity Contributed to His Termination.

Courts recognize that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Weeks v. Norfolk S. Ry.*, No. 5:16-cv-102, 2017 U.S. Dist. LEXIS 149828, at *6 (M.D. Ga. Sep. 15, 2017) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)) (internal quotation marks omitted). "Circumstantial evidence that protected activity was a contributing factor in an adverse employment decision may include evidence of [ ] temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity." *Ray*, 971 F. Supp. 2d 869, 884-85 (quoting *DeFrancesco*, 2012 DOL Ad. Rev. Bd. LEXIS 23, *11) (internal quotation marks omitted).

Here, Fresquez has offered an abundance of each of the types of circumstantial evidence through which he can prove his case. For example, Fresquez has demonstrated that Carpenter and Paz initiated the discipline process that resulted in Fresquez' termination on the same day Fresquez told Paz that he had reported them to the FRA and on the same day that Fresquez objected to Paz removing an unrepaired defect from the TIMS system. (Supra at #.) The Tenth Circuit has held that temporal proximity of less than one month can be sufficient, in and of itself, to establish causation. *See*, *e.g.*, *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 n.5 (10th Cir. 2008). As another example, Fresquez has demonstrated that Paz asked him whether he wanted to string-line the defect instead of ordering him to so do, and that he did not refuse to string-line the defect and instead made clear to Paz, who has made a habit of being dishonest, that he would string-line the defect if so ordered. (Supra at BNSF's Prop. Fact No. #.) In other words, Fresquez has demonstrated that BNSF's stated reason for the discharge is false. (*Id.*) As a third example,

Fresquez has demonstrated that Carpenter conspired with the hearing officer—Percival—and the only witness who testified against Fresquez in Fresquez' internal hearing—Paz—to ensure the hearing resulted in Fresquez' termination;[2] that Carpenter chose to charge Fresquez with insubordination instead of failure to follow instructions and that such choice was based on subjective criteria; that Carpenter and some of the supervisors under him continually harassed Fresquez because he refused to turn a blind eye to their circumvention of the FRA's defect-reporting regulations; and that BNSF has had more FRSA complaints filed against it than any other railroad. (Supra at #.) And this Court has held that "evidence of pretext includes but is not limited to prior treatment of the plaintiff; the employer's policy and practice regarding employment of a protected class (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria in employment decisions." *Johnson v. Weld Cnty.*, No. 06-cv-02362-JLK, 2008 U.S. Dist. LEXIS 72620, at *53 (D. Colo. Sep. 24, 2008). As yet another example, Fresquez has demonstrated that BNSF has offered leniency to other employees charged with insubordination, and a disinterested employee testified that other people have acted similar to Fresquez and no one else has been terminated for it. (Supra at #.) In other words, Fresquez has demonstrated that BNSF inconsistently applies its policies. (*Id.*) As a fifth example, Fresquez has offered evidence of Carpenter and Paz threatening him for refusing to turn a blind eye to their illegal conduct, of his refusing to turn a blind eye to their illegal conduct resulting in Carpenter telling others that he "wanted Fresquez' head," and of Paz trying to intimidate others by telling them that he had "taken care of Fresquez" and would do the same to them if they engaged in FRSA-protected activity. (Supra at #.) Indeed, it is not at all clear what more evidence Fresquez could offer of BNSF's antagonism or hostility

---

[2] This also explains why BNSF did not invite the only unbiased witness—Herzog—to the hearing. (Supra at BNSF's Prop. Fact No. 51.)

toward his protected activity. (*Id.*) Finally, Fresquez has demonstrated that he was regarded as a bad employee only when he worked under Carpenter. (Supra at BNSF's Prop. Fact No. #.) Fresquez engaged in FRSA-protected activity only when he worked under Carpenter because it was Carpenter and some of the supervisors under Carpenter who were circumventing the FRA's defect-reporting regulations, meaning Fresquez has demonstrated a change in BNSF's attitude toward Fresquez after he engaged in protected activity. (*Id.*)

### 2. BNSF's Arguments to the Contrary are Based on Misstatements of Law, Pertinent Facts Being Disregarded, and a Reliance on Inferences to Which It is Not Only Not Entitled but Also That are Belied by Common Sense.

For obvious reasons, BNSF tries to distance Carpenter and Paz from the decision to terminate Fresquez, arguing that Detlefsen and Miller made the termination decision and that they were unaware of Fresquez' protected activity. (Def Br. #.) But Detlefsen and Miller's knowledge of the Fresquez' protected activity is irrelevant both because of the nature of the applicable burden-shifting framework and BNSF's kangaroo-court hearing process. And even were their knowledge somehow relevant, they were aware of Fresquez' protected activity.

#### a. *Fresquez' objections to and reporting of illegal conduct in 2015 contributed to his being charged with insubordination and terminated.*

BNSF argues that Fresquez' Spring of 2015 protected activity could not have contributed to his being charged with insubordination or termination because it is too remote in time. BNSF's argument ignores what it means to be a "contributing factor." BNSF's argument also ignores Fresquez' temporal-nexus-staying activity.

A reasonable person could find that Fresquez' 2015 protected activity, at the very least, colored Carpenter's and Paz's view of him, especially when one considers the way in which Carpenter responded to such activity (threatening Fresquez' job and telling Cole that Cole was on the "right track" with writing Fresquez up for insubordination and that they would "put

together the next steps" when Akers returned). (Supra at #.)  And a reasonable person could find that such color played at least some part, even if it was only one percent, in Carpenter charging Fresquez with insubordination. (Supra at #.)  Given that the Tenth Circuit has interpreted "contributing factor" to mean "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision, a reasonable person could therefore find that Fresquez' 2015 protected activity contributed to him being charged with insubordination and/or being terminated.

Furthermore, it is not as though Fresquez stayed in the same position for the next year and was left alone. (Supra at #.)  Rather, he bid to another position. (Supra at #.)  Indeed, from when he engaged in protected activity in 2015 to when Carpenter charged him with insubordination, Fresquez spent less than three months in the track inspector position—a timeframe that establishes temporal proximity. CITE.

### b. Miller's and Detlefsen's knowledge of Fresquez' protected activity is irrelevant.

As it does in every case, BNSF uses the insulation its discipline process creates between the plaintiff and the alleged decision makers to argue that it is entitled to summary judgment, *i.e.*, it argues it is entitled to summary judgment regardless of whether Fresquez' protected activity caused Carpenter and Paz to have it out for him because they had nothing to do with the termination decision. But the question before the court is not whether Miller and Detlefsen decided to terminate Fresquez because of his protected activity; rather, it is whether any reasonable person could find that Fresquez' protected activity contributed in any way to his termination. *See*, *e.g.*, *BNSF Ry. Co.*, 816 F.3d at 638-339.

As an initial matter, there are two adverse actions at issue in this case, Fresquez being charged with insubordination and Fresquez being terminated. (Complaint (Dkt. 1) at ¶ #.) While

BNSF argues that being charged, in and of itself, is not an adverse action, *see* Def. Br. at #, such argument ignores that the FRSA prohibits railroad from "discharge[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done" to engage in protected activity. 49 U.S.C. 20109(a). Such language has resulted in courts and the Department of Labor, which receives *Chevron* deference, recognizing that "while the definition of adverse employment action in a retaliation claim is already broader than in a substantive discrimination claim under Title VII and similar statutes, in the context of FRSA, 'adverse action' is even more expansively construed[,]" and therefore includes being charged with a rule violation, regardless of whether discipline is imposed. *Thomas v. Union Pac. R.R. Co.*, 203 F. Supp. 3d 1111, 1120-21 (D. Or. 2016) (citing *Fricka v. Nat'l R.R. Passenger Corp.*, No. 14-047, 2015 DOL Ad. Rev. Bd. LEXIS 74 (ARB Nov. 24, 2015)). Because the charging decision was made by Carpenter, and not Miller or Detlefsen, their knowledge is irrelevant to at least one adverse action.

Even assuming arguendo that the only adverse action was the termination, BNSF would still not be entitled to the relief it seeks.  When determining whether Fresquez' protected activity contributed to his termination, the Court must consider that Carpenter and Paz were not simply idle participants in the events culminating in Fresquezs termination. Instead, Carpenter was responsible for not only electing to charge Fresquez but also for electing to charge him with a dismissible offense instead of a non-dismissible offense. (Supra at #.) And Paz was the only witness who testified against Fresquez in Fresquezs internal hearing, the transcript from which ostensibly served as Detlefsen's and Miller's basis for deciding to terminate Fresquez. (Supra at #.)

The record in this case also demonstrates that BNSF's discipline process does not insulate the decision maker in the way that BNSF would have this Court believe. Indeed, Fresquez has demonstrated that the PEPA team and decision maker almost always sustain the discipline. (Supra at #.) Put differently, everything following the decision to charge an employee with a workplace rule violation and hold an internal hearing for such violation is a dog and pony show, meaning the discipline decision is—for all intents and purposes—made when the local supervisor decides to charge and remove the employee from service for a supposed workplace-rule violation.

Even assuming *arguendo* that there was some argument that BNSF's hearing process serves to somehow insulates decision makers from the charging decision, such argument still would not apply in this case. It is undisputed that Carpenter and Paz conspired with the hearing officer to ensure that Fresquez' hearing was even more unfair, something which even BNSF's own witness admitted was highly unusual and colored the internal hearing. (*Supra* at #.) And even were that not the case, Miller admitted in an email to his supervisor that he sought out and relied on Carpenter's opinion when making the termination decision. (*Supra* at #.)

The takeaway is that Carpenter and Paz retaliated against Fresquez because Fresquez engaged in FRSA-protected activity, and they did so by charging Fresquez with insubordination and inserting themselves into the hearing that resulted in Fresquez' termination. It therefore cannot be seriously argued that Miller's and Detlefsen's knowledge of Fresquez' protected activity is relevant. *See*, *e.g.*, *Johnston v. BNSF Ry. Co.*, No. 15-3685, 2017 U.S. Dist. LEXIS 170681, at *21-23 (D. Minn. Oct. 16, 2017)

### c.   Miller and Detlefsen knew about Fresquez' protected activity.

For the above-discussed reasons, Fresquez need not prove that Miller and Detlefsen knew about Fresquez' protected activity, much less that such knowledge contributed to their decision to terminate him. That is not to suggest, however, that Miller and Detlefsen did not, in fact, know about Fresquez' protected activity or that such knowledge did not contribute to their decision to terminate Fresquez. Indeed, the testimony of BNSF's witnesses demonstrates the opposite is true.

As an initial matter, Fresquez' protected activity includes objecting to Paz taking a defect out of the TIMS system simply because it could not be seen with the naked eye, and Fresquez' alleged refusal to string-line the defect is part and parcel with such objection. (BNSF's Prop. Fact Nos. 36-50.) In other words, at least one of the ways in which Fresquez engaged in FRSA-protected activity cannot be separated from BNSF's purported reason for terminating him. (BNSF's Prop. Fact Nos. 51-71.) It necessarily follows that Miller and Detlefsen not only knew about at least one of the ways in which Fresquez engaged in FRSA-protected activity but also that such protected activity contributed to their discipline decision. *See*, *e.g.*, Ray, 971 F.Supp.2d at 887 ("The FRSA's legislative history . . . reveals a Congressional intent to comprehensively address the problem of railway retaliation . . . Effective enforcement of the Act requires presumptive causation under circumstances such as [the plaintiff]'s, where viewing [insubordination] as an 'independent' ground for termination could easily be used as a pretext for eviscerating protection for [employees refusing illegal orders]." (quoting Henderson, 2012 WL 5391422 at *6) (internal quotation marks omitted).

While the forgoing is sufficient to reject BNSF's argument, it's worth noting that Fresquez' colloquy with Paz regarding string-lining the defect was neither the only FRSA-protected activity of which Miller and Detlefsen were aware nor the only FRSA-protected

activity that contributed to their discipline decisions.  As examples, one of the supervisors who participated in the scheme to circumvent the FRA's defect-reporting regulations testified that it was common knowledge at BNSF that Fresquez refused to toe the company line when it came to putting productivity ahead of safety and that he had heard about Fresquez" history of engaging in FRSA-protected activity from several other supervisors, including Miller; Fresquez' union representative brought both his FRSA-protected activity and Carpenter's retaliatory response to Miller's attention; and other acts of Fresquez engaging in FRSA-protected activity were discussed in the internal hearing, which Miller and Detlefsen read. (Supra at BNSF's Prop. Fact Nos. 62, 68.) The question then is what role did Miller's and Detlefsen's knowledge of the other FRSA-protected activity in which he engaged play in their discipline decisions.

Miller testified that he did not offer leniency to Fresquez because he viewed Fresquez as a problematic employee and Fresquez had a discipline history that did not warrant leniency. Regarding the former, Miller viewed Fresquez as a problematic employee because that is what Carpenter and some of the supervisors under Carpenter led Miller to believe, and they did that because Fresquez objected to their circumvention of the FRA's defect-reporting regulations. (Supra at BNSF's Prop. Fact No. 68.) Concerning the latter, Fresquez' discipline history was the result of Carpenter and the managers under Carpenter birddogging Fresquez, in hopes they could get him to fall in line regarding their circumvention of the FRA's defect-reporting regulation. (BNSF's Prop. Fact No. 26.)

In short, there can be no doubt that Miller and Detlefsen knew about Fresquez FRSA-protected activity. Neither can there be any doubt that their knowledge of Fresquez' FRSA-protected activity contributed to their decision to terminate him. At the very least, Fresquez has demonstrated that it should be left to a jury to decide to whether Fresquez' FRSA-protected

activity contributed to his termination. *See*, *e.g.*, *Roop*, 2017 U.S. Dist. LEXIS 177646, at *13-14.

## B. BNSF HAS FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT IT WOULD HAVE TERMINATED FRESQUEZ

Once Fresquez proves by a preponderance of the evidence that his FRSA-protected activity contributed to the adverse action taken against him, BNSF is liable unless it shows by clear and convincing evidence that it would have terminated Fresquez even in the absence of his protected activity. *See*, *e.g.*, *BNSF Ry. Co.*, 816 F.3d at 640 (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)). Importantly, "[i]t is not enough to confirm the rational basis of [BNSF's] employment policies and decisions." *Henderson v. Wheeling & Lake Erie Railway*, No. 11-013, 2012 DOL Ad. Rev. Bd. LEXIS 106, *34 (ARB Oct. 26, 2012). "Instead, [the Court] must assess whether they are so powerful and clear that termination would have occurred apart from the protected activity." *Id.*

Regarding the way in which BNSF makes such showing, "it is not enough for [it] to show that [Fresquez] violated its safety rules, that it had a legitimate motive (i.e. [Fresquez'] rule violations) for imposing the disciplinary action, or that it imposes 'appropriate discipline' against employees for safety violations and unsafe behavior regardless of whether they [engaged in protected activity]." *Defrancesco v. Union Railroad Co.*, No. 13-057, 2015 DOL Ad. Rev. Bd. LEXIS 51, *27 (ARB Sept. 30, 2015). "Instead, [BNSF is] required to demonstrate through factors extrinsic to [Fresquez'] protected activity that the discipline to which [Fresquez] was subjected was applied consistently, within clearly-established company policy, and in a non-disparate manner consistent with discipline taken against employees who committed the same or similar violations but were not injured." *Id.* Because the FRSA afforded employees the right to refuse illegal and/or dangerous orders, BNSF must show not only that Fresquez refused an order

but also that the order was legal and safe, and that it has terminated every other similarly situated employee who has questioned a similar order in the manner Fresquez questioned Paz's order. *See* 49 U.S.C. § 20109(a)(2), (b)(1)(B).

BNSF has not met its burden because it cannot prove, much less by clear and convincing evidence, that every reasonable person would find that Paz asked Fresquez if he wanted to sting-line the defect because Paz legitimately wanted to find and repair the defect. The timing of when Paz called Fresquez to a defect that could not be repaired with the machines to which they had access, Paz suggesting that the defect was not present because it could not be see with his naked eye, and Paz not allowing Fresquez to string-line the defect when Fresquez returned to the defect demonstrate that Paz asked Fresquez whether he wanted to string-line the defect merely as a means to justify removing the defect from the TIMS system regardless of whether it was present. (BNSF's Prop. Fact Nos. 36, 39-40, 42, 44-46.) Indeed, after Herzog confirmed the defect was present and couldn't be repaired with the machines to which they had access, that is exactly what Paz did. (*Id.*)

BNSF has also not met its burden because it cannot prove, much less by clear and convincing evidence, that every reasonable person would find that Fresquez was insubordinate. Paz did not order Fresquez to string-line the defect; rather, Paz asked Fresquez whether he wanted to string-line the defect, a distinction which BNSF's own witness concedes is dispositive on the issue of whether Fresquez was insubordinate. (Supra at BNSF's Prop. Fact Nos. 41, 44, 46.) Indeed, the only unbiased witness to the colloquy between Paz and Fresquez did not understand him to be refusing an order. (*Id.*)

It is worth noting that the above analysis is supported by the nature of the rule BNSF used to justify Fresquez termination. While BNSF has contended that it is entitled to terminate

employees for insubordination even if their insubordination regards an illegal order, "[t]he FRSA's legislative history . . . reveals a Congressional intent to comprehensively address the problem of railway retaliation . . . Effective enforcement of the Act requires presumptive causation under circumstances such as [the plaintiff]'s, where viewing the [insubordination] as an 'independent' ground for termination could easily be used as a pretext for eviscerating protection for [employees refusing illegal orders]." Ray, 971 F.Supp.2d at 887 (quoting Henderson, 2012 WL 5391422 at *6) (quotations omitted); *see also Hutton*, 2013 WL 2450037, at *7 ("Defendant may not mask retaliation against injured employees behind an ostensibly beneficial policy with rules that are, on their face, so vague and confusing.")

Importantly, this is true regardless of BNSF's proffered justification for the rule. *See*, *e.g.*, *Johnson Controls*, 499 U.S. at 199 ("absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy"). While BNSF may have good reason to terminate an employee who objects to an illegal or dangerous order in a way of which BNSF disapproves, the FRSA prohibits retaliation even if there is compelling justifications for it. *See*, *e.g.*, Henderson, 2012 WL 5391422, at * 6. Indeed, the ARB has made clear that the 'legitimate business reason' burden of proof analysis . . . does not apply to FRSA whistleblower cases." *Id.*

Finally, BNSF has not met its burden also because it cannot prove, much less by clear and convincing evidence, that every reasonable person would find that it has terminated every other similarly situated employee who has questioned a similar order in the manner Fresquez questioned Paz's order. While BNSF has offered comparators, it has not provided any of the information necessary to determine whether they are at all similarly situated to Fresquez. (Supra at BNSF's Prop. Fact No. 61.) At the same time, BNSF admits it has offered similarly situated employees leniency, and a disinterested employee testified that other people have acted like

Fresquez and no one else has been terminated for it, which is the opposite of proving that it has terminated every other similarly situated employee who has questioned a similar order in the manner Fresquez questioned Paz's order. (Supra at BNSF's Prop. Fact Nos. 61. 67.)

This is especially true when one considers Miller's reason for not offering Fresquez leniency. As discussed supra at 48-49, Miller did not offer leniency to Fresquez because he viewed Fresquez as a problematic employee and Fresquez had a discipline history that did not warrant leniency; however, Miller viewed Fresquez as a problematic employee because that is what Carpenter and some of the supervisors under Carpenter led Miller to believe, which they did that because Fresquez objected to their circumvention of the FRA's defect-reporting regulations, and Fresquez' discipline history was the result of Carpenter and the managers under Carpenter birddogging Fresquez, which they hoped would get him to fall in line regarding their circumvention of the FRA's defect-reporting regulation. Indeed, the given explanations for the difference in treatment between Fresquez and other similarly situated employees supports and does not undermine Fresquez' case. *See*, *e.g.*, *Henderson*, 2012 WL 5391422, at *10 (disparate treatment of employees "has long been recognized as circumstantial evidence relevant to whether an employer engaged in unlawful conduct.")

At the end of the day, BNSF is entitled to summary judgment on its burden only if it demonstrates by clear and convincing evidence that every reasonable person would find that Paz gave Fresquez a legal and safe order, Fresquez refused the order, and it has terminated every other similarly situated employee who refused a similar order in the manner Fresquez questioned Paz's order. BNSF has not (and cannot) prove any of these elements, much less all three of them. As Congress intended, Fresquez' claims should be heard by a jury. *See*, *e.g.*, *Roop*, 2017 U.S. Dist. LEXIS 177646, at *13-14.

## C.  COMPENSATORY DAMAGES

Fresquez testified that BNSF retaliation has taken a significant toll on him. Fresquez told the jury, for example, about his constantly worrying about providing for his son, who suffers from a blood disease that requires that he have comprehensive health insurance—something Fresquez lost when BNSF terminated him. As another example, Fresquez told the jury about the humiliation in telling his son that he had been fired, the difficulty in telling his son that he no longer had a job solely because he did the right thing, and struggling with telling his son that he needed to eat while they were at his grandmother's because Fresquez did not know when he would be able to afford groceries again. As a final example, Fresquez testified that losing a job where he had a decade of seniority and having to start a new career, all while trying to provide for his son, has caused him to have many a sleepless night. Fresquez has suffered all of the forgoing because he did what was right, a fact that Fresquez told the jury has changed him as a person.

BNSF has nevertheless argued that Fresquez should be estopped from seeking compensatory damages for emotional distress. The Court has already recognized that plaintiffs "may rely on [their] own testimony to establish emotional distress damages, provided that it is sufficiently detailed and does not rely on conclusory statements." *Santacruz v. Standley & Assocs., LLC*, No. 10-cv-00623-CMA-CBS, 2011 U.S. Dist. LEXIS 27885, at *19 (D. Colo. Mar. 17, 2011). And Fresquez' testimony is sufficiently detailed.

## D.  PUNITIVE DAMAGES

BNSF identifies a litany of things it claims Fresquez must show to be entitled to punitive damages. (Def. Br. (Dkt. 50) at 13-14.) But the Tenth Circuit has clarified that Fresquez need show only that BNSF understood its obligations under federal law and engaged intentional acts

of discrimination. *See*, *e.g.*, *Flitton v. Primary Residential Mortgage, Inc.*, 238 F. App'x 410, 419 (10th Cir. 2007) (citing *EEOC v. Heartway Corp.,* 466 F.3d 1156, 1169 (10th Cir. 2006) (quoting *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535 (1999)); citing *EEOC v. Walmart Stores,* 187 F.3d 1241 (10th Cir. 1999)); *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1136-38 (10th Cir.2006); *Juarez v. ACS Gov't Solutions Group,* 314 F.3d 1243, 1247 (10th Cir. 2003)). The record demonstrates that a reasonable person could find that BNSF understood its obligations under federal law and engaged in intentional acts of discrimination.

Regarding whether BNSF understood its obligations under federal law, it has proposed fact after fact regarding it knowing and training its managers on the FRSA. (BNSF's Prop. Fact No. 25-26.) While Fresquez disputes that the training is adequate, such inadequacy certainly is not due to BNSF's lack of understanding the FRSA. (*Id.*) Given how much time BNSF spends appearing before and writing briefs to courts to defend its violations of the FRSA, there may be no one who knows the law better. (*Id.*)

Concerning whether BNSF engaged intentional acts of discrimination, Fresquez does not allege that BNSF disciplined him as part of some facially neutral policy that just happens to disparately affect employees who engage in FRSA-protected activity; rather, Fresquez alleges that BNSF manufactured a reason to terminate him because he testified against it. (Complaint (Dkt. 1).) If the jury finds that BNSF violated the FRSA, it therefore could not be for any other reason other than it believes BNSF engaged in intentional discrimination.

There is plenty of reason to think a jury will so find. For example, Fresquez has shown pretext, including by demonstrating that Carpenter conspired with the hearing officer—Percival—and the only witness who testified against Fresquez in Fresquez' internal hearing—Paz—to ensure the hearing resulted in Fresquez' termination, including by not inviting the only

unbiased witness; that the decision to charge him with "insubordination" and not "failure to follow instructions" was the result of subjective criteria; that Carpenter and some of the supervisors under him continually harassed him for engaging in FRSA-protected activity; and that BNSF has had more FRSA complaints filed against it than any other railroad. (Supra at BNSF's Prop. Fact Nos. 25, 36, 51, Fresquez' Prop. Fact Nos. 5, 18-21.)  As another example, Fresquez has shown the falsity of BNSF's explanation, including by demonstrating that he never refused any order and that he instead made clear to Paz, who has made a habit of being dishonest, that he would string-line the defect if so ordered. (Supra at BNSF's Prop. Fact No. 46.) For a final example, Fresquez has shown antagonism towards his protected activity, including by demonstrating that Carpenter and Paz threatened him for engaging in protected activity; that Carpenter told others that he "wanted Fresquez' head" because Fresquez objected to his circumvention of the FRA's defect reporting regulations; and that Paz boasted to others about getting Fresquez terminated because he refused to toe the company line. (Supra at BNSF's Prop. Fact Nos. 36, Fresquez Prop. Fact No. 2, 6.) In short, Fresquez has offered not only direct evidence of intentional discrimination but also nearly every kind of circumstantial evidence of intentional discrimination imaginable.

BNSF argues that Fresquez should nevertheless be estopped from seeking punitive damages because his evidence of retaliation is "scant at best." (Def. Br. at 14.) But the FRSA's burden-shifting framework allows BNSF to escape liability if it demonstrates that it had a legitimate, nondiscriminatory reason to terminate Fresquez and would have acted on that reason even absent Fresquez' protected activity. *See*, *e.g.*, *BNSF Ry. Co.*, 816 F.3d at 640. If the jury finds BNSF liable, it has therefore rejected BNSF's argument as to why punitive damages cannot be awarded.

As a last resort, BNSF argues that even if it did intentionally retaliate against Fresquez, he should be estopped from seeking punitive damages because it has a hotline its employees can call to report retaliation and it's not a habitual FRSA offender. (Def Br. at 14.) The Tenth Circuit has clarified that BNSF must show only that KCSR (1) understood its obligations under federal law, and (2) engaged intentional acts of discrimination. *See*, *e.g.*, *Flitton*, 238 F. App'x at 419 (citing *Heartway,* 466 F.3d at 1169 (quoting *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535 (1999)). And whether BNSF has a hotline or has previously violated the FRSA has nothing to do with either of these factors, meaning BNSF's argument is merely an argument for the jury as to why it should not assess significant punitive damages and not an argument for striking Fresquez' claim for punitive damages.

Moreover, BNSF anti-retaliation policies are a joke, which explains why its managers habitually retaliate against the employees who engage in FRSA-protected activity. (BNSF's Prop. Fact Nos. 25-26.) Indeed, Paz has received no meaningful discipline despite an unprecedented number of reports being made against him, and BNSF still has not investigated the allegations at the center of this case, failures that make punitive damages not only warranted but also necessary. *See*, *e.g.*, *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1138 (10th Cir. 2006) (explaining that, "even if an employer[ ] adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy[ ], a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address . . . violations of which it was aware.") (quoting *Cadena v. Pacesetter Corp.,* 224 F.3d 1203, 1210 (10th Cir. 2000)) (internal quotation marks omitted).

The seminal case on punitive damages in FRSA cases—*Barati v. Metro-North R.R. Commuter R.R.*, 939 F. Supp. 2d 143, 145 (D. Conn. 2013)—confirms Fresquez' argument. In

that case, the court sustained the statutory maximum punitive damage award ($250,000) because the railroad's discipline of the plaintiff under its workplace rules was really "a self-serving effort to discourage [FRSA-protected activity] in order to [inflate their evaluations and bonuses]." *Id.* at 146. For the reasons discussed supra at 41-45, that is precisely what a reasonable juror could find here.

**CONCLUSION**

A reasonable person could (and would) conclude that Fresquez' FRSA-protected activity contributed to Carpenter and Paz having it out for him, that Carpenter and Paz sought to get rid of Fresquez by charging him with insubordination for questioning their illegal activity, and that BNSF would not have terminated Fresquez but for Carpenter and Paz charging Fresquez with such workplace-rule violations and inserting themselves into BNSF's investigation. A reasonable person's ability to so find dooms BNSF's motion for summary judgment both as to the merits of Fresquez' claim and his claim for punitive damages. BNSF's motion should be denied, and the case should proceed to trial.

February 15, 2019

Respectfully submitted,

/s/ Nicholas D. Thompson
Nicholas D. Thompson (MN#0389609)
THE MOODY LAW FIRM, INC.
500 Crawford Street, Suite 200
Portsmouth, VA 23704
(757) 393-4093 – Telephone
(757) 397-7257 - Facsimile
nthompson@moodyrrlaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of February, 2018 I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Keith M. Goman, Esq.
Gillian Dale, Esq.
Hall & Evans, LLC
1001 Seventeenth Street
Suite 300
Denver, CO 80202
gomank@hallevans.com
daleg@hallevans.com

/s/ Nicholas D. Thompson
Nicholas D. Thompson (MN#0389609)