1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 17-cv-00844-WYD-SKC
4

5     BRANDON FRESQUEZ,                           Volume I(a) of VI

6            Plaintiff,                           (Pages 1 - 128)

7            vs.

8     BNSF RAILWAY CO.,

9            Defendant.

10   ---------------------------------------------------------------

11                        REPORTER'S TRANSCRIPT
                              JURY TRIAL
12
     ---------------------------------------------------------------

13
             Proceedings before the HONORABLE WILEY Y. DANIEL,
14   Judge, United States District Court for the District of
     Colorado, and a jury of ten, commencing at 9:00 a.m. on the
15   11th day of February, 2019, in Courtroom A1002, Alfred A.
     Arraj United States Courthouse, Denver, Colorado.
16

17                            APPEARANCES
18
     For the Plaintiff:
19   NICHOLAS D. THOMPSON and JONATHAN L. STONE, THE MOODY LAW
     FIRM, 500 Crawford Street, Suite 200, Portsmouth, VA 23704
20
     For the Defendant:
21   KEITH M. GOMAN and GILLIAN DALE, HALL & EVANS, LLC,
     1001 17th Street, Suite 300, Denver, CO 80202
22

23

24
        JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25       Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

              Proceedings reported by mechanical stenography;
                   transcription produced via computer.

17-cv-00844-WYD-SKC                    Jury Trial                         I(a) - 2

1                               I N D E X

2

      JURY INSTRUCTIONS                                              PAGE
3
      Instructions of The Court                                       17
4

5     OPENING STATEMENTS                                             PAGE

6     Mr. Thompson                                                    29
      Mr. Goman                                                       52
7

8     PLAINTIFF'S WITNESS                                            PAGE

9     DAVID JOE LYDICK
          Direct - Mr. Thompson                                       69
10        Cross - Mr. Goman                                          105
          Redirect - Mr. Thompson                                    124
11

12
                        PLAINTIFF'S
13                      EXHIBITS                     RECEIVED

14                         6                             28

15                         7                             28

16                         8                             28

17                         21                            28

18                         26                            28

19                         30                            76

20                         52                            28

21                         53                            28

22                         55                            28

23                         56                            28

24                       59:33-39                        84

25

      Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC          Jury Trial                    I(a) - 3

1    MOTIONS                                                        PAGE

2    Defendant's Motion to Exclude Plaintiff's Trial
     Exhibit No. 5
3        Ruling of The Court                                          5

4    BNSF Railway Company's Motion in Limine Regarding
     Compliance With Federal Regulations
5        Ruling of The Court                                        127

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced 9:00 a.m.,

2        February 11, 2019, outside the presence of

3        the jury.)

4            THE COURT:  All right, have a seat.  This is

5    17-cv-00844, Fresquez versus BNSF Railway.  Would counsel

6    enter their appearances.

7            MR. THOMPSON:  Nick Thompson appears for the

8    plaintiff with Jonathan Stone, and plaintiff appears in

9    person.  Good morning, Your Honor.

10           MR. GOMAN:  Good morning, Your Honor.  Keith Goman

11   and Gillian Dale on behalf of BNSF.  We have Adam Miller, a

12   BNSF employee, with us at the table.

13           THE COURT:  All right.  Let me move these documents

14   out of the way so I can see.

15           So some of the motions in limine that are pending I'm

16   going to have to deal with during trial, but there's one I

17   want to rule on this morning.  But I want to get to this issue

18   that was brought to my attention actually on Friday.  That's

19   why I entered this minute order.

20           So is Darron Boltin going to be called as a witness?

21           MR. THOMPSON:  Yes, Your Honor.

22           THE COURT:  Why didn't you want to use the Court's

23   technology?  Let me just say, we spent $75,000 -- I didn't do

24   it, but the government did -- last fall upgrading the system

25   so everything in this courtroom is now high definition.  Why

1   would you want to use a system that isn't the Court's system?

2          MR. THOMPSON:  We don't care how he appears, but BNSF

3   is responsible for --

4          THE COURT:  Okay.

5          MR. GOMAN:  We are fine using the Court's system.

6   Because Darron Boltin is a BNSF employee, we had Anthony work

7   with him to find a system that worked.

8          THE COURT:  Well, you've got to use the Court's

9   system.  That's why I entered that order, because you are

10  going to have better reception.  Plus, that's what I want you

11  to do anyway.

12         All right.  So you've met with our technology folks,

13  and you know what to do?

14         MR. GOMAN:  Yeah.

15         THE COURT:  All right.  Okay.

16         All right.  One of the motions that's pending is

17  Defendant's Motion to Exclude Plaintiff's Trial Exhibit No. 5.

18  So I looked at that, and here's what I think.  And I'm going

19  to make a formal ruling here in a minute.  I believe that the

20  factual portions of this document can come in, but the legal

21  portions cannot.  So I'm going to have my law clerk give each

22  side a redacted copy, and you can follow along with me because

23  I'm going to make a ruling on this.  And then it's up to the

24  plaintiff to decide if you want to use the redacted copy or

25  not, but if you do, then that's the only thing that can be

1    admitted.

2           So I've looked at the motion, the response, and done

3    some research, and this is what my ruling is on the

4    defendant's objection to the admissibility of the OSHA letter,

5    Exhibit 5, ECF number 120.  Defendant seeks to exclude a

6    letter from the Occupational Safety and Health Administration,

7    OSHA, which determined there was reasonable cause to believe

8    defendant violated 49 U.S.C. Section 20109.  Plaintiff seeks

9    to admit this letter as Exhibit 5.  Defendant makes two --

10   makes two arguments for the inadmissibility of the letter.

11          First, defendant argues the letter should be excluded

12   for lack of relevance under Federal Rule of Evidence 402

13   because findings of the Secretary of Labor are reviewed

14   de novo at trial.  I disagree and find that the findings are

15   clearly relevant because they relate to whether defendant

16   terminated plaintiff in violation of the Federal Railroad

17   Safety Act.

18          However, defendant also argues the letter should be

19   excluded because its probative value is outweighed by its

20   danger of unfair prejudice, confusing the issues, or

21   misleading the jury under Federal Rule of Evidence 403.  I

22   partially agree with this argument.  With respect to the

23   factual findings contained in the OSHA letter, I find the

24   probative value exceeds the risk of unfair prejudice,

25   confusing the issues, or misleading the jury.  The probative

1   value exceeds the risk of unfair prejudice, confusing the

2   issues, or misleading the jury because the letter recounts

3   facts directly related to the series of events which allegedly

4   led to plaintiff's termination.

5              With respect to the legal conclusions arrived at in

6   the OSHA letter, I find the probative value does not exceed

7   the risk of unfair prejudice, confusing the issues, or

8   misleading the jury.  In this regard, I find the Tenth

9   Circuit's opinion in *Tuffa versus Flight Services & Systems,*

10  *Inc.*, 644 Fed. Appendix 853, 856, Tenth Circuit 2016,

11  persuasive.  In *Tuffa* the Court held the district court

12  properly excluded an EEOC document which found reasonable

13  cause to believe that defendant violated Title VII.  The

14  unfair prejudice and jury confusion in that case related to

15  the risk that the jury "may have felt the need to defer to the

16  EEOC because of its perceived expertise" and "the EEOC letter

17  might have confused the jury because different standards and

18  theories were involved in the EEOC proceeding and the jury

19  trial."  Here, the legal conclusions in the OSHA letter may

20  unfairly prejudice the defendant by making the jury feel

21  compelled or pressured to rely on the legal conclusions

22  arrived at by the Secretary because of his expertise.  Another

23  possible prejudice is that the letter renders ultimate

24  opinions on the questions that the jury will be called upon to

25  decide in this case.  Finally, the OSHA letter uses a

1   reasonable cause standard of review, while the jury in this

2   case must use a preponderance of the evidence standard.

3          Although neither party raised this Federal Rule of

4   Evidence 803(8)(A)(iii), I note my exclusion of the legal

5   conclusions but not the factual findings is consistent with

6   this rule which allows public records of factual findings from

7   a legally authorized investigation to be admitted as

8   nonhearsay in a civil case.

9          So I will write that up and enter the order.

10          So the bottom line is that I grant in part and deny

11   in part the motion.  And I grant it to the extent it seeks to

12   exclude admissibility of the entire document; I deny it to the

13   extent it seeks to exclude factual findings.

14          So what I have done in this redacted document is

15   eliminate everything that's not a factual finding, which

16   includes all the legal conclusions -- which includes a

17   paragraph on page 1 and all the legal conclusions that are on

18   page 3 and page 4 and a part of page 5.  So if the plaintiff

19   chooses to admit this redacted document, you can, but it's up

20   to you.  So you decide if you want to admit it or not.

21          All right.  So any other preliminary matters we need

22   to take up?  Did I -- I can't remember.  Did I put time limits

23   on your opening statements?

24          MR. THOMPSON:  You did, Your Honor, a half hour.

25          THE COURT:  All right.  Are there any exhibits that

1    you seek to admit in front of the jury, once we have a jury,

2    that are stipulated to?  And if so, you should move to admit

3    those in front of the jury before opening statements occur.

4          MR. THOMPSON:  Would you like us to move to admit

5    them one by one or just move to admit all stipulated exhibits?

6          THE COURT:  I'll leave that up to you.  It's totally

7    up to you.  It probably makes more sense, because the jury

8    won't remember what you are saying, that you move to admit the

9    ones that are stipulated to, and then give me the numbers.

10   Again, that's if you want to use them in opening.  And the

11   same applies to the defendant.  But the only exhibits that I

12   would receive would be ones for which there's a stipulation as

13   to admissibility, and there are quite a few.  So either side

14   may do that, but it's up to you if you choose to do it.

15         So I'm going to do -- I think I probably told you,

16   when you were here a few weeks ago, I'm going to do a

17   comprehensive set of voir dire questions, and then we'll

18   follow up with individual voir dire by each side.  And I'm

19   going to limit you to not more than 15 to 20 minutes, and I'll

20   decide if it's 15 or 20 minutes once we get going because I

21   want to get a jury picked, if at all possible, before we take

22   our lunch break.

23         Any other preliminary matters we need to take up --

24         MR. THOMPSON:  Yes, Your Honor.

25         THE COURT:  -- before we get the jurors in here?

1        MR. THOMPSON:  Three, briefly.  The first is

2   Defendant's Exhibit 79 [sic] is excerpts from Brandon

3   Fresquez's phone text messages, identified in the exhibit list

4   as just an excerpt without Bates number, so we didn't know

5   what excerpts.  We are also going to introduce excerpts, but

6   they are not the ones that defendants included in what was

7   given to you.  So what the parties think makes the most sense

8   is, after we admit them, to -- essentially, what we give to

9   the jury to be the pared down list.  Because the list of

10  entire texts is about 1800 pages, and so what the parties want

11  to do is be able to refer to that.  Neither side is objecting

12  to the use of them.  And then what we actually send back to

13  the jury and give to you will be the pared one down [sic] that

14  we've used throughout the trial.

15       THE COURT:  Let's deal with that after we get a jury

16  picked and we have opening statements.  That's not something I

17  need to decide now, is it?

18       MR. THOMPSON:  It's not, Your Honor.

19       THE COURT:  Yeah.  I want to just see what you're

20  talking about, but I don't want to take the time to do it this

21  morning.

22       What else?

23       MR. THOMPSON:  The only issue that needs to be taken

24  up before the jury, there are two pictures on plaintiff's

25  PowerPoint slide that defendant objects to.  Plaintiff thinks

1    they are appropriate to use.

2             THE COURT:  Wait a minute.  You are saying there are

3    two pictures on your slides that you object to?

4             MR. THOMPSON:  That defendant objects to.

5             THE COURT:  That's not what you said.  You said

6    plaintiff objects to.

7             MR. THOMPSON:  Plaintiff does not object to it.

8             THE COURT:  All right.  And you want to show that in

9    opening?

10            MR. THOMPSON:  Yes, Your Honor.

11            THE COURT:  All right.  Show it to me.

12            MR. THOMPSON:  Sure.

13            THE COURT:  Where is it?

14            MR. THOMPSON:  Pull it up on the computer for Your

15   Honor.  So the first one is on -- on it twice, but in the

16   background -- and we are not going to talk about any

17   particular incidents, but it's just a picture of a train

18   derailing, because we are going to be talking about the

19   effects of not reporting defects.  Frankly, the one we are

20   going to talk about during trial, the pictures we have are way

21   worse, so we thought this was a safer version to use during

22   opening.

23            THE COURT:  All right.  So what you want to show is

24   what I'm looking at here on the screen?

25            MR. THOMPSON:  Yes, Your Honor.  We are not going to

1    blow it up or talk about any details of any derail.

2         THE COURT:  And I, obviously, want to hear your

3    objection, but when you present this, what are you going to

4    say about it?  How will you present this?

5         MR. THOMPSON:  Sure.  We are going to explain the

6    three different types of defects there are and the importance

7    of accurately reporting defects, because if you don't, trains

8    derail, and things like in this picture happen.

9         THE COURT:  Well, is there any derailment in this

10   case related to anything that the plaintiff complained about?

11   I'm not saying that he didn't complain about safety issues,

12   but was there ever a derailment, whether it be akin to what

13   I'm looking at here or otherwise, that occurred?

14        MR. THOMPSON:  No, Your Honor, because the plaintiff

15   accurately reported.  That's the entire issue is this didn't

16   happen because of plaintiff.

17        THE COURT:  Let me hear from the defendant on this

18   picture.

19        MR. GOMAN:  Your Honor, as far as I know, this is a

20   picture that was just downloaded off the Internet last night.

21   It's not listed as an exhibit, and there's going to be no

22   discussion or foundation laid for that paragraph.  I think it

23   has no relevance and is prejudicial to show a picture of what

24   a train derailment might potentially look like.

25        THE COURT:  I agree with the defendant.  So you can

1    show this, but you have to take this picture out.  There are

2    two concerns here.  One is we are not dealing with an actual

3    derailment that occurred here, but I think that before the

4    jury sees this there would have to be an adequate foundation

5    laid to get it into evidence.  I'm not saying that that can't

6    happen, but I sustain the objection.  So you need to delete,

7    which you can do, I assume, to take this picture off of this

8    front page.

9              MR. THOMPSON:  Yes, Your Honor.

10             THE COURT:  What's the other?

11             MR. THOMPSON:  The other picture is a picture of

12   Brandon and his child.  It's pulled up on the screen now.

13   Much of Brandon's testimony about why he didn't report BNSF to

14   the FRA earlier is going to regard his child and wanting to

15   ensure that he didn't lose his job so he could care for them.

16   Brandon is going to testify at length about his child during

17   his damages testimony as well, Your Honor.

18             THE COURT:  What's your objection?

19             MR. GOMAN:  That, too, isn't a picture we have seen

20   or has been disclosed or listed as an exhibit, and I don't see

21   the relevance of the picture of his son.

22             THE COURT:  Well, I disagree with that.  How are you

23   prejudiced that you haven't seen a picture of the plaintiff

24   and his son?  Help me understand.  I don't quite understand.

25   What's the prejudice?

1        MR. GOMAN:  Sure.  I mean, I guess it's not as much a

2    prejudice argument as it is a lack of relevance argument.  I

3    think I understand why they want to use this picture.  It's a

4    picture of him, he's a devoted dad, and here's his son.  I

5    don't think that bears on any issues here.

6        THE COURT:  Let me just say this.  The demonstrative

7    exhibit is not evidence, and I will tell the jury that they

8    are seeing that but it's not evidence.  And I don't see any

9    harm of having the plaintiff show a picture of the plaintiff

10   and son.

11       How old is your son?

12       MR. FRESQUEZ:  13.

13       THE COURT:  How old was he in this picture?

14       MR. FRESQUEZ:  Uh, 11, 12.

15       THE COURT:  So if you want to show it, with the

16   understanding I will make sure the jury understands that this

17   is not evidence, it's a demonstrative exhibit which the jury

18   will see, but it will not be presented as an exhibit during

19   trial, unless you want to.

20       All right.  Is that it?

21       MR. THOMPSON:  Yes, Your Honor.

22       THE COURT:  And how long is this PowerPoint

23   presentation?

24       MR. THOMPSON:  Half hour.

25       THE COURT:  Oh, you are going to use the PowerPoint

1    during your entire opening?

2            MR. THOMPSON:  Yes, Your Honor.

3            THE COURT:  All right.

4            MR. GOMAN:  Just to make a record that I also showed

5    Mr. Thompson the PowerPoint I intend to use in my opening

6    statement.  I just want to put on the record that I don't

7    believe there are any objections to it.

8            THE COURT:  Any objections?

9            MR. THOMPSON:  No objections.

10           THE COURT:  All right.  Anything else we need to take

11   up from either side before we get the jury in here and we

12   start this trial?

13           MR. THOMPSON:  Not for plaintiff, Your Honor.

14           MR. GOMAN:  No, Your Honor.

15           THE COURT:  I do have a question, though, because at

16   the beginning of the trial I'm going to have to tell the jury

17   how long this trial is going to last.  What is your current

18   estimate of how long this trial will last?

19           MR. THOMPSON:  We estimate that it's going to end on

20   Friday, and we have done things to speed that up.  For

21   example, the parties are now stipulating to at least parts of

22   an expert report in lieu of calling that expert.  So we still

23   think we will be done by Friday, maybe even a little earlier

24   now.

25           THE COURT:  Okay.  That's good, because we are facing

17-cv-00844-WYD-SKC          Jury Trial              I(a) - 16

1   a potential government shutdown again.  I just heard on the

2   news this morning that the politicians have reached an impasse

3   on agreeing to whatever they are attempting to agree to.  So

4   there's funding through Friday.  And even if there is a

5   shutdown, I think the AO has told us at least there's funding

6   into next week, because they used most of their reserves when

7   we had that first idiotic shutdown that lasted five weeks.

8   But at least -- even though I warned you that I might continue

9   this case, we did get funding such that there is funding now

10  for the jurors to be paid.

11          But I think it would be prudent for another reason to

12  get this case completed by Friday, and that's because Monday

13  is a federal holiday, President's Day.  And I'm not suggesting

14  that I will say or do anything to rush the jury's verdict.  If

15  they need to go next into next week, they will come back on

16  next Tuesday to reach a verdict.  But I think it would be

17  smart to complete everything that's within your control such

18  that they can start deliberating on Friday.  So whatever I can

19  do to speed it up in fairness to both sides, I intend to do,

20  meaning we could come in a little earlier, end a little later,

21  reduce our break times.  So let's be as efficient as we can.

22          So we'll take a short break, and when the jurors are

23  up here, I'll come out, and we will begin our little journey

24  here.

25          (Proceedings recessed 9:16 a.m. to 9:33 a.m.,

1        resuming in the presence of the jury panel.)

2        (Jury Selection is contained in Volume I(b).)

3                    *       *       *       *       *

4        THE COURT:  All right.  So the remaining 10 of you

5   will be the jury in this case.  I want five on the front row

6   and five on the back row, and move so you are next to one

7   another.

8        Before we take our lunch break, I'm going to do a

9   couple things.  Mr. Keech is going to administer an oath, and

10  then there are some brief preliminary instructions that I'm

11  going to read to you, so that when we come back we'll have our

12  opening statements and begin with the evidence in the case.

13       All right.  Please stand.

14       COURTROOM DEPUTY:  And each of you raise your right

15  hand.

16    (Trial jury sworn.)

17       THE COURT:  All right.  So have a seat.  And I'm

18  going to read some preliminary instructions, and then, as I

19  said, we'll take our lunch break for about an hour and

20  15 minutes.  When we come back, we'll have opening statements.

21       We are about to begin the trial of the case you heard

22  about during jury selection.  Before the trial begins, I'm

23  going to give you instructions that will help you to

24  understand what will be presented to you and how you should

25  conduct yourself during the trial.

1    During the trial, you will hear me use a few terms

2 that you may not have heard before.  Let me briefly explain

3 some of the most common to you.

4    The parties who sue are called "the plaintiffs."  In

5 this case, of course, the plaintiff is Brandon Fresquez.

6    The party being sued is called "the defendant."  In

7 this action, the defendant is BNSF Railway Company.

8    You will sometimes hear me refer to "counsel."

9 "Counsel" is another way of you saying "lawyer" or "attorney."

10    I will sometimes refer to myself as "the Court."

11    When I sustain an objection, I am excluding that

12 evidence from this trial for a good reason.  When you hear

13 that I have overruled an objection, I am permitting that

14 evidence to be admitted.  When I say "admitted into evidence"

15 or "received into evidence," I mean that this particular

16 statement or the particular exhibit may be considered by you

17 in making the decisions you must make at the end of the case.

18    By your verdict you will decide disputed issues of

19 fact.  I will decide all questions of law that arise during

20 the trial.  Before you begin your deliberation at the close of

21 the case, I will instruct you in more detail on the law that

22 you must follow and apply.

23    Because you will be asked to decide the facts of this

24 case, you should give careful attention to the testimony and

25 evidence presented.  Keep in mind that I will instruct you at

1    the end of the trial about determining the credibility or

2    believability of the witnesses.

3         During the trial, you should keep an open mind and

4    should not form or express any opinion about the case until

5    you have heard all the testimony and evidence, my final

6    instructions on the law, and then the lawyers' closing

7    arguments.

8         While the trial is in progress, you must not discuss

9    the case in any manner among yourself or with anyone else.  In

10   addition, you should not permit anyone to discuss the case in

11   your presence.

12        From time to time during the trial I may make rulings

13   on objections or motions made by the lawyers.  It is a

14   lawyer's duty to object when the other side offers testimony

15   or other evidence that the lawyer believes is not admissible.

16   You should not be unfair or partial against a lawyer or the

17   lawyer's client because the lawyer has made objections.  If I

18   sustain or uphold an objection to a question that goes

19   unanswered by the witness, you should not draw any inferences

20   or conclusions from the question.  You should not infer or

21   conclude from any ruling or other comment I may make that I

22   have any opinions on the merits of the case favoring one side

23   or the other.  I do not favor one side or the other.

24        The trial lawyers are not allowed to speak with you

25   during this case.  When you see them at a recess or pass them

1   in the halls and they do not speak to you, they are not being

2   rude or unfriendly.  They are simply following the law.  The

3   same applies with equal force to me.  Don't -- if you see me,

4   don't smile, don't gesture.  Just ignore me, and I will ignore

5   you, for purposes of us having contact outside the courtroom.

6          During the trial, it may become necessary for me to

7   talk to the attorneys out of your hearing about questions of

8   law or procedure.  Sometimes you may be excused from the

9   courtroom during these discussions.  I will try to limit those

10   interruptions as much as possible, but you should remember the

11   importance of the matter you are here to determine and should

12   be patient even though the case may seem to go slowly.

13          The case will proceed as follows.  First, the lawyers

14   for each side may make opening statements.  What is said in

15   the opening statements is not evidence but is simply an

16   outline to help you understand what each party expects the

17   evidence to show.  A party is not required to make an opening

18   statement.

19          After the opening statement, the plaintiff will

20   present evidence in support of his claims, and the defendant's

21   lawyer may cross-examine the witnesses.  The defendant is not

22   required to introduce any evidence or to call any witnesses.

23   However, if BNSF introduces evidence, the plaintiff may then

24   present what is called "rebuttal evidence" to rebut what was

25   presented by the defendant.

1     After the evidence presentation is concluded, I will

2 instruct you on the law that you are to apply in reaching your

3 verdict.  After that, the attorneys for the parties will make

4 their closing arguments, which explain what they believe the

5 evidence has shown.  What is said in closing arguments, just

6 like what is said in opening statements, is not evidence.

7     Now, the evidence in the case will consist of the

8 following:  1, the sworn testimony of the witnesses, no matter

9 who called the witness; 2, all exhibits received in evidence,

10 regardless of who may have produced the exhibits; 3, all facts

11 that have been judicially noticed and that you must take as

12 true for purposes of this case.

13     Depositions may also be received in evidence.

14 Depositions contain sworn testimony, with the lawyers for each

15 party being entitled to ask questions.  In some cases, a

16 deposition may be played for you on videotape.  Deposition

17 testimony may be presented [sic] by you subject to the same

18 instructions that apply to witnesses testifying in open court.

19     Statements and arguments of the attorneys are not

20 evidence in the case unless made as an admission or

21 stipulation of fact.  A stipulation is an agreement between

22 both sides that certain facts are true.  When the lawyers on

23 both sides stipulate or agree to the existence of a fact, you

24 must, unless otherwise instructed, accept the stipulation as

25 evidence and regard that fact as proved.

 1          I may take judicial notice of certain facts.

 2   However, it's very unlikely because I normally don't.  If I

 3   were to declare that I will take judicial notice of some fact

 4   or event, you must accept that fact as true.

 5          As I have told you, if I sustain an objection to any

 6   evidence, or if I order evidence stricken, that evidence must

 7   be entirely ignored.

 8          Certain evidence may be admitted for a limited

 9   purpose only.  When I instruct you that an item of evidence

10   has been admitted for a limited purpose, you must consider it

11   only for that limited purpose and for no other purpose.

12          You are to consider only the evidence in the case,

13   but in your consideration of the evidence you are not limited

14   to the statements of the witnesses.  In other words, you are

15   not limited solely to what you see and hear as the witnesses

16   testify.  You may draw, from the facts that you find have been

17   proved, such reasonable inferences or conclusions as you feel

18   are justified in light of your experience.

19          At the end of the trial, you will have to make a

20   decision based on what you recall of the evidence.  You will

21   not have a written transcript to consult, and it is difficult

22   and time-consuming for the reporter to read back lengthy

23   testimony.  I urge you to pay close attention to the testimony

24   as it is given.

25          Now, I'm going to let you take notes, and what I mean

 1   by that is you may use notepads that will be provided to take

 2   notes if you choose to.  However, you are not required to do

 3   so.  If you take notes, you should not allow the note-taking

 4   to detract from your close attention to the testimony and

 5   demeanor of each witness and all other evidence received

 6   during the trial.  Take notes sparingly.  Do not try to

 7   summarize all testimony.  For example, notes can be

 8   particularly helpful when dealing with measurements, times,

 9   distance, identities, and relationships.  Whether you take

10   notes or not, you should rely on your memory as much as

11   possible and not upon your notes or the notes of other jurors.

12   Any notes you take are to refresh your own individual memory.

13          The notepads may be used only in the courtroom or

14   jury room.  You may take these notepads from the courtroom to

15   the jury room and vice versa.  However, they may not be taken

16   anywhere else.  Please write your name on your notepads, which

17   Mr. Keech will give you before you return, to be assured that

18   no one else will read your notes.  At the end of the case your

19   notes will be returned to the court and destroyed.

20          So there's one final instruction I will give you, and

21   it's an important one, and I think you will understand why,

22   and then we'll take a lunch break.

23          In your deliberations your duty is to apply my

24   instructions of the law to the evidence that you have seen and

25   heard in the courtroom.  You are not allowed to look at, read,

 1    consult, or use any material of any kind, including any

 2    dictionaries or medical, scientific, technical, religious or

 3    law books, the Internet, or any material of any type or

 4    description in connection with your jury service.  I want to

 5    emphasize that you must not seek or receive any information

 6    about this case from the Internet, which includes Google,

 7    Wikipedia, blogs, and any other website.  You are not allowed

 8    to do any research of any kind about this case.

 9         During your deliberations, you must not communicate

10    with or provide any information to anyone about this case.

11    You may not use any electronic device or media, such as a

12    telephone, cell phone, smart phone, iPhone, Blackberry, or

13    computer, the Internet, any Internet service, any text or

14    instant messaging service, or any Internet chat room, blog, or

15    website, such as Facebook, MySpace, LinkedIn, YouTube, or

16    Twitter, to communicate to anyone any information about this

17    case or to conduct any research about this case until I accept

18    your verdict.  In other words, you cannot talk to anyone on

19    the phone, correspond with anyone, or electronically

20    communicate with anyone about this case.  You can only discuss

21    the case in the jury room with your fellow jurors during

22    deliberations.  I expect you will inform me as soon as you

23    become aware of another juror's violation of these

24    instructions.

25         You may not use these electronic means to investigate

1   or communicate about the case because it is important that you

2   decide this case based solely on the evidence presented in

3   this courtroom.  Information on the Internet or available

4   through social media might be wrong, incomplete, or

5   inaccurate.  You are only permitted to discuss the case with

6   your fellow jurors during deliberations because they have seen

7   and heard the same evidence you have.

8           In our judicial system it is important that you are

9   not influenced by anything or anyone outside of this

10   courtroom.  Otherwise, your decision may be based on

11   information known only by you and not your fellow jurors or

12   the parties in the case.  This would unfairly and adversely

13   impact the judicial process.

14           So that concludes my preliminary instructions.  So I

15   want the attorneys to stay.  I want to mention something

16   independent of what we are talking about now.  So you are

17   excused.  I want to start again in an hour and 10 minutes or

18   2:15.

19      (Jury out at 1:04 p.m.)

20           THE COURT:  All right, have a seat.  So after the

21   lunch break, but not now, I'm going to have my law clerk give

22   you a set of draft jury instructions.  I want you to begin to

23   look at those because I decided it was useful and necessary in

24   this case to give you these earlier in the trial, and at some

25   point we will have a charge conference.

1            And then the thing I mentioned up at sidebar is

2     related to the damages instruction, and there's a

3     parenthetical note at the end of that that explains why,

4     unless you have some law to the contrary, I believe that the

5     back pay -- amount of lost wages and back pay is an equitable

6     remedy.  And let me just -- I'm going to tell you what it says

7     here.

8            The Court has been unable to find any cases analyzing

9     in detail whether back pay is or is not an equitable remedy to

10    be determined by the Court under the FRSA.  However, the

11    Sarbanes-Oxley Act is governed by the same burden-shifting

12    framework as the FRSA.  And there's a case cite to support

13    that.  The Sarbanes-Oxley Act has almost identical language

14    concerning remedies for back pay as the FRSA.  And then I give

15    you the statutes to compare.  Courts interpreting the back pay

16    remedies provision in the Sarbanes-Oxley Act have concluded

17    that back pay is an equitable remedy to be fashioned by the

18    court.  And then I gave you some law to consider.

19            So I'm open to any law to the contrary, but as I

20    mentioned at sidebar, I've tried numerous Title VII related

21    cases, and in all the more recent cases the attorneys have

22    agreed with me that back pay and front pay are both equitable

23    remedies.  And if an economist testifies, and if we all agree

24    that back pay is to be decided by me, then the jury wouldn't

25    hear that testimony, but I would.  And I don't know how you

1    are going to present back pay in this case.  So -- but I want

2    you to look at that because I am open to reconsidering that if

3    you have some law that suggests otherwise, but it isn't what

4    you have experienced in the past, it isn't what other judges

5    have done, it's what the law requires.  That's all I care

6    about.  So if you have some law that disagrees with that.  So,

7    anyway, after the break my law clerk will give you those jury

8    instructions when you come back.

9            All right.  We'll be in recess until 2:15.

10          (Proceedings recessed 1:07 p.m. to 2:19 p.m.,

11        resuming outside the presence of the jury.)

12          THE COURT:  All right, let's bring the jury in, and

13   we can have opening statements.

14          MS. DALE:  Your Honor.

15          THE COURT:  Yes.

16          MS. DALE:  One question.  We have somebody in the

17   gallery who was wondering if he could use his laptop out

18   there.  Would that be okay?

19          THE COURT:  I don't care, as long as he is not taking

20   pictures.

21          MR. GOMAN:  He won't be.

22          THE COURT:  Any objection?

23          MR. THOMPSON:  No objection.

24          THE COURT:  That's fine.

25          MS. DALE:  Thank you.

1      (Jury in at 2:22 p.m.)

2          THE COURT:  All right, have a seat, and let's proceed

3  with opening statements.

4          MR. THOMPSON:  Your Honor, plaintiff offers his

5  stipulated-to exhibits:  Exhibits Nos. 6, 7, 8, 21, 26, 52,

6  53, 55, and 56.

7          THE COURT:  All right.  Are all those stipulated to,

8  Counsel?

9          MR. GOMAN:  Yes, Your Honor.

10          THE COURT:  All right.  So those exhibits are now

11  received in evidence, which means that, if counsel chooses to,

12  he can refer to them in opening statements, and you will see

13  them on the monitors.

14      (Plaintiff's Exhibits 6, 7, 8, 21, 26, 52, 53,

15      55, 56 received.)

16          THE COURT:  And you can rotate the monitors around in

17  front of you, if you want to, because two of you will share a

18  monitor.  I mean, it will pivot if you want to put it in front

19  of you.  It will turn around.  Just turn it -- it will turn

20  around, and you can put it right in front of you, and slide it

21  so both of you -- okay.  It's up to you however you want to

22  use it.

23          JUROR NO. 10:  I'm good.

24          THE COURT:  All right.  Go ahead.

25          MR. THOMPSON:  Thank you, Your Honor.

1          The evidence will show that we are here today because

2     Plaintiff Brandon Fresquez finally stood up to his

3     supervisor's violations of federal law.  I am Nick Thompson.

4     I represent the plaintiff, Brandon Fresquez.

5          Let's start by talking about the parties.  First,

6     BNSF.  They are, as you heard some of the members of the jury

7     talk about, one of the nation's biggest railroads, one of the

8     Class 1s.  Since May of 2016, which is when Brandon was fired,

9     they have operated over 790,000 trains.  It's important that

10    BNSF safely operate those trains because they carry things

11    like gasoline, petroleum, ammonium hydroxide, and they do so

12    through downtown Denver.

13         Over the next five days you will hear a lot about

14    track defects.  What are they?  They are issues or defects

15    with the rail that occur over time through wear and tear of

16    trains riding on them that over time can now cause a train to

17    derail.  They are essentially problems with the rail that need

18    to be fixed.

19         You will also hear about the Federal Railroad

20    Administration.  That is to the railroad what OSHA is to

21    construction.  They set regulations and oversee the railroads

22    in making sure that they comply with inspection requirements.

23    They dictate how often railroads need to inspect their tracks,

24    what defects need to be reported, and what needs to be done

25    with a reported defect.

1          There are, to put it simply, three classifications of

2     defects.  The first is the most serious.  That's something

3     that requires a track be taken out of service immediately.  No

4     trains can operate over it until the defect is fixed.

5          The second type is a slow order defect.  Trains can

6     still operate over it, but the speed of those trains need to

7     be reduced.

8          And, finally, something called non-class defects.

9     These are defects where nothing has to happen immediately, but

10    under federal law -- you will hear from a former Federal

11    Railroad Administration inspector that under federal law the

12    railroad has 30 days to either repair them or take the track

13    out of service.  The FRA requires that for two reasons.

14    First, if you don't repair these within 30 days, over time

15    they get worse, and they can derail a train.  Second, it

16    encourages the railroad to repair them, not to wait.

17         Brandon Fresquez was a track inspector.  What do

18    track inspectors do?  They are the employees who perform the

19    FRA-required inspections, but they work for the railroad.  So

20    that kind of puts them, like this tightrope walker, in between

21    a rock and a hard place where they are constantly balancing.

22    Because, on one hand, their job is to find defects, issue slow

23    orders, take tracks out of service, but their employer's job

24    is to move trains as quickly as possible over territory.  When

25    Brandon takes tracks out of service, issues slow orders, he is

1    hurting BNSF's bottom line.  It's like a health inspector

2    working for a restaurant.  There are these competing

3    interests.  So track inspectors always find themselves just

4    trying to balance, do good enough a job, but not too good of a

5    job.

6           Brandon Fresquez, the plaintiff, started working for

7    BNSF on November 7 of 2005.  Two days later his son, Xavier,

8    was born.

9           Brandon will tell you he loved his job for three

10   reasons:  One, as I think you will gather when he testifies,

11   Brandon is a rules-type person.  This job is meant for him.

12   He's the type of person that at a crosswalk, even if there's

13   no traffic coming, waits for the signal to change so he's not

14   jaywalking.  This job is right up his alley.

15          Second, his coworkers, many of whom are going to come

16   in here and testify about him, he very much enjoyed working

17   with them.  They found him to be knowledgeable and a genuinely

18   nice employee to work with.  Brandon felt the same way about

19   them.

20          And, finally, the benefits.  It's a good job.  With a

21   high school education, you can get good pay and really good

22   insurance.  And when you have a son like Xavier who has a

23   health condition that requires you to go to the hospital

24   often, those benefits are hugely important.  You will hear

25   later on that's one of the reasons that Brandon waited so long

1    to do the right thing, because he didn't want to lose his job.

2         As I said, Brandon will tell you he loved his job,

3    but that changed when Mark Carpenter became his division

4    engineer.  What is a division engineer?  Brandon is a

5    union-level employee, a track inspector.  Above that is the

6    roadmaster.  Above that is division engineer.  For maintenance

7    of the track, Mark Carpenter was the head honcho in Denver.

8         Mark Carpenter himself will tell you he places a huge

9    emphasis on scorecards.  What are scorecards?  BNSF ranks its

10   managers based on a number of analytics that they refer to as

11   a scorecard.  It's things like velocity of trains over the

12   territory, how fast trains are moving, how many defects on the

13   system there are that haven't been repaired, how many slow

14   orders are on your system.

15        This ranking was hugely important to Mark Carpenter.

16   But you'll hear from one of the managers under Mark Carpenter

17   that it doesn't make a whole lot of sense for these analytics

18   to be so big to him because they don't have a whole lot of

19   control over them.  One of Mark Carpenter's roadmasters will

20   tell you, look, there's really one way to honestly increase

21   these measures; it's by repairing defects timely.  However,

22   the way you repair defects, you need two things:  manpower,

23   and capital, capital budget for machines and track, to repair

24   it.  But Mark Carpenter doesn't set that.  That comes from

25   down in Fort Worth, BNSF headquarters.  So Mark has to do with

1   what he has.  He can't really, in an honest way, improve those

2   metrics in any major way.  There is, if you are dishonest,

3   however, and BNSF's witnesses will admit this, if you are a

4   dishonest manager, there is a way.  What you can do is delete

5   defects from the system, show them as repaired when they are

6   not repaired, put tracks back in service when they are

7   supposed to be out of service, remove slow orders.  That will

8   increase these metrics.

9        So let's talk about Brandon Fresquez's track

10  inspections while under Mark Carpenter.  Over time, and it was

11  really a number of years, Brandon Fresquez came to believe

12  that Mark Carpenter and the roadmasters, at least some of the

13  roadmasters under him, were misreporting defects.

14       What caused him to believe that?  Brandon would

15  inspect track.  He would put a slow order, or he would take

16  the track out of service.  The next time he came back around

17  to that territory, that section of track, which could be

18  months, he'd find the slow order is gone, the track's back in

19  service, but the defect is still there.  Clearly someone had

20  shown this as repaired or deleted the defect even though the

21  defect had not been repaired.

22       There was also then, started after Brandon came into

23  suspicion, a couple of specific instances of not just defects

24  disappearing, but specific instances of his managers telling

25  him to do the wrong thing.  For example, Brandon will tell you

17-cv-00844-WYD-SKC          Plaintiff's Opening          I(a) - 34

1    about the time he was at the petroleum track.  He is out there

2    with a roadmaster.  So this is someone who works for Mark

3    Carpenter.  This guy's name is Michael Paz.  He's kind of Mark

4    Carpenter's right-hand man.  Him and Michael Paz find a defect

5    that's inarguably there.  This is on a track that leads into a

6    oil plant.  They find a defect that is inarguably there.  They

7    are going to report it, take the track out of service.  That's

8    until Michael Paz gets called to Mark Carpenter's office.

9    Michael Paz then comes back out and says:  Brandon, if you

10   take this track out of service, you are going to be fired.

11   I'm just trying to be your buddy.  This isn't me doing it.

12   I'm just telling you that's what's going to happen.

13        So now Brandon is again between a rock and a hard

14   place.  He knows it's coming from a division engineer, he will

15   tell you, to not take this track out of service, but this is a

16   defect going into an oil plant.  So he goes back and forth to

17   Michael Paz, says:  Look, we have guys right here that can

18   repair it.  Just let us repair it.  It's a win/win.  I don't

19   have to misreport; you don't get in trouble.

20        So Michael Paz relents.  And that's generally how

21   Brandon handled things like this is he would go would back and

22   forth, kind of try and de-escalate the situation of let's just

23   try to do the right thing, there's an easy fix, doesn't

24   require us to violate the law, let's go ahead and do this.

25   And it generally worked, until he does a ride-along with Mark

1    Carpenter.

2           This is the first time in seven years that Brandon

3    was on Mark Carpenter's territory that he asked to do a

4    ride-along.  They come to a defect where Brandon made a

5    mistake.  He will be the first one to tell you, I made a

6    mistake.  He put that the defect was here, when it was really

7    100 yards away.  So it was over there.  Defect was still

8    present.  It was just 100 yards off.

9           So Mark Carpenter chastises him for putting the wrong

10   location and then says:  All right.  Well, go ahead and delete

11   it.  At which point Brandon says:  What do you mean delete it?

12   Why don't we just change the location?  It's right there.  You

13   can see it.  At which point Mark Carpenter says:  Nope, delete

14   it.

15          Brandon has never been faced with -- especially from

16   the division engineer like this.  He can't talk Mark Carpenter

17   into doing the right thing.  He doesn't want to lose his job.

18   As I told you, the pay is huge.  The benefits are important to

19   him.  He's doing this for his son.  And so he does the right

20   thing, or wrong thing.  He says, okay, removes the defect.

21          But it weighs on him.  For Brandon this is the straw

22   that broke the camel's back.  It's no longer just defects

23   being deleted, you know, roadmasters asking him to do the

24   wrong thing, but generally he can get them to come around.

25   This is now the division engineer directly telling him to

1    misreport a defect.  That tightrope walking, he is falling

2    now.  He has to choose.  Does he want to do the illegal thing,

3    or does he want to upset his division engineer?

4           Shortly thereafter, one of the roadmasters directly

5    asks him to do something illegal.  It's the end of the month.

6    Brandon will tell you:  I need to inspect this track.  We all

7    know there's a bunch of defects.  I'm going to have to take it

8    out of service.  Ryan Akers tells him:  Don't do it.  You are

9    going to get in trouble.

10          Brandon then leaves for the day, calls his union rep,

11   Staci Moody-Gilbert, who will testify she in turns calls Adam

12   Miller.  That's Mark Carpenter's boss.  So it's Brandon's

13   boss's boss's boss.  And Staci tells him -- you will read the

14   texts.  Staci tells him:  Hey, you know, Mark Carpenter and

15   the roadmaster under him are trying to get our track

16   inspectors to misreport defects.  This is the first time that

17   Brandon has really stood up, not just tried to work with them

18   to convince them, first time he stood up to BNSF.  And not

19   only stood up to them.  Went outside the chain of command.

20   Went up to Adam Miller.

21          Shortly thereafter, on June 4th, 2015, another

22   roadmaster asked him to do something illegal.  Specifically,

23   Brandon is going to take a track out of service that has a

24   defect that hadn't been repaired in 30 days.  Cason Cole says:

25   Don't do it.  It's been repaired.

1    Brandon knows it hasn't been repaired.  He is looking

2    at the track.  In fact, the FRA found the defect itself later

3    on.  So Brandon says:  No, I'm taking the track out of

4    service.  That's what he does.

5        This all then comes to a head on June 11, 2015 where

6    Brandon Fresquez confronts Mark Carpenter.  On May 31st, so

7    about a week and a half prior, Brandon had obtained proof

8    positive that BNSF was violating federal regulations.  Up to

9    that point it had been his word versus theirs.  And their word

10   is Mark Carpenter, and this is a lowly track inspector versus

11   Mark Carpenter's word.  Brandon doesn't think anyone is going

12   to believe him.  Now, though, he's obtained proof positive.

13       Specifically, when Brandon is investigating track, he

14   finds a whole bunch of defects, I mean, more than normal, that

15   are not in the system.  So he writes to the IT department, who

16   has no skin in the game, says:  Hey, where are these defects?

17       The IT department writes back and says:  Ryan

18   Akers -- one of the roadmasters -- said all 35 of these are

19   repaired.

20       Brandon looks at them.  They are clearly not

21   repaired.  Brandon is looking at a defect at the moment they

22   are talking, not repaired.  The FRA found it, not repaired.

23       Brandon takes pictures.  His union had told him, when

24   he contacted his union:  Hey, BNSF has a history of doing

25   this.  You need to protect yourself.  Start taking pictures.

1    Start documenting to cover yourself.

2            So Brandon takes pictures of the defects.  Joe

3    Lydick, an FRA investigator, will look at them and tell you

4    this is not -- clearly not a repaired defect.

5            So Brandon confronts Mark Carpenter with this

6    evidence, says:  Look, I know what you are guys are doing.

7    You can't do this.

8            This is in a morning safety briefing.  So every

9    morning they have safety briefings.  Brandon confronts him in

10   front of the group and says:  I have evidence of what you are

11   doing.  You can't do this.  This is illegal.  It's wrong.

12   It's dangerous.

13           Mark Carpenter orders him into the next room in

14   private, goes in there and berates him, tells him he's a

15   terrible track inspector, doesn't know what he's doing,

16   threatens his job and says:  If you are going to continue to

17   report defects, I'm going to fire you.

18           Throughout the conversation Brandon asks for a union

19   rep.  He wants his representation in this.  Mark Carpenter

20   says no.

21           Then Brandon's doctor calls.  Sorry.  Brandon's son's

22   doctor calls.  And Brandon says:  I need to take this.  At

23   which point Mark Carpenter says:  Do not answer that phone.

24   You are talking to division engineer Mark Carpenter.  Letting

25   Brandon know who is in charge, that he can fire Brandon.

1     For Mark Carpenter and the roadmasters under him,

2  that's strike one, strike two, and strike three for Brandon.

3  He objected once, objected twice, and now reported them not

4  only to his union, but also had confronted Mark Carpenter with

5  it.  He's now gone from a nuisance -- as a track inspector who

6  really insists on the rules, he was always a nuisance to them.

7  Now he's gone to a threat.  He has proof positive they are

8  violating the law.  So the retaliation amps up.

9     Now, Brandon at this point is still trying to

10  tightrope walk.  He doesn't want to lose his job.  It's hugely

11  important to him and his family.  So what he decides to do is

12  bid off the track inspector position.  He says:  Hey, if I can

13  bid off, I don't have to deal with reporting defects anymore.

14  That will solve the problem from my end.

15     So he bids a position that has nothing to do with

16  defects.  And during that time, no issues.  He's under the

17  radar, keeping a low profile.

18     That changes in February of 2016, about nine months

19  later.  Reason being, given Brandon's certifications, there's

20  only certain positions he can hold.  A more senior person

21  bumped him off that position.  So he's bumped back.  When he

22  comes back, he has one of two choices:  either go as a track

23  inspector, or he can join -- take a position that might

24  require him to travel off the territory.  He is the primary

25  care provider for his son.  That's a nonoption.  So he bumps

1    back the track inspector position.

2            What he finds is things are even worse than they were

3    before.  Any guise that they were following the rules is now

4    out the window.  It's open and obvious.

5            So as soon as he can, he bids back off again.  Again,

6    that works until now May 2nd, 2016.  He's bumped back again as

7    a track inspector.  The first day he's there, Brandon will

8    tell you Michael Paz says:  Don't do anything today.  I want

9    to get my house in order.  Don't inspect any track.

10           So they pay him for the day to do nothing, sit in an

11   office and twiddle his thumbs.  May 3rd, the second day back,

12   the first day that Brandon inspects.  As he's inspecting, he

13   finds a defect that's not in the system that should be.  And

14   when he looks, Michael Paz had reported it as repaired the

15   very night before.

16           So Brandon confronts Michael Paz and says:  Look, you

17   can't do this.  I see what you mean when you say "get your

18   house in order" was take defects out of the system.  You can't

19   do this.

20           Michael Paz doesn't even deny it.  He just laughs at

21   Brandon.

22           Day Four, the second day inspecting.  Fresquez takes

23   a track out of service that was originally reported back in

24   June of 2015, almost a year prior.  The defect, when Brandon

25   had bumped back the first time, was no longer in the system,

1   and Brandon had to re-report it.  Now he's taking out of

2   track -- now he's taking it out of service, at which point

3   Michael Paz says, essentially, taking this track out of

4   service, when you do that, doesn't make friends.  When you

5   keep secrets, you should have let me know you were taking it

6   out of service, this doesn't make friends.  He is threatening

7   Brandon.

8          Then the last day, May 5, 2016, the crescendo.

9   Michael Paz asks Brandon to reclassify a track -- or

10  reclassify a defect.  Excuse me.  What do I mean by that?

11  Well, back in March, the first time he bumped back, Brandon

12  had wanted to issue a slow order on a defect.  Michael Paz

13  said, No, no, don't issue a slow order.  That will reduce

14  train speed.  Report it as a 30-day defect.  That way I can

15  run trains at full speed for 30 days.

16         Brandon will tell you there's nothing illegal about

17  Michael Paz doing that.  At that point in time the correct

18  classification actually was 30-day defect.  Brandon was only

19  putting the slow order on because it's on a curve where

20  derails are more likely to happen.  So he's putting it on a

21  slow order just erring on the side of caution, but there's

22  nothing wrong with classifying it as 30-day defect.  So

23  Brandon agrees.

24         When he comes back in May, the defect is still there,

25  hasn't been repaired.  Under federal regulation, it needs to

1    be removed from service.  So when he tells Michael Paz that,

2    Michael Paz says:  All right.  Well, now I want you to

3    classify it as a slow order, so I can continue to run trains

4    on it, albeit at a slower speed.  But I want you to change the

5    classification.  Never mind what I said the first time.  Now

6    change it to a slow order.

7            You can't do that.  You don't get to have your cake

8    and eat it too, reporting it one day as one thing and the next

9    day, when it benefits you, changing it to another.  So Brandon

10   now doesn't know what else to do.  He's already reported them

11   to the union.  He's already confronted Mark Carpenter.  So now

12   he does what's a last resort for him.  He calls the Federal

13   Railroad Administration.  This is a cardinal sin at BNSF.  You

14   are not only going outside the chain of command; you are going

15   outside the company and reporting them.

16           Brandon calls the FRA, which tells him, you're right,

17   you don't just get to reclassify defects whenever you want.

18           So Brandon then calls Michael Paz back and says:

19   Hey, I talked to my friends in high places -- which everyone

20   knows means the FRA.  They say you can't do what you are

21   doing.  To which Michael Paz responds:  I have friends in high

22   places too.  I have Mark Carpenter on my side.  We don't lose.

23           Brandon discusses and says:  Look, what you guys are

24   doing is wrong and illegal.  You are taking defects out of the

25   system.  This time, again, Michael Paz didn't deny.  He even

1    admits.  He goes, Yeah, we'll work on that.

2          Shortly thereafter, Brandon goes back to inspecting

3    track, finds another defect that had been misreported, takes

4    another track out of service.  The problem is now, for Mark

5    Carpenter and Michael Paz, Brandon has gone from a nuisance,

6    when he was insisting on regulations being followed, to a

7    threat, when he went to his union and then to Adam Miller, to

8    now an enemy.  Brandon has gone outside of the company to the

9    FRA.

10         So 20 minutes later Brandon is called to a defect.

11   Michael Paz calls him.  When he shows up there, he sees

12   Michael Paz and Jay Herzog, a coworker, who will also testify

13   in this case.  They tell him, We can't see the defect.

14   Essentially implying they are going to take the defect out of

15   the system because it can't be seen.  Brandon says:  Look,

16   this isn't the kind of defect that you can just see.  You need

17   to measure it.  At which point Michael Paz says:  It's not my

18   job to, you know, to, uh, keep defects in the system.  It's

19   your job to find them.  Remeasure it.  Brandon says:  What's

20   the point?  You're clearly going to take this out of the

21   system.  That's why you're calling me here, to get me to

22   participate in taking this out of the system.  What's the

23   point in having me remeasure this?  You know, why?

24         Why did Brandon think that they wanted him to

25   participate in illegally removing a defect?  Let's talk about

1    the defect's nature.

2              First of all, it had been present for years.  This is

3    a defect that not only had been verified by track inspectors,

4    but there's something called geometry cars, these cars that

5    run over the rails and measure them using lasers.  They had

6    found this defect for years.  There is no argument this defect

7    had been present.

8              Second, it couldn't have been repaired that day even

9    if they had wanted to.  This type of defect, you essentially

10   need to rip up a whole bunch of the track.  It requires all

11   kinds of men and all kinds of machines they didn't have on

12   staff.  So calling him to this defect, they will tell you they

13   couldn't have repaired it even if they wanted to.  Most

14   notably, Paz didn't even bring the tools that were needed to

15   remeasure them.  If Paz really wanted to find the defect, he

16   would have brought the proper tools.  Herzog had them, but

17   Michael Paz didn't.

18             So all this leads Brandon to believe what you're

19   really doing is you're trying to get me to participate in you

20   ultimately removing the defect.  So what does he do?  Brandon

21   decides the best thing to do is leave.  Number one, it

22   deescalates what is clearly a tense situation.  He has just

23   reported Michael Paz to the FRA.  Things are clearly tense

24   when he shows up.  In fact, the first thing Michael Paz says

25   to him is, See, Brandon, trouble follows you wherever you go.

1   So Brandon thinks by leaving he can deescalate things.  Then

2   he can come back and discuss it later and try and get the

3   right thing to be done when tensions are not so high.

4           Second, he wants to avoid being involved for three

5   reasons.  First, as I told you, Brandon is a rules guy.  If

6   what they are doing is wrong, he wants no part of it for that

7   reason alone.

8           Second, if and when this defect causes a derail, it's

9   not going to be Mark Carpenter's head on the block.  It's not

10  going to be Michael Paz's head on the block.  Whenever trains

11  derail in Mark Carpenter's territory, it's the track inspector

12  who loses his job.  So Brandon not only has nothing to gain by

13  measuring the defect.  He has a whole lot to lose.

14          Even more so for the third reason.  If the FRA finds

15  a defect and finds it has been misreported, it's not just BNSF

16  that gets fined.  They can fine Brandon up to 100,000

17  personally.  So Brandon wants no part in this whatsoever.

18          It's also worth noting that when he leaves, that

19  doesn't change anything.  He's not necessary there.  It takes

20  one person, arguably two, to measure the defect.  They have

21  the tools there.  It's pretty clear the only reason they were

22  calling him there is to get him to participate in this.  They

23  don't even need him there.  So Brandon leaves.

24          Michael Paz sees an opportunity.  How do we know

25  that?  Jay Herzog will tell you he was concerned they were

1   going to use this to fire Brandon.  It was well known, he will

2   tell you, that they wanted Brandon gone, and he was concerned

3   that Michael Paz would use this as an opportunity to fire

4   Brandon.  So he calls Brandon, at least tries to call Brandon

5   to tell him, Hey, come back.  Michael Paz says:  Stop what

6   you're doing.  Don't call him.  This is exactly what I need.

7          You will hear the radio call.  So there is a

8   back-and-forth radio call, once Brandon is in his truck and

9   leaving, between Michael Paz and Brandon Fresquez.  Now, for

10  some reason in the audio BNSF produces you only hear Brandon's

11  end, but what you hear is Brandon saying:  What's the point?

12  Why are we doing this?  What's the point?  We know what you

13  are going to do anyways.  You're going to take this out of the

14  system.  And finally the call ends with Brandon saying:  I

15  didn't say no.  I'm not refusing an order.  I just don't

16  understand the point of this.

17          At the end of that call, that back and forth between

18  Michael Paz and Brandon Fresquez, Brandon is called to a more

19  serious defect, one that can derail a train.  So he drives to

20  that.  He fixes the issue.  He then drives back.  He's

21  hoping -- now, why would you go back?  What Brandon is hoping

22  is, like had happened in times past, that tension will be a

23  little less, things will deescalate, he will convince Michael

24  Paz to do the right thing.  But when Brandon gets back, that's

25  not what happened.  Brandon offers to help, and Michael Paz

1    says:  Nope, it's too late.  You stay right there.

2          As a brief non sequitur, it turns out Brandon was

3    correct in his belief.  The defect was present.  Michael Paz

4    will testify it was not.  Brandon will testify it is.  But

5    also Jay Herzog, who has no skin in the game, will testify the

6    defect was present.  More than that, BNSF's records will show

7    somebody reported the defect, which couldn't have been

8    repaired that day, as having been repaired.  Moreover, the

9    system -- what BNSF produced will show it as repaired under

10   Jay Herzog's name.  Herzog will tell you, We didn't repair the

11   defect, and I didn't enter this in the system.

12         Now, there were three people there that could have

13   entered this in the system:  Jay Herzog, who will tell you he

14   didn't do it; Brandon Fresquez, who was fired, removed from

15   service that day, couldn't have done it; and Michael Paz.

16         All right.  Now let's return to the sequence of

17   events.  I want to talk about some of the disputed evidence.

18   There is going to be a dispute as to whether Brandon was

19   ordered or asked.  Now, as an initial matter, a gut reaction

20   to that is:  What's the difference?  If your supervisor asks

21   you to do something, isn't it the same thing?  However, BNSF's

22   own manager will tell you:  No, there's a difference between

23   those things.  If you are ordered to do something, it's

24   insubordination not to.  If you are asked, that's different.

25         There will also be issues regarding the timing of

1    when Mr. Paz asked.  Mr. Paz will say, I asked -- I asked

2    him -- or Mr. Paz will say, I ordered him before he left.

3    Brandon will say it was already once he was in the truck and

4    that he, therefore, went on to the other defect and back as

5    fast as possible.

6         The radio call.  Michael Paz and Jay Herzog will

7    testify that Michael Paz asked three times.  On the radio call

8    you will hear, he responds three times.  That radio call is in

9    the truck.  The radio call, even though you can only hear one

10   end of it, supports that it was not until Brandon was in the

11   truck.

12        Finally, the nature of Herzog's statement.  Jay

13   Herzog that day wrote a statement that BNSF will introduce.

14   However, he wrote it because Michael Paz ordered him to,

15   ordered him to sit in his truck, and Michael Paz sat with him

16   in the truck.  Jay Herzog will tell you he felt very

17   uncomfortable.  He knew what Michael Paz wanted him to write,

18   that he wanted to implicate Brandon, and he felt very

19   uncomfortable.

20        It's worth noting that after Brandon filed the case,

21   Jay Herzog, when not in front of Michael Paz, wrote his own

22   affidavit supporting everything that Brandon will say.

23   Shortly thereafter, Brandon -- not Brandon.  Shortly

24   thereafter, BNSF fired Jay Herzog, shortly after he submits

25   the affidavit supporting Brandon.

 1          Now, Carpenter's decision.  You will hear about that

 2    under the union agreement, union employees have a right to a

 3    hearing.  To the extent that any rules prohibited what Brandon

 4    did, and we will argue since what they were doing was illegal

 5    Brandon had a right to object, but even if he didn't, there's

 6    two rules that apply.  One is insubordination, which is a

 7    terminable offense.  The other is the failure to follow

 8    instructions, which is not.  You will hear that there were

 9    employees who did far worse and didn't get fired.  They were

10    instead charged with failure to follow instructions.  Who made

11    that decision?  It was Mark Carpenter.  Mark Carpenter decided

12    to charge him.

13          Now, there is a hearing process that you will hear

14    about.  The problem with that is that it's not a fair hearing.

15    It's not like this where we get discovery, where we get to

16    call witnesses, where there's a judge who is neutral, a jury

17    who is neutral.  There's a judge, but it's management.  He is

18    also the jury.  He's also the prosecutor.  He's judge, jury,

19    and executioner.  So the evidence will show that the hearing

20    is just really a formality.  Once Mark Carpenter charged

21    Brandon Fresquez with insubordination, it was inevitable that

22    he was going to be terminated.

23          They are going to try and say that the decisionmaker

24    was somebody else, but the evidence will show that the real

25    decision in this case was whether to charge Brandon and what

1    to charge him with, and that was done by Mark Carpenter.  The

2    adverse action in this case is the charge.  The rest is just a

3    natural consequence.

4           What will BNSF say?  They are going to demean

5    Fresquez.  They are going to say:  We were complying with the

6    law.  Any hiccups were just a computer issue.  And they are

7    going to point to Adam Miller and Stephanie Detlefsen and say:

8    Hey, this is who really made the decision, not Mark Carpenter.

9           So let's talk about demeaning Mr. Fresquez.  Number

10   one, they are going to call him a poor track inspector, but if

11   that were true, because of the importance of it, the rules

12   require that he be disqualified.  They never disqualified him

13   for substantive reasons.  This is after-the-fact

14   justification.

15          They are also going to say he is argumentative.  In

16   fact, I suspect BNSF will put up timelines with all the times

17   he had these coachings and counselings.  What you will hear

18   when you actually listen to the witnesses, though, is these

19   all regarded safety issues.  Yeah, he's argumentative.  It's

20   him doing that tightrope walking.  So every time they are

21   documenting on their timeline him being argumentative, they

22   regard safety.  Most importantly, what I want you to know is

23   when they put up their timeline, he is only disciplined when

24   he is under Carpenter.  When he track inspects on different

25   departments or different regions, no discipline.

1          The computer glitch.  They are going to say:  We were

2   complying with the law.  Any defects falling out of the system

3   was a computer issue.

4          First off, so what?  It's their computer system,

5   their obligation.  That shouldn't be visited upon Brandon

6   Fresquez.  Second, we have text messages that show this is not

7   just defects falling out of the system.  It's managers trying

8   to get Brandon to change, illegally, defects.  Finally, Mark

9   Carpenter himself will tell you he was violating the law.  He

10  will tell you he ordered tracks to be left in service even

11  after 30 days if the defect had not been repaired.  No dispute

12  BNSF was violating the law.

13         As a last resort, they will say:  Well, look, even if

14  Mark Carpenter retaliated, it was Miller and Detlefsen, who

15  didn't know anything about anything, who made the decision, so

16  we couldn't have retaliated as an organization.

17         As I told you, the real decisionmaker, because what

18  Adam Miller does is just a natural consequence, the real

19  decisionmaker is Mark Carpenter the moment he charges him.

20  That was the issue.

21         Second, Mark Carpenter sent an e-mail to the witness,

22  Michael Paz in this case, and the hearing officer telling them

23  how to testify, what questions to ask.  An e-mail so unusual

24  BNSF's own witness will tell you, I have never seen this, and

25  I don't condone it.  So, in other words, even were the hearing

1   process fair, Mark Carpenter infected it.

2          Finally, you will see that Adam Miller did know what

3   was going on.  Brandon Fresquez's union rep will testify that

4   she told him.  And in the hearing transcript itself, Brandon

5   Fresquez talked about what was going on, that BNSF was

6   covering up defects.  At the same time, Adam Miller will tell

7   you, despite those allegations, he never even investigated it.

8   To date they have never investigated whether Mark Carpenter

9   and Michael Paz were deleting defects.

10          At the end of the day, we believe the evidence will

11  show three things:  First, that Mr. Fresquez objected and

12  otherwise refused to participate in violations of FRA

13  regulations.  Second, that Fresquez's objections and refusals

14  to violate FRA regulations contributed to his termination.

15  And, finally, that BNSF would not have terminated Fresquez

16  absent his objections and refusals to violate FRA regulations.

17          Thank you.

18          THE COURT:  All right.  Opening for the defendant.

19          MR. GOMAN:  Good afternoon again.  On behalf of the

20  men and women that work for BNSF Railway, I'd like to explain

21  during this opening statement exactly why Brandon Fresquez was

22  fired in May of 2016.

23          On May 5th of 2016, and for no good reason, Brandon

24  Fresquez just plain refused to do what his boss and

25  supervisor, Mike Paz, asked and then instructed him to do.  He

1    was asking him and instructing him to measure the track, to

2    inspect it, to see if the track was safe to run trains on.

3    And Brandon Fresquez refused and drove away.  He refused to

4    do, in other words, what he was hired to do, what he had been

5    highly trained to do, and what he was paid to do.

6          That's it.  That's the whole story.  You just heard a

7    much different and more complicated story during this opening

8    statement, but those are allegations.  That's Mr. Thompson

9    standing up in court and alleging things.  Let's talk about

10   what the evidence is going to show.

11         Let's start with May 5th of 2016.  Let's talk about

12   who these people are.  Jay Herzog is a track foreman.  He's

13   Mr. Fresquez's coworker.  They are colleagues.  They both

14   belong to the same labor union.  He needs help doing his job

15   that day.

16         Brandon Fresquez is a track inspector, as you heard.

17   We will talk more about track inspectors in a second.

18         Mike Paz is a roadmaster.  He's a supervisor.  His

19   job is to oversee the both of them.

20         What they are doing out there is inspecting track.

21   They are doing what they are hired to do.  So Jay Herzog goes

22   out there to this location.  For the last couple of days they

23   had been doing some work in and around this location in south

24   Denver.  There are a number of defects in the track that had

25   been reported.  One of them had been reported by a geometry

1    car.  Jay Herzog went to where he thought that track defect

2    was, but he couldn't find it.  He didn't have the right GPS

3    tool.

4           So Jay Herzog, Mr. Fresquez's coworker, calls Brandon

5    Fresquez, and he calls Mike Paz.  He says:  Hey, guys, I need

6    some help.  I can't find this defect.  I need to locate

7    exactly where it is.  We need to see has it been repaired,

8    does it need further repair, what can we do about this.

9           It's another day on the job, as far as they're

10   concerned.

11          So Mike Paz shows up.  He has a GPS coordinate

12   device.  And Brandon Fresquez shows up at about the same time.

13   So Jay Herzog and Mike are on the track.  They are trying to

14   find -- pinpoint exactly where this geometry car has reported

15   this defect.  And Jay Herzog turns to Mike Paz, he says:  I

16   can't find it.  I don't see a defect right here, but this is

17   where my GPS is pointing me.  And Mike Paz says:  Yeah, just

18   by eyeballing it, I can't see it either.

19          That's not unusual.  This is the type of defect, an

20   alignment defect, that you typically can't see with your naked

21   eye.  So Mike Paz turns to Brandon Fresquez, and he says, Hey,

22   Brandon, will you go get your string-line and measure this

23   track so we can see if this is the location where this

24   geometry car has reported this defect.

25          A string-line is the particular tool that a track

1    inspector has that will tell them one way or another is this

2    track safe, can the defect be removed, or do we need to do

3    more work.

4           Let's pause right there.  Before we talk about

5    Mr. Fresquez's response, let's talk in a little bit more

6    detail about track inspection at BNSF.  Mr. Thompson said it's

7    important.  I'm not contending they have understated that.

8    It's incredibly important.  BNSF builds and maintains its own

9    track.  It's done it for more than a hundred years.  It needs

10   to be expected constantly.  You will hear about tracks that

11   are inspected six, seven days a week, sometimes four days a

12   week.  They have track inspectors out there all the time

13   trying to find, report, and repair track defects.

14          This equipment right here, this is just one example

15   of many, but it shows a geometry car there in the middle.

16   What a geometry car is is a big, sophisticated, expensive

17   piece of equipment whose only mission, it's only job, it's

18   only purpose is to find track defects.  It goes down the

19   track, and it measures for things like alignment defects.  And

20   it will report, using GPS coordinates, if it finds a defect.

21          They have other equipment.  You will hear about a

22   little bit of it during this trial.  They have equipment that

23   can go down the track and take a photograph, a high-resolution

24   photograph at 70 miles an hour, and detect a missing bolt or a

25   track that's just a little bit out of spec, because BNSF wants

 1    to find, report, and fix track defects.  And track inspectors,

 2    like Mr. Fresquez, are incredibly important to that mission.

 3          And that mission is safety.  That's what this is

 4    about, first and foremost, safety.  They do haul freight

 5    trains.  They haul them in Denver.  They haul them across the

 6    western United States.  If tracks aren't within spec, if

 7    there's an issue that makes it unsafe for trains to travel, it

 8    can have devastating consequences.  It can be dangerous.  It

 9    can put people in harm's way.

10          Less importantly, but in addition to that, it's

11    incredibly expensive.  You will hear Mr. Fresquez's first

12    witness tell you if a freight train goes off the tracks, it

13    can cost upwards of $2 million.  So BNSF puts a lot of time,

14    energy, and attention into finding track defects, and track

15    inspectors do that as their sole job.

16          Brandon Fresquez isn't the only track inspector at

17    BNSF.  In 2016, they employed 616 track inspectors.  They

18    hired them, they trained them, and they paid them to find

19    track defects and report them.  In other words, they hire

20    them, pay them, and train them to do the job that Mr. Fresquez

21    says he was retaliated against just for having done.

22          The rules at BNSF tells you this.  A track inspector,

23    you're to detect, correct, and protect the track.  That's what

24    you do every day all day.  If you find a defect, not that you

25    should or consider doing one of the following, you are

1    required to make repairs, place slow orders, remove tracks

2    from service, and report to the FRA what you've found.

3          So the allegations you just heard from Mr. Thompson,

4    those are allegations of federal crimes he just stood up and

5    told you about.  He just said supervisors admitted to

6    committing federal crimes, casually, apparently, repeatedly,

7    and they criticized Mr. Fresquez for reporting any defects,

8    even though that's the only thing his job required him to do.

9          So back to May 5th of 2016.  Of course, Mike Paz and

10   Jay Herzog turned to Brandon Fresquez and asked him to measure

11   the track.  He's the one who had been trained to do that.  So

12   they say:  All right.  We need to see if this is the spot

13   where this geometry car reported it.  This is what the GPS

14   coordinates say.  Brandon, will you go get your string-line?

15   Nah, I don't see the point, he says.  They turn to him:  Will

16   you go to your truck and get your string-line?  We need to

17   measure it.  We need to do our jobs here.  No, it's pointless.

18   You guys have made up your minds.  You don't want to know if

19   the track is defective or not.  They say again:  Brandon, will

20   you get your string-line?  We need to measure this track.

21   That's why we are here.  We've got a crew of people waiting to

22   make this repair.  No, it's pointless.

23         So he walks off, gets in his truck and drives off,

24   and parks 200 feet down the right-of-way, for reasons that are

25   really only truly known to Mr. Fresquez.  So Mike Paz calls

1    him on the radio.  He has a PAC set on his radio, a little

2    handheld radio.  Brandon, come on, are you going to come back

3    and measure this?  We're here.  We're waiting.  No, I don't

4    see the point.

5            And as a matter of fact, we have that here.  This

6    becomes -- this was played at his investigation hearing.

7            Let's go ahead and play the audio.

8        (Audio played.)

9            MR. GOMAN:  So then he leaves.  Some six or seven

10   minutes later he does get called off on another issue, and he

11   leaves.  So Mike Paz and Jay Herzog get out and measure the

12   track themselves.  They had no interest in deleting defects

13   out of the system.  They went and got Mr. Herzog's

14   string-line, sat down, and did Mr. Fresquez's job for him

15   because he just plain refused.

16           This is a big deal at BNSF.  Maybe we'll find it's a

17   big deal anywhere, but at BNSF when your job is

18   safety-critical, you can't just blow off your supervisor.  You

19   can't just say no and leave.  Especially if, as in

20   Mr. Fresquez's case, you have done a similar thing before as a

21   BNSF employee.  We'll come back to that in a second.

22           Let's talk about rules at BNSF.  It probably comes as

23   no surprise to any of us that there are a lot of rules at

24   BNSF.  It's a freight railroad.  It's a safety sensitive

25   workplace.  Some of the rules -- the one that Mr. Fresquez

1    violated -- are pretty basic.

2          Conduct.  1.6, right, one of the first rules they

3    have.  You can't be insubordinate, just like you can't be

4    negligent or dishonest.  Willful disregard of your duties is

5    cause for dismissal and must be reported.  You can't just

6    refuse to do your job.

7          And it makes sense.  Right?  When a roadmaster, whose

8    job it is to make sure the track is inspected, when he says,

9    Mr. Track Inspector, I need you to measure the track, then you

10   measure the track.  That's it.  And if he had, he'd still be

11   working at BNSF, but he refused.  He was insubordinate.

12         But these aren't the only rules we're going to talk

13   about.  So these are rules about safety.  They are pretty

14   plain and, I would submit, not controversial in this case.

15   But BNSF also has rules -- and this gets to the discipline

16   piece.  So how do we do discipline in an environment where the

17   employees have a collective bargaining agreement?  They all

18   belong to a labor union.  We have written rules.  You write

19   out what your policy is for discipline, and you tell your

20   employees:  If you do this, then this is what's going to

21   happen.  If you do this, you will be placed on probation.  If

22   you do this, you stand for dismissal.  It's fair to let your

23   employees know that.

24         Here is a list of violations which may result in

25   immediate dismissal.  Insubordination is one of them.  So it's

17-cv-00844-WYD-SKC          Defendant's Opening                I(a) - 60

1    a one-strike-and-you're-out type rules violation.  And he knew

2    this.  He knew this better than most employees.  We'll come

3    back to that.

4          Other rules we are going to talk about is this

5    collective bargaining agreement.  We will probably talk about

6    this this afternoon.  The union sits down with the company,

7    and they say:  What are the rules about discipline?  How are

8    we going to handle this?  What's the process going to be?  And

9    it lays out the process.

10          And the first part of it is a roadmaster, someone

11   like Mike Paz, he's not a discipline decisionmaker.  He can

12   report misconduct, and that's all he did here.  He called his

13   boss and said this is what just happened out there, but that's

14   all he can do.  And then one level above, Mark Carpenter, the

15   division engineer, who, by the way, was the division engineer

16   since 2006.  You might have got the impression that he only

17   later supervised Brandon Fresquez, but that's just not the

18   case.

19          But the discipline decision is made by people who

20   aren't on the ground, and that's for a reason.  Right?  They

21   don't want a roadmaster who might have a personality conflict

22   with a subordinate employee.  They don't want someone who

23   might just have gotten in a squabble with an employee to make

24   these important decisions.  So they say all that's going to

25   happen on the ground is that you can notice someone for an

1   investigation, and then we'll have a hearing.  We'll have a

2   hearing where you can tell your side of the story with your

3   union advocate, and the company can tell us its side of the

4   story.  And that transcript of that investigation will get

5   sent to Stephanie Detlefsen in Labor Relations.  Stephanie

6   Detlefsen doesn't know Brandon Fresquez.  She doesn't know any

7   of the track inspectors.  She doesn't know Mark Carpenter.

8   She doesn't know Mike Paz.  But she looks at this

9   investigation transcript, and she says:  Well, the evidence is

10  plain.  He was insubordinate.  Under the policy,

11  insubordination is a dismissible offense, so I recommend he be

12  dismissed for this.

13          That recommendation goes to Adam Miller, who is in

14  court, the one who sits here being accused of having

15  retaliated against Brandon Fresquez.  It goes to him, and they

16  look at the -- Mr. Miller looks at the transcript.  He has

17  Stephanie Detlefsen's recommendation.  And he reads it, and he

18  concludes the same thing Ms. Detlefsen did.  It's pretty

19  plain.  The dispatch recording tells us what happened there.

20  He was insubordinate.  So what do we do about it?  He looks at

21  the policy.  He says, Yeah, one strike and you're out.

22  Insubordination, you're gone.  But let's take a closer look.

23  He's an 11-year employee.  Maybe he just had a bad day.  Maybe

24  this was out of character for him.

25          But then he looks at his transcript, and he sees back

17-cv-00844-WYD-SKC          Defendant's Opening                    I(a) - 62

1    in 2010 he violated BNSF's rules against insubordinate conduct

2    and was given what's called a Level S violation.  What that

3    means is a supervisor, Mark Carpenter, in fact, looked at his

4    conduct and said:  This is serious.  This is insubordination,

5    and you can be fired for this, but I'm going to show leniency.

6    I'm going to go one step back.  We are going to give you a

7    record suspension.  No missed time.  No dock in pay.  But you

8    should know this is serious.  And if the message were unclear,

9    this is one of the coach and counselings.  This is just a

10   written -- this is like a safety interview with an employee

11   where he is told by his boss:  "Walking away from your foreman

12   or any supervisor will not be tolerated and will result in

13   disciplinary action if it ever occurs again."

14        He's told that in 2010, and the issue had nothing to

15   do with safety.  Mr. Fresquez got in an argument with his

16   foreman about where and when he was supposed to show up at

17   work.  So his foreman, a coworker, reported him as not having

18   complied with instructions, as having just walked away with

19   him when he was just trying to talk to him about his job.  So

20   his roadmaster back then, someone who had nothing to do with

21   his dismissal, says:  You can't do that.  You can't just walk

22   away from a supervisor who is trying to talk to you about

23   safety or your performance.

24        So Adam Miller decided he really had no choice.  He's

25   already been shown leniency once.  He stands for dismissal.

1    It's too bad he decided to refuse to follow his roadmaster's

2    instructions on May 5th, but that was his decision, and

3    dismissal is the consequence.

4            That is what this case should be about, but, again,

5    you heard a much different story in opening statement, so

6    let's talk about that.  It's really a grand conspiracy.

7    Right?  A blatant commission of federal crimes, not just by

8    Mark Carpenter or Mike Paz, but by all of the roadmasters that

9    had been supervising Mr. Fresquez going back years.  Damon

10   Fry, Jeremy Holton, Ryan Akers, Cason Cole, Mike Paz.  All of

11   them had been falsifying track defects, and all of them had

12   been giving Mr. Fresquez a hard time.

13           These are extremely serious allegations.  And while

14   this trial isn't about how good of a job in 2014 did BNSF do

15   at inspecting track, but we can't just let these allegations

16   lie, so we went and talked to these people.  Several of them

17   don't work for BNSF anymore.  One retired.  One went to law

18   school and is a lawyer down in Dallas.  One lives in Indiana,

19   to be closer to his family.  And we asked them about these

20   allegations that you have been -- or you were, when you worked

21   at BNSF, you were deleting defects.  You were pressuring

22   Mr. Fresquez into not reporting defects.  They will tell you:

23   Not only did I not do that, I would have been crazy to do

24   that.  If a train derails because of a defect in the track

25   that I took out of the system without inspecting, I could be

1   federally prosecuted.  If I just removed defects from the

2   track willy-nilly, I would be in -- not only is it lying and

3   dishonest, but they would be in significant trouble.  So they

4   talked with us and they will talk with you-all about the job

5   they did to inspect track and report defects.

6           But the other important thing about these allegations

7   to note, the most serious allegations, the idea that

8   Mr. Carpenter admitted to doing this misconduct, that he told

9   Mr. Fresquez, Stop reporting defect reports, that Mike Paz

10  admitted he was falsifying federal records and he would try

11  and work on it, all of those allegations rest on the word of

12  Mr. Fresquez.  There's no other witnesses.  There's no one

13  else that heard those accounts.  So you are going to have to

14  evaluate whether that is something that a manager would ever

15  say.  Yeah, I committed that felony you are accusing me of.

16  If that's something a manager did say -- and you don't have

17  just their word to consider.  We have a year's worth of text

18  messages between Mr. Fresquez and these managers, and we're

19  going to walk through several of them, and you'll see exactly

20  how they respond to Mr. Fresquez's reports of track defects.

21  He'll tell them, We have a track defect at this location.

22  They will respond, Okay, we'll send a foreman out.  He'll tell

23  them, This track is going out of service tomorrow.  Okay.  The

24  guys will have to work overtime then to get it fixed.

25          The text messages and the e-mails tell a much

1  different story than what you just heard, so we are going to

2  look at them.  But another thing to consider about these

3  allegations, the very serious allegations you just heard, many

4  of them for the first time came to light after Mr. Fresquez

5  filed this lawsuit.  In other words, the evidence of

6  misconduct that he thought he had stumbled upon, the evidence

7  of wrongdoing, he didn't report it to BNSF's safety hotline,

8  an anonymous hotline designed specifically so that if there's

9  reports of wrongdoing or suspicions of wrongdoing they can

10  report it, be reported in there.  He never called the hotline.

11          He never reported any misconduct to the FRA.  Now,

12  you heard Mr. Thompson tell you that the first time he called

13  the FRA was May 5th of 2016.  You'll have to look at the

14  evidence and consider whether that's true.  Who he called that

15  day was a gentleman named Kirby O'Connor.  He is an FRA track

16  inspector.  The reason why we know he called him is because

17  Kirby O'Connor's name was programmed into Brandon Fresquez's

18  cell phone, because FRA track inspectors and BNSF track

19  inspectors are in fairly regular communication, and it is no

20  big deal.  Mr. Fresquez did it.  The other track inspectors

21  you are going to hear from do it.  If you have a question

22  about how to apply a federal regulation, should this be a

23  class-specific defect, should this be a non-class-specific

24  defect, if you have a question and you can't get ahold of your

25  roadmaster or someone else, call up the FRA inspector and see

1    what they think, see how they would like to see that reported.

2    That's all he did on May 5th of 2016.

3           And the conversation with Mike Paz went like this.

4    The morning -- this is about another defect.

5           I have a track that's going out of service at

6    such-and-such location.

7           Why is it going out of service?

8           Mr. Fresquez responds:  It's a tie defect.

9           Mike Paz responds:  Does it have to go out of service

10   or can we slow order it?

11          Mr. Fresquez says:  Well, hold on, let me check.

12          So he hangs up.  Calls the FRA track inspector, says:

13   Here's the situation.  How should this be reported?  FRA track

14   inspector apparently tells him:  No, that's a 30-day defect.

15   That needs to come out.

16          So Brandon Fresquez calls back Mike Paz.  He says:

17   No, it's a 30-day defect.  We have to take it out of the

18   system -- or we have to take the track out of service unless

19   we can just get it fixed.

20          So Mike Paz says:  Okay.  Fix it.

21          That's it.  It's just them doing their job.  No grand

22   conspiracy.  No larger story.  Just track inspectors trying to

23   fix track.

24          But we talked to these individuals, and they are

25   going to come in here, and they are going to tell you:  No, we

17-cv-00844-WYD-SKC          Defendant's Opening          I(a) - 67

1    would disagree with Mr. Fresquez and other track inspectors

2    sometimes about the proper report of a track defect.  That's

3    kind of par for the course.  Some of them are subjective.

4    Typical example is, well, if it doesn't drain properly, that's

5    a 30-day defect.  One person can look at it and think it's

6    draining properly; another might disagree.  So a roadmaster

7    has the authority and is required by his or her job to put a

8    track back in service if they think it's the right thing to

9    do, but it's not a secret.  They log in with their username,

10   using their password, and they state, I am the one, I, Mike

11   Paz, or I, Ryan Akers, I put this track back in service.  I

12   own it.  So if the FRA or Mr. Fresquez or anyone else wants to

13   question them for having done that, they know who to talk to.

14        So the idea that this e-mail to someone in IT is a

15   smoking gun of wrongdoing, we went out and talked to Thomas

16   Royston, the guy who is now retired but that fielded that

17   e-mail, and you will hear him tell you that was kind of an

18   everyday e-mail.  A track inspector had questions about

19   defects, and I looked it up and sent him a response.  It's

20   something that happens all the time.  It's not any evidence of

21   wrongdoing.

22        But what these employees will also tell you is, yeah,

23   Mr. Fresquez could be a difficult employee.  He might fail to

24   complete a training class but blame it on his roadmaster.  He

25   might fail to report to work on time but blame it on his

1    foreman.  He might be encouraged to meet his FRA track

2    inspections and meet the frequency required and blame it on

3    someone else for his failure to do that.  He could be

4    antagonistic, but he did his job.  When he violated a rule, he

5    was held accountable for it, but he had a clean slate in 2016.

6    And if he just would have measured the track, he'd still be

7    working at BNSF.

8            What you are also going to see in this timeline is

9    not just evidence of misconduct.  You're going to see evidence

10   of second chances and third chances.  Mark Carpenter, who is

11   apparently out to get Mr. Fresquez, saying:  All right, yes,

12   you are reporting him as having violated a rule, Mr. Foreman,

13   but we're not going to pursue it.  Or Mike Paz saying:  I

14   know, Mr. Contractor, I know you don't appreciate the way

15   Mr. Fresquez treated you, but I'm just going to talk to him.

16   I'm not going to make a bigger issue out of it.  You will see

17   examples of lenient treatment up until May 5th of 2016 when he

18   made the choice to refuse to measure that track.  But that was

19   his choice, and his attempts now to blame BNSF and the

20   roadmasters that were trying to supervise him, they're not

21   credible, and they're not supported by the evidence.

22           That's all I have to say.  I appreciate your

23   attention during this opening statement and look forward to

24   working with you this week.

25           THE COURT:  All right.  Let's call your first witness

1    for the plaintiff.

2            MR. THOMPSON:  Plaintiff calls Joe Lydick.

3            COURTROOM DEPUTY:  Please raise your right hand.

4        (The witness was sworn.)

5            COURTROOM DEPUTY:  Please be seated.

6            THE WITNESS:  Thank you.

7            COURTROOM DEPUTY:  Please state your full name, and

8    spell your full name for the record.

9            THE WITNESS:  David Joe Lydick, L-y-d-i-c-k.

10       **DAVID JOE LYDICK, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

11   BY MR. THOMPSON:

12   Q.  Good afternoon, Mr. Lydick.  Please tell us a little bit

13   about you.

14   A.  Well, I have 48 years of railroad experience.  I started

15   on the railroad in 1970 as a track laborer, worked my way up

16   through management on Southern Railway.  I was assistant track

17   supervisor, track supervisor, TNS supervisor.

18           And then from there I went to work for Inland Steel

19   Coal, and I laid rail underground for the Inland Steel Coal

20   and handled all their rail and track issues.

21           And then from there I worked for the Missouri PUC,

22   which had a state participation program with the Federal

23   Railroad Administration, and I worked as a federal state

24   inspector enforcing C.F.R. Part 213, which is the track safety

25   standards.

1           After that I went to work for the FRA, which is the

2    Federal Railroad Administration, in Milwaukee, Wisconsin, and

3    spent a short time there.  That office was closed, and I moved

4    to the Chicago office.  And in both of those locations I

5    worked as a FRA track safety inspector.

6           From there I went to Denver as the district chief.

7    As the district chief, I was responsible for all the craft

8    distinctions that FRA enforces regulations on, which includes

9    track, mechanical, operating practices, signal and train

10   control, hazardous material, and grade crossing trespasser.  I

11   was overseeing the Denver office, the Wichita office, the

12   Omaha office, and the Des Moines office at that time.

13          From there I went to Sacramento, California, as the

14   deputy regional administrator, and I led the same disciplines

15   again over a four-state region which included California,

16   Arizona, Nevada, and Utah.

17          And then from there I went to Jacksonville, Florida,

18   as a safety assurance compliance program manager, which was a

19   systemic position that handled all systemic safety issues on

20   the CSX Railroad that covered 26 states -- 23 states.  I'm

21   sorry.  And then I retired at the end of 2008 and started my

22   consulting business.

23   Q.  Tell me about your consulting business.

24   A.  It's listed in my curriculum vitae, but I do

25   investigation, I do training, I -- I serve in this role as an

1   expert witness.  And it's more detailed in my curriculum

2   vitae.

3   Q.  When you testify, is that generally for plaintiffs?

4   A.  Pardon?

5   Q.  When you testify, is that generally for plaintiffs?

6   A.  Yes.

7   Q.  Why don't you do work for the railroads?

8   A.  Because if you do work for the plaintiffs, the railroad's

9   not going to hire you.

10  Q.  Would you work for the railroad if they hired you?

11  A.  Sure.

12  Q.  Have you ever worked for myself or Mr. Stone?

13  A.  No.

14  Q.  In the last decade, though, you have done work for my law

15  firm, though?

16  A.  Yes.

17  Q.  How many times?

18  A.  Six or seven cases I think I've handled with them.

19  Q.  Over a 10-year period?

20  A.  Yes, sir.

21  Q.  What's the highest degree you have obtained?

22  A.  I have a master's in business from Jacksonville

23  University.

24  Q.  Are you a member of any professional associations?

25  A.  I am a project, uh -- I'm a PMP with the Project

1    Management Institute.  And then also I'm a -- been a member of

2    the American Railway Engineering and Maintenance of Way

3    Association since 1979.  And I'm also a certified FRA trainer

4    for C.F.R. Parts 1 through 5.

5    Q.  Have you won any honors or awards?

6    A.  Again, my curriculum vitae has all of my awards, but the

7    most prestigious, I got the Secretary of Transportation award

8    for my work with rail highway grade crossing safety across the

9    United States.  And then I've got numerous superior

10   achievement awards from them.

11   Q.  Do you specialize in any particular field?

12   A.  I'm a track -- I specialize in track and anything that has

13   to do with engineering standards as far as bridges or roadway

14   worker safety that's found in C.F.R. Part 214.  I also

15   specialize in harassment and intimidation of employees that

16   had to do with accident and injury reporting.  I led a

17   year-and-a-half-long audit on CSX, and my report was sent to

18   Oberstar's committee and contributed to the Whistleblower Act

19   that is in place now.

20   Q.  You are talking about the law this case is being brought

21   under?

22   A.  Pardon?

23   Q.  Are you talking about the law that this case is being

24   brought under?

25   A.  Yes, sir.

1    Q.  Do you have any specialized training regarding how to

2    report or remediate track defects?

3    A.  Yes.

4    Q.  Tell me about that.

5    A.  Of course, my own railroad experience coming up through

6    the ranks, supervising other individuals to inspect and make

7    repairs.  My years with the Federal Railroad Administration,

8    the training that I'd give to railroads that I've been

9    involved with.  And then now I'm certified with FRA to train

10   on Classes 1 through 5 under the new C.F.R. Part 243

11   regulation.

12   Q.  So you actually train track inspectors?

13   A.  Yes.  I just recently trained in the field, for three

14   weeks, track inspectors in the -- one week in December of '18

15   and then two weeks in January of this year between Miami and

16   West Palm Beach.

17   Q.  Fair to say, then, you are fairly familiar with track

18   defects and how to report them?

19   A.  Yes, I am.

20   Q.  During opening, I tried my best to explain to the jury

21   what track defects are.  Can you please better explain it to

22   them.

23   A.  The track defect is the -- you will find -- and the C.F.R.

24   is part of the Code of Federal Regulations, and I don't have

25   that with me here today, but I have the compliance manual that

1    guides for the interpretation of those regulations, and in

2    this guide it has designated track by speed.  And you have to

3    reach certain thresholds within the track to comply with this

4    manual.  If you drop below those thresholds that are speed

5    based, then you have to lower your track speed in compliance

6    with the track conditions that you have.  So if something, for

7    instance -- for -- a simple one is track gauge for Class 1

8    track, which is the lowest speed, 10 miles per hour, has to be

9    at least 58-inch gauge.  So if you don't meet that 58, if it's

10   58 and a quarter, 58 and an eighth, then you have to lower

11   that speed to less than 10 miles an hour, which in this

12   case -- I'm trying not to confuse you, and I'm trying to tell

13   you -- probably a better example is if you drop below that in

14   Class 2, then that would be Class 1 or not meet any class, and

15   then you would have to operate at 10 miles an hour for 30

16   days.  And then if you didn't correct it, then you would have

17   to take the track out of service.

18   Q.  What causes defects to arise or occur?

19   A.  It has to do with climate, weather.  It has to do with the

20   tonnage that goes over the track.  And that's what causes the

21   track to degradate.  So the more wheel loads you have over the

22   track and the severe weather conditions you have with lack of

23   proper track conditions causes it to deteriorate.

24   Q.  Just kind of the wear and tear over time?

25   A.  Yes.

17-cv-00844-WYD-SKC          Lydick - Direct                    I(a) - 75

1    Q.  So they need to be constantly inspected?

2    A.  Yes.

3    Q.  Are there actual requirements for how often a railroad

4    needs to have the track inspected?

5    A.  It depends, again, on speed and class of track.  So if --

6    if Class 3 or 4 track, it has to be twice weekly with one day

7    in -- calendar day in between.  Other classes of track it can

8    be weekly.  Yard tracks can be monthly.  So that's the way

9    it's determined.

10   Q.  I saw you bring a big book up there.  I think you referred

11   to it earlier.  What's it called?

12   A.  It's called the -- simply, it's called the track

13   compliance manual.

14   Q.  What does that do?

15   A.  So it's the guide to FRA inspectors in the field, as well

16   as railroad-trained FRA inspectors, on how to interpret the

17   regulations.

18   Q.  Is it published -- who publishes it?

19   A.  The Federal Railroad Administration.

20            MR. THOMPSON:  Plaintiff offers Exhibit 30.

21            THE COURT:  Exhibit?

22            MR. THOMPSON:  30.

23            THE COURT:  Any objection to 30?

24            MR. GOMAN:  No objection, Your Honor.

25            THE COURT:  All right.  Exhibit 30 is received.

1       (Plaintiff's Exhibit 30 received.)

2    BY MR. THOMPSON:

3    Q.  There's also a little book track inspectors or railroad

4    employees will sometimes use; right?

5    A.  Yes.

6    Q.  That's this little guy?

7    A.  Yeah.  That's the field handbook.

8    Q.  Is that something the FRA publishes?

9    A.  No.

10   Q.  Is that official?

11   A.  No.

12   Q.  I assume, based on the size, there's regulations missing

13   from that little book.  Right?

14   A.  Yes, the interpretations of them, yes.

15   Q.  Is it kind of a little crib sheet?

16   A.  Yes.  It's a quick reference.

17   Q.  Not something on which you should rely?

18   A.  Correct.

19   Q.  For purposes of the jury, is this the official manual you

20   were talking about --

21   A.  Yes.

22   Q.  -- on the screen?

23   A.  Yes.

24   Q.  We'll refer to that more later on, but I want to talk a

25   little more about inspecting first.

1          How does the FRA require railroads to inspect track?

2   A.   Excuse me?

3   Q.   Is there a certain way in which railroads are supposed to

4   require to inspect track?

5   A.   Yes.

6   Q.   Tell me about that.

7   A.   Well, based on the track safety standards, it tells them

8   by visual or either ultrasonic or with geometry cars that if

9   they test the track in any of these methods, then it has

10   minimum standards they have to meet.

11   Q.   What is a geometry car?

12   A.   A geometry car is a instrumented car that operates on the

13   rail.  Some of the original equipment look like a piece of

14   passenger equipment that was designed -- you know, converted

15   to this geometry car, which was based on instrumentation that

16   was hooked to the wheels and then fed information to a

17   computer, and they ran this car over the track, and it did

18   give them the -- the data under load which was a dynamic

19   measurement, which is required, and then it printed out a

20   computer report of exceptions.

21   Q.   So what happens then with that computer report of

22   exceptions?

23   A.   So then once they have that -- as far as the FRA is

24   concerned, when they have this data and this report is

25   provided, then they have knowledge.  So they are supposed to

1   verify these defects in the field.  When I was with the

2   Federal Railroad Administration, if we had -- was operating

3   with them on the car -- the Federal Railroad Administration

4   has their own car, and some of the railroads have their own

5   car as well.  So the railroad would ride with us on the

6   federal railroad car.  And if there was a two-class drop, we

7   expected them to immediately slow order the track to meet

8   that.  And then anything other than that they could verify in

9   the field behind the car.

10  Q.  So if I understand you correctly, I just want to make sure

11  I follow.  So after the geometry car spots a defect, the track

12  inspector is required to go out there and verify it?

13  A.  Yes, it has to be verified in the field.  But if it's a

14  two-class drop, it's supposed to be slow ordered immediately

15  or more.

16  Q.  Has the FRA ever taken issue with railroads, or BNSF in

17  particular, ordering railroad or track inspectors to not only

18  inspect track but also to repair it?

19  A.  Could you repeat that?

20  Q.  Yeah.  Has the FRA ever taken issue with railroads, or

21  BNSF in particular, ordering track inspectors not just to

22  inspect track but also to repair it?

23          MR. GOMAN:  Objection to relevance and 404.

24          THE COURT:  Yeah, and let me just say this.  I

25  haven't heard this witness be designated as an expert.  Is he

1    an expert?  When are you going to get to the designation so I

2    can figure out what his range of opinions should be?

3              MR. THOMPSON:  Sure.  Let's skip to that part, and

4    then we can come back.

5    BY MR. THOMPSON:

6    Q.  In this case you were hired by me?

7    A.  Yes.

8    Q.  For what?

9    A.  To take a look at all the documents provided, which are

10   listed in 5.0 of my report, but it included the deposition of

11   Mr. Fresquez, the deposition of Mr. Carpenter, the deposition

12   of Mr. Paz, and all the exhibits and supporting documents

13   which were given to me in this case, and determine if there

14   was any acts or omissions in compliance with the federal

15   railroad track safety standards by BNSF.

16   Q.  Were you asked for any particular conclusion, or were you

17   allowed to form your own opinion?

18   A.  I formed my own opinions.

19   Q.  Have plaintiffs tried to hire you in the past that you

20   have denied their case?

21   A.  Yes.

22   Q.  Why?

23   A.  Because before I even take the case, I usually look at the

24   complaint or photos that are provided and make a determination

25   at that point in time whether I believe it's a valid case or

1    not.

2    Q.  Did you write a report for this case?

3    A.  Yes, I did.

4    Q.  Does it include your resumé?

5    A.  Yes.

6    Q.  Does it include your job history?

7    A.  Yes.

8    Q.  Does it include your education?

9    A.  Yes.

10   Q.  Does it include the awards you have received?

11   A.  Yes.

12   Q.  Does it include your litigation history?

13   A.  Yes.

14   Q.  Does it include your fee schedule?

15   A.  Yes.

16   Q.  Does it also identify the materials you reviewed?

17   A.  Yes.

18   Q.  Does it identify all of the materials you reviewed?

19   A.  Yes.

20   Q.  After reviewing those materials listed in your report, did

21   you reach any opinions?

22   A.  Yes.

23   Q.  Do you hold those opinions to a reasonable degree of

24   professional certainty?

25   A.  Yes, I do.

1  Q.  I think you told me earlier there were two depositions you

2  read after you wrote that report.  Is that right?

3  A.  Correct.

4  Q.  Did those depositions change your opinion?

5  A.  No.  They supported it.

6  Q.  Are your opinions identified in your report?

7  A.  Yes.

8  Q.  Are the facts on which those opinions are based identified

9  in your report?

10  A.  Yes.

11  Q.  Do you believe your testimony will be helpful in assisting

12  the judge or jury understand the facts of this case?

13  A.  Yes.

14          MR. THOMPSON:  Your Honor, at this time I tender

15  Mr. Gavalla [sic] as an expert in the field of track safety

16  and defect reporting.

17          THE COURT:  Any objection?

18          MR. GOMAN:  Just to be clear, I believe this is

19  Mr. Lydick.

20          I don't object to the witness's qualifications.  I do

21  object to the relevancy of his testimony, as outlined in our

22  motion in limine.  I'd renew that.

23          THE COURT:  Yeah, I understand that.  All right.  So

24  you don't object to -- you object to his designation based on

25  what I have taken under advisement?  Is that what you are

1   saying?

2          MR. GOMAN:  That's right.

3          THE COURT:  But you believe he's qualified?

4          MR. GOMAN:  That's right.

5          THE COURT:  I will allow this witness to give

6   opinions under Rule 702.  And if, in fact, there is a

7   continuing objection at some point by the defendant, we may

8   very well have to take up some legal matters outside the

9   presence of the jury, but we will see when that might occur.

10  All right.

11  BY MR. THOMPSON:

12  Q.  Mr. Lydick, I am going to show you Plaintiff's Exhibit 59,

13  which has not been admitted yet.  Do you recognize this

14  document?

15  A.  Yes.

16  Q.  What is it?

17  A.  That's my report.

18  Q.  That includes all the information we just talked about?

19  A.  Yes.

20          MR. THOMPSON:  Your Honor, plaintiff offers

21  Exhibit 59.

22          MR. GOMAN:  Objection to hearsay, Your Honor.

23          THE COURT:  Well, let me just tell you what I do.  I

24  don't allow expert reports to come in because they really

25  truly are hearsay when you have a witness here who can testify

1    about his opinions.

2          Now, to the extent his report may include his resumé

3    and factual information unrelated to his opinions, I don't

4    have any problem with that coming in, but I'm not going to

5    admit the report because, again, it is hearsay because the

6    witness is here to give his opinions.  So --

7          MR. THOMPSON:  Your Honor, we just want -- we want

8    things like the resumé and things like that so we don't have

9    to go over every award he's received.

10         THE COURT:  Wait a minute.  Hold on.  Let me flip in

11   this big book, which weighs a lot, and 59 is near the back.

12   All right.

13         All right.  What portions of Exhibit 59 are you

14   seeking to admit, with the understanding I'm not going to

15   admit the opinion portion because you need to ask him

16   questions and he needs to answer?

17         MR. THOMPSON:  Yes, Your Honor.  Section 2, which is

18   on page 2, his statement of his qualifications.

19         THE COURT:  Statement of qualifications.

20         MR. THOMPSON:  Yes, Your Honor.

21         THE COURT:  What else?

22         MR. THOMPSON:  Section 3, which is actually an

23   attachment, his fee structure.

24         THE COURT:  Hold on.  It says, "My fee structure is

25   attached."  Where is that?  On what page is his fee structure?

1          MR. THOMPSON:  It is the very last page, Your Honor,

2     page 39.  And really, if Your Honor looks, it's really pages

3     33 through 39 that we want to admit.  That contains all the

4     factual information regarding his qualifications.

5          THE COURT:  All right.  Any objection to admitting

6     pages 33 through 39?

7          MR. GOMAN:  No.

8          THE COURT:  All right.  So pages 33 of 39 through 39

9     of 39 are received, but only those pages, of Exhibit 59.

10        (Plaintiff's Exhibit 59:33-39 received.)

11         MR. THOMPSON:  May I proceed, Your Honor?

12         THE COURT:  You may.

13    BY MR. THOMPSON:

14    Q.  So during opening, I tried to explain the different

15    remediations of track defects.  I want to see if I more or

16    less have it right.

17         There are some track defects that rise to the level

18    of having to take the track out of service immediately.

19    A.  Correct.

20    Q.  There are others that you can leave the track in service,

21    but you have to slow down the travel of trains on it.

22    A.  Correct.

23    Q.  Hypothetically, you could run trains indefinitely on that

24    slow order.

25    A.  As long as it didn't degradate any further, yes.

1    Q.  As long as the defect doesn't get worse, you can continue

2    to run trains, just slower?

3    A.  Correct.

4    Q.  There's some defects that you don't even need to do

5    anything immediately?

6    A.  Correct.

7    Q.  Those are non-class defects?

8    A.  Non-class-specific, yes.

9    Q.  How long does a railroad have to repair non-class-specific

10   defects?

11   A.  30 days.

12   Q.  What happens if they don't repair it in 30 days?

13   A.  The track's out of service.  Depending on the type of

14   track it is.  If it's main line track -- the compliance manual

15   says you have three options.  You either have to fix it, you

16   can put it in excepted track status, or you can take it out of

17   service.  In a main line situation, excepted track status

18   wouldn't apply, and if it wasn't fixed, you'd have to have it

19   out of service.

20   Q.  What are the consequences of not taking a track out of

21   service or appropriately remediating a defect?

22   A.  It's noncomplying, and violations are usually recommended.

23   Q.  What are the real world consequences?  I mean, fines

24   aside, what are the real --

25   A.  The real consequences is that if you do something like

1   that, you are endangering the public and the employees that

2   work on the railroad.  You have the potential for a

3   catastrophic accident, which could be a hazardous material

4   release, you know, oil.  It could be a passenger train

5   derailment.  I mean, because the way that we have always

6   looked at it at FRA is you have design standards, maintenance

7   standards, and you have minimum safety standards, and if you

8   do below minimum safety standards, you are in the red zone,

9   which is very high risk.

10  Q.  Is this just in theory, or in real world do trains derail

11  because of defects?

12  A.  Oh, trains derail because of defects, yes.

13  Q.  Have people been killed from that?

14  A.  Yes.

15  Q.  Has the environment ever been polluted because of that?

16  A.  Yes.

17  Q.  Have people other than the people actually in the train

18  been killed from that?

19  A.  Yes.

20  Q.  I suppose from time to time there's disputes between track

21  inspectors and managers as to whether something constitutes a

22  defect.

23  A.  Yes, there is that.

24  Q.  Which way should somebody err if it's unclear whether a

25  defect requires remediation or not?

1   A.   Err on the side of safety.

2   Q.   If a track inspector and a manager can't agree on what

3   should be done with a defect, is there anybody they can call?

4   A.   The Federal Railroad Administration.

5   Q.   In your time at the FRA, did you ever investigate track

6   inspectors being put under pressure not to report defects?

7   A.   Yes, and so -- and also so did the agency through the 2008

8   Safety Act that was requested from Congress to look at track

9   inspectors as well.

10  Q.   Tell me about that.  What kind of pressure were track

11  inspectors getting?

12          MR. GOMAN:   I object to relevance and 404 to the

13  extent this applies to BNSF.

14          THE COURT:   Is this a general question?   I don't

15  understand this question.  Is this a -- is this a general

16  question, or is it in relationship to things that may have

17  happened in this case?

18          MR. THOMPSON:   Both.

19          THE COURT:   Well, I'm going to sustain the objection

20  because I don't understand the question, but I will let you

21  rephrase it.

22  BY MR. THOMPSON:

23  Q.   Through your expertise and experience, have you ever

24  learned that BNSF puts pressure on track inspectors not to

25  report defects?

1          MR. GOMAN:  Same objection.

2          THE COURT:  Sustained.  I want to talk to the jury --

3   I mean -- "talk to the jury."  I don't want to talk to the

4   jury.  I want to talk to counsel outside your presence.  So

5   I'm going to send you back to the jury room for a few minutes

6   so I can discuss a legal matter.

7      (Jury out at 3:50 p.m.)

8          THE COURT:  Okay, have a seat.  As you know, a motion

9   in limine filed by BNSF objects to testimony in general about

10  railroad defects and how they were handled unless there's a

11  connection between that testimony and what plaintiff is

12  alleging in the case.  And so before I can get my arms around

13  whether or not there's merit or not, that's why I deferred it,

14  I need to hear some testimony.

15         So what I want to do is have the witness answer this

16  question outside the presence of the jury, and I will allow

17  you some more questions and answers, so I can get a sense of

18  where you are going with this.  I don't want it to go on for

19  20 or 30 minutes, but I want to get a sense of how this

20  relates to the claim that plaintiff is asserting with regard

21  to the timeline that you outlined in your opening statement.

22  BY MR. THOMPSON:

23  Q.  In your experience, do railroads ever pressure track

24  inspectors not to accurately report defects?

25  A.  Yes.

1   Q.  What motivation do railroads have to do that?

2   A.  Because they're trying to move trains.

3   Q.  Does it hurt their bottom line to take tracks out of

4   service?

5   A.  Yes.

6   Q.  Does it apply to BNSF?

7   A.  Yes.

8   Q.  Does it apply to Mr. Fresquez?

9   A.  Yes.

10        THE COURT:  Well, why does it apply to Mr. Fresquez?

11  What's the connection between those two?

12        THE WITNESS:  Well, they create a hostile environment

13  where if track -- and it's a, you know, it's a cultural thing

14  as well as a safety issue.  And they create an environment

15  where there -- like a chilling effect where they don't want to

16  take care of the safety defects that are out there, they don't

17  want to report them, because if they do they are going to take

18  the heat for it.  So they're put between, you know, being

19  responsible for inspecting the track, and then when they try

20  to do their job then they get, you know, harassed and

21  intimidated after that.

22        THE COURT:  All right.  Go ahead, Counsel.

23  BY MR. THOMPSON:

24  Q.  Are you aware of specific instances of that at BNSF?

25  A.  Yes.

1   Q.  Tell me about those.

2   A.  Well, there was a couple -- it was contained in my report.

3   I was the expert that was hired on another case in Minnesota,

4   which was Jason Johnston versus BNSF, and there was an

5   allegation through him in his testimony that because he took

6   tracks out of service that he was later dismissed because of

7   that.

8   Q.  So in opening, I will represent to you, BNSF essentially

9   said it would be nuts for anybody to do this.  Nobody does

10  this.  There's dire consequences of misreporting defects.  In

11  other words, saying this didn't happen.  It would have been

12  nuts.

13          In your experience, do managers, in fact, do this to

14  track inspectors?

15  A.  Yes.

16  Q.  In your experience, do they, in fact, have a motive to, I

17  guess, encourage or force inspectors to misreport or

18  underreport defects?

19  A.  Yes.

20          MR. THOMPSON:  Regarding generally, Your Honor,

21  there's then three specific issues I'm going to talk about

22  track defects, but regarding generally the pressure inspectors

23  are under, that's the totality of it.

24          THE COURT:  All right.  Let me ask this question,

25  because while I am not allowing the report in, direct me to

1    some pages in this report, which I have not read, that would

2    somehow tie or relate his testimony to things that

3    Mr. Fresquez is complaining about.  Where is that in the

4    report?

5              MR. THOMPSON:  Your Honor, we are talking just

6    generally about the pressures that, in the railroad industry,

7    that track inspectors are under.  And, in fact, under the

8    Barati court's ruling, we can't introduce specific instances.

9    We can, however, introduce generally the pressures they are on

10   as long as they also apply to the plaintiff.

11             THE COURT:  Well, I am asking for you to direct me to

12   where in the report that is discussed.  I assume it's in here,

13   but I don't know where it is.

14             MR. THOMPSON:  Sure.

15             THE COURT:  So I want to know what page it is because

16   I want to look at it, the general comments, unless there's no

17   objection to this from the defendant.

18             MR. GOMAN:  There is, Your Honor.

19             THE COURT:  So where in the report does he talk about

20   general conduct by BNSF that has some relationship to the

21   plaintiff's claims in this case?

22             THE WITNESS:  Keep going back the other way.  No,

23   that's down.

24             MR. THOMPSON:  You say "when," Joe.

25             THE COURT:  I mean, the witness can help me find it.

1   Just tell me what page.

2          THE WITNESS:  Okay.  Let me get mine.

3          THE COURT:  You know your report better than counsel

4   probably.  I have got the hard copy here in front of me.  It's

5   Exhibit 59 in the book.  Oh, you have got a different book.

6          THE WITNESS:  So page 12 of 32 talks about the FRA

7   track inspection time study, and that's stated in part.

8          THE COURT:  Mine goes to page 39.  Is it the same

9   report?

10          MR. THOMPSON:  Yes, 12 of 39, Your Honor.

11          THE WITNESS:  12 of 39.

12          THE COURT:  All right.  Let me look at this.

13          THE WITNESS:  11 of 39.

14          THE COURT:  Hold on.  Where do you want me to start

15   reading?

16          THE WITNESS:  11 of 39.

17          THE COURT:  All right.  Let me read it.  Hold on.

18          Let me make sure I understand what defendant's

19   objection is.  So stand up and tell me, Mr. Goman, what are

20   you objecting to regarding what is being offered at this point

21   in time?

22          MR. GOMAN:  Sure, and let me be more specific.  The

23   idea that what Mr. Lydick said initially, railroads have a

24   motivation to keep trains moving, and by removing slow orders

25   trains moves faster, I don't have an objection to that, but

1   when he goes into this 2002 letter that produced this study

2   about the safety culture at BNSF and CSX, that has nothing to

3   do with this case, and the only possible relevance runs afoul

4   of Rule 404 as impermissible character evidence about how BNSF

5   was inspecting track, according to this letter in 2002.

6              THE COURT:  Where is the letter in 2002?  Where is

7   that?

8              MR. GOMAN:  Page 11.

9              THE COURT:  Page 11?

10             MR. GOMAN:  Yeah.  That whole quote there is just a

11  quote.

12             THE COURT:  Oh, this is from a letter.

13             MR. GOMAN:  Right.

14             THE COURT:  Oh, I see.

15             What's the date of this letter?

16             I'm asking the witness.

17             THE WITNESS:  2002.

18             THE COURT:  2002?

19             THE WITNESS:  Yes.

20             THE COURT:  Well, how does that have any relationship

21  to what happened in 2015 and 2016?

22             THE WITNESS:  Well, the question was was [sic] there

23  ever been problems with harassment and intimidation of track

24  inspectors trying to perform their duties, and there has been.

25  And, you know, size of territory, take them off their normal

1   inspection activities, encouraging them not to put slow orders

2   on, those type of things.

3         And then the second portion of that has to do with

4   the Safety Act was in 2008, and as a act of Congress, they had

5   the FRA perform this track inspector safety audit, and then --

6   it was a very thorough audit, and they came out with they

7   believe that one of the items that needed to be corrected was

8   the safety culture and the way they were treating track

9   inspectors.

10        THE COURT:  What's your response to that, Counsel,

11   Mr. Thompson?

12        MR. THOMPSON:  Yes, Your Honor.  So Mr. Goman stood

13   up and essentially said nobody would do this, we don't

14   pressure inspectors not to -- to underreport, in fact, we do

15   the opposite.  We have every right now to give evidence, after

16   Mr. Goman said nobody does this, that not only do people do

17   it, people at BNSF have done it, the motives still continue to

18   exist, and that in Mr. Lydick's experience it is continuing

19   today.  In other words, BNSF doesn't get its cake and eat it

20   too and say this never happens, and we don't get to stand up

21   and put on evidence, yes, it has happened, it's continuing to

22   happen.

23        THE COURT:  All right.  Let me hear some more

24   questions and answers, a few more.

25   BY MR. THOMPSON:

1   Q.  So I note a line in your report where it says:  If the

2   inspector issues a speed restriction, the inspector will

3   likely take heat from the supervisor, who in turn is getting

4   pressure from above.

5   A.  Correct.

6   Q.  Is that accurate?

7   A.  Yes.

8   Q.  What is that based on?

9   A.  That's based on the 2008 act of Congress which, you

10  know -- I think it was 2011 the report was published, and

11  there was -- management -- FRA, rail management, and rail

12  labor all, you know, were included in this study, and this was

13  the outcomes that came out of it.

14  Q.  Was this a congressional finding?

15  A.  Yes.  It was sent back to Congress, their findings.

16  Q.  Do the motives for managers to do this back in 2011

17  continue to exist today, in your experience?

18  A.  Yes.

19          THE COURT:  How do you know that?

20          THE WITNESS:  It's an isolated -- it's not systemic.

21  It's isolated areas that you find it.  Personally, uh, it's

22  just through conversations I have with former FRA people that

23  I know, but otherwise I haven't visually inspected it and

24  found it myself.

25          THE COURT:  All right.  Let me ask this question.  I

1    just want to get to the bottom of this.  As you know,

2    Mr. Fresquez is alleging certain conduct in 2015 and 2016.

3    Did you, as part of your report, evaluate whether or not what

4    he's alleged has any relationship to the safety concerns you

5    assert generally about BNSF?

6              THE WITNESS:  Yes.

7              THE COURT:  And where is that in your report?

8              THE WITNESS:  Uh . . .

9              THE COURT:  Julie, find for me where Mr. Goman

10   objected and I sent the jury out.

11             COURTROOM DEPUTY:  I show the jury out at 15:50:44 on

12   the Bridge.

13             MR. THOMPSON:  Your Honor, one of the findings is the

14   last bullet point on page 30.

15             THE COURT:  Page 30?

16             MR. THOMPSON:  Yes, Your Honor, the last bullet

17   point.

18             THE COURT:  All right.  Hold on.

19             All right.  When was the FRA track inspector time

20   study conducted?

21             THE WITNESS:  The act was in 2008, and if I

22   remember -- let me get to my documents here -- I think it was

23   completed in 2011, the report itself.

24             THE COURT:  All right.  Mr. Thompson, what is the

25   first date that the plaintiff is alleging improper conduct by

1   the defendant's representatives in relationship to him later

2   being terminated in 2016?

3          MR. THOMPSON:  He alleges that defects were falling

4   out of the system or being deleted the entire time Mark

5   Carpenter was working there.  He objected to the conduct in

6   2015.  That's when the retaliation started.

7          THE COURT:  I'm sorry.  Okay.  So he didn't start

8   objecting til 2015.

9          MR. THOMPSON:  That's correct, Your Honor.

10          THE COURT:  How is what was conducted in 2011, this

11   study here, relevant to what was going on in 2015 and '16?

12   That's what I'm having trouble with.

13          MR. THOMPSON:  We don't intend to say any more than

14   that there's pressure on inspectors to underreport defects,

15   nothing more than that.

16          THE COURT:  That's all you want to say?

17          MR. THOMPSON:  Yes.  There's a line on page 11.  This

18   is the line we want.

19          THE COURT:  Hold on.  Page 11.

20          MR. THOMPSON:  Yep.

21          THE COURT:  Let me go back to page 11.

22          All right.  What are you talking about?

23          MR. THOMPSON:  "If the inspector issues a speed

24   restriction, the inspector will likely take 'heat' from the

25   supervisor, who in turn is getting pressure from above."

1          THE COURT:  Where is that on page 11?  This is from

2    this letter, isn't it?  This is still from this letter, isn't

3    it?

4          MR. THOMPSON:  I'm sorry?

5          THE COURT:  It's the May 8, 2002 letter.

6          MR. THOMPSON:  I'm sorry.  It's the bottom of page

7    12.  I will highlight it on the monitor.

8          THE COURT:  Where it says, "Inspectors are under more

9    pressure to get inspections done" -- all right.  I heard

10   Mr. Goman say there's no objection to that testimony.

11         Didn't I hear you say that?

12         MR. GOMAN:  That's right.  If he wants to explain the

13   motivations in the railroad industry, that's fine.  My

14   objection is if he goes into:  and I or the FRA found in 2008

15   this or found in 2002 this.

16         THE COURT:  Yeah, I'm going to sustain the objection.

17   I don't think he can go back and talk about what happened in

18   2008 and 2011.

19         MR. THOMPSON:  We don't have any intention of

20   offering that evidence, Your Honor.

21         THE COURT:  Well, you have been wasting our time

22   then.  All right.  Let's bring the jury back in.

23         Hold on a second.  When did we start timewise?

24         COURTROOM DEPUTY:  About 2:20.

25         THE COURT:  Okay.  We need to take a break.  We are

1  going to take a 10-minute break, and then we will come back.

2       (Proceedings recessed 4:08 p.m. to 4:20 p.m.,

3       resuming outside the presence of the jury.)

4          THE COURT:  All right, let's bring the jury back in

5  and continue.

6       (Jury in at 4:22 p.m.)

7          THE COURT:  All right, have a seat.  Let's continue.

8  BY MR. THOMPSON:

9  Q.  Do railroads have a financial incentive to retaliate

10  against track inspectors who do too good of a job?

11  A.  Yes.

12  Q.  In your experience, do managers act on that incentive?

13  A.  Yes.

14  Q.  You agree with both plaintiff and BNSF, that's incredibly

15  shortsighted; right?

16  A.  Correct.

17  Q.  But it happens anyway?

18  A.  Yes.

19  Q.  You told me earlier about what I'm going to refer to as

20  the 30-day rule.

21  A.  Yes.

22  Q.  Explain that to me again.  What is it?

23  A.  There's two.  There's two.  213.9(b) of the track safety

24  standards gives the track inspector the right, on something

25  that doesn't meet Class 1 standards that is class specific, to

1    slow order it to 10 miles an hour for 30 days until they

2    repair it.

3           The second part of 213.9(b) talks about

4    non-class-specific defects.  In other words, these defects

5    don't meet any class of speed of operation.  So there's

6    varying levels that you will -- the inspector will find these.

7    It might be at a level that when he initially finds this, that

8    he feels it can be safe to operate trains on for 30 days, and

9    so he doesn't have to slow order it.  So under his

10   qualifications that's in the regulations under 213.7, a

11   qualified inspector is making that determination, and they

12   have 30 days to correct or -- either correct it or take it out

13   of service.

14   Q.  Do you have an opinion as to whether Mark Carpenter and

15   the managers under him were following that regulation?

16   A.  Based on the documentations I reviewed in this case, no.

17   Q.  Is there any wiggle room in that rule?  Is it unclear?

18   A.  No.  It's very plain language in the compliance manual,

19   and there's no wiggle room.

20   Q.  I'd like to turn your attention to page 201 of Plaintiff's

21   Exhibit 30.

22           MR. THOMPSON:  Can you please publish to the jury.

23   BY MR. THOMPSON:

24   Q.  What is this?

25   A.  This is a page out of the track compliance manual that's

1  shown on the screen, and it's guidance to the FRA inspectors

2  that work for the Federal Railroad Administration, but it's

3  also guidance to the railroad itself because these are

4  published so the railroad have them in their possession.

5  Q.  In your opinion, is it at all reasonable to believe that

6  you can keep tracks in service with a defect even if the

7  defect has not been repaired in 30 days?

8  A.  No.

9  Q.  Is that a violation of federal law?

10  A.  Yes.

11  Q.  Do you believe Mark Carpenter was violating that law?

12  A.  Yes.

13        MR. THOMPSON:  All right.  You can go ahead and take

14  that off.  Thank you.

15  BY MR. THOMPSON:

16  Q.  What about if you report something as a 30-day defect, can

17  I now change it to a slow order defect so I can continue to

18  run trains on it?

19  A.  No.

20  Q.  Why not?

21  A.  Because, first of all, it's not a class-specific defect,

22  and, second of all, your 30 days is your time's up.

23  Q.  So I don't get to pick and choose which remediation I want

24  on any given day?

25  A.  No.

1    Q.   Would changing a class defect that you have reported as a

2    30-day defect to a slow order violate federal law?

3    A.   Yes.

4    Q.   Does the FRA require railroads to keep their track defect

5    reports in any certain format?

6    A.   Yes.

7    Q.   Tell me about that.

8    A.   So, again, in the compliance manual here it's found under

9    C.F.R. Part 213.241.   It talks about what's required for

10   records inspection and how the record is supposed to be kept.

11   And it's supposed to be -- the record is supposed to be --

12   designate the tracks inspected, the speed of those tracks or

13   the class of those tracks.   It's supposed to show -- any

14   deviations from the standards are all supposed to be recorded.

15   It's supposed to show what remedial action was taken.   And

16   it's supposed to be signed and recorded on the day of

17   inspection.

18   Q.   Can I decide, you know what, I don't want to use the

19   system, I think I'm just going to keep a notebook full of

20   defects?

21   A.   No.

22   Q.   Does that violate federal law?

23   A.   Yes.

24   Q.   I'm going to show you Plaintiff's Exhibit 29, page 6 and

25   page 7.   Will this help you describe what defects are to the

1  jury?

2  A.  Yes.

3       MR. THOMPSON:  Your Honor, I'd like to publish just

4  pages 6 and 7 of Exhibit 29 to the jury just for demonstrative

5  purposes.

6       THE COURT:  Any objection?

7       MR. GOMAN:  No objection.

8       THE COURT:  All right.  "Demonstrative" means you

9  will look at it, but it's not an exhibit, so you won't see it

10  again when you deliberate and get the received exhibits.

11  BY MR. THOMPSON:

12  Q.  Is what you are seeing -- first, let me ask you.  Is page

13  7 or page 6 more helpful to describe to the jury?

14  A.  7.

15  Q.  Okay.  Do you want me to blow it up some?

16  A.  Yes.  Bring it right in here.  Yes.

17  Q.  All right.  Is this a defect?

18  A.  Yes.

19  Q.  Why?

20  A.  It's known as fouled ballast.  In C.F.R. Part 213.103(c)

21  it talks about fouled ballast, and it talks -- and it also --

22  you see the indication of subgrade saturation, which is a

23  drainage issue.  So these defects -- there's two -- there's a

24  knowledge standard with the Federal Railroad Administration.

25  There's prior knowledge, and there's constructive knowledge.

1    Prior knowledge was the defect recorded previously, and they

2    knew it was there, and they didn't comply with the regulations

3    within the 30 days.  Constructive knowledge has to do with

4    somebody that's qualified under the qualifications found in

5    the track safety standards recognizes that this defect didn't

6    get this way in the last 30 days.  This is the type of defect

7    that it has to accum- -- you know, develops over time and more

8    degradation.

9              So what you have here is the foul -- the ballast is

10   so foul and the track is pumping here, that it creates a

11   condition out the end of the ties that's known as squeeze.  So

12   you know that this track has a geometry condition there, and

13   you know that the ballast section and the drainage is not in

14   compliance with the standards.

15   Q.  Any question that this is a defect?

16   A.  No.  There's no subjectiveness to this at all.  It's a

17   defect.

18   Q.  Not a close call?

19   A.  No.

20   Q.  If a manager for BNSF reported this as being repaired when

21   it's in this condition, would that violate federal law?

22   A.  Yes.

23   Q.  Over the time of this case you have met with Brandon

24   Fresquez and discussed defects and defect reporting?

25   A.  Yes.

1   Q.  Do you find him to be knowledgeable about the requirements

2   of reporting defects?

3   A.  Yes.

4          MR. THOMPSON:  I have nothing further.

5          THE COURT:  All right.  Cross-examination.

6                        **CROSS-EXAMINATION**

7   BY MR. GOMAN:

8   Q.  All right.  Mr. Lydick, good afternoon, sir.

9   A.  Good afternoon.

10  Q.  Okay.  So you were hired as an expert witness by

11  Mr. Fresquez's attorneys; is that right?

12  A.  That's correct, yes, sir.

13  Q.  And your testimony there at the end was about one defect

14  in June of 2015; is that right?

15  A.  Correct.

16  Q.  Do you know when that defect was reported or when that

17  photograph was taken?

18  A.  It's date-stamped.

19  Q.  Okay.  Have you seen a version of that photograph that

20  wasn't date-stamped?

21  A.  I think I have.  I think I did.

22  Q.  Do you have any explanation for why one photograph has a

23  date stamp and that same photograph doesn't?

24  A.  My experience has been they get cut off sometimes or -- I

25  don't understand why, but that's my understanding.

17-cv-00844-WYD-SKC                  Lydick - Cross                  I(a) - 106

1    Q.  Okay.  You looked at that photograph and gave the opinions

2    you just did.  Have you looked at, well, like TIMS records or

3    anything else to see whether that defect was reported?

4    A.  Yes, I looked at TIMS records.  I looked at other

5    conditions that he hasn't given you photographs of in the

6    amount of time.  My interest was the non-class-specific defect

7    and then when it was written and when it was -- you know, how

8    many days before it was repaired.

9    Q.  No, I understand, but my question was intended to be more

10   specific.  Did you look at TIMS records to see exactly when

11   that defect that we just talked about --

12   A.  I looked at all the TIMS records.  I don't have

13   specific -- I can look in my file if you want me to.

14   Q.  I don't want you to go search for it.  I just didn't

15   know --

16   A.  I did, yes.

17          Sorry.  I didn't want to drag that out, but --

18   Q.  Okay.  Let's take a step back.  You know this is an FRSA

19   or sometimes referred to as a whistleblower case; right?

20   A.  Correct.

21   Q.  So the allegation is that the dismissal in 2016 was in

22   retaliation for engaging in protected activity; right?

23   A.  Yes, sir.

24   Q.  You are familiar with the requirements of the

25   Whistleblower Act, 20109?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.  Yes.

2   Q.  You also, based on your career's worth of experience, know

3   a lot about railroad rules; right?

4   A.  Yes.

5   Q.  Like the safety rules that govern employee conduct; right?

6   A.  Yes.

7   Q.  You also know a lot about collective bargaining

8   agreements, how they work, what they require, those kinds of

9   things?

10  A.  Yes.

11  Q.  You spent a good portion of your career dealing with

12  collective bargaining agreements and sometimes fighting about

13  whether they have been complied with or not.

14  A.  Well, I'm familiar with them.  I mean, more of my career I

15  spent on track safety issues than I did collective bargaining

16  agreements, to be honest with you.

17  Q.  Sure.  To leave that point alone, just to sum up, you are

18  familiar with collective bargaining agreements and railroad

19  safety rules?

20  A.  Correct.

21  Q.  Okay.  As a quick aside, every railroad that you are aware

22  of has rules prohibiting insubordination; right?

23  A.  That's correct.

24  Q.  I think you put it this way in your deposition.  Every

25  employer you are aware of has rules prohibiting

17-cv-00844-WYD-SKC                Lydick - Cross                I(a) - 108

1    insubordination.

2    A.   Correct.

3    Q.   I mean, you can't very well run a railroad if employees

4    are free just to disregard what their supervisors tell them to

5    do; right?

6    A.   Correct.

7    Q.   So help me understand then.  So Mr. Fresquez's attorneys,

8    they hired you in this case and paid you a fair amount of

9    money; right?  $275 an hour?

10   A.   250.

11   Q.   250?

12   A.   Yes, sir.

13   Q.   To write your report?

14   A.   Yes, sir.

15   Q.   And then $450 an hour to come to court and testify?

16   A.   Yes, sir.

17   Q.   And you came from where?  Where did you come from?

18   A.   Saint Augustine, Florida.

19   Q.   They paid for you to fly here, stay here, and go back

20   home?

21   A.   Yes, sir.

22   Q.   Okay.

23        THE COURT:  Is it warmer in Saint Augustine than it

24   is here?

25        THE WITNESS:  80 degrees today, Your Honor.

Julie H. Thomas, RMR, CRR                                (303)296-3056

1          MR. GOMAN:  Pretty warm in this courtroom.

2          THE COURT:  I never ask questions on substantive

3    points, but that was an informational point.

4    BY MR. GOMAN:

5    Q.  Doing what you're doing here today, getting hired by

6    plaintiffs' attorneys to write reports and then coming into

7    court and testify for them, that's essentially how you make

8    your living; right?

9    A.  That and training, you know, trying to work at training

10   and other aspects of it.

11   Q.  But 90 to 95 percent of your income comes from consulting

12   on litigated cases like you are doing here today?

13   A.  That is correct.

14   Q.  So when attorneys hire you to look at a case, they tell

15   you what they want you to look into and what they want you to

16   offer opinions on; right?

17   A.  No.

18   Q.  No?  They don't tell you what subjects they want you to

19   look at?

20   A.  Well, they tell me what they're hiring me as far as, you

21   know, for the track safety standards, that I wasn't giving

22   opinions on FRSA, whistleblower.

23   Q.  That's right.  Even though you have background in that

24   area, they told you we don't want you to weigh in on whether

25   this dismissal violated the FRSA; right?

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1    A.  I was asked not to give any opinions in that area,

2    correct.

3    Q.  They also didn't ask you to look into whether or not

4    Mr. Fresquez violated BNSF rules on May 5th of 2016; right?

5    A.  That is correct.

6    Q.  They didn't want you to look into whether Mr. Fresquez's

7    dismissal violated the collective bargaining agreement that

8    governs his employment; right?

9    A.  That's correct.

10   Q.  So your opinions, then, about the track defect and whether

11   certain track was defective, whether Mr. Fresquez was a good

12   track inspector, you formed those opinions having reviewed

13   Mr. Fresquez's deposition, the Complaint his lawyer filed, and

14   that's it; right?

15   A.  No, and the TIMS reports and the other documentation that

16   I have.  The regulations that are applicable.  The engineering

17   standards that BNSF has.  I mean, it's in 5.0 of my report.

18   Q.  Sure.

19   A.  That's what I looked at.

20   Q.  But the conclusions you drew about defects were being

21   improperly reported or removed by managers, you formed that

22   opinion prior to having reviewed anyone else's deposition

23   besides Mr. Fresquez's; right?

24   A.  Correct.

25   Q.  Ryan Akers, Cason Cole, all of the individuals that have

1  been deposed in this case, you have never seen their

2  depositions; right?

3  A.  That's correct.

4  Q.  Just right before I took your deposition you were shown

5  Mr. Paz and Mr. Carpenter's deposition.  You hadn't reviewed

6  that until then; right?

7  A.  I didn't understand your question.

8  Q.  I will ask that more plainly.

9        When you wrote your report, you had not looked at

10  Mike Paz or Mark Carpenter's deposition?

11  A.  That is correct.

12  Q.  You hadn't heard their side of the story?

13  A.  Correct.

14  Q.  The only person you have talked to, actually interviewed,

15  is Mr. Fresquez.

16  A.  That's correct.

17  Q.  Real quick.  Track inspection.  Extremely important;

18  right?

19  A.  The most important.

20  Q.  BNSF employs more than 600 track inspectors in any given

21  year.  Were you aware of that?

22  A.  I'm not surprised, no, sir.

23  Q.  The FRA requires that railroad track inspectors like

24  Mr. Fresquez, requires they be qualified; right?

25  A.  Correct.

1  Q.  But it doesn't mandate any particular type of training?

2  A.  Uh, not formally mandates.  They usually look at the

3  railroads, what their training plan is, and, you know, they --

4  they -- if they're trying to make determination if an

5  inspector is qualified or not, the FRA will go and look at

6  their training history and, you know, what was their basis for

7  qualification.

8  Q.  Sure, but the federal regulations, the federal law, it

9  doesn't say, BNSF, if you are going to have a track inspector,

10  he needs to have X number of hours of classroom training?

11  A.  Not at this point, but it's coming.

12  Q.  You'd like to see that regulation.  It's just not there.

13  A.  Yeah.  It's there, but it's not enforced yet.

14  Q.  So with Mr. Fresquez, when he's trained in 2006 and 2007

15  and ongoing to be a track inspector, BNSF decided specifically

16  what training are we going to give him, how are we going to do

17  it?

18  A.  That's correct.

19  Q.  You heard -- you saw in his deposition he has tier 1, tier

20  2, and tier 3 certifications?

21  A.  Yes.

22  Q.  Those are BNSF designations that they required him to

23  achieve; right?

24  A.  Correct.

25  Q.  The FRA didn't mandate that.  They chose to require those

1    certifications.

2    A.  Well, to a point they do because what the regulation

3    requires for like, you know, CWR qualification, which was

4    added later in the standards.  So there was, you

5    know -- usually the railroad will mirror what the FRA is

6    asking and train accordingly.

7    Q.  You are not contending in this case that BNSF did a poor

8    job of training Mr. Fresquez, are you?

9    A.  No.

10   Q.  All right.  Track inspection.  It's important because it's

11   the first line of defense against derailments; right?

12   A.  Yes, it is.

13   Q.  Derailments are bad because they are dangerous to the

14   public and to BNSF employees; right?

15   A.  Yes.

16   Q.  They are also bad because they can be incredibly

17   expensive; isn't that right?

18   A.  Correct.

19   Q.  You write in your report, by my count, about four

20   derailments.  Does that sound right?

21   A.  Four or five.  It was just, you know, examples.

22   Q.  Sure.  So in your report, when you have been retained in

23   this case, you look at four different examples, and only one

24   of them involves BNSF; right?

25   A.  Correct.

1   Q.  And that had nothing to do with Mark Carpenter or Mike Paz

2   or anyone else that the jury has heard about in this case?

3   A.  That's correct.

4   Q.  So you were retained in this case, cited some examples of

5   derailments.  None of them had anything to do with Denver,

6   Colorado, or Mark Carpenter.  Is that right?

7   A.  That's correct.

8   Q.  Some of them, though, were pretty incredibly expensive;

9   right?  You talked about a 2 and a half million dollar

10  derailment that happened?

11  A.  Yes.

12  Q.  Cost of fixing it, repairing the track, repairing the

13  cars, it adds up pretty quickly; right?

14  A.  Yes.

15  Q.  So railroads have a significant financial incentive to

16  avoid derailments.  Would you agree with that?

17  A.  Definitely.

18  Q.  Track inspectors at BNSF for that reason are required to

19  report track defects they find; right?

20  A.  Correct.

21  Q.  And not just send a text to their manager.  They are

22  required to log them in an official database.  Right?

23  A.  Correct.

24  Q.  Track inspectors can be fined by the FRA if they don't

25  find -- or don't report a track defect; right?

1   A.  Yes, as well as other managers.

2   Q.  That was going to be my next question.  So like a

3   roadmaster.  If a roadmaster were to log into that same

4   system, delete a defect report, and the FRA were to find out

5   about it, they could be personally fined; right?

6   A.  That's correct.

7   Q.  And the fines can be upwards of a hundred thousand dollars

8   if there's an injury involved; right?

9   A.  Correct.

10  Q.  Okay.  Let's switch gears a little bit, just talk more

11  about the fundamentals of the track inspector's job.

12          It's a pretty typical task, is it not, for a track

13  inspector to be asked to go out with a track foreman and help

14  locate defects?  You've heard of that; right?

15  A.  Yes.

16  Q.  Help identify where, for instance, a geometry car has

17  reported a defect and figure out if it's there or not; right?

18  A.  Correct.

19  Q.  That's part of what a track inspector's experience allows

20  him to do, to help locate things like that.

21  A.  Correct.

22  Q.  A roadmaster, by contrast, at BNSF, he's considered a

23  first-line supervisor; right?

24  A.  Yes.

25  Q.  And he or she, it's their job primarily just to make sure

1  that the track inspector is doing his job; right?

2  A.  Yes.

3  Q.  They are not the ones every day out there inspecting

4  track, measuring track.  It's really their job to make sure

5  the track inspector is doing his.  Right?

6  A.  Yes.

7  Q.  All right.  Safety, then.  The FRA's goal is safety;

8  right?

9  A.  Yes.

10 Q.  When you were an FRA track inspector -- you were; right?

11 I'm not sure I heard you say that today.  You were a track

12 inspector for the FRA?

13 A.  Yes, sir.

14 Q.  You worked pretty closely with BNSF, or BN, about track

15 inspection issues?

16 A.  Yes.

17 Q.  And just -- this doesn't have to be specific to BN.  With

18 any railroad you were working with, you tried very hard to

19 make sure there was an open dialogue between railroad track

20 inspectors and you, as the FRA inspector; right?

21 A.  Yes.

22 Q.  You wanted to make sure that they were -- felt free to

23 call you up and ask questions, report problems, anything like

24 that; right?

25 A.  Yes.

17-cv-00844-WYD-SKC               Lydick - Cross                    I(a) - 117

1    Q.  Part of what you would do as an FRA track inspector is

2    talk with the railroad track inspectors about what issues they

3    were having?

4    A.  Sometimes that was available to me, sometimes not, because

5    some railroads didn't want you to ride with the union

6    representative or the nonmanagement person.  They wanted you

7    to ride with the roadmaster.

8    Q.  I see.  And these track inspection records you have been

9    talking about that you have reviewed -- the jury has heard a

10   little bit about TIMS records.

11   A.  Yes.

12   Q.  What are those?

13   A.  Track inspection maintenance.

14   Q.  That's BNSF's system; correct?

15   A.  Correct.

16   Q.  That's a database that Mr. Fresquez and other track

17   inspectors access and work with every day.

18   A.  Yes.

19   Q.  Okay.  The FRA can also look at those records; right?

20   A.  Yes.

21   Q.  So the FRA can -- nowadays they just log into a kiosk;

22   right?

23   A.  That's my -- you know, that's pretty much typical of what

24   I'm aware of.

25   Q.  So the FRA will come to BNSF's office in Denver, and they

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   will say:  All right.  I'm going to look at six months of your

2   TIMS track inspection records to see what they show and see if

3   I take issue with any of this.

4   A.  Correct.

5   Q.  You did, as a FRA track inspector, and it's still done to

6   this day?

7   A.  Well, I did it in a different format, but we're more

8   advanced now.

9   Q.  No kiosks and computers then.

10  A.  Yeah.  It was paper.

11  Q.  The TIMS records that Mr. Fresquez and his attorneys sent

12  you, so that's the kind of record that the FRA can look at if

13  they choose to?

14  A.  Correct.

15  Q.  And Mr. Fresquez could have sent those records to the FRA

16  if he wanted to; right?

17  A.  Uh, I don't know if the BNSF would approve that, but --

18  but if he decided he wanted to, he could.

19  Q.  Well, he sent them to you in this case; right?

20  A.  Well, but this was, you know, after the fact.

21  Q.  Right.  When he was an employee at BNSF, you haven't seen

22  any evidence that he sent TIMS records to the FRA or anyone

23  else to complain about the things he's now complaining about;

24  isn't that right?

25  A.  I haven't -- I haven't seen or heard that.  I don't know

1    what -- how to answer that.

2    Q.   Okay.  All you know is he sent them to you, his retained

3    expert.  You don't know if he sent them anywhere else.  Is

4    that right?

5    A.   Well, all I know is he shared them with his attorney, and

6    his attorney shared them with me.

7    Q.   All right.  When you were at the FRA -- just a couple more

8    topics here.

9              There was a recommendation at some point in time to

10   the railroads that one of the ways you can improve your track

11   inspection practices is by, I'm going to quote here, implement

12   a safety reporting system to provide a confidential,

13   nonpunitive, and anonymous way for employees to report safety

14   concerns.

15   A.   Correct.

16   Q.   BNSF did exactly that, didn't they?

17   A.   It's my understanding if -- could you be more specific?

18   Q.   Yes.  BNSF hired a third-party contractor to run a hotline

19   whose sole purpose was to be a resource for employees to

20   anonymously report misconduct by their supervisors; right?

21   A.   That's my understanding.

22   Q.   And that's a good thing; right?  The FRA was encouraging

23   the railroads to do that.

24   A.   Should be.

25   Q.   You are aware that Mr. Fresquez never called that hotline

1  during his career; right?

2  A.  Based on the documents that I have, that's the way I

3  understand it.

4  Q.  The 30-day defect rule, let me just touch on that really

5  quickly.  You read Mark Carpenter's deposition where he was

6  asked about that?

7  A.  Correct.

8  Q.  And you saw, then, where he said the compliance manual

9  says exactly what you just described, Mr. Lydick; right?  I

10  mean, he knew exactly what the compliance manual said, right,

11  that a track needs to be taken out of service?

12  A.  My understanding, he thought he had a right to put a slow

13  order on it afterwards.

14  Q.  What he said was the regulation itself, the FRA

15  regulation, does not state specifically tracks need to be

16  taken out of service after 30 days; right?

17  A.  You are saying that he is saying that the tracks didn't

18  need to be taken out of service after 30 days.

19  Q.  Let me ask the question a little more clearly.  You read

20  Mark Carpenter's deposition.

21  A.  Right.

22  Q.  You saw where he was asked about this.

23  A.  Right.  Could you show me that on the screen?

24  Q.  I could if need be, but I don't think we disagree on this

25  point.

17-cv-00844-WYD-SKC          Lydick - Cross                I(a) - 121

1   A.  Okay.

2   Q.  So let me ask it again.

3   A.  All right.

4   Q.  You are aware Mr. Carpenter said --

5   A.  Right.

6   Q.  -- the compliance manual says take it out of service.

7   A.  Correct.

8   Q.  He also said the regulation itself doesn't state

9   specifically take it out of service.

10  A.  And I don't know where he was reading.

11  Q.  Well, the regulation does not say take it out of service,

12  does it?

13  A.  It says fix it, except the track, or take it out of

14  service.  So if it's a main line track, you can't except it.

15  And if you didn't fix it, the only other option you have is

16  take it out of service.

17  Q.  Sure.  And that's exactly what the compliance manual says;

18  right?

19  A.  Exactly.

20  Q.  But not the regulation.

21  A.  Well, the compliance manual is the guidance for the

22  regulation.  It's the interpretation.

23  Q.  Setting that aside -- we'll cut to the chase and ask

24  Mr. Carpenter his view of that regulation.

25          You also saw Mr. Carpenter say, but I was fully aware

Julie H. Thomas, RMR, CRR                            (303)296-3056

1    that FRA track inspectors under me were trained to apply these

2    regulations; right?

3    A.  You'd have to show it to me, or I'd have to look at it.  I

4    mean --

5    Q.  Do you recall Mr. Carpenter saying, so if someone like

6    Mr. Fresquez or John Bennett or Darrell Law or anyone else who

7    was inspecting track, if they wanted to take a track out of

8    service after 30 days, they were told to do exactly that?

9    A.  I don't remember that specifically.

10   Q.  This idea about this 30-day defect rule and Mark

11   Carpenter's interpretation of it, you didn't see any evidence

12   that Mr. Fresquez ever reported to anyone outside of BNSF that

13   30-day defects were staying in service beyond the deadline;

14   right?

15   A.  Toward the end it's my understanding he contacted the FRA,

16   and the FRA said he was right in his decisions.

17   Q.  Your understanding is Mr. Fresquez reported to the FRA to

18   report misconduct or just ask a question?

19   A.  Not misconduct.  That he called them and asked if he was

20   right in the way he was applying the regulations.

21   Q.  I see.  We talked about BNSF's hotline.  Then I'll just

22   leave it at this.  The FRA also makes it very easy for people

23   to report misconduct; right?

24   A.  Well, you can contact us.  I mean, when I say "us," in my

25   former life, you could contact us.

1   Q.  Someone like Mr. Fresquez could just call up the

2   inspector; right?

3   A.  Uh, there's nothing prevents it, if he has the phone

4   number and that, but I don't know what exactly his contact was

5   with the FRA inspector.

6   Q.  You didn't ask him that?

7   A.  Uh, I don't remember specifically what he told me, but I

8   don't think that he was the one that usually went with him on

9   the inspection.

10  Q.  The other thing a track inspector can do if they can't get

11  ahold of them or can't find the phone number, they can go

12  online to the FRA's website and lodge a complaint on their

13  home page; right?

14  A.  I'm sure that's available, yes.

15  Q.  Okay.  Anyone, it could be a citizen, it could be

16  Mr. Fresquez, anyone can go on there and say, Hey, I have a

17  real problem with this track defect at this location; right?

18  A.  They could do that, yes.

19  Q.  You didn't see any evidence that Mr. Fresquez ever got on

20  that website to make a complaint about any of the things he's

21  talking about in this case, do you?

22  A.  Not that I'm aware of, no.

23          MR. GOMAN:  I don't have any more questions, Your

24  Honor.

25          THE COURT:  All right.  Redirect.  And let's see if

1    we can finish this witness today.

2                        **REDIRECT EXAMINATION**

3    BY MR. THOMPSON:

4    Q.  You read Mark Carpenter's deposition?

5    A.  Yes, sir.

6    Q.  In it he admitted to violating federal law; right?

7    A.  Yes.

8    Q.  Pretty cavalierly, didn't he?

9    A.  The way I understood it, yes.

10   Q.  Mr. Goman talked to you about BNSF's hotline; right?

11   A.  Yes.

12   Q.  In your experience, are employees scared to call the

13   hotline?

14   A.  Yes.

15   Q.  Why?

16   A.  Because they're afraid that -- that it's not anonymous,

17   that the managers will find out who it was by different means.

18   Q.  And do what?

19   A.  And take a -- puts a target on their back and take action

20   against them.

21   Q.  Mr. Goman also pointed out that Mr. Fresquez did not

22   notify the FRA in certain ways; right?

23   A.  Yes.

24   Q.  He did call the FRA; right?

25   A.  Yes.

17-cv-00844-WYD-SKC          Lydick - Redirect                I(a) - 125

1   Q.   20 minutes later he was fired; right?

2   A.   Somewhere in that neighborhood, yes.

3   Q.   Maybe if he had more opportunity to file a complaint in

4   that way, maybe he would have done it?

5             MR. GOMAN:  Objection:  argumentative and leading.

6             THE COURT:  Sustained as to both.

7   BY MR. THOMPSON:

8   Q.   Mr. Goman also asked you about your knowledge of the

9   Federal Railway Safety Act.

10  A.   Yes.

11  Q.   And he asked you about insubordination?

12  A.   Yes.

13  Q.   Do employees have a right to be insubordinate if what they

14  are asked to do is to violate federal law?

15  A.   In my opinion, they do.

16  Q.   Mr. Goman also asked you about you not being asked to form

17  an opinion as to whether BNSF violated the FRA; right?

18  A.   Yes.

19  Q.   Do you believe they violated the FRA?

20  A.   Yes.

21  Q.   I mean FRSA.

22  A.   Yes.

23            MR. THOMPSON:  Nothing further.

24            THE COURT:  All right.  Is there any recross?

25            MR. GOMAN:  If I could have just a second.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1           No questions, Your Honor.

2           THE COURT:  Is this witness likely to be recalled or

3    not?

4           MR. THOMPSON:  No, Your Honor.

5           THE COURT:  All right.  This witness is excused.

6           All right.  We are going to stop for today, but let's

7    figure out, so the jury can hear this, what forward progress

8    we can make tomorrow.  So what witnesses will be -- will

9    testify tomorrow?

10          MR. STONE:  Your Honor, it would be Staci

11   Moody-Gilbert, as well as Mr. Fresquez for sure.  And then it

12   really depends on the Court's calendar as far as are we strict

13   to 5:00 or go longer or not.  Certainly we'd like to go a

14   little longer if we can get witnesses done, but . . .

15          THE COURT:  Well, you are talking about my calendar.

16   I want to have us move along, but I also don't want us to be

17   here until 8 o'clock at night.

18          MR. STONE:  Yes, sir.  So those two for sure.

19          THE COURT:  So we'll figure that out tomorrow.  So we

20   are going to start again promptly at 9 o'clock.  Well, we

21   didn't start this morning at 9:00 because we had some

22   preliminary matters, but be here so we can start right at

23   9 o'clock.  So if you are further away rather than closer,

24   please give yourself adequate time so you won't get stuck in

25   traffic and call and say, I'm running late in heavy traffic.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    So please, because I want to get started right at 9:00, and

2    then we should plan to go not later than maybe 5:30 tomorrow

3    if we need to do that to finish a witness, but otherwise it

4    will be around 9:00 to 5:00 -- or at 9:00 to around 5:00 or a

5    little bit later.

6           All right.  So you are excused until tomorrow

7    morning.  Remember to stay off the Internet per my

8    instruction.

9        (Jury out at 4:56 p.m.)

10           THE COURT:  All right, have a seat.

11           So it seems to me, in light of how the testimony

12   proceeded, Mr. Goman, that I should deny your motion in limine

13   that's at issue because I don't know that there's anything

14   more for me to say, because I think the testimony was

15   presented in a way that didn't offend those things that you

16   were objecting to.  You don't have any objection to that, do

17   you?

18           MR. GOMAN:  Um, no, I think that's right.  I'm just

19   hesitating because I don't remember the motion in limine.

20   Yeah --

21           THE COURT:  That's what I'm going to do anyway, but I

22   want to --

23           MR. GOMAN:  Right.  I will just officially say

24   nothing then.

25           THE COURT:  All right.  So based on the record that

17-cv-00844-WYD-SKC              Jury Trial                    I(a) - 128

1    was presented before the Court, I am going to deny as moot

2    BNSF Railway Company's Motion in Limine Regarding Compliance

3    With Federal Regulations, and that's document number 88 filed

4    on December 7th, 2018.

5            All right.  Let's see if we can make good progress

6    tomorrow, so be here so we can start right at 9 o'clock.

7        (Proceedings recessed 4:57 p.m.,

8        February 11, 2019.)

9

                          REPORTER'S CERTIFICATE
10
             I, JULIE H. THOMAS, Official Court Reporter for the
11   United States District Court for the District of Colorado, a
     Registered Merit Reporter and Certified Realtime Reporter,
12   CA CSR No. 9162, do hereby certify that I reported by machine
     shorthand the proceedings contained herein at the time and
13   place aforementioned and that the foregoing pages constitute a
     full, true and correct transcript.
14           Dated this 4th day of April, 2019.

15
                         _____/s/ Julie H. Thomas_____
16                         Official Court Reporter

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                              (303)296-3056