1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 17-cv-00844-WYD-SKC
4

5    BRANDON FRESQUEZ,                        Volume II of VI

6          Plaintiff,                     (Pages 288 - 561)

7          vs.

8    BNSF RAILWAY CO.,

9          Defendant.

10  --------------------------------------------------------------

11                      REPORTER'S TRANSCRIPT
                           JURY TRIAL
12
   --------------------------------------------------------------

13
           Proceedings before the HONORABLE WILEY Y. DANIEL,
14  Judge, United States District Court for the District of
   Colorado, and a jury of ten, commencing at 9:16 a.m. on the
15  12th day of February, 2019, in Courtroom A1002, Alfred A.
   Arraj United States Courthouse, Denver, Colorado.

16

17                          APPEARANCES

18
   For the Plaintiff:
19  NICHOLAS D. THOMPSON and JONATHAN L. STONE, THE MOODY LAW
   FIRM, 500 Crawford Street, Suite 200, Portsmouth, VA 23704
20
   For the Defendant:
21  KEITH M. GOMAN and GILLIAN DALE, HALL & EVANS, LLC,
   1001 17th Street, Suite 300, Denver, CO 80202
22

23

24
       JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25      Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

           Proceedings reported by mechanical stenography;
                transcription produced via computer.

17-cv-00844-WYD-SKC                 Jury Trial                    II - 289

1                         I N D E X

2
    PLAINTIFF'S WITNESSES                                          PAGE
3
    STACI MOODY-GILBERT
4       Direct - Mr. Thompson                                     293
        Cross - Mr. Goman                                         331
5       Redirect - Mr. Thompson                                   368
        Recross - Mr. Goman                                       370
6   BRANDON FRESQUEZ
        Direct - Mr. Thompson                                     371
7       Cross - Mr. Goman                                         491

8

9                     PLAINTIFF'S
                      EXHIBITS                      RECEIVED
10
                         1                             393
11
                         2                             315
12
                         3                             315
13
                         28                            377
14
                         29                            417
15
                         32                            443
16
                         36                            447
17
                         41                            469
18
                         43                            467
19
                         44                            457
20
                         45                            457
21
                         47                            445
22
                         48                            452
23
                         60                            292
24
                         61                            292
25

    Julie H. Thomas, RMR, CRR                         (303)296-3056

```
 1
 2          DEFENDANT'S
            EXHIBITS                    RECEIVED
 3          A-3                              361
 4          A-14                             525
 5          A-45                             351
 6          A-48                             352
 7          A-49                             479
 8          A-50                             479
 9          A-54                             488
10          A-60                             360
11          A-68                             343
12          A-78                             558
13          A-79:754-757                     322
14          A-79:891-892                     436
15          A-79:132                         518
16          A-79:94                          552
17          A-79:95-96                       553
18          A-79:97                          556
19
20          EXHIBITS
            REFUSED                     PAGE
21          A-8                              522
22          A-43                             535
23
24
25
```

1            (Proceedings resumed 9:16 a.m.,

2         February 12, 2019, outside the presence of

3         the jury.)

4              THE COURT:  All right, have a seat.

5              So our late juror finally arrived.  All right.  Let's

6    bring the jury in.

7              Why don't you bring your witness in.

8              MR. STONE:  Yes, sir.

9         (Jury in at 9:17 a.m.)

10             THE COURT:  All right.  Good morning, and have a

11   seat.

12             So do you remember yesterday that I told you to make

13   sure that you left early enough because with traffic downtown

14   and all the road construction you were going to be late?  So

15   one of you caused us to have to wait an extra 15 minutes

16   before we started.  So I won't lift up the juror's name, but

17   you know who you are.  So I'm telling you again, if we say we

18   are going to start at 9:00, absent a snowstorm or some

19   extraordinary event, please, please give yourselves adequate

20   time to get here on time.  All right?  Does everybody

21   understand that?

22             JURORS:  Yes, Your Honor.

23             THE COURT:  All right.  Call your next witness by

24   name, and let's have her sworn in.

25             MR. THOMPSON:  Before that, Your Honor, we have some

17-cv-00844-WYD-SKC          Jury Trial                    II - 292

1   more stipulated exhibits to enter.  Plaintiff moves to admit

2   Exhibit 6, Exhibit --

3           COURTROOM DEPUTY:  6 is already in, Your Honor.

4           MR. THOMPSON:  Is 26 as well?

5           COURTROOM DEPUTY:  26 is as well.

6           THE COURT:  You need to keep track of what we

7   received yesterday.  We received yesterday 6, 7, 8, and the

8   others.

9           MR. THOMPSON:  Exhibit 60 and Exhibit 61, Your Honor.

10          THE COURT:  So what do you want?  26?  Are you saying

11  26 too?

12          COURTROOM DEPUTY:  26 is already in.

13          THE COURT:  That's already in too?  Just 60 and 61?

14          MR. THOMPSON:  Yes, Your Honor.

15          THE COURT:  Are those stipulated to?

16          MR. GOMAN:  They are stipulated to.  We'd like to

17  make a record eventually, but they are stipulated to.

18          THE COURT:  Well, then you don't have any objection,

19  do you?

20          MR. GOMAN:  That's right, we do not.

21          THE COURT:  All right.  So exhibits 60 and 61 are

22  received.

23       (Plaintiff's Exhibits 60, 61 received.)

24          THE COURT:  All right.  Let's have the witness sworn

25  in.

Julie H. Thomas, RMR, CRR                        (303)296-3056

1           MR. THOMPSON:  Good morning, Ms. Moody-Gilbert.

2           Oh, I'm sorry.

3           COURTROOM DEPUTY:  Do you want to call the witness?

4           THE COURT:  What's her name?

5           MR. THOMPSON:  Ms. Moody-Gilbert.

6           COURTROOM DEPUTY:  Please raise your right hand.

7      (The witness was sworn.)

8           COURTROOM DEPUTY:  Please be seated.

9           Please state your full name, and spell your full name

10  for the record.

11          THE WITNESS:  Staci Moody-Gilbert, S-t-a-c-i,

12  M-o-o-d-y dash G-i-l-b-e-r-t.

13   **STACI MOODY-GILBERT, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

14  BY MR. THOMPSON:

15  Q.  Good morning, Ms. Moody-Gilbert.  Could you please tell us

16  about you.

17  A.  My name is Staci Moody-Gilbert.  I am a general chairwoman

18  for the Brotherhood of Maintenance of Way employees division,

19  IBT.  I represent the men and women that build the nation's

20  railroads, maintain the railroads, the bridges, and the

21  buildings on all the railroad properties across the United

22  States.

23  Q.  How long have you done that for?

24  A.  Well, I started in the railroad industry in 1993 as a

25  track laborer.  I worked out on the tracks for 12 years as a

1  laborer, a machine operator, a foreman, and a welder.  And

2  then in 2005 I went into the union office as the assistant to

3  the general chairman.  And I worked in that position until

4  2008 and went to the claims and grievance coordinator

5  position.  In 2010 I was elected as a vice chairman for the

6  Burlington system division central region.  And then in 2012 I

7  was elected as the general chairwoman and then reelected in

8  2016.

9  Q.  Does your union negotiate wages and things like that on

10 behalf of your union members?

11 A.  Yes, we do.

12 Q.  As part of that, does your union circulate to you and its

13 other general chairmen information about the profit BNSF earns

14 every year?

15 A.  Yes, they do.

16 Q.  In 2016 do you know how much profit BNSF earned?

17             MR. GOMAN:  I object to relevance.

18             THE COURT:  What is the relevance of this?

19             MR. THOMPSON:  It's a factor explicitly to be

20 considered for punitive damages under the Tenth Circuit, Your

21 Honor.

22             MR. GOMAN:  Your Honor, can we approach?

23             THE COURT:  Hold on.

24             I want to excuse the jury for a minute.  I want to

25 hear some argument on this outside your presence.  So just go

1   back to the jury room.  I will bring you back in a few

2   minutes.

3        (Jury out at 9:21 a.m.)

4        THE COURT:  Okay.  So have a seat.  The reason I want

5   to hear some argument on this, I'm not sure I agree with the

6   objection, but this is a union representative.  How does she

7   have information about the profits of BNSF?

8        MR. THOMPSON:  Sure.  So the union negotiates wages

9   on behalf of its members.  As part of that, a consideration is

10  the company's profit.

11       Moreover, it's publicly filed information in 2016, so

12  this is something the Court, if it wanted, could take judicial

13  notice of.

14       THE COURT:  No, I don't take judicial notice of

15  hardly anything.  I am certainly not going to take judicial

16  notice of something I'm unaware of.

17       What's your basis of your objection?

18       MR. GOMAN:  Sure.  So the first was relevance.  In a

19  case where punitive damages are capped at $250,000, I don't

20  see the relevance of talking about BNSF's profit in 2016.

21       Separate and apart from that, I have an objection

22  under Rule 26.  This witness has not been disclosed as a

23  witness to provide this type of information.  And did we know

24  that she was being presented to do that, we would have filed

25  appropriate motions and objections before trial.

1    THE COURT:  All right.  I left the pretrial order, I

2  think, back in chambers.  What does the pretrial order say

3  about the scope of her testimony?

4    MR. GOMAN:  It says:  Staci Moody-Gilbert is expected

5  to testify about BNSF's disciplinary process.

6    THE COURT:  About what?

7    MR. GOMAN:  BNSF's disciplinary process.

8    THE COURT:  So, Mr. Thompson, did you ever disclose

9  that she was going to talk about the alleged profits of the

10  railway defendant?  And if you didn't, isn't that a problem

11  for you?

12    MR. THOMPSON:  Again, we think it's a fact.  They

13  publicly filed this information, so it comes as no surprise,

14  but I'll certainly look at what we disclosed.

15    THE COURT:  Well, that's not the test.  If she were

16  an employee of the railroad, then maybe the question is proper

17  of her.

18    MR. THOMPSON:  I'm sorry.  Say that again, Your

19  Honor?

20    THE COURT:  I just said if she were an employee of

21  BNSF, then maybe it's something she might be familiar with.

22    MR. THOMPSON:  Oh, she is.  So the way it works, they

23  maintain their seniority with BNSF.  So, for example, if she

24  were to lose her election in 2020, she bumps back to a BNSF

25  employee.

1          THE COURT:  Let me hear further foundation from her

2     outside the presence of the jury, and I will let her answer

3     the question, and then we'll see if there's still an

4     objection.  Go ahead.

5          MR. THOMPSON:  Sure.

6     BY MR. THOMPSON:

7     Q.  How long did you work for BNSF?

8     A.  I started in 1993, so almost 26 years.  12 years actually

9     before I took my indefinite leave of absence for my union

10    position.

11    Q.  You are still employed by BNSF, though?

12    A.  Yes.  I'm just on an indefinite leave of absence.

13    Q.  If you were to, for example, lose your chair position in a

14    vote in 2020, what would happen?

15    A.  I would go back to the ranks and work back out on the

16    railroad tracks until my retirement.

17    Q.  You are still listed on their employment rosters?

18    A.  Yes.

19    Q.  You still draw RRB just like all their employees?

20    A.  Yes.

21    Q.  Your national bargaining unit bargains wages and health

22    benefits with them?

23    A.  Yes.

24    Q.  As part of that, your national circulates to its general

25    chairpersons the information of BNSF's profit?

1   A.  Yes.

2   Q.  You read that information when they send it to you?

3   A.  Yes.

4   Q.  It's part of your job to be aware of that information?

5   A.  Yes.

6   Q.  In 2016 do you know how much profit BNSF earned?

7   A.  $4 billion profit.

8           THE COURT:  All right.  You still object to her

9   testimony?

10          MR. GOMAN:  Yes, I do.

11          THE COURT:  Why?

12          MR. GOMAN:  For the same reasons.  Again, with the

13  punitive damages capped, I don't think it's relevant.  And any

14  potential relevance is substantially outweighed by the danger

15  of unfair prejudice.  I renew my objection on the grounds of

16  an inadequate disclosure.

17          THE COURT:  Let me see the final pretrial order, if

18  you have a copy of it.  Like I said, I had one yesterday, but

19  I left it back in chambers.

20          MR. GOMAN:  Can I approach, Your Honor?

21          THE COURT:  Yeah.  Just -- I'll give it right back to

22  you.  I just want to look at it.

23          I don't see her name.  Where is her name in the final

24  pretrial order?

25          MS. DALE:  I think she might be a may-call.

1          THE COURT:  A may-call.  Hold on.

2          MR. GOMAN:  She may have a strikethrough, Your Honor.

3   She was one of the witnesses who went from may-call to

4   will-call or vice versa.

5          THE COURT:  I'm just looking for her in here.  Oh, I

6   see it.

7          Let me just ask this question, Ms. Moody-Gilbert.  As

8   part of the disciplinary process, is that how you learn about

9   the profits of the railroad?  Tell me how you learn about the

10  profits of the railroad.

11         THE WITNESS:  As part of the bargaining unit that

12  participates in the national bargaining procedures when we

13  bargain with the railroads, this information is given to us.

14         THE COURT:  How is this a surprise to you that she

15  might testify about profits of your client?  I don't quite

16  understand that.

17         MR. GOMAN:  Well, there's been no exhibit or no

18  disclosure that says anything about profits or the

19  negotiations for how much railroad employees are going to

20  earn.  If there had been an exhibit listed or a specific

21  disclosure, we would have briefed the issue before trial about

22  is this something that in this trial needs to be heard and

23  does she have an adequate foundation to address it.

24         THE COURT:  Well, we have got the draft jury

25  instructions.  At the charge conference we will talk about

1    whether or not the jury should be told that there is a cap on

2    punitive damages.  So I don't see that there is a prejudice.

3    So I'm going to overrule the objection.  I will allow the

4    testimony.

5              Let's bring the jury back in.

6              Mr. Thompson, I'd warn you.  Before you sort of ask

7    questions that might be objectionable, you may want to lay a

8    better foundation.  So you need to lay a better foundation

9    before you re-ask this question.

10             MR. THOMPSON:  Yes, Your Honor.

11             THE COURT:  All right.

12         (Jury in at 9:29 a.m.)

13             THE COURT:  All right, have a seat, and let's

14   continue.

15   BY MR. THOMPSON:

16   Q.  Before you joined the union, for which railroad did you

17   work?

18   A.  I hired on with the former Burlington Northern Railroad,

19   which then merged with the Burlington -- with the Santa Fe, so

20   now it's Burlington Northern Santa Fe.

21   Q.  For how long did you work for it?

22   A.  I worked actively on the tracks for 12 years and then went

23   to the union side.

24   Q.  And the members you represent work for BNSF?

25   A.  BNSF and five other railroads.

17-cv-00844-WYD-SKC      Moody-Gilbert - Direct      II - 301

1   Q.   Are you still an employee of BNSF?

2   A.   Yes.  I'm on an indefinite leave from the BNSF Railway.

3   Q.   If you were to lose your reelection in 2020, what happens?

4   A.   I would go back to the tracks and be a maintenance of way

5   worker.

6   Q.   Does your union negotiate wages and benefits with BNSF?

7   A.   Yes, they do.

8   Q.   When it does that, does it consider the profit BNSF earns?

9   A.   Yes.

10  Q.   Does it circulate that to its general chairwomen and men?

11  A.   Yes, it circulates to the national bargaining group.

12  Q.   Are you part of that group?

13  A.   Yes.

14  Q.   Do you review that information?

15  A.   Yes, we do.

16  Q.   Do you know how much BNSF earned in profit in 2016?

17  A.   $4 billion.

18  Q.   Most of your day is not spent negotiating wages and

19  benefits, though; right?

20  A.   No.  No, it's not.  Most of it is representing the

21  members, the men and the women out on the tracks.

22  Q.   How familiar are you with the discipline process?

23  A.   Very, very familiar with it.

24  Q.   Will you walk me through the process, please.

25  A.   Okay.  So under the collective bargaining agreement, we

17-cv-00844-WYD-SKC        Moody-Gilbert - Direct              II - 302

 1    have a rule.  It's called Rule 40 for the BNSF Railway.  In

 2    that rule it states that an employee that has 60 days or more

 3    service with the carrier will not be disciplined or dismissed

 4    until they have a fair and impartial hearing or investigation.

 5         And so part of that process -- if an incident is to

 6    occur, um, the employee calls the roadmaster or the

 7    supervisors and advises them of what has happened.  In some

 8    cases, the supervisor will go to the scene, identify who was

 9    all there.  They may take statements.  Or they may just tell

10    the employee, Go to the section house, and they start the

11    process of the drug and alcohol tests and that kind of thing.

12         At some point the employee will get a certified

13    letter.  Um, a notice of investigation is what it's called.

14    And in that notice of investigation, it will say, you know, an

15    investigation has been scheduled for you.  Please plan to

16    attend.  They took that language out, but, you know, basically

17    if you are in trouble, you have to go to the investigation.

18         So, um, the facts -- to ascertain the facts of

19    alleged failure to either, you know, maintain your track

20    authority or obtain proper track authority or conduct or, um,

21    you know, there's a whole list of rules that they use to

22    identify.  Now, in the investigation notice, they don't

23    necessarily provide us with the rule number.  And BNSF has

24    three huge rule books that any rule could apply.  So if a

25    person is brought up on conduct charges, it just may say, you

1   know, alleged violation of conduct, but there's multiple

2   bullet points under the conduct rule.

3           So we don't really know going into an investigation

4   what rule the person is going to be charged with.  They give

5   us a vague idea, and then -- say if it's conduct and you're

6   insubordinate, they could also use the rule 1.13, which would

7   be failure to comply with instructions.  So we don't really

8   know if it's a said rule or what we're going to be dealing

9   with when we get there.

10          You know, in cases where there's a conduct issue, if

11  it's insubordination, if they're looking to fire the employee,

12  they use insubordination conduct.  If it's something where

13  they don't want to fire the employee, they could use failure

14  to comply with instructions, because conduct would be a

15  stand-alone dismissible offense, whereas failure to comply

16  with instructions doesn't fall under that.

17  Q.  How many hearings have you been involved in?

18  A.  Several.  Several -- I would say several hundred as far

19  as -- in 2010 to 2012 I was actually the representative that

20  sat in the hearing with the member, and since 2012 I handle

21  the second appeals process for the investigations.

22  Q.  All right.  So for a while you were actually the officer

23  that represented them in the hearing?

24  A.  Yes.

25  Q.  Now you are the officer that does the appeals?

1    A.   Right. We have a two-step process under BNSF.  The vice

2    chairman who represents the person during the hearing will

3    write the first appeal.  We get the decision back from the

4    railroad within 30 days.  The first -- the vice chairman

5    writes the first appeal letter. It goes to the division

6    managers.  The division managers can either choose to uphold

7    the discipline or, you know, if they take a second look at it,

8    you know, they have the opportunity to remove or reduce the

9    discipline.

10          If they uphold the discipline, then the transcript

11   and the first letters come to me.  I write the secondary

12   appeal to the Labor Relations Department at BNSF.  Then they

13   will either overturn it or they will uphold it.  Most

14   generally, they uphold it.  And then we go to claims

15   conference and progress from there.

16   Q.   Let's talk about the hearing itself.  Is this a fair

17   process once you are at the hearing?

18   A.   No.

19   Q.   What makes it unfair?

20   A.   I think, first of all, in the investigation notice the

21   company has already determined what rules they are going to

22   bring into the investigation.  They do not allow us to have

23   that information until we get to the -- the hearing.  It's not

24   like here where we have a judge or a jury.  It's just -- it's

25   us, the member that's being, um, investigated, and then they

1   have a company officer who conducts themselves as the company

2   conducting officer.  And, you know, to my knowledge, they're,

3   they're not legal -- legally trained.  They're not lawyers.

4   They're company officers that have been through some courses

5   given by the company to come in and ask the questions.

6          During the process, a lot of times the conducting

7   officer actually will put in the rules that they feel the

8   member has violated.  The conducting officer gives those to us

9   and enters them into the record.  Rather than having their

10  company witness, which is usually a roadmaster or a supervisor

11  of some sort, come in and testify, the conducting officers

12  will enter the exhibits.

13         It's pretty clear in most cases that they have

14  already -- the conducting officer has already talked with the

15  company witness and the company has the -- they -- they

16  actually if -- say if there were five guys at the -- at the

17  location where the incident was, if they took five statements

18  from those people, they actually pick and choose who they want

19  to come in to the hearing, whether they want to just introduce

20  a statement that was provided by that person or whether they

21  actually want to have somebody provide testimony.  Now, if

22  somebody may have a different view of the event that may not

23  help the company solid their case, then they may not even call

24  that person to come to the investigation hearing.  So they --

25  they kind of have the opportunity to pick and choose who they

17-cv-00844-WYD-SKC       Moody-Gilbert - Direct                II - 306

 1    want to attend and what statements they want to submit.

 2    Q.   You gave me a lot of information there.  I want to kind of

 3    break down a little bit and make sure I understand it

 4    correctly.

 5              So these hearings have a hearing officer that

 6    presides over them?

 7    A.   Yes.

 8    Q.   That's a member of management?

 9    A.   Yes.

10    Q.   And the company witness is a member of management?

11    A.   Yes.

12    Q.   The hearing officer -- does the union have any say in what

13    hearing officer presides over any given hearing?

14    A.   No.

15    Q.   So that's chosen by the company?

16    A.   Yes.

17    Q.   And it sounds like they -- they act kind of as a

18    prosecutor asking questions of the witnesses.  Is that right?

19    A.   They do.  They usually have something written out that

20    they -- some guideline that they follow.

21    Q.   Who rules on objections?

22    A.   The conducting officer.

23    Q.   The same person asking the questions?

24    A.   Yes.

25    Q.   I think you said they don't -- they're not lawyers; right?

1   A.  Not to my knowledge, no.

2   Q.  As a charged employee, for example, if Brandon wanted to

3   have a lawyer, me, come represent him at the hearing, can I

4   represent him at the hearing?

5   A.  No.

6   Q.  I think you said the witnesses sometimes -- or management

7   sometimes gathers statements beforehand.

8   A.  Yes, they'll gather statements.

9   Q.  Do they share those with the union?

10  A.  Not until we get to the hearing.

11  Q.  Do they share ones they are not going to offer?  So if a

12  witness writes a statement that helps the employee, but

13  they're not going to use -- the managers are not going to use

14  that, are they required to give it to the union?

15  A.  They typically will not give it to us.

16  Q.  Can they enter statements from witnesses without actually

17  calling a witness?

18  A.  Yes, they do.

19  Q.  So the union can't -- doesn't have a right of

20  confrontation?

21  A.  Not necessarily.  I mean, we have asked, you know, in

22  certain forums, to recess to bring a witness in.  Sometimes

23  that has not been granted.  Sometimes they will bring them in

24  over the phone rather than bring them in face to face.

25  Q.  Can the company order witnesses to attend?

1   A.  The company will send the notice to the people they want

2   to attend.  It will say, Arrange to attend as a witness.

3   Q.  Can the union order witnesses to appear?

4   A.  We can make the request to have them made available.

5   Q.  Who do you make that request to?

6   A.  Usually to the, um -- on the notice of investigation it

7   gives us a contact person to make requests for waivers or, um,

8   postponements, that kind of stuff.  So usually that would be

9   the person, because we won't know who the conducting officer

10  is until we get to the hearing.

11  Q.  Does the company actually do that when you request a

12  witness?

13  A.  They will make them available.  You know, they make them

14  take a day off without pay, and so -- but -- the only time we

15  have ever had them deny our request is if there was an

16  incident involving outside contractors that were not railroad

17  employees, they -- they say they don't have to bring them in

18  to testify.

19  Q.  The witnesses that the company orders to be there on its

20  behalf, who pays them?

21  A.  The company does.

22  Q.  Does the company pay the employee the union wants there?

23  A.  No.  No, they don't.

24  Q.  How long do hearings typically take?

25  A.  Oh, around two hours.  Sometimes a little longer,

1   depending on the situation.

2   Q.  So they condense this five-day trial into two hours?

3   A.  They could, yes.

4   Q.  You have been involved in hundreds of hearings?

5   A.  I would say, you know, probably not hundreds of hearings

6   themselves, but the appeals process, I've done hundreds of the

7   appeal letters.

8   Q.  How many employees are you aware of -- or, rather, how

9   many hearings are you aware of where the charged employee has

10  been completely exonerated for substantive reasons, in other

11  words, the company found -- said, I don't think he did it?

12  A.  Not many.  I -- I don't know that I could give you an

13  exact number.

14  Q.  Can you take --

15  A.  Just not very many.

16  Q.  Can you think of even one, as you sit here today, in

17  particular?

18  A.  There was an investigation held last year where we had a

19  semi truck driver that was on a bank, and his truck was

20  loaded, and the bank gave out, and the semi rolled down the

21  hill with him in it.  During the investigation process, they

22  actually canceled the investigation because they didn't have

23  enough evidence to prove that he did something wrong.

24  Q.  So they didn't even -- that hearing didn't actually even

25  go to a decisionmaker?

17-cv-00844-WYD-SKC          Moody-Gilbert - Direct                    II - 310

1   A.   No.   It actually got canceled during the process.

2   Q.   Can you think of any hearing that went all the way to

3   sending it -- the transcript to the decisionmaker where the

4   decisionmaker, in this case Adam Miller, has said, You know

5   what, I've read the transcript, and I think this employee

6   didn't do this, this rule violation?

7   A.   Oh, I don't know that at that level we've gotten many

8   overturned.   I mean, if it's -- if there is something at that

9   level, sometimes it goes to the general manager of the

10  division, but it doesn't happen very often.

11  Q.   Less than 1 percent of the time?

12          MR. GOMAN:   Objection to leading.

13          THE COURT:   Sustained.

14  BY MR. THOMPSON:

15  Q.   How often do you think that happens?

16  A.   Probably less than 1 percent of the time.   I mean, it

17  would be -- it doesn't happen very often unless it's a

18  procedural thing.

19  Q.   You're talking about the timing of the hearing, things

20  like that?

21  A.   Yes.   Like, the timely responses.   When we write an appeal

22  letter to the -- when they give us a decision, if the decision

23  is past 30 days, you know, that's a problem.   If -- we've got

24  60 days once we -- we get the decision to write them an appeal

25  letter.   If we're late, they call us out on it, or if they're

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   late with their decision to come back with us 60 days later,

2   then it's usually a procedural thing.

3   Q.  Ultimately, though, these are reviewed by an arbitrator,

4   so that should make it fair; right?

5   A.  Well, ultimately if they get that far, yes, they would go

6   to an arbitrator.  You know, we have a process where once we

7   get all the letters written back and forth, um, then we go to

8   what we call claims conference, which is a face-to-face

9   conference with the Labor Relations Department trying to run

10  through the facts of the case and trying to see if we could

11  get the decision overturned.  If we don't, then we file the

12  confirmation conference letter.  We send the file to the BMWED

13  Chicago arbitration office, and they review the case.  And at

14  that point they either select a third division arbitration

15  board or a public law board, and the cases will go there.

16  Q.  For public law boards, can they -- what do they review

17  when they're making their decision?

18  A.  The public law board, it's basically the -- the

19  investigation notice, the transcript, and the letters that are

20  exchanged between the parties, which would be the disciplinary

21  decision, the initial appeal letter, the carrier's first

22  declination, our second appeal letter, the carrier's second

23  declination, and any exhibits that would have been presented

24  during the investigative hearing.

25  Q.  So, for example, in this case we got evidence that helps

1  Brandon.  Can you add that to the record when you are doing

2  the appeal?

3  A.  Once it goes -- once -- once it goes to our arbitration

4  office, there's nothing else to be added.  I mean, you know,

5  we -- we can only -- I can only write my appeals based on

6  what's happening in the transcript.

7  Q.  And we're talking about the transcript from that kangaroo

8  court hearing?

9  A.  Yes.

10         MR. GOMAN:  Objection, Your Honor.  It's leading and

11  argumentative.

12         THE COURT:  Sustained on both counts.

13         And so the jury should disregard the question.  And,

14  in general, questions are not evidence.  It's only what the

15  witness says in response.  But I sustained the objection, so

16  you should disregard all of that.

17  BY MR. THOMPSON:

18  Q.  How long -- strike that.

19         Does BNSF have progressive discipline?

20  A.  They do.  They have what's called the PEPA policy.  And in

21  the PEPA policy, they have listed standard violations or

22  non -- nonserious violations, which is a standard violation,

23  or a serious violation.

24         A nonstandard violation would be something like, um,

25  if I missed work today, you know, they could consider that as

1    a -- as a standard violation, not serious.

2           If I'm out there with track authority, and I give the

3    track out from under myself, and I'm sitting in between a

4    section of track without any protection, then that's generally

5    considered what they call a Level S, which is a serious

6    violation.  That comes with a -- usually a record suspension

7    of 30 days and a one-year or a three-year what they call a

8    review period.  It used to be the probationary period.

9           During that time, if I commit another offense, it

10   depends if it's a standard or a serious violation.  If it's a

11   serious violation or a standard violation, they would look

12   back at my employee transcript and identify that within the

13   last year I gave the track out from under myself and now today

14   I have another violation.  And even though my first offense

15   was only a one-year probationary period, they still go back

16   three years and say -- you know, look at my record and say,

17   Okay, well, in 2015 she had a violation and she had a one-year

18   probationary period.  Now, 2018, she has another violation.

19   And so within that three-year period I actually can be

20   disciplined progressively because that's the way their --

21   their policy works.

22   Q.  Can --

23   A.  And they also list stand-alone dismissible offenses.

24   Q.  For the progressive discipline, can BNSF go back more than

25   three years and consider discipline?

1   A.  Not according to the PEPA policy.

2   Q.  That's BNSF's policy?

3   A.  That's BNSF's policy for performance accountability.

4   Q.  I think earlier you said that BNSF has a lot of rules.  Is

5   that right?

6   A.  They do.  There are three manuals that they use.  They

7   have the maintenance of way operating rules, the maintenance

8   of way safety rules, engineering instructions, and then they

9   have all kinds of policies, like vehicle policy,

10  corporate lodging policies, corporate lodging cards or

11  corporate cards.  And then if you work in a specialized field

12  like welding, you also have welding manuals that you have to

13  abide by.

14  Q.  I'm going to show you what's marked as Plaintiff's

15  Exhibit 2.

16          MR. THOMPSON:  Mr. Keech, will you please pull that

17  up for the witness.

18  BY MR. THOMPSON:

19  Q.  Do you recognize this document?

20  A.  Yes.

21  Q.  What is it?

22  A.  Maintenance of way safety rules.

23  Q.  This is one of the rule books you talked about?

24  A.  Yes.

25          MR. THOMPSON:  Plaintiff moves for the admission of

1   Exhibit 2.

2           MR. GOMAN:  No objection, Your Honor.

3           THE COURT:  All right.  Exhibit 2 is received and may

4   be shown to the jury.

5       (Plaintiff's Exhibit 2 received.)

6   BY MR. THOMPSON:

7   Q.  This is one of the three manuals you were talking about?

8   A.  Yes.

9   Q.  124 pages of rules?

10  A.  Front and back.

11          MR. THOMPSON:  Will you please take it off the jury

12  screen.  Thank you, Mr. Keech.

13  BY MR. THOMPSON:

14  Q.  I'm now going to show you Plaintiff's Exhibit 3.  Do you

15  recognize this document?

16  A.  Yes.

17  Q.  What is it?

18  A.  Maintenance of way operating rules.

19  Q.  This is the second of the three manuals you talked about?

20  A.  Yes, it is.

21          MR. THOMPSON:  Plaintiff moves for the admission of

22  Exhibit 3.

23          MR. GOMAN:  No objection.

24          THE COURT:  All right.  Exhibit 3 is also received.

25      (Plaintiff's Exhibit 3 received.)

1   BY MR. THOMPSON:

2   Q.  So this is -- this is different than Exhibit 2.

3   A.  Yes, it is.

4   Q.  Whole different set of rules?

5   A.  Yes.  There are some duplicates in there, but not

6   necessarily the exact same language.

7   Q.  How many pages of additional rules?

8   A.  Um, I can't see the bottom of the exhibit.

9   Q.  I'm pointing --

10  A.  124, front and back.

11  Q.  So we are now talking 248 rules with just those two

12  manuals?

13  A.  That many pages of rules so far in those two manuals, yes.

14          MR. THOMPSON:  Mr. Keech, will you please take it off

15  so I can show the next exhibit.

16  BY MR. GOMAN:

17  Q.  Ms. Moody-Gilbert, I am showing you Exhibit 21.  Do you

18  recognize this document?

19  A.  Yes.  That's the engineering instruction manual.

20          COURTROOM DEPUTY:  This exhibit was previously

21  received, Your Honor.

22          THE COURT:  I know.  I've got it.

23          MR. THOMPSON:  I'm sorry, Mr. Keech?

24          COURTROOM DEPUTY:  21 is in evidence.

25          MR. THOMPSON:  All right.  Let's go ahead and show it

1    then.   Thank you.

2    BY MR. THOMPSON:

3    Q.   This is the third manual you were talking about?

4    A.   Yes.

5    Q.   Now 46 more pages of rules?

6    A.   Front and back.

7    Q.   Front and back?

8    A.   Yes.

9    Q.   Are all --

10   A.   They are double-sided pages, so --

11   Q.   That's a lot of rules.

12   A.   That's a lot of rules.  It's hard to follow all the rules

13   without knowing if you are breaking another rule.

14   Q.   What happens to work flow if employees follow all the

15   rules?

16   A.   Well, it slows the process down because you have so many

17   rules to follow, um, there's -- you just don't know.  I mean,

18   you'd have to memorize all of the rules to make sure that you

19   weren't violating some rule somewhere along the way.  And to

20   work, you know, to the rule every day, it would -- it would

21   slow process down.

22   Q.   Have you ever had instances whereby employees, quote,

23   worked to rule?

24           MR. GOMAN:  I object to relevance.

25           THE COURT:  Overruled.

1    A.  I think if you worked to rule, the work would stop because

2    there's so much.  And so you -- you follow the rules the best

3    that you can in hopes that you are not breaking something.

4    BY MR. THOMPSON:

5    Q.  Are you familiar with the term "weed weasels"?

6    A.  I am.

7    Q.  What are weed weasels?

8    A.  "Weed weasels" are the term that is used for the exempt

9    officers that go around -- they're -- they're actually called

10   the ops test group, which -- they've been found in the weeds

11   watching people work.  That's why they get the term "weed

12   weasels."  They use binoculars to watch people work from afar

13   just to make sure they are not breaking any rules.  You know,

14   it's basically they've went out and rented vehicles so they

15   are not driving around in company vehicles, so people don't

16   really know who they are.

17          The purpose of the ops test is to make sure that the

18   rules are being followed, but at the same sense we have had a

19   lot of occasions where the, um, ops team or weed weasels will

20   watch a person break a rule, and then they'll go to them and

21   they'll fail them on it, and so then they get a mark on their

22   record for failing an ops test.  It's an operations test.  And

23   so just by them, you know, hanging out and watching people

24   work, it's -- it's kind of a, um -- the membership feels like

25   they're always under the gun and always -- you know, that the

 1   railroad is just gunning to find reasons to get them in

 2   trouble.

 3   Q.  Have you had employees complain that they are being

 4   targeted as a result of that?

 5          MR. GOMAN:  Objection to relevance and 404.

 6          THE COURT:  Sustained as it's worded.

 7   BY MR. THOMPSON:

 8   Q.  Are the members you represent scared to report safety

 9   concerns to BNSF?

10          MR. GOMAN:  Same objection, Your Honor, and

11   foundation.

12          THE COURT:  Sustained.

13   BY MR. THOMPSON:

14   Q.  Have you ever had members you represent complain to you

15   that they are scared to report safety concerns?

16          MR. GOMAN:  Same objection, Your Honor.

17          THE COURT:  Overruled.  I will let her answer that

18   question with a yes or no.

19   A.  Yes.

20   BY MR. THOMPSON:

21   Q.  Do you have kind of a standard, um, spiel you give them

22   once they tell you a concern?

23   A.  Usually when a member calls and say they are concerned,

24   they have got some safety concerns, or there's other issues

25   that they feel that, um, the company has targeted them or

1    they're watching them a lot, you know, I always recommend that

2    they make sure they document everything, who they have

3    conversations with.  If it's, you know, inspections or

4    specific things, make sure that you've always got a copy of

5    what you have entered.  The railroad has several programs that

6    they enter inspection reports on.  Or like if you're out on a

7    big gang, you know, when you go out and you put so many ties

8    in the railroad track that day, they have reports that they

9    have to -- to put in where this is how many ties we put in,

10   this is the slow order that's on the territory or the piece of

11   rail where we worked today.  There's a lot of reports that

12   they have to -- to put in for railroad, FRA, and different

13   entities.  And so I always recommend that, you know, they keep

14   copies of all of that stuff because you just never know when

15   you are going to need it.

16   Q.  Did you ever have that conversation with Mr. Fresquez?

17   A.  I shared that information with him, yes.

18   Q.  You told -- did you tell him to start taking pictures and

19   keeping reports?

20   A.  I did.

21          MR. THOMPSON:  Mr. Keech, can we put just for the

22   witness.

23   BY MR. THOMPSON:

24   Q.  I'm going to show you Defendant's Exhibit 79 [sic]

25   starting at page 754.  Do you recognize that phone number?

```
 1   A.  I do.
 2            THE COURT:  Wait, wait.  Defendant's Exhibit 79 or
 3   A-79?  Is it A-79?
 4            MR. THOMPSON:  Yes, Your Honor.
 5            THE COURT:  All right.
 6            MR. THOMPSON:  At page -- starting at page 754.
 7            MR. GOMAN:  Your Honor, if I may, I object to this
 8   line of questioning as outside the scope of this witness's
 9   disclosed testimony.
10            THE COURT:  I need to understand who is the author
11   and/or recipient of these messages so I can rule on the
12   objection.  So see if you can ask some questions here.
13   BY MR. THOMPSON:
14   Q.  Do you recognize the phone numbers in this text message?
15   A.  Yes.  The 402 number is my phone number.
16   Q.  And what about the 720 number?
17   A.  That would be Brandon's phone number.
18   Q.  All right.
19            THE COURT:  What's the objection?
20            MR. GOMAN:  It's outside the scope of this witness's
21   disclosed testimony in the pretrial order.
22            THE COURT:  Overruled.
23            MR. THOMPSON:  Plaintiff moves to admit Defendant's
24   Exhibit 79 [sic] at pages 754, 755, 756, and 757.
25            THE COURT:  Any objection to the admission of those
```

1    pages?

2          You said 754, 755, 760 --

3          MR. THOMPSON:  No, 756, 757.  So it's 754 through

4    757, Your Honor.

5          THE COURT:  All right.  Any objection to those pages

6    being received?

7          MR. GOMAN:  Can you scroll down so I can --

8          MR. THOMPSON:  Sure.  It's just the texts between

9    Staci and Brandon.

10          MR. GOMAN:  Will you go down more?

11          Okay.  Same objection as before, Your Honor.

12          THE COURT:  I don't know what you mean.  You've made

13    a bunch of objections.  What are you talking about?

14          MR. GOMAN:  The objection to this being outside the

15    scope of this witness's disclosed testimony.

16          THE COURT:  All right.  Overruled.  So pages 754,

17    755, 756, and 757 of Defendant's A-79 are received.

18       (Defendant's Exhibit A-79:754-757 received.)

19          MR. THOMPSON:  Mr. Keech, will you please publish it

20    to the jury.

21    BY MR. THOMPSON:

22    Q.  All right.  For purposes of the jury, I think you have

23    already said, whose 402 number is this?

24    A.  That would be mine.

25    Q.  And who is the 720 number?

1   A.   That would be Brandon.

2   Q.   Right here you said, quote:  "Called Adam Miller and left

3   him a detailed message.  Will let you know what [sic] I hear

4   back from him," end quote.

5        Did I read that correctly?

6   A.   Yes.

7   Q.   Who is Adam Miller?

8   A.   Adam Miller at the time was the general director of line

9   maintenance for the Powder River Division.

10  Q.   The gentleman sitting right here?

11  A.   Yes.

12  Q.   You work frequently with Mr. Miller; right?

13  A.   I have, yes.

14  Q.   Why were you calling him and texting Brandon that you

15  called him?

16  A.   Well, we had a situation where they had a meeting in the

17  morning, and Brandon got asked to leave the meeting.  And I

18  had called Adam to make him aware that we had a situation

19  concerning some track inspection, and Adam said that he would

20  look into it and get back to me.

21  Q.   What was the issue concerning the track inspection?

22  A.   There was a section of track that they always usually had

23  trouble with, and there was a -- you know, one opinion that

24  the track should be removed from service and one opinion that

25  it shouldn't.

17-cv-00844-WYD-SKC        Moody-Gilbert - Direct              II - 324

1    Q.   Whose opinion was that it shouldn't be removed?

2    A.   Should not?

3    Q.   That it should be removed from service.

4    A.   Brandon.

5    Q.   Whose opinion was it that it should stay in service?

6    A.   The manager from the area, supervisor.

7    Q.   Was that Mark Carpenter?

8    A.   Mark Carpenter was the DE there, yes.

9    Q.   Taking you to the next page, are the yellow texts you?

10   A.   Yes.

11   Q.   And the blue texts Brandon?

12   A.   Yes.

13   Q.   All right.  Will you please read the last two texts from

14   you.

15   A.   Okay.  Um, it says:  "Ok.  Keep me posted on what is

16   happening.  Keep a detailed diary of the conversations, dates,

17   locations, times, and witnesses - just in case they issue you

18   an investigation notice.  Staci."

19        The second text says:  "If you give them a verbal

20   statement or a written statement make sure you write it down

21   and make sure you keep a copy."

22   Q.   Why are you telling Brandon to keep copies of things?

23   A.   Because in a situation where, you know, there's a

24   disagreement, sometimes, um, you know, in a situation where an

25   employee is either targeted or there's a known supervisor in

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    the area that has retaliation mannerisms, and a situation like

2    this comes up, you know, typically an employee is not going to

3    get kicked out of a meeting for, you know, advising that this

4    is what the track situation is going to be.  In this case, you

5    know, it seemed to me that it had escalated.  And in the end,

6    knowing the supervisors from that area, we just wanted to make

7    sure that Brandon kept really good records of what was

8    happening.

9    Q.  All right.  Scrolling to the next page, 756, will you

10   please read the first text from you to Brandon.

11   A.  "Also you may want to start taking snapshots of your

12   inspection reports or print them off at the end of the day

13   just in case the supervisors are going in" -- "in the and

14   changing them or removing them.  Staci."

15   Q.  Were you telling Brandon that for the same reason?

16   A.  Yes, I was.

17   Q.  And then I'm going to bring you to your third text on the

18   page, right -- I'm putting my pointer -- whatever you want

19   to -- cursor --

20   A.  Okay.

21   Q.  -- on it.  Can you please read that text.

22   A.  "Adam said he is looking into the situation.  He says he

23   will give me a call tomorrow.  Once I talk to him, I will let

24   yoy [sic] know what he tells me.  Staci."

25   Q.  Did you, in fact, talk to Mr. Miller?

1   A.  I did.

2   Q.  And you told him what was going on?

3   A.  I did.

4        MR. THOMPSON:  Thank you, Mr. Keech.

5   BY MR. THOMPSON:

6   Q.  Tell me kind of the work environment out on the tracks.

7   What kind of environment is it?

8   A.  It's an environment of intimidation.  Um, the --

9        MR. GOMAN:  Your Honor, I apologize.  I object to

10  this question.  404 evidence, and lacks foundation.

11       THE COURT:  Overruled.  I will allow it.  But -- but

12  I'm going to require, just so I can understand the basis for

13  it, that there be a foundation laid.  So I'm going to sustain

14  in part the objection until I hear a foundation that would

15  indicate this witness has some knowledge of the subject matter

16  you want her to talk about.

17  BY MR. THOMPSON:

18  Q.  Have you worked out on the tracks for BNSF?

19  A.  I have.

20  Q.  Do you talk to your members about the environment out on

21  the track?

22  A.  Every day.

23  Q.  Every day you talk to them about that?

24  A.  Every day.

25  Q.  That's one of your primary roles; right?

17-cv-00844-WYD-SKC          Moody-Gilbert - Direct                II - 327

1    A.   Yes, either through meetings, union meetings, company

2    meetings or, you know, track visitations when I go out for job

3    briefs or track visits.  You know, we talk with the membership

4    about how their working conditions are and how they are

5    feeling.  I mean, we don't do a union meeting on the tracks

6    because it's more primarily about safety.

7    Q.   What's the environment out on the tracks at BNSF?

8              MR. GOMAN:  Additional objection to hearsay.

9              THE COURT:  Overruled.  This witness is talking about

10   her understanding of what exists, so I find it's not hearsay.

11   You may answer.

12             THE WITNESS:  Thank you.

13             A lot of what we hear is there's a lot of

14   intimidation.  A lot of the employees are worried that when

15   they go to work in the morning, they are going to go home at

16   night with some kind of disciplinary action.  We hear a lot of

17   comments in meetings that, you know, the railroad hires you

18   today and they spend the next 30 years trying to fire you.

19   And I think that comes from over the years the railroad has

20   gone to a heavy-handed discipline policy.  They, um -- you

21   know, it used to be you could sit down with a manager and talk

22   with them about a situation if something came up.  That's not

23   so much today anymore.  Mostly they go out, something happens,

24   the member gets an investigation notice.  And up to the point

25   that they're -- the investigation is held, the member isn't

1   approached by the manager to say, you know, Geez, what

2   happened out there?  What can we do to make it different?

3          You know, sometimes we have been able to do a

4   sit-down with the management and the member and the union and

5   what we call a round table discussion and work our way through

6   things.  In 2005 we had a safety agreement that had

7   alternative handling in that to where you could do different

8   things to where you wouldn't necessarily get discipline on

9   your record, but at some point the railroad management decided

10   that program didn't work for them anymore, so they canceled

11   that.

12          So for a lot of years all we had was the disciplinary

13   PEPA policy, and that changes.  Every couple of years they

14   change their policies and how things are done there.  We do

15   currently have a program that's called RRE, which is risk

16   reduction education, but that's discretionary.  If the

17   managers don't want to use it, they don't.  And, you know, it

18   just seems that a lot of the membership has discipline on

19   their record because of the heavy-handed disciplinary process

20   that they have gone through the last few years.

21          And so when I was on the tracks, railroading was fun.

22   I mean, we enjoyed going to work.  Nobody talked about

23   retirement.  Nobody talked about being scared because you're

24   going to end up with discipline somewhere along your record.

25   And today that's not the case.  I mean, you talk to somebody,

1   and they say, Four days and 12 hours left and I'm out of here.

2   You know, it's -- it's not fun for them anymore.  And a lot of

3   people feel that the management doesn't listen.  They don't

4   communicate with the members as well, the communication

5   between the unions and the company.  Some managers are very

6   good to work with, and some are not so good to work with just

7   because, you know, it's intimidation and if you don't do this

8   I'm going to write you up, or if you don't do that I'm going

9   to write you up, we're going to go to investigation.  And so

10  it's -- it's not a -- a very conducive environment to work in

11  today.

12  BY MR. THOMPSON:

13  Q.  Is it unusual for an employee over the course of a decade

14  to have two record S suspensions on his record?

15  A.  Not -- not now.

16  Q.  In your experience, would an employee questioning whether

17  to remeasure a track, then leaving the scene, and coming back

18  and offering to measure the track warrant termination?

19  A.  No.

20  Q.  Do you find that unusual?

21  A.  I do.  You know, in a situation like this, I don't view

22  that, um -- you know, if the -- again, if the manager would

23  have had a conversation with Brandon and said, Look, you know,

24  what seems to be the issue here, let's work it out, I don't

25  think that, you know, Brandon would have been dismissed.  I

1    think at that point hotter heads prevailed, and I don't

2    think -- in some cases, this wouldn't have been a dismissal.

3    In some cases, people would have been written up for failure

4    to comply with instructions.  And they may have been given a

5    standard reprimand, or they may have been given a Level S, but

6    it doesn't always end in dismissal.

7    Q.   What is the difference between those two rules?

8    A.   Well, conduct -- insubordination is within the conduct

9    rule, and that is listed as a dismissible offense.  Rule 1.13,

10   which is failure to comply with instructions, is not.  And so

11   depending how they want to use that rule, in this case, you

12   know, had it been failure to comply with instructions, more

13   than likely would not have ended up in a dismissal.

14   Q.   As a practical matter, what's the difference between those

15   two rules?  I mean, how are they used differently?

16   A.   Depends on -- it depends on who you are, in my opinion.

17   Because, you know, sometimes if -- if you're a liked employee,

18   you are going to get the -- you are going to get the failure

19   to comply with instruction rule.  If you're not so well liked,

20   you're going to get the insubordination rule.  If there's a

21   target or they have made the decision prior to the

22   investigation hearing that they are going to dismiss you, it's

23   going to come up as a conduct charge in the investigation

24   notice.  It doesn't tell us which one.  It just says conduct,

25   but it doesn't tell us exactly which of the bullet points they

1    are going to use.

2    Q.  The allegations Brandon relayed to you are very serious.

3    A.  Absolutely, they are.

4    Q.  You relayed those to Adam Miller?

5    A.  We talked.  Adam and I discussed.  You know, I mean, Adam

6    and I have worked together a lot through the years.  Um, you

7    know, they call it growing up in the railroad.  And when I was

8    a vice chairman, Adam was a DE.  And then when I got elected

9    to the general, Adam went to the GDLM job.  And we worked well

10   together.  And when I had an issue and I took it to Adam, Adam

11   was one of the managers that when he told you he would look

12   into it, he would.

13   Q.  Do you know if in this case he actually looked into it?

14   A.  Well, we had a conversation, you know, and I -- I -- I

15   believe that Adam did look into it.

16   Q.  Would it surprise you if he testified he never looked into

17   Mr. Fresquez's allegations?

18   A.  It would, because when I called him and he told me he

19   would look into it, I would take him at his word, yes.

20           MR. THOMPSON:  Thank you.  I have nothing further.

21           THE COURT:  Cross-examination.

22                       **CROSS-EXAMINATION**

23   BY MR. GOMAN:

24   Q.  Good morning, Ms. Moody-Gilbert.

25   A.  Good morning.

17-cv-00844-WYD-SKC        Moody-Gilbert - Cross              II - 332

1    Q.  Give me one second to get set up here.

2           All right.  Just a few background questions.  Can you

3    see me all right?

4    A.  Yes.

5    Q.  I don't want to -- all right.

6           You are the elected general chairwoman of the

7    Brotherhood of Maintenance of Way?  Is that --

8    A.  I'm one of them, yes.  I represent the Burlington system

9    division.

10   Q.  Who elects you?

11   A.  The membership.

12   Q.  The whole membership, or just this region?

13   A.  The membership from the Burlington system division.

14   Q.  How many employees is that?

15   A.  Well, we do this by what we call delegates.  And we have

16   42 local lodges.  Each lodge has a delegate, and the delegates

17   are chosen by the members.

18   Q.  I see.  Was Mr. Fresquez a delegate?

19   A.  No.

20   Q.  How often do you stand for reelection?

21   A.  Every four years.

22   Q.  All right.  When are you next up?

23   A.  July of 2020.

24   Q.  Do you plan to run?

25   A.  I do.

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC          Moody-Gilbert - Cross                II - 333

 1   Q.  You like the job you are doing now?

 2   A.  I love the job I do.

 3   Q.  You think it's worthwhile, helpful?

 4   A.  Absolutely.

 5   Q.  You said you're still an employee of BNSF.  When is the

 6   last time you collected a paycheck from BNSF?

 7   A.  It would have been in 2005.

 8   Q.  Okay.  So you -- got it.  So you have maintained your

 9   seniority, right, so you have a job waiting for you if you

10   need it, but really in no other sense are you working for

11   BNSF?  Is that --

12   A.  No.  No.

13   Q.  BNSF can't fire you from your job as a general chairwoman?

14   A.  No.  I'm on an indefinite leave of absence under Rule 16.

15   Q.  The only way you can lose your job as a general chairwoman

16   is if you stepped down or if the membership, people like

17   Mr. Fresquez and his coworkers, were to vote you out of

18   office.

19   A.  Correct.  Or if I did something really bad and they

20   brought charges against me, so --

21   Q.  Got it.  You haven't done that yet; right?

22   A.  No.

23   Q.  The role of a general chairwoman and really the role of

24   the union as a whole is to advocate on behalf of your

25   employees; right?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.  On behalf of the members, the employees for the railroads,

2   yes.

3   Q.  As a quick aside, Mr. Fresquez, do you know if he ever

4   held an elected position with the union?

5   A.  I think he had a local lodge position.

6   Q.  What is that?

7   A.  What is a local lodge position?

8   Q.  Well, let me ask you this question.  If Mr. Fresquez in

9   his deposition said he was a local president --

10  A.  Okay.

11  Q.  -- what is that?

12  A.  That's just -- it's a position within our local lodges.

13  Um, we're structured from a national level, and then we go

14  down to the system or federation level, and then each of the

15  systems or federations have local lodges.  So within the local

16  lodges you have a local chairman, a president, a vice

17  president, and a secretary/treasurer.  And the local lodge

18  president is the member that has control of, like, union

19  meetings.

20  Q.  Okay.  That, too, is an elected role?

21  A.  Yes.

22  Q.  Okay.  Let me see if you agree with this:  The role of the

23  union, the Brotherhood of the Maintenance of Way Employees, is

24  to confront management of the railroads in the halls of

25  Congress, in the state legislatures, and in the nation's court

1   system, and at the bargaining tables.

2           Do you agree with that?

3   A.  Well, I think that we would try to do it together rather

4   than confronting each other.

5   Q.  Okay.

6   A.  You know, I mean, it's in the members' best interests for

7   us to try to come to an agreement that works for everybody,

8   you know, not saying that in certain situations that, you

9   know, it doesn't -- I mean, it's a union and a railroad or a

10  union and a corporation.

11  Q.  Understood.  And, um -- well, let me have this.

12          MR. GOMAN:  If I can show the witness what I have up

13  on my screen.

14  BY MR. GOMAN:

15  Q.  It wouldn't surprise to you learn that the website for the

16  Brotherhood of Maintenance of Way says just that, would it?

17          MR. THOMPSON:  I'm going to object, Your Honor.  This

18  is hearsay.

19          THE COURT:  Well, I'll let her -- overruled, to the

20  extent the witness is familiar with what you are showing her.

21  So I will let you ask some questions about that.

22  BY MR. GOMAN:

23  Q.  You have been on the BMWED's website, I assume.  Right?

24  A.  Yes, I have.

25  Q.  So did I quote that correctly?  Confront management in the

1    halls of Congress, in the state legislatures, through use of

2    our newspaper and the journal, the nation's court system, and

3    at the bargaining tables.  Do you see that in there?

4    A.  I see that in there.

5    Q.  Okay.

6    A.  It wasn't written by me, so . . .

7    Q.  I understand, but it's on the union's website as a

8    statement of what they can do for their members; right?

9    A.  Well, it's on the BMWED website, yes.

10   Q.  The BMWE has accomplished a lot for its members.  Would

11   you agree with that?

12   A.  Yes.

13   Q.  In contrast to someone who works in like an at-will job, a

14   BMWE member has the right to union representation in the

15   disciplinary process; right?

16   A.  Yes.

17   Q.  They have the right to be protected by a collective

18   bargaining agreement; right?

19   A.  Yes.

20   Q.  These are things that the union has achieved on behalf of

21   its members; right?

22   A.  Yes.

23   Q.  And things you are proud of.

24   A.  Yes.

25   Q.  All of the things you mentioned, pay, overtime, benefits,

 1   things like that, that's all been negotiated by the union;

 2   right?

 3   A.   Yes.

 4   Q.   Protection against discrimination is also something the

 5   union offers for its members?

 6   A.   Yes.

 7   Q.   Let's talk about the right of representation.  That's an

 8   important right.

 9   A.   Absolutely.

10   Q.   It's -- I think it's actually the first thing listed on

11   the website for what the union offers its employees.  Right?

12   A.   Okay.

13   Q.   And, specifically, it's the right of representation in a

14   disciplinary investigation hearing; correct?

15   A.   We -- yes, I mean, we have the right to -- the member has

16   the right to request that we have -- you know, that they have

17   representation when they are brought -- charges are brought

18   against them from the railroad, yes.

19   Q.   And what -- the union official that was in that role in

20   Mr. Fresquez's case was Mr. Jim Varner; right?

21   A.   Yes.

22   Q.   He was a pretty good chairman; right?

23   A.   He's a very good vice chairman, yes.

24   Q.   He would sit the employee down, answer any questions he or

25   she had about the process?

1    A.  Well, I wasn't -- I did not sit in with Jim, and so I

2    don't think it's fair for me to answer what he may or may not

3    have done.

4    Q.  Do you have any idea what Mr. Varner was doing on behalf

5    of the employees when they faced an investigation?

6    A.  My role is -- their role is to go in and represent the

7    employee or the member, and beyond that I don't get involved

8    in their day-to-day representational activities.  When it

9    comes to discipline, I do the appeal letters.

10   Q.  Let's do it this way.  When you were in Mr. Varner's role,

11   when you were the general chairwoman doing the investigations,

12   you would sit the employee down and explain the process;

13   right?

14          MR. THOMPSON:  I'm going to object, Your Honor, to

15   relevance.  What she did for other members has no bearing on

16   what was done for Mr. Fresquez.

17          THE COURT:  Overruled.  This is cross-examination.

18   A.  When I was a vice chairman and I represented the members

19   in a hearing, yes.  I mean, they don't know the process,

20   per se.

21   BY MR. GOMAN:

22   Q.  And I'm just trying to give the jury a sense for what a

23   union official can do on behalf of an employee.

24   A.  Sure.

25   Q.  Explain the process, talk them through.  This is how it's

1   going to go.  This is how I think we should defend ourselves

2   in the hearing.  Right?

3   A.  Well, we never -- we never know exactly how it's going to

4   go because we don't know what evidence will be presented.  I

5   mean, we give them, you know, a basic overview of how the

6   proceedings are typically conducted.

7   Q.  One of the things the union chairman will do for an

8   employee facing investigation is they will help line up

9   witnesses to call during that investigation; right?

10  A.  If there are -- if there are witnesses that, um, we feel

11  that should be called, then yes, we send a letter on their

12  behalf.

13  Q.  You will attend the hearing with them, question witnesses,

14  introduce exhibits; right?

15  A.  If we have exhibits, yes.

16  Q.  And you will make a closing argument.

17  A.  Yes.

18  Q.  Okay.  We're going to come back to that in just a second.

19          Let's talk about safety on the railroad.  Safety is

20  important to the union; right?

21  A.  Yes.

22  Q.  If an employee has a safety concern, the union will help

23  that employee raise it or bring it up so that something can be

24  done about it; right?

25  A.  If requested.  I mean, sure.

1    Q.  You want to respect the employee's right to remain

2    anonymous if he or she wants it handled that way; right?

3    A.  If that's the way they wish to handle it, yes.

4    Q.  And, of course, you -- as the union chairwoman, you are

5    going to respect that.  You are not going to make an employee

6    make a complaint if they don't want to.

7    A.  It's up to the employee.  I mean, we encourage

8    communication between the employee and the union and the

9    company.

10   Q.  And the process can work like this.  Well, Mr. Fresquez,

11   for instance, if he believes he has some information that's

12   evidence or proof of wrongdoing, he could send it to you and

13   have you send it on to the FRA; right?

14   A.  There's a query process, yes.

15   Q.  And that way you do your best to make sure the employee

16   remains anonymous but the FRA gets the information that the

17   employee thinks they should have; right?

18   A.  It's just a process.  I mean, there's -- you know, at some

19   point if -- depending on how far that query goes, you know,

20   it's not all anonymous all the time.

21   Q.  Okay.  And, again, you can't make Mr. Fresquez participate

22   in that process.  You can just be an avenue for him to do that

23   if he wants to.

24   A.  If he chooses to, yes.

25   Q.  So Mr. Fresquez brought an issue up to you about a

1    supervisor in April of 2015; is that right?

2    A.   It was an issue of the track inspection.

3    Q.   Okay.  That kind of --

4    A.   A difference of opinion.

5    Q.   I thought something happened in a briefing.  Did I

6    misunderstand that?

7    A.   Well, I think the briefing -- he was requested to leave

8    the briefing, I believe.

9    Q.   I see.  That's where the argument was about the track

10   issue?

11   A.   As far as my understanding is.

12   Q.   Okay.  Mr. Carpenter wasn't involved in that briefing,

13   though, was he?

14   A.   I don't know.  I was not there.

15   Q.   Okay.  If Mr. Fresquez were to testify that Ryan Akers was

16   the one in that briefing, would you have any reason to

17   disagree with that?

18   A.   No.

19   Q.   Okay.  At any rate, you felt comfortable enough with

20   Mr. Miller to bring that to his attention, say, Hey, here's an

21   issue; I'd like it to be looked into.  Right?

22   A.   Yeah.

23   Q.   You didn't have any concern that Mr. Miller would try and

24   retaliate against Mr. Fresquez for that, did you?

25   A.   I had confidence that Adam would look into it if I brought

1    an issue to him.

2    Q.  If you thought he was going to retaliate against

3    Mr. Fresquez, you wouldn't have brought it up to Mr. Miller.

4    Fair?

5    A.  I would have taken it somewhere else probably, yes.

6    Q.  There are other ways employees can report misconduct.

7    They can call a hotline at BNSF?

8    A.  They do have an employee hotline, yes.

9    Q.  You don't discourage employees from calling that, do you?

10   A.  No.

11   Q.  You do know that Mr. Fresquez, though, never called the

12   hotline during his career at BNSF?

13   A.  I don't know that for sure.

14   Q.  You don't know that.  All right.

15        Let's get back to this discipline process then.  I

16   want to talk about the collective bargaining agreement, which

17   is Exhibit A-68.  If I could --

18        MR. GOMAN:  I'd move for admission of Exhibit A-68.

19        THE COURT:  Any objection?

20        MR. THOMPSON:  Is this the entire agreement?

21        THE COURT:  No, talk to me, not to each other.  Do

22   you have any objection to A-68?

23        MR. THOMPSON:  We do.  We think the entire agreement

24   should be put in if they're going to move for it.

25        THE COURT:  Aren't you offering the whole exhibit?

17-cv-00844-WYD-SKC        Moody-Gilbert - Cross              II - 343

1            MR. GOMAN:  It's the rule relating to discipline.

2            THE COURT:  How thick is this document?

3            MR. GOMAN:  I believe the whole thing is roughly 100

4    pages.  The one I am tendering is three pages.  I don't have

5    an objection to the whole thing coming in.  I just -- I don't

6    have it right here.

7            THE COURT:  What are you asking, the whole document

8    come in?

9            MR. THOMPSON:  Yes, Your Honor.

10           THE COURT:  Do you object to that?

11           MR. GOMAN:  No.

12           THE COURT:  All right.  So I will receive a whole

13   document.  Is that A-68?

14           MR. GOMAN:  Yes.

15           THE COURT:  All right.  A-68 in its entirety is

16   received.

17           MR. GOMAN:  Okay.

18       (Defendant's Exhibit A-68 received.)

19   BY MR. GOMAN:

20   Q.  Can you see that on your screen, Ms. Moody-Gilbert?

21   A.  Yes.

22   Q.  This is an agreement between the union and BNSF; is that

23   right?

24   A.  Yes, it is.

25   Q.  A collectively bargained agreement; right?

1   A.   Correct.

2   Q.   What does that mean?

3   A.   That means that the parties have sat down together and,

4   um, come to an agreement on certain rules, and when that's

5   done, it's voted on and accepted.

6   Q.   Accepted by both sides, by --

7   A.   Yes.

8   Q.   -- BNSF and by the union?

9   A.   Yes.

10  Q.   So this idea that lawyers aren't allowed in these

11  proceedings, Mr. Fresquez can't have a lawyer, and BNSF can't

12  have a lawyer; right?

13  A.   That's my understanding.  I mean, you could probably come

14  in and sit there, but you are not allowed to actually do the

15  representation.

16  Q.   I see.  Okay.  But the agreement doesn't provide for a

17  right to a lawyer for BNSF or for Mr. Fresquez?

18  A.   Just to come in and sit there.

19  Q.   Okay.  The idea that the union can request witnesses

20  attend, that's written into the agreement; right?

21  A.   Yes, in Rule 40.

22  Q.   Okay.  You mentioned that as the process plays itself

23  out -- so there's rules that relate to the discipline

24  investigation.  Then there's rules that relate to the appeal.

25  Right?

1    A.   Yes.

2    Q.   You said the union is kind of stuck with what's in the

3    investigation transcript and the exhibits that are admitted.

4    They can't look outside that.  They can't present more

5    evidence later.  Right?

6    A.   It depends on -- yeah, I mean, you get your testimony,

7    your transcript, your exhibits, you know, and we -- we base

8    our appeal letters off of the exhibits and the transcripts.

9    Q.   And BNSF does too; right?  When you're working with Labor

10   Relations, they look at the transcript and the exhibits, and

11   they are stuck with it.

12   A.   I don't know the company process is -- you know, I'm not

13   part of the company management, so . . .

14   Q.   What about when it goes to arbitration?  Right?  I mean,

15   the parties talk about what was in the investigation and what

16   evidence was produced at the hearing; right?

17   A.   Okay.  So I'm not part of the arbitration process.  Once

18   it gets to our Chicago office, they handle that process.

19   Q.   Got it.  Okay.

20          As a quick aside, you said you're concerned

21   discipline at BNSF is becoming more heavy handed; is that

22   right?

23   A.   It waxes and wanes.  I mean, you know, at times they are

24   very heavy handed.  They brought the risk reduction in trying

25   to do something different, but again that's very subjective.

1  Q.  What is coaching and counseling?

2  A.  That is where the manager would sit down and talk to the

3  member.  Sometimes the union is allowed to come in, and

4  sometimes they're not, so, you know, just kind of depends.  I

5  mean, it's just conversation, typically.

6  Q.  It's not discipline; right?

7  A.  Well, it is discipline because they are being disciplined.

8  They get a letter in their file, so it is discipline.

9  Q.  Well, you wouldn't ever stand for dismissal for having

10  one, two, or 15 coaching and counselings; right?

11  A.  Not to my knowledge.  You know, I mean, you get letters in

12  your files at this railroad.  Some railroads don't give you

13  letters.

14  Q.  I see.  So the letter will be in your personnel file so

15  people can see it and keep it, but it doesn't like put you on

16  that progressive disciplinary track; right?

17  A.  Well, I don't know that -- I don't know that the

18  railroad -- I don't know their process.  I don't know how far

19  they go back and say this is what happens, you know, outside

20  of what the PEPA policy governs.

21  Q.  You have read the PEPA policy.  It doesn't say if an

22  employee has had five coaches and counseling, they stand for

23  this level of discipline, or two, they stand for this level of

24  discipline.

25  A.  Right, if they have two, you know, if it's coaching and

1   counseling . . .

2   Q.  It's irrelevant.

3   A.  Well, it's not irrelevant.  It's still discipline in our

4   eyes.

5   Q.  So a manager sits down with an employee and says, This is

6   what happened.  I'd like to see some improvement in these

7   areas.  Right?

8   A.  Well, I don't know because we're not -- I don't

9   participate in them, so I don't know what their conversation

10  is.

11  Q.  Do you know how many times BNSF managers attempted

12  coaching and counseling with Mr. Fresquez?

13  A.  No.  I don't have access to his personnel file.

14  Q.  Do you know if he was told in a coaching and counseling

15  session in 2010 that walking away from his supervisors when he

16  was being talked to about safety or his performance isn't

17  tolerated at BNSF?

18  A.  If that was a coaching and counseling session -- I -- I

19  don't have any knowledge of that, so . . .

20  Q.  Understood.

21          All right.  So this process that the union and BNSF

22  have bargained for, it has timelines; right?

23  A.  Yes.

24  Q.  And those timelines have to be followed or the discipline

25  will be thrown out; right?

17-cv-00844-WYD-SKC        Moody-Gilbert - Cross                II - 348

1    A.   According to the rule, yes.

2    Q.   Okay.   The timelines in Mr. Fresquez's case -- and, by the

3    way, you were involved in his appeal; right?

4    A.   I wrote his appeal letter however many years ago that was,

5    but yes.

6    Q.   Do you recall whether the timelines were followed in

7    Mr. Fresquez's case?

8    A.   I don't, without looking at the file.

9    Q.   I see.

10   A.   The --

11   Q.   You understand that if an employee is withheld from

12   service pending the investigation, it kind of shortens the

13   timelines; right?

14   A.   Shortens the timelines as far as?

15   Q.   The hearing has to be held sooner.

16   A.   It has to be held within 10 days from the day they are

17   withheld from service.

18   Q.   And that's sooner than otherwise; right?

19   A.   Well, the other is 15 days from the date of the occurrence

20   is when the investigation must be held.

21   Q.   And so this process in the agreement is:   The

22   investigation hearing is held.   The union can present

23   witnesses and exhibits, and the company can too.   Right?

24   A.   Yes.

25   Q.   Okay.   And then a transcript is prepared of that hearing;

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   right?

2   A.   Correct.

3   Q.   And that transcript then is what you look at when you're

4   doing your appeal.

5   A.   Yes.  After the transcript is sent in to be transcribed,

6   it goes back to the conducting officer.  They edit whatever

7   edits they have, and then we get the copy of it.

8   Q.   Got it.  So the hearing is the employee's chance and

9   BNSF's chance to tell their sides of the story.

10  A.   It's, well, according to the investigation notice, to

11  ascertain the facts.

12  Q.   Ultimately if the parties can't agree, it's heard by a

13  neutral arbitrator; right?

14  A.   If the case gets up to that point, yes, it will go to an

15  arbitration board.

16  Q.   That arbitration board can -- well, they have a lot of

17  power; right?

18  A.   Well, I don't know what you mean by power.  I mean, they

19  can render a decision.

20  Q.   Let me be specific.  They can put the employee back to

21  work and award him or her back pay; right?

22  A.   They could.

23  Q.   They could totally undo the discipline and say:  BNSF, you

24  got this 100 percent wrong.  That employee is going back to

25  work, and you are paying him for all the time he missed.

1   Right?

2   A.  Well, they don't always issue back pay.

3   Q.  Of course.  They don't always overturn the discipline

4   either; right?

5   A.  Exactly.

6   Q.  But they have the power to if they decide that's what's

7   right?

8   A.  Well, if there's a clear violation, then they could.

9   Q.  They can also review the discipline and say:  Yes, there

10  was a rules violation here, but we think the discipline was

11  too harsh.  We're going to knock it down to a reprimand or a

12  Level S or something like that.

13  A.  They could.

14  Q.  So in Mr. Fresquez's case, if the public law board

15  decided --

16          MR. THOMPSON:  I'm going to object, Your Honor.  This

17  is just like the OSHA's findings, irrelevant and unfairly

18  prejudicial.

19          THE COURT:  All right.  Without -- Mr. Goman, without

20  telling me what your question is, are you about to ask a

21  question predicated on an administrative decision?

22          MR. GOMAN:  Yes.

23          THE COURT:  You can't do that for the same reasons I

24  wouldn't allow the plaintiff's exhibit to contain legal

25  rulings from an administrative body.  So I sustain the

1    objection.

2              MR. GOMAN:  Understood.  Let me move on for a second.

3              THE COURT:  Well, you need to move on more than just

4    for a second.  Let's move on.

5              MR. GOMAN:  Let me move on.  How about that?

6    BY MR. GOMAN:

7    Q.  All right.  Let's talk about Mr. Fresquez's case then.

8    Let me show you Exhibit A-45, Ms. Moody-Gilbert.

9              MR. GOMAN:  If I could show this just to the witness.

10             THE COURT:  Well, you don't have to say that.  Until

11   an exhibit is in evidence, Mr. Keech will only show it to the

12   witness.  So let's --

13   BY MR. GOMAN:

14   Q.  Do you recognize that, Ms. Moody-Gilbert?

15   A.  That would be the investigation notice.

16   Q.  For Mr. Fresquez?

17   A.  Yes.

18             MR. GOMAN:  I move for admission of Exhibit 45 [sic].

19             MR. THOMPSON:  No objection.

20             THE COURT:  All right.  Exhibit A-45 is received.

21        (Defendant's Exhibit A-45 received.)

22             MR. THOMPSON:  Do you want to move for all your

23   stipulated exhibits?

24             MR. GOMAN:  Your Honor, at this time I also move for

25   the admission of stipulated Exhibit 48 [sic].

17-cv-00844-WYD-SKC       Moody-Gilbert - Cross        II - 352

1          THE COURT:  Forty what?

2          MR. GOMAN:  48.

3          THE COURT:  All right.  48 is also received.

4          COURT REPORTER:  A-48?

5          THE COURT:  No, 48.

6          MR. GOMAN:  A-48.

7          THE COURT:  Oh, A-48.  I thought you said 48.  All

8   right.  And A-48 is not objected to?

9          MR. THOMPSON:  No, Your Honor.

10          THE COURT:  All right.  So I will receive A-45 and

11  A-48.

12     (Defendant's Exhibit A-48 received.)

13  BY MR. GOMAN:

14  Q.  All right.  Ms. Moody-Gilbert, we are back on

15  Exhibit A-45.  This is the notice of investigation that

16  Mr. Fresquez received?

17  A.  That's what it appears to be, yes.

18  Q.  Okay.  You see here he was noticed that there is an

19  investigation for the purpose of ascertaining the facts in

20  connection with his alleged refusal to comply with his

21  supervisor's instructions on May 5th of 2016; right?

22  A.  That's what it says, yes.

23  Q.  Okay.  This was issued in compliance with the timelines

24  that the CBA lays out; right?

25  A.  Yes.

1    Q.  You're not claiming this rule here is confusing, are you?

2    A.  It can just be used in a lot of different ways.  There's a

3    lot of rules in those books that they can use to, you

4    know -- when you go in, you don't know what rule number it is

5    because the railroad chooses not to give us that information.

6    Q.  And I understand, and I understand in that cases -- in

7    other cases it can potentially be confusing.  Here, though,

8    you are not contending that Mr. Fresquez was confused or

9    unaware of what he was being charged with, are you?

10   A.  I don't know what Mr. Fresquez was thinking.  I wasn't

11   there when he was issued the notice.

12   Q.  Okay.  Charging him with refusing to comply with his

13   supervisor's instructions on a specific date, that's a fairly

14   clear statement of what the company thinks he did wrong.

15   Would you agree with that?

16   A.  Well, a lot can happen in a day.  I don't know at what

17   point the supervisor took exception to what he did during the

18   day.

19   Q.  I see.  You have reviewed the whole record, though; right?

20   A.  Well, several years ago.

21   Q.  Okay.  You mentioned weed weasels on direct examination.

22   Do I have that right?

23   A.  That's what they're -- that's the term that's out in the

24   field.

25   Q.  All right.  You're not telling this jury in this case that

1   what Mr. Paz and Mr. Herzog were doing were weed weaseling

2   Mr. Fresquez, are you?

3   A.  I did not say that.

4   Q.  And you are not contending that.  You don't believe that;

5   right?

6   A.  I don't know what happened at the location that day.  I

7   was not there.

8   Q.  I see.  You talked about ops testing?

9   A.  Operations.

10  Q.  Operations testing?

11  A.  Mm-hmm.

12  Q.  Operations testing is required by the federal government;

13  right?

14  A.  As far as I know.

15  Q.  So an employee will watch -- a supervisor will watch

16  someone like Mr. Fresquez and observe him and see if he's

17  violating rules prescribed by the federal government; right?

18  A.  Well, rules, not necessarily prescribed by the government.

19  There are the railroad book of rules.

20  Q.  Are you aware of Mr. Fresquez ever having failed an ops

21  test?

22  A.  I don't have access to his personnel file.

23  Q.  Are you aware of any employees -- any supervisors ever

24  weed weaseling Mr. Fresquez?

25  A.  I don't -- I'm not in the field with Mr. Fresquez on a

1    daily basis, so . . .

2    Q.  All right.  Let's go to Exhibit A-48.  Do you recognize

3    this as just the cover sheet to this investigation transcript?

4    A.  It's -- yes.

5    Q.  All right.  So you talked on direct examination about

6    admitting exhibits and calling witnesses.  BNSF can't make

7    Mr. Fresquez or Mr. Varner call witnesses if they don't want

8    to; right?

9    A.  Well, if they're -- in the agreement, the union agreement,

10   there's a provision that if there are witnesses that Brandon

11   or the union representative would like to bring into the

12   investigation, they have that right to do so.

13   Q.  Right, but BNSF couldn't say, Mr. Fresquez, you have to

14   call Mr. Herzog in your defense.

15   A.  Not that I'm aware of.

16   Q.  You know Mr. Fresquez and Mr. Varner decided not to call

17   Mr. Herzog as a witness; right?

18   A.  I was not involved in the process on how his investigation

19   was going to be handled.

20   Q.  Well, in your appeal of this discipline, did you contend

21   that one of the reasons why it was unfair is because

22   Mr. Herzog was not there as a witness?

23   A.  I'd have to look at the documents.  It's been since 2016,

24   so -- and I've done a lot of appeals since then, so it's hard

25   to remember everything.

1  Q.  Do you have a problem with employees at BNSF writing

2  statements about incidents that happen at work?

3  A.  Do I have a problem with it?

4  Q.  Yeah.  Do you think that's bad or something your members

5  shouldn't do?

6  A.  I just know that the company is going to require them to

7  write one.

8  Q.  And if an employee witnesses misconduct and his or her

9  supervisor asks them to write a statement about what they saw,

10  you don't have a problem with a union member complying with

11  that instruction, do you?

12  A.  Well, it's going to be an instruction from the supervisor.

13  Q.  So they have to comply; right?

14  A.  Well, if they don't, then they are in trouble.

15  Q.  I see.  Okay.

16        Were you aware that Mr. Herzog sent a copy of his

17  statement to Brandon Fresquez before his disciplinary hearing?

18  A.  I was not a part of that preinvestigation process, so I --

19  I don't get involved in that.  That's handled by the vice

20  chairman.

21  Q.  If he had done that, if Mr. Herzog had sent it to

22  Mr. Fresquez, Mr. Fresquez could have admitted that statement

23  during the hearing; right?

24  A.  That would be up to him and his union representative.

25  Q.  Oh, sure, but if they decide to do that, it would be

1   accepted and made part of the transcript?

2   A.  If the hearing officer would accept it.  Sometimes they

3   don't.

4   Q.  I see.  So to be clear, if Brandon Fresquez told Jay

5   Herzog never to make statements to exempt officers about other

6   employees, you wouldn't support that, would you?

7   A.  I don't know that that statement would have been made, so

8   I don't really -- I don't know what you expect for an answer

9   because --

10  Q.  You haven't seen --

11  A.  -- I wasn't there.

12  Q.  You haven't seen his text messages.  So I'm asking you as

13  a representative of the union, if he said that, you wouldn't

14  support that, would you?

15  A.  Well, again, that's going to be part of the investigation

16  process.

17  Q.  Do you recall, when you read this investigation

18  transcript, Mr. Fresquez accusing Mr. Herzog and Mr. Paz of

19  bullying him on May 5th of 2016?

20  A.  You know, I've read a lot of transcripts, and I don't

21  exactly know exactly what was in there verbatim.  You know, I

22  don't know that, um -- I don't remember all of the arguments.

23  Q.  Well, let's take a look then.  I'm going to show you page

24  19.

25              THE COURT:  Of which exhibit?

1          MR. GOMAN:  Of Exhibit A-48.

2    BY MR. GOMAN:

3    Q.  Just generally speaking, Mr. Fresquez's testimony here:

4    "Again, he didn't instruct me to stringline the defect.  At

5    the time of me walking away, I felt that I was being bullied.

6    I was defenseless, as Paz was tag-teaming me with another

7    employee."

8          You were aware that was kind of the gist of what

9    Mr. Fresquez testified to at the investigation.  Do you recall

10   that now?

11   A.  That's what's in the testimony, yes.

12   Q.  Okay.  And that was more or less his defense.  Mr. Herzog

13   and Mr. Paz were teaming up on me.

14   A.  Mr. Paz is the -- is the exempt officer there, yes.

15   Q.  Right.

16   A.  So --

17   Q.  But Mr. Herzog was a coworker, a fellow union member.

18   A.  Well, and how a person feels is -- you know, that's --

19   that's different.  I mean, if Brandon felt that he was being

20   bullied, then I don't have a reason to dispute that.

21   Q.  So this investigation hearing is held, and the decision is

22   made to dismiss Mr. Fresquez; right?

23   A.  The company dismissed him, yes.

24   Q.  And that decision was ultimately made by Mr. Adam Miller.

25   Were you aware of that?

1   A.   Whoever we get the letter from that says this is the

2   disciplinary decision.  You know, there's all kinds of

3   signatures on those.  We don't know exactly who makes that

4   determination.  Sometimes Labor Relations makes the

5   determination.  Sometimes they give that power to the

6   division.  So it just --

7   Q.   So you don't know, to answer the question, who made the

8   decision.

9   A.   Just whose ever signature was on that letter --

10  Q.   Mr. Miller never gave you any indication that he had any

11  interest in retaliating against Mr. Fresquez, did he?

12  A.   I didn't talk to Mr. Miller once we got the dismissal.

13  Q.   Let's talk about PEPA then.  Let me show you Exhibit A-60.

14        Do you recognize this as the Policy for Employee

15  Performance Accountability at BNSF?

16  A.   That's the cover page, yes.

17  Q.   And if I just scroll through this so you can tell us what

18  we are looking at.  This is a six-page policy, and it's the

19  complete policy, isn't it?

20  A.   Well, I don't know.  That was the policy effective in

21  2013.  They have since changed it at least once or twice.

22  Q.   Okay.

23        MR. GOMAN:  Your Honor, I move for admission of

24  Exhibit A-60.

25        MR. THOMPSON:  It's a stipulated-to exhibit, Your

1    Honor.

2              THE COURT:  So no objection?

3              MR. THOMPSON:  No objection.

4              THE COURT:  A-60 is received.

5         (Defendant's Exhibit A-60 received.)

6    BY MR. GOMAN:

7    Q.  Miss Moody-Gilbert, this policy here applies to all BNSF

8    employees; is that right?

9    A.  It's supposed to, in my knowledge, yes.

10   Q.  Let's just talk about this last page here.  It lists out

11   violations which may result in immediate dismissal; right?

12   A.  That's what the paper says, yes.

13   Q.  And you are aware that insubordination is one of those

14   charges; right?

15   A.  Yes.

16   Q.  Are you familiar with Mr. Fresquez's disciplinary history?

17   A.  We're not given the copies of their transcripts, their

18   employee transcripts, and that's where that stuff is, until

19   we've got a corrected decision.

20   Q.  I'm going to -- I'm sorry.  Were you finished?

21   A.  Yeah.

22             MR. GOMAN:  I'm going to offer Exhibit A-3, Your

23   Honor.  I believe it's stipulated.

24             THE COURT:  A-3, all right.  A-3 -- well, it's not

25   stipulated on my sheet, but do you agree to it?

1            MR. THOMPSON:  We didn't stipulate to this, but --

2            MR. GOMAN:  I apologize.  It's an employee

3    transcript.

4            THE COURT:  A-3 is what he's referring to.  Do you

5    have any objection?

6            MR. THOMPSON:  We don't have any objection to it.

7            THE COURT:  You have no objection?  All right.  A-3

8    is received.

9        (Defendant's Exhibit A-3 received.)

10   BY MR. GOMAN:

11   Q.  All right.  This second page here shows a discipline

12   record; is that right?

13   A.  Yes.

14   Q.  Do you see here that in 2010 Mr. Fresquez was found to

15   have failed to comply with instructions and engaged in

16   insubordinate conduct?  Do you see that there?

17   A.  Yeah, I see where he -- there's a 30 day -- or a waiver of

18   30 days with time served.

19   Q.  A waiver meaning he chose not to go to investigation;

20   right?

21   A.  Right.

22   Q.  Got it.  Okay.  So let's talk about this discipline for a

23   second.

24            You mentioned that you believe the disciplinary

25   process at BNSF is unfair.  Is that right?

1   A.  Yes.

2   Q.  Okay.  And partly that's because, what, a small percentage

3   of employees are exonerated in the discipline process?  Is

4   that right?

5   A.  I feel that the process that they use is unfair.

6   Q.  Okay.  Let's talk about it -- let's just use this case as

7   an example.  So Mr. Fresquez -- were you aware that in 2012 a

8   contractor reported that he had committed a critical decision

9   failure?  Did you know that?

10  A.  No.  Sometimes, like these waivers, we -- if the company

11  offers them a waiver, then that's it.  There's no -- you know,

12  we don't write appeals.  We don't go beyond that.  And if

13  somebody reported that he had done something, we may or may

14  not have been notified of that.

15  Q.  Well, let's talk about why that is.  So 2012 -- stick with

16  me -- if a contractor had reported he engaged in misconduct,

17  and Mr. Fresquez's supervisor investigated and determined that

18  he didn't think there was a rules violation, no investigation

19  would ever be held; right?

20  A.  If they determined so.

21  Q.  And that's how the process should work.  The supervisor

22  should look into it before even bringing charges; right?

23  A.  You would think so.

24  Q.  It works at the arbitrator level, too, though.  In

25  Mr. Fresquez's case, were you aware that his discipline for

1  using a cell phone while driving a work truck was reviewed by

2  an arbitrator?

3  A.  Well, I'm sure whatever is in the record would be what

4  would be -- I mean, I don't know what the arbitrator reviewed,

5  but if it was in the record.

6  Q.  If the arbitrator determined that, yes, that is a rules

7  violation, but we think because it was a new policy the

8  Level S should be knocked down a level, arbitrators can do

9  that; right?

10 A.  They could reduce the -- the discipline, yes.

11 Q.  You don't know one way or another if that happened in

12 Mr. Fresquez's case?

13 A.  Well, other than what the record here shows.

14 Q.  You mentioned you are aware of very few employees being

15 exonerated after a hearing; is that right?

16 A.  Well, at that level.  I mean, I'm not saying that when it

17 goes to arbitration there isn't some changes there, but at the

18 division level.

19 Q.  I'm talking about the division level.  So Mr. Fresquez

20 intends to call in this case a Mr. Yancey, a Mr. Goodnight,

21 and a Mr. Snow.  Do you know those gentlemen?

22 A.  They are members of our system, yes.

23 Q.  So were you aware that in 2016 Mr. Snow was noticed for an

24 investigation for damaging equipment?  Did you know that?

25 A.  Well, they may have got a notice.  I don't get the

1    notices.  Those go our to our vice chairman.

2    Q.  Were you aware that went to a hearing and the hearing

3    officer determined --

4              MR. THOMPSON:  Objection, Your Honor.

5    BY MR. GOMAN:

6    Q.  -- he didn't violate a rule, so they --

7              THE COURT:  What's the objection?

8              MR. THOMPSON:  Relevance.  Also evidence not in the

9    record.  He's asking her questions about witnesses that have

10   nothing to do with this case.

11             THE COURT:  Well, overruled.  If she's aware of the

12   incident, she can answer.  If she's not aware, she will say

13   that as well.

14             So let's restate the question so it's clear what you

15   are asking here.

16             MR. GOMAN:  Sure.

17   BY MR. GOMAN:

18   Q.  Were you aware that Mr. Snow went to an investigation for

19   a violation of a rule and was exonerated by the hearing

20   officer one month before Mr. Fresquez had his investigation?

21   A.  If they're exonerated by the hearing officer or at the

22   division level before it gets to me, then that's something

23   that I -- I get the disciplinary cases when I have to write

24   the appeal letters.  So if they sign waivers or they get

25   exonerated prior to getting to that point, you know, at some

1   point we get the records in the office, but --

2   Q.  You don't --

3   A.  There's a lot of investigation notices out there.

4   Q.  So if employees admit to misconduct or the hearing officer

5   says, I don't think there's anything here, you wouldn't

6   necessarily know about it or remember it?

7   A.  Well, not necessarily because, like I said, if I don't

8   write the appeal letter, then it's -- doesn't get to my level.

9   Q.  So if the same thing happened with Mr. Goodnight, another

10  witness that plaintiff intends to call, you don't have any

11  awareness of that either?

12  A.  If it didn't get to the point where I have to write an

13  appeal letter -- like I said, at some point the documents come

14  to the office, they get filed away, but it doesn't necessarily

15  reach my desk.

16  Q.  What about Mr. Yancey, then, the third employee that

17  plaintiff intends to call?  Were you aware that he was found

18  to have violated a rule, but BNSF's Labor Relations Department

19  overruled that decision?

20  A.  Well, they could do that at claims conference, which I am

21  not a part of.

22  Q.  Do you know if that happened in Mr. Yancey's case?

23  A.  I don't recall if it did or not.

24  Q.  So I get that it's a small sample size, but the three

25  employees that Mr. Fresquez intends to call in this case, each

1    of them have been exonerated by this discipline process?  Did

2    you know that?

3            MR. THOMPSON:  I'm going to object, Your Honor.

4    She's already said she is not aware of this.

5            THE COURT:  I will let him ask his questions.

6    Overruled.

7    BY MR. GOMAN:

8    Q.  Did you know that?

9    A.  Not necessarily.  I mean, they have got 9,000 maintenance

10   of way people out there, and, you know, so -- our system

11   represents a portion of those, and so there's a lot more

12   people out there with discipline than have been exonerated.

13   Q.  Got it.  Last question, Ms. Moody-Gilbert.  In reviewing

14   Mr. Fresquez's case, are you aware that he was prevented from

15   presenting any evidence or any witnesses at his investigation

16   hearing that he wanted to call?

17   A.  I don't know what was discussed between vice chairman and

18   the conducting officer or what their -- their process was.

19   Like I said, I'm not involved in that process, so I don't know

20   what was discussed.

21   Q.  I understand, but you reviewed the investigation

22   transcript, and in that did you see any evidence that the

23   company prevented Mr. Fresquez from calling witnesses or

24   presenting whatever exhibits he wanted to present?

25   A.  I'd have to review.  It's been three years.

1    Q.  As you sit here now, you don't remember anything?

2    A.  Well, like I said, I have reviewed and written hundreds of

3    appeal letters since now and then, so it's kind of hard to

4    remember every detail of every case.

5            MR. GOMAN:  Understood.  Thank you.  I don't have any

6    more questions.

7            THE COURT:  Hold on.  How long is our redirect likely

8    to be?

9            MR. THOMPSON:  Less than 10 minutes, Your Honor.

10           THE COURT:  All right.  We are going to take our

11   midmorning break because we have been going over an hour and a

12   half.  We are going to take a 15-minute break, and when we

13   come back, let's finish this witness.  And who is your next

14   witness?

15           MR. THOMPSON:  Mr. Fresquez.

16           THE COURT:  All right.  We'll be in recess for

17   15 minutes.

18       (Proceedings recessed 10:48 a.m. to 11:09 a.m.,

19       resuming outside the presence of the jury.)

20           THE COURT:  All right, let's bring the jury in and

21   continue.  Have a seat until the jury gets here, please.

22       (Jury in at 11:10 a.m.)

23           THE COURT:  All right, have a seat.  Let's continue

24   with redirect.

25   ///

1                        **REDIRECT EXAMINATION**

2     BY MR. THOMPSON:

3     Q.  Mr. Goman asked you about coaching and counseling.  Do you

4     recall that?

5     A.  Yes.

6     Q.  Do union members have a right to representation when they

7     are being coached and counseled?

8     A.  If they ask.  They should have someone there if they ask.

9     Q.  If they don't ask, do they have an automatic right to it?

10    A.  I would say yes.

11    Q.  So is coaching and counseling something BNSF could use to

12    harass an employee?

13    A.  I think they could hold it over their head.

14            MR. THOMPSON:  Mr. Keech, will you please pull up

15    A-45.

16    BY MR. THOMPSON:

17    Q.  This is the notice of investigation Mr. Goman showed you.

18    A.  Okay.

19    Q.  Do you see the highlighted portion?

20    A.  Yes.

21    Q.  That could apply to insubordination; right?

22    A.  Yes.

23    Q.  Could it also apply to failure to comply with

24    instructions?

25    A.  Yes.

1          MR. THOMPSON:  Thank you, Mr. Keech.

2    BY MR. THOMPSON:

3    Q.  Your job is to advocate for members?

4    A.  Yes.

5    Q.  Would you lie for them?

6    A.  No.

7    Q.  How many locals do you have?

8    A.  42.

9    Q.  Do you think it will affect who votes for you if you come

10   in here and lie for a former president of one of your locals?

11   A.  Absolutely it would.

12   Q.  Negatively; right?

13   A.  Very negatively.

14   Q.  Integrity is important to your organization?

15   A.  Absolutely.

16   Q.  Do you have Elton John tickets tonight?

17   A.  I do.

18   Q.  Do you want to get out of here so you can go see that?

19   A.  As long as I do what I need to do here.

20          MR. THOMPSON:  You're free.  Thank you.

21          MR. GOMAN:  Your Honor, brief recross?

22          THE COURT:  You have a right to recross.  If you want

23   to make it brief, I encourage that.

24   ///

25   ///

1                          **RECROSS-EXAMINATION**

2    BY MR. GOMAN:

3    Q.   The question about coaching -- excuse me.  The question

4    about coaching and counseling, when you say employees have a

5    right to have a union representative there, why -- what is

6    that based on?

7    A.   Well, they -- in our union agreement they have right to

8    representation, and, you know, the union feels that coaching

9    and counseling is a form of discipline because it gives them a

10   mark in their record.

11   Q.   I see.  In the collective bargaining agreement, in Rule 40

12   nowhere does it make any reference to coaching and counseling,

13   does it?

14   A.   It says discipline.

15   Q.   And nowhere in that agreement does it say coaching and

16   counseling, sitting down with an employee and offering them

17   tips, is discipline?

18   A.   Well, if they're offering them tips, but typically it's

19   more than that.

20   Q.   The collective bargaining agreement, Rule 40, it does not

21   say anything about coaching and counseling.  Can we agree?

22   A.   It just talks about discipline.

23           MR. GOMAN:  All right.  Thank you.

24           THE COURT:  All right.  You may step down.

25           Is this witness excused?

 1            MR. THOMPSON:  She is, Your Honor.

 2            THE COURT:  All right.  Call your next witness.

 3            MR. THOMPSON:  The plaintiff, Brandon Fresquez.

 4            THE COURT:  Just so you know, we are going to go to

 5    not later than 12:20, 12:25 at the latest, before we take our

 6    lunch break, so . . .

 7            COURTROOM DEPUTY:  Please raise your right hand.

 8        (The witness was sworn.)

 9            COURTROOM DEPUTY:  Please be seated.

10            Please state your full name, and spell your full name

11    for the record.

12            THE WITNESS:  Brandon Fresquez, B-r-a-n-d-o-n,

13    F-r-e-s-q-u-e-z.

14     **BRANDON FRESQUEZ, THE PLAINTIFF HEREIN, DIRECT EXAMINATION**

15    BY MR. THOMPSON:

16    Q.  Can you please tell us about you.

17    A.  My name is Brandon Fresquez.  I'm 33 years old.  I have a

18    son.  His name is Xavier.  He is currently 13 years old.  He

19    was born two days after I started with BNSF.  I started with

20    BNSF November 7, 2005.  My son was born November 9, 2005.

21    Q.  Who is the primary care provider for your son?

22    A.  I am.

23    Q.  Do you pay child support?

24    A.  I do.

25    Q.  If you are the primary care provider, why are you paying

1    child support?

2    A.  Uh, it was ruled, uh, a while back by the courts that I

3    had to pay child support.

4    Q.  If you are the primary care provider, why aren't you

5    challenging that?

6    A.  I get to see my son.  I don't want to take the risk of

7    losing my son.  And my son's mom doesn't argue -- doesn't

8    argue -- she allows me to see my son, and I'm happy with that.

9    Q.  Are benefits important to you for any reason related to

10   your son?

11   A.  It is.

12   Q.  Tell me about that.

13   A.  While going through all this, uh, my -- my son was in and

14   out of the hospital, and at that time, uh, we were having a

15   really hard time getting him to school, and so we took him to

16   the hospital.  And through a bunch of tests and through months

17   of testing they found out basically that, uh, there was

18   something wrong with his blood.  And to this day through all

19   the testing -- we stopped the testing.  They were having --

20   they couldn't figure out the exact cause, but once a year we

21   have to take him back for -- to -- we're supposed to take him

22   back once a year to get checked for cancer.

23   Q.  That's expensive, I imagine.

24   A.  It is.

25   Q.  Good insurance is important to you then?

1   A.  It is.

2   Q.  Where are you originally from?

3   A.  I was born and raised here in Denver, Colorado.

4   Q.  What's your educational background?

5   A.  High school diploma.  I graduated here in Denver, Emily

6   Griffith High School.

7   Q.  Before BNSF, where did you work?

8   A.  I started working when I was 14.  Um, I started off

9   working in a nursing home.  I worked continuously at the

10  nursing home.  I also held other jobs at the same time.  I

11  would deliver newspapers, phone books.  I worked at call

12  centers.  Right -- and then right prior to starting with BNSF,

13  I worked for the City and County of Denver, but that was only

14  just for a short time because I started with BNSF.

15  Q.  Up and until you worked with BNSF, had you ever been

16  unemployed?

17  A.  Uh, no.

18  Q.  Ever been disciplined from a job?

19  A.  No.

20  Q.  Ever fired?

21  A.  No.

22  Q.  Any coaching and counseling prior to working at BNSF?

23  A.  No.

24  Q.  Ever asked to leave a job?

25  A.  Uh, I left the call center because it was a call center,

 1  and at that time I, uh, I worked in the executive offices,

 2  which basically what that meant is I took all escalated

 3  situations, and you could only take so many people yelling at

 4  you.  And it just -- it wasn't a -- a career.  It was just a

 5  job.  So I did leave that position.

 6  Q.  That was your choice?

 7  A.  That was my choice.

 8  Q.  Nobody told you to leave?

 9  A.  No.

10  Q.  When did you start working for BNSF?

11  A.  11 -- November 7, 2005.

12  Q.  Tell us about that.

13  A.  I hired out -- I applied.  I hired out of here in Denver.

14  Everybody starts off as a trackman, also known as a laborer.

15  You also hear the reference section men.

16          Would you like my whole career?

17  Q.  Let's start with -- tell me more, first, about what a

18  laborer does.

19  A.  A laborer is basically someone that fixes the track, the

20  people that are out there actually doing the maintenance.

21  Q.  What position did you go to from there?

22  A.  Because I was the youngest guy on the railroad at that

23  time, it caused me to travel.  Um, so I worked many places,

24  from Montana to Wyoming to Texas.  I worked throughout the

25  system.

1    I then went to a track inspector, and in '07 I

2    started being a track inspector.  And I permanently stayed a

3    track inspector from the time -- off and on I would go between

4    different positions, but primarily I have been a track

5    inspector my career.

6    Q.  Tell us about what a track inspector does.

7    A.  He is the eyes and ears of the railroad.  He provides --

8    he monitors the railroad to make sure they are in compliance

9    with the Federal Railroad Administration standards.  He's

10   there to make sure there's no derailments.  He's the person

11   that they call when a car gets hit, if someone gets hit.  He's

12   there to monitor all the safety functions of the railroad.

13   Q.  What kind of certifications do you need to obtain to be a

14   track inspector?

15   A.  It changes.  It's changed over the years, but I held all

16   my current -- I've always stayed current, but you have to pass

17   all the tests required.  You have to go to class, schooling.

18   Um, and you just have to pass all the tests and demonstrate

19   that you know what you are doing.

20        MR. THOMPSON:  Mr. Keech, will you please show the

21   witness Exhibit 28.

22   BY MR. THOMPSON:

23   Q.  Do you recognize this document?

24   A.  Yes.

25   Q.  What is it?

1   A.   That is a TIMS report.   TIMS is -- stands for the Track

2   Inspector Management System.   It's a report that is generated

3   when the inspectors input their inspections.

4   Q.   Tell me how you actually go about, I guess, finding a

5   defect and then putting it in this system.

6   A.   In this system it was -- it's pretty simple.   If I was to

7   go out and find a defect, I could just go onto my computer,

8   select the area that I want -- I was inspecting.   I could

9   select the milepost -- well, I don't select the milepost.   You

10  enter the milepost, you select the defect from the drop-down,

11  and then you select the type of repair you want to do on it

12  within the drop-down system.

13          MR. THOMPSON:   Plaintiff moves to admit Exhibit 28.

14          THE COURT:   Any objection?

15          MR. GOMAN:   Just a foundational objection.   A time

16  frame.   Relevance is the focus of my foundation objection.

17          THE COURT:   Well, I don't understand what you are

18  saying.   What about the foundation is the basis for your

19  objection?

20          MR. GOMAN:   How does he know this is a TIMS

21  inspection record from BNSF, and how did he obtain it?

22          THE COURT:   Well, I thought he said this is something

23  he inputted.   Isn't that what he said, Counsel?

24          MR. THOMPSON:   That's what he said, Your Honor.

25          THE COURT:   Yeah, I don't understand the objection,

1   so, therefore, it's overruled.  Exhibit 28 is received.

2        (Plaintiff's Exhibit 28 received.)

3   BY MR. THOMPSON:

4   Q.  All right.  Mr. Fresquez, can you walk me through what

5   these different columns mean?  What's "Inspect Date"?

6   A.  So in the first column it says "Inspect Date."  That's

7   when I indicate the day it was inspected.  So right under that

8   it says January 2nd, 2016.

9        The next column to the right is line segment.  The

10  "LS" stands for line segment.  Railroads are named by line

11  segments and also territories.  477 is actually here in

12  Denver.  It's the Denver branch.

13       The next column is "BMP."  That stands for beginning

14  milepost.  And then under that would be the actual milepost

15  number.

16       The next column is "EMP," which stands for ending

17  milepost.  So that would be the section of track you are

18  inspecting.

19       The director -- I don't know what the director

20  actually stands or the "Dir."

21       The next column actually stands for asset and track.

22  It tells you what track you are inspecting.  So right under

23  "Asset/Track" it says Main 2, so you were inspecting Main 2.

24  Q.  Let me pause you right there.  What does that mean,

25  Main 2?

1   A.   The railroad -- so railroads have, uh -- if it was only

2   one track, it would be a single track.   Okay?   Um, it's just

3   titled single.   It's a single track because there's only one.

4   When a railroad has multiple tracks, they have to name the

5   tracks so you understand where you are at at all times.

6        So it varies due to different cities or different

7   territories, but you could have -- if I was looking from -- if

8   I'm standing on the tracks in Denver and looking to Pueblo,

9   Main 1 would be on my right side; Main 2 would be on my left

10  side.   So Main 1 track would be closest to -- say if you were

11  going down I-25, would be closest to I-25.   Main 2 would be

12  the furthest one from I-25.   That's how that works.

13  Q.   Are all tracks main tracks?

14  A.   No.   There's different types of tracks.   So you can have

15  main tracks.   You can have yard tracks.   So if you ever drive

16  down here by -- on Park Avenue west in downtown, there's a big

17  yard where they build the trains.   That's a yard track.   They

18  would be titled yard tracks.   Some smaller tracks that just

19  provide delivery to a business, that might be titled a back

20  track, or they could still title it as a yard track.   A back

21  track and a yard track are very similar.   It's just the way

22  you title it.   You also have sidings, which they use to run

23  trains around other trains on main lines.

24  Q.   Is a main track kind of like the interstate?

25  A.   So when you think of main track -- so Denver is the main

1    terminal.  Denver is a main hub of BNSF.  So everything coming

2    south, everything coming, you know, east, everything has to

3    come through Denver.  So it's similar to I-70 and I-25.

4              That's what I inspected.  I inspected the main line.

5    I inspected I-25 and I-70, because them are the main routes in

6    and out of town.

7    Q.  Were there other track inspectors in Denver when you

8    worked there?

9    A.  Yes.

10   Q.  Did they inspect the main track?

11   A.  No.

12   Q.  You did that.

13   A.  Yes.

14   Q.  All right.  So let's continue on now.  We are now on

15   "Trav."  What does that mean?

16   A.  Transverse.  A transverse means how you inspected the

17   track.  Transverse means I could put -- so track inspectors

18   have a truck with train wheels on them, basically what it is.

19   And they could drop their train wheels onto the track, and we

20   drive our trucks on the track.  Transverse means did you go

21   over the track, or did you inspect the track by, um -- let's

22   go back to that example.

23             If I am looking at two tracks going from Denver to

24   Pueblo, I could be on track 1, I could also inspect track 2,

25   but I'm not transversing that track because I'm not on that

1    track.  I'm visually looking at it, but I'm not actually going

2    over it.  So the transverse means are you actually on the

3    track.

4    Q.  All right.  Pick up with the next column, please.  What

5    does that mean?

6    A.  "By," and that's just a type of -- you could -- Hi-Rail is

7    meaning your truck is on the track and you are going.  You

8    could also walk the track.  There's different forms of

9    inspections.  I could ride a train.  We'll ride a train from

10   time to time to see how it feels.  There's different types of

11   inspections we could use.

12   Q.  Any reason to go over the columns that are left blank, or

13   should they be blank?

14   A.  The majority of the time they're blank.

15   Q.  Let's go to, then, "FRA Defect Code."  What does that

16   column mean?

17   A.  The FRA Defect Code refers back to the compliance manual

18   that Mr. Lydick testified earlier in this case about.  It's a

19   code that -- it's basically the law.  It's referencing the law

20   that refers to that type of defect.

21   Q.  It's your understanding the law requires you to report

22   defects?

23   A.  Yes.

24   Q.  If I'm understanding you correctly, you have to identify

25   the law that requires each individual defect to be reported?

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 381

1   A.  Yes.  The way the system is set up, the minute we

2   acknowledge that -- when we enter that defect, it attaches the

3   actual code to that defect.

4   Q.  What does "Defect BMP" mean?

5   A.  Defect begin milepost.  It's -- that's all that really

6   means.

7   Q.  Is that the actual location of the defect?

8   A.  Yeah.

9   Q.  How accurate is that?

10  A.  It's pretty accurate, but there are -- it doesn't have to

11  be perfect.  And the reason being is because railroads over

12  time have actually -- so the thing about a railroad, railroads

13  have been around for hundreds of years.  Um, so over time the

14  railroad might move its track over to the right, to the left.

15  And in the beginning of time, though, if a -- if the railroad

16  had a milepost -- we think of milepost as 5,280 feet.  Over

17  time when they move the tracks slightly and over, it messes

18  with that 5,280 feet.  So you could have -- and they won't go

19  and adjust every single milepost because it's just going to be

20  a mess.  So they will alter it and say, hey, um, this section

21  of the track is going to be a long mile.  This section of

22  track is going to be a short mile.  So you could have a mile

23  that is only 3,000 feet, you could have a mile that's

24  8,000 feet, but it's identified in the system.  But pretty

25  much it's pretty much accurate.

1    Q.  If I'm understanding you correctly, and I want you to

2    correct me if I'm misunderstanding you, the Defect BMP will be

3    pretty close but not always spot on.

4    A.  Correct.

5    Q.  Then the last column that's filled in, "Remedial Action,"

6    what does that mean?

7    A.  That's the type -- so the remedial action is what we are

8    putting in the system.  So when we find a defect, we select

9    the type of remedial action that we want to apply to it.  So

10   if we looked at the first remedial action, it says, Scheduled

11   for repair 30 days, it actually looks like the type of

12   defect -- if we would just scroll down to the next page, it's

13   going to be a non-class defect.  Again, as testified earlier

14   in this case, the non-class actually says you have 30 days to

15   fix it.  That's the max that you have.  So that's -- that's

16   how that reads.

17   Q.  All right.  So we're going to the next page, which is more

18   columns.

19   A.  Yeah.

20   Q.  "Defect/Inspection Comments," what does that mean?

21   A.  So this defect, in the first one under the

22   Defect/Inspection Comments, has been in the system.  It

23   doesn't tell you how long this one has been in the system

24   unless you just scroll back and forth.  But it says the defect

25   has been prepopulated into this inspection form.  What that

1    means is it's in the system already.  Someone found it prior,

2    and every time you go over that track that defect is going to

3    pop up and tell you am I there or am I not there, acknowledge

4    me or have I been fixed.  And that's what that means.

5    Q.  So when a defect has been previously found and you inspect

6    the track and go to report it, it will kind of autofill?

7    A.  It will autofill the system.  But you still have -- sorry,

8    sir.  But you still have to acknowledge it.  You still have to

9    say, hey, it's active, or, no, it's not active.

10   Q.  What does it mean if you are finding a defect that you

11   know you have reported before but it's not prepopulating?

12   A.  It's probably been taken out of the system.

13   Q.  Is there a reason to take a defect out of the system?

14   A.  Absolutely.  Um, the way BNSF works is BNSF wants to move

15   trains.  Um, and when you have defects, usually you have to

16   take tracks out of service, put up slow orders, and they don't

17   want to, um -- so let's -- let's go back to that example.  I

18   said I had I-70 and I-25.  If I take -- so if I'm inspecting

19   I-25, and I shut down I-25, I take it out of service, there's

20   no way in and out of town unless you took some back way.  So

21   they don't want to shut down that road.  And everything going

22   south is the same scenario.  So it's in their best interests,

23   um, if it's not in the system, nobody knows about it.  And

24   also what it does is every time you take it out of the system,

25   and you reenter it, it restarts the time clock.  It's not

1   legal, but that's what happens.

2   Q.  As a track inspector at BNSF, can you do your job too

3   well?

4   A.  Absolutely.

5   Q.  Explain that to us.

6   A.  Again, like I said, they -- they, um -- it's in their best

7   interests to have someone not doing the track too well because

8   they are in the -- their moneymaker is moving trains.  That's

9   really what it is.  The more trains you move, the more money

10  they make.

11           Also, the supervisors are all graded by how much --

12  how well the trains are moving.  With Denver being a main hub,

13  it's, uh, very important to get the -- it's just like DIA

14  where you have arrival times and departure times.  There are

15  arrival times and departure times that they are graded on.

16  We'll get reports say, hey, Denver did good this quarter, all

17  our trains were on time.  So it's in their best interests to

18  move trains.

19  Q.  It's incredibly shortsighted to put pressure on a track

20  inspector to misreport a defect, isn't it?

21  A.  It is.

22  Q.  Does it happen anyway?

23  A.  Yeah, it does.

24  Q.  And track inspection is hugely important; right?

25  A.  Yes.

1   Q.  If an employee demonstrates an inability to effectively

2   inspect track, will he or she be disqualified from the job?

3   A.  Can you repeat that, please.

4   Q.  Sure.  If a track inspector, despite being certified,

5   demonstrates an inability to effectively inspect track --

6   A.  Yes, they can.  They could disqualify a person.

7   Q.  What's disqualification?

8   A.  It just means that they take away your certification, and

9   you have to prove again that you are capable of performing

10  that job --

11  Q.  Are managers --

12  A.  -- before --

13  Q.  Sorry.  Go ahead.

14  A.  -- before you could get another position.

15  Q.  Are managers required to do that if a track inspector is

16  unable to effectively inspect track?

17  A.  Yeah, because if you have an inspector out there that's

18  not knowing what they're doing, you are not only putting BNSF

19  assets at risk, you are putting the public at risk, and you're

20  putting the employees at risk.

21  Q.  Have you ever been disqualified as a track inspector?

22  A.  I have.

23  Q.  Tell me about that.

24  A.  I want to say in 2006, within my first year I got started,

25  I put in for a position, uh, in Douglas, Wyoming.  And at that

1    time I didn't understand how the BNSF system worked.  So I

2    thought BNSF was going to pay for my lodging.  Normally

3    they -- when you go out of town, they pay for your lodging

4    because -- that's what I thought within my first year.  At

5    that time they told me they weren't going to pay for my

6    lodging because the position was what's called a headquartered

7    position, meaning it's usually for the locals, the people that

8    live in the city.

9           So, of course, I can't afford to pay for a hotel an

10   entire month and pay for my food, so when I could, I right

11   away bid off.  And I bid off -- when I mean I bid off, I went

12   to another position within 30 days.  Because I went to another

13   position where they paid for my lodging, they called me up and

14   told me I was disqualified from the position.

15   Q.  So it's your understanding you were disqualified simply

16   because you didn't stay long enough for the manager's liking?

17   A.  That's correct.

18   Q.  Not because you weren't good at inspecting track or

19   anything like that?

20   A.  That's correct.  It was just based on because I didn't

21   stay the 30 days.

22   Q.  You became a track inspector again thereafter?

23   A.  Yes.  I think it was -- I came back -- because at the time

24   I was traveling.  I was always on the road.  So I came back to

25   Colorado in June 2007, and I got a track inspector position.

1    And at that time I primarily stayed a track inspector up until

2    my dismissal.

3    Q.  Have you ever been disqualified for substantive reasons?

4    A.  No.

5    Q.  That's something BNSF would have had to do if they

6    believed you couldn't adequately inspect track?

7    A.  That's correct.

8    Q.  I'd like to go to your employee transcript, Exhibit A-3.

9    Is this something you -- is this something you see while you

10   were an employee of BNSF?

11   A.  Not in this form, no.

12   Q.  But you've seen it since then as part of this case?

13   A.  That's correct.

14   Q.  Is there anything that's inaccurate about it?

15   A.  Yes.

16   Q.  Please direct me to that.

17   A.  The -- my last job position was actually a track inspector

18   position, and for whatever reason my job title has been

19   changed to gang/section foreman.

20   Q.  All right.  So they just -- BNSF is just listing the wrong

21   job?

22   A.  That's correct.

23   Q.  You were, in fact, the track inspector?

24   A.  That's correct.

25   Q.  Other than that, is anything wrong about the transcript

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    that you see?

2    A.   No.

3    Q.   All right.  So I want to ask you about some of the

4    discipline in here.  You were here when Mr. Goman questioned

5    Ms. Moody-Gilbert on it?

6    A.   Yes, sir.

7    Q.   All right.  So let's start with the earliest one, the 2010

8    one.

9    A.   Okay.

10   Q.   Can you tell me what that -- what happened?

11   A.   Yes.  I showed up early to work.  Uh, it was approximately

12   7:30 in the morning.  I got called to the roadmaster's office.

13   The roadmaster is my supervisor.  At that time the supervisor

14   wanted me to sign a document.  He covered the document, and I

15   stated, I will not sign that document until you allow me to

16   read it.  I asked for a witness multiple times.  It did not

17   happen.  At that time he became irate.  Uh, so what I did is I

18   walked out of the office.  At that time my supervisor's office

19   was above our break room.  I walked out of the office, went to

20   get a union official, and by the time I got my union official

21   I was wrote up for insubordination.

22   Q.   I see it says "Waiver."  What does that mean?

23   A.   A waiver is basically -- they gave me the option to sign a

24   waiver.  What that means is I basically pled guilty.  At the

25   time my union said because I had no witness and he had no

```
 1    witness, he would automatically win because the company will

 2    always take the company's side.  So they told me they were

 3    going to fire me, and that's what their attempt was gonna do,

 4    so I signed a waiver as -- saying I was guilty so I could keep

 5    my job.

 6    Q.  Were you guilty?

 7    A.  I walked out of the office.  That's -- they said because I

 8    walked out of the office, uh -- I did walk out of the office

 9    to get a union rep.

10    Q.  Did you offer to return once you had the union rep?

11    A.  I tried, but by that time I was already wrote up for

12    insubordination.

13    Q.  Under the collective bargaining agreement, do you have a

14    right to representation in those circumstances?

15    A.  I do.

16    Q.  Were you ever allowed to read the document that Mr. --

17    A.  No.  The first time I think I actually fully seen the

18    document was in this discovery process in this case here.

19    Q.  Years later?

20    A.  Years later.  I did sign -- I think it does show I did

21    sign it, but I never actually got to read the full document.

22    Q.  So it says here "Review Period 12."  What does that mean?

23    A.  They put me on probation for one year, 12 months.

24    Q.  This happened in 2010?

25    A.  That's correct.
```

1   Q.  Under the collective bargaining agreement, could BNSF

2   consider this discipline in 2016 when it terminated you?

3   A.  No.

4   Q.  I'm going to change colors on this because I want to

5   highlight another one.

6          Who is the roadmaster in that incident?

7   A.  His name was Alton Damon Fry.  He goes by Damon Fry.

8   Q.  He was your roadmaster?

9   A.  He was.

10  Q.  That would have been your immediate supervisor at the

11  time?

12  A.  Yes.

13  Q.  Who was his boss?

14  A.  Mark Carpenter.

15  Q.  All right.  I'm going to highlight an incident that

16  happened in 2013.  Tell me about this.

17  A.  Uh, BNSF had a policy that we were not allowed to use

18  handheld devices while driving.  I used my phone while I was

19  driving.  I was actually calling a coworker to tell him my

20  location, and somebody saw me.  And they took me to

21  investigation and found me guilty.  I was guilty.  I was using

22  my phone while driving.

23  Q.  Why did you take it to an investigation if you were

24  guilty?

25  A.  Again, we don't ever know what we are going to

1   investigation for.  They basically give us a notice, say, hey,

2   you are going to investigation.  We have no knowledge until we

3   get there what the case is actually about.

4           And what we found out later is I received a notice

5   five days later that I was just -- they gave me a notice five

6   days later.  And, like I said, they basically give you a piece

7   of paper, says you're going to investigation.  And when you

8   get into the investigation is when they actually tell you what

9   you are going -- what your investigation is for.

10  Q.  After the investigation, you knew you had violated the

11  rule, though; right?

12  A.  Yes.

13  Q.  But you appealed it to a public law board?

14  A.  That's just a process that the union goes through no

15  matter what.  That's basically what happens.

16  Q.  Did you think anything was unfair about the result of that

17  hearing?

18  A.  I did.  I think it was -- the punishment was a little

19  harsh.  Um, at that time, I mean -- I just thought it was a

20  little harsh.

21  Q.  So you didn't dispute that you had violated the rule, but

22  you thought you were punished too harshly?

23  A.  That's correct.

24  Q.  Did you appeal that to a public law board?

25  A.  Uh, yes.

1          MR. THOMPSON:  Mr. Keech, I'm going to show a

2    document just to the witness.

3          Well, I thought I was.  Let's skip that for the

4    moment.

5    BY MR. THOMPSON:

6    Q.  What did the arbitrator find?

7    A.  She -- she agreed.  She said, uh, basically the punishment

8    was too harsh, and they, uh --

9          MR. GOMAN:  Your Honor --

10   A.  -- dropped the --

11         MR. GOMAN:  I'm sorry.  I apologize to interrupt, but

12   I didn't know that's where we were going.  I object to an

13   arbitrator's findings coming in, based on the Court's previous

14   ruling.

15         MR. THOMPSON:  Your Honor, not being offered for the

16   truth of the matter.  This is discipline that they could use

17   or could not use to escalate his subsequent discipline that's

18   at issue in this case.  So it's being offered to show that

19   they couldn't use it.

20         THE COURT:  It's being offered to do what?

21         MR. THOMPSON:  To show that under their progression

22   policy, because of the arbitrator's award, they could not use

23   that discipline to escalate Mr. Fresquez's termination.

24         MR. GOMAN:  I apologize.  I misunderstood.  Withdraw

25   the objection.

1        THE COURT:  The objection is withdrawn, so you may

2   continue with the answer.

3        Why do you don't you re-ask the question so it's

4   clear what you are asking.

5        MR. THOMPSON:  Sure.

6   BY MR. THOMPSON:

7   Q.  What did the arbitrator find on the phone issue?

8   A.  She dropped the original charge stating, in short, the

9   punishment was too harsh.

10  Q.  So was your suspension reduced?

11  A.  I believe it was.  I don't remember right offhand.

12  Q.  I'm showing you what has been marked as Exhibit 1.  Do you

13  recognize this document?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's a letter that they send out -- uh, that they sent out

17  to me.  It's from -- it's just stating the award from the

18  arbitrator.

19  Q.  This is the arbitration award we have been talking about?

20  A.  Yes.

21        MR. THOMPSON:  Plaintiff offers Exhibit 1.

22        MR. GOMAN:  No objection.

23        THE COURT:  All right.  Exhibit 1 is received.

24     (Plaintiff's Exhibit 1 received.)

25  BY MR. THOMPSON:

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 394

1   Q.  All right.  So right here you can see that the discipline

2   was modified as a result of this.

3   A.  That's correct.

4   Q.  So going back to your transcript then, I see it says

5   "Formal Reprimand."  What is that?

6   A.  Um, I'm unsure.

7   Q.  What does the 12 under Review Period mean?

8   A.  From -- 12 months.

9   Q.  So you have on here -- prior to your termination, you have

10  a record suspension and a formal reprimand; right?

11  A.  That's correct.

12  Q.  Did you ever actually get any real suspension?

13  A.  No.

14  Q.  So it's just a record and a reprimand.

15  A.  Yes.

16  Q.  Under the PEPA policy, could any of the discipline you

17  received be considered when they were assessing your

18  discipline severity in 2016?

19  A.  No.

20  Q.  So when Mr. Goman was up during opening talking about all

21  the discipline you received, that couldn't be used for

22  purposes of why we are here today; right?

23  A.  No.

24          MR. GOMAN:  Objection:  leading and argumentative.

25          THE COURT:  I'm sorry?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1          MR. GOMAN:  I had an objection for leading and

2    argumentative.

3          THE COURT:  Oh, okay.  I'm sorry.

4          MR. THOMPSON:  I can re-ask the question.

5          THE COURT:  All right.  Rephrase your question,

6    please.

7    BY MR. THOMPSON:

8    Q.  You saw during opening Mr. Goman get up with a timeline of

9    all your discipline and coachings?

10   A.  I did.

11   Q.  Could that discipline and coaching be used to determine

12   your discipline severity in this case?

13   A.  No.

14   Q.  Any idea why Mr. Goman was talking about it then?

15          MR. GOMAN:  Objection:  argumentative.

16          THE COURT:  Overruled.  He can answer.

17   A.  Uh, can you repeat that, please.

18   BY MR. THOMPSON:

19   Q.  Yeah.  Any idea why Mr. Goman was mentioning it then?

20   A.  To make me look like a bad employee.

21   Q.  Were you a bad employee?

22   A.  No.

23   Q.  How did you feel about your job?

24   A.  I loved my job.  I loved providing safety for the -- the

25   railroad and, you know, providing safety for the public, and I

1   loved working with the guys.  It's a great environment when

2   everything is being done correct.

3   Q.  Before we move on, I forgot to mention, I want to look at

4   all your -- back at Exhibit A-3.  What is this list here,

5   "Quality/Rules/Safety Training"?

6   A.  It's all my training courses.

7   Q.  I'm just going to scroll through it.  It looks like one

8   page, two pages, three pages, four pages.  So four pages worth

9   of training while at BNSF?

10  A.  Yes.

11  Q.  Did you know how to report track defects?

12  A.  I did.

13        MR. THOMPSON:  Thank you, Mr. Keech.  You can take it

14  off the screen.

15  BY MR. THOMPSON:

16  Q.  All right.  So I interrupted you.  Sorry.  Tell me about,

17  um, whether you liked your job at BNSF.

18  A.  I loved my job.  I loved the benefits.  You know, I loved

19  working with the guys.  We had great relationships.  Uh, when

20  everything is being done correctly, everything was good.  Um,

21  but it had to be being done correctly.  And there was times

22  when things wouldn't be done correctly, and I was losing

23  sleep.  I mean, but overall I loved my job.

24  Q.  What did you like about the work itself?

25  A.  Oh, I just, you know, loved, you know, providing safety,

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 397

1  knowing that, you know, we don't have to worry about, you

2  know, a derailment or, um, people getting hurt, you know.  It

3  just -- I enjoyed it.

4  Q.  Are you a rules-oriented person?

5  A.  Oh, absolutely.  Um, you know, I get a lot of, um,

6  comments about it, but I -- I'm just by the book.  That's just

7  who I am.

8  Q.  Was I right when I said you probably don't cross the

9  street when the crosswalk is not lit?

10  A.  Yeah.  And actually they got mad at me the other day

11  because I stopped them from crossing the street.

12  Q.  What about the wages?  How do they compare to what you can

13  make outside of BNSF?

14  A.  It's about $60,000, uh, less than what I make.

15  Q.  Is that wages and benefits together?

16  A.  It is.

17  Q.  How much longer had you planned to work at BNSF?

18  A.  Until my -- until I was 60.

19  Q.  What's so magic about turning 60?

20  A.  At 60 years old, we get to claim our full retirement, our

21  benefits, our pensions.

22  Q.  All right.  So let's talk a little bit about that.  The

23  railroad industry isn't under Social Security; is that right?

24  A.  That's correct.

25  Q.  What do you guys have instead?

 1   A.  We have railroad retirement.

 2   Q.  Is that kind of like a -- like Social Security plus a

 3   pension?

 4   A.  It is.

 5   Q.  What do you need to qualify for that?

 6   A.  Uh, basically once we turn 60 we can start claiming, uh --

 7   we can start receiving our railroad retirement.  Some of the

 8   older guys that, um -- for me it would have been 40 -- I would

 9   have had 40 years on the railroad.  You could also start

10   claiming it the minute you have -- no, let me repeat that.

11        They say it's 30/60, 30 years in at 60 years old.

12   For me I would have had 40 years in at 60 years old.

13   Q.  So if I'm understanding you correctly, you can retire with

14   full benefits at age 60 if you have 30 years of service?

15   A.  That's correct.

16   Q.  And at age 60 you would have had 30 years of service?

17   A.  Yes.  I would have actually had 40.

18   Q.  How were the benefits at BNSF as compared to employment

19   outside of BNSF?

20   A.  Oh, they're -- it's a big difference.  Um, BNSF is

21   considered to have one of the best benefit packages around.

22   The health benefits are great.  The retirement is great.  It's

23   one of the best around.

24   Q.  Tell me about the stress on you and your family of earning

25   60,000 less per year in benefits and wages.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 399

1   A.  It is, um -- it was really hard, and it's been really

2   hard.  Uh, I remember I had a conversation with my son, and I

3   remember I was sitting outside his school right after, um --

4   shortly after I lost my job, and I remember I was sitting

5   there, and I knew I had to tell him that I no longer had a

6   job.  And at the time I had to tell him, uh -- I call him

7   Hijo.  I said, Son, when we go to Grandma's house, you have to

8   eat because I don't have money to buy you food.  And that's

9   hard, as a dad, to tell your son that you can't feed your son

10  for doing your job correctly.  That's really hard.

11  Q.  Have you found work now?

12  A.  I have.

13  Q.  How long did it take you?

14  A.  Uh, the first -- it took three months for me to receive my

15  first offer -- my first -- it took three months for me to

16  start a new job after leaving here.

17  Q.  Did you wait three months to apply and that's why it took

18  you three months?

19  A.  No.  I applied to many positions.

20  Q.  Did you apply to railroad positions?

21  A.  Yes.

22  Q.  What happened when you applied to railroad positions?

23  A.  There is only one other major railroad here on the western

24  half of the United States, and that's Union Pacific.  I filled

25  out the application because they were hiring here in Denver.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   And the minute I hit submit, I received a letter that says you

2   have been rejected.

3   Q.  Is that because you disclosed in your application that you

4   had been terminated by BNSF?

5   A.  That's correct.

6   Q.  Why didn't you lie about it?

7   A.  I wanted to be honest, because at the end of the day it's

8   going to come out.  No matter if I lied about it and I got my

9   hopes up and I got the job, if they found out I did lie, and I

10  didn't disclose it, they could terminate me any time.

11  Q.  What job did you find three months later?

12  A.  A building inspector.  I started off inspecting roofs.

13  Q.  Is that still what you do?

14  A.  It is.

15  Q.  For the same company?

16  A.  No.  I transferred companies.  I started -- I actually

17  transferred to a different couple companies, but I am now

18  working for a company based out of California that operates

19  multiple city and county offices.

20  Q.  Why did you move companies?

21  A.  Better pay.

22  Q.  Did you receive any discipline at the old company?

23  A.  No.

24  Q.  Any kind of coachings, counselings?

25  A.  No.

1   Q.  Anyone complain about you?

2   A.  No.

3   Q.  Was that full-time employment?

4   A.  I started off, when I first got the position, it was a --

5   I started with one city.  It was just basically part-time.  It

6   was what they call seasonal.  At the time they ended my

7   season, and my next position ended up being full-time.  And I

8   worked full-time until I switched and I got another full-time

9   position.

10  Q.  You are still currently employed?

11  A.  I am.

12  Q.  All right.  So let's go back to BNSF.  Who is Mark

13  Carpenter?

14  A.  Mark Carpenter is my boss's boss.  He is also called a

15  division engineer.

16  Q.  For the maintenance of way, how many division engineers

17  are there for the Denver territory?

18  A.  There's only one for Denver.

19  Q.  He's kind of the head guy?

20  A.  He is.

21  Q.  To whom does he report?

22  A.  Adam Miller.

23  Q.  The gentleman sitting right here?

24  A.  Yes.

25  Q.  Had you ever met Adam Miller?

1    A.  Yes.

2    Q.  Tell me about that.

3    A.  I have actually only had one conversation with Adam

4    Miller.  Uh, it's the only time I ever rode what we would call

5    a geo car.  It's the train that comes in to measure the track.

6    Um, the conversation was very short.  It was just basically a

7    hi, um, and that's all it really was.  He just happened to be

8    on the geo car the same time I was on the geo car.  That's the

9    only conversation I have ever really had with him.

10   Q.  So in a decade, the only time you saw him on the territory

11   is that one time?

12   A.  No, I seen him plenty of times on the territory.  My -- I

13   seen him plenty of time.  From my understanding, he loved to

14   come down to Denver because he liked mountain biking, so he

15   would come down.  I would see him, but I wouldn't speak to

16   him.

17   Q.  You were here when Staci Moody-Gilbert testified?

18   A.  I was.

19   Q.  You heard her say that she had reported your concerns to

20   Mr. Miller?

21   A.  Yes.

22   Q.  Did Mr. Miller ever call you?

23   A.  No.

24   Q.  When did Mark Carpenter become your division engineer?

25   A.  I don't know exact date when he started in Denver.

1   Whenever it was in Denver.  I wanted to say '08, but I'm

2   unsure the exact date.

3   Q.  Was he the only division engineer you worked under?

4   A.  No, I have worked under plenty of division engineers.

5   Q.  Tell me about that.  I guess if he is the head honcho in

6   Denver, how were you working under other division engineers?

7   A.  Like I say, I traveled the system, and I've worked

8   throughout.  My territory actual -- my actual work territory

9   goes from Casper, Wyoming, to Monument, down here by Colorado

10  Springs, all the way out to -- I don't even know the town.

11  Somewhere in Illinois.

12          MR. THOMPSON:  Your Honor, I understand you wanted to

13  go for 15 more minutes, although now is a really good time to

14  stop, so --

15          THE COURT:  I don't want to stop now.

16          MR. THOMPSON:  Yes, Your Honor.

17          THE COURT:  I said 12:15, and it's 11:55.

18          MR. THOMPSON:  Yes, Your Honor.

19  BY MR. THOMPSON:

20  Q.  Did you have reason to believe that Mark Carpenter or the

21  roadmasters under him were violating FRA regulations?

22  A.  Yes.

23  Q.  Tell me about that.

24  A.  There was a couple isolated incidents where when you go

25  into TIMS, our Track Inspector Management System, that you

1   were, you know, kind of noticing defects not being in there.

2          There was also an incident where --

3   Q.  Let me pause you there.  Expand on that.  You would go

4   into TIMS, and defects weren't there.

5   A.  So as we referenced earlier in this TIMS report, the

6   system should prepopulate a defect.  If it's there, it's going

7   to tell you it's there.  The only way for it not to

8   prepopulate is to tell you to either be repaired or be removed

9   somehow.

10  Q.  Were you finding defects that existed in the field but

11  were not prepopulating?

12  A.  Yes.

13  Q.  What did that cause you to believe?

14  A.  They were being removed somehow.

15  Q.  Who did you suspect was removing them?

16  A.  Uh, the management.  Mark Carpenter, uh, and the

17  roadmaster.

18  Q.  Did you feel like you could do anything about it at that

19  point in time?

20  A.  No.

21  Q.  Why not?

22  A.  It's basic -- it's their word versus my word, and they

23  control the system.

24  Q.  Around the time you are starting to suspect that Mark

25  Carpenter was taking defects out of the system, did you have

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 405

1   an issue at a petroleum track?

2   A.  Yeah -- yes.  So there's a track here in Denver.  Um, it's

3   called Colorado Petroleum.  As the word states, it's

4   petroleum.  It's a storage unit.  It's a storage unit or -- a

5   facility that deals with petroleum and different type of

6   gases, diesels.  I found a defect, and at that time I called

7   Michael Paz.

8   Q.  Let me pause you there.  Who is Michael Paz?

9   A.  He -- a roadmaster.

10  Q.  Who was he under?

11  A.  Mark Carpenter.

12  Q.  Okay.  Go ahead and pick up.

13  A.  I called Michael Paz to come out to the location.  He

14  showed up with Marty Feighner at the time.

15  Q.  Who is Marty Feighner?

16  A.  I don't know his title, but he reports directly to Adam --

17  at the time it was Adam Miller.

18  Q.  Okay.  Go ahead and pick up.

19  A.  And they both told me, good job, you know, the defect is

20  there.

21  Q.  So if I'm understanding correctly, both Michael Paz and

22  Marty Feighner acknowledged the defect was there?

23  A.  Yes.

24  Q.  Then what happened?

25  A.  Michael Paz -- so we notified the yard, Hey -- the person

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    in charge of the track -- we are going to fix this.  Michael

2    Paz gets called to the office, uh, to Mark Carpenter's office.

3    Michael Paz returns shortly after and tells me, uh, I'm here

4    to tell you from Mark Carpenter, um, if that defect is in the

5    system tonight, you will be wrote up for insubordination.

6    Q.  Was this the first time you were told to -- affirmatively

7    told to misreport a defect?

8    A.  Yes.

9    Q.  What happened next?

10   A.  I negotiated with Paz, Michael Paz.  At the time I

11   negotiated with him.  I actually came -- I said, uh -- I said,

12   Look, the guys -- the guys were already there.  I says, This

13   is going to take an hour to fix.  I said, Let's fix it so the

14   defect gets fixed and it looks like you did your job by not

15   having it in the system.  And he -- he agreed, and we fixed

16   that defect.

17   Q.  When about in time was this?

18   A.  What was that?

19   Q.  When did this happen?

20   A.  Early '14, 2014.

21   Q.  At some point did you do a ride-along with Mark Carpenter?

22   A.  I did.

23   Q.  When did that happen?

24   A.  Uh, I would like -- um, April '14.  2014.

25   Q.  2014 or 2015?

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 407

1   A.  I don't, uh -- I want to say it was -- I can't remember

2   right offhand.

3   Q.  If the records show it was 2015, you wouldn't have any

4   reason to dispute that?

5   A.  No.

6   Q.  In the decade prior, had Mark Carpenter ever ridden with

7   you?

8   A.  No.

9   Q.  Tell me about the ride-along with Mr. Carpenter.

10  A.  It was -- it was awkward that he wanted to ride with me,

11  because any time they had officers in town or were, uh, on our

12  territory, Mark Carpenter would be with them officers.  So on

13  every other division -- we call ourselves divisions.  On every

14  other division they would have an inspector pilot them.  What

15  I mean by pilot them is because the inspectors know the

16  territories the best, they have them, um, basically pilot them

17  throughout the territory.  For whatever reason, every time

18  they hit Denver, um, they were done.  They -- or they jumped

19  around to avoid, and I was never asked to ever pilot anybody.

20        So, therefore, it was really awkward.  During that

21  ride-along, he wanted to inspect my defects.  One of the

22  defects that we came up to first, um, I was off -- I noted it

23  hundred feet, 200 feet short of the actual location.  So at

24  that time he belittled me and told me to remove the defect,

25  knowing the defect I was off by just 200 feet.

1        We continued that ride.  He also had me remove a

2   couple other defects.  And then he also, uh -- at that time,

3   um, because we were not allowed to use handheld devices, we

4   couldn't use our phone.  We had to use Bluetooth or, I mean,

5   wireless devices.  I had Bluetooth.  I went out and got

6   Bluetooth, uh, headset.  He said my Bluetooth headset wasn't

7   good enough.  And that was basically the ride-along.

8   Q.  I want to make sure I understand correctly.  So you had

9   reported a defect, and you were off by a hundred feet.

10  A.  Give or take, yes.

11  Q.  Did Mr. Carpenter acknowledge that the defect was, in

12  fact, present?

13  A.  Yeah, but he wanted it removed.

14  Q.  Did you remove it?

15  A.  I did.

16  Q.  Does that violate federal law?

17  A.  It does.

18  Q.  Why did you agree to violate federal law?

19  A.  It's hard to stand up to these guys and keep your job.

20  Q.  All right.  Well, after the fact why didn't you go to the

21  FRA?  You heard Joe Lydick.  You could have called them.

22  A.  You're scared to lose your job and -- you know, you're

23  really scared.  You need the benefits.  You need, um -- you're

24  really scared.  It's not easy.

25  Q.  At that point in time did you think you could prove that

1    BNSF was violating federal regulations?

2    A.  No.  Like I said, it's their word versus my word.

3    Q.  I mean, if you went to Adam Miller, who do you think he'd

4    believe?

5    A.  Say that again, please.

6    Q.  If you had gone to Adam Miller, who did you think he'd

7    believe?

8    A.  They ain't going to believe me.

9    Q.  What about the FRA?

10   A.  Uh, it's their word versus mine.  I don't -- I don't think

11   they would believe me.

12   Q.  Up to that point had you been able to resolve any issues

13   regarding defect reporting with managers?

14   A.  I've always been able to negotiate with these guys.  I

15   really have.  And I -- I would try to do it one-on-one with

16   these guys because that's the best way to negotiate with them.

17   I would always try to find a way to get the defect fixed or

18   negotiate to let the defect stay -- I mean, the slow order

19   stay.  I have always been able to do that with them.

20   Q.  Did you view what happened with Mark Carpenter as an

21   isolated incident?

22   A.  It was isolated, but I felt that it was -- it was isolated

23   at the time.

24   Q.  Did you think things would get better?

25   A.  Uh, at that time I guess I didn't have -- will it get

1  better?  I don't think it would have got better because I

2  think that was, uh -- when your supervisors are telling you to

3  start taking defects off, I think they're just kind of getting

4  more, uh -- how do you say it?  Um, well, I don't -- they're

5  just getting more aggressive, I guess.  I don't -- I guess

6  that's -- I'm trying to think of a word.  They're just --

7  yeah, I guess that's the best way to say it.

8  Q.  Did it get better?

9  A.  Say it again, please.

10  Q.  Did it get better?

11  A.  No.

12  Q.  Did Mark Carpenter ordering you to violate federal

13  regulations weigh on you?

14  A.  He did.

15  Q.  My question is a little different.  You ended up

16  violating.  You agreed.  You did it.  Right?

17  A.  Yes.

18  Q.  Did that bother you?

19  A.  It did.

20  Q.  Did you think about it?

21  A.  It did.  It started a war within myself.

22  Q.  Tell me about that.

23  A.  I was trying to avoid conflict to keep the peace, and all

24  it really did was create a war within myself.

25  Q.  All right.  So I want to talk to you now about what

1  happens on April 29, 2015.  You saw the text messages from

2  Ms. Moody-Gilbert; right?

3  A.  That's correct.

4        MR. THOMPSON:  Mr. Keech, could you take those off

5  the screen, please.  Thank you.

6  BY MR. THOMPSON:

7  Q.  What precipitated those text messages?

8  A.  There was a track that's been out of service, and it kept

9  getting put back in service.

10  Q.  Let me stop you there.  What track?

11  A.  533.

12  Q.  Is there anything special about 533?

13  A.  It's just a track.  They use it every day.  It's a grain

14  track.  They also use it for auto -- to storage auto -- what

15  we call auto trucks.  That's how dealerships get their cars,

16  through the trains.

17  Q.  How often does that type of track need to be inspected?

18  A.  This is once a month.

19  Q.  So what happens on 4/29/2015 regarding that track?

20  A.  Well, it's towards the end of the month.  So towards the

21  end of the month you are always on a crunch because you have

22  so many assets -- you might have hundreds of assets that have

23  to be inspected.  When we call "assets," we mean tracks.  So

24  it's towards the end of the month, so you are trying to get

25  all your assets done because we had to have everything done by

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 412

1   the end of the month.  And at the beginning of the month it

2   restarts the cycle.  So we're in the crunch.

3          During that morning briefing -- so every morning we

4   get together and we have briefings.  We have -- we talk about

5   the day ahead, defects, who's doing what, who's working where.

6   I notified the supervisor at that time, the roadmaster --

7   Q.  Who was that?

8   A.  Ryan Akers.

9   Q.  He works under Mark Carpenter?

10  A.  That's correct.

11  Q.  Okay.  Go ahead and continue.

12  A.  I notified him that the track was going to be out of

13  service because that's -- it was defective.  And at that time

14  he told me if I want to continue receiving a paycheck, I will

15  inspect that track and I will not show any defects on it.  Um,

16  and I said, You know what you are telling me to do.  You are

17  telling me to falsify reports.  And he immediately kicked me

18  out of the office.

19          Um, and at that time that's when I called Staci and,

20  uh -- and I think we came up to the conclusion for myself I

21  felt really uncomfortable being at work, and I wanted to go

22  home because that was the best scenario at the time, and Staci

23  says, Ask them if you can go home.  And I asked to go home,

24  and they allowed me to go home for the day.

25  Q.  Was this your first time contacting the union about what

Julie H. Thomas, RMR, CRR                          (303)296-3056

1  you believed to be violations of federal law?

2  A.  Yes.

3  Q.  Do you know whether the union then raised the issue with

4  BNSF?

5  A.  Staci says she contacted Adam Miller, um, and that's what

6  the end of that was.

7  Q.  So you heard Mr. Goman talk to her earlier about when

8  employees go to unions they can remain anonymous; right?

9  A.  That's correct.

10 Q.  Is there any way, regardless of whether they used your

11 name or not, that Ryan Akers wouldn't know this was you that

12 filed a complaint?

13 A.  No.  I'm the only main line inspector.  I'm the only main

14 track inspector in Denver.  So my scenarios are not like,

15 uh -- say, for instance, you have a huge warehouse or you

16 have -- working at Wal-Mart where you have a hundred cashiers

17 and someone complains.  Well, you might have a hundred

18 cashiers, you might not know who that cashier is that

19 complained.  It's not like that.  I'm the only person that

20 does this job.  I'm the only main line inspector, so all my

21 scenarios are one of a kind.  So anything that's reported is

22 automatically, yeah, we know who reported it.  So it's not

23 really anonymous.

24 Q.  Is this the first time you refused to violate federal

25 regulations and couldn't get BNSF to, you know, convince them

Julie H. Thomas, RMR, CRR                        (303)296-3056

1    to do the right thing?

2    A.  Yes.

3    Q.  Is it your first time reporting BNSF to your union?

4    A.  Yes.

5    Q.  Let me ask you this.  Not long before you had agreed to

6    violate federal law when Mark Carpenter asked you; right?

7    A.  I did.

8    Q.  Why now were you standing up to them?

9    A.  Because it's just wrong.  It's really wrong.  We're

10   putting everybody at risk, and we're putting the public at

11   risk.  It just -- it ate me up inside.  That's really what it

12   did.

13   Q.  Why didn't that happen when Mr. Carpenter asked you?  I

14   mean, why now?

15   A.  You can only take so much.  It's like the last straw.

16   That's how I could explain it.

17   Q.  I'm going to show you Plaintiff's Exhibit 29, which has

18   not yet been admitted.  Do you recognize this document?

19   A.  I do.

20   Q.  What is it?

21   A.  It's an e-mail exchange between me and the IT department.

22   Q.  All right.  That's the first two pages?

23   A.  That's correct.

24   Q.  What are pages 3 and 4, just generically?

25   A.  It's a -- it's a response and a couple inspection reports.

1    Q.   What is page 5?

2    A.   It's a FRA report.

3    Q.   What is an FRA report?

4    A.   The government has their own FRA inspectors, and they will

5    come out here and they'll find defects, and they will issue a

6    report similar to what -- basically the same thing we do.

7    It's just they have more authority because they are the

8    government.  Um, they'll write up a defect and say you have

9    30 days to fix it, or whatever type of defect it is.

10   Q.   What are pages 6 and 7?

11   A.   Uh, it's the defects.  They are fouled ballast defects.

12   Q.   Are those pictures you took?

13   A.   They are.

14   Q.   What does this series of documents demonstrate?

15   A.   It demonstrates that BNSF was violating federal

16   guidelines, federal standards, federal law and --

17            MR. THOMPSON:  Plaintiff moves --

18   A.   -- and it led to me being terminated.

19            MR. THOMPSON:  Plaintiff moves to admit Exhibit 29.

20            MR. GOMAN:  Your Honor, the only objection I have is

21   to page 5.  It's not clear to me how he obtained and can

22   authenticate that document.

23            THE COURT:  Let me see page 5.

24            MR. THOMPSON:  Yes, Your Honor.

25            THE COURT:  All right.  Let's have you ask questions

1    of him about page 5 and whether or not he can explain what it

2    is.

3              MR. THOMPSON:  Sure.

4    BY MR. THOMPSON:

5    Q.  Do you recognize page 5 of Exhibit 29?

6    A.  I do.

7    Q.  What is it?

8    A.  It's a FRA report.

9    Q.  How do you know that?

10   A.  Because it's from the PARS system.

11   Q.  What is the PARS system?

12   A.  It's the system we use, we interact with.  It communicates

13   with TIMS.  They work side by side.  PARS is actually how we

14   report our work.

15   Q.  Is this something you used routinely as part of being a

16   track inspector at BNSF?

17   A.  Yes.

18   Q.  And you recognize this as such?

19   A.  Yes.

20             MR. THOMPSON:  Plaintiff moves to admit Exhibit 29,

21   all pages.

22             MR. GOMAN:  No objection, Your Honor.

23             THE COURT:  All right.  Let me ask you a question.

24   These pictures that are at the back of this, weren't they --

25             MR. THOMPSON:  Yes, sir.

Julie H. Thomas, RMR, CRR                              (303)296-3056

```
 1            THE COURT:  -- weren't they introduced earlier as

 2    part of another exhibit?

 3            MR. THOMPSON:  As demonstrative.

 4            THE COURT:  As a demonstrative only.

 5            MR. THOMPSON:  Yes, sir.

 6            THE COURT:  All right.  All right.  Exhibit 29, which

 7    is at the bottom of this big, thick book that weighs about

 8    30 pounds, is received.

 9        (Plaintiff's Exhibit 29 received.)

10            THE COURT:  All right.  Why don't we stop for our

11    lunch break.  There's a legal matter I want to raise with

12    counsel outside the presence of the jury.

13            So I want to start again -- I want the jurors to be

14    back by 1:30, and my goal will be to start not later than

15    1:35.  So we will be in recess with the jury until 1:35.

16        (Jury out at 12:14 p.m.)

17            THE COURT:  All right, have a seat.  As you know,

18    yesterday I gave you, through my law clerk, the proposed draft

19    jury instructions, and I want to lift up Instruction 21 again.

20    As you know, I crossed out what the parties had proposed,

21    meaning:  "The plaintiff claims for compensatory damages

22    includes the following distinct type of damages, and you must

23    consider them separately:

24            "1.  Lost wages and benefits the Plaintiff would have

25    earned in his employment with BNSF if he had not been
```

1    discharged on May 27, 2016, through today's date."

2          And then accompanying it is the comment that is noted

3    in bold about the fact that I can't find any law directly

4    under the FRSA that says whether or not, analogous to

5    Title VII retaliation cases, that back pay is an equitable

6    remedy to be decided by the Court.

7          Now, this is my first trial under the FRSA in almost

8    24 years, so I want the parties to give me some law on this

9    one way or the other.  Now, what I don't know, is there any

10   damage information that will come from this witness, the

11   plaintiff, or is it going to come through the economist who

12   will testify later?

13         MR. THOMPSON:  Yes, Your Honor.  So there was going

14   to be exhibits that were admitted through him.  We weren't

15   going to spend a whole lot of time on it.  We have actually

16   stipulated to them.  And from plaintiff's perspective, we have

17   actually looked at the case law.  I have never had a judge do

18   what this Court is going to do, but I actually think you're

19   right.

20         THE COURT:  Well, don't say that because I'm right.

21   Being right is important, but I want to make sure I'm right --

22   this is my best sense of what I should do.

23         Let me hear from the defendant.

24         MS. DALE:  Your Honor, we have not seen FRSA

25   appellate cases deciding this issue specifically, but given

1   the analogies that you had listed in Sarbanes-Oxley and also

2   to Title VII claims, we agree it's an equitable remedy, and

3   back pay should be decided by the judge.

4          THE COURT:  All right.  Since the parties are

5   agreeing to what I propose, then that's what we'll do, which

6   means that any testimony that you want me to hear about back

7   pay and lost wages needs to be presented outside the presence

8   of the jury.  So if there's something that the plaintiff is

9   going to testify to about damages, then we probably ought to

10  handle that in a way that the jury doesn't hear it.  And then

11  do you have an economist who is going to testify?

12         MR. THOMPSON:  We do although the parties stipulated

13  to his report coming in.

14         THE COURT:  They did?  Okay.

15         MR. THOMPSON:  So --

16         THE COURT:  Is it self-explanatory?

17         MR. THOMPSON:  Yeah, we just figured why waste the

18  Court's time --

19         THE COURT:  That's fine.  That's fine.  And obviously

20  I will only look at that if, in fact, there's a liability

21  finding for the plaintiff at the end of the day.

22         MR. THOMPSON:  I have a question about closing I was

23  going to raise later, but now probably makes sense.  So we

24  were going to tie his emotional distress damages to his wage

25  loss and say, Look, we think, you know, emotional distress

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   relates to wage loss in this way.  As long as I explain to

2   them that we are not asking them to decide wage loss, am I

3   able to give them a number?

4         THE COURT:  Well, all right, let me explain just so

5   the record is clear.  The Proposed Jury Instruction No. 21 --

6   and, again, we'll have a charge conference later this week,

7   and you can make whatever record you want to on other

8   things -- says:  "Damages for any emotional distress, pain,

9   suffering, inconvenience, or mental anguish that the Plaintiff

10  experienced as a consequence of his termination by BNSF.  No

11  evidence of monetary value of such intangible things as pain

12  and suffering has been, or need be, introduced into evidence.

13  There is no exact standard for setting the compensation to be

14  awarded for these elements of damages.  Any award you make

15  should be fair in light of the evidence presented at trial."

16        Now, it would seem to me if you are going to use wage

17  loss to support emotional distress, pain and suffering,

18  inconvenience, or mental anguish, I think that I need to give

19  the jury a limiting instruction that tells them that any award

20  of back pay or lost wages is to be determined solely by the

21  Court, not by them.

22        So let me hear a response from defendant as to

23  whether or not you object to how he says he wants to use wage

24  loss information.

25        MS. DALE:  Your Honor, we would have asked the same

1    thing.  Even if he wasn't going to do that, we would ask for a

2    limiting instruction so the jury understands that if there is

3    an issue of wage loss, it will be decided separately, and they

4    are not trying to work it into emotional distress.

5              THE COURT:  I will ask the parties to write up a

6    proposed limiting instruction.  I think it should be short and

7    to the point.  When were you going to get into that with him?

8    Today?

9              MR. THOMPSON:  Wage loss?

10             THE COURT:  Yes.

11             MR. THOMPSON:  We're not going to, given the Court's

12   rulings.

13             THE COURT:  No.  Are you going to ask him anything

14   about emotional distress, pain and suffering?

15             MR. THOMPSON:  We have.  We asked him the amount he

16   makes, and we have asked about the stress it's caused him.

17             THE COURT:  All right.  So you have covered that.

18   That's fine.

19             MS. DALE:  Your Honor, as long as we are on the

20   topic, one more issue.  So what we have -- we don't have an

21   economics expert.  We have a mitigation damages expert.  So

22   our thought was to call her in the event that there's a jury

23   verdict in favor of the plaintiff, afterwards, in terms of

24   damages --

25             THE COURT:  Here's what I think is the fair thing to

1   do.  If, in fact, there is a verdict in favor of the plaintiff

2   on liability, presumably there would also be some damages, but

3   unrelated to lost wages, then we should have a separate

4   hearing, and I would say next week while all this is fresh in

5   my mind, outside the presence of the jury, where you can

6   present any and all evidence you wish to present on the damage

7   issues that I must decide.  And I have no issue with you

8   tendering the expert report, but I want to have a chance to

9   read it.  And you can argue about what it is, and if there's a

10  mitigation person -- let me ask you about that.  He testified

11  that within three months he got another job.  Are you -- is

12  your mitigation argument related to that he could have gotten

13  a job that paid him more versus what he's making, or that he

14  should have done something sooner than three months to get a

15  job?

16          MS. DALE:  Both.  So our expert will testify that he

17  should have been able to get a job within one to two months,

18  that he should have been able to get a higher-paying job

19  within one to two months.  Also, the first job he got was a

20  part-time job, so our expert will say he should have gotten

21  full-time work within one to two months.

22          THE COURT:  All right.

23          MS. DALE:  There was also a period after the

24  part-time job where he was out of work for I think another

25  eight or nine months.

1    THE COURT:  All right.  So let me just make two

2   observations here.  I want to stay away from all that in

3   testimony before the jury.  However, if we have a hearing next

4   week on mitigation issues, then I would probably allow

5   Mr. Thompson or his colleague there to call Mr. Fresquez back

6   as a rebuttal witness if he wants to comment on anything.  I

7   think that should be fair.  Or any other witness to rebut what

8   is presented.  All right.

9        All right.  So let's do this.  We will stop for now,

10  and we will start again at 1:35.

11      (Proceedings recessed 12:23 p.m. to 1:39 p.m.,

12       resuming outside the presence of the jury.)

13      THE COURT:  Okay.  Let's bring the jury in.  Have a

14  seat.

15      (Jury in at 1:40 p.m.)

16      THE COURT:  All right, you may be seated.

17      Let's continue with the examination of the witness.

18  BY MR. THOMPSON:

19  Q.  Before the break you discussed a ride-along with Mark

20  Carpenter; right?

21  A.  That's correct.

22  Q.  And that was the first time you had ever been explicitly

23  ordered to misreport a defect and not be able to resolve it by

24  some other way?

25  A.  That's correct.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 424

1    Q.  You went along with it?

2    A.  Yes.

3    Q.  You didn't remember the date of it, the exact date.  I'm

4    going to show you Exhibit A-43.  Does this refresh your

5    recollection?

6    A.  Yes.

7    Q.  When was the ride-along?

8    A.  April 9th, 2015.

9    Q.  20 days later is when the incident with Akers happens?

10   A.  Yes, that's correct, when I was removed from the office

11   when he told me to falsify the -- the defect.

12   Q.  And that's the first time you stand up to him?

13   A.  Yes.

14   Q.  So on April 9th you violate the FRA regulations?

15   A.  That's correct.

16   Q.  April 29th you tell them I'm not doing this anymore?

17   A.  That's correct.

18          MR. THOMPSON:  Will you please show Exhibit 29 to the

19   jury.

20   BY MR. THOMPSON:

21   Q.  Before break you said this proves BNSF was violating FRA

22   regulations.

23   A.  That's correct.

24   Q.  Okay.  Walk me through what, I guess, what led to the

25   creation of this e-mail in the first place.  What happens that

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   you e-mail Thomas Royston?

2   A.  As you can read, it says:  "Good morning.  I contacted to

3   the [sic] help desk this morning with an issue with TIMS.  It

4   is not pre populating this defect.  I talked to David" --

5   which was another individual in the IT department -- "he told

6   me to email you.  I was just trying to find out whats going on

7   with this defect, wasn't sure if it was removed or what.

8   Thanks."

9          That's referring to when I'm doing my regular

10  inspections, this defect quits prepopulating.  And like I

11  mentioned before, when it's in the system, it's going to

12  prepopulate, and you have to say, yes, it's an active defect.

13  Q.  At the bottom of the e-mail, is this that defect you are

14  discussing?

15  A.  That's correct.  That's actually a screenshot from the

16  actual TIMS system.  And that is the defect I was referring

17  to.

18  Q.  So where is -- where was the defect located?

19  A.  Uh, the line segment is 477, which means it's here in

20  Denver.  Um, the defect reported was milepost 3.297.  And the

21  defect, it says, "Fouled...ballast failing to provide adequate

22  drainage for the track."  And as you can see, this defect

23  was -- I performed -- it says "Performed on."  I performed an

24  inspection on April 27, 2015, and it states my name.  And at

25  the bottom where it says "Defect Comments," it says it was

1  prepopulated, meaning it was in the system, and all I did was

2  acknowledge it saying it's an active defect.  Because if you

3  look under "Remedial Action," it says we scheduled it for

4  repair for 30 days or less.

5  Q.  But it wasn't in the system when you tried to report it?

6  A.  No.  It was removed.  Well, it was not in the system, and

7  that's all I knew at that time.

8  Q.  And so you were contacting Mr. Royston?

9  A.  That's correct.

10 Q.  What did Mr. Royston tell you had happened?

11 A.  Basically he responds with a e-mail, and I could tell you

12 what the actual e-mail says.  It says:  "Brandon this defect

13 was just shown repaired by Ryan Akers and it is now closed

14 out.  There were actually 35 defects that we closed out this

15 week.  I have attached the spreadsheet and the repair dates

16 are in RED in column R.  All of these defects will no longer

17 populate in Tims, and were so old that most would not populate

18 any longer.  This one at 3.297 was 261 days old first found on

19 August 2nd, 2014.  Ryan had us close out all these defects in

20 this sheet."

21 Q.  And then I'll go over -- is this the sheet Mr. Royston was

22 discussing?

23 A.  Yes.  He sent me also an attachment of a spreadsheet, and

24 this is the actual spreadsheet that he sent me.

25 Q.  So Mr. Akers had had all of these defects removed as

1   repaired?

2   A.  That's correct.

3   Q.  Were they, in fact, repaired?

4   A.  No.

5   Q.  How do you know that?

6   A.  If we look at milepost 536.7 under defect milepost where

7   it says "Back" --

8   Q.  Are you talking about the area I have highlighted in

9   yellow?

10  A.  Yes, sir.

11  Q.  How can you look at that and tell that defect was not

12  repaired?

13  A.  It doesn't make sense.  Back -- as I was explaining

14  earlier, back is a track.  So back track.

15          You see his repair date, and the way he repaired it

16  he actually says "Switch undercut."  Now, it's not a switch.

17  It's a track.  Now, why does that -- it's kind of, uh,

18  confusing, but if you go back to where it says "Asset Type"

19  and you look underneath the column in "Asset Type," it says

20  turnouts.  A turnout is a switch.  So you would only switch

21  undercut a switch.  You wouldn't switch undercut a back track

22  because it's totally different.

23  Q.  So this kind of repair that Mr. Akers said was done is not

24  how you would have repaired this track?

25  A.  No.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 428

1   Q.  So you knew the repair had not, in fact, been made?

2   A.  That's correct.  I knew it wasn't repaired.

3   Q.  Were there any other ways that, looking at this, you knew

4   the repair was not made?

5   A.  Yes.  We go down to 3.297, the other one highlighted in

6   the other color, so if you look at this defect right here, it

7   says it was -- if we go over to -- continue to the right where

8   it says "Surfaced 9/14/14."  He says he repaired it on

9   9/14/14.

10            We go back to that e-mail screenshot.

11  Q.  Talking about page 1?

12  A.  Yeah.  And we'll go back to the actual screenshot from

13  TIMS.  It says I performed an inspection on 4/27/15, and I

14  acknowledge that same defect as an active defect on 4/27/15.

15  He --

16  Q.  If I'm understanding you correctly, Mr. Akers told

17  Mr. Royston to delete the defect that is highlighted in orange

18  because it had been repaired on 9/14/14?

19  A.  That's correct.

20  Q.  You, however, per your e-mail to Mr. Royston, found it on

21  April 27, 2015 unrepaired?

22  A.  That's correct.

23  Q.  Was that track ever taken out of service?

24  A.  I later tried.

25  Q.  Okay.  I want to talk about that in a minute, but at the

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   time you inspected it, the track was in service?

2   A.  Yes.

3   Q.  Was that a violation of federal law?

4   A.  It was.

5   Q.  Were you the only person that acknowledged that defect?

6   A.  No.

7   Q.  Did the federal government also find that defect after

8   Mr. Akers said it was repaired?

9   A.  Yes.  Well, no, it was -- yes.

10  Q.  So I'm going to turn your attention to page 5.  What is

11  this?

12  A.  That's a FRA report.  It's basically when the FRA makes a

13  report, um, somehow their system talks to our system, or

14  someone inputs it, I don't know how it actually works, but

15  that's an FRA report, and it shows -- would you want me to

16  explain it?

17  Q.  Yeah, please.

18  A.  Okay.  On this FRA report, um, it's talking about who

19  reported.  On the second column to the right it says May 21st,

20  2015.  FRA wrote up the same defect on May 21st, 2015.

21  Q.  How do you know it's the same defect?

22  A.  'Cause if you go over to the columns -- I mean, the

23  comments, it says:  "Fouled or insufficient ballast...restrain

24  the track laterally, longitudinally or vertically, south

25  Hoggins switch, closure area."  It's the same defect.

1  Q.  So that was the same area or location?

2  A.  It was.

3        So if we go back to the left, sir, it says the FRA

4  gave BNSF until June 19th, 2015 to fix it.

5  Q.  So I just want to make sure I understand the order of

6  events.  You find the defect out in the field that you thought

7  should have already been in the system.

8  A.  Correct.

9  Q.  And it wasn't?

10  A.  That's correct.

11  Q.  You contact Mr. Royston.

12  A.  Yes.

13  Q.  He tells you Mr. Akers had deleted 35 defects.

14  A.  That's correct.

15  Q.  Or, rather, showed them as repaired.

16  A.  Yes.

17  Q.  And told IT to take them out of the system.

18  A.  Yes.

19  Q.  After that date, you looked at the FRA.  The FRA found the

20  defect.

21  A.  That's correct.

22  Q.  Did you also go and take pictures of that defect?

23  A.  I did.

24  Q.  Are pages 6 and 7 that defect?

25  A.  It is.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1  Q.  Are these the same pictures that Mr. Lydick looked at and

2  said this is inarguably a defect?

3  A.  Yes.

4  Q.  When did you take these pictures?

5  A.  That time stamp on that picture right there is June 8,

6  2015.

7  Q.  This is the defect that Mr. Akers said was repaired?

8  A.  Yes.

9  Q.  Mr. Lydick said there's no way this was repaired.  Do you

10 agree with him?

11 A.  I do.

12 Q.  Is this even a close call?

13 A.  No.

14 Q.  So at that point in time you knew that Mr. Akers was

15 violating FRA regulations?

16 A.  Yes.  And -- yes.

17 Q.  What did you do with the information?

18 A.  At that time I, uh, I ended up confronting Mark Carpenter

19 in our safety briefing later on.

20 Q.  How did you do that?  Tell me about it.

21 A.  Again, every morning we have briefings, and we talk about

22 the day at hand, defects, any safety issue.  And that morning

23 Mark Carpenter just happened to be in our office.  Normally

24 his office is down the block.  And I, you know, said, What's

25 going on?  We're not -- we're not fixing these defects.  And

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Direct          II - 432

1   the minute I started talking about defects, he immediately

2   removed me from the office, took me into the system

3   roadmaster's office, and started belittling me.  And I --

4   Q.  What did he say to you?

5   A.  What's that?

6   Q.  What did he say to you?

7   A.  He just -- he started belittling me.  And I started asking

8   for a witness, and he ignored me.  He told me it wasn't my job

9   to take tracks out of service, find defects.  It was only my

10  job to write the report.  He told me I was a bad inspector.

11  If I continue to find defects, he will fire me or disqualify

12  me.  And later on during the conversation -- and I'll never

13  forget this -- my son's doctor calls, and I said, I need to

14  answer this.  And he puffed up real nice and big, and he goes,

15  No, you're speaking to Division Engineer Mark Carpenter.  And

16  I won't forget that because he referred to himself in the

17  third person.  And it continued.  It lasted about an hour of

18  him just belittling me.

19  Q.  Did you ask for union representation during that meeting?

20  A.  I did multiple times.

21  Q.  What did Mark Carpenter say then?

22  A.  He ignored it.

23  Q.  Did he say anything about you reporting BNSF to your

24  union?

25  A.  Oh, yeah, absolutely.  He told me, Don't -- he calls them

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   "the organization."  He said, Don't you ever call the

2   organization again, which means to him the union.

3   Q.  And you had just a week prior or two weeks prior called

4   Ms. Moody, and she had contacted Adam Miller; right?

5   A.  Yes.  And actually just prior to that there was also

6   another incident which I contacted the union about.

7   Q.  All right.  So help me understand this.  Mr. Carpenter

8   tells you stop reporting defects; right?

9   A.  Yes.

10  Q.  As a practical matter, you can't stop reporting defects.

11  I mean, even if you were going to violate FRA regulations, you

12  have to report some defects.  Right?

13  A.  That's correct.

14  Q.  So was Mr. Carpenter really telling you not to report any

15  defects whatsoever?

16  A.  Can you say that again, please.

17  Q.  Yeah.  Did you understand Mr. Carpenter to be telling you

18  not to report any defects whatsoever?

19  A.  More or less.  It was just don't report defects that are

20  going to stop traffic, that are going to take a lot of hours

21  to fix.

22  Q.  Are there defects you can report without affecting BNSF's

23  profit?

24  A.  Everything will affect BNSF's profit because it will slow

25  down trains no matter what, but some things -- for instance,

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 434

1   this defect on the screen, you know, it will take longer to

2   fix than a smaller defect.

3   Q.  So you weren't --

4   A.  So --

5   Q.  You weren't getting pushback every time you reported a

6   defect?

7   A.  No, no.

8   Q.  It was just the ones that majorly affected traffic?

9   A.  Yeah, it would be basically the ones that are going to

10  create traffic jams.

11  Q.  I'm going to show you --

12         MR. THOMPSON:  Mr. Keech, can we show it just to the

13  witness, please.

14  BY MR. THOMPSON:

15  Q.  I'm going to show you Exhibit A-79, starting at page 3008

16  or, rather, Bates labeled 3008.  It's actually page 891.

17         Do you recognize this document?

18  A.  It's a text message exchange.

19  Q.  Whose numbers are these?

20  A.  Uh, it looks like it might be Cason Cole's.

21  Q.  Who is Cason Cole?

22  A.  He was assistant roadmaster at the time in Denver, another

23  roadmaster supervisor.

24  Q.  What does this chain of text messages show?

25         THE COURT:  Well, it's not in evidence.  This one

1    is -- you are --

2              MR. THOMPSON:  I'm trying to lay the foundation to

3    admit it.

4              THE COURT:  All right.  Go ahead, but don't read

5    what's on there.

6    BY MR. THOMPSON:

7    Q.  What do pages, just generally -- it's pages 891 and 892,

8    it's Bates labels 3008 through 09, of your text messages show?

9    A.  Uh --

10   Q.  Just generally.

11   A.  It appears I took a track out of service, and he said

12   okay.  That's what it -- and that's what appears.

13   Q.  All right.  I'll have you look at the second page.

14   A.  Okay.

15   Q.  The very top of it, you sending a text.  Mr. Cole

16   responding.  Do you see that?

17   A.  Yes.

18   Q.  What does this regard?

19   A.  So the top text says, uh, Main 2 --

20   Q.  Don't read it.

21             THE COURT:  Wait.  He is reading, so let's see if we

22   can get these in evidence.

23             MR. THOMPSON:  Sure.

24             THE COURT:  Because he's reading from documents that

25   aren't in evidence.  We just can't --

1          MR. THOMPSON:  Sure.  Plaintiff moves Exhibit A-79,

2    891 through 892.

3          MR. GOMAN:   No objection.

4          THE COURT:  All right.  Pages 891 through 892 of A-79

5    are received.

6        (Defendant's Exhibit A-79:891-892 received.)

7    BY MR. THOMPSON:

8    Q.  Actually, I'm going to do a brief non sequitur,

9    Mr. Fresquez.

10   A.  Say that again, please.

11   Q.  Before we go into this, I have a question generally.

12          How did we get these text messages?

13   A.  Oh, during the process, all this, they had me send my

14   phone away to a third-party company, a lab, and they extracted

15   all my information from it, all the text messages, all my

16   data, everything.

17   Q.  Did you provide all your text messages to BNSF?

18   A.  I did.

19   Q.  Are you the only witness in this case to do that?

20   A.  I did.  Yes.

21   Q.  Why would you provide all your text messages?

22   A.  Because I have nothing to hide.

23   Q.  In fairness to BNSF, Mr. Paz also provided text messages

24   with you; right?

25   A.  Yes, he provided text messages after I provided mine, and

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 437

1   it's just mine and his conversations.

2   Q.  So it's already what you had provided?

3   A.  That's correct.

4   Q.  All right.  So turning back to this text message, who is

5   Cason Cole again?  Sorry.

6   A.  He was a roadmaster in Denver, Colorado.

7   Q.  Under Mark Carpenter?

8   A.  Yes.

9   Q.  All right.  This top message, will you read that for me?

10  A.  It says:  Main 2 oos between south Denver walnut fra

11  defects non class.

12          "Oos" stands for out of service.  "M2" stands for

13  Main 2, track number 2.  "South Denver" is, you know, just a

14  name for an area.

15  Q.  Is this you trying to take a track out of service?

16  A.  Yes, sir.

17  Q.  And Mr. Cole telling you not to do it?

18  A.  Yeah.  He was direct:  Don't do it.

19  Q.  Are the pictures that we looked at earlier -- is that the

20  defect?

21  A.  Yes.

22  Q.  Did Mr. Cole tell you on -- sorry.  What was the date?

23  A.  6/4.

24  Q.  -- on June 4th why he didn't want you to remove this?

25  A.  He said, uh -- he met me on site.  Uh, he basically went

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   off on me.  And I asked for a witness multiple times.

2   Actually, before we even got out there, I allowed him -- I let

3   him know in the briefing, and he actually said to me in the

4   morning briefing, Taking tracks out of service bids

5   consequences.  And I know I had to do my job anyways, and I

6   took it out of service.  And he came out there on site and

7   went off on me.  And I asked for a witness multiple times.

8   And I remember a comment.  He said, I don't care if you ask

9   for a pink donkey -- because I was asking for a witness,

10  and/or a purple donkey, one of them colors.  And I never got

11  it, and they ended up putting the track right back in service.

12  Q.  Did you take it out of service?

13  A.  I did.

14  Q.  Mr. Cole told you not to?

15  A.  I did.  Yes.

16  Q.  You did anyway?

17  A.  Yes.

18  Q.  Why?

19  A.  Because it's just the law.  FRA states any defect after

20  30 days, non-class defect after 30 days, has to be taken out

21  of service.

22          MR. THOMPSON:  Okay, Mr. Keech, we can take it off

23  the screen.  Thank you.

24  BY MR. THOMPSON:

25  Q.  You now have, according to you, proof positive with the

1    Royston e-mail that BNSF is violating the law; right?

2    A.  Yes.

3    Q.  Why didn't you go to the FRA with it?

4    A.  'Cause you're -- I'm scared.  I mean, there's no -- no one

5    was able to obtain this information except me.  I was the only

6    person in Denver that did what I did on the main line.  So

7    there was no way for them -- for me to remain anonymous.

8    There's absolutely no way.  The minute someone starts to

9    query, hey, someone -- the main lines has issues, they're

10   going to figure, well, the main line, he is the main line guy.

11   So there is no actual way.  And I don't want -- I didn't want

12   to lose my job.

13   Q.  During this time, is that when your son is having some of

14   his health issues?

15   A.  Yeah.

16   Q.  Could you afford to lose your job at that point in time?

17   A.  No.

18   Q.  So is there something you tried to do to, um, I guess get

19   away from this?

20   A.  Shortly after the incident with Mark Carpenter where he

21   pulled me out of the office and just went off on me, I leave

22   the position to the first vacant position I could go to.

23   Q.  Tell me about that process.  Explain to a nonunion person

24   how you leave the position you are in.

25   A.  BNSF is based off seniority.  So basically every two weeks

1    a list of jobs come out, vacant positions, and we could put in

2    for them positions.  And then it goes based off your rank to

3    see if you got that position.

4            So I left at the first opportunity I had to leave to

5    another position.

6    Q.  To what position did you go?

7    A.  It was a foreman flagman.

8    Q.  Anything having to do with reporting track defects?

9    A.  Yeah, it was a -- it basically what -- yeah, I didn't have

10   to report any defects.

11   Q.  That's not part of that job?

12   A.  No.

13   Q.  While you were in that job, any discipline issues,

14   coaching and counseling, anything like that?

15   A.  No.

16   Q.  What happens next?

17   A.  I stayed on that job until early February, when someone

18   took my position.

19   Q.  Explain that, what you mean took your position.

20   A.  Because we're based off rank, if someone is -- so say, for

21   instance, um, my job is coming to an end, my position.  Since

22   it's coming to an end, I could go -- what we call being

23   bumped.  I could bump someone out of their position, and that

24   person would then bump someone else out of their position.

25   It's all based off rank.

1   So there was a senior guy that was taking my

2   position, and so it caused me to go to another position.

3   Q.  All right.  And so did you come back to the track

4   inspector position?

5   A.  I did.

6   Q.  When?

7   A.  Early February.

8   Q.  Why on earth would you bid back to a position or bump back

9   to a position where this was happening?

10  A.  Because I'm certified as a track inspector and a foreman.

11  There's only limited positions I could actually take.  BNSF

12  actually has a policy.  So I can't -- so, for instance, if I'm

13  work -- since I'm certified as a track inspector, I can't go

14  work as a laborer or a section man, trackman.  Because BNSF

15  actually has a policy if I'm working as a laborer or a

16  trackman and there's a vacant position say, for instance, in

17  Red Oak, Iowa, they could force me to go to Red Oak, Iowa.  If

18  there's a vacant track inspector position in Red Oak, Iowa,

19  they could force me to go work in Red Oak, Iowa.  So I have to

20  go work at my highest position possible, which is a track

21  inspector or a foreman.

22  Q.  So it wasn't that you couldn't hold a different position.

23  It was if you did, it would be mobile.

24  A.  No.  So a lot of times when you're forced, they're

25  headquartered positions, meaning you would be forced to that

1    area.  And they give you -- I think at the time they give you

2    $15 a day.

3    Q.  What's the problem with working somewhere not in Denver,

4    to you?

5    A.  I wouldn't have my son.  I couldn't take care of my son.

6    Q.  So that's why you bumped back to the track inspector

7    position?

8    A.  Yes.

9    Q.  When you got back, were things better?

10   A.  No.

11   Q.  Were they worse?

12   A.  Yes.

13   Q.  I'm going to show you Exhibit 32.  Do you recognize this

14   document?

15   A.  It -- the -- the title on the top says "BNSF TIMS - Non

16   Class Specific," and past due defects, so it's a non-class

17   past due list.

18   Q.  Is this the type of document you are familiar with from

19   working at BNSF?

20   A.  Yes.

21   Q.  And you recognize it as such?

22   A.  Say it again, please.

23   Q.  You recognize this document?

24   A.  Yes.

25   Q.  What does it show?

1    A.   It has all the non-class -- all the defects that are

2    supposed to be fixed within 30 days past due.

3             MR. THOMPSON:  Plaintiff moves to admit Exhibit 32.

4             MR. GOMAN:  Your Honor, with foundation as to the

5    handwriting on this and other pages, as long as that's laid, I

6    don't have an objection.

7             THE COURT:  All right.  I'm going to -- I think I'm

8    satisfied it's -- a proper foundation has been laid.  So

9    Exhibit 32 is received.

10        (Plaintiff's Exhibit 32 received.)

11            MR. THOMPSON:  Will you please publish it to -- thank

12   you.

13   BY MR. THOMPSON:

14   Q.   All right.  So you are going to have to dumb it down for

15   me a little bit.  What does this exhibit show BNSF was doing

16   wrong?

17   A.   Okay.  If we look at the first column, it says "Due Date"

18   on the far left.  It says it was due -- this defect in this

19   column was due February 28, 2015.  The line segment is 2.

20   That's just another part of Denver.  Then it talks to you

21   about milepost, ending milepost, the type of track, the track

22   asset, which is just an ID for us, the track name.  Then it

23   says the FRA rule, which is the type of defect.  And then it

24   has descriptions of the defect.  And then it says remedial

25   action was repair within 30 days.  Then it says the date that

1   it was found.  Um, I guess this one, for instance, was in

2   January 30th, 2015, and it was reported by me.  And then it

3   has more comments on it.

4   Q.  So is this a list of defects that should take tracks out

5   of service?

6   A.  Yes.

7   Q.  Were these tracks still in service?

8   A.  Yes.

9   Q.  I'm going to scroll through.  I won't do all 14 pages, but

10  is this, when you get back, 14 pages of defects that should

11  have required tracks to be removed that were not?

12  A.  Yes.

13  Q.  So things had gotten worse when you got back?

14  A.  Yes.

15          MR. THOMPSON:  Mr. Keech, will you please take this

16  off.  Sorry.

17  BY MR. THOMPSON:

18  Q.  I'm going to show you Plaintiff's Exhibit 47.  Do you

19  recognize this document?

20  A.  Yes.

21  Q.  Sorry.  Exhibit 47.  What is page 1?

22  A.  It's a text message exchange between me and roadmaster

23  supervisor Ryan Akers.

24  Q.  What is page 2?

25  A.  Text message exchange between roadmaster supervisor

1   Michael Paz.

2   Q.   What is page 3?

3   A.   Text message exchange between Michael Paz and I.

4          MR. THOMPSON:  Plaintiff moves to admit Exhibit 47.

5          MR. GOMAN:  No objection.

6          THE COURT:  All right.  Exhibit 47 is received.

7       (Plaintiff's Exhibit 47 received.)

8   BY MR. THOMPSON:

9   Q.   What does page 1 show that's important in this case?

10  A.   Just this demonstrates that BNSF was violating federal law

11  and led to my termination.

12  Q.   Explain to me how -- what Exhibit 1 -- how that supports

13  that.

14  A.   So this text message exchange happened on June 29, 2015.

15  It shows I'm reporting a tie defect.  It's just a type of

16  defect.  And I'm notifying Ryan Akers that this defect is

17  active as of that time.

18  Q.   That's June 29, 2015?

19  A.   June 29, 2015.

20  Q.   All right.  I scroll to the next page.  This is nine

21  months later, if I'm doing math right.

22  A.   That text message exchange is from Tuesday, March 8, 2016,

23  so months later.

24  Q.   What does it show?

25  A.   That I'm rereporting the same defect that I reported in

1    June 29, 2015, to a different supervisor.

2    Q.  And who is that supervisor?

3    A.  This one is Michael Paz.  The first report was to Ryan

4    Akers.

5    Q.  Why would you need to rereport this defect if you reported

6    it nine months earlier?

7    A.  When I got back, it was removed from the system, but it

8    was still in the field.

9    Q.  Do you know why it was not in the TIMS system when you got

10   back?

11   A.  I don't.  I just know it was showing repaired.

12          MR. THOMPSON:  Thank you, Mr. Keech.

13   BY MR. THOMPSON:

14   Q.  I'm showing you what's marked Exhibit 36.  Do you

15   recognize this document?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's a broken frog.  A frog is a component of the track

19   that allows a train to go from one track to another track.  It

20   opens and closes with spring compression.  That's what we're

21   looking at here.

22   Q.  Did you take this picture?

23   A.  I did.

24          MR. THOMPSON:  Plaintiff offers Exhibit 36.

25          MR. GOMAN:  No objection.

1          THE COURT:  All right.  Exhibit 36 is received.

2      (Plaintiff's Exhibit 36 received.)

3  BY MR. THOMPSON:

4  Q.  Once you bumped back to the position, did an incident

5  happen at this frog?

6  A.  Say it again, please.

7  Q.  Yeah.  Once you bump back in March of 2016, was there an

8  incident involving this frog?

9  A.  I bumped back in February, but this was during that time,

10  my first bumpback.  That was early March.  And while doing a

11  regular inspection, I had noticed a frog was broke.  Obviously

12  it's not bolted up.  But during further investigation, the

13  frog was actually cracked in half.

14  Q.  Let me pause you there.  So I put my cursor there.

15  There's a bolt missing there; right?

16  A.  That's correct.

17  Q.  But that's an easy fix, isn't it?

18  A.  Yes, sir.

19  Q.  So why couldn't we just fix it that way, just put the bolt

20  back in, we're good to go?

21  A.  Because internally in between the two -- internally in

22  between the points that you can't see, um, you can't get a

23  photo with a phone, it's actually cracked in half.  It cracks

24  all the way around -- it's actually broke.

25  Q.  What's the problem with using a cracked frog?

1   A.  A frog is -- these frogs are the main component.  Like I

2   say, it opens and closes on the spring compression.  That's

3   how they work.  And you have a spring frog -- this was right

4   by the stockyards, National Western Stock Show.  You derail,

5   you're going to have major problems.

6   Q.  Could this cause a derail?

7   A.  It will.

8   Q.  Did you tell anybody about the cracked frog?

9   A.  Yes.  When I found it, I notified Michael Paz.  I notified

10  the laborers.  Everybody arrived to fix it because it's a big

11  fix.  And Michael Paz arrived on scene, and the other guys

12  were there also, and everybody verified it was broke, um.  I

13  got called off at the time to another area, and when -- it was

14  that -- it was put back in service.

15  Q.  Michael Paz put the track back in service?

16  A.  He actually -- I slow ordered it.  I could put it down to

17  a 10 mph, and it was put back at full maximum authorized

18  speed.

19  Q.  Does that violate federal regulations?

20  A.  It does.

21  Q.  What did you do?

22  A.  Well, at that time nothing.  What ended up happening is

23  Michael Paz left on a leave or a vacation, and at that time I,

24  uh, talked to David Dunn, which is another supervisor --

25  Q.  Let me freeze you right there.  David Dunn is another

1   roadmaster under Mark Carpenter?

2   A.   He is.

3   Q.   You have had problems with several roadmasters under Mark

4   Carpenter at this point in time?

5   A.   That's correct.

6   Q.   Why would you go to David Dunn?

7   A.   I thought he was trustworthy.

8   Q.   You think David Dunn is an honest person?

9   A.   I do.

10  Q.   Okay.  What happened when you went to Mr. Dunn?

11  A.   He said, Let's go out there and meet at the location.  And

12  he brought another supervisor with him, which was Scott

13  Frederick at the time.  And we all met at that location, and I

14  showed him it was actually broke in half.  And they looked for

15  themselves, and they verified it was broke.  And Scott

16  Frederick turned and shook my hand, he said, Good job.  And

17  they emergency ordered a frog.  We call them frogs.  That's a

18  switch component.  And they replaced it.

19  Q.   All right.  So in the month or less or two months or less

20  that you bumped back, you found a 14-page list of defects that

21  had not been accurately reported.  Right?

22  A.   Well, the list is, uh -- yeah, the list could be

23  accurately reported, but it's just that they're, um, they

24  weren't compliant with the FRA's guidelines of non-class

25  30 days that they had to remove from service.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 450

 1   Q.  It sounds like you believed during that month Mr. Akers

 2   had taken a defect out of the system.

 3   A.  Uh, Mr. Paz?

 4   Q.  I'm sorry, Paz.  I am referring to Exhibit 47.  I guess --

 5   you believe somebody took this defect out of the system.

 6   A.  Yes, at the time I believe somebody -- well, it showed

 7   repaired.  That -- yeah, that one showed repaired because I

 8   had to reenter it into the system.

 9   Q.  But you didn't know who did it?

10   A.  No, I don't.

11   Q.  And then you had the incident with Mr. Paz and the frog.

12   A.  That's correct.

13   Q.  So what did you do then?

14   A.  I decided to leave again to the first open vacant position

15   I could go to, which was -- again I went to a foreman flagman.

16          MR. THOMPSON:  Thank you, Mr. Keech.

17   BY MR. THOMPSON:

18   Q.  All right.  So you bid off the position again.

19   A.  Yes, sir.

20   Q.  Had you been trying to bid or looking for bids ever since

21   you had bumped back?

22   A.  Yeah.  You always keep your eyes open.

23   Q.  How long are you off of the track inspector position at

24   this point in time?

25   A.  Well, um, I only stayed on that foreman flagman for --

Julie H. Thomas, RMR, CRR                        (303)296-3056

1    till May 2nd because once again someone displaced me from my

2    position, so it caused me to go back to the inspector

3    position.

4    Q.  When did you arrive back?

5    A.  Uh, May 2nd was my first day, 2016.

6    Q.  You get bumped back on May 2nd?

7    A.  Yes, sir.

8    Q.  What happens the first day you're back?

9    A.  Nothing.  Conversation with Mr. Paz, he tells me not to do

10   anything so he could get his house in order.

11   Q.  So what did you do all day?

12   A.  Nothing.

13   Q.  They paid you to twiddle your thumbs?

14   A.  Drive -- yeah, basically -- sorry to interrupt you.  I

15   kind of just drove around.  I didn't really do anything.

16   Q.  And that's because Mr. Paz told you not to inspect track?

17   A.  Yes, sir.

18   Q.  You were a track inspector, though.

19   A.  That's correct.

20   Q.  What happens the next day?

21   A.  During my regular inspection going through Denver, I text

22   Paz that there's a severe defect that I found.  Further

23   investigation found that it was actually shown repaired the

24   night before by Michael Paz.

25   Q.  Okay.  I'd like to show you Plaintiff's Exhibit 48.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 452

1              What kind of document is this page 1?

2    A.   That's again from the TIMS system.

3    Q.   Is this something you are familiar with in your ordinary

4    course of business while you worked at BNSF?

5    A.   Yes, sir.

6    Q.   And what is page 2?

7    A.   That's a text conversation about the defect we just

8    referenced between Michael Paz and I.

9              MR. THOMPSON:  Plaintiff offers Exhibit 48.

10             MR. GOMAN:  No objection.

11             THE COURT:  All right.  Exhibit 48 is received.

12         (Plaintiff's Exhibit 48 received.)

13   BY MR. THOMPSON:

14   Q.   I assume on here this red box is of consequence.

15   A.   Yes, sir.

16   Q.   Now, that red box isn't normally there.  Is that something

17   you put on there to help us?

18   A.   Yes, sir.

19   Q.   All right.  Show me what we are looking at.

20   A.   Again, this is a TIMS report.  It's telling you on

21   May 2nd, 2016, when the report was generated.  Um, it tells

22   you the milepost, which is 3.498.  It tells you defect

23   repaired since last inspection.  That means that someone went

24   in there and repaired that defect.

25             And if we scroll down -- if you scroll down to the

Julie H. Thomas, RMR, CRR                           (303)296-3056

 1   corresponding column, it says that the -- tells you the

 2   defect, the location, says just north of Kalamath, and it has

 3   the person's name that showed it repaired.  That was Michael

 4   Paz, and he showed it repaired at 1617 p.m.

 5   Q.  So Michael Paz reported this defect the night before as

 6   having been repaired?

 7   A.  Yes.

 8   Q.  What's page 2?

 9   A.  That's a -- so Michael Paz showed it repaired on May 2nd,

10   2016.  This is a text conversation between Michael Paz and I

11   on May 3rd, 2016, about the same defect that he said he

12   repaired.  And I'm notifying him, as you can -- it says:

13   About 2 and 7/8ths dip at 3.4 just north of Kalamath crossing.

14          It's the same defect, and now -- at 3 inches it's --

15   at 3 inches it's out of service.  2.78 means it's severe.

16   Q.  Did this cause you to form any belief as to what Mr. Paz

17   meant by getting his house in order?

18   A.  Yes.

19   Q.  What is that belief?

20   A.  He was circumly -- he was going to take care of his

21   defects.

22   Q.  Illegally remove them --

23   A.  Yes.

24   Q.  -- from the system?

25          In violation of FRA regulations?

1   A.  Yes.

2   Q.  Did you confront Mr. Paz about it?

3   A.  Yes.

4   Q.  Tell us about that.

5   A.  I went into Mr. Paz's office, and I actually -- I said, I

6   know what happened to my defects.  And I was -- at the time I

7   was drawing -- he had a board.  I was drawing on his board.  I

8   know what happened -- I know what happened to my defects.  And

9   he laughs at me.

10  Q.  He laughed at you?

11  A.  He -- yes, he literally laughed at me.

12  Q.  Did he even deny --

13  A.  No.

14  Q.  -- your allegations?

15  A.  No.  Sorry to interrupt.  No.

16          MR. THOMPSON:  Thank you, Mr. Keech.

17  BY MR. THOMPSON:

18  Q.  All right.  So that was your second day back, first day

19  inspecting?

20  A.  Yes, sir.

21  Q.  What happens the next day?

22  A.  So the next day during my regular inspection I once again

23  find a defect that was originally reported back in June.  This

24  is the one I, um, I reported back in June, and when I got

25  back, uh, in February, I had to rereport because it was

1    removed from the system.

2            So on Wednesday, my second day actually inspecting in

3    May, I noticed it wasn't actually repaired.  This is one of

4    the ones that should have been repaired back in March, April.

5    So I take the track out of service because that's the proper

6    thing to do.

7    Q.  Let's show the jury Exhibit 47.

8            So we've already talked about the first two pages of

9    this.  This is you reporting the defect in June of 2015?

10   A.  Yes, sir.

11   Q.  When you bumped back the first time in February, and now

12   in March, it's not there anymore?

13   A.  That's correct.  So I had to rereport on March 8th.

14   Q.  Or, rather, the defect is there.  It's not in the system

15   anymore, though.

16   A.  That's correct.

17   Q.  So what happens on -- what's this text message on May 4th?

18   Tell us about it.

19   A.  It's a text exchange of me notifying him.  I say:  LoDo

20   siding out of service.

21           Excuse me.  That's the location, and that's where the

22   defect is at.  "OOS" is out of service.

23           Why.

24           It's a joint tie defect.

25           Then he says:  If you were planning on pulling it

1    today you should speak up secrets don't make friends.

2             And I said:  I been telling you about it.

3    Q.  And you had been telling him about it since back in June,

4    almost a year prior?

5    A.  Well, I -- no -- yes.  Not -- at that time in June it was

6    Ryan Akers.  They had a swap, supervisor swap, but I did

7    notify them in March.

8    Q.  And you rereported it in early 2016?

9    A.  March 8th.

10   Q.  Why was this track still in service?

11   A.  Um, it's an important track.

12   Q.  Is that a violation of federal law?

13   A.  It is.  This is a track next to Elitch's and the Pepsi

14   Center.

15   Q.  Did Mr. Paz even question that the defect was over 30 days

16   and that the track needed to be taken out of service?

17   A.  No.

18   Q.  He just instead texted you that pulling tracks doesn't

19   make friends.

20   A.  That's correct.

21   Q.  All right.  So let's talk about the last day you work at

22   BNSF.

23             MR. THOMPSON:  Mr. Keech.

24   BY MR. THOMPSON:

25   Q.  So you have now been back on the track inspector for three

 1   days.

 2   A.   I had been inspecting three days.  This is my actual

 3   fourth day back.

 4   Q.   Fourth day back.  You had only inspected for two of those,

 5   though.

 6   A.   Correct.

 7   Q.   You had had a confrontation with Mr. Paz already.

 8   A.   Yes, sir.

 9   Q.   You had also had a text message where he threatens you.

10   A.   Yes, sir.

11   Q.   What happens -- well, let's do this.

12        Do you recognize Exhibit 44?

13   A.   Yes, sir.  That's a text conversation between David Dunn,

14   the supervisor, and I.

15   Q.   Dunn is the roadmaster you think is an honest roadmaster?

16   A.   Yes, sir.

17   Q.   What's Exhibit 45?

18   A.   A group conversation between David Dunn, Michael Paz,

19   and I.

20        MR. THOMPSON:  Plaintiff offers Exhibits 44 and 45.

21        THE COURT:  Any objection?

22        MR. GOMAN:  No objection.  Excuse me.

23        THE COURT:  All right.  Exhibits 44 and 45 are

24   received.

25        (Plaintiff's Exhibits 44, 45 received.)

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 458

BY MR. THOMPSON:

Q.  Please tell us what's happening in Exhibit 44.

A.  In 44 on February 11, 2016, um, I notified David Dunn that there's a non-class defect at this location.  I also sent him pictures.

Q.  I'm going to scroll on those pictures or zoom in.  Please tell us how this is a non-class defect.  What's wrong with this?

         I heard you laugh.  Why are you laughing about that?

A.  'Cause it's not a -- you could see it.  The tie's all broke in half.  All the mud.

Q.  Let me freeze you right there.  What are ties?

A.  Ties are what hold the track together, um, from getting too wide or too small.  It basically keeps the track -- in theory, we want to keep the track spread apart at 56 1/2 inches, but it could be a little bit wider, a little bit narrower, but in theory we try to keep it at 56 1/2 inches.

Q.  And it's the ties that do that?

A.  Yes.

Q.  What happens if the track is not the proper width?

A.  Proper width, you would derail a train.

Q.  And so how is this a defect?

A.  There's all that mud in there.  You can see all the mud. You can see that the track is what we would call pumping,

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    meaning the track is just -- because it's sitting in mud, the

2    track is just going up and down.  If it was sitting on solid

3    rock, it would have a solid, firm ground and won't pump.  When

4    it's in mud, it just pumps.  You can see it in the pictures.

5              Also, all the ties are just broke in half.

6    Q.  All right.  So that is back in February, the first time

7    you bump back; right?

8    A.  Yes, sir.

9    Q.  What did you want to do at that point in time?

10   A.  I wanted to -- because it's in a curve, um, a curve is

11   basically, uh, simple terms, it -- it's a half circle.

12   Because it's in a curve and due to the condition, I wanted to

13   put a 10 mph on it.  This is the main line which the track is

14   a lot faster.  Paz states he doesn't want a 10 mph on it.  He

15   just wants it classified as a non-class, which it -- that's

16   the correct thing to do with non-class is the right defect.  I

17   just wanted to slow it down still because I felt safer at a

18   slower speed.

19   Q.  So on February 11 you report this defect to Michael Paz

20   and David Dunn; is that right?

21   A.  Yes, sir.

22   Q.  You wanted to put a slow order on it.

23   A.  I wanted to still put my non-class on it, but I also

24   wanted to slow the track down.

25   Q.  So you wanted to be more cautious than was necessary

1   because it was in a curve.

2   A.  Yes, sir.

3   Q.  But there's nothing wrong or at least illegal about just

4   putting in a class defect.

5   A.  No, absolutely not.  That's the right thing to do.

6   Q.  And by putting it as a class defect, you can continue to

7   operate trains at the same speed.

8   A.  If we put it as a class defect, yes, they will be able to

9   run trains at -- can you repeat that, please.

10  Q.  Sure.  If you report it as a class defect -- or a

11  non-class defect, you can run trains on it for 30 days at

12  whatever speed it's classified for.

13  A.  Yes.  So a non-class defect states that they can run

14  trains up to full speed up to 30 days.  After 30 days the

15  track has to be removed from service.

16  Q.  Okay.  So you want to slow trains.  Michael Paz says no.

17  And you actually agree that's legal.  That's an okay thing to

18  do.

19  A.  Yes, sir.

20  Q.  What does that have to do with -- I mean, this is back in

21  February.  What he's doing is legal.  What does this have to

22  do with what happens in May?

23  A.  Again, I left that position in February to another

24  position, but I had to come back in May.  On May 5th I tried

25  to take that -- I noticed that defect hasn't been fixed, past

1    30 days.  I try to take the track out of service, and at that

2    time he wants me to reclassify the defect to allow them to run

3    trains at full speed.

4              MR. THOMPSON:  Thank you, Mr. Keech.  We can take it

5    off the screen.

6    BY MR. THOMPSON:

7    Q.  So in May this same defect has not been repaired?

8    A.  That's correct.

9    Q.  And you report it as a non-class defect.  So what does

10   that mean?

11   A.  Again, it's 30 days.  They had 30 days from February 11,

12   2016, to repair that defect.

13   Q.  So what does FRA regulation require you do?

14   A.  Take the track out of service.

15   Q.  Did you tell Michael Paz that?

16   A.  Yeah.

17   Q.  What did Michael Paz try and get you to do then?

18   A.  So I called Mr. -- I actually -- it ends up being --

19   originally started as a text message.  I notify him it was out

20   of service.  At that time he -- we ended up talking on the

21   phone.  He wants me to change it to a class-specific defect,

22   which means he will run the trains at full speed.  I tell him

23   I was going to call the FRA.  Well, I said, Let me call my

24   friends in high places.  We end the conversation.

25              I talk -- I make a phone call to actually a couple

1  different FRA, um -- first I called directly -- his name was

2  Kirby O'Connor.  He was a FRA agent.  He was over the Colorado

3  side.  Colorado, um -- he was over Colorado.  I couldn't get

4  ahold of him, so I called the regional office out of -- I

5  believe it was California.  I'm not sure exactly the location.

6  And they got me in touch with another FRA agent.  I spoke to

7  him momentarily, um, just -- and then Kirby O'Connor ended up

8  calling me back also.  Um, um, he said -- and we talked about

9  the situation at hand.  And he said, Yes, you are correct, um,

10  you can't reclassify a defect.

11          And so I call Mr. Paz back.

12  Q.  I want to freeze you right there.  I want to make sure I

13  understand what's going on.  So you had originally reported

14  the defect, and you wanted to put a slow order on it.

15  A.  Yes, sir.

16  Q.  Mr. Paz had told you, no, let's report it as a non-class

17  defect.

18  A.  Yes, sir.

19  Q.  When you found the track not repaired months later, you

20  were then required, because it had been reported as a

21  non-class defect, to take the track out of service.

22  A.  That's correct.

23  Q.  And Mr. Paz then says, Forget what I told you the first

24  time.  Now let's do a slow order 'cause then I can run trains

25  on it indefinitely.

1   A.   That's correct.

2   Q.   So you for the first time call the FRA.

3   A.   Yes, sir.

4   Q.   You talked to the FRA before.

5   A.   Yeah, I have actually talked to the FRA before like about

6   other just questions, if I had -- if I was wondering a

7   question, but I've never actually called the FRA in a

8   situation as this.

9   Q.   Did you tell the FRA that Michael Paz was asking you to

10  change a defect from one classification to another?

11  A.   Yes.

12  Q.   What did the FRA tell you?

13  A.   They told me I was correct in what I was doing.

14  Q.   Did you then call Michael Paz?

15  A.   Yes.

16  Q.   What did you tell him?

17  A.   We have a conversation.  At that time I -- we negotiate to

18  end up fixing the track.  Um, but during that time, you know,

19  I said, you know, basically, Admit that you are falsifying

20  reports, the defects.  That's why you were laughing when I

21  asked you about it.  And he admits to it.  And he said, We'll

22  work on it -- well, he'll work on it.  And then he says, We

23  have to find a happy meeting place.

24  Q.   Before that did you tell Michael Paz that you had called

25  the FRA?

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 464

1   A.  Uh, I said my friends in high places.

2   Q.  Could that have been anybody except the FRA, anybody but

3   the FRA?

4   A.  No, because you can't call, um -- there's no management

5   person to call that would resolve the issue for you.

6   Q.  It was clear that you had called -- to Michael Paz you had

7   called the FRA?

8   A.  Yes.

9   Q.  What did Michael Paz respond?

10  A.  He has Mark Carpenter, and he doesn't lose, which is his

11  supervisor.

12  Q.  Michael Paz said he had Mark Carpenter on his side and

13  they don't lose?

14  A.  That's correct.

15  Q.  What did you infer that he meant?

16  A.  Well, uh, they're going to continue doing what they're

17  doing because they felt that they were over the law and they

18  would do whatever they had to do.

19  Q.  Did Mr. Paz during that call reference Mr. Akers ever

20  firing an employee?

21  A.  Yeah, and actually -- yeah.  So during that phone call,

22  the second phone call, he says -- and this was really unique.

23  Um, he said, I'll pull a Ryan Akers, walk behind you and find

24  8 missing clips and fire you.

25          That was really unique because that was in reference

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    to how they fired -- well, it was in reference to another

2    inspector.

3    Q.   Is that -- is that weed weasel thing that Staci talked

4    about?

5    A.   Uh, not necessarily.

6    Q.   Is it referencing following employees and waiting until

7    they violate a rule to fire them?

8    A.   I would take it that way, yes.

9    Q.   Is that how you took it?

10   A.   Yes.

11   Q.   Were you scared at that point?

12   A.   Yes.

13   Q.   How tense are things when that phone call ends?

14   A.   I mean, as tense as it could get.

15   Q.   Did you go to another defect then?

16   A.   Yeah, so shortly after that, um, there was another defect

17   that disappeared, um, between the -- couple month between the

18   first time I got back in February and May, that disappeared

19   out of the system.  So I'm required to protect it.  Um, and I

20   called the dispatcher at 12:44, and I notify him that I am

21   reprotecting a defect and I had to slow down trains.

22   Q.   What kind of defect was it?

23   A.   This would also be known as an SSC.  It just basically

24   means that, due to the condition of the rail, the rail can't

25   be tested.  FRA has guidelines to what we need to do.  Um, we

1   need to test rail.  BNSF also has guidelines for testing rail.

2   Q.  Did the rail have any color of paint on it?

3   A.  Yeah.  So one of the guidelines that FRA says is when

4   making defects, it has to be in highly orange paint on both

5   sides.  It has to be marked.  It has to have labeling on it to

6   notify there is a defect there.

7   Q.  Were you specifically going to this defect, or did you

8   just find it while continuing to inspect track?

9   A.  It's just a normal inspection.  I didn't directly go find

10  that defect.  It was just part of the inspection process.

11  Q.  And there's still bright orange paint on the rail?

12  A.  Yeah.

13  Q.  What does that mean?

14  A.  The defect is active and you could -- this is not a defect

15  that -- this is one of them defects you could visually see

16  because it's on top of the rail, and due to the condition of

17  the rail you could visually see it.

18  Q.  Did you get out and look if the defect was, in fact, still

19  there?

20  A.  It was.

21  Q.  Was there a slow order in place?

22  A.  No.

23  Q.  Why not?

24  A.  It was removed.

25  Q.  Somebody removed it?

 1  A.  Yes.

 2  Q.  Do you know who removed it?

 3  A.  No.

 4  Q.  I'm going to show you Plaintiff's Exhibit 43.  Do you

 5  recognize this document, generally what it is?

 6  A.  Yes, sir.  It's a green screen.  It's -- it reflects a

 7  slow order, a slow order that gets issued to trains.

 8  Q.  Is this the type of document or system you routinely used

 9  when you were a BNSF --

10  A.  Yes.

11  Q.  -- track inspector?

12          MR. THOMPSON:  Plaintiff offers Exhibit 43.

13          MR. GOMAN:  No objection.

14          THE COURT:  Exhibit 43 is received.

15      (Plaintiff's Exhibit 43 received.)

16  BY MR. THOMPSON:

17  Q.  What does this show the jury, Mr. Fresquez?

18  A.  So if we start on the top, it says Pikes Peak.  It says

19  "PIKESP."  It stands for Pikes Peak subdivision.  That's here

20  in Denver.

21          Restriction number is -- all slow orders are ordered

22  by restriction numbers.  That's how we identify them.

23          Issue date is May 5th, 2016.  So that's when I issue

24  it.  Well, I give it to the dispatchers May 5th, 2016.

25          It tells you the milepost, 3.3 to 3.7.

1              It tells you the speed, 25.

2              It tells you the type of track, Main 2.

3              And then we'll skip down the yellow flags and all

4     that.  That's just -- we'll skip that.

5              Reason -- so under "Reason" -- so under "Reason" it

6     says "DT," defective track.

7              "Authorized by Fresquez."  That's me.

8              And "OK" means the time the dispatcher received it

9     was 1244.

10             Then it says the dispatcher's initials were SRG.

11    Q.  Is this you on May 5th putting a slow order on that track?

12    A.  Yes, sir.

13             MR. THOMPSON:  Thank you, Mr. Keech.

14    BY MR. THOMPSON:

15    Q.  I'm going to show you Plaintiff's Exhibit 41.  Do you

16    recognize this document?

17    A.  Yes, sir.

18    Q.  What is it?

19    A.  It's --

20    Q.  Just generally, what is it?

21    A.  It's a defect list.

22    Q.  Is this the type of document you would routinely deal with

23    when you were an inspector for BNSF?

24    A.  Yes, sir.

25             MR. THOMPSON:  Plaintiff offers Exhibit 41.

1          MR. GOMAN:  No objection.

2          THE COURT:  All right.  41 is received.

3      (Plaintiff's Exhibit 41 received.)

4   BY MR. THOMPSON:

5   Q.  What does 41 show us?

6   A.  So if you look in the red box, it's talking about that

7   SS -- so "SSC" stands for shelled spalled or corrugated rail

8   due to the condition.  So it tells you the type of defect.  It

9   tells you when the test date was, which was -- it was

10  originally found May 4, 2015.  It gives you a milepost, 3.695.

11  It says Main 2.

12          But if we go down to the left-hand corner, it tells

13  you it was removed, "Defect Removed," and then they showed it

14  as repaired.

15  Q.  Let me show you page 2.  What does page 2 show?

16  A.  So page 2 shows that that same defect was refound, um,

17  shortly after by the same -- by the same team.

18  Q.  All right.  So somebody marked this as repaired even

19  though the defect was still present.

20  A.  Correct.  And just to clarify, this is not a defect

21  inspectors actually find.  This is -- BNSF hires a third-party

22  company to come in and ultrasound their rail.  It's a huge

23  truck that sits on the rail, and only one operator has access

24  to inspect the rail.  And it shoots sound waves into the rail

25  and bounces back with defects.  And this was one of them.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 470

1   Q.  Was the orange paint still on the rail when you were

2   there?

3   A.  Yes.

4   Q.  Would it have been on the rail if it was repaired?

5   A.  It would have been removed because it's on the rail.  You

6   would have -- so they stop the defect, they would cut the

7   defect and remove it from the track and scrap that rail, put a

8   new piece in.

9   Q.  This is obvious, then, this has not been repaired, but

10  somebody's reported it as repaired?

11  A.  That's correct.

12  Q.  And that's on Exhibit 43?

13  A.  Yes, sir.

14  Q.  You are reporting it -- you are putting a slow order on

15  for that defect?

16  A.  Yes, sir.

17  Q.  At what time?

18  A.  1244.

19  Q.  Of May 5th?

20  A.  Yes, sir.

21  Q.  All right.  What happens next?

22  A.  About 20 minutes -- 20 minutes later I received a call

23  from Michael Paz.

24  Q.  Just so I'm clear, 20 minutes after you put the slow order

25  on this track?

1   A.  Yes.  So it was 20 minutes after I put this slow order on

2   I received a call from Mr. Paz to meet him at a location, and

3   the location was actually south Denver.

4          MR. THOMPSON:  Thank you, Mr. Keech.

5   BY MR. THOMPSON:

6   Q.  Was there a defect there you had discussed with anybody

7   earlier?

8   A.  At south Denver?

9   Q.  Yeah.

10  A.  Yeah, it was -- we discussed a defect in the morning

11  briefing, and they sent a crew out there to try to fix this

12  defect.  And we all discussed it during the morning briefing,

13  what type of defect it was.  Um, that's when we discussed it.

14  Q.  Had you been to the defect?

15  A.  Not in that day.

16  Q.  All right.  So Michael Paz calls you there.  I guess

17  before we get to what happened once you are there, let's talk

18  more about this defect's nature.  What kind of defect was it?

19  A.  It was a -- what we would call -- to make it in simple

20  terms, is, um, the track has to be perfectly uniformed.  So if

21  you have a curve, you need a perfect curve so you don't derail

22  a train.  You don't want a curve with -- looks like a snake.

23  You want a perfect curve.  So it's called an alignment.  So

24  this was an alignment curve and a switch which moves one train

25  from one track to another track.

1   Q.  Had it been reported previously?

2   A.  Yes, it was actually found in 2014.

3   Q.  By whom?

4   A.  By -- it was actually found by a geo car, one of them big

5   trains that has lasers and all that.

6   Q.  Was it consistently found since then?

7   A.  There was -- yes, it was found a couple times.  It's not

8   found every run of the geo car because it depends what track

9   the geo car is on.

10  Q.  Was there any question the defect was present?

11  A.  Uh, any question?  No.  And actually this was, um -- we

12  spoke to multiple managers, and this was actually verified by,

13  uh, another supervisor.  His name was Ryan Akers.

14  Q.  So you are being called to a defect that is inarguably

15  there; is that right?

16  A.  Yes.

17  Q.  If Michael Paz had really wanted to fix the defect, if he

18  is calling you there to fix it, is that something you could

19  have done?

20  A.  Not I, no.

21  Q.  Why not?

22  A.  There was too many components in it.  So to begin, this is

23  a switch, so it moves a train from one track to another track.

24  So it's not an easy fix.  There's a lot of moving components

25  in this.  You actually have to have another department there

1   because the compartment that controls the electricity part of

2   the switch that opens and closes it automatically would have

3   to be there.

4          These switches also have furnaces in them.  It's

5   actually a furnace like you would have in your house, and they

6   run ductwork, just like you would have in your house, through

7   the ground and into the switch.  And the reason we do that is

8   so we keep the snow melted and we can open and close it, the

9   dispatchers can open the close the track as needed, because

10  they are based out of Fort Worth, Texas.  So to begin with, to

11  fix this type of defect someone would have to disconnect the

12  furnace.  Um, it's not an easy job.  It's not -- on top of

13  that, the machines that they sent out there, um, don't --

14  aren't going to do that.

15  Q.  So once you are called to this defect that can't even be

16  fixed, what happens?

17  A.  Uh, basically what happens is when we originally get out

18  there, Michael Paz -- when I pull up, Michael Paz is already

19  there.  There's a foreman, Herzog.  He's the guy in charge of

20  the crew there.  They are already there.  And when I pull up,

21  Michael Paz says -- he's messing around with his, uh, GPS

22  unit, and I try to crack a joke.

23  Q.  Why were you trying to crack a joke?

24  A.  Because I wanted to relieve -- you know, the tension was

25  high.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 474

1    Q.  From what?

2    A.  Just from all the day -- you know, they're not -- they're

3    not happy about defects and our earlier conversations.

4    Q.  With the FRA?

5    A.  Yeah.

6    Q.  Is the tension pretty palpable when you are there?

7    A.  Say again, please.

8    Q.  Sure.  Is it pretty tense when you pull up?

9    A.  It is.

10   Q.  So you crack a joke or try to?

11   A.  I try to crack a joke.  And I did say, I called my friends

12   in high places, and, um, just trying to make light of the

13   situation.  And then eventually we walk out into -- 'cause he

14   wants me there to, uh, find the defect.

15   Q.  Let me stop you there for a second.  Is Mr. Paz trained to

16   find defects?

17   A.  He is.

18   Q.  How many people does it take to measure a defect?

19   A.  One.

20   Q.  And how many people were there?

21   A.  Two already.

22   Q.  You need a GPS, though, to locate defects; right?

23   A.  You could use a GPS, yes.

24   Q.  Did Michael Paz have one?

25   A.  Yes.

1  Q.  You need a string-line to measure defects?

2  A.  Yes.

3  Q.  Did Jay Herzog have one?

4  A.  Yes.

5  Q.  Why on earth are they calling you there then?  Why do they

6  need a third person?

7  A.  Uh, I -- I believe it was a setup.

8  Q.  Explain that to me.  What did Michael Paz say to you?

9  A.  When we got out there, um, he says, I don't see it.

10  Mr. Herzog says he doesn't see it.  I said, This is not a type

11  of defect that you can just see.  Our eyes aren't trained to

12  see a straight line, and you have to measure this defect.  Paz

13  says, It's not there, and he continues walking -- at the time

14  we were walking north.  And we get to about the -- well, he

15  said, Come on, on to the next one.  I said, You can't do this.

16  And I actually asked Mr. Herzog to stay back.

17  Q.  Why did you ask Jay Herzog -- Jay Herzog is a coworker.

18  He is not a manager.  Right?

19  A.  Yeah, that's correct.

20  Q.  Why ask him to stay back?

21  A.  Because I know these guys, and I know how to -- I try to

22  negotiate with them and mediate with these guys, and, you

23  know, I thought maybe -- well, first, I didn't want, you know,

24  Paz to try to use someone against me, but I also thought, hey,

25  you know, I could negotiate and come out with the right plan.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 476

1   Q.  Had you in the past been able to negotiate sometimes with

2   Michael Paz?

3   A.  Yes, I had.

4   Q.  Did you think that Jay Herzog being part of the

5   conversation might complicate matters?

6   A.  Yes.

7   Q.  Why?

8   A.  It's easier -- it's easier to negotiate one on one versus

9   in a group.  Just, people don't want to -- it's just easier.

10  Q.  What did you think Michael Paz was trying to do?

11  A.  Well, I -- he was just trying to falsify the defect, and

12  it was basically have me do it.  That's what I believed.

13  Q.  So you believed that he was trying to get you to measure

14  the defect, and then he was going to falsely mark it as

15  repaired anyway.

16  A.  Yes.  It was going to be removed from the system no matter

17  what.

18  Q.  Did Mr. Paz ask you to measure the defect?

19  A.  He did.

20  Q.  Did you measure the defect?

21  A.  No.

22  Q.  What did you do?

23  A.  I actually drove away, and, uh, I --

24  Q.  I want to make sure I understand this.  So a manager asks

25  to you measure a defect, and you instead drove away?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   A.   Yes, I did.

2   Q.   Why not just measure the defect?

3   A.   Well, you know, if something -- if I participate in them

4   falsifying defects -- I didn't want nothing to do with that.

5   Not only that, I'm fined up to $105,000 out of my own pocket

6   per incident for anything going wrong.

7   Q.   That's if the FRA finds that your name is on the repair,

8   you actually personally get fined?

9   A.   That's correct, I am personally fined.  And also at that

10  time Mark Carpenter had a policy any train that went on the

11  ground, the inspectors are automatically held responsible, not

12  the managers.

13  Q.   So if you do what Mr. Paz says, and there's an issue, you

14  believe it's going to be you in trouble, not somebody else?

15  A.   Yes, I would be in trouble.  That would be on me.

16  Q.   So you left.

17  A.   I did.

18  Q.   Did you tell Mr. Paz, I'm not doing it?

19  A.   No.

20  Q.   What did you say to him?

21  A.   I walked away.  Um, I was always taught just try to walk

22  away from confrontation.  It's just easier when everybody

23  walks away.  I walked away, I got in my truck, and I drove

24  about 200 feet away.  And I parked next to, um, the crew that

25  was about to fix them tie defects that we talked about

1    earlier.  And I sat there, and I talked to them.  I said, This

2    is what they're trying to do.  And we talked.  And then, uh,

3    Mr. Paz calls me on the radio and asks me if I want to

4    string-line it.  And I never said no.  I just didn't see the

5    point -- the reason why you would want me to string-line

6    something when you have already made your decision.  It's

7    just -- it's a setup.

8    Q.  Was that recording captured on audio?

9    A.  It was.

10   Q.  Both sides of the conversation?

11   A.  No.

12   Q.  Whose side was captured?

13   A.  Only mine.

14   Q.  That's audio BNSF produced in this case?

15   A.  It is.

16   Q.  Any idea why only your voice is heard, not Mr. Paz's?

17   A.  No.

18   Q.  Have you ever heard an audio where only the employee's

19   voice is captured?

20   A.  No.

21          MR. THOMPSON:  Plaintiff offers Defendant's

22   Exhibits -- sorry -- Exhibit A-49 and A-50.

23          THE COURT:  A-49 and A-50?

24          MR. THOMPSON:  Yes, Your Honor.

25          THE COURT:  Any objection to those?

```
 1             MR. GOMAN:   No objection.

 2             THE COURT:  All right.  A-49 and A-50 are received.

 3        (Defendant's Exhibits A-49, A-50 received.)

 4   BY MR. THOMPSON:

 5   Q.  I'm going to play the audio for you.

 6             THE COURT:  Which audio are you playing?

 7             MR. THOMPSON:  Sorry.

 8             THE COURT:  Which one?

 9             MR. THOMPSON:  It's the audio call from -- between

10   Mr. Paz and Mr. Fresquez.

11             THE COURT:  Okay.  All right.

12   A.  You're not playing Warren G, are you?

13   BY MR. THOMPSON:

14   Q.  Sorry?

15   A.  It says --

16   Q.  No, I'm not going to play Warren G, if I can help it.

17             MR. THOMPSON:  That's not being picked up on the

18   court audio, is it?

19             COURTROOM DEPUTY:  Are you --

20             MR. THOMPSON:  I'm hooked up via HDMI.

21             COURTROOM DEPUTY:  You may need to connect the audio

22   too.

23             THE COURT:  Is our volume turned up, Mr. Keech?

24             COURTROOM DEPUTY:  It is.

25             MR. THOMPSON:  I was doing so well technologically
```

1  until now.

2          All right.  Let's try this again.

3          Going somewhere.

4          Let's try that.  I will try again.

5          I'm going to restart it for you.

6      (Audio played.)

7          MR. THOMPSON:  Let me pause it right there.

8      (Audio paused.)

9  BY MR. THOMPSON:

10  Q.  Whose voice is this right now?

11  A.  That's mine.

12      (Audio played.)

13          MR. THOMPSON:  Let me pause that.

14      (Audio paused.)

15  BY MR. THOMPSON:

16  Q.  Who is that now?

17  A.  That's the dispatch, Fort Worth, Texas.

18  Q.  What does dispatch do?

19  A.  He controls all the train movements, all the emergency

20  issues.

21      (Audio played and paused.)

22  BY MR. THOMPSON:

23  Q.  I'm going to pause it right there.  What is the dispatch

24  asking you to do?

25  A.  Right there, nothing.  He's talking to the train.

 1   Q.  Oh, sorry.  I need to keep playing it then.

 2       (Audio played and paused.)

 3   BY MR. THOMPSON:

 4   Q.  That's dispatch talking to you; right?

 5   A.  Yes, sir.

 6   Q.  What's dispatch asking you to do?

 7   A.  He's telling me that there is a obstruction in the

 8   crossing that could derail a train at Kalamath Street.

 9   Q.  All right.  What did you do?

10   A.  I had to head that direction.

11   Q.  Before that I hear you say something along the lines of:

12   I don't see the point.  You have already made your decision.

13   A.  That's correct.

14   Q.  What did you mean by that?

15   A.  That was a reference to the string-lining conversation

16   between me and Michael Paz.  He asked me if I wanted to

17   string-line the defect, and I stated, I don't see the point.

18   You have already made your decision.  Meaning he was going to

19   falsify the report.

20   Q.  The very last thing you say to Michael Paz is, I didn't

21   say no.

22   A.  That's correct.

23   Q.  What did you mean by that?

24   A.  He tries to say, uh, I take that as a no.  That was his

25   response.  And I say I don't -- I didn't say no.

1  Q.  Why did you tell him that?

2  A.  The minute you say no, they're going to fire you.

3  Q.  Under federal law, you have a right to say no if what he's

4  doing is illegal; right?

5  A.  That's correct.

6  Q.  You knew that then?

7  A.  Yes, sir.

8  Q.  The defect you were called off to by dispatch, how serious

9  was that?

10  A.  Uh, it wasn't as serious as reported by -- I believe it

11  was reported -- it was reported by a pedestrian.  I was able

12  to take care of the situation, and then shortly after that I

13  returned back to that same location where Mr. Paz and

14  Mr. Herzog was.

15  Q.  Did you immediately go back after attending the other

16  defect?

17  A.  Yes.

18  Q.  Why would you go back if you think that Mr. Paz is trying

19  to violate federal regulations?

20  A.  Well, I thought maybe the tension was, you know -- the

21  tension is still high, but I thought maybe I could still, you

22  know, negotiate, talk.  Um, so I actually approached Mr. Paz,

23  and I -- at that time Mr. Paz and Mr. Herzog were already

24  string-lining the defect, and I approached, and I asked if

25  they needed help.  And Mr. Paz says, No, we'll have time to

17-cv-00844-WYD-SKC          Fresquez - Direct          II - 483

1   argue the facts later.  And I asked Jay, Is it there?  Jay

2   Herzog.  I said, Is the defect there?  He says, Yes.

3   Q.  The defect was there?

4   A.  Yes.

5   Q.  I'm sorry.  I missed it.  Did you offer to remeasure the

6   defect?

7   A.  I offered to help, yes.

8   Q.  And Paz told you, Don't bother?

9   A.  Yeah, he said -- he said, uh, It's too late.  We'll have

10  time to argue the facts later.

11  Q.  What happened next?

12  A.  I received a message to meet him at the office, um, and at

13  that time when he showed up at the office they handed me a

14  investigation, saying I was -- it was just a investigation

15  letter.

16  Q.  Did you go to a disciplinary hearing?

17  A.  I did.

18  Q.  Who were the witnesses against you?

19  A.  It was just Mr. Paz and the hearing officer.

20  Q.  Well, the hearing officer is not a witness; right?

21  A.  No.  It was just -- Mr. Paz was the witness against me.

22  Q.  The only witness there was Michael Paz?

23  A.  Uh, yes, sir.

24  Q.  Well, Jay Herzog had also been at the scene.  Why wasn't

25  he there?

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 484

1   A.  I don't have an answer for that one.  I'm not sure.

2   Q.  Why didn't you ask for Jay Herzog to be there?

3   A.  Uh, that's up to my union official.  It's not up to me.

4   And also if I ask for a witness, they're not paid.  BNSF

5   doesn't pay the -- if I ask for a witness, BNSF will not pay

6   that person his day's wages.

7   Q.  When Mr. Paz testified in the hearing, was he honest?

8   A.  Uh, no.

9   Q.  Tell me about that.  How did he lie?

10  A.  Uh, it just -- during the radio conversation, it, um -- he

11  says I say "nah," "nah," and it's just not accurate, and --

12  Q.  I'm going to ask you about that in a second, but right now

13  I want to focus on what Mr. Paz said.

14          Did Mr. Paz lie during the investigatory hearing?

15  A.  Yeah, he told me he told -- directed me.  He -- I think he

16  said, uh -- I think if I -- he said he directed me three times

17  to remeasure the defect.

18  Q.  Did Mr. Paz ever order you to remeasure the defect?

19  A.  No.  He asked.

20  Q.  Is there a difference between telling a supervisor no if

21  they are asked versus ordered?

22  A.  Yes.

23  Q.  One is not terminable; right?

24  A.  That's correct.

25  Q.  Did Mr. Paz testify about whether the defect was there?

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 485

1    A.  Yeah.  He testified the defect was not there.

2    Q.  The defect, in fact, was there.

3    A.  That's correct.

4    Q.  Did Mr. Paz leave the track in service that day?

5    A.  Um, I was already pulled from service, so I'm unsure if

6    the track was left in service.

7    Q.  Did Mr. Paz ever ask you to measure the defect before you

8    got in your truck?

9    A.  I do not recall him ever asking me to remeasure the defect

10   before I got in the truck.

11   Q.  Did Mr. Paz testify to anything about whether you offered

12   to measure when you returned?

13   A.  Say it again, please.

14   Q.  Sure.  In the hearing, did Mr. Paz say anything about

15   whether you offered to measure when you returned?

16   A.  Not that I recall.

17   Q.  All right.  So I want to look at -- there's ultimately a

18   transcript of this hearing; right?

19   A.  Yes, sir.

20   Q.  Including the audio we just listened to?

21   A.  Yes, sir.

22   Q.  I'm going to show you Defendant -- sorry -- A-48.

23           COURTROOM DEPUTY:  Did you swap the HDMI cable back

24   in?

25           MR. THOMPSON:  I did, even all the way.  I was doing

Julie H. Thomas, RMR, CRR                        (303)296-3056

1    so good for a while.

2    BY MR. THOMPSON:

3    Q.  Is this the transcript from the hearing?

4    A.  Yes, sir.

5    Q.  Is this the transcript of the audio we just listened to?

6    A.  No.

7    Q.  Let me rephrase.  Is this supposed to be the transcript

8    from the audio?

9    A.  Yes, supposed to be.

10   Q.  Do you think it's incorrect?

11   A.  Yes.

12   Q.  Where do you think it's incorrect?

13   A.  Uh, the words were added, the "nah," the "no."

14   Q.  You don't think you said "nah" or "no"?

15   A.  I didn't.

16   Q.  What do you think you said?

17   A.  Well, I paused when I was speaking, and you hear it

18   throughout the conversation.  So the "ah," I'm pausing, the

19   "ah," but that second "no" is not there.

20   Q.  Are you allowed to see the transcript before it's sent to,

21   for example, Adam Miller?

22   A.  No.

23   Q.  Are you allowed to see the transcript before it goes to an

24   arbitrator?

25   A.  Yes.

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 487

1   Q.  Are you allowed to make changes to the transcript?

2   A.  No.

3   Q.  So, for example, after your deposition -- you were deposed

4   in this case; right?

5   A.  Yes, sir.

6   Q.  You got a copy of the transcript.  You were allowed to

7   make any changes if there were any mistakes.

8   A.  Yes, sir.

9   Q.  Were you given that opportunity?

10  A.  No.

11  Q.  Is BNSF given that opportunity?

12  A.  Yes.

13  Q.  Do you know if they changed the transcript?

14  A.  It doesn't match -- the transcripts don't match the actual

15  audio.

16          MR. THOMPSON:  Thank you, Mr. Keech.

17          THE COURT:  How much longer do you estimate you will

18  be?

19          MR. THOMPSON:  20 minutes.

20          THE COURT:  All right.

21  BY MR. THOMPSON:

22  Q.  I'm going to show you Exhibit A-54 [sic].  Do you

23  recognize this document?

24          COURTROOM DEPUTY:  54 or A-54?

25          MR. THOMPSON:  A-54.

1          COURTROOM DEPUTY:  Are you sure?  It looks -- the

2    sticker says 54.

3          MR. THOMPSON:  It sure does.  That's not the one I

4    want either.  Try this again.  There we go.

5          COURTROOM DEPUTY:  And this is a stipulated exhibit,

6    Your Honor.

7          THE COURT:  No, I see it.

8          MR. THOMPSON:  Defendant hasn't moved for it.  We

9    will move for the admission.

10         THE COURT:  Any objection?

11         MR. GOMAN:  No.

12         THE COURT:  All right.  It's received, A-54.

13      (Defendant's Exhibit A-54 received.)

14         MR. THOMPSON:  To make things easy, can I just move

15   for all of the defendant's stipulated exhibits?

16         THE COURT:  Well, I'd rather have you specify what

17   you are talking about so that there's no misunderstanding,

18   because on a couple of occasions the stipulation wasn't noted.

19         MR. THOMPSON:  Okay.

20         THE COURT:  So I -- so if you want to seriatim go

21   through them, you can.

22         MR. THOMPSON:  We can do that later, Your Honor.

23   Let's finish Mr. Fresquez.

24   BY MR. THOMPSON:

25   Q.  Do you recognize this exhibit?

1   A.  Yes.

2   Q.  What is it?

3   A.  It's a dismissal letter.

4   Q.  Your dismissal letter; right?

5   A.  Yes.

6   Q.  BNSF terminated you?

7   A.  Yes.

8   Q.  What's the effect been on you?

9   A.  Say that again, please.

10  Q.  What's the effect been on you?

11  A.  What's the effect on me?

12  Q.  Yeah.

13  A.  It's been hard.  You know, I -- I had to find new jobs.

14  You know, it has been really stressful.  Um, it's been

15  extremely hard.

16  Q.  You have found other work now.  Is it still stressful?

17  A.  It is.

18  Q.  Why?

19  A.  I don't make near, you know -- I don't -- my wage

20  difference is great, and it's hard.  And the benefits aren't

21  as good.  Um, retirement is not as good.  Um, you know, it's

22  just been hard.

23  Q.  Has it changed who you are as a person?

24  A.  Uh, yeah.

25  Q.  Tell us about that.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Direct                    II - 490

1   A.  I don't sleep no more, I can tell you that much.  My

2   stress levels are out the door.  I got fat.

3   Q.  Tell us about that.  How much weight have you gained since

4   you were terminated?

5   A.  Um, in '17, early -- like early '17 I was still putting on

6   weight, but I was about 190.  I think I've ballooned up to

7   like 245, 250.  It just -- I -- I gained a lot of weight, and

8   I didn't change my diet much.  I think a lot of it just had to

9   do with stress.  I really do.

10  Q.  When you worked for BNSF, did you coach anything?

11  A.  Say that again, please.

12  Q.  Yeah.  When you worked for BNSF, did you coach anything?

13  A.  I coached baseball.

14  Q.  Tell the jury about what kind of level of baseball you

15  coached.

16  A.  I coach, uh, competitive youth, um, sports.  I was working

17  for a program that was considered one of the top in the

18  western half of the United States.  We pride ourselves in -- I

19  think 2017 we had 59 recruits.  We had 59 kids commit to

20  college.  It was very competitive.

21  Q.  Did you enjoy that?

22  A.  I did.

23  Q.  After BNSF fired you, did you quit doing that?

24  A.  I no longer do that.

25  Q.  Did stress play a role in why you quit doing that?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  A.  It does.  It absolutely does.

2  Q.  Has the stress of this affected pretty much everything you

3  enjoy doing?

4  A.  It does.  It really does.

5  Q.  Let me ask you this, then.  If you had to do it all over

6  again, would you do the same thing?

7  A.  Would I go through this process again?

8  Q.  Would you have stood up to Mark Carpenter and Michael Paz

9  and reported them?

10  A.  Yeah.

11  Q.  Why?

12  A.  Like I mentioned earlier, to avoid conflict and keep

13  peace, it really created a war within myself.  You know, I

14  hated myself.  And, um, at least I know I did the right thing.

15  At the end of the day, I know I did the right thing.

16          MR. THOMPSON:  I have nothing further.

17          THE COURT:  All right.  Cross-examination.

18                          **CROSS-EXAMINATION**

19  BY MR. GOMAN:

20  Q.  All right.  Mr. Fresquez, good afternoon, sir.

21  A.  Good afternoon.

22  Q.  Can you hear me all right?

23  A.  Yes, sir.

24  Q.  Let's go to May of 2016 first.  Okay?

25  A.  Yes, sir.

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 492

1    Q.  May 2nd of 2016 you are on a flagging job; is that right?

2    A.  No.

3    Q.  What job are you doing May 2nd of 2016?

4    A.  I'm a track inspector.

5    Q.  Okay.

6            THE COURT:  Keep your voice up.  Move a little closer

7    to the mic.

8    A.  Track inspector.

9    BY MR. GOMAN:

10   Q.  I understood you to say you had bid back off of a flagging

11   job to be a track inspector on the main line in Denver in

12   early May of 2016.  Is that right?

13   A.  I bumped back.

14   Q.  Okay.  What job were you doing before you bumped?

15   A.  A flagman, foreman flagman.

16   Q.  Got it.  So you are working a flagging job, and then you

17   bump back into a track inspector position.

18   A.  That's correct.

19   Q.  Why did that -- the flagging job, someone else bumped you

20   off of it; is that right?

21   A.  That's correct.

22   Q.  When you are deciding then where you go, you are going to

23   go work next, you have a couple options available to you;

24   right?

25   A.  Uh, I don't -- I don't recall the options.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    Q.  You could work as a foreman, for one; right?

2    A.  I could work for a foreman, yes, or track inspector.  It

3    equals same position.

4    Q.  Right.  So you could bid back on a job as a track

5    inspector, or you could bid on a job as a foreman in May of

6    2016; right?

7    A.  No, I think I could bump back.  I can't bid.

8    Q.  I think it's just a terminology thing.  You can bump

9    someone else and take their job and start working that job.

10   A.  Uh, yes, sir.

11   Q.  And you get to choose where you are going to bump.

12   A.  Yes, sir.

13   Q.  Obviously it has to be somewhere you have seniority;

14   right?

15   A.  Yes, sir.

16   Q.  All right.  And that's May 1st or May 2nd of 2016,

17   somewhere in there?

18   A.  Yes, sir.

19   Q.  So, according to your testimony, for the last year and a

20   half at least, the roadmasters in Denver had been harassing

21   you.  Is that fair?

22   A.  That's fair to say, yes.

23   Q.  Bullying you?

24   A.  Yes, sir.

25   Q.  They had been lying?

1    A.   Yes, sir.

2    Q.   And not just Mike Paz, but Mike Paz especially.  Is

3    that -- is that fair?

4    A.   Uh, yes, we could say that, yes.

5    Q.   All right.  You could have, if you wanted to, bid on a job

6    east of Denver as a track inspector in May of 2016; right?

7    A.   I don't recall that.

8    Q.   Okay.  Well, let me ask you this.  Any reason to doubt

9    that in your deposition you testified, Yeah, I believe I could

10   have held in Keenesburg, but I chose not to?

11   A.   That's a possibility, yes.

12   Q.   The Keenesburg track inspector job would have reported to

13   a different roadmaster; right?

14   A.   Yeah, and it's further east.

15   Q.   Right.  Mr. Sintas, is that the name of the gentleman?

16   A.   Sintas.

17   Q.   Sintas.  Okay.

18        Had you worked for him before?

19   A.   No.  He was a new roadmaster.

20   Q.   No reason to think he was up to no good; is that right?

21   A.   No, sir.

22   Q.   But May 1st or 2nd of 2016 you decide to bid on the main

23   line track inspector job in Denver; is that right?

24   A.   That's correct.

25   Q.   And you knew by doing that you would be reporting directly

1   to Mike Paz; right?

2   A.  Yes, sir.

3   Q.  The reason why you bid onto that job in Denver is you

4   believed it would pay a little bit better than the Keenesburg

5   job; is that right?

6   A.  Absolutely.

7   Q.  So let's get right to it then.  So early May of 2016, I

8   believe this is May 5th of 2016, according to your testimony,

9   you confront Mr. Paz about deleting defects from the system.

10  Is that right?

11  A.  That's one of the times, yes.

12  Q.  Okay.  And what you say is, Admit you're taking defects

13  off the system improperly.  Is that right?

14  A.  Something to that degree, yes.

15  Q.  And he says, I admit I'm doing exactly that.

16  A.  Yes.

17  Q.  Just you and Mr. Paz in this conversation?

18  A.  It was a phone conversation, yes.

19  Q.  Got it.  And then he says, I'll work on not doing that in

20  the future?

21  A.  He said, I'll work on it.

22  Q.  Got it.  That's a big deal; right?

23  A.  Absolutely.

24  Q.  Do you understand that to be a federal crime; right?

25  A.  Yes.

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 496

1    Q.  Okay.  This is in the context of a disagreement about the

2    classification of a defect; right?

3    A.  Uh, no, this conversation was actually about -- it started

4    as that reclassification, yes, but it actually led to other --

5    it was actually a conversation we had earlier in the week

6    where he was laughing at me.

7    Q.  Well, let's go to the conversation then on May 5th so we

8    don't get confused.  Is that -- in the morning on May 5th of

9    2016 you talked to him about the proper classification of a

10   tie defect; is that right?

11   A.  It's, uh -- it's around 11 o'clock or so.

12   Q.  Okay.  But that's what you are talking about, a tie

13   defect?

14   A.  Uh, yeah, if I'm -- unless I lost you.

15   Q.  Okay.  Well, you -- the conversation where you say, I

16   think this needs to go out of service; it's past due.  Right?

17   A.  Repeat that?

18   Q.  The conversation where you say, I think this class, uh --

19   I'm sorry -- I think this track needs to go out of service

20   because it's past due.

21   A.  I don't think.  I know.

22   Q.  So you tell that to Mr. Paz.

23   A.  Yeah.

24   Q.  And he says, Can it not be reclassified as a

25   class-specific defect?

17-cv-00844-WYD-SKC          Fresquez - Cross                II - 497

1    A.  Oh, it can't.

2    Q.  I'm asking you to just clarify what Mr. Paz said.

3    A.  No, he said he wanted to reclassify it as a class-specific

4    so he could run trains.

5    Q.  Got it.  And so you said, Let me check on that.  Right?

6    A.  Yes, sir.

7    Q.  Okay.  I want to be pretty specific then about what you

8    tell Mr. Paz when you call him back.

9    A.  Okay.

10   Q.  You end the conversation by saying, All right, I'm going

11   to check on it and make sure, or something like that.  Right?

12   A.  Something to that degree, yes.

13   Q.  Okay.  And then when you call him back, you say, It needs

14   to go out of service, but we have a crew here to fix it.

15   Right?

16   A.  It was something to that degree.  We negotiate to fix the

17   defect because the guys were ready to go.

18   Q.  So let's look at how you describe that conversation in

19   your investigation hearing.  Okay?

20   A.  Okay.

21   Q.  Let me show you -- this is Exhibit A-48.  We are on page

22   28.  Can you see that?

23   A.  Yes, sir.

24   Q.  All right.  All right.  So you describe that conversation

25   we just talked about; right?  He says, I'll work on not doing

1    it anymore.  Right?

2    A.  Yes.

3    Q.  Or something to that effect.  And then you say, "I tell

4    him I will not take Main 2 out of service if he fixes that

5    defect today."

6    A.  That's correct.

7    Q.  Okay.  And he says okay.

8    A.  That's correct.

9    Q.  And that's the end of it.

10   A.  Yeah, for that defect, yes.

11   Q.  You didn't say anything in the investigation hearing about

12   having told him you called your friends in very high places;

13   right?

14   A.  The -- the company investigation?

15   Q.  Right, the one we are looking at right here.

16   A.  Uh, I don't believe so, no.

17   Q.  I'm trying to figure out who would have had any idea that

18   you had called the FRA on May 5th of 2016.  Okay?

19         So in this investigation hearing, do you agree with

20   me that you didn't say anything about having called the FRA

21   that morning?

22   A.  I said my friends in high places.

23   Q.  Did you say that in the investigation hearing, sir?

24   A.  Not in the investigation hearing.

25   Q.  Okay.  So you told Mike Paz -- your testimony is today you

1   told Mike Paz, I called my friends in very high places.

2   Right?

3   A.   Yes, sir.

4   Q.   And Mike Paz said what?

5   A.   That he had Mark Carpenter, and he doesn't lose.

6   Q.   I'm not sure I understand it.  He doesn't lose what?  What

7   did you understand that to mean?

8   A.   Basically it's if you put him against anybody, that him

9   and Mark Carpenter are together, and Mark Carpenter doesn't

10  lose.

11  Q.   Okay.  During that same conversation, Mike Paz also tells

12  you he's going to make up a reason to fire you; right?

13  A.   Yeah, he did.

14  Q.   So you are talking May 5th, 2016, just a couple hours

15  before this insubordination incident, he tells you

16  point-blank, I am going to make up a reason to fire you.

17  A.   Yeah, and I know that exactly because I jumped onto the

18  section truck, which was parked next to us, and all the guys

19  were sitting in the truck, and I told them what he told me.

20  And they said, You should report that.

21  Q.   Yeah.  That's a pretty remarkable admission; right?

22  A.   It is.

23  Q.   That's the kind of thing that you'd want the company to

24  know about in an investigation hearing where your job is on

25  the line; right?

1   A.  You don't want to -- you don't want to -- in the company

2   investigation, it's the company that reviews the document.

3   You want to get your job back.  And if you mention -- the

4   minute you mention that in a company investigation, that's

5   going to go around to multiple parties that you went to the

6   FRA or called the FRA.  There's absolutely no chance you are

7   getting back.

8   Q.  So I don't understand that.  You accused your boss of

9   having admitted to falsifying track defect reports and

10  committed a federal crime in your company investigation; is

11  that right?

12  A.  That's correct.

13  Q.  But you are not willing to say your boss told you he was

14  going to invent an excuse to fire you hours before noticing

15  you for an investigation?

16  A.  I did not say that in my transcript, no.

17  Q.  Okay.  And you didn't say that in your transcript because

18  you wanted to get your job back?

19  A.  Absolutely.

20  Q.  Okay.  You still want to get your job back; right?

21  A.  Correct.

22  Q.  Okay.  The first time you told anyone, though, that Mike

23  Paz had promised to fire you without reason was in the context

24  of this lawsuit; right?

25  A.  Say that again, please.

17-cv-00844-WYD-SKC           Fresquez - Cross              II - 501

1    Q.  The first time you told anyone that Mike Paz had told you

2    he's going to invent an excuse to fire you is in this lawsuit;

3    right?

4    A.  No.  Again, like I said, when he said, I'll go -- I'll

5    pull a Ryan Akers, find nine -- eight missing clips, and I'll

6    fire you, I jumped on the section that was next to me that

7    day, and I told them what he told me.

8    Q.  I see.  So you told your coworkers?

9    A.  Yes, sir.

10   Q.  Which coworkers?

11   A.  I think I spoke with, uh -- it was -- the whole truck was

12   full.  I couldn't tell you exactly who was in that truck

13   because they change trucks.

14   Q.  I see.  Okay.  So then a couple hours after that

15   conversation, you go to south Denver; is that right?

16   A.  I was already at south Denver.  The conversation happened

17   when I was in south Denver.

18   Q.  Okay.  At what time, even approximately, do you show up

19   with Mr. Herzog and Mr. Paz at the location of this alignment

20   defect?

21   A.  They were there already.  I showed up well after them.

22   Q.  Okay.  Now, is it your testimony that it was Mike Paz who

23   wanted you there?

24   A.  Michael Paz is the one that called me, yes.

25   Q.  So if Jay Herzog were to say or testify that he needed

Julie H. Thomas, RMR, CRR                         (303)296-3056

1  help from both you and Mike Paz, you disagree with that?

2  A.  I don't -- I don't know what Paz -- I don't know -- I

3  don't know if Jay needed my help.  I just know Michael Paz is

4  the one that called me.

5  Q.  Well, you did sit in on Jay Herzog's deposition, though;

6  right?

7  A.  No.

8  Q.  In this case?

9  A.  No.

10  Q.  You weren't listening in over the phone?

11  A.  No, we -- it started, but then I lost it.

12  Q.  Have you read the statement that Jay Herzog wrote in this

13  case?

14  A.  I haven't read Herzog's deposition.

15  Q.  What about the statement that he wrote that day?

16  A.  Uh, I don't -- the one he handed to Paz?

17  Q.  Right.

18  A.  I haven't actually fully read that thing.  I have seen it

19  in the discovery, but I haven't fully read it.

20  Q.  Let's make sure the jury understands who Jay Herzog is.

21  He's a foreman; right?

22  A.  Yes, sir.

23  Q.  That's a job that you could have held at that point in

24  time.

25  A.  It depends.

1  Q.  He's a coworker, as opposed to a manager, is all I'm
2  trying to say.
3  A.  Yes, sir.
4  Q.  He's not someone that you report to or who could bring you
5  up on discipline.
6  A.  That's correct.
7  Q.  You like him; right?  He's a friend of yours?
8  A.  Not a friend.  He's a coworker.
9  Q.  You wouldn't have and didn't have any reason to think he
10  would be falsifying track defects; right?
11  A.  Uh, not to my knowledge, no.
12  Q.  You wouldn't have any reason to think he would want
13  anything to do with bullying you into misreporting track
14  defects; right?
15  A.  Can you repeat that, please.
16  Q.  You don't have any reason to think Jay Herzog would be
17  interested in bullying you or harassing you into misreporting
18  or fraudulently reporting track defects?
19  A.  No, not necessarily, no.
20  Q.  So let's talk about this defect then.  The defect was an
21  alignment defect; is that right?
22  A.  Yes.
23  Q.  That means it had been reported by a geometry car
24  initially; right?
25  A.  Uh, yes, this one was, yes.

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 504

1    Q.  And based on your understanding, it had been reported

2    something like two years prior to that.

3    A.  Yes, and it was verified by Ryan Akers.

4    Q.  Meaning he went out there, found it, and said, yep,

5    there's a defect there?

6    A.  Yes, sir.

7    Q.  And so the company put a slow order on that track?

8    A.  That's correct.

9    Q.  And that's an appropriate remedial action; right?  You are

10   not taking any issue with that?

11   A.  Yeah, that's correct.

12   Q.  And that slow order had remained in effect for the last

13   two years?

14   A.  Yes.

15   Q.  Two years prior to when you --

16   A.  I don't know how long it had actually remained in effect.

17   I just know it was prior to -- it was there.

18   Q.  But you didn't have any reason to think this was any sort

19   of a high-priority defect for BNSF.

20   A.  No.

21   Q.  So your contention is Mike Paz just wanted to remove this

22   slow order without measuring it.

23   A.  That's correct.

24   Q.  He just wanted to delete it out of the system so he could

25   remove that slow order that had been in place for a couple

Julie H. Thomas, RMR, CRR                        (303)296-3056

 1  years.

 2  A.   That was -- yes.

 3  Q.   Okay.  And a roadmaster has the ability and the authority

 4  to remove slow orders; right?

 5  A.   When they are repaired.

 6  Q.   Absolutely.  I mean, they are charged with -- if they

 7  inspect track like you inspect track, if they verify that the

 8  defect is not there, they can get into the same system you use

 9  and remove that defect.

10  A.   Yes.

11  Q.   And they do that under their own name, using their own

12  credentials.

13  A.   I believe so, yes.

14          THE COURT:  All right.  We are going to take our

15  midafternoon break since we have been going for about an hour

16  and 45 minutes.  So we will take a break until 3:40, a

17  17-minute break.

18          Do you think you will finish this witness today,

19  Mr. Goman?

20          MR. GOMAN:  I do believe I will finish my

21  cross-examination.

22          THE COURT:  That's what I mean.

23          Do you think we will finish this witness today?

24          MR. THOMPSON:  Yes, Your Honor.

25          THE COURT:  All right.  Well, let's do our best to do

1    that.  So we'll start again in 17 minutes.

2         (Proceedings recessed 3:22 p.m. to 3:47 p.m.,

3         resuming in the presence of the jury.)

4              THE COURT:  All right, have a seat.

5              Let's continue with the cross.

6    BY MR. GOMAN:

7    Q.  All right.  Mr. Fresquez, I think where we left off was

8    this.  You agree that a roadmaster is someone who can get into

9    that TIMS database and clear out a defect, marking it as

10   repaired; right?

11   A.  Yes, sir.

12   Q.  Mike Paz or any other roadmaster doesn't need your help to

13   do that; right?

14   A.  No, sir.

15   Q.  He can just sit back in his office with the door closed,

16   log into the system, and clear out that defect if that's what

17   he wants to do.

18   A.  Yes, sir.

19   Q.  And that's, in fact, what you think he had been doing over

20   the last several months; right?

21   A.  Yes, sir.

22   Q.  So he doesn't need anyone, not you or Jay Herzog, to

23   witness him committing a federal crime; right?

24   A.  I didn't understand that question.

25   Q.  He doesn't need you there watching him while he's doing

1   that; right?

2   A.   That's correct.

3   Q.   But that's exactly what, according to your testimony, he

4   was trying to do on May 5th of 2016; right?

5   A.   I don't understand your question.

6   Q.   His intention is to remove this defect from the system.

7   Do I have that right?

8   A.   That was my belief, yes.

9   Q.   So he calls you and says, Mr. Fresquez, come here to this

10  track location.  Right?

11  A.   That's correct.

12  Q.   And your contention is he was doing that so you could see

13  him remove the defect improperly.  Do I have that right?

14  A.   I -- I think, uh -- no.

15  Q.   Where am I -- what am I missing?

16  A.   If I'm involved, they will have me do it.

17  Q.   They would have you measure it?

18  A.   That's correct.

19  Q.   So you would see --

20  A.   No -- I apologize.  Go ahead.

21  Q.   They would have you measure it with a string-line,

22  presumably?

23  A.   That -- yes, sir.

24  Q.   And then Jay Herzog and Mike Paz and you would see that

25  that defect is still there; is that right?

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 508

1   A.  We would measure it -- I mean, yes.

2   Q.  So that you were right there looking at the track,

3   verifying that defect, so then he could remove it.  Is that

4   what I'm to understand you thought was happening?

5   A.  It was my belief that it was going to be removed no matter

6   what.

7   Q.  Okay.  Mike Paz didn't want it string-lined.  He was

8   just -- this is kind of a power play.  That's why he asked you

9   to do it.  Right?

10  A.  I don't know what Paz was actually thinking.

11  Q.  Well, I --

12  A.  I guess I don't understand your question the way you

13  asked.

14  Q.  Yeah.  The reason why you didn't want to string-line this

15  track is because you thought Paz was just going to remove it

16  from the system regardless of what the measurement showed;

17  right?

18  A.  That's correct.

19  Q.  So Paz had no interest in measuring or string-lining this

20  track.

21  A.  No.

22  Q.  Okay.  So this kind of defect, you can't see it with the

23  naked eye; right?

24  A.  No, not usually, no.

25  Q.  I think everyone in this case will agree with that.  If

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 509

1   you are looking at it, you can't see whether it's there.  You

2   need a string-line.  Right?

3   A.  Yes, sir.

4   Q.  You need a string-line to accurately and correctly

5   determine whether the track is defective; right?

6   A.  Yes, sir.

7   Q.  You had one in your truck; right?

8   A.  Yes, sir.

9   Q.  And you had one because your job requires you to

10  string-line and measure track; right?

11  A.  Yes, sir.

12  Q.  Okay.  You heard Mike Paz testify in the investigation

13  hearing he told you to string-line the track, you refused and

14  left.  You disagree with that testimony; right?

15  A.  Yes, sir.

16  Q.  You are aware Jay Herzog has said in this case Mike Paz

17  told you to measure the track, you ignored him and left.

18  You're aware of that; right?

19  A.  Uh, yes, sir.

20  Q.  They are both wrong.  They are mistaken on that point.  Do

21  I have that right?

22  A.  Uh, I understand that they asked -- he asked me.  Not

23  Herzog, but Paz.

24  Q.  Okay.  So you drive 200 feet away and park; right?

25  A.  Yes, sir.

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 510

1   Q.  You can still see Mike and Jay.  They can still see you.

2   Right?

3   A.  Yes, sir.

4   Q.  About six or seven minutes later, after that radio

5   conversation with Mike Paz ends, you get a call to go to

6   Kalamath Street?

7   A.  Uh, no, the conversation is on the radio.

8   Q.  Right.

9   A.  What we just heard.

10  Q.  Right.  So you have a conversation on the radio.  You are

11  in your truck.  Mike Paz is trackside.

12  A.  I'm -- you lost me.

13  Q.  The radio -- the dispatch recording that Mr. Thompson

14  played for us, where are you when you are talking on the

15  radio?

16  A.  200 feet away, give or take.

17  Q.  Where is Mr. Paz?

18  A.  Behind me.

19  Q.  About 200 feet away?

20  A.  Yes, sir.

21  Q.  Okay.  You have that conversation.  About six or seven

22  minutes go by.  You get the call out to Kalamath Street.

23  Right?

24  A.  I don't know the time frame.

25  Q.  Does that sound about right?  I mean, it's on the dispatch

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    tape, but I --

2    A.  Yeah, it's on the dispatch tape.  The dispatch tape isn't

3    six or seven minutes long, so --

4    Q.  You go to Kalamath Street.  Then you come back to where

5    Mr. Paz and Mr. Herzog are.

6    A.  That's correct.

7    Q.  What are they doing when you get back?

8    A.  String-lining it.

9    Q.  But they didn't want to string-line it, I thought.

10   A.  They are string-lining it.

11   Q.  String-lining the track so that Mr. Paz can later remove

12   it from the system?

13          Is that right?

14   A.  Uh, is that a question?

15   Q.  Yes.  They are string-lining the track, and you believe

16   they are doing that so that Mike Paz can delete it from the

17   system?  Is that what you believe happened?

18   A.  It was my opinion that was going to be removed no matter

19   what.

20   Q.  Okay.  Let's talk about this radio conversation then.  As

21   a matter of fact, let's show Exhibit A-48.  I'm going to blow

22   up the dispatch recording.  Okay?

23          And then let's just do this real quick.  I just want

24   to play this clip here for you and have the jury hear it one

25   more time.  This is Exhibit A-50.  I'm just going to play the

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 512

1    first 40 seconds.

2        All right.  We'll listen to it real quick.

3        (Audio played and paused.)

4    BY MR. GOMAN:

5    Q.  So I paused it at 25 seconds.  What did Mr. Paz say to you

6    that prompted you to say that in response?

7    A.  Uh, it was something -- Do you want to string-line the

8    defect?  Something to that degree.

9    Q.  And that's what he said the first time too; right?  We

10   heard two sentences from him?

11   A.  Correct.

12   Q.  He said the same thing both times.  Do you want to

13   string-line the defect?

14   A.  Yeah.

15   Q.  You did not understand that to be an instruction from your

16   boss?

17   A.  No.  That's a question.

18   Q.  Okay.  Why do you think he was curious to know whether you

19   wanted to string-line the defect?

20   A.  I -- it was my belief that, uh -- why would -- can you

21   repeat that, please.

22   Q.  Yes.  If he doesn't actually want you to string-line the

23   defect, why does he ask you three times if you are interested

24   in doing it?

25   A.  Because then it's me who is measuring it.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC            Fresquez - Cross                    II - 513

1    Q.  So he wanted you to come back and measure the string-line;

2    right?

3    A.  He asked if I wanted to.

4    Q.  And he is your boss?

5    A.  That's correct.

6    Q.  As a roadmaster, he has the authority and he's within his

7    rights to tell you to string-line a section of track; right?

8    A.  He could tell me to do something, that's correct.

9    Q.  And you didn't; right?

10   A.  He asked.  He asked.

11   Q.  And you didn't do it; right?

12   A.  When you ask someone, you give them the option to make a

13   choice.

14   Q.  You didn't string-line the track; right?

15   A.  No, I -- no, I didn't.

16           MR. GOMAN:  Let's play the last sentence.

17        (Audio played and paused.)

18   BY MR. GOMAN:

19   Q.  Why do you say, "My final opinion is..."?  What did he say

20   to prompt that?

21   A.  I take that as a, uh -- can you repeat -- can you replay

22   that, please.

23   Q.  Yeah.

24        (Audio played and paused.)

25   BY MR. GOMAN:

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Q.  So "My final opinion is it's...kind of pointless to

2   stringline something if you've already made your decision."

3   What did he say to prompt you to say that?

4   A.  He said, I take that as a no.

5   Q.  Okay.

6   A.  That's why I respond, "I didn't say no."

7   Q.  Right, but, I mean, your actions pretty clearly conveyed

8   you weren't going to string-line that track; right?

9   A.  At that time I didn't want any part of that, no.

10  Q.  You didn't want to string-line the track.

11  A.  At that time, no.

12  Q.  Okay.  But your contention is he was asking, not ordering.

13  Do I have that right?

14  A.  That's correct.

15  Q.  Okay.  If you wanted to measure the track to make sure

16  it's safe for train travel, you could have; right?

17  A.  Well, it was already protected.  So meaning it was already

18  protected with a slow order.  It was already reduced to that

19  speed.  It's not that it was a defect that we were trying to

20  make sure it was safe for train travel because train travel

21  was already safe because it was already protected.

22  Q.  Sure.  You wanted to see if you could remove that slow

23  order or not; right?

24  A.  It was to determine if they could remove the slow order,

25  yes.

1   Q.  You don't want to remove a slow order if it's improper;

2   right?

3   A.  That's correct.

4   Q.  So you could have gone back there and measured the track

5   with a string-line.  You chose not to.  Right?

6   A.  At that time, yes.

7   Q.  It would have been safe to measure the track.

8   A.  It wouldn't have mattered at that time because it was

9   already protected.

10  Q.  I just mean getting out there and using your string-line,

11  you could have done that safely; right?

12  A.  Uh, yeah.

13  Q.  And then if you had done that, if you had just measured

14  the track like Mike Paz was asking you to do, you would have

15  had proof positive about exactly how that defect measured;

16  right?

17  A.  Uh, yes.

18  Q.  You would have known down to the eighth of an inch what

19  that alignment defect was and if it was still there and where;

20  right?

21  A.  Yes.

22  Q.  You could have taken a picture with your cell phone to

23  prove that that defect was verified; right?

24  A.  No.

25  Q.  You couldn't take a picture with your cell phone?

1    A.  Uh, no.

2    Q.  Because you're out trackside, is that what you --

3    A.  No.  You wouldn't see -- it wouldn't come up in a picture

4    because alignment is multiple spots.

5    Q.  I see.  Okay.

6         The last thing you say on the radio is, I didn't say

7    no.  Is that right?

8    A.  That's correct.

9    Q.  You knew on May 5th of 2016 that insubordination was a

10   fireable offense; right?

11   A.  That's correct.  Yes, sir.

12   Q.  And that was essentially your defense in the company

13   investigation.  I didn't say no to him.  I just told him it

14   was pointless and drove away.  Right?

15   A.  Uh, I drove away and came back, yes, sir.

16   Q.  And, again, that's what you said in your investigation.  I

17   didn't use the word "no."  I drove away, told him it was

18   pointless, and left.  Do I have that right?

19   A.  Yes, sir.

20   Q.  Okay.  Jay Herzog saw and heard everything that happened

21   that day?

22   A.  Uh, I don't -- I'm not Jay Herzog, so I don't know what he

23   saw and heard.

24   Q.  Where was he standing when you were having this

25   conversation with Mike Paz?

 1  A.  At times he was next to me, and at times he was behind me.

 2  Q.  I mean, you guys are within a few feet of each other;

 3  right?

 4  A.  Not within a few feet at times.

 5  Q.  Is there any reason why Jay Herzog and Mike Paz wouldn't

 6  have been able to hear what you were saying?

 7  A.  Uh, I don't -- I don't have that answer for you.

 8  Q.  Were you upset with Jay Herzog for having written a

 9  statement about what happened that day?

10  A.  Yes, sir.

11  Q.  Why?

12  A.  Because when you get pulled out of service, naturally you

13  are frustrated and upset.  And if someone wrote a statement,

14  which Mr. Herzog did, I was frustrated.  You're going to be

15  frustrated with the person.  I was frustrated with Jay Herzog.

16  Q.  What if all he was doing was telling the truth about what

17  happened?

18  A.  And I -- I texted Mr. Herzog, and I showed my frustration.

19  And I also texted him and said, I understand, uh, what you

20  did.

21          MR. GOMAN:  Let's -- let me show the witness

22  Exhibit A-79.  It's page 132.

23          Your Honor, I move for admission of this page of

24  Exhibit A-79.

25          THE COURT:  Page 132.  Any objection to that?

1           MR. THOMPSON:  No, Your Honor.

2           THE COURT:  All right.  Page 132 of Exhibit 79 -- of

3    A-79 is received.

4       (Defendant's Exhibit A-79:132 received.)

5    BY MR. GOMAN:

6    Q.  So this is the next message you were talking about?

7    A.  Yes, sir.

8    Q.  This is you to Jay Herzog; right?

9    A.  Yes, sir.

10   Q.  Hey, man, it's is what it is.  If okay with you can we get

11   together or did you by chance get a copy of the statement you

12   wrote.  I just need to get facts so I can try to get my job

13   back.

14          Right?

15   A.  Yes, sir.

16   Q.  Then here's the exchange.  That's Mr. Herzog saying:  Yeah

17   man.  We can.

18          And then you tell him:  Just for future reference we

19   don't give statements or talk about other employees to the

20   roadmaster --

21   A.  That's correct.

22   Q.  -- or any exempt 'cause shit like this happens.

23   A.  Yes, sir.

24   Q.  So even if what Mr. Herzog is doing is reporting what he

25   believes is misconduct, you don't think he should write a

 1  statement?

 2  A.  No, he should, and actually there's more to this

 3  conversation.

 4  Q.  What's the rest of the conversation?

 5  A.  Uh, if we go to -- that's not -- that's a whole different

 6  person.

 7  Q.  Okay.  Who are you texting here?

 8  A.  Uh, that's someone different.

 9  Q.  Okay.  All right.  Did Mr. Herzog send you his statement?

10  A.  No.

11  Q.  Did you talk with him?  When you say, give me a call, he

12  says -- or can we get together, he says, Yeah man we can.

13  A.  Yes, we did.

14  Q.  Okay.  Talked about what happened?

15  A.  Yes, sir.

16  Q.  Talked about what he would say if you called him in your

17  investigation hearing?

18  A.  Uh, no.

19  Q.  It didn't come up?

20  A.  No, it was -- you know, um, there -- actually, it ended up

21  being I texted him back about -- basically saying, Hey, you

22  have every right to write a statement on anybody.  Because I

23  knew what I said, hey, we shouldn't write -- I knew that was

24  wrong.  So I think it was the next day or day after I said,

25  Hey, you know what, you have every right to write a statement

1    on someone.  And then we talked on the phone, and I told him

2    he was right.

3    Q.  I see.  When you talked with him, did you ask him to come

4    to the investigation hearing and testify on your behalf?

5    A.  No, sir.

6    Q.  He would have; right?  He told you that, didn't he?

7    A.  I don't recall that.

8    Q.  Okay.  The reason why you didn't want him at the

9    investigation hearing is you knew he would corroborate

10   Mr. Paz's account of insubordination; isn't that right?

11   A.  No.

12   Q.  Why didn't you want him at the investigation?

13   A.  Well, one, I just don't want to get other people involved.

14   It just -- I just don't want to get other people involved in

15   my business.  It's --

16   Q.  So let's talk about that.  Let's talk in more detail,

17   then, about your allegations here today that managers and

18   coworkers are engaging in misconduct.

19        You believe roadmasters that have been supervising

20   you have been mistreating you and lying about it since your

21   career started; right?

22   A.  No.

23   Q.  Well, let's go all the way back to 2006.  I think this is

24   close to where you started your direct examination.  Your

25   roadmaster when you first worked as a track inspector was

1   Keith Samples; right?

2   A.  Yes, sir.

3   Q.  He is not someone that reported to Mark Carpenter, is he?

4   A.  No.

5   Q.  Let me show you Exhibit A-8.

6          MR. GOMAN:  Your Honor, I move for admission of

7   Exhibit A-8.

8          THE COURT:  Any objection?

9          MR. THOMPSON:  Yeah.  There's been no foundation

10  laid.

11         THE COURT:  Can you blow it up, or do I need to get

12  the book?

13         MR. THOMPSON:  Actually, Judge, we have a second

14  objection as well.  I apologize.

15         THE COURT:  What's your second --

16         MR. THOMPSON:  We object to relevance as well.  Under

17  the PEPA policy, it's going to be considered for the

18  discipline, so anything predating those dates is irrelevant to

19  this case.

20         THE COURT:  Yeah, I'm going to sustain the objection

21  based on relevancy.  This is a letter dated October 17,

22  2016 -- 2006.  Excuse me.  October 17, 2006.

23         MR. GOMAN:  Your Honor, can I respond to the

24  relevancy?

25         THE COURT:  Go ahead.

1      MR. GOMAN:  This is being offered as it relates to

2  the credibility of Mr. Fresquez's accusations that managers

3  are lying and mistreating him.  It was addressed in his direct

4  examination when he was disqualified from being a track

5  inspector.  I agree it has nothing to do with the PEPA policy.

6      THE COURT:  Well, it's hearsay because the author --

7  I mean, it's hearsay.  It's an out-of-court statement offered

8  for the truth of the matter asserted therein.  I sustain the

9  objection based on hearsay as well.

10      MR. GOMAN:  Fair enough.

11  BY MR. GOMAN:

12  Q.  Mr. Fresquez, the letter, um, from Mr. Samples, you

13  understand what that's about; right?

14      MR. THOMPSON:  I'm going to object, Your Honor:

15  relevance and hearsay.

16      THE COURT:  Sustained.

17  BY MR. GOMAN:

18  Q.  Do you recall your testimony on direct examination where

19  you were asked about being disqualified as a track inspector

20  in 2006?

21  A.  Uh, somewhat, yes.

22  Q.  You remember telling this jury that your explanation for

23  that was you bid on another job because of the hotel pay or

24  something like that?

25  A.  Oh, you're -- yes.  I thought you were talking about

1   during deposition.  No, yeah.

2   Q.  Okay.  So in that situation you bid onto another job, and

3   you didn't do anything wrong, in your mind.  Right?

4   A.  Absolutely not.

5   Q.  But Mr. Samples --

6           MR. THOMPSON:  Objection, Your Honor.  This is

7   irrelevant and hearsay.

8           THE COURT:  Well, I have to -- Mr. Goman, I have said

9   the letter can't come in, so you can't quote from it.

10          MR. GOMAN:  And I don't intend to, Your Honor.

11          THE COURT:  Go ahead.

12  BY MR. GOMAN:

13  Q.  When Mr. Samples disqualified you from that track

14  inspector position, you believed he was lying when he did

15  that; right?

16  A.  Not lying, no.

17  Q.  Well, you believe he was dishonest; right?

18  A.  Not dishonest.  I just think -- so -- so basically when we

19  are disqualified, as stated earlier, we have to go through a

20  hearing process.  I never actually had a hearing process when

21  I was disqualified.  And this is the position that I left, um,

22  because I didn't stay 30 days.

23  Q.  You believe what Mr. Samples told you wasn't true; right?

24  A.  I don't understand what you are saying.

25  Q.  When Mr. Samples told you you had been disqualified from

1    being a track inspector, you didn't believe -- for failure to

2    complete training, you didn't believe that was true; right?

3    A.  At that time I didn't know it was within the year.

4    Q.  And you thought Mr. Samples had some sort of ulterior

5    motive for having done that; right?

6    A.  Absolutely not.

7    Q.  So you didn't accuse him of engaging in any misconduct in

8    your deposition?

9    A.  Uh, I don't recall.  It doesn't, uh -- no, I -- I don't

10   recall, honestly.

11   Q.  Well, let's see if you recall this one.  Let's go to 2010.

12          All right.  In 2010, you are working as a track

13   inspector; right?

14   A.  Yes, sir.

15   Q.  Do you remember working in Denver in that time period?

16   A.  I have -- yeah, I have worked in Denver a lot.

17   Q.  All right.  Let's talk about what led up to your

18   insubordination charge.  Do you remember your foreman, Steve

19   Lyons?

20   A.  Yes, sir.

21   Q.  You believe Steve Lyons lied when he said you failed to

22   show up to work at the time and place he told you to show up;

23   right?

24   A.  I don't know if -- I don't recall saying any -- any of

25   that.

1   Q.  Let me show you Exhibit A-14.  You do recall receiving

2   this letter; right?

3   A.  Uh, it says in 2010.

4   Q.  Right.

5   A.  I haven't -- I would have to read it to review the whole

6   thing.

7   Q.  Is that your signature down at the bottom?

8   A.  Yes, sir.

9   Q.  And that's the date, August 30th of 2010?

10  A.  Yes, sir.

11  Q.  Do you recall Mr. Fry wanting you to sign a coaching and

12  counseling letter?

13  A.  Yes, sir.  No, I don't -- I don't -- I signed a lot under

14  Mr. Fry.

15         MR. GOMAN:  Your Honor, I'd move for admission of

16  A-14.

17         MR. THOMPSON:  Your Honor, we object.  It's

18  irrelevant, hearsay.

19         THE COURT:  Well, I disagree because it's signed by

20  the plaintiff.  So I will overrule the objection, and

21  Exhibit A-14 is received.

22      (Defendant's Exhibit A-14 received.)

23  BY MR. GOMAN:

24  Q.  All right.  Let's talk about your foreman reporting your

25  misconduct.  Steve Lyons said to his supervisor, Mr. Fry, you

1    failed to comply with his instructions.  Do you remember that?

2    A.  Can I read it?

3    Q.  Sure.

4           MR. THOMPSON:  Your Honor, I'm going to object.  Even

5    if it's relevant, this is hearsay within hearsay now.  We are

6    talking about not only what the person -- whoever wrote the

7    letter said, but also what somebody told him.

8           THE COURT:  Well, I have already received it, so

9    objection noted, but the jury is looking at it, and it's in

10   evidence.

11   A.  Okay.

12   BY MR. GOMAN:

13   Q.  Mr. Lyons is reporting in 2010 you failed to comply with

14   his instructions.  In your mind, he was wrong.  He was making

15   that up.  Right?

16   A.  I didn't say that.

17          MR. GOMAN:  Let's --

18   A.  I don't recall saying that.

19          MR. GOMAN:  -- get his deposition.

20          COURTROOM DEPUTY:  The larger?

21          MR. GOMAN:  Yes.  There should be only one.

22          COURTROOM DEPUTY:  Actually, there's a smaller

23   excerpt.

24          MR. GOMAN:  Okay.  The larger version.

25   A.  This did happen, though.  I do remember this event.  I

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1   just don't recall saying what you said.

 2   BY MR. GOMAN:

 3   Q.  Okay.  We are going to show you a copy of your deposition

 4   you gave in this case, Mr. Fresquez.

 5   A.  Okay.

 6            COURTROOM DEPUTY:  I hand the witness the transcript

 7   of a deposition taken September 9, 2017.

 8   BY MR. GOMAN:

 9   Q.  All right.  Can you flip to page 110, please.

10            MR. GOMAN:  With the Court's permission, I can show

11   him on the screen, if there's no objection.

12            THE WITNESS:  Okay.

13            THE COURT:  Well, let's just have you read it.

14            MR. GOMAN:  Okay.

15   BY MR. GOMAN:

16   Q.  Tell me when you are on page 110, and go down to line 21.

17   A.  Okay.

18   Q.  So I asked you a question.

19            And just to back up, you understood you were under

20   oath in your deposition; right?

21   A.  Yes, sir.

22   Q.  "To cut to the chase a little bit," and this was my

23   question to you, "you believe you did comply with your

24   foreman's instructions and all the other rules that are cited

25   here, but Mr. Fry made you sign this, and that's the only

1    reason why you did" -- it goes to the next page -- "is that

2    right?"

3           And your answer was:  "Yes.  Yes, that's absolutely

4    correct."

5           Right?

6    A.   That's what you are reading, yes.

7    Q.   Then you went on to describe why you felt like Mr. Fry was

8    treating you unfairly, much like you did here in your

9    testimony today; right?

10   A.   Uh, I would have to say yes.

11          MR. THOMPSON:  Your Honor, I'm going to object.  If

12   we are going to read the answer, I think we need to read the

13   whole answer.

14          THE COURT:  Which answer?  I don't have it in front

15   of me.

16          MR. THOMPSON:  So on page 111 Mr. Goman has had

17   Mr. Fresquez read the first sentence but not the remainder of

18   the answer.

19          THE COURT:  All right.  Read the whole answer,

20   Mr. Goman.

21          MR. GOMAN:  Sure.

22          THE COURT:  Read his answer.

23   BY MR. GOMAN:

24   Q.   "Yes, that's absolutely correct.  I was actually told by

25   my union rep to sign it or whatever, but he actually covered

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    this up in his office, and this is why I walked out to get a

2    union rep, because he wanted -- if this is -- I believe this

3    is the one.  I didn't actually get to see the documentation

4    until after the fact, but he literally covered it up and told

5    me I had to sign it and that's where I said I will not sign it

6    until I know what I'm signing."

7          Did I read that correctly?

8    A.  Yes, sir.

9    Q.  So both the foreman, Mr. Lyons, and Mr. Fry were

10   mistreating you; fair?

11   A.  I didn't say Mr. Lyons.  I don't -- I don't -- me and

12   Mr. Lyons have issues, yes.

13   Q.  Well, he reported you failed to comply with his

14   instructions, and you don't agree with that.

15   A.  He was just a coworker.

16   Q.  Okay.  You believe Mr. Fry was retaliating against you;

17   right?

18   A.  Me and Mr. Fry had issues, yes.  I, um -- there was -- at

19   times I felt like he was harassing me, yes.

20   Q.  And right here.  You believe he's discriminating against

21   you and retaliating against you; right?

22   A.  At times, yes.

23   Q.  You hadn't done anything wrong in this insubordination

24   incident.  Mr. Fry was at fault.  Right?

25   A.  No.  I walked out of the office.  I was -- when I walked

1   out of the office, I was in the wrong.

2   Q.  So now you are admitting that you were in the wrong in

3   this insubordination incident.

4   A.  Well, all I did was walk out of the office.  That's all I

5   did.  I mean, if they want to say, hey, you shouldn't walk out

6   of the office, then I was wrong by walking out of the office,

7   but that's all I did.

8   Q.  Can I have you go to page 102 in your deposition, sir.

9   A.  Yes, sir.

10  Q.  Tell me when you are at line 8.

11  A.  Go ahead.

12  Q.  I asked you:  "Do you believe you did anything wrong in

13  that instance?"

14          And your answer was:  "No."

15  A.  Okay.  Yes.

16  Q.  That's your whole answer; right?

17  A.  Yes.

18  Q.  Then I asked you:  "Do you believe that he was

19  discriminating or retaliating against you?"

20          And your answer was:  "Yes."

21  A.  Yes.

22  Q.  Okay.  Damon Fry was critical of you on other occasions

23  though; right?

24  A.  Yes, sir.

25  Q.  Damon Fry was critical of you in 2011 for not having

Julie H. Thomas, RMR, CRR                         (303)296-3056

1   inspected the track as often as the regulations required;

2   right?

3   A.  Uh, I don't recall that one.

4   Q.  Okay.  Do you remember him ever being critical of you for

5   having done that?

6   A.  He was critical of me a lot.

7   Q.  And you don't believe any of his criticisms of you ever

8   had any validity; right?

9   A.  They did.  At times, yes.  I am a human being.  I do make

10  mistakes.

11  Q.  Well, let's look at that.  Let's go to page 74 of your

12  deposition.

13          So we're talking about 2011.  Do you see on page 74

14  where I asked you, line 3:  "What do [sic] you recall, what

15  was his concern or his complaint about the work you're doing

16  as a track inspector?"

17          Your answer:  "It wasn't a concern or a complaint.

18  It was a way to oppress me from finding defects and reporting

19  defects, what it really came down to."

20          That was your testimony under oath; right?

21  A.  Yes, sir.

22  Q.  And that's your testimony here today?  Damon Fry was

23  oppressing you?

24  A.  At times, yes.

25  Q.  From reporting defects; is that right?

1   A.  Yes, sir.

2   Q.  So really the oppression, the bullying you are reporting

3   here in this case started back in 2010 at least; is that

4   right?

5   A.  At -- at times it, uh -- there was, uh, oppression or

6   retaliation.  It's not every supervisor.  It's not.  It's not

7   every day.  But at times there is.

8   Q.  In 2011, you didn't think you were doing anything wrong

9   with the way you were inspecting track; is that right?

10  A.  Not in -- not inspecting track, no.

11  Q.  What you believe Damon Fry was actually up to was just

12  trying to discourage you from reporting track defects?

13  A.  At times, yes.

14  Q.  And you keep saying "at times."  At no time do you believe

15  that Mr. Fry had a valid criticism of you.  Is that fair?

16  A.  I didn't understand that question.

17  Q.  Sure.  Well, let me have you go to page 75 of your

18  deposition.

19          You were asked on line 8:  "So you don't believe that

20  any of the criticisms that Damon Fry had about the job you

21  were doing as a track inspector were valid?"

22          And your answer:  "I do not."

23          Right?

24          MR. THOMPSON:  Your Honor, I object.  This is

25  improper impeachment.  He just said he didn't understand the

1   question.

2           THE COURT:  Under Rule 32 of the Federal Rules of

3   Civil Procedure, a party's deposition can be used for any

4   purpose.  It's not limited to impeachment.  So objection

5   overruled.

6   BY MR. GOMAN:

7   Q.  Let's move forward in time.  Jeremy Holton supervised you

8   as an assistant roadmaster; is that right?

9   A.  Yes, sir.

10  Q.  He also was critical of you and the job you were doing as

11  a track inspector; isn't that right?

12  A.  I don't recall.

13  Q.  You don't recall him reporting that he was giving you

14  instructions and you were ignoring them?

15  A.  I don't recall that.

16  Q.  Okay.  Do you believe that any of Jeremy Holton's

17  criticisms of you were valid?

18  A.  Again, I'm a human being.  I do make mistakes.  I don't

19  recall what you are asking.

20  Q.  Do you think Jeremy Holton was trying to bully you into

21  not reporting track defects?

22  A.  Uh, at times.  Because they are supervisors, they don't

23  want to stop trains, so at times there would have been.

24  Q.  So Damon Fry and Jeremy Holton were both trying to bully

25  you into not reporting track defects?

1    A.  At times it probably was, but I don't recall offhand any

2    instances, offhand right now.

3    Q.  Mark Carpenter, the division engineer, he certainly is

4    someone that you believe were -- was bullying you into not

5    reporting track defects; right?

6    A.  Oh, absolutely.

7    Q.  Let's look at Exhibit A-43.

8         Mr. Fresquez, you recognize Exhibit A-43; right?

9    A.  Yes, sir.

10   Q.  This is the e-mail Mark Carpenter wrote after that

11   ride-along we talked about in April 2015; right?

12   A.  Yes, sir.

13        MR. GOMAN:  Your Honor, I move for the admission of

14   A-43.

15        MR. THOMPSON:  Your Honor, we object.  This is

16   hearsay.  Nobody on this e-mail has testified to it.

17        THE COURT:  All right.  Let me look at it.  Let's see

18   if I can read it on the screen here.

19        MR. GOMAN:  I can pull up the top part, if you'd

20   like.

21        THE COURT:  Is Carpenter going to testify?

22        MR. GOMAN:  Yes.

23        THE COURT:  Well, then this should come in through

24   him, because it is hearsay.  It's being offered for the truth

25   of the matter asserted therein.  It was authored by someone

1    other than the declarant.  So I will sustain the objection.

2            MR. GOMAN:  Your Honor, I don't intent to offer this

3    for the truth of the matter asserted.  I believe it's relevant

4    as to how Mr. Fresquez reacted to it.

5            THE COURT:  Let me read the whole thing.  There you

6    go.  Pull it up.

7            I still think it's hearsay, so I'm going to refuse it

8    with this witness.  So let's move on to something else.

9    BY MR. GOMAN:

10   Q.  The ride-along you went on with Mr. Carpenter, you recall

11   that; right?

12   A.  Yes, sir.

13   Q.  You don't believe any of the criticisms or concerns he

14   expressed about your track inspection were valid; right?

15   A.  Uh, I never said that.  Uh, I don't recall saying that.

16   Uh, I can't give you an answer on that.  I don't recall the

17   whole e-mail offhand or the exact day offhand.  I remember

18   certain events on that day.

19   Q.  Mr. Carpenter's criticisms of your track inspection, you

20   described them as a cover-up; right?

21   A.  At -- yes.

22   Q.  So that suggests to me you don't believe they are valid.

23   He was trying to cover something up when he said, Here are the

24   things I think you need to improve on.  Is that right?

25   A.  Yes.

1    Q.  Every time Mr. Carpenter told you to remove a defect, you

2    disagreed with him; is that right?

3    A.  Not every time, no.

4    Q.  Will you turn to page 94 in your deposition, sir?  Tell me

5    when you are at line 10.

6    A.  What was it?

7    Q.  Yeah.  Page 94, line 10.

8    A.  Okay.

9    Q.  Do you recall me asking you:  "Everywhere, though, that he

10   said you need to remove a defect or update a comment, was it

11   the right or [sic] appropriate thing to do in your mind?"

12        And you answer:  "No."

13   A.  Okay.

14   Q.  So none of it was right or valid or the proper thing to

15   do; right?

16   A.  The ones he wanted to remove -- okay.  Go ahead.

17   Q.  The ones he agreed with you on, you thought were valid.

18   The ones he disagreed with you on, you thought were invalid.

19   Fair?

20   A.  Yes.

21   Q.  Let's finish up this exchange with Mark Carpenter.  So

22   when he told you to remove a defect and you didn't think it

23   should be removed, um, did you tell Mr. Carpenter that?

24   A.  Uh, I don't -- I don't recall offhand right now.

25   Q.  But you did go ahead and remove that defect, though;

1   right?

2   A.  I did.

3   Q.  You didn't report that exchange to anyone; right?

4   A.  I think I talked to, uh, Ryan Akers about it.

5   Q.  I see.  You didn't call the hotline or the FRA.

6   A.  No.

7   Q.  So as far as Mark Carpenter knew back then, he recommended

8   to you to remove a defect, and you did; right?

9   A.  I did, yes.

10  Q.  And that's the last he heard of it, as far as you know.

11  You didn't bring it up to him again.

12  A.  No, not this instance, no.

13  Q.  Okay.  What about Cason Cole?  Did he ever have any valid

14  criticisms of you as a track inspector?

15  A.  I'm sure at times.  He was my supervisor for quite a

16  while, so I'm sure at times he did.

17  Q.  Do you recall Cason Cole having reported you were failing

18  to comply with his instructions?

19  A.  Uh, are we talking about the June 4th incident?

20  Q.  I think that's one example.  Do you recall that one?

21  A.  I do.

22  Q.  You disagree.  You were right, and he was wrong.

23  A.  Yes, sir.

24  Q.  Okay.  So Ryan Akers, when he told you to remove a defect

25  that you didn't think should be removed, he was wrong about

1    that, and you were right; right?

2    A.  I don't know what incident you are talking about.

3    Q.  The one that led up to him telling you to stop reporting

4    defects.

5    A.  Uh, the track was -- can you repeat that question, please.

6    Q.  Yes.  Mr. Akers, as I understood your direct testimony, at

7    some point in time he tells you, Stop reporting defects.

8    Right?

9    A.  He told me not to -- he told me to inspect the track and

10   to not report any defects on that track, that's correct.

11   Q.  Okay.  Obviously you are saying he was wrong about that

12   and you had done nothing wrong.

13   A.  At that -- that briefing I didn't do anything wrong, no.

14   Q.  So let's take a step back.  Is it your claim in this case

15   that you have been retaliated against for having taken tracks

16   out of service?  Is that what you are claiming here?

17   A.  Reporting defects and taking tracks out of service.

18   Q.  So reporting track defects and then recommending tracks be

19   pulled from service; right?

20   A.  Yes, sir.

21   Q.  Are you also claiming here that you were retaliated

22   against for reporting that your managers were improperly

23   deleting track defects out of the TIMS system?

24   A.  Yeah.

25   Q.  So there's kind of two separate things here:  reporting

1   track defects, taking tracks out of service; and then

2   reporting wrongdoing by your managers.  Right?

3           Let's try to keep those two straight.  Reporting

4   track defects, that's something you started doing in 2006;

5   right?

6   A.  Uh, yes.

7   Q.  Taking tracks out of service, that's something you started

8   doing in 2006; right?

9   A.  Uh, I don't know if I took any, uh, tracks out of service

10  in 2006, because I was only on that job for a small time, and

11  that was 2006, so I don't . . .

12  Q.  You certainly were taking tracks out of service by 2007

13  and for the rest of your career.  Can you agree with that?

14  A.  Yes, sir.

15  Q.  So the conduct that you believe led to the retaliation

16  against you taking tracks out of service, removing slow

17  orders -- placing slow orders and reporting track defects, you

18  had been doing that for nearly 10 years at the time you were

19  dismissed; is that right?

20  A.  Off and on, yes, sir.

21  Q.  Okay.  The second piece, then, what I will call the more

22  serious allegation, that you reported your supervisors for

23  having deleted track defects, that's the one I want to talk

24  about here and I want to focus on.  Okay?

25  A.  Okay.

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 540

1   Q.  I want to be real specific about how you reported that

2   misconduct, the misconduct you just talked about at length on

3   your direct examination.

4          You know BNSF has a hotline; right?

5   A.  Yes, sir.

6   Q.  We have heard a lot of witnesses talk about it.  You never

7   called the hotline to report any of the misconduct you just

8   told this jury about; right?

9   A.  That's correct.

10  Q.  You know it's anonymous, and you know that you can have

11  someone else or a union rep call on your behalf?

12  A.  No.

13  Q.  You know it's anonymous; right?

14  A.  Supposed to be, yes.

15  Q.  Okay.  You never went to human resources to report

16  directly any of the misconduct you described --

17  A.  No.

18  Q.  -- on direct examination.

19         The e-mail that you received from Thomas Royston, the

20  one that was in Exhibit 29 -- let's pull it up.  This e-mail

21  here, the fact that you sent out this request and Mr. Royston

22  responded, you never forwarded that e-mail to anyone, did you?

23  A.  No.

24  Q.  You never showed anyone at the company or anyone in your

25  union this e-mail?

Julie H. Thomas, RMR, CRR                           (303)296-3056

1    A.   No.

2    Q.   The first time you showed it to anyone was for purposes of

3    this lawsuit; right?

4    A.   Uh, yes.

5    Q.   You certainly didn't show this e-mail to the FRA.

6    A.   No.

7    Q.   Okay.  It would have been fairly easy to report it to the

8    FRA if you wanted to; right?

9    A.   Uh, yes.

10   Q.   They --

11   A.   Well, I don't know the actual process of reporting to the

12   FRA, so --

13   Q.   FRA track inspectors came out and rode with you on your

14   territory; right?

15   A.   No.

16   Q.   No, they didn't?

17   A.   No.

18   Q.   All right.  Let me have you take a look at Exhibit A-79.

19        You never did that?

20   A.   From time to time, but it was -- BNSF had a policy where,

21   uh, the exempts rode with the FRA.  So I could have rode along

22   with the exempts or -- but BNSF has a policy any time there's

23   a FRA agent on properties, an exempt has to be present.

24   Q.   I see.  So you would go on ride-alongs with the FRA.

25   There just might have been a supervisor there with you.

1   A.  Yeah.  I don't remember how many exact times I actually

2   rode with the FRA agent.

3   Q.  The e-mail, by the way, that you talked about in

4   Exhibit 29, you're aware that Mr. Royston, the one who sent

5   that e-mail out, you're aware, aren't you, that he's testified

6   in this case that it's not unusual for a roadmaster to have

7   him delete old defects?  Are you aware of that?

8   A.  I think I did read that, yes.

9   Q.  And you're aware that Mr. Royston, at least according to

10  his testimony, he didn't tell anyone about this e-mail.  It

11  wasn't that big of a deal.  Right?

12  A.  I don't remember exactly what his deposition said.

13  Q.  By the way, just as a quick aside, let's look at

14  Exhibit 29 again.  Just these photographs here.  You took

15  these, I assume.

16  A.  Yes, sir.

17  Q.  Okay.  Just used your camera?

18  A.  Yes.

19  Q.  Okay.  How does that date stamp get on there?

20  A.  Because you can send them with a date stamp or not a date

21  stamp, so we produced both of them to you.

22  Q.  So I don't understand that.  So you take the photograph,

23  and it has a date stamp on it?

24  A.  Well, the date stamp is produced when the photo is taken.

25  Q.  And then you can choose to remove it?

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 543

1    A.  No, you don't remove it.  It's just the way it's in the --

2    it's in the camera.

3    Q.  I see.  What kind of a file format is that?  I don't

4    understand.

5    A.  I don't know what type of file it is.

6    Q.  Okay.  So just so the jury is clear on what we are talking

7    about, you sent us a copy of this photograph in discovery;

8    right?

9    A.  I sent you two photographs.  I sent you that one and one

10   without a date stamp.

11   Q.  Well, let's be specific.  You sent us this one right here

12   that we are looking at; right?

13   A.  Yes.

14   Q.  And this one right here; right?

15   A.  Yes.

16   Q.  But when you first sent those to us, they didn't have any

17   date stamps on it; right?

18   A.  I don't know who got which one first.

19   Q.  Then you disclosed them later, and it had a date stamp.

20   A.  I don't recall which ones you guys got first.

21   Q.  You didn't put that on there or take it off?

22   A.  No.

23   Q.  All right.  We talked about Exhibit 29.  You don't forward

24   or send that to anyone.  You talk with your union

25   representative about whether you can have them report

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   something anonymously on your behalf; right?

2   A.   Say again, please.

3   Q.   Do you remember talking with the union officials, I think

4   Ms. Moody-Gilbert was one of them, about if you had evidence

5   of misconduct --

6   A.   Yes.

7   Q.   -- what you could do with it?

8   A.   Yes.

9   Q.   They told you what the process would be?

10  A.   Yes.

11  Q.   And you decided not to do it?

12  A.   Yes.

13  Q.   So even the Exhibit 29, you didn't even share that with

14  your union representatives.

15  A.   No.  She's never seen it.

16  Q.   Okay.  So you claim, then, that the first time you

17  reported the misconduct that you just told this jury about is

18  when?

19  A.   I think we went to Staci, and she contacted Adam Miller on

20  April 29th, 2015.

21  Q.   Well, let's be specific, though.  So what you reported to

22  Ms. Moody-Gilbert was that exchange you had with Ryan Akers;

23  right?

24  A.   Yes, when I was told to falsify the -- the track.

25  Q.   Okay.  When else have you made a report like that?  When

1  did you next report that Mike Paz and Ryan Akers and Cason

2  Cole were deleting defect reports?

3  A.  I think the next -- well, the next conflict would have

4  been -- well, I received the e-mail May 1st.  The next

5  conflict would have been, uh, June 4th.

6  Q.  What are you describing?  I don't know what you mean by

7  "next conflict."

8  A.  You are saying when -- you asked a question when's the

9  next time that I reported something.

10 Q.  Right.  When did you report the misconduct that you

11 described here today?  When did you report that to anyone?

12 A.  I think it was June 4th.

13 Q.  Who did you report it to?

14 A.  I think it was the union.

15 Q.  Okay.  You just reported the same type of conduct?

16 A.  Yes.

17 Q.  What did they do for you?

18 A.  Uh, there's -- nothing really.

19 Q.  Okay.  The misconduct, then, that you are talking about

20 here, you certainly never called up anyone in Labor Relations

21 and said, I have an issue I want you to know about.

22 A.  Oh, no.  That's -- no.

23 Q.  You don't even know who Stephanie Detlefsen is; right?

24 A.  No.

25 Q.  And you never reported any misconduct by any BNSF manager

1   to the FRA; is that right?

2   A.   That's correct.

3   Q.   You had Kirby O'Connor's phone number programmed into your

4   cell phone; right?

5   A.   Yes, sir.

6   Q.   You could have picked it up and called him any time you

7   wanted.

8   A.   Excuse me.  Yes, sir.

9   Q.   Okay.  What you tell the FRA on May 5th in that call, I

10   want to be specific, you said:  I have this type of defect.

11   It's a 30-mile-an-hour track.  Am I doing this correctly?

12          Right?

13   A.   Uh, yes, it was something to that degree.

14   Q.   And that was the whole conversation?

15   A.   Yeah, it was basically it.  And I said:  I got this type

16   of defect, this type of track.  Um, am I doing this right?

17   Q.   You didn't say anything about Mike Paz trying to get you

18   to falsify a report?

19   A.   No, because I knew no matter -- yeah.  No, I didn't.

20   Q.   You didn't say that to the FRA ever?

21   A.   No.

22   Q.   Okay.  Calling the FRA to confirm that you are properly

23   reporting a defect, that's not that big of a deal at BNSF, is

24   it?

25   A.   Uh, once you tell them you called the FRA, they -- no.

1   Q.  Well, that's why you have their phone number; right?  So

2   you can call them and ask them questions if you have them?

3   A.  But I didn't -- so I -- I received a phone number from the

4   regional office a long time ago, and I just called from time

5   to time to ask random questions as a random track inspector.

6   Q.  I see.  So as of really the date of, well, May 5th, you

7   had never talked to Mark Carpenter about reporting anything to

8   the FRA.

9   A.  I confronted him about the defects.  No.  Repeat that,

10  please.

11  Q.  Yeah.  You never talked to Mark Carpenter about having

12  called the FRA?

13  A.  No.

14  Q.  So as far as you know, he had no idea that you had called

15  them on May 5th; right?

16  A.  No, I had never seen Mark Carpenter after May 5th.

17  Q.  You never told Adam Miller that you called the FRA after

18  May 5th.

19  A.  No, I never saw Adam Miller after May 5th.

20  Q.  Or Stephanie Detlefsen.

21  A.  No.

22  Q.  Ned Percival, the hearing officer?

23  A.  No.

24  Q.  You never told him you called the FRA either?

25  A.  No.

1    Q.  These people, Mark Carpenter, Mike Paz, they certainly

2    would know you had been reporting track defects; right?

3    A.  Uh, yes.

4    Q.  For your whole career.  And that's -- that's really your

5    contention here.  You believe you were dismissed by BNSF for

6    doing your job as a track inspector; right?

7    A.  Yes.

8    Q.  Your job is to find and report track defects; right?

9    A.  Yes.

10   Q.  You are required by rule to report track defects.

11   A.  Yes.

12   Q.  You are required by rule to take tracks out of service if

13   that's what BNSF's rules or the FRA required; is that right?

14   A.  Yes.

15   Q.  You are not the only one at BNSF that reports track

16   defects; right?

17   A.  That's -- yes.

18   Q.  You are not the only one that takes tracks out of service;

19   right?

20   A.  Yes.

21   Q.  Every other track inspector over the course of their

22   career has done the exact same things that you are claiming

23   led to your retaliation; right?

24   A.  Yes.

25   Q.  BNSF spent a lot of time training you to be a track

1    inspector; right?

2    A.  Yes.

3    Q.  Sent you to Overland Park, Kansas, to learn how to do the

4    job the right way?

5    A.  When we first started, we all went, yes.

6    Q.  Trained you on what the FRA regulations were?

7    A.  Yes.

8    Q.  Where you can find them, how you can and should interpret

9    them?

10   A.  Yes.

11   Q.  BNSF trained you about the non-class-specific defect rule;

12   right?

13   A.  Uh, I learned that, um -- they do talk -- certain people

14   do talk about it, yes.

15   Q.  Everything you learned about track inspecting you learned

16   from your employer.  Fair enough?

17   A.  And a lot of self-education.

18   Q.  Okay.  Let's talk, then, about Mike Paz in 2016.  Early

19   2016, you are doing the job of a flagman; is that right?

20   A.  Yes, sir.

21   Q.  And that job, in about January or early February it gets

22   abolished; is that right?

23   A.  Uh, the first one?

24   Q.  Yeah.

25   A.  Yeah.

17-cv-00844-WYD-SKC          Fresquez - Cross                    II - 550

1   Q.  You liked working as a flagman; right?

2   A.  Oh, yeah.

3   Q.  It's a pretty easy job; right?

4   A.  It's less stressful, yes.

5   Q.  I mean, you're protecting track and making sure that no

6   harm comes to people that are on it; right?

7   A.  Yes.

8   Q.  You are not inspecting anything, though, and a large part

9   of the day you are in your truck; right?

10  A.  I didn't.

11  Q.  You were upset that your job had been abolished in early

12  2016; right?

13  A.  Uh, I was frustrated being -- you know, you like your job.

14  I mean, but it was part of the -- I don't think Paz or anybody

15  was doing anything wrong.

16  Q.  Well, who abolished that job?

17  A.  Paz.

18  Q.  And he abolished it because he didn't believe BNSF needed

19  two flaggers on that job?

20  A.  No.

21  Q.  He thought --

22  A.  What happened was, uh, it was a third-party company we

23  were, uh -- that requested one of us to be abolished, and one

24  of us got abolished.

25  Q.  Okay.  And so the senior guy stayed on the job, and you

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   bumped off?

2   A.  Correct.

3   Q.  And, again, you were upset at Mr. Paz?

4   A.  I was frustrated, yeah, of course.

5   Q.  And you told him, You know what's going to happen if you

6   bump me off this job.  I'm going to go right back on the main

7   line.  Right?

8   A.  Yeah.

9   Q.  And he knew that?

10  A.  Yeah.

11  Q.  He knew by abolishing that job, you were going to be his

12  track inspector.

13  A.  Yes, sir.

14  Q.  And he did it anyway; right?

15  A.  Yes, sir.  I don't think he had a choice.

16  Q.  Well, let me show you Exhibit A-79.  This is page 94.

17          Mr. Fresquez, these are your text messages to a Jake

18  Yancey; right?

19  A.  Yes, sir.

20  Q.  Jake Yancey is a buddy of yours?

21  A.  Not a buddy.  A coworker.

22  Q.  You are not friends with Jake Yancey?

23  A.  No.  We are just coworkers.

24  Q.  You didn't ask him to help you with your lawsuit?

25  A.  He's just a coworker.  I didn't approach him.  No, I did

 1   not.

 2   Q.  Okay.

 3   A.  Well -- no, he actually -- no.

 4   Q.  These are text messages between you and Mr. Yancey

 5   discussing the job being abolished; right?

 6   A.  Uh, it appeared we are talking about a notice of a --

 7   yeah, so I'm --

 8   Q.  A notice of your job being abolished; right?

 9   A.  It's about that time, so yeah.

10   Q.  Okay.

11         MR. GOMAN:  Your Honor, I'd move for admission of

12   page 94 of Exhibit A-79.

13         THE COURT:  Any objection?

14         MR. THOMPSON:  No objection.

15         THE COURT:  All right.  Page 94 of Exhibit A-79 is

16   received.

17      (Defendant's Exhibit A-79:94 received.)

18   BY MR. GOMAN:

19   Q.  The contractor said he didn't need to flagman, which he

20   does, and Mike said okay.  Right?

21   A.  Yes, sir.

22   Q.  And then you told Jake:  I said okay, and I told Mike it

23   looks like I'm bumping the main.  Right?

24   A.  Yes, sir.

25         MR. GOMAN:  Let me do this.  If I could show just to

1   the witness the next two pages.

2   BY MR. GOMAN:

3   Q.   These are more text messages between you and Mr. Yancey;

4   right?

5   A.   Uh, yes.

6   Q.   And page 96, again more text messages between you and Jake

7   Yancey in January and February of 2016; right?

8   A.   That's his number, yes.

9   Q.   Okay.

10          MR. GOMAN:   Your Honor, I'd move for admission of

11   pages 95 and 96.

12          THE COURT:   Any objection?

13          MR. THOMPSON:   No objection, but can we refer to them

14   by Bates number, since we are working off different exhibits,

15   please?

16          MR. GOMAN:   Yes.   3627 and 3626.

17          THE COURT:   All right.   Pages 95 and 96 of the same

18   exhibit are received.

19      (Defendant's Exhibit A-79:95-96 received.)

20   BY MR. GOMAN:

21   Q.   All right.   We -- read this text to the jury, and then

22   explain what you are talking about here.

23   A.   It says:   I been fucking with chip, I been telling him,

24   your turning your back on the brotherhood doing a job that

25   requires 2 flagman by yourself.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   Q.  What do you mean, "turning your back on the brotherhood"?

2   A.  If you read it, so it says, I been fucking with chip.  So

3   what it meant was just messing around, so just teasing him.

4   That's all that really means.

5           You're turning your back on the brotherhood, it's

6   just a joke.  And it says it requires two flagmen; you are

7   trying to do it by yourself.

8   Q.  I see.  And then on the next page you send this text to

9   Mr. Yancey; right?

10  A.  Yes, sir.

11  Q.  The date is February 5th of 2016; is that right?

12  A.  Uh, yeah.

13  Q.  Your job has been abolished, but you are not yet back

14  working as a track inspector; right?

15  A.  Yes.

16  Q.  So read to the jury what you write in this text message to

17  Mr. Yancey.

18  A.  Uh, Main 1 and 2 be out of service 9 a.m. then be like

19  can't start until after lunch 'cause we can't work through

20  lunch, and I have to leave Denver by 230 'cause I need to be

21  back in the big lift by 330 'cause I can't get OT.

22  Q.  What are you talking about?

23  A.  I have no idea.

24  Q.  This is your text message; right?

25  A.  Yeah, but it's just one text message out of a string of

1   conversations.

2   Q.  Okay.  Well, let's walk through it.  Main 1 and Main 2

3   will be out of service at 9 a.m. then be like I can't start

4   working until after lunch 'cause we can't work through lunch.

5            You are texting Mr. Yancey; right?

6   A.  Uh, yes.

7   Q.  What's his job?

8   A.  He's the guy that fixes the track.

9   Q.  So you are telling him:  I'm going to report both main

10  lines out of service.  You, Mr. Yancey, say you can't work

11  through lunch.  Right?

12  A.  Say it again?

13  Q.  You are telling Mr. Yancey, Say you can't work until

14  lunch.  Both mains will be out of service.

15           It's a way to really put BNSF in a bind.  Right,

16  Mr. Fresquez?

17  A.  No.  That's -- you're -- no.  You're putting words that

18  I --

19  Q.  So what does this mean?

20  A.  I have -- you have to take the whole conversation to --

21  and I don't know what happened, what we were just bullshitting

22  about February 5th, 2016.

23  Q.  Well, as I read this, you're upset that your flagging job

24  is being abolished, and so you are going to take the main

25  lines out of service in a way that would really impact train

1   service.

2   A.  It could be a joke.  It could be sarcastic.  You have to

3   take the whole context into --

4   Q.  Did you end up taking the main line out of service on your

5   first day back?

6   A.  I can't tell you that for sure.

7           MR. GOMAN:  Let me just show the witness the next

8   page.

9           This is Fresquez 3628.  Your Honor, I'd move for

10  admission of Exhibit -- page 97 or Bates 3628.

11          MR. THOMPSON:  No objection.

12          THE COURT:  All right.  Page 97 of the same

13  exhibit is now in evidence.

14     (Defendant's Exhibit A-79:97 received.)

15  BY MR. GOMAN:

16  Q.  All right.  What are you -- what do you text to

17  Mr. Yancey?

18  A.  Main 2 out of service at 23rd.

19          Okay, we'll head that way.  Good job.  I love it.

20  Q.  What's M2?

21  A.  Main 2.

22  Q.  So February 10th, that's the first day you came back to

23  work as a track inspector; right?

24  A.  I would have to look at the transcript.

25  Q.  Okay.  Does that sound about right?

1    A.  It was early February, yeah.

2    Q.  All right.  You have told this jury that you believe Mike

3    Paz was just waiting for you to make one slip-up; right?

4    A.  Uh, I didn't say -- I didn't say that.

5    Q.  Is that the case?  Is that what you believe, that he was

6    waiting to trick you into committing a rules violation so he

7    could fire you?

8    A.  I believe he wanted me to participate in the measurement

9    defect, yes.

10   Q.  What about before that, though?  When you were -- I think

11   it was you were a nuisance and then a threat and then you

12   became the enemy.  This is when you were a threat; right?

13   A.  Uh, I forgot how Mr. Thompson worded that, yes, or I would

14   have to --

15   Q.  So just tell the jury.  Things were pretty hostile between

16   you and Mr. Paz.  That's your testimony; right?

17   A.  Uh, yeah, at times, yeah.

18   Q.  The whole time; right?

19   A.  No.  Actually, me and Mr. Paz when -- we got along in the

20   beginning.

21   Q.  You got along in 2016; right?

22   A.  No, he was actually -- he was around prior to.

23   Q.  You also got along in 2016; right?  Really until the day

24   of your insubordination?

25   A.  No, we -- me and Mr. Paz had things in common.  At the

 1   time we both lifted weights, so we would BS and bullshit

 2   because we both lifted weights.  We had something in common,

 3   but there was a lot of still conflicts there.

 4   Q.  Let me have you take a look at Exhibit A-78.  Do you

 5   recognize what this is?

 6   A.  Uh, it's a text exchange between me and Mr. Paz in 2015.

 7   Q.  And if we scroll through, we march forward in time.  Do

 8   you see this text chain goes all the way until May of 2016?

 9   Right?

10   A.  Correct.

11   Q.  Those texts are friendly, are they not?

12   A.  Yeah.  Of course.  Well, I didn't read them all, but I'm

13   assuming.  I try to keep a friendly relationship with my

14   superiors.  I tried my best.

15          MR. GOMAN:  Your Honor, I'd move for admission of

16   Exhibit A-78.

17          MR. THOMPSON:  No objection.

18          THE COURT:  All right.  You said A-78?

19          MR. GOMAN:  Yes, Your Honor.

20          THE COURT:  A-78 is received.

21     (Defendant's Exhibit A-78 received.)

22   BY MR. GOMAN:

23   Q.  Let's take a look at a few of these.  Do you remember this

24   text exchange?  Oop.  Where it starts, Quick question.

25   A.  Um, okay.

17-cv-00844-WYD-SKC          Fresquez - Cross                II - 559

1    Q.  Do you remember what that's about?

2    A.  Uh, it's about a third-party company.  It was actually

3    about Qwest.

4    Q.  You were calling to report a crew failed to clean up after

5    themselves?

6    A.  No.

7    Q.  What were you reporting to Mike?

8    A.  They wanted to -- at the time I was -- Qwest hired us to

9    watch them work, basically.  They were working on the

10   right-of-way they needed to do.  And they were under

11   assumption -- someone told them that they could leave or they

12   could come back in spring, or it was something like that.  So

13   that's just me asking Mr. Paz, um, what he wanted to do.

14   Q.  And how did he respond?

15   A.  Yes, that's correct, they need to clean up as they go.

16   Q.  No issue with that; right?

17   A.  No.

18   Q.  Getting late in the day.  I'm going to go ahead to page --

19        THE COURT:  All right.  How much longer do we have?

20   Because we are going to stop at 5:00, so I just want to see

21   how much longer we have for this witness.

22        MR. GOMAN:  15 minutes.

23        THE COURT:  No, we're not going to finish it today,

24   because I can't hold you to that and have it work.  What about

25   for redirect?

Julie H. Thomas, RMR, CRR                           (303)296-3056

1          MR. THOMPSON:  About the same.

2          THE COURT:  Okay.  All right.  In fact, why don't we

3    just stop now, 'cause it's 5 minutes to 5:00.  And what I want

4    to do is sort of get a sense of what we can get accomplished

5    tomorrow.  So how long do you think it will be before this

6    witness leaves the stand?  30 minutes?  45 minutes?

7          MR. GOMAN:  30 minutes.

8          THE COURT:  All right.  And then who is your next

9    witness for the plaintiff?

10         MR. THOMPSON:  Mark Carpenter.

11         THE COURT:  All right.  And who is after Mark

12   Carpenter?

13         MR. THOMPSON:  Jay Herzog.

14         THE COURT:  Herzog.  Who else?

15         MR. THOMPSON:  Michael Paz, if necessary, although

16   leaning towards not calling him.

17         THE COURT:  All right.  Carpenter, Herzog.  And can

18   we get more done tomorrow?

19         MR. THOMPSON:  We should be all the way through

20   Goodnight, Snow, and Yancey.  They should just be quick.

21         THE COURT:  All right.  So let's all get here on time

22   tomorrow morning, and we will start right at 9 o'clock again.

23         MR. THOMPSON:  Sorry, Your Honor.  Mr. Goman reminded

24   me Darron Boltin's call is scheduled at 3:00, so we will do

25   him at 3 o'clock no matter what.

17-cv-00844-WYD-SKC          Fresquez - Cross                II - 561

1          THE COURT:  That's fine.  And let me just mention

2   that to the jury.

3          I approved a witness, Darron Boltin, testifying by

4   video.

5          Where is he testifying from?

6          MR. GOMAN:  Gillette, Wyoming.

7          THE COURT:  Gillette, Wyoming, at 3 o'clock.  So we

8   will take him out of order even if we are in the middle of

9   somebody else's testimony at 3 o'clock tomorrow.

10          All right.  So you are excused until tomorrow

11   morning.

12      (Proceedings recessed 4:56 p.m.,

13      February 12, 2019.)

14

15                    REPORTER'S CERTIFICATE

16

17          I, JULIE H. THOMAS, Official Court Reporter for the
    United States District Court for the District of Colorado, a
    Registered Merit Reporter and Certified Realtime Reporter,
18   CA CSR No. 9162, do hereby certify that I reported by machine
    shorthand the proceedings contained herein at the time and
19   place aforementioned and that the foregoing pages constitute a
    full, true and correct transcript.
20          Dated this 4th day of April, 2019.

21

                    _____/s/ Julie H. Thomas_____
22                   Official Court Reporter

23

24

25

Julie H. Thomas, RMR, CRR                        (303)296-3056