1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3

Civil Action No. 17-cv-00844-WYD-SKC

4

5   BRANDON FRESQUEZ,                    Volume III of VI

6        Plaintiff,              (Pages 562 - 855)

7        vs.

8   BNSF RAILWAY CO.,

9        Defendant.

10  ------------------------------------------------------------

11                  REPORTER'S TRANSCRIPT
                      JURY TRIAL

12

13  ------------------------------------------------------------

          Proceedings before the HONORABLE WILEY Y. DANIEL,
14  Judge, United States District Court for the District of
    Colorado, and a jury of ten, commencing at 9:09 a.m. on the
15  13th day of February, 2019, in Courtroom A1002, Alfred A.
    Arraj United States Courthouse, Denver, Colorado.

16

17                        APPEARANCES

18
    For the Plaintiff:
19  NICHOLAS D. THOMPSON and JONATHAN L. STONE, THE MOODY LAW
    FIRM, 500 Crawford Street, Suite 200, Portsmouth, VA 23704

20
    For the Defendant:
21  KEITH M. GOMAN and GILLIAN DALE, HALL & EVANS, LLC,
    1001 17th Street, Suite 300, Denver, CO 80202

22

23

24

       JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25      Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

          Proceedings reported by mechanical stenography;
               transcription produced via computer.

17-cv-00844-WYD-SKC          Jury Trial                    III - 563

1                           I N D E X

2
    PLAINTIFF'S WITNESSES                                  PAGE
3
    BRANDON FRESQUEZ
4       Cross - Mr. Goman (Resumed)                        567
        Redirect - Mr. Thompson                            596
5   MARK CARPENTER
        Direct - Mr. Thompson                              611
6       Cross - Mr. Goman                                  632
    MICHAEL PAZ
7       Direct - Mr. Thompson                              677
        Cross - Mr. Goman                                  728
8       Redirect - Mr. Thompson                            781
    DARRON BOLTIN
9       Direct - Mr. Stone                                 757
        Cross - Ms. Dale                                   765
10      Redirect - Mr. Stone                               775
    JAY HERZOG
11      Direct - Mr. Thompson                              798
        Cross - Mr. Goman                                  835
12

13
    DEFENDANT'S WITNESSES                                  PAGE
14
    MARK CARPENTER
15      Direct - Mr. Goman                                 646
        Cross - Mr. Thompson                               668
16  DARRON BOLTIN
        Direct - Ms. Dale                                  776
17      Cross - Mr. Stone                                  779
    MICHAEL PAZ
18      Direct - Mr. Goman                                 784
        Cross - Mr. Thompson                               794
19      Redirect - Mr. Goman                               795
        Recross - Mr. Thompson                             797
20

21

22

23

24

25

    Julie H. Thomas, RMR, CRR                      (303)296-3056

17-cv-00844-WYD-SKC                Jury Trial                        III - 564

1                    PLAINTIFF'S
                     EXHIBITS                        RECEIVED
2
                     9                                613
3
                     10                               613
4
                     11                               613
5
                     12                               613
6
                     13                               613
7
                     14                               613
8
                     15                               613
9
                     16                               613
10
                     17                               613
11
                     20                               724
12
                     23:1-4                           820
13
                     54                               765
14
                     62                               623
15

16

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                            (303)296-3056

17-cv-00844-WYD-SKC                Jury Trial                    III - 565

|  | DEFENDANT'S |  |
|---|---|---|
| 1 | EXHIBITS | RECEIVED |
| 2 | A-43 | 663 |
| 3 | A-46 | 732 |
| 4 | A-70 | 606 |
| 5 | A-79:2-4 | 574 |
| 6 | A-79:17 | 578 |
| 7 | A-79:22 | 580 |
| 8 | A-79:23,27-28, 43 | 582 |
| 9 | A-79:44-45 | 589 |
| 10 | A-79 | 596 |
| 11 | A-96 | 593 |

```
 1              DEFENDANT'S
                EXHIBITS              RECEIVED

 2              A-43                     663

 3              A-46                     732

 4              A-70                     606

 5              A-79:2-4                 574

 6              A-79:17                  578

 7              A-79:22                  580

 8              A-79:23,27-28,           582
                43

 9

10              A-79:44-45               589

11              A-79                     596

12              A-96                     593

13

14              EXHIBITS
                REFUSED                PAGE

15              4                        830

16              A-18                     660

17

18

19

20

21

22

23

24

25
```

17-cv-00844-WYD-SKC          Jury Trial                  III - 566

1          (Proceedings resumed 9:09 a.m.,

2          February 13, 2019, outside the presence of

3          the jury.)

4               THE COURT:  All right, have a seat.

5               The same juror who was late yesterday is late again,

6      so I'm going to ask him why he can't be on time.  So anyway.

7          (Jury in at 9:10 a.m.)

8               THE COURT:  All right, have a seat.

9               So, Mr. Soto, you were 15 minutes late yesterday, and

10     you were basically 10 minutes late today.  Why can't you get

11     here on time?

12              JUROR NO. 1:  I was doing my homework.

13              THE COURT:  You need to get here on time.

14              JUROR NO. 1:  Yes, sir.

15              THE COURT:  And I'm telling you I want you here on

16     time.  Do you understand what I'm saying?

17              JUROR NO. 1:  Yes, sir.

18              THE COURT:  Because the 10 minutes and the 15 minutes

19     add up, and my goal is to get this case to the jury, if

20     possible, on Friday.  And when you don't show up on time, you

21     may not think it makes a difference, but it does.  So I'm

22     putting you on notice.  You need to get here on time.  Do your

23     homework whenever you need to, but get here on time.  Do I

24     make myself clear?

25              JUROR NO. 1:  Yes.

1              THE COURT:  All right.  Let's continue.

2          **BRANDON FRESQUEZ, THE PLAINTIFF HEREIN,**

3             **CROSS-EXAMINATION (Resumed)**

4   BY MR. GOMAN:

5   Q.  Mr. Fresquez, good morning, sir.  I believe when we left

6   off we were talking about some text messages between you and

7   Mr. Paz.  So let's jump back into that.

8          I want to go to a text message exchange on May 3rd of

9   2016, so two days before you were taken out of service.

10          MR. GOMAN:  If I can show to the witness, on his

11  screen, page 21 of Exhibit A-20 -- I'm sorry -- A-78.  Excuse

12  me.

13  BY MR. GOMAN:

14  Q.  All right.  These four text messages here, just to remind

15  us, your text messages are in gray on the left-hand side?

16  A.  Yes, sir.

17  Q.  Okay.  So when you texted Mr. Paz on May 4th of 2016,

18  10 mile an hour, et cetera, et cetera, you are telling him

19  about a track defect you found?

20  A.  Yes, sir.

21  Q.  And he responds, I'll send Fosten to it when he can?

22  A.  Yes, sir.

23  Q.  Who is Fosten?

24  A.  An employee.  A coworker.

25  Q.  Who is he to you?

17-cv-00844-WYD-SKC          Fresquez - Cross                III - 568

1   A.  He's also my brother.

2   Q.  What does he do for a living?  What's his job?

3   A.  He works for BNSF.

4   Q.  More specifically?

5   A.  He works for BNSF.  They can change positions.  I don't

6   know what he's doing right now.

7           THE COURT:  Hold on.  Is this Exhibit -- you said

8   A-70, so the jurors aren't seeing it.  Or is this A-79?  What

9   is this?

10          MR. GOMAN:  A-78.

11          THE COURT:  A-78.  All right.  We weren't sure what

12  you were saying, so the jury is not looking at it.

13          Is it in evidence?

14          COURTROOM DEPUTY:  A-78 is in evidence, Your Honor.

15          THE COURT:  All right.

16          MR. GOMAN:  I apologize.  I wasn't paying attention,

17  Your Honor.

18  BY MR. GOMAN:

19  Q.  Let's back up so we are on the same page.

20          You are on the left-hand side.  10 mile an hour,

21  541.6.  That's you reporting a track defect.

22  A.  Yes, sir.

23  Q.  Mr. Paz says, I'll send Fosten to it when he can.  Right?

24  A.  Okay.  Yes.

25  Q.  Fosten is your brother, and the reason why Mr. Paz is

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   sending him to the defect is because that was his job, to

2   repair track defects.

3   A.  At the time it would have been, yes.

4   Q.  Okay.  Then you next say, LoDo siding out of service.  Is

5   that right?

6   A.  Yes, sir.

7   Q.  And Mr. Paz responds, Why.  Is that right?

8   A.  Yes, sir.

9   Q.  You're not criticizing your supervisor for just asking

10  why, why is this track going out of service, are you?

11  A.  No.

12  Q.  Reasonable follow-up question from a roadmaster?

13  A.  Yes.

14  Q.  Okay.  That text was, it looks like, May 4th at 10:16 a.m.

15  Is that right?

16  A.  Yes, sir.

17  Q.  Let me go to page 23.  Your text message on the top, Will

18  need a frog welder at the up diamond, is that just about

19  another defect?

20  A.  Yes, sir.

21  Q.  Mike Paz's response to you is:  Happy Track Day Brandon!

22  Please close out the defect in TIMS tonight.

23          What did you take that to mean?

24  A.  Happy Track Day, Brandon.  Um, it's kind of like a -- I'm

25  trying to think of a way to put it.  Um, he repaired it, but

1    then, you know, it was kind of at cause, or there was an issue

2    with it, kind of repairing it.  It kind of delayed trains.  So

3    Happy Track Day, Brandon.  It's kind of, um -- what do they

4    call it?  Like a backhanded -- uh, it just -- it didn't come

5    off right.

6    Q.  Okay.

7            THE COURT:  Would you move a little closer to the

8    microphone, please.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  Keep your voice elevated.

11   BY MR. GOMAN:

12   Q.  You didn't take that as just a joke, Happy Track Day, that

13   defect has been repaired?

14   A.  I took it as sarcastically.

15   Q.  Is this the LoDo siding that we are looking at, or can you

16   tell?

17   A.  That one is, yes.

18   Q.  So the defect that you had reported, was it that morning

19   or the day before?

20   A.  That morning.

21   Q.  Okay.  It gets repaired and then can be placed back in

22   service then; is that right?

23   A.  Yes, sir.

24   Q.  And that's what should happen; right?  If a track goes out

25   of service, marshal the resources, get it fixed; right?

17-cv-00844-WYD-SKC            Fresquez - Cross            III - 571

1    A.   That's correct.

2    Q.   Okay.  Back to this idea -- and I'm sorry.  So May 4th,

3    that was the day before you were withheld from service.

4    A.   Yes, sir.

5    Q.   Okay.  This idea that managers would question or just ask

6    follow-up questions about why you are taking a track out of

7    service, um, let's say in the couple years before you were

8    dismissed from BNSF, did you ever time the reporting of your

9    track defects so that your friends and coworkers would have to

10   or would get to work overtime to repair them?

11   A.   Not necessarily.  There was times where, um, just due to

12   the cause, but not -- not necessarily.  I mean, we'd joke

13   about it because we already know what's going to be going out,

14   a track, or the guys would want to work overtime, but not

15   necessarily saying, hey, um -- everything I did was -- if I

16   took it out of service, there was a reason I took it out of

17   service.  It's not necessarily saying, um, Hey, I'm going to

18   take this track out of service so you guys can work overtime.

19   It doesn't work like that because I would get in a lot of

20   trouble for doing just that.  But there was cause to take

21   tracks out of service, and at times I knew they were going to

22   work overtime, so we would talk about it.  Hey, you guys are

23   going to stay late.  Or, Hey, do you got something for me?  I

24   would say, Yeah, I actually do have something for you.

25   Because there are tracks that do require to be out of service,

17-cv-00844-WYD-SKC          Fresquez - Cross                III - 572

1    and it just happens to play out that way.

2    Q.  So I'm not sure I understood that answer.  I think you

3    started by saying, "Not necessarily."  So let me try to

4    clarify my question.

5            Did you ever time the reporting of your track defects

6    or taking tracks out of service so that your friends and

7    coworkers could work overtime?

8    A.  No, not necessarily.

9    Q.  Okay.  Would you ever wait to report a track as needing to

10   go out of service until the very last minute so that your

11   friends and coworkers would get to work overtime?

12   A.  Uh, not necessarily.

13           MR. GOMAN:  Let me show just the witness then, if I

14   can -- I'm going to switch to Exhibit A-79, and this is page

15   2.  The Bates label is Fresquez 2617.  And I'd like to talk

16   right now about this page and the next two.

17   BY MR. GOMAN:

18   Q.  So I'm going to show this to you, Mr. Fresquez.  Do you

19   recall the phone number ending in 6052?  Was that Jake

20   Yancey's phone number?

21   A.  Yes, sir.

22   Q.  Who is he?

23   A.  He's the foreman.  He's the guy that repairs all the

24   tracks.

25   Q.  Okay.  I'm going to go to the next page.  4723, the last

1    four of that phone number, do you recognize that as Derek

2    Goodnight's phone number?

3    A.  I don't know Derek Goodnight's phone number offhand.

4    Q.  Let's go to the top, then, page 1 here.  This came from

5    the text messages you disclosed to us; right?

6    A.  Yes, sir.

7    Q.  So on this sheet it has Mr. Goodnight's phone number

8    listed as 4723; right?

9    A.  Yes, sir.

10    Q.  So let's go back, then, to that third page.  And now I'll

11    go to the fourth one.

12        So this is a text message chain between you and Derek

13    Goodnight and Jake Yancey; is that right?

14    A.  Uh, yeah.

15    Q.  Okay.

16        MR. GOMAN:  Your Honor, I move for the admission of

17    pages 2 to 4 of Exhibit A-79.

18        THE COURT:  Any objection?

19        MR. THOMPSON:  What are the Bates numbers?

20        THE COURT:  Let's deal with the pages.  Okay?

21        MR. THOMPSON:  No objection.

22        THE COURT:  Figure it out.  Pages.  They are on the

23    screen.  Do you object to 2, 3, or 4?

24        MR. THOMPSON:  We do not.

25        THE COURT:  All right.  Pages 2, 3, and 4 are

1   received.

2       (Defendant's Exhibit A-79:2-4 received.)

3   BY MR. GOMAN:

4   Q.  All right.  Let's take a closer look.  Mr. Fresquez, your

5   text messages are in blue; right?

6   A.  Yes, sir.

7   Q.  So you say, Overtime tonight, question mark, to

8   Mr. Yancey; is that right?

9   A.  Yes, sir.

10  Q.  And he says, Let's do it.  Last check of the year.  And,

11  All night long.....all night.

12          What did you take that to mean?

13  A.  That's just how he talks as a person.

14  Q.  I don't know what you mean by that.

15  A.  That just -- that's just his personality.

16  Q.  What did you understand Mr. Yancey to mean when he texted

17  you that?

18  A.  I don't take -- that's just who he is.  I don't take it

19  either way because I know who he is as a person.  That's just

20  how he talks.

21  Q.  I guess I'm trying to ask a more basic question.  When he

22  says, All night long.....all night, you understood that to

23  mean that Mr. Yancey was saying, in kind of a funny way, yeah,

24  I would like to work all through the night --

25  A.  No.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Q.  -- for an overtime shift?

2   A.  No.  He actually just says, Yes sir let's do it, and I

3   just took that, yes, he's going to work overtime.

4   Q.  Okay.  So you don't have an explanation for this jury as

5   to what "all night long" means?

6   A.  No, because, you know, you're trying to put words in my

7   mouth.  And if you don't understand that person, how they

8   actually talk, then you don't understand the full context of

9   the conversation.  That's just naturally who he is.

10  Q.  Okay.  Well, let's go to how you respond then.  You start

11  talking about the joint at walnut Main 2.

12  A.  Correct.

13  Q.  Here you just list a number of track defects; right?

14  A.  Yes, sir.

15  Q.  So you're telling him what would need to be worked on on

16  that overtime shift that night; right?

17  A.  Just all the defects are present.

18  Q.  So let's go to the next page then.  It continues.  Here

19  you continue to describe the defects that you are reporting;

20  is that right?

21  A.  Yes, sir.

22  Q.  And in that third one there, That stuff I can justify.

23  A.  Exactly.  That's legitimate stuff.

24  Q.  What do you mean by "that I can justify"?

25  A.  That's -- because I'm not going to pull something out I

1    can't justify.  That's why I say that's the stuff I can

2    justify.  That's legitimate defects that require to be fixed.

3    Q.  Shouldn't that be assumed, though?  I mean, why would you

4    have to say, I can justify these.  It suggests to me --

5    A.  Because --

6    Q.  Hold on one second, sir.  It suggests to me that there are

7    some you reported that you can't justify.

8    A.  No.

9    Q.  Mr. Yancey responds, Let's do it.  Pull it out get the

10   wheels started.  Right?

11   A.  Yeah.

12   Q.  What did you understand that to mean?

13   A.  That he's willing to work on the defects.

14   Q.  What does "pull it out" mean?

15   A.  "Pull it out" just means take it out of service.

16   Q.  So take the track out of service.  That means the company

17   will then marshal the resources to work through the night and

18   pay these gentlemen to fix it; right?

19   A.  Yes, sir.

20   Q.  Okay.

21   A.  But if you read the text right under it -- it says, Don't

22   need to pull it out, I already have a slow order on it.

23   Q.  That's right.  That's exactly right.  So you text him

24   back, Don't worry, we don't need to take it out of service.

25   You can still work overtime because they have slow orders.

1    A.  Yes.

2    Q.  Okay.

3    A.  No, I didn't say "overtime."  There is nothing about

4    overtime on there.

5    Q.  But that's what you are talking about, though.

6    A.  I said I don't know -- my text says, Don't need to pull it

7    out, I already have slow orders on them.

8    Q.  Sure.  I'm just trying to read it in context with this

9    string here.  You are talking about, I don't need to pull it

10   out of service to justify overtime.  They already have slow

11   orders on it.  Right?

12   A.  I didn't say that.  This is what I said.  I said, Don't

13   need to pull it out, I already have slow orders on them.

14   Q.  Okay.  How does Mr. Goodnight respond to that text?

15   A.  Pull it out!!  Pull it out!!

16   Q.  What did you understand that to mean?

17   A.  That's just how they talk.

18   Q.  Right, but what did he mean, as you understood it, when he

19   texted that to you?

20   A.  That's -- that's just who they are.  That's how they talk.

21   It's, uh -- that's just who they are.  I don't take it either

22   way.  They're willing to work.  Pull it out, pull it out, to

23   them, is we're willing to work.  We're willing to fix the

24   defects.

25   Q.  Pull the track out of service?

17-cv-00844-WYD-SKC          Fresquez - Cross                III - 578

1   A.  Yeah, you could say that, but it just means to them --

2   when you actually know the person, it just means that they're

3   willing to work.

4   Q.  Same thing with, Looking for all nighter.  That's what

5   Mr. Yancey says.  Same thing; right?

6   A.  Yeah, that's just who they are.

7   Q.  Okay.  Next page.

8           MR. GOMAN:  Actually, let's do this.  If I could show

9   just to the witness, I want to move ahead to page 17.

10  BY MR. GOMAN:

11  Q.  All right.  Page 17, Mr. Fresquez, is that text messages

12  between you and Mr. Goodnight and Mr. Yancey?

13  A.  Uh, yes, sir.

14  Q.  Concerning reporting track defects and whether they want

15  to fix them or not?

16  A.  Yes, sir.

17          MR. GOMAN:  Your Honor, I move for admission of page

18  17.

19          MR. THOMPSON:  No objection.

20          THE COURT:  All right.  Page 17 of Exhibit A-79 is

21  also received.

22      (Defendant's Exhibit A-79:17 received.)

23  BY MR. GOMAN:

24  Q.  All right.  You text Mr. Goodnight and Mr. Yancey, The fra

25  defect for gauge plate at atlas is oos tomorrow if someone

17-cv-00844-WYD-SKC          Fresquez - Cross                III - 579

1   wants ot install tonight.

2          Out of service tomorrow; right?

3   A.  Correct.

4   Q.  So you are just telling them it's coming out of service,

5   so if you guys want to work OT tonight, have at it?

6   A.  We could avoid going out of service tomorrow.

7   Q.  Mr. Yancey responds, Yeah, we can do it.  I hear lionel

8   richie in the background.

9          The all night long; right?  That's what that's in

10  reference to?

11  A.  No.  He says, Yep we can do it.  I hear lionel richie in

12  the background.  We'll get er done.  OT BABY.

13  Q.  Right.  What did he mean by "I hear Lionel Richie in the

14  background"?  What did you understand him to mean?

15  A.  I don't know what Lionel Richie he is talking about.  I

16  just read the text.

17  Q.  He is pleased, though, that you have reported this defect

18  that will require him to work overtime, plainly; right?

19  A.  I didn't report the defect.  It's reported by the FRA.

20  That's why it says it's a FRA defect.

21          MR. GOMAN:  Let's go to page 22, if I can show just

22  the witness.

23  BY MR. GOMAN:

24  Q.  Okay.  Here, too, text messages between you and Mr. Yancey

25  and Mr. Goodnight; is that right?

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Cross                    III - 580

1   A.  Yes, sir.

2   Q.  Okay.  You text Mr. Yancey -- I'm sorry.

3          MR. GOMAN:  Your Honor, I move for admission of page

4   23 of Exhibit A-79.

5          THE COURT:  Is it 23 or 22?  Which -- you said 22

6   first.  Now you are saying 23.

7          MR. GOMAN:  I meant 22.  I apologize.

8          THE COURT:  All right.  Any objection to 22?

9          MR. THOMPSON:  No objection.

10         THE COURT:  All right.  Page 22 of the same exhibit

11  is now received.

12      (Defendant's Exhibit A-79:22 received.)

13  BY MR. GOMAN:

14  Q.  All right.  You text, Want easy overtime?  Right?

15  A.  Yes, sir.

16  Q.  It looks like that one goes unanswered, because if you

17  look, we skip ahead to the next day.  Is that right?

18  A.  Uh, yes, sir.

19  Q.  Okay.  And then Mr. Yancey asks you, What is on the OT

20  agenda tonight???

21  A.  Yes, sir.

22  Q.  And you say, Nothing major.  But then you talk about some

23  things that would justify overtime hours that night; right?

24  A.  Some FRA defects, yes.

25         MR. GOMAN:  If I can show just the witness the next

1    page.

2    BY MR. GOMAN:

3    Q.  And let me do it this way.  I'm going to show you right

4    now, Mr. Fresquez, just so we can do these in one shot -- this

5    is page 23.  Can you confirm these are text messages between

6    you and Mr. Yancey?

7    A.  Yes, sir.

8    Q.  Then I'm going to go to 27.  Can you confirm these are

9    text messages from Mr. Goodnight and Mr. Yancey?

10   A.  Yes.

11   Q.  Same question with 28.

12   A.  Yes.

13   Q.  And then one more, 43.  Again text messages.  It looks

14   like this is between you and Derek Goodnight.  Right?

15   A.  Yes.

16   Q.  What's Derek Goodnight's job, by the way, back in 2015?

17   A.  We had two crews.  One was headed by Jake Yancey to fix

18   the track.  The other was headed by Derrick Goodnight to fix

19   the track.

20          MR. GOMAN:  Your Honor, I'd move for the admission in

21   Exhibit A-79 of pages 22 through 23, 27 through 28, and page

22   43.

23          THE COURT:  All right.  22 is already received.  So

24   you are moving 23, 27, 28, and 43?

25          MR. GOMAN:  Yes.

1          THE COURT:  Any objection?

2          MR. THOMPSON:  No objection.

3          THE COURT:  All right.  Those pages, meaning 23, 27,

4    28, and 43, are now received.

5       (Defendant's Exhibit A-79:23,27-28,43 received.)

6    BY MR. GOMAN:

7    Q.  All right.  That is Mr. Yancey saying, What is in store

8    for ot tonight, and you say, I don't have really anything.  Is

9    that right?

10   A.  Yes, sir.

11   Q.  But then we go to the next page, and you found some

12   things; right?

13   A.  Yeah.

14   Q.  So you identify some things that could maybe justify some

15   overtime; is that right?

16   A.  These are just defects or items that need to be fixed.

17   Q.  So --

18   A.  If they work overtime, that's their choice.  I mean -- I

19   mean, normally that's what they would do, they would work

20   overtime to fix it.  Because our day is very short, so, you

21   know, a lot of times the defects you can't fix within one to

22   two hours.

23   Q.  Pretty plainly, though, Mr. Yancey is asking you to find

24   and report some defects that would justify him working

25   overtime hours; right?

17-cv-00844-WYD-SKC          Fresquez - Cross                III - 583

1   A.  No.  These have already been reported, more than likely.

2   Q.  I mean, do you know that?  Do you remember this defect

3   from January 2015?

4   A.  Uh, without actually having my reports in front of me, I

5   couldn't tell you if they were reported, but obviously, I

6   mean, if the switch protector is broke, that's a main

7   component.  I mean, that's -- I was probably aware of that if

8   that's what I'm telling him, so --

9   Q.  Well, it's nothing major, though; right?

10  A.  Oh, yeah.

11  Q.  Well, you said, I -- I don't have really anything.  What

12  did you mean by that?

13  A.  At that time I couldn't think of anything.

14  Q.  Okay.  We're going to go to page 27.  This is a string of

15  text messages from, looks like, Mr. Yancey and Mr. Goodnight.

16  Right?

17  A.  Yes.

18  Q.  These are two of the witnesses that you plan to call in

19  this case?

20  A.  Uh, I believe my attorney is planning to call them.

21  Q.  What are they talking about here?  We can read each one if

22  we need to, but can you just sum it up for the jury?

23  A.  Uh, I'll have to read through it.  Give me a sec, please.

24          They're just --

25          MR. THOMPSON:  Your Honor, I object to this question.

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC        Fresquez - Cross             III - 584

 1   If Mr. Goman wants to question on what other people meant by

 2   text, he should ask those people.

 3          THE COURT:  Hold on.  Let me -- I'm going to have you

 4   restate the question, because I'm unclear as to whether or not

 5   you are asking him to talk about what he knows or what

 6   somebody else knows.  So restate the question.

 7   BY MR. GOMAN:

 8   Q.  Mr. Fresquez, will you tell the jury what you understood

 9   Mr. Yancey and Mr. Goodnight to be asking in this series of

10   text messages?

11   A.  I don't remember that instance.  We were in a group text,

12   and sometimes they would just go back and forth through the

13   group text.

14   Q.  Okay.  So when Mr. Yancey writes, Check that rail on

15   Main 2..... we will do it....we will do it all night long.....

16   out of service today, four exclamation points, what did you

17   understand that to mean?

18   A.  I'm not involved in that text conversation that's going

19   back and forth between -- um, and I don't remember it.

20   Q.  All right.  Last one.  Let's go to page 43.  You text,

21   Want ot, to Mr. Goodnight; right?

22   A.  Uh, yeah.

23   Q.  What did you mean by that?

24   A.  Well, without reading the full context, I'm asking him if

25   he wants OT.

1   Q.  Meaning what?

2   A.  Want overtime.

3   Q.  And he responds saying, I'm busy right now.  I'm working

4   on something else.  Right?

5   A.  He says, We are going to be on the rail train for a few

6   still.  Want to ask Faeh if you need something asap.

7   Q.  And you respond, No big deal just if wanted ot.  Right?

8   A.  Yes, sir.

9   Q.  Meaning you could report something that would require them

10  to work overtime if they wanted to, but it's really not that

11  big of a deal if they're not interested in working overtime;

12  isn't that right?

13  A.  No, because I don't know the full context.  I don't know

14  the full context of the conversation.

15  Q.  Okay.  Can you -- what -- you don't know what you are

16  talking about, then, when you say that?

17  A.  No.  This was March 10th, a text conversation from

18  March 10th, 2015.

19  Q.  All right.  Well, we can go down then.  Mr. Goodnight

20  responds again saying he's busy.  Hit you up when I'm done.

21  And you say, No biggie can do another night.  What did you

22  mean by that?

23  A.  Obviously, no big deal, can do it another night.

24  Q.  So clearly, then, when you report track defects in tracks

25  that are about to go out of service, BNSF will marshal the

1    resources to fix and repair them; right?

2    A.  Uh -- can you repeat that, please.

3    Q.  Yes.  When you report track defects on a track that's

4    either about to go out of service or has recently gone out of

5    service, BNSF will marshal the resources to have it fixed;

6    right?

7    A.  I don't really understand what you are asking because

8    it's -- so the way it works is we'll report a defect.  The

9    majority of our defects are non-class defects.  And what

10   happens is we'll put in -- say, for instance, I put a defect

11   in today.  BNSF has 30 days to fix that defect, or it's going

12   to go out of service.  And one of the exhibits shows that

13   there's no way they are in compliance, so a lot of times these

14   guys have to work overtime.  And we're trying to get in

15   compliance, and I'm trying to avoid taking tracks out of

16   service.  So these guys are going to work overtime to try to

17   avoid taking tracks out of service.  That's the basis of it.

18   Q.  Okay.  Let's switch topics a little bit.

19          You talked to this jury yesterday about a

20   non-class-specific defect report?

21   A.  Yes, sir.

22   Q.  And let me -- I believe it's Exhibit 32.  Let me just

23   double-check.  Yeah.  That's in.

24          I was going to show you the first page here so we all

25   know what we're talking about.

 1   A.  Yes, sir.

 2   Q.  All right.  This is what we talked about as the

 3   non-class-specific defect list?

 4   A.  That one is the non-class specific past-due defects.

 5   Q.  How did you get a copy of this?

 6   A.  Uh, I prefer -- I think I got it from Derek Goodnight, but

 7   I didn't actually -- I think I did get it from Derek

 8   Goodnight.

 9   Q.  Yeah.  You just asked him for one; right?

10   A.  I did.

11   Q.  And you asked him for one in June, June of 2016, after you

12   received your dismissal paperwork.

13   A.  June 20 -- no, I asked him would he -- I don't know if

14   I -- I don't recall asking for a specific date.  I think I

15   just asked for random.

16   Q.  I asked that question poorly.  It was in June of 2016 when

17   you asked him to get that --

18   A.  Correct.

19   Q.  Okay.  And you knew he could get it, right, as a BNSF

20   employee?

21   A.  Well, no, he had -- so we print them off, and they have --

22   they have them.

23   Q.  That's what I'm asking.  So all of the track foremen, the

24   laborers, the track inspectors, the roadmasters, they all can

25   just print up that Exhibit 32 any time they want.

17-cv-00844-WYD-SKC          Fresquez - Cross                    III - 588

1   A.  Uh, yes.

2   Q.  So you asked Derek Goodnight, Hey, would you print one of

3   those out for me?  I think it might help me in my appeal.

4   Right?  Your union appeal.

5   A.  That's correct.

6   Q.  So he did and sent it to you; right?

7   A.  Say again?

8   Q.  He did that, and he sent it to you; right?

9   A.  Yes.

10  Q.  And no big deal for Mr. Goodnight to have done that.  I

11  mean, he can do it every day if he wants.  Right?

12  A.  Well, yeah, they have -- yeah, that's part of their job is

13  to print that copy off.

14  Q.  All right.  Despite what we just talked about and the

15  timing of defect reports, I mean, your -- your supervisors,

16  they responded appropriately when you told them you were

17  taking tracks out of service; right?

18  A.  A majority of the time, yes.

19  Q.  Let's talk about an example.

20        MR. GOMAN:  If I can show just to the witness pages

21  44 and 45 of Exhibit A-79.

22  BY MR. GOMAN:

23  Q.  Do you recognize that phone number, Mr. Fresquez, 5549?

24  A.  I don't.

25  Q.  Yeah, let's go back up to the top.

17-cv-00844-WYD-SKC          Fresquez - Cross                    III - 589

1          You disclosed to us that that's Ryan Akers phone

2    number.  Do you see that as number 2 there?

3    A.  Yes, sir.

4    Q.  So let's go back down to 44 and 45.  These are texts

5    between you and Mr. Akers; is that right?

6    A.  Yes, sir.

7    Q.  Okay.  And 45 here, same thing, text messages between you

8    and Mr. Akers?

9    A.  Yes, sir.

10   Q.  So just as a for instance --

11          MR. GOMAN:  Well, Your Honor, I move for admission of

12   Exhibit A-79, page 44 and 45.

13          THE COURT:  Any objection?

14          MR. THOMPSON:  No objection.

15          THE COURT:  All right.  Those pages are also

16   received.

17      (Defendant's Exhibit A-79:44-45 received.)

18          THE COURT:  How much longer?  You said yesterday

19   you'd be 15 minutes, and we are approaching now 30 minutes.

20   How much longer do you have for this cross?

21          MR. GOMAN:  I will get moving, Your Honor.

22   15 minutes.

23          THE COURT:  All right.

24   BY MR. GOMAN:

25   Q.  You are reporting track defects here, including an

Julie H. Thomas, RMR, CRR                         (303)296-3056

1  out-of-service defect; right?

2  A.  Yes.

3  Q.  And Mr. Akers says, K sounds good, lock it out and place

4  tcm, thanks man.  What does that mean?

5  A.  Uh, I -- is this the same chain?  I guess I'm -- I lost

6  you there.

7  Q.  Sure.  See the date and time stamp?

8  A.  Yes, sir.

9  Q.  That's the same chain there; right?

10  A.  Yes, sir.

11  Q.  So when he says, K sounds good, lock it out, what did you

12  understand him to mean?

13  A.  "Lock it out" means it's out of service.  So a train

14  can't -- we have special locks.  No one else has keys for

15  them.  So we lock out a track meaning that they can't put -- a

16  train can't go on there safely.

17  Q.  And then "place tcm" what does that mean?

18  A.  TCM is a track condition message.  Dispatcher prints it

19  out on a piece of paper, and every train crew gets this paper

20  to know what is going on out there so if they get stuck they

21  are not trying to go to the wrong track, or they are aware of

22  walking conditions, just a variety of things.

23  Q.  Okay.  And this is March 30th of 2015?

24  A.  Yes.

25  Q.  A few weeks before Mr. Akers, according to your testimony,

17-cv-00844-WYD-SKC          Fresquez - Cross                    III - 591

 1   tells you to stop reporting track defects?

 2   A.  Yes.  This is actually about that track.

 3   Q.  Okay.  Let's switch gears then.

 4       I want to go back to -- you testified on direct exam,

 5   in 2013 when you had the handheld device rules violation -- do

 6   you remember that?

 7   A.  Yes, sir.

 8   Q.  Did I hear you correctly?  Did you say that you took

 9   responsibility for having violated that rule?

10   A.  Yeah.  I -- I acknowledged that I did it.

11   Q.  When?

12   A.  After the fact.  So basically, again, like we said, when

13   we go into an investigation, we have no idea what we are going

14   to investigation for.  They will give us a piece of paper that

15   says you violated this rule.  And I ended up getting mine -- I

16   think it was five days after I violated the rule, so I had no

17   idea.  And it just says you violated a rule.

18   Q.  And, Mr. Fresquez --

19   A.  It doesn't say -- it doesn't say when.  It doesn't say any

20   information on it.  They gave it to me.  So I had no -- when I

21   went to investigation, I had absolutely no idea what I was

22   being investigated on.

23   Q.  That's what I thought I heard you say.  So let's --

24       MR. GOMAN:  Let me show the witness what was

25   disclosed in this case as BNSF 0062.

17-cv-00844-WYD-SKC          Fresquez - Cross                    III - 592

1    BY MR. GOMAN:

2    Q.  Mr. Fresquez, can you tell me, do you recognize that as

3    the investigation notice you received for that violation?

4    A.  Yes.

5            MR. GOMAN:  Your Honor, I move for admission of what

6    will be marked as the next exhibit in our line.

7            MS. FARRELL:  That would be A-96.

8            MR. GOMAN:  A-96.

9            MR. THOMPSON:  Let me object, Your Honor.  This

10   hasn't been previously disclosed as an exhibit.

11           THE COURT:  Let me look at it.

12           Was this document previously disclosed in discovery?

13           MR. GOMAN:  Yes.

14           THE COURT:  When?

15           MR. GOMAN:  In our initial disclosures.  On the

16   bottom right-hand corner you can see the Bates label.

17           THE COURT:  Do you disagree with that, Mr. Thompson?

18           MR. THOMPSON:  Sorry, Your Honor?

19           THE COURT:  Did you see this document before?

20           MR. THOMPSON:  We've seen it before, Your Honor.

21           THE COURT:  All right.  So you don't have any

22   objection to it.

23           MR. THOMPSON:  We object because it's not on the

24   witness -- on the exhibit list.

25           THE COURT:  All right.  Overruled.

 1              And what is this, A-96?

 2              MR. GOMAN:  Is that right?

 3              COURTROOM DEPUTY:  Yes, Your Honor.

 4              THE COURT:  All right.  A-96 is received.

 5         (Defendant's Exhibit A-96 received.)

 6   BY MR. GOMAN:

 7   Q.  All right.  You said you didn't know what you had been

 8   charged with, sir.  Alleged use of a handheld electronic

 9   device while operating a motor vehicle on Friday, November 16,

10   of 2012.  Right?

11   A.  Yes.

12   Q.  So you knew at least that much about the allegation.

13   A.  Yeah, but you don't know what you are actually going in

14   for.  You don't know -- you -- now that I seen this, it says

15   handheld device, but you don't know the time or the -- and I

16   had received this something like five days after the fact.

17   Five days went by before I even received the letter.

18   Q.  Okay.  But, I mean, you could presumably look in your

19   phone log and see if you had used your phone on that date.

20   A.  Yeah, but I didn't think about it.

21   Q.  Okay.  When you said you took responsibility, you were

22   asked in the investigation hearing, Were you using your cell

23   phone at 8 o'clock in the morning on November 5th of 2012, and

24   you said, I don't recall.

25   A.  I don't recall.  No, I don't.

17-cv-00844-WYD-SKC          Fresquez - Cross          III - 594

 1   Q.  But you do now because you told us on direct examination

 2   you remember that exact phone call.

 3   A.  Because after the fact I went back and looked at my phone

 4   records to see if it really did happen, and it did happen.

 5   Q.  I see.

 6           Switching topics one more time.  You are claiming

 7   emotional distress from having been dismissed by BNSF; right?

 8   A.  Yes, sir.

 9   Q.  To clarify, you have not gone to see a mental health

10   provider for counseling for depression or anything like that;

11   right?

12   A.  No, sir.

13   Q.  But, I mean, you've -- it's weighed on you.

14   A.  Of course.

15   Q.  You mentioned a couple things.  You had to quit coaching

16   baseball because of the stress of this dismissal; right?

17   A.  I started coaching the way I didn't want to be coaching.

18   You know, that's -- that really took a toll on me, and so I,

19   uh, decided I no longer wanted to coach.  It was taking a toll

20   on my son and my relationship because I did have a lot of

21   stress built up.

22   Q.  When did you decide that?

23   A.  Uh, June, June of '18.

24   Q.  So you are dismissed May of 2016.  Coached for two years.

25   Then decide the stress is too much so you should stop.

Julie H. Thomas, RMR, CRR                          (303)296-3056

 1   A.   This is a lot of stress.  It's been going on for three

 2   years.

 3   Q.   Okay.  You weren't coaching in October of 2018, for

 4   instance?  Four months ago?

 5   A.   I was -- I assisted with the team, but I wasn't actual

 6   head coach or, um -- I just helped a guy here and there for

 7   one month, two months.

 8   Q.   Well, you made it into the team picture; right?

 9   A.   Yeah.  That's what I just said.

10   Q.   So when you say you quit coaching baseball, you mean you

11   coached until June of 2018 and then became an assistant kind

12   of part-time coach?

13   A.   I helped out.  It was a fall team.  The fall teams last

14   two or three months.  And the guy asked me if I would help out

15   because he needed another player, which my son went there.  So

16   I said, I'll help out, but I didn't want no part of it, no

17   part of the actual head coaching.  And I didn't take no leads.

18   I kind of just helped him out, and I taught 'em how to hit.

19   Q.   Last topic.  The health insurance was a big piece because

20   of your son's health condition; right?

21   A.   Okay.

22   Q.   If I understood your testimony correctly, that was one of

23   the things that caused you --

24   A.   BNSF has great health insurance, yes.

25   Q.   Just to clarify, you did keep your BNSF-provided health

17-cv-00844-WYD-SKC          Fresquez - Redirect          III - 596

1   insurance for five months after your dismissal; right?

2   A.  Uh, something like that, yes.

3   Q.  They let you keep it as just a benefit to the employees

4   that have been fired.  You keep it for five months.  Right?

5   A.  Yes.

6   Q.  Okay.  And then after that, your son went on his mother's

7   health insurance; right?

8   A.  Uh, yes.

9   Q.  Okay.  So he never went without health insurance?

10  A.  No.

11          MR. GOMAN:  Okay.  I don't have any more questions.

12          THE COURT:  All right.  Let's have redirect.

13                  **REDIRECT EXAMINATION**

14  BY MR. THOMPSON:

15  Q.  In this case you produced thousands of texts; right?

16  A.  Yes.  I believe I produced 1,799 pages of texts.

17          MR. THOMPSON:  Your Honor, we offer all of the pages.

18          THE COURT:  Of which exhibit?

19          MR. THOMPSON:  It's A-79, but it's 1,799 pages.

20          THE COURT:  Any objection to that?

21          MR. GOMAN:  No, Your Honor.

22          THE COURT:  All right.  Then the entirety of

23  Exhibit A-79 is now received.

24      (Defendant's Exhibit A-79 received.)

25  BY MR. THOMPSON:

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Redirect          III - 597

1    Q.  All right.  So Mr. Goman picked, I don't know, a handful

2    of those to cross-examine you on; right?

3    A.  Yes, sir.

4    Q.  And he blew it up so you could only see part of it; right?

5    A.  Yes, sir.

6    Q.  Why don't we look at what some of the remainder says.

7            Let's first start with Mr. Paz's texts.  Do you

8    remember Mr. Goman asking about this, about how Mr. Paz didn't

9    take any issue with you taking a siding out of service?

10   A.  Yes, sir.

11   Q.  On the next page, what does he say right up here?

12   A.  If you were planning on pulling it out today, you should

13   speak up.  Secrets don't make friends.

14   Q.  Did you take that as a threat?

15   A.  Yeah.

16   Q.  Mr. Paz didn't threaten you every time you took a track

17   out of service.

18   A.  No, they don't.

19   Q.  It was only when you took the important ones out; right?

20   A.  Yeah, when they're tracks you need.

21   Q.  Let's look at some of your texts and see what they -- the

22   whole thing actually says.

23            So I'm going to turn your attention to page 500.  Do

24   you remember Mr. Goman asking you about this, Overtime

25   tonight?

Julie H. Thomas, RMR, CRR                         (303)296-3056

```
 1   A.  Yes, sir.

 2   Q.  Making it sound like you're artificially reporting defects

 3   to, uh, get your bodies overtime?

 4   A.  Yes, sir.

 5   Q.  All right.  Right above that, who is this?

 6   A.  That was Derek Goodnight.

 7   Q.  What does he ask?

 8   A.  Is that in golden?

 9   Q.  And what do you say?

10   A.  Yup just found it, looks like it's been there for months.

11   Q.  Is this the picture you are talking about?

12   A.  Uh, that one, no.

13   Q.  It's another defect?

14   A.  Yeah, that was -- yeah.

15   Q.  And it was bad enough where you guys were joking around

16   about a horrible defect because that's how bad it was; right?

17   A.  Yes.

18   Q.  You weren't making up defects to get your buddies

19   overtime.

20   A.  Say that again, please.

21   Q.  You weren't making up defects to get your buddies

22   overtime.

23   A.  No.  It was all, like I said, just things I could justify.

24   It's real things.

25   Q.  There were enough defects there to keep people working
```

1    overtime for years.

2    A.  Yes, they do.

3    Q.  Really, any time you want somebody to get overtime, you

4    could do that.

5    A.  Yes.

6              MR. GOMAN:  Objection to leading, Your Honor.

7              THE COURT:  It is leading.  Sustained.  Let's have

8    the witness testify.

9              And so I will instruct the jury to disregard the

10   answer, if you heard one.

11   BY MR. THOMPSON:

12   Q.  If you had wanted to, is there any day you couldn't have

13   given your buddies overtime?

14   A.  Uh, they could work overtime seven days a week, there's so

15   much work.

16   Q.  Are they even really your buddies?  Are these people you

17   hang out with socially?

18   A.  No, they're not.  I just -- they're my colleagues.  They

19   are my coworkers.

20   Q.  These were the guys that -- what do they do?

21   A.  They are the maintenance.  They are the guys that fix the

22   tracks.

23   Q.  All right.  I'm going to ask you about one more of these

24   about the overtime issue.  I see right here, um, you say,

25   Don't need to pull out, I already have slow orders on them.

17-cv-00844-WYD-SKC          Fresquez - Redirect          III - 600

1          What does that mean?

2   A.   That I can't -- I don't have to pull it out.  I can't --

3   it already is protected.

4   Q.   If you were trying to mess with BNSF, is that what you

5   would have written?

6   A.   No.  I would have pulled it out.

7   Q.   Let's go -- instead of diving into your texts and spending

8   the next however long there, let's just step back a little

9   bit.

10          Were you ever accused by anybody at BNSF of falsely

11   reporting defects to get anyone overtime or for any other

12   reason?

13   A.   No.

14   Q.   Any manager ever make a comment to you about trying to get

15   people overtime?

16   A.   Not -- no, not that I can recall.

17   Q.   That's not why you were fired; right?

18   A.   No.

19   Q.   There is actually one more text I want to show you at page

20   745.  Do you remember yesterday Mr. Goman asked you about a

21   text you sent to Jay Herzog, and he blew this up so you

22   couldn't see the rest of the text?  Right?

23   A.   That's correct.

24   Q.   In that you took issue, it looks like, with, um,

25   Mr. Herzog giving a statement?

 1  A.  Yes, it was the same day I was pulled out of service.  I

 2  was a little frustrated, yes.

 3  Q.  What did you text to him a day later?

 4  A.  Hey man just want to say no hard feelings.  You have every

 5  right to right [sic] a statement against anyone.  It's life,

 6  shit happens.  Like I said no hard feelings.  Talk to you

 7  later.

 8         Then I also said, Did you guys ever fix the alignment

 9  in south Denver?

10  Q.  What's the alignment in south Denver?

11  A.  It was a defect where, uh, I got into my truck and drove

12  200 feet away where, um, Mr. Paz said, um, it's not there.

13  Q.  What did Mr. Herzog say when you asked him if that defect

14  that you were fired over had been fixed?

15  A.  Nope.

16         MR. THOMPSON:  Thank you, Mr. Keech.

17  BY MR. THOMPSON:

18  Q.  When I first examined you, you said that bumping back to

19  the track inspector position in Denver was the only thing you

20  could do to stay home.

21  A.  That's correct.

22  Q.  When Mr. Goman cross-examined you, he pointed out there

23  was a Keenesburg job you could have taken.

24  A.  Yes, sir.

25  Q.  Why did you tell me that the Denver job was the only one

17-cv-00844-WYD-SKC         Fresquez - Redirect              III - 602

1   you could take and stay home?

2   A.  Well, Keenesburg, the office alone is 40-plus miles from

3   my home just to the office.  The actual territory ends in

4   Sterling, Colorado, which is over 115 miles from my home.  So

5   track inspectors are on call 24/7, so a lot of times we get

6   calls in the middle of the night.  And I actually did that job

7   before, and there was plenty of times you get a call at

8   1 o'clock in the morning for something going on at Sterling,

9   Colorado, which is a two-hour drive.  It just -- I needed to

10  stay home and take care of my son, and I -- it's too far away.

11  Q.  Yesterday you were also asked about issues with Mr. Holton

12  and Mr. Fry, long before 2015, harassing you to misreport

13  defects.  Do you recall that?

14  A.  Yes, sir.

15  Q.  Was that the same type of harassment you were experiencing

16  in 2015?

17  A.  Not necessarily, no.  It's a given -- so roadmasters' jobs

18  are to move trains, and it's your job as a track inspector to

19  stop trains, put slow orders on, to find defects, take tracks

20  out of service.  Your job is to protect the railroad.  So

21  there is that, uh, pushback, but it's not the same as let's

22  get him up for insubordination.

23  Q.  Was what was happening with Mr. Fry and Holton just a

24  normal kind of tightrope walking?

25  A.  Majority, yes.

17-cv-00844-WYD-SKC          Fresquez - Redirect          III - 603

1   Q.   That was different than what happened in 2015?

2   A.   Yes.

3   Q.   In 2015 it was Mr. Akers, Mr. Cole, Mr. Paz?

4   A.   That's correct.

5   Q.   Did Mr. Dunn ever harass you?

6   A.   No.

7   Q.   Mr. Goman also pointed out that you had issues with Cason

8   Cole, one of the roadmasters; right?

9   A.   Yes, sir.

10  Q.   Is the issue that Mr. Goman was talking about the issue

11  with this track?

12  A.   Yes.

13  Q.   When Mr. Goman was making it sound like you were being

14  unnecessarily difficult, this is the track we were talking

15  about?

16  A.   Yes.

17  Q.   What did Mr. Lydick say about whether this was a defect?

18  A.   He said absolutely a defect, no questions asked.

19  Q.   Were you in the right, then, to challenge Mr. Cole?

20  A.   Yes.

21  Q.   You were also asked yesterday about whether Mr. Paz has

22  the right to instruct you to do something.

23  A.   Say again, please.

24  Q.   You were asked yesterday if Mr. Paz has a right to

25  instruct you to do something.  Do you recall that?

Julie H. Thomas, RMR, CRR                        (303)296-3056

1  A.  Uh, I think so, yes.

2  Q.  Does he have the right to instruct you to do something?

3  A.  He has a right to give me directives, yes.

4  Q.  Does he have a right to instruct you to violate federal

5  law?

6  A.  No.

7  Q.  Do you have a right to object and refuse to do that?

8  A.  Yes, on -- yeah.

9  Q.  During your conversation with Mr. Paz, you said something

10  along the lines of, You have already made up your mind.

11  Right?

12  A.  Yes.

13  Q.  Did Mr. Paz at ever -- any point ever say, What do you

14  mean?  I don't know what you are talking about?

15  A.  No.

16  Q.  Mr. Paz clearly understood what you were accusing him of?

17  A.  Yes.

18          MR. GOMAN:  Objection:  leading.

19          THE COURT:  Sustained.

20  BY MR. THOMPSON:

21  Q.  Did Mr. Paz understand what you were accusing him of?

22          MR. GOMAN:  Objection:  foundation.

23          THE COURT:  Sustained.

24  BY MR. THOMPSON:

25  Q.  Do you believe Mr. Paz understood what you were accusing

17-cv-00844-WYD-SKC          Fresquez - Redirect                    III - 605

1   him of?

2   A.   Yes.

3   Q.   Yesterday Mr. Goman made it sound crazy to believe that

4   Mr. Paz would ask you to remeasure something and then take it

5   out of service.  Do you recall that?

6   A.   Yes.

7   Q.   You text Jay Herzog about whether the defect had been

8   repaired?

9   A.   I did, yes.

10  Q.   What did he say?

11  A.   No, they didn't repair it.  He said, Nope.

12          MR. THOMPSON:  I'm going to show the plaintiff

13  Defendant's Exhibit A-70.

14  BY MR. THOMPSON:

15  Q.   Do you recognize this document?

16  A.   Uh, yes.

17  Q.   What is it generally?

18  A.   It's just, uh -- it's a -- that one shows it's a geo car

19  defect.  It shows that the alignment 62, the surface defect.

20  Q.   Hold on.  Let me cut you off, because I want to talk more

21  about it in detail, but I want to get it to the jury first.

22  A.   Okay.

23  Q.   Do you recognize generally what system this is from?

24  A.   Yes.

25  Q.   What system?

1  A.  It appears to be the engineering page or PARS system.

2  Q.  Is that a system you are familiar from working at BNSF?

3  A.  Yes.

4         MR. THOMPSON:  Plaintiff offers Defendant's Exhibit

5  A-70.

6         MR. GOMAN:  No objection.

7         THE COURT:  All right.  Exhibit A-70 is received.

8      (Defendant's Exhibit A-70 received.)

9  BY MR. THOMPSON:

10  Q.  All right.  So I want to bring your attention to the

11  milepost.  Is that where the defect on May 5th that you were

12  at with Paz and Herzog, where it was located?

13  A.  Yes.

14  Q.  Was that defect on May 5th a crossover track type defect?

15  A.  Yes.

16  Q.  Was it a surface defect?

17  A.  Yes.

18  Q.  Was it an alignment defect?

19  A.  Yes.

20  Q.  Mr. Paz -- or, sorry.  Did Mr. Herzog tell you that defect

21  was not repaired?

22  A.  That's correct.  He said, Nope.

23  Q.  What does it say right down here at the bottom of the

24  report?

25  A.  Repaired, Jay Herzog.  It says:  Repaired, Jay Schweers

1    Herzog, 5/5/16.

2    Q.  That's the day you were out there with Mr. Paz and

3    Mr. Herzog?

4    A.  Yes.

5    Q.  How crazy does it seem to believe that Mr. Paz would

6    falsely report this defect?

7            MR. GOMAN:  Objection to argumentative and leading.

8            THE COURT:  Overruled.

9    A.  It clearly -- it clearly shows someone went in there and

10   showed it repaired.

11   BY MR. THOMPSON:

12   Q.  Your belief was right.

13   A.  Yeah.

14           MR. THOMPSON:  Thank you, Mr. Keech.

15   BY MR. THOMPSON:

16   Q.  Mr. Goman asked you about calling the hotline?

17   A.  Yes.

18   Q.  About calling HR?

19   A.  Yes.

20   Q.  About calling Labor Relations?

21   A.  Yes.

22   Q.  You didn't call any of them?

23   A.  That's correct.

24   Q.  You did -- did you confront Mr. Carpenter?

25   A.  Yes.

17-cv-00844-WYD-SKC          Fresquez - Redirect                    III - 608

1   Q.   He was your supervisor's supervisor?

2   A.   Yes.

3   Q.   Did you contact your union?

4   A.   I did.

5   Q.   Did your union contact Mr. Miller?

6   A.   Yes.

7   Q.   He was your supervisor's supervisor's supervisor?

8   A.   That's correct.

9   Q.   Did you contact the FRA?

10  A.   Yes.

11  Q.   How many people do you think you had to contact before

12  BNSF would investigate this?

13          MR. GOMAN:   Objection:   leading and argumentative.

14          THE COURT:   Sustained as to leading.

15  BY MR. THOMPSON:

16  Q.   Mr. Fresquez, how many people do you believe you would

17  have had to report it to before BNSF investigated?

18          MR. GOMAN:   Same objection.

19  A.   You would think once you reported to --

20          THE COURT:   Overruled.

21          MR. THOMPSON:   The Judge has to rule.

22  BY MR. THOMPSON:

23  Q.   Okay.   Go ahead.

24  A.   I think once you report it to one person, it should be

25  investigated.

Julie H. Thomas, RMR, CRR                            (303)296-3056

17-cv-00844-WYD-SKC          Fresquez - Redirect                III - 609

1    Q.  Last thing.  You were asked about Mr. Royston's e-mail.

2    Do you recall that?

3    A.  Yes.

4    Q.  Refresh the jury's recollection of who Mr. Royston is.

5    A.  He was in the IT department.  He's the guy I asked, uh, if

6    this defect has been removed from the system.

7    Q.  That's the list of 35 defects Mr. Akers wanted removed?

8    A.  Yes.

9    Q.  And Mr. Royston testified it's not a big deal to have

10   managers tell him to remove defects.

11   A.  Yes.

12   Q.  Mr. Royston doesn't know -- does Mr. Royston know whether

13   those defects have actually been repaired?

14   A.  No.  He just sits in an office -- I don't know where he

15   sits, but he's just an IT person.

16   Q.  Is it a big deal to have IT remove 35 unrepaired defects

17   from the system?

18   A.  Yeah.

19   Q.  What can happen?

20   A.  Well, derailments.  I mean, major derailments.

21   Fatalities.  It's not good.  No good things come from it.

22   Q.  Is that why you confronted Mr. Carpenter?

23   A.  Yes.

24   Q.  Is that why you called your union?

25   A.  Yes.

17-cv-00844-WYD-SKC          Fresquez - Redirect          III - 610

1   Q.  Is that why your union contacted Adam Miller?

2   A.  Yes.

3   Q.  Is that why you called the FRA?

4   A.  Yes.

5           MR. THOMPSON:  I have nothing further.

6           THE COURT:  All right.  If there's any recross, let's

7   make it brief.

8           MR. GOMAN:  No, Your Honor.

9           THE COURT:  All right.  You may step down,

10  Mr. Fresquez.

11          Call your next witness.

12          MR. THOMPSON:  Mark Carpenter.  Your Honor, we are

13  calling him adversely.

14          THE COURT:  All right.  Then is there any objection

15  to him asking leading questions?

16          MR. GOMAN:  Uh, no, Your Honor.

17          THE COURT:  All right.

18          COURTROOM DEPUTY:  Please raise your right hand.

19      (The witness was sworn.)

20          COURTROOM DEPUTY:  Please be seated.

21          Please state your full name, and spell your full name

22  for the record.

23          THE WITNESS:  My name is Mark Carpenter, M-a-r-k,

24  C-a-r-p-e-n-t-e-r.

25  ///

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    **MARK CARPENTER, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

2   BY MR. THOMPSON:

3   Q.  You were the division engineer for BNSF in the Denver

4   region?

5   A.  I'm sorry?

6   Q.  You were the division engineer for BNSF in the Denver

7   region?

8   A.  Yes, I was.

9   Q.  Michael Paz reported to you?

10  A.  He did.

11  Q.  Cason Cole reported to you?

12  A.  Yes.

13  Q.  Ryan Akers reported to you?

14  A.  Yes.

15  Q.  David Dunn reported to you?

16  A.  Yes.

17  Q.  Indirectly, Mr. Fresquez reported to you?

18  A.  Correct.

19       MR. THOMPSON:  I'm going to show the witness

20  Plaintiff's Exhibit 9.

21  BY MR. THOMPSON:

22  Q.  Do you recognize this document?

23  A.  I do.

24  Q.  What is it?

25  A.  It's an engineering scorecard.

1     MR. THOMPSON:  I'm going to show the witness

2   Plaintiff's Exhibit 10.

3   BY MR. THOMPSON:

4   Q.  What is this?

5   A.  It's the same thing.

6   Q.  Same question for Plaintiff's Exhibit 11.

7   A.  Same thing.

8   Q.  Same question for Plaintiff's Exhibit 12.

9   A.  Also the same thing.

10  Q.  Same question for Plaintiff's Exhibit 13.

11  A.  Same thing.

12  Q.  Same question for Plaintiff's Exhibit 14.

13  A.  Also the same thing.

14  Q.  Same question for Plaintiff's Exhibit 15.

15  A.  That's part of the engineering scorecard.  That appears to

16  be the ranking of individual supervisors.

17  Q.  And do you recognize the person that's unredacted to be

18  Adam Miller?

19  A.  As number 5?

20  Q.  Yes, sir.

21  A.  Yes.

22  Q.  Who is number 22?

23  A.  That's me.

24  Q.  All right.  Do you recognize Plaintiff's Exhibit 16?

25  A.  Same as before.

1    Q.  More scorecard documents?

2    A.  Yes.

3    Q.  Do you recognize Plaintiff's Exhibit 17?

4    A.  Same.

5    Q.  More scorecard documents?

6    A.  Yes, more scorecard documents.

7    Q.  Will you please tell the jury what scorecards are.

8    A.  It's a measure of various metrics of performance in the

9    engineering department.

10              MR. THOMPSON:  Plaintiff moves Exhibits 9 through 17.

11              THE COURT:  Any objection?

12              MR. GOMAN:  Your Honor, no objection.  I'd like to

13   discuss at a later time the --

14              THE COURT:  You'd like to what?

15              MR. GOMAN:  I'd like to discuss at a later time the

16   sealing of these records concerning public access, but I have

17   no objection to their use in this case.

18              THE COURT:  All right.  Well, for now what we are

19   dealing with is the Court receives Exhibits 9 through 17.

20        (Plaintiff's Exhibits 9, 10, 11, 12, 13, 14, 15,

21        16, 17 received.)

22   BY MR. THOMPSON:

23   Q.  BNSF uses these to rank its managers; right?

24   A.  It does.

25   Q.  Slow orders will negatively affect a manager's territory

17-cv-00844-WYD-SKC          Carpenter - Direct                    III - 614

1    or ranking?

2    A.   They can.

3    Q.   Tracks being out of service can negatively affect a

4    manager's rankings.

5    A.   I don't know as that was specifically identified on

6    engineering scorecards, no.

7    Q.   Let's back up a step then.  Velocity, the speed of trains

8    over your territory, negatively affects a manager's rankings.

9    A.   Related to speed restrictions, yes.

10   Q.   These rankings were a big deal to you.

11   A.   Me personally, yes.  I think it was an objective measure

12   of manager's performance rather than subjective.  It was more

13   objective.

14   Q.   You told the supervisors under you that the rankings were

15   a big deal to you.

16   A.   I think it's a good guide for things that are important to

17   our -- our work, yes.

18   Q.   And you told that to the managers under you?

19   A.   Yes.

20   Q.   All right.  I want to talk to you a moment about what I

21   have been calling the 30-day rule.  For non-class defects, the

22   FRA requires railroads to fix them within 30 days.

23   A.   Some people interpret it that way, yes.

24   Q.   The compliance manual clearly states that; right?

25   A.   The compliance manual I think does.

1    Q.  The compliance manual is published by the FRA?

2    A.  Uh, yes.  It's an explanation of the code I think

3    initially primarily for their inspectors, but it was also made

4    available to the railroad.

5    Q.  You, however, believed tracks could be left in service

6    even if a non-class defect had not been repaired within

7    30 days.

8    A.  I think what the regulation says is --

9    Q.  Hold on.  Mr. Carpenter, I'm asking you what you believed,

10   not what the regulations said.

11   A.  I am answering your question.

12   Q.  Tell us your belief, not what -- you are not an expert on

13   this, so you tell us what your belief was.

14   A.  I'm sorry.  Ask the question again?

15   Q.  Sure.  You believed you could leave tracks in service even

16   if the defects had not been repaired within 30 days.

17   A.  That's correct.

18   Q.  You shared that position with the managers who worked with

19   you.

20   A.  Uh, yes, I told them what my opinion was.

21   Q.  Multiple managers told you they disagreed with that

22   opinion.

23   A.  I don't think that's an accurate statement.

24   Q.  You were deposed in this case; correct?

25   A.  I was.

17-cv-00844-WYD-SKC          Carpenter - Direct                III - 616

1    Q.  You were put under oath in your deposition?

2    A.  Yes.

3    Q.  And you were -- you told the truth?

4    A.  Yes.

5    Q.  All right.

6             MR. THOMPSON:  Let's pull up and show the jury Mark

7    Carpenter's deposition.

8             COURTROOM DEPUTY:  Is that okay, Your Honor?

9             THE COURT:  Well, let's do two things.  Let's give

10   the witness the official copy.  I don't mind if you use

11   highlights on the screen, but let's make sure the witness has

12   the opportunity to access the original deposition if he needs

13   to.

14            MR. THOMPSON:  Do you have it?

15            MR. STONE:  No.

16            MR. THOMPSON:  It's electronic?

17   BY MR. THOMPSON:

18   Q.  Let's do it this way then.  I'm going to read from your

19   deposition to you.  I want to make sure I read it correctly.

20            "Did anyone ever challenge or confront you or let you

21   know...they disagree with you or [sic] your interpretation of

22   that regulation?"

23   A.  They -- they certainly could have.

24   Q.  Your answer then was:  "Several times."

25   A.  And --

Julie H. Thomas, RMR, CRR                         (303)296-3056

1   Q.  Did I read that correctly?

2   A.  Line 6?

3   Q.  Yeah.  Here, I'll blow it up.

4   A.  Yes.

5   Q.  After your deposition, but before this trial, did you meet

6   with BNSF's attorneys?

7        THE COURT:  Let me stop you here.  I insist that

8   original depositions be in court.  So I'm not going to stop

9   you from using it, but you need to make sure you bring the

10  original deposition so the witness can have access to it.

11       MR. THOMPSON:  We will remedy that immediately, Your

12  Honor.

13       THE COURT:  All right.  That applies to the defendant

14  if you use depositions.

15  BY MR. THOMPSON:

16  Q.  After you were deposed, but before you testified today,

17  did you meet with BNSF's lawyers?

18  A.  Yes.

19  Q.  Is there anything else about your deposition you want to

20  change?

21  A.  Well, I don't think I have changed my -- my deposition,

22  but no.  I had an opportunity to read it.

23  Q.  When these managers confronted you, did that cause you to

24  change your belief as to whether tracks need to be removed

25  from service if defects had not been repaired within 30 days?

1   A.  Uh, no.

2   Q.  Did you ever call the FRA to verify your belief?

3   A.  I don't think I specifically called the FRA about 30-day

4   defects, no.

5   Q.  Did you ever ask Adam Miller?

6   A.  We could have talked about it.  We talked about a number

7   of things.

8   Q.  You think you did talk about this with Adam Miller?

9   A.  We could have.  He had -- he had the list of our defects

10  available.

11  Q.  So Mr. Miller knew there were defects that were more than

12  30 days old where the tracks were still in service?

13  A.  It's was available systemwide.

14  Q.  Did you ever ask BNSF's in-house counsel, the law

15  department, whether your interpretation was correct?

16          MR. GOMAN:  Your Honor, objection.  I think that asks

17  for an attorney-client privileged communication.

18          THE COURT:  He can answer that.  Overruled.  He can

19  answer that with a yes or no.

20  A.  No.  I'm not sure what they would know about it.

21  BY MR. THOMPSON:

22  Q.  Did you ever ask Labor Relations whether your

23  interpretation was correct?

24  A.  About track standards?

25  Q.  Yeah.

1   A.  No.

2   Q.  Did you ever call the hotline?

3   A.  No.

4   Q.  Did you ask anybody?

5   A.  Again, as you've pointed out previously, probably several

6   times we had discussions with various managers, uh,

7   supervisors that work for me, colleagues, et cetera.

8   Q.  Can you recall any manager who agreed with your

9   interpretation?

10  A.  Agreed?

11  Q.  Yeah.

12  A.  Not by name, but I didn't come to that conclusion by

13  myself.

14  Q.  You think someone at BNSF told you that?

15  A.  Well, again, I don't -- you know, having worked there for

16  so long and worked with the -- with the track safety standards

17  for so long, I don't remember exactly who -- who might have

18  had that opinion as well.

19         THE COURT:  Let's remove this deposition excerpt from

20  the screen.

21         MR. THOMPSON:  Thank you, Judge.

22  BY MR. THOMPSON:

23  Q.  I'd like to talk to you about the discipline decision in

24  this case.

25         You are the employee that charged Mr. Fresquez with

1   insubordination?

2   A.  Uh, yes.

3   Q.  That's after Michael Paz called you and gave you his

4   version of events?

5   A.  Mm, yes.

6   Q.  That's when you chose to charge Mr. Fresquez with

7   insubordination; right?

8   A.  Well, I'm not in the habit of making those decisions in a

9   vacuum.  I had gotten in the habit of talking to other people

10  about it.  This would be a good opportunity to talk to Labor

11  Relations.  That's what they do.

12  Q.  All right.  Well, there were three people there that day:

13  Michael Paz, Jay Herzog, and Brandon Fresquez.  Right?

14  A.  Yes.

15  Q.  Before charging Brandon with insubordination, did you ask

16  Mr. Fresquez for his side of the story?

17  A.  I did not.

18  Q.  Did you ask Mr. Herzog what had happened?

19  A.  I don't think that I talked to Mr. Herzog.

20  Q.  After talking to Michael Paz or Labor Relations, did you

21  have any understanding as to why Brandon Fresquez would leave

22  the track after being asked to remeasure a defect?

23  A.  I don't.  And that's the purpose of the formal

24  investigation, to have all sides tell their story.

25  Q.  It doesn't make sense that somebody would do that; right?

17-cv-00844-WYD-SKC          Carpenter - Direct                III - 621

 1  A.  Again, I didn't know the circumstances, was not there, and

 2  at the time may not have even collected all of the evidence.

 3  Q.  But you had no problem charging Brandon Fresquez with

 4  insubordination.

 5  A.  The way a formal investigation works is, again, it's an

 6  opportunity --

 7  Q.  You can --

 8  A.  -- to sit down --

 9  Q.  Mr. Goman will give you an opportunity to talk, if you can

10  just answer my question.

11  A.  Your question again?

12  Q.  You had no problem at that time charging Mr. Fresquez with

13  insubordination.

14  A.  Initiating the steps to find out what the details were.

15  Q.  By charging him with insubordination.

16  A.  That's the process.

17  Q.  There's a similar rule to insubordination that BNSF also

18  has, failing to follow instructions; right?

19  A.  Yes.  I --

20  Q.  And those two rules, they are on a continuum with

21  insubordination over here and failure to follow instructions

22  over here, and in the middle there's kind of a gray area.

23  Right?

24  A.  I think so.  There could be, yes.

25  Q.  And so it can be subjective whether somebody is being

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    insubordinate or failing to follow instructions.

2    A.  I think it's like it is with any legality.  There is some

3    subjectiveness to it, yes.

4    Q.  BNSF policy dictates that there's a maximum discipline

5    that can be imposed for a particular rule violation; right?

6    A.  There are regulated -- identified levels of discipline,

7    yes.

8    Q.  Insubordination, of those two rules, is the more serious

9    one.

10   A.  Yes.

11   Q.  Insubordination is a dismissible offense in and of itself.

12   A.  I believe it is.

13   Q.  And you chose to charge Brandon with the more serious rule

14   violation.

15   A.  Again, that was probably after some discussions with, uh,

16   Labor Relations.

17   Q.  And then you chose to charge Brandon with a more serious

18   violation; right?

19   A.  Uh, correct.

20   Q.  All right.  Let's move now.  There's a hearing after that,

21   after the charge; right?

22   A.  There is.

23   Q.  You agree that it would probably be best for you not to be

24   involved in the hearing process so it would appear impartial.

25   A.  I think that adds to impartiality, yes.

1    Q.  I'm going to show you Plaintiff's Exhibit 62.  Do you

2    recognize this document?

3    A.  I do.  That's an e-mail from me to Michael Paz.

4           MR. THOMPSON:  Plaintiff offers Exhibit 62.

5           MR. GOMAN:  No objection.

6           THE COURT:  All right.  Exhibit 62 is received.

7        (Plaintiff's Exhibit 62 received.)

8    BY MR. THOMPSON:

9    Q.  This is May 6th, the day after Mr. Fresquez was charged?

10   A.  I think.  I'm not familiar with all of the dates at this

11   point.

12   Q.  All right.  I'm going to highlight some text I'd like you

13   to read to the jury, please.

14          Will you please read that paragraph to the jury.

15   A.  It says:  "In this case, I think it would be better to

16   tell the story through questions by Conducting Officer to you

17   as primary Witness rather than via a prepared Statement.  The

18   document can be used to refresh your memory prior to the

19   hearing but would not have" -- "but would not have as an aid

20   to refer to as it can be called into transcript as evidence.

21   You should not enter any exhibits other than the Dispatchers

22   Radio Transcripts if appropriate, CO" -- or the conducting

23   officer -- "will listen to all testimony and read appropriate

24   Rules at the conclusion."

25   Q.  Next paragraph, please.

1  A.  It says:  "I would answer" -- again, conducting

2  officer's -- "initial question about what happened by simply

3  saying 'Employee refused to get tools and measure repaired

4  track defect when instructed to do so.'  CO will follow with

5  more specific questions to develop...details."

6  Q.  Next paragraph, please.

7  A.  "One strategy of Representative could be to paint a

8  picture of a simple misunderstanding of instructions or lack

9  of knowledge on how to follow, be firm about your instructions

10  being clear and direct, not light and optional.  Another

11  strategy could be employee was called away and intended to

12  return and follow your instructions later, be firm about that

13  too.  Another may be that there was a safety concern, I don't

14  believe that's true but be thinking about how you would

15  respond to that.  The Representative may ask why the employee

16  was held out of service, my response would be employees who

17  refuse to follow supervisors instructions are insubordinate

18  and cannot work for the railroad -- they are held out of

19  service until facts of the incident are determined."

20  Q.  Last paragraph, please.

21  A.  "Herzog's statement although not strong does give insight

22  into some potential reasons Principal might use as an excuse

23  for his actions.  We've not listed Herzog as a witness and are

24  not intending to have him at the Hearing which is correct but

25  do have the option to call if as things develop, it becomes

 1  apparent his testimony is needed."

 2  Q.  So you are telling the hearing officer and the charging

 3  officer not to bring Mr. Herzog to the hearing?

 4  A.  I am.  I didn't think that he would add anything to -- to

 5  the investigation substantial.

 6  Q.  There were three people there that day; right?

 7  A.  Yes, there were.

 8  Q.  Mark -- or Michael Paz was one of them?

 9  A.  Again, to my knowledge.  I was not there.  Michael Paz

10  and, uh, and Brandon and Jay Herzog.

11  Q.  Did you think Brandon and Michael Paz's accounts of the

12  situation might differ?

13  A.  They could, and --

14  Q.  Is there a third person there you could have called to

15  find out?

16          MR. GOMAN:  I object.  He needs to let the witness

17  answer the question.

18          THE COURT:  Yeah, let him finish his answer.

19  BY MR. THOMPSON:

20  Q.  Is there a third person you could have called --

21  A.  Yes.

22  Q.  -- as a witness to find out whose version was correct?

23  A.  Yes, and did, in fact, get a statement from Mr. Herzog.

24  Q.  You told them not to call him as a witness.

25  A.  I did.  I mean, not at the time.  It does put the coworker

17-cv-00844-WYD-SKC          Carpenter - Direct                    III - 626

1    in an uncomfortable position, and if the -- if the, uh -- if

2    the evidence is sufficient, um, that would be a reason not to

3    call.

4    Q.   Do you think this e-mail shows you being uninvolved in the

5    hearing?

6    A.   No, I don't.  I think that it shows me giving some

7    guidance to Michael Paz about how -- what kind of witness he

8    should be.

9    Q.   About how to fire Brandon Fresquez.

10   A.   No, I didn't say that, and I didn't, uh -- in fact, I was

11   uncertain of what the outcome of the investigation would be.

12   Q.   As we sit here today, can you recall an employee who's

13   gone all the way through a hearing and has been

14   substantively -- or cleared for substantive reasons,

15   altogether cleared?

16   A.   Can I think of an instance?

17   Q.   Yeah.

18   A.   Not a specific instance.  I know that that happened from

19   time to time.

20            MR. THOMPSON:  Thank you, Mr. Keech.

21   BY MR. THOMPSON:

22   Q.   You at some point listened to the recording -- there's a

23   recording of the call between Michael Paz and Brandon

24   Fresquez.  Right?

25   A.   Yes, there are some dispatcher recordings.

Julie H. Thomas, RMR, CRR                            (303)296-3056

1    Q.  And you heard Brandon say, I didn't say no, at the end of

2    it; right?

3    A.  I probably did, yes.

4    Q.  Other than that, you never hear Fresquez saying the word

5    "no" during that recording; right?

6    A.  I haven't listened to the recording in a long time,

7    so . . .

8    Q.  All right.  Let's pull up when you did listen to the

9    recording.  You remember listening to it in your deposition?

10   A.  Uh, yes.

11   Q.  So I'm going to show you at page 105:24.

12           I asked you:  "Other than that, did you ever hear

13   Brandon say the word 'no'?"

14           You answer:  "In that recording?  No, I didn't."

15           Is that correct?

16   A.  That's correct.

17           MR. THOMPSON:  Thank you, Mr. Keech.

18   BY MR. THOMPSON:

19   Q.  Eventually there's a transcript produced from that

20   hearing?

21   A.  Yes.

22   Q.  You read it?

23   A.  Uh, yes, that was typical.

24   Q.  Mr. Fresquez alleged that Michael Paz, one of your

25   supervisors, was trying to surreptitiously remove a defect

1    from the system, and that he left because he didn't want to

2    participate in a violation of federal law.  Right?

3    A.  That's information I would have gotten from the

4    transcript?

5    Q.  Yeah.

6    A.  I haven't read it in so long, I could not say.

7    Q.  You didn't do anything to investigate that allegation, did

8    you?

9    A.  After the formal investigation?

10   Q.  At any point in time.

11   A.  No.

12   Q.  That's a serious allegation; right?

13   A.  It could be, yes.

14   Q.  It's a violation of federal law.

15   A.  Yes.

16   Q.  You did nothing to investigate it.

17   A.  Again, after I read the investigation and looked at the

18   claim, no, I didn't, didn't do anything.

19   Q.  This is probably not the first time an employee has

20   declined or refused to remeasure a defect; right?

21   A.  It would be speculation on my part.  I can't -- I can't

22   think of any specific circumstance.  I'm not sure why you

23   would, but . . .

24   Q.  Can you think of another employee who's been fired for

25   refusing to remeasure a defect?

1   A.   No.

2   Q.   After Mr. Fresquez filed this lawsuit, BNSF changed the

3   systems it uses to report defects, right, went from the TIMS

4   system to the EAM system?

5   A.   Uh, yes.  Well -- yes.

6   Q.   Unlike the TIMS system, the EAM system locked out

7   inspections for defects that were not repaired within 30 days.

8   A.   Yes.

9   Q.   BNSF did that to force its employees to timely repair

10  defects.

11  A.   They didn't say why, but I would assume that that was the

12  intent.

13  Q.   And that was problematic for you, wasn't it?

14  A.   Uh, did we have some past-30-day defects or some expired

15  defects?  Yes.

16  Q.   You don't think it was practical to repair all the defects

17  before their expiration.

18  A.   I know it was an ongoing effort that we worked on very

19  hard.

20  Q.   My question was different.  Your opinion is that it's not

21  practical to repair all defects within 30 days.

22  A.   No, I'm not ready to say that.  We -- we are up for the

23  task.  We had a certain amount of resources and used those as

24  efficiently and expeditiously as we could.

25  Q.   I'm going to show you your deposition at page 21, starting

1    at line 12.

2              I asked you:  "And why was that problematic for you

3    or the people underneath you?"

4              You answer:  "Well, in any -- I would say any -- any

5    terminal, and I think that can probably be documented --

6    there's typically a large number of defects to manage in some

7    cases that are beyond the capabilities of -- of repair.  So

8    sometimes it was not practical to -- to have all of the

9    defects repaired prior to their expiration."

10             Did I read that correctly?

11   A.  You did, and I would stand by that statement.  I think

12   it's true.  I don't think it's true.  I know it's true.

13   Q.  In short, you don't think it's practical to follow the

14   FRA's guidebook.

15   A.  No, I'm not saying that.  I'm saying that sometimes the

16   resources were not available to, uh, meet the expectation of

17   30 days, if that was the case.

18             MR. THOMPSON:  Thank you, Mr. Keech.

19   BY MR. THOMPSON:

20   Q.  Shortly after BNSF switched to the EAM system, you decided

21   to retire; right?

22   A.  I retired, yes.

23   Q.  You were three and a half months away from being 60 years

24   old?

25   A.  Mm, I'd have to do the math.  It was a short time before

1    my birthday.

2    Q.  And 60 is an important number because you get your full

3    retirement age at 60 if you have 30 years of service; right?

4    A.  No, I -- I don't know as I'll -- it's important to divulge

5    the -- the specifics of it, but that relates to, uh, to the

6    railroad retirement piece.  The company pension is -- is

7    30 years and 55 years --

8    Q.  Sure.

9    A.  -- old.

10   Q.  So the railroad retirement piece, at 60 years of age --

11   A.  Correct.

12   Q.  -- you qualify for full retirement.  Is that right?

13   A.  Yes, mm-hmm.

14   Q.  And you retired three and a half months -- some months shy

15   of that.

16   A.  Yes.

17   Q.  The law this case is being brought under, the Federal

18   Railway Safety Act, you don't remember receiving any training

19   from BNSF on that law.

20   A.  I can't say that.

21   Q.  I'm not sure I understand you.  Do you recall receiving

22   any training on the FRSA from BNSF?

23   A.  Lots of training.  We certified a code of conduct every

24   year that included several elements, several pieces.  I don't

25   think it was specifically included in that, so I'll say no, I

17-cv-00844-WYD-SKC          Carpenter - Cross                    III - 632

1   don't recall.

2   Q.  All right.  I'm going to show you page 135 of your

3   deposition, starting at line 7.

4        I asked you:  "What training do you receive from the

5   FRSA from BNSF?"

6        I assume I meant from BNSF on the FRSA.

7        You respond:  "I don't recall.  I mean, I'm aware of

8   it, so I assume I received some."

9        I then ask you:  "As we sit here today, you don't

10  recall what training you received on that law?"

11       Your answer was:  "No."

12       Did I read that correctly?

13  A.  Uh, yes, I think so.

14       MR. THOMPSON:  Thank you, Mr. Keech.

15  BY MR. THOMPSON:

16  Q.  You would agree with me that if you don't train

17  supervisors on policies or laws, they're not a whole lot of

18  good; right?

19  A.  Yes.  They have to know.

20       MR. THOMPSON:  I have nothing further.  Thank you.

21       THE COURT:  All right.  Cross-examination.

22                     **CROSS-EXAMINATION**

23  BY MR. GOMAN:

24  Q.  Good morning, Mr. Carpenter.

25  A.  Good morning.

Julie H. Thomas, RMR, CRR                           (303)296-3056

 1   Q.  Let me just first hit on the topics that Mr. Thompson did.

 2   Try to take these in order.

 3          Let's talk first about the dismissal of Mr. Fresquez.

 4   Can you just tell the jury generally what your role in

 5   assessing discipline to BNSF employees was as a division

 6   engineer?

 7   A.  It's not specifically outlined about who -- who does this,

 8   but in my case, as the manager, I assumed the primary

 9   responsibility for initiating formal investigations, uh,

10   teaching supervisors how to conduct investigations, reading

11   transcripts.  It's how I learned.  Back in the day, I

12   conducted a formal investigation, and the general manager from

13   the operating department read the transcript and scribbled in

14   the margins, Well, you should have asked this question here

15   and you should have asked that question there and so on and so

16   forth.  So I just -- a large overview is to train people in

17   that process.

18   Q.  When you were involved in Mr. Fresquez's misconduct or

19   just in employee discipline more generally at BNSF, were you

20   aware that you could not retaliate against employees for

21   having engaged in protected activity?

22   A.  I'll say yes.  That makes sense.  But just -- it sounds

23   somewhat self-serving, but it violates my personal code.

24   Q.  So in Mr. Fresquez's case, do you recall how you first

25   heard about his insubordination?

1    A.  In the track measurement incident?

2    Q.  Yes.

3    A.  I assume it was a phone call.

4    Q.  Okay.  And who was that phone call from?  Do you remember?

5    A.  Well, I would assume it was from Mike Paz.  And, again, it

6    may have been a phone call.  It may have been an in-person

7    meeting.  I'm not sure exactly, but I assume a phone call.

8    Q.  All right.  Let me show you what was just admitted as

9    Exhibit 62.  I'm going to go to the second page of that.  I'm

10   going to blow it up maybe a little bit bigger.

11        Do you recall receiving this statement from Mr. Paz?

12   A.  Yes.

13   Q.  Has it been a while since you've read this statement, sir?

14   A.  It's been a while.

15   Q.  Okay.  Did you ask Mr. Paz to write out this statement?

16   A.  That was customary.

17   Q.  Why, though?  I mean, what about at this time an alleged

18   insubordination incident would require a manager to write a

19   statement?

20   A.  Well, in any case of discipline, and there's a variety, I

21   mean, it could be a safety rule violation or something, uh,

22   just seems appropriate for people to gather their thoughts

23   about what happened, uh, as soon as possible.  Plus, it also

24   gives a foundation or a tool to -- to review the facts of the

25   case or at least that person's interpretation of the facts.

1   Q.  After talking with Mike Paz and reviewing this statement

2   here, did you believe that you had enough information to

3   notice an investigation into whether Mr. Fresquez was

4   insubordinate on May 5th?

5   A.  I did.  And, again, I'd like to clarify.  It's a little

6   different than what we're doing here today.  The -- the formal

7   investigation is the opportunity to have witnesses, exhibits,

8   representation, et cetera, sit down and discuss, discuss the

9   facts and put it on the record.  And then the transcript of

10  that meeting is -- is typically read by someone else who was

11  not present.  Not always.  Sometimes it's read by someone who

12  was present.  And a discipline decision is made.

13  Q.  Do you believe that process is fair?

14  A.  Uh, yes, I do.

15  Q.  Before you decided to notice that investigation, did

16  you -- you mentioned -- did you speak with Labor Relations?

17  A.  I don't recall.  I just -- I am assuming that on something

18  as serious as this, in addition to the fact I don't know as I

19  had dealt recently with a potential insubordination case, and

20  consequently I wanted to get their guidance.  Since they, um,

21  work with people across the system who may have been in a

22  similar situation, I wanted to get their input.

23  Q.  Do you recall any advice or guidance you received from

24  Labor Relations?

25  A.  I don't specifically, but I -- I am -- I'm fairly

1    confident that I would not have ventured very far away from

2    their recommendation.

3    Q.  Well, so that was my next question.  So if Labor Relations

4    had said, for instance, Now, this is -- this is more like

5    failure to comply with instructions, as opposed to refusal to

6    comply with instructions, any reason that you are aware of

7    that you wouldn't have taken that advice?

8    A.  No.  I think ultimately there are several -- several

9    steps.  The initial investigation, the transcript is produced,

10   and then the employee has an opportunity to appeal that, and

11   it potentially goes to an arbitrator.  So there are several

12   levels there.  And Labor Relations can be included in that

13   review.  In fact, I think they are.  So to -- to make them

14   aware that this is, you know, this is what's coming, I think

15   it's appropriate to include them.

16   Q.  So --

17   A.  And -- and I'm rambling.  And -- and take their

18   recommendation.  They're the experts.

19           MR. GOMAN:  I'm going to show the witness

20   Exhibit A-45.  Let me confirm this is a stipulated exhibit.

21           COURTROOM DEPUTY:  A-45 has been received.

22           MR. GOMAN:  Thank you.

23   BY MR. GOMAN:

24   Q.  Mr. Carpenter, do you recognize -- can you see that on the

25   screen there?

1    A.  I can.

2    Q.  Do you recognize what that is?

3    A.  That's a notice of investigation.

4    Q.  Let me just blow this up here.

5           You were the one that decided to issue this notice of

6    investigation; is that right?

7    A.  Yes.

8    Q.  It says in there "in connection with your alleged refusal

9    to comply with supervisors instructions on May 5, 2016."

10          Why that particular language?  Do you recall?

11   A.  Well, I think that's fitting because that's what it is.

12   It is a formal meeting to determine the facts.

13   Q.  Refusal to comply with instructions, is that different in

14   your mind from failure to comply with instructions?

15   A.  I misunderstood what your question was.  You weren't

16   asking about the "alleged" piece.

17   Q.  Right.  I'm asking about the refusal to comply as opposed

18   to failure to comply.

19   A.  I'm sorry.  Ask your question again.

20   Q.  Yeah.  It says "refusal to comply with instructions."  Is

21   that different in your mind and more serious than failure to

22   comply with instructions?

23   A.  Yes, I think there's a larger burden of proof for --

24   Q.  Meaning what?

25   A.  Well, I think that it, um -- there's a greater

1    responsibility to, uh, uh, demonstrate that it was

2    intentional.

3    Q.  When you made the decision to notice this investigation,

4    were you aware that Mr. Fresquez allegedly called the Federal

5    Railroad Administration to report misconduct that day?  Did

6    you know that?

7    A.  No.

8    Q.  Were you aware that Mr. Fresquez at least allegedly was

9    contending his supervisors were deleting defect reports out of

10   the system improperly?

11   A.  No.  No, I was aware of the fact that he may have

12   disagreed with his supervisors about his interpretation of

13   defects, but . . .

14   Q.  And were you recalling anything in particular, or was it

15   just over the course of his career?

16   A.  Well, there are several incidents that I was involved with

17   where he was in a disagreement with his supervisors about what

18   a defect was, but . . .

19   Q.  Did those disagreements have any bearing on your decision

20   to notice this investigation?

21   A.  No.

22   Q.  Let me show you again Exhibit 62, this e-mail that you

23   sent to Mr. Paz.  What was your purpose in sending this

24   e-mail?

25   A.  I had heard Mike's, uh, recitation of the events, and I

1   was encouraging him to be definitive in his answers.

2   Q.   Why?  I mean, why are you offering advice at all to

3   Mr. Paz?

4   A.   Well, newer supervisors typically -- and actually over the

5   course of 39 years I was involved in a lot of formal

6   investigations, and witnesses who were not definitive in their

7   answers and confident about the testimony they were giving

8   made it hard to determine what had actually happened.

9   Q.   Did you intend to change or shape Mr. Paz's testimony

10   during the investigation hearing?

11   A.   I did not.  And it's not included in this e-mail, but it's

12   certainly beyond just an assumption that that was my

13   expectation.  You go to the investigation and tell the truth.

14   Q.   What other involvement, if any, did you have in

15   Mr. Fresquez's eventual investigation and dismissal?

16   A.   That -- that was it, substantial, you know.

17   Q.   All right.  Let's go then to the next topic that was

18   brought up.  Let's talk about the track defects.

19        A general question:  Does BNSF inspect its tracks

20   more frequently than the FRA requires?  Or did BNSF?  I keep

21   forgetting you don't work there anymore.  Did BNSF inspect

22   railroad tracks at intervals that exceeded FRA requirements?

23   A.   They did.

24   Q.   What kind of day-to-day interaction did you have with

25   track inspectors at BNSF?

1   A.  It was sporadic, I would say.  Certainly not every morning

2   or every day, but here and there.

3   Q.  The 30-day defect rule, the non-class-specific defect

4   rule, did you try to keep your interpretation of that

5   regulation a secret?

6   A.  I didn't, but it's something I didn't force on my

7   supervisors because I think it's their territory to manage.

8   Q.  So help me understand.  You're the division engineer.  You

9   supervise the roadmasters; right?  There's no level in

10  between?

11  A.  No, technically there is not.

12  Q.  So was it your role, then, to tell roadmasters when to

13  approve tracks being taken out of service or when to object or

14  things like that?

15  A.  No.  I mean, we all received the same training.  In -- in

16  many cases or some of those cases the supervisors were former

17  inspectors themselves.  I mean, we all had basically the same

18  information.

19  Q.  How long were you the division engineer in Denver?

20  A.  Well, it seemed like a long time.  It was 10 -- 10 years.

21  Q.  Were you aware that during that time there were track

22  inspectors who would remove tracks from service if

23  non-class-specific defects hadn't been repaired?

24  A.  I think so.  I mean, it was something that I left to the

25  discretion of the supervisor and his inspector.

17-cv-00844-WYD-SKC          Carpenter - Cross          III - 641

1   Q.   Did you ever criticize the employees for having done that?

2   A.   I think that that would be counterproductive.

3   Q.   What do you -- explain, please.

4   A.   Well, we want an inspector who is confident and

5   knowledgeable.  It's -- it's basically a self-directed

6   exercise.  You inspect the track.  You are there by yourself.

7   You're not -- not with your supervisors.  You know, we need

8   those folks to make the right calls.  So if I snipe or

9   second-guess calls, that's -- that's, again, going to be

10  counterproductive.

11  Q.   What was your expectation or your desire, I suppose, in

12  terms of how frequently non-class-specific defects would be

13  repaired?

14  A.   How frequently?

15  Q.   Yeah.  What was your expectation in terms of when that

16  would happen?

17  A.   As soon as possible.  My goal, and this may sound like pie

18  in the sky, is a railroad with no defects.  It's not something

19  that I'm -- I'd rather do something else than fix some

20  defects.

21  Q.   Wouldn't -- but wouldn't it be safer just to remove tracks

22  from service after 30 days pass?  There's a non-class-specific

23  defect.  30 days come and go.  Repair hasn't been made.

24  Wouldn't it be safer to just remove that track from service?

25  A.   Not necessarily, but many of the non-class are nondescript

17-cv-00844-WYD-SKC          Carpenter - Cross          III - 642

1    and subjective in nature, and I can't say that I'm aware of

2    any, uh, derailment that was -- specifically pertained to a

3    non-class-specific defect.

4    Q.   Whether the defect is class specific or non-class

5    specific, if a track inspector or a roadmaster encountered a

6    condition that he or she believed was unsafe for train travel,

7    what was your expectation that they do?

8    A.   That they take the appropriate action.

9    Q.   Meaning what?  What options are available to them?

10   A.   Well, they could repair it.  They could -- they could --

11   in some cases, they could reduce the speed and continue to

12   operate.  In other cases, the track needed to be removed from

13   service.

14   Q.   You mentioned that you know other terminals had

15   non-class-specific defects -- tracks with expired

16   non-class-specific defects remain in service.  Do I have that

17   right?

18   A.   I cannot say that for -- for certain.  I mean, I didn't --

19   I didn't talk to my colleagues a lot about it, but the defect

20   numbers were available systemwide, so I could look and -- and

21   I wasn't tracking specific defects, per se, was just looking

22   at some total counts.

23   Q.   I see.  Did you believe that to be the case?

24   A.   I assumed that we -- we were not unique here.

25   Q.   Did you do anything to attempt to hide, either from the

1    FRA or from your bosses, the non-class-specific defects at

2    BNSF in your territory that were still in service?

3    A.   No.   Our records are subject to inspection by the -- by

4    the FRA at any time.   In fact, it's -- you know, it can be

5    unannounced.

6    Q.   Did you say "unannounced"?

7    A.   I think it can.   I mean, it's -- or very -- a very short

8    announcement.   We'll be there, you know, tomorrow to look at

9    your records.

10   Q.   Can you describe for the jury the process of the FRA

11   inspecting BNSF's track inspection records?

12   A.   Well, it used to be pretty -- pretty manual.   I mean, I

13   would have to -- I think in the past -- well, for one thing,

14   the FRA didn't look at a lot of records here.   A portion of

15   the FRA, the man that was concerned with rail defects, would

16   come in and look at our records about how we were managing

17   rail defects and, um -- but records were printed, and many

18   times he would take those back to the motel and look at them

19   at night and come back and say:   Well, it looks like you --

20   you misapplied a remedial action here.   Or, This is one that's

21   expired, and it's still showing in the system.   And I took

22   this list with me today, and I don't see the defect out there.

23   It's been repaired.   Or -- things like that, so . . .

24   Q.   Was the FRA ever critical of you for leaving tracks in

25   service after 30 days?

1  A.  No.  The FRA really didn't show much -- much interest in

2  that, in that portion of track inspection.

3          THE COURT:  All right.  We're going to take our

4  midmorning break.  Do you think we can finish this witness

5  before lunch, or is this going to extend past lunch?

6          MR. GOMAN:  I do, Your Honor.  I have two more

7  questions on cross-examination.  I would like to go ahead and

8  do direct examination before Mr. Carpenter leaves.

9          THE COURT:  Why don't you ask your two more

10  questions.  Then we'll take a midmorning break.  And if you go

11  to a third question, we will still take a midmorning break.

12  BY MR. GOMAN:

13  Q.  When did you retire, Mr. Carpenter?

14  A.  Oh, December 1st of '16.

15  Q.  Why did you retire?

16  A.  I don't know.  Why does anybody retire?

17  Q.  I can't ask you another question, so I have to leave it at

18  that.

19          MR. GOMAN:  No further questions, Your Honor.

20          THE COURT:  All right.  So do we have redirect on the

21  points that were covered in cross?

22          MR. THOMPSON:  Um, no, Your Honor.

23          THE COURT:  All right.  So what we're going to do,

24  we're going to take our break, and when we come back, if you

25  want to ask him direct examination questions, you may.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1      All right.  So we'll be in recess for 16 minutes.  We

2  will start again at 11:05, and we will go to not later than

3  12:30 before we take our lunch break today.

4      (Proceedings recessed 10:49 a.m. to 11:08 a.m.,

5        resuming outside the presence of the jury.)

6          THE COURT:  All right, let's bring the jury in.

7          MR. GOMAN:  Your Honor, there was one real quick

8  matter I was hoping to bring up before the jury comes in.

9          THE COURT:  Go ahead.

10         MR. GOMAN:  Mr. Cason Cole is here.  He's a witness

11 we plan to call.  He has to fly back to Dallas tonight.  I

12 talked to Mr. Thompson.  They can't call him out of order, but

13 Mr. Thompson does not object to having Mr. Cole appear via

14 videoconference tomorrow afternoon or Friday morning.

15         THE COURT:  Why can't he be called out of order?  I

16 mean --

17         MR. THOMPSON:  We have expert witnesses that we are

18 also paying for that have flights.  So it's just pick your

19 poison.

20         THE COURT:  How long will this witness's testimony

21 last?  The one you are talking about.

22         MR. GOMAN:  I believe his direct examination will be

23 20 minutes.

24         THE COURT:  What's he going to talk about?

25         MR. GOMAN:  He's going to talk about the June 4th of

17-cv-00844-WYD-SKC          Carpenter - Direct                    III - 646

1    2015 incident where he sent a text message to Mr. Fresquez

2    that has been alleged to have been retaliatory.

3              THE COURT:  I don't know.  Let's -- let's see where

4    we are when we break for lunch, and we can figure out what

5    should happen or not happen.

6              All right.  So the witness needs to leave the

7    courtroom if he is going to testify.

8              MR. GOMAN:  Yeah.

9              THE COURT:  But have him hang around in the witness

10   room.

11             MR. GOMAN:  Thank you, Your Honor.  That's all.

12             THE COURT:  All right.

13        (Jury in at 11:10 a.m.)

14             THE COURT:  All right, have a seat.

15             Let's continue.

16        **MARK CARPENTER, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

17   BY MR. GOMAN:

18   Q.  All right.  Mr. Carpenter, just a few more questions.

19   Because we didn't get to do this at the start, would you

20   introduce yourself to the jury?  Just tell them where you

21   live, first of all.

22   A.  I live in Bennett, Colorado.  Nobody knows where Bennett,

23   Colorado, is, but it's -- it's about 30 miles east on I-70.

24   Q.  You retired in December of 2016; is that right?

25   A.  Yes.

1  Q.  Have you worked since then?

2  A.  No.  For -- for pay?  No.

3  Q.  Any plans to go back to work at BNSF or anywhere else?

4  A.  Not at this time, no.

5  Q.  Okay.  I want the jury just to hear a little bit of

6  background about you.  How old were you when you came to work

7  at BNSF?

8  A.  20.

9  Q.  I guess, what was the railroad called back then?

10  A.  I started for a small regional.  We're from Missouri, and

11  I started for the Frisco Railroad in 1977.  Subsequent

12  mergers, two more mergers, wound up being the BNSF.

13  Q.  In your early career, did you move around a lot as a

14  railroader?

15  A.  I think we've counted up seven, seven moves, six or seven

16  or eight.  Something like that.  I'd have to go through it

17  again, but . . .

18  Q.  Is that unusual in the industry?

19  A.  I think typical.

20  Q.  When you hired out as a 20-year-old, what job did you do?

21  A.  Just track laborer.

22  Q.  How long were you a track laborer?

23  A.  I'm not sure exactly.  It was the hardest work I had ever

24  done.  It was hot and continuous.  Year maybe two, and then I

25  had the opportunity to be a truck driver and went from there.

1    Q.  Have you worked in the track department -- excuse me.

2           Did you work in the track department your entire

3    career at the railroad?

4    A.  I did.

5    Q.  Can you give us a sketch, just what positions you've held

6    and when you held them?

7    A.  That laborer's position, truck.  It's a union shop, so

8    seniority prevails.  Early on I had an opportunity to go to

9    apprentice foreman school.  I was selected by my supervisor.

10   And that was a six-week course.  And then gave me an

11   opportunity to bid on, um, foreman's positions.  Worked

12   production gangs.  Worked on a local section maintenance crew.

13          And then '81 or '82 went to Kansas City as an

14   assistant roadmaster there in the terminal.  Did that for a

15   while.  Went back to operating surfacing gangs for about a

16   year and some other -- other work.

17          And then I forget the year exactly, maybe '84, I had

18   recently gotten married, and we had a -- a small baby.  We

19   moved to Billings, Montana, and worked production gangs there.

20   Roadmaster at a little place called Forsyth, Montana, for six

21   or seven years.

22          Then we moved to Minneapolis and lived in the Twin

23   Cities for three years, and I worked in a capital planning

24   capacity there and traveled all across the northern tier of

25   states inspecting railroad and making recommendations and

1    plans for capital maintenance.

2           Moved from there to Lincoln, Nebraska.  Some terminal

3    construction at Lincoln.

4           Moved from there back to Springfield where I did more

5    capital planning work for six or seven years.

6           After that moved to Canyon, Texas, Amarillo, Texas,

7    and worked on new construction.  That was a fun job in -- in

8    Kansas and Oklahoma, double tracking.

9           And then in 2007 came here as the division engineer.

10   Q.  All of your 40-year career at BNSF was spent in the track

11   department; is that right?

12   A.  It was.

13   Q.  Now that you are retired, you said you're collecting a

14   pension from BNSF; is that right?

15   A.  That's correct.

16   Q.  You're not being paid to come in here and testify today?

17   A.  No, I'm -- I'm not.

18   Q.  I asked you if you would come in and testify, and you

19   agreed; right?

20   A.  Yes.

21   Q.  Do you remember Mr. Fresquez as an employee?

22   A.  I do.

23   Q.  How well did you know Mr. Fresquez?

24   A.  Probably as well as I knew other employees in his

25   capacity, I would say.

1   Q.  How often would you interact with Mr. Fresquez or any

2   track inspector, for that matter?

3   A.  I'll describe it in terms of numbers.  If our workforce is

4   80 people, hundred people, 20 or 25, upwards of 30 of those

5   would be inspectors.  Um, and the territory extends, you

6   know -- at one point it went from Amarillo all the way up to,

7   uh, Guernsey, Wyoming, if you're familiar with where that is,

8   north of Cheyenne, and then out to McCook.  So, you know, in

9   supervising that, that territory and those -- that number of

10  inspectors, it could be infrequent that I would be in personal

11  contact with -- with an inspector.

12  Q.  So if we get to Denver 2007, 2008, at any given time just

13  roughly how many track inspectors are you supervising?

14  A.  On the territory, or here in Denver?

15  Q.  On the -- on your territory as the division engineer.

16  A.  I'm guessing 25 to 30 percent at -- at some point.

17  Q.  Did you expect and believe that each of those track

18  inspectors were reporting track defects whenever they found

19  them?

20  A.  Well, it's critical to how we do our business.  I mean,

21  if -- if we intend to operate trains without derailments, you

22  have to have good inspections so you can make the repairs.

23  Q.  Did you expect that every one of your track inspectors

24  were placing slow orders when appropriate on those tracks?

25  A.  Yes.

1   Q.  Same question with taking tracks out of service.  Did you

2   expect that every one of the track inspectors you supervised

3   was taking tracks out of service when they determined that

4   that was the right and appropriate thing to do?

5   A.  That was one -- one of their tools, yes.  Or is one of

6   their tools.

7   Q.  Let's return to Mr. Fresquez then.

8           MR. GOMAN:  I'm going to show the witness Exhibit

9   A-18.

10  BY MR. GOMAN:

11  Q.  Mr. Carpenter, were you included on this e-mail dated

12  November 5th of 2010?

13  A.  I was.

14  Q.  Who is this e-mail from?

15  A.  Alton Damon Fry.

16  Q.  Remind the jury.  Who is he?

17  A.  He was working as a roadmaster at the time here in Denver.

18  Q.  Would he have been Mr. Fresquez's supervisor?

19  A.  He would have been.

20  Q.  I've just blown up the first few sentences here.  Without

21  going into any detail, do you, having seen it, recall the

22  event that's described in this e-mail?

23  A.  I'd have to read the whole e-mail, but yes, I have -- I

24  have a recollection of it -- recollection of it.

25  Q.  In general, does it concern a coworker's report of

1   misconduct by Mr. Fresquez?

2          MR. THOMPSON:  Your Honor, I object.  Mr. Carpenter

3   has already testified that he didn't consider any of the

4   previous, um, issues with Mr. Fresquez when charging him.

5   This 2010 e-mail is, therefore, irrelevant, especially given

6   the PEPA policy.

7          THE COURT:  Why is this relevant?

8          MR. GOMAN:  Your Honor, this e-mail is one example,

9   of several, of lenient treatment after Mr. Fresquez engaged in

10  the protected activity he is claiming led to his retaliation

11  in this case.

12         MR. THOMPSON:  Your Honor, we claim protected

13  activity in 2015 and 2016, not in 2010.

14         THE COURT:  All right.  There's a legal matter I need

15  to discuss with the attorneys.  I'm going to send the jury

16  back just for a few minutes.

17      (Jury out at 11:20 a.m.)

18         THE COURT:  All right, have a seat.

19         So, Mr. Thompson, I want you, as an officer of the

20  court, to tell me what specific protected activity you are

21  asserting in this case for purposes of your retaliation claim.

22         MR. THOMPSON:  Yes, Your Honor.  So it is the 2015

23  May report to the union, which is forwarded to Adam Miller.

24  It is the objection in 2015, I forget if it's April or May, to

25  Ryan Akers having Mr. Fresquez remove track.  It's the May

17-cv-00844-WYD-SKC          Carpenter - Direct                III - 653

1   2015 objection by Mr. Fresquez to Cason Cole's ordering him to

2   keep track in service.  It is the May 2016 objection to

3   Mr. Paz's orders and 2016 report to the FRA.

4          THE COURT:  Are you alleging any protected activity

5   prior to the 2015 and 2016 incidents you have just identified?

6          MR. THOMPSON:  No, Your Honor.

7          THE COURT:  All right.  And so everything you've

8   talked about earlier in time is background?

9          MR. THOMPSON:  Yes, Your Honor.

10          THE COURT:  Okay.  All right.  So then how is this

11   relevant if, in fact, the plaintiff is not alleging any

12   protected activity until 2015?

13          MR. GOMAN:  Your Honor, so the protected activity is

14   talking with his supervisors and sometimes disagreeing with

15   his supervisors about the proper report of track defects and

16   proper classification of track defects.  Mr. Fresquez has been

17   engaging in that same behavior since 2006 and 2007.  That's

18   his job.

19          This e-mail, and several others like it, demonstrate

20   that Mr. Fresquez was treated leniently by the company when it

21   knew he was engaging in at least alleged misconduct.

22          THE COURT:  But how does that have any bearing on the

23   protected activity that undergirds the retaliation claim

24   that's being tried now?  That's what I'm trying to understand.

25          MR. GOMAN:  Sure.  So two things.  First of all, I

1    would just note that in Mr. Fresquez's testimony and in the

2    Complaint in this case he alleged and the Complaint alleges

3    that every time he took tracks out of service, reported slow

4    orders, and reported defects he was engaging in protected

5    activity.  So that's how the case has been pled and up until

6    this point and up through Mr. Fresquez's testimony.

7              In addition, the allegation -- this particular

8    e-mail, A-18, deals with the --

9              THE COURT:  Let me see the whole exhibit here.

10             MR. GOMAN:  Yeah -- the underlying insubordination

11   event that led up to Mr. Fresquez's first charge of

12   insubordination in 2010, which was considered by Mr. Miller

13   when he made the dismissal decision.

14             THE COURT:  All right.  I don't think -- I think I've

15   got to hold the plaintiff to what is being alleged -- well,

16   let me put it this way, to what you now assert as protected

17   activity.  So what you are telling me, Mr. Thompson, is for

18   purposes of what you will assert in closing argument as to

19   protected activity, it's what you have identified as occurring

20   in 2015 and '16, and nothing before that, and everything

21   before that is background?

22             MR. THOMPSON:  That's correct, Your Honor.

23             THE COURT:  So I think under 403 the prejudicial

24   effect of this exhibit is outweighed by substantial prejudice,

25   as well as confusing of the issues.

1      So let me just read the rule here, which I know very

2  well, but I want to make sure there's no issue about what I'm

3  saying.  So 403 reads:  The court may exclude relevant

4  evidence if its probative value is substantially outweighed by

5  danger of one or more of the following:  unfair prejudice,

6  confusing the issues, misleading the jury, undue delay,

7  wasting time, or needlessly presenting cumulative evidence.

8      I don't think the last thing applies, but I think the

9  others might.  So under 403 I'm going to sustain the objection

10 and disallow the line of questioning as it relates to this one

11 exhibit.  I can't speak for other things you might want to

12 offer, and we will take them one at a time.

13      MR. GOMAN:  Since the jury is out, can we discuss

14 what I intend to go into next?

15      THE COURT:  Sure.  Go ahead.

16      MR. GOMAN:  What I intend to offer next is there's, I

17 believe, four more examples of roadmasters reporting that

18 Mr. Fresquez had failed to comply with their instructions.

19 What I'd like to ask Mr. Carpenter about is why in May of 2016

20 you decided to notice the investigation for refusal to comply

21 with instructions, for insubordination.  And his answer I

22 believe, as an offer of proof, is affected by this wasn't a

23 one-time event for Mr. Fresquez.  He had been reported to have

24 done similar things in the past.

25      THE COURT:  All right.  Let's hear some Q and A

1   outside the presence of the jury on that point.

2           MR. GOMAN:  Sure.

3           THE COURT:  Do an abbreviated version, but I want to

4   hear what the witness would say in response to those

5   questions.

6   BY MR. GOMAN:

7   Q.  Mr. Carpenter, were you aware that in 2010 Mr. Fry

8   reported to you that a foreman and Mr. Fry himself were

9   concerned that Mr. Fresquez had failed to comply with their

10  instructions?

11  A.  I was.

12  Q.  Did you initiate any sort of formal disciplinary

13  proceedings against Mr. Fresquez at that time?

14  A.  I'm sorry.  I don't know.

15  Q.  In 2011 Mr. Holton reported that Mr. Fresquez failed to

16  comply with his instructions.  Do you recall whether you

17  initiated disciplinary proceedings in 2011?

18  A.  I -- I don't think so.

19  Q.  In 2015 Cason Cole reported to you that Mr. Fresquez

20  engaged in -- or failed to comply with his instructions.  Did

21  you initiate any disciplinary proceedings in June of 2015?

22  A.  No, not in that case.

23  Q.  And what was different, then, about May 5th of 2016?  Why

24  did you decide to initiate this disciplinary process then?

25  A.  Well, I think it's appropriate for me to say that I don't

1    supervise the track inspectors.  Frontline supervisors do.  So

2    in the course of my tenure at Denver, there were a number of

3    supervisors.  And it may sound evasive, but I don't intend it

4    to be that way.  I think it's up to the individual supervisor

5    to develop their opinions, working relationships with the

6    employee group, rather than me predisposing them by saying,

7    So-and-So's a bad actor; you've got to do something here.

8    Everybody kind of starts out with a clean slate.

9          So it did appear that most of the supervisors had had

10   some, at least one, if not several, incidents with -- with

11   Brandon, and I'll simply say that the recent event was the

12   most clear-cut, it appeared to me.

13         MR. GOMAN:  That's an abbreviated version of what I

14   intend to walk through.

15         THE COURT:  Okay.  Well, here's what I think is

16   probably relevant, and under 403 the probative value would

17   probably be greater.  I will allow you to ask him to explain

18   why he took the action he took in 2016, but that needs to be

19   the springboard for his ability to talk about other things.

20   And if he can't really remember something that happened,

21   because he said he couldn't remember what happened in 2010 or

22   '11, I'm not going to let him talk about it, but I think it's

23   fair for him to recall, as accurately as he can, why he took

24   the action in 2016.  And so we'll just see where that takes

25   us.

1          MR. GOMAN:  Understood.  I guess I'd just note one

2    final concern.  Given that the case was pled to include

3    protected activity for protecting or reporting track defects,

4    et cetera, things he had been doing since the start of his

5    career, I stood up in opening statement and said, You are

6    going to hear about lenient conduct and lenient treatment by

7    BNSF up until 2016, and then I was accused of having just

8    tried to poison the well and paint Mr. Fresquez as just a bad

9    employee.  I believe that's going to lend some credence to

10   that argument if I'm now not permitted to introduce evidence

11   of lenient treatment from 2011 to 2016.

12          THE COURT:  Well, respond to that Mr. Thompson,

13   because I've got some thoughts, but I want to hear from you on

14   that issue.

15          MR. THOMPSON:  Two separate issues, Your Honor.

16   First, what counsel said in opening statements doesn't all of

17   a sudden open the door to otherwise inadmissible evidence.  I

18   can get up there and say whatever I want to.  That doesn't

19   mean now all of a sudden I can introduce whatever I want.  It

20   still -- you have to weigh the evidence's prejudicial value.

21          Second, it's worth noting in Mr. Carpenter's

22   deposition what he said when he was asked whether he

23   considered this information was no.  So even to the extent

24   he's now going to change his testimony, this evidence is still

25   unfairly prejudicial given his prior testimony.

1      THE COURT:  The other thing is, as you know, there's

2  a BNSF motion in limine regarding claim for retaliation for

3  taking tracks out of service.  In there BNSF argues that

4  plaintiff should not be permitted to argue that his

5  termination constituted retaliation for taking tracks out of

6  service.  BNSF says that 49 U.S.C. Section 20109(b)(1)(C), a

7  statute that was not pled in the Compliant, covers the act of

8  refusing to take railroad tracks out of service.  And then we

9  can quote from that, but I'm not going to do it.

10      What are you seeking through this motion as it

11  relates?  Because I think there's some relationship between

12  this motion and what I'm now hearing.

13      MR. GOMAN:  Well, that motion is specific just to

14  removing tracks from service.  I don't believe that motion

15  applies to reporting track defects or placing slow orders.  So

16  what I'm seeking in that motion is an order that Mr. Thompson

17  cannot say when Mr. Fresquez attempted to remove a track from

18  service that was protected activity.

19      THE COURT:  You're not saying that anyway, are you?

20      MR. THOMPSON:  Only when he did it over his, uh,

21  manager's instructions not to do it.

22      THE COURT:  Okay.  Is that limited to what happened

23  in 2015 and '16?

24      MR. THOMPSON:  Yes, Your Honor.

25      THE COURT:  All right.  Bryan, come here a second.

1    All right.  Here's what I'm going to do.  I'm going

2    to stick to what I said a moment ago.  I am going to disallow

3    this exhibit for the reasons noted.  However, I will allow you

4    to ask a question in front of the jury about why he took the

5    action he took in 2016.  Let's see where that goes and if

6    there's some issue that I need to reconsider.  But I don't

7    make advisory rulings, so I've got to sort of hear what the

8    answer is.  And the witness needs to be reminded that he is

9    under oath.  I'm not saying he is not telling the truth, but

10   he can only remember what he remembers, and I just heard him

11   say that really he was not, in effect, the direct supervisor

12   of the inspectors, track inspectors, and he relied on the

13   immediate supervisor to establish a relationship.  So it

14   sounds like he didn't have frequent contact with any of the

15   track inspectors, including not limited to Mr. Fresquez, other

16   than perhaps an infrequent contact with them.  So that has to

17   be taken into account so that the testimony is fair for both

18   sides.

19          All right.  All right.  Let's bring the jury back in.

20      (Jury in at 11:34 a.m.)

21          THE COURT:  All right, have a seat.

22          For the reasons noted outside the jury's presence, I

23   sustained the objection to the last exhibit, and it will not

24   be received at this time.

25          So you may proceed with your ongoing questions on

 1   direct examination.

 2            MR. GOMAN:  All right.

 3   BY MR. GOMAN:

 4   Q.  Mr. Carpenter, let's just jump right to it.  May 5th of

 5   2016, after receiving the phone call from Mr. Paz and

 6   reviewing his statement and after, I suppose, talking with

 7   Labor Relations, why did you decide to notice an investigation

 8   into Mr. Fresquez's misconduct?

 9   A.  It appeared to be a case of insubordination.

10   Q.  And why?  What about it made you conclude that?

11   A.  Well, I would have to look at Mike's statement again, but

12   it appeared that Brandon refused to do what he was instructed

13   to do.

14            MR. GOMAN:  Let me bring up, then, that statement.

15   BY MR. GOMAN:

16   Q.  And let me ask you this.  Did you believe that Mr. Paz had

17   a right to ask Mr. Fresquez to string-line the track?

18            MR. THOMPSON:  I'm going to object, Your Honor, to

19   leading.

20            THE COURT:  It is leading.  Sustained.

21   BY MR. GOMAN:

22   Q.  This is Exhibit 62.  Let me rephrase that.  This is the

23   statement of Mr. Paz's that you reviewed?

24   A.  Yes.

25   Q.  Okay.  Do you recall reading in there that Mr. Fresquez

1   was told to string-line the track?

2   A.  Yes.

3   Q.  Did that seem concerning or unusual to you?

4   A.  No.

5   Q.  Why not?

6   A.  Well, that's how you would identify that defect.

7   Q.  Did you think it was unusual or inappropriate for Mr. Paz

8   to ask Mr. Fresquez to do that?

9   A.  Absolutely.  That's Mr. Paz's job.  And it's also

10  Mr. Fresquez's job to be conversant with the tools and be able

11  to measure the track for defects.

12  Q.  In reading Mr. Paz's statement or Mr. Herzog's statement

13  or talking with Mr. Paz, do you recall any excuse or

14  justification being raised for Mr. Fresquez having failed to

15  measure the track?

16  A.  I do not.

17  Q.  All right.  Lastly, I'm going to switch topics now.  I'm

18  going to go to Exhibit A-43.

19          MR. GOMAN:  Let me show this to the witness.

20  BY MR. GOMAN:

21  Q.  All right.  Mr. Carpenter, can you read that e-mail, and

22  just tell me if you recall it.

23  A.  I do.

24  Q.  Just generally, without getting into the specifics yet,

25  what does this e-mail refer to?

17-cv-00844-WYD-SKC          Carpenter - Direct              III - 663

1   A.  It's a summary of a trip that I took with -- with Brandon

2   inspecting track.

3             MR. GOMAN:  Your Honor, I'd move for the admission of

4   Exhibit A-43.

5             THE COURT:  Any objection?

6             MR. THOMPSON:  No objection, Your Honor.

7             THE COURT:  All right.  A-43 is received.

8        (Defendant's Exhibit A-43 received.)

9   BY MR. GOMAN:

10  Q.  Mr. Carpenter, just more of a foundational question.  Why

11  are you sending this e-mail to the people on this list?

12  A.  Well, obviously to Brandon to confirm our discussion, and

13  I assume that Ryan Akers was his supervisor.  All those other

14  people were either supervisors or related somehow to track

15  inspection, so . . .

16  Q.  So this e-mail describes what?  What were you confirming

17  with Mr. Fresquez?

18  A.  Again, a summary of our time together.  I don't know as I

19  outlined the time exactly, but --

20  Q.  Sure.  If we look at the -- what's the date of that

21  e-mail?

22  A.  It's Thursday, April the 9th, at 5 o'clock in the

23  afternoon, 5:15.  So probably when I got done, I sat down and

24  jotted down some notes.

25  Q.  Was it unusual for you to write some notes about a

Julie H. Thomas, RMR, CRR                           (303)296-3056

1  ride-along you have done with a track inspector?

2  A.  No.  It's a training opportunity.  I want the supervisors

3  out riding with the inspectors as well, and these are some of

4  the things that you might look for.  Here's a suggested guide.

5  Here's how I handle it.

6  Q.  Why did you decide to do this ride-along with Mr. Fresquez

7  in 2015?

8  A.  Periodically ride along with the inspectors.  I mean, if

9  you are going to be responsible as the manager for track

10  maintenance of an area, you need to understand what the track

11  looks like yourself.  So it's a good opportunity to spot check

12  a section of track.  It's also a good opportunity to spend

13  some time with an inspector, reinforce best practices, do some

14  training, teaching, learn something yourself.  I mean . . .

15  Q.  So Mr. Fresquez in 2015 had been a track inspector since

16  2006 or so.  Does that sound right?

17  A.  Well, I think he had a variety of jobs.  I mean, off and

18  on.  I don't know the schedule.

19  Q.  Why wait until 2015 to have one of these ride-alongs with

20  him then?

21  A.  Why wait?

22  Q.  Yeah.

23  A.  I don't -- I wouldn't -- I wouldn't call it waiting.  It's

24  just that was an opportunity to.  I don't know as I was

25  avoiding.  See I don't have any record, per se, of every

1   inspection that I made with individuals.  Some were formal;

2   some were informal.  Some I would -- I would do some

3   spot-checking and verbally talk to the supervisor, if he

4   wasn't present, about what we saw.  Many times the supervisor

5   would be, uh, in our company, and we'd have that discussion

6   right then, so . . .

7   Q.  So talking about this ride-along with Mr. Fresquez then,

8   how was the conversation between the two of you?  Was it

9   hostile?  Was it friendly?

10  A.  No, I don't think so.  As I recall, it took us a while to

11  get on the track, and we had probably a wide ranging

12  discussion about a variety of topics.

13  Q.  Did you review any defects that Mr. Fresquez had reported?

14  A.  During the course of this trip?

15  Q.  Yes.

16  A.  I don't know that -- that they were specifically defects

17  that he had initiated, but it was a defect list.

18  Q.  Did you make any recommendations to Mr. Fresquez about

19  whether certain defects could be removed?

20  A.  I did.

21  Q.  Why?

22  A.  Because we, during our inspection, did not find those

23  defects or found those defects to be in error, or there was

24  something that needed to be adjusted about them.

25  Q.  Do you know whether with each of those defects they had

17-cv-00844-WYD-SKC          Carpenter - Direct               III - 666

1   originally been reported by Mr. Fresquez?

2   A.  I don't.

3   Q.  So was this e-mail intended to be a criticism of

4   Mr. Fresquez?

5   A.  It was, again, intended to be a summary in writing of what

6   we covered that day.

7   Q.  Did you find or come across any defects that were properly

8   reported and had been properly logged?

9        MR. THOMPSON:  Objection:  leading again.

10       THE COURT:  Sustained.

11  BY MR. GOMAN:

12  Q.  When -- when you were doing your inspection, you said you

13  reviewed defects that had been reported on this territory?

14  A.  Yes.

15  Q.  We talked about the ones that you recommended that were

16  going to be removed?

17  A.  Correct.

18  Q.  Were there other defects that you took no issue with?

19  A.  I think so.

20  Q.  Okay.  Are any of those documents here in this e-mail?

21  A.  I don't think so.

22  Q.  Why didn't you document those?

23  A.  They didn't need adjustment.  I mean, the list was

24  accurate.

25  Q.  Okay.  When you were finished with this ride-along with

Julie H. Thomas, RMR, CRR                        (303)296-3056

1    Mr. Fresquez, how did you leave things with him?

2    A.  Uh, knowing me, I probably verbally said:  Now, we talked

3    about XYZ, and, you know, I'd like this damage fixed in the

4    truck and, uh, want you to get the vehicle detailed and --

5    there's just some incidental information in here reminding me

6    of what the gate crossing activation code is at Kalamath and

7    some things like that, so just a general summary.  I assume it

8    was -- it was a suitable trip.

9    Q.  How did Mr. Fresquez seem to you?  Did he seem upset?

10   A.  No.

11   Q.  Did he seem pleased?

12       I asked that question poorly.  Did he seem upset?

13   A.  No.

14   Q.  Do you recall there being arguments or disagreements about

15   track defects?

16   A.  With me?

17   Q.  Yeah, on this ride-along.

18   A.  No.

19   Q.  Do you recall any concerns raised by Mr. Fresquez about

20   supervisors or roadmasters behaving inappropriately or any --

21   A.  You know, I don't specifically, no, no -- you know, he --

22   he has a word with me about, uh, you know, something specific.

23   I don't recall anything.

24       MR. GOMAN:  Okay.  Thank you, Mr. Carpenter.  I don't

25   have any more questions.

1          THE COURT:  All right.  Cross-examination on those

2   points only.

3                        **CROSS-EXAMINATION**

4   BY MR. THOMPSON:

5   Q.  All right.  Mr. Carpenter, I'm showing you Plaintiff's

6   Exhibit 30, which is already into evidence.

7          COURTROOM DEPUTY:  I'm sorry.  You said 30?

8          MR. THOMPSON:  Yes, sir.

9   BY MR. THOMPSON:

10  Q.  Do you recognize this document?

11  A.  It looks like the compliance manual.

12  Q.  That's the one you talked about was published by the FRA?

13  A.  Yes.

14  Q.  Turn to page 201.

15         MR. GOMAN:  Your Honor, I object to this as outside

16  the scope.

17         THE COURT:  Yeah, how is this -- this doesn't appear

18  to be what was covered.  How does this have any relationship

19  to what I heard on the direct examination?

20         MR. THOMPSON:  Mr. Carpenter testified that it's

21  unclear, as far as I understand his testimony, it's unclear as

22  to whether the FRA requires tracks be taken out of service

23  after 30 days.

24         THE COURT:  All right.  I'll allow it.

25  BY MR. THOMPSON:

1    Q.  Mr. Carpenter, I want you to just read to yourself the

2    highlighted portion.  Let me know when you are done.

3    A.  Okay.

4            Okay.

5    Q.  Is there anything that's unclear about this sentence?

6    A.  Not in the compliance manual, no.

7    Q.  Thank you.

8            MR. THOMPSON:  Thank you, Mr. Keech.

9    BY MR. THOMPSON:

10   Q.  I think you had also said you weren't aware of any trains

11   that had derailed as the result of a non-class defect.  Is

12   that right?

13   A.  I don't recall any.

14           MR. THOMPSON:  I'm going to show just the witness

15   Plaintiff's Exhibit 59.

16   BY MR. THOMPSON:

17   Q.  I'm going to highlight a portion I'd like you to read,

18   again, just to yourself.  Let me know when you are done.

19   A.  Okay.

20   Q.  Did you know -- let me actually -- sorry, I cut you off.

21   I want you to go to the next page and read the rest of it, and

22   then let me know when you've done that, please.

23   A.  Okay.

24   Q.  Did you know that on July 16th, 2015, a BNSF train

25   derailed loaded with oil?

1    A.  I may have.

2    Q.  Do you have any reason to dispute that?

3    A.  No.

4    Q.  Homes had to be evacuated?  Any reason to dispute that?

5    A.  I'm not sure -- whose report is this?

6    Q.  It is Joe Lydick's, an FRA expert who testified in this

7    case.

8    A.  Okay.  I don't -- don't know him, but no, I wouldn't have

9    any reason to dispute it.

10   Q.  No reason to dispute that homes had to be evacuated?

11   A.  Oh, that homes had to be -- could have been.

12   Q.  Any reason to dispute that it was a non-class defect that

13   caused the derailment?

14   A.  Again, I don't know enough about it to know.

15   Q.  Okay.  Thank you.

16         MR. THOMPSON:  Thank you, Mr. Keech.

17   A.  Where was that exactly?

18   BY MR. THOMPSON:

19   Q.  Let me see.  I can read what Mr. Lydick writes, if you'd

20   like.

21   A.  Oh, the Glasgow subdivision.

22   Q.  "On July 16, 2015 at approximately 5:45 p.m. (MDT)

23   westward BNSF Loaded Unit Petroleum Crude Oil Train" -- then

24   it gives the train number -- "derailed 22 cars, line items 77

25   through 98 (consist positions 79 through 70 [sic]), at

1    milepost 167.2 on the Glasgow Subdivision of the BNSF's

2    Montana Division."

3    A.  Okay.

4            MR. THOMPSON:  John, did you say that's Exhibit 62?

5            MR. STONE:  62.

6            MR. THOMPSON:  Plaintiff's?

7            MR. STONE:  Plaintiff's.

8    BY MR. THOMPSON:

9    Q.  I'm going to pull up for you your e-mail to -- maybe I'm

10   going to, if I can.

11           All right.  We talked about this e-mail earlier.  We

12   know who Michael Paz is.  I forgot to ask you who Everett

13   Percival is.

14   A.  Everett Percival was the conducting officer in the

15   investigation.

16   Q.  He would be the hearing officer?

17   A.  Yes, the hearing officer.

18   Q.  All right.  I see -- I'm going to highlight a portion for

19   you.  It says:  "Another may be that there was a safety

20   concern, I don't believe that's true but be thinking about how

21   you would respond to that."

22           Do you see that?

23   A.  I do.

24   Q.  What was the safety concern to which you were referencing?

25   A.  Well, I don't know.  Apparently it was speculation on my

17-cv-00844-WYD-SKC          Carpenter - Cross          III - 672

1   part about -- I mean, I didn't -- I didn't read anything in

2   any statements or hear anything that led me to believe there

3   was a safety concern.

4   Q.  Do you think it was Brandon Fresquez alleging that

5   Michael Paz was telling him to misreport a track defect?

6   A.  No, not necessarily.  It could have been a track

7   protection concern.  I mean, there's several ways to interpret

8   that.

9   Q.  What would the track inspection concern have been in this

10  instance?

11  A.  Track protection concern.  You know, the employee's

12  authority to be at the location on the track.  I guess I'm not

13  sure what I was thinking about then.

14  Q.  Could you have been thinking about Mr. Fresquez calling

15  the FRA?

16  A.  No, I guess I was unaware that he called the FRA.

17  Q.  You talked to Michael Paz before sending this e-mail;

18  right?

19  A.  I'm sure I did.

20  Q.  And before charging Brandon Fresquez with insubordination?

21  A.  It seems like it would be appropriate to talk to the guy

22  that was there, yes.

23  Q.  He didn't mention to you that Brandon had told him he had

24  called the FRA?

25  A.  No, I don't recall him saying that.  And I'm not really

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-cv-00844-WYD-SKC          Carpenter - Cross                III - 673

 1   sure how that would apply, but . . .

 2   Q.  Let me ask you about the defect they were -- the location

 3   they were at with Mr. Herzog, Mr. Paz, and Mr. Fresquez.  Are

 4   you familiar with that location?

 5   A.  Um, you know, it's been a couple years, but I -- yes.

 6   Q.  Okay.  I mean, it's the type of defect that would be a

 7   major undertaking to repair; right?

 8   A.  Well, you are asking about the defect?  You asked about

 9   the location.

10        MR. THOMPSON:  Actually, Mr. Keech, let's turn that

11   off because I'm not going to ask him about A-70 yet.  Thank

12   you.

13   BY MR. THOMPSON:

14   Q.  The location they were at on May 5, 2016 --

15   A.  I think was south Denver, yes.

16   Q.  Are you familiar with that defect?

17   A.  Uh, surface alignment 62.  I think it's a geometry car

18   defect, if I'm not -- well, yeah, it is.

19   Q.  So the testimony in this case so far has been it would be

20   a huge undertaking to repair this defect.  Any reason to

21   dispute that?

22   A.  I don't know how huge it is.  It can be a little difficult

23   to find.

24   Q.  The testimony in this case is even if they had wanted to,

25   they couldn't have repaired it with the people and machines on

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   hand that day.  Any reason to dispute that?

2   A.  I don't -- I don't have that information.  I don't have

3   that information.

4           MR. THOMPSON:  Now let's please publish A-70 to the

5   jury.

6           THE COURT:  Publish what?

7           MR. THOMPSON:  Exhibit A-70, Defendant's Exhibit

8   A-70.

9   BY MR. THOMPSON:

10  Q.  Any idea why this defect on that same day is being showed

11  as repaired?

12  A.  Well, unless Mr. Paz and Mr. Herzog determined that it

13  wasn't there or had been repaired.  Again, I'm not recalling

14  what the background was, whether it had been -- a repair had

15  been attempted or -- or what the situation was.

16  Q.  I will represent to you that Mr. Herzog has testified in

17  this case and will come into this courtroom and testify the

18  defect existed and it wasn't repaired.  Does this Exhibit A-70

19  then surprise you?

20  A.  Well, if -- yeah, that would seem to be a conflict in his

21  testimony.

22  Q.  It would seem like Michael Paz went into the system and

23  violated federal law by misreporting the defect, wouldn't it?

24  A.  I don't -- I'm not sure how Michael Paz is involved here.

25  Q.  Well, good point, because his name is not on this.

Julie H. Thomas, RMR, CRR                        (303)296-3056

1          There were three people at the defect that day;

2    right?

3    A.  Again, as far as I know.

4    Q.  Brandon was fired, so he wouldn't have had access to BNSF

5    systems.  Right?

6    A.  Uh, yes, that happened fairly promptly.  We took him out

7    of service.

8    Q.  Jay Herzog has testified he didn't make this repair.  In

9    fact, he doesn't even use this system.  Any reason to dispute

10   that?

11   A.  I'll say no.  I don't -- I mean, it's fairly simple to

12   use.  I don't know why he wouldn't use it.

13   Q.  That leaves one person out of those three.  Who is that?

14   A.  That were at the derailment?

15   Q.  Yep.

16   A.  You are wanting me to speculate that Mike Paz showed this

17   repaired when it wasn't?  I can't do that.

18   Q.  Out of the three people, who's left that we haven't talked

19   about?  We have talked about Jay Herzog?

20   A.  Of the people I am aware of, yes.

21   Q.  Michael Paz; right?

22   A.  Right.

23          MR. THOMPSON:  I have nothing further.

24          THE COURT:  All right.  Any redirect?

25          MR. GOMAN:  No.  Thank you.

```
17-cv-00844-WYD-SKC              Jury Trial                    III - 676
```

 1            THE COURT:  You may step down.  You are excused.

 2            Is this witness excused?

 3            MR. THOMPSON:  Yes, Your Honor.

 4            THE COURT:  You may return to the booming metropolis

 5   of Bennett, Colorado.

 6            THE WITNESS:  Do you know where it is?

 7            THE COURT:  I do, and it's not a booming metropolis.

 8            All right.  Call your next witness.  And we are going

 9   to stop in about 20 minutes to take our lunch break.

10            MR. THOMPSON:  Michael Paz.

11            THE COURT:  All right.

12            MR. THOMPSON:  Calling him adversely, Your Honor.

13            THE COURT:  All right.  Before this witness comes,

14   it's clear to me now it will be impossible to have this

15   gentleman testify, whoever, and I don't necessarily like video

16   deposition -- testimony, but if that's something the parties

17   agree to, I won't oppose it, but I want to move this -- let's

18   continue to move this trial along.

19            So do you have any issue with this other gentleman

20   testifying by video if it can be arranged?

21            MR. THOMPSON:  Mr. Cole?  No, Your Honor.

22            THE COURT:  All right.

23            MR. GOMAN:  We'll release him for the day.

24            THE COURT:  All right.

25            COURTROOM DEPUTY:  Please raise your right hand.

1          (The defendant was sworn.)

2              COURTROOM DEPUTY:  Please be seated.

3              Please state your full name, and spell your full name

4     for the record.

5              THE WITNESS:  Michael Paz, M-i-c-h-a-e-l, P-a-z.

6         **MICHAEL PAZ, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

7     BY MR. THOMPSON:

8     Q.  What's your job title?

9     A.  I am a roadmaster.

10    Q.  That's a first-level management?

11    A.  Yes, FLS supervisor.

12    Q.  Frontline supervisor?

13    A.  Frontline supervisor, yes.

14    Q.  What were you in 2016?

15    A.  The same position.

16    Q.  Mr. Fresquez reported to you?

17    A.  Yes, he did.

18    Q.  And you reported to Mr. Carpenter?

19    A.  That is correct.

20    Q.  What are scorecards?

21    A.  I guess the best way I can describe them, it's kind of

22    like a -- it's a metric system of different categories,

23    safety, budget, velocity, testing car, miles, et cetera,

24    defects that are in the track found by geometry cars.  And

25    it's like a metric system goals that we have, and we try to

1    meet all those numbers.  It gives us kind of like a ranking, I

2    guess you would call it.

3    Q.  Speed of trains over the territory affects your ranking.

4    For example, if you have slow orders or tracks out of service

5    that are slowing trains, that can negatively affect your

6    ranking.  Right?

7    A.  Yes, it could.

8    Q.  Mr. Carpenter told you these were a big deal to him, very

9    important; right?

10   A.  Mr. Carpenter did put a lot of emphasis on the scorecard,

11   yes.

12   Q.  So let's talk about how you can reduce slow orders and

13   taking rails out of service.  You can repair defects; right?

14   A.  Correct.

15   Q.  In order to do that, you need track time.  So you need to

16   tell trains not to run so you can get men out on the track.

17   A.  Yes.

18   Q.  You need capital.  You need the machines and manpower and

19   rail to fix it.

20   A.  Correct.

21   Q.  You don't control how much track time you get.

22   A.  So a big part of my role as a roadmaster, I control the

23   planning aspect of it.  So every week I have to send in plans

24   to Fort Worth, the planner we have, and they put holds on

25   trains so I can make the repairs I request to make.

1    Q.  Fort Worth has to approve that.

2    A.  They approve it, yes.

3    Q.  You do not have any control over how much manpower or

4    capital you are given.

5    A.  No, I do not.

6    Q.  And if you go over budget making repairs, your boss is

7    going to be on you about that.

8    A.  Uh, I guess I wouldn't say "on me."  He would ask the

9    question.  So I have to track where the dollars went just to

10   show where I spent the money if I go over.

11   Q.  That's something you are going to need to explain to your

12   manager?

13   A.  Yes.

14   Q.  So that's if you honestly want to report -- repair defects

15   and keep trains moving, that's how you do it; right?

16   A.  Did you say if I honestly wanted to -- honestly wanted to

17   do it?

18   Q.  Yeah, legitimately, not violating the law.  What you do is

19   you repair defects so the trains can continue to run; right?

20   A.  Correct, yes.

21   Q.  Another way to do it, though, would be just to remove slow

22   orders, regardless of whether they should be in place.  That

23   will increase velocity; right?

24   A.  That would be illegal.  We wouldn't be allowed to do that.

25   Q.  That wasn't my question.  My question is:  If I remove a

1    slow order illegally, that would allow me to operate a train

2    over it; right?

3    A.  If it didn't derail, essentially, yes.

4    Q.  If I deleted defects from the system, that would allow me

5    to continue to move trains over the territory.

6    A.  Repeat that one more time, please.

7    Q.  Sure.  Another thing you could do, if you are a dishonest

8    manager, you could delete defects from the system, thereby

9    keeping trains running.

10   A.  If you were dishonest, yes.

11   Q.  So let's talk about that.  What are non-class defects?

12   A.  There's a category of non-class defects.  So basically

13   it's a -- a non-class defect would be deemed -- it's an FRA

14   terminology that they use.  It's a minimum standard guidelines

15   that they give us.  FRA is Federal Railroad Administration.

16   If the defect meets that category as non-class, you have

17   30 days to repair it or remove the track from service.

18   Q.  So if the defect is not repaired within 30 days, what's

19   supposed to happen?

20   A.  Remove from service.

21   Q.  Who requires that?

22   A.  The FRA.

23   Q.  The Federal Railroad Administration?

24   A.  Correct.

25   Q.  That's a federal regulation?

1    A.  Yes, it is.

2    Q.  What did Mark Carpenter think should happen when defects

3    were more than 30 days old?

4    A.  Um, well, there was some -- you know, he kind of, uh -- he

5    had his interpretation of it.  We have had a few

6    conversations.  If you were to look in the FRA manual, I

7    believe it just says that the defect must be repaired within

8    30 days, and it doesn't have the verbiage "remove" -- or

9    "remove track from service."  So he explained that to us a few

10   times.  I'd collaborate back with him that my understanding

11   was that the track should be removed from service, and then he

12   was pretty firm in his beliefs that it didn't state that; it

13   just stated that it must be repaired within 30 days.

14   Q.  Mr. Carpenter believed you could continue to run trains

15   even if defects had not been repaired within 30 days; right?

16   A.  Yes, he made that belief to me before.

17   Q.  And he told you that's because he thought the regulation

18   was unclear.  It didn't specify what's supposed to happen

19   after 30 days.

20   A.  Correct.

21        MR. THOMPSON:  Please show the witness and the jury

22   page 201 of Plaintiff's Exhibit 30.

23        Oh, I need to plug in.  I'm sorry.  Now please show

24   the witness and jury Plaintiff's Exhibit 30.

25   BY MR. THOMPSON:

1    Q.  Do you recognize what this document is here?  Maybe it's

2    helpful if I go to page 1 of it first.

3            Do you recognize this document?

4    A.  The, um -- yeah, the compliance manual for the FRA.

5    Q.  It's published by the FRA?

6    A.  Yes.

7    Q.  Okay.  I'm going to bring you to page 201.  I'm going to

8    have you read the highlighted portion to yourself.

9    A.  Okay.  I've read it.

10   Q.  Do you think anything is unclear about what I've

11   highlighted?

12   A.  To my understanding, no.

13           MR. THOMPSON:  Thank you, Mr. Keech.

14   BY MR. THOMPSON:

15   Q.  You told Mark Carpenter you disagreed with his

16   interpretation?

17   A.  Yes.

18   Q.  On a couple of different occasions at least, you told

19   Mr. Carpenter you disagreed.

20   A.  That would be correct.

21   Q.  Did Mr. Carpenter change his mind?

22   A.  Um, no, he still had his same belief.

23   Q.  Did you report him to the FRA?

24   A.  No.

25   Q.  Did you report him to Adam Miller?

 1   A.   No, I did not.

 2   Q.   Did you call the BNSF hotline?

 3   A.   No.

 4   Q.   Did you call in-house counsel for BNSF?

 5   A.   No, I did not.

 6   Q.   Did you call anybody?

 7   A.   Um, no.  I've had some conversations with Doreen Powers.

 8   She's our MEC, manager engineering certification.  She kind of

 9   deals with FRA training.  We talked about on the disagreement

10   of beliefs with Mark and what, kind of, her take was, just a

11   casual conversation.  She sided with the 30-day rule being out

12   of service.  And I didn't report it to anybody because Mark

13   never directed me that I was to follow his guidance.  He just

14   shared his belief and his understanding and let myself and

15   other roadmasters manage it with our belief.

16   Q.   You followed his instructions on his belief of how he

17   interpreted the rule.  I mean, you followed his system; right?

18   A.   No, I didn't.

19   Q.   Do you remember when you were deposed in this case?

20   A.   Yes.

21   Q.   You were placed under oath?

22   A.   Yes.

23   Q.   Did you tell the truth?

24   A.   Yes.

25   Q.   I'm going to bring you to page 28, line 23.  I'm going to

1    read it.  I want you to let me know if I read it correctly.

2           Here's what I asked:  "Here is what I'm asking:  Did

3    you say, I don't care what Mark says, I think Mark is wrong,

4    I'm going to do it my way.  Or did you say, okay, Mark's my

5    boss, and I got to do what he says?"

6           You answer:  "Two ways I can answer that.  I follow

7    my supervisor's instructions on his beliefs of how it read

8    under his guidance, I followed his system."

9           Do you see that?

10   A.   Yes.

11   Q.   Did I read any of that incorrectly?

12   A.   Uh, no, not incorrectly on that piece, no.

13   Q.   You told the employees under you to do the same; right?

14   A.   No.  The part that you didn't read on there states what I

15   told my employees --

16   Q.   All right.

17   A.   -- that followed the next sentence where you stopped.

18   Q.   All right.  I'm going to read -- show you now page 29 of

19   your exhibit [sic] at line 8.

20          I ask you:  "Did you ever relay Mark's interpretation

21   of the rule to any of the employees you supervised?"

22          Your answer:  "I don't recall any exact

23   conversations, but I'm sure maybe it was probably discussed."

24          Did I read that correctly?

25   A.   Um, yes.

1        MR. THOMPSON:  Thank you, Mr. Keech.

2   BY MR. THOMPSON:

3   Q.  After your deposition, but before testifying here, did you

4   meet with BNSF's lawyers?

5   A.  After my deposition, is the question?

6   Q.  Yeah, and before today.

7   A.  Yes.

8   Q.  Is there anything else about your deposition, after

9   meeting with them, you want to change?

10  A.  I don't believe so, no.

11  Q.  All right.  Let's talk about when track inspectors and you

12  disagree about defects.  I imagine there's been times where

13  you and track inspectors have disagreed as to whether a defect

14  is present.  Is that right?

15  A.  Yes.

16  Q.  When that happens, do you talk to the inspector, see if

17  you can reach an agreement?

18  A.  Yes.

19  Q.  But you don't always reach an agreement, I assume.

20  A.  Uh, sometimes we, you know, we don't -- we can't come to

21  an agreement on our -- on that, no.

22  Q.  I will give you an example.  There was an example where

23  Brandon brought you out to a spring frog that he thought was

24  broken.  You thought it was not.  Right?

25  A.  Correct.

17-cv-00844-WYD-SKC                  Paz - Direct                    III - 686

1    Q.  You left that track in service?

2    A.  Um, depending on what spring frog you are talking about.

     Do you have more details on the spring frog?

4    Q.  Sure.  We can pull up a picture.  Will a picture of it

5    help?

6    A.  It could, yes.

7    Q.  Okay.  Actually, let's go about this a different way so

8    I'm not dinking around with electronics for a little while.

9           Do you know if Mr. Dunn subsequently ordered a frog

10   to replace it?

11   A.  Um, Mr. Dunn's ordered frogs in the past.  Do you have a

12   specific example that you can --

13   Q.  Yeah.  So I'm talking about the time you went out with

14   Brandon to a frog.  You thought it was okay to run trains

15   over.  Brandon did not.  Did that ever happen?

16   A.  I -- ask the question.  I guess if you are asking me to --

17   was that an example of what you were trying to get a question?

18   Can you repeat that?

19   Q.  Sure.  Do you recall going to a spring frog with Brandon?

20   Brandon thought the track should be taken out of service.  You

21   thought the track should remain in service.  Did that ever

22   happen?

23   A.  For the vague question, because we have multiple, multiple

24   spring frogs out there, I would say yes, there's probably been

25   times.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC              Paz - Direct                III - 687

1   Q.  Where you guys dis- -- how often were you guys disagreeing

2   about whether a spring frog was broken?

3   A.  I guess -- I don't know.  I don't have a number to give

4   you where we disagreed, but I'm just saying there could have

5   been a frog out there that's a spring frog that we could have

6   disagreed whether track should have been or not been in

7   service.

8   Q.  Do you have any reason to dispute that you kept the track

9   in service?

10  A.  Once again, sir, you didn't give me an example of a time

11  or a place or anything like that, so it's hard for me to

12  answer that question unless you have a specific.

13  Q.  The defect I'm talking about is at milepost 539.1.  Does

14  that refresh your recollection?

15  A.  I know the area.  It's a newer construction area.

16  Q.  Do you recall a time you were out there and Brandon and

17  you disagreed about whether a spring frog was broken?

18  A.  The only thing I recall with a disagreement we had there,

19  because it was new construction so it stands out, there was a

20  new spring frog that was installed, so new.  It was brand-new

21  track.  And the best way I describe it, Brandon had looked in

22  the engineering instructions and said that the base was broke

23  or cracked or something of that nature.  The best way that --

24  when I went out to the job site, the best way I can describe

25  it, if you were to take a screwdriver and O-ring pick and you

Julie H. Thomas, RMR, CRR                            (303)296-3056

17-cv-00844-WYD-SKC                Paz - Direct                        III - 688

1    were to scratch the surface of steel, which is what the

2    component was made out of.  It was a scratch.  Brandon had

3    seen that and indicated that it was broken and should be

4    removed from service.  And I said:  Brandon, that's a scratch

5    to me.  It's not broke.  The rail's not broke or anything like

6    that.

7         He disagreed.  We could not come to a solution, so

8    the track -- I said:  Brandon, I'm putting my name on it.

9    I'll take responsibility for it since I'm the roadmaster.

10   Thank you for your concern, but this isn't a break in my

11   judgment.

12        I left the track in service for that reason.  And I

13   believe some time had passed.  I think Mark went on vacation.

14   I might have been on vacation as well.  David Dunn was my

15   assistant.  So when they did this, the spring frog -- so it's

16   a moving component.  When a train goes through this, this

17   539.1, it -- all the direction went through the moving part of

18   the frog, so it wore out the springs and stuff in it

19   consistently.  It was a consistent maintenance, uh, revolving

20   door.  We constantly had to perform maintenance on this

21   location.  So the covering DE was Scott Frederick at the time,

22   I believe.  He gave the authority to spend the money to get a

23   different type of frog that didn't have moving components, and

24   they installed it with that.

25   Q.  Did you know that while you were on vacation Mr. Fresquez

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                 Paz - Direct                    III - 689

 1   contacted David Dunn and they went out there together?

 2   A.  Uh, um, I guess not exactly, but --

 3   Q.  And Mr. Frederick went there with them too.  Did you know

 4   that?

 5   A.  I knew Mr. Frederick ordered the frog I just described,

 6   yes.

 7   Q.  Did you know that he ordered the frog after going out

 8   there with Brandon and confirming, just as Brandon had told

 9   you, that the spring frog was broken?

10   A.  Well, I recall the conversation when I got back with

11   Mr. Carpenter about Mr. Frederick ordering the new frog.  And

12   it was described to me that it was because of all the -- the

13   main line movement went through the turnout, which was the

14   part that opens consistently.  Scott Frederick, based on that,

15   the way that I -- it was told to me, that he ordered it for

16   those reasons, that they wanted to change the design of it so

17   we didn't have the revolving door of maintenance on it.

18   Q.  Oh, so it's just happenstance that while you were on

19   vacation and Brandon brought them out there, they decided to

20   order a new one.  That's what you are telling us?

21   A.  Yes, that's the truth that I was given, yes.

22   Q.  Let me ask you this, then.  You and Brandon disagreed

23   about what should be done with the track; right?

24   A.  At that location?

25   Q.  Yes.

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1    A.   Yes.

 2    Q.   Did you call the FRA to ask?

 3    A.   No.

 4    Q.   You just overruled Brandon.

 5    A.   Uh, with my experience, I didn't feel that it was an

 6    issue.

 7    Q.   That's all that matters, right, your experience?

 8    A.   No.  If that was the case, I wouldn't have took Brandon's

 9    concerns and I wouldn't have taken the time to go out to the

10    field and verify with him.  So, no, I wanted to see -- I

11    trusted that he had a concern.  Otherwise he wouldn't have

12    called me.  Therefore, I went to the field to see what his

13    concern was and if there really was.

14    Q.   When there's a disagreement about whether a track should

15    be taken out of service, what's safer to do:  leave the track

16    in service, or take it out of service?

17    A.   Well, we tell all our employees -- a phrase we use on BNSF

18    is "When in doubt, pull it out."  So if you're unsure, then

19    remove it from service, and then, you know, supervisor,

20    et cetera, other track inspectors, may come out and help make

21    that decision.

22    Q.   You didn't do that in this case.

23    A.   Yes, I just described that I went out to the field and I

24    met with Brandon.

25    Q.   You didn't call anybody else to get any other opinions.

1  A.  No, not that I recall at the time, no.

2  Q.  All right.  So I'd like to go to May 5th of 2016.  Do you

3  remember that date?

4  A.  Not -- um, not exactly, but if you refresh my memory, I --

5  Q.  Sure.  The day Brandon was fired.

6  A.  The day that he was insubordinate?

7  Q.  Sure.  Does that help?

8  A.  Well, I'm just saying because I think it was -- if it was

9  the day that we were in the south Denver where he was

10  insubordinate, wouldn't have been the day he was fired.  He

11  was removed from service pending investigation.

12  Q.  Everybody that's pending investigation is always fired;

13  right?

14  A.  No.

15  Q.  As you sit here today, can you name one person who's gone

16  all the way to an investigation and received no discipline

17  whatsoever?

18  A.  Um, yeah.  Darrell -- Darrell Law.  He's a track

19  inspector.  Well, he is now.  At the time he was a regulator

20  operator, which is just an on-track machine.  He had struck

21  something.  We went to -- with the machine and caused some

22  damage.  Went to investigation and determined all the facts,

23  whether he was at fault, if he could have done something

24  different.  And it was deemed he was not at fault.  He

25  received back pay, and he is still working for us today.

17-cv-00844-WYD-SKC                Paz - Direct                III - 692

1    Q.  All right.  So you've got one of your employees.  Can you

2    think of another one that, for substantive reasons, was found

3    completely not guilty of any charges?

4    A.  Yes.  James Warner.  Um, a remote audit got him.  Remote

5    audit is like a kind of -- we have drive cams, camera systems,

6    in our trucks.  They had thought that he was using a cell

7    phone while driving a company vehicle, which is a rules

8    violation.  So they set up an investigation to determine the

9    facts.  Um, and what was found is he has a flip phone, so kind

10   of the older ones.  It wasn't a smart phone.  So you can only

11   use it when you open it.  So, therefore, we got an

12   investigation.  He had the phone.  He said, No, it doesn't

13   work unless it's open.  So we determined all the facts.  He

14   received back pay, and he still works for us today, and he

15   wasn't --

16   Q.  You think he got no discipline?

17   A.  No discipline.

18   Q.  When they got back pay, are you saying from an arbitrator?

19   A.  Yeah, so like --

20   Q.  Hold on.  Let me freeze you.  You guys disciplined them,

21   didn't you?

22   A.  No, we didn't discipline them.

23   Q.  They went up to an arbitrator.  An arbitrator overturned

24   it, not you guys.

25   A.  I don't have authority to issue discipline or anything

1    like that.

2    Q.   BNSF disciplined them, didn't they?

3    A.   No.

4    Q.   Who overturned it?  What's there to overturn?

5    A.   So there was never anything to overturn.  It was strictly

6    just an alert that there might be a rules violation, so you

7    need to investigate this.  An investigation, that's all it is.

8    It's strictly that word.  We are just investigating the facts.

9    And then when it -- it wouldn't have went -- I don't think it

10   would have went to the arbitrator.  That's kind of above my

11   level.  But whoever decided that there was no fault, they just

12   sent a message back saying there was no fault.  And for the

13   time the employee was at the investigation, he received pay

14   back from the company for that.

15   Q.   You don't know whether it was an arbitrator or not.  I

16   mean, you have no idea one way or the other, it sounds like.

17   A.   Yeah, I don't know those cases.  I don't want to speak out

18   of turn, so no.

19   Q.   So let me ask my question again, then.  Can you think of

20   an instance where an employee went to a hearing and BNSF, not

21   an arbitrator after the fact, BNSF found for substantive

22   reasons the employee did not commit any rule violations?

23   A.   I think those cases would fall into that category.

24   Q.   You just said you don't know whether they're an arbitrator

25   or not.  Which one is it?

Julie H. Thomas, RMR, CRR                                      (303)296-3056

1  A.  I think you're trying to word it that BNSF -- what you're

2  trying to get me to say is BNSF issued discipline and then an

3  arbitrator disagreed with BNSF.  That's not the case, to

4  answer your question.

5  Q.  How do you know that?

6  A.  Because BNSF said there was no fault found.  So,

7  therefore, it wouldn't have went to an arbitrator.

8  Q.  What makes you believe that?

9  A.  Because typically if there was discipline assessed, I

10 would receive a letter that said this employee was found

11 fault, and then the union -- or the employee would typically

12 appeal it with the union, and the union would send it to

13 arbitration and ask them, a third party, to overlook this.

14         In this case, I never received a discipline letter,

15 which tells me that it never went to arbitration.

16 Q.  Got it.  So you don't know what happened.  You just know

17 for Mr. Warner and Mr. Law you didn't receive a discipline

18 letter.

19 A.  Correct.

20         THE COURT:  I want both of you to slow down a little

21 bit.

22         MR. THOMPSON:  Sure, Your Honor.

23         THE COURT:  You're talking a little less slow.  We

24 are going to go -- within the next 10 minutes, but not right

25 now, find a convenient breaking point.  How much longer do you

17-cv-00844-WYD-SKC                Paz - Direct                III - 695

1    estimate you will be with this witness?

2              MR. THOMPSON:  Half hour.

3              THE COURT:  Okay.  All right.  Stop within the next

4    10 to 12 minutes, but not right now.  Find a convenient

5    stopping point.

6    BY MR. THOMPSON:

7    Q.  So let me ask you differently, then.  Is there anyone who

8    affirmatively you know that after a hearing it went to Adam

9    Miller and he substantively reviewed the transcript and said

10   no discipline?

11   A.  I can't say if it went to Adam Miller, no.

12   Q.  You can't identify any employee as we sit here today for

13   that?

14   A.  My assumption is, this is just my assumption, that --

15   Q.  I am not asking your assumption.  I am saying, as we sit

16   here today, can you identify one single employee who was

17   charged with a rules violation, the transcript from that went

18   to Adam Miller, and Adam Miller said no discipline whatsoever?

19   A.  No, because the way you --

20   Q.  Thank you.

21   A.  -- worded the process would be backward.  They were never

22   charged.

23   Q.  Thank you.  You will get to talk when Mr. Goman --

24   A.  Sorry.  I was trying to answer your question.

25   Q.  All right.  So let's go back to May 5th, 2016.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1      Earlier in that morning did Brandon try and take a

2  track out of service?

3  A.  Early that morning?  Yes.

4  Q.  And Brandon told you he was trying to do that because the

5  track had a non-class defect that had not been repaired within

6  30 days.

7  A.  That was his statement, yes.

8  Q.  You knew the track had a non-class defect that had not

9  been repaired in 30 days.

10  A.  No.  When we had that conversation, no.

11  Q.  All right.  So I'm going to show your deposition.

12  Actually, before I do that, maybe we can fix this.

13      When you say, at that time, no, what do you mean by

14  that?

15  A.  So when I was first notified when Mr. Fresquez said that

16  he was removing a track from service, I was asking him for

17  more details.  So I said, Brandon, like, what's the condition,

18  why is it going from track speed to immediately out of

19  service?  And he just said, It's a non-class-specific defect.

20  So my question was, Well, should've this have been a slow

21  order?  Because with a tie defect, you have different class of

22  speeds.  So as the ties deteriorate, as they get older and

23  they get damaged, you have to run slower and slower and

24  slower.  And in this case it went from track speed straight to

25  out of service, which in FRA terminology doesn't really add

17-cv-00844-WYD-SKC                  Paz - Direct                      III - 697

1    up.  So I was trying to ask those questions, and all

2    Mr. Fresquez would say was, It's a non-class-specific defect,

3    and he wouldn't elaborate any more details.  So I did ask

4    those questions.

5    Q.  You asked him if it could be moved to a slow order defect.

6    A.  Yes.

7    Q.  A slow order defect would allow you to indefinitely run

8    trains, albeit at a slower speed; right?

9    A.  As long as the conditions don't worsen.

10   Q.  This was a defect you had previously told Brandon, when he

11   wanted to put a slow order on it, to not do that; right?

12   A.  No, I don't recall any of that.  No.

13   Q.  Do you have any reason to dispute that?

14   A.  Uh, yes, because I wouldn't tell a track inspector that

15   wanted to slow order something -- I wouldn't tell him to not

16   do that if a defect was there.

17   Q.  You are denying that you initially, when Brandon reported

18   it, told him not to put a slow order and instead to put a

19   30-day defect?  Is that what you are testifying?

20   A.  So I don't recall Mr. Fresquez initially reporting it to

21   me in that conversation.  I believe I received a text message

22   that stated that this track was going out of service, and that

23   was my first warning.  So I don't recall --

24   Q.  You think May 5 of 2016 is the first time you got a

25   warning about this defect?

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1   A.   That I can recall right now, yes.  A conversation with

2   Mr. Fresquez, yes.

3   Q.   All right.  So, as I'm understanding your testimony,

4   Brandon on the morning of May 5, 2016, says he is taking a

5   track out of service because there's a 30-day defect that has

6   not been repaired.  Right?

7   A.   That was his statement yes.

8   Q.   You agree that's what the FRA requires.

9   A.   If it was legitimately coded as an F or a 30-day

10  non-class-specific, then yes.

11  Q.   You then ask him if it can be a slow order defect instead.

12  A.   Yeah, I asked him if it possibly was coded wrong, if --

13  input in the system wrong and it should have been a slow order

14  to start with.  That was the questions I asked to gather some

15  more information around it, yes.

16  Q.   Brandon then hangs up with you?

17  A.   Um, I think we -- I don't know all the details.  We talked

18  about it.  I think I asked him -- I think I actually stated

19  that he could ask Kirby O'Connor, which is our FRA inspector,

20  also for guidance.  And he told me that the FRA is not a good

21  inspector and didn't really -- didn't really understand what

22  he was doing either.

23          But then he did come back and say -- I don't know if

24  it was through a text message or through phone.  Mr. Fresquez

25  says, Don't worry about it, or something.  I have the section

1    here; they're going to go ahead and fix it.  So since he had

2    lined that up, I just agreed with him to go ahead and let the

3    section fix what he wanted done so we could continue business

4    throughout the day.

5    Q.  So you told Brandon to call the FRA.

6    A.  Sure, yes.  Yes.

7    Q.  That was your idea.

8    A.  Yeah.  I have no problem, uh, with employees talking to

9    the FRA.

10   Q.  My question is different.  Was it your idea for Brandon to

11   call the FRA?  Is that what your testimony is?

12   A.  I think in a text message that I did recommend that, yes.

13   Q.  You think you text messaged it?

14   A.  I think so, yes.

15   Q.  You produced your texts in this case, but only with

16   Brandon; right?

17   A.  Yes.

18   Q.  Have you looked through them?

19   A.  Yes.

20   Q.  You think that text is in there?

21   A.  I know it is.

22   Q.  All right.  Do me a favor, and during the lunch break find

23   it for me.

24   A.  Yes.

25   Q.  All right.  So Brandon -- does Brandon, in fact, call the

1  FRA?

2  A.  No.  Like I said, Brandon said Kirby, which is the FRA

3  inspector, wasn't a good inspector and didn't know what he was

4  doing.  I think that's in a text message also.

5  Q.  Your opinion is Brandon never called the FRA on the

6  morning of May 5th?

7  A.  I don't know that he called them.  Just that's what he

8  told me in the text message.

9  Q.  Did Brandon tell you that he called the FRA?

10  A.  Uh, no, not in this case.

11          THE COURT:  Okay.  We are going to stop for our lunch

12  break.  We are going to start again in an hour and 15 minutes.

13          Let's talk about what we can get accomplished today.

14  How much longer will this witness testify?

15          MR. THOMPSON:  A half hour, from our end, Your Honor.

16          THE COURT:  I understand, but what about for the

17  defendant?

18          MR. GOMAN:  I believe 45 minutes of my questioning.

19          THE COURT:  All right.  And are you going to also do

20  direct exam of this witness?

21          MR. GOMAN:  Yeah.

22          THE COURT:  All right.  So after him, assuming we

23  finish him around 3 o'clock, who -- is that when you have to

24  call the other witness?

25          MR. THOMPSON:  We are taking Darron Boltin out of

1    order.  I'd like to get Jay Herzog done today and hopefully at

2    least David Dunn started.

3            THE COURT:  What I want to direct you to do, I'm not

4    ordering you to, I want you to do your best to finish this

5    witness before we do the other witness at 3 o'clock.  So see

6    if you can be as concise, if possible.

7            MR. THOMPSON:  I will work on that over lunch, Your

8    Honor.

9            THE COURT:  It's both sides.  It's a bilateral

10   comment to both of you.

11           All right.  So we'll start again at one hour and

12   15 minutes.

13      (Proceedings recessed 12:25 p.m. to 1:45 p.m.,

14        resuming outside the presence of the jury.)

15           THE COURT:  All right.  What is your real issue?

16           MR. THOMPSON:  So, Your Honor, when Mr. Paz was

17   testifying, I asked him if he could identify anybody who had

18   been exonerated through the hearing process.  He identified

19   two employees.  The issue with that is as follows.

20           We brought a motion to compel in this case to

21   identify how often employees are exonerated.  What we agreed

22   upon at the motion to compel -- we had a conference.  What we

23   agreed upon is that BNSF would say we know people have been

24   exonerated, but they would not identify any particular person.

25           Mr. Paz, their manager, has just testified to

1   something different than what BNSF agreed to and the reason

2   that we dropped the motion to compel.  We, therefore, think an

3   instruction to the jury is proper.

4         THE COURT:  Well, the jury doesn't know anything

5   about a motion to compel.  That's all discovery gobbledygook

6   before we had the final pretrial conference.  I mean, why

7   should I give a limiting instruction?  I don't understand

8   that.

9         MR. THOMPSON:  Because BNSF has taken a position in

10  this case that we agreed to, and in good faith acted upon, and

11  didn't conduct further discovery, and now it's had a manager

12  testify contrary to that position, we are left doing trial by

13  ambush.  We can't meaningfully respond because we took BNSF at

14  their word.

15        THE COURT:  Mr. Goman, what's your response?  Stay

16  there, and keep your voice up.

17        MR. GOMAN:  My recollection of the agreement is that

18  several witnesses had already been deposed, and they were

19  asking at deposition have you exonerated an employee in an

20  investigation hearing, and they said either yes, but I can't

21  remember names or yes, I can give you two examples.  So I

22  said, We'll stick with that.  We'll live with that state of

23  discovery.  And the agreement was there would be no further

24  discovery on that point.

25              I did not intend to introduce evidence of names of

1    specific employees that had been exonerated by the

2    disciplinary process as substantive evidence in the trial.

3    Mr. Thompson chose to ask Mr. Paz a question, and I -- I

4    can't -- I don't know what he would have me do in that

5    situation.  I can't tell Mr. Paz to mislead the Court or

6    somehow answer that question any differently than he did.

7         THE COURT:  Yeah, I'm confused, Mr. Thompson.  I

8    don't understand why I should -- I mean, I understand what you

9    are saying, but I had no involvement in the motion to compel.

10   Was it actually filed or not filed?

11        MR. THOMPSON:  I think this was at the -- I don't

12   remember if it was filed versus in the conference.  It was on

13   the record that the agreement was made.

14        THE COURT:  But this was before the magistrate judge;

15   right?

16        MR. THOMPSON:  Yes, Your Honor.

17        THE COURT:  I'm not going to do anything.  I

18   understand what you are saying, but I don't know that it makes

19   any sense for me to do anything.  It certainly doesn't make

20   any sense to give a limiting instruction because the jury

21   would be very confused about what I'm limiting.  All right.  I

22   understand what you are saying, but I'm not going to do

23   anything about it.

24        MR. THOMPSON:  Understood, Your Honor.

25        THE COURT:  All right.  Let's bring the jury back in

 1   and continue.  Are we on track to finish this witness before

 2   3 o'clock?

 3           MR. THOMPSON:  Yes, Your Honor.

 4           THE COURT:  All right.  Make sure we do that.

 5       (Jury in at 1:49 p.m.)

 6           THE COURT:  All right, you may be seated.

 7           Let's continue.

 8   BY MR. THOMPSON:

 9   Q.  Mr. Paz, let's pick up with the morning of May 5th, 2016.

10   I think you said Brandon contacted you because he wanted to

11   take a track out of service.  Right?

12   A.  That was on May 5th, you said?

13   Q.  Yes, sir.

14   A.  Um, can you -- do you have a little more details around

15   May 5th, please?

16   Q.  On the morning of May 5th did Brandon contact you and

17   notify you that he wanted to take a track out of service

18   because of a 30-day defect?

19   A.  With nothing jogging my memory as far as detail, it's

20   possible.  I don't know.

21   Q.  I think you then told us that you asked him if it could be

22   a slow order instead.

23   A.  Was this with the tie condition?  Is that --

24   Q.  Yeah.

25   A.  Yes, I asked if it -- being it was a tie condition, in my

1    experience, knowing the FRA, typically a tie condition, unless

2    it's something catastrophic, doesn't just go from running

3    trains at full speed to out of service, which was very

4    alarming to me because track inspectors inspect this track

5    four times a week, so how it could go from no issues to

6    automatically not safe?  So I'd asked him if possibly it

7    should have been slow ordered rather than remove from service

8    or, you know, it probably was input in the system wrong as far

9    as an FRA coding when it actually should have been slow

10   ordered prior instead.

11   Q.  And you testified that you texted Brandon that he should

12   call the FRA?

13   A.  Or I seen -- no, not that I -- I didn't text Brandon to

14   call the FRA.  I think we talked about talking with the FRA.

15   Q.  Oh, you didn't say, Yes, it's in my text and I will find

16   it at lunch?

17   A.  Yes, I did say that, yes, that I would be able to find the

18   text.

19   Q.  And you also said Brandon never said anything to you about

20   calling the FRA on May 5th.

21   A.  No, he never said that he called the FRA, no.

22   Q.  Just want to make sure I understand correctly.  So I want

23   to show you your texts.

24            These are your texts; right?

25   A.  Yes.

17-cv-00844-WYD-SKC                  Paz - Direct                    III - 706

1   Q.   Looking at May 5th, you show me in those texts where you

2   tell Brandon to call the FRA.

3   A.   Yes, I reviewed this document at lunch trying to find it.

4   I couldn't find the text messages.

5   Q.   Must have been deleted, I guess, huh?

6   A.   No, it wasn't deleted.  It's just not in this document.  I

7   couldn't find it over lunch.  I do know that I've seen it, and

8   I do know we had that conversation.

9   Q.   Totally.  All the time people produce their phones to and

10  produce it in discovery and they can't find the texts.  Right?

11  A.   I can't answer that, no.

12          THE COURT:  Mr. Thompson, I need you to slow down.

13          MR. THOMPSON:  Yes, Your Honor.

14          THE COURT:  You are talking faster than the witness,

15  and that's saying something.  So both of you I want you to

16  talk slower so that there is a complete and accurate record of

17  what is being said.

18  BY MR. THOMPSON:

19  Q.   Do you have any explanation for how the text that you told

20  the jury was there is not in what you produced in this case?

21  A.   Yes.  I -- it's not in this document that he's showing.  I

22  do know a hundred percent for a fact that Mr. Fresquez did say

23  that in words that Mr. Kirby O'Connor was not a good track

24  inspector, and I did see it somewhere in a document.  No, it

25  is not on this document, but it is somewhere, and I hope it

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Paz - Direct                        III - 707

1   comes up in the future of this trial.

2   Q.  Do you have your phone on you?

3   A.  No.  It's in the back room.

4   Q.  When we take a break, can you look and see on May 5th if

5   you can find that text?

6   A.  You have my text messages, sir, on the screen.  It's not

7   on that phone.

8   Q.  All right.  I think you said Brandon never told you that

9   he called the FRA.  Right?

10  A.  Not in this case, no.

11  Q.  I'm going to turn to page 125 of your deposition, starting

12  at line 18.

13          THE COURT:  Did we bring the originals?  Are they

14  here?

15          MR. THOMPSON:  We have got them coming overnight,

16  Your Honor.  I apologize.

17          THE COURT:  Go ahead.

18  BY MR. THOMPSON:

19  Q.  Starting at line 18, I asked you:  "Do you remember a

20  conversation with Brandon in May of 2016 when he told you he

21  called the FRA about a defect?"

22          Your answer was:  "I don't remember a conversation

23  with Brandon per se, but I think I may [sic] remember him

24  saying he called the FRA, or something."

25          Did I read that correctly?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    A.  Uh, you read it correctly on this.

2    Q.  Thank you.

3    A.  -- document, yes.

4          MR. THOMPSON:  Thank you, Mr. Keech.

5    BY MR. THOMPSON:

6    Q.  All right.  So let's talk more about the defect Brandon is

7    calling about.  I think you said it was a tie defect?

8    A.  Yes.

9          THE COURT:  Hold on a second.  Hold on a second.

10        (Discussion off the record.)

11        THE COURT:  We have a technical problem.  We have

12   Bridge, which is a simultaneous transcript of the unofficial

13   transcript.  The one on my big screen is frozen, but I've got

14   a smaller screen, so we'll just go with the smaller screen for

15   now.

16        All right.  Let's continue.  Reask your question.

17   BY MR. THOMPSON:

18   Q.  The defect we are talking about, was that a tie defect?

19   A.  Yes.

20        MR. THOMPSON:  I'm going to show the witness

21   Exhibit 79 -- A-79.  I apologize.

22   BY MR. THOMPSON:

23   Q.  So I'm showing you a text between Brandon Fresquez and

24   John Bennett.  Who is John Bennett?

25   A.  He is a scheduled employee for BNSF at -- when I was

1   working with John Bennett, he was a track inspector.

2   Q.  Based on the milepost location and the five --

3            MR. THOMPSON:  Sorry, Mr. Keech.  Will you please

4   publish it to the jury?

5   A.  Um, fixed --

6   BY MR. THOMPSON:

7   Q.  Based on the milepost and five broken ties in a row, do

8   you think that's the defect we're talking about?

9   A.  Um, the mileposts are close, yes.

10  Q.  I think you said that's the first time Brandon ever

11  reported the defect was on May 5th.  Is that right?

12  A.  Um, I don't recall saying -- that's the first time we had

13  a conversation about him removing it from service, and I

14  didn't recall a prior knowledge about it.

15  Q.  I will tell you what Brandon has told the jury, and I want

16  to understand if you agree or disagree.  So here's what

17  Brandon said happened.  He said he tried to report this defect

18  back in February of 2016.  He wanted to put a slow order on

19  it.  You said, That's not necessary; mark it as a 30-day

20  defect.  Brandon agreed with you and put on a 30-day defect.

21  Then in May of 2016, after 30 days, because it had been marked

22  as a 30-day defect Brandon wanted to take it out of service.

23  You then said, Can't we mark it as a slow order?

24           Do you agree or disagree that that's what happened?

25  A.  I don't recall.  I would disagree 'cause Brandon would

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    typically protect it without having to -- he wouldn't need my

2    permission to put a slow order on.  That doesn't sound like

3    Mr. Fresquez.  He would -- he would protect it.

4    Q.  Do you recall taking a slow order off of this defect?

5    A.  Um, this -- in the same time frame, or just in my career

6    in Denver?

7    Q.  In February of 2016 when Brandon reported it and wanted to

8    put a slow order on it, do you recall having him mark it as a

9    30-day defect?

10   A.  I don't recall that.

11   Q.  Let me show you Exhibit 44.  This is Brandon on

12   February 11, 2016, reporting the defect to Mr. Dunn.  Do you

13   agree that that picture, that represents a defect that needs

14   to be reported?

15   A.  This picture on the screen doesn't give the wide view.

16   It's real -- a real narrow.  But I would definitely say

17   there's a condition there, yes.

18   Q.  And we see five broken concrete ties in a row.  Do you see

19   that?

20   A.  Yes.

21   Q.  Let's go to -- make sure it's in evidence first.

22              COURTROOM DEPUTY:  44 has been received.

23              MR. THOMPSON:  44 has.  I'm going to check on 45

24   before I show it to him.

25              COURTROOM DEPUTY:  It has as well.

1              MR. THOMPSON:  Thank you, Mr. Keech.

2    BY MR. THOMPSON:

3    Q.  So I'm going to now go to Plaintiff's Exhibit 45, which is

4    that same day.  It's a text between you and Mr. Dunn.  You

5    write:  As far as your 10 mph for details 213.109(B) states

6    cross ties are non-class specific.  Your location is a less

7    than 2 degree curve which states you need 8 cross ties within

8    39 feet.  Where does this justify a 10 mile per hour --

9    10 mph?

10             Did I read that correctly?

11   A.  Yes, you read that correctly.

12             MR. THOMPSON:  Thank you, Mr. Keech.

13   BY MR. THOMPSON:

14   Q.  All right.  So if Brandon is right, can you classify a

15   defect on one day as a non-class defect and then after the

16   30 days switch it to a slow order just to avoid stopping

17   trains?

18   A.  If it -- well, if he initially inputted the defect wrong,

19   he could recode that, uh, you know, as a mistake in the

20   system, maybe write some comments.  But the second part of

21   your question, if it was legitimate non-class specific, after

22   30 days it would be removed from service.

23   Q.  Yeah.  Telling somebody this should be a non-class defect

24   and then changing it to a slow order, if both those -- if the

25   first report is accurate, that violates federal law, doesn't

1    it?

2    A.  If the first report was legitimately accurate, yes.

3    Q.  And that's what you were trying to do on May 5th, isn't

4    it?

5    A.  Is report things accurately?

6    Q.  No.  You were trying to violate federal law --

7    A.  No, absolutely not.

8    Q.  -- by changing the classification.

9         All right.  So let's fast-forward.  I guess, not

10   fast-forward.  After that that same day do you call Brandon to

11   a defect?

12   A.  No.  I believe he -- well, what defect?  In general?  Any

13   defect?

14   Q.  Sure.  There was a point in time later that morning where

15   you, Mr. Herzog, and Mr. Fresquez are at a defect.

16   A.  Yes, I was called to a defect, yes.

17   Q.  You called --

18   A.  By Mr. Herzog.

19   Q.  And then you called Brandon there.

20   A.  Yeah, I might have called him, or he might have been

21   there.  I don't recall, but yes, I could have called him to

22   also be there.

23   Q.  When Brandon arrived, he told you that he had called the

24   FRA.

25   A.  I don't recall that conversation.

17-cv-00844-WYD-SKC                Paz - Direct                III - 713

1   Q.  And you told him you have Mark Carpenter on your side, you

2   don't lose, didn't you?

3   A.  No.  No, I never said anything close to that.

4   Q.  Did you have a GPS with you?

5   A.  Yes, I did.  That was the reason I was called there.

6   Q.  Did Mr. Herzog have a string-line there?

7   A.  Um, I believe he did in his truck.

8   Q.  Why did you need Brandon there?

9   A.  So Mr. Herzog had called me.  Mr. Herzog, he was a foreman

10  of a surfacing gang that corrects like geometry defects on the

11  track.  So he had called me there that day and said he was

12  trying to locate whether or not the work they had just done

13  repaired a defect which had a GPS location on it.  He stated

14  that Mr. Fresquez was there.  They did not have an approved

15  GPS device.  He was using a cell phone app, and it was putting

16  him way out into a field that wasn't even on the track.  And

17  he asked if I would come there with an approved GPS so we

18  could verify whether they had repaired it or not.

19          So I arrived.  And to do the full circle, since

20  Brandon was the track inspector, I thought the foreman that

21  repaired the work, me as the roadmaster, and Brandon as the

22  track inspector, we could all verify whether it was repaired

23  or not.  And when I showed up --

24  Q.  Let me stop you there.  That answered the question.

25  A.  That answered the question?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Q.  Yeah.

2   A.  Okay.

3   Q.  You didn't need Brandon there to measure the defect, did

4   you?

5   A.  No, just it was on a --

6   Q.  Thank you.  So let's talk about the nature of the defect

7   there.  It was a geo car defect; right?

8   A.  Yes.

9   Q.  Meaning it had been reported by essentially cars that run

10   over the track with lasers?

11   A.  In simple terms, yes.

12   Q.  It had been there for years, hadn't it?

13   A.  Um, I believe that defect in particular had come in prior

14   to my -- my realm of taking responsibility there.  So it had

15   been there some time.  I don't know the exact time.

16   Q.  So the track should have been out of service, shouldn't it

17   have?

18   A.  No.  No, absolutely not.

19   Q.  Didn't you just say that the defect had been there for

20   quite some time?

21   A.  It was a geometry car defect.  It doesn't fall under the

22   30-day rule.  It was a slow order protected.

23   Q.  Oh, there was a slow order on the track?

24   A.  Yes.

25   Q.  Was there a slow order on the track when you arrived?

1   A.  Yes, there was a 10 mph slow order on there.

2   Q.  What would you need to do to repair that defect?

3   A.  So this was an alignment defect, which basically means if

4   you picture like a track being straight and then it kind of

5   did like -- just the alignment was off a little bit.  So we

6   have machines that come in, have computer systems on board,

7   and they will realign the track back to make, in simple terms,

8   the track straight again.  So that's what Mr. Herzog was there

9   for that day with the machines to correct that.

10  Q.  Did Mr. Herzog have the machines if he wanted to correct

11  it right then and there?

12  A.  Yes, he did.

13  Q.  Any reason why everybody else has testified to the

14  opposite?

15  A.  I can't speak for them, no.

16  Q.  Did you bring your string-line?

17  A.  Um, it was probably in my toolbox.  We did not use my

18  string-line that day.  I don't recall.  I believe it was

19  Jay's.

20  Q.  You could have gone and gotten a string-line instead of

21  ordering Mr. Fresquez to get his.

22  A.  Mr. Fresquez was the track inspector is why I wanted him

23  to string-line.

24  Q.  That wasn't my question.  My question was:  You could

25  have, had you wanted to, gotten your string-line and measured.

1   A.  Oh, yes, I'm fully capable, yes.

2   Q.  It doesn't take three people to measure that defect.

3   A.  No, typically two is a good number, 'cause it's a 62-feet

4   long, the cord that we use.  So two is of benefit, but it can

5   be done with one.

6   Q.  You told Brandon you couldn't find the defect.

7   A.  We verified that we couldn't find it.

8   Q.  Brandon told you, See, you already made your decision.

9   Right?

10  A.  Um, you're kind of jumping through the conversation, but

11  he did say that at one point, yes.

12  Q.  You understood Brandon was saying you have already

13  determined the defect was present; right?

14  A.  He had said that a few times, yes.

15  Q.  Sorry.  I misspoke.  You understood Brandon to be telling

16  you that he believed you had already determined the defect was

17  not present; right?

18  A.  Yes, he said there was no point in inspecting it.  Or

19  measuring.  Excuse me.  Correction.

20  Q.  Because he thought you were going to take the defect out

21  of the system anyways; right?  That's what he was telling you.

22  A.  I can't speak with what he thought, but that's what he

23  told me about there was no point.

24  Q.  Did you at any point ask him, What are you talking about?

25  What do you mean?  I don't understand.

17-cv-00844-WYD-SKC                Paz - Direct                III - 717

1   A.  Yes.

2   Q.  You did.  Anybody else hear that on the radio?

3   A.  On the radio?

4   Q.  Sure.

5   A.  No.

6   Q.  Anybody else hear it at all?

7   A.  Jay Herzog.

8   Q.  Any idea why he'd testify differently?

9   A.  Um, well, the statement that he wrote and signed, he had

10  the same statement that he had heard it as well.  If he

11  testified different, I don't know about that.

12  Q.  Brandon then leaves the defect; right?

13  A.  He actually leaves the job site, the area, yes.

14  Q.  He drives 200 feet away, give or take?

15  A.  Um, yeah, he drove, I don't know, maybe 300 feet, stopped,

16  and then completely left the area.

17  Q.  You did not ask him to string-line the defect until after

18  he left; right?

19  A.  No, false.  I instructed him three times to verify whether

20  the defect was there and use his string-line, and he kept

21  repeating, There's no point, three times.  And he looked at me

22  for a brief moment, got in his truck and drove off.  So me and

23  Jay Herzog had to finish the verification.

24  Q.  So at the defect you told him three times to remeasure the

25  defect.

Julie H. Thomas, RMR, CRR                                (303)296-3056

1   A.   Yes, I did.

2   Q.   Then why are you calling him on the radio and saying it

3   again?

4   A.   That was the fourth time.  Once he drove off, I tried to

5   call him on the radio to ask him to come back for a fourth

6   time, to give him another chance to come back and help us, and

7   he said, There's no point.  You've already made your decision.

8   Which was not the case.  I was asking him to verify it, and --

9   Q.   Brandon never told you, No, I won't do that, did he?

10  A.   He didn't verbally say that.

11  Q.   In fact, he told you, I didn't say no.

12  A.   At the end of a conversation on the radio he just stated,

13  I didn't say no.

14  Q.   And he subsequently returns to the defect, doesn't he?

15  A.   Later -- later in the day after some time had passed, yes.

16  Q.   And he offered to measure the defect, didn't he?

17  A.   No, he did not.

18  Q.   Then why do you say, Brandon, it's too late?

19  A.   He -- so Mr. Fresquez had approached the job site.  Me and

20  Jay Herzog were still on site.  And he had came up, started

21  arguing again whether the defect was there or not.  And I just

22  said, Brandon, I don't want to argue.  I said, What's done is

23  done.  Jay and myself had already verified it.  And I think he

24  left at that point officially.

25  Q.   You then called Mark Carpenter?

1  A.  That was -- Mark Carpenter was already contacted when he

2  had drove off the first time.

3  Q.  Did you notify Mark Carpenter that Brandon came back?

4  A.  Um, I don't know if I notified him -- I called him

5  directly.  It was in my -- in the investigation I did note

6  that Mr. Fresquez did come back.

7  Q.  You ordered Mr. Herzog to write a statement?

8  A.  I asked him to write a statement on the facts that he had

9  seen and what he heard that day.

10 Q.  So you asked him and ordered Brandon.  Is that right?

11 A.  I asked him to order Brandon?  Excuse me.

12 Q.  You asked Brandon -- or you asked Mr. Herzog to write a

13 statement, but you ordered Brandon to remeasure the defect; is

14 that right?

15 A.  I instructed Brandon, as he was the track inspector.  It's

16 his role and responsibility to measure defects.  Yes, I did

17 instruct him.

18 Q.  Where did you sit Mr. Herzog while you had him write a

19 statement?

20 A.  Mr. Herzog -- I didn't tell him to sit anywhere.  He was

21 in the truck with me, in my company truck.

22 Q.  He got into your truck of his own volition?

23 A.  Yes, he did.

24 Q.  You didn't tell him to get in there?

25 A.  No.

1    Q.  He just walked up and hopped in your truck?

2    A.  Yeah.  It's not uncommon for employees to sit in the same

3    truck together, no.

4    Q.  And you watched him, over his shoulder, as he wrote the

5    statement, didn't you?

6    A.  No.  I was in the driver's seat.  There's like a center

7    console.  It's an F-250.  He was in the passenger seat.  And I

8    distinctly said, Jay, I know this is uncomfortable, but if you

9    would please just write a statement since this is a rules

10   violation.  I said, Don't worry about my opinion.  Don't

11   worry.  I just strictly want the facts.  He said, No problem,

12   and he wrote the statement.

13   Q.  Was the defect present?

14   A.  What was our findings?  Is that the question?

15   Q.  Yeah.

16   A.  We found that we couldn't find the defect there after

17   measuring it, no.

18   Q.  So you took the slow order off?

19   A.  No.  The slow order was not immediately taken off at that

20   point.

21   Q.  When was it taken off?

22   A.  I don't have the exact date.  It wasn't taken off at that

23   time because Jay had to get his crew together, I had to

24   further -- with the rules violations, I had to follow up with

25   Mr. Fresquez.  So we left the job site once the track and time

1   was given up.

2   Q.  At some point the slow order was taken off because you

3   couldn't find the defect.

4   A.  I'm sure it was, yes.

5   Q.  A slow order had been on for years, apparently.

6   A.  Yeah, it was protected for years as a 10 mph, slow

7   ordered, yes.

8   Q.  But the defect was never there?

9   A.  No, it was there.  Like I say, Jay Herzog was the

10  surfacing gang foreman, which has the machines to correct it.

11  So it was there prior, yes, it was, but Jay Herzog fixed it

12  that day when --

13  Q.  Oh, so the defect was there.  It's just that Mr. Herzog

14  fixed it.

15  A.  Yes, with his machines prior to verifying it, yes.

16  Q.  In the hearing -- strike that.

17        You were a witness in Mr. Fresquez's internal

18  hearing; right?

19  A.  Yes, with BNSF.

20  Q.  You said the defect was not present; right?

21  A.  Yeah, because we had repaired it.

22  Q.  You also said in your deposition the defect was not

23  present.

24  A.  Yes, because it was repaired.

25  Q.  This is the first time you've ever told anybody the defect

1    was present.

2    A.  Present?  I said it was repaired.  So if it -- maybe I

3    misspoke, but if it's repaired, it wouldn't be present.  So it

4    was present prior to us repairing it, yes, and the geometry

5    car data showed that.

6    Q.  All right.  We'll get back to that.

7           So Mr. Herzog repaired it that day.

8    A.  Yes.

9    Q.  Any idea why he would testify he did not repair it?

10   A.  Um, no, 'cause he's the one that closed out the defect, so

11   I wouldn't know why he would testify any different.

12   Q.  Any idea why everybody else would testify that to repair

13   this defect you would need to shut down almost all of Denver?

14   A.  Likewise, like I said when you asked about the planning

15   question a week in advance, I had requested shutdown windows

16   at south Denver where this location was, and we had planned a

17   week in advance to hold trains to make this repair.

18   Q.  Ah.  So Denver was shut down when you arrived there.

19   A.  There's three main tracks that go through this location.

20   The area where we were working, trains were not going through.

21   Q.  Do you know who closed out the defect in the PARS system?

22   A.  Yes.  Jay Herzog did.

23   Q.  Any idea why he would testify he didn't do that?

24   A.  I don't know why he would testify any different, no.

25   Q.  Any idea why he would testify that he doesn't even know

1   how to use the PARS system?

2   A.  No, because that's how he pays himself, so I don't know

3   how he would not know how to use it.

4   Q.  Before the internal hearing you received an e-mail from

5   Mark Carpenter; right?

6   A.  Yes.

7   Q.  He told you that he thought it would be best if you

8   testified in a certain way in that e-mail, didn't he?

9   A.  Um, no, I don't recall him giving he -- telling me how to

10  testify, no.

11  Q.  I'm going to show you Plaintiff's Exhibit 62.

12          Go ahead and have you read that to yourself.  Let me

13  know when you're finished.

14  A.  Okay.  I've completed it.

15  Q.  Does this refresh your recollection about whether Mark

16  Carpenter told you that he thought it would be best if you

17  testified in a certain way?

18  A.  Um, yes, I recall this e-mail.

19  Q.  He told you how he would answer questions.

20  A.  Um, yeah, in this writing he says how he would -- he would

21  conduct himself, yes.

22  Q.  He told you what exhibits he would enter.

23  A.  Yes, I believe so.

24          MR. THOMPSON:  May I show just the witness, please,

25  P-20 [sic].

17-cv-00844-WYD-SKC                Paz - Direct                III - 724

1    BY MR. THOMPSON:

2    Q.  Do you recognize this document?

3    A.  Um, yes, 2016 performance and development review for

4    myself.

5    Q.  What is it?

6    A.  Um, so this is both by myself and my manager.  Um, it's a

7    performance and development plan.  Um, basically we have one

8    every year, goals, things we'd like to do, initiatives.  And

9    then also -- that's given to me by my supervisor, and then I

10   write back with how I met those goals, areas I want to

11   improve, how I want to better myself, better my team,

12   et cetera.

13          MR. THOMPSON:  Plaintiff offers Exhibit 20.

14          MR. GOMAN:  Your Honor, I object to relevance.

15          THE COURT:  You object to relevance?

16          Put it up on the screen.  Let me look at it.

17          MR. THOMPSON:  Sure.  And I can zoom in to the part

18   we are going to be talking about, if Your Honor would like,

19   which will make it abundantly clear why it's relevant.  Bear

20   with me one second, Your Honor.  Highlight it for Your Honor.

21          THE COURT:  I'll overrule the objection.  There are

22   things in here that relate to some of the claims in this case.

23   So Exhibit 20 is received.

24      (Plaintiff's Exhibit 20 received.)

25   BY MR. THOMPSON:

1   Q.  For one of your achievements in your review you wrote an

2   achievement was removing Brandon Fresquez from service for

3   insubordination, didn't you?

4   A.  That would be false.

5   Q.  All right.  Let me see if I can read this correctly.

6   "Brandon Fresquez - Removed from service for insubordination."

7   Is that right?

8   A.  You said "achievement."  This isn't under Achievements.

9   Q.  Did I read it correctly, Mr. Paz?

10  A.  What you just read is correctly [sic], yes.

11  Q.  Thank you.

12        MR. THOMPSON:  Thank you, Mr. Keech.

13  BY MR. THOMPSON:

14  Q.  Has BNSF ever disciplined you?

15        MR. GOMAN:  I object to relevance.

16        THE COURT:  I'll let him answer with a yes or no.

17  A.  Um, yes.

18  BY MR. THOMPSON:

19  Q.  What was the nature of the discipline, the severity of it?

20        MR. GOMAN:  Renew the objection.

21        THE COURT:  Hold on.  Before I'll let a substantive

22  answer, I want to know the time frame.

23  BY MR. THOMPSON:

24  Q.  When were you disciplined?

25  A.  Um, last -- so 2018.

1   Q.   2018 you were disciplined?

2   A.   Yes.

3   Q.   What was the nature of the discipline?

4        MR. GOMAN:  Same objection, Your Honor.

5        THE COURT:  Sustained.

6        MR. THOMPSON:  I just want the severity, Your Honor.

7   I don't want anything more about it.

8        THE COURT:  Sustained.

9        MR. THOMPSON:  Thank you, Your Honor.

10        THE COURT:  The time frame of these events occurred

11   through 2016.  In 2018 Mr. Fresquez was no longer employed by

12   BNSF.  So the prejudicial effect of his answer would outweigh

13   any probative value under Rule 403.  So that's why I'm

14   sustaining the objection.

15   BY MR. THOMPSON:

16   Q.   Have you ever been disciplined for retaliating against

17   employees for properly reporting track defects?

18        MR. GOMAN:  Same objection.

19        THE COURT:  Overruled.  He can answer that.

20   A.   No, I haven't been.

21   BY MR. THOMPSON:

22   Q.   Have you ever been disciplined by BNSF for telling its

23   employees to report safety concerns?

24   A.   No.

25   Q.   In fact, you are not aware of any manager who's been

1  disciplined by BNSF for that; right?

2  A.  For employees reporting defects or safety concerns?

3  Q.  Correct.

4  A.  Not that I'm aware of, no.

5  Q.  All right.  So I want to go back and talk about the defect

6  being present.  You now today admit to the jury the defect was

7  present; right?

8  A.  Yes, prior to the repair, yes.

9  Q.  You were deposed in this case; right?

10  A.  Oh, yes.  Yes, I was.

11       MR. THOMPSON:  John, what's the investigatory hearing

12  transcript?  Is it 45?

13       MR. STONE:  What's that?

14       MR. THOMPSON:  The investigatory hearing transcript,

15  is it 45?

16       Actually, I have nothing further at this time,

17  Mr. Paz.

18       THE WITNESS:  Thank you.

19       THE COURT:  All right.  Any recross?  Or wait a

20  minute.  What is this?

21       MR. GOMAN:  I believe this is cross-examination.

22       THE COURT:  Cross.  I'm sorry, cross.  Is there any

23  cross?

24       MR. GOMAN:  Um, yes.

25  ///

Julie H. Thomas, RMR, CRR                              (303)296-3056

1           **CROSS-EXAMINATION**

2    BY MR. GOMAN:

3    Q.  Mr. Paz, some clarifying questions first.  Can you explain

4    to the jury when you say the defect was not present on May 5th

5    of 2016, the day of insubordination, what do you mean?

6    A.  So not present -- so this is all after the fact.  So we

7    had shut down traffic for that day on that track indicated.

8    Yes, there was a defect previously.  That's why we were there

9    to make the repairs with Mr. Herzog's crews and his machines.

10   And when Brandon was asked to verify it, he was asked to

11   verify it to make sure that we did indeed correct it properly.

12          So that's why I said it's not -- it was no longer

13   present because it had been repaired.

14   Q.  Have you ever testified to anything other than that?

15   A.  No, I haven't.

16   Q.  Did you testify in the investigation hearing, in

17   Mr. Fresquez's company hearing?

18   A.  Yes, I did.

19   Q.  How did you -- what was your testimony about whether that

20   defect was there or not in the company hearing?  Do you

21   remember?

22   A.  That it was not there.

23   Q.  Meaning it had been repaired?

24   A.  It had been repaired, yes.

25   Q.  What was your testimony in the deposition?

1  A.  That it was not present, had been repaired.

2  Q.  All right.  Let's go back to May 5th of 2016.  Actually,

3  let's talk about that first.

4          Offhand and when you were walking up to the witness

5  stand here today, did you remember the date of Mr. Fresquez's

6  insubordination?  Did you have that in your head?

7  A.  No, not the exact date, no.

8  Q.  So unless I'm or Mr. Thompson is asking you questions

9  specific about the date of the insubordination, did May 5th

10  mean anything to you?

11  A.  The date itself did not mean anything, no.

12  Q.  Let's talk about the conversation about Kirby O'Connor and

13  whether he's a good inspector or not.  Do you recall being

14  asked in your deposition about conversations with Mr. Fresquez

15  concerning Mr. O'Connor?

16  A.  I don't know if it was asked in my deposition or not.  May

17  have been.

18  Q.  Shortly before your testimony here today did you review

19  your deposition to refresh your memory?

20  A.  Yes, I read through.  I got through most of it.

21  Q.  I'm going to show you page 91 of your deposition.  I'm

22  just going to have you -- you don't need to read it out loud,

23  so -- but I'm going to blow it up so we can see it.  After you

24  are done, let me know when you've read it to yourself.

25  A.  Okay.  I've completed it.

17-cv-00844-WYD-SKC                 Paz - Cross                 III - 730

1   Q.  The conversation that's described in your deposition, do

2   you remember talking with Mr. Fresquez about Kirby O'Connor?

3   A.  Yes, I do.

4   Q.  So the jury recalls, who is Kirby O'Connor?

5   A.  He is the Federal Railroad Administration track inspector.

6   Q.  As you were walking in here today, did you recall what day

7   that conversation happened on?

8   A.  No.  No, I didn't.

9   Q.  I know you said you believed that that was a text message

10  conversation.

11  A.  Yeah, I'm fairly confident that I believe I seen it -- I

12  seen it in a text somewhere, too, also that -- 'cause I had

13  mentioned something in the nature that, Brandon, you can also

14  ask the FRA, just trying to prove my case that I wasn't trying

15  to do anything fraudulent or anything.  And Mr. Fresquez said

16  that Kirby wasn't the best track inspector.  Simply that.

17  Q.  Do you recall what day that conversation happened?

18  A.  No.

19  Q.  Let's talk about May 5th of 2016, the day that you

20  reported Mr. Fresquez as having been insubordinate.  Okay?

21          Mr. Herzog called you for help finding the defect.

22  Was that an unusual or surprising request?

23  A.  Um, no, I get -- employees call, you know, quite

24  frequently.  If they have a question or they need help with

25  something, they'll call me.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                  Paz - Cross                  III - 731

1    Q.  Why do you need a GPS to find the defect out there in

2    south Denver?

3    A.  Um, so south Denver, there's three mains that go through

4    there, multiple crossovers.  So by crossover, like tracks that

5    connect to each other.  It was a geometry car defect that was

6    there, which is a technology-based defect that they found on

7    the train, which gives us GPS coordinates.  To further verify

8    that we were -- we did repair the exact location and we were

9    verifying the location, we wanted to GPS it to also make sure

10   we were hundred percent.

11   Q.  We'll jump back to that in just a second, but the

12   conversation with Mr. Fresquez about whether a track should go

13   out of service that morning, another track, was that -- how

14   would you describe that conversation, the tone of it?

15   A.  Um, I would say it was just a neutral conversation.

16   Q.  Were you upset by what he told you?

17   A.  No, I wasn't upset.  I was just kind of asking the

18   questions to gain more details around the defect.

19   Q.  Did Mr. Fresquez seem upset to you?

20   A.  I wouldn't say upset.  I would say just short answers.  He

21   wouldn't give you any explanation.  He wouldn't give you any

22   in-depth knowledge of why he put it on there.  It was just

23   very short answers.

24          MR. GOMAN:  I'm going to show the witness

25   Exhibit A-46.

Julie H. Thomas, RMR, CRR                           (303)296-3056

 1   BY MR. GOMAN:

 2   Q.  Mr. Paz, I don't want you to tell the jury anything about

 3   the contents of this statement, but do you recognize this to

 4   be Jay Herzog's statement?

 5   A.  Yes, I do.

 6   Q.  I'm going to go to the second page.  Is this just the rest

 7   of that statement?

 8   A.  Yes.

 9   Q.  Is this a statement Mr. Herzog wrote for you on May 5th of

10   2016?

11   A.  Yes, it is.

12   Q.  Did you tell him what to put in this statement?

13   A.  No, I did not.

14          MR. GOMAN:  Your Honor, I'd move for admission of

15   Exhibit A-46.

16          MR. THOMPSON:  No objection.

17          THE COURT:  All right.  A -- you said 46?

18          MR. GOMAN:  Yes, Your Honor.

19          THE COURT:  A-46 is received.

20      (Defendant's Exhibit A-46 received.)

21   BY MR. GOMAN:

22   Q.  When Mr. Herzog writes we met at the crossover to verify

23   some defects, what did you understand him to mean?

24   A.  Um, that we were just verifying whether the defect was

25   repaired or not.

1   Q.  Is that what you recall, too?

2   A.  Yes.

3   Q.  It describes red tag defects at the crossovers.  What does

4   that mean?

5   A.  Red tag defects, it's a defect labeled as, I guess, the

6   color code red tag, basically meaning we needed to put a slow

7   order on it when the geometry car first came through, and

8   therefore we had to protect it, which we did.  And then in

9   this statement Mr. Herzog, you know -- we were there to verify

10  that we repaired it.

11  Q.  The statement I have highlighted -- the part of the

12  statement I have highlighted here from Mr. Herzog, did you

13  find it to be accurate and consistent with what you saw?

14  A.  Uh, yes, it's pretty accurate to how I recall it, yes.

15  Q.  Did you also write out a statement that afternoon?

16  A.  Yes, I did.

17  Q.  All right.  I'm going to show you that statement.

18          Okay.  When is the last time you looked at this

19  statement?  Do you recall?

20  A.  If I recall, maybe a year, two years ago.

21  Q.  Okay.  Fair to say your memory about what happened that

22  day would be better when you gave this statement than it is

23  today?

24  A.  Putting my memory on this day of the statement probably --

25  yes, it would be better.

1   Q.  You wrote it how long after the insubordination happened?

2   A.  I think I wrote it the same day.  Yes, 5/5.  I dated it.

3   Yes.

4   Q.  All right.  Let's talk about then trackside.  You are out

5   there with Mr. Fresquez.  Let's get -- when he shows up, did

6   he seem upset or angry?

7   A.  Um, well, he -- not so much with me as first.  When he

8   showed up, he approached Mr. Herzog, and he said, Why did you

9   call Paz?  Is he your boy now or something?  He's like, Why

10  did you call Paz here?

11          And Jay said, No, Brandon.  You know that the GPS you

12  had is not approved and it took us in the field.  I called Paz

13  to come so he could bring an approved GPS and we can verify

14  whether this defect is repaired or not.

15          And then we had a briefing.  We got on the track.  We

16  went to verify.  And like I said, it was an alignment defect,

17  so you would see -- if the rail was straight, you would see a

18  kick typically as a reference point for an alignment condition

19  or concern.  So Jay, knowing the area that he had just

20  repaired, when we had the GPS with us, we kind of just did an

21  eye view to get us in the general area so we can have kind of

22  a focal point, a starting point to see what we can see

23  visually.  So myself and Jay were looking at the track just

24  visually, and Mr. Fresquez said, See, there you are, you have

25  already made your decision.  You're just going to look at the

1   track.

2           And I said, No, Brandon, we've got the GPS.  We are

3   just looking to see how the repairs look visually.

4           And he said, No, you've already made -- you've

5   already made up your mind.

6           I said, No, Brandon, we are going to GPS this.  Go

7   get your string-line, and we will verify whether or not this

8   is valid or invalid.

9           Mr. Fresquez said, No, there's no point.

10          I said, Brandon, I'm instructing you to get your

11  string-line.  We need to verify whether this is valid or

12  invalid.

13          He said, No, there's no point.

14          And then he kind of looked at us briefly, and he got

15  in his truck and left.  And then for the fourth time I got on

16  the radio --

17  Q.  Let me stop you there.

18  A.  Oh, sorry.

19  Q.  No, that's fine.  When you wrote out the statement here in

20  62, had you listened to the dispatch recordings of what

21  Mr. Fresquez said?

22  A.  No.

23  Q.  You eventually did hear those dispatch recordings in the

24  investigation hearing?

25  A.  Yes, I did.

1  Q.  Did you pull those?

2  A.  No, I didn't.

3  Q.  Do you know how they were obtained?

4  A.  Um, I'm sure somebody requested it through like the IT or

5  telecom department or dispatching center possibly as well.

6  Q.  You understand your side of the conversation is not there.

7  A.  Yes, I do understand that.

8  Q.  Why do you think that is?

9  A.  Um --

10       MR. THOMPSON:  I'm going to object, Your Honor.

11  There's been no foundation this witness would know that

12  information.

13       THE COURT:  Sustained.

14  BY MR. GOMAN:

15  Q.  You had nothing to do with the preparation of those

16  dispatch recordings?

17  A.  No, I did not.

18  Q.  Is there any doubt in your mind that you had a

19  conversation with Mr. Fresquez over the radio on May 5th of

20  2016?

21       MR. THOMPSON:  Objection, Your Honor:  leading.

22       THE COURT:  Sustained.

23  BY MR. GOMAN:

24  Q.  How certain are you that you had a conversation with

25  Mr. Fresquez over the radio?

17-cv-00844-WYD-SKC                    Paz - Cross                    III - 737

1    A.  Hundred percent.

2    Q.  What were you talking with him on?  What were you using?

3    A.  I was on a portable radio.

4    Q.  The jury's heard what Mr. Fresquez said on the dispatch

5    recording, so I just want to ask, What were you saying to him?

6    A.  After Brandon had walked away for the third time and I

7    seen that he drove off, and I knew this was a serious rules

8    violation for insubordination, I gave him a fourth opportunity

9    on the radio to try to get him to come back.  And once again

10   he said, No, there's no point.

11          And then I did confirm.  I said, Brandon are you

12   saying no?

13          And then at the end of it he said, Well, I didn't say

14   no.  Or something in that nature.  But he had drove completely

15   off the job site, so . . .

16   Q.  Do you believe there was anything dangerous or unsafe

17   about string-lining that track out there?

18   A.  No, not performing a string-line, no.

19   Q.  Did Mr. Fresquez ever tell you that he thought it was a

20   dangerous or unsafe task?

21   A.  No, he didn't.

22   Q.  All right.  Let's talk about, then, what you find.

23          You and Mr. Herzog measured the track together?

24   A.  Yes, we did.

25   Q.  Were you talking about what the measurements were?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    A.  Yes.

2    Q.  Were there other defects you were looking for that day,

3    too?

4    A.  Um, there's possible.  I just know that our main focus was

5    the one, the alignment defect.

6    Q.  Let's go then to Exhibit A-70.

7         You've seen this before; right, Mr. Paz?

8    A.  Yes, I have.

9    Q.  What record keeping system is this kept in?

10   A.  So this is a record keeping of our geometry car defects.

11   Um, red tag is how we have been referring to it.

12   Q.  You see where Mr. Herzog's name is there?

13   A.  Um, yes, it's under the Repaired column.

14   Q.  Okay.  How does an employee's name come to be associated

15   with a repair date?

16        MR. THOMPSON:  Objection, Your Honor.  There's been

17   no foundation that this witness would know that answer.

18        THE COURT:  Overruled.  You can answer if you know.

19   A.  Um, so every -- every BNSF employee has their own login

20   and credentials that no one knows other than the employee, and

21   we are not to give those credentials out to anyone.  So with

22   those credentials you log into these systems, this engineering

23   defect system, and you would say that it's repaired, and it

24   would time stamp your name based on your employee ID and your

25   login credentials.

1   BY MR. GOMAN:

2   Q.  Do you know Jay Herzog's login credentials?

3   A.  No, I don't.

4   Q.  Can you enter a defect in this system without knowing

5   those credentials?  Can you enter a defect in his name without

6   knowing those credentials?

7   A.  No, I can't.

8   Q.  Do you know Brandon Fresquez's credentials?

9   A.  No, I don't.

10  Q.  Why have Mr. Herzog verify this repair, as opposed to you?

11  Could you have done it?

12  A.  I could have.  It's always practice that who repairs the

13  defect is the one who shows it repaired in the system.

14  Q.  Back up a little bit.  This defect here, it had been on

15  for two years?

16  A.  Based on the records, yes.

17  Q.  And do you take issue with -- is that a problem for you?

18  A.  No.  No, it's not a problem that it was on.  Just

19  something we wanted to get repaired, though.

20  Q.  Was it a high-priority defect for you?

21  A.  No.

22  Q.  Is this the type of defect that you would remove from the

23  system fraudulently to increase your scorecard ranking?

24  A.  No.

25  Q.  Do you think this defect would have any effect on your

17-cv-00844-WYD-SKC                 Paz - Cross                      III - 740

1   scorecard ranking?

2   A.  No.  This was in a crossover.  No.

3   Q.  What do you mean it's a crossover?  I don't understand

4   that.

5   A.  So I guess just the way I typically look at it when you

6   talk about the scorecard, our tracks let's just say run east,

7   west, north, and south.  They typically run at a high speed or

8   the highest speed safe for that track.  This was a crossover,

9   so it's when we switched from one track to another, which is a

10  slow speed already, and it doesn't fall under the metrics of

11  the scorecard.

12  Q.  If this defect had remained in place, if you weren't able

13  to repair the alignment defect, do you think your supervisors

14  would have been upset with you?

15  A.  No.

16  Q.  Did Mark Carpenter ever talk with you about this defect?

17  A.  Um, other than, you know, maybe for planning purposes when

18  I requested the windows, in that nature.

19  Q.  Did you fraudulently remove this defect from the system,

20  Mr. Paz?

21  A.  No.

22  Q.  Did -- all right.  So let's go back to the scene of the

23  insubordination.

24          You said you called Mark Carpenter after Mr. Fresquez

25  left?

1    A.  Yes, I did.

2    Q.  Why?

3    A.  Because it was a serious rules violation, and I had to

4    report it to my supervisor.

5    Q.  From that point forward, did you have any role in deciding

6    to notice an investigation into that rules violation?

7    A.  No.  My job was simply just to report the violation.  And

8    then, you know, obviously I had to go back for my testimony,

9    but that was it.

10   Q.  Who decided to notice the investigation for

11   insubordination?

12   A.  Mark Carpenter gave me the investigation notice to give to

13   Mr. Fresquez.

14   Q.  Anything unusual about that?  Is that usually how it's

15   done?

16   A.  Yes.

17   Q.  You testified in the investigation hearing?

18   A.  Yes, I did.

19   Q.  Did you testify truthfully?

20   A.  Yes.

21   Q.  Did you shade your testimony because of the e-mail from

22   Mark Carpenter?

23   A.  No, I did not.

24   Q.  After the investigation was done, did you look back at

25   that transcript?

17-cv-00844-WYD-SKC                Paz - Cross                    III - 742

 1   A.   No.

 2   Q.   Okay.

 3   A.   I guess, right after or --

 4   Q.   Yeah.

 5   A.   No, not after, no.

 6   Q.   We have been involved in litigation now, and for

 7   preparation for this case have you looked at it since?

 8   A.   Yes.

 9   Q.   Okay.  After that transcript was prepared, did you have

10   anything to do with the decision to dismiss Mr. Fresquez?

11   A.   No, I did not.

12   Q.   Did anyone call you to ask you your opinion?

13   A.   No.

14   Q.   Ned Percival was the hearing officer?

15   A.   Correct.

16   Q.   Before this hearing, did you know who he was?

17   A.   Vaguely.  He was a different department than I was.

18   Q.   Was he someone who supervised Mr. Fresquez or you?

19   A.   Neither, no.

20   Q.   The investigation hearing is recorded, and a transcript

21   was prepared.  Did you have anything to do with the

22   preparation of that transcript?

23   A.   No.

24   Q.   In your performance evaluation we just looked at, it's

25   Exhibit 20, there is a section where you comment on

17-cv-00844-WYD-SKC                    Paz - Cross                    III - 743

1   Mr. Fresquez's dismissal for insubordination; right?

2   A.  Yes.

3   Q.  Why is that in your performance review?

4   A.  So under that review, like, there's multiple categories.

5   That one was under People.  So I just outlined the events that

6   had happened that year, because it was for 2018.  I was just

7   highlighting everything involved around people.

8   Q.  Was this a significant event, Mr. Fresquez's --

9   A.  Yes, it was.

10  Q.  Did you -- were you proud or pleased that this had

11  happened?

12  A.  Um, no, definitely not proud or pleased.

13  Q.  Did you get any sort of, I don't know, bonus or even

14  attaboys for having played a role in Mr. Fresquez's dismissal?

15  A.  I got nothing extra for it, no.

16  Q.  I want to switch topics.  There's been an allegation in

17  this case that you have been deleting defect reports from the

18  TIMS system fraudulently.  All right?

19  A.  Okay.

20  Q.  Have you ever done that?

21  A.  No.

22  Q.  What do you think the consequences would be for you, for

23  your employment or for you personally, if you did that?

24  A.  Well, two things that come to mind.  One, BNSF, if they

25  were to find out, I would lose my position, my career.  If the

1   FRA was to find out, then I could be personally fined by the

2   FRA.

3   Q.  Even if the FRA didn't find out, but BNSF did, Adam Miller

4   or one of your other bosses, what do you think the

5   consequences would be then?

6   A.  I think I would be terminated.

7   Q.  I want to talk, then, about the specific allegations of

8   the deletion of defects.  I'm going to show you what's been

9   admitted as Exhibit 36.

10          MR. GOMAN:  I'm sorry.  Will you confirm?

11          COURTROOM DEPUTY:  It has been admitted.

12          MR. GOMAN:  I'm sorry.  Are we pulling it up?  Thank

13   you.

14   BY MR. GOMAN:

15   Q.  Do you know what this is, Mr. Paz?

16   A.  Yes.  It's a component of a spring frog.

17   Q.  Just by looking at it, can you tell whether this is one

18   you've seen before or not?

19   A.  Yeah, I believe I recall this, yes.

20   Q.  Okay.  What, if anything, is obvious about the frog?

21   A.  That it's -- the compressor there, that canister-looking

22   device, is missing a bolt.

23   Q.  What's the repair like for that?

24   A.  It's minor repairs.  You just get any, you know -- we have

25   bolts that fit this, but it's just a nut-and-wrench-type

17-cv-00844-WYD-SKC                 Paz - Cross                III - 745

 1   repair.  You put a bolt in and tighten it back up.

 2   Q.  Do you recall Mr. Fresquez telling you that there was a

 3   scratch on -- or what he thought was a crack on a spring frog?

 4   A.  Yes, I do.  Yes.

 5   Q.  Tell me everything you remember about that conversation.

 6   A.  So I just remember we had a new construction.  So by new

 7   construction, we just installed some brand-new track within

 8   the recent months.  The new spring frog, which would look

 9   similar to this one, same component, that he looked at the

10   base of the rail, the base of the frog, and said that it was

11   cracked through as if it was broken.  So I showed up to the

12   job site and looked.  And I thought he was maybe joking with

13   me because when we went up there, it was like -- how I

14   described like a screwdriver scratching a piece of steel.  It

15   was just like a scratch compared to a break.  And then I could

16   tell that he was serious, so we talked about it.  He was still

17   adamant that the rail was completely broke.  I was adamant

18   that it was a scratch.  And I said, Well, Brandon, you have

19   done your due diligence.  You have showed it to me.  I'm

20   signing off that it's not a defect and that we are safe for

21   movement.  He still didn't agree, but I guess he agreed to

22   disagree.

23   Q.  This is the same spring frog that was apparently later

24   replaced by Mr. Dunn and someone else; is that right?

25   A.  Um . . .

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Paz - Cross                III - 746

 1   Q.  And I guess I don't mean this photograph, but the one you

 2   are talking about.

 3   A.  Oh, the same style of frog, yes.

 4   Q.  What do you know about the circumstances?

 5        Let me just ask you this.  When did that happen?  Do

 6   you know?

 7   A.  When they replaced it?

 8   Q.  Yeah.

 9   A.  It was some time after, you know, myself and Brandon had

10   that conversation.  I don't have the exact time frame.

11   Q.  Let me go then to -- and I'm sorry.  Your recollection is

12   it was replaced why?

13   A.  Um, so, like I said, it was a notorious maintenance

14   location 'cause the -- all the traffic of the trains were

15   going through the turnout side, which is the moving component

16   side, and an RBM frog that didn't have any moving components

17   would be more suitable there than what we initially installed.

18   So we spent the money to get a better frog for that location.

19   So we completely changed the style of frog there.

20   Q.  Do you take any issue with that replacement?

21   A.  No.  I was happy about that.

22   Q.  Let me show you Exhibit 48.  It's two pages here.  I want

23   to start with this text here.  Read this through to yourself.

24        Do you recall, um, this text message exchange?

25   A.  Um, yes.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                    Paz - Cross                    III - 747

1    Q.   Okay.  Let me give you some context here.  Do you remember

2    when Mr. Fresquez bid back onto the main line track inspector

3    job in May of 2016?

4    A.   Um, yes, I believe he bumped back, but I remember him

5    coming back, yes.

6    Q.   Did you tell Mr. Fresquez you needed to get your house in

7    order?

8    A.   Um, no, I don't know what he means -- or no.

9    Q.   Did you tell Mr. Fresquez not to report or inspect any

10   track the first day he was back because you needed to get your

11   house in order?

12   A.   No, I don't recall that conversation at all.

13   Q.   Did you make any attempt to clear out a bunch of defects

14   before Mr. Fresquez bumped back onto the main line inspector

15   in May of 2016?

16   A.   No.

17   Q.   Why not?

18   A.   Well, for one, if they were actually there, that would be

19   fraudulent.  Like I said, if BNSF ran their audit, I could

20   lose my job.  The FRA when they do their audits, they would

21   see my name time stamped on there.  And then ultimately

22   Mr. Fresquez, like I said, would be inspecting four times a

23   week; he would have seen that as well.

24   Q.   So what would you have to gain by, let's say, on May 2nd

25   of 2016 going out and deleting a bunch of defects from the

1  system before Mr. Fresquez came back?  What would that have

2  benefited you?

3  A.  Nothing.

4  Q.  Let's talk about this one in particular.  So that bottom

5  text message exchange, do you see Mr. Fresquez reporting a

6  dip?

7  A.  Yes.

8  Q.  You know what that's referring to; right?

9  A.  Yes, I do.

10  Q.  Let me show you what was shown to the jury yesterday.

11  This record here, and then I'm going to call out the bottom.

12  Looking at this record here, does it appear to relate to that

13  text message that Mr. Fresquez sent you?

14  A.  Yes, it does.

15  Q.  So explain to the jury how you know that.

16  A.  Just in the Comments it says just north of Kalamath

17  Street, which is the crossing that was indicated in that text

18  message.

19  Q.  So we see Mr. Fresquez text messaging you about the defect

20  that it looks like you removed from the system on May 2nd.

21  A.  Yes.

22  Q.  What's going on?

23  A.  So like in the text messages Mr. Fresquez told me that he

24  had a defect just north of the Kalamath crossing, and then I

25  said that, okay, that we can hit it on the way down for

1   tomorrow's window.  How long is it, by how long is the defect.

2   And what I meant by hitting it on the way down, Jay Herzog's

3   crew, the surfacing gang, were going to be in that area, so I

4   just said we would fix it on the way through.  And then so

5   they did fix it, and I reported it as repaired.

6   Q.  But why the day before did you report it as repaired?

7   A.  Um, I don't know.  They could have got there a day early

8   on their travels.  I'm not sure.  But I know it's repaired.

9   Otherwise, I wouldn't have closed it.

10  Q.  Do you -- do you recall anything else about this defect?

11  A.  No.  No, nothing out of the ordinary, I guess.

12  Q.  How many track defects do you deal with, I don't know, in

13  a week?

14  A.  Oh, a lot.  When I was in Denver, I mean, I would say

15  close to a hundred weekly, give or take.

16  Q.  All right.  Let's go to then Exhibit 47.  This is an

17  e-mail text message, excuse me, to Ryan Akers.  And I'm going

18  to go to the second one.  What is this text message exchange?

19  Please explain to the jury what you are talking about.

20  A.  So on the very top, the blue one there, East Mills out of

21  service 58 1/2 inch gauge, so Mr. Fresquez is just saying that

22  the track has got wide gauge, so the track is going too far

23  out, on both sides turnout and straight.  Then he says he has

24  a 10 mph, which means trains can only go at 10 mile per hour

25  on the siding, west end of Cherokee bridge.

1          And then I just said, Just curious on why the it

2     would be a 10 mph due to a joint tie?  Or are you using the

3     verbiage of the FRA stating the inspector's judgment.

4          So when I hear joint tie defect, I think of 30-day

5     defect, that we have 30 days to repair it.  So, in my mind, if

6     Brandon placed a 10 on it, that maybe there's some other

7     conditions out there that warrant a slower speed than just

8     allowing operations at 30 days.

9     Q.  If he put a 10 mile an hour on it in addition to

10    designating it as a non-class-specific defect, do you have an

11    issue with him doing that?

12    A.  No.  If the conditions are there, that's what we want him

13    to do.

14    Q.  All right.  So that was March 8th of 2016.  Let's look at

15    this exchange May 4th of 2016.  When Mr. Fresquez tells you

16    LoDo siding out of service, you asked him why; is that right?

17    A.  Yes.

18    Q.  Does this look like it's the same defect you are referring

19    to in that previous text message?

20    A.  It's the same -- LoDo siding is the same location.

21    Q.  Why are you asking him why if you already had a

22    conversation about this defect two months prior?

23    A.  Because we could have done some work there.  We could have

24    gooped, you know, replugged the tie, got it nipped up.  We

25    could have done a repair.  And then it was closed out, so I

1    kind of moved on to the next defects that were out there, the

2    other defects.

3    Q.  Then you say, If you were planning on pulling it you

4    should speak up, secrets don't make for friends.

5         What do you mean?

6    A.  You know, we have a briefing every morning at 7:30, and I

7    was simply stating that's something if you were going to pull

8    something out of service, that you were planning on pulling

9    out, you should probably speak up in the morning briefing, let

10   us know, so we can plan accordingly.

11   Q.  Were you a little frustrated when you sent that text

12   message?

13   A.  Yes, I'd say that's a -- yes, I was.

14   Q.  Why?  I mean, why do you need to -- why is it your

15   preference that you discuss in the morning briefing what's

16   going out of service?

17   A.  Well, it's just counterproductive.  If we can plan and get

18   ahead of things -- 'cause there's more than one defect out

19   there.  There's more than one track inspector, and we try and

20   prioritize and have our work groups go out there by that

21   priority, understanding things change.  But when you plan to

22   do something, it would be nice to get a heads-up on it.

23   Q.  Let me go to Exhibit 44.  And then Exhibit 45.

24        Explain to the jury what you are describing to

25   Mr. Fresquez and Mr. Dunn.

1    A.   Okay.  So I'm just describing, like, some FRA knowledge.

2    I might have misspoke when I said non-class, meaning

3    class-specific in this.  But I just said, As far as your

4    10 mph for details 213.109(B) states cross ties are non-class

5    specific.  Your location is less than a 2 degree curve which

6    states you need 8 cross ties within 39 feet.  Where does this

7    justify a 10?  And then I said, 8 cross ties is a reference

8    for Class 3.

9         So I'm just trying to get all the facts, all the

10   details, so I can answer those questions if my supervisor is

11   to ask.  Because knowing the FRA, I know what the tolerances

12   are.  So I was asking Brandon kind of what else is out there,

13   because here's what the FRA states.

14   Q.   Are you telling him what to do?

15   A.   No.  I'm asking a question.

16   Q.   Okay.  Back to the TIMS system real quick.  When you clear

17   out a defect in the TIMS system, are you -- can you just write

18   comments in there, or is it a drop-down box?

19   A.   As far as a certain portion of it, it's -- there's

20   probably a spot in there, if I remember right, you can write

21   some comments, but as far as, like, when you go to close out a

22   defect, there's drop-down boxes that give you like X amount of

23   responses that you are allowed to use.

24   Q.   What do you do if a defect is coded improperly?  How do

25   you report that in the system?  How do you clear that out of

17-cv-00844-WYD-SKC                Paz - Cross                    III - 753

1   the system?

2   A.  I don't -- in TIMS I don't recall there being a drop-down

3   box that said, you know, defect was entered improperly.  So a

4   lot of times the inspector would say repaired, you know,

5   before inspection or something in that nature.  Verbiage might

6   be a little off.

7   Q.  Well, let's be specific.  That would mean it hadn't been

8   repaired, but it's still being removed from the system?

9   A.  Yeah, so it was kind of our only way to remove it from the

10  system.  And you could write some comments in there if you

11  wanted to say, like, this wasn't repaired, but it was inputted

12  improperly or, you know, we've put a slow order when it should

13  have been this.

14  Q.  Have you ever done that?

15  A.  Yes, I believe I have probably, yes.

16  Q.  Meaning cleared out a defect because it was inputted

17  improperly in the first place?

18  A.  Um, yes.

19  Q.  Okay.

20  A.  Yeah.

21  Q.  All right.  Last document.  This is Exhibit 32.  Do you

22  recognize what this is?

23  A.  Um, yes.  This is a TIMS report for the 30-day defects.

24  Q.  Who has access to this?

25  A.  It's pretty much open to BNSF employees.  It's on the

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Paz - Cross                III - 754

 1   website.

 2   Q.  Could Mr. Fresquez and Mr. Goodnight see this?

 3   A.  Yes.

 4   Q.  Okay.  Can you just tell us -- I have a couple of specific

 5   questions about this one.  First of all, when was this defect

 6   listed as due?

 7   A.  It was due on 2/28 of 2015.

 8   Q.  All right.  And then it describes where the defect

 9   location is at; right?

10   A.  Yes.

11   Q.  And then the Remedial Action, what does that mean?

12   A.  Scheduled for 30 days or less.

13        And that's where the drop-down box I was talking

14   about, like if you were to -- you have the automatic replies

15   on the drop-down box, that's one of them.

16   Q.  It says Reported By.  Do you see Mr. Fresquez's name

17   there?

18   A.  Yes.

19   Q.  I mean, every -- just -- there's a number of different

20   inspectors listed here; right?

21   A.  Yes.

22   Q.  So this isn't unique to Mr. Fresquez?

23   A.  No, it's not.

24   Q.  But what does that mean that he reported a

25   non-class-specific defect?

17-cv-00844-WYD-SKC                Paz - Cross                III - 755

1    A.  Simply that.  It just means that he reported a

2    non-class-specific defect.

3    Q.  Would he be permitted to take that track out of service

4    after 30 days if it hadn't been repaired?

5    A.  Yes, that is his responsibility, yes.

6    Q.  Is there any indication in here that he had done that?

7    A.  Um, no, because if it was removed from the system, it

8    wouldn't be on this report.

9    Q.  Okay.  But it could be that the defect just wasn't

10   properly cleared; right?

11   A.  It could have been repaired, um, and then nobody went in

12   and showed it repaired in this report.

13   Q.  Okay.

14          MR. GOMAN:  I don't have any more cross-examination

15   questions.

16          THE COURT:  All right.  We're going to take a break

17   because Darron Boltin is supposed to testify by video -- where

18   is he?  You said Wyoming?

19          MR. GOMAN:  Yes, Your Honor.

20          THE COURT:  -- at 3 o'clock.  And IT should be here

21   momentarily to set up the equipment.  And so we're going to

22   make this our midafternoon break.  And so as soon as IT is

23   here.  Hopefully they are in the hall so they can come in and

24   we get him on the screen.  So I want to make it at least a

25   10-minute break, but I'm hoping we can start in the next

17-cv-00844-WYD-SKC                Jury Trial                III - 756

1   10 minutes.

2        (Proceedings recessed 2:54 p.m. to 3:08 p.m.,

3        resuming outside the presence of the jury.)

4            THE COURT:  All right, let's bring the jury back in.

5        (Jury in at 3:09 p.m.)

6            THE COURT:  So, Mr. Stone, I want you to encourage

7   the witness to speak slower so the court reporter can take it

8   down accurately, and the same with you.

9            MR. STONE:  Yes, Your Honor.

10           THE COURT:  And maybe I'm saying it to him.  So speak

11  slowly.

12           MR. STONE:  Yes, Your Honor.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  All right.  So call your next witness,

15  with the understanding this witness is called out of order and

16  we will return to Mr. Paz when he's done.

17           MR. STONE:  For the record, Your Honor, we are

18  calling Mr. Darron Boltin adversely.

19           THE COURT:  All right.

20           COURTROOM DEPUTY:  Please raise your right hand.

21        (The witness was sworn.)

22           COURTROOM DEPUTY:  Please state your full name, and

23  spell your full name for the record.

24           THE WITNESS:  Darron Boltin, D-a-r-r-o-n,

25  B-o-l-t-i-n.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    **DARRON BOLTIN, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

2    BY MR. THOMPSON:

3    Q.  Mr. Boltin, what's your current position with BNSF

4    railroad?

5    A.  I am the director of administration for the Powder River

6    Division.

7    Q.  How long have you been in that position?

8    A.  Three years.

9    Q.  As a result of that position, are you familiar with the

10   BNSF employee discipline process?

11   A.  Yes, sir, I am.

12   Q.  How long have you been in the position where you're

13   oversight?  You said three years for the BNSF?

14   A.  Yes, sir.

15   Q.  Can you explain your role in the process for the

16   discipline process, sir?

17   A.  I provide the general oversight for the entire process.  I

18   guess you could say from start to finish.  I don't actually

19   have hands-on.  I am more of a resource or a tool for those

20   that are actually applying it, our supervisors, anybody that

21   has questions.  So I'm more of a research -- resource for

22   them.

23   Q.  So your job is to make sure the process is implemented

24   fairly and run appropriately?

25   A.  Yes, sir.

1  Q.  Okay.  In your years in that position, sir, can you for

2  the record state today an individual who went to a hearing and

3  was found not guilty for substantive reasons, discipline was

4  found not valid?

5  A.  I cannot give you a name specifically of anybody.  I know

6  that that does occur.

7  Q.  Okay.  Regarding the process, hearing officers are

8  supposed to be neutral; is that correct?

9  A.  Yes.

10  Q.  Okay.  Other managers that bring the discipline are not

11  supposed to tell the hearing officer what to say; correct?

12  A.  Correct.

13  Q.  What testimony to put on, what evidence to submit;

14  correct?

15  A.  Correct.

16  Q.  I'm going to show you Plaintiff's Exhibit 62.

17          MS. DALE:  Your Honor, I object to testimony on this

18  exhibit based on the fact that he's not -- this exhibit or

19  this e-mail is not to or from Mr. Boltin.  He is not copied on

20  it.  He has no personal knowledge of it other than having seen

21  it at the deposition.

22          MR. STONE:  The question, Your Honor, is going to

23  revolve around whether the e-mail is proper.  He's just

24  testified that it is his role to understand the implementation

25  of the program and process, and this is an e-mail involving

17-cv-00844-WYD-SKC          Boltin - Direct               III - 759

1    the discipline procedure, Your Honor.

2            THE COURT:  Okay.  Well, this exhibit is already in

3    evidence.  So because it's in evidence, I'll overrule the

4    objection, and the witness can comment on it, depending upon

5    what your questions are.

6            MR. STONE:  Thank you.

7    BY MR. STONE:

8    Q.  Do you see the exhibit, sir, from where you are at?

9    A.  Yes, sir.

10   Q.  Can you take a moment to review the e-mail, sir?

11   A.  Sure.

12           Okay.

13   Q.  Do you recall seeing this e-mail previously?

14   A.  Not prior to today, sir.

15   Q.  Yes, sir.  And this e-mail, you've had an moment to review

16   it, it is from the charging officer to the hearing officer; is

17   that correct?

18   A.  Yes, sir.

19   Q.  And it's explaining what testimony to put on, what

20   evidence to submit, things of that nature; correct?

21   A.  It so appears.

22   Q.  And you would take issue with this e-mail being sent; is

23   that correct?

24   A.  Yes, sir.

25   Q.  Have you ever seen another manager send an e-mail such as

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   this in another disciplinary process?

2   A.  I have not.

3   Q.  You would agree that sending an e-mail of this nature is

4   unfair to the charged employee; is that correct?

5   A.  Yes, sir.  It's unfair to the process too, as well.

6   Q.  Okay.  So to follow that point, you would discourage this

7   practice for process reasons; is that correct?

8   A.  Yes, sir.

9   Q.  Fairness in the process.

10  A.  Yes.

11  Q.  Also, based on your understanding of the process, because

12  this e-mail was discovered after the fact, this is not part of

13  the record; is that correct?  It's not part of the discipline

14  record?

15  A.  Uh, no, sir, it's not.

16  Q.  So during the arbitration proceeding, when Fresquez

17  appeals this matter, the arbiter wouldn't know that this

18  e-mail was sent; is that correct?

19  A.  I would suspect not, no.

20  Q.  Okay.  Now, I have some questions regarding how the

21  transcript is prepared.  There are some issues regarding what

22  words were included in a recording that occurred, so I'm going

23  to ask you those questions.

24          Is a transcript of the hearing taken?

25  A.  Yes, it is.

17-cv-00844-WYD-SKC                Boltin - Direct                III - 761

1   Q.   Is it taken in real time?

2   A.   Yes.

3   Q.   Physically, how is it transcribed?  Is there a court

4   reporter in the room?

5   A.   No, sir.  We have an audio recorder that's present.

6   Q.   Okay.  And that audio recorder, how does that turn into a

7   transcript?  How physically how does that convert into a

8   transcript?

9   A.   At the completion of the hearing, the audio is uploaded

10  into a database, at which time a third-party vendor takes

11  control of that audio, transcribes it, turns it into paper,

12  and places it back into the database.

13  Q.   Do you know who that third-party vendor is?

14  A.   At the time it was AcuTrans.

15  Q.   Okay.  Can hearing officers make changes to the transcript

16  after it's been transcribed?

17  A.   They have the opportunity to go in and change inaudibles.

18  A lot of times people are not heard.  They can go back in and

19  make changes to inaudibles, but not in the way the transcript

20  reads.

21  Q.   Okay.  Can union -- does the union have the same right to

22  do that?

23  A.   No, sir.

24  Q.   How does he physically make the transcripts?  What's the

25  process for that, the hearing officer, when he makes changes

1  to the transcript?

2  A.  They just go in -- it's a document that they can go in and

3  make any changes they need to.  For instance, if there's a

4  misspelling of a name or an inaudible that he remembers

5  time -- there are times where they do not remember exactly

6  what was said, so they won't change anything.

7  Q.  Is it your understanding that AcuTrans keeps a copy of

8  these transcripts?

9  A.  I do not know that.

10 Q.  You do you know who keeps a copy of the transcripts?

11 A.  I know that we have one that is uploaded into our

12 database.  That's the only one that I'm aware of.

13 Q.  Of all transcripts for disciplinary --

14 A.  Yes.

15 Q.  -- proceedings?

16 A.  Yes, sir.

17 Q.  Let me show you Plaintiff's Exhibit 54.

18       MR. STONE:  Can we call up, Mr. Keech, 54?  This has

19 not been admitted yet.

20       COURTROOM DEPUTY:  Actually, the jury can't see it.

21 It can only go to the witness.  That's the only copy with the

22 VTC.

23 BY MR. STONE:

24 Q.  Can you see the Exhibit 54, Mr. Boltin?

25 A.  Uh, yes, it's okay.  Um, yes, sir.

17-cv-00844-WYD-SKC          Boltin - Direct                III - 763

1   Q.  Okay.  Now, it was your testimony previously that AcuTrans

2   collects and produces the transcripts; correct?

3   A.  Uh, yes.

4   Q.  Okay.  Do you have any knowledge as to why they deleted

5   transcripts?

6   A.  No, sir, I don't.

7   Q.  I am going to refer you to paragraph 3 of Exhibit 54.  Can

8   you take a moment to read that, sir?

9   A.  Just waiting a second, sir, for it to come up full size.

10  It's in a little-bitty quadrant right now.

11  Q.  Take your time.

12  A.  Okay.  Yes, sir, I've read it.

13  Q.  Now, paragraph 3, isn't that inconsistent with your

14  understanding that you keep copies of the transcript, sir?

15          THE COURT:  Let's have this in evidence.

16  A.  Yes, sir.

17          THE COURT:  Hold on.  Stop.

18          MR. STONE:  Fair enough.  Move to enter Plaintiff's

19  54.

20          MS. DALE:  Objection to foundation.  He's not

21  familiar with this.  He's not familiar with the -- he has no

22  foundation to speak to this exhibit.

23          MR. STONE:  The only issue raised on objection, Your

24  Honor, in the exhibit list was relevance, Your Honor.

25  Relevance I can argue.  Authentication and foundation was not

1    raised in the exhibit list.

2              THE COURT:  Well, let's -- hold on.  Hold on.  I will

3    let her raise foundation, but put it up on the screen so I can

4    see it.

5              COURTROOM DEPUTY:  I'm not sure I can, Your Honor --

6              THE COURT:  You can't?

7              COURTROOM DEPUTY:  -- with the VTC.

8              THE COURT:  Let me find which of these heavy books

9    has Exhibit 54.  What paragraph are you focusing on, 3?

10             MR. STONE:  It's on page 2, paragraph 3, Your Honor.

11             THE COURT:  All right.  I'm going to overrule the

12   objection for this reason.  He's already testified that

13   AcuTrans had a role in this, and I think the purpose of the

14   questioning is to see if he has knowledge about whether or not

15   paragraph 3 was either followed or not followed.  So to that

16   extent I think it's appropriate for this witness to consider

17   that aspect of the document.  So, over objection, I'll admit

18   Exhibit 54.

19             MS. DALE:  Your Honor, can I also raise a relevance

20   objection?

21             THE COURT:  Yes.  Go ahead.

22             MS. DALE:  So the transcript in this case we have.

23   So if there's destruction of some transcripts, it's irrelevant

24   to this case.  We have the transcript.  We also have the

25   recording that is disputed.  So the jury can compare the

17-cv-00844-WYD-SKC          Boltin - Cross          III - 765

1   transcript to the recording.  So whether other transcripts are

2   not available has no relevance to this proceeding.

3        THE COURT:  Well, all right.  I understand what you

4   are saying, but I'm still going to overrule the objection.  I

5   will let the witness answer.  And, of course, you can

6   cross-examine him on anything he might say that you disagree

7   with.  All right.  So Exhibit 54 is received.

8        (Plaintiff's Exhibit 54 received.)

9        MR. STONE:  Thank you, Your Honor.

10  BY MR. STONE:

11  Q.  Mr. Boltin, you are reading at paragraph 3 the deletion of

12  investigative hearing transcripts for dates prior to December

13  2015.  Is that contrary to your understanding of the practice,

14  proper practice?

15  A.  Um, out here in the field, yes.  Sir, I'm responsible for

16  maintaining the integrity of this process out here in the

17  field, which is something I take serious.  So this is the

18  first time I've seen this, and it goes against my belief, yes.

19  Q.  Do you have any knowledge as to why it was deleted?

20  A.  No, I do not.

21       MR. STONE:  Okay.  No further questions, Your Honor.

22       THE COURT:  All right.  Cross-examination.

23                    **CROSS-EXAMINATION**

24  BY MS. DALE:

25  Q.  Good afternoon, Mr. Boltin.

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC                Boltin - Cross                    III - 766

1   A.  Good afternoon.

2   Q.  When an investigation is noticed in the Powder River

3   Division, a letter goes out to the employee with your name on

4   it; is that correct?

5   A.  That's correct.

6        MS. DALE:  Okay.  And if we could pull up

7   Exhibit A-45.  I believe this has been admitted.

8   BY MS. DALE:

9   Q.  Do you have Exhibit 45 with you -- A-45?

10  A.  Yes, ma'am.

11  Q.  Okay.  And can you take a look at that?

12  A.  Okay.

13  Q.  And is that the letter that you sent in this case opening

14  this investigation?

15  A.  Yes.

16  Q.  Okay.  And when the disciplinary letter is issued, if it

17  is issued, sometimes it will go out under your name as well;

18  is that correct?

19  A.  That's correct.  On occasion, they do.

20  Q.  Okay.  Do you have Exhibit A-54 in front of you?

21  A.  Yes, ma'am, I do.

22  Q.  And was this the disciplinary letter that went out in this

23  case under your name?

24  A.  Yes, ma'am.

25  Q.  And in most cases that's the beginning and ending of your

Julie H. Thomas, RMR, CRR                                (303)296-3056

1   involvement in a hearing; is that correct?

2   A.  That is correct.

3   Q.  And in this case, that was the extent of your involvement;

4   is that correct?

5   A.  That is correct.

6   Q.  There are some cases where a hearing officer might call

7   you and ask you for advice about a PEPA issue; is that

8   correct?

9           MR. STONE:  Objection, Your Honor:  leading.

10  A.  Yes.

11          THE COURT:  Hold on.  Hold on.  This is --

12          MS. DALE:  This is cross.

13          THE COURT:  -- cross, and even though you called this

14  witness adverse, at least with respect to everything you

15  covered, she can ask leading questions because it is her

16  cross-examination of her own witness.

17  BY MS. DALE:

18  Q.  So just to make sure the record is clear, a hearing

19  officer or someone else might call you and ask you questions

20  about the PEPA policy; is that correct?

21  A.  Yes.

22  Q.  And if you had questions and you weren't able to answer

23  their questions, who would you contact about that?

24  A.  I would contact a member of our PEPA team.

25  Q.  Okay.  And do you recall that happening in this case?

1   A.  I do not, not in this case.

2   Q.  Okay.  In 2016 in the Powder River Division, would a

3   hearing officer decide whether there was a rules violation or

4   not?

5   A.  The hearing officer conducts the hearing, and then the

6   information goes to a decisionmaker who would then make that

7   ruling.

8   Q.  So does the hearing officer decide what level of

9   discipline will be imposed if there is a violation found?

10  A.  They would apply the PEPA policy based on the outcome of

11  the hearing.

12  Q.  But my question is --

13  A.  PEPA policy basically lays it out for us.

14  Q.  Okay.  I apologize for interrupting.

15          My question is:  Does the hearing officer decide what

16  the level of discipline is?

17  A.  They don't make the final decision, but they may -- they

18  may have some input into it.

19  Q.  They really don't make any decision, do they?

20  A.  Well, no, ma'am.  The PEPA policy is very specific on the

21  level of discipline based on the infraction, based on the

22  nature of it, whether there's been prior discipline in the

23  past, so there's really no decision, so to speak, to be made.

24  It's laid out for us.

25  Q.  Okay.  Let's go back to Exhibit 62 that you were looking

1    at before --

2    A.   Okay.

3    Q.   -- and the letter at the bottom.  It's actually from

4    Mr. Paz to Mr. Carpenter; is that correct?

5    A.   Yes, it is.

6    Q.   And then the letter at the top is from Mr. Carpenter to

7    Mr. Paz; is that correct?

8    A.   Yes.

9    Q.   Okay.  So Everett Percival, who was the hearing officer,

10   this is not actually to him.  He is just cc'd.  Is that

11   correct?

12   A.   Correct.

13   Q.   Okay.  So let's assume you have a relatively new

14   roadmaster, an experienced division engineer.  The division

15   engineer is giving the roadmaster advice about how the hearing

16   process works.  Is there anything inappropriate about that?

17   A.   No.

18   Q.   Is there anything wrong with discussing what witnesses

19   might be called, what evidence might be put on at a hearing?

20   A.   No.

21   Q.   And on the flip side of that, if the union representative

22   were to meet with Mr. Fresquez and talk about what witnesses

23   they are going to present, what evidence they are going to

24   present, is there anything inappropriate about that?

25   A.   No, there's not.

17-cv-00844-WYD-SKC                Boltin - Cross                III - 770

1   Q.  So you would expect both sides to get together and figure

2   out how they are going to present their case.  Is that

3   accurate?

4   A.  Yes.

5   Q.  So when you talk about due process, really your concern is

6   that the issues are not prejudged.

7   A.  Correct.

8   Q.  Can you still see me?  We have lost your picture.

9   A.  Yes, I can see you.

10          MS. DALE:  Your Honor, do you want me to just --

11          THE COURT:  You are asking me why the screen is

12   blank?

13          MS. DALE:  Well, I'm asking if you want me to just

14   keep going, because we can still hear, but I can't see him.

15          THE COURT:  Yeah, let's see if Mr. Keech has any

16   thoughts about how to get a picture back.  Can the witness

17   still hear us?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Can you see us?

20          THE WITNESS:  Yes, sir, I can.

21          THE COURT:  We can't see you.

22          Unless there's some objection, why don't we continue.

23   Is that okay with both sides?

24          MR. STONE:  We're really close to finishing, Your

25   Honor.  I think we should just continue.  No objection.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Boltin - Cross                    III - 771

1              THE COURT:  Let's continue without a picture.  So go

2    ahead, Counsel.

3              MS. DALE:  Okay.

4    BY MS. DALE:

5    Q.  So backing up just a minute, when you talk about due

6    process, really your concern is that the deciding officer is

7    not prejudging the issues.  Is that correct?

8    A.  That's correct.

9    Q.  You would not want the deciding officer involved in any

10   discussion of how to present the case; correct?

11   A.  Correct.

12   Q.  In this case, is it your understanding that Adam Miller

13   was the deciding party?

14   A.  Yes, that's what I was told, yes.

15   Q.  And he was not copied on this e-mail, was he?

16   A.  No, he was not.

17   Q.  And, to your knowledge, he had no involvement in the

18   investigation hearing; is that correct?

19   A.  Correct.

20   Q.  To your knowledge, in this case, did Everett Percival have

21   any input into the disciplinary decision?

22   A.  I have no knowledge.

23   Q.  To your knowledge, did Mike Paz have any input into the

24   disciplinary decision?

25   A.  I have no knowledge of that either.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                   Boltin - Cross                    III - 772

1   Q.  To your knowledge, did Mark Carpenter have any input into

2   the disciplinary decision?

3   A.  Not that I'm aware of.

4   Q.  Okay.  Changing gears for a moment, Mr. Stone had asked

5   you if you are aware of cases where there was investigation

6   that was held but no discipline was issued.  Do you recall

7   that?

8   A.  Yes, I do.

9   Q.  And you indicated that you are aware of such cases; you

10  just didn't recall names off the top of your head.  Is that

11  correct?

12  A.  That is correct.

13  Q.  How many hearings do you deal with in any given year?

14  A.  Well, you know, there's probably anywhere from maybe

15  around 1500 hearings a year.  If we look at the investigation

16  notice you referenced earlier, the dismissal letter was dated

17  May, and the sequence number on this file was 434, so up

18  through May there's been 434 of them.  So there's quite a few.

19  Q.  Do you remember the names of all the people that are

20  involved in hearings?

21  A.  I do not.

22          MS. DALE:  Your Honor, I have a few more questions.

23  I believe it's direct, though, if I could just take a moment.

24          THE COURT:  Yeah, go ahead.  You can ask some

25  questions on direct examination.

Julie H. Thomas, RMR, CRR                                    (303)296-3056

17-cv-00844-WYD-SKC                Boltin - Cross                III - 773

1   BY MS. DALE:

2   Q.  Mr. Boltin, you were asked previously some questions about

3   Exhibit 54.  Do you recall those questions?

4   A.  Yes, I do.

5   Q.  To your knowledge, is the investigation transcript in this

6   case still in existence?

7   A.  I have not looked in the system to see if they are or not.

8   Q.  So you don't know one way or the other?

9   A.  No, I do not.

10  Q.  And this e-mail -- okay.  This e-mail, if you look at the

11  second page, paragraph 3, it refers to --

12  A.  Okay.  I just lost visual here.

13          COURTROOM DEPUTY:  I don't know if he's going to be

14  able to see any exhibits because we have lost video.

15          MS. DALE:  We've lost -- oh.

16          THE WITNESS:  I can still hear you, but I cannot see

17  any video.

18          COURTROOM DEPUTY:  He isn't seeing any exhibits.

19          MS. DALE:  Oh, he didn't have this.

20  BY MS. DALE:

21  Q.  Let me just read this paragraph to you.  It refers to

22  materials that are either dated or related to request from

23  BNSF from January 1st, 2009, through December 31st, 2015.  Do

24  you recall when the hearing in this case was held?

25  A.  Um, the hearing was held May 13th, 2016.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Boltin - Cross                III - 774

1   Q.   Okay.  So this letter does not apply to the hearing at

2   issue; is that correct?

3   A.   Appears not to, correct.

4            MS. DALE:  Okay.  Your Honor, I believe the rest I

5   have is direct, but it will be brief.  I don't know if they

6   had re --

7            THE COURT:  Are there any --

8            MR. STONE:  I've got some questions, Your Honor.

9            THE COURT:  Do you have any questions regarding what

10  she's --

11           MR. STONE:  Yes.

12           THE COURT:  Okay.  IT is indicating that his

13  bandwidth may not have been long enough or lasted long enough

14  and that's why it's cut off.  The only way to get his picture

15  back is to disconnect and reconnect.  So do you want to try to

16  disconnect and reconnect or just go the audio?

17           MR. STONE:  I don't have any more exhibits, Your

18  Honor, so I can just go with audio.

19           THE COURT:  Ms. Dale, what's your pleasure?

20           MS. DALE:  I apologize.  Sorry?

21           THE COURT:  Yeah, you weren't listening.  We'd have

22  to disconnect and reconnect to get the video back.  Mr. Stone

23  is willing to just go with audio.  Is that acceptable to you?

24           MS. DALE:  Yes, Your Honor.  I apologize.

25           THE COURT:  All right.

1      **REDIRECT EXAMINATION**

2   BY MR. STONE:

3   Q.  Mr. Boltin, I just have a couple follow-up questions on

4   the questions you were asked just a moment ago.  So the

5   disciplinary officer in this case, Adam Miller, only gets what

6   the hearing officer enters into evidence; is that correct?

7   A.  He gets what the -- what is gathered during the entire

8   hearing, whether it's from BNSF or from the union side.  So he

9   would get all the evidence that was entered during the

10  hearing.

11  Q.  But he's not getting evidence at a later date or through

12  another forum; is that correct?

13  A.  That's correct.

14  Q.  So, therefore, the evidence that's submitted at the

15  hearing is vitally important for his review; is that correct?

16  A.  That is correct.

17  Q.  Okay.  So the issue you had with the e-mail, Plaintiff's

18  62, was sending that information to the hearing officer;

19  correct?  Regarding what testimony, what evidence, and things

20  of that nature?

21  A.  Which exhibit was that, sir --

22  Q.  The e-mail we reviewed just a few moments ago where the

23  hearing officer was provided information regarding what

24  evidence was to be submitted, what witnesses, things of that

25  nature.

1   A.  Okay.  Then, again, what was your question regarding that?

2   Q.  Fair enough.  So that's the issue you have is contacting

3   the hearing officer with what evidence and questions and

4   things of that nature should be provided at the hearing

5   beforehand; correct?

6   A.  I would take exception if he was giving him a direction on

7   which way to go.  I don't take exception as far as procedure

8   goes.

9   Q.  Fair enough.  Thank you.

10          MR. STONE:  No further questions.

11          THE COURT:  All right.  Ms. Dale.

12      **DARRON BOLTIN, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

13  BY MS. DALE:

14  Q.  Mr. Boltin, I just had a few more questions just about the

15  hearing process very generally.

16          The employee at a hearing is not represented by an

17  attorney; is that correct?

18  A.  Correct.

19  Q.  Is the company represented by an attorney in the hearing?

20  A.  No, they are not.

21  Q.  Does the employee have any representation at all?

22  A.  Yes.  They have a union official.  Typically it is a local

23  chairman.

24  Q.  Okay.  If a scheduled employee is called as a witness by

25  the union, they are not paid by BNSF; is that correct?

 1    A.   Correct.

 2    Q.   Can the union pay them if they want to?

 3    A.   Yes, they can.

 4    Q.   Okay.  And can a union request that the hearing officer

 5    bring in an employee to testify?

 6    A.   Yes, they can.

 7    Q.   And if the hearing officer brings in a scheduled employee

 8    to testify, then would they get paid?

 9    A.   Um, yes, if it is requested by BNSF, then they would be

10    compensated for any lost wages.

11    Q.   Okay.  So in your experience in reviewing these hearings,

12    generally speaking, if a union requested a scheduled employee

13    be brought in to testify, under what circumstance would the

14    hearing officer go ahead and call them?

15    A.   Um, based on relevance.  If they have relevant information

16    or evidence that pertains to that case, then we wouldn't take

17    exception to it.  An example of where we might not is if the

18    union wanted to call in 35 employees to testify to the

19    principal's character, we may not do something like that.

20    Q.   Okay.  And then changing gears again for just one moment,

21    you talked about investigations where a hearing was held and

22    no discipline was issued.  Are you aware of any cases where an

23    investigation is noticed but then cancelled because the

24    company decides it doesn't have enough information or enough

25    evidence to go forward?

 1   A.  Yes, we do that.

 2   Q.  And are you --

 3   A.  I wouldn't say frequently, but it's often.

 4   Q.  Okay.  And are you aware of cases where an investigation

 5   is held and one employee is found responsible for a violation,

 6   but other employees are not?

 7   A.  Yes.

 8   Q.  Changing gears again, I just want to talk briefly about

 9   discipline.

10           Is it your understanding that insubordination is a

11   stand-alone dismissible offense regardless of any prior

12   discipline?

13   A.  Yes.

14   Q.  Are you aware of any employees other than Brandon Fresquez

15   who have been fired for insubordination?

16   A.  I am aware of cases in such nature, but I do not know

17   names.

18   Q.  Okay.  And we talked before briefly about the PEPA policy.

19   A decisionmaker isn't allowed to look at prior discipline

20   that's outside the review period for purposes of determining

21   what the discipline is in this case; is that correct?

22   A.  Correct.

23   Q.  Can the decisionmaker look at prior discipline for other

24   reasons?

25   A.  Yes.

1   Q.  Can you give me an example?

2   A.  Um, if somebody had a one-time offense or maybe a second

3   offense and the decisionmaker might be considering leniency,

4   they may take a look at employee's record to see if they have

5   had prior discipline, maybe something of a similar nature,

6   when deciding whether or not to grant leniency in a case.

7   Q.  And can you explain to the jury what leniency means?

8   A.  So we have different levels of discipline within our PEPA

9   policy, and one of those is a serious violation, something of

10  a serious nature.  Typically something of a serious nature we

11  would issue a Level S discipline, which is a 30-day record

12  suspension.  Those are reviewable up to three years, in some

13  cases 12.  If another -- if that same employee has another

14  Level S violation within that review period, they could be

15  subject to termination.  However, based on an employee's

16  record, they have had a clean past, the disciplining officer

17  could decide to grant leniency and issue a second Level S or

18  give them a second chance, if you will.

19          MS. DALE:  Thank you.  I have no further questions.

20          THE COURT:  All right.  Anything further from you,

21  Mr. Stone?

22          MR. STONE:  I just have one follow-up question.

23                      **CROSS-EXAMINATION**

24  BY MR. STONE:

25  Q.  We have -- AcuTrans would keep track of -- it's your

1  understanding and your position that AcuTrans would keep track

2  of what changes were made to a transcript and who made them;

3  is that correct?

4         MS. DALE:  Objection, Your Honor.  I don't --

5  A.  I did not --

6         MS. DALE:  I believe it's outside the scope of the

7  direct.

8         THE COURT:  It's all right.  I will allow it.

9         MR. STONE:  I'm not sure if he answered or not.  Did

10  he?  Let me ask it again.

11  A.  I didn't finish.  Would you like me to finish?

12  BY MR. STONE:

13  Q.  Why don't you start over, because I don't think we heard

14  you, so --

15  A.  Okay.  I do not know what they keep or don't keep.  All I

16  know is we submit the audio to AcuTrans; they transcribe it

17  and send it back to us.  Beyond that, I don't know what they

18  do.

19         MR. STONE:  Okay.  No further questions, Your Honor.

20         THE COURT:  All right.  Ms. Dale, do you have

21  anything else?

22         MS. DALE:  No, Your Honor.

23         THE COURT:  All right.  That concludes the witness's

24  testimony, and he's excused as a witness.

25         Let's recall Mr. Paz.  How much longer do we have

17-cv-00844-WYD-SKC                Paz - Redirect                III - 781

1   with him today?

2           MR. THOMPSON:  I'm hoping less than four questions

3   with Mr. Paz, Your Honor.

4           THE COURT:  All right.  I want to finish him before

5   5 o'clock, so -- and, in fact, I want to finish him well

6   before that so we can call another witness and speed this

7   trial up.

8           MR. THOMPSON:  We intend to finish him by 4 o'clock

9   and call Mr. Jay Herzog, Your Honor, and get him done today

10  too.

11          THE COURT:  All right.

12      **MICHAEL PAZ, PLAINTIFF'S WITNESS, REDIRECT EXAMINATION**

13  BY MR. THOMPSON:

14  Q.  Mr. Paz, on May 5th you, Jay Herzog, and Brandon Fresquez

15  were at a defect; right?

16  A.  Yes.

17  Q.  You told the jury that you found and repaired that defect

18  that day.

19  A.  We didn't find it that day.  We repaired it that day.

20  Q.  The defect was present that day.

21  A.  Prior to us repairing it, yes.

22  Q.  That day it was there.  You saw it.  It was there.  It got

23  fixed.  Right?

24  A.  No, I didn't see it that day, because when I was there, I

25  was at the verification piece of it.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                    Paz - Redirect                      III - 782

1   Q.  So you didn't find the defect that day.

2   A.  What was that?  What did you say?

3   Q.  You didn't find the defect that day.

4   A.  I didn't find the defect that day, no.

5   Q.  Did anybody find the defect that day?

6   A.  Um, no, 'cause when we string-lined it, it was repaired.

7   Q.  So you repaired the defect that day that you couldn't

8   find?

9   A.  Yes, because the work had already been repaired, yes.

10  Q.  Okay.  So I want to make sure I understand now.  So now

11  you are saying you didn't find the defect that day; right?

12  A.  Yes, because I was there after the fact.  It had been

13  repaired that day.

14  Q.  So it had been repaired that day.

15  A.  Yes.

16  Q.  Got it.  Did you tell the hearing officer that the defect

17  was present that day?

18  A.  Um, I guess I don't know -- I don't recall.  I don't know.

19  Q.  In your deposition, did you testify that the defect was

20  present that day?

21  A.  Um, I could have, because I could have said there was a

22  defect there that we repaired, so that would say I would have

23  testified that there was a defect present.

24  Q.  Well, let's see what you testified.  I'm reading at page

25  133, starting at line 2.  This is you talking.

Julie H. Thomas, RMR, CRR                                        (303)296-3056

1       "I said, Brandon, it's too late.  Me and Jay are

2    already doing it, we're done.  He said, whatever, and he left,

3    I think.  I don't know where -- he left.  Then" --

4            Now "then" means after; right?  That's what the word

5    "then" means?

6    A.  Yes, "Then Jay Herzog," yes.

7    Q.  "Then Jay Herzog said I agree that this is fixed.  I

8    agreed with him, and Jay Herzog closed out the defect."

9            "This is the same track that after -- that was

10   indicated earlier, that after we repaired it Mr. Fresquez says

11   the BNSF design team designed the tracks wrong and it could

12   never be fixed.  That was his other accusation prior to us

13   fixing this."

14           "So the defect didn't exist?"

15           What is your answer to that?

16   A.  The same as it has been.  When I showed up, it was

17   repaired.

18   Q.  My question is, what was your answer to:  "So the defect

19   didn't exist?"

20   A.  If we repaired it, it didn't exist.

21   Q.  My question was what did you answer when you were asked in

22   your deposition, "So the defect didn't exist?"

23   A.  "No."

24   Q.  Do you know what the word "exist" means?

25   A.  Yeah.  It would actually belong.  It would be there.

 1              MR. THOMPSON:  I have nothing further.

 2              THE COURT:  All right.  Let's have cross-examination.

 3   Or what are you doing?

 4              MR. GOMAN:  I don't have any recross-examination.  I

 5   would like direct examination.

 6              THE COURT:  All right.  How long?

 7              MR. GOMAN:  Half an hour.

 8              THE COURT:  Okay.  Let's see if we can shorten it.

 9      **MICHAEL PAZ, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

10   BY MR. GOMAN:

11   Q.  Mr. Paz, just a little background about you, sir.  Where

12   were you born and raised?

13   A.  I was born and raised in McCook, Nebraska.

14   Q.  Where do you live now?

15   A.  I am back in McCook, Nebraska.

16   Q.  Who do you live there with?

17   A.  Uh, my wife and daughter.

18   Q.  Prior to coming to BNSF, did you serve in the military?

19   A.  Yes, I did.

20   Q.  Tell us just a little bit about your military service.

21   What branch?  What did you do?

22   A.  I was in the -- went -- right out of high school I was in

23   the Army National Guard, signed an eight-year contract, which

24   is a six by two.  Enlisted as a mechanic for my MOS.  Went to

25   air assault school.  Became a noncommissioned officer.

1   Achieved the rank of sergeant.  Did two deployments for

2   hurricane relief, Hurricane Katrina, Hurricane Gustav.  I have

3   been to Kuwait, and then I was deployed to Iraq for Operation

4   Freedom.

5   Q.  Did you ever have to supervise or lead people in the

6   military?

7   A.  Yes.

8   Q.  Can you tell the jury, are there any differences between

9   supervising people in the military versus employees at BNSF?

10  A.  The military is more -- if you have a rank, it's more

11  direct.  You give orders to execute whatever task you are

12  giving.

13          BNSF believes in an empowered workforce, so more the

14  employee -- you know, I give direction, but they also are

15  empowered to speak up if something doesn't sound right or it's

16  unsafe.  So it's a lot of collaboration.  We didn't have that

17  so much in the military.

18  Q.  Why did you decide to come work at BNSF?

19  A.  Well, I wasn't quite ready for college at that time.  My

20  dad and my uncle both work on the scheduled side of BNSF, and

21  they were both consistently encouraging me to come to BNSF.

22  So I did because I wasn't quite sure what I wanted to do with

23  my life.  And then I love it, so I've been here since.

24  Q.  You love it, you said?

25  A.  Yes, I do.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Paz - Direct                III - 786

1   Q.  Have you worked in the track department your whole career?

2   A.  Yes.

3   Q.  Have you held any nonmanagement or union scheduled

4   positions at BNSF?

5   A.  Yes.  So I hired out in 2005 as a track laborer out of

6   Alliance, Nebraska.  I did that clear up till 2010, holding

7   various -- machine operator, like I said, laborer, different

8   roles like that on the scheduled side before I became a

9   manager.

10  Q.  How long have you been a roadmaster?

11  A.  Um, 2012 is when I got my first roadmaster position.

12  Q.  As a roadmaster, are you tier 3 certified?

13  A.  Yes, I am.

14  Q.  Tell the jury what that means.

15  A.  It's just the highest level of FRA qualification that BNSF

16  deems, which qualifies you to inspect track and supervise

17  those who inspect track.

18  Q.  How long have you been tier 3 certified?

19  A.  I believe they came out with tier 3 2013ish approximately.

20  Q.  I'm going to jump around a little bit so I can try to cut

21  to the chase.

22          Have you ever had a track inspector refuse to measure

23  track when you have asked or told them to do it?

24  A.  No, I haven't.  Well, other than Mr. Fresquez.

25  Q.  What was your reaction when Mr. Fresquez refused to

17-cv-00844-WYD-SKC                    Paz - Direct                    III - 787

1    measure the track on May 5th of 2016?

2    A.  Um, my reaction, you said?

3    Q.  Yeah.

4    A.  I guess I was just surprised.  It was almost like -- well,

5    he knew that we had been there to repair it, and in my mind

6    that was -- my interpretation was that he didn't want to

7    verify it 'cause I think that he knew that we had repaired it.

8    So, therefore, he just became argumentative and refused to

9    verify that it was repaired.

10   Q.  How long before May of 2016 had you supervised

11   Mr. Fresquez?

12   A.  Directly, um, just maybe four or five months prior.

13   Q.  Can you describe for the jury what your experience was

14   like, just generally speaking, supervising Mr. Fresquez?

15   A.  Um, I guess, generally speaking, I guess kind of

16   difficult.  I think he possessed the skills, the technical

17   skills.  He's very one -- one -- his-way-or-no-way type

18   individual, which made it difficult to collaborate with, to

19   try to reason with.  I guess that's my best -- how I can

20   explain Brandon.

21   Q.  Did you ever talk with Mark Carpenter about Mr. Fresquez?

22   A.  Um, track inspector responsibilities, those type natures,

23   yes.

24   Q.  Anything that would be different than the conversations

25   you have about every other track inspector you supervise?

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                 Paz - Direct                    III - 788

1    A.  No.

2    Q.  Did Mr. Carpenter ever tell you anything like, I want to

3    see him gone, or I don't want him to work here anymore, or

4    anything like that?

5    A.  No.

6    Q.  All right.  So February of 2016 you are aware Mr. Fresquez

7    is working on a flagging job; is that right?

8    A.  Yes.  When I first got the supervisor role in Denver, he

9    was on the flagging position.

10   Q.  Do you know why he stopped working as a flagman?

11   A.  Yeah.  So when I first -- that was my transitioning point

12   into this role.  He was working for a contractor.  So a

13   contractor was paying BNSF for two flagmen to be present over

14   a span of track.  The contractors had called myself and stated

15   that they were going to shorten their working limits and we

16   only needed to provide one flagman, if I deemed that was okay.

17   So I reviewed the track, the mileage that they were working,

18   and he was the less senior employee that was working on that

19   project, so he was given his notice that he would be given a

20   bump to find a new position.

21   Q.  Did you talk with him about that?

22   A.  Yes, I did.

23   Q.  Did you know when you abolished that flagging position

24   that Mr. Fresquez would come back and be your main line track

25   inspector?

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Paz - Direct                III - 789

1   A.  Yes, 'cause when I mentioned -- when I told him what was

2   going on, what I just explained, he stated that the

3   contractors were lying and they were trying to save money and

4   that if I cut the job then I know what happens, that he would

5   come back to the track inspector position.

6   Q.  Did you have any problem with that?

7   A.  No.  No.  That's his right to come back.

8   Q.  Over the next several months he was a track inspector for

9   a while, then he held a couple other flagging jobs, and then

10  would go back and forth; is that right?

11  A.  Correct.

12  Q.  I want to show you Exhibit A-78, page 19, just to refresh

13  your memory.  I just have a question about this.

14        Can you read the top of that text message there?

15  A.  Yes.  It says, If I read right, there is a rule that

16  exempts city workers from following our -- sorry.

17  Q.  Sorry about that.  And you don't need to read this to the

18  jury.  Does that refresh your memory as to what's going on

19  there?

20  A.  Yes.

21  Q.  So tell the jury what's going on, what the circumstance

22  was.

23  A.  So we had replaced a crossing for vehicular traffic.  The

24  City of Denver agreed to pay for the paving work, and the City

25  of Denver sent their employees out to conduct the asphalt

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Paz - Direct                III - 790

1   work.  Brandon, I asked him to go provide protection with

2   them, flagging.  Well, they didn't have all the same PPE that

3   we have, and --

4           MR. THOMPSON:  Your Honor, I object to this line of

5   questioning.  There's no relevance to Mr. Fresquez's

6   discipline.  It's character evidence.

7           THE COURT:  Overruled.  I will allow it.

8   A.  So I explained to Mr. Fresquez that they're City workers,

9   they do not fall under the same categories as we enforce with

10  our contractors that we pay to be on site.  And he disagreed

11  with me, and I just told him basically, Brandon, I'm not

12  trying to pull one over on you.  That's what the rule says.  I

13  would personally do it myself if I could, because I know what

14  the rule reads.

15          He argued with the City workers.  The City called me

16  and said, you know, We were willing to help you, but based on

17  your employee's attitude we're leaving.  We are not going to

18  help you.  We have to move on.  And I told him I understood.

19          Then Brandon texted me after they already left, and

20  he said that he looked in the rule and that's what it is.  He

21  said there's a exempt city -- or exempt.  And then I told

22  him -- I explained to him that that's -- yes, that's what I

23  was trying to say, Brandon.  He said, No, you didn't know

24  that.

25  BY MR. GOMAN:

17-cv-00844-WYD-SKC                  Paz - Direct                         III - 791

1    Q.  Did you pursue any sort of formal discipline for

2    Mr. Fresquez having kicked off these contractors?

3    A.  No, there was no discipline.

4    Q.  I want to go forward then to page 20.  You sent him a

5    text.  Can you read that there?

6    A.  Yes, I can.

7    Q.  You want -- tell me why you wanted to speak with

8    Mr. Fresquez about something -- a conversation you had with

9    JCI.

10   A.  So this was in Big Lift, Colorado.  We have one of our

11   depots there where our maintenance crews report to.  JCI is a

12   contractor.  They come and inspect our buildings.  I think

13   they check fire extinguishers, make sure the building is still

14   up to code, everything is good.  They just handle the

15   maintenance on the buildings.

16          Well, he had been there today on his routine

17   inspection and was approached by Mr. Fresquez.  I don't recall

18   the exact conversation they had.

19          MR. THOMPSON:  Your Honor, I object as both hearsay

20   and irrelevant.

21          THE COURT:  Okay.  This is direct examination.  I

22   will allow it.

23   BY MR. GOMAN:

24   Q.  Go ahead.

25          THE COURT:  Overruled.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.  Mike, he was the representative with JCI, he had called me

2   very upset and asked if I knew of a Brandon Fresquez.  And I

3   said, Yes, he works for me.  And he said kind of like, What is

4   his problem?  I said, I don't know.  What's going on?  And he

5   had stated that he had never been treated the way -- by --

6   never been treated the way he's been treated by Brandon by

7   anybody on the BNSF.  And I asked him what had happened, and I

8   don't recall the full conversation, something about Brandon

9   said he wasn't allowed to be on property and he needed to

10  leave, et cetera.  And then JCI continued to try to tell

11  Mr. Fresquez that he was allowed to be there, it was his job

12  to inspect the building, and Brandon was just argumentative.

13          And he asked that -- if I would follow up with

14  Brandon because nobody should be treated the way he was

15  treated.

16  BY MR. GOMAN:

17  Q.  You spoke with Mr. Fresquez about that conversation?

18  A.  Yeah.  I texted him, because I didn't know if he was on

19  the track or something, just call me when he could.

20  Q.  Is it against BNSF's rules to be discourteous or

21  quarrelsome?

22  A.  Yes, there's a rule for conduct.

23  Q.  Did you pursue any sort of formal investigation against

24  Mr. Fresquez for this incident with the contractor?

25  A.  No, I didn't.

17-cv-00844-WYD-SKC                Paz - Direct                III - 793

1   Q.  So we come to May 5th of 2016.  As a BNSF employee, what

2   is your understanding as to what the Code of Conduct says

3   about those that report safety concerns?

4   A.  Conduct with safety concerns?

5   Q.  Yeah, the Code of Conduct that you certify on.

6   A.  Oh, Code of Conduct.

7   Q.  What does that say about an employee's right to bring

8   safety concerns, just generally?

9   A.  Just generally, that all employees have the right to

10  report unsafe acts or any concerns they may have.

11  Q.  Do you respect an employee's right to do that?

12  A.  Yes.

13  Q.  Do you encourage your tract inspectors to bring issues

14  like that to your attention?

15  A.  Yes, I do.

16  Q.  When you called Mr. Carpenter to tell him what

17  Mr. Fresquez had done, was it your intention to get

18  Mr. Fresquez fired?

19  A.  No, it wasn't.

20  Q.  Was it your intention to retaliate against him for

21  reporting track defects?

22  A.  No.  That's his sole -- I mean, that's his job is to

23  report track defects.

24  Q.  Was it your intention to get back at him for having called

25  the FRA?

17-cv-00844-WYD-SKC                  Paz - Cross                      III - 794

1   A.   No.

2   Q.   Did you ever tell Mr. Fresquez you would find an excuse to

3   fire him if he continued to report track defects?

4   A.   No.  I wouldn't.  I would never say that.

5   Q.   To your knowledge, did Mr. Fresquez ever call the FRA to

6   complain you were misreporting track defects?

7   A.   No.  I never got a report from the FRA that he was.

8   Q.   Has anyone from the FRA -- well, strike that.

9        MR. GOMAN:  Thank you, Mr. Paz.  I don't have any

10  more questions.

11       THE COURT:  All right.  Cross-examination on those

12  points.

13                    **CROSS-EXAMINATION**

14  BY MR. THOMPSON:

15  Q.   The defect you, Mr. Herzog, and Mr. Fresquez were at on

16  May 5th, 2016, it was repaired earlier in the day than when

17  you three were there?

18       MR. GOMAN:  Your Honor, objection to asked and

19  answered.

20       THE COURT:  Sustained.

21  BY MR. THOMPSON:

22  Q.   Let me ask you this.  Why would Jay Herzog and you be

23  looking for a defect Mr. Herzog repaired earlier that day?

24  A.   Because --

25  Q.   It doesn't make a lot of sense, does it?

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1   A.  -- he needed a GPS.

 2   Q.  He repaired it that day.  How did he find it?

 3   A.  We have to verify it.

 4          MR. THOMPSON:  Totally makes sense.  Thank you.

 5          MR. GOMAN:  Can I be permitted --

 6          THE COURT:  Go ahead.  You have a right to re --

 7          MR. GOMAN:  Redirect.

 8          THE COURT:  Yeah, whatever it is.

 9                      **REDIRECT EXAMINATION**

10   BY MR. GOMAN:

11   Q.  I hate to go over it, but there appears to be some sort of

12   dispute.  I want to make sure I understand the process.

13          If a geometry car reports a defect, BNSF will place a

14   slow order in this case?

15   A.  Correct.

16   Q.  That slow order can stay on for as long as BNSF wants it

17   to?

18   A.  Unless conditions change, yes.

19   Q.  You lined out a crew to make an attempt to repair that

20   condition to see if you could remove the slow order?

21   A.  Yes.

22   Q.  Prior to that, you had no reason to doubt that defect was

23   there.  Is that right?

24   A.  After the repair?

25   Q.  Before the repair.

1   A.   Repeat that question one more time.

2   Q.   Yep.  From 2004 to 2006, you don't have any reason to

3   doubt that that defect was there.

4   A.   No.  There was a slow order placed, and it was in the

5   system still, so I assumed it was there.

6   Q.   I misspoke.  2014 to 2016.  Right?  Okay.

7        The surfacing gang comes through for what purpose?

8   A.   To correct the defect.

9   Q.   After the surfacing gang is done, why do you go back to

10   the location where the defect was reported initially?

11   A.   Because Mr. Herzog had called me stating that the GPS that

12   Mr. Fresquez was using was a cell phone app and it was taking

13   him out into a vacant field, and they needed an approved GPS

14   to 100 percent verify that they had repaired the right

15   location.  So he asked if I would bring the GPS device.

16   Q.   Is that what is done in every instance like this?  You GPS

17   the location to verify it's been done?

18   A.   We don't GPS every defect, but if -- when in doubt, we use

19   the GPS.

20   Q.   After you find the location with the GPS, is that where

21   you string-line?

22   A.   Yes, it is.

23   Q.   Why?

24   A.   Because we wanted to verify that it was repaired before we

25   show the defect closed.

1   Q.  After you string-line, what do you find?

2   A.  We didn't find the defect.

3   Q.  Meaning that it had been --

4   A.  It did not measure out to be a defect.

5   Q.  Meaning it had been repaired?

6   A.  It had been repaired.

7   Q.  So it was proper for Mr. Herzog to close it out?

8   A.  Yes, it was.

9           MR. GOMAN:  No further questions.

10          MR. THOMPSON:  One question, Your Honor.

11          THE COURT:  Go ahead.  This is the last word.

12                    **RECROSS-EXAMINATION**

13  BY MR. THOMPSON:

14  Q.  How many times in your career have you called three

15  employees to find a defect that you fixed earlier that day?

16  A.  Um, I didn't call the employees on this one.  They called

17  me.  But I don't recall.

18          MR. THOMPSON:  Nothing further.

19          THE COURT:  All right.  You may step down.

20          THE WITNESS:  Thank you.

21          THE COURT:  This witness is excused.  Call your next

22  witness.  Who is your next witness?

23          MR. THOMPSON:  Jay Herzog, Your Honor.

24          COURTROOM DEPUTY:  Please raise your right hand.

25      (The witness was sworn.)

1          COURTROOM DEPUTY:  Please be seated.

2          Please state your full name, and spell your full name

3    for the record.

4          THE WITNESS:  My name is Jay Herzog.  That's J-a-y,

5    H-e-r-z-o-g.

6       **JAY HERZOG, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

7    BY MR. THOMPSON:

8    Q.  Are you social friends with Brandon Fresquez, Mr. Herzog?

9    A.  No.

10   Q.  Since he's been fired, have you hung out with him at all?

11   A.  No.

12   Q.  But you were friendly with him; right?

13   A.  Yes, as coworkers.

14   Q.  You guys got along at work?

15   A.  Yes.

16   Q.  Would you lie for him?

17   A.  No.

18   Q.  You generally know what this case is about; right?

19   A.  Yes.

20   Q.  Do you have any skin in the game here?

21   A.  No.

22   Q.  How long did you work at BNSF?

23   A.  For six years.

24   Q.  Every day for six years?

25   A.  Yes.  I don't believe I was really ever laid off.

1    Q.  If you saw a manager violating rules or regulations, would

2    you feel comfortable confronting him or her?

3    A.  Yes and no.  Um, we try to stand up -- we had tried to --

4    I'm no longer an employee of BNSF, but we tried to stand up

5    for the safety rules and for our safety and always do what was

6    right, but speaking out and speaking against a supervisor, uh,

7    doesn't always go very well.  It's, uh -- there's kind of a

8    bit of social hierarchy, if you will, involved in the job,

9    meaning that there's favorites.  And as Brandon and I had

10   stood up for safety concerns, um, it usually quickly put you

11   in a place opposite of good favor from our boss.

12   Q.  Were you worried if you raised a safety concern you would

13   be fired?

14   A.  No.  I wasn't worried that I would be fired for raising a

15   safety concern, but I had raised safety concerns personally,

16   and I was ridiculed about it.  I was told to break the rules,

17   and I was embarrassed in public, like in our morning

18   briefings.

19        I was asked to fix defects by myself in a hump yard,

20   in the Denver yard.  And I had stated that, you know, I can't

21   do that.  I can't work by myself with power tools in a hump

22   yard without a lookout where there's rolling equipment, cars

23   being cut on multiple tracks.  And I was just told to do it.

24   And I had repeatedly stated to our manager in briefing, I

25   can't do that.  It's against the rules.  I can't do that as a

1   lone worker.  And then that kind of became a joke for the

2   manager, you know, to call out -- call me out, kind of

3   embarrass me in front of the crew.

4   Q.  Because you were complying with federal regulations?

5   A.  Right, because I was looking out for my livelihood,

6   following the rules, and using something that the company

7   built as empowerment, standing up, which was a tool that they

8   had used, to stand up if you were -- if something unsafe was

9   going on.  They called it empowerment, saying that you had the

10  ability to stop what was going on, pull everyone aside, and

11  say, you know, we shouldn't be doing this.  You have the power

12  to stop unsafe acts.

13  Q.  Who was the manager you are talking about?

14  A.  Michael Paz in Denver.

15  Q.  How long did you work with Mr. Fresquez?

16  A.  About two years in Denver.

17  Q.  Actually, what did you do when you were at BNSF?

18  A.  Well, like everyone in maintenance of way, I started as a

19  laborer.  I became a truck driver, acquired my CDL.  I

20  required [sic] all my machine operating qualifications.  I

21  became a welder, a head welder, a welding foreman, a foreman,

22  and then a track inspector.  So I routinely operated in those

23  two years as a foreman and as a track inspector here in

24  Denver.

25  Q.  When you were a foreman, what do you do?

17-cv-00844-WYD-SKC        Herzog - Direct        III - 801

1    A.  You manage personnel, manage equipment, travel and -- I

2    was usually the foreman of a surfacing gang, and fix surface

3    defects.

4    Q.  So a track inspector finds the defects, and the surfacing

5    gang fix them?

6    A.  Yes, if it was a surface-related defect.  There's all

7    different types and variations of defect, but if it was

8    surface or alignment related, yes.

9    Q.  What kind of track inspector was Brandon Fresquez?

10   A.  Brandon was an excellent or exceptional track inspector.

11   In my tenure with the railroad, I had to pay my dues, meaning

12   live on the road and travel all over the district and various

13   states to gain my qualifications, so I met a lot of different

14   people, a lot of different track inspectors.  And when I got

15   to Denver and met Brandon and, uh, learned about Brandon, saw

16   his participation, it was very clear and evident that he was,

17   uh, excellent at his job.  He knew the rules better than

18   almost anyone I had ever seen.  He knew his territory

19   exceptionally well.  And, you know, that was -- that was

20   pretty impressive for me because I had been around a lot of

21   older track inspectors, and I was a young track inspector too.

22   Q.  Did you ever see Brandon stand up to any supervisors over

23   safety concerns?

24   A.  Yes, routinely.

25   Q.  Tell us about that.

1   A.   Brandon would -- Brandon wasn't afraid to speak up about

2   safety.  And if you know anything about the railroad, there's

3   a pretty high injury rate.  There's a pretty high mortality

4   rate.  You know, the railroad hasn't gone any years ever

5   without a death, and we're working in an extremely dangerous

6   field.  We've got these giant rule books, no exaggeration, of

7   rules, safety concerns that we're, you know, obligated to

8   follow.  And it's our job, as we have accepted, to do that job

9   and follow all those rules and to go home safe.

10  Q.   Did you ever see Brandon get removed from any safety

11  briefings?

12  A.   Yes.

13  Q.   Tell us about that.

14  A.   Brandon was -- we were all in our morning briefing, and

15  Brandon had said, you know, in previous briefings that, you

16  know, this track is going to have to be out of service in, you

17  know, say five days, and then in two days he'd say in three

18  days.  Then today he would say this track is going out of

19  service today being as it's got a 30-day defect and it hasn't

20  been repaired.  Brandon was then accused of trying to hijack

21  the meeting.  And they were telling Brandon that, you know,

22  no, it's not going to go out of service.  And they accused him

23  of hijacking the meeting, which he was just trying to follow

24  the FRA, do his job, and they pulled him out of the meeting.

25  Q.   Who is they?

17-cv-00844-WYD-SKC          Herzog - Direct          III - 803

1  A.  That day it was Mark Carpenter and Michael Paz.

2  Q.  Other than raising safety concerns, did you ever see

3  Brandon be argumentative?

4  A.  No.  He wasn't argumentative.  He was just a guy that did

5  his -- he crossed all the Ts and dotted all the Is.  He

6  followed the rules, and that is our job.  And there is an

7  extreme amount of responsibility, as an inspector, especially

8  in a large metropolitan area.  That track is yours, and when

9  and in the case of a derailment there's going to be one person

10  that is going to be standing up for it, and it's the track

11  inspector.

12  Q.  So I want to talk about May 5th, 2016, the last day

13  Brandon Fresquez worked for BNSF.  Do you remember that day?

14  A.  Yes.

15  Q.  Tell us about it.

16  A.  Well, the geo car had gone by.  The geo car is a car with

17  all kinds of computers and testing devices that will test the

18  track that it travels over.  It's an unmanned, and there's

19  manned geo cars.  And then it prints out a report.  It

20  generates a report on these defects.

21          So this geo car had gone by, and I had been given a

22  list of these surface defects the geo car had kicked out.  I

23  had been out to locate a defect on this report, and I was

24  unable to find it.  I didn't have a GPS device.  So I had told

25  Mr. Paz that I wanted help locating this device.  I understood

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    the general part of south Denver that it was in and the track,

2    and I needed help finding it.  He said he'd go out there with

3    me and help me locate it.

4    Q.  Do you know why you called Brandon Fresquez?  Here's what

5    I'm really asking.  You and Paz are both capable of trying to

6    find this defect.  Why call Brandon?

7           MR. GOMAN:  I'm going to object to foundation.  I

8    don't believe the witness has testified to that.

9           THE COURT:  Overruled.  He can answer if he knows.

10   A.  No, other than the fact that it was Brandon's territory,

11   there's really not a reason that the track inspector needed to

12   be there.

13   BY MR. THOMPSON:

14   Q.  So I'll represent to you that Michael Paz just testified

15   that you had repaired the defect with your surfacing gang

16   earlier in the day.  Did that happen?

17   A.  No, absolutely not.

18   Q.  All right.  Tell me what happens next when you and Brandon

19   and Michael -- sorry.  Does Brandon at some point arrive to

20   the scene with you?

21   A.  Yes, Brandon does show up.  We fill out our on-track

22   safety.  We go out across the tracks and follow the GPS and

23   determine, okay, we are at the location of the -- the defect.

24   Q.  Let me pause you one second.  I want to talk about the

25   nature of this defect.  I think you already said it was a

1   geometry car defect.  Right?

2   A.  Yes.

3   Q.  For how long of a time period had it been reported?

4   A.  It had been, you know -- I don't have the records, you

5   know.  This has been several years.  But this geo car defect

6   had been reported multiple times and had been there and had

7   been known about for a long, extended period of time.

8   Q.  There's no doubt the defect was there.  You just needed to

9   find it.  Right?

10  A.  Correct.  I mean, I -- I didn't know exactly where it was.

11  Brandon did.  Brandon knew exactly where it was because he had

12  been on that territory for some time and known that it had

13  never been repaired.

14  Q.  With the machines you had on hand that day and the people

15  you had on hand that day, is this the type of defect you could

16  have even fixed?

17  A.  No.

18  Q.  Why not?

19  A.  It wasn't -- it was basically -- the actual location, the

20  actual type of defect in this alignment defect was a switch

21  point alignment, meaning here's the rail, and the switch point

22  comes like this.  That's where the alignment was a problem due

23  to the speed that it was on.  You know, my gang could fix a

24  surface, meaning the up and down in the track and the

25  side-by-side, um, alignment, but this was actually more -- was

1    actually a hardware issue.  Either the wrong hardware had been

2    installed, and there's nothing that we could do about it.

3    That's why nothing had been ever done about it.  That's why it

4    had remained there.

5    Q.  How big of a deal would it be to fix this defect?

6    A.  It would be a major undertaking.  This was in -- I believe

7    it was Main 2, if that's correct, of this -- there are three

8    tracks.  So this Main 2 is the middle track.  So in order to

9    really fix this, new hardware would have been needed to put

10   in, like a new switch point, 1 -- Main 1, Main 2, and possibly

11   Main 3 would have been shut down.  It would have taken

12   probably one or two sections, welders.  It -- this would have

13   been like an all-hands-on-deck type of repair.

14   Q.  Is it something that everybody in Denver would have known

15   it was repaired?

16   A.  Yes.

17   Q.  You would have had to shut down, I mean, a huge area;

18   right?

19   A.  Right.  And it's not to say that they didn't ask for a

20   repair to be done, but it's such a high traffic place, these

21   three tracks in south Denver where trains meet coming from

22   north and south, that they -- they won't give you that amount

23   of time.

24   Q.  Did you have that amount of time on May 5th, 2016?

25   A.  No.  I -- actually, one of my machines blew a hydraulic

1   fitting, and so the one machine of mine, the regulator, had

2   leaked out 50 to 100 gallons of hydraulic fluid.  And so my

3   machine was sitting there dead in the water or dead on the

4   tracks and unable to operate.  That day -- we didn't fix

5   anything that day.

6   Q.  All right.  So Brandon Fresquez at some point arrives.

7   A.  Yes.

8   Q.  Tell me what happens then.

9   A.  Brandon arrives.  We go out with the GPS and, uh, with

10  Mr. Paz and Brandon and I, and we verify, okay, the GPS says

11  it's at this switch point.  And then Mr. Paz tells Brandon to

12  go get a string-line, go to his truck and get a string-line.

13  Q.  Okay.  Then what happens?

14  A.  Brandon says, You're trying -- You're just trying to prove

15  that this defect isn't here.  And basically a conflict, a

16  verbal, you know, argument ensues, this back and forth, and

17  I'm kind of the odd man out.  And Brandon is saying, You're

18  trying to -- You're trying to measure this and say that

19  there's no defect here when we know there's a defect here.

20  And -- and Mike says, Go get a string-line.

21  Q.  At any point during that back and forth did Michael Paz

22  deny Brandon Fresquez 's allegations?

23  A.  No.

24  Q.  Does Brandon at some point leave?

25  A.  Yeah.  Brandon walks -- walks off the track towards his

1    pickup, and then he gets in his pickup.

2    Q.  Did Brandon ever refuse an order from Michael Paz?

3    A.  No.

4    Q.  Did you then try to call Mr. Fresquez?

5    A.  Yeah, I tried to radio him.  And, uh, you know, this seems

6    like a -- well, first of all, I know this contentious

7    relationship between Paz and Brandon.

8    Q.  Let me pause you right there.  Are things pretty tense

9    that day?

10   A.  Yes.  Things have been very tense.

11   Q.  Are they tense because Brandon is enforcing FRA

12   regulations over, essentially, what Michael Paz wants them to

13   do?

14          MR. GOMAN:  Your Honor, objection:  leading.

15          MR. THOMPSON:  I'll withdraw.  I will reask.

16   BY MR. THOMPSON:

17   Q.  Do you have any understanding as to why the relationship

18   between Michael Paz and Brandon Fresquez was tense?

19   A.  Yeah.

20   Q.  Why?

21   A.  Because Brandon was continually following or attempting to

22   follow the FRA, the Federal Railroad Administration

23   guidelines, which we have assigned and sworn to do, and our

24   supervisor wasn't in compliance, wasn't trying to comply with

25   it.

1    Q.  When Brandon left, were you concerned that Mr. Paz was

2    going to use this as an opportunity to do anything?

3    A.  Yeah.

4    Q.  What were you afraid he was going to try to do?

5    A.  He said -- I tried to call him on the radio.  I tried to

6    call Brandon.  And Mike says -- Mike Paz says, No, don't, Jay,

7    don't call him.  This is just what I need.  This is just what

8    I need.  Don't call him.

9    Q.  What did you understand Mike Paz to be telling you when he

10   said, Don't call him.  This is just what I need?

11   A.  That he was going to use it against him.  He was going to

12   try to pin something on him, try to hang him for this.

13   Q.  Did Brandon Fresquez at some point return?

14   A.  I don't think so.  I -- I heard him get called by the

15   dispatcher later to another site.  I don't recall if he got --

16   I don't think he returned that -- to that location.

17   Q.  Did you get ordered to Mike Paz -- sorry.  At some point

18   were you ordered to Mike Paz's truck?

19   A.  Yeah, we, uh, we left the track, and, uh, Mike gives me

20   this big moral character-check talk, talking about if there's

21   ever a time in your life that you need to have integrity and

22   if you ever need to do the right thing, this is right now, and

23   that I need you to come into my pickup and write a statement

24   for me.

25   Q.  Let me pause you there.  So Mike Paz ordered you to get in

17-cv-00844-WYD-SKC                    Herzog - Direct                          III - 810

1   his truck?

2   A.  Yeah.

3   Q.  Did he get in the truck with you?

4   A.  Yeah.

5   Q.  Why?  Or did you know?

6   A.  No.  He -- he gave me some notebook paper and said, I need

7   you to be honest and have integrity and write everything that

8   happened right here.  And I felt, uh, I felt pretty

9   uncomfortable.  I didn't know if I had -- as a union member,

10  being told to do this by a -- an exempt officer, I didn't know

11  if I had any ground to -- to refuse that or not.  And so he

12  gave me the paper, and I sat there and wrote, you know, my

13  account while he sat next to me in the pickup.

14  Q.  Was he reading over your shoulder as you were writing it?

15  A.  He very well could have been.  We are sitting next to each

16  other, and I'm writing on a clipboard.

17  Q.  Before going to his truck, did you find the defect?

18  A.  Yes.

19  Q.  Was it there?

20  A.  Yes, the defect was there right -- right where, you know,

21  the GPS and Brandon said it was.

22  Q.  Did you repair it that day?

23  A.  No.

24  Q.  As far as you know, was it ever repaired?

25  A.  Not to my knowledge, no.

Julie H. Thomas, RMR, CRR                                    (303)296-3056

17-cv-00844-WYD-SKC                    Herzog - Direct                    III - 811

 1   Q.  Was a slow order at some point taken off that segment of

 2   track?

 3   A.  Probably.  If it was said that it was repaired, which, you

 4   know, if you recall in my deposition --

 5   Q.  I'm going to ask you about that in a little bit.

 6   A.  Okay.

 7   Q.  All right.  So after you write a statement, were you ever

 8   asked to do anything else?  For example, were you invited to

 9   or asked to come to Brandon Fresquez's disciplinary hearing?

10   A.  No.

11   Q.  Would you have come to that if you were asked?

12   A.  Yes.

13   Q.  Would you have testified just the way you are testifying

14   today?

15   A.  Absolutely.

16   Q.  Do you think that testimony would have helped Brandon

17   Fresquez?

18   A.  Yes.

19   Q.  All right.  So now I want to talk about the supposed

20   repair.  I'm going to show you Exhibit A-70.

21          This is what you are talking about; right?  Is this

22   the document that you are talking about?

23   A.  Is this supposed to be on the screen?

24   Q.  It should be.

25   A.  No, I don't have anything.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1        MR. THOMPSON:  Let me plug it in.  It's me,

2   Mr. Keech.  I apologize.

3   A.  There it is.  Okay.

4   BY MR. THOMPSON:

5   Q.  Is this the form you were referring to that you saw in

6   your deposition that shows the defect repaired?

7   A.  That's correct.

8   Q.  Okay.  Are you familiar with this system where this is

9   entered into?

10  A.  Yes and no.

11  Q.  Tell us about that.

12  A.  The system that we used to remove defects is called PARS.

13  That's where we would enter our time, our payroll for the day,

14  um, and then we would access work orders from there.  And that

15  would allow us, in a work order, to find the defect and remove

16  it.

17        This is a totally separate system that I never used

18  as a track inspector or a foreman, but I know that roadmasters

19  would use it because they would take me into their office and

20  take me through all -- you know, get on their computer, go

21  through all this, a different system, and bring defects up

22  this way, which I didn't ever use or, um, access.

23  Q.  All right.  So you see on the bottom of this page it says

24  that you repaired this defect on May -- May 5 th of 2016.  Do

25  you see that?

1    A.  Yes.

2    Q.  Did you repair it?

3    A.  No.

4    Q.  Did you enter in any system whatsoever that you repaired

5    it?

6    A.  No.

7    Q.  Who do you think did?

8           MR. GOMAN:  Objection to foundation.

9           THE COURT:  Overruled.

10   A.  Mike Paz.  There's no way that I would go out there with

11   my machines broke down that day and say that I repaired this

12   long-standing defect when I didn't even get my machines out

13   there in that -- on that track in that segment.  And when I

14   saw this in deposition, my jaw dropped.

15   BY MR. THOMPSON:

16   Q.  You had never seen this before this case; right?

17   A.  That's correct.  That was obvious to me that someone's

18   falsifying defect repairs and that they were putting my name

19   on it.

20   Q.  On May 5th, 2016, that's exactly what Brandon accused Mike

21   Paz of trying to do.  That's what Brandon believed was going

22   to happen.  Right?

23   A.  That's right.

24           MR. GOMAN:  Objection to leading.

25           THE COURT:  It is leading.  Sustained.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Herzog - Direct                    III - 814

```
 1   BY MR. THOMPSON:

 2   Q.  What did Brandon accuse Mike Paz of?  What did Brandon say

 3   he believed was happening on May 5th, 2016?

 4   A.  He is trying to say that you are saying there's not a

 5   defect here.

 6   Q.  Was Brandon Fresquez -- did you understand him to be

 7   saying that he believed Mike Paz was going to falsify the

 8   defect?

 9   A.  Yeah, he was -- had Brandon there, and he wanted to have a

10   string-line there to say that, well, we can't find it, there

11   is no defect here.

12   Q.  Turns out you believe Brandon Fresquez was correct about

13   that.

14   A.  Right.

15   Q.  Based on Exhibit A-70; right?

16   A.  Right.  And all the geo cars from here on after going over

17   it would find the same defect.

18   Q.  After that day the geo car would continue to find the

19   defect?

20   A.  Sure.

21   Q.  Did you ever have reason to believe --

22           MR. THOMPSON:  Sorry.  Thank you, Mr. Keech.

23   BY MR. THOMPSON:

24   Q.  Did you ever have reason to believe that Mark Carpenter or

25   Michael Paz removed defects from the system?
```

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1    A.  Yes.

2    Q.  Tell us about that.

3    A.  Well, I operate as a track inspector and a foreman.  I

4    operated on several territories there in Denver or tracks as a

5    track inspector.  And the track inspector program was called

6    TIMS.  And every day you would go in there and mark what you

7    inspected, and you would see all the assets, meaning all the

8    tracks and switches and everything, and the defects would be

9    there also.  And it wasn't a secret that sometimes these

10   defects that -- you know, it's your track, it's been there,

11   you have been asking for it to get repaired, would maybe just

12   disappear.  So I'd ask the section foreman, this section

13   foreman, Hey, did you guys repair this, or did you remove this

14   defect?  No.  And I'd ask the other section foreman.  There

15   was only two.  Did you or your crew go out here and repair

16   this and remove it?  No.  So it just -- just vanished.  And as

17   track inspectors, you know, there's about four of us, that --

18   it was something that was happening.

19   Q.  Did you report that conduct to the FRA?

20   A.  I attempted to --

21   Q.  Tell us about that.

22   A.  -- through FRA number, um.  You know, I was -- in a lot of

23   part of this time I was working also as the Denver yard track

24   inspector where there's more than 48 tracks and hundreds of

25   switches and assets.  And being as it's a low-level class,

1    it's kind of the back burner for repairs.  And so I had, you

2    know, tens, dozens, hundreds sometimes of defects that weren't

3    getting repaired.  And in reading the FRA, you know, there's

4    wording in the FRA about willful negligence in allowing these

5    defects to not be repaired.  And there's a number that you

6    could report it to, and I did call that FRA number to report

7    it, and, um, basically it just came to a dead end, and nothing

8    happened of it.

9    Q.  Did you ever tell BNSF that you had attempted to contact

10   the FRA?

11   A.  No.

12   Q.  Would you be concerned or were you concerned that if they

13   found out you were trying to contact the FRA, they would

14   retaliate against you?

15   A.  Yes.  Yeah, the -- the BNSF employees -- the FRA are the

16   big guys that come around.  Right?  It's the fed that's coming

17   around.  And when the FRA would come around, things would be

18   different.  Sometimes they might know that the FRA was coming,

19   say, in two days so they would put out what they call a blitz

20   where all hands on deck, we are going to go out and try to

21   repair all these defects that we can before the FRA gets here,

22   and sometimes successfully, sometimes not.  But the other

23   times the FRA will just show up.  Well, that's more of a

24   surprise.  And the FRA goes and walks your tracks and finds

25   all these defects, and they can write fines for that.

1       So the FRA guy -- the FRA inspector is a pretty big

2  deal, pretty serious.  And, no, I would not want BNSF to know

3  that I'm telling the FRA that willful violations are being

4  made.

5  Q.  That's something you would be scared about.

6  A.  Yeah, my job.

7       MR. THOMPSON:  All right.  I'm going to show only the

8  witness Plaintiff's Exhibit 23.

9  BY MR. THOMPSON:

10  Q.  I don't want you to read to me what's there.  I just want

11  to know what Plaintiff's Exhibit 23, pages 1 through 6, are

12  generally.  Do you recognize them?

13  A.  Yes.

14  Q.  What are they?

15  A.  One is a -- what I took to be kind of an offensive meme.

16       MR. GOMAN:  Your Honor, I am going to object if we

17  are going to describe the content of these records.  I have an

18  objection to their introduction.

19       THE COURT:  All right.  Help me understand.  Who

20  generated these records?

21  BY MR. THOMPSON:

22  Q.  Mr. Herzog, whose notes are these?

23  A.  Several of these pages are my notes, and several of

24  them -- a couple of them are my coworker's notes.

25  Q.  Is that Mr. Goodnight?

1   A.  Yes.

2   Q.  So let's do -- so page 1 is just a picture, so we'll start

3   with page 2.  Whose note is this?

4   A.  This one is mine.

5   Q.  Did you contemporaneously record it?

6   A.  Um, like as the talk was happening, yes, I wrote down

7   because it was highly unusual and what I felt kind of

8   threatening.

9   Q.  All right.  What about page 3?  Is this your note?

10  A.  Yes.

11  Q.  Same thing with when you wrote it?

12  A.  Yes.

13  Q.  Page 4?

14  A.  Yes.

15  Q.  Are pages 5 and 6 Mr. Goodnight's notes?

16  A.  I believe so, yes.

17  Q.  Did he give those to you?

18  A.  Yeah.  I asked him if he had taken any notes on what had

19  happened in that briefing or that safety meeting.

20  Q.  Mr. Goodnight was also writing them down at the same time?

21  A.  That's correct.

22        MR. THOMPSON:  Your Honor, we offer Plaintiff's

23  Exhibit 23.

24        MR. GOMAN:  Your Honor, the objection is to

25  relevancy.  This all concerns things that happened in

1   September and August of 2016, I believe, after the relevant

2   events in this lawsuit.

3           THE COURT:  All right.  I need to look at these

4   notes.

5           MR. THOMPSON:  Sure.

6           THE COURT:  What exhibit is it?

7           MR. THOMPSON:  Plaintiff's Exhibit 23.  I can

8   highlight particularly why it's important.  There's a couple

9   different spots.

10          THE COURT:  All right.  Show it to me.

11          MR. THOMPSON:  I will momentarily, Your Honor.

12          Here's one.  And it continues on all the way through

13  there.  I guess I can try and circle it.

14          THE COURT:  All right.  Go ahead.  Let me see the

15  next page.

16          All right.  I have a question.  You don't have any

17  objection to the other worker's notes being in here?

18          MR. GOMAN:  No, I have a foundation objection in

19  addition.  I just believe these are all irrelevant.

20          THE COURT:  Well, I don't think they are irrelevant

21  based on what I'm seeing, but I am concerned, Mr. Thompson,

22  about admitting the notes of the coworker because he's not

23  here.

24          MR. THOMPSON:  That's okay.  Mr. Goodnight is going

25  to come in and testify too.

1            THE COURT:  I think at this point the only thing I

2    will let you receive are the notes written by this witness.

3            MR. THOMPSON:  Yes, Your Honor.

4            THE COURT:  Which pages contain his notes?

5            MR. THOMPSON:  Plaintiff's Exhibit 1 through 4.

6    Sorry.  Plaintiff's Exhibit 23, pages 1 through 4.

7            THE COURT:  The objection is overruled as to

8    Exhibit 23, pages 1 through 4, because these notes were

9    written by the witness, Mr. Herzog, and I find that they are

10   relevant.

11        (Plaintiff's Exhibit 23:1-4 received.)

12   BY MR. THOMPSON:

13   Q.  Mr. Herzog, where did you write these notes?

14   A.  I believe this -- this one was at the Holiday Inn where we

15   had our safety meeting.

16   Q.  Who was talking during that safety meeting that you were

17   writing notes about?

18   A.  Michael Paz, our roadmaster.

19   Q.  I want you to explain to me what this first note -- it

20   looks like it says:  Don't follow certain individual.

21   Negative direction.  Not here for games with career.  It going

22   to catch up with him.

23            Did I read it correctly?

24   A.  Yeah.  He said, uh, I don't want you guys to be following

25   a certain individual.  This is like verbatim.  He wouldn't say

1   the individual's name.  That person is going in a negative

2   direction, and I want you guys -- you know, I'm not here to

3   play games, especially with your careers.

4   Q.  Did you understand him to be threatening you if you stuck

5   up for that individual?

6   A.  Yes.  And --

7   Q.  Right here I want to ask about this note where it says,

8   Line is drawn in the sand.  What's that mean?

9   A.  That's what I took as one of the most threatening things

10  that he said to the group of us.  He's going to draw a line in

11  the sand here.

12  Q.  What was going on that he was drawing a line in the sand?

13  About what?

14  A.  Whether it's us bringing up safety rules and concerns,

15  issues about defects not being repaired, being told to do, you

16  know, unsafe practices, you know, basically standing up and

17  empowering ourselves for our own safety and our coworkers'

18  safety.

19  Q.  At the bottom it says, Separate self from certain person.

20  Is that the same individual you talked about earlier?

21  A.  These were just these vague words he was using.  I want

22  you guys to separate yourself from a certain person.  You know

23  who they are, is what he was saying.

24  Q.  Did you have any understanding as to who he was talking

25  about?

Julie H. Thomas, RMR, CRR                                    (303)296-3056

17-cv-00844-WYD-SKC                 Herzog - Direct                    III - 822

1   A.  Yeah.  He was either talking about, you know, myself --

2   Q.  Let me freeze you for a second, because I don't want to

3   get a whole bunch of names.  Here's what I really want to

4   know.  What was different about these people that he wanted

5   them to separate from and everybody else?  What was Mr. Paz

6   taking issue with these people doing?

7   A.  People that would voice safety concerns and wrongdoing.

8   Q.  All right.  Let me ask you about page 3.  Right here.  I

9   see a note where it says, When I've had problem guys before, I

10  had them removed.  Do you see that?

11  A.  Yes.

12  Q.  Did Michael Paz say that?

13  A.  Yes.

14  Q.  Was he referring to Brandon Fresquez?

15          MR. GOMAN:  Objection:  foundation.

16          THE COURT:  Sustained.

17  BY MR. THOMPSON:

18  Q.  Who did you believe he was referring to?

19          MR. GOMAN:  Objection to relevance.

20          THE COURT:  Overruled.  He may answer.

21  A.  Brandon and, uh, you know, apparently anyone else that he

22  has had removed before.

23  BY MR. THOMPSON:

24  Q.  Did you ever report these threats to anyone?

25  A.  Yes.

17-cv-00844-WYD-SKC                    Herzog - Direct                    III - 823

1   Q.   How did you do that?

2   A.   Well, conveniently, the BNSF has a hotline that you can

3   report harassment and bullying and threats like that to, so I

4   called the hotline.

5   Q.   How did that work out for you?

6   A.   It didn't work out.

7   Q.   Explain that to me.

8   A.   Well, I called the hotline.  I had talked to my -- you

9   know, the other foremen, and I told them if they felt -- how

10  they felt, asked them how they felt, said that I had called

11  the hotline.  And from then on our relationship with Mr. Paz

12  was definitely going downhill.  And, um, they brought an HR

13  rep and questioned us for a day or two.  And, um, and it

14  seemed like those of us that made phone calls were definitely

15  on a separate list and singled out as people that had made

16  calls to the 1-800 number.

17  Q.   Did it affect the overtime you were allowed to have after

18  you filed a complaint?

19  A.   Yeah.  It affected a lot of things.  It affected the work

20  environment.  It affected overtime.  You know, there was no --

21  no longer overtime could be had for certain individuals.

22  Myself and a few of the other foremens were those certain

23  individuals.

24  Q.   Were --

25  A.   When I talk about a social hierarchy, the favorites, it

Julie H. Thomas, RMR, CRR                                      (303)296-3056

1    was clear they were allowed to have overtime.  You know, they

2    could rake up all the overtime that we weren't allowed to have

3    as kind of a type of punitive ratcheting down on us, but we

4    weren't able to have any.

5    Q.  Were the nonfavorites the ones that reported Mr. Paz's

6    illegal conduct?

7    A.  Yes, the people that called the hotline, and their entire

8    crews basically.

9    Q.  I want to ask you about one other bullet point on here.

10   It says, Bullying union members to violate BNSF safety rules,

11   lone worker, flagman -- and then is that O5 or OS?

12   A.  An OS, yes.

13   Q.  Out of service?

14   A.  It's operating switch.

15   Q.  Operate machinery when not qualified, violate FRA and BNSF

16   policies via defect removal.  Do you see that?

17   A.  Yes.

18   Q.  I'm particularly interested in violate FRA and BNSF

19   policies via defect removal.  What are you talking about

20   there?

21   A.  In that part I'm talking about he would have --

22   Q.  Let me stop one second.  Again, you are talking about

23   Michael Paz?

24   A.  Mike Paz would -- you know, there's a lot of turnover in

25   these -- in our job positions.  And it's kind of confusing,

 1   but you could bid off a job and go to another job.  And young

 2   guys, say, who maybe are not from around there, much

 3   seniority, or aren't going to stand up to the manager, would

 4   come into one of these positions, and he'd -- Mr. Paz would,

 5   say I want you to go out and remove X slow order.  And these

 6   defects here, he'd say, they have been repaired.  I want you

 7   to remove those.  Well, the new track inspector who just

 8   showed up, he doesn't know.  He just got the territory today.

 9   Boss is telling him to do something, so he does it.

10   Q.  Was Michael Paz trying to get rid of guys who would stand

11   up to him about violating FRA regulations?

12   A.  Yes.  Yeah, he was eliminating job positions.  He was

13   eliminating overtime.  He eliminated an entire group of four

14   guys, a four-man job roster that was in Denver, and moved it

15   out of town.  And yeah, he was -- he was trying to do that.

16          And the bullying union members was in regard to me,

17   how he would try to make a mockery of me.  And I would say

18   that I wasn't gonna violate these lone worker rules and

19   working an OS by myself, and then he would routinely in days

20   after that make jokes about that.

21   Q.  Had you done anything more egregious than just refuse to

22   violate safety regulations?

23   A.  No.

24          MR. THOMPSON:  Thank you, Mr. Keech.

25   BY MR. THOMPSON:

17-cv-00844-WYD-SKC          Herzog - Direct          III - 826

1   Q.  I'm going to show you Plaintiff's Exhibit 4.  Do you

2   recognize this document?

3   A.  Yes.

4   Q.  What is it?

5   A.  My affidavit.

6          MR. THOMPSON:  Plaintiff offers Exhibit 4.

7          MR. GOMAN:  Objection to hearsay.

8          THE COURT:  What's the date of it?  I'm asking you to

9   ask the witness what's the date of it.

10          MR. THOMPSON:  Sure.

11   BY MR. THOMPSON:

12   Q.  What is the date on which you signed this affidavit,

13   Mr. Herzog?

14   A.  November 18th, 2016.

15          THE COURT:  All right.  Let me see the whole

16   document.

17          MR. THOMPSON:  Sure, Your Honor.  Maybe I can lay

18   some more foundation to relevance, if the Court would like.

19          THE COURT:  It's up to you.

20   BY MR. THOMPSON:

21   Q.  While you were still working at BNSF, before this case was

22   in federal court, when it was just with OSHA, did Brandon

23   Fresquez's attorneys ask you for an affidavit?

24   A.  Yes.

25   Q.  And basically all the stuff you have said here; right?

Julie H. Thomas, RMR, CRR                        (303)296-3056

```
 1    A.   That's correct.

 2    Q.   Did you sign that affidavit?

 3    A.   Yes, I did.

 4    Q.   Were you nervous or at all concerned that BNSF would

 5    retaliate against you for providing an affidavit that

 6    supported Mr. Fresquez?

 7    A.   Yes.

 8    Q.   Then why did you do it?

 9    A.   Because it was the right thing to do, and I knew that it

10    was wrong how Brandon was terminated, how an excellent

11    employee who was just trying to follow the rules that we were

12    trained to follow by the Federal Railroad Administration was

13    fired.   And that I was under those -- in that same boat, and

14    that it was wrong that he was wrongly terminated.

15    Q.   Did you write the affidavit?

16    A.   Yes, in -- yes, I did, in my handwriting, yeah.

17    Q.   So you wrote it, but then somebody from Brandon's law

18    office put it on essentially letterhead and things like that?

19    A.   That's correct.

20    Q.   Did you review it before it was submitted?

21    A.   Yes.

22              MR. THOMPSON:  Plaintiff offers Exhibit 4.

23              THE COURT:  All right.  I want to excuse the jury for

24    a minute.  I need a brief legal argument about this document.

25    And I will bring you back in a few minutes.  We are going to
```

1    stop at 5:10.  We are going to catch up on our 10 minutes from

2    this morning, but I will let you go by 5:10.

3          And we are not going to finish this witness today,

4    are we?

5          MR. THOMPSON:  I think from my end we will, Your

6    Honor.

7          THE COURT:  Well, you have questions, don't you?

8          MR. GOMAN:  Uh, yeah.  Yeah.

9          THE COURT:  How long will your questioning last?

10         MR. GOMAN:  45 minutes.

11         THE COURT:  All right.  Then we will have to continue

12   the witness until tomorrow, but I will bring the jury back in

13   in a minute.

14      (Jury out at 4:42 p.m.)

15         THE COURT:  Let me ask you a question about this

16   document.  What is this?  It's an affidavit for the Department

17   of Labor, Occupational Safety and Health Administration,

18   Region VIII.  Is this a public document?

19         MR. THOMPSON:  Yes, Your Honor.

20         THE COURT:  So if somebody went to the records of

21   OSHA, they could get this document?

22         MR. THOMPSON:  Yes, Your Honor.

23         THE COURT:  Why shouldn't this be admitted pursuant

24   to Rule 803(8) of the Federal Rules of Evidence?

25         MR. GOMAN:  Your Honor, this record is drafted,

1   according to his testimony today, by Mr. Herzog.  It's not a

2   record or statement that sets out the activities of OSHA, a

3   matter observed by OSHA, or factual findings from a legally

4   authorized investigation.  This is just a hearsay statement

5   from Mr. Herzog.

6           THE COURT:  What's the -- then respond to that,

7   Mr. Thompson.  What's the exception of the hearsay rule --

8           MR. THOMPSON:  Yes, Your Honor.

9           THE COURT:  -- that would allow this to come in.

10           MR. THOMPSON:  Two separate reasons.  First, it's not

11   being offered for the truth of the matter.  I'm not going to

12   discuss any allegations in the affidavit.  Instead, my next

13   question is going to be:  Shortly after you submitted this

14   affidavit, did BNSF fire you?

15           THE COURT:  All right.

16           MR. THOMPSON:  Do you believe that was in retaliation

17   for submitting this affidavit?

18           THE COURT:  All right.  Here's what I think is a

19   compromise ruling.  I think you can get him to acknowledge --

20   I will let you get him to acknowledge he filed an affidavit,

21   but I won't allow it to be received because I think it is

22   hearsay.  It is being offered for the truth of the matter

23   asserted therein.  If you choose to, you can get him to

24   acknowledge, if you believe it to be true, that what's in the

25   affidavit is consistent with his testimony today, and then

1   whatever else you want to ask.

2            So I think there's merit to this being a hearsay

3   document.  I don't know of an exception that applies.  So I'm

4   going to refuse the exhibit, but I think he should be allowed

5   to testify that he submitted an affidavit, again, without it

6   being received.

7            All right.  Let's bring the jury back in.

8            We are going to go to 5:10 today, and then we'll

9   stop.

10       (Jury in at 4:48 p.m.)

11            THE COURT:  All right, have a seat.

12            For the reasons stated outside the presence of the

13   jury, I have sustained the objection to the admission of

14   Exhibit 4.

15            You may continue with your questioning.

16   BY MR. THOMPSON:

17   Q.  Did you submit an affidavit to OSHA supporting Brandon

18   Fresquez?

19   A.  Yes.

20   Q.  Did you accuse Mark Carpenter and Michael Paz of violating

21   FRA regulations?

22   A.  Yes.

23   Q.  After you submitted that affidavit, did BNSF fire you?

24   A.  Yes.

25   Q.  What for?

1   A.  For looking at a cell phone while driving a pickup.

2   Q.  Are there other employees  who have looked at their cell

3   phone while driving a pickup that were not fired?

4   A.  Yes.

5   Q.  Why do you believe you were fired?

6   A.  Because I signed an affidavit in a whistleblower case

7   against the company.

8   Q.  If you had it to do again, would you?

9   A.  Yes.

10   Q.  This had to have been really hard on your family, hasn't

11   it?

12   A.  Yes, I --

13         MR. GOMAN:  Objection to the relevance of this.

14         THE COURT:  Overruled.

15   BY MR. THOMPSON:

16   Q.  Why would you do it again?

17   A.  Because it was the right thing to do.  It wasn't right

18   that Brandon got terminated.  It wasn't right that I got

19   terminated for using a cell phone while driving a pickup.

20   Yeah, I did.  I went through -- we were expecting our first

21   child when this happened, when I got terminated.  I went

22   through -- you know, it was my career job that I had had.  I

23   was looking forward to a long career.  I was a good worker.  I

24   had achieved pretty good seniority.  I had achieved and

25   obtained a lot of qualifications.  I had been awarded a lot of

1   different awards by the railroad for being an employee who's

2   gone above and beyond the call of duty.  And then I was fired

3   and went through a really kind of long depression as a result

4   of that.

5   Q.  Tell us about those awards.  What kind of awards have you

6   won from BNSF?

7   A.  Several of them are called On Guard awards for going the

8   extra mile, doing extra things, like reporting trespassers on

9   property on the railroad tracks.  I found a young teenager

10   that was running away from home on the railroad tracks.  I

11   turned in some vandals that were stealing BNSF railroad

12   property, hardware, metal, steel hardware, and they were

13   caught.  I reported a fire that some homeless people were

14   having underneath a railroad bridge in downtown Denver.  And I

15   received, you know, these awards as a result of that.

16   Q.  Previous to when you submitted the affidavit, did BNSF

17   view you as a good employee?

18   A.  Yes.

19   Q.  Did that change after the hotline complaints and

20   affidavit?

21   A.  Yes.

22   Q.  Out on the tracks it's almost like a construction

23   environment; right?

24   A.  It's very much like that, yes.  It is -- it's basically

25   railroad construction in a sense.

1   Q.  There's cursing, things like that; right?

2   A.  Yeah.  It's a -- you know, we're swinging sledge hammers,

3   using real loud equipment.  We work a lot of long hours.  It's

4   a real difficult, dangerous blue-collar job.

5   Q.  Did you ever see a manager kind of just look the other way

6   or anything like that when an employee would violate federal

7   regulations?

8   A.  Safety rules, yes, and some other regulations, yes, just

9   to get the job done.

10  Q.  If the employee was someone who enforced safety and he or

11  she violated a rule, would supervisors turn a blind eye to

12  that?

13  A.  Yes.

14  Q.  And I asked it quite differently, so -- I'm phrasing it

15  poorly.

16          So it sounds like you have some employees who really

17  follow federal regulations and some that don't.  Is that

18  right?

19  A.  That's right.

20  Q.  Are the ones that don't treated more favorably?

21  A.  Sometimes, yes.

22  Q.  Would managers sometimes look the other way for rules

23  violations when it was someone that violated federal

24  regulations for them?

25  A.  Yeah.  Yes.

```
 1   Q.  What if someone like you or Brandon Fresquez, someone that

 2   stood up to BNSF, violated a rule?

 3   A.  No.

 4   Q.  Would they turn a blind eye to that?

 5   A.  No.

 6   Q.  Have you seen other employees not follow orders?

 7   A.  Yes.

 8   Q.  Ever seen anybody fired for it?

 9   A.  No.

10   Q.  Have you seen other employees use their phone while

11   driving?

12   A.  Yes, including -- including supervisors.

13   Q.  Ever seen anybody fired for it?

14   A.  No.

15   Q.  Do you think you would have been fired for it if you

16   hadn't submitted an affidavit?

17   A.  No.

18   Q.  Do you think Brandon would have been fired for it if he

19   hadn't stood up to Michael Paz and Mark Carpenter?

20           MR. GOMAN:  Objection to --

21   A.  No.

22           MR. GOMAN:  -- speculation.

23           THE COURT:  Sustained.

24           MR. THOMPSON:  I have nothing further.

25           THE COURT:  All right.  Let's go for -- until 5:10
```

 1   with cross-examination.

 2                        **CROSS-EXAMINATION**

 3   BY MR. GOMAN:

 4   Q.  Good afternoon, Mr. Herzog.

 5   A.  Afternoon.

 6   Q.  All right.  Let's go right to May 5th of 2016.  Okay?  You

 7   were a foreman on a surfacing gang.  Do I have that right?

 8   A.  Yes.

 9   Q.  The function of a surfacing gang is to repair track;

10   right?

11   A.  Yes, alignment and surface deviation.

12   Q.  That's the reason for being for a surfacing gang.

13   A.  That's correct.

14   Q.  And that's why you were there on May 5th of 2016, to work

15   on removal of some defects out there in south Denver; right?

16   A.  That's correct.

17   Q.  So the first thing you needed to do was go to a location

18   where there had been a reported problem and find it; right?

19   A.  Right.  I had attempted to locate that defect visually and

20   was unable, in the previous day or days, to visually locate

21   it.  I could not with the naked eye see where it was.

22   Q.  And the reason why you wanted to locate it is because it

23   was your job that day to fix it; right?

24   A.  Right.  The geo car had kicked out this report that there

25   was an alignment issue here, and now I'm being told I need to

1   go there and fix it.

2   Q.   You weren't just curious about whether this two-year-old

3   defect still existed.   Your job was to repair it.   Right?

4   A.   I was told by my supervisor, Mike Paz, to go there and

5   repair it.

6   Q.   All right.   So you have a whole group of machines there to

7   repair the defect if you can find it; right?

8   A.   Only two.

9   Q.   Okay.

10  A.   Two machines.

11  Q.   You have the whole gang there to repair the defect if you

12  can find it; right?

13  A.   Yes.   It's a three-person gang, myself and two operators.

14  So there's three of us and two machines.

15  Q.   Okay.   I understood you to say on direct examination that

16  you weren't going to be able to repair that defect even if it

17  was there.

18  A.   That's correct.

19  Q.   That's not true, though; right?

20  A.   It is true.

21  Q.   Well, you were looking for it so you could repair it;

22  right?

23  A.   Yes, I was looking for it in order to repair it, but until

24  I realized that it was in a switch, I can't lift -- the

25  surfacing gang -- what that machine does, it's a giant machine

1    that stretches out over 90 feet and grabs the track and lifts

2    it up in the air and aligns it.  On regular track, that's not

3    a problem.  It also tamps the ties.  But in a switch, you

4    know, where tracks meet and come together and trains transfer,

5    you can't just do that in a switch without support, which

6    would be a section or many men on the ground, because ties

7    will fall, clips will fall off, et cetera.

8    Q.  I see.

9    A.  So on a main line like that, I can't go out there by

10   myself without any support and attempt to fix a defect in a

11   switch.  And I wouldn't pull up a switch out of the rock

12   without any section maintenance crews there.

13   Q.  So you called Brandon Fresquez and Mike Paz for help;

14   right?

15   A.  I think I asked -- I asked Mike Paz that morning, and then

16   I'm not sure if I called him again or I told him that I was

17   there, and he came out.

18   Q.  You can't remember if you were the one who called

19   Mr. Fresquez or not?

20   A.  That's correct.

21   Q.  Okay.  I'm going to show you the deposition you gave in

22   this case.

23         MR. GOMAN:  Actually, we have a sealed copy, if we

24   could approach.

25         With the Court's permission, to speed this along, I

17-cv-00844-WYD-SKC                Herzog - Cross                III - 838

1   can show it on the screen if you would permit.

2           THE COURT:  Yeah, I just want the witness to have a

3   copy.  I have no issue with it being shown on the screen.  The

4   witness should have an original.  And, again, I order

5   plaintiff to bring all their depositions tomorrow and give

6   them to Mr. Keech if you are going to use more of them.

7           COURTROOM DEPUTY:  I hand the witness the transcript

8   of a deposition taken December 12, 2017.

9   BY MR. GOMAN:

10  Q.  All right.  I'm going to highlight page 100, Mr. Herzog.

11  A.  Okay.

12  Q.  Line 16.  My question was:  "... what you're trying to do,

13  you're trying to use GPS or whatever to locate where this

14  defect is?"

15          And what was your answer, sir?

16  A.  "Yes.  I didn't have GPS, all I had was my naked eye, so

17  I've asked Mike Paz if he would -- and Brandon Fresquez, the

18  track inspector, whose managing -- whose territory that is,

19  to, hey, will you, please, show me what we're looking for here

20  because I -- because to the naked eye, you can't see it."

21  Q.  When you asked Mike Paz for help, he says sure; right?

22  A.  Right.

23  Q.  It was your idea that he go out there and try and help you

24  find this defect; right?

25  A.  Will you repeat the question?

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-cv-00844-WYD-SKC                Herzog - Cross                III - 839

1   Q.  It was your idea that Mike Paz go out to that track to

2   help you do your job; right?

3   A.  Right.  I've been out there, tried to locate it myself,

4   can't find it, can't verify it.  I don't have a GPS.  So I'm

5   asking my supervisor, or someone who does have a GPS, to help

6   me find it.

7   Q.  So the two people you asked were Mike Paz and Brandon

8   Fresquez; right?

9   A.  Yes.

10  Q.  Okay.  Mike Paz says, Sure, I'll meet you out there.  I'll

11  help you out.  Right?

12  A.  Yes.

13  Q.  When they show up, when Mr. Paz and Mr. Fresquez show up,

14  they don't seem upset or angry, do they?

15  A.  Um, upset or angry.  No, they seem awkward and tense.

16  Q.  Okay.

17  A.  And, uh, you know, one of the things I think was said when

18  Brandon was -- showed up was, You see, Brandon, trouble just

19  follows you everywhere you go.

20  Q.  I see.  Um --

21  A.  So there's definitely a real awkward, tense relationship.

22  And it puts me in a pretty awkward place, too, being as I'm

23  kind of the middleman or odd man out, but it's --

24  Q.  All right.

25  A.  -- but it's definitely contentious.

17-cv-00844-WYD-SKC                Herzog - Cross                      III - 840

 1   Q.  Let's talk about this defect then.  You are trying to find

 2   a location where it had been reported; is that right?

 3   A.  That's correct.

 4   Q.  And you say, I can't see this defect with my naked eye.

 5   Right?

 6   A.  That's correct.

 7   Q.  You weren't -- were you telling the truth when you said

 8   that?

 9   A.  Yes.

10   Q.  Were you trying to trick Mr. Fresquez into string-lining

11   the track?

12   A.  No.

13   Q.  You just wanted to find this location so you could see if

14   the track was defective; right?

15   A.  Right, via GPS.

16   Q.  Okay.  Mr. Paz then says, Yeah, I can't -- I can't see

17   this defect either, but I -- we seem like we are in the

18   location where the GPS is pointing us.  Right?

19   A.  Right.

20   Q.  So Mike Paz tells Brandon Fresquez, Go to your truck and

21   get your string-line so we can measure this.  Right?

22   A.  Right.

23   Q.  That's the right tool to measure this type of defect;

24   right?

25   A.  Maybe, yes.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Q.  I mean, that's what you would use to --

2   A.  It's one of -- could be one of the tools.

3   Q.  That's what you would use to find an alignment defect;

4   right?

5   A.  Yes, or a board.  Yeah, or a switch point board.  A

6   straight edge.

7   Q.  At this point in time it certainly appears to you that

8   both you and Mike Paz are interested in just figuring out

9   whether the track is defective; right?

10  A.  Yeah, locating it, finding out -- he wants to find out if

11  it was defective.  I just want to find out where it is.

12  Q.  He, Mike Paz, wants to find out if it's defective; right?

13  A.  Yes.

14  Q.  Asking Brandon Fresquez to get his string-line and measure

15  the track is a pretty reasonable request; right?

16  A.  Yes.

17  Q.  It's Brandon Fresquez's job to measure the track with a

18  string-line to see if it's defective; right?

19  A.  Yes.  However, a big part of these geometry cars, they

20  find things that, A, the track inspector can't find by naked

21  eye or by routine means, by routine instruments and tools.

22  They're able to measure things such as unbalance, alignments,

23  that aren't easily taken with, say, two points of measurement.

24  So that's -- the whole idea of having these geometry cars is

25  they find more than we and our primitive instruments do.

17-cv-00844-WYD-SKC                    Herzog - Cross                    III - 842

1   Q.  Yes, but as you told me in your deposition, sometimes

2   these geometry cars make mistakes; right?

3   A.  They could, yes.

4   Q.  So that's why you measure it before planning out any sort

5   of repair or verification; right?

6   A.  That's right.

7   Q.  So at this point in time when Mr. Paz tells Mr. Fresquez,

8   Go get your string-line so we can measure this, it appears to

9   you that Mr. Paz and you are only interested in measuring this

10  track.  That's all you want to accomplish.  Right?

11  A.  Right.

12  Q.  There is no doubt that if Mr. Fresquez had chosen to

13  measure the track with a string-line, he could have done so

14  safely; right?

15  A.  Yes.

16  Q.  And it would make sense that Mr. Fresquez measure the

17  track because he's the one who has been trained to do that;

18  right?

19  A.  We all have.

20  Q.  Okay.

21  A.  All three of us have the same FRA qualifications and

22  abilities to complete this task.

23  Q.  But it makes --

24  A.  And we're all -- excuse me.  And we're all obligated by

25  the FRA.

17-cv-00844-WYD-SKC                Herzog - Cross                III - 843

 1   Q.  It makes sense that Mike Paz would ask the track

 2   inspector, as opposed to you, the foreman, because

 3   Mr. Fresquez is probably the best one at measuring that

 4   defect; right?

 5   A.  Or -- yeah, or myself.

 6   Q.  Okay.  If Mike Paz had asked you to measure the defect,

 7   you would have just done it; right?

 8   A.  I would have attempted to do it, yes.

 9   Q.  You're not going to remove anything from a track

10   inspection database fraudulently, are you?

11   A.  No, I'm not.

12   Q.  You wouldn't ever do that, would you?

13   A.  No, I would not.

14   Q.  That's why you would want to measure it to verify whether

15   it's there or not; right?

16   A.  Yes.

17   Q.  So the instruction, the directive from Mike Paz to get a

18   string-line and measure the track, that's the kind of

19   instruction that a track inspector like Mr. Fresquez has to

20   comply with; right?

21   A.  Yes.

22   Q.  But Brandon Fresquez doesn't go get his string-line, does

23   he?

24   A.  No.

25   Q.  Brandon said something like -- excuse me.  Mr. Fresquez

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    said something like, What's the point?  You've already made

2    your decision.  Right?

3    A.  Right.

4    Q.  And then he -- well, before he walks to the truck, based

5    on your understanding, Mike Paz hadn't made that decision yet,

6    had he?

7    A.  I didn't really understand what decision Mike Paz had

8    made.

9    Q.  Well, you didn't think he had made any decision.  He just

10   wanted to know if the defect was there.  Right?

11   A.  Right, or prove that it's not there.  Find whether it's

12   there or not.

13   Q.  There you go.  So this back and forth, Go get your

14   string-line, I don't see the point, that happens two or three

15   times while you're standing there by the track; right?

16   A.  Yes.

17   Q.  And it's always Mike Paz telling him to go get his

18   string-line and Mr. Fresquez saying, I don't see the point;

19   right?

20   A.  Yes.

21   Q.  And then Mr. Fresquez walks to his truck and drives off;

22   right?

23   A.  Yes.

24   Q.  If Mr. Paz had told you to measure the defect, you can't

25   think of any reason why you wouldn't have just done it; right?

17-cv-00844-WYD-SKC          Herzog - Cross          III - 845

 1   A.  Right.

 2   Q.  And that's what happens.  Mr. Fresquez leaves.

 3   A.  Yes.

 4   Q.  So you go get your string-line.

 5   A.  Mm-hmm.

 6   Q.  Yes?

 7   A.  Yes.

 8   Q.  And you and Mike Paz measure this track to see if it's

 9   defective; right?

10   A.  Yes.

11   Q.  It took you about five or ten minutes to do that?

12   A.  Yes.

13   Q.  Were you trying to bully or tag team Brandon Fresquez that

14   day?

15   A.  No.

16   Q.  Were you trying to trick him into improperly removing a

17   defect from the TIMS report?

18   A.  No.

19   Q.  Were you trying to bully Brandon Fresquez on May 5th of

20   2016?

21   A.  No.

22   Q.  Do you have any idea why Mr. Fresquez would accuse you of

23   having done that that day?

24          MR. THOMPSON:  I'm going to object, Your Honor.  That

25   misstates the record.

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC                Herzog - Cross                      III - 846

 1              THE COURT:  Overruled.

 2    A.  No.

 3    BY MR. GOMAN:

 4    Q.  Mr. Fresquez drives off, and Mike Paz calls him on the

 5    radio; is that right?

 6    A.  Yes.

 7    Q.  Tells --

 8    A.  I call him, and Mike calls him.

 9    Q.  You both try to get ahold of him; right?

10    A.  I believe so, yes.

11    Q.  Because you both want him to come back and do his job;

12    right?

13    A.  Yes.

14    Q.  But he doesn't.

15    A.  I don't think -- that's correct.

16    Q.  I didn't understand that answer.

17    A.  I'm sorry.

18    Q.  You agree with me, he didn't come back to do the job?

19    A.  That's correct.  I don't know if Mr. Paz calls him on the

20    radio, but when I attempted to, he told me not to because,

21    This is just what I need, he said.  So I don't actually know

22    if Mike Paz tried to call him back because he seemed -- he did

23    not want me to call him back.  He didn't want Brandon to come

24    back at that point.

25    Q.  So I'm not -- I don't understand that part.  Let me show

Julie H. Thomas, RMR, CRR                               (303)296-3056

17-cv-00844-WYD-SKC                Herzog - Cross                    III - 847

 1   you Exhibit A-46.  Can you see that there on the screen?

 2   A.  Yes.

 3   Q.  This is the second page of the statement you wrote that

 4   afternoon?

 5   A.  Yes.

 6   Q.  And then this is the first page?

 7   A.  Yes.

 8   Q.  All right.  So the last sentence on the first page,

 9   "Fresquez continued to his truck and drove down the

10   right-of-way."  Right?

11   A.  Yes.

12   Q.  And the next thing you write in your statement, "I called

13   Brandon on the phone after Paz contacted him on the radio.  He

14   doesn't [sic] answer my calls."  Right?

15   A.  Yes.

16   Q.  You told the truth in this statement; right?

17   A.  Yes.

18   Q.  Everything you put in this statement was 100 percent

19   factual and accurate; right?

20   A.  Yes, but it doesn't mean I was thorough.  I didn't want to

21   be as thorough as I had to be because I felt like I was being

22   manipulated.  I didn't realize if I was -- if I was being

23   forced to do this, as my supervisor was sitting there next to

24   me.  So my thought as I was writing this sentence was, Well, I

25   have to write down what happened, but I'm not going to be

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   as -- I'm not going to write a novel.  And, you know, my head

2   was kind of spinning.  I was feeling pretty weird about what

3   was going on.

4   Q.  So you were manipulated into writing a truthful statement;

5   is that right?

6   A.  Or being coerced to do it, yes --

7   Q.  Okay.

8   A.  -- on the spot.

9   Q.  Your statement says, "I called Brandon on the phone after

10  Paz contacted him on the radio.  He didn't answer my calls."

11  Is that right?

12  A.  Yes, that's what it says.

13  Q.  We have heard Mr. Fresquez on the radio saying something

14  like it's not -- I don't see the point.  It's pointless to

15  measure it.  You guys have already made up your mind.  You've

16  got your foreman there.

17          Are you sure you called him on the radio, or could it

18  have been Mike Paz?

19  A.  I'm pretty sure I called him on the radio on the spot --

20  on the track, because I can't use my phone on the track, and

21  on the phone.

22  Q.  So Mike Paz and you called him on the radio to get him to

23  come back.

24  A.  Yes.

25  Q.  And then it's unsuccessful, so you walk off the track, you

1   get on your cell phone, and you call him to get him to come

2   back and do his job; right?

3   A.  Or to talk to him, yes.

4   Q.  And he doesn't answer your phone calls.

5   A.  Correct.

6   Q.  So at what point in time did Mr. Paz supposedly say, Stop,

7   I have what I need?  After those attempted phone calls?

8   A.  As I was attempting to contact him on the radio.

9              THE COURT:  All right.  We're going to stop for

10  today.  How much -- let's talk about, in front of the jury,

11  what progress we may make tomorrow.  So what witnesses will be

12  completed tomorrow, starting with this witness?  How much

13  longer do we have with Mr. Herzog?  First you, Mr. Goman.

14             MR. GOMAN:  30 minutes.

15             THE COURT:  What about from you, Mr. Thompson, on

16  redirect?

17             MR. THOMPSON:  I don't currently have any redirect,

18  Your Honor.

19             THE COURT:  All right.  And then after Mr. Herzog is

20  finished, who is next?

21             MR. THOMPSON:  We are going to called David Dunn.

22             THE COURT:  How long will he take?

23             MR. THOMPSON:  Our part should take a half hour or

24  less.

25             THE COURT:  All right.  David Dunn.  All right.  I am

17-cv-00844-WYD-SKC                Jury Trial                    III - 850

 1   putting 30 minutes down here for direct.

 2            Who is after David Dunn?

 3            MR. THOMPSON:  Derek Goodnight, Jason Snow, and Jacob

 4   Yancey.

 5            THE COURT:  How long will all of them take?

 6            MR. THOMPSON:  They should be about the same.  They

 7   should be quick, Your Honor.

 8            THE COURT:  Will that complete your evidence?

 9            MR. THOMPSON:  Lastly, George Gavalla, our expert.

10            THE COURT:  How long will he take?

11            MR. THOMPSON:  What do you think, John?

12            MR. STONE:  About an hour.

13            MR. THOMPSON:  About an hour for Mr. Gavalla.

14            THE COURT:  All right.  So we'll probably go into the

15   afternoon tomorrow.

16            Is the defendant -- will the defendant be ready to

17   call witnesses?

18            MR. GOMAN:  Yes.

19            THE COURT:  And what witnesses -- assuming you have

20   three hours tomorrow afternoon, tell me the witnesses the

21   defendant will call.

22            MR. GOMAN:  Sure.  We have available to call Damon

23   Fry, Cason Cole --

24            THE COURT:  Wait a minute.  Wait a minute.  Damon

25   Fry.  Okay.

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-cv-00844-WYD-SKC                    Jury Trial                    III - 851

 1          MR. GOMAN:  Cason Cole, Ryan Akers, and Jeremy
 2   Holton.
 3          THE COURT:  Jeremy -- oh, yeah.  Okay.  I don't know
 4   what your times are because you didn't put times on your
 5   witness list, but are these longer, medium, or shorter
 6   witnesses?
 7          MR. GOMAN:  Shorter.  Cason Cole is the witness
 8   appearing remotely.
 9          THE COURT:  Right, right.  Okay.
10          All right.  Now, let's talk about Friday.  Will we
11   get this evidence portion of the case completed on Friday, or
12   what is your own sense?  Or sometime on Friday?  It's really
13   on the defendant.
14          MR. GOMAN:  We intend to call Ned Percival, Stephanie
15   Detlefsen, Adam Miller, and Dane Freshour, and then
16   potentially a coworker.
17          THE COURT:  All right.  So let me just say this to
18   the jury.  It is very possible that this case will go into
19   Tuesday.  I can only rush it so much.  I can't put undue
20   pressure.  But what I'd like to do is get everything
21   substantially completed, if not fully completed, as to the
22   evidence on Friday, because the attorneys and I still have to
23   work on jury instructions.  And then if you come back Tuesday,
24   what would happen is you would hear my final instructions and
25   closing arguments, and then you would deliberate, start your

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    deliberation.  If, obviously, we haven't finished all the

2    evidence by Friday, then we would finish that on Tuesday and

3    do the balance.  So we'll continue to monitor this, but I

4    think you should anticipate that there is a higher rather than

5    lower probability you have to come back on Tuesday.  I will do

6    my best to see if I can speed things up, in fairness to both

7    sides.

8            All right.  So we are going to start at 9 o'clock

9    tomorrow, and all of you need to be here, and we will start

10   promptly at 9:00.

11       (Jury out at 5:13 p.m.)

12           MR. THOMPSON:  Your Honor, there's an issue we think

13   we should take up before tomorrow.

14           THE COURT:  What's the issue?

15           MR. THOMPSON:  So defendant just indicated that it

16   may call Mr. Fry and Mr. Holton tomorrow.  That concerns the

17   2010 and 2011 conduct the Court has already excluded exhibits

18   on.  I don't understand how it would be relevant at this

19   point.

20           THE COURT:  Well, in light of what they view as their

21   protected activity, if the testimony about 2010 and '11 is

22   just a backdrop, I suppose I need to let you make a record,

23   but if there's an objection to this, I could sustain it.  Why

24   do you think you need to call those witnesses?

25           MR. GOMAN:  Your Honor, in this trial Mr. Fresquez

1  has been given ample opportunity to talk about the background,

2  his history of reporting track defects and taking tracks out

3  of service.  He's also made significant allegations of

4  misconduct against the supervisors that were supervising him

5  in 2014, 2015, and 2016.  Calling BNSF -- former BNSF

6  employees that supervised him in 2010 through 2013 does two

7  things.  It provides a backdrop for the -- these complaints of

8  misconduct that Mr. Fresquez is making and really undermines

9  the credibility that he only observed and reported and spoke

10 out against misconduct in 2014, 2015, and 2016.  He's been

11 reported to have not complied with instructions and been

12 insubordinate and borderline insubordinate since 2010.  To

13 claim now that it's because he was a whistleblower is

14 inconsistent with that history.

15        In addition, this previous testimony goes to whether

16 or not his protected activity was a contributing factor if he

17 engages in similar conduct in 2010 through 2013 and was not

18 retaliated against and was, in fact, shown leniency.

19        THE COURT:  I'm going to tell you what I'm going to

20 do.  There's no doubt about it.  I remember what Mr. Fresquez

21 talked about.  So long as the testimony you offer is a factual

22 response to what he was able to present as background, I think

23 it's proper.  If it goes into more detail than is appropriate,

24 since as I understand it, Mr. Thompson, the triggering events

25 for the current claim are what transpired in 2015 and '16,

1    then there may be a basis for an objection, but I'm not going

2    to -- if you are asking me now to exclude them, I'm not going

3    to exclude them because there has been testimony and exhibits

4    that the jury has seen regarding the three disciplinary things

5    that occurred to Mr. Fresquez.  He talked about them.  And if

6    there's a contrary point of view that's consistent with

7    background, I think I should allow that.  If it goes on more

8    than it should, then there should be an objection.  So I'll

9    refuse what you are requesting.

10           I want to move this along.  The jury is getting

11   tired.  The testimonies have gone on longer than they should

12   have.  I can't do much with the plaintiff.  We now get into

13   the area where both sides have now presented evidence, and you

14   are about to engage in what I'm going to call undue,

15   unnecessary repetition.  What I'm prepared to do is cut you

16   off in front of the jury and tell you to stop, this is

17   redundant, and I won't let you continue.  I don't like to do

18   that, but if this pace doesn't pick up, then I will do it.

19           So I'm putting you on notice.  You need to streamline

20   your testimonies, move it along, and do everything humanly

21   possible to have at least all the evidence presented before we

22   stop on Friday.  I'm going to do everything humanly possible

23   to make that happen.  I would start earlier, but I think

24   that's a futile gesture because one juror can't seem to get

25   here at 9:00.  So if I start at 8:30, then that doesn't help.

17-cv-00844-WYD-SKC          Jury Trial                    III - 855

1          So I'm putting you on notice to be more efficient.

2     For example, Mr. Goman, when I asked you to speed things up,

3     instead of taking 30 minutes you took 15 minutes.  I like

4     that.  I appreciate that.

5          Like I said, I practiced law for 24 years, done a lot

6     of trials.  I have been doing this now in my 24th year.

7     Sometimes shorter is better.  I am saying that to both of you.

8     Longer, repetitive testimony is something that you should want

9     to minimize, but I don't know if you really do.

10         All right.  We will start tomorrow at 9:00.

11      (Proceedings recessed 5:18 p.m.,

12      February 13, 2019.)

13
                          REPORTER'S CERTIFICATE
14
              I, JULIE H. THOMAS, Official Court Reporter for the
15      United States District Court for the District of Colorado, a
        Registered Merit Reporter and Certified Realtime Reporter,
16      CA CSR No. 9162, do hereby certify that I reported by machine
        shorthand the proceedings contained herein at the time and
17      place aforementioned and that the foregoing pages constitute a
        full, true and correct transcript.
18            Dated this 6th day of April, 2019.

19
                          _____/s/ Julie H. Thomas_____
20                            Official Court Reporter

21

22

23

24

25

Julie H. Thomas, RMR, CRR                              (303)296-3056