1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3

   Civil Action No. 17-cv-00844-WYD-SKC

4

5   BRANDON FRESQUEZ,                Volume IV of VI

6       Plaintiff,           (Pages 856 - 1155)

7       vs.

8   BNSF RAILWAY CO.,

9       Defendant.

10  ---------------------------------------------------------------

11              REPORTER'S TRANSCRIPT

                JURY TRIAL

12

13  ---------------------------------------------------------------

       Proceedings before the HONORABLE WILEY Y. DANIEL,

14  Judge, United States District Court for the District of

   Colorado, and a jury of ten, commencing at 9:03 a.m. on the

15  14th day of February, 2019, in Courtroom A1002, Alfred A.

   Arraj United States Courthouse, Denver, Colorado.

16

17                  APPEARANCES

18

   For the Plaintiff:

19  NICHOLAS D. THOMPSON and JONATHAN L. STONE, THE MOODY LAW

   FIRM, 500 Crawford Street, Suite 200, Portsmouth, VA 23704

20

   For the Defendant:

21  KEITH M. GOMAN and GILLIAN DALE, HALL & EVANS, LLC,

   1001 17th Street, Suite 300, Denver, CO 80202

22

23

24

      JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,

25     Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

      Proceedings reported by mechanical stenography;

        transcription produced via computer.

1                         I N D E X

2

   PLAINTIFF'S WITNESSES                                    PAGE
3

JAY HERZOG
4       Cross - Mr. Goman (Resumed)                         859
        Redirect - Mr. Thompson                             872
5   DAVID SCOTT DUNN
        Direct - Mr. Thompson                               879
6       Cross - Ms. Dale                                    914
        Redirect - Mr. Thompson                             929
7   JACOB IVEN YANCEY
        Direct - Mr. Thompson                               932
8       Cross - Mr. Goman                                   956
        Redirect - Mr. Thompson                             974
9       Recross - Mr. Goman                                 974
    JASON DEAN SNOW
10      Direct - Mr. Thompson                               975
        Cross - Ms. Dale                                    987
11      Redirect - Mr. Thompson                             999
        Recross - Ms. Dale                                 1000
12  DEREK GOODNIGHT
        Direct - Mr. Thompson                              1004
13      Cross - Mr. Goman                                  1013
        Redirect - Mr. Thompson                            1021
14  GEORGE ADAM GAVALLA
        Direct - Mr. Stone                                 1024
15      Cross - Mr. Goman                                  1048
        Redirect - Mr. Stone                               1057
16


17

   DEFENDANT'S WITNESSES                                    PAGE
18

RYAN AKERS
19      Direct - Ms. Dale                                  1059
        Cross - Mr. Thompson                               1079
20      Redirect - Ms. Dale                                1100
        Recross - Mr. Thompson                             1105
21  STEPHANIE DETLEFSEN
        Direct - Mr. Goman                                 1108
22

23

24

25

17-cv-00844-WYD-SKC                    Jury Trial                    IV - 858

1          PLAINTIFF'S
           EXHIBITS                              RECEIVED
2
           23:5-6                                  1008
3
           58:30-36                                1033
4

5
           DEFENDANT'S
6          EXHIBITS                              RECEIVED

7          A-52                                    1126

8          A-61                                    1130

9          A-63                                    1131

10         A-93                                    1053

11

12         EXHIBITS
           REFUSED                                 PAGE
13
           57                                      1005
14
           A-57                                    1138
15

16

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                              (303)296-3056

1      (Proceedings resumed 9:03 a.m.,

2      February 14, 2019, outside the presence

3      of the jury.)

4          THE COURT:  All right, let's bring the jury in and

5   get started.

6          MR. THOMPSON:  Your Honor.

7          THE COURT:  Yes.

8          MR. THOMPSON:  One issue to make the Court aware of.

9   We overnighted transcripts.  FedEx put them on the wrong

10  truck.  My fault they're not here in the first place, but

11  that's why they're not here today.

12         THE COURT:  Okay.  All right.

13     (Jury in at 9:04 a.m.)

14         THE COURT:  All right, have a seat.  Good morning,

15  and let's continue the cross of the witness.

16                  **JAY HERZOG, PLAINTIFF'S WITNESS,**

17                  **CROSS-EXAMINATION (Resumed)**

18  BY MR. GOMAN:

19  Q.  Good morning, Mr. Herzog.

20  A.  Good morning.

21  Q.  Yesterday on direct examination I believe I heard you say

22  you were aware of employees who had done the same thing as

23  Mr. Fresquez and not faced any discipline.  Is that right?

24  A.  Yes.

25  Q.  Let me be specific.  You're not aware of any employees at

1  BNSF who have been told to do something by their supervisor,

2  refused to do it, and then left without doing that task and

3  not faced any discipline.  You don't know of any cases like

4  that, do you?

5  A.  Not off the top of my head.

6  Q.  Let's go to the investigation hearing.  Neither BNSF nor

7  Mr. Fresquez asked you to testify in the disciplinary

8  investigation hearing; is that right?

9  A.  That's correct.

10  Q.  If Mr. Fresquez had asked you to come in and testify, you

11  would have done it; right?

12  A.  Yes.

13  Q.  And when you came in to testify, you would have testified

14  in that investigation hearing to what's in your written

15  statement; right?

16  A.  Yes, and to what -- the facts that happened.

17  Q.  And so this is A-46, just so we're reminded.  So you would

18  have testified to the contents of this written statement in

19  the investigation hearing if you were called; is that right?

20  A.  Yes.  Again, I felt a little coerced to write this

21  statement under direct supervision of my boss, Mr. Paz, who

22  was sitting right next to me.  It was a pretty uncomfortable

23  situation.  I was told to do it right on the spot.  I didn't

24  understand if I had any rights to not do it there, do it in

25  private, or do it another time, or refuse it altogether.

1    Q.  And I --

2    A.  So that was a pretty -- and that wasn't spoken to me by

3    Mr. Paz either.

4    Q.  And I understand that.  I heard you say that, but you also

5    said this statement was truthful and accurate.  Right?

6    A.  Yes, but it was also a bit brief, and when I was penning

7    this next to my supervisor, I thought it would be in the best

8    interest to not, you know, write a novel either.

9    Q.  The affidavit that you end up writing later in 2016 and

10   giving to Mr. Thompson, do you recall that affidavit?

11   A.  Yes.

12   Q.  Mr. Thompson's office typed up that affidavit for you;

13   right?

14   A.  That's correct.

15   Q.  And they sent it to you, and you confirmed that it was

16   accurate; right?

17   A.  That's correct.

18   Q.  But it wasn't written out in your own hand; is that right?

19   A.  Originally it was, yes.

20   Q.  Word for word?

21   A.  Um, not word for word.  I don't believe the -- it was, you

22   know, transferred from pen to copy word for word.

23   Q.  Okay.  Let's turn to whether you and Mr. Paz found a

24   defect in the track on May 5th of 2016.  Okay?

25          You were pretty clear in your direct examination you

1   don't -- you know the track was defective when you

2   string-lined it; right?

3   A.   Yes.

4   Q.   And you didn't measure -- you didn't repair it that day;

5   right?

6   A.   That's correct.

7   Q.   I asked you about that in your deposition, and you

8   testified differently, didn't you?  Do you recall?

9   A.   No.

10  Q.   All right.

11       MR. GOMAN:  I'm going to show the witness page 124 of

12  his deposition.

13  BY MR. GOMAN:

14  Q.   All right.  At the end -- at the very bottom of page 123

15  you asked about writing the statement and feeling

16  uncomfortable; right?

17  A.   Yes.

18  Q.   And then you say:  "...then I think finally my part came

19  for my regulator to get repaired and so then I rejoined my

20  surfacing gang...and made the repair and...then we continued."

21       Right?

22  A.   Yes.

23  Q.   So --

24  A.   That's not in reference to the track defect.  That's in

25  reference to the ballast regulator, the second of my two

1   machines that was broke down.

2   Q.  Okay.  So let me ask you about that then.

3        You made repairs to the track that day; right?

4   A.  I don't -- I think we -- we might have regulated and

5   tamped some track that day, but not in that crossover on

6   Main 2 in south Denver.  After that -- basically that machine

7   causing us to be -- that was broken, basically my machines sat

8   there almost all day without getting any repairs done.

9   Q.  All right.  So I asked you then that report, A-70 -- let

10  me show you that real quick.  I asked you in your deposition

11  whether this was the defect that you repaired that day.  Do

12  you remember that?

13  A.  No.

14  Q.  Let's go look at it.  Let's go to page 141 of your

15  deposition.  All right.  Starting first at line 24.

16       So I asked you:  "Does that" -- A-70 -- "Does that

17  describe the defect that you were looking for and found on

18  May 5th...?"

19       And you said:  "...I'm not sure if this is the one or

20  not."  "I'm not sure" -- at the end there -- "if this is the

21  defect or not."

22       Right?

23  A.  That's what it says, yes.

24  Q.  Okay.  And that's how you testified in your deposition

25  under oath; right?

1    A.  Yes.

2    Q.  Okay.  And I asked you again about that same record:  "Are

3    you sure this is not the defect you and Mike and Brandon were

4    looking for?"

5           And you said:  "No, I'm not sure."

6    A.  "Are you sure this is not the defect" --

7    Q.  So I'm showing you the record in A-70, Mr. Herzog, in your

8    deposition.

9    A.  Yes.

10   Q.  I'm saying is this the defect, the one that shows you made

11   the repair, is this the defect you and Mr. Fresquez were

12   looking for?  And you said repeatedly, I'm not sure.  Right?

13   But now you are sure?

14   A.  Can we verify the location of this defect and to where it

15   is exactly?  Because, you know, this has been several years

16   since I've been on the job, several years since I've been in

17   this territory.  I'm not -- three years removed, not that

18   familiar with the mileposts.  If we can verify the exact GPS

19   coordinates, the milepost and the track, then we can verify

20   the defect.

21   Q.  And that's the point; right?  You repaired defects every

22   day as a track foreman; right?

23   A.  That's correct.

24   Q.  It's hard to remember whether on a certain date three

25   years ago you repaired a particular defect.  Is that fair?

17-cv-00844-WYD-SKC                Herzog - Cross                        IV - 865

1   A.  Yes and no.  The track defect that Mr. Paz took me to via

2   GPS was in a crossover.

3   Q.  Mr. Herzog, did you report any defects as having been

4   repaired on May 5th of 2016?

5   A.  We would have to look at the record.  Again, my machines

6   were broken down for 90, 80 percent of the day that day.

7   Q.  On page 142 I asked you:  "...did you report any defects

8   as having been repaired or able to be cleared out of the

9   system...?"

10          And you said:  "I did report defects repaired I bet

11  that day, but not in this engineering defects geometry

12  format."

13          Right?

14  A.  Yes.

15  Q.  So does that refresh your memory you did, in fact, report

16  defects as being repaired?

17  A.  I bet I did.  It's possible that I did.

18  Q.  Just not in this format.  This is A-70.  Right?

19  A.  Right, and the format is a completely separate computer

20  program that I did not use.

21  Q.  You report defects as having been repaired in PARS.

22  A.  That's correct.

23  Q.  And do you know whether or not this engineering defects

24  page syncs and pulls data from PARS and reports it?  Do you

25  have any idea whether that's the case?

1    A.  Um, it -- I do not.  Specifically, no.

2    Q.  The whole time you worked at BNSF, you were never aware of

3    any supervisor taking your login credentials and logging into

4    the system and reporting repaired defects; right?

5    A.  I don't know.

6    Q.  You certainly didn't give out your password and login

7    credentials to Mike Paz, did you?

8    A.  No.

9    Q.  All right.  Let's switch gears.  You are presently -- you

10   made some pretty serious allegations about BNSF and Mr. Paz

11   and Mr. Carpenter in particular on your direct examination.

12   Fair?

13   A.  Yes.

14   Q.  You are presently trying to get your job back at BNSF; is

15   that right?

16   A.  I'm really not involved in the process, no.

17   Q.  The union is filing a grievance because you were

18   dismissed; right?

19   A.  Yes.

20   Q.  And if that arbitration is decided in your favor, the next

21   day you are going to come back to work at BNSF; right?

22   A.  No.

23   Q.  No?

24   A.  No.  It will be my choice, if that job is offered back.

25   I'm currently involved in real estate right now, in real

1    estate school.  I have a family at home.  And choosing to

2    resume the job with BNSF would definitely take a lot of

3    thinking.  And after what we've gone through as coworkers and

4    the union, I'm not sure that I would accept a job with this

5    company again.  It's a good job, it has great pay, but the

6    stress, the grief, the things that we deal with, the long

7    hours, the company has whittled away at our benefits, it's

8    not -- it's not the same that it used to be.

9    Q.  I see.  So that's different, though, than what you said in

10   your deposition under oath.  Let's look at page 11.

11           "If an arbitration [sic] awards you your job back at

12   BNSF, is that what you plan to do, meaning go back and work at

13   BNSF?"

14           Your whole answer was:  "Yes."

15           "In the maintenance of way department?"

16           "Yes."

17           Work as a foreman or a track inspector?

18           Yeah.

19           So your answer has changed here today; is that right?

20   A.  Yes, it has.  I have a son now, and the priorities in my

21   life are a lot different than they were before the birth of my

22   child.

23   Q.  When was your child born?

24   A.  September 22nd.

25   Q.  Of what year?

1   A.   2017.

2   Q.   That was before your deposition; right?

3   A.   I'm not sure if it was or not.

4   Q.   Okay.

5   A.   Yeah, just before.  You're right.

6   Q.   You've called -- excuse me.

7          You called the BNSF hotline to report misconduct on

8   two occasions; right?

9   A.   That's correct.

10   Q.   And both of those were later in 2016; is that right?

11   A.   I'm not sure as the date.

12   Q.   None of those had anything to do with mistreatment of

13   Mr. Fresquez; is that right?

14   A.   Correct.

15   Q.   You and several other coworkers called the hotline at the

16   same time to report the misconduct you described yesterday;

17   right?

18   A.   That's correct.

19   Q.   Every one of those coworkers except for you is still

20   working at BNSF; right?

21   A.   I'm not sure if that's accurate or not.

22   Q.   You gave -- you wrote out an affidavit that you think was

23   submitted to OSHA; right?

24   A.   Yes.

25   Q.   Do you know how many employees have been interviewed that

1   work at BNSF about Mr. Fresquez's allegations?

2   A.  No.

3   Q.  Do you know if any of those employees have been dismissed?

4   A.  No.

5           I left the territory, also.  I moved from Denver to

6   Omaha.

7   Q.  All right.  Let's talk --

8   A.  And so I wasn't really that close with any of these

9   employees like I was with -- nor was I with Brandon.  So I

10  moved out-of-state.

11  Q.  So let's talk about your allegation that you were

12  dismissed in retaliation for writing that affidavit real

13  quick.  Let's just get the facts straight.

14          In December of 2016, you moved from Denver to

15  Nebraska?

16  A.  Yes.

17  Q.  Right?  For family reasons?

18  A.  Yes.

19  Q.  In February of 2017, you were alleged to have violated

20  BNSF's rules concerning the use of a handheld device while you

21  were driving a truck; right?

22  A.  Yes.

23  Q.  And that allegation came up because the Drive Cam system

24  at BNSF alerted managers to a emergency braking event; right?

25  A.  Yes.

1   Q.  And the camera, the drive camera, showed you with your

2   cell phone in your hand; right?

3   A.  Yes.

4   Q.  At that time when you were alleged to have committed that

5   rules violation you were already on probation; right?

6   A.  Yes.

7   Q.  You were under a Level S from 2014; right?

8   A.  That's correct.

9   Q.  And you were reprimanded two additional times before you

10  ever wrote that affidavit and gave it to Mr. Thompson; right?

11  A.  Yes.

12  Q.  Okay.  Driving a work truck with a cell phone in your hand

13  is a serious violation of BNSF's rules; right?

14  A.  Yes.  It's something that I witnessed doing sitting next

15  to Mr. Paz on multiple occasions.

16  Q.  And you don't think that's safe to be doing that; right?

17  A.  Well, my supervisor was doing it, so it can't be that

18  unsafe.  He's under the same rules and guidelines as I am.

19  Q.  Well, I asked you in your deposition if you violated that

20  rule and you were using a cell phone, you believe it's right

21  for the company to take violations of that rule seriously.

22  Right?

23  A.  Yes.

24  Q.  It's a safety thing; right?

25  A.  Yes.  Is it worth all the investment in career and

1    training that I have under the job?  I would argue no.

2    Q.  The people --

3    A.  But I guess that's --

4    Q.  The people at BNSF that were involved in your dismissal

5    had nothing to do with Mr. Fresquez's case; isn't that right?

6    A.  I don't know who was involved, the people.  I do know that

7    all the higher-ups commingle.  They all know each other.  They

8    all, um, you know, have each other's phone numbers, get

9    together for meetings, conferences, et cetera.  So it's not to

10   say that, you know, they're strangers to one another.

11   Q.  You believe that Mark Carpenter had a role in getting you

12   fired; right?

13   A.  I'm not to say yes or no.  I -- I don't know whose role it

14   was.

15   Q.  Well, you said that in your deposition, that you believed

16   Mark Carpenter and Mike Paz were responsible for getting you

17   fired; right?

18   A.  If that's what the deposition says, yes.

19   Q.  Even though Mark Carpenter retired from BNSF in December

20   of 2016, three months before you were fired?

21   A.  Yeah.  Yes.  He retired.

22   Q.  And --

23   A.  I believe he was forced to retire under some FRA

24   allegations.

25   Q.  And you're upset about your dismissal, and you believe

1   Mark Carpenter and Mike Paz are responsible for it; right?

2   A.  I'm not so upset about my dismissal anymore.  I have

3   accepted those facts, and, um, that's water under the bridge

4   for me.

5           MR. GOMAN:  No further questions, Your Honor.

6           THE COURT:  All right.  Redirect.

7                    **REDIRECT EXAMINATION**

8   BY MR. THOMPSON:

9   Q.  Mr. Goman talked to you about Exhibit A-70, which shows

10  the defect you, Mr. Herzog [sic], and Mr. Fresquez were at on

11  May 5th, 2016; right?

12  A.  Yes.

13  Q.  So at your deposition you had some question as to

14  whether -- you seemed unsure as to whether that was the

15  defect.  Was that your first time seeing the document?

16  A.  Yes.

17  Q.  Were you literally reading the milepost and things like

18  that as you were sitting there trying to figure out if that

19  was the defect?

20  A.  Yes.

21  Q.  Was that your hesitancy?

22          MR. GOMAN:  Objection to leading.

23          THE COURT:  Sustained.

24  BY MR. THOMPSON:

25  Q.  Why were you hesitant to confirm that was the defect at

1  that point in time?

2  A.   Because I'm not looking at a actual geographical track map

3  with the crossovers, with the tracks.  I'm just looking at a

4  piece of paper with GPS coordinates and mileposts.  And like I

5  said, when you're not there -- I don't -- you know, it's like

6  looking at a map.  What milepost is this highway?  Is this --

7  you know, I don't know.  I want to see the track chart which

8  shows the tracks, the crossovers, et cetera, to verify that

9  that is exactly where it is.

10 Q.   Doing does everything else on that sheet -- I mean, does

11 everything match up, to the best of your recollection, things

12 like the track type, the defect type, things like that?

13 A.   Yes.

14 Q.   Is there anything that doesn't match up on there?

15 A.   Yes.  The -- the format that it's in.

16 Q.   You're just not used to seeing that format?

17 A.   Right.  That program isn't a program that I used.

18 Q.   Regardless of whether that's, you know, whatever form,

19 Mike Paz testified the defect was fixed earlier in the day by

20 you.  Did that happen?

21 A.   No.

22 Q.   Was the defect present?

23 A.   Yes.

24 Q.   The entire day?

25 A.   Yes.

17-cv-00844-WYD-SKC                Herzog - Redirect                IV - 874

1   Q.  Your entire career, as far as you know.

2   A.  Yes.

3   Q.  And you would have known if that defect was fixed when you

4   were there.

5               MR. GOMAN:  Objection to leading.

6               THE COURT:  Sustained.

7   BY MR. THOMPSON:

8   Q.  Would you have known if that defect was present -- sorry.

9               Would you have known if that defect was fixed when

10  you were there?

11  A.  There's a very good -- yes, I would have known.  Like I

12  said, it would have been an all-hands-on-deck procedure.

13  Q.  All right.  I want to turn your attention to your

14  deposition.  Mr. Goman asked you about your testimony in your

15  deposition about whether a defect was present.  He only showed

16  you part of it, so I want to read the whole thing.  I have

17  highlighted in yellow the part Mr. Goman had you read.

18              "Well, you know, then I had to go to Mike's pickup

19  and he asked me to write a statement and that made me real

20  uncomfortable, and, you know, then I" -- "I think I [sic]

21  finally my part came for my regulator to get repaired and so

22  then I rejoined my surfacing gang and crew and I [sic] made

23  the repair and, you know, then we continued."

24              Did I read that correctly?

25  A.  Yes.

1   Q.  And Mr. Goman made it seem like that was the defect at

2   issue?

3   A.  Yes.

4   Q.  I'd like you to read why Mr. Goman blew it up so you

5   couldn't read the rest.  Go ahead and read that for the jury.

6   A.  "After measuring the defect between milepost 4 and 5?"

7            "Yeah."

8            "What did you find when you measured the defect?"

9            "I think there was a defect there, a geometry -- like

10  a -- basically in the end the point of the switch I believe,

11  which because of how the switch fits in the stock rail, it's

12  not something we can fix."

13  Q.  And you're talking about the defect that Mr. Fresquez,

14  you, and Michael Paz were at?

15  A.  Yes, the one the geometry car kicked out.  It's a matter

16  of hardware.  It's a matter of the rail and the switch point

17  not fitting together properly.  My machines are incapable of

18  changing that, the way metal fits against metal.

19  Q.  Have you ever given a different statement as to whether

20  the defect was present?

21  A.  No.

22  Q.  Have you ever given a different statement that could in

23  any way be construed as a different statement that the defect

24  was not fixed?

25  A.  No.

17-cv-00844-WYD-SKC        Herzog - Redirect              IV - 876

1  Q.  Why?

2  A.  Because it was a long-standing defect.  I got showed the

3  defect and the location via GPS.  It was in a switch point,

4  and there's no way that a surfacing gang can fix that defect.

5        MR. THOMPSON:  Thank you, Mr. Keech.

6  BY MR. THOMPSON:

7  Q.  Mr. Goman asked you about your hotline complaint, and you

8  said that it didn't concern Mr. Fresquez; right?

9  A.  Yes.

10 Q.  Did Mike Paz brag during those meetings about firing

11 Brandon Fresquez?

12       MR. GOMAN:  Objection to leading.

13       THE COURT:  Sustained.

14 BY MR. THOMPSON:

15 Q.  Did Mike Paz brag about terminating anybody during those

16 meetings?

17       MR. GOMAN:  Same objection.

18       THE COURT:  It is still leading.  Sustained.

19 BY MR. THOMPSON:

20 Q.  What did Mike Paz say, if anything, about Brandon Fresquez

21 during those meetings?

22 A.  That don't follow certain people, and I have had certain

23 people removed before that were a problem.

24 Q.  Who did you believe he was talking about?

25 A.  Well, you'd think the guy that just got fired.  And then

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   you would think, well, some of us who have stood up to the

2   supervisor for safety violations and trying to be coerced into

3   violating the safety rules.

4   Q.  If you were a manager and trying to send a message to the

5   other employees that you didn't want them to follow FRA

6   regulations, who would you terminate?

7            MR. GOMAN:  Objection to leading and argumentative.

8            THE COURT:  Sustained.

9   BY MR. THOMPSON:

10  Q.  Did you believe Mike Paz was trying to send any kind of

11  message?

12  A.  Yes.

13  Q.  What kind of message?

14  A.  A kind of -- a message saying, uh, don't -- don't push

15  back against me or else.  Even if it's about safety, even if

16  it's about the rules, even if it's about FRA, don't push back

17  or else.  And that line in the sand, other people have, and

18  other people I have had them removed.  You know, that was said

19  in front of the whole group of us.

20  Q.  Who would you fire to send that message?

21  A.  Those of us that have stood up for the rules and empowered

22  ourselves.

23  Q.  Is that Brandon Fresquez?

24  A.  Yes.

25            MR. THOMPSON:  I have nothing further.

1          THE COURT:  All right.  Is there any recross?

2          MR. GOMAN:  No.

3          THE COURT:  All right.  You may step down.  You are

4    excused.

5          THE WITNESS:  Thank you.

6          THE COURT:  Is this witness excused?

7          MR. THOMPSON:  He is, Your Honor.

8          THE COURT:  Mr. Goman?

9          MR. GOMAN:  Yes.

10          THE COURT:  Call your next witness.

11          MR. THOMPSON:  David Dunn.

12          THE COURT:  David Dunn.

13          MR. THOMPSON:  We're calling him adversely, Your

14    Honor.  He is a member of management.

15          THE COURT:  All right.

16          COURTROOM DEPUTY:  Please raise your right hand.

17       (The witness was sworn.)

18          COURTROOM DEPUTY:  Please be seated.

19          Please state your full name, and spell your full name

20    for the record.

21          THE WITNESS:  David Scott Dunn.  Do you want me to

22    spell it also?

23          COURTROOM DEPUTY:  Yes, please.

24          THE WITNESS:  D-a-v-i-d, S-c-o-t-t, D-u-n-n.

25    ///

1    **DAVID SCOTT DUNN, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

2    BY MR. THOMPSON:

3    Q.  Good morning, Mr. Dunn.

4    A.  Good morning.

5    Q.  I'm sure your attorneys have told you there are some

6    pretty serious allegations against management in this case.

7    Right?

8    A.  Yes.

9    Q.  I want you to know at the outset, Brandon says when he

10   worked with you, you were a by-the-book guy.  Do you agree

11   that you are a by-the-book guy?

12   A.  I try to be, yes, sir.

13   Q.  You try to do what's right?

14   A.  Yes, sir.

15   Q.  Before you worked for BNSF, what did you do?

16   A.  Immediately before that I was self-employed with a

17   landscaping company for two years.

18   Q.  What about before then?

19   A.  I'm sorry?

20   Q.  What about before then?

21   A.  Before that I -- for four years I was supervisor of a

22   large landscaping company in Aurora, Colorado, about 65

23   employees.

24   Q.  Were you ever a police officer?

25   A.  Yes.  I was a Aurora police officer.  I went through the

17-cv-00844-WYD-SKC                Dunn - Direct                    IV - 880

1   Aurora academy in 2003.  So that was six months long.  I spent

2   two months on the streets in the FTO program.  So not quite a

3   full year.

4   Q.  Did you enjoy that job?

5   A.  I did, yes.

6   Q.  You weren't asked to leave under any bad circumstances or

7   anything like that?

8   A.  No, sir.

9   Q.  So the law is important to you, isn't it?

10  A.  Yes.

11  Q.  Where do you work now?

12  A.  Where do I work now?

13  Q.  Yes, sir.

14  A.  I'm having just a little trouble hearing you.

15          So I am the division assistant roadmaster.  And now

16  this year we have had changed our roles, so now I'm in charge

17  of the gang production.  So I'm kind of based out of Denver,

18  but I go everywhere.  Like this last week I was in McCook for

19  a couple days.  The week before that I was in Cheyenne,

20  Wyoming, for the week.  So I do spend a lot of time on the

21  road now.

22  Q.  We appreciate you coming back for this.

23  A.  Thank you.

24  Q.  In 2016 you were a member of management?

25  A.  Yes.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                Dunn - Direct                      IV - 881

1   Q.   You reported to Mark Carpenter?

2   A.   Yes, sir.

3   Q.   What was your hierarchy relationship to Michael Paz?

4   A.   I was the -- so in 2016, if Mark was still there, I was

5   still tied to the terminal, so I was the terminal assistant

6   roadmaster.  So I was a pay grade 28.  Mr. Paz was a pay grade

7   29.  He was in charge of the terminal.  I was tied to the

8   terminal, but I did not report to Mr. Paz.  I reported

9   straight to Mr. Carpenter.

10  Q.   So Mr. Paz didn't have any supervisory authority over you?

11  A.   No, sir.

12  Q.   I think I understood you and the jury probably understood

13  you.  I don't think it's going to read right.  Let me ask it

14  differently.  I asked it in the negative.

15          Did Mr. Paz in 2016 have any supervisory authority

16  over you?

17  A.   No.

18  Q.   Did Mr. Fresquez report to you in 2016?

19  A.   Did he report to me in 2016?  I'm sorry.  I'm having a

20  little trouble hearing you.

21  Q.   Sure.  I'll try and speak into the mic more.

22  A.   I would say yes and no.  If I was covering for Denver,

23  then yes, he would report to me.  If I was not in the -- if I

24  was not covering, if Mr. Paz was not currently there, then he

25  would report to Mr. Paz if Mr. Paz was there.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Q.   So let's talk about when you worked in Denver in 2016.

2   A.   Okay.

3   Q.   BNSF ranked its managers using scorecards?

4   A.   Yes, sir.

5   Q.   Those scorecards didn't mean anything to you, though?

6   A.   They did not mean that much to me because it was not my

7   territory.  I was not in charge of that territory.  So,

8   therefore, the things that they are judged on or ranked on, I

9   really didn't have that much control over it.  As far as

10  budget, you know, if Mr. Paz ordered $200,000 worth of parts

11  or supplies, you know, that was out of my control.  All I

12  could do was just my small part and being frugal with -- if I

13  ordered something, trying to be frugal with what I got, that

14  kind of thing.  But overall I didn't have that much, um -- I

15  don't know how to term it, but I didn't have a whole lot of

16  input on it, I guess.

17  Q.   Because it takes things like manpower, capital, things

18  like that to improve your ranking, to reduce defects, things

19  like that, and that came from above your -- your pay grade;

20  right?

21  A.   That's correct.

22  Q.   So all you could do is do the best with what you were

23  given.

24  A.   I could just work on my small part, yes.

25  Q.   You told Mr. Carpenter that that was the reason the

17-cv-00844-WYD-SKC                 Dunn - Direct                    IV - 883

1    scorecards did not mean that much to you.

2    A.  Mr. Carpenter asked me one time in his office where we

3    were at on the scorecard, and I told him I didn't know.  And

4    that upset him.  He asked me why I didn't know, and I said,

5    Well, I really don't have that much influence on it;

6    therefore, I don't spend a lot of time looking at it.

7           The other thing that I viewed it as, if you were a

8    good roadmaster that you just got the job and you had a really

9    hard territory, there was only so much you were going to be

10   able to do.  Therefore, if you were a good roadmaster and you

11   got a really good territory, you were going to look great

12   right off the bat.  So I didn't put that much weight into it

13   just because I had very little input on it.

14   Q.  All right.  So let's talk about some of the FRA defect

15   reporting rules.  Okay?

16   A.  Okay.

17   Q.  In your job you're familiar with those rules?

18   A.  Yes.

19   Q.  In fact, it's your job to know those rules.

20   A.  Yes.

21   Q.  And I assume, as a law enforcement officer, it's important

22   to you to read over the law and the regulations and follow

23   them.

24   A.  Yes.

25   Q.  The FRA requires that when defects are not repaired within

1   30 days, the rail must be taken out of service; right?

2   A.  If a defect is not repaired within 30 days, you have two

3   options:  It's either repaired before traffic, or it's out of

4   service.

5   Q.  There's no middle ground there?

6   A.  There's no middle ground.

7   Q.  You believe that regulation is crystal-clear.

8   A.  Yes, sir.

9   Q.  And the idea that you could read it and interpret it some

10  other way is nonsense; right?

11  A.  That's how I interpret it.

12  Q.  When defects were past 30 days, the practice under Mark

13  Carpenter was to leave the track in service; right?

14  A.  Yes, sir.

15  Q.  So under Mark Carpenter, when he was the DE, it was common

16  practice to violate FRA regulations.

17  A.  Yes, sir.

18  Q.  You were concerned about that.

19  A.  Yes, sir.

20  Q.  And so you confronted Mr. Carpenter about it.

21  A.  I called Mr. Carpenter on the phone, yes.

22  Q.  What did Mr. Carpenter say to you?

23  A.  When I called Mr. Carpenter and I read the paragraph to

24  him and I said I have some concerns of that, he says, That's

25  not how I interpret the rule.

1  Q.  He told you, quote, We are not going to take any tracks

2  out of service, end quote, didn't he?

3  A.  Yes.

4  Q.  Did you report him to anybody?

5  A.  No, sir.

6  Q.  He was your boss; right?

7  A.  Yes, sir.

8  Q.  And reporting your boss isn't something somebody easily

9  does.

10  A.  Say that again, sir?

11  Q.  Sure.  Reporting your supervisor is not something one

12  easily does.

13  A.  I would not want to go above the rank or go above him.

14  Q.  When you were first in Denver as a manager, track

15  inspector -- track inspectors used the TIMS system to report

16  track defects.

17  A.  That's correct, yeah, T-I-M-S.

18  Q.  At some point in time Denver switched to the EAM system.

19  A.  Not only Denver.  BNSF switched to the EAM system, which

20  is a computer system.

21  Q.  And under the EAM system, you couldn't keep tracks in

22  service if a defect was on them that had not been repaired

23  within 30 days.

24  A.  When the inspector went to put in that inspection for that

25  track, he had two options:  If he had a defect, it was either

1   repaired before traffic or the track was out of service.

2   There was only two options.

3   Q.  So I want to talk to you about the problem this created

4   for Mark Carpenter.  Okay?

5   A.  Okay.

6   Q.  The main line track inspector after Brandon Fresquez, who

7   was that?

8   A.  I don't know the succession of who.  So many people move

9   jobs so often, it's hard to -- hard to keep track of.

10  Q.  When the switch was about to happen, did a track inspector

11  come into your office and tell you he had some concerns

12  because BNSF was rolling out the EAM system?

13          MS. DALE:  Object to hearsay.

14          THE COURT:  Sustained.

15  BY MR. THOMPSON:

16  Q.  Did anyone tell you -- strike that.

17          Did you ever have reason to believe that rolling out

18  the EAM system was going to create problems for Mark Carpenter

19  and the supervisors under him?

20  A.  Well, I think what you are referring to is when John

21  Bennett came in my office.

22          MS. DALE:  Objection:  hearsay.

23          THE COURT:  Well, the witness is instructed not to

24  say what Mr. Bennett said, but I don't know what he's about to

25  say.  So I will sustain the objection, but the witness can

1  finish the answer, but he can't repeat what he was told by

2  Mr. Bennett.

3          THE WITNESS:  Oh, I cannot?  Okay.

4          MR. THOMPSON:  Your Honor, if I may respond, it's not

5  being offered for the truth of the matter.  It's being offered

6  for the belief of the witness and what he does with the

7  information.

8          THE COURT:  All right.  I need to understand who John

9  Bennett is before you go further --

10         MR. THOMPSON:  Sure.

11         THE COURT:  -- with this line of questioning.

12 BY MR. THOMPSON:

13 Q.  Who was John Bennett?

14 A.  John was the main line track inspector.

15 Q.  After Brandon Fresquez?

16 A.  I don't know if it was right after, but at this time.

17 Q.  His job is to report track defects?

18 A.  Yes, sir.

19 Q.  At the time he was using the TIMS system?

20 A.  Yes, sir.

21 Q.  He was aware BNSF was rolling out the EAM system?

22 A.  Well, EAM was coming, and everyone knew that, so -- I'm

23 not sure how much you want me to say, but yes.

24 Q.  He shared with you a belief that this was going to create

25 a problem for Mark Carpenter and the supervisors under him.

17-cv-00844-WYD-SKC              Dunn - Direct                    IV - 888

1   A.  Well, the reason John Bennett came into my office is

2   Mr. Carpenter instructed him to put in a paper inspection.

3   Q.  Let me freeze you a second.  You're getting little bit

4   ahead of me.

5   A.  Well . . .

6   Q.  Did Mr. Bennett come into your office at some point?

7   A.  Yes.

8   Q.  And he shared a concern with you?

9   A.  He shared a concern about having to put in a paper

10  inspection.

11  Q.  Tell me about that concern.

12  A.  The only way we can put in a paper inspection is if the

13  computer system is down.

14  Q.  Sorry.  Let me freeze you one second.  For the jury --

15          COURT REPORTER:  Wait.

16          MR. THOMPSON:  Sure.

17          COURT REPORTER:  The answer is:  The only way we can

18  put in a paper inspection --

19  A.  -- is if the computer system is down at the time.

20          THE COURT:  All right.  Now ask your question again.

21  And you still need to slow down, Mr. Thompson.

22          THE WITNESS:  Sorry.

23          THE COURT:  And speak slower and enunciate better.

24  Go ahead.

25  BY MR. THOMPSON:

1    Q.   For the jury, what is a paper copy?  What was Mr. Bennett

2    talking about?

3    A.   A paper inspection is just in a book where he would put in

4    that he inspected the track that day.  I've never seen a paper

5    inspection, I have never done one, but it would be an

6    inspection that would not be turned in to -- not be done on

7    the computer.

8    Q.   I will represent to you an expert who used to work for the

9    FRA has testified in this case that if the electronic system

10   is working, it is illegal to keep defect reports off the

11   books, to use a paper copy.  Any reason to dispute that?

12   A.   No reason to dispute that.

13   Q.   All right.  So Mr. Bennett tells you what?  Go ahead and

14   pick up.

15   A.   So Mr. Bennett came into my office, shut the door, said, I

16   have concerns about --

17            MS. DALE:  Object to hearsay.

18   A.   -- how to do a paper inspection.

19            THE COURT:  Hold on.  This is hearsay.  I sustain the

20   objection.

21            MS. DALE:  Your Honor, can I also raise an additional

22   objection of relevance?

23            THE COURT:  No, I think it's relevant, but I think I

24   won't let him say verbatim what Mr. Bennett told him because I

25   think it is hearsay, and it is being offered for the truth of

1    the matter asserted therein.

2             All right.  Go ahead.

3    BY MR. THOMPSON:

4    Q.  Did you come to learn that Mark Carpenter had ever told

5    anybody to use paper copies instead of the electronic system?

6    A.  Just Mr. Bennett.

7    Q.  And he told you that -- I'm sorry.

8             You learned that Mark Carpenter had ordered other

9    people to not use the EAM system?

10   A.  One person.

11   Q.  What did you do once you learned Mr. Carpenter had told at

12   least one person not to use the EAM system and to instead use

13   a paper copy?

14   A.  I called Mrs. Doreen Powers on the phone with Mr. Bennett

15   in my office.

16   Q.  Let me pause you there.  Who is Doreen Powers?

17   A.  Doreen Powers is the MEC who is in charge of track

18   inspectors training.

19   Q.  All right.  Tell us about that call.

20   A.  I just called Mrs. Powers and said that Mr. Carpenter is

21   having us put in a paper inspection in Denver.

22   Q.  What happens the next day?

23   A.  Um . . .

24   Q.  Or maybe let me help you a little bit, since I have

25   reviewed the record, and you probably haven't in a few years.

17-cv-00844-WYD-SKC          Dunn - Direct                    IV - 891

1            Was a training class held the very next day on EAM?

2    A.  Yes, sir, I believe so.

3    Q.  What was the first thing the person who was providing the

4    training told you?

5            MS. DALE:  Object to hearsay.

6            MR. THOMPSON:  Your Honor, this is an admission by a

7    party opponent.  This is BNSF management.

8            THE COURT:  Well, I don't know who is making the

9    statement, so you have to help me understand who is making the

10   statement.

11           MR. THOMPSON:  Sure.

12   BY MR. THOMPSON:

13   Q.  From where did the trainer come?

14   A.  I'm not sure what his name or his title was, but he was in

15   charge of the training for that day for EAM.

16   Q.  Sent by Fort worth?

17   A.  I do not know.

18   Q.  As far as you know, he was a manager at BNSF?

19   A.  Yes, sir.

20   Q.  What did he tell you and tell the group to start that day?

21   A.  His first statement was:  If you were about to put a paper

22   inspection in and the computer system is working, you are

23   about to break federal law.

24   Q.  All right.  So I want to make sure I understand correctly.

25   You came to believe that Mark Carpenter was ordering an

1   employee to circumvent the new system, which was going to

2   cause problems for him, by using paper copies instead.

3   A.  For that day, yes.

4   Q.  You then called Doreen Powers?

5   A.  Yes.

6   Q.  The very next day BNSF decides to hold a training?

7   A.  Training was already scheduled for that day.

8   Q.  That training starts by the instructor addressing your

9   concern.

10  A.  Yes, sir.

11  Q.  Did you ever tell Mark Carpenter about that instructor's

12  instructions?

13  A.  No, sir.

14  Q.  Did you talk to Mark Carpenter after that meeting, after

15  the instruction on the EAM system?

16  A.  Mr. Paz and, I believe -- we had a conference call with

17  Mark.

18  Q.  What did you say to Mark?

19  A.  I remember talking about that now, with the EAM, it's

20  either repaired before service or -- or repaired before

21  traffic or the track is out of service.

22  Q.  And Mark Carpenter told you, quote, It will be business as

23  usual here in Denver, end quote.

24  A.  Yes.

25  Q.  You took that to mean that Mr. Carpenter wanted you guys

1    to continue to leave tracks in service after 30 days.

2    A.  I didn't know what to believe, or I didn't know what was

3    going to happen.

4    Q.  Did you object to Mr. Carpenter's instruction?

5    A.  Uh, no.

6    Q.  Two weeks later Mr. Carpenter retired?

7    A.  If that was the timeline.  I'm not exactly sure what the

8    timeline was.  Shortly after.

9    Q.  Prior to calling Doreen Powers on him, had you ever heard

10   Mark Carpenter tell you he was going to retire?

11   A.  No, sir.  Just jokingly, but . . .

12   Q.  All right.  I'd like to talk to you about Brandon

13   Fresquez.  If Brandon was returned to work, would you want him

14   working under you?

15   A.  I wouldn't have any problems with him coming back to work.

16   Q.  You thought he was a good employee.

17   A.  I didn't -- I didn't work around Brandon that much.  I

18   didn't know Brandon very well.

19   Q.  As far as you knew when you worked with him, you found him

20   to be a good employee.

21   A.  I didn't have any problems with Brandon.

22   Q.  In fact, there was an incident where he located a

23   hard-to-find defect at a broken frog with you; right?

24   A.  Yes, sir, myself and Mr. Frederick.

25   Q.  Tell me about that.

1   A.   That morning Mr. Frederick asked me to get in his

2   Suburban, we were going to go look at a frog.  So we drove out

3   to the Fox OS east of the yard -- I'm trying to slow down.  I

4   was their lookout while Brandon and Mr. Frederick got up on

5   the tracks and looked at the frog.  Brandon was trying to show

6   Mr. Frederick where the crack was.  Mr. Frederick was saying

7   there wasn't a crack.  So Mr. Frederick walked back over to

8   his Suburban.  He got out an aerosol spray can.  It was like a

9   leak -- not a leak detector but like a crack -- it would show

10  where there was a crack.  He sprayed down the frog where

11  Brandon was pointing, and there was -- there was a crack in

12  the frog.  So Mr. Frederick said, you know, Hey, good job,

13  Brandon.  You did the right thing.  Thank you for showing that

14  to me.

15          And then we went ahead and ordered a new frog from

16  Alliance, Nebraska.  And it took I think a day or two to get

17  in, and we replaced that frog.

18  Q.   You replaced it right away; right?

19  A.   As soon as we could, yes.

20  Q.   Because that's a big defect or a big issue if that frog

21  was cracked.

22  A.   It was a big issue.

23  Q.   Did you know that Brandon had reported that defect to Paz

24  and tried to put a slow order on the track --

25  A.   No, sir.

1   Q.  -- and Paz overruled him and removed it?

2   A.  No, sir, I did not know that.

3   Q.  If Brandon put a slow order on the track because the frog

4   was cracked, and Michael Paz or anybody else, for that matter,

5   removed it without first repairing the frog, that's a safety

6   concern; right?

7   A.  That was a safety -- that would be a safety concern, and

8   it would go on whoever -- the ownership of that would go on

9   the person that took it -- took it off, took the slow order

10  off.

11  Q.  I'd like to talk a little bit about your relationship with

12  Michael Paz.  Okay?

13  A.  Okay.

14  Q.  Fair to say you guys do business differently?

15  A.  We're -- we're different people.

16  Q.  Shortly after you twice reported Michael Paz for violating

17  safety rules and regulations, he retaliated against you by

18  filing a complaint with HR saying that you were trying to

19  undermine him; right?

20          MS. DALE:  Object to relevance, Your Honor.

21          THE COURT:  Overruled.

22  A.  I found out about that at my deposition, yes, sir.

23  BY MR. THOMPSON:

24  Q.  It appears that's what happened; right?

25  A.  I don't know.

1   Q.  Had you ever done anything to Michael Paz to warrant him

2   filing a complaint against you other than twice report him for

3   violating safety regulations?

4   A.  Not that I'm aware of.

5   Q.  So let's talk about that first one.

6           As a manager, one of your jobs is to complete safety

7   interviews with union-level employees; right?

8           MS. DALE:  Your Honor, I object to this line of

9   questioning.  This issue arose in July of 2017.  It's more

10  than a year after Mr. Fresquez was gone.  It has nothing to do

11  with track inspection.  It has nothing to do with defects.  It

12  has nothing to do with Mr. Fresquez.

13          THE COURT:  Is that true?  Are we talking about July

14  of 2017?

15          MR. THOMPSON:  Yes, Your Honor.  It has --

16          THE COURT:  Okay.  Sustained.

17  BY MR. THOMPSON:

18  Q.  Mr. Paz retaliated against you by filing an HR complaint

19  for twice reporting him for violating safety concerns?

20  A.  I wouldn't take it as retaliation.

21  Q.  He reported you to HR, saying you were trying to undermine

22  him.

23  A.  Yes, sir.

24  Q.  Outside of those two safety issues you reported him for --

25  actually, those were violations of federal law, weren't they?

1    A.   Explain to me which ones you are talking about.

2    Q.   Sure.  The one where Michael Paz was dumping toxic waste

3    into --

4              MS. DALE:  Objection, Your Honor.

5    BY MR. THOMPSON:

6    Q.   -- a waterway.

7              THE COURT:  What's the objection?

8              MS. DALE:  First of all, he hasn't testified to this,

9    but if he had been asked about this, I would have made the

10   objection that this again arose in July of 2017.  It has

11   nothing to do with Mr. Fresquez.  It has nothing to do with

12   track inspection.  It's more than a year after Mr. Fresquez

13   was terminated.

14             THE COURT:  Is all of that true, Mr. Thompson?  We

15   are talking about things that happened in July of 2017?

16             MR. THOMPSON:  We are, Your Honor.  And I don't want

17   to get into it.  All I'm asking the witness is those were

18   violations of federal law that he reported.  Michael Paz

19   retaliated against him.  The witness has asked me what I'm

20   talking about.  I don't know a better way to let him know than

21   telling him.

22             THE COURT:  Hold on.  Let me go back and look at this

23   question again.

24             Okay.  I'm going to overrule the objection insofar as

25   the question was:  "The one where Michael Paz was dumping

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   toxic waste into --"  The witness can answer that with a yes

2   or no if that's an incident that he's referencing, and then

3   we'll see where that takes us.

4   BY MR. THOMPSON:

5   Q.  One of the instances that you reported would be a

6   violation of federal law, that's dumping toxic soil into a

7   waterway.

8   A.  Yes, sir.

9   Q.  You reported Mr. Paz for that?

10  A.  I raised -- I raised a concern.

11  Q.  Because you thought he was violating federal law.

12  A.  He was dumping it in a Colorado watershed, yes.

13  Q.  You told him not to do that.

14          MS. DALE:  Objection, Your Honor.  This is getting

15  into the details of this incident which, again, was July of

16  2017, has nothing to do with Mr. Fresquez.

17          THE COURT:  Well, but I see some tangential

18  relevance, so I'm going to overrule your objection.  I will

19  allow it.

20  BY MR. THOMPSON:

21  Q.  You told Michael Paz, quote, You can't change the course

22  of drainage in Colorado, end quote.

23  A.  Yes, sir.

24  Q.  And you told him he was using contaminated dirt, at least

25  dirt that may be contaminated.

17-cv-00844-WYD-SKC                 Dunn - Direct                      IV - 899

1   A.  At the time we were concerned it was contaminated.

2   Q.  And Michael Paz told you, quote, Well, that's how I'm

3   going to repair it, end quote.

4   A.  Yes, sir.

5   Q.  You then contacted your DE.

6   A.  I contacted the acting DE at the time.

7   Q.  That would have been a violation of federal law?

8   A.  I believe so.

9   Q.  You reported Mr. Paz for it?

10  A.  When you say "reported," I don't --

11  Q.  Sure.  You called your boss --

12  A.  Yes, sir.

13  Q.  -- and told him you were concerned.

14  A.  Yes, sir.

15  Q.  That is one of the reasons you believe Mike Paz filed an

16  HR complaint against you.

17  A.  I don't know.

18  Q.  The only other thing you did to him was also report him

19  for violating BNSF's regulations.

20  A.  Referring to?

21  Q.  Sure.

22      MS. DALE:  Objection, Your Honor.  He's again trying

23  to get into the employee interviews, which you have already

24  excluded.

25      THE COURT:  I don't know what -- hold on.  Let me

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   send the jury back so I can get a context for what we're

2   talking about.

3            So I'll bring you back in a minute or two or three.

4        (Jury out at 9:50 a.m.)

5            THE COURT:  All right, have a seat.

6            Mr. Thompson, where are you going with this?  I'm

7   trying to --

8            MR. THOMPSON:  Sure.

9            THE COURT:  Doesn't this have some relationship to a

10   motion in limine?

11           MR. THOMPSON:  It does, Your Honor.  All I'm trying

12   to get is that he reported Michael Paz for violating federal

13   law once, violating BNSF safety regulations the second time.

14   Mr. Paz retaliated against him.  The witness asked me what I'm

15   talking about.  I don't know another way to tell him than ask

16   him questions about the actual violation itself.

17           THE COURT:  What more are you seeking to introduce?

18   You have already asked him about retaliation.  He didn't

19   answer that affirmatively.  And so I'm trying to understand

20   what more you are trying to --

21           MR. THOMPSON:  Sure.  The witness has testified, I

22   believe, that Michael Paz filed an HR complaint against him

23   saying that Mr. Dunn was trying to undermine him in response

24   to Mr. Dunn twice reporting him.  We have covered one of those

25   reports.

1    THE COURT:  All right.  I want you to pick up where

2  you left off.  I want to hear some testimony --

3    MR. THOMPSON:  Sure.

4    THE COURT:  -- outside the presence of the jury so I

5  can see how far you want to go with this.  And then if there's

6  an objection, I will rule on it.

7    MR. THOMPSON:  Sure.

8  BY MR. THOMPSON:

9  Q.  So we have talked about one of the incidents in which you

10 reported Michael Paz or -- not use the word "reported" -- told

11 your division engineer on him; right?

12 A.  Yes, sir.

13 Q.  You believe that's a violation of federal law?

14 A.  What -- yes, the dumping in the watershed was, yes, sir.

15 Q.  And you believe -- or let me put it differently.

16    Michael Paz didn't have any other reason other than

17 that and another complaint you made about him to file an HR

18 complaint against you.

19 A.  I don't know.  I don't know why he filed the complaint --

20 or called HR, I should say.

21 Q.  The timing is he filed it after you made those two

22 complaints; right?

23 A.  I'm not sure of the timeline.

24 Q.  Sure.  So let me show you -- I'm going to show you BNSF

25 3320.  This is Mr. Paz's e-mail claiming you are harassing

1    him.  The date on this, is that shortly after you reported him

2    for the waterway incident and the safety interview incident?

3    A.  I do not remember what date the watershed incident was.

4         MS. DALE:  We don't have a picture.

5         COURTROOM DEPUTY:  There's nothing up on the --

6         MR. THOMPSON:  Oh, I'm sorry.

7    BY MR. THOMPSON:

8    Q.  Let's focus on the safety interview part, because we have

9    already talked about the dumping toxic waste.

10        Is Monday July 17, 2017, shortly after the safety

11   interview issue?

12   A.  I don't remember the date, sir.

13   Q.  Okay.

14   A.  I didn't write any of this down or keep a log --

15   Q.  Sure.

16   A.  -- of this or anything.

17   Q.  I understand.

18        Other than the toxic waste, reporting him for the

19   toxic waste thing, and reporting him for the safety interview

20   issue, did Mr. Paz have any other reason to file a HR

21   complaint against you?

22   A.  I don't believe so.

23   Q.  The safety issue is you believed he was forging BNSF

24   documents; right?

25   A.  Yes, sir.

1  Q.  As a manager, one of your jobs is to complete safety

2  interviews with union-level employees.

3  A.  Not my job as an assistant.  The jobs of each roadmaster

4  of their territory.

5  Q.  You became aware that Mike Paz had not completed or would

6  not be able to complete his interviews by the deadline.

7  A.  There was a lot of talk at that time of the deadline and

8  how many each roadmaster was missing, yes.

9  Q.  Over the course of one night, 12 to 13 of those interviews

10  showed up as having been done.

11  A.  Mr. Paz was out of town at a derailment on the Western

12  Slope, and when he came back on Monday, all of them were done,

13  yes.  The 12 to 14 I can't remember.  It was either 12 or 14.

14  Q.  You didn't know, but you suspected they may not have been

15  done.

16  A.  I suspected they were not done, yes.

17  Q.  So you called the employees that Michael Paz had said he'd

18  interviewed.

19  A.  I asked them at work.  I didn't call them.  They were all

20  in the depot area.  So as I ran across each one, I asked if

21  they were contacted for a safety, uh, interview.  And the ones

22  I contacted were not aware of it.

23  Q.  They told you they had not been interviewed.

24  A.  Exactly, yes, sir.

25  Q.  You then believed Michael Paz had, in fact, not done the

1   interviews.

2   A.  Yes, sir.

3   Q.  And he may have forged the documents saying otherwise.

4   A.  Yes, sir.

5   Q.  And you reported that to your manager.

6   A.  Yes, sir.

7   Q.  Other than that and reporting him for the toxic waste

8   issue, Michael Paz didn't have any reason to file an HR

9   complaint against you.

10  A.  None that I'm aware of, sir.

11          MR. THOMPSON:  That's our offer of proof, Your Honor.

12          THE COURT:  All right.  What's the objection to

13  what --

14          MS. DALE:  The original objection is relevance.  This

15  is all happening in July of 2017.  It's more than a year after

16  Mr. Fresquez was gone and has nothing to do with Mr. Fresquez,

17  has nothing to do with track inspections, has nothing to do

18  with defects.

19          An additional objection is it's improper character

20  evidence under Rule 404.  He is trying to establish that

21  Mr. Paz acted consistently with these allegations when he

22  terminated Mr. Fresquez or when he disciplined Mr. Fresquez.

23          THE COURT:  The problem with the argument is that I

24  think that this testimony has some relevance to the culture

25  that existed at the railroad.  And I don't think it's limited

1    to July of 2017.  I think it just shows Mr. Paz's conduct in

2    the workplace.  And even though it's some months after

3    Mr. Fresquez was terminated, it relates to the same kind of

4    work in a similar environment.  And this witness is someone

5    who worked with both Paz and Fresquez.

6           So what I'm going to do is say that under 403 the

7    probative value outweighs prejudicial effect.  However, I

8    don't want there to be any repetition of what we have already

9    covered.

10          MR. THOMPSON:  Understood, Your Honor.

11          THE COURT:  And tell me, Mr. Thompson, so I can track

12   you, what else do you think you need to have the jury hear,

13   again, without repeating what they have already heard?

14          MR. THOMPSON:  So just for timewise you are asking,

15   Your Honor?

16          THE COURT:  Yes.  Assuming I allow this, what are you

17   going to -- where -- how will you resume this in front of the

18   jury?

19          MR. THOMPSON:  I'm going to ask about the safety

20   interviews.  I'm going to ask about a conversation with

21   Mr. Goodnight where Mr. Goodnight tells Mr. Dunn that Mike Paz

22   is pressuring him to misreport defects.  I'm going to ask

23   about one piece of comparator evidence that will take two

24   minutes.  I've got one final question.  We should be done in

25   10 minutes on our end.

1          THE COURT:  How can you get Goodnight's statement in?

2    Why is that not hearsay?

3          MR. THOMPSON:  It's goes as being not offered for the

4    truth of the matter.  It's being offered for Mr. Dunn's

5    response to it.

6          THE COURT:  What was Mr. Dunn's response?

7          MR. THOMPSON:  Nothing, because Mr. Paz had filed

8    this HR complaint against him.

9          MS. DALE:  That's not what he said in his deposition

10   at all.  That's misrepresents what Mr. Goodnight said.

11   Mr. Goodnight expressed concerns with the way Mr. Paz was

12   doing defects, whether he was adequately repairing them.  He

13   did not say anything about him pressuring him into

14   misreporting defects.

15         THE COURT:  Well, I'm not going to make an advisory

16   ruling, but I am going to allow this line of questioning in

17   without any repetition of what's already been said, because

18   again, as I said, I think under 403 the relevance outweighs

19   any prejudicial effect.

20         All right.  Let's bring the jury back in and continue

21   with the questioning.  And I'm not foreclosing the defendant

22   from raising new objections as I hear testimony, but anyway --

23   but I'm going to allow the line of questioning.  If you think

24   something is objectionable, object, and I will make a ruling.

25         (Jury in at 10:00 a.m.)

1          THE COURT:  All right, you may be seated.  Let's

2   continue.

3   BY MR. THOMPSON:

4   Q.  All right.  So we talked about the first thing you

5   reported to your DE about Michael Paz's conduct that concerned

6   you.  I want to talk about the second.

7          As a manager, one of your jobs is to complete safety

8   interviews with the union-level employees; right?

9   A.  It's one of the jobs of the headquartered roadmaster, yes.

10  Q.  You became concerned that Michael Paz would not be able to

11  complete his safety interviews in time.

12  A.  We talked about it as a group on a conference call and how

13  many of the interviews each roadmaster was missing at the

14  time.

15  Q.  Over the course of one night, 12 to 13 interviews of

16  Mr. Paz then showed up in the system as having been completed.

17  A.  They were not completed on Friday.  Then Monday morning

18  they were completed.  And he had been out of town on a

19  derailment on the Western Slope, so I had some concerns.

20  Q.  You were concerned that he couldn't have done that while

21  he was at a derailment.

22  A.  Yes, sir.

23  Q.  So what did you do then?

24  A.  I raised the question to my acting DE.

25  Q.  Did you talk to the employees first?

1  A.  Yes.  As I ran across some of them, not all 14 or all

2  12 -- I can't remember what the number was -- I would -- I

3  asked each one that I came across.

4  Q.  And they all told you they had not been completed?

5  A.  The ones I contacted said they had not had any interaction

6  with Mr. Paz about their safety annual interview.

7  Q.  You believe Mr. Paz, then, had fraudulently -- or forged

8  BNSF documents.

9  A.  That's what I believed at the time, yes, sir.

10  Q.  You raised that concern with your manager.

11  A.  Yes, sir.

12  Q.  That was the second violation of federal law or BNSF

13  regulations you reported.

14  A.  I don't know if I'd say the second was a federal law, but

15  yes, a concern.

16  Q.  Those are the only reasons Michael Paz would have had to

17  report you to HR for harassing him.

18          MS. DALE:  Asked and answered.

19          THE COURT:  Overruled.

20  A.  I don't know of any reason why Mr. Paz would report me to

21  HR.

22  BY MR. THOMPSON:

23  Q.  Okay.  Let's now talk about the next issue.

24          This case is about whether Michael Paz and Mark

25  Carpenter were pressuring Brandon Fresquez to misreport track

1    defects.  Did you ever become concerned or have an employee

2    share a concern that they believed Paz was asking them to

3    close out defects when they were not repaired?

4    A.  Mr. Goodnight came into my office --

5            MS. DALE:  Object to hearsay, Your Honor.

6            THE COURT:  Overruled.  I'm going to view this as not

7    hearsay because the witness can talk about its impact on him,

8    what was said.

9    A.  Mr. Goodnight, who was a track inspector or -- I can't

10   remember what Mr. Goodnight's role was at the time -- came in

11   and had concerns about how the repairs were being done, if

12   they were adequate repairs.

13   BY MR. THOMPSON:

14   Q.  You told Mr. Goodnight that he should talk to Paz or call

15   the hotline.

16   A.  I said he had two options:  He can either go talk to

17   Mr. Paz, who was the roadmaster, or his other option would be

18   to call the 1-800 number and view his concerns.

19   Q.  You didn't take this complaint to your manager.

20   A.  I did not.

21   Q.  You had learned your lesson by Mr. Paz complaining about

22   you; right?

23   A.  I wouldn't say that.

24   Q.  All right.  Let's talk about what we call comparators.

25           Specifically, there's an instance where you told some

1    employees at the start of the day not to go home early; right?

2    A.   Repeat that again.

3    Q.   Sure.  And here's what I'm ultimately getting to so you

4    know.  There was an issue where you told employees not to go

5    home early.  They went home early anyway.

6    A.   There was a mini tie gang, TP44, that was in Cheyenne,

7    Wyoming, working.  I had had an earlier, a week before that,

8    incident with them in Oxford, Nebraska, where they had went

9    home early on a Friday.

10             I will try to talk slow.

11             So when I was with them in Cheyenne the following

12   week, I made a point to tell the foreman and assistant

13   foreman, with the whole group there, that no one was going

14   home early on a Friday.

15             When about 11 o'clock I realized that the gang had

16   already shut down and went home, then I started trying to

17   figure out what happened, where everybody was.  That came to

18   an investigation where the foreman and assistant foreman -- I

19   don't want to say really charged, but were, um, taken to

20   investigation for failure to comply with instructions.

21   Q.   So you told them that morning, Do not go home early.

22   A.   I told them that on a Wednesday, yes, and on Friday they

23   went home early.

24   Q.   Were you at all unclear about your order?

25   A.   No, sir.

1  Q.  It was an order; right?

2  A.  Yes, sir.

3  Q.  They went home on Friday early anyway?

4  A.  That was what it looked like at first, and then I didn't

5  do my due diligence.  Half the gang went home.  Half the gang

6  were staying there and were working.  They were in a part of

7  the yard I couldn't get to because it was up on the Air Force

8  Base.  I didn't have access.

9  Q.  At the time you made the charging decision, the decision

10 to charge them with a rule violation, you believed they had

11 violated a direct order.

12 A.  Yes, sir.

13 Q.  You charged them with failure to comply with instructions,

14 not with insubordination.

15 A.  Yes, sir.  Failure to comply, yes, sir.

16 Q.  And you did that because you knew insubordination would

17 get them fired.

18 A.  I didn't want the entire gang to be fired for that, for

19 the actions of the foreman and assistant foreman.

20 Q.  You didn't charge the foreman or the assistant foreman

21 with insubordination.  You charged them with failure to

22 comply.

23 A.  That's correct.

24 Q.  And they got to keep their jobs.

25 A.  Yes, sir, because I didn't do my due diligence, and at the

1    investigation I had to admit that I didn't do my -- the

2    homework that I should have that day and realized that they

3    did not go home, as far as half the gang.  Half the gang did;

4    half the gang didn't.  But the foreman has the right to send

5    the employees if they are under his control home, so the

6    employees weren't -- I didn't want the employees to be held

7    responsible for what the foreman set them up as, if that makes

8    sense.

9    Q.  Yeah.  You are a manager that tries to work with your

10   employees.

11   A.  Yes, sir.

12   Q.  If the decision was up to you and the record showed that

13   Michael Paz asked Brandon to remeasure a defect, and Brandon

14   left and said, Why?  You have already made your decision,

15   would you have charged Brandon with insubordination if the

16   decision were up to you?

17   A.  I don't think that's fair for me to answer that question

18   because I was not there.

19          MR. THOMPSON:  I have nothing further.  Thank you,

20   Mr. Dunn.

21          THE COURT:  All right.  We need to take a midmorning

22   break now because some technical issues regarding courtroom

23   equipment need to be fixed.  So we are going to take a

24   15-to-20-minute recess, but then when we come back I want to

25   go until about 12:05, and then we'll take our lunch break.

1          So how much longer do we have with this witness?

2          MS. DALE:  Your Honor, I probably have about 15, 20

3  minutes.

4          THE COURT:  All right.  And then who is your next

5  witness?

6          MR. THOMPSON:  It's going to be Jason Snow.

7          THE COURT:  How long will he be?

8          MR. THOMPSON:  10 minutes.

9          THE COURT:  All right.  And then after Jason Snow?

10          MR. THOMPSON:  Jacob Yancey.

11          THE COURT:  Same time frame?

12          MR. THOMPSON:  Yeah.  Maybe a half hour, I guess, a

13  little longer.

14          THE COURT:  All right.  I want to see if we can move

15  this along.

16          All right.  So we will be in recess for 15 to 20

17  minutes.

18      (Proceedings recessed 10:07 a.m. to 10:36 a.m.,

19      resuming outside the presence of the jury.)

20          THE COURT:  All right.  So Mr. Neihart, did your get

21  your monitor working again?  Is your monitor working?

22          LAW CLERK:  Yes, it is.

23          THE COURT:  All right.  Let's bring the jury in, and

24  we'll continue working.  So we will go until about 12:15 today

25  before we break for lunch.

1       (Jury in at 10:38 a.m.)

2             THE COURT:  All right, have a seat.

3             So I want to make an announcement here.  This is

4    unrelated to the case.  So today is Mr. Keech's birthday.  He

5    is a Valentine baby, although he is no longer a baby.  And so

6    everyone is directed to be extra nice and kind to him because

7    it's his birthday.  And if anyone fails to do that, there will

8    be consequences, but I will let him decide what the

9    consequences are.

10            So, anyway, happy birthday, Mr. Keech, and we're glad

11   that you are still serving the Court and doing great work for

12   justice.

13            All right.  Let's proceed with the cross-examination

14   of the witness.

15            MS. DALE:  Would you like us to sing, Your Honor?

16            THE COURT:  Pardon?

17            MS. DALE:  Would you like us to sing Happy Birthday?

18            THE COURT:  No, because I don't know the quality of

19   the presentation.  Plus, I'm not sure how the court reporter

20   would take it down, and it would create a confusing record,

21   and this is already confusing enough.  So, no, but thank you

22   for the offer.

23                        **CROSS-EXAMINATION**

24   BY MS. DALE:

25   Q.  Good morning, Mr. Dunn.

1   A.  Good morning.

2   Q.  You started as the assistant roadmaster at the Denver

3   terminal in August of 2015; is that correct?

4   A.  That's correct.

5   Q.  And at that time Mr. Fresquez was not working as a track

6   inspector; is that correct?

7   A.  That's correct.

8   Q.  So the first time you worked with him as an inspector is

9   when he returned in February of 2016; is that correct?

10  A.  Yes, sir.  Or yes, ma'am.

11  Q.  And so you only worked with him for a couple of months?

12  A.  Very short time.

13  Q.  And you really didn't work with him directly that much;

14  correct?

15  A.  That's correct.

16  Q.  Okay.  So I wanted to talk to you about a couple of things

17  that Mr. Thompson raised on your original testimony.

18          So let's start with the discussion with Derek

19  Goodnight.  You told Mr. Goodnight that if he had any concerns

20  with the way Mr. Paz was repairing defects that he needed to

21  either talk to Mr. Paz or call the hotline; is that correct?

22  A.  That is correct.

23  Q.  To your knowledge, he never talked to Mr. Paz about that,

24  did he?

25  A.  I don't know what he did after he left my office.  I don't

1   know if he talked to Mr. Paz or called the 1-800 number.

2   Q.  So you have no idea if he called the hotline with respect

3   to that --

4   A.  I do not know.

5   Q.  Okay.  There was an issue that you discussed earlier

6   relating to contaminated soil.  You never saw the actual

7   results of the soil test; is that correct?

8   A.  That is correct.

9   Q.  And you never saw any e-mail communications between Mike

10  Paz and anyone else discussing whether those soil -- whether

11  that soil could be used; is that correct?

12  A.  I did not see the e-mails, that is correct.

13  Q.  And this all occurred in July of 2017?

14  A.  That is correct.

15  Q.  So this is over a year after Mr. Fresquez was terminated.

16  A.  Yes.

17  Q.  And it had nothing to do with Mr. Fresquez; is that

18  correct?

19  A.  That is correct.

20  Q.  Did Mr. Fresquez ever raise any concerns with you about

21  soil?

22  A.  No.

23  Q.  Okay.  Then another issue you raised with respect to

24  Mr. Paz was the notion of employee interviews.  You agreed

25  that really you didn't take the right approach to that; is

1    that correct?

2    A.   That's correct.  I should have went in and confronted

3    Mr. Paz about it before I -- before I did anything else.

4    Q.   So you never talked to Mr. Paz about his perspective on

5    that issue.

6    A.   No, I did not.

7    Q.   Were you aware that BNSF conducted an investigation of

8    those complaints?

9    A.   No, I was not.

10   Q.   So then you don't know what the results of those

11   investigations were.

12   A.   I do not know what the results are --

13   Q.   Okay.

14   A.   -- or were.

15   Q.   Okay.  And so that issue also arose in July of 2017?

16   A.   Yes.

17   Q.   And, again, this is over a year after Mr. Fresquez was

18   terminated?

19   A.   Yes.

20   Q.   And, again, it had nothing to do with Mr. Fresquez; is

21   that correct?

22   A.   That is correct.

23   Q.   You discussed that Mr. Paz had -- and you saw the

24   e-mail -- had sent an e-mail to HR expressing concerns about

25   you.

17-cv-00844-WYD-SKC                Dunn - Cross                        IV - 918

1   A.  Yeah, that's the first time I've seen that.

2   Q.  Were you disciplined as a result of that complaint?

3   A.  No.

4        If you remember, I did not even know about the

5   complaint until the deposition.  So I might not have even -- I

6   might have never even known that he had turned -- called the

7   1-800 number on me.

8   Q.  Understood.

9        So there was some discussion about the EAM rollout.

10  Do you recall that discussion?

11  A.  Retaining -- or as far as referring to what?

12  Q.  The EAM rollout where there were some concerns expressed

13  about paper inspections.

14  A.  There was some concerns about --

15  Q.  I don't need you to get into it.  I'm just asking, do you

16  remember that --

17  A.  Oh, yes.

18  Q.  -- part of your testimony?

19  A.  Yes.  I'm sorry.

20  Q.  Mr. Bennett expressed some concern to you about the use of

21  paper inspections; is that correct?

22  A.  Yes.

23  Q.  And you contacted Doreen Powers and expressed that concern

24  to her?

25  A.  Yes.

17-cv-00844-WYD-SKC                    Dunn - Cross                        IV - 919

1    Q.  And immediately after that, or the next day, BNSF came in

2    and confirmed what you believed, which was the -- sorry -- the

3    interpretation of the FRA regulation.

4    A.  Yes.

5    Q.  So BNSF confirmed that your interpretation of the

6    regulation was correct.  They didn't agree with Mark

7    Carpenter.

8    A.  That is correct.

9    Q.  Okay.  To your knowledge, is Mr. Bennett still working for

10   BNSF?

11   A.  Yes, he is.

12   Q.  There was some discussion of a frog defect that

13   Mr. Fresquez found.  Do you recall that?

14   A.  Just the -- I would say no.

15   Q.  Just now, on your testimony, do you recall talking to

16   Mr. Thompson about a frog defect?

17   A.  Yes.

18   Q.  Okay.  Who is Mr. Frederick again?

19   A.  Mr. Frederick was the MRP, manager of railway planning.

20   Q.  Okay.  And he wasn't able to see that defect with his

21   naked eye; is that correct?

22   A.  That's correct, he could not see it.

23   Q.  And you don't know anything about any conversations that

24   Mr. Fresquez had with Mr. Paz about this --

25   A.  No.

17-cv-00844-WYD-SKC                    Dunn - Cross                          IV - 920

1   Q.  -- or any other frog defect; correct?

2   A.  No, I do not.

3   Q.  Would you agree with me that not all defects are created

4   equal?

5   A.  I would agree with that.

6   Q.  Would you agree with me that there's some subjectivity in

7   inspecting tracks?

8   A.  Yes.

9   Q.  So, in other words, two people could look at one section

10  of track and disagree as to whether there was a defect there

11  or not?

12  A.  That's correct.  I would agree with that.

13  Q.  And two people could look at the same section of track or

14  look at a defect and disagree as to whether -- how serious

15  that defect was?

16  A.  There are certain defects I would agree with that, yes.

17  Q.  Some of them are objective, but some of them are

18  subjective?

19  A.  That's correct.

20  Q.  Okay.  Now, with respect to the FRA regulation relating to

21  non-class-specific defects, Mark Carpenter never told you that

22  he intended to violate the FRA regulations; correct?

23  A.  That is correct.

24  Q.  He just told you that he read the regulation differently.

25  A.  He had a different interpretation.

1  Q.  And he never tried to hide that his interpretation was

2  different, did he?

3  A.  No, he did not.

4  Q.  He knew that you disagreed with him.

5  A.  Yes.

6  Q.  And he knew that other people disagreed with him.

7  A.  Yes.

8  Q.  And he didn't get angry with you when you disagreed with

9  his interpretation, did he?

10  A.  Not at all.

11  Q.  Did you ever see him get angry with anyone else for

12  disagreeing with his interpretation?

13  A.  I've never seen Mr. Carpenter angry at all.

14  Q.  Okay.  He never tried to convince you that he was right

15  and you were wrong?

16  A.  No.

17  Q.  And you never saw him try to bully a track inspector or

18  anyone else into leaving a track in service after 30 days?

19  A.  No, I did not.

20  Q.  You also mentioned an investigation hearing where you had

21  charged some employees with failure to follow instructions.

22  Do you remember that conversation?

23  A.  Yes.

24  Q.  What happened in that hearing?

25  A.  What happened in that hearing?

17-cv-00844-WYD-SKC                 Dunn - Cross                    IV - 922

1    Q.   What was the final result of that hearing?

2    A.   It was thrown out.

3    Q.   So, in other words, it went through an investigation, and

4    the employees involved were found not responsible for the

5    discipline.

6    A.   That is correct.

7    Q.   Are you aware of any other instances where an employee was

8    cleared after a hearing?

9         MR. THOMPSON:  Objection, Your Honor.  BNSF has said

10   that's exactly what they are not going to do.

11        MS. DALE:  Without -- may I rephrase?

12        THE COURT:  Hold on.

13        I don't understand your objection.  What are you

14   saying?

15        MR. THOMPSON:  Sure.  BNSF has stipulated that they

16   will not offer evidence of individual employees who were

17   exonerated by the process.  Their testimony, they've said,

18   will be we can't identify a single person; however, we know it

19   happens sometimes.

20        MS. DALE:  May I rephrase, Your Honor?

21        THE COURT:  Well, I hadn't intended to sustain your

22   objection, but if you want to rephrase --

23        MS. DALE:  Then I won't rephrase.

24        THE COURT:  No, the objection is overruled, but the

25   witness needs to answer the question with a yes or no.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1     Let's have the question read back so it's clear what

2  he's answering.

3     (The record was read by the reporter as follows:

4     "Are you aware of any other instances where an

5     employee was cleared after a hearing?")

6  A.  Yes.

7     MS. DALE:  Your Honor, I believe what I have left,

8  which is not much, is direct.  Oh, sorry.  I do have one other

9  section.

10  BY MS. DALE:

11  Q.  So Mr. Fresquez is alleging in this case that Mark

12  Carpenter and Mike Paz were directing track inspectors not to

13  report defects.  Did you ever witness that?

14  A.  No.

15  Q.  Could a track inspector get in trouble for not reporting

16  defects?

17  A.  Yes.

18  Q.  Are you aware of that happening?

19  A.  Yes.

20  Q.  Can you explain that?

21  A.  So Mr. Breneman was the track inspector up on the Brush

22  Sub, one just east of Denver, and he had been failing to put

23  any defects in.  We did a high-rail inspection with FRA --

24     MR. THOMPSON:  I'm going to object, Your Honor:

25  relevance.  We don't know the time frame this is happening.

1   THE COURT:  Overruled.  I will allow it.

2   A.  And there were five FRA violations written that day for

3   defects that the FRA found that Mr. Breneman should have found

4   himself and put into the system.

5   BY MS. DALE:

6   Q.  And what happened to Mr. Breneman?

7   A.  Mr. Breneman was taken to investigation for -- I don't

8   know.  I can't remember what the charge was, but for -- for

9   those violations.

10  Q.  Okay.  Do you know what the discipline imposed was?

11  A.  I don't remember what the discipline was, but there was

12  some discipline.

13  Q.  Okay.  Mr. Fresquez is also alleging that Mark Carpenter

14  and Mike Paz were removing defects from the reporting system

15  even though they had not been repaired.  Did you ever witness

16  that?

17  A.  No, I did not.

18  Q.  Did Mr. Fresquez ever report to you that he believed

19  Mr. Carpenter or Mr. Paz were improperly removing defects from

20  the system?

21  A.  Not -- not that I remember, no.

22  Q.  As a manager at BNSF, do you have an incentive to make

23  sure that defects are reported and repaired?

24  A.  Yes.

25  Q.  And what's that incentive?

17-cv-00844-WYD-SKC                Dunn - Cross                      IV - 925

1   A.   Just for the safe -- safe movement of train travel.  Just

2   for knowing you are doing your job correctly.

3   Q.   What's the risk if you don't properly repair defects?

4   A.   Possibility of derailment or injuries.

5   Q.   Mr. Thompson asked you some questions about the scorecard.

6   Is safety a factor on the scorecard?

7   A.   Yes.

8          MS. DALE:  Your Honor, I have some direct, but that

9   was it for cross.

10          THE COURT:  All right.  How long is your direct?

11          MS. DALE:  Five minutes.

12          THE COURT:  Okay.  Why don't we just include it now,

13   and then you can cover both if you have further questions,

14   just in the interest of time.

15          MS. DALE:  Okay.

16          THE COURT:  All right.

17   BY MS. DALE:

18   Q.   Mr. Dunn, when Mr. Fresquez returned to his track

19   inspector job in early 2016, was there an incident where he

20   was disruptive in a safety briefing?

21   A.   Yes.

22   Q.   Can you tell me about that?

23   A.   So that morning Mr. Fresquez was coming back as a track

24   inspector.  We have a briefing room, tables and chairs all

25   lined out.  In the back of the room were like three desks

1   lined up in a row that nobody used.  They were just there for

2   storage.  So Brandon came in, had his hoodie, hooded

3   sweatshirt, all the way up to his eyes.  Was a little

4   combative as far as just, um, verbally going back and forth

5   with some of the employees.

6           And I'm trying to talk slow so I don't get too far

7   ahead of you there.

8           And had just made some comments out loud.  And so I

9   was trying to do the morning briefing, so I stopped, and I

10  said:  Hey, Brandon, why don't you come up to the front of the

11  room.  I'll give you 10 or 15 minutes to get everything off

12  your chest, you know, talk about whatever you want to talk

13  about, and then I want you just to go back and sit down and be

14  quiet because you are disrupting the safety meeting.

15  Q.  And that was the extent -- or did he come up and talk to

16  the group?

17  A.  No.

18  Q.  What did he say?  What was his response?

19  A.  He was just upset about being back.

20  Q.  Okay.  Did you meet with him after that meeting, just him,

21  one on one?

22  A.  Yes, I did.  At that safety briefing I told him when the

23  briefing was over that I wanted to talk to him in my office

24  just for a minute.

25  Q.  Why did you want to talk to him separately?

1    A.   Just so that he knew that his problems and his, um, his

2    battle was with Mr. Paz and not myself, that I'd never had any

3    problems with Brandon, and that I wanted to lay out the

4    expectations that I had for him as he came back to being a

5    track inspector.

6    Q.   What were those expectations?

7    A.   That if he found something that needed to be taken out of

8    service, or if there was defects on the main line that was

9    going to be taken out of service, that I wanted a five or ten

10   minutes heads-up so I could send out an e-mail or call the

11   terminal to let them know what was coming and to get people

12   rounded up for repairs, let -- just a whole communication

13   circle so everybody knew what we had and what was coming, that

14   we had people coming to repair it.

15   Q.   Is there some reason that you felt you needed to convey

16   that to Mr. Fresquez, that he should give you an advance

17   notice if he was taking track out of service?

18   A.   That's the expectation I give to every track inspector

19   when I cover territories, that when we have, um, meetings with

20   track inspectors, I convey that expectation to everyone the

21   same way.  That's what I expect them to do.  If they find

22   something they need to take out of service, that they need to

23   let me know, you know, a few minutes ahead of time of when

24   they're going to take it out of service just so I can

25   communicate that.

1   Q.  Did you have any reason to believe that Mr. Fresquez

2   wasn't doing that already?

3   A.  I didn't have any -- I didn't have any knowledge to that

4   effect.  We did have a meeting with Mr. Carpenter the week

5   before Brandon came back, just myself and Mr. Carpenter.

6   Q.  You never heard any criticisms of Mr. Fresquez when he was

7   previously a track inspector that he would take a track out of

8   service without giving notice?

9   A.  Just -- just the rumor mill.

10           MR. THOMPSON:  I object, Your Honor.  This is clearly

11  hearsay.

12           THE COURT:  Hold on.

13           Sustained as to -- it's eliciting hearsay.

14  BY MS. DALE:

15  Q.  Mr. Dunn, did any manager at BNSF ever give you any reason

16  to believe that Brandon Fresquez reported too many defects?

17  A.  No.

18  Q.  Are you aware of any manager taking issue with the way

19  Mr. Fresquez reported track defects?

20  A.  No.

21           MS. DALE:  That was all I had.  Thank you.

22           THE COURT:  All right.  Cross-examination.  Not

23  cross-examination.  Redirect of the witness.

24  ///

25  ///

1                    **REDIRECT EXAMINATION**

2  BY MR. THOMPSON:

3  Q.  I'd like to talk with you for a minute about the time you

4  pulled Mr. Fresquez into your office.

5  A.  Okay.

6  Q.  You told him, Your problem is with Michael Paz, not me.

7  A.  That's correct.

8  Q.  We have always gotten along.

9  A.  That's correct.

10  Q.  And Brandon said, Okay.

11  A.  That's correct.

12  Q.  You didn't have a problem with him again, did you?

13  A.  No.

14  Q.  You twice reported Michael Paz for what you believed to be

15  a violation of federal law and a violation of BNSF

16  regulations.

17  A.  Yes.

18  Q.  I'd like to read from Mark Carpenter's deposition and get

19  your thoughts on what he said.

20          MS. DALE:  Objection.  How is this redirect?

21          THE COURT:  This isn't redirect.  You shouldn't be

22  reading -- Carpenter has already testified.

23          MR. THOMPSON:  Your Honor, the way this is redirect

24  is BNSF offered that he didn't know about the HR complaint and

25  essentially nobody ever retaliated against him.

1           THE COURT:  Hold on.

2           MR. THOMPSON:  Sure.

3           THE COURT:  Let me read, without you talking about

4    it, what's up on the screen here.

5           No.  No, this is improper use of this.  If this is

6    something that you wanted the jury to hear, you should have

7    asked Mr. Carpenter about it.  I'm not going to let you use

8    this.

9           MR. THOMPSON:  Understood.

10   BY MR. THOMPSON:

11   Q.  Mr. Dunn, did Mr. Carpenter ever tell you that he had took

12   an issue or thought it was problematic that you were

13   undermining Michael Paz?

14   A.  No.

15   Q.  I'd like you to read from Mark Carpenter's deposition,

16   please, at line 4 through 21.  Just to yourself, please.

17          THE COURT:  He can do that, but I'm not going to let

18   you ask a question about it.

19          Unless you don't object.  Do you object?

20          MS. DALE:  I do object.

21          THE COURT:  All right.

22          MR. THOMPSON:  I'm sorry, Your Honor.  For the

23   record, what is the issue with asking him about Mark

24   Carpenter's deposition?

25          THE COURT:  Explain your objection.  What is the

1   basis for your objection?

2           MS. DALE:  As you said, I think this is improper use

3   of deposition testimony.  If there were questions about this

4   testimony, it should be directed to Mark Carpenter.  Mr. Dunn

5   has no idea what Mark Carpenter testified to in his

6   deposition.

7           THE COURT:  I think this is an improper use of

8   Carpenter's deposition, so I sustain the deposition [sic], and

9   I direct you to move on to something else.

10          MR. THOMPSON:  Yes, Your Honor.

11  BY MR. THOMPSON:

12  Q.  Did Mr. Carpenter ever have a discussion with you about

13  undermining Michael Paz?

14  A.  Not that I remember, no.

15  Q.  That could have happened?  You just don't remember one way

16  or the other?

17  A.  Could have.  I don't remember.

18          MR. THOMPSON:  Thank you.

19          THE COURT:  All right.  Do you have anything further

20  with this witness?

21          MS. DALE:  No, Your Honor.

22          THE COURT:  All right.  This witness is excused.

23  Call your next witness.

24          MR. THOMPSON:  We call Jacob Yancey.

25          COURTROOM DEPUTY:  Please raise your right hand.

1       (The witness was sworn.)

2            COURTROOM DEPUTY:  Please be seated.

3            Please state your full name, and spell your full name

4   for the record.

5            THE WITNESS:  Jacob Iven Yancey.  You want me to

6   spell the full name?

7            COURTROOM DEPUTY:  Yes, please.

8            THE WITNESS:  J-a-c-o-b, I-v-e-n, Yancey,

9   Y-a-n-c-e-y.

10     **JACOB IVEN YANCEY, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

11  BY MR. THOMPSON:

12  Q.  Good morning, Mr. Yancey.

13  A.  Good morning.

14  Q.  Will you please tell the jury about yourself.

15  A.  I'm the father of two, two girls, a 10-year-old and

16  13-year-old.  Work at BNSF for around 14 to 15 years, foreman

17  there.  I've been in Denver almost my whole career there.  Uh,

18  coach -- I coach high school baseball and football, and I

19  coach my younger -- my oldest daughter's softball team.

20  Q.  What do you do for BNSF, in layman's terms?

21  A.  I'm a foreman.  I run a gang, and I fix and repair the

22  tracks when the track inspectors find it.  My group, me and a

23  couple of guys, usually go out and fix any of the problems

24  that they find.

25  Q.  Were you a coworker with Brandon Fresquez?

1    A.  Uh, yes.

2    Q.  Did you guys hang out outside of work?

3    A.  No, just -- just at work.

4    Q.  Have you seen him since he was terminated?

5    A.  Uh, no.

6    Q.  In this case you are going to be testifying for Brandon.

7    Are you concerned that BNSF will retaliate against you?

8    A.  Yes, sir, I have some concerns with that.

9    Q.  Then why are you testifying anyways?  You have a lot to

10   lose; right?

11   A.  Yeah, it's a career and livelihood, but it's the right

12   thing to do, and, um, it needs to be done.

13   Q.  Did you ever have reason to believe BNSF was misreporting

14   track defects?

15   A.  Misreporting or -- like the repairs or --

16   Q.  Sure.  Marking defects that existed -- either taking them

17   out of the system or marking them as repaired when they were

18   not?

19          MR. GOMAN:  I object to relevance as to this

20   witness's belief.  I don't see what that has to do with

21   Mr. Fresquez's case.

22          THE COURT:  All right.  Hold on.  I don't understand

23   the question.  The question was one thing; then you changed

24   it.  So let me have you ask a clearer question.

25          MR. THOMPSON:  Sure.

1   BY MR. THOMPSON:

2   Q.  Did you ever believe that Mark Carpenter and Michael Paz

3   were either deleting defects from the TIMS system or marking

4   defects that had not been repaired as repaired in the TIMS

5   system?

6   A.  Yes.  Defects were disappearing in the system.  We were in

7   charge of fixing them, me and the other foreman, and we would

8   only take out the ones that we had fixed, and there were some

9   defects that would disappear off the list that we did not fix.

10  Q.  How many defects that are overdue are in the system now,

11  give or take?

12          MR. GOMAN:  Objection to relevance.

13          THE COURT:  Yeah, to the extent it's talking about

14  the present tense, the objection is sustained.

15          MR. THOMPSON:  Sure.

16  BY MR. THOMPSON:

17  Q.  Has BNSF changed its practice, as far as you are aware?

18  A.  Um, not particularly.  The new system, the EAM system,

19  makes it a little bit harder than back in the past.

20  Q.  Are they now complying with the law?

21  A.  The --

22  Q.  Sure.  Are they now accurately reporting defects?

23  A.  Oh, the track inspectors report them accurately, and it

24  shows up on the list, but, uh, the system makes it a little

25  harder to hide it.

1    Q.  Is BNSF still hiding it?

2    A.  Not that I know of.  I mean, they could be taking some

3    defects out, but your B numbers now, if you take them out,

4    they know.  They can track who took it out.

5    Q.  And the EAM system did that?

6    A.  Yes, that's correct.

7    Q.  Are there, nevertheless, tracks that are in service that

8    should be out of service?

9    A.  Yes, there are tracks that are in service that should be

10   out of service.

11   Q.  Explain that.

12   A.  When a defect --

13        MR. GOMAN:  Object to the relevance, if we are

14   talking about current times.

15        THE COURT:  Overruled.  I will allow this answer.

16   A.  Okay.  When a defect, according to FRA, uh, standards,

17   goes past 30 days on certain defects, the track either has to

18   be repaired within those 30 days or it's pulled out of

19   service, needs to be locked or out of service, and they cannot

20   run trains until the repair is made.

21   BY MR. THOMPSON:

22   Q.  Did we subpoena you for this case?

23   A.  Yes.

24   Q.  So did you have any choice to be here?

25   A.  No.

1    Q.   And we did that -- when did we do that, relative to trial?

2    A.   It was not too -- not too long ago.  I don't know the

3    exact date, but maybe a week or two ago.  I'm not positive.

4    Q.   Prior to then, had we ever talked to you?

5    A.   No, sir.

6    Q.   Prior to two days ago, had I ever met you?

7    A.   No, sir.

8    Q.   Ever talked to you on the phone?

9    A.   No, sir.

10   Q.   Have any idea what you were going to say?

11   A.   No, sir.

12   Q.   Did you, however, meet with BNSF's lawyers?

13   A.   Uh, yes, twice.

14   Q.   Why?

15   A.   Um, our roadmaster had told us that we had -- we were

16   required to meet them and we had to go and talk to them.

17   Q.   You were ordered to meet with them?

18   A.   That's correct.

19   Q.   Were you ever ordered to meet with me?

20   A.   No, sir.

21   Q.   Did BNSF's lawyers ask you what kind of an employee

22   Brandon Fresquez was?

23   A.   Uh, yeah, I believe so.

24   Q.   What did you tell them?

25   A.   Um, he was an asset to the company.  He was very good at

1   his job, and he stood up for safety and for the right thing.

2   Q.   In this case, BNSF has pointed to two pieces of discipline

3   Brandon had back in 2010 and 2011, a formal reprimand and a

4   record suspension.

5        Is there anything unusual at BNSF about an employee

6   having, five years ago, a formal reprimand and a record

7   suspension on his record?

8        MR. GOMAN:  Objection to foundation.

9        THE COURT:  Sustained.  It's a lack of foundation.

10  BY MR. THOMPSON:

11  Q.   Do you know whether it's unusual for employees to have

12  discipline on their record?

13  A.   No, a lot of us do.

14  Q.   Is there anything unusual about the discipline I just

15  described on Mr. Fresquez's record being there?

16  A.   A letter of reprimand or -- or some sort of discipline,

17  no.

18  Q.   Does most everyone have that on their record?

19  A.   A lot of people do.

20  Q.   Were you ever at a meeting or a safety briefing where

21  Brandon Fresquez was removed by the -- from the room by Mark

22  Carpenter?

23  A.   Yes.

24  Q.   Please tell the jury what happened in that meeting.

25  A.   Brandon had came in.  We -- well, first off, we have a

 1   safety briefing.  We come in in the morning.  They line us out

 2   for what we're going to do for the day.  And at that time the

 3   track inspectors usually can, you know, bide for our time

 4   because we have a lot of things to fix.  They kind of go

 5   through what we're -- what the priorities are, and the track

 6   inspectors can kind of throw things out and try to pawn for

 7   our -- for our time.  And Brandon was doing that at that time,

 8   was -- said he had a defect that was out of service.  Um, Mark

 9   did not want to hear it, we had a lot of work to do, and said

10   that he would talk to him separate.  And he -- Brandon said,

11   Well, I need to get this done.  And Mark had pulled him out of

12   the meeting and shut the -- took him to one of the offices and

13   shut the door.

14   Q.  Was Brandon in any way inappropriate during that meeting?

15   A.  No.  That's what most of the track inspectors will do.

16   They will -- they will ask or talk to the -- our supervisor

17   and actually, you know, debate and see where we're going to go

18   and if they can get us.  So you kind of have to fight for --

19   fight for getting the help because we're really limited on

20   manpower.

21   Q.  Did you ever work under Mike Paz?

22   A.  Yes.

23   Q.  For how long?

24   A.  Several years.  I'm not positive on the dates.

25   Q.  Did you ever witness him being embarrassed about an

1   employee knowing the regulations or rules better than him?

2          MR. GOMAN:  Objection to relevance.

3          THE COURT:  Overruled.

4   A.  Yes, he, uh -- there's -- there's a lot of people in there

5   that have plenty of years and have done the job for longer

6   than he has, and he did get embarrassed if you had brought

7   that to his attention or, in his opinion, showed him up.

8   BY MR. THOMPSON:

9   Q.  How would he respond when that happened?

10  A.  Usually it was kind of an aggressive confronting attitude,

11  or he would target you later on in some sort of retaliation.

12  Q.  Were the employees doing anything more than just telling

13  him what federal law required?

14  A.  No, not in most cases.  And in some cases it would be just

15  a better way to fix the track from guys that have more

16  knowledge than he did.

17  Q.  Did you ever have that happen to you?

18  A.  Yes, sir, on several occasions.

19  Q.  Was there an incident with -- with clips?

20  A.  Oh, yes, down at Palmer Lake.

21  Q.  What are clips?

22  A.  Um, they're fasteners on a cement tie.  They kind of look

23  like a pigtail, and they hold the tie, which is the -- in this

24  case it's cement ties, and they hold the rail to the tie so it

25  doesn't flex back and forth.

1   Q.  Can you tell the jury what happened with the clips and

2   Mr. Paz?

3           MR. GOMAN:  Object to relevance.  And also ask, if

4   it's not sustained, we clarify the time period.

5           THE COURT:  Yeah, let's have the time frame.

6   BY MR. THOMPSON:

7   Q.  When did this happen?

8   A.  Just a couple of years ago.

9   Q.  Did Mr. Paz retaliate against you for embarrassing him?

10          MR. GOMAN:  Objection to relevance.

11          THE COURT:  All right.  Hold on.  I'm not telling you

12  what to do, but in a way I am.  I need to understand what we

13  are talking about here before you ask the question that's

14  pending.  So I sustain the objection to the last question

15  because I need to hear a foundation for it before I can

16  appropriately rule on it.

17          MR. THOMPSON:  Sure.

18  BY MR. THOMPSON:

19  Q.  Was there ever an incident where you embarrassed Michael

20  Paz by raising a safety concern he had overlooked?

21  A.  Yes, sir.

22  Q.  When did that happen?

23  A.  Probably a couple years ago in February.

24  Q.  So we're talking 2017, '16, somewhere in there?

25  A.  Yeah, it would be probably 2017.

1    Q.  Did Michael Paz -- strike that.

2         How did Michael respond -- Michael Paz respond after

3    you embarrassed him by pointing out the safety concern?

4         MR. GOMAN:  Objection:  401, 403, and 404.

5         THE COURT:  Overruled.

6    A.  Well, he got confrontational down there.  I explained to

7    him why we couldn't go about the way he wanted to do it.

8    BY MR. THOMPSON:

9    Q.  So let me freeze you there.  Explain to the jury what you

10   mean by that.  What were you doing, and what did Michael Paz

11   ask you to do?

12   A.  Okay.  He wanted us down there -- we took over the Union

13   Pacific Railroad at Palmer Lake, which is near Colorado

14   Springs.  They have different material than we do, and he

15   wanted us to replace ties down there.  On a Monday I went down

16   there, and he was supposed to send the backhoe down.  It never

17   came down, so we repaired everything we could there --

18   Q.  Let me freeze you there.  What's a backhoe?

19   A.  A backhoe is a -- it's like a -- it's a piece of equipment

20   that has a shovel on the front and a scoop in the back.  And

21   we turn it around and use the scoop to remove the ties and

22   insert the ties underneath the rail so we don't have to take

23   the rail out.  It actually digs the holes, pushes it out,

24   pushes it back in.

25   Q.  Okay.  Go ahead and continue with what happened.

 1   A.   Okay.  And Monday the backhoe never came down, so we

 2   worked in the OS and fixed everything we could down there.

 3          Tuesday came around.  We were told to be down there

 4   running a form B, which is our form of protection.  We control

 5   the train traffic through there both directions so that we can

 6   safely work.  And the backhoe finally showed up around noon.

 7   Michael was down there at 11:00 wondering why we weren't

 8   taking the ties out.  Well, I don't have a machine to take the

 9   ties out.  And these ties weigh 4 or 5,000 pounds.  You're not

10   a -- him not going to be able to pull those out myself.  I

11   like to think of myself as strong, but not that strong.

12          But he wanted me to cut all the clips off of all

13   these ties and be ready for it.  Well, if you cut that many

14   clips off in a row, that rail is not secure, and you could

15   cause a derailment.

16          So I was going to make sure that I had the backhoe

17   there because I waited the whole last day or the whole Monday

18   and never saw a backhoe.  So I did not want to make the track

19   unsafe until I knew that we had the backhoe down there.  Plus,

20   it's February.  The ground is frozen.  I don't want to take

21   out eight in a row.  I am going to try one at a time, make

22   sure we can get it in, and still work with train traffic and

23   keep trains moving.

24          Well, he wanted all the clips cut off, and I

25   explained to him if we do that then we are going to shut down

1  both trains north and southbound, and that's not going to be a

2  conversation anybody wants.

3  Q.  Let me freeze you right there.  Was anybody else present

4  for this?

5  A.  Yes.  Jason Snow and -- he was my laborer.  And Marty

6  Smyth was my truck driver.

7  Q.  Go ahead and continue.  Did they hear this conversation?

8  A.  Oh, yeah.  They were out at the -- we were all out at the

9  truck.

10 Q.  Go ahead and continue.

11 A.  So he had a guy from Fort Worth, some planning guy with

12 him.  So when I expressed that, the guy --

13 Q.  Hold on.  I'm going to pause you again.  So there's a

14 gentleman from Fort Worth there as well?

15 A.  Yes, that's correct.

16 Q.  And Fort Worth is BNSF headquarters?

17 A.  Yes, sir.

18 Q.  Did Michael Paz in any way demonstrate that you saying

19 this in front of somebody from headquarters embarrassed him?

20 A.  It was all in the body language, and I knew.  And as soon

21 as he left, he had -- he had cut our gang and moved -- opened

22 another gang in Denver.  He knew that both Jason and I lived

23 down south, so it was convenient for us.  Plus, it was to

24 punish me and Jason for, um, essentially showing him up down

25 there.  And he moved it to Denver, which is, you know, 20, 30

1    miles from where I live and 70 miles from where Jason lives.

2    Q.  All right.  So I want to make sure I understand this

3    correctly.  Michael Paz comes out and asks you to do something

4    unsafe.

5    A.  That's correct.

6    Q.  You tell him it's dangerous.

7    A.  Yes, sir.

8    Q.  You do that in front of somebody from headquarters.

9    A.  Yes, sir.

10   Q.  Michael Paz then responds by cutting your gang.

11   A.  That's correct.

12   Q.  Which made only you and Jason Snow have to travel much

13   further for work.

14   A.  That's correct.

15   Q.  All right.  I want to talk about May 5th, 2016, the last

16   day Brandon Fresquez worked for BNSF.

17   A.  Okay.

18   Q.  Do you remember that day?

19   A.  Yes, sir.

20   Q.  So there was a defect at which Mr. Herzog, Mr. Fresquez,

21   and Mr. Paz had a conversation.  Do you know what I'm talking

22   about?

23   A.  Yes, sir.

24   Q.  Where were you that day?

25   A.  We were at the north end of the OS, which is the opposing

1    signals.  It's where the trains have to stop because that's

2    where all the switches are.  So we were at the north end, and

3    they were somewhat in the middle, maybe two, 300 feet from us.

4    Q.  Talking about a football field?

5    A.  Yeah.  Yeah, probably.

6    Q.  Could you see them fairly clearly?

7    A.  Oh, yes.

8    Q.  All right.  There was a radio call between Michael Paz and

9    Brandon Fresquez at some point.

10   A.  Yes, sir.

11   Q.  Did you hear that?

12   A.  Uh, yes, sir.

13   Q.  So BNSF has produced audio in this case that contains,

14   conveniently, only Mr. Fresquez's voice.  Mr. Paz's voice is

15   not there.  BNSF's explanation has been, well, he wasn't --

16   Brandon was in his truck, which has a stronger radio; Mr. Paz

17   was not in a truck, he was on a PAC radio, and so you couldn't

18   hear him.

19        Do you have reason to dispute that contention?

20   A.  Mike was in the truck.  We could see him.

21   Q.  You could see him in the truck?

22   A.  Yes, sir.

23   Q.  During the radio conversation?

24   A.  Yes, sir.

25   Q.  Could you hear the radio conversation?

1   A.  Yes, sir.

2   Q.  Were you listening to the radio conversation?

3   A.  Yes, sir.

4   Q.  Did Mike Paz ever order Brandon Fresquez to remeasure that

5   defect?

6   A.  No.

7   Q.  If Mike testified that he did order Brandon Fresquez to

8   remeasure that defect in the internal hearing, was Mike Paz

9   being dishonest?

10  A.  Yes.

11  Q.  Was the defect at issue that they were all around, was

12  that discussed during the morning safety briefing?

13  A.  Yes, it was.

14  Q.  By who?

15  A.  By Brandon in the morning meeting.

16  Q.  Did Michael Paz raise it at all?

17  A.  Did he bring it up or --

18  Q.  Yeah.  It's a poor question.

19  A.  No, Brandon brought it up.

20  Q.  Did Michael Paz ever discuss wanting to leave that track

21  in service regardless of whether the defect was repaired?

22  A.  Yes, 'cause it was going to be a lengthy job, and it would

23  shut down an important part of the track.

24  Q.  I want to make sure I understand you correctly.  So you

25  have a safety briefing before you guys go to work on May 5,

1    2016.

2    A.  Yes, sir.

3    Q.  You are there?

4    A.  Yes, sir.

5    Q.  Is Jason Snow there?

6    A.  Yes, sir.

7    Q.  Michael Paz is there?

8    A.  Yes, sir.

9    Q.  And Brandon Fresquez is there?

10   A.  Yes, sir.

11   Q.  Brandon, if I'm understanding you correctly, says, I'm

12   going to take this track out of service because this defect is

13   too old.

14   A.  Yes, sir.

15   Q.  How did Michael Paz respond?

16   A.  Um, he basically told him, No, we're not going to take

17   that out.  Um, it is good for track.

18          Brandon had just came off -- Brandon had written it

19   up before.  He had came off of the track inspector job, went

20   to a flagging job for -- I don't know how long he was on the

21   flagging job, but came back, and the defect was still there.

22   So it's his duty to take it out, and, you know, he was

23   expressing that, and Mike said it's not.  So, um, then we went

24   about our business after that, and Brandon, you know, had to

25   do what he had to do.

1  Q.  So there's been -- it's not entirely clear to me, but

2  Mr. Paz has kind of given three different version of events.

3  I want to ask you about each of them.

4       First, Mr. Paz, in the investigatory hearing and in

5  his deposition, said the defect was not present.  Do you have

6  reason to disagree with that statement?

7       MR. GOMAN:  Your Honor, objection to leading and

8  argumentative.  He can ask the witness what he heard.

9       THE COURT:  Yeah, sustained as to the form of the

10  question.

11       MR. THOMPSON:  Sure.

12  BY MR. THOMPSON:

13  Q.  Was the defect present?

14  A.  I believe so, if he had taken the notes on it.  I

15  personally did not go down and measure it myself, but there's

16  notes, and a geo car had tested through there on several

17  occasions.

18  Q.  Was the defect repaired that morning?

19  A.  No, sir.  Jay went down there, and his machines were

20  broken down, so the surface gang never came down there.  I was

21  down working on another one, and I never repaired it, and I

22  was the one in the area.

23  Q.  So let me stop you right there, because Mr. Herzog said

24  the same thing, and I want to ask you.  Have you talked to

25  Mr. Herzog before today?

17-cv-00844-WYD-SKC                 Yancey - Direct                    IV - 949

1    A.  Before today?  No.

2    Q.  As far as you know, was the defect ever repaired?

3    A.  Not as far as I know.  I never repaired it.  I don't

4    believe that Mr. Goodnight repaired it, and we would have been

5    the two that would have done it.  Jay Herzog, if he went down

6    at another time, I was not there, so I -- if he said he

7    didn't, then no, he didn't repair it either.

8    Q.  Is this the kind of defect that people would have known if

9    it was repaired?

10   A.  Um --

11   Q.  Let me ask it differently.  That's actually a poor

12   question.

13          What kind of undertaking would it be to repair this

14   defect?

15   A.  Like how much work was it going to be?

16   Q.  Yeah.  Would it have been a big deal?

17   A.  Oh, yeah, it would have been a real big deal.  Where it is

18   is in a crossover where one track crosses over to another

19   track, and it's a real tight area.  It was going to take

20   several guys.  I'm not even sure the surfacing gang could even

21   fix it.  I think we would have had to dismantle switch parts

22   and everything else to fix it, if it's what I believe the

23   defect is.

24   Q.  Is that the type of defect everybody in Denver would have

25   known if it was repaired?

1    A.  Oh, yeah.  That's a big project.

2    Q.  Brandon Fresquez is then removed from service by Michael

3    Paz; right?

4    A.  Shortly after that.

5    Q.  Did Michael Paz ever brag about it, say anything along the

6    lines of, I've got him now, anything like that?

7    A.  Just through hearsay we heard, through hearsay, of that,

8    but I never -- I never heard him.

9    Q.  You didn't hear it directly?

10   A.  Directly, no, sir.

11   Q.  All right.  So earlier you told me that you were concerned

12   about it sounded like two different things.  One, BNSF

13   misreporting defects or not accurately reporting defects.

14   Secondly, about tracks still being in service right now that

15   should be out.  Right?

16   A.  Yes, sir.

17   Q.  Have you ever reported BNSF to the FRA?

18   A.  I have talked to the FRA.  Kirby, um, was our FRA

19   inspector at the time, and I have talked to him.  And the new

20   guy we talk to face to face a lot.

21   Q.  Prior to today, have you ever told BNSF that you called

22   the FRA or that you reported them to the FRA?

23   A.  Yes, in our meeting I told him that I've talked to the

24   FRA.

25   Q.  You told who that?

1    A.  Uh, is it Keith?  Yeah, the gentleman right there.

2    Q.  Oh, got it.  So when you were ordered to talk to BNSF's

3    attorneys, you told them.

4    A.  Yes, sir.

5    Q.  Did you ever tell any management at BNSF?

6    A.  Uh, no, sir.

7    Q.  Would you be fearful of retaliation if you told BNSF

8    managers that you had reported them to the FRA?

9    A.  Uh, yes, sir.

10   Q.  BNSF has a hotline.

11   A.  Yes, sir.

12   Q.  Did you ever call that hotline?

13   A.  Yes, sir, I have.

14   Q.  About what?

15   A.  Um, we had several issues going on in town.  There's

16   favoritism, some harassment going on, hostile work

17   environment.  A lot of it came from and was inflicted on us

18   that stood up for safety condition or safety issues, and if

19   you brought things up, the -- the heat was on you.

20   Q.  Who was the manager that put the heat on you?

21   A.  Um, Michael Paz.

22   Q.  Did you ever call the hotline?

23   A.  Yes, sir, I did.

24   Q.  And that's what you told them?

25   A.  Yes, sir.

1   Q.   What were the consequences of that to you?

2   A.   To me or --

3   Q.   Yeah.  How did BNSF treat you after you reported Michael

4   Paz to the hotline?

5   A.   It actually got worse.  We, uh -- we actually, uh -- the

6   heat was on more.  They were watching us.  They were trying to

7   nitpick every little thing we did and trying to get us, uh, in

8   a disciplinary action or disciplinary scenario.

9   Q.   That hotline is supposed to be anonymous; right?

10  A.   Yes, sir.

11  Q.   Do you think Michael Paz knew you had reported him?

12  A.   Oh, yes, sir.

13  Q.   Why do you believe that?

14  A.   Shortly after the phone calls were made, I believe there

15  was several, you're looking at 8 -- probably 8 to 11 phone

16  calls, there was a list of people they wanted to meet with

17  afterwards, and everybody who had made that phone call was on

18  that list.  So I'm pretty sure it was referred over to them.

19  Q.   How has Michael Paz treated the people on that list after

20  they called the hotline?

21  A.   We were -- we were -- like I said, they intensified

22  the -- the micromanaging.  They tried to put you in scenarios

23  where you would violate rules or they could get you to punish

24  you.

25  Q.   Who is Troy Little?

1   A.  He was the track inspector right now on the main line in

2   play.  I think he's been on the railroad for 10 or 12 years.

3   Q.  So after Brandon Fresquez, Troy Little was the track

4   inspector?

5   A.  I believe so.  I believe he took it over.

6   Q.  Is there ever an instance that you are aware of where

7   Mr. Little was not performing his job duties?

8           MR. GOMAN:  Objection to relevance.

9           MR. THOMPSON:  This is comparator evidence, Your

10  Honor.

11          THE COURT:  I'll allow the question.  I will overrule

12  the objection, but it's a yes or no answer.

13  A.  Yes.

14  BY MR. THOMPSON:

15  Q.  Why do you believe he was not performing his job duties?

16  A.  There was times when I would run a Form B for months on a

17  time, protecting the track, once again, a gang out there, and

18  I would never see him come through.  You are supposed to

19  inspect the track every other day, and I would never hear or

20  see from him.  And so I would never see him, and assuming that

21  he's not riding the track if I have it from 4:30 in the

22  morning until 7 o'clock at night and I never see him.

23  Q.  Did Michael Paz ever catch Mr. Little sleeping?

24  A.  It wasn't Mike.  It was the FasTracks guys, the light rail

25  guys that run through Golden.

1    Q.  Tell us about that.

2    A.  We were working down south, and we had gone to lunch.

3    Mike had met us down there for lunch.  And he got a phone call

4    from CDOT concerned about one of our track inspectors by the

5    track.  Um, the guy that had rode the commuter line back and

6    forth, um, had seen him there and didn't see any movement, was

7    concerned that something had happened to him.  And this -- he

8    had gone back and forth several times and not seen any

9    movement, and they had called Mike about it on his phone while

10   we were at lunch, and Mike was on speaker.

11   Q.  What did you learn?

12   A.  Well, they learned that he was sleeping because they got

13   out and knocked on the window.  The police went over there and

14   knocked on the window, and he was actually sleeping.

15   Q.  Did Mr. Little, as far as you know, get in any

16   discipline -- any trouble for either not inspecting for two

17   months or for falling asleep while at work?

18   A.  Not that I know of.

19   Q.  Is that worse -- strike that.

20        In this case, Brandon produced his cell phone, some

21   1800 pages of texts.  BNSF has picked out a few of those and

22   questioned about them.  They include texts with you in which

23   there's discussions of essentially you saying, Yeah, pull out

24   the track, let's get some overtime.  I'd like to ask you about

25   that.  Okay?

1   A.  Okay.

2   Q.  Do you recall ever sending texts like that?

3   A.  I'm sure.  We kind of have a running joke about it.  We

4   have so much work to do, and, you know, if we find things --

5   and there's always something out there.  There's always

6   something.  So we have a running joke, Hey, you know, you're

7   going to ride at 2 o'clock.  I know we're going to get

8   overtime.  So we'd say, Hey, you know, go ahead, get us some

9   overtime.  We do the same thing with the FRA guy when he comes

10  in town.  It's more of a running joke than anything.  I

11  honestly would rather go home and spend time with my kids,

12  but, you know, it is what it is.  We'll do the work.  But it's

13  more of a joke than anything going on if, you know -- there's

14  no -- I mean, I'll work, whatever we need to do, repair

15  whatever we need to do, but all in all, I'd rather be home

16  with my family.

17  Q.  There's enough defects there to give you overtime every

18  day of the year?

19  A.  Oh, yes.

20  Q.  Did Brandon, as far as you know, ever pull a track out of

21  service just so you or one of his buddies could get overtime?

22  A.  No, sir, just if it needed repaired.

23  Q.  What message did BNSF terminating Brandon Fresquez send to

24  the employees?

25  A.  I think that if you stand up, they're going to eventually

 1   get you one way or another.

 2   Q.   Was there a better way -- that's a poor question.

 3        If you wanted to send a message by retaliating

 4   against somebody, was there any better person than Brandon

 5   Fresquez to do that to?

 6   A.   No, 'cause he was probably one of our louder voices for

 7   safety and for defects.

 8        MR. THOMPSON:   I have nothing further.   Thank you.

 9        THE COURT:   Cross-examination.

10                      **CROSS-EXAMINATION**

11   BY MR. GOMAN:

12   Q.   All right.   Mr. Yancey, good morning, sir.

13   A.   Good morning.

14   Q.   We've met before, I think twice.   Right?

15   A.   Yes, sir.

16   Q.   Okay.   The first time you and I met was probably two years

17   ago roughly.   Does that sound right?

18   A.   Yeah, I don't know for sure what the dates, but yes, sir.

19   Q.   It was -- I was there, and there was someone from human

20   resources that was there; right?

21   A.   MacKenzie, yes.

22   Q.   MacKenzie is an HR rep or something like that?

23   A.   Yeah, at the time, as far as I know, yes.

24   Q.   We talked.   I asked you questions about the allegations

25   Mr. Fresquez is making in this lawsuit; right?

1   A.  Yes, sir.

2   Q.  And MacKenzie asked some questions, too, mostly took

3   notes; is that right?

4   A.  I believe so.

5   Q.  You told me a lot of the same things you are saying here

6   today; right?

7   A.  Yes, sir.

8   Q.  And Miss Ostrander was there.  She took notes and wrote

9   them down; right?

10   A.  Is that MacKenzie?  Is that what her last name is?

11   Q.  Yeah, Ostrander.

12   A.  Oh, okay.

13   Q.  You didn't receive any discipline between then and now,

14   did you?

15   A.  Uh, no, sir.

16   Q.  We met two weeks ago, maybe, again?

17   A.  Sounds about right.

18   Q.  Had a very similar conversation.  Asked you questions

19   about what you knew about the case and the allegations?

20   A.  Yes, sir.

21   Q.  I understand your supervisor probably told you, Hey, you

22   need to go meet with this lawyer.  Right?

23   A.  Yes, sir.

24   Q.  It wasn't -- would you describe that as a confrontational

25   meeting you and I had?

 1   A.  No, sir.

 2   Q.  I just asked you questions about what you knew; right?

 3   A.  Yes, sir.

 4   Q.  And you told me the same things you are saying here today;

 5   right?

 6   A.  Uh, yes, sir.

 7   Q.  You were subpoenaed to come here to court today?

 8   A.  Yes, sir.

 9   Q.  You weren't subpoenaed to meet with Mr. Thompson a couple

10   of days ago; right?

11   A.  No, sir.

12   Q.  He just asked you, said, I have some questions for you,

13   and you came up and met with him?

14   A.  Uh, yes, just prior.  He just wanted to talk about the

15   questions.

16   Q.  He told you what questions he was going to ask you at

17   trial today; right?

18   A.  Yes, sir.

19   Q.  You -- all the employees in the track department at BNSF

20   belong to the same union; is that right?

21   A.  Uh, yes, sir.

22   Q.  Have you ever been an office holder in that union?

23   A.  Yes, sir.

24   Q.  What -- explain that, would you?  What was your office,

25   and when did you hold it?

1   A.  I was the president of our local, and I was also the local

2   chairman.  The president just runs the meetings.  We go over

3   what's going on.  The local chairman deals with time slips

4   where if we have contractors or someone doing the job we are

5   supposed to be doing, we fill out the time, the dates, the

6   hours they worked, and it gets submitted to a arbitration

7   board to get the right people paid for the job.  I'm also

8   supposed to do some stuff with the discipline with

9   investigations and stuff.  Our investigations scenarios, um,

10  you were supposed to get some training for that.  So I never

11  actually got to do any of the investigations or never got to

12  do the training, but I did hold the position of local chairman

13  and did deal with time slips.

14  Q.  A local chairman also can be kind of a conduit or a way

15  that employees can bring safety concerns to the attention of

16  management if the employee doesn't want to bring it him or

17  herself; right?

18  A.  Yes.

19  Q.  You do that on behalf of your members?

20  A.  Yes, sir.

21  Q.  You have done it through the course of your career; right?

22  A.  Yes, sir, even when I wasn't in office.

23  Q.  Safety is important to you?

24  A.  Oh, yes, sir.

25  Q.  You have been bringing up safety issues since you were

1  hired at BNSF.

2  A.  Yes, sir.

3  Q.  What year was that again?

4  A.  '05.  2005.

5  Q.  You have been formally disciplined one time at BNSF; is

6  that right?

7  A.  That's correct.

8  Q.  That was how many years ago?

9  A.  I'm not positive on it.  It was a long time ago.

10  Q.  If I said 2009 or 2010, does that sound right?

11  A.  Probably, probably correct.

12  Q.  Since that time you have not been reprimanded, suspended,

13  or anything else?

14  A.  Uh, no, sir.

15  Q.  Not been docked in pay or anything like that?

16  A.  No, sir.

17  Q.  Have you worked in and around Denver your whole career?

18  A.  Pretty much the whole career, yes.

19  Q.  I'm going to switch gears.  You talked a little bit about

20  a non-class-specific defect list; is that right?

21  A.  I didn't bring up the non-class-specific, but --

22  Q.  Do you know what that is?

23  A.  Yes.

24  Q.  What is a non-class-specific defect list?

25  A.  There's certain defects that require 30 days.  There's

1    other defects that have actions that you have to take that are

2    not as severe, but at a certain date those also have to come

3    out.

4    Q.   How do you, as an employee, get your hands on a

5    non-class-specific defect list?

6    A.   Um, now we can print them up.  Before -- I mean, the

7    systems have changed a little bit.  We can go in and we can

8    print up the list of the defects that are due and the

9    non-class-specifics through the EAM.

10   Q.   So any employee in Denver, whether it's a track laborer or

11   a division engineer, can go in any day of the week any time

12   and find out exactly how many non-class-specific defect lists

13   are in a territory?

14   A.   I think so.  I know I can.  I can't speak for the other

15   people, but I do believe -- I know that the other foremen do

16   it most of the time and the inspectors.

17   Q.   You believe there's an issue with non-class-specific

18   defects remaining in service longer than they should; right?

19   A.   Yes.

20   Q.   You believe that's an issue today; is that right?

21   A.   Yes.

22   Q.   Who is the division engineer in Denver currently?

23   A.   It's -- oh, Manal Bishr.

24   Q.   Who is the roadmaster you report to?

25   A.   Now?

17-cv-00844-WYD-SKC                Yancey - Cross                IV - 962

1    Q.  Yeah.

2    A.  George Mukai.

3    Q.  When was the last time Mike Paz was the roadmaster in

4    Denver?

5    A.  Um, I'm going to say maybe October.  I'm not really

6    positive.  Last year.  It was October, November.  Had to have

7    been -- yeah, I'm not positive.  Probably have been the fall

8    of last year.

9    Q.  All right.  As a quick aside, did you ever work under Ryan

10   Akers?

11   A.  Yes, sir.

12   Q.  How was he as a manager?

13   A.  He was very good leader.

14   Q.  You enjoyed working with him?

15   A.  Yes, sir.

16   Q.  Did you ever suspect him of misconduct?

17   A.  Uh, at that time we didn't have a whole lot of access to

18   that, but my personal opinion, probably not.

19   Q.  I mean, you were working with him every day, and, you

20   know, you're talking about defects, what needs to be repaired

21   and all that --

22            MR. THOMPSON:  Your Honor, this is outside the scope

23   of cross and is now leading.

24            MR. GOMAN:  Your Honor, this is cross-examination.

25            THE COURT:  This is cross-examination.

1           MR. THOMPSON:  This is outside the scope of cross.

2   We didn't talk about Ryan Akers or anybody else.

3           THE COURT:  Overruled.

4   BY MR. GOMAN:

5   Q.  Let me start again.  Ryan Akers was a roadmaster in Denver

6   before Mr. Paz?

7   A.  Uh, yes.

8   Q.  You enjoyed working with him?

9   A.  Yes.

10  Q.  Thought he was a good leader and honest guy?

11  A.  As far as I know, yes.

12  Q.  You never reported him of engaging in any misconduct?

13  A.  No, sir.

14  Q.  And as far as you know, no one else did either; right?

15  A.  I can't speak for other people, but I know I didn't.

16  Q.  Let's fast-forward a little bit then.  When was the first

17  time you called BNSF's hotline to report misconduct or to

18  report anything, I guess?

19  A.  I'm not positive on the dates.  It was, um -- you guys

20  have a record of it.  I don't.  It's when everybody called.

21  It was the summer of probably '17, would be my guess.

22  Q.  Let me see if I can help us anchor that in time.

23  Mr. Fresquez is dismissed in May of 2016.

24  A.  Okay.

25  Q.  Does it sound right to you that in the fall of 2016, maybe

1   September or October, is when you first called the hotline?

2   A.   Could have been possible.  Yeah, that could have been it.

3   Q.   And you called to report Mr. Paz for engaging in a variety

4   of misconduct; right?

5   A.   That's correct.

6   Q.   You and how many other employees?

7   A.   I'm pretty sure it was at least eight more.

8   Q.   Did you report it anonymously, or did you report it using

9   your name?

10  A.   I did it anonymously.

11  Q.   Okay.  You said later there was some type of request to

12  interview employees about those reports?

13  A.   Yes.

14  Q.   I mean, you don't take an issue with human resources

15  following up on these reports, do you?

16  A.   Uh, no.

17  Q.   Okay.  And if what human resources did was they just tried

18  to identify people who would have been in safety briefings

19  with Mr. Paz, would you have had any issue with that approach

20  to follow up?

21  A.   No, but it was everybody on the list that called.  It

22  wasn't -- nobody outside of that scope.

23  Q.   How do you know who called?

24  A.   Because I know who called.  They talked to me.

25  Q.   So you all got together and talked about calling at the

1  same time, to make 9 or 10 or 11 calls about Mr. Paz on the

2  same day; right?

3  A.  I -- I don't know if it was on the same day, but we had

4  all had enough at that point, and most everybody was calling

5  within the next three days.

6  Q.  Mr. Goodnight was one of those people?

7  A.  Yes, sir.

8  Q.  Mr. Snow too?

9  A.  Yes, sir.

10 Q.  Both those gentlemen still work at BNSF?

11 A.  Yes, sir.

12 Q.  Didn't face any sort of formal discipline for having

13 called the hotline?

14 A.  Not for calling the hotline, but they have both had issues

15 since, I believe.

16 Q.  Was there another time you called the hotline?

17 A.  I -- no, not me.

18 Q.  I see.  So the one time you called it was in the fall of

19 2016; is that right?

20 A.  That sounds right.  I'm not positive on the dates.

21 Q.  Okay.  The whole time Mr. Fresquez was working as a track

22 inspector in Denver, did you ever call the hotline to report

23 supervisors were mistreating him?

24 A.  No, sir.

25 Q.  Did you ever call the hotline to report you felt like

1    supervisors were being unfair with Mr. Fresquez in safety

2    briefings?

3    A.  No, sir.

4    Q.  Do you know if Mr. Fresquez did?

5    A.  Uh, don't know.

6    Q.  Let's talk then about May 5th of 2016.  So this is -- to

7    help you with the date, this is the date of the

8    insubordination incident.  You are working -- you and a bunch

9    of people are working with, I don't know, a crew in Denver.

10   Is that right?

11   A.  Yes, sir, three of us.

12   Q.  What was -- were you on a crew with Jay Herzog?

13   A.  No, sir.  He was on surfacing gang.  We were section.

14   They're two different groups.

15   Q.  Got it.  And they do different things; right?

16   A.  Yes, sir.

17   Q.  Mr. Herzog leads his crew to do his repairs?

18   A.  Yes, sir, him and two machines, and I have a truck driver

19   and a laborer on my truck.

20   Q.  Got it.  Is it -- you guys -- all of you were doing some

21   work in the same area that day; right?

22   A.  Well, we were working, and Jay and Mike and them were down

23   at the other end, so . . .

24   Q.  You had what's called a window; is that right?

25   A.  I -- I believe so.  I'm not positive if we had a window

1   down there or not.

2   Q.  But if you guys --

3   A.  We had time to work down there, if that's --

4   Q.  Just so the jury knows what we're talking about, they stop

5   the trains.  They let the work crews get out there so you can

6   do whatever work you need to do on the track.

7   A.  That's correct.

8   Q.  And a window means it's over maybe a larger area so that

9   you can get in there and do a bunch of things.

10  A.  Yes, sir.

11  Q.  So that day -- and do you remember the couple days

12  previous having a window in south Denver?

13  A.  I honestly don't know.  I know we had problems with the

14  IJ, and I know we went down to fix it several times.

15  Q.  Could have been the case you had two or three days of work

16  to do down there.  You just don't remember.

17  A.  It's positive -- yeah, that could happen.

18  Q.  All right.  So that morning, May 5th, you had a safety

19  briefing; is that right?

20  A.  Yes, sir.

21  Q.  And this is -- so this is how you remember things.

22  Mr. Fresquez and Mr. Paz are arguing about a defect; is that

23  right?

24  A.  I don't know if it's arguing.  He -- Brandon was trying to

25  get help down there to work on it.  He had presented it to

 1    Mike.  I don't know if I consider it argument.

 2    Q.  I apologize.  So they are talking about a defect.

 3    A.  Okay.  Yes.

 4    Q.  That was meant to be a question.  They are talking about

 5    it.

 6    A.  Yes, sir.

 7    Q.  And it's one of those non-class-specific defects, as you

 8    recall?

 9    A.  I'm not sure if it was non-class or a class defect.  I'm

10    not positive.

11    Q.  You were talking about having to take it out of service.

12    A.  Because it was past its date.

13    Q.  And that applies to non-class-specific defects; right?

14    A.  Yes, at a certain date, yes.

15    Q.  Okay.  So they have a discussion about that, and is

16    that -- do you understand that to be the defect they were

17    talk -- that they eventually go out to try to measure?

18    A.  I believe so.

19    Q.  Okay.  Your understanding -- so let's get out to

20    trackside, right, where it's Mr. Fresquez, Mr. Herzog, and

21    Mr. Paz, later in the day.  Your understanding of what's going

22    on is Mr. Paz is telling Mr. Fresquez to measure track that

23    earlier that day Mr. Fresquez had measured.  Do I have that

24    basically right?

25    A.  That's correct.

1   Q.  So, in other words, he's telling him to remeasure a defect

2   that he had already measured earlier that day.

3   A.  I guess so.

4   Q.  You don't hear what they are talking about.

5   A.  Only what went on on the radio afterwards.  So, no, I

6   don't know beyond that.

7   Q.  So let's talk about that conversation on the radio.  You

8   are able to hear both Mr. Paz and Mr. Fresquez on the radio.

9   A.  That's correct.

10  Q.  It's obvious they are talking to one another; right?

11  A.  Yes, sir.

12  Q.  Have you listened to a dispatch recording of that --

13  A.  No, sir, never heard it.

14  Q.  -- conversation?

15          I'm going to show you what is in evidence as A-48.

16          Okay.  This is the portion of the investigation

17  hearing transcript where that dispatch recording was played.

18  Okay?

19  A.  Okay.

20  Q.  It records Mr. Fresquez saying:  "Nah, you guys already

21  made your decision.  You got a Foreman there, and you guys

22  have made your decision, so."

23          Is that essentially what you remember Mr. Fresquez

24  saying?

25          MR. THOMPSON:  Your Honor, I object.  I think we

17-cv-00844-WYD-SKC                Yancey - Cross                    IV - 970

1   should play the audio.  We have contested this is an accurate

2   transcription.

3              THE COURT:  Well, overruled.  This is

4   cross-examination.

5   BY MR. GOMAN:

6   Q.  Is it -- you don't remember verbatim, I'm guessing, what

7   Mr. Fresquez said that day.

8   A.  No, sir.

9   Q.  Does this generally, though, sound like what you remember

10  from the conversation?

11  A.  Just that first part, or the whole thing?

12  Q.  Why don't you read the whole thing.

13  A.  Uh, yes, sir.

14  Q.  Okay.  So when Mr. Fresquez says, "you guys already made

15  your decision.  You got a Foreman there, you've [sic] made

16  your decision," what do you remember Mr. Paz having said to

17  him to prompt that response?

18  A.  Um, I think he probably wanted him to take some

19  measurements.  He had already taken the measurements that day,

20  and Mike had already told him he's not taking it out of

21  service.  So Brandon felt it was pointless and, um -- I don't

22  know if it would have done any good to have him come down

23  there when he's already got the notes that he took earlier.

24  Q.  Okay.  So Mike Paz is telling Mr. Fresquez to come back

25  and measure the track; right?

1    A.  I suppose.  I don't -- I can't remember for sure, but with

2    only half of it I couldn't tell you.

3    Q.  Give us your best recollection as to what you remember.

4    You said on direct examination you remembered essentially what

5    Mr. Fresquez said; right?

6    A.  Yeah, I -- I'm thinking he probably wanted to come down

7    there and show him what they measured, you know, not

8    necessarily have Brandon measure it, but show what Jay and

9    Mike were measuring.  And he didn't want to go down there

10   because they already made their decision.  It was kind of a

11   waste of time for everybody.

12   Q.  Got it.  So Mr. Paz is telling him to come back; right?

13   A.  I suppose.  Yes.

14   Q.  And Mr. Fresquez isn't.

15   A.  Well, he was there for a while, and then he pulled down by

16   us.  So I don't know what happened outside the truck there at

17   that point.

18   Q.  Well, right.  They are not talking on their radio and have

19   it recorded by dispatch when they are standing next to each

20   other; right?

21   A.  Yeah, the whole time, so I don't know what happened until

22   they got in the trucks at that point.

23   Q.  So this is after Mr. Fresquez has driven away.  You are

24   listening to them on the radio.  Right?

25   A.  Yes, sir.

1   Q.  So your understanding -- well, let me ask this

2   differently.

3          Is insubordination a big deal at BNSF?

4   A.  Yes, sir.

5   Q.  It's known by every employee at BNSF that insubordination

6   will get you fired; right?

7   A.  Yes, sir.

8   Q.  And if what happened was Mr. Fresquez was told to do

9   something and for no good reason he just ignored it and left,

10  he just refused to do it, that's insubordination at BNSF;

11  right?

12  A.  I think it's kind of a gray area here.  He had already

13  taken the notes.  He had given the notes, and they were

14  measuring on their own.

15  Q.  So I have heard you say that, and I will just put it to

16  you that there's been testimony in this case that there was no

17  measurement that morning, that this was a geometry car

18  reported defect.

19  A.  I'm pretty sure Brandon had recorded it earlier when the

20  geo car -- when he had the job prior to also, and I was under

21  the understanding that he had measurements for it before.  I

22  don't know for sure.

23  Q.  Why would Mr. Herzog then be out there trying to measure

24  the track, if there's no point?

25  A.  I think Jay was just told to go down there.  He went down

1    there to see what the situation was.  We don't like to go in

2    blind, so . . .

3    Q.  Let's make it a hypothetical then.  Your understanding of

4    the insubordination rule at BNSF, that's what I'm interested

5    in.  If an employee, say it's a track inspector or a foreman,

6    is trackside, and he or she is told by the roadmaster, I need

7    you to measure this track.  We're just trying to verify this

8    defect.  That's a pretty typical request; right?

9    A.  Sure.  Yes.

10   Q.  It's the track inspector's job to measure the track;

11   right?

12   A.  Yes.

13   Q.  So if for no good reason the track inspector or the

14   foreman just says, No, I don't want to do that, and leaves,

15   that's insubordination; right?

16   A.  If there was no good reason, yes.

17   Q.  And that's a big deal at BNSF; right?

18   A.  Yes.

19   Q.  It's commonly understood that that's the type of behavior

20   that will get you fired at BNSF; right?

21   A.  Yes.

22          MR. GOMAN:  I don't have any more questions.

23          THE COURT:  All right.  Any redirect?

24          MR. THOMPSON:  Briefly.

25          THE COURT:  Well, we'll see if it's brief.

1              MR. THOMPSON:  I think two questions, Your Honor.

2              THE COURT:  That doesn't mean it will be brief.

3              THE WITNESS:  I'll do my part.

4              MR. THOMPSON:  Sorry.  I've already misspoke.  Three

5    questions.

6                        **REDIRECT EXAMINATION**

7    BY MR. THOMPSON:

8    Q.  You agree that refusing an order with no good reason is

9    insubordination.

10   A.  Yes, sir.

11   Q.  Does refusing to participate in illegal conduct qualify as

12   good reason?

13   A.  Good reason to not do it, if it was illegal?

14   Q.  Yeah.

15   A.  Yeah, I -- I wouldn't do it also.

16   Q.  Do you think Brandon was insubordinate that day?

17   A.  I don't believe so.

18             MR. THOMPSON:  Thank you.

19             THE COURT:  All right.  Any further recross, on that

20   limited issue?

21                      **RECROSS-EXAMINATION**

22   BY MR. GOMAN:

23   Q.  Is there anything illegal about measuring railroad track?

24   A.  Uh, no, sir.

25             MR. GOMAN:  Nothing further.

1            THE COURT:  All right.  You may step down.

2            THE WITNESS:  Thank you.

3            THE COURT:  This witness is excused.  Call your next

4   witness.

5            MR. THOMPSON:  Jason Snow.

6            COURTROOM DEPUTY:  Please raise your right hand.

7       (The witness was sworn.)

8            COURTROOM DEPUTY:  Please be seated.

9            Please state your full name, and spell your full name

10  for the record.

11           THE WITNESS:  Jason Snow.  Oh, sorry.  Jason Dean

12  Snow.  It's J-a-s-o-n.

13    **JASON DEAN SNOW, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

14  BY MR. THOMPSON:

15  Q.  Will you please tell the jury about you.

16  A.  I'm Jason Snow.  I have been with BNSF for eight years.

17  I'm currently a foreman for BNSF as of right now.

18  Q.  What does a foreman do?

19  A.  Uh, fix defects that are found by the track inspectors,

20  uh, that are given to us on a piece of paper.

21  Q.  Are you socially friends with Brandon Fresquez?

22  A.  Uh, I am on Facebook, but I do not talk to him on a

23  regular basis, no.

24  Q.  Prior to this case, have you seen him after he was

25  terminated?

1   A.  No, I have not.

2   Q.  You're testifying in support of him today.  Are you

3   concerned that BNSF will retaliate against you?

4   A.  Yes.

5   Q.  Why?

6   A.  Don't want to be fired.

7   Q.  What has caused you to be concerned that you might be

8   fired for testifying to the truth?

9   A.  All the things that have happened in the past.

10  Q.  Tell the jury a little bit about that.

11  A.  Defects disappearing.  Um, people having their hands in

12  the cookie jar basically.

13  Q.  Why are you testifying for Brandon anyway?

14  A.  I don't -- I think he was an asset to the company, and

15  when he was released, I think they made a terrible decision.

16  Q.  All right.  So I think you said you had reason to believe

17  that BNSF was misreporting or deleting defects.  Is that

18  right?

19  A.  Yes.

20  Q.  What were those reasons?

21  A.  'Cause I was a laborer at the time, and me and my foreman

22  never fixed any of them, and the list slowly got smaller and

23  smaller.

24  Q.  So defects were disappearing that you hadn't fixed?

25  A.  Yes.

1    Q.  Well, could somebody else have fixed them?

2    A.  At the time it was the section I was on and another

3    section, so no.

4    Q.  Are rails at BNSF still in service that should be out of

5    service because of old defects?

6              MS. DALE:  Object to relevance.

7              THE COURT:  Overruled.

8    A.  As far as I know, yes.

9    BY MR. THOMPSON:

10   Q.  We were -- we subpoenaed you for this case; right?

11   A.  Yes.

12   Q.  You don't have a choice to be here.

13   A.  Yeah, no choice.

14   Q.  Prior to subpoenaing, had you ever talked to us?

15   A.  No.

16   Q.  Prior to two days ago when you came down for trial, had

17   you ever met or talked to us on the phone?

18   A.  No.

19   Q.  Did we have any idea what you were going to say?

20   A.  No.

21   Q.  We met for dinner two nights ago, though; right?

22   A.  Yes, we did.

23   Q.  Did I tell you what questions I was going to ask, or did

24   you just tell me what had happened?

25   A.  I told you what was happening.

17-cv-00844-WYD-SKC             Snow - Direct                IV - 978

1   Q.  Did I ever tell you what questions I was going to ask?

2   A.  No, sir.

3   Q.  You also talked to BNSF's lawyers; right?

4   A.  Yes, I did.

5   Q.  Why?

6   A.  Because I was told to.

7   Q.  Did you have a choice?

8   A.  No.

9   Q.  Did they ask you what kind of an employee Brandon Fresquez

10  was?

11  A.  Yes.

12  Q.  What did you tell them that?

13  A.  He was a great -- great employee and what he did.

14  Q.  What made him a great employee?

15  A.  He knew the book.  He knew the rules.  He --

16  Q.  Did he follow them?

17  A.  He followed the rules to a T.

18  Q.  All right.  So one of the things BNSF has done in this

19  case is, um, paint Brandon to be a poor employee due to a

20  record of suspension and a formal reprimand in 2010 and 2011.

21  In your experience at BNSF, is there -- I guess, is it unusual

22  to have that type of discipline on your record from five years

23  ago?

24          MS. DALE:  Object to foundation.

25          THE COURT:  Overruled.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    A.  I think it is.

2    BY MR. THOMPSON:

3    Q.  Does everybody at BNSF have discipline on their record?

4    A.  Some more than others.

5    Q.  Especially the guys that stand up for safety issues?

6    A.  Yes.

7            MS. DALE:  Object to leading.

8            THE COURT:  Sustained.  And the jury is instructed to

9    disregard the answer.

10   BY MR. THOMPSON:

11   Q.  Who are the people that get formal reprimands and record

12   suspensions on their record?

13           MS. DALE:  Object to foundation.

14           THE COURT:  Overruled.

15   A.  If you -- if you have an accident, you get reprimanded.

16   BY MR. THOMPSON:

17   Q.  What about if you don't have an accident?

18           Here's what I really want to know.  Does raising

19   safety concerns in any way affect who gets disciplined at

20   BNSF?

21           MS. DALE:  Objection.

22   A.  I think it does.

23           THE COURT:  Wait a minute.  Sustained.  So again the

24   jury is instructed to disregard the answer.

25   BY MR. THOMPSON:

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Q.  Do you have reason to believe -- strike that.

2          Do you believe that standing up for safety concerns

3   can result in you getting disciplined?

4   A.  Yes.

5   Q.  Tell us about that.

6          MS. DALE:  Object to foundation, Your Honor.

7          THE COURT:  Overruled.

8   A.  Like if we -- if we see something that's not correct or

9   right, we will bring it to attention, and they want it fixed

10  regardless.  It's about production.

11  BY MR. THOMPSON:

12  Q.  If I'm understanding you correctly, BNSF puts production

13  over safety?

14  A.  As --

15         MS. DALE:  Objection:  leading.

16  A.  Sometimes I see it that way.

17         THE COURT:  That is leading.

18         MR. THOMPSON:  I will re-ask it, Your Honor.

19         THE COURT:  So the objection is sustained.

20  BY MR. THOMPSON:

21  Q.  Does BNSF ever put productivity over safety?

22  A.  I think they do.  They pride themselves in safety, but if

23  you ever go out on a real gang or production gang, it's all

24  about production.

25  Q.  Has Michael Paz ever done that?

17-cv-00844-WYD-SKC                Snow - Direct                    IV - 981

1    A.  As of what?

2    Q.  Sorry.  That's a poor question.

3            Was Michael Paz ever your supervisor?

4    A.  Yes.

5    Q.  Did Michael Paz ever put productivity ahead of safety?

6            MS. DALE:  Object to foundation.

7    A.  I think so.

8            THE COURT:  Sustained.  And I will instruct -- tell

9    the jury to disregard the answer.

10   BY MR. THOMPSON:

11   Q.  Let's talk about May 5th, 2016, the last day Brandon

12   worked for BNSF.  Did you see Mike Paz, Brandon Fresquez, and

13   Jay Herzog at a defect?

14   A.  Yes.

15   Q.  Earlier that morning, was that defect discussed in a

16   safety briefing?

17   A.  Yes, it was.

18   Q.  Please tell the jury about that.

19   A.  It was a defect that was not protected, and Brandon was

20   going to take it out of service because it was not fixed at

21   the time or in the certain amount of time that it needed to be

22   fixed.

23   Q.  Did Michael Paz in any way object to Brandon saying he

24   wanted to take it out of service?

25   A.  Yes, he did.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC            Snow - Direct                    IV - 982

1   Q.  What did Michael Paz say?

2   A.  He asked Brandon if he thinks he's the smartest person in

3   the room.

4   Q.  Does Brandon, in your experience, know the FRA regulations

5   better than Michael Paz?

6   A.  Yes, I think he does.

7   Q.  Have you met anybody at BNSF that knows the regulations

8   better than Brandon?

9   A.  No.

10  Q.  So going back to May 5th, 2016, when the guys are at the

11  defect can you see them?

12  A.  Yes.

13  Q.  How far away are you?

14  A.  Three-tenths of a mile.

15  Q.  You can't hear them when they are out on the track,

16  though.

17  A.  No.

18  Q.  At some point is there a radio call between Michael Paz

19  and Brandon Fresquez?

20  A.  Yes.

21  Q.  Could you hear both sides of that conversation?

22  A.  Yes, I could.

23  Q.  So in this case I will represent to you BNSF has produced

24  the audio from that.  However, for whatever reason, it

25  contains only Brandon Fresquez's side of the conversation.

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC                Snow - Direct                    IV - 983

1    BNSF has said that's because Mike was not in a truck and using

2    a mic outside of the truck, and Brandon was in a truck which

3    has a stronger radio.  Do you have reason to dispute that

4    contention?

5    A.  Yes.

6    Q.  What?

7    A.  'Cause I witnessed him in his truck driving past us

8    talking to Brandon on the radio.

9    Q.  Him being who?

10   A.  Michael Paz.

11   Q.  So when you heard the conversation, Michael Paz was in his

12   truck?

13   A.  Yes.

14   Q.  You saw that?

15   A.  Yes.

16   Q.  Could you hear both sides of the conversation?

17   A.  Yes, I could.

18   Q.  Did Michael Paz ever order Brandon Fresquez to repair

19   the -- or to remeasure the defect?

20   A.  No, he did not.

21   Q.  Do you know whether that defect actually did exist?

22   A.  As -- yes.

23   Q.  Was it repaired that day?

24   A.  No.

25   Q.  How do you know that?

17-cv-00844-WYD-SKC                 Snow - Direct                       IV - 984

1    A.  Because it would have been a very extensive project.

2    Q.  What makes it an extensive project?

3    A.  'Cause of where it sat between two switches.

4    Q.  Okay.  Explain to the jury, who is not in the railroad,

5    why that's a big deal.

6    A.  So basically we would have had to undo both switches and

7    realign the defect that was found.

8    Q.  Is that the type of repair where everybody in Denver would

9    have known it was done?

10   A.  Yes.  Everybody would have been there.

11   Q.  As far as you know, has that defect ever been repaired?

12   A.  No.

13   Q.  Is that track still in service?

14   A.  Yes.

15   Q.  After Brandon Fresquez was removed from service, how did

16   Michael Paz act?  Was he happy? upset? sad?

17   A.  He was happy.

18   Q.  Tell us about that.

19   A.  He basically told certain people not to follow other

20   people or else they'll be fired as well.

21   Q.  Did he ever brag about firing Brandon Fresquez?

22   A.  Yes.

23   Q.  Why do you believe Brandon Fresquez was fired?

24             MS. DALE:  Object to foundation.

25             THE COURT:  Sustained.

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1   A.  I think he was fired --

2            THE COURT:  Sustained.  You can't answer.

3            THE WITNESS:  Sorry.

4   BY MR. THOMPSON:

5   Q.  Did you ever call BNSF's hotline?

6   A.  Yes, I did.

7   Q.  About what?

8   A.  About favoritism.

9   Q.  By who?

10  A.  Michael Paz.

11  Q.  Who was he favoring?

12  A.  His friends.  I'd see it that way.

13  Q.  Were those people that stood up for safety concerns or did

14  not stand up for safety concerns?

15           MS. DALE:  Object to foundation.

16           THE COURT:  Overruled.

17  A.  People that, uh, like, did what he asked.

18  BY MR. THOMPSON:

19  Q.  After you reported Michael Paz to BNSF's hotline, did his

20  treatment of you change?

21  A.  Yes.

22  Q.  What did he do?

23  A.  Started trying -- or he started to record his

24  conversations in the morning.

25  Q.  What do you mean by that?

1    A.  Like he'd bring a recorder in and have recorded

2    conversations with us during the briefing.  He'd be more

3    formal over the radio, everything.

4    Q.  Did he tell you that he was recording you?

5    A.  No.

6    Q.  Did he hide the recording device?

7    A.  Yes.

8    Q.  Do you have any understanding as to why he hid the

9    recording device?

10   A.  I have no idea.

11          MS. DALE:  Objection:  lack of personal knowledge.

12          THE COURT:  Overruled.

13   BY MR. THOMPSON:

14   Q.  You can answer.

15   A.  I have no idea why he tried to hide it from us.

16   Q.  While he was recording you, did he ever say things to try

17   and entrap you?

18   A.  Yes.

19   Q.  All right.  Lastly, in this case Brandon has produced all

20   of his text messages, some 1800 pages.  The only witness to do

21   that.  BNSF has gone through them and found certain texts,

22   kind of picked through and picked, I don't know, 25 that they

23   want to talk about.  In those there's discussions between you

24   guys about pulling tracks out of service for -- you know, to

25   get you guys overtime.  Do you recall ever saying anything

1    like that?

2    A.  Well, it's just like an ongoing joke that we have, but we

3    have more than enough work to do.  He would never do it.

4    Q.  He being Brandon?

5    A.  Yes, him being Brandon.

6             MR. THOMPSON:  I have nothing further.

7             THE COURT:  Cross-examination.

8                        **CROSS-EXAMINATION**

9    BY MS. DALE:

10   Q.  Good morning, Mr. Snow.  It's still morning, I guess.

11            Is it correct that you met with Mr. Goman and with a

12   HR representative about two years ago, a couple years ago, to

13   discuss this case?

14   A.  Yes.

15   Q.  And you talked about some of the same things that you just

16   talked about in your testimony?

17   A.  Yes.

18   Q.  And you have not been disciplined since then; correct?

19   A.  No.

20   Q.  Mr. -- you mentioned that you had met -- you met with

21   Mr. Thompson and Mr. Fresquez two nights ago.

22   A.  Yes, I did.

23   Q.  To discuss your testimony?

24   A.  Yes.

25   Q.  And you weren't subpoenaed to appear for that; right?

1  A.  No.

2  Q.  You appeared voluntarily?

3  A.  Yes.

4  Q.  Let's talk about what you had just left off with, which

5  was the hotline complaint.  One of the issues that you raised

6  in the hotline complaint was that Mr. Paz said he would send

7  employees home if their phone went off during the morning

8  briefing or if they walked in late.  Was that one of your

9  complaints?

10  A.  Yes.

11  Q.  So basically he was directing employees to pay attention

12  and be on time; right?

13  A.  Yes.

14  Q.  Another complaint that you had was you had a concern that

15  Mr. Paz was going to hire contractors to take current

16  employees' jobs; is that correct?

17  A.  That is correct.

18  Q.  Okay.  So he told employees that if there was a job out

19  there that had to be done immediately and you guys weren't

20  available, he would bring someone else in to do it; is that

21  right?

22  A.  Yes.

23  Q.  You did not in your complaint say that he was improperly

24  removing defects from the system; right?

25  A.  No.

 1   Q.  You did not in the complaint say that he was improperly

 2   repairing defects; is that correct?

 3   A.  No.

 4   Q.  In that complaint you did not allege that he was ordering

 5   employees to violate safety rules; correct?

 6   A.  No.

 7   Q.  And you actually did not file your complaint anonymously.

 8   You had your name in there; right?

 9   A.  Yes.

10   Q.  And you have not been disciplined since that time;

11   correct?

12   A.  No.

13   Q.  You are aware that BNSF conducted an investigation of

14   those hotline complaints?

15   A.  Yeah.

16   Q.  And they brought in some HR people, and they interviewed

17   the people that they were aware that complained; is that

18   right?

19   A.  As far as I know, yes.

20   Q.  Do you have any idea what happened with that

21   investigation?

22   A.  Absolutely nothing happened.

23   Q.  Okay.  Well, let me ask it this way.  Do you -- were you

24   aware of whether or not Mr. Paz was disciplined as a result of

25   the investigation?

 1   A.   No, he was not.

 2   Q.   How do you know that?

 3   A.   'Cause he still works here.

 4   Q.   Okay.  So you know he wasn't fired as a result of the

 5   investigation.

 6   A.   Yes.

 7   Q.   Do you have any idea of whether he was disciplined,

 8   something less than termination?

 9   A.   That I have no idea.

10   Q.   Okay.  If somebody at BNSF told you to do something

11   unsafe, you would stand up for that; right?

12   A.   Yes, I would.

13   Q.   You would disagree.  And that's called the empowerment

14   rule?

15   A.   Yes.

16   Q.   Have you invoked that before?

17   A.   I have.

18   Q.   Have you reported a foreman for doing something improper?

19   A.   No.

20   Q.   With respect to your time?

21   A.   No.

22   Q.   You don't recall reporting that someone was -- a foreman

23   was entering your time improperly and you weren't getting

24   paid?

25   A.   No, I have not.

17-cv-00844-WYD-SKC                    Snow - Cross                    IV - 991

1   Q.  With respect to the defects, you said that there was

2   occasions where a defect would just disappear from the system;

3   correct?

4   A.  Yes.

5   Q.  You are aware that there were some glitches with the

6   electronic reporting system; correct?

7   A.  I have -- I am aware with the new EAM system that there

8   was glitches, yes.

9   Q.  There were glitches with the old TIMS system too; correct?

10          MR. THOMPSON:  Objection, Your Honor --

11  A.  Not that I know of.

12          MR. THOMPSON:  -- foundation.

13          THE COURT:  What are you objecting to?  The last

14  question?

15          MR. THOMPSON:  Yeah, asking him if he knows anything

16  about the computer system glitches.

17          THE COURT:  Overruled.  This is cross-examination.

18  He can say what he knows, if he knows anything.

19  BY MS. DALE:

20  Q.  Did you ever work under the TIMS system?

21  A.  No.  Well, I never had access to it.

22  Q.  Okay.  Were you aware -- did you ever hear that there were

23  some glitches with the TIMS system?

24  A.  No.

25  Q.  You're aware -- but you believe there are glitches with

17-cv-00844-WYD-SKC                    Snow - Cross                      IV - 992

1    the EAMS system, the current system?

2    A.  Yes.

3    Q.  Where defects will disappear as a result of computer

4    issues?

5    A.  Yes.

6    Q.  Okay.  So let's turn to the date of the incident for which

7    Mr. Fresquez was disciplined.

8            So you were not present at the location where

9    Mr. Fresquez, Mr. Paz, and Mr. Herzog were talking; is that

10   correct?

11   A.  That is correct.  I was farther down the track.

12   Q.  Okay.  And you are a foreman currently; correct?

13   A.  I am currently a foreman.

14   Q.  It's not unusual for a foreman to call an inspector to

15   help locate a defect, is it?

16   A.  No.  We do it all the time.

17   Q.  Okay.  And you mentioned that you heard Mr. Paz's portion

18   of the conversation with Mr. Fresquez after Mr. Fresquez had

19   driven off; correct?

20   A.  Yes.

21   Q.  And you heard Mr. Paz tell Mr. Fresquez to come back and

22   measure the defect; correct?

23   A.  Yes.

24   Q.  You are aware that insubordination is a big deal at BNSF?

25   A.  Yes.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                  Snow - Cross                        IV - 993

1   Q.   That's a fireable offense?

2   A.   Yes.

3   Q.   Mr. Thompson mentioned in his direct that a lot of people

4   have discipline on their employee record.  It's not uncommon.

5   Correct?  Do you remember him saying that?

6   A.   Yes.

7   Q.   You don't have any discipline on your employee record, do

8   you?

9   A.   I have been to investigation before, yes.

10  Q.   You have been to investigation?  Do you have any

11  discipline on your record currently?

12  A.   No.  It got cleaned.

13          MS. DALE:  Your Honor, if I could have one moment.

14          THE COURT:  You may.

15          MS. DALE:  All right.  Can we pull up A-79?  And go

16  to page 116.

17          And, Your Honor, the entirety of the text messages

18  have been admitted?

19          THE COURT:  I know that.

20          MS. DALE:  Okay.

21          THE COURT:  So you don't have to say something I

22  know.

23          MS. DALE:  I apologize.

24  BY MS. DALE:

25  Q.   Okay.  Mr. Snow, is your phone number (719) 244-0308?

1   A.  Yes, it is.

2   Q.  Do you recognize these text messages?  And you can flip

3   through them, if it's helpful.

4   A.  How do you do that?

5   Q.  Um, okay, maybe you can't.  Sorry.

6        Does this look familiar?

7   A.  Yes.

8   Q.  So let's start at the beginning of the first page.

9   Mr. Fresquez is asking you if this is Jason Snow; correct?

10  A.  Yes.

11  Q.  And is this after you were noticed for the investigation

12  that you just mentioned?

13  A.  Yes.

14  Q.  Okay.  And he indicates -- he's asking you for a picture

15  of your investigation.  Do you know why he was asking you for

16  that?

17  A.  He just wanted to see what it was about.

18  Q.  Was he the union president at that time?  Or do you know?

19  A.  I don't remember.

20  Q.  Did he have some involvement in the union?

21  A.  Yes.

22  Q.  Okay.  And so turning to the next page, there's some

23  communications between you and Mr. Fresquez about the

24  investigation.  And tell me what's going on there.

25  A.  So in the rule book it states that you have to be properly

1   trained on a machine before being released to run it.

2   Q.  Okay.

3   A.  And when this accident occurred, I asked him if he knew,

4   like, what I could do to kind of save my skin.

5   Q.  Okay.

6   A.  And I was not properly trained on it at the time of the

7   accident.

8   Q.  Okay.  So he's helping you formulate a defense for the

9   investigation hearing.

10  A.  Yes.

11  Q.  Okay.  If you go down to the text message that's 3/30/2016

12  at 17:56, and if you could read that one for me.

13  A.  Okay.  The way I see it, according to the rules, you

14  advised your supervisor you needed to be trained.  You were

15  told to run it without the proper training.  You were not

16  certified that you know -- that you were knowledgeable or

17  skillful on the machine yet.  You were not being supervised.

18  You were following instructions to operate the machine.

19  That -- or machine.  This conversation stays between us.  No

20  one needs to get out about it.  I'll talk to Jim Varner in the

21  morning.

22  Q.  So he's giving you advice on what to say at the hearing;

23  correct?

24  A.  Yes.

25  Q.  Do you have any idea why he said that there -- the

1   conversation should stay between you?

2   A.  'Cause there's people out here that like to change

3   conversations.

4   Q.  Okay.  So let's move to the next page.  So this is 118.

5   Is this you sending the charge to Mr. Fresquez?

6   A.  Yes.

7   Q.  Okay.  And if you look in the charge itself, do you see at

8   the bottom of the first paragraph where it says "for the

9   purpose of ascertaining the facts and determining your

10  responsibility, if any, in connection with your alleged

11  failure to properly operate equipment resulting in collision

12  with damage to equipment on March 28, 2016"?  Do you see that?

13  A.  Yes.

14  Q.  So you knew what the hearing was going to be about.

15  A.  Yes, I did.

16  Q.  Okay.  And then turning to the next page, the bottom text,

17  is that Mr. Fresquez sending you the rule that you were going

18  to invoke to defend yourself?

19  A.  Yes.

20  Q.  Okay.  And then turning to the next page, if you could

21  flip -- read through that.

22          And so is this you and Mr. Fresquez continuing to

23  talk about how to defend this case at hearing?

24  A.  Yes.

25  Q.  Okay.  And then go to the bottom, and this one sort of

1   goes over to the next page, but can you read that one that's

2   at 8:42?

3   A.  Okay.  Going to talk to Jim Varner.  The more info we have

4   the better off we will -- or we are.  Jay Herzog said he will

5   be a witness to say that you were not trained nor were being

6   supervised.  The way I see it -- see it you were just

7   following the instructions given to you by your supervisor.

8   I'll let you know what Jim says about it later.

9   Q.  Okay.  So did Brandon Fresquez ask Jay Herzog to be a

10  witness at your hearing?

11  A.  Yes.

12  Q.  And did Jay Herzog --

13  A.  Yes.

14  Q.  -- appear?

15          Did you get the hearing officer to order Jay Herzog

16  to show up, or did he do it voluntarily?

17  A.  He did it voluntarily.

18  Q.  And what happened with this investigation hearing?

19  A.  It went all the way to arbitration, and then the

20  arbitrator found me not guilty due to the lack of evidence

21  that BNSF provided.

22  Q.  Okay.  If you look at the -- let's see.  8:55 on page 121.

23  Do you see where Mr. Fresquez says, You got off, all charges

24  dropped, and then your response is, Yep, not enough evidence

25  against me?  Is that correct?

1    A.  Yes, that is correct.

2    Q.  Okay.

3            MS. DALE:  Can I have one moment, please.

4            THE COURT:  Go ahead.

5    BY MS. DALE:

6    Q.  Okay.  So let's just clarify the timing on this really

7    quickly.  March 30th, 2016 was when you got the notice for the

8    investigation?

9    A.  Yes.

10   Q.  And then you're communicating with Mr. Fresquez

11   March 31st?  Correct?  About the hearing?

12   A.  Yes.

13   Q.  And then the notice indicates that the hearing itself was

14   going to be held April 7th, 2016.

15   A.  Yes.

16   Q.  Okay.  And then you knew at least by May 13th, so just

17   over a month later, that you would not -- you were not

18   charged.  So sometime between April 7th and May 13th you knew

19   that you were not going to be disciplined.

20   A.  I got my certified letter in the mail on, like, day 25, I

21   do believe it was.

22   Q.  And it indicated that there was going to be no discipline?

23   A.  Yes, ma'am.

24   Q.  Because of the hearing?

25   A.  Yes.

17-cv-00844-WYD-SKC          Snow - Redirect                    IV - 999

1   Q.  Okay.  Thank you.

2          THE COURT:  Any redirect?

3          MR. THOMPSON:  Yes, Your Honor.

4                  **REDIRECT EXAMINATION**

5   BY MR. THOMPSON:

6   Q.  I'd like to ask you briefly about these e-mails.  BNSF put

7   you on a machine you were not qualified for; is that right?

8   A.  Yes.  Well, I bid for the machine to try to get training

9   for it so I knew how to run it because I have a date for it.

10  Q.  And then they didn't train you?

11  A.  No.

12  Q.  I understood.  What you said is not going to read

13  correctly.

14          Did they train you on the machine?

15  A.  No, they did not train me properly on the machine.

16  Q.  That violates BNSF regulations; right?

17  A.  Yes.

18  Q.  You were subsequently charged with an accident on that

19  machine.

20  A.  Yes.

21  Q.  However, you can't be held liable because they didn't

22  train you.

23  A.  Yes.

24  Q.  BNSF -- or, sorry.  Brandon Fresquez, as your union

25  president, knew that.

1    A.   Yes, he did.

2    Q.   So he shared that information with you.

3    A.   Yes.

4    Q.   Did he ever instruct you to lie?

5    A.   No.

6    Q.   Did he ever instruct anybody to lie?

7    A.   No.

8    Q.   He was just doing what a union president should do; right?

9    A.   Yes.

10   Q.   And it's because he knew the rules.

11   A.   Yes.

12            MR. THOMPSON:   Thank you.

13            THE COURT:   Any recross?

14                    **RECROSS-EXAMINATION**

15   BY MS. DALE:

16   Q.   I want to make sure that we're absolutely clear on the

17   record.  When you received your letter 25 days later, that was

18   a finding that you were not responsible for the discipline

19   that resulted from the hearing; correct?

20   A.   Yes.  The letter stated that there was not enough evidence

21   brought forth, and all charges were dropped, basically.

22   Q.   Not enough evidence brought forth at the hearing; correct?

23   A.   Yes.

24   Q.   It was not reviewed by the public law board?

25   A.   It went to an arbitrator, so like a third-party source

17-cv-00844-WYD-SKC                Snow - Recross                IV - 1001

1    that sees it.

2    Q.  You believe that in the less than -- in the 25 days

3    between the hearing and when you received that letter it went

4    to an arbitrator?

5              MR. THOMPSON:  Object, Your Honor --

6    A.  That's what they told me.

7              MR. THOMPSON:  -- asked and answered, and cumulative.

8              THE COURT:  Overruled.  Let's ask it again.  Go

9    ahead.

10   BY MS. DALE:

11   Q.  That's what who told you?

12   A.  That's what I was always told.  After the investigations

13   are held, it goes to a third party.

14   Q.  After an investigation is held and there is a disciplinary

15   conviction, then it can be sent to an arbitrator.  Is that

16   your understanding?

17   A.  Yeah.  So basically they found me guilty regardless, and

18   it went to an arbitrator.

19   Q.  The letter you got said you were found not responsible.

20   And that's from BNSF, correct, not the arbitrator?

21   A.  That's what the letter states, but you are always guilty.

22   Like if you were to get into any damage to vehicles or

23   anything, you're -- you're at fault.

24   Q.  You were always guilty, but you were found not guilty

25   after a hearing; correct?

1    A.   25 days later.

2    Q.   Based on the hearing.

3    A.   Based on the hearing and my -- what I presented to them

4    to -- the rule that I gave them that I was not properly

5    trained.

6              MS. DALE:  Thank you.

7              THE COURT:  All right.  That's it.

8              MR. THOMPSON:  Nothing, Your Honor.  I don't have

9    anything.

10             THE COURT:  No, I know.

11             You are excused.

12             THE WITNESS:  Okay.

13             THE COURT:  All right.  Now, we are going to take our

14   lunch break in a minute, but I want to sort of figure out what

15   else we can get accomplished today.  Who are your remaining

16   witnesses?

17             MR. THOMPSON:  Derek Goodnight, who should take less

18   than a half hour.  George Gavalla, who should take an hour.

19             THE COURT:  I would encourage you to do everything

20   humanly possible to avoid repetition.  I heard repetition with

21   these last couple witnesses.  So let's, if we can, focus on

22   things that have not been previously presented.

23             MR. THOMPSON:  Yes, Your Honor.

24             THE COURT:  And who is the hour-long witness?

25             MR. THOMPSON:  George --

1          MR. STONE:  Our expert witness, Your Honor.

2          THE COURT:  All right.  How long do you think the two

3    of them will take?  A couple of hours?

4          MR. THOMPSON:  Yeah, at most.

5          THE COURT:  All right.  And then is the defendant

6    ready to present witnesses?

7          MR. GOMAN:  Yes.

8          THE COURT:  Okay.  All right.  So I'm going to ask

9    this question later but not now.  I want to see if we are on

10   track to get the evidence portion of this case concluded by

11   tomorrow.  So just think about that, because that's what I'd

12   like to see happen.  I can't order it, but I'm encouraging you

13   to make it happen, if at all possible, in a way that's fair to

14   both sides.

15         All right.  We are going to take a lunch break for an

16   hour and 15 minutes, and we will start again at 1:30 p.m.

17      (Proceedings recessed 12:13 p.m. to 1:35 p.m.,

18      resuming outside the presence of the jury.)

19         THE COURT:  All right, let's bring the next witness

20   in, and bring the jury in.

21      (Jury in at 1:36 p.m.)

22         THE COURT:  All right, have a seat.

23         Call the next witness by name.

24         MR. THOMPSON:  Derek Goodnight.

25         COURTROOM DEPUTY:  Please raise your right hand.

17-cv-00844-WYD-SKC          Goodnight - Direct                    IV - 1004

1            THE WITNESS:  Yes, sir.

2        (The witness was sworn.)

3            COURTROOM DEPUTY:  Please be seated.

4            THE WITNESS:  Thank you, sir.

5            COURTROOM DEPUTY:  Please state your full name, and

6    spell your full name for the record.

7            THE WITNESS:  Derek Goodnight.  D-e-r-e-k,

8    G-o-o-d-n-i-g-h-t.

9        **DEREK GOODNIGHT, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

10   BY MR. THOMPSON:

11   Q.  Good afternoon, Mr. Goodnight.  Will you please tell the

12   jury about yourself.

13   A.  Um, I have worked for BNSF for seven years.  I have a wife

14   and two babies.  And currently in a track inspector position

15   in the yard in Denver.

16   Q.  In this case we wanted to subpoena you to come in and

17   testify; right?

18   A.  That's correct.  You did have to subpoena me.  I, uh --

19   Q.  You did not want to be subpoenaed?

20   A.  I did not want to be subpoenaed.  I didn't want to be

21   involved.

22   Q.  I'm going to show you -- just the witness -- what is

23   marked Plaintiff's Exhibit 57.

24            Do you recognize this document?

25   A.  Yes, sir.  It's a e-mail from me.

17-cv-00844-WYD-SKC          Goodnight - Direct                    IV - 1005

1   Q.  This is an e-mail you wrote?

2   A.  Yes, sir.

3   Q.  Is it in response to us trying to locate you to subpoena

4   you to testify today?

5   A.  Correct.

6          MR. THOMPSON:  We request to publish Plaintiff's

7   Exhibit 57 to the jury.

8          THE COURT:  You want to admit it?

9          MR. THOMPSON:  Yes, Your Honor.

10          THE COURT:  Okay.  Any objection?

11          MR. GOMAN:  Yeah, I object.  It's hearsay.

12          THE COURT:  Let me look at it.

13          Well, this is hearsay.  I'm going to sustain the

14   objection, but you may inquire, if you choose to, about some

15   of the things that are referenced there.

16          MR. THOMPSON:  Sure.

17   BY MR. THOMPSON:

18   Q.  Did you ever communicate to our office that you did not

19   wish to participate in this trial?

20   A.  Yeah, verse -- well, with this e-mail here.

21   Q.  And what did you say in the office -- in the e-mail was

22   the reason for that?

23   A.  I -- I just didn't want to like -- I feel like, uh, didn't

24   want to be a target.  Like I have too much to risk at home

25   with two babies and a wife.  And just really want to do my job

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   and go home and spend time with them.  And feel like I've been

2   on the radar for several years now.  I just want to -- in the

3   past I stood up for what was right, and, uh, nothing came

4   about it.  And just didn't want to further be a target.

5   Q.  Were you concerned that by coming to testify for

6   Mr. Fresquez, BNSF would retaliate against you?

7   A.  That is a concern.  I just -- like he's lost his job.  Jay

8   Herzog has lost his job.  I just -- I felt like everyone

9   involved . . .

10  Q.  All right.  We were at some point able to actually find

11  you and subpoena you?

12  A.  You did.  You had to find me and issued me a subpoena.

13  Q.  So you didn't have a choice in being here?

14  A.  No, sir.

15  Q.  I appreciate, um, the precarious position you are in with

16  your boss's boss's boss sitting right here and you testifying

17  about the company.  So I'll tell you what.  I'm going to ask

18  as little questions as I can.  If at any point you get

19  uncomfortable with the question and what the answer will be,

20  you let me know, and I will see if I can rephrase it.

21  A.  Okay.

22  Q.  But there's some questions I need to ask you.

23  A.  Yeah, I understand.

24          MR. THOMPSON:  I'm going to show just the --

25  A.  Sure.

1          MR. THOMPSON:  -- witness Plaintiff's Exhibit 23.

2    Pages 1 through 4 have already been received.  I am going to

3    show him pages 5 and 6.

4    BY MR. THOMPSON:

5    Q.  Do you recognize pages 5 and 6?

6    A.  Yes, sir.  That is my handwriting.

7    Q.  Are these contemporaneous notes that you recorded?

8    A.  Yes.

9    Q.  Was it when Mr. Paz was speaking?

10   A.  Um, I know, uh -- these are just notes over probably a

11   couple years of things that were, like, specifically happening

12   to me.  And then I believe -- it's been a while, but there's

13   one, like, on a Holiday Inn letterhead, and that was a

14   specific, uh, safety meeting, and that -- that note I was,

15   like, writing down verbatim, word for word.

16   Q.  Okay.

17   A.  But the other notes I believe are just my account of --

18   yeah, here's a safety meeting one.

19   Q.  All right.  So page 6 is the contemporaneous one, the one

20   you wrote down in real time?

21   A.  Yeah, that's verbatim, word for word.

22   Q.  Okay.  And page 5 is notes that you took over the -- a

23   period of time, it sounds like.

24   A.  Correct.

25   Q.  About what you were witnessing or what was happening to

1  you at BNSF?

2  A.  Yeah, and then specifics happening to me.

3       MR. THOMPSON:  Plaintiff offers the remaining pages

4  of Plaintiff's Exhibit 23.

5       MR. GOMAN:  Your Honor, I object:  401 and 403.

6       THE COURT:  Okay.  The remaining pages, as I

7  understand it, are pages 5 and 6.  I don't find merit in the

8  objection, and pages 5 and 6, which have been authenticated

9  and identified by this witness as something he wrote, are

10 received in evidence.

11    (Plaintiff's Exhibit 23:5-6 received.)

12 BY MR. THOMPSON:

13 Q.  All right.  I've highlighted a couple notes.  I don't want

14 to ask you about the whole thing, again, because I'm

15 sympathetic to your concern, but there are some of the notes

16 I've highlighted that I need to ask you about.  Okay?

17 A.  Yes, sir.

18 Q.  So right here I see it says:  "Bullying guys to do things

19 they are not comfortable with or feel unsafe about."

20       Did I read that correctly?

21 A.  Correct.  Um, just -- it was like, uh, you will -- like,

22 like threatening.  You will do this, you know, no ifs, ands,

23 or buts.

24 Q.  Was that about Michael Paz?

25 A.  No, it was from Michael.

 1   Q.  It was Michael Paz that was doing --

 2   A.  It was Mike, yeah.

 3   Q.  The next highlight in green, it says:  "Fearing

 4   retaliation...has already fired other guys."

 5           Do you see that?

 6   A.  Correct.

 7   Q.  And it says:  "Bullying to remove defects & slow orders

 8   without verifying them."

 9           Did I read that correctly?

10   A.  That is correct.

11   Q.  To whom are you referring that's bullying you to remove

12   defects and slow orders without verifying them?

13   A.  Mike Paz.

14   Q.  Who is the "already fired others guys" -- strike that.

15   A.  Referring to Brandon Fresquez and Jay Herzog.

16   Q.  Did Mike Paz talk about that?

17   A.  Um, in the safety meeting one there might have been, uh --

18   sorry.  It's been several years since I've seen these notes,

19   but --

20   Q.  Sure.

21   A.  Um, in that safety meeting note he referred -- you know,

22   he was -- you know, a couple other guys have been fired.

23   Q.  For reporting safety concerns?

24   A.  I don't think he got into that.  It was just like a rant,

25   but . . .

1    Q.  Got it.  He was just letting you guys know that he could

2    fire people.

3    A.  Yeah, it was, you know.

4    Q.  All right.  There's a bullet point here that says:  "'Last

5    person to disagree with me I had removed.'"

6    A.  Correct.  That was -- I believe that was from the safety

7    meeting.

8    Q.  That was Michael Paz that said that?

9    A.  Correct.

10   Q.  To whom do you think he was referring?

11   A.  To Brandon.

12   Q.  Fresquez?

13   A.  Yeah, regarding him.

14   Q.  Then it says:  "Bullying & threatening to move equipment

15   not qualified on.  'You will'...  'I have a paper trail'..."

16           Did I read that correctly?

17   A.  Correct.

18   Q.  Is that something Michael Paz said?

19   A.  Correct.

20   Q.  What did you understand him to mean?

21   A.  Like if you didn't do it, you were being insubordinate,

22   which is a fireable offense from BNSF.

23   Q.  Can you get on equipment that you are not certified for?

24   A.  You shouldn't.  You have to be two different levels of

25   qualifications to run or operate machinery, each particular

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1   machinery, so . . .

 2   Q.   Then I see in blue here it says:  "Audit failures out of

 3   retaliation."

 4            What does that mean?

 5   A.   I just -- I felt at the time I was being gone after with

 6   a -- give me audit failures on my truck.  You know, we'd be

 7   out all night till, you know, super late on derailments and

 8   not given time to put my truck back in order, even, you

 9   know -- I would explain I still need to go back and scrap and

10   go through everything, and, uh -- you know, so then he'd go

11   through my truck.  And all they could find was like a broken

12   hammer, and I'd get writ- -- I can't remember the type of

13   write-up.  Get written up for it.

14   Q.   By Michael Paz?

15   A.   Yes, sir.

16   Q.   All right.  Then I see highlighted here:  "Favoritism --

17   overtime & investigation/discipline."

18            What did you mean by that?

19   A.   Like not all the -- it's based off of a position, and not

20   the correct guys were called out first to correct types of

21   jobs or overtime.

22   Q.   Was Michael Paz treating people who did not object to

23   safety concerns more favorably?

24   A.   Yes, they were the ones that were given the overtime or

25   the callouts.

1  Q.  And I see a highlight here:  "Baiting people into

2  arguments while wearing recorder."

3          What does that mean?

4  A.  For like about three days in safety meetings he would wear

5  a recorder.  And, uh, Marty Smyth, he tried to get in a

6  confrontation with, and maybe even Jay Herzog at the time.  I

7  don't know.  Jay might have been gone.  But he would rile up

8  Jay.  I think for about three days he'd wear a recorder trying

9  to . . .

10 Q.  Did he tell the men he was wearing a recording?

11 A.  No, sir.  We -- we could see it hanging out of his polo

12 shirt.

13 Q.  All right.  Then it says:  "Threatening BNSF career

14 several times."

15         What are you talking about there?

16 A.  Just that second thing like, um, do not follow certain

17 individuals, otherwise it's going to catch up with you, you

18 know.  I mean, that's what was told to me personally.

19 Q.  Got it.

20         All right.  So I have one last question.

21         MR. THOMPSON:  May we show just the witness for a

22 second, Mr. Keech?

23 BY MR. THOMPSON:

24 Q.  All right.  I will represent to you that we filed the OSHA

25 complaint, so we started this case, on August 25th, 2016.

1          MR. THOMPSON:  Okay.  Mr. Keech, we can put it back

2     up.

3     BY MR. THOMPSON:

4     Q.  Are these notes -- are these dates accurate that these

5     notes were taken on 9/9/16, 9/20/16, 9/21/16?

6     A.  Yeah, I can't recall, but I'm kind of like OCD, and I'm

7     just constantly taking notes for my own personal, you know,

8     for my -- for work and anything that's happening.  So I'm

9     always, you know -- everything's dated.  So if I have a date

10    on it, I would think it's correct.

11    Q.  So when Mr. Paz is saying, Don't play games with your

12    career, don't follow certain individuals, and that he is

13    drawing a line in the sand, that's a month or less after we

14    filed a complaint --

15    A.  I guess so.  Yeah, I wasn't aware of when you filed the

16    complaint, but if the -- I believe my dates would be correct

17    'cause I'm crazy like that.

18          MR. THOMPSON:  Thank you, Mr. Goodnight.  I really

19    appreciate you being here.

20          THE WITNESS:  Thank you, sir.

21          THE COURT:  All right.  Cross-examination.

22          MR. GOMAN:  Sure.

23                         **CROSS-EXAMINATION**

24    BY MR. GOMAN:

25    Q.  Good afternoon, Mr. Goodnight.

1   A.  How are you?

2   Q.  You and I have met before; right?

3   A.  Yes, sir.

4   Q.  Twice?

5   A.  Twice, yes, sir.

6   Q.  First time a couple years ago?  Is that right?

7   A.  Correct.

8   Q.  You and I spoke, and there was a human resources person

9   there?

10  A.  Yeah, it was regarding, um, those notes which were

11  pertaining to several HR and 1-800 calls.

12  Q.  And there had recently been a lawsuit filed, and so I got

13  involved, and we asked some questions about that; right?

14  A.  Yes, sir.

15  Q.  You told me then you didn't really want to talk about the

16  complaint?

17  A.  I just -- I knew that -- like, I don't recall specifics

18  against Brandon.  I just know this is what -- what happened to

19  me personally, and I didn't want to discuss it any further.

20  Q.  And I respected that; right?  We didn't probe.  Is that

21  right?

22  A.  You did.

23  Q.  And then we met again, I think --

24  A.  Last week or --

25  Q.  -- after you got or shortly before you got subpoenaed

1   maybe?

2   A.  Yeah.  Was it last week?

3   Q.  Similar conversation.  I asked you, Hey, you have been

4   identified as a witness he is going to call.  Mind if I ask

5   you questions about what you are going to testify --

6   A.  Correct.

7   Q.  All right.  No one's harassed you or said anything

8   negative against you for having met with me, have they?

9   A.  No, not at all.

10   Q.  You understood I was BNSF's lawyer in the case; right?

11   A.  Yes, sir.

12   Q.  You told me you had made a hotline complaint sometime in,

13   I think, August or September of 2016; is that right?

14   A.  I -- that's all the notes.  I haven't read them since

15   then, but yes, several.

16   Q.  What had happened was several employees actually got

17   together and decided as a group to call the hotline either on

18   the -- it was the same night or maybe over the course of two

19   days.  Is that right?

20   A.  I don't believe like collaborated together, but, um, I've

21   called several times for me specifically.

22   Q.  Called the hotline, you mean?

23   A.  Yes, sir.

24   Q.  You are aware of other people that have called the hotline

25   to report misconduct by supervisors; right?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    A.   I could only estimate or, you know, allege there's

2    probably a dozen.  I couldn't . . .

3    Q.   Were all of your hotline complaints concerning Mr. Paz?

4    A.   Yes, sir.

5    Q.   What was your job when you were -- when you made these

6    hotline complaints?

7    A.   A foreman.

8    Q.   You are now working as what?

9    A.   A track inspector.

10   Q.   How long have you been a track inspector?

11   A.   Like a month and a half.

12   Q.   You have to get certain required amounts of training to

13   become a track inspector?

14   A.   Yes, sir.  You have to get tier 3 or FRA qualified.

15   Q.   BNSF allowed you to enroll in those classes and paid for

16   you to have all that training?

17   A.   They did.

18   Q.   Did they send you somewhere, or did you get --

19   A.   No locally.  I have two babies.  I didn't want to travel

20   for that.

21   Q.   Then you took the tests and got the certifications to

22   become a track inspector?

23   A.   I did.  I needed my tier 2 to get my requal for my

24   foreman.  They didn't have a tier 2 class, so I was forced

25   then to get tier 3.  And then I just -- I mistakenly took this

1   position.

2   Q.  Um, being a track inspector, you are finding the

3   transition to be a little bit tough?

4   A.  Very.

5   Q.  A lot of responsibility?

6   A.  A lot.

7   Q.  You take your job to protect the track seriously?

8   A.  Yes, sir.

9   Q.  You understand that the people you report to want you to

10  find and report defects; right?

11  A.  Correct.

12  Q.  They want you to protect the track?

13  A.  Yeah, that's my job.  I mean, and there's -- you know,

14  Amtrak runs on it, and . . .

15  Q.  Your supervisors at BNSF, if you find a defect that's

16  unsafe for trains and requires the tracks to be taken out of

17  service, that's what they want you to do; right?

18  A.  That is correct.  As you know, before we spoke that day I

19  had to take a track out of service.

20  Q.  I remember you saying that.  That's your job.

21  A.  Yes, sir.

22  Q.  You have been doing that, and you plan to continue doing

23  that.

24  A.  Yes, sir.

25  Q.  When you were a foreman, did you ever take tracks out of

1   service?

2   A.   I might have, but maybe just to get the defect down or the

3   track was already out of service.  'Cause if it gets to day

4   30, it's out of service, and then we have to do it.

5   Q.   And you do.

6   A.   Yes, sir.

7   Q.   Switching gears a little bit, when you and I met, I asked

8   you some questions about, Well, what do you have to say about

9   Mr. Fresquez's case?  Right?  And you told me you weren't

10  there on May 5th, you didn't hear anything that happened

11  leading up to the insubordination.  Right?

12  A.   Yeah, that specific incident I was not at that job

13  location.

14  Q.   And you didn't have anything to say about roadmasters or

15  other supervisors bullying or threatening Mr. Fresquez?

16  A.   Um, I don't, like, know specifically what happened.  Like,

17  I just know, you know -- I have my own notes, and you guys

18  have all copies of that and --

19  Q.   That's right.  You never made any sort of hotline

20  complaints concerning supervisors' treatment of Mr. Fresquez;

21  is that --

22  A.   I've only called upon myself.

23  Q.   Okay.  Did you work under Ryan Akers and Cason Cole?

24  A.   Yes, sir.

25  Q.   How long have you worked at BNSF?

17-cv-00844-WYD-SKC          Goodnight - Cross          IV - 1019

1    A.  Seven years.  Well, I guess eight, um, next March -- this

2    March, so . . .

3    Q.  So Mark Carpenter was the division engineer when you were

4    hired?

5    A.  Correct.

6    Q.  And then who was the division engineer next?

7    A.  Marty Feighner, and now Manal Bishr currently.

8    Q.  You have not reported any mistreatment by Ryan Akers or

9    Cason Cole?

10   A.  No.  They're great supervisors to work under.

11   Q.  Never had any issues with Mr. Akers?

12   A.  Never.

13   Q.  Found him to be a straight-up guy?

14   A.  Yeah.

15   Q.  Same thing with Cason Cole?  I know he's a little bit

16   greener, but --

17   A.  Yeah, lots greener, but he's a good guy.

18   Q.  Okay.  You trusted him like --

19   A.  Yeah.

20   Q.  He never tried to threaten you or bully you?

21   A.  No, sir.

22   Q.  Same thing with Mr. Akers?  He never tried to threaten you

23   or bully you?

24   A.  No.

25   Q.  Okay.  You -- is it -- you described your issues with

1   Mr. Paz.  You said you had a real personality conflict with

2   him.  Right?

3   A.   Correct.

4   Q.   You really didn't like his management style and got the

5   impression he wasn't that fond of you.  Is that fair?

6   A.   Yeah, I don't know what I did personally.  There just -- I

7   was another target and was harassed and bullied.  And I, I

8   guess mistakenly, called HR and stood -- I tried to stand up,

9   and nothing came of it.

10  Q.   So I wanted to ask you about that.  Do you know what the

11  end result of your hotline call was?

12  A.   I know there was no result on my end.

13  Q.   You know, um -- well, do you know whether Mr. Paz ever

14  received any discipline for the complaints you --

15  A.   I wouldn't be aware of that, no.

16  Q.   Okay.  You said there was no, no follow-up.  You did talk

17  to human resources; right?

18  A.   We did.  Um, we did, and . . .

19  Q.   They interviewed you and talked about your concerns?

20  A.   They did, and I believe that's the reason MacKenzie -- and

21  that's who I gave all these notes to, and it was like a waste

22  of time.

23  Q.   She never followed up with you to tell you --

24  A.   Never.

25  Q.   -- what actions they took with Mr. Paz?

17-cv-00844-WYD-SKC           Goodnight - Redirect                    IV - 1021

1   A.  Hmm-mm.

2   Q.  Is that right?

3   A.  That's correct.

4   Q.  Mr. Paz has moved on?

5   A.  He has.

6   Q.  Okay.  You are working under new roadmasters?

7   A.  Correct.

8   Q.  You enjoy your job at BNSF?

9   A.  I do.

10  Q.  You believe in BNSF's safety mission?

11  A.  I do.  We do the best we can and keep trains moving and go

12  home to our families.

13  Q.  You like your job?

14  A.  I do some days.

15  Q.  You want to keep working at BNSF --

16  A.  I do.

17  Q.  -- until you --

18  A.  I would like to continue a career there.

19  Q.  Until you choose to retire?

20  A.  Yes, sir.

21          MR. GOMAN:  Thank you.  No more questions.

22          THE COURT:  Any redirect?

23                    **REDIRECT EXAMINATION**

24  BY MR. THOMPSON:

25  Q.  So as a lawyer, you are never supposed to ask a question

1  you don't know the answer to.  I'm going to do exactly the

2  opposite.  I'm sure my cocounsel would kick me if I were

3  closer.

4              I heard you say that you mistakenly called HR.  Does

5  that mean you regret calling HR?

6  A.  I do.  I would never do it again.  Um, I feel -- at the

7  time I feel like that further put like a target on my back.

8  Q.  Did you believe that Mr. Paz retaliated against you after

9  that?

10  A.  I do, and others.

11  Q.  You said safety is important at BNSF; right?

12  A.  Yeah, that's their number one objective.

13  Q.  Are there tracks in service in Denver today that have

14  defects that are more than 30 days old?

15  A.  I'm sure -- since I've been in a hotel room for two days

16  waiting, I'm sure when I go back to work tomorrow there's

17  going to be several, and I'm going to need a box of locks to

18  take things out of service.

19  Q.  Last one, I -- last one, I promise.

20              Mr. Goman, when you met with him --

21  A.  I don't know who that is.

22  Q.  Sorry.  BNSF's attorney.

23  A.  Okay.

24              THE WITNESS:  I'm sorry.  I didn't know your last

25  name.

1   BY MR. THOMPSON:

2   Q.  Did he ask you what kind of employee Brandon was?

3   A.  I think he asked me if we were like friends or -- I didn't

4   really know him personally.  We were just work associates.

5   Q.  What kind of employee was Brandon?

6   A.  My opinion, he was like the biggest asset BNSF had as a

7   track inspector.  Especially now, I'm like in his shoes now, I

8   took one of the old positions he was on, and it's like mind

9   blowing, like, the accountability you have and, you know.  He

10   really did a great job.

11          MR. THOMPSON:  Thank you, Mr. Goodnight.

12          THE WITNESS:  Thank you.

13          THE COURT:  Any recross?

14          MR. GOMAN:  No.

15          THE COURT:  All right.  You are excused.

16          THE WITNESS:  Thank you, sir.

17          THE COURT:  All right.  Call your next witness.

18          MR. STONE:  We are going to call Mr. Gavalla, Your

19   Honor.

20          THE COURT:  Is this your last witness?

21          MR. STONE:  This will be our last witness, Your

22   Honor.  Yes, sir.

23          THE COURT:  All right.

24          Come to the witness stand.

25          COURTROOM DEPUTY:  Please raise your right hand.

1          (The witness was sworn.)

2              COURTROOM DEPUTY:  Please be seated.

3              Please state your full name, and spell your full name

4    for the record.

5              THE WITNESS:  George Adam Gavalla.  G-e-o-r-g-e,

6    Adam, A-d-a-m, Gavalla, G-a-v, as in Victor, a-l-l-a.

7    **GEORGE ADAM GAVALLA, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

8    BY MR. STONE:

9    Q.  Good afternoon, Mr. Gavalla.  Can you state for the jury

10   your formal education, walk us through your formal education,

11   all the degrees you have attained?

12   A.  I have four years of high school.  I took four years of

13   college work.  I did not get a degree.  I got the credits, but

14   I never went back and took comprehensive examinations, which

15   were required in those days, because I was working on the

16   railroad by that time.

17   Q.  And that's my next question.  Can you walk us through your

18   railroad career, sir?

19   A.  Pardon?

20   Q.  Can you walk us through your railroad career?

21   A.  Yes, sir.  I started out working on the tracks for

22   Consolidated Rail Corporation, a large railroad in the

23   northeast, in the signal department.  Would you like my duties

24   or anything of that nature?

25   Q.  Yes.  Please walk us through your career, sir.

1   A.  So my duties were primarily the construction, maintenance,

2   inspection, and testing of railroad signal equipment.  And as

3   part of the inspection process, I was required to inspect

4   switches in turnouts.  That's the -- those places where two

5   rails from two separate tracks come together, and the switch

6   machine switches the rails from one to another.  That's how

7   you change a train from one track to another.  I had to

8   inspect those with track inspectors in accordance with federal

9   regulations.  I did that for eight years.

10          Then I became a representative for the Brotherhood of

11  Railroad Signalmen.  It was a labor organization that

12  represented signal workers.  And in that capacity I

13  represented all the signal workers in New England states and

14  New York state.  And I had to become familiar with the

15  practices and rules and procedures for signal workers on six

16  different railroads.

17  Q.  And how long were you in that position, sir?

18  A.  Six years.

19  Q.  And after that position, what was your next position?

20  A.  I was appointed for the next four years to the national

21  office of the Brotherhood of Railroad Signalmen, where I

22  became the director of research.  And in that capacity I

23  handled discipline cases, claims, and grievances.  I would

24  participate in actually representing, uh, local, uh, signal

25  workers who were charged with disciplinary procedures.  I

1    would handle their appeals with the railroad, and in some

2    cases I would write and argue submissions before panels of

3    arbitration.

4         I also became active in working with the Federal

5    Railroad Administration.  While I was at the national office,

6    I became the director of research, and that required me to

7    become familiar with federal rules, regulations, and policies

8    regarding railroad safety.  And so to do that, I had to know

9    existing regulations and proposed regulations.  I would write

10   position papers for -- on behalf of the signal workers.  I

11   would testify at hearings before the Federal Railroad

12   Administration.

13        And that is the agency, by the way, the Federal

14   Railroad Administration, is the agency which regulates

15   railroad safety nationwide.

16   Q.  Is that when you joined the Federal Railroad

17   Administration?

18   A.  Well, after four years of being the director of research

19   where I was interacting with the Federal Railroad

20   Administration, I eventually was hired by the Federal Railroad

21   Administration.

22   Q.  And can you describe your career with them, sir?

23   A.  I started out as what was known as a safety project

24   coordinator.  Essentially, it's like a project manager.  And I

25   was responsible for conducting large-scale safety assessments

1    of some of the largest railroads in the U.S.  So I would have

2    teams of inspectors from -- the Federal Railroad

3    Administration has field offices and regional offices broken

4    up into eight regions.  And some of the largest railroads

5    might cover four or five different regions.  So I would have

6    inspectors from each of those regions working on looking at

7    just one major railroad.  And I would have the signal

8    expert -- I would have the signal experts, the track experts,

9    the experts in the freight trains and freight cars and

10   locomotives, the operating practices experts, which would be

11   the experts who oversee train crews and train dispatchers, and

12   the hazardous material experts, and we would take a systematic

13   look at railroads to see if there's any systemic, systemwide

14   safety problems.  And this would include track issues, track

15   safety, track inspections.  And if we found them, we would

16   work with the railroads and with the rail labor organizations

17   and with the FRA field people to try to resolve those issues.

18   Q.  Describe in detail your experience and training regarding

19   the role of railroad safety data and FRA's railroad safety

20   inspection and regulatory programs.

21   A.  Well, after I became -- well, when I was -- when I was a

22   safety project coordinator, as part of our assessment of

23   safety assessment, one of the things we would look at are the

24   safety statistics for a railroad.  We'd look at reported

25   accidents and injuries.  We would look at FRA inspection data,

1   because these FRA safety inspectors would perform their own

2   inspections and would find defects and would make records of

3   those.  So we would look at the defects that were being found.

4   In that capacity, I had to work and become familiar with the

5   safety database, and I worked with the Office of Safety

6   Analysis, which was a group within the Office of Safety at

7   FRA.  And they explained to me how the process worked, how the

8   data worked, and they would actually help sort data for me and

9   work with me to assess safety trends based on the data.

10  Q.  Describe in detail your experience and training regarding

11  FRA's in-depth analysis of what safety data to identify risk

12  factors and chronic problems for the purpose of targeting

13  safety inspection and enforcement activities.

14          MR. GOMAN:  Objection to relevance.  This relates to

15  the railroad industry as a whole and an unspecified period of

16  time.  I'm not sure what it has to do with this case.

17          THE COURT:  Overruled.  He may answer.

18  A.  Well, after those two years working as a safety project

19  coordinator, I was actually promoted to the head of the FRA

20  Office of Safety.  So the Office of Safety had about

21  70 percent of the personnel within the Federal Railroad

22  Administration.  So all the regional offices across the

23  country, all the local offices across the country, about 100

24  technical experts in the FRA headquarters, all reported to me.

25  And in that capacity, I was responsible for overseeing the

1  Federal Railroad Administration's accident investigation

2  program, safety enforcement program, and safety inspection

3  program.  In addition, I was responsible for seeing --

4  overseeing the group that collected the data and analyzed the

5  data.

6          So I had to work closely with these people literally,

7  if not on a daily basis, definitely on a weekly basis.  And

8  during that period of time, we worked collaboratively to

9  revise FRA's and enhance FRA's data analysis program.  We

10  brought more resources to the program.  We developed databases

11  that were available to the public, a public website.  We

12  developed programs to analyze accident and injury trends.

13          And we, uh, developed these programs so that were --

14  that could be done by safety inspectors.  Then we taught the

15  safety inspectors how to do them.  Then we worked to

16  incorporate into FRA safety inspectors' daily routines the use

17  of safety data and teaching them how to use it to determine

18  where safety problems are, because many -- many FRA safety

19  inspectors at the time had tons of knowledge and experience,

20  which was extremely valuable in going out and actually seeing

21  what's on the railroad and determining what's safe or not, but

22  they really didn't have the experience or training in how to

23  evaluate data, inspection data, outside their immediate area.

24  So we helped them find the big picture using data to

25  supplement their own experiences.

BY MR. STONE:

Q.   Describe in detail your training and experience regarding the development and implementation of railroad-related safety regulations, policies, and procedures involving railroad safety.

A.   Well, actually I became involved in crafting safety policies even before I came to the FRA.  When I was the director of research for the signalmen, our organization and the track workers organization, the Brotherhood of Maintenance of Way Employees, both petitioned the Federal Railroad Administration to issue standards, safety standards, to protect railroad -- to protect track workers and signal workers -- we called them roadway workers because they worked along the railroad tracks -- from being struck and killed by trains.  And we had proposed some things for them to adopt. Eventually, the Federal Railroad Administration set up the very first -- they called it a negotiated rulemaking, where they brought in railroad industry experts and some union experts to work with FRA's own experts under a formal process where we got together and developed recommendations to prevent signal workers and track workers from being struck and killed by trains.  These were eventually adopted as safety standards nationwide by the time that I actually was hired by the FRA.

Q.   Describe in detail your training --

A.   Well, I --

1    Q.  I'm sorry.

2    A.  It was a little bit more than that.

3    Q.  Go ahead.

4    A.  So when I became the head of the Office of Safety, I was

5    in charge of half of the rulemaking process.  So new rules and

6    regulations and safety standards that were issued by the

7    agency were done with the technical experts under my

8    jurisdiction and the legal experts under the Office of Chief

9    Counsel.  So we would work on revising rules, regulations, and

10   procedures.  For example, by the time I became the head of the

11   Office of Safety, I did the final -- I was involved in the

12   final review of the track safety standards, as an example.

13   Q.  Describe in detail your training and experience regarding

14   the FRA's regulations and policies intended to protect

15   railroad workers from harassment and intimidation.

16   A.  Well, during my time at FRA, even before I became the head

17   of the Office of Safety, the FRA had issued a standard that

18   prohibited railroads from harassing or intimidation -- from

19   engaging in harassment or intimidation of employees that was

20   intended to prevent them from reporting accidents and injuries

21   or seeking medical treatment.  Well, this regulation came in

22   place shortly before I got there.  It didn't take long for us

23   to realize that it wasn't very effective because it was too

24   narrowly crafted.  After the employees, if they -- after

25   the -- if they, uh, reported an accident or an injury

1   afterwards and were subject to harassment and intimidation,

2   the regulation didn't protect them.  It was also very

3   difficult to enforce.  Part of that requirement to prevent

4   harassment and intimidation said the railroad must set up its

5   own internal process to audit this reporting to make sure that

6   it's done honestly and accurately, but we found out that just

7   having a requirement to have a process doesn't mean that the

8   process was going to be implemented in a positive and a fair

9   manner.

10  Q.  You were hired by the Moody Law Firm to testify in this

11  matter; is that correct?

12  A.  Yes, sir.

13  Q.  And in the course of being hired, you prepared a written

14  report; is that correct?

15  A.  Yes, I did.

16  Q.  And attached to that written report was a curricula vitae,

17  a CV, listing all your experience and training and education;

18  is that correct?

19  A.  It was a summary of it, yes, sir.

20          MR. STONE:  Okay.  Can we show the witness

21  Exhibit 58?  It's not been admitted.

22          COURTROOM DEPUTY:  It's up.

23          MR. STONE:  It's up?

24  BY MR. STONE:

25  Q.  I'm on page 30.  Is that your CV, Mr. Gavalla?

1    A.  Yes.

2    Q.  I'm going to scroll down.  Can you make sure it's the

3    complete CV?

4           And that's the end, right, page 35?

5    A.  Yes.

6    Q.  And then page 36, sir, what's that?

7    A.  That's my fee schedule.

8    Q.  That's your standard fee schedule in testifying in a case

9    such as this?

10   A.  Yes, it is.

11          MR. STONE:  Your Honor, I'd move to admit Exhibit 58,

12   but just pages 30 through 36, which is Mr. Gavalla's CV and

13   his fee schedule.

14          THE COURT:  Any objection?

15          MR. GOMAN:  No objection.

16          THE COURT:  So regarding Exhibit 58, pages 30 to

17   36 --

18          MR. STONE:  Page 30 to 36, yes, Your Honor.

19          THE COURT:  -- are received.

20      (Plaintiff's Exhibit 58:30-36 received.)

21          MR. STONE:  I move to qualify Mr. Gavalla as an

22   expert in the field of railroad safety and the railroad

23   industry standards and practices regarding harassment and

24   intimidation of railroad workers who report defects.

25          THE COURT:  Any objection?

1           MR. GOMAN:  No objection.

2           THE COURT:  All right.  This witness may give

3   opinions under Rule 702 in the area designated by counsel.

4   BY MR. STONE:

5   Q.  Mr. Gavalla, what is the FRA?

6   A.  It's the Federal Railroad Administration.  It's a

7   government agency that oversees, regulates railroad safety.

8   Q.  What is the FRA's primary mechanism for ensuring the

9   safety and integrity of a railroad's tracks and track

10  infrastructure?

11  A.  Well, that would be the track inspection program.  And

12  essentially how that works is FRA has track safety inspectors

13  throughout -- throughout the country.  During my tenure, there

14  were about -- actually, when I started out, there were about

15  50 track inspectors.  I was able to increase it to about 75

16  track inspectors.  So that meant that each FRA track inspector

17  on average was responsible for about 5,000 miles of track.

18  Obviously, one person can't do too much to inspect 5,000 miles

19  of track, but the way the process was designed to work is the

20  FRA inspectors weren't so much inspecting the tracks as

21  inspecting the railroad's own track inspection program.

22  Because railroads were required to have their own track

23  inspectors, and they were required to inspect the tracks

24  either -- depending on the type of track, it could be either

25  twice a week, once a week, or once a month.

1    And the railroad's own track inspectors were required

2    to find any defects in the track that didn't meet the federal

3    standards for track.  And if they found them, they were

4    required to immediately repair them or to take remedial

5    action, corrective action.  And that could be, one, bringing

6    the track into compliance by either -- if you could possibly

7    repair the defect yourself, do it.  If not, you might have to

8    slow the train down to a level that would be safe.  And if

9    that didn't work, you'd actually have to shut down operations

10   until repairs could be made.

11   So this is what the railroad's own track inspectors

12   were supposed to do.  And what the FRA track inspectors would

13   do is before they would actually go out and inspect a section

14   of track, before they would do that they would look at the

15   track inspection records of the railroad's own track

16   inspectors, and they would match.  They would say if we find a

17   lot of defects in the track, are these defects being reported

18   in the railroad track -- the railroad inspector's own records?

19   If they found that they were, they would say, okay, well, the

20   railroad is doing a good job of inspecting the track and

21   taking care of it.  If they found that they weren't, they

22   would conclude that the railroad's own track inspection

23   program was not being properly implemented and was not finding

24   and fixing the defects.

25   Q.  Can you describe generally what are the FRA's track safety

1    standards?

2    A.  Yeah.  Those are a series of federal requirements that

3    they cover -- first of all, they set engineering standards.

4    So, for example, how far the rails need to be -- how close

5    together they need to be or how far apart they can be.  That's

6    considered the gauge of the track.  If one rail is higher or

7    lower than the other, that's cross level.  There are standards

8    for how much is allowable depending on the speed of the train.

9    The alignment of the track.  How quickly does a track go into

10   a curve?  What's the elevation of the outside rail to bank the

11   curve?  So there's all technical engineering standards for

12   that.  That's number one.

13            Number two, as I pointed out, the railroad is

14   supposed to have its own inspection program.  They are

15   required to inspect the track on a periodic basis as defined

16   in the standards.  And the inspectors, if they find defective

17   conditions, they are required to take remedial action to

18   either correct it, repair it, or close service down.  So --

19   and those are all within the standards.

20   Q.  Has the FRA established mandatory standards of care for

21   track inspections?

22   A.  Essentially, yeah, that's what I was just talking about.

23   Q.  Okay.  Can we state that -- I'm going to ask you some

24   opinions here in a second, and you will agree that all your

25   opinions are within a reasonable degree of professional

1   certainty?

2   A.   Yes, sir.

3   Q.   Okay.  Do you have an opinion regarding if there is a

4   standard of care in the railroad industry regarding

5   remediating track safety defects?

6   A.   Certainly.

7   Q.   Can you describe it?

8   A.   Yeah.  It's kind of what I mentioned.

9          MR. GOMAN:  I object to this opinion, Your Honor, as

10   not helpful to the jury, and under 403 I'm not sure what it

11   adds to this case.

12          THE COURT:  Overruled.  It makes senses to me.

13   Anyway, for whatever it's worth.  Overruled.  The witness may

14   answer.

15   A.   Could you repeat the question, please.

16   BY MR. STONE:

17   Q.   Do you have an opinion regarding is there a standard of

18   care in the railroad industry regarding remediating track

19   safety defects?

20   A.   Yes.  Track inspectors, when they find a defective

21   condition that doesn't meet the requirements of the standards,

22   doesn't meet those engineering standards, are required to take

23   corrective action immediately.  And that could include, one,

24   repairing the defect, either by -- if you could fix it

25   yourself, fix it.  Or if you have people nearby to fix it, fix

1    it.  If you can't fix it right away, you might be able to slow

2    the speed down of the trains that would allow a safe level of

3    operation given the condition of the track.  And if that

4    didn't work, you would actually have to suspend operations,

5    suspend train operations until such time it could be -- the

6    defect could be repaired.

7              And in some circumstances, you can have a qualified

8    employee actually standing there watching the train go over

9    the track, and that would be considered -- the terminology

10   would be walk the train over the track.  So if there's -- some

11   defects you could allow a train to go at 2 miles an hour, if

12   there's somebody watching it, so if the train should derail,

13   you could stop it before things get too bad.

14   Q.  Do you have an opinion regarding if there are any

15   mandatory remedial actions necessary to properly address track

16   safety defects?

17   A.  Those remedial actions are just what I just said.  You

18   either repair the defect, or slow it down, or slow down the

19   train, or you stop service over the track until it's repaired,

20   or you could walk the train over.

21   Q.  Do you have an opinion regarding if there is a standard of

22   care in the track safety standards regarding who is

23   responsible for compliance with track safety defects?

24   A.  Well, that's -- that's a very broad requirement.  It

25   includes not only the railroad and the railroad company, but

1   any individual that's involved in the inspection of the track.

2   So even the track inspectors themselves could be held liable

3   for following those standards.

4   Q.  Do you have -- I'm sorry.  Scratch that.

5          Do you have an opinion regarding if the FRA

6   regulations provide a standard for track safety which

7   constitutes a knowledge standard?

8   A.  Yes.  That's something unique about FRA's track standards.

9   A knowledge standard basically, as it applies to the tracks,

10  says a railroad is only held liable for fines or compliance

11  with a safety condition if they have knowledge that the

12  condition is unsafe.  So, in other words, if an FRA inspector

13  were to come out on a track, find a defect of the track, say

14  the rails were too far apart, or maybe the cross level wasn't

15  right, and there was no record that it had -- that condition

16  had been that way prior to the FRA inspector's there, he could

17  not fine the railroad.  If there were an accident and it was

18  found that there was one of these defects in the track, and

19  there was no record of the defect of having existed there

20  immediately prior to it, again, the railroad, at least by the

21  FRA, would not find it liable for that.

22         That's unique because other FRA regulations regarding

23  the safety of freight cars and locomotives and signals was

24  what is known as a strict liability standard.  That is, if the

25  defect was there, the railroad was responsible for it

17-cv-00844-WYD-SKC              Gavalla - Direct                      IV - 1040

1   regardless.  But the track was different.  They had to have

2   knowledge of this defect before they could be held responsible

3   or accountable under the FRA.

4   Q.   What effect, if any, does this knowledge standard have on

5   the reporting of track defects?

6   A.   Well, there is a concern, and it has been a concern since

7   before I was with the agency, that sometimes there's a

8   disincentive to actually find and report track defects because

9   if you don't find the defects, and then you're not going to

10  get fined for it if the FRA inspector finds it, or if it's not

11  fixed right away and it were to cause an accident, if they had

12  no record of it, then that prevents them from being held

13  accountable to a degree, provided -- so -- and if you don't

14  find a defect, a concern is that it's not going to get

15  repaired right away.  That's a concept called deferred

16  maintenance, which is something that, again, has been going on

17  from time to time on some railroads or some parts of railroads

18  since before I was with the -- before I worked in the

19  industry.  So if you don't find a defect and you don't report

20  it, and then you don't fix it, you save money in the short

21  term in track maintenance, provided, of course, you don't have

22  an accident before the defect is eventually repaired at some

23  point in the future.  So there's concerns of a disincentive

24  there with that type of standard.

25  Q.   Do you have an opinion regarding if there is a history in

1   the railroad industry to discourage track inspectors to report

2   track defects they discover while working for the railroad?

3          MR. GOMAN:  Your Honor, objection under 403 and 404.

4          THE COURT:  Repeats the question.

5          MR. THOMPSON:  Absolutely, Your Honor.

6   BY MR. STONE:

7   Q.  Do you have an opinion regarding if there is a history in

8   the railroad industry to discourage track inspectors to report

9   track defects they discover while working for the railroad?

10          THE COURT:  Is there an objection?

11          MR. GOMAN:  Same objection.

12          THE COURT:  Yeah, it's overruled.  The witness should

13   answer with a yes or no, if he has an opinion.

14   A.  Yes.

15   BY MR. STONE:

16   Q.  Can you describe that opinion, sir?

17   A.  Certainly.  During my time at the FRA, we have found

18   instances across the industry in various railroads in various

19   places where, in some cases, inspectors -- track inspectors

20   from the railroad would complain about being coerced into not

21   reporting defects.  In other cases, FRA inspectors feeling

22   that they suspected that track inspectors were not finding and

23   fixing the defects as required.  There was one particularly,

24   uh, severe case where we actually, when I was the head of the

25   Office of Safety, sent a team of inspectors to one particular

1   railroad because we noticed that their track-caused accidents

2   were going up over the years, and we were getting a lot of

3   complaints about poor inspections or track inspectors not --

4   not being allowed to do their inspections or not having the

5   time because their inspection territories were so large.

6          And as the result of that particular safety

7   assessment, we actually entered into what was known as a

8   compliance agreement where we required the railroad to sit

9   down and explain to us, to the FRA, how did they determine the

10  length of the inspection territories for each track inspector.

11  And when they did that analysis, they realized they were short

12  about a hundred inspectors, by their own standards, and that

13  the procedures were such that supervisors -- track supervisors

14  were claiming to be -- have no knowledge of the safety defects

15  that existed out there.

16         So the railroad changed their procedures to require

17  the track supervisors and managers to occasionally ride with

18  the track inspectors so that they would be held accountable

19  for the condition of the tracks.  After that was done, the

20  track-caused accidents went down.

21  Q.  Do you have an opinion -- is there a history in the

22  railroad industry of harassment and intimidation of railroad

23  track inspectors who report track defects?

24  A.  As I pointed --

25         MR. GOMAN:  Same objection under 403 and 404.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1        THE COURT:  Overruled.

2   A.  As I pointed out, yes, it does come up from time to time

3   on various railroads or on parts of railroads.

4   BY MR. STONE:

5   Q.  Can you describe that history in detail, sir?

6   A.  Well, basically what I just talked about in terms of on

7   this one major railroad.  That was the most extreme case, but

8   more typically it involves a certain section of track, maybe a

9   certain railroad division or a subdivision.  Large railroads

10  are broken up into, for management purposes, into regions.

11  And the regions are further subdivided into divisions.  And

12  the divisions are subdivided into subdivisions.  So sometimes

13  you'd see the issues come up on a subdivision basis, sometimes

14  on a divisional basis.

15  Q.  So what is the result in the railroad industry of this

16  history of harassment and intimidation on the railroad track

17  inspectors?

18  A.  Well, you know, the worst-case scenario is that track

19  defects don't get repaired in a timely manner.  And if that's

20  the case, while the railroad's bottom line -- they may, again,

21  in the short term not have to -- you know, their maintenance

22  costs may -- may go down, the concern is that these defects

23  can and do result in accidents, track-caused accidents.  And

24  so if you have an area where defects are not being reported

25  and not being repaired in a timely manner, the concern is that

17-cv-00844-WYD-SKC                Gavalla - Direct                    IV - 1044

1    eventually there's going to be accidents there.

2            And depending on the circumstances, some -- many

3    accidents just result in derailments where just the railroad

4    cars are damaged and the track is damaged, but sometimes

5    there's employees killed.  Sometimes there's people who live

6    along the track that are negatively impacted and hurt.  And,

7    God forbid, if there's hazardous materials in the train, then

8    the public at large could be put in jeopardy.

9    Q.  Why is the FRA not able to monitor all the railroad tracks

10   in the U.S.?

11   A.  Well, they monitor all of them, but it's how frequently

12   can you monitor them.  Again, during my tenure there, and

13   while I doubled -- well, I increased the track inspection --

14   FRA's track inspection workforce by 50 percent.  It took five

15   years to do that, but still it was like 5,000 miles was the

16   average territory.  We had some track inspectors -- one

17   particular case was up in Montana and Wyoming.  The geographic

18   area of his territory was the size of France.  Now, the amount

19   of track in there was about as much as any other track

20   inspector, but it's spread out over a long distance.  So when

21   you have that, there's only so much resources that the agency

22   has to devote to that.  And, again, they -- so they have to

23   use their resources wisely in what they inspect and what they

24   decide to take defects on and what they decide to take fines

25   and penalties on.

1   Q.  If track inspector -- you testified previously track

2   inspectors can be personally liable for defects that aren't

3   found; is that correct?

4   A.  That's correct.  Railroad track inspectors can be liable.

5   Q.  And if the railroad track inspectors can be personally

6   liable, why would they ever underreport track safety defects?

7   A.  Well, again, the chance of getting -- of having an FRA

8   inspector actually find cases that were, uh -- and prove a

9   case where a railroad track inspector is not reporting the

10  inspection defects are not very good, not very great, because

11  it may be once a year or couple times a year that the FRA is

12  going to be out there.

13          If, on the other hand, the track inspector is hearing

14  from his supervisors and managers on a daily basis to -- and

15  being given pressure to not report certain conditions, that's

16  something that they're going to have to face on a daily basis.

17  So it's no surprise that -- that these -- many railroad track

18  inspectors just simply don't report when they're being given

19  pressure to not record defects.  And, quite frankly, I'm not

20  surprised -- I'm surprised whenever one does come forward

21  because that person sticks out.

22  Q.  When you worked for the FRA, were you ever responsible for

23  investigating claims of retaliation by railroad management

24  against railroad employees?

25  A.  Uh, yes, but it was -- it was in regards to the standard

1   that I talked about previously regarding reporting accidents

2   and injuries.

3   Q.  Okay.  During that experience with the FRA in

4   investigating those matters, did the railroads ever contend

5   that because there's a discipline hearing process and a

6   supposed neutral manager decides the decision based on that

7   hearing, it's not culpable for any retaliation?

8            MR. GOMAN:  I object to the relevance of this.

9            THE COURT:  I don't quite understand the question.

10   Re-ask the question.

11            MR. STONE:  I will re-ask it, Your Honor.

12   BY MR. STONE:

13   Q.  During your experience with the FRA in your investigation

14   of those matters that we have just discussed regarding

15   retaliation against railroad employees, did the railroads ever

16   contend that because there was a discipline process and the

17   employee was disciplined in some way, the adverse action was

18   taken, i.e., the retaliation, that if that was reviewed by a

19   neutral manager, that decision makes them unculpable for any

20   retaliation allegation?

21            MR. GOMAN:  Again, same objection.

22            THE COURT:  All right.  Overruled.  If the witness

23   understands that question, he may answer it.

24   A.  Well, I'll explain -- my understanding is has the railroad

25   ever claimed that they have had procedures in place, whether

1  it's the disciplinary process or any other process, where

2  there's a review by someone who -- a corporate officer who is,

3  they contend, is a neutral party, and if they have that does

4  that, uh, mean that they're not culpable or that it's not

5  possible for retaliation to take place?  Is that the question?

6  BY MR. STONE:

7  Q.  That's the question.

8  A.  Yeah.  Certainly I've heard that argument.  Most anyone at

9  FRA would not respond to that argument with a straight face

10  simply because while it's -- in some cases it's required, at

11  least from the procedures I talked about reporting accidents

12  and injuries.  The railroads were required to have a process

13  where they audit their own people to see that they're

14  following these process of honest and accurate reporting, uh,

15  you know, to the letter.  And despite having these

16  requirements to audit this in place, the agency still found

17  many, many, many cases where it wasn't being done.

18          So it's one thing to have a process in place on

19  paper.  It's another thing to enforce it properly and actually

20  have the neutral actually be neutral, to actually have the

21  neutral actually go ascertain all the facts, not just what

22  he's told by, you know, the management people.  So just having

23  a process on paper doesn't assure anything.  If you have a

24  process and it's carried out properly and fairly, well, then

25  that would make a difference.

1        MR. STONE:  Thank you, Mr. Gavalla.  No further

2    questions.

3        THE COURT:  Cross-examination.

4                     **CROSS-EXAMINATION**

5    BY MR. GOMAN:

6    Q.  Good afternoon, Mr. Gavalla.

7    A.  Good afternoon.

8    Q.  So you have been retained as an expert witness by

9    Mr. Fresquez's attorneys; is that right?

10   A.  Yes, sir.

11   Q.  They called you up and said, We'd like you to look at this

12   case and focus in on these issues.  Is that right?

13   A.  Correct.

14   Q.  They pay you for the time you spend writing your report?

15   A.  Yes, sir.

16   Q.  They pay you to fly into town here and testify at trial.

17   A.  That's correct.

18   Q.  Where do you live?

19   A.  Connecticut.

20   Q.  How much have you been paid on this case so far?

21   A.  Um, I think I've just been paid the $3,000 retainer.

22   Q.  You have been hired by plaintiffs attorneys in about a

23   dozen railroad FRSA cases?

24   A.  These attorneys for this case, or just in my career?

25   Q.  Overall.

1   A.  Overall, yes, about a dozen.

2   Q.  Okay.  You're familiar with railroad disciplinary

3   processes; is that right?

4   A.  Yes, sir.

5   Q.  You're familiar with railroad collective bargaining

6   agreements between the railroads and the unions?

7   A.  I'm familiar with the collective bargaining process.  I'm

8   familiar with specific agreements for the signalmen, and in

9   some cases I've been given agreements from some other crafts

10  to look at.

11  Q.  Mr. Fresquez's attorneys in this case -- well, let me back

12  up.

13          The only information you know about Mr. Fresquez's

14  case is they sent you a Complaint; right?

15  A.  That's what they sent to me, yes.  That's all they sent

16  me.

17  Q.  So that's just a list of the allegations being made by

18  Mr. Fresquez's attorneys?

19  A.  That is correct, yes, sir.

20  Q.  You didn't look at any depositions in this case?

21  A.  No, sir.

22  Q.  None of the evidence exchanged back and forth?

23  A.  Correct.

24  Q.  So you've not even talked to Mr. Fresquez; is that right?

25  A.  I have not.

1    Q.  Or any of the managers at BNSF that were involved in this

2    case?

3    A.  That is correct.

4    Q.  So -- and really, I mean, your opinions are about the

5    railroad industry as a whole.  They're really not even

6    specific to BNSF.  Is that fair?

7    A.  That's a fair statement.

8    Q.  By the way, the last stop in the discipline process for

9    railroad employees is reviewed before a neutral arbitrator; is

10   that right?

11   A.  That is correct.

12   Q.  And that arbitrator, according to the collective

13   bargaining agreements, if they review a discipline case and

14   disagree, they think the discipline is too harsh, they can

15   give the person -- the employee his or her job back?

16   A.  They can -- I believe they can, yeah.

17   Q.  With back pay; right?

18   A.  Yes, in most cases, yes.

19   Q.  So if I understand your opinions correctly, railroads

20   should not discipline employees in retaliation for reporting

21   track defects.  Is that fair?

22   A.  That's a fair statement, yes, sir.

23   Q.  Railroad employees should report the defects they find;

24   right?

25   A.  Correct, and initiate remedial actions.

17-cv-00844-WYD-SKC            Gavalla - Cross                    IV - 1051

1   Q.  I guess we could back up one step.  Track inspectors

2   should inspect the track, first, and measure the track to be

3   able to determine if it's defective in the first place; right?

4   A.  Well, they should inspect the track.  And if measurements

5   are required to verify the defect, they should certainly

6   measure the track.

7   Q.  There are some track defects that can't be seen by the

8   naked eye.  You need to measure it with a tool.  Right?

9   A.  That is correct.

10  Q.  So it would be reasonable for a manager to ask a track

11  inspector to measure a section of track to see if it is

12  defective or not; right?

13  A.  If it's -- if it's the type of defect that can't be

14  readily determined just by looking at it, I would say yes.

15  Q.  Like an alignment defect?

16  A.  An alignment defect could be.  An experienced inspector

17  might realize that there's an alignment problem but may not

18  know the extent of it and may need to measure it to determine

19  just what level of remedial action is necessary.

20  Q.  Railroads should have rules prohibiting insubordination by

21  its employees; right?

22  A.  Certainly.

23  Q.  Really all workplaces should have rules prohibiting

24  insubordination by their employees; right?

25  A.  Correct, and depending on what you mean by

17-cv-00844-WYD-SKC                 Gavalla - Cross                    IV - 1052

1   insubordination, but certainly there's -- there's levels of

2   it, but yes.

3   Q.  All right.  Just a few questions then about the FRA.  When

4   you were at the FRA, you encouraged the agency to develop a

5   relationship with railroad employees such that they felt

6   comfortable reporting safety concerns; right?

7   A.  That's what we tried to do when I was at the agency, yes.

8   Q.  You'd do outreach to the labor unions for that purpose.

9   You'd reach directly out to the unions so you could be a

10  conduit of information about safety concerns.  Right?

11  A.  That's correct.  We tried to do that.

12  Q.  The FRA's policy, at least when you were there, was to

13  allow a safety complaint to be brought by an employee of a

14  railroad anonymously; right?

15  A.  Well, we -- we tried to keep the complaints anonymous.

16  The reality was -- and we received many, many complaints where

17  the complainant, the railroad worker, would come back and say,

18  Well, I sent this to you anonymously, but then I had my

19  supervisors chewing me out for complaining.  The reality is

20  when you -- when you review a complaint, when the FRA reviews

21  a complaint, they have to go to the railroad and get

22  information about it.  And often just by looking at that

23  information, the railroad can kind of tell where it originally

24  came from.  But while the policy was to keep the name

25  anonymous, it didn't always end up that way.

17-cv-00844-WYD-SKC            Gavalla - Cross                    IV - 1053

1    Q.  Let me show you Exhibit A-93.

2            MR. GOMAN:  Just the witness.

3    BY MR. GOMAN:

4    Q.  Do you recognize this, sir?

5    A.  Yes.  That's a violation reporting form from the FRA

6    website.

7    Q.  I'm just showing you the second page there.

8    A.  Yes.

9    Q.  That's the remainder of that web page?

10   A.  Yes.

11   Q.  This is the way that employees or citizens can make an

12   anonymous report of wrongdoing to the FRA?

13   A.  Yes, sir.  That's one way.

14           MR. GOMAN:  Your Honor, I'd move for admission of

15   Exhibit A-93.

16           MR. STONE:  I don't have any objection.

17           THE COURT:  All right.  A-93 is received.

18       (Defendant's Exhibit A-93 received.)

19   BY MR. GOMAN:

20   Q.  A person can find this form just by going onto the FRA's

21   home page; right?

22   A.  If they know where to look, yes, they can.

23   Q.  Another way the FRA makes sure track is safe is by going

24   out and actually inspecting the railroad track themselves;

25   right?

1    A.  Correct.

2    Q.  The FRA has been inspecting BNSF's track since as long as

3    you have been involved in the FRA; right?

4    A.  I'm sure since as long as there's been a BNSF, going back

5    to the 1970s when the standards first came out.

6    Q.  The other or another way the FRA makes sure BNSF is

7    maintaining its track properly is they periodically request

8    and access BNSF's track inspection records.

9    A.  Yes, typically before an FRA inspector will go out and

10   physically inspect the track, they'll try to look at the

11   records so they'll have that knowledge before they go out and

12   do their own inspections.

13   Q.  But they don't have to announce that, do they?

14   A.  Sir?

15   Q.  The FRA doesn't have to announce they are coming to get

16   those inspection records, do they?

17   A.  Well, typically that's -- it's the railroads that maintain

18   the inspection records, so FRA has to request them.  And

19   typically the FRA inspectors have to request railroad

20   supervision tell them where they are intending to inspect on a

21   particular day so they can gain access.  So the FRA inspectors

22   can't wander around the railroad tracks on their own.  If

23   they're getting on the rail to inspect the track, they need to

24   have procedures in place so they are not going to run trains

25   on top of them and strike them with trains.  So they have to

17-cv-00844-WYD-SKC          Gavalla - Cross                    IV - 1055

1   arrange with the management to be escorted on the property and

2   to be driven around on the property.

3   Q.  Nowadays, though, the FRA just shows up, and they can

4   download it right from a kiosk at BNSF's offices; right?

5   A.  I know that many larger railroads do have electronic

6   record keeping.  And if you are saying that that's the

7   process, it may be.  When I was there, it was typically a --

8   it was you had to show up in an office to get that

9   information.

10  Q.  If a train derails, the FRA can come in and say, We are

11  going to investigate the cause of that derailment.

12  A.  They can, yes.

13  Q.  The National Transportation Safety Board also has

14  authority to investigate train derailments; right?

15  A.  They have authority to, yes.

16  Q.  Particularly if there's an injury, the NTSB will get

17  involved; is that right?

18  A.  Typically the NTSB gets involved in major accidents.  FRA

19  gets involved in lesser accidents, but still they're typically

20  accidents where there's serious injuries or a significant

21  amount of property damage.  The vast majority of railroad

22  accidents are not investigated by either the FRA or the NTSB.

23  Q.  Then the FRA publishes their findings and reports about

24  train derailments; right?

25  A.  Well, they have safety statistics that report all the

1    train derailments that were reported to FRA by the railroads.

2    And only those actions that meet a certain -- above a certain

3    damage threshold have to be reported to FRA, or if there's an

4    injury or a fatality involving an accident that also has to be

5    reported to FRA.  If it's below the threshold, it's not

6    reported to FRA.

7    Q.  Just real quick, you've not done any sort of study in this

8    case to determine, well, for instance, whether the number of

9    train derailments in Mr. Fresquez's territory went up or down

10   after he left BNSF's employ.  Have you done a study like that?

11   A.  No, sir.

12   Q.  And you've not been asked to look for and you haven't

13   looked for any evidence that BNSF was underreporting track

14   defects in 2015 and 2016.

15   A.  That's correct.

16   Q.  Do you know how many track inspectors BNSF employs?

17   A.  I don't.  I know it's in the hundreds, but how many -- I

18   may have seen that figure.  I don't recall it.

19   Q.  The federal government doesn't tell BNSF how many track

20   inspectors it has to have, does it?

21   A.  That's correct, except in those rare circumstances where I

22   talked about there was one particular railroad where there was

23   a big issue.  And we actually entered into an agreement called

24   a compliance agreement where they actually had to specify to

25   the FRA how many track inspectors they would have.  But

17-cv-00844-WYD-SKC          Gavalla - Redirect                    IV - 1057

1   typically in most cases they do not.

2   Q.  That railroad was CSX; is that right?

3   A.  That is correct.

4   Q.  The FRA also doesn't tell BNSF how many hours of training

5   it needs to provide its track inspectors with, does it?

6   A.  That is correct.

7   Q.  So BNSF decides how many track inspectors they are going

8   to hire and pay and how extensively they are going to train

9   them.

10  A.  Essentially, yes.

11          MR. GOMAN:  I don't have any more questions.

12          THE COURT:  Redirect.

13                  **REDIRECT EXAMINATION**

14  BY MR. STONE:

15  Q.  Couple follow-up points, Mr. Gavalla, based on the

16  questions.

17          FRA reviews the inspection records of the railroads;

18  correct?

19  A.  Yes.

20  Q.  So, therefore, the accuracy of these records are vitally

21  important?

22  A.  Absolutely, yes.

23  Q.  If defects are removed from the system, that limits the

24  FRA's ability to monitor the compliance with the track safety

25  standards; correct?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    A.   That's correct, yes.

2    Q.   Okay.  Is it possible for FRA track inspectors to inspect

3    all of the track on -- for BNSF, for example?

4    A.   Typically, when I was with the FRA, we did an analysis,

5    and the agency said it could inspect two-tenths of 1 percent

6    of railroad activity at any given time.  Ideally, we tried to

7    set a goal for track inspectors to inspect all of their

8    territory within a year.  That didn't always make it, but --

9    so you might see one FRA track inspector per year, would not

10   be unusual.  In some cases you might see them two or three

11   times a year.  In some cases you might see them once every

12   couple years.

13   Q.   It's for that reason the FRA relies on the accuracy of the

14   track inspection reports?

15   A.   Absolutely.

16             MR. STONE:  No further questions.

17             MR. GOMAN:  No, Your Honor.

18             THE COURT:  All right.  The witness may step down,

19   and he's excused.

20             Who is your next witness?

21             MR. THOMPSON:  Plaintiff rests, Your Honor.

22             THE COURT:  Plaintiff rests.  All right.

23             Who is the defendant's first witness?

24             MS. DALE:  Ryan Akers, Your Honor.  We do have a

25   Rule 50 evidence that we're filing.

1      THE COURT:  I want to defer that until after the

2   evidence is in because the rules just require you to make it

3   before the case goes to the jury.

4      MS. DALE:  All right.  We are filing it now, but we

5   don't need to argue it now.

6      THE COURT:  You are filing a written motion?  Why

7   don't you make a verbal motion?  Let me just tell you.  On

8   this case I need to hear all the evidence before I can decide

9   anything.  I would encourage you, if you haven't already filed

10  it, to hold off until later in the case.  If you have filed

11  it, fine, but I'm not going to have any argument on it or

12  consider it until I have heard all the evidence.

13     MS. DALE:  Understood.

14     THE COURT:  All right.  So we are going to stop, oh,

15  in about 20 or 25 minutes for our midafternoon break, so just

16  keep that in mind.

17     COURTROOM DEPUTY:  Please raise your right hand.

18   (The witness was sworn.)

19     COURTROOM DEPUTY:  Please be seated.

20     Please state your full name, and spell your full name

21  for the record.

22     THE WITNESS:  Ryan Akers.  R-y-a-n, A-k-e-r-s.

23     **RYAN AKERS, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

24  BY MS. DALE:

25  Q.  Good afternoon, Mr. Akers.

17-cv-00844-WYD-SKC          Akers - Direct          IV - 1060

1   A.  Good afternoon.

2   Q.  Would you introduce yourself to the jury?  Tell them a

3   little bit about yourself.

4   A.  You already know my name.  Currently I'm a roadmaster out

5   of Pueblo, Colorado, for BNSF.  I've got a family of -- soon

6   to have three kids come tomorrow.  I'm not sure what else I

7   need to talk about.

8   Q.  And I understand that your wife will be giving birth

9   tomorrow whether she likes it or not.

10  A.  Yes.

11  Q.  So we are going to try and get you out of here today.

12  A.  Okay.

13  Q.  Can you just walk us briefly through your history -- your

14  work history with BNSF?

15  A.  Yes.  I hired on start 2007 June as a trackman.  Became a

16  roadmaster in 2013, assistant roadmaster.  Then moved on to a

17  roadmaster in Denver -- I forget what exactly year that was,

18  but still doing that same role just at a different location.

19  Q.  Okay.  So you started as scheduled?

20  A.  Yes.

21  Q.  And eventually moved to exempt?

22  A.  Yes.

23  Q.  Were you a union member as scheduled?

24  A.  Yes.

25  Q.  Are you still a union member?

1    A.  I still pay my dues, yes.

2    Q.  So what is your current position then?  And where are you?

3    A.  Pueblo roadmaster.

4    Q.  Tell us what the roadmaster does generally.

5    A.  Just manage and maintenance repairs of the railroad tracks

6    basically.

7    Q.  How many people do you supervise?

8    A.  Around 30.

9    Q.  And at some point in time were you the roadmaster in

10   Denver?

11   A.  Yes.

12   Q.  Do you recall about what time frame that was?

13   A.  It was 2014 to the end of 2015, somewhere around there.

14   Q.  Okay.

15         MS. DALE:  Can we bring up Exhibit 7, please.  I

16   believe this has been admitted.

17   BY MS. DALE:

18   Q.  Mr. Akers, do you see the exhibit in front of you?

19   A.  Yes.

20   Q.  And have you seen this e-mail chain before?

21   A.  I believe so.

22   Q.  Okay.  And I realize it's been a while.  This is almost

23   four years now.  So let's start with the e-mail in the middle,

24   and I have a question there.

25         It says, "Ryan when he returns" -- so this is June of

1  2015.  Do you recall where you were at that time?

2  A.  I believe I was on military leave.

3  Q.  Okay.  So then let's go down to the bottom.  So it's an

4  e-mail from Cason Cole to Mark Carpenter and yourself; is that

5  correct?

6  A.  Yes.

7  Q.  And they are talking about an issue between Mr. Fresquez

8  and Mr. Cole with respect to a switch.  Do you vaguely

9  remember what this issue was about?

10  A.  I'm not sure the exact situation.  Um, it appears that we

11  were doing some work on something and had an issue there.

12  Q.  Okay.  So on the second paragraph of the last e-mail

13  Mr. Cole mentions some work that they had done several weeks

14  ago, and it says, "which Akers and others can attest to."  Do

15  you recall that work being done?

16  A.   Uh, it was probably one of our planned projects we were

17  doing to fix some of the defects we have.

18  Q.  Okay.  And it indicates that Mr. Fresquez had refused to

19  move -- remove the defect.  Do you recall that issue between

20  Mr. Cole and Mr. Fresquez?

21  A.  I remember there being some issues with some defects.

22          MR. THOMPSON:  Your Honor, I object.

23          THE COURT:  What's the basis?

24          MR. THOMPSON:  Twofold.  Mr. Akers said he doesn't

25  recall this, and it's also leading.

1           THE COURT:  Let me have you restate the question

2   because part of it is leading, part of it is not.  And I need

3   to understand if the witness has personal knowledge about

4   this, whether or not he remembers any of this.

5           MS. DALE:  Okay.

6   BY MS. DALE:

7   Q.  This e-mail indicates that you could attest to some --

8   some work that had been done, but that Mr. Fresquez was

9   refusing to remove a defect.  Do you remember that dispute?

10  A.  I remember being -- there being disputes over issues like

11  this, yes.

12  Q.  Okay.  So you remember generally that there were disputes

13  like this.  You don't remember this specific --

14  A.  Yeah.

15  Q.  -- dispute?

16          Okay.  So let's move on to the e-mail at the top.

17  This is from Mark Carpenter to Adam Miller.  And I understand

18  you are not copied on this, but I'm going to give you some

19  background on this.  Mr. Carpenter is indicating that there's

20  a potential here for disqualification of Mr. Fresquez and/or

21  discipline in relation to this issue.

22          My question to you is:  Do you recall if there was

23  any move to disqualify Mr. Fresquez or any discipline at this

24  time?

25  A.  No, I don't recall any moves of that nature.

1    Q.  Okay.  If there are these issues -- ongoing issues with

2    Mr. Fresquez and Mr. Cole, do you know why there was no move

3    to disqualify him or to discipline him?

4    A.  Um, I know their difficulties with dealing with

5    Mr. Fresquez was that we were just trying to involve him in

6    the team and trying to make a -- make a working relationship

7    between us.

8    Q.  Okay.  Did you personally ever have an issue with

9    Mr. Fresquez failing to do something you had directed him to

10   do?

11   A.  Yes.

12   Q.  Can you tell the jury about that?

13   A.  Um, for example, I was in a meeting with Carpenter, and,

14   um, he interrupted.  He came into the room, interrupted.  I

15   asked him to step outside for a minute, and he refused.  And I

16   repeated my request several times, you know, to get him to

17   leave the room, and he -- he was basically refusing until I

18   got a little bit more adamant about my stance on the issue.

19   Q.  Okay.  So did he eventually leave?

20   A.  Eventually he did.  I asked him to go to my office and

21   wait and we'll talk then, and then he got in his truck and

22   left.

23   Q.  Okay.  So turning to another issue, there's been some

24   discussion in this proceeding about the FRA regulation

25   relating to non-class-specific defects.  Are you familiar with

1    that regulation?

2    A.   Yes.

3    Q.   And what's your approach to those types of defects?

4    A.   We try to repair -- we repair everything within the

5    timeline.

6    Q.   And what if you don't get it repaired within the timeline?

7    A.   We'll take it out of service.  We'll fix it that last day.

8    Q.   Okay.  You understand that Mark Carpenter didn't -- or did

9    you understand that Mark Carpenter did not interpret the FRA

10   regulation the way that you did?

11   A.   Yes.

12   Q.   Did he know that you disagreed with his interpretation?

13   A.   Yes.

14   Q.   Did he express anger with you for disagreeing with his

15   interpretation?

16   A.   No.

17   Q.   Did he try to convince you that he was right and you were

18   wrong?

19   A.   No.

20   Q.   Did he ever try to convince you that you should leave a

21   track in service that you thought should be taken out of

22   service?

23   A.   No.

24   Q.   Did you ever hear him try to convince a track inspector

25   not to take a track out of service?

1   A.   No.

2   Q.   Okay.  So I want to move to the specific allegations

3   relating to you in this matter.

4          First of all, Mr. Fresquez claims that on April 29th,

5   2015, you told him to stop reporting defects or he would no

6   longer be getting a paycheck.  Did you do that?

7   A.   No.

8   Q.   Mr. Fresquez has also alleged that you ordered employees

9   to report defects as being repaired even though they hadn't

10  actually been repaired.  Did you do that?

11  A.   No.

12  Q.   Mr. Fresquez claims that you were deleting defects

13  yourself even though they hadn't been repaired.  Did you do

14  that?

15  A.   No.

16  Q.   Can you think of a reason why you would want to misreport

17  the repair of defects?

18  A.   There is no reason I would want to do that.

19  Q.   Well, don't you want to keep up velocity?

20  A.   Yeah, but I'd as soon have it fixed so we don't have a

21  bigger issue.

22  Q.   What's the risk if you do misreport defects?

23  A.   Tampering with a federal document.  I mean, if not it's

24  a -- you could have a catastrophic event with a train on the

25  ground or something like that.

1   Q.  Could you be subject to fines by the FRA?

2   A.  Yes.

3   Q.  Okay.  So I want to talk about some specific defects that

4   Mr. Fresquez alleges that you improperly removed.  So can we

5   look at Plaintiff's Exhibit 47?

6           And is this your phone number up at the top?

7   A.  Yes.

8   Q.  Okay.  And is this a text message between you and

9   Mr. Fresquez?

10  A.  It looks like it.

11  Q.  Does it look like a picture of him on the side there?

12  A.  Yeah, probably.

13  Q.  Okay.  So this text is dated June 29th, 2015; is that

14  correct?

15  A.  Yes.

16  Q.  Okay.  Then can you identify the defect that he describes

17  right underneath the picture?

18  A.  He's saying a joint tie defect, looks like, on a LoDo

19  siding.

20  Q.  What does the 10 mph mean?

21  A.  It means the track's only good for 10 mile an hour at that

22  location.

23  Q.  What does the .6 to .7 mean?

24  A.  Milepost range.

25          THE COURT:  Hold on.  Can you move a little closer to

1   the microphone and elevate your voice, please.

2          THE WITNESS:   Yeah.  Sorry.

3   A.  Yeah, so he's saying the location basically of the

4   milepost range of where he is putting the defect.

5   BY MS. DALE:

6   Q.  The .6 to .7 does?  Okay.

7          Did you remove this defect from the system even

8   though it hadn't been repaired?

9   A.  No.

10  Q.  Okay.  So let's turn to the next page.  Do you see this is

11  text messages between Mr. Paz and Mr. Fresquez?

12  A.  Yes.

13  Q.  And Mr. Fresquez has testified that this text exchange

14  demonstrates that the defect he identified on the first page

15  was not repaired nine months later.

16          So can you look at the middle text?  Do you see where

17  it says, 10 mile per hour LoDo siding 0.5 to 0.5?

18  A.  Yes.

19  Q.  Is that the same location?

20  A.  No.

21  Q.  Then if you turn to the third page, and again do you see

22  that these are text messages between Mr. Paz and Mr. Fresquez?

23  A.  Yes.

24  Q.  And then if you look down at the third text message, do

25  you see where it says, LoDo siding oos?  That means out of

1   service?

2   A.  Yeah, that means out of service.

3   Q.  Okay.  And I'll represent to you that Mr. Fresquez has

4   testified that this text message chain shows that two months

5   later, in May of 2016, that same defect was still there and

6   still had not been repaired.

7           So looking at the text message that says, LoDo siding

8   out of service, does that tell you where on LoDo siding the

9   tie defect is?

10  A.  On this, no, it does not tell me where.

11  Q.  And I guess I was not very clear.

12          So it says, LoDo siding out of service.  Mr. Paz

13  says, Why.  And then Mr. Fresquez responds, Joint tie defect.

14  Do you see that?

15  A.  Yes.

16  Q.  So can you tell from those exchanges where on the LoDo

17  siding out of service the joint -- I'm sorry -- LoDo siding

18  the joint tie defect is?

19  A.  Unclear the location on this.

20  Q.  Okay.  How long is the LoDo siding?

21  A.  I'm not sure.  Close to a mile long.  Somewhere around

22  there.  I'm not sure.

23  Q.  Do you have any idea how many ties might be on the LoDo

24  siding?

25  A.  Oh, a lot.  I'm not sure how many are there.

17-cv-00844-WYD-SKC          Akers - Direct                    IV - 1070

1    Q.   Multiple?

2    A.   Yeah.   There's a tie about every 19 inches or so.

3    Q.   Okay.   Could you have more than one joint tie defect on

4    the LoDo siding?

5    A.   It's possible.

6    Q.   Could you have joint tie defects at different locations?

7    A.   Yes.

8    Q.   Could you have a joint tie defect show up at the same

9    place, reoccur at different times on the same location?

10   A.   It could happen, yes.

11   Q.   So, in other words, if you fixed it, is it possible that a

12   joint tie defect could reoccur later?

13   A.   Uh, yes.

14   Q.   Okay.   All right.   So let's turn to Plaintiff's Exhibit

15   29.   And I understand that you were not copied on this e-mail,

16   but just for background, Mr. Fresquez writes to Mr. Royston,

17   who is in IT, I believe, indicating that there is a defect

18   that he reported that he can't find.   Mr. Royston responds

19   that you had asked him to remove 35 defects.

20            Do you recall that?

21   A.   Yes.

22   Q.   Okay.   Why were you -- explain the circumstances.   Why

23   were you asking Mr. Royston to remove defects from the system?

24   A.   They were defects that we weren't able to access through

25   the TIMS system.   They weren't showing up to where we could do

1    that, so we had to go through in from the back office and

2    close them out that way.

3    Q.  Okay.  So if a defect was not showing up in the TIMS

4    system, does that show that it was improperly removed?

5    A.  I guess -- can you say that again?

6    Q.  If a defect was not showing up in the TIMS system, does

7    that tell you that it must have been improperly removed?

8    A.  No.

9    Q.  Well, why else would the defect not be there?

10   A.  In the system?  Something -- the system dropped out, or it

11   was not reported against properly, or something with the

12   system, so we just had to go in that back way to clear out the

13   defects.

14   Q.  Okay.  So you mentioned clearing out the defects.  What

15   would you do in order to clear out the defects?  Would you

16   just do what you did, send an e-mail, or would you check them

17   first?

18   A.  I'd go out and inspect them, inspect all locations, and

19   verify that the repairs had been made.

20   Q.  Okay.  If you turn to the third page of this exhibit, and

21   this was the list that was attached to the e-mail that

22   Mr. Royston sent.  Is this the list of the 35 defects that you

23   cleared out?

24   A.  It looks like it, yes.

25   Q.  Did you verify that each and every one of these had, in

1   fact, been repaired and should properly be removed?

2   A.  Yes.

3   Q.  Okay.  So there was two defects on this list that

4   Mr. Fresquez had highlighted as proving that there was no

5   repair made.  The first one is at the "536.700 Back."  Do you

6   see that one?

7   A.  Yes.

8   Q.  And then if you go along the line, it says, "Switch

9   undercut."  And then Mr. Fresquez said that there's no switch

10  there so that could not possibly have been repaired.

11          Do you have an explanation for that?

12  A.  We were -- when we were in that location, we did a lot of

13  switch undercutting and different ballast repair stuff in that

14  area, and that's just the comment I used.

15  Q.  So is there a switch anywhere near that location?

16  A.  Yeah, there are some switches in the neighborhood of that

17  location.

18  Q.  Was that switch actually undercut?

19  A.  Yes.

20  Q.  And then the other location that Mr. Fresquez had

21  highlighted, if you go down to "3.297 Main," do you see that

22  one?

23  A.  Yes.

24  Q.  Okay.  And then under the Repair it says, "Surfaced

25  9/14/2014."  Do you see that?

17-cv-00844-WYD-SKC          Akers - Direct          IV - 1073

1    A.  Yes.

2    Q.  Explain to the jury what you mean by surfaced.

3    A.  Using a machine basically that, um, surfaces the track in

4    a way that it fixes all the geometry.  You can lift it.  You

5    can -- you can take out surface anomalies with this type of

6    equipment.  And that's kind of what we were doing at that

7    location.

8    Q.  Okay.  If you could then turn to -- all right.  So this is

9    September 14th, 2014, that the surfacing was done, according

10   to your report; correct?

11   A.  Yes.

12   Q.  Okay.

13         MS. DALE:  So then go back to Fresquez 292.  No.

14   Sorry.  Next one.  Next page.

15   BY MS. DALE:

16   Q.  Do you know what this report is?

17   A.  Yeah.  It's on our engineering defects site where we can

18   report, um, FRA or geometry or rail defects.

19   Q.  Okay.  So look up at the top there where it says "477" and

20   then "3.35."  Is that showing you the location?

21   A.  Yes.

22   Q.  Okay.  And then the location that we had talked about two

23   pages earlier was 3.297 Main.  This is 3.35 Pikes Peak.  Is

24   this the same location?

25   A.  It's fairly close, yes.

1    Q.  It's close?  Okay.  So can you explain why in May of 2015

2    you are performing remediation work if you had already done

3    that remediation in September of 2014?

4    A.  Uh, it was a re- -- we had a recurring issue there.  So,

5    you know, a year later the same kind of defect came back in

6    the same area.

7    Q.  Is that unusual, in your experience, for a defect to

8    reoccur in the same location?

9    A.  It's not unusual.

10   Q.  Okay.  Look at the next page, which is the first of the

11   pictures.  Is this what you would call a fouled ballast

12   defect?

13   A.  At this location, yes.

14   Q.  So can you explain to the jury what that means, what a

15   fouled ballast is?

16   A.  Well, a fouled ballast is basically where the drainage is

17   clogged, and it's causing kind of surface anomalies to

18   develop.  So basically just due to the wrong kind of, you

19   know, dirt getting in the track or something, it's causing the

20   track to have a different kind of geometry than it should.

21   Q.  Okay.  So what could cause a fouled ballast to reoccur at

22   the same location?

23   A.  Um, like in this location there's a lot of infrastructure

24   nearby, and the drainage from the city kind of flows into that

25   area.

 1  Q.  Do you recall having work done on more than one occasion

 2  in this area?

 3  A.  Yeah, we worked on this location several times.

 4  Q.  Okay.  So would it be surprising if the same defect showed

 5  up multiple times within a year or two?

 6  A.  No, I would not be surprised by that.

 7  Q.  So does this documentation prove that, in fact, you

 8  improperly removed that defect from the system even though it

 9  hadn't been repaired?

10  A.  No.

11          THE COURT:  Okay.  We're going to stop, unless --

12  you're not about to finish, are you?

13          MS. DALE:  No.  Sorry.

14          THE COURT:  All right.  No, no, I'm just asking.

15          All right.  We are going to take a 15-minute break,

16  and we'll start again.

17          How much longer do you estimate you will be with this

18  witness?

19          MS. DALE:  I'm actually really close.  I would say

20  five minutes.

21          THE COURT:  Well, all right, I will give you five

22  more minutes if you can finish in five minutes.  If you

23  haven't --

24          MS. DALE:  Are you going to hold me to it?

25          THE COURT:  -- we'll still stop.  I will give you

17-cv-00844-WYD-SKC                Akers - Direct                IV - 1076

 1    five more minutes.

 2              MS. DALE:  Fair enough.

 3              THE COURT:  But if you take more, I'm not going to

 4    penalize you, but see if you can finish in the next five

 5    minutes on direct.

 6              MS. DALE:  Understood.

 7    BY MS. DALE:

 8    Q.  Mr. Akers, have you ever removed a defect from the TIMS

 9    system or the EAMS system that had not actually been repaired?

10    A.  No.

11    Q.  I want to change course really quickly.  Have you ever

12    written up a track inspector for failing to report defects?

13    A.  Yes.

14    Q.  Tell me about that.  Or tell the jury about that.

15    A.  Uh, well, we had an employee that was, I could say, ghost

16    inspecting.  You know, he was not actually doing the

17    inspections, putting inspections in.  You know, a lot of

18    defects were going unreported and issues were arising, and we

19    had to write that employee up and --

20    Q.  Who was that employee?

21    A.  It was Eric Bettin.

22    Q.  So how did you learn that there was an issue with him not

23    reporting defects?

24    A.  Well, there were some issues happening on his track more

25    often.  Some other employees were saying they haven't seen him

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    in his area of work.

2    Q.   Okay.  Did you personally write him up for that?

3    A.   Yes.

4    Q.   What did you charge him with?

5    A.   Uh --

6    Q.   If you remember.

7    A.   It was like falsifying reports.  Falsifying track

8    inspection reports was the main charge.

9    Q.   Why is this significant to you that he wasn't actually

10   doing his job as a track inspector?

11   A.   It could ultimately lead to, you know, having a major

12   derailment, injuries, you know, anything of that nature.

13   Q.   Okay.  So, I mean, according to Mr. Fresquez, he

14   doesn't -- you didn't want the track inspectors writing

15   defects.  So this should be a good thing for you.  Why did you

16   care?

17   A.   I mean, I want my inspectors to write the defects so we

18   can address the issues we have.

19   Q.   Do you know what happened to Mr. Bettin as a result of

20   this write-up?

21   A.   He was dismissed.

22   Q.   Okay.  And then changing course again, where were you in

23   May of 2016?

24   A.   I was in my job at La Junta as the La Junta roadmaster.

25   Q.   Did you have any involvement in the decision to charge

1   Mr. Fresquez with a rules violation in May of 2016?

2   A.  No.

3   Q.  Did you have any involvement in his investigation hearing

4   in May of 2016?

5   A.  No.

6   Q.  Did you have any involvement in the decision to terminate

7   Mr. Fresquez's employment?

8   A.  No.

9        MS. DALE:  Can I have one moment, Your Honor?

10       THE COURT:  Go ahead.

11  BY MS. DALE:

12  Q.  Mr. Akers, do you understand that you are not allowed to

13  retaliate against employees for reporting safety concerns?

14  A.  Yes.

15  Q.  Have you ever done that?

16  A.  No.

17       MS. DALE:  No questions.  Thank you.

18       THE COURT:  All right.  We are going to take our

19  break to 3:30.  So we will take a 17-minute break, and we will

20  come back and continue the examinations.

21     (Proceedings recessed 3:13 p.m. to 3:35 p.m.,

22     resuming outside the presence of the jury.)

23       THE COURT:  All right, let's bring the jury back in.

24     (Jury in at 3:37 p.m.)

25       THE COURT:  All right, you may be seated.

1            Let's proceed with the cross-examination.

2                        **CROSS-EXAMINATION**

3    BY MR. THOMPSON:

4    Q.  Mr. Akers, Miss Dale asked you about a time that Brandon

5    Fresquez was, and I think I'm quoting here, hijacking a

6    briefing.  Is that right?

7    A.  Yes.

8              MS. DALE:  Objection.  I did not ask that question.

9              THE COURT:  I don't remember what you asked or didn't

10   ask.

11   BY MR. THOMPSON:

12   Q.  Okay.  Did you talk --

13             THE COURT:  So --

14             MR. THOMPSON:  Sorry, Judge.

15             THE COURT:  -- I will allow the question, but the

16   witness needs to understand it.  If he doesn't understand it,

17   I will have him tell you that.

18   BY MR. THOMPSON:

19   Q.  Do you recall talking about Brandon hijacking a briefing?

20   A.  Today?

21   Q.  Yeah.

22   A.  Yeah, he interrupted my -- the meeting I was having.  It

23   was really a briefing, but I said a meeting.

24   Q.  You used the word "hijacking."  Am I misrecalling that, or

25   did you?

1   A.  Not today, no, I did not use the word "hijacking."

2   Q.  Mr. Fresquez, when he interrupted your meeting, was

3   discussing whether a defect was being accurately reported;

4   right?

5   A.  I don't recall what his reason was for interrupting.

6   Q.  You were deposed in this case; right?

7   A.  Yes.

8   Q.  You swore to tell the truth?

9   A.  Yes.

10  Q.  And you did tell the truth; right?

11  A.  Yes.

12  Q.  Let's see what you said in your deposition.

13          "Question:  Do you remember any of the times he

14  hijacked a briefing other than about defects not being

15  reported or repaired correctly?"

16          MS. DALE:  Objection, Your Honor.

17  BY MR. THOMPSON:

18  Q.  Your answer:  "No."

19          MS. DALE:  Objection.

20  BY MR. THOMPSON:

21  Q.  Did I read that correctly?

22          THE COURT:  Hold on.  What's the objection?

23          MS. DALE:  This is improper impeachment.  He was not

24  talking about the briefing.  He was talking about a meeting

25  with Mark Carpenter.

1    THE COURT:  All right.  Let me see the -- oh, I can't

2  see the deposition because you don't have it.  I need to see

3  the deposition to get a context for the statement.  Let's go

4  back, and show me, Counsel, how this is related to what you

5  think it's related to.

6    MS. DALE:  And, Your Honor, we have a hard copy if

7  that --

8    THE COURT:  Yeah, let me see the hard copy.

9    MR. THOMPSON:  Thank you.

10    THE COURT:  Ms. Dale, where should I start to read to

11  get the context for this question?

12    MS. DALE:  Page 60.

13    THE COURT:  All right, page 60.  Okay.

14    I can't tell what this relates to.  It seems to

15  relate to a meeting.  Can you ask the witness what this

16  relates to?  Because unless I take time to read more of this,

17  which I don't want to do, I can't figure it out.

18    MR. THOMPSON:  Sure.  I can go about it a different

19  way.

20  BY MR. THOMPSON:

21  Q.  Earlier you testified about Brandon interrupting a

22  meeting; right?

23  A.  Yes.

24  Q.  Do you recall a time Brandon ever disrupted a briefing

25  that was something other than whether a defect should be

1   accurately reported?

2   A.  Well, he interrupted a lot of our morning briefings.

3   Q.  Was there ever a time that it was about anything other

4   than accurately reporting defects?

5   A.  It was kind of whatever he felt like talking about that

6   day.

7   Q.  All right.  Let's show you what you said in your

8   deposition.  I asked you:

9           "Question:  Do you remember any of the times he

10  hijacked a briefing other than about defects not being

11  reported or repaired correctly?"

12          Your answer at that time was:  "No."

13          Correct?

14  A.  Correct.

15  Q.  After your deposition, but before trial, you spoke with

16  BNSF's lawyers, didn't you?

17  A.  After the deposition?

18  Q.  Yeah, but before today.

19  A.  Just I've talked with them.

20  Q.  After speaking with BNSF's lawyers, is there anything

21  about your deposition, other than this, that you'd like to

22  change?

23  A.  No.

24  Q.  I'll actually leave this up.  I apologize.

25          So I want to clarify something because I'm not -- it

1   wasn't clear to me from your testimony.  I'm going to show you

2   Plaintiff's Exhibit 47.  Do you remember talking about this

3   with Ms. Dale?

4   A.  Yes.

5   Q.  And it has two pages she discussed; right?

6   A.  Yes.

7   Q.  Sorry.  It wasn't clear to me.  Do you think that the

8   defect on page 1 that's reported in the text message on

9   6/29/2015 is a different defect than on March 8, 2016, or do

10  you think it's the same defect but just things had changed

11  since then and it's not surprise that there's new issues with

12  it?

13  A.  Well, based on the location in his text messages, it would

14  appear it's a different location.

15  Q.  Okay.  So let's talk about that.  Milepost .6 to .7,

16  that's at the Cherry Creek bridge?

17  A.  It's in that neighborhood, yes.

18  Q.  Let's go to the next page then.  And what do we see here?

19  Let me know if I read this text correctly.  10 miles per hour

20  LoDo siding .5 to .5 no joint ties on west end of Cherokee

21  bridge.  Did I read that correctly?

22  A.  Yes.

23  Q.  Let's look at something else in this picture.  I'll blow

24  it up a little bit for you.  So we are back at page 1, which

25  is supposedly the different defect than on page 2.  Right?  Do

1  you see right here, this piece of scrap?

2  A.  Piece of plywood, yes.

3  Q.  Yeah.  Now, going to page 2, we are going to blow that

4  picture way up so we can look at that better.  Do you see that

5  piece of scrap there again?

6  A.  That other piece of scrap was on the outside of the track.

7  That looks like it's on the inside.

8  Q.  Yeah.  The piece of scrap has moved; right?

9  A.  Or whatever -- scrap or whatever you want to call it.

10  That also doesn't look like the same picture because the other

11  picture had two ties in it.  That has one tie.

12  Q.  So you think despite the scrap, despite the Cherokee

13  bridge, despite being the same 10 miles per hour on the LoDo

14  siding, you think this is a different defect.  That's what you

15  are telling the jury?

16  A.  That's what it appears to be because his original milepost

17  is .6 to .7.  The next one is .5.  That's a tenth of a mile

18  off.

19  Q.  Oh, that's a ton, isn't it?  You guys are never off by a

20  tenth of a mile.

21        MS. DALE:  Objection:  argumentative.

22        THE COURT:  You're both talking over each other too.

23        MR. THOMPSON:  I will withdraw it, Judge.

24  BY MR. THOMPSON:

25  Q.  The milepost, they are not exact; right?

1   A.  The milepost is what the milepost is.

2   Q.  Yeah, but you guys have long miles and short miles because

3   the track distances change over time.

4   A.  There's some locations, yes, where you have a short mile.

5   Q.  And being off by a tenth of a mile, not all that big a

6   deal, is it?

7   A.  Well, from here this looks like to me a different

8   location.

9   Q.  I guess -- okay.  Fair enough.  So you think that's

10  different.

11          Let's talk about 29, Plaintiff's Exhibit 29.  So you

12  reported 35 defects to Mr. Akers -- or, sorry, to Mr. Royston

13  as being repaired; right?

14  A.  Yes.

15  Q.  Mr. Fresquez on May 1st reports a defect you had reported

16  as repaired; right?

17  A.  I guess he's reporting -- he is trying to report some

18  defect there.

19  Q.  Yeah.  Do you think it's one of the ones on your list, or

20  do you think it's a different defect?  Or you just don't know?

21  A.  I don't know what he was trying to report to on this.

22  Q.  Okay.  Let's dig in there.  So you see Mr. Fresquez

23  reporting at milepost 3.297.  You see that?

24  A.  Yes.

25  Q.  Mr. Royston responds and says there's 35 defects that

1  Mr. Akers closed out this week.  Do you see that?

2  A.  Yes.

3  Q.  We then have the defect list, and there we go, milepost

4  3.297.  Same milepost; right?

5  A.  Correct.

6  Q.  Think it's the same defect?

7  A.  Same location.  I don't know if it's the same defect,

8  but . . .

9  Q.  You reported -- according to Mr. Royston, you told him to

10  delete it because it had been repaired, you have told him,

11  that week; right?

12  A.  Yes.

13  Q.  Do you know Mr. Fresquez went out and took pictures of the

14  defect?

15  A.  I'm sure he did.

16  Q.  All right.  I'll show you that.

17       Do you think this happened in the course of less than

18  five days?

19  A.  I'm not sure.  Based on -- the work I did took several

20  weeks to come up with all that information, if not longer.

21  Q.  Oh, all right.  So it may not have been repaired the day

22  you reported it.

23  A.  Yes.

24  Q.  But you had repaired it at some point in time.

25  A.  I repaired it based on our work plan.

1    Q.  And you didn't check whether it was still repaired when

2    you told Mr. Royston to delete it.

3    A.  For the date that I gave him, yes.

4    Q.  All right.  As I understand it, you used a paper list to

5    keep those 35 defects.

6    A.  A paper list?

7    Q.  Yeah.  You -- let's go back a step.

8           You tracked that you had repaired 35 defects; right?

9    A.  Yes.

10   Q.  You reported that to Mr. Royston?

11   A.  Yes.

12   Q.  And you did that, you kept notes, paper written --

13   handwritten notes.

14   A.  Yes.

15   Q.  You destroyed those notes after this case was filed.

16   A.  No.

17   Q.  Do you still have them?

18   A.  No.

19   Q.  You destroyed them; right?

20   A.  I -- as soon as I deleted those defects, we didn't -- I

21   didn't need that paperwork anymore.

22   Q.  All right.  So let's see what you said in your deposition.

23   Well, actually, let's be clear.

24          If BNSF had come to you when this case -- after this

25   case had been filed with OSHA, could you have provided those

1   notes to BNSF?

2   A.   Those notes?  Probably not.

3   Q.   All right.  I asked you the same thing during your

4   deposition.  Let me pull it up.  Let's see what you said.

5           THE COURT:  Tell me what page you are referring to

6   this time.

7           MR. THOMPSON:  I will, Your Honor.  It's page 83 in

8   Mr. Akers' deposition.  It starts at line 21, Your Honor.

9   BY MR. THOMPSON:

10  Q.   I ask:  "So if BNSF would have come and asked you for

11  those paper lists, you could have given them to them?"

12          "Answer:  Most likely, yes."

13          Did I read that correctly?

14  A.   Yes.

15  Q.   I then asked:  "And you could have shown me every repair

16  where you pulled it from; right?"

17          Your answer was:  "Yes."

18          Did I read that correctly?

19  A.   Yes.

20  Q.   Instead, since you destroyed those notes, we'll have to

21  take your word for it; right?

22  A.   I didn't --

23          MS. DALE:  Objection:  argumentative.

24          THE COURT:  Overruled.  I will allow it.

25  BY MR. THOMPSON:

1   Q.  So we hired an expert in track defect reporting under the

2   FRA regulations, Joe Lydick.  He testified that you cannot

3   keep paper notes.  You have to use the electronic system.

4        Did you know what you were doing was illegal?

5   A.  I didn't do anything illegal.

6        MS. DALE:  Objection:  argumentative.

7        THE COURT:  Overruled.

8   BY MR. THOMPSON:

9   Q.  You kept paper notes of defect reports; right?

10   A.  I used the paper list to track what I was doing, but it

11   was reported electronically through Royston.  So it was

12   electronically reported.

13   Q.  How much longer after you repaired the defects did you

14   report them to Mr. Royston?

15   A.  That depends on the defect, I guess.

16   Q.  Give me some ranges.  Are we talking, hey, I made these

17   repairs days ago, I made them minutes ago, I made them weeks

18   ago, I made them years ago?

19   A.  Just based on whenever I went through the defect list and

20   I went out there and inspected them to see if there had been

21   work to satisfy the defect, and -- or the last time we worked

22   on that defect in that location.

23   Q.  All right.  So let's look at the list that was -- that

24   Mr. Royston used, the repair dates you gave him.

25        Now, you sent this to Mr. Royston in May or late

17-cv-00844-WYD-SKC                    Akers - Cross                    IV - 1090

1    April of 2015; right?

2    A.  It appears that way.

3    Q.  I see a repair date for the defect at issue of 9/14/14.

4    Do you see that?

5    A.  Yes.

6    Q.  Let's see if we can find one earlier than that.

7             6/30/14, do you see that?

8    A.  Yes.

9    Q.  4/17/15, do you see that?

10   A.  Yes.

11   Q.  So you were carrying around these paper notes and not

12   using the electronic system for over a year.

13   A.  We're just trying to clear up the list is all we're trying

14   to do.

15   Q.  What prompted you to finally send them to Mr. Royston?

16   A.  We couldn't get them cleared through the maintenance desk

17   or through the TIMS system, so that was the route we had to

18   go.

19   Q.  You held on to those notes for over a year; right?

20   A.  Apparently.

21   Q.  And then after Mr. Fresquez filed his case, you destroyed

22   them.

23   A.  No, I didn't destroy anything because of this case.

24   Q.  After this case was filed, you threw away your notes,

25   didn't you?

1   A.  I deployed to Afghanistan, so I didn't have anything left.

2   Q.  And you threw them away before you went there.

3   A.  I didn't intentionally throw anything away that had to

4   deal with my job in Denver.

5   Q.  Did you save them?

6   A.  I left all my stuff in my office, and I left.

7   Q.  Oh, so now you didn't throw them away.

8   A.  I don't know where they are.  Could have thrown them away.

9   Could have not.  I don't know.

10  Q.  You just don't know.  Did you look in your office when we

11  filed this case?  Or when BNSF said you had discovery

12  obligations, did you look for those notes?

13  A.  No.

14  Q.  BNSF's lawyers never said, Hey, you are being accused of

15  maliciously deleting 35 defects.  Why don't you look for your

16  notes?

17  A.  I didn't do anything malicious, but --

18  Q.  Right, but you are being accused of that; right?  You know

19  that.

20  A.  I guess.

21  Q.  And you never thought, Hey, I've got notes that prove I

22  didn't delete these.  You never thought to look for them?

23  A.  I didn't do anything wrong, so I didn't feel the need to

24  go tracing my footsteps.

25  Q.  I see.  All right.

1              Let's talk about the 30-day rule.  If a non-class

2     defect is not fixed within 30 days, what do you believe should

3     happen to that track?

4     A.  I believe we take it out of service and fix it, if not

5     fixed prior.

6     Q.  You believe the FRA requires that?

7     A.  I believe that's their intent, yes.

8     Q.  But that was not Mark Carpenter's interpretation of the

9     regulations, was it?

10    A.  No.

11    Q.  You discussed your belief with Mr. Carpenter.

12    A.  Yes, I did.

13    Q.  In fact, you discussed it with him several times.

14    A.  It was a topic of concern, yeah.  We talked about it.

15    Q.  Mr. Carpenter never changed his opinion.

16    A.  No.

17    Q.  You didn't call the FRA?

18    A.  I was doing things under a more restrictive than what Mark

19    was asking, so I had no need to go.

20    Q.  My question was different.  You didn't call the FRA, did

21    you?

22    A.  No.

23    Q.  You didn't tell Adam Miller?

24    A.  No.

25    Q.  You didn't call BNSF's legal counsel?

1    A.   No.

2    Q.   You didn't call the hotline?

3    A.   No.

4    Q.   You didn't call anybody.  And that's because you didn't

5    want to, quote, blow the whistle on anybody, end quote; right?

6    A.   Well, I was not trying to blow a whistle or not blow a

7    whistle.  I just had a stricter policy I wanted to maintain

8    with my work group, so that's how we did it.

9    Q.   All right.  Let's pull up your deposition at page 38.

10        You said --

11        MS. DALE:  Objection, Your Honor.  I don't believe

12   this is proper impeachment.  It's not inconsistent with what

13   he just said.

14        THE COURT:  I'm sorry.  I can't hear what you are

15   saying.

16        MS. DALE:  Sorry.  I don't believe this is proper

17   impeachment.  It's not inconsistent with what he just

18   testified to.

19        THE COURT:  Well, I don't know.  Let me look at it.

20   What is it, page 38?

21        MR. THOMPSON:  38, starting at line 18 through line

22   24.

23        THE COURT:  Are you going to have these original

24   depositions here tomorrow?

25        MR. THOMPSON:  We are, Your Honor.  I apologize.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1           THE COURT:  This is another reason why I need them.

2    I want the witness to have an opportunity to look at the

3    original if he chooses to for context, and then sometimes, as

4    I am doing now, the Court has to do the same.  And unless

5    Ms. Dale has memorized all this, she doesn't have her copy in

6    front of her.

7           Do you have another copy?

8           MS. DALE:  Uh, no, but it's on the screen.

9           THE COURT:  That's fine, but I want to make sure I

10   understand the context.

11          All right.  So what's your objection?

12          MS. DALE:  Your Honor, I don't believe it's proper

13   impeachment.  I don't believe that the deposition testimony is

14   inconsistent with what he just said.

15          MR. THOMPSON:  Your Honor, if I may respond.

16          THE COURT:  You may.

17          MR. THOMPSON:  It's deposition testimony.  I can

18   stand up here and read it out loud the whole thing if I want,

19   as long as it's relevant.

20          THE COURT:  No, you can't.  Well, you can if he's a

21   party, but he's not a party.  He's just a representative of

22   the entity.

23          All right.  I'm going to overrule the objection.  Go

24   ahead and ask your question.

25   BY MR. THOMPSON:

1   Q.  At your deposition you said:  "I didn't call anybody to

2   tell them my disagreement, no."

3          I then asked you:  "Why not?"

4          You answered:  "Because it wasn't an issue that I

5   felt like I needed -- I wasn't trying to blow a whistle on

6   anybody.  We were just trying to figure out what our plan was

7   to correct everything."

8          Did I answer that correct -- did I read that

9   correctly?

10  A.  Yes, you did.

11  Q.  Thank you.

12         You believe, however, Adam Miller knew about Mark

13  Carpenter's interpretation of the rule; right?

14         MS. DALE:  Object to foundation.

15         MR. THOMPSON:  I can ask it differently.

16         THE COURT:  Overruled.

17  BY MR. THOMPSON:

18  Q.  You can go ahead, or I can re-ask.  Did you have a belief

19  as to whether Adam Miller knew about Mark Carpenter's

20  violation of the 30-day rule?

21  A.  I don't know if he knew.

22  Q.  You believed he did, though.

23  A.  I would assume he would.

24  Q.  Everybody knew; right?

25         Is that a yes?

17-cv-00844-WYD-SKC                Akers - Cross                    IV - 1096

1   A.  I don't know.  I don't know everybody.

2   Q.  Sure.  Fair enough.

3            You believed Adam Miller knew that Mark Carpenter was

4   violating federal regulations.

5   A.  I don't think that Mark was necessarily violating the

6   regulation.  His interpretation just wasn't the same as what I

7   have.

8   Q.  Or what the law actually says; right?

9   A.  We just didn't have the same interpretation of the law.

10  Q.  And you believe Adam Miller knew of Mark Carpenter's

11  interpretation.

12  A.  I would assume they would talk about it, but, again,

13  that's an assumption.

14  Q.  All right.  So there's been some questions in this case

15  about why the FRA didn't notice this.  I want to ask you about

16  that.  Okay?

17           When you worked in Denver, you had access to the

18  territory's TIMS system?

19  A.  Yes.

20  Q.  That's something you could pull up.

21  A.  Yes.

22  Q.  But when the FRA, if they were to come and request those

23  records from you, you couldn't give them to the FRA.  You

24  would instead have to request them from BNSF.  Right?

25           MS. DALE:  Your Honor, I believe this is outside the

17-cv-00844-WYD-SKC                 Akers - Cross                    IV - 1097

1   scope.  I did not ask him any questions about the FRA coming

2   to inspect their records.

3              THE COURT:  Yeah, but there were questions you asked

4   him about the role of the FRA.

5              MS. DALE:  No, it was about the FRA regulation and

6   the interpretation of that, not about anything the FRA

7   actually did.

8              THE COURT:  Well, I always give some latitude in

9   cross.  I think there's a sufficient nexus between the two

10  that I will allow the question.  So objection overruled.

11  BY MR. THOMPSON:

12  Q.  When the FRA would request records from you, you'd have to

13  request them from BNSF's headquarters; right?

14  A.  Yes, I'd have to send that up as a request.

15  Q.  You were prohibited from giving the records directly to

16  the FRA.

17  A.  It's a company policy to have it -- have that request sent

18  up.

19  Q.  Would the FRA let you know ahead of time they were coming?

20  A.  Sometimes, yes.

21  Q.  Were there any times in Denver that they didn't let you

22  know they were coming at least a few days or a week ahead of

23  time?

24  A.  Yes.

25  Q.  How many times?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.  I don't recall the amount of times.

2   Q.  It didn't happen very often, did it?

3   A.  No.

4   Q.  And so in theory, and I'm not saying you did this, but in

5   theory, you guys could wait until the FRA told you they were

6   going to come inspect, where they were going to inspect, and

7   you guys could have done a blitz to try to repair everything

8   really quickly.  Hypothetically, you could do that; right?

9   A.  I don't -- they typically let you know a few days out.  So

10  to blitz and fix something in front of them -- and they don't

11  always tell you where they want to inspect.

12  Q.  So I want to be crystal-clear about this because I think

13  BNSF's counsel misrepresented our position to you.

14          We only allege you at one time purposely violated the

15  FRA regulations.  In fact, the testimony has been you were

16  overall a good supervisor.  I want to talk about that one

17  time.  Okay?  What is -- strike that.

18          Is track 533 or 0533, is that a grain track?

19  A.  I don't recall.

20  Q.  You just don't remember one way or the other?

21  A.  There's a lot of track numbers out there.  I can't

22  remember them all.

23  Q.  If Mr. Fresquez testified that it was a grain track, you

24  wouldn't have reason to dispute that?

25  A.  No.

1   Q.  Grain tracks need to be -- especially this one, need to be

2   inspected monthly; right?

3   A.  Well, I guess if you are talking about like a back track

4   or some kind of a Class 1, yes.

5   Q.  And if it's not inspected, it has to be taken out of

6   service; right?

7   A.  Correct.

8   Q.  And if there's defects that are over 30 days on it, you

9   believe it needs to be taken out of service?

10  A.  Yes.

11  Q.  Taking a grain track out of service can hurt BNSF's profit

12  because that's where the customer is.  That's how you get to

13  the customer and load the cars.  Right?

14  A.  It's access for the customer, yeah.

15  Q.  So Brandon alleges that on April 29, 2015, because you

16  were being pressured to from Mark Carpenter, you asked him to,

17  since it was the end of the month and it had to be done,

18  inspect a track and not to take it out of service, a grain

19  track.  You dispute that; right?

20  A.  Can you say that again?

21  Q.  Sure, I think so.  Brandon Fresquez alleges that on

22  April 29, 2015, it was the end of the month, and so you asked

23  him to inspect this track.  However, you knew there were going

24  to be defects there, so you told Brandon to ignore the defects

25  and keep the track in service anyways.  You dispute that;

1   right?

2   A.  I don't believe I'd ever say that.

3   Q.  Did you know that Brandon that evening contacted his union

4   rep -- or actually while he as at work contacted his union

5   rep?

6           MS. DALE:  Object to foundation.

7           THE COURT:  Overruled.

8   A.  I didn't know he contacted the union rep.

9   BY MR. THOMPSON:

10  Q.  Any reason Brandon would have to contact a union rep about

11  you?

12  A.  No.

13  Q.  Did you know that that union rep went to Adam Miller with

14  a concern?

15  A.  Uh, I'm vaguely aware that something like that happened.

16  Q.  Did Adam Miller talk to you about it?

17  A.  Yeah, there were -- I don't know what the conversation

18  was.  If it happened, I don't recall.

19          MR. THOMPSON:  I have nothing further.  Thank you.

20          THE COURT:  All right.  Redirect.

21                    **REDIRECT EXAMINATION**

22  BY MS. DALE:

23  Q.  Okay.  Can we go back to Exhibit 29?

24          In your experience, is there a difference in location

25  between .5 and between .6 and .7?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   A.  Yes.

2   Q.  If you were going out to look for a joint tie defect,

3   would you be looking in two different locations based on those

4   directions?

5   A.  Yeah, I would be looking a tenth of a mile off.

6   Q.  And Mr. Thompson asked you about the photos on page 1

7   versus page 2.  Do you believe those are two different

8   locations?

9   A.  The pictures, to me, don't look consistent.

10  Q.  All right.  Then with respect to Exhibit 47, were you

11  reporting that each of these defects had been repaired in the

12  last week?

13  A.  I never reported against these defects.

14  Q.  Were you asking -- telling Mr. Royston to remove these

15  defects when -- when you asked him to remove those defects,

16  were you telling him they had all been repaired in the past

17  week?

18  A.  No.

19  Q.  How long had that process been ongoing?

20  A.  It had gone on for several months doing the investigation

21  to make sure that the repairs were adequate.

22  Q.  Okay.  So why did you wait, as opposed to doing them every

23  single day that you did a repair?

24  A.  I just wanted to make the conversation one time.  I didn't

25  want to have to keep trying to contact the back office all the

```
 1    time to repair them all every week.

 2    Q.  Did you independently confirm that each one of these

 3    repairs had been made?

 4    A.  Yes.

 5    Q.  Did you ask Mr. Royston to remove any defects that had

 6    not, in fact, been repaired?

 7    A.  No.

 8    Q.  If you look at the photo, do you see there was a time

 9    stamp on that?

10    A.  On this text here?

11    Q.  On the photo?

12              MS. DALE:  Oh, I apologize.

13              THE WITNESS:  Yeah.

14              MS. DALE:  Yeah, it was --

15              MR. GOMAN:  That's 47.

16              MS. DALE:  Oh, I thought I moved to 29.

17    BY MS. DALE:

18    Q.  Okay.  So looking at the photos, do you see the time stamp

19    on that?

20    A.  No.

21    Q.  It's really difficult to read.  It's in blue --

22              MR. THOMPSON:  I think you have the one without the

23    time stamp.  Do you want me to plug it in?

24              MS. DALE:  Yeah.  Would you mind?

25              MR. THOMPSON:  I want to make sure I have got the
```

17-cv-00844-WYD-SKC                Akers - Redirect                IV - 1103

1    same picture up.

2            THE COURT:  Wait a minute.  I don't want counsel to

3    talk to each other.

4            MS. DALE:  I apologize, Your Honor.

5            THE COURT:  Talk to me, and I will mediate here.

6    What's the issue?

7            MS. DALE:  It appears that our exhibit we have put up

8    is an older version.  They had replaced it with a newer

9    version.  So I'm just -- Mr. Thompson has agreed to pull up

10   the newer version.

11           THE COURT:  All right.  Well, talk to me because when

12   you make comments to each other, the court reporter takes them

13   down, and they don't make any sense for this record.

14           MS. DALE:  My apologies.

15   BY MS. DALE:

16   Q.  Okay.  Now, does this make sense, the question?  Do you

17   see that there's a time stamp on this one?

18   A.  Yes.

19   Q.  What's the time stamp on that?

20   A.  June 8, 2015.

21   Q.  Then if you go back to the first page of this exhibit, the

22   report that Mr. Fresquez entered, what date is that?

23   A.  May 1, 2015.

24   Q.  Look down at the bottom of the e-mail.

25   A.  Oh.

17-cv-00844-WYD-SKC                Akers - Redirect                IV - 1104

1    Q.   Is that a TIMS report?

2    A.   The bottom part, there's a TIMS report deal there, yes.

3    Q.   That's a screenshot from a TIMS report?

4    A.   That's what it looks like, a screenshot of what the

5    inspector would have saw on the TIMS.

6    Q.   Okay.  So what's the date on that one?

7    A.   I see a date of 4/27/2015 on there.

8    Q.   Okay.  So the photo was not taken five days later;

9    correct?

10   A.   Correct.

11   Q.   Is there any way that these sort of defects could reappear

12   between April 27th and June 8th even if they had been

13   repaired?

14   A.   They could have, depending on the amount of moisture or

15   something like that.

16   Q.   How does moisture affect a track defect?  Or how could

17   that cause a track defect?

18   A.   You know, moisture can build up.  It can, um -- drainage

19   from the city area draining in can wash silt into the track,

20   that kind of thing.  It can accumulate.

21            MS. DALE:  Your Honor, can I have a moment?

22            THE COURT:  Go ahead.

23            MR. THOMPSON:  You want to hook up?

24            MS. DALE:  No, I'm good.  Thank you.

25            THE COURT:  Go ahead.

1   BY MS. DALE:

2   Q.  You mentioned when you were talking to Mr. Thompson that

3   you were in Afghanistan.  When were you there?

4   A.  The --

5            MR. THOMPSON:  I'm going to object, Your Honor:

6   relevance.

7            THE COURT:  Overruled.

8   A.  I left in October 2016, and I came back at the end of --

9   well, December of 2017.

10   BY MS. DALE:

11   Q.  Why were you in Afghanistan?

12   A.  National Guard.  We got called up to . . .

13   Q.  Okay.  Did you feel that there was any need to keep the

14   written notes after you had inputted the same information into

15   TIMS?

16   A.  No.

17            MS. DALE:  Thank you.

18            THE COURT:  All right.  Is there any recross?

19            MR. THOMPSON:  There is briefly, Your Honor.

20                    **RECROSS-EXAMINATION**

21   BY MR. THOMPSON:

22   Q.  You made a fair point.  The picture in Exhibit 29 is taken

23   a month and a week or two after this report; right?

24   A.  Yes.

25   Q.  What about when the FRA cited BNSF for that same defect?

1  When was that?

2  A.  May 21st, 2015.

3  Q.  Closer in time; right?

4  A.  Yes.

5  Q.  All right.  So let's talk about ties for a second.

6  They're big pieces of lumber soaked in creosote; right?

7  A.  Soaked in some kind of oil, yes.

8  Q.  That's to prevent wear and tear or to make them last

9  longer; right?

10  A.  Yes.

11  Q.  I have them in my retaining wall.  They have been there

12  forever, and they last a long time.

13  A.  Yeah.

14  Q.  They don't wear down in a week or two, do they?

15  A.  Not typically.

16  Q.  All right.  So I'm going to bring up the picture one more

17  time.  You agree with us that this does show a defect that

18  would be necessary to report; right?

19      If you need me to zoom in on any part, go ahead and

20  let me know.

21  A.  Um, yeah, I would take -- I would accept that as a defect.

22  Q.  Yeah.  Did you know that the e-mail you talked about

23  earlier when they were -- Mr. Cole was trying to get Brandon

24  for insubordination was for leaving that -- or taking that

25  track out of service because of that defect?

1   A.  I don't recall that.

2   Q.  It would be proper to take that track out because of that

3   defect; right?

4   A.  That defect doesn't necessarily warrant to be out of

5   service.

6   Q.  Fair enough.  If it's more than 30 days old?

7   A.  If it was written in 30 days, at the end of 30 days you

8   could.

9          MR. THOMPSON:  Thank you, Mr. Akers.

10          MS. DALE:  Briefly, Your Honor?

11          THE COURT:  No, you're done.  You've already had

12   redirect, and recross is the last.

13          All right.  This witness is excused.  All right.  Who

14   is your next witness?

15          MR. GOMAN:  Stephanie Detlefsen.

16          THE COURT:  How long is her testimony?

17          MR. GOMAN:  I think her direct will be 45 minutes.

18          THE COURT:  All right.  Then we'll probably have to

19   bring her back tomorrow.  There's a legal matter I want to

20   raise with counsel, but I'm going to excuse the jury.  So I

21   want you to stop no later than 4:45.  So go for 37 minutes,

22   and then I'll excuse the jury.

23          And then before I do that, though, I want to just

24   again figure out if we can get the evidence in tomorrow.  Let

25   me ask you that now.  Do you think we can get all of your

1    evidence in tomorrow?

2            MR. GOMAN:  I do.

3            THE COURT:  I'm going to have to stop tomorrow at 10

4    minutes to 4:00.  I've got an activity with my grandson I've

5    got to be at at 4:30.  So we are going to stop at 10 minutes

6    to 4:00 tomorrow.

7            COURTROOM DEPUTY:  Please raise your right hand.

8        (The witness was sworn.)

9            COURTROOM DEPUTY:  Please be seated.

10           Please state your full name, and spell your full name

11   for the record.

12           THE WITNESS:  Stephanie Detlefsen.

13   S-t-e-p-h-a-n-i-e, D-e-t-l-e-f-s-e-n.

14   **STEPHANIE DETLEFSEN, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

15   BY MR. GOMAN:

16   Q.  Good afternoon, Miss Detlefsen.

17   A.  Good afternoon.

18   Q.  Let's just introduce you to the jury.  Can you tell them

19   where you live and what you do for a living?

20   A.  Yes.

21           Hello, my name is Stephanie Detlefsen.  I live and

22   work in the Dallas/Fort Worth area of Texas.  And I work in

23   Labor Relations.  I help oversee the discipline policy for our

24   union employees at BNSF.

25   Q.  Can you lift that microphone just a little bit, tilt that

1    up towards -- there we go.

2          Just a little bit about you.  Are you married?

3    A.  I am.  I'm married.

4    Q.  Do you have a family?

5    A.  Yes.  I am married, and I have three children.

6    Q.  What does your husband do?

7    A.  He is an American Airlines mechanic.

8    Q.  How long have you worked at BNSF?

9    A.  I've worked at BNSF for 17 years.

10   Q.  What did you do before coming to BNSF?

11   A.  Before I worked for BNSF, I worked for Delta Airlines.

12   Q.  When you were hired at BNSF, what were you hired to do?

13   A.  When I was hired at BNSF, I was hired in the claims

14   department.

15   Q.  When did you start working in Labor Relations?

16   A.  Let's see.  I moved into Labor Relations in 2007, and I

17   moved into my current position in 2014.

18   Q.  What is your education background?

19   A.  I have a bachelor's degree in English.

20   Q.  All right.  Let's start big picture.  Can you explain to

21   the jury, what is Labor Relations?  What does that mean?

22   A.  Sure.  So most of our workforce is unionized.  We have

23   several different unions, and they each have collective

24   bargaining agreements.  And I manage a small collective

25   bargaining agreement.  That's part of my job, but the majority

1   of my day is spent helping oversee this discipline policy.

2   Because when a union employee gets into any kind of trouble,

3   maybe has violated a rule, under their agreement there's all

4   these steps that we follow to give them an investigation, and

5   then there's an appeal process after, and -- I'm sorry.  Did I

6   go on too long?

7   Q.  No, no.  That's fine.  So more specifically then as it

8   relates to employee discipline, what is your role in that

9   process?  What do you do?

10  A.  Okay.  So we have a policy; we call it PEPA.  It's the

11  Policy for Employee Performance Accountability.  And along

12  with two other people, I help oversee that policy.  So any

13  union employee that stands for dismissal, they don't get

14  dismissed without the case going through our team.  And we

15  make sure that the collective bargaining agreement has been

16  complied with, that there's no violations there, and that the,

17  um, policy that we have is applied consistently throughout our

18  system.

19  Q.  The jury's heard a little bit about the collective

20  bargaining agreement.  It governs things like timelines for

21  discipline?

22  A.  Yes, exactly.  They have rules set in place, how the

23  appeals go, how the investigations go, and there's timelines

24  for each step of the way.

25  Q.  Who decides what goes into that collective bargaining

1    agreement?  In other words, who decides what that process is

2    going to be?

3    A.   The unions and the company agree to that.

4    Q.   Do they renegotiate that from time to time?

5    A.   Uh, the discipline rules, I don't think they have been,

6    um, reopened or whatever for a very long time.  They seem to

7    be old rules.

8    Q.   The process that's laid out in the agreement between the

9    union and BNSF, does that require your level of review?

10   A.   I'm sorry.  I don't understand your question.

11   Q.   Yeah, it wasn't very artfully asked.

12          Your job in Labor Relations is to review potential

13   dismissal cases; is that right?

14   A.   Yes.

15   Q.   Is that review by you in Labor Relations, is that required

16   by the collective bargaining agreement?

17   A.   No, that's not part of the collective bargaining

18   agreement.  That's just an extra layer of protection for the

19   employee.

20   Q.   Why does BNSF do that?  What's the purpose?

21   A.   To make sure that we're applying our policy consistently

22   and that employees who work in Montana are being treated the

23   same as the ones employed in Kansas or California.  Just so

24   everyone is being treated the same way under our policy.

25   Q.   We have also heard in this case that employees like

1   roadmasters or assistant roadmasters don't have a role in

2   deciding discipline.  Is that intentional?

3   A.  What was your question again?

4   Q.  Yeah.  Roadmasters and assistant roadmasters, kind of

5   first-level supervisors, don't have a role in deciding what

6   the discipline is going to be.  Are you aware of that?

7   A.  No.  There's -- I am only involved in the potential

8   dismissals.  So if they are issuing a formal reprimand or

9   something, I wouldn't know about that.

10  Q.  I see.  So when it comes to a dismissal then, does someone

11  like a roadmaster or an assistant roadmaster, does he or she

12  have a say in the ultimate decision to dismiss?

13  A.  It's a collective process.  So I'm not sure what part they

14  would play on their end, but they wouldn't have the final say

15  for sure.

16  Q.  All right.  So tell us -- you were involved in

17  Mr. Fresquez's discipline, obviously.

18  A.  I was.

19  Q.  What is your process, though?  How do you get first

20  notified that there's a potential dismissal case?

21  A.  The field officer will send us the records.  So I would

22  get the investigation transcript, the exhibits that go with

23  that transcript, and the employee's work history, and then I

24  would review all of those.

25  Q.  Why are you reviewing it?  What's the purpose of your

1   review?

2   A.   So, first of all, I make sure that the charges within the

3   notice of investigation, coupled with the employee's work

4   history, could warrant dismissal.  Because sometimes I'm sent

5   cases in error, and I would just send them back and say, This

6   employee doesn't stand for dismissal.

7        And then I look at the rule or the alleged rule

8   violation, coupled with the employee's work history.  Or if

9   it's a stand-alone offense, then I go to the employee -- or to

10  the investigation transcript itself.  I read through it, and I

11  read through the exhibits and make sure that the testimony and

12  exhibits support the charges within the notice of

13  investigation, that no collective bargaining agreements have

14  been violated, and then I would make my recommendation.

15  Q.   Do you know the employees under consideration for

16  potential dismissal?

17  A.   No.

18  Q.   Is that intentional?

19  A.   Yes.

20  Q.   Okay.  Let's talk about the PEPA policy real quick.  I'm

21  going to show you admitted Exhibit A-60.

22  A.   Is it going to be on this screen right here?

23  Q.   It should be.

24  A.   Yep.

25  Q.   All right.  This is just the first page.  Do you recognize

1   that as BNSF's Policy for Employee Performance Accountability?

2   A.  I do.

3   Q.  What is this?

4   A.  This is the thing that we call PEPA, and this spells out

5   our discipline policy for union employees.

6   Q.  All right.  We're looking at the last page there

7   describing "Stand Alone Dismissible Violations."  What does

8   that mean?

9   A.  So the "Stand Alone Dismissible Violations" mean this

10  isn't a progressive thing.  You could have zero discipline on

11  your record, and you could have been employed for 40 years,

12  but if one of these rule violations is proven, then you stand

13  for dismissal automatically.

14  Q.  After your involvement -- let's jump ahead a little bit.

15  Then we'll talk about Mr. Fresquez's case.

16          After you review a case for potential dismissal, if

17  you recommend dismissal, in your opinion, is appropriate,

18  what's the next step?

19  A.  I would send my recommendation back to whoever sent it to

20  me, and then that person would take my recommendation and vet

21  it through their leadership.  I'm not involved in those

22  discussions, though.

23  Q.  All right.  So you make a recommendation, but not the

24  ultimate decision; is that right?

25  A.  That's right.

17-cv-00844-WYD-SKC          Detlefsen - Direct          IV - 1115

1   Q.  All right.  Let's assume, then, the decision to dismiss is

2   made.  Does the process end there?

3   A.  No.  A dismissal letter would be issued, but then the

4   process for the appeals would begin.

5   Q.  We don't need to go through all the details, but can you

6   just tell us generally, what are the important steps in the

7   appeal of discipline that employees like Mr. Fresquez have the

8   right to?

9   A.  Sure.  Under their collective bargaining agreement, they

10  are -- just like there were steps leading up to the

11  investigation, there are steps after discipline is issued, and

12  the employee has the right to appeal.  It would be probably --

13  usually at the local level.  There's a step there.  Then if

14  that is denied, it would get elevated to the general

15  chairman's level.  If it gets denied there, then it would

16  ultimately go to arbitration, and a third-party neutral person

17  would decide the case.

18  Q.  Looking back at A-60 real quick, you see I have

19  highlighted where insubordination is listed as a stand-alone

20  dismissible offense?

21  A.  Yes.

22  Q.  Has insubordination been a stand-alone dismissible

23  violation since you've been working in Labor Relations?

24  A.  Yes.

25  Q.  All right.  So Mr. Fresquez's case then, do you remember

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    how you first got involved in reviewing his potential

2    dismissal case?

3    A.  I don't, but I get involved the same way no matter what

4    the case is.  It's just there's a team of three, and cases get

5    sent in, and we just try to balance our workload, and I just

6    am the one that took the case.

7    Q.  All right.  I want to show you what's been admitted as

8    Exhibit A-45.

9    A.  Okay.

10   Q.  By the way, I know these events happened a while ago.  Did

11   you review some of these documents to try to refresh your

12   memory for today's testimony?

13   A.  I did.

14   Q.  All right.  So do you recognize this then?

15   A.  Yes.

16   Q.  What is this?

17   A.  This is the notice of investigation.

18   Q.  Do you see there where it says alleged refusal to comply

19   with supervisor's instructions on May 5th?

20   A.  Yes.

21   Q.  Is there a distinction, in your mind, between refusal to

22   comply with instructions and failure to comply with

23   instructions?

24   A.  Absolutely.  Under our policy, a failure to comply with

25   instructions would be a Level S, which means it's serious, and

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   you are on probation, but you are not subject to immediate

2   dismissal.  Whereas, a refusal to do what your supervisor

3   tells you to do is insubordination.

4   Q.  How would you describe the difference between failure to

5   comply with instructions and refusal to comply with

6   instructions?

7   A.  So a failure to comply with instructions would be if you

8   are my boss and you tell me to do something, and I say okay,

9   and I do it, but I don't do it as well as you wanted me to do

10  it, or I skip a step, I forget to do something, then I didn't

11  do exactly what you told me to do.  I failed to comply with

12  your instructions, but I still made an effort.

13          And insubordination would be you told me to do

14  something, and I say no.

15  Q.  Is refusal to comply with instructions, is that the same

16  thing or equivalent to insubordination?

17  A.  Yes.

18  Q.  All right.  Did you review the transcript of the

19  investigation hearing in Mr. Fresquez's case?

20  A.  I did.

21  Q.  Is that something you review in every potential dismissal

22  case?

23  A.  Yes.

24  Q.  Let me ask you that.  Will you describe to the jury

25  everything you review when you are reviewing potential

1  dismissal cases?

2  A.  I review three things:  the employee's work history, the

3  investigation transcript, and the exhibits that go with that

4  transcript.

5  Q.  Do you ever review more than that?

6  A.  No, I don't -- I can't, and I don't.

7  Q.  What do you mean you can't?

8  A.  Because the record is what the record is.  So that is all

9  we have to, um, move forward with for the union to appeal on.

10  They can't add anything to it.  We can't add anything to it.

11  And that's all that the arbitrator would see.  That's all I

12  see.

13  Q.  So some of the people that were involved and mentioned in

14  the transcript, there's Mr. Fresquez, obviously, and there's a

15  Michael Paz also listed.  Do you know either of those

16  gentlemen?

17  A.  No.

18  Q.  Have you ever met or spoken with either of them?

19  A.  No.

20  Q.  You mentioned the employee's work history you look at.

21  Why do you look at that?

22  A.  It's not necessary for a stand-alone.  I just like to get

23  a picture of the employee's work history, see if this has been

24  a problem in the past, that kind of thing, see if they have

25  been given leniency before.  But generally I look at it

1   because a lot of the cases that we get to review aren't

2   stand-alone, so I would need to see what the progression is.

3   If the person is already on a Level S, and this new case is a

4   Level S, then they would stand for dismissal.  So I always

5   look at the work history.

6   Q.  So let's talk about the transcript of Mr. Fresquez's

7   hearing.  This is what's been already admitted as

8   Exhibit A-48.  Let me just show you the cover page.

9        All right.  Do you recognize this as the

10  investigation transcript you reviewed in Mr. Fresquez's case?

11  A.  Yes.

12  Q.  When you are reviewing this investigation transcript, what

13  are you looking for?

14  A.  I'm looking to see that the testimony given and the

15  exhibits attached to the transcript support the charges within

16  the notice of investigation, and I'm making sure that there's

17  no fatal flaws as far as the collective bargaining agreement

18  goes, that there's no fatal procedural error.

19  Q.  Why don't you -- I want to talk about a few specifics of

20  this transcript, but why don't you just sum up for the jury.

21  After reviewing this transcript, did you find that the charge

22  of insubordination was substantiated, proven, in this hearing?

23  A.  Yes, I did.

24  Q.  Generally speaking, what did you see that convinced you of

25  that?

17-cv-00844-WYD-SKC          Detlefsen - Direct          IV - 1120

1   A.  His boss gave him a directive three times to do something,

2   and each time the employee argued with him and didn't do it,

3   and then he got in his truck and drove away.  And his boss

4   told him one more time that he needed him to string-line to

5   see if there was a defect there, and again the employee argued

6   with him and said he didn't see the point in doing it.  So

7   that was four times his boss told him to do something, and he

8   didn't do it.

9   Q.  All right.  Did you find anything unclear or vague about

10  Mr. Paz's instructions to Mr. Fresquez?

11  A.  No.  He gave very clear testimony that he told him, Grab

12  your string-line, and string-line this defect.

13  Q.  All right.  Let's go to the next page.

14        Okay.  Did you also look at Mr. Paz's explanation for

15  why he was having Mr. Fresquez do the string-lining?

16  A.  Would you repeat that?

17  Q.  Yeah.  Did you consider or look at whether this was a

18  proper instruction for a roadmaster to give a track inspector?

19  A.  Oh, yeah, seemed very basic.

20  Q.  In reviewing Mr. Paz's testimony -- I'm not sure how best

21  to ask this -- did this seem like a, I don't know, a close

22  call for insubordination or a difficult case for

23  insubordination?

24  A.  No.  This was a very clear-cut case of insubordination.

25  Q.  Why do you say that?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.  I haven't had a case that was as clear as this really.  To

2   say no three times and then get in your truck and drive away

3   and then no one more time, I mean, it's insubordination the

4   first time.  Usually that's it.  You know, somebody says no to

5   their boss, that's it.  But this was multiple times.

6   Q.  You reviewed Mr. Fresquez's explanation for what happened.

7   A.  Yes.

8   Q.  Now, he did not admit that he was insubordinate; fair?

9   A.  No, he did not.  He denied being insubordinate.

10  Q.  Why is this not just a he-said/he-said then?

11  A.  Well, for a couple of reasons.  First of all, his

12  explanation didn't make any sense.  Paz was very clear, and

13  his story was easy to follow and made sense and was supported

14  even by Mr. Fresquez's testimony that he kept saying

15  throughout the investigation he didn't see the point in doing

16  it, which if your boss tells you to do something, that's the

17  point in doing it.

18          So I didn't understand, also, why he said he was the

19  one that wanted to string-line it.  He kept saying that

20  throughout the investigation, that it was his idea, that he

21  wanted to do it.  So I thought that was a big disconnect too.

22  Then what are you arguing about?  If you wanted to do it, then

23  just do it, because your boss wants you to do it too.

24          And then the audio from the -- when he was in the

25  truck after he drove away, again, was just supporting what his

1   boss had said, that he was arguing saying he doesn't see the

2   point in doing it.

3   Q.  Mr. Fresquez -- well, what did he contend -- well, let me

4   ask it this way.

5          He says in the dispatch recording and in the

6   investigation, I didn't say no, I didn't use the words "no."

7   Right?

8   A.  Right.

9   Q.  Did you find that -- I mean, did that bear on your

10  analysis at all?

11  A.  No.

12  Q.  Why not?

13  A.  Because he -- he said no by arguing and driving away and

14  not doing it.

15  Q.  There's been some criticisms in this case of this

16  investigation for Jay Herzog not having been present at the

17  investigation.  Did you consider that in your analysis?

18  A.  No.

19  Q.  Why not?

20  A.  Well, the record was pretty clear on the evidence that was

21  in there.

22  Q.  What about Mr. Paz's voice not having been heard on the

23  dispatch recording?  You are aware of that; right?

24  A.  Yes, they brought that up at the investigation.

25  Q.  And was Mr. Paz asked about that?

1   A.  He was.

2   Q.  Do you recall what his explanation was?

3   A.  Yes.  He explained that he was on a portable PAC set and

4   that that doesn't reach as far, doesn't have as strong a

5   signal strength as the truck radios do.

6   Q.  Did you end up, really for purposes of this litigation,

7   investigating that explanation?

8   A.  Yes.

9   Q.  What did you find?

10  A.  I found that that's --

11       MR. THOMPSON:  Objection, Your Honor.  This is

12  hearsay.  She is now testifying to what somebody else told

13  her.

14       THE COURT:  I can't tell what she's going to say, but

15  she can't repeat what others told her.  So why don't you ask a

16  clearer question --

17       MR. GOMAN:  Okay.

18       THE COURT:  -- that takes her away from hearsay

19  testimony.

20       MR. GOMAN:  Sure.

21  BY MR. GOMAN:

22  Q.  Well, and let's step back from that.  The fact that

23  Mr. Paz's voice was not on the dispatch recording, was that

24  important to your analysis?  Did that affect your ultimate

25  thinking on the case?

1    A.  No.

2    Q.  Okay.  Given the statements that were recorded for

3    Mr. Fresquez on the dispatch recording, was there really any

4    doubt in your mind as to what Mr. Paz was telling him?

5    A.  No.  It completely supported Mr. Paz's version of events.

6    Q.  In the investigation hearing, does Mr. Fresquez's union

7    representative make an allegation of retaliation?

8    A.  He did.

9    Q.  Is that an uncommon charge for a union chairman to raise

10   in an investigation hearing?

11   A.  No.

12   Q.  Did you, though, consider what the allegation -- that the

13   allegation was being made?

14   A.  Did I consider it?

15   Q.  Yeah.

16   A.  Yes.

17   Q.  And did that influence your ultimate thinking on the case?

18   A.  Well, it was addressed on the record, so I did take it

19   seriously, and I elevated it to the law department.  Any time

20   I see the word "retaliation" in an investigation transcript, I

21   involve the law department.

22         But that particular retaliation claim was unique in

23   that it was actually discussed on the record, and it didn't

24   make sense to me that that would have been considered

25   retaliation.

1    Q.  What do you mean "that"?  Explain to the jury what you are

2    talking about.

3    A.  So apparently there had been a discussion earlier in the

4    day about a 30-day defect that, my understanding is, the day

5    before everything's track speed, everything is fine, then the

6    next day Mr. Fresquez informs Mr. Paz that he's got to take

7    the track out of service.  And Mr. Paz pressed him for

8    details, you know, Hey, this track was working yesterday.  Why

9    is it all of a sudden out of commission?  And he explained

10   it's a 30-day defect.  But then in the same conversation he

11   said, But I've got guys here that can fix it.  So Mr. Paz

12   said, Okay, so it's going to get fixed?  And he said, Yeah.

13          So it didn't seem like it was, um, an outstanding

14   problem, like it had been resolved.

15   Q.  All right.  So after concluding that, in your opinion,

16   Mr. Fresquez was proven to have been insubordinate, what's the

17   next step in your role?

18   A.  So after I concluded that he had been insubordinate, I

19   sent my recommendation to the field.

20   Q.  Okay.  To do that do you have to review the PEPA policy?

21   A.  I did not have to review the PEPA policy.

22   Q.  Fairly straightforward in this case?

23   A.  Right.

24   Q.  So what was your recommendation?

25   A.  I supported a stand-alone dismissal.

1          MR. GOMAN:  Let me show just the witness, if I could,

2     Exhibit A-52.

3     BY MR. GOMAN:

4     Q.  Can you see that, or do you want me to blow it up a little

5     bit?

6     A.  Yes, I can see it.

7     Q.  What is this?

8     A.  This was my response back to the person who sent in the

9     case saying that I have read the record, and I consulted with

10    the law department, and I support a stand-alone dismissal on

11    the basis of insubordination.

12    Q.  All right.  Who are you sending that to?

13    A.  I sent it to Everett Percival.  He goes by Ned, Ned

14    Percival.

15          MR. GOMAN:  Your Honor, I move for admission of A-52.

16          MR. THOMPSON:  No objection.

17          THE COURT:  All right.  A-52 is received.

18       (Defendant's Exhibit A-52 received.)

19    BY MR. GOMAN:

20    Q.  Let me just blow up Mr. Percival's e-mail to you.

21          Did Mr. Percival, the conducting officer, did he make

22    any sort of conclusions or recommendations as to what he

23    thought should happen?

24    A.  No.

25    Q.  Okay.  When you say you send your recommendation to the

1   field, you understand the next step is someone else, in this

2   case Mr. Miller, is going to then decide what to do?

3   A.  Right.  I would expect that the leadership would have a

4   discussion following my recommendation and hopefully follow

5   it.

6   Q.  When you are reviewing potential dismissal cases, do you

7   consider how Labor Relations -- well, what recommendations

8   Labor Relations has made for similarly situated employees?

9   A.  Absolutely.  That is the biggest part of my job is just to

10   apply this policy consistently throughout our system.

11   Q.  Have you reviewed other cases of insubordination?

12   A.  I have.

13   Q.  What is your recommendation in those cases?  Is it ever

14   different than dismissal?

15   A.  Never.  It's always stand-alone dismissal if the

16   investigation proves the charges.

17   Q.  Just as a for instance, I'm going to show you --

18          MR. GOMAN:  If I can just show just the witness

19   Exhibit A-76.

20   BY MR. GOMAN:

21   Q.  Ms. Detlefsen, do you recognize this?

22   A.  Yes.

23   Q.  It's four pages.  Let me just scroll down.

24          What are we looking at?  Don't describe the contents

25   in detail, but just generally describe what this is.

17-cv-00844-WYD-SKC          Detlefsen - Direct          IV - 1128

1   A.  Okay.  So this is an employee work history on a case that

2   I reviewed and supported a stand-alone dismissal for

3   insubordination.

4   Q.  Do insubordination cases come around a lot?

5   A.  No.

6           MR. GOMAN:  Your Honor, I'd move for admission of

7   Exhibit A-76.

8           MR. THOMPSON:  Plaintiff objects, Your Honor.

9   Ms. Detlefsen has not established any of the criteria for

10  comparator evidence, such as same supervisor, whether the

11  conduct is similar, whether the employees are in the same

12  craft, doesn't know why they're found insubordinate.  In order

13  to be comparator evidence, you have to establish those things.

14  Ms. Detlefsen has testified to none of them.

15          THE COURT:  What's your response to what he said?

16          MR. GOMAN:  I can lay more foundation, if the Court

17  would like.

18          THE COURT:  It's up to you.

19  BY MR. GOMAN:

20  Q.  Are you aware of the circumstances of this particular case

21  in A-76?

22  A.  Yes.

23  Q.  Do you believe the conduct of the employee is similar to

24  what Mr. Fresquez engaged in?

25  A.  Yes.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    Q.  It is a different craft and different supervisors; right?

2    A.  That's right.

3         MR. GOMAN:  Your Honor, I'd move for admission of --

4    renew the motion for admission.

5         MR. THOMPSON:  Your Honor, we object.  She said it's

6    a different craft, different supervisor.  It's not comparator

7    evidence under the law.

8         THE COURT:  Yeah, I don't think this is proper

9    comparator evidence.  So I find under 403 that the factual

10   underpinnings of the situations are different.  Further, they

11   involve different supervisors, different geographical areas

12   and, more fundamentally, that if I were to allow this evidence

13   under Rule 403, that even though it might be probative, that

14   the probative value is substantially outweighed by danger of

15   unfair prejudice, confusing the issues, and misleading the

16   jury.  So I refuse this exhibit.

17   BY MR. GOMAN:

18   Q.  I'm going to switch gears, Ms. Detlefsen.  Are you aware

19   as an employee at BNSF you are not permitted to retaliate

20   against people who raise safety concerns?

21   A.  That's right.

22   Q.  In fact, are you required to certify that you are not

23   going to do that as an employee?

24   A.  Every year.

25   Q.  Let me show you a couple things.  I'm going to show you

1   Exhibit A-61.

2           MR. GOMAN:  Let me show this just to the witness.

3   BY MR. GOMAN:

4   Q.  What is this here?

5   A.  This is our corporate policy for EEO, antidiscrimination

6   and harassment.

7   Q.  Among the provisions in here, what does this policy say

8   about discrimination?

9   A.  That we cannot discriminate.

10          MR. GOMAN:  Your Honor, I'd move for admission of

11  Exhibit A-61.

12          MR. THOMPSON:  No objection.

13          THE COURT:  All right.  A-61 is received.

14      (Defendant's Exhibit A-61 received.)

15  BY MR. GOMAN:

16  Q.  And then if I can just publish it real quick.  This is a

17  two-page policy here?

18  A.  Yes.

19  Q.  All right.

20          MR. GOMAN:  Then let me show just the witness

21  Exhibit A-63.

22          COURTROOM DEPUTY:  Your Honor, if it saves time, A-63

23  is a stipulated exhibit, according to the list.

24          MR. GOMAN:  I'd move for admission of A-63.

25          MR. THOMPSON:  No objection.

17-cv-00844-WYD-SKC          Detlefsen - Direct          IV - 1131

 1                  THE COURT:  You said A-63 or A-69?

 2                  MR. GOMAN:  63.

 3                  THE COURT:  All right.  A-63 is received.

 4          (Defendant's Exhibit A-63 received.)

 5   BY MR. GOMAN:

 6   Q.  All right.  We are looking at just the first page here.

 7   Looks like this one is 30 pages.  Can you just tell the jury

 8   what the Code of Conduct is?

 9   A.  Do you want me to just read that first paragraph?

10   Q.  Sure.  It's probably a better descriptor.

11   A.  Okay.  "At BNSF, we take pride in our high ethical

12   standards and in being a company where employees are proud to

13   work and ethics and compliance are priorities.  The Code of

14   Conduct plays an important role in our ongoing ethics and

15   compliance efforts and is an integral part of our Vision &

16   Values."

17   Q.  What is your understanding what the potential consequences

18   could be for your employment if you were to make a

19   recommendation for dismissal based on discriminatory or

20   retaliatory reasons?

21   A.  I would expect to be fired.

22   Q.  Have you ever done such a thing in your career at BNSF?

23   A.  No, and I never would.

24   Q.  When you made the recommendation that Mr. Fresquez should

25   be dismissed, what did you base that recommendation on?

1   A.  I based it on the testimony and the exhibits entered.  It

2   was a clear case to me.  I don't know how to answer your

3   question beyond that.

4   Q.  When you made that recommendation, did you know that

5   Mr. Fresquez had from time to time over the previous years

6   complained in job safety briefings about safety concerns?

7   A.  No.  That wasn't part of the record.

8   Q.  Were you aware that Mr. Fresquez had from time to time

9   talked with or argued with his roadmasters about the proper

10  reporting of defects?

11  A.  No.  That wasn't part of the record.

12  Q.  If Mr. Fresquez had ever made a complaint to the BNSF

13  hotline in his career, is that something you would be made

14  aware of?

15  A.  No, unless he brought it up.  I've seen it brought up in

16  investigations, but it wasn't brought up in this

17  investigation.

18  Q.  When you made your recommendation that Mr. Fresquez should

19  be dismissed, were you aware that he is alleging he called an

20  FRA track inspector to talk about a defect that morning?

21  A.  No.  Again, that was not part of the record.

22  Q.  All right.

23          MR. GOMAN:  Your Honor, there's one topic I would

24  cover, but I feel more comfortable approaching and discussing

25  it before bringing it up in front of the jury.

17-cv-00844-WYD-SKC                Jury Trial                    IV - 1133

1          THE COURT:  Have you covered everything else you want

2    to ask?

3          MR. GOMAN:  Yes.

4          THE COURT:  All right.  Why don't we stop for today

5    with the jury.

6          I'm going to start at 8:30 tomorrow.  We've got to

7    make up some time.  So can everyone be here so we can start

8    right at 8:30?  All right.  So we are going to start promptly

9    at 8:30.  And we are going to maybe even take slightly shorter

10   breaks.  We will take a lunch break, but I want to make sure

11   we get the evidence.

12         It is going to be impossible, let me just say this to

13   the jurors, even if we receive all the evidence tomorrow, to

14   actually preclude you from coming back on Tuesday, but what I

15   want to do is perhaps have -- if we finish earlier tomorrow,

16   we can work on a charge conference, meaning review of jury

17   instructions with the attorneys, and then on Tuesday morning

18   hopefully we will be in a position to conclude the case, and

19   that means the Court reading the final instructions, closing

20   argument, and then deliberations by the jurors.  Now, how long

21   the jury deliberates is not up to me.  It's up to you.  So --

22   but my goal would be to make sure you start your deliberations

23   sometime on Tuesday, but I'm not sure when that would be.

24         All right.  So we'll be in recess until 8:30 a.m.

25   tomorrow morning.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1        (Jury out at 4:44 p.m.)

2              THE COURT:  Have a seat.

3              What's the issue you wish to raise?

4              MR. GOMAN:  I would like to ask Ms. Detlefsen

5   questions about the appeal process and then move to admit

6   Exhibit A-57, which is the PLB award in this case.

7              THE COURT:  The what?

8              MR. GOMAN:  The public law board, which ultimately

9   denied his grievance.  We discussed this pretrial.  I have

10  since redacted the ultimate conclusion of the public law board

11  and would seek to admit just the factual findings that that

12  board made, similar to how the Court ruled and resolved the

13  OSHA issue.

14             THE COURT:  Have you shown the proposed redaction to

15  plaintiff's counsel?

16             MR. GOMAN:  I have not, but I can just tell you it's

17  redacting the last two sentences of the award.

18             THE COURT:  Do you object to that?

19             MR. THOMPSON:  We do, Your Honor.  Under the *Ray*

20  *versus Union Pacific* case, the Court in that case makes clear,

21  and I think it's instructive here, that the PLB findings are

22  nothing more than oftentimes recitation of the parties'

23  letters they submit, nothing more.  The board doesn't actually

24  make findings.  They just repeat what the parties say.  This

25  is hearsay within hearsay, irrelevant, unfairly prejudicial.

1          THE COURT:  How long is this document?  Four pages?

2          MR. GOMAN:  Yeah.

3          THE COURT:  What's the exhibit number?

4          MR. GOMAN:  A-57.

5          THE COURT:  Let me see if I can find it in the book.

6          COURTROOM DEPUTY:  It should be in volume two, I

7    believe.

8          THE COURT:  Yeah.  Let's see if i can get to it.

9          COURTROOM DEPUTY:  Actually, it's volume one.  I'm

10   sorry.

11         THE COURT:  I've got it.  Let me look at it.

12         MR. THOMPSON:  Your Honor, while you are looking, may

13   I also add one more objection, please?

14         THE COURT:  Well, hold on.  I want to read it first.

15         MR. THOMPSON:  Sure.

16         THE COURT:  All right.  What is the public law board?

17   For example, I know what the EEOC is, Civil Rights Commission.

18   Maybe even I even know what OSHA is.  But what is the public

19   law board?

20         MR. THOMPSON:  So what it is, is you have a board of

21   three --

22         THE COURT:  I'm really asking Mr. Goman first --

23         MR. THOMPSON:  Oh, I'm sorry.

24         THE COURT:  -- because he is the one urging this.

25         MR. GOMAN:  So there are three members of the public

1   law board, and by law they hear and resolve each of these

2   employee grievances.  There's one neutral arbiter, and then

3   there's one representative from the railroad and one

4   representative from the labor union.  And then a decision is

5   made.  It's not a government agency, but it is a public law

6   board authorized by law to perform its functions.

7          THE COURT:  So you saw the minute order or order I

8   sent out regarding admissibility of the report.  My concern is

9   I don't know what this thing is.  And if there's any merit to

10  what Mr. Thompson is saying that this tends to summarize the

11  parties' respective positions and doesn't constitute actual

12  factual findings, more analogous to some of these entities I'm

13  familiar with, I'm concerned about whether or not allowing

14  this to come in is consistent with the rationale that I put in

15  this order.  And so -- plus, I think this is cumulative.  I

16  mean, I think the jury already understands that whatever

17  appeal was taken was ruled in favor of the company, meaning

18  Mr. Fresquez was terminated.  So I don't understand why this

19  isn't just cumulative and why you would need it in evidence.

20         MR. GOMAN:  Your Honor, it's -- so if you look at the

21  document, it's -- it does summarize the railroad's position

22  and then the labor union's position, but then it issues its

23  findings.  It makes a decision.

24         THE COURT:  Yeah, but what's the basis for the

25  summary?  Is it based on what each party has said below,

1   absent any ability, as you would have in some other

2   proceedings, for the attorneys, which weren't present here, to

3   make arguments?  I'm concerned about the way that this entity,

4   that I don't fully understand, to be honest with you, public

5   law board, arrived at what it said.  If I don't fully

6   understand that, I -- I think that this is a close call

7   anyway.  And I don't understand why you need it because it's

8   clear that the public law board ruled against Mr. Fresquez.

9   And I suspect if you were to ask her that question, she would

10  answer it.  I mean, if you talk to her about the appeals,

11  because that's been raised by plaintiff's counsel, I don't

12  think there would be -- maybe there might be objection, but I

13  don't have -- I have no problem with her explaining how the

14  appeals work, if she knows that, and what the ultimate outcome

15  of the appeal was, but I'm disinclined to let this in.

16           MR. THOMPSON:  Your Honor, we object to -- I think

17  the jury gets it anyways because he is not working at BNSF,

18  but we object to it being told the PLB has found against him

19  unless we also get to issue OSHA's findings.  Then it's --

20           THE COURT:  Well, the OSHA findings, the only thing I

21  left in were some of the factual things that are already in

22  evidence anyway.  I took out all of the policy statements

23  because OSHA's rulings can't be something the jury considers

24  because the law needs to come from me.

25           MR. THOMPSON:  We agree.  Are we allowed to ask the

17-cv-00844-WYD-SKC                Jury Trial                    IV - 1138

1   witness or essentially offer that OSHA found in his favor,

2   without findings?

3            THE COURT:  No.

4            MR. THOMPSON:  Okay.  That's what I understand BNSF

5   to be doing with the PLB order.

6            THE COURT:  No.  I mean, I don't know what the

7   questions would be.  I'm not foreclosing an objection.

8            Okay.  Here's what I'm going to do.  I am going to

9   rule that I don't believe that the imprimaturs that existed

10  regarding the factual findings in the OSHA letter, proposed

11  Exhibit 5, which is summarized in my order re admissibility of

12  a portion of that report, accompanied by a reduction of the

13  portion of the report that I thought was objectionable, is

14  similar in nature to what is being offered through proposed

15  Exhibit A-57.  So I find on the record before me that any

16  probative value is substantially outweighed by unfair

17  prejudice and confusion of the issues if I were to allow it.

18  So for that reason I refuse Exhibit A-57.

19           I express no opinion about what this witness can say

20  or not say about appeals because I don't know what you are

21  going to ask her.

22           MR. GOMAN:  For purposes of the record, and briefly,

23  then I formally move to admit A-57 in redacted form.  We will

24  tender a copy of the redactions I propose.

25           THE COURT:  That's fine, but as I understand it, the

1   redaction is only as to the last paragraph of the document.

2           MR. GOMAN:  Just the last two sentences.

3           THE COURT:  The last two sentences.  All right.  Even

4   with that redaction, my ruling remains the same, but if you

5   want to have me refuse that, you can tender it tomorrow.

6           MR. GOMAN:  Okay.

7           THE COURT:  Okay.  Now, the witness can step down

8   from the witness stand.

9           All right.  This goes to Mr. Thompson and his

10  colleague, Mr. Stone.  So I looked at this, BNSF's Motion for

11  Judgment as a Matter of Law.  Now, I am not having oral

12  argument, I'm not going to decide it, but a couple things jump

13  out at me.  First off, while I will obviously allow the

14  defendant to argue whatever it wants, I think that at the end

15  of the day you are going to have a hard time convincing me

16  that anything about the May 2016 events is appropriate for

17  disposition under Rule 50.  But as to 2015, I want to use,

18  first, one of these -- something that's said here.

19          "Plaintiff now claims that he first engaged in

20  protected activity when he reported to his union

21  representative in April of 2015 that his Roadmaster, Ryan

22  Akers, stated he would fire Plaintiff if he did not inspect a

23  particular track and show no defects on it."  Then it talks

24  about the rest of what's stated here.  I'm not going to read

25  all that.

1    But Mr. Akers was not Mr. Fresquez's supervisor.  In

2  fact, he was off in Afghanistan from November 2016 to sometime

3  in 2017.  He wasn't even in the chain of command that was in

4  place when Mr. Fresquez was fired or terminated 11 months

5  later under, I think, totally different circumstances perhaps.

6  So I'm having trouble understanding how this April 2015

7  incident is truly a protected activity within the meaning of

8  the law.

9    And then the same applies to -- I know I haven't

10 heard from Cason Cole yet, but in the first paragraph -- full

11 paragraph on page 5: "Plaintiff also claims that he engaged

12 in protected activity when he objected to an order by Cason

13 Cole, Assistant Roadmaster, in May of 2015, not to remove from

14 service a track that Plaintiff did not believe had been

15 properly repaired."  And then the rest of this is noted about

16 how this doesn't appear to be retaliation for anything that

17 was actually pled and, again, because plaintiff was not

18 terminated until May of 2016 that this isn't a protected

19 activity which can form the basis of the case.

20    And then there's a third claim again related to

21 something involving Mr. Akers in June of 2015.

22    So I'm not ruling on any of this today, but I do want

23 to get some indication from you, Mr. Thompson, about what your

24 response to that is.  And I'm going to order that you file a

25 written response to this by noon tomorrow because we may very

1   well take this up tomorrow, and I need a written response.

2   You can say anything you want about 2016, but I'm less

3   concerned about that, but I am concerned about 2015.

4          And the issue really is all of the activity that

5   occurred in 2015 appeared to end because there was some point

6   in '15 and early '16 where Mr. Fresquez was doing something

7   else.  He was a flagger, and he did some other things, and

8   then he got bumped from that position, and then, even though

9   he wasn't happy about it, he then became a track inspector

10  again.  So then the triggering events that culminated with the

11  May 5th, 2016 incidents really couldn't have started until he

12  resumed working as a track inspector with Paz as his immediate

13  supervisor, let's say, in early March 2016.  That's what I

14  heard.

15         Now, I would have a different thought about this if

16  Paz had been a supervisor in 2015.  If you were alleging that

17  Paz in 2015 was involved in any of these events, then -- but

18  the people who were involved in those events principally as

19  his supervisor were Akers, who no longer was his supervisor at

20  some point in 2015 and wasn't around with the company because

21  he was on military assignment in Afghanistan in May of 2016,

22  Mr. Cole wasn't involved, and I recognize that Mark Carpenter

23  was still involved, but the testimony from Mark Carpenter is

24  that while he initiated the investigation it was all

25  predicated on what Paz told him.

Julie H. Thomas, RMR, CRR                           (303)296-3056

17-cv-00844-WYD-SKC                    Jury Trial                    IV - 1142

1        So, again, I'm pretty certain that while I'll give

2   defendant the opportunity to make an argument, for 2016 I

3   think those are triable issues, but I do need a more

4   definitive response about why the activities described in 2015

5   are protected activities.  I'm not suggesting that the jury

6   shouldn't have been told about them, but the question is, how

7   can they be protected activities in light of everything I've

8   heard which seems to suggest that the triggering events really

9   commenced in March, in March of 2016, and culminated with what

10  we have all heard testimony about.

11       So do you have any brief thing you want to say now?

12  If not, you can think about it and file something tomorrow.

13  But I'm concerned about the nexus between the 2015 events and

14  how they can be protected activities given the retaliation

15  claim that's being asserted in this case.

16            MR. THOMPSON:  Yes, Your Honor.

17            THE COURT:  And don't talk fast.  I want you to talk

18  slow.

19            MR. THOMPSON:  And I will try to enunciate, Your

20  Honor.

21            Our position is that in May -- I apologize -- April

22  of 2015 is the first time Mr. Fresquez stands up to

23  roadmasters under Mark Carpenter.  There's three instances

24  which the Court has referenced.  We believe that was strike

25  one, strike two, strike three.  He is now viewed as a bad

1    employee because he is standing up for safety concerns.  He

2    bumped off shortly after so he can avoid retaliation.

3            THE COURT:  Let me -- I am not suggesting that it

4    isn't proper to have Mr. Fresquez talk about that.  I'm not

5    talking about excluding it.  But what I am concerned about is

6    we have to give an instruction to the jury that identifies the

7    protected activities.  So how can those events be predicate

8    activities in light of the record that's before me?  So I'm

9    not at all suggesting that -- I don't even know if defendant

10   is asking they be stricken from the record.  If they were, I

11   wouldn't do it.  But the question is how can those be --

12           MR. THOMPSON:  Oh.

13           THE COURT:  -- defined protected activities --

14           MR. THOMPSON:  Sure.  We believe but for the May 2016

15   incident this doesn't happen.  So we agree, it's background as

16   to why BNSF views him the way it does.

17           THE COURT:  So how can they be protected activities,

18   that's really what I'm asking you, under the law?

19           MR. THOMPSON:  They're protected activities under the

20   law.  It's whether they contributed to an adverse action.

21   They contributed because they colored BNSF's view of

22   Mr. Fresquez, particularly Mr. Carpenter.

23           THE COURT:  So Instruction 16 in the proposed set

24   says:  "An employee engages in protected activity as defined

25   in the FRSA if the employee, in good faith, 1, lawfully

17-cv-00844-WYD-SKC                Jury Trial                      IV - 1144

1  provides information, directly causes information to be

2  provided, or directly assists in any investigation regarding

3  any conduct which the employee reasonably believes constitutes

4  a violation of any Federal law, rule, or regulation relating

5  to railroad safety if the information is provided to an

6  employee's supervisor or the FRA; or, 2, lawfully refuses to

7  violate or assist in violating any Federal law, rule, or

8  regulation relating to railroad safety or security; or, 3,

9  reports a hazardous safety or security condition."

10          Now, let me explain.  I didn't say this.  I should

11  have.  Yesterday when I asked you what the protected

12  activities were, that's when you said it included the 2015 and

13  the 2016 events.  So my comment is predicated on what you

14  declared as protected activity.  The ones I'm focusing on are

15  not the 2016 ones, although obviously you may want to respond

16  to them in your written response, but it's the nexus between

17  what the law requires and whether or not the 2015 events are

18  truly protected activity for which no direct discipline ever

19  happened.  He didn't get terminated because of what happened

20  in 2015.  He got terminated because of what happened in 2016.

21  And the parties have differing views as to why that happened,

22  and that's something the jury has to decide.  I'm convinced

23  about that.

24          So, again, are you still asserting that the 2015

25  events are protected activity?

1              MR. THOMPSON:  Yes, and let me try and better

2    articulate.  So there are three activities in 2015.  The first

3    time Mr. Fresquez stands up to Mark Carpenter and the

4    supervisors under him is when Mr. Akers asks him to misreport,

5    to violate FRA regulations.  Mr. Fresquez refuses.  So that's

6    inarguably protected activity.  Especially because he reported

7    it to his union, who reported it to Adam Miller.  That's issue

8    one.  So I will talk about whether that contributed in a

9    moment, but it's inarguably protected activity under the law.

10             The second event happened shortly thereafter.  It

11   again involves Mr. Fresquez objecting to violating FRA

12   regulations, which is protected conduct under the law.

13             Then strike three is Mr. Cole telling him to put a

14   track back in service which would violate FRA regulations.

15   Mr. Fresquez refuses, which is again protected activity under

16   the law.

17             Now, the question I think the Court is asking is,

18   well, how did those contribute, not whether they are

19   protected, how did that contribute to what happened in 2016.

20   They contributed as such.  They colored Mark Carpenter's view

21   of Brandon Fresquez.  What happened in 2016 was inevitable

22   when Brandon bumped back because they now viewed him, because

23   of the 2015 instances, as a problematic employee.  Now, while

24   that may not under, for example, Title VII cases be a

25   motivating factor or things like that, the law in this case is

1   whether it contributed in any way.  And coloring an employer's

2   view under the law is contributing at least in part.

3            THE COURT:  All right.  I want to think about this.

4   I am ordering you to file a written response by 12 noon

5   tomorrow.  And I encourage you to spend more of your time on

6   the 2015 incident and what you have just said, although you

7   can say whatever you want to about 2016.

8            All right.  So can we get the evidence concluded

9   tomorrow, and by what time?

10           MR. GOMAN:  I believe there's an outside chance we

11  could finish maybe just after the noon hour.  We have trimmed

12  down our witness list.  We have -- well, although I suppose we

13  did have Cason Cole ready to go at 9:00.  We will finish with

14  Ms. Detlefsen at 8:30.

15           THE COURT:  Yeah, I want to finish her before we go

16  to Cole, even if we start Cole a few minutes late.  How much

17  do you have with the witness, whatever her name is?

18           MR. THOMPSON:  Ms. Detlefsen.

19           THE COURT:  Detlefsen.

20           MR. THOMPSON:  Ten minutes.

21           THE COURT:  Are you almost done?

22           MR. GOMAN:  Yes.  And then in terms of other

23  witnesses, I believe we have four remaining to call.

24           THE COURT:  Including Mr. Cole, or other than

25  Mr. Cole?

1          MR. GOMAN:  Including Mr. Cole.

2          THE COURT:  Okay.

3          MR. GOMAN:  Four, plus then a deposition excerpt we'd

4   like to read.

5          THE COURT:  Let me ask you this question.  How long

6   do you think we will need for our charge conference tomorrow?

7          MS. DALE:  I don't know.

8          THE COURT:  Have you studied the jury instructions?

9          MS. DALE:  I have, and we have some issues.  I don't

10  know that it would take more than an hour maybe.

11         THE COURT:  Yeah.  What about you, Mr. Thompson?

12         MR. THOMPSON:  We object to three instructions, and

13  our objection, although substantive, is minimal.

14         THE COURT:  All right.  So here's what I'm thinking

15  that may be achievable, because I still need to stop by 10 to

16  4:00.  If we can finish the evidence and then have our charge

17  conference in about an hour, it's possible that we could

18  complete the jury instructions, and I could even read the jury

19  instructions to the jury, and then we would hold off until

20  Tuesday closing arguments.  And I will only do that if there's

21  adequate time to make a complete record on the jury

22  instructions.  But it would seem to me that would be a way to

23  do everything tomorrow except closing arguments.  And I don't

24  want to do the closing arguments tomorrow and then have the

25  jury not start deliberating until Tuesday.  That doesn't make

17-cv-00844-WYD-SKC                 Jury Trial                    IV - 1148

1    any sense.  But I think I could have them hear the

2    instructions, because I give individual drafts of the

3    instructions to the jurors anyway, plus the original, so they

4    will have a written set anyway.

5           So that's what I want to do, and the goal would be to

6    get all that done not later than quarter to 4:00 tomorrow,

7    meaning complete the charge conference, have me read the

8    instructions, and we will be done in the 3:00 to 3:45 time

9    frame.

10          All right.  Anything else today?

11          MR. THOMPSON:  Two things, Your Honor.

12          THE COURT:  What?

13          MR. THOMPSON:  Number one, just a point of

14   clarification.  For the brief in response, I assume we can do

15   just argument.  I assume that's all the Court wants.

16          THE COURT:  Well, have you read what they filed?

17          MR. THOMPSON:  I have not, Your Honor.

18          THE COURT:  You need to read it.  What I want you to

19   respond to are any factual disagreements with what is asserted

20   on pages 4 and through the top of page 5, which address the

21   three incidents in 2015.  And then the rest of page -- top of

22   page 6, excuse me, page 5 and top of page 6.  The rest of

23   page 6 deals with 2016.  You will see what the rest of it

24   says.

25          So, no, I'm suggesting that you respond in a complete

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    way to what is being said here about the 2015 incidents,

2    because I have some concerns about whether they are legitimate

3    activities or protected activity within the meaning of the

4    law.  I'm not making a decision, but I'm alerting you so I can

5    give you the benefit to give me your thoughts.

6              MR. THOMPSON:  Your Honor, one other issue to raise.

7    Tomorrow defendant intends to read from a deposition testimony

8    transcript of Mr. Royston.

9              THE COURT:  Who is he?

10             MR. THOMPSON:  He is an IT person for BNSF who is

11   going to purportedly testify to a glitch in the TIMS system

12   that caused defects to fall out.  We have objected to numerous

13   lines of the deposition, and I don't know if the Court wants

14   to take that up now or in the morning.

15             THE COURT:  I'm not going to take it up now.  It's

16   5:10.  I haven't read the deposition.  Do I have a transcript

17   of it that shows me what's been objected to?  Is it in

18   different colors?

19             MS. DALE:  So it's a little confusing.  There's three

20   different colors.  I believe blue is ours, the yellow --

21   Mr. Thompson can correct me if I'm wrong -- the yellow is

22   theirs, and there's some section in green that they would read

23   only if his objection relating to the glitch is overruled.

24             But can I make one point on that?  Objections to the

25   deposition were supposed to be done 10 days in advance of

1    trial, so I think this is untimely.

2          MR. THOMPSON:  We have objected to the deposition.  I

3    don't understand.

4          MS. DALE:  No, they were supposed to be submitted to

5    the Court 10 days before trial.

6          THE COURT:  Well, if there's truly a substantive

7    objection, I'm not going to say I can't consider it, because

8    normally I don't look at these depositions until the day of

9    trial because it's a waste of my time and -- it's a waste of

10   my time.  I follow along, because I've been doing this long

11   enough, I can generally figure out.

12         But -- so the first color here looks like it's blue.

13   Whose words are these, which side?

14         MS. DALE:  That's ours.

15         THE COURT:  That's yours.  Okay.  And where are the

16   objections from the plaintiff?

17         MR. THOMPSON:  There are comments.

18         THE COURT:  Say it again?

19         MR. THOMPSON:  There are comments in the PDF format.

20   So we highlighted a different color, we e-mailed BNSF, and we

21   attached our comments.

22         THE COURT:  Where are your comments?  I don't have

23   that, do I?

24         MS. DALE:  No, it's not in the PDF.  We only

25   submitted the transcript with the highlighting.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1        THE COURT:  So where are the objections?  Did you

2   file them with the Court?

3        MR. THOMPSON:  We did not, Your Honor.

4        THE COURT:  How will I know what they are if you

5   don't -- can you give me them to me now?

6        MR. THOMPSON:  I can, Your Honor.

7        THE COURT:  Do you have paper?

8        MR. THOMPSON:  We do not have paper.  We have to

9   print it out in comment format.  I can e-mail it to the Court.

10        THE COURT:  No, don't e-mail.  Just bring it tomorrow

11   morning.

12        MR. THOMPSON:  Yes, Your Honor.

13        THE COURT:  And make sure that you really intend to

14   assert all of the objections that you are asserting.

15        MR. THOMPSON:  It's one objection throughout, Your

16   Honor.

17        THE COURT:  What's the objection?

18        MR. THOMPSON:  The issue is they're calling him to

19   testify to this glitch.  When he testified, however, he was

20   actually a 30(b)(6) witness.  They didn't tell him.  He didn't

21   prepare.  And what he testified is he is a help desk guy.  So

22   he was aware of it only because other people told him.  He

23   doesn't know why it was there, how it worked, what BNSF did to

24   fix it.  He just knew there was a glitch.  That's not proper

25   foundation to then testify about the glitch.

1        THE COURT:  Is that accurate?

2        MR. GOMAN:  I mean, we are not offering the testimony

3   to prove that there's some problem in the coding that led to

4   this glitch.  We are offering it to substantiate Mr. Royston's

5   testimony that this supposed e-mail -- this e-mail from Ryan

6   Akers that is supposed evidence of a violation of federal law

7   was a routine thing for a BNSF manager to do.  Because of a

8   computer glitch, these TIMS reports would just fall off the

9   system after so long.  So Ryan Akers had to do exactly what he

10  did.  So the fact that he can't, you know, pinpoint exactly

11  why this glitch existed is immaterial, and we are not offering

12  it for that purpose.

13        THE COURT:  So how long is it going to take to read

14  all this?

15        MR. THOMPSON:  It's 40 pages, Your Honor.

16        THE COURT:  No, I know, but not everything is being

17  read, is it?

18        MS. DALE:  The highlighted.

19        MR. THOMPSON:  Oh.

20        THE COURT:  You are only reading what's highlighted?

21        MS. DALE:  Correct.

22        THE COURT:  Yeah, you're not -- that's not 40 pages.

23        MR. THOMPSON:  Correct, Your Honor.

24        THE COURT:  Does the plaintiff wish to read anything

25  from this, or are you just objecting to the whole thing?

17-cv-00844-WYD-SKC                Jury Trial                    IV - 1153

1          MR. THOMPSON:  If the Court overrules our objections,

2    we have counterdesignations.

3          MS. DALE:  But there are some designations regardless

4    of the ruling.

5          MR. THOMPSON:  That's right.

6          THE COURT:  So where are the counterdesignations?

7    What color are they in?

8          MS. DALE:  Yellow.  So ours is blue, theirs is

9    yellow, and then the green is only if you overrule the

10   objection, theirs.

11         THE COURT:  I don't see much yellow.  Is there yellow

12   in here?

13         MS. DALE:  There's some.

14         THE COURT:  Show me.

15         MS. DALE:  Page 29.

16         THE COURT:  I see 29 and 30.  Is that it, or is there

17   more?

18         MR. THOMPSON:  I think there's one more.  It's

19   minimal, Your Honor.  Page 20 and 21.

20         THE COURT:  20 and 21, all right.  Okay.  And

21   that's -- okay.  I see that now.

22         All right.  Those are the only four pages you wish to

23   read as counterdesignations?

24         MR. THOMPSON:  If our objection is overruled, yes.

25   Or, sorry.  If our objection is sustained, yes.  If our

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC                Jury Trial                    IV - 1154

1    objection is overruled, there are the ones in green as well.

2            Or are those yours, Gillian?

3            MS. DALE:  No.  Yours are green.  Ours are blue.

4            MR. THOMPSON:  So if the testimony comes in about the

5    TIMS system, the defect issue with the glitch, then we want

6    the green as well.

7            THE COURT:  All right.  And you are going to read

8    this, or is it a video?

9            MS. DALE:  We are going to read it.

10           THE COURT:  Okay.  Who is going to be the reader?

11           MS. DALE:  Mr. Atencio will be the witness.

12           THE COURT:  So this is a word of warning for the

13   reader.  Look at this before you start reading, because

14   sometimes readers don't read what's on the script, and I have

15   to interrupt them and say, by the way, it really says this.

16   So read it in advance, look at it so you aren't stumbling over

17   your words or, more importantly, saying the words incorrectly.

18           All right.  We are done until tomorrow morning.

19       (Proceedings recessed 5:15 p.m.,

20       February 14, 2019.)

21

22                    REPORTER'S CERTIFICATE

23           I, JULIE H. THOMAS, Official Court Reporter for the
     United States District Court for the District of Colorado, a
24   Registered Merit Reporter and Certified Realtime Reporter,
     CA CSR No. 9162, do hereby certify that I reported by machine
25   shorthand the proceedings contained herein at the time and
     place aforementioned and that the foregoing pages constitute a

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-cv-00844-WYD-SKC                 Jury Trial                        IV - 1155

1   full, true and correct transcript.
            Dated this 7th day of April, 2019.

2

3                       _____/s/ Julie H. Thomas_____
                          Official Court Reporter

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                              (303)296-3056