1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3
Civil Action No. 17-cv-00844-WYD-SKC
4

5    BRANDON FRESQUEZ,                      Volume V of VI

6          Plaintiff,               (Pages 1156 - 1380)

7          vs.

8    BNSF RAILWAY CO.,

9          Defendant.

10   -----------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                         JURY TRIAL
12   -----------------------------------------------------------

13
            Proceedings before the HONORABLE WILEY Y. DANIEL,
14   Judge, United States District Court for the District of
     Colorado, and a jury of ten, commencing at 8:34 a.m. on the
15   15th day of February, 2019, in Courtroom A1002, Alfred A.
     Arraj United States Courthouse, Denver, Colorado.
16

17
                          APPEARANCES
18
     For the Plaintiff:
19   NICHOLAS D. THOMPSON and JONATHAN L. STONE, THE MOODY LAW
     FIRM, 500 Crawford Street, Suite 200, Portsmouth, VA 23704
20
     For the Defendant:
21   KEITH M. GOMAN and GILLIAN DALE, HALL & EVANS, LLC,
     1001 17th Street, Suite 300, Denver, CO 80202
22

23

24
        JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25       Denver, CO 80294, (303)296-3056   (CA CSR No. 9162)

            Proceedings reported by mechanical stenography;
                transcription produced via computer.

17-cv-00844-WYD-SKC                 Jury Trial                        V - 1157

1                              I N D E X

2

    DEFENDANT'S WITNESSES                                        PAGE
3
    STEPHANIE DETLEFSEN
4       Direct - Mr. Goman (Resumed)                            1159
        Cross - Mr. Thompson                                    1170
5       Redirect - Mr. Goman                                    1195
        Recross - Mr. Thompson                                  1199
6   CASON COLE
        Direct - Mr. Goman                                      1201
7       Cross - Mr. Thompson                                    1223
        Redirect - Mr. Goman                                    1230
8   EVERETT EDWARD PERCIVAL
        Direct - Ms. Dale                                       1233
9       Cross - Mr. Thompson                                    1257
    DANE A. FRESHOUR
10      Direct - Mr. Goman                                      1265
        Cross - Mr. Thompson                                    1290
11      Redirect - Mr. Goman                                    1298
    ADAM MILLER
12      Direct - Mr. Goman                                      1300
        Cross - Mr. Thompson                                    1350
13      Redirect - Mr. Goman                                    1367
        Recross - Mr. Thompson                                  1374

14

15

                    PLAINTIFF'S
16                  EXHIBITS                  RECEIVED

17                  18                          1278

18

19                  DEFENDANT'S
                    EXHIBITS                  RECEIVED
20
                    A-59                        1270
21
                    A-65                        1308
22
                    A-67                        1269
23
                    A-69                        1312
24
                    A-73                        1306
25

    Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC                Jury Trial                           V - 1158

```
 1

 2              EXHIBITS
                REFUSED                                    PAGE
 3
                51                                         1182
 4
                A-57                                       1165
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

17-cv-00844-WYD-SKC          Detlefsen - Direct              V - 1159

1         (Proceedings resumed 8:34 a.m.,

2         February 15, 2019, outside the presence of

3         the jury.)

4              THE COURT:  All right, let's bring the jury in, and

5    let's do our best to finish this witness sooner rather than

6    later.

7         (Jury in at 8:35 a.m.)

8              THE COURT:  Have a seat.  Good morning.

9              Let's proceed with the redirect.

10             MR. GOMAN:  Your Honor, I believe we are still on

11   direct examination.

12             THE COURT:  You're still on direct?

13             MR. GOMAN:  Yeah.

14             THE COURT:  I'm moving you further along than I can,

15   I guess.  All right.  Direct.

16             **STEPHANIE DETLEFSEN, DEFENDANT'S WITNESS,**

17                  **DIRECT EXAMINATION (Resumed)**

18   BY MR. GOMAN:

19   Q.  Ms. Detlefsen, good morning.

20   A.  Good morning.

21   Q.  When we left off, we were talking about the Labor

22   Relations review of Mr. Fresquez's dismissal.  One thing I

23   forgot to cover and want to make sure I do.  I'm going to show

24   you Exhibit 62 that's been received.

25             Do you recognize this e-mail?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    A.   Yes.

2    Q.   You weren't included on this e-mail; is that right?

3    A.   No.

4    Q.   How did you come to learn about this e-mail?

5    A.   In preparation for this trial.

6    Q.   When you were reviewing Mr. Fresquez's dismissal case, did

7    you have -- did you look at any e-mails, including this one,

8    about the process leading up to his hearing?

9    A.   No.

10   Q.   So I want to talk about this e-mail.  The jury has already

11   heard the context, so let me try to cut to the chase.   In

12   looking at this e-mail, does it cause you any concerns in

13   terms of the, I guess, the integrity of the discipline process

14   at BNSF?

15   A.   Uh, I don't like parts of it.  I don't like, um, where

16   the, um -- where Mr. Carpenter says, I would respond this way.

17   But, generally speaking, we want conducting officers and

18   witnesses to meet and prepare ahead of time so that we know

19   that everyone is ready to hold a sound investigation, make

20   sure that the witness has their exhibits, their statements,

21   their timelines.  So I would encourage people to prepare, but

22   I would have -- if I knew about this e-mail, I would have

23   given Mr. Carpenter a call and said, In the future, I know

24   that you are trying to prepare everyone, make sure this is a

25   good, sound investigation, but we want to tell people to tell

 1   their story.  So you would encourage them to use their own

 2   words.  I would never tell people what to say.

 3   Q.  In looking at this e-mail, did you also look at the

 4   attachment?

 5   A.  Yes.

 6   Q.  Did you understand that attachment to be Mr. Paz's

 7   statement that he wrote May 5th of 2016?

 8   A.  Yes.

 9   Q.  Have you looked at the statement and compared it to

10   Mr. Paz's testimony in the investigation hearing?

11   A.  Yes, in that it seems to be consistent.

12        MR. THOMPSON:  Your Honor, I object.  A witness

13   reading a statement that she did not consider at the time of

14   the discipline decision and testifying that it's consistent

15   with what a witness said earlier is inappropriate, irrelevant,

16   infairly [sic] prejudicial.

17        THE COURT:  All right.  Overruled.  I will allow it.

18   BY MR. GOMAN:

19   Q.  Let me ask this question.  After reviewing this statement

20   and this e-mail, did you have any concerns that the

21   investigation hearing held in Mr. Fresquez's case was unfair?

22   A.  No.

23   Q.  Why not?

24   A.  Because the content of the e-mail from the supervisor

25   didn't change the facts of the case at all.

1    Q.  All right.  I'm going to switch gears then.  I'm going to

2    show you what's been admitted as Exhibit A-3.

3            Do you recognize this?

4    A.  Yes.

5    Q.  What is this?

6    A.  This is Mr. Fresquez's work history.

7    Q.  I'm going to pull out the discipline record.

8            Did you consider Mr. Fresquez's discipline history

9    when you made your recommendation?

10   A.  I don't recall, um, how much consideration I gave.  I

11   always look at the work history, but he didn't have anything

12   active at the time.

13   Q.  What do you mean "active"?

14   A.  He didn't have any active discipline at the time.  My

15   policy justification was stand-alone.  It wasn't on the basis

16   of a second Level S or anything like that.

17   Q.  Do you see, though, in 2010 there's some discipline for

18   insubordination?

19   A.  Yes.

20   Q.  Do you see Mr. Fresquez received a record suspension for

21   that?

22   A.  Yes.

23   Q.  What does that indicate to you?

24   A.  That indicates to me some mishandling.  I don't know the

25   facts of the case, but if the case had been sent to me and it

1    was proven insubordination, I would have recommended

2    stand-alone dismissal in 2010.

3    Q.  Do you see, though -- can you tell from looking at this

4    whether there was a disciplinary hearing held?

5    A.  No, Mr. Fresquez took a waiver.

6    Q.  If an employee is noticed for an investigation for

7    insubordination, but they are offered a waiver to a Level S,

8    would that come to your attention in Labor Relations?

9    A.  It would not, but, again, I would not have supported a

10   waiver for a Level S.

11   Q.  Just real quick, what is a Level S?  What does that mean?

12   A.  A Level S means level serious.  Um, the rule violation was

13   very serious, and you are going to have a probationary period

14   attached to that, and a future Level S violation within that

15   review period would subject you to dismissal.

16   Q.  I'm going to switch gears again.  After the decision to

17   dismiss Mr. Fresquez is made, that starts the appeal process?

18   A.  No.  After the dismissal is -- or after the discipline is

19   issued, then there's a timeline associated with that for the

20   union to start their appeal.

21   Q.  Eventually, if BNSF doesn't change its mind during the

22   appeal process, what is the final step in an appeal?

23   A.  Then we would go to arbitration and have a neutral

24   third-party person decide the case.

25   Q.  Okay.  How long does the process usually take from

1   discipline investigation hearing until review by a neutral

2   arbitrator?

3   A.   Probably a couple of years.

4   Q.   Is there any chance it could ever happen in three weeks

5   time?

6   A.   Three weeks?  No.

7   Q.   At the end of -- well, after the neutral arbitrator

8   reviews the case, does the arbitration board issue findings?

9   A.   Yes.  They issue an award, and both parties are tied to

10   the award.

11   Q.   I don't want you to tell me anything about the findings or

12   anything about the decision, but does the award contain the

13   factual findings, an explanation of the rationale for the

14   arbitration board?

15   A.   Yes.

16          MR. GOMAN:  I would like to show just the witness

17   Exhibit A-57.

18   BY MR. GOMAN:

19   Q.   Ms. Detlefsen, do you recognize what this is?

20   A.   Yes.

21          MR. THOMPSON:  Your Honor, I object.  Showing a

22   refused exhibit to a witness and having her questioned on it

23   is --

24          THE COURT:  I agree.  I refused this yesterday.  I

25   told you if you presented it redacted, I would refuse it

1    again, but I think it's inappropriate to show this to the

2    witness.

3              MR. GOMAN:  And, Your Honor, just to be clear, my

4    understanding of the Court's ruling was to preserve the record

5    I needed to present it and move.

6              THE COURT:  Okay.  I thought you were going to move

7    without her -- well, why does she need to comment on it?

8              MR. GOMAN:  She doesn't.  So I would move to admit

9    Exhibit A-57.

10              THE COURT:  All right.  Same objections as yesterday?

11              MR. THOMPSON:  Yes, Your Honor.

12              THE COURT:  Then the Court's ruling remains the same.

13    It's refused for the reasons I noted outside the presence of

14    the jury yesterday.

15    BY MR. GOMAN:

16    Q.  New topic.  The jury heard from a gentleman named Jay

17    Herzog during this trial.  Are you familiar with Mr. Herzog?

18    A.  Yes.

19    Q.  Do you understand that he has been dismissed from BNSF?

20    A.  Yes.

21    Q.  All right.  So the testimony in this case was that that

22    dismissal had something to do with his participation in

23    Mr. Fresquez's case.  So I want to ask you about that.

24              What was your role in Mr. Herzog's discipline?

25    A.  I reviewed Mr. Herzog's cases and supported dismissal.

17-cv-00844-WYD-SKC          Detlefsen - Direct          V - 1166

1  Q.  How did you end up being the one responsible for reviewing

2  his case?

3  A.  It's just a team effort.  We just balance the workload,

4  and I just happened to get his cases.

5  Q.  Do you remember when you reviewed Mr. Herzog's case for

6  potential dismissal?

7  A.  No.  It was years ago, I think.

8  Q.  If I were to tell you he was dismissed sometime in

9  February of 2017, does that sound right?

10  A.  Yes.

11  Q.  When you were reviewing his case for dismissal, did you

12  identify any connection between his rules violations and

13  Mr. Fresquez's case?

14  A.  No.

15  Q.  When you were reviewing his case for potential dismissal,

16  did you know that Mr. Herzog had signed an affidavit that --

17  in connection with Mr. Fresquez's case?

18  A.  I had no idea.

19  Q.  Did you know that he had been interviewed about

20  Mr. Fresquez's case?

21  A.  No.

22  Q.  Did you know that he had made hotline complaints?

23  A.  I had no idea.

24  Q.  We don't need a tremendous amount of detail, but why did

25  you recommend dismissal in Mr. Herzog's case?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   A.  Well, I did two dismissals, and the first one was on the

2   basis of a second Level S, and then the second dismissal was

3   on the basis of a third Level S.

4   Q.  I don't understand.  Why does someone get two dismissals?

5   A.  We would dismiss up to three times, because until an

6   arbitrator has rendered an award, the company still has an

7   employer-employee relationship with that person.  And

8   arbitrations can overturn discipline, including dismissals,

9   and they do all the time.  So if there's any outstanding

10  discipline that would result in a dismissal, we would continue

11  to follow the contract and go through the discipline process.

12  Q.  All right.  So the first -- well, you said Mr. Herzog had

13  a second Level S and that led up to his dismissal?

14  A.  Yes.

15  Q.  What was his first one?  Do you remember?

16  A.  No.

17  Q.  How long had he been under a Level S review?  Do you

18  remember that?

19  A.  If I remember correctly, he was nearing the end of a

20  three-year review period.

21  Q.  Quickly, what is a review period?  What does that mean?

22  A.  It's a probationary period.  So when you get a Level S, it

23  means you violated a serious rule, and you are going to be on

24  probation for a while.

25  Q.  If an employee commits another level S violation within

 1   that review period, what does that mean?

 2   A.  It means they're up for dismissal.

 3   Q.  What was the finding -- well, what was the rule violation

 4   at issue in Mr. Herzog's second Level S, the first one you

 5   reviewed?

 6   A.  Second Level S, the first one I reviewed, was using a cell

 7   phone while driving.

 8   Q.  What was your recommendation in that case?

 9   A.  I supported dismissal.

10   Q.  Why?

11   A.  Because that's a serious safety rule, and he was already

12   on a Level S probationary period.

13   Q.  How did the company find out that Mr. Herzog was using a

14   cell phone while driving?

15   A.  Um, he narrowly avoided hitting a truck in front of him.

16   So whenever there's a sudden braking or uneven surface,

17   something sudden, it will trigger the Drive Cam in the truck.

18   Q.  And the Drive Cam is what?

19   A.  It's a camera that records both outside and inside the

20   vehicle.

21   Q.  How does someone at BNSF find out that there had been a

22   sudden braking event and the camera recorded something?

23   A.  The Drive Cam company itself would send us the exception.

24   Q.  What was the second event that led up to the second

25   dismissal for Mr. Herzog?

1    A.  So on that one he was high-railing without turning on his

2    HLCS, which is high rail limits compliance system.  So he was

3    out on the track without having the alarm to tell us if he got

4    out of his authority and to tell him that he got out of his

5    authority.

6    Q.  Is that a serious rules violation?

7    A.  Yes.

8    Q.  Why?

9    A.  Because authority gives you the right to be on that

10   section of track.  If you are outside of your authority, you

11   could get yourself killed.

12   Q.  In reviewing Mr. Herzog's dismissal cases, did you see any

13   indication that anyone who was involved in Mr. Fresquez's

14   discipline, either as a witness or a decisionmaker, had

15   anything to do with Mr. Herzog's dismissal?

16   A.  No.

17   Q.  When Mr. Herzog committed those rules violations, was he

18   working in a new territory under new supervision?

19   A.  I didn't remember that at the time, but in preparation for

20   this trial I realized that.

21   Q.  All right.  Last question, last topic.  We talked at the

22   end of your examination yesterday about what you knew and what

23   you didn't know when you recommended dismissal for

24   Mr. Fresquez.  One more of those questions.

25          There's been some evidence in this case that

1   Mr. Fresquez talked to his union representative about some

2   disagreements he had with supervisors and that that union

3   representative then talked to BNSF management about that.  Did

4   you have any idea that any of those exchanges took place?

5   A.   No.

6   Q.   Did anything like that influence your decisionmaking in

7   Mr. Fresquez's case?

8   A.   No.

9          MR. GOMAN:  I don't have any more questions.

10          THE COURT:  Go ahead.

11                      **CROSS-EXAMINATION**

12   BY MR. THOMPSON:

13   Q.   Good morning, Ms. Detlefsen.

14   A.   Good morning.

15   Q.   I think yesterday you told us that a charging officer, a

16   company witness, and a hearing officer play a role in

17   discipline, but they don't make the final decision.  Is that

18   right?

19   A.   Yes.

20   Q.   So kind of the hearing officer, the charging officer, the

21   company witness, they contribute, but they are not the end-all

22   be-all?

23   A.   I honestly am not involved in those conversations, so I

24   don't know if the company witness even contributes.  I don't

25   know.

1   Q.  Well, he has to contribute in some way.  He testifies at

2   the hearing.

3   A.  Absolutely, yes.

4   Q.  Yeah.  I mean, so --

5   A.  I just mean subsequent conversations I don't know.

6   Q.  Sure.  But those three people contribute.  They are a

7   contributing factor in the discipline process.  Right?

8   A.  Yes.

9   Q.  All right.  I'd like to talk to you -- actually, strike

10  that.

11          In this case, then, the decisions and actions of Mark

12  Carpenter, who was the charging officer, and Michael Paz, who

13  was the company witness, were a contributing factor to

14  Mr. Fresquez's discipline; right?

15          MR. GOMAN:  Object to the form of the question.  It

16  also calls for a legal conclusion.

17          THE COURT:  Overruled.

18  A.  They played a part in the process.

19  BY MR. THOMPSON:

20  Q.  Yeah.  They contributed to it; right?

21  A.  Well, I came to my own conclusion about the discipline.  I

22  guess I don't understand your question.

23  Q.  Sure.  In order to get there, where you review it, those

24  people had to contribute to the process.

25  A.  That's right.

17-cv-00844-WYD-SKC          Detlefsen - Cross          V - 1172

1   Q.  And if they wanted to, and I'm not saying they did, but if

2   they wanted to, they could taint it so what you are reviewing

3   is tainted; right?

4   A.  I don't understand how they could taint it.

5   Q.  Sure.  They could lie in a hearing, they could hide

6   evidence, things like that, if they wanted to.

7   A.  I suppose I wouldn't know that.

8   Q.  Right.  That's my point.  Those people can taint the

9   process without you knowing it; right?

10  A.  Okay.

11  Q.  Do you agree with that?

12  A.  I don't really know how to respond to that.  I didn't see

13  any evidence of that.

14  Q.  I get that.  Would you know if the process had been

15  tainted by them?

16  A.  It seems like I would get an indication from the whole

17  record.  So if Mr. Paz was lying, it seems like it would come

18  through, but instead Mr. Fresquez's testimony seemed to

19  support Mr. Paz's version of events.

20  Q.  Got it.  So you thought Mr. Paz was telling the truth.

21  A.  Yes, I did.

22  Q.  And Mr. Fresquez was lying.

23  A.  Yes.

24  Q.  Okay.  If it were the other way around, hypothetically,

25  Michael Paz was lying and Brandon Fresquez was telling the

1   truth, that might have changed your decision; right?

2   A.  Yes.

3   Q.  All right.  So I'd like to talk to you about two different

4   rules.

5          BNSF prohibits insubordination; right?

6   A.  Yes.

7   Q.  It also prohibits failure to follow instructions?

8   A.  That's right.

9   Q.  What's the difference between those two rules?

10  A.  So a failure to comply with instructions would be -- I

11  think I talked about this yesterday -- if my boss tells me to

12  do something, and I do it, but I don't do it as well as he

13  wanted me to or I skipped a step, I didn't do it quite right.

14  I failed to comply with his instructions.

15          Whereas, insubordination would be he tells me to do

16  something, and I tell him no, I'm not going to do it.

17  Q.  BNSF has three different levels of discipline severity.

18  In other words, a rule violation kind of fits into one of

19  three columns as to how severe it is.  Right?

20  A.  That's right.

21  Q.  What are those three columns?

22  A.  So we have standard handling.  That would be -- those are

23  generally rules that nobody is going to get hurt.  I'm late to

24  work, or, um, I missed a call for work, something like that.

25  That would be standard handling.

1              Serious would be it subjects people and equipment to

2       some sort of harm.  It's a safety rule, generally speaking.

3       But we've got Level S violations that are also, like we talked

4       about, failing to comply with instructions.  So it's not

5       always safety.  It could be sleeping at work.

6              And then the stand-alone is what we talked about.

7       That would be theft, dishonesty, insubordination, those kind

8       of rules.

9       Q.  Which column is failure to follow instructions in?

10      A.  That's a Level S.  That's serious.

11      Q.  Okay.  If Mr. Fresquez had been charged with failure to

12      follow instructions, could he have been terminated?

13      A.  No.  He would have been given a Level S.

14      Q.  If Mark Carpenter had chosen to charge him with failure to

15      follow instructions, BNSF could not have fired him.

16      A.  He wouldn't have been charged correctly, but yeah, I would

17      not have supported dismissal for failing to comply with

18      instructions.

19      Q.  In fact, you couldn't have.  The PEPA policy prohibits

20      that; right?

21      A.  That's right.

22      Q.  So for all intents and purposes, whether right or wrong,

23      it was Mr. Carpenter's charging decision that enabled BNSF to

24      at least be able to fire Mr. Fresquez.

25      A.  You have to be charged properly to be disciplined for the

1    appropriate level of the charges.  So, yes, if somebody is

2    insubordinate -- and that's something I train the field on.

3    If somebody is insubordinate, you can't charge them with

4    failing --

5              COURT REPORTER:  Excuse me.

6              THE WITNESS:  I'm sorry.

7              COURT REPORTER:  "You can't charge them with

8    failing" --

9    A.  -- to comply with instructions because that's a different

10   level of discipline.  So if somebody is insubordinate, you

11   need to make sure you charge them appropriately.

12             THE COURT:  She's signaling she wants you to talk a

13   little slower, please.  All right.

14             MR. THOMPSON:  I've been doing the same thing all

15   week to her.

16             THE COURT:  He is incorrigible about talking fast.

17             THE WITNESS:  I will try.

18             THE COURT:  I am saying that in a nonprejudicial way,

19   so the record is clear that I'm just making an observation.

20   BY MR. THOMPSON:

21   Q.  I'd like to talk for a moment about the fairness of the

22   hearing process just generally.  Okay?

23   A.  Okay.

24   Q.  You review, give or take, 20 transcripts per month?

25   A.  Yes.

17-cv-00844-WYD-SKC          Detlefsen - Cross                V - 1176

 1   Q.  For how many years have you done that?

 2   A.  This is my fifth year.

 3   Q.  As we sit here today, can you recall a single instance of

 4   you recommending no discipline whatsoever to all charged

 5   employees in a hearing for substantive reasons, in other

 6   words, because you believed, I read the transcript, I don't

 7   think they did what they were accused of?

 8   A.  No.

 9   Q.  I think yesterday you testified that you sometimes contact

10   legal counsel.

11   A.  Yes.

12   Q.  I was going to point to Mr. Balanon, but he's hiding.

13           Is that Mr. Balanon?

14   A.  Usually, yes.

15   Q.  Has he ever once convinced you to change your discipline

16   decision?

17           MR. GOMAN:  I object.  This asks for attorney-client

18   privileged communications.

19           THE COURT:  Who is Mr. -- you said balance?

20           MR. THOMPSON:  Balanon.

21           THE COURT:  Who is Balanon?

22           MR. THOMPSON:  He is in-house counsel.  Yesterday she

23   testified that she contacts the legal department to seek their

24   advice.  We are, therefore, entitled to find out if that

25   advice has ever changed her mind.

1          THE COURT:  I don't know if this -- I can't -- I

2    don't know enough to conclude whether or not attorney-client

3    privilege is implicated.  So --

4          MR. THOMPSON:  Would you like me to ask it

5    differently, Your Honor?

6          THE COURT:  Well, here's what I would need to know is

7    the frequency with which she talks to in-house counsel and

8    what the subject matters of those conversations are, without

9    revealing what they are.  And that will allow me to understand

10   whether or not there's a legitimate objection of

11   attorney-client privilege, since it involves a lawyer who is

12   not in the courtroom.

13         MR. THOMPSON:  Sure.

14   BY MR. THOMPSON:

15   Q.  Sometimes when you are reviewing transcripts, you contact

16   the law department to get their input.

17   A.  That's right.

18   Q.  In other words, to make sure that if you fire somebody,

19   you are not violating, you know, any number of federal or

20   state laws.

21   A.  That's right.

22   Q.  Without telling me what legal counsel has told you, have

23   you ever talked to them and changed your discipline decision?

24   A.  No.

25   Q.  I mean, they don't really -- strike that.

1      What they really do is just help you get away with
2  it; right?
3  A.  No.
4  Q.  You talked today about some of the training that BNSF
5  provides on its policies regarding retaliation?
6  A.  Yes.
7  Q.  BNSF's law department provides a PowerPoint from time to
8  time?
9  A.  I received a PowerPoint training presentation, yes.
10  Q.  I'm going to show you Plaintiff's Exhibit 51.  This is a
11  copy of BNSF's -- one of their PowerPoint presentations;
12  right?
13  A.  Yes.
14  Q.  This is on the training they provide on the Federal
15  Railway Safety Act, the law this case is being brought under?
16  A.  That's right.
17  Q.  You agree with me that policies are only as good as the
18  training that is provided; right?
19  A.  Policies are only as good as, I guess, how much people
20  comply with them and follow them.
21  Q.  Sure.  And part of that is training employees adequately
22  on it?
23  A.  Yes, we need to be trained.
24      MR. THOMPSON:  Plaintiff offers Exhibit 51.
25      THE COURT:  Any objection?

17-cv-00844-WYD-SKC          Detlefsen - Cross          V - 1179

1        MR. GOMAN:  Yeah, I don't believe an adequate

2   foundation has been laid.  I also believe this is an

3   attorney-client privileged communication.

4        THE COURT:  It's a what?

5        MR. GOMAN:  I'm sorry?

6        THE COURT:  It's attorney-client.  Why is it an

7   attorney-client document?

8        MR. GOMAN:  It's a communication from BNSF in-house

9   counsel to supervisors.

10       I also believe there's an inadequate foundation

11  through this witness to comment on this document.

12       THE COURT:  All right.  Where is this document?  How

13  long is this document?

14       MR. THOMPSON:  It's 42 pages.  I'm going to ask about

15  three of them.  And, Your Honor, may I address Mr. Goman's

16  comments briefly?

17       THE COURT:  Go ahead.

18       MR. THOMPSON:  First, this was publicly filed and

19  unsealed in another case.  Another judge has already made this

20  public record.

21       Second --

22       THE COURT:  I don't know anything about what other

23  judges do unless I read their orders.  Go ahead.

24       MR. THOMPSON:  Understood.  It's Bates stamped from a

25  different case.

1          Moreover, this is exactly what Mr. Goman said he was

2     not going to do.  We asked to take a deposition, trial

3     deposition on this if they were going to object to foundation.

4     Mr. Goman said, I'm not going to say this isn't BNSF's

5     PowerPoint or that we don't have foundation.  I am going to

6     object to relevance and prejudice.

7          THE COURT:  All right.  Here's what I will let you

8     do.  Let's see if I can get a better understanding of what

9     this document is and isn't through your questions of this

10    witness.

11         MR. THOMPSON:  Sure.

12    BY MR. THOMPSON:

13    Q.  BNSF trains its employees on the FRSA?

14    A.  Yes.

15    Q.  That training includes from the law department.

16    A.  Yes.

17    Q.  That's only to managers?

18    A.  I don't know who they train.

19    Q.  Do you know if they train union-level employees?

20    A.  No, I don't think they do.

21    Q.  But they train people like Mark Carpenter, Michael Paz on

22    it?

23    A.  Like I said, I don't know who all they train on it.  I

24    know they train me.

25    Q.  Okay.  And they use PowerPoints like this?

17-cv-00844-WYD-SKC          Detlefsen - Cross                V - 1181

1   A.  Yes.

2   Q.  And you base your decisions, at least sometimes, on the

3   education you receive through such PowerPoints.

4   A.  I don't.

5   Q.  You ignore BNSF's law department's PowerPoints?

6   A.  I don't.  I refer to the law department for them -- see,

7   when I use the law department to help me review a case, they

8   are reading it through a different lens than I am.  I manage

9   the discipline.  I decide the appropriate level of discipline.

10  And they look at it through a legal standpoint.

11  Q.  Yeah, my question is a little different.  Sorry.

12          You flag cases to bring to the law department; right?

13  A.  I don't flag them.  If I see a word like "retaliation,"

14  then I immediately include them.

15  Q.  And it's the education they provide in PowerPoints like

16  this that cause you to look for those kinds of words; right?

17  A.  That's right.

18          MR. THOMPSON:  Your Honor, we offer Plaintiff's

19  Exhibit 51.

20          MR. GOMAN:  Your Honor, renew my objections as

21  previously stated.  I also believe that -- I mean, this is a

22  50 -- I'm sorry -- 42-page document, and it's riddled with

23  prejudicial irrelevant information.

24          THE COURT:  Well, I agree with Mr. Goman.  I'm

25  flipping through this now.  A couple of the pages of this have

17-cv-00844-WYD-SKC           Detlefsen - Cross                V - 1182

1   already come in evidence, as I remember.  For example, if I'm

2   wrong on this, or maybe -- page 4 of 42, hasn't that been

3   referenced?

4          MR. GOMAN:  Yes, that has.

5          THE COURT:  As a separate exhibit?

6          MR. GOMAN:  That's right.

7          THE COURT:  All right.  And then also 5 of 42?

8          MR. GOMAN:  Yeah, that's right.  That's come in

9   otherwise.

10          THE COURT:  This is a broad ranging document, and

11   this witness had nothing to do with preparing it.  I think, on

12   this record, that the prejudicial effect outweighs the

13   probative value on a substantial basis under Rule 403.  So I'm

14   going to refuse it at this time.  So Exhibit 51 is refused.

15   BY MR. THOMPSON:

16   Q.  Does BNSF's law department train its employees not to

17   write incriminating e-mails?

18   A.  They tell us that our e-mails should be professional and

19   that they could end up in court.

20   Q.  Part of what they tell you is, hey, if you are discussing

21   something like Brandon's case, make phone calls instead

22   because they are not discoverable; right?

23   A.  I would say that, like I said, e-mails should be

24   maintained -- they should maintain professionalism and, um,

25   that we need to be aware that they could be used in court.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    Q.  My question was a little different.

2           Part of what BNSF tells you or tells the employees

3    that it's training on the FRSA is be careful about e-mails.

4    They are discoverable.  Make telephone calls instead.  Right?

5    A.  I guess that, um, phone calls are easier to have

6    sometimes, yes.

7    Q.  And they're not discoverable; right?

8    A.  That's right.

9    Q.  All right.  So we've talked about the fairness of the

10   hearing process generally.  I'd like to talk specifically

11   about the fairness of Mr. Fresquez's hearing.  Okay?

12   A.  Okay.

13   Q.  You review only the transcript that you are provided and

14   the exhibits?

15   A.  I review the employee's work history, the investigation

16   transcript, and the exhibits to the investigation.

17   Q.  You don't consider other evidence, for example, things we

18   found in this case.

19   A.  That's right.

20   Q.  So, for example, you didn't consider that Jay Herzog

21   testified that Brandon did not refuse an order; right?

22   A.  I'm sorry.  What was the question?

23   Q.  Sure.  Jay Herzog testified in this case that Brandon did

24   not refuse an order.  That's not something you could have or

25   did consider.

1   A.   Jay Herzog wasn't a witness.

2   Q.   Right.  So you couldn't have considered that; right?

3   A.   That's right.

4   Q.   You couldn't and didn't consider that Jason Snow and Jacob

5   Yancey heard Mike Paz's call with Brandon Fresquez, and each

6   have said that Mr. Paz never ordered Mr. Fresquez to remeasure

7   the defect.

8   A.   What was your question?

9   Q.   Sure.  In this case there were two other coworkers present

10  that heard the radio conversation.  They have both testified

11  that Mr. Paz never ordered Brandon Fresquez to remeasure the

12  defect.  Because that wasn't in the hearing, that's not

13  something you could consider; right?

14  A.   That's right, but I would consider this, that if I'm an

15  employee and I've got witnesses to prove my innocence, I would

16  have called those witnesses to the investigation to testify on

17  my behalf, and they weren't there.

18  Q.   Would witnesses who really have no skin in the game and,

19  if anything, have a reason not to testify against the company,

20  would them testifying that essentially Paz was lying maybe

21  change your opinion?

22  A.   I would have to read that record.

23  Q.   Yeah.  I mean, that could change your opinion; right?

24  A.   It could.  I would have to read the record.

25  Q.   In the hearing, Michael Paz testified that the defect did

1   not exist; right?

2   A.   I don't remember that.

3   Q.   Sure.  So I'll show you.

4        So I'm going to show you Defendant's Exhibit A-48,

5   which is the hearing transcript, at page 33.  I'm going to

6   start at line 2.

7        Ned Percival, he says:  "What were the results of

8   your stringlining?  Did you, was a defect noted or not?"

9        Michael Paz responds:  "Uh, at the first location,

10  no, we couldn't find anything, um, in that a -- in that area."

11       Ned Percival then asks:  "So both, from my

12  understanding, the locations under, in question, both you and

13  Mr. Herzog stringlined them and no defects were found?"

14       Michael Paz responds:  "That is correct."

15       Did I read that; correctly?

16  A.   Yes.

17  Q.   You agree with me that Michael Paz testified that the

18  defect did not exist; right?

19  A.   He agrees right here that no defects were found.

20  Q.   I'll testify -- or I'll represent to you that in this case

21  Mr. Paz, in front of the jury, said the defect was present, we

22  had just repaired it earlier in the day.  That's not something

23  you could have considered because he didn't say that in the

24  hearing; right?

25  A.   To me the -- the question of the hearing wasn't about

17-cv-00844-WYD-SKC          Detlefsen - Cross              V - 1186

1   whether or not there was a defect.  It was whether or not

2   Mr. Fresquez was insubordinate to Mr. Paz.  That's what I was

3   reading it to look for, not really so much about whether or

4   not there was a defect in the track.

5   Q.  Sure.  And we'll get to that in a second, but you said one

6   of the things that -- really your main reason for finding

7   against Mr. Fresquez was you believe Paz told the truth, you

8   believe Mr. Fresquez lied; right?

9   A.  That's right.  I believe that Mr. Fresquez -- he said that

10  he wasn't insubordinate, and I think that's a lie.  He was

11  insubordinate, according to my reading of the transcript.

12  Q.  All right.  So if Michael Paz lied about other things,

13  that might have affected your decision; right?

14  A.  No.

15  Q.  Really?  So if he lied about whether a defect is present,

16  that wouldn't cause you to be concerned that he might be lying

17  about other things?

18  A.  To me, the defect thing was separate.  I read very clear

19  testimony that an employee refused to do the work that a

20  supervisor assigned him to do, and that's what the case was

21  about for me.

22  Q.  To remeasure the defect; right?

23  A.  To string-line the defect.

24  Q.  That Michael Paz was lying about whether it was present or

25  not.

Julie H. Thomas, RMR, CRR                            (303)296-3056

1        MR. GOMAN:  Objection:  argumentative, and asked --

2        THE COURT:  Sustained.  It is argumentative.

3   BY MR. THOMPSON:

4   Q.  How many times does a manager have to lie before you start

5   to question his integrity?

6        MR. GOMAN:  Same objection.

7        THE COURT:  That's a different question.  Overruled.

8   She can answer it.

9   A.  I don't know how to respond to that.  I didn't think that

10  he was lying about the case.

11  BY MR. THOMPSON:

12  Q.  I get that.  So my question is different.

13       How many times would Michael Paz have to lie before

14  you would start to think, you know what, maybe it's not

15  Brandon Fresquez who is lying, maybe it's Michael Paz?

16  A.  I guess I would have to read a different transcript to

17  come to a different conclusion.

18  Q.  I'll represent to you that the person Michael Paz said

19  fixed the defect testified he has never fixed that defect.

20  Would that cause you to question Michael Paz's integrity?

21  A.  Again, I would have to read a different transcript.  The

22  transcript that I had in front of me, he seemed very

23  straightforward, and I believed him.

24  Q.  I'm asking you something different.  Michael Paz has

25  testified that earlier that morning, on May 5th, Jay Herzog

1  repaired the defect.  Jay Herzog unequivocally testified he

2  did not and has never repaired that defect.  Would that cause

3  you to question Michael Paz's integrity?

4  A.  No.

5  Q.  Two employees who are still working for BNSF, Jacob Yancey

6  and Jason Snow, testified that that defect was present that

7  day, was not repaired that day, has never been repaired.

8  Would that cause you to question Michael Paz's integrity?

9  A.  I guess I don't understand these questions.  His integrity

10  as far as what he was telling in the transcript or . . .

11  Q.  Generally.  If a manager is willing to illegally remove

12  defects from the system and lie about it, does that cause you

13  to question his integrity?

14  A.  Yes.

15        MR. GOMAN:  Objection to relevance.

16        THE COURT:  Overruled.  She may answer.

17  BY MR. THOMPSON:

18  Q.  And your decision in this hearing transcript was based in

19  part on integrity.  You believed Michael Paz.  You did not

20  believe Brandon Fresquez.

21  A.  The record supported Mr. Paz's version of events,

22  including Mr. Fresquez's testimony.

23  Q.  So let's talk about that.  I think that's what you said

24  earlier too.  You said this isn't a he-said/he-said because

25  Brandon's version of events just doesn't make sense.  Right?

17-cv-00844-WYD-SKC          Detlefsen - Cross          V - 1189

1   A.   That was one of the factors.   It did not make sense to me.

2   Q.   Brandon's story was that he believed Michael Paz was

3   trying to get him to participate in illegally removing a

4   defect, and he did not want to be a part of it.   I'm not

5   saying you have to agree that's what happened, but that's what

6   Mr. Fresquez said; right?

7   A.   He said that he didn't see the point in string-lining it

8   because he had already made up his mind, which didn't make

9   sense because he did want to string-line it.

10  Q.   And Brandon explained in the hearing, I think Mr. Paz was

11  already planning on removing the defect regardless of whether

12  I was going to measure it, which by the way is a violation of

13  federal law, and I didn't want to have any part in it.   That

14  was really his explanation; right?

15  A.   That wasn't the explanation that I read.   The explanation

16  I read, he just kept saying, I just don't see the point.

17  You've already made up your mind.   I don't see the point.

18  Q.   Made up your mind to do what?

19  A.   I think he was saying to remove the defect, but that

20  didn't ring true because he was trying to string-line --

21  Q.   Right.

22  A.   -- and he was trying to tell him -- no, he, Mr. Paz, was

23  trying to tell Mr. Fresquez to string-line.

24  Q.   Right.   So what Brandon was saying was, You, Michael Paz,

25  have already made up your mind, whether the defect is present

1   or not, to remove it.  So why bother?  Just go ahead and do

2   your illegal conduct.  Don't include me.

3           And I'm not saying that's what happened.  What I'm

4   asking you is that was Brandon's version of events; right?

5   A.  Yes.

6   Q.  Did you know that day the defect was reported as

7   supposedly being repaired?

8   A.  No.

9   Q.  Did you know that it was reported as having been repaired

10  by Jay Herzog?

11  A.  No.

12  Q.  Did you know that Jay Herzog testified he has not then or

13  ever repaired that defect?

14  A.  No.

15  Q.  Did you know that every employee other than Paz who has

16  testified in this case about that defect has said it existed

17  then, it exists today, because it has never been repaired?

18  A.  No.

19  Q.  Yet it shows up in BNSF's system as having been repaired.

20  Did you know that?

21  A.  I don't have anything to do with track defects.

22  Q.  The person that Mr. Paz got to help him when Brandon

23  refused was Jay Herzog; right?

24  A.  Yes.

25  Q.  And Jay Herzog's name shows up as the person that repaired

1    it in BNSF's system?

2             MR. GOMAN:  Your Honor, objection:  asked and

3    answered.  This witness has said repeatedly she doesn't know

4    what the track defect reports show.

5             THE COURT:  Yeah, sustained.

6    BY MR. THOMPSON:

7    Q.  Hypothetically, if Michael Paz was willing to falsify a

8    defect and put the name in the system of the person he forced

9    to help him, Jay Herzog, Brandon's story that he didn't want

10   to measure the defect because he thought Michael Paz was going

11   to do the same thing to him, it starts to make a lot more

12   sense, doesn't it?

13   A.  Hypothetically -- say it again?

14   Q.  Sure.  I'll try.

15            Brandon's story that he didn't want to measure the

16   defect because he was afraid his name would be put illegally

17   in the system starts to make a lot more sense if it's true

18   that Michael Paz falsely removed the defect and put the name

19   of the person he forced to measure the defect, Jay Herzog, as

20   having removed that defect; right?

21   A.  That would make a different story.

22   Q.  Until today, that's things you hadn't heard?

23   A.  That's right.

24   Q.  Let's assume, for the sake of argument, that Brandon

25   legitimately believed that's what Michael Paz was going to do.

1  Michael Paz wanted him to remeasure the defect so that Michael

2  Paz could take it out of the system and put Brandon's name

3  there.  Would Brandon Fresquez have a right to refuse that

4  order?

5  A.  Our guidance on the railroad would be to empower yourself,

6  you know, don't do anything illegal or unsafe.  But I think

7  that there would have been a better way to handle it.

8  Q.  Would he have a right to leave?

9  A.  A right to leave?  I don't know about a right to leave.

10  We say, um, you know -- there's hotline calls.  You could have

11  elevated the problem.  I don't know that leaving is the right

12  solution.

13  Q.  Let's assume, for the sake of argument, that everything

14  Brandon said is true.  That's legitimately what happened.

15  Would you have recommended insubordination and termination

16  when he left?

17          MR. GOMAN:  I object to that question.  I'm not sure

18  how this witness could answer that, assuming everything --

19          THE COURT:  Well, she can answer it to the best of

20  her ability.  So the objection is overruled.  This is

21  cross-examination.

22  A.  This is really hard.  Everyone, um, tries to say if this,

23  if that.  To me, I would just have to read the record.  I

24  don't know.  I would have to read the testimony of all of the

25  people.  And if it was a different fact pattern, then I might

1   have a different outcome.  I don't know.

2   BY MR. THOMPSON:

3   Q.  So you have read the hearing transcript in this?

4   A.  I read this one, yes.

5   Q.  Let's say you believed Brandon and not Michael Paz.  Would

6   you have recommended that Brandon be terminated?

7   A.  That Mr. Fresquez did not want to do work because he felt

8   it was illegal, would I have supported dismissal?  No.

9   Q.  BNSF has very good antiretaliation policies on paper.  We

10  talked all about those yesterday.  I mean, they check every

11  box.  Right?

12  A.  I hope so.

13  Q.  Yeah.  I mean, they're as good as any I've seen.  On paper

14  those policies look really good.  Do you agree with that?

15  A.  Yes.

16  Q.  You also agree with me, I assume, but let me know if you

17  don't, that policies are only good if you enforce them.

18  A.  If people follow them, yes.

19  Q.  Yeah.  So one of the things you need to do is discipline

20  supervisors who violate them.

21  A.  That's true.

22  Q.  And you also need to train those supervisors on them.

23  A.  That's true.

24  Q.  Would it cause you concern if Mark Carpenter, the charging

25  officer in this case, testified he never or at least does not

1    recall ever receiving training on the FRSA?

2    A.   No.

3    Q.   That wouldn't bother you?

4    A.   No.  It didn't seem to have a place in this hearing -- or

5    the transcript that I read was about insubordination.

6    Q.   I'm not talking about even just this case.  Would it

7    bother you if a manager at BNSF testified, I don't think I've

8    ever been trained on the FRSA?

9    A.   Like I said before, I don't know who the law department

10   goes to and trains personally.  I know that we all certify, as

11   officers of the company, on the Code of Conduct, and that

12   explains very clearly that we have an antiretaliation policy.

13   Q.   Sure.  My question is different.

14        If managers are not being trained on those policies,

15   would that cause you concern?

16   A.   I don't -- I don't know how much training people are

17   supposed to get.  I think we are supposed to know that you

18   don't retaliate, and we have to certify on the Code of Conduct

19   every year that we don't retaliate.

20        MR. THOMPSON:  I have nothing further.  Thank you,

21   Ms. Detlefsen.

22        THE COURT:  Okay.  Redirect.  Now we're on redirect.

23   So let's make it short, if possible.

24        MR. GOMAN:  All right.

25   ///

1                    **REDIRECT EXAMINATION**

2    BY MR. GOMAN:

3    Q.  Let's talk about those hypotheticals, Ms. Detlefsen.

4            What is empowerment at BNSF?

5    A.  Empowerment would be that you should never do anything

6    that you think is unsafe or illegal.

7    Q.  If Mr. Paz had said, Mr. Fresquez, log into the PARS

8    database and mark this defect as repaired, even though we both

9    know it hasn't been, would you support that?

10   A.  No.

11   Q.  If Mr. Fresquez said in the investigation, He told me to

12   log into the system, mark it as repaired, and I knew it

13   wasn't, so I refused, would you have viewed that as

14   insubordination?

15   A.  No.

16   Q.  In the investigation transcript, did Mr. Fresquez ever say

17   he believed measuring a track is an illegal action?

18   A.  No.

19   Q.  Have you ever heard anyone say measuring a track is

20   illegal or contrary to federal law?

21   A.  No.

22   Q.  Did you believe when Mr. Paz told Mr. Fresquez to measure

23   the track to see how it measured, he was telling him to do

24   something illegal?

25   A.  No.

1    Q.   Did Mr. Fresquez's union representative argue that that

2    was the case?

3    A.   No.

4    Q.   I'm going to switch topics.  You were asked a bunch of

5    questions about who contributed to the process, who

6    contributed to the discipline decision.  As you understand it,

7    what was Mike Paz's role in Mr. Fresquez's discipline?

8    A.   I don't know that he had any part to do with his

9    discipline.  I know that he was a witness at the

10   investigation.

11   Q.   When you said he contributed to the process, what did you

12   mean by that?

13   A.   I mean that under the collective bargaining agreement we

14   have to hold hearings, and, um, he played a part in that.  He

15   was a witness.

16   Q.   Are you aware of Mr. Paz having anything to do with the

17   dismissal decision, other than having testified at that

18   investigation hearing?

19   A.   No.

20   Q.   Same question with Mr. Carpenter.  To your knowledge, what

21   involvement did he have in Mr. Fresquez's discipline decision?

22   A.   I don't know if he had any.

23   Q.   So when you said he contributed to the discipline process,

24   what did you mean?

25   A.   It was my understanding -- I don't recall, but I think,

1    um, the indication was that his name was the name on the

2    charging letter.

3    Q.  Meaning what?  What does that mean he did?

4    A.  Meaning a letter for a notice of investigation went out

5    under his letterhead.

6    Q.  All right.  Next topic.  You testified on

7    cross-examination about whether you've -- I don't remember how

8    it was put -- you failed to -- whether you have ever found a

9    substantive -- I don't know -- you failed to find a

10   substantive rules violation or something to that effect.

11   A.  Right.

12   Q.  Let me ask you this question.  Do you believe your review

13   that you do in Labor Relations is meaningful?

14   A.  Very.

15   Q.  Why?

16   A.  Because I don't know these people, and I can have a very

17   coolly detached reading of a transcript and see if the charges

18   are supported and make sure there's no violation of the

19   agreement.

20        So I do recommend sometimes no discipline or lesser

21   discipline or leniency, but I've never found -- by the time it

22   gets to me, this is somebody who stands for dismissal.  This

23   is, you know, a big rule violation or a accumulation of a

24   bunch of rule violations.  I haven't really found that there

25   wasn't a rule violation there.  I have just determined, for

17-cv-00844-WYD-SKC        Detlefsen - Redirect        V - 1198

1    whatever reasons, a different handling should be taken.

2    Q.  I see.  So you have reviewed potential dismissal cases,

3    recommended back to the field that the employee not be

4    dismissed.

5    A.  That's right.

6    Q.  Then, last, you were asked some questions about training

7    you have received from the law department and others.  You

8    said something like phone calls are easier to have?  Is that

9    right?

10   A.  Yes.

11   Q.  What do you mean by that?

12   A.  Um, because things can be taken out of context.  If I

13   write an e-mail, you can't hear my tone.  You don't know

14   really what my intent was.  So e-mails can be taken out of

15   context and frequently are in court and portrayed as something

16   bad when they're not necessarily bad at all.  So it's just

17   easier just to have a phone call.

18   Q.  Are you told never to write e-mails about discipline or

19   discipline decisions?

20   A.  No.  We're just told to make sure that they stay

21   professional and remember that they can end up in court.

22            MR. GOMAN:  I don't have any more questions.

23            THE COURT:  All right.  Is there any recross?

24            MR. THOMPSON:  Yes, Your Honor, brief.

25            THE COURT:  Make it brief.

1      MR. THOMPSON:  I will.

2                 **RECROSS-EXAMINATION**

3  BY MR. THOMPSON:

4  Q.  If Brandon Fresquez believed Michael Paz was going to have

5  him participate in falsely removing a defect, his leaving the

6  scene makes sense.  I'm not saying you'd do it, but his

7  actions then make sense.  Right?

8  A.  I would say then his testimony wouldn't make sense.

9  Q.  Is there any other reason that it makes sense for him to

10  leave the scene and refuse to measure the defect?

11  A.  I don't know why he did that.

12      MR. THOMPSON:  Thank you.

13      THE COURT:  All right.  This witness is excused.

14      All right.  We are going to take a short break

15  because we have to set up the communication for -- what's his

16  name?  Cole?

17      MR. GOMAN:  Cason Cole, that's right.

18      THE COURT:  Cason Cole.  Where is he?  Is he in

19  Texas?

20      MR. GOMAN:  Dallas.

21      THE COURT:  Dallas.  All right.

22      And then he will testify via video.  And let me just

23  make it clear.  You must give these witnesses who testify via

24  video the same care and consideration as if they were here in

25  open court.  And hopefully -- and I will say this to our IT

1   person.  The last witness who testified, after 20 or 30

2   minutes we lost the video and only had the audio, and so let's

3   see if we can do what we can to keep the video intact for the

4   entirety of this witness's examination.  All right.

5        (Jury out at 9:24 a.m.)

6           MR. THOMPSON:  Your Honor, there's two housekeeping

7   matters and one legal matter we'd like to take up at some

8   point today, whenever the Court pleases.

9           THE COURT:  I don't want to do it right now unless

10  you think it has to be done right now.

11          MR. THOMPSON:  Just before jury instructions, Your

12  Honor.

13          THE COURT:  All right.  Remind me.

14          MR. THOMPSON:  Will do.

15       (Proceedings recessed 9:24 a.m. to 9:41 a.m.,

16       resuming outside the presence of the jury.)

17          THE COURT:  All right, let's bring the jury in.

18          How long is this going to last, the testimony?

19          MR. GOMAN:  The direct exam, 20 minutes.

20          COURTROOM DEPUTY:  For what it's worth, Your Honor, I

21  don't know that he's going to see the exhibits on his end.

22          THE COURT:  Okay.

23       (Jury in at 9:43 a.m.)

24          THE COURT:  All right.  Call your next witness by

25  name.  Have a seat.

1          MR. GOMAN:  All right.  We are next going to call

2     Mr. Cason Cole.

3          COURTROOM DEPUTY:  Please raise your right hand.

4        (The witness was sworn.)

5          COURTROOM DEPUTY:  Please state your full name, and

6     spell your full name for the record.

7          THE WITNESS:  It is Cason Cole.  That's C-a-s-o-n,

8     Cole, C-o-l-e.

9      **CASON COLE, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

10    BY MR. GOMAN:

11    Q.  All right.  Mr. Cole, good morning.  Can you see the

12    courtroom, sir?

13    A.  I cannot.  I lost the video.

14    Q.  Okay.  We are going to press on, with the Court's

15    permission, and hopefully that comes back up.

16          THE COURT:  Hold on, Mr. Goman.  He most likely

17    cannot see exhibits.  Can we do this direct examination

18    without referencing any exhibits?  And if you say you can't,

19    how is he going to see exhibits that you might want him to

20    reference?

21          MR. GOMAN:  Your Honor, I sent him two exhibits that

22    I believe are the only two that either me or Mr. Thompson want

23    to use.

24          THE COURT:  Fair enough.  So he's got them there, and

25    they match what is on the exhibit list?  They are the same

 1   exhibits on the exhibit list?

 2          MR. GOMAN:  And they have both been admitted.

 3          THE COURT:  All right.  That's fine.

 4   BY MR. GOMAN:

 5   Q.  All right.  Okay.  Mr. Cole, introduce yourself to the

 6   jury, please.  Tell us what you do for a living.

 7   A.  So I am a lawyer in Dallas, Texas.

 8          Oh, video just came back.  And it went away again.

 9          I am a lawyer in Dallas, Texas, currently.

10   Q.  All right.  How long have you been an attorney?

11   A.  Since October of 2018.

12   Q.  Just real quick, you came to Denver this week to testify

13   in this Fresquez versus BNSF trial?

14   A.  That's correct.

15   Q.  All right.  We couldn't get you on Wednesday or Thursday,

16   so you flew back; is that right?

17   A.  That's right.

18   Q.  All right.  Let's dive right into it then.

19          Have you given a deposition in this case?

20   A.  I have.  I believe it was in about November of 2017.

21   Q.  Prior to giving that deposition, did you know anything

22   about Mr. Fresquez's dismissal or the fact that he had filed a

23   lawsuit?

24   A.  Uh, no, prior to that I had no knowledge of either of

25   those events.

1   Q.  All right.  Tell me about your career at BNSF.  When did

2   you start?

3   A.  So I started after I graduated from college in 2013.  I

4   think I started sometime in the middle of June in 2013.  I was

5   a management trainee.  I had a training process in Fort Worth

6   and Kansas City, and then I ended up in Missouri working from

7   about August of 2013 until April -- I believe it was around

8   April of 2014.  At that point I interviewed and got an

9   assistant roadmaster job in Denver, and so I moved to Denver

10  around April of 2014 and worked in that capacity until June,

11  the end of June in 2015.

12  Q.  All right.  Why did you leave BNSF?

13  A.  To go to law school.

14  Q.  All told, then, you worked at BNSF for approximately two

15  years?

16  A.  That's correct.

17  Q.  Okay.  And how long did you work in the track maintenance

18  department?

19  A.  The whole time I was there.  That was the only department

20  that I -- that I was in.

21  Q.  Do you have any plans to go back and work at BNSF as an

22  employee?

23  A.  No, I do not.

24  Q.  What kind of law do you practice?

25  A.  I'm a patent attorney.

1  Q.  I'm going to then try to jump right now to issues that

2  have come up in this case.  There's been an allegation in this

3  case that you either falsified track inspection records or

4  instructed track inspectors that worked for you to falsify

5  track inspection records.  Did you ever do that?

6  A.  No, I did not.

7  Q.  What do you believe the consequences for your employment

8  at BNSF would have been if you did either of those things?

9  A.  I think it would have probably resulted in severe

10  consequences for me, whether that was some sort of, you know,

11  punishment through our procedures, year-end reviews, or

12  ultimately a termination.  Um, it wouldn't have been good,

13  especially if something that I falsified resulted in a

14  derailment, an injury, you know, some sort of catastrophic

15  event.

16  Q.  Did you take safety seriously when you were an assistant

17  roadmaster at BNSF?

18  A.  Yes, very much so.

19  Q.  Did you encourage your employees, specifically your track

20  inspectors, to raise safety concerns and report defects when

21  they had them?

22  A.  I did.  I mean, we constantly talked about safety, not

23  just of our employees but the people that we worked with from

24  other departments, particularly the train crews that operated

25  on the tracks that we maintained and inspected.  And so it was

1   a constant conversation about how do we maintain the safest

2   work environment possible.  And, you know, I hadn't -- I

3   haven't worked at a ton of employers, but it really was kind

4   of striking how -- how much of a focus is placed on that.  We

5   constantly had monthly safety meetings.  We, you know, had

6   people come in and were constantly -- it was part of the

7   discussion, and people were encouraged to, uh, you know, raise

8   safety issues when they saw them, and we, you know, preached

9   that we were ready to take remedial action and fix things as

10  they came up.

11  Q.  When you were at BNSF, were you trained about FRA track

12  inspection regulations?

13  A.  I was.  It was part of the initial -- it was part of the

14  initial, uh, orientation program that I referenced, um, you

15  know, back in 2013.  There was a -- there was an intermediate

16  training that I had to do to make sure that I was in

17  compliance, and then -- that was in Kansas City with an FRA

18  inspector that worked -- he was the training guy for BNSF.

19  And then we had a tier 3 program as the FRA rolled out a new

20  layer of certification, we had that with Doreen Powers, the

21  manager of engineering certification, that I did.  I think

22  that was in late 2014 or early 2015.  So I was trained, in

23  those respects, on FRA compliance issues.

24  Q.  Let me ask you about a specific part of your training.  I

25  know it's been a while, but do you remember what your training

17-cv-00844-WYD-SKC                  Cole - Direct                    V - 1206

1   was from BNSF insofar as what you were supposed to do if a

2   non-class-specific defect had not been repaired within

3   30 days?

4   A.  I'm sorry.  I just lost audio.

5   Q.  Can you hear me now?

6           MR. GOMAN:  Great.  Anthony, is there anything you

7   can do to help us?

8           MR. ATENCIO:  There's nothing.  They control this.

9           COURTROOM DEPUTY:  I've been trying to get ahold of

10  him.  I haven't been successful.

11          THE COURT:  So ask again if he can hear you.

12          MR. GOMAN:  Cason, can you hear me?

13          THE COURT:  Let's get automation.  Tell Brantley we

14  have an emergency, to come up here immediately.

15          And then if we can't get this fixed, then I want to

16  go to another witness.  I don't want to sit here for an hour

17  trying to get this to work.  And then hopefully we can come

18  back to this.

19          Oh, he's back again.

20          MR. GOMAN:  Hey, Cason, can you hear me?

21          Hey, Cason?

22          THE COURT:  Do you have the ability to call him on

23  another number or anything?

24          MR. ATENCIO:  We do.  We would need your assistance

25  here from Robb.

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC               Cole - Direct                    V - 1207

1        THE COURT:  Can you attempt to call him, Mr. Keech,

2    on a number?

3        COURTROOM DEPUTY:  I'm now trying to get somebody

4    else from IT.

5        THE COURT:  Okay.

6        COURTROOM DEPUTY:  I'm trying to get ahold of IT.

7        MR. ATENCIO:  It sounds like we can hear you, Cason,

8    on the system.

9        THE COURT:  He's back.  See if you --

10       MR. GOMAN:  Hey, Cason, can you hear me?

11       MR. ATENCIO:  If we can just do like we did Friday.

12   If we can just call from a landline, and if we can use video

13   computerwise and telephone through the landline, that way they

14   are two different systems, so if we lose one we still have the

15   other one.

16       THE COURT:  Is someone from automation coming up?

17       COURTROOM DEPUTY:  I don't know.  I can't get ahold

18   of anybody.  Brantley had gone over to HR.  He had to do

19   something over there.  I didn't try 2020, though, now.

20       MR. ATENCIO:  Is there a direct dial number here?

21       COURTROOM DEPUTY:  I don't know what it is offhand.

22   I had it here, but when they swapped out the monitors, they

23   took the little note I had.

24       THE COURT:  We get a voice mail on 2020.

25       COURTROOM DEPUTY:  I have a hunch they're out and

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    about.

2            THE COURT:  Okay.  Here's what we are going to do.

3    We are going to take a break.  And can you call another

4    witness and we can come back to him?

5            MR. GOMAN:  Yes.

6            THE COURT:  Why don't we do this.  We are going to

7    take not more than a 10-minute break.  Let's call this our

8    midmorning break.  And then if we can't get this restored in

9    10 minutes, then I want you to call another witness.

10           MR. GOMAN:  Cason, can you hear me now?

11           THE WITNESS:  We still can't hear you.

12           THE COURT:  Off the record.

13       (Discussion off the record.)

14           THE COURT:  All right.  Let's do this.  Let's have

15   the jury go back to the jury room.  We are going to take not

16   more than a 10-minute break.  We either get this working or

17   call another witness.

18       (Proceedings recessed 9:59 a.m. to 10:10 a.m.,

19       resuming outside the presence of the jury.)

20           THE COURT:  All right, let's bring the jury in.

21           MR. GOMAN:  All right.  Cason, the jury is coming

22   back in now.

23           THE WITNESS:  Okay.

24           MR. ATENCIO:  It's because they're using wireless

25   over there.  It's not going to be a quality feed.

1          MR. GOMAN:  Okay.  Cason, can you hear us?

2          THE WITNESS:  I can hear you.

3          THE COURT:  So while we are waiting on the jury, who

4   is your next witness after this witness?

5          MR. GOMAN:  Ned Percival.

6          THE COURT:  Okay.

7      (Jury in at 10:12 a.m.)

8          THE COURT:  All right, have a seat.  We were able to

9   restore communication between Dallas and here.  However, the

10  picture isn't -- the quality of the picture is diminished

11  because we are using, in effect, a backup system, but I think

12  at least for now we have both audio and video.

13         So let's, if we can, pick up where we left off.

14         MR. GOMAN:  All right.  Cason, the jury is back in

15  now, and I'm going to continue my examination.

16  BY MR. GOMAN:

17  Q.  Real quickly, when we left off, we were talking about your

18  training as an assistant roadmaster.  Do you recall what your

19  training was from BNSF as to what you are supposed to do if

20  there's a non-class-specific defect that hasn't been repaired

21  within 30 days?

22  A.  Um, yeah.  Through the FRA training that I mentioned

23  earlier that we conducted within BNSF, it was my

24  understanding, and through experience, that if not repaired

25  within 30 days, the track was to be taken out of service.

17-cv-00844-WYD-SKC             Cole - Direct                V - 1210

1   Q.  Did you come to understand that Mark Carpenter, your boss,

2   disagreed with that interpretation?

3   A.  Yes, I did.

4   Q.  So what did you do then?  I mean, what -- did you discuss

5   that with Mr. Carpenter?

6   A.  Uh, I did.  I mean, it was -- it was a discussion among

7   several of us, Ryan Akers, Mark Carpenter, Doreen Powers.

8   And, you know, it really was an issue that had been lingering

9   for a long time.  The defects had been left in the track, and

10  there were a bunch of them, and we expressed, you know, our

11  concern that they shouldn't still be in there.  My real

12  concern was not that they were presenting conditions that

13  would, you know, cause a train to derail or serious issues

14  like that.  Um, it really was kind of driven from the track

15  inspectors were constantly griping about it, and I felt that

16  they could, you know, hold it over our heads, so to speak.

17  But, you know, we had that conversation with Mark, and

18  ultimately it was his call as to what we did.

19  Q.  Okay.  Did you -- the track inspectors working below you,

20  did you have the expectation that they'd report all of the

21  non-class-specific defects they'd find?

22  A.  Yes, I did.

23  Q.  Was it your expectation that those would be repaired

24  within 30 days?

25  A.  Um, it was -- in theory, that was our expectation.  In

1  practice, we knew that we had a bunch of them and that we

2  weren't going to get to all of them within 30 days.  That was

3  the reality of it.

4  Q.  Okay.  Was -- did you talk about -- did you help put a

5  plan in place to work on and try to remedy that situation?

6  A.  Yes.  You know, starting with Mark, and I'm sure above his

7  head with Adam and others, there was a focus on getting

8  defects in general repaired, but these non-class specifics,

9  cleaning them up, making sure that we didn't have defects in

10  the system that weren't still in the track, that the system

11  accurately reflected what was still in the track.  As there

12  had been different roadmasters and people in charge and a

13  bunch of turnover, we weren't sure that all these defects were

14  still legitimate, legitimately in the track.  So that was an

15  issue, kind of cleaning up the paperwork.  And then also using

16  our resources as far as, you know, our operating resources and

17  our capital resources when we had capital crews come in.  That

18  was very much a focus to try to get these defects fixed and

19  out of the system.

20  Q.  I'm going to switch now and ask you some questions about

21  Mr. Brandon Fresquez.

22      Do you recall being Mr. Fresquez's supervisor when

23  you worked in Denver?

24  A.  Yes, I do.  He was there the whole time I was there, so

25  April 2014 to June 2015.

17-cv-00844-WYD-SKC               Cole - Direct                    V - 1212

1   Q.  About how many track inspectors did you supervise when you

2   were an assistant roadmaster?

3   A.  I would say there were about four to six probably.  Maybe

4   more like six.  Um, we had probably three or four in Denver

5   and maybe two south in a place called Big Lift.

6   Q.  Was Mr. Fresquez a track inspector in Denver the whole

7   time you were there?

8   A.  He was.  He kind of alternated between what we called the

9   terminal there in Denver, and then he was on the main track

10  toward the end.

11  Q.  Can you just give us a sense of -- and did Mr. Fresquez

12  present any challenges for you as a supervisor?

13  A.  He did.  You know, he was probably, um -- you know, he was

14  probably the most difficult, uh, employee that I had to deal

15  with in my two years on the railroad.  Um, he certainly I

16  felt, like, was capable.  He knew the rules.  He knew the FRA

17  requirements.  He had been working on the railroad for a

18  number of years, and I certainly felt like he was competent.

19  Um, but he was, I think, pretty immature.  He was -- could be

20  manipulative.  I think he could be vindictive.  He, you know,

21  he presented a lot of challenges.

22  Q.  I mean, in what sense -- was -- let me ask the question

23  this way.  Did he present challenges to you because he was

24  raising safety concerns?

25  A.  Um, he raised what he called safety concerns.  You know,

1   he was challenging because, um, it was all about him.  He

2   wasn't a team player.  He didn't want to buy into the kind of

3   vision that we tried to sell that we were all on the same team

4   pulling in the same direction, and we all have similar goals.

5   And we understand that Denver has certain constraints and

6   issues, and we want to try to work toward fixing those and

7   improving the situation best that we can, but we're trying to

8   pull in the same direction.  He really was never bought into

9   that vision.  Um, I think he had his own agenda, whatever that

10  may have been, and tried to manipulate things to further that

11  agenda.

12  Q.  Did you ever have similar-type problems with other track

13  inspectors you supervised?

14  A.  Uh, no, I really didn't have the types of issues that I

15  had with Brandon with others.  Typically if issues came up,

16  you could have a conversation with them and explain to them

17  that, you know, you're on their side and you want -- you have

18  their best interests in mind.  And if there are safety issues,

19  if there's -- if there's disagreement as to what the FRA rules

20  require or the BNSF rules require, we can certainly seek a

21  third party's opinion on that and go outside of, you know,

22  this conversation and get resolution.  But he really I don't

23  think, when it came down to it, was ever interested in a

24  solution.  He really was just interested in perpetuating, you

25  know, and focusing on and harping on what he perceived to be

1    the problem.

2    Q.  Was Mr. Fresquez -- I mean, did he ever -- was he ever

3    disruptive in safety briefings or group meetings?

4    A.  Uh, yes, he was.  I think, you know, my experience was

5    early on he was somewhat reasonable, you know, in 2014, um,

6    toward the latter part of 2014.  In early 2015 is when it

7    started to get, um -- it started to get difficult dealing with

8    him.  And that was one of the big things he would do was try

9    to, you know, we called it hijack the briefings or, um, you

10   know, just grandstand generally, talking about the safety

11   issues that were out there, the track defects, you know,

12   blah-blah-blah, and, um, really just try to take the focus

13   away from what we deemed to be the priorities into his world.

14   And we needed to try to appease him, you know, with what he

15   thought were the issues we need to be dealing with.

16   Q.  Did you have a problem with employees raising safety

17   concerns or talking about track defects during morning

18   briefings?

19   A.  Um, I mean, I don't -- I didn't have a problem with it,

20   no.  I think that that was always something that was

21   supposed -- that was what that time was supposed to be, and we

22   were supposed to talk about certainly each inspector's issues

23   that they had on their particular domain, you know, and our

24   plan and our resources in order to try to remediate those.

25   Q.  Why then was it a problem or an issue for you that

1    Mr. Fresquez would raise these kind of concerns at safety

2    briefings?

3    A.   I guess it was a problem because I didn't -- I never felt

4    like he was, um, like I said, coming from a place of good

5    faith or, you know, reasonable, um, disagreement that he

6    wanted to try to solve these and solve them, you know,

7    collectively.  He really was focused on manipulating, you

8    know, every issue -- a lot of issues that he had to try to

9    achieve his end goals, whatever those may have been.

10          So I think that was really the issue is the timing,

11   the way he would do it, um, those sorts of things, always led

12   me to believe that he never was interested in a solution or in

13   good faith working toward, you know, solving some of these

14   things.

15   Q.   I want to talk to you about a specific incident that

16   happened in June of 2015.  So just to set the stage a little

17   bit, when was your last day with BNSF?

18   A.   I believe it was at the end of June, June 30th or

19   June 31st, in 2015.

20   Q.   I assume that you had been planned -- you had planned on

21   going to law school for the last months, last few months

22   leading up to that.

23   A.   That's right.  At some point I think early in 2015 I had

24   applied and gotten in and decided that that's what I was going

25   to do.  I hadn't told anyone until probably late May or early

1   June.

2   Q.  So I want to talk to you about something that happened

3   June 4th of 2015, but fair to say that by June 4th of 2015 you

4   knew you only had a few weeks left with the company?

5   A.  That's fair to say.

6   Q.  Okay.  There should be an exhibit that you have with you,

7   Mr. Cole.  You probably have it labeled as Exhibit A-55.

8           MR. GOMAN:  The exhibit that's been admitted, Your

9   Honor, is Exhibit 7, and it's the same, same exhibit.

10          THE COURT:  Plaintiff's Exhibit 7 is the same as

11  A-55?

12          MR. GOMAN:  That's right.

13          THE COURT:  All right.

14  BY MR. GOMAN:

15  Q.  Mr. Cole, I can't show this to the jury right now, so I'm

16  going to try to explain to them what you are looking at.  Do

17  you see an e-mail about halfway down the page from you to Mark

18  Carpenter and Ryan Akers?

19  A.  Yes, I do.

20  Q.  Okay.  Can you tell -- explain to the jury -- I don't need

21  you to read the whole e-mail to them, but can you just explain

22  what you are e-mailing to Mark Carpenter?

23  A.  So this I think was after an incident where -- you can see

24  lower down that the -- there was a notice sent out --

25  notification sent out that the main track was taken out of

1    service.  This was kind of the culmination of some incidents

2    that we had leading up to that with him hijacking the

3    briefings, trying to take tracks out of service that we felt

4    like there was no basis for taking out of service, just

5    generally being disruptive and, you know, just really, really

6    difficult to deal with.  So I'm sort of at my wit's end.  I

7    had talked to Mark about what are our next steps in order to

8    deal with this, you know, just really troublesome employee.

9           And I think that morning he had told me that he was

10   going to take the main track out of service, and I told him I

11   think that I had -- that he had no basis for doing that.  And

12   he proceeded to do it anyway, and so I had to go down there,

13   make sure that it was the same spot that we had been talking

14   about, and I placed it back in service and sent this e-mail to

15   Mark.

16          Some of this is in response to conversations that

17   Mark and I had had about, you know, what do we do, what do we

18   do with this guy.  And you can see, um, some of the -- some of

19   the things that I outlined there.

20   Q.  Do you remember anything about this track condition in

21   particular?

22   A.  I remember a little bit.  It was an issue where we had had

23   a bunch of mud, they call it fouled ballast and, you know, it

24   was a concern because it was so muddy and so ill supported

25   with rock down there that it was causing the track to sag,

1   which is not good when a train is going over a spot that's,

2   you know, sagged like that.  And so that's something that we

3   always keep an eye out for and are real concerned about.

4          So this was -- that was an issue in the preceding

5   weeks, I think, and we had done a bunch of work there.  As you

6   can see, I talk about in the e-mail we had had to go down and

7   it was sort of an emergency situation, I think, a few weeks

8   prior to that where we had to work on a Friday, Friday evening

9   I believe, and dump a bunch of rock and get that -- get that

10  track, you know, up to par, at least kind of put a Band-Aid on

11  it.

12         And so, you know, it was -- it was very much in my

13  mind.  It was a place where we had done work.  I knew about

14  it.  And he for some reason woke up that morning and decided

15  that it needed to be taken out of service, and so that's what

16  he did.

17  Q.  Do you have an exhibit labeled 29 in front of you?

18  A.  Yes, I do.

19  Q.  Here, too, I'm just going to describe to the jury what you

20  are looking at because we can't display it.  There's two

21  photographs on pages 6 and 7 of this exhibit.  The first one

22  you can kind of see the date stamp in there.  It says June 4th

23  of 2015.  And the next one says June 8th of 2015.  Do you see

24  that?

25  A.  Um, what page are you looking on?

1   Q.  Yeah.  If you look at Exhibit 29, it's the last two pages

2   of that exhibit.

3   A.  Yeah, I see the date stamps in the pictures.

4   Q.  Okay.  Does that show a condition where mud has

5   accumulated in the track ballast?

6   A.  Yes, it does.

7   Q.  Okay.  If the repairs had been done a couple weeks before

8   that, um, and there's -- and mud reappears, is that

9   essentially what happened here?

10  A.  Um, it could have -- it could have, or it could have, um,

11  reappeared worse than it was before.  Um, I think what

12  probably happened is we dumped a bunch of new rock on the

13  shoulder and tried to support it.  Um, that doesn't

14  necessarily mean it's going to -- all the mud is going to go

15  away and it's going to disappear.  But a lot of times what

16  happens is as it's under load as the train goes over it after

17  the work is performed, that new mud will, you know, rise to

18  the surface and will appear.  So it could look significantly

19  different than it did, you know, a couple of weeks before or

20  whatever the period of time was.

21  Q.  So if -- so let's put that all together.  If what happens

22  is you guys do some work to address a track condition in May

23  of 2015, let's assume that Mr. Fresquez goes out there

24  June 4th of 2015, and he sees what he thinks is a fouled

25  ballast condition.  What should he do, as a track inspector?

  1   A.  Well, if it's just fouled ballast, then he should enter a

  2   defect as a non-class specific, and the 30-day period is

  3   triggered.  What you --

  4   Q.  Let me just ask you another question real quick.  Was it

  5   appropriate or consistent with the FRA regulations, though, to

  6   take that track out of service on June 4th of 2015?

  7   A.  No.  And the only reason you would want to take it out of

  8   service is, like I said before, where it's causing the track

  9   to sag and there's what we called cross level issues or things

 10   like that where the rails are uneven or there's a dip that

 11   could cause a train to derail.  But if it's just muddy and it

 12   just looks bad, and maybe under loads it may be pumping, it

 13   may be moving, um, you know, you would want to measure it, but

 14   it certainly probably -- it wouldn't warrant a out-of-service

 15   condition unless you measured it such that it fell over the

 16   threshold for FRA regulations.

 17   Q.  When you went out there, did you talk with Mr. Fresquez

 18   about his taking the track out of service?

 19   A.  Yes, I did.  We had a conversation there on site.  I

 20   remember he, um, you know, was very evasive and, um, I guess

 21   insubordinate.  He wouldn't really listen to anything I was

 22   saying, and he demanded a witness, you know, for whatever

 23   reason.  I guess I was the big bad wolf, and he needed a

 24   second, you know, person to witness all the terrible things

 25   that I was saying.  But he, uh, he expressed that he was --

17-cv-00844-WYD-SKC                Cole - Direct                V - 1221

 1    felt sorry for me, that I was going to get fired because of

 2    this because of the way I was treating him, et cetera.  But,

 3    yeah, we had a long conversation.  Part of the e-mail that I

 4    sent to Mark kind of reflects that.

 5    Q.  Did you place that track back in service?

 6    A.  I believe I did.  I think I called the dispatcher and told

 7    them that it was a frivolous out-of-service condition and that

 8    it could be placed back in service.

 9    Q.  If you look at your e-mail back in Exhibit 7, does it

10    state in there that you placed the track back in service?

11    A.  Yes, it does, the first sentence.

12    Q.  By doing that -- so, again, we are a few weeks before you

13    are going to leave the company for good -- did you believe you

14    were violating a federal regulation?

15    A.  No, I did not.

16    Q.  Were you putting the track back in service because you

17    wanted to see BNSF's velocity metrics improve or so you could

18    get a bigger bonus from the company?

19    A.  No, there were no monetary -- there was nothing to be

20    gained monetarily to me through any sort of reward like that

21    or any sort of personal pride or anything.  It just -- it was

22    clearly, to me, a frivolous out-of-service event, and it

23    needed to be placed back in service.

24    Q.  Were you aware, as a BNSF employee, that you cannot and

25    could not, I should say, retaliate against employees for

1   raising safety concerns?

2   A.  Yeah, I was generally aware that that was not allowed.

3   Q.  Did you do that on June 4th of 2015?

4   A.  Um, no, I didn't retaliate in any way against him.  I

5   expressed my dissatisfaction with the way he had been behaving

6   as an employee.  You know, in my mind, he -- he had no reason

7   to have exhibited this pattern of behavior, um, and I

8   expressed what I thought about it, what we were going to do

9   going forward, and that it wasn't going to be tolerated.  And

10  that was my own feelings and the conversation that I had had

11  with Ryan and with Mark and others.

12  Q.  So you leave the company then several weeks later.  Do you

13  know if there was ever any follow-up, any sort of move to

14  bring any discipline against Mr. Fresquez for what happened

15  June 4th?

16  A.  I have no knowledge of that, no.

17  Q.  After you left BNSF to go to law school, did you talk with

18  anyone at BNSF the next spring about Mr. Fresquez's

19  insubordination event?

20  A.  No.  I -- during that intervening period, I had no

21  conversations with anybody about, um, Mr. Fresquez or his

22  employment status or anything like that.

23  Q.  No one ever asked you your opinion about his dismissal?

24  A.  No, they did not.

25          MR. GOMAN:  Okay.  Thank you, Mr. Cole.  I don't have

 1   any more questions.

 2          THE COURT:  All right.  Cross-examination.

 3          So I want to direct both Mr. Thompson and the witness

 4   to talk as slowly as possible because the audio has some

 5   issues, but it's important that everybody hear what's being

 6   said and that the court reporter can take down, with as much

 7   accuracy as possible, the testimony.

 8          MR. THOMPSON:  The good news is I am otherwise a slow

 9   talker, so we should be good.

10                       **CROSS-EXAMINATION**

11   BY MR. THOMPSON:

12   Q.  Good morning, Mr. Cole.

13   A.  Good morning.

14   Q.  You were a relatively young supervisor.

15          Yes?  No?  Maybe?

16   A.  Is that a question?  Is that a question?

17   Q.  I can add "right" to the end, if that helps.

18          You were a young supervisor; right?

19   A.  Yes, I was -- I had just graduated from college and was a

20   year, six months in or whatever, when I moved to Denver.

21   Q.  You never spent any time out on the tracks, as a union

22   member, track inspecting, repairing defects, anything like

23   that?

24   A.  I did not work in the union workforce, correct.

25   Q.  You respected Mark Carpenter.

1   A.  I'm waiting for the question.  Um, is there a question

2   coming?

3   Q.  Did you respect Mark Carpenter?

4   A.  I did.  I did respect Mark Carpenter, yes.

5   Q.  You thought he taught you a lot about being a manager;

6   right, question mark?

7   A.  Yes, I -- I think he taught me a lot about how to manage

8   people, um, leadership skills, you know, a lot of the soft

9   skills as well as, um, some technical, you know, railroading

10  things, but yes.

11  Q.  So let's talk about what he taught you.  You agree that if

12  a railroad does not repair a non-class defect within 30 days,

13  the track needs to be removed from service; right, question

14  mark?

15  A.  I -- that was my view of the FRA rule, correct.

16  Q.  The regions under Mark Carpenter were not following that

17  rule; right, question mark?

18  A.  The what under Mark Carpenter?

19  Q.  The region, territory, division, whatever you want to call

20  it.

21  A.  Uh, I can't speak for the region as a whole, but I know

22  that we had at least some non-class-specific defects that had

23  been in there -- in the track past 30 days.

24  Q.  You believed that violated FRA regulations; right,

25  question mark?

1   A.   Um, yes, I believed that that was against the FRA's

2   protocols.

3   Q.   You raised your concern with Mark Carpenter; right,

4   question mark?

5   A.   Yes, I did.

6   Q.   You raised your concern with Adam Miller; right, question

7   mark?

8   A.   Uh, I think that Adam was part of that conversation at

9   some point, yes.

10  Q.   They didn't do anything about it; right, question mark?

11  A.   Um, I don't know that I would agree with that.  As I

12  stated on direct, um, we certainly cleaned things up, and we

13  put an emphasis on getting defects repaired, confirming that

14  some of the ones that were still in the system, on the files

15  had, you know, been repaired at some point and so they just

16  had not been properly reported.  So that was the focus as far

17  as capital work, as far as operating resources, to get defects

18  repaired.  So I wouldn't say nothing was done about it.  I

19  think a fair amount was done about it.

20  Q.   Can companies ignore federal regulations because

21  headquarters doesn't give them enough capital?

22          MR. GOMAN:  I object to that question, Your Honor.

23  I'm not sure what the relevance is.

24          THE COURT:  Overruled.

25  A.   I don't -- I don't, uh, exactly know the answer to that.

1    I can't speak for companies generally, but, you know -- I

2    don't know what you're getting at.  If you have something more

3    specific --

4    BY MR. THOMPSON:

5    Q.  Sure.

6    A.  -- you could ask.

7    Q.  You're a lawyer; right?

8    A.  I am.

9    Q.  You went to law school; right?

10   A.  I did.

11   Q.  You now practice law; right?

12   A.  Right.

13   Q.  Are employers exempted from federal regulations because

14   they want to earn more profit?

15   A.  Again, this isn't my area of the law, and I can't speak

16   generally.  There -- as you know as a lawyer, there are

17   exceptions all over the place, so if you could -- I don't know

18   if you want to talk legal, legalese with me, but, you know, if

19   you could ask something more specific, I could try to answer

20   it.

21   Q.  Sure.  Let's be very specific.  Are you aware of any

22   federal regulations that allow railroad companies to say, hey,

23   I know the law requires us to fix defects, but we can make a

24   lot more money if we don't, so we're not going to do that?

25   Are you aware of any federal regulation that lets them do

1   that?

2   A.   I'm not aware of any federal regulation generally

3   regarding railroads and, um, their -- their requirements under

4   the law as far as fixing defects, complying with FRA

5   requirements, et cetera.  That's not my -- that's not my

6   wheelhouse.

7   Q.   You left tracks in service that had non-class defects that

8   had not been repaired within 30 days; right?

9   A.   Uh, I don't know what you mean by I left tracks -- tracks

10  in service.  We certainly had tracks in service under our

11  purview that had defects that were past the 30-day, um, time

12  period.

13  Q.   I think you said that in 2015, early 2015, Brandon became

14  more difficult.  Is that right?

15  A.   That's right.

16  Q.   He was no longer being a team player?

17  A.   Um, yeah, I would maybe rephrase it a little differently.

18  I would just say he had an agenda that didn't comport with the

19  rest of our team's, and he was, you know, I felt, manipulating

20  his view of the world in order to fit his end goals.

21  Q.   Yeah, I think you told Mr. Goman that Mr. Fresquez in 2015

22  was no longer buying in, was the word you used.

23  A.   Buying in, is what I said?

24  Q.   That's what you said.

25  A.   Well, I mean, I don't know if you have ever managed

1    employees, but certainly you want to try to lay out a vision

2    for the team so that everyone can feel that they are a part

3    and that they are contributing and that we're sort of working

4    toward something bigger than ourselves.  And certainly part of

5    that is making money, because how do we stay employed unless

6    we make money; right?  But also a part of that at BNSF is,

7    like I said, we're very committed to safety.  You know, we

8    took a lot of time off from actually trying to fix defects and

9    make the railroad money in order to just train ourselves on

10   safety and to try to make it a safer workplace for ourselves

11   and the train crews and everyone else that was affected.  So

12   that's -- that's part of the overarching goal.

13           And when you have an employee that's, you know, not

14   going to go along with that, typically you would just fire

15   them, you know.  And, unfortunately, the union has a lot of

16   protection and, um, we -- we dealt -- we had to, you know,

17   deal with trying to deal with this really difficult employee

18   under, um, constraints such as that.

19   Q.  Yeah, it's really unfortunate that the union tried to

20   prevent you from firing an employee who wasn't buying in to

21   you and Mark Carpenter's violations of federal law.  Pretty

22   unfortunate, huh?

23   A.  No, I think it was unfortunate that Mr. Fresquez, um, was

24   hired in the first place and, um, that he stayed as long as he

25   did acting the way he did.  You know, if I ever acted like

1   that in a job, I would certainly be terminated long before it

2   ever got to federal court.

3   Q.   How often do you violate federal law for your employer?

4   A.   For my current employer?

5   Q.   Yeah.

6   A.   I hope -- I hope I don't do it ever.

7   Q.   I'm going to turn your attention to Plaintiff's Exhibit

8   29, page 7, please.  Let me know when you're there, please.

9   A.   These pages aren't marked.  Can you describe it to me?

10  Q.   Sure.  It's a railroad track with a whole bunch of crud in

11  it, and there's a picture date on it that says 6/8/2015.

12  Q.   Okay.  I'm there.

13  A.   You agree with me that's a track defect?

14  Q.   Uh, the version I'm looking at is pretty black and white,

15  um, but it does look like there's mud, and I think most people

16  would consider that a fouled ballast defect.

17  Q.   Now I'd like you to go to the one that's marked 6/4/2015.

18  A.   Okay.

19  Q.   Do you see the railroad ties are all corroded and there's,

20  again, a bunch of gunk in there?

21  A.   Uh, I can't really see ties, but I see the mud in there.

22  Q.   Yeah.  I mean, you can't see the ties because they're not

23  there anymore, they're so corroded; right?

24  A.   I don't know.

25  Q.   That's -- the date on that picture is 6/4 of 2015?

1    A.   Yes.

2    Q.   I'd like you to go to Exhibit 7, your e-mail to Mark

3    Carpenter.

4    A.   Okay.

5    Q.   That's the same date that Brandon tried to take the track

6    out of service, you put it back in, and recommended that he be

7    charged with insubordination; right, question mark?

8    A.   Um, I'm just reviewing it.

9            I said I would support an investigation for failure

10   to comply, um, with employee instructions and requirements.

11   Q.   And the date on that's --

12   A.   Basically -- oh.

13   Q.   The date on that is June 4th, 2015; right?

14   A.   That's what it says.

15   Q.   The same date on the picture; right?

16   A.   Uh, that's what the picture says, yes.

17           MR. THOMPSON:   Thank you.

18           THE COURT:   All right.   Redirect.

19                    **REDIRECT EXAMINATION**

20   BY MR. GOMAN:

21   Q.   Mr. Cole, were you critical of Mr. Fresquez on June 4th of

22   2015 because he wanted to report the ballast as being fouled,

23   or were you critical because he wanted to take the track out

24   of service?

25   A.   I was critical of him because he wanted to take the track

1    out of service, because he failed to communicate, um, prior to

2    that that he thought that he had a concern, much less a

3    legitimate concern, about the train safety at that location.

4    And so it was because he took it out of service, that's why we

5    had the conversation.

6    Q.   If he had reported that that track had a defective

7    condition, a non-class-specific defective condition, thereby

8    starting over the 30-day count, would you have had an issue

9    with that?

10   A.   No, I don't think I would have had an issue with it.  It

11   clearly was a place that we had put attention, that we tried

12   to fix, and I think we did to an extent, but, you know, you

13   can only do so much with hand tools and the limited amount of

14   bodies that you have.  And so, um, you know, it may have

15   reappeared.  It may have exacerbated.  So if he wanted to put

16   a new defect there, um, and I felt like he was in good faith

17   trying to protect his track, then certainly I wouldn't have

18   had a problem with it.

19   Q.   If a track inspector reports to you that he or she thinks

20   a track needs to go out of service, and you look at the

21   condition and you determine, as that employee's boss, you

22   don't think it should go out of service, did you believe as a

23   roadmaster or assistant roadmaster you had that right to have

24   a good faith disagreement?

25   A.   Yes, I did.  And those, you know, came up from time to

1  time.  I think with everybody else that I supervised or came

2  across, it was a much more amicable, much more reasonable

3  conversation than with Brandon, um, who, like I said, you

4  never felt like he was approaching it from a let's reach a

5  solution on this so we can reach our end goal of protecting

6  the track, maintaining the safety of train crews when there

7  are trains on the ground and all the rest of it.  But, yeah,

8  usually it's a conversation, and if we need to go outside of

9  that, bring a third party in, I'm more than happy to do that

10 if we have a disagreement on a rule or a regulation, something

11 like that.

12 Q.  Lastly, Mr. Cole, you have criticisms of Mr. Fresquez as

13 an employee; right?

14 A.  Yes, I do.

15 Q.  Were you critical of him as an employee because you felt

16 like he was strictly and in good faith applying federal law

17 and regulation?

18 A.  No, that's not why I was critical of him.  And if he was,

19 we certainly wouldn't have had the conflict that we did.

20        MR. GOMAN:  Thank you, Mr. Cole.  I don't have any

21 more questions.

22        THE COURT:  Recross, if any.

23        MR. THOMPSON:  I'm done with this one, Your Honor.

24        THE COURT:  All right.  This witness is concluded.

25 May he be excused?

1           MR. GOMAN:  Yes.

2           MR. THOMPSON:  Yes, Your Honor.

3           THE COURT:  All right.  Let's disconnect.

4           Call your next witness.

5           MR. ATENCIO:  Thank you, sir.

6           MS. DALE:  Your Honor, we call Ned Percival.

7           THE COURT:  How long do you estimate you will be with

8    your direct?

9           MS. DALE:  I'm going to say 20 minutes.

10          THE COURT:  All right.

11          COURTROOM DEPUTY:  Please raise your right hand.

12      (The witness was sworn.)

13          COURTROOM DEPUTY:  Please be seated.

14          Please state your full name, and spell your full name

15   for the record.

16          THE WITNESS:  Everett Edward Percival, also known as

17   Ned Percival.  E-v-e-r-e-t-t, E-d-w-a-r-d, Percival,

18   P-e-r-c-i-v-a-l.  And my nickname is Ned, N-e-d.

19          **EVERETT EDWARD PERCIVAL, DEFENDANT'S WITNESS,**

20                      **DIRECT EXAMINATION**

21   BY MS. DALE:

22   Q.  Good morning, Mr. Percival.

23   A.  Good morning.

24   Q.  You were formerly an employee with BNSF; is that correct?

25   A.  That's correct.

1   Q.   You are retired now?

2   A.   Yes, I am.

3   Q.   So you are no longer on BNSF's payroll?

4   A.   No, I'm not.

5   Q.   Is BNSF paying you to appear today?

6   A.   No.

7   Q.   Can you just briefly tell the jury about your work history

8   with BNSF?

9   A.   Sure.  I had 40 years service, 20 as a scheduled or

10  union-represented employee, and 20 as an officer of the

11  company.

12  Q.   And what was your most recent role as an officer of the

13  company?

14  A.   From May of 2014 until my retirement in -- actual

15  retirement was, uh, March of 2017, I was superintendent of

16  operating practices here in Denver.

17  Q.   And you said you worked for BNSF for over 40 years; is

18  that correct?

19  A.   Just under 40.

20  Q.   Just under, I apologize.  Were you ever disciplined during

21  that time?

22  A.   No, I was not.

23  Q.   Were you ever a -- you mentioned that you were a scheduled

24  employee --

25  A.   Yes.

1   Q.  -- for the first 20 years.  Were you ever a union

2   official?

3   A.  Yes.  I was on the local committee of adjustments for the

4   Brotherhood of Locomotive Engineers in Gillette, Wyoming,

5   in -- would be early '80s --

6   Q.  Okay.

7   A.  -- mid-'80s.

8   Q.  Sorry.

9   A.  Sorry.

10  Q.  In that role did you ever represent employees in

11  disciplinary hearings?

12  A.  Yes, a few times.

13  Q.  And you sometimes acted as a hearing officer for BNSF when

14  you were on the exempt side; is that correct?

15  A.  Yes.

16  Q.  So can you explain to the jury what it is that a hearing

17  officer did during those last couple of years?

18  A.  In general, what a hearing officer does?

19  Q.  Yeah.

20  A.  The conducting officer or hearing officer -- he is known

21  as a conducting officer commonly -- is responsible for

22  ensuring that the principal or the accused person, um,

23  receives a fair and impartial hearing, that all the pertinent

24  facts are presented and entered into a record, a recorded

25  record that's transcribed.  And he maintains -- he or she

1   maintains order in the hearing room and conducts the

2   investigation in, um, in an orderly and fair manner, efficient

3   manner.

4   Q.  Are you involved at all with scheduling the hearing?

5   A.  Um, sometimes.  You know, there's logistics to be worked

6   out with everybody, so I -- yes, at some point.

7   Q.  So in terms of figuring out when people can get there?

8   A.  Yes.

9   Q.  Okay.  Did you have any role in getting exhibits, making

10  sure those were in the record?

11  A.  Yes.  During the hearing, as exhibits are presented, I --

12  the investigating officer numbers them and then attaches them

13  to the transcript, um, for later reference.

14  Q.  Okay.  And did you have any role in making sure that the

15  time limits under the collective bargaining agreement were

16  followed?

17  A.  Yes.  Me, personally -- it's kind of hard to explain.

18  It's not hard.  It's just a lot.  Uh, there are a great

19  deal -- number of agreements across the various crafts, so you

20  keep a -- you research whatever craft that you are -- the

21  employee is working under, the time limits for that specific,

22  um, investigation or that craft, and form a timeline to make

23  sure that we meet all the deadlines to comply with the -- with

24  the terms of their agreement.

25  Q.  So what were some of those deadlines that each agreement

1   might have?

2   A.  I'm sorry.  It's been three years since I was really

3   involved in it, but, um --

4   Q.  Maybe I should clarify.  I'm not asking you what the

5   actual numbers are --

6   A.  Okay.

7   Q.  -- but, for example, was there a time limit you had to

8   have the hearing done by?

9   A.  Yes.  Depending on the agreement, of course.  One that

10  comes to mind right now specifically was in my former role in

11  Minnesota I was a director of administration, and for, say, a

12  former railroad, that is a part of BNSF now, called the, um,

13  Great Northern Railroad, an engineer had to be notified and

14  the investigation conducted within five days of the event or

15  the first knowledge of the event, which -- and the reason that

16  comes to mind is that was very difficult to accomplish to

17  accommodate the agreement.

18  Q.  So what happens if you don't meet the time limit to get

19  the hearing done within a certain amount of time?

20  A.  In arbitration, and as it should be, to be honest with

21  you, with putting both hats on, that's -- it's a due process

22  matter.  The employee -- what happens at arbitration, almost

23  every case, is if the timelines aren't complied with exactly,

24  any discipline -- excuse me -- any discipline assessed is

25  removed, and the employee is made whole or paid for time lost,

1   depending on what the extent of the discipline was.

2   Q.   Okay.  And so there were strict time limits, and you

3   mentioned that one could be within five days.  Did you ever

4   have to schedule a hearing before an investigation was

5   completed on the management side?  I'm sorry.

6   A.   Excuse me?  I don't understand your question.

7   Q.   So given your time limits, was there ever an occasion

8   where you had to schedule the hearing even though the

9   management side, the company, had not completed its

10  investigation?

11  A.   Oh, yes.  Many times.

12  Q.   Okay.  So what happens if you set a hearing and then,

13  through the management side investigation, you find out

14  there's really just not enough evidence to go forward?

15  A.   Me personally?

16  Q.   Yes.

17  A.   I can speak for me personally.  It got canceled.

18  Q.   And you did that in your role?

19  A.   Yes.

20  Q.   Okay.  When you were acting as a hearing officer, was it

21  your goal to make sure that the employee was found responsible

22  for the charged offense?

23  A.   As the conducting officer?

24  Q.   Correct.

25  A.   No.

1   Q.   What was your goal?

2   A.   My role was to ensure that the principal -- the charged

3   employee or the accused employee received a fair and impartial

4   hearing, that, um, he was able to ask questions of -- him and

5   his representative, if he had one, was afforded the

6   opportunity to ask any and all questions that were pertinent

7   to the incident under investigation, and to enter any exhibits

8   that are pertinent to the investigation.

9          I would ask questions of the principal or the company

10  witness or witnesses, and then in turn, um, I would ask the

11  principal to ask -- if they had questions and allowed them to

12  ask them and their representative to ask questions.

13  Q.   Okay.  So were you the hearing officer in Brandon

14  Fresquez's disciplinary case in 2016?

15  A.   Yes, I was.

16  Q.   And he was in the maintenance of way craft; is that

17  correct?

18  A.   Yes, he was.

19  Q.   And you were in the transportation craft?

20  A.   Yes.

21  Q.   Can you explain to the jury what I mean by a craft?

22  A.   Sorry.  Railroad jargon is -- it's like another language.

23  I feel for you.

24         Let's say it's a different type of employee.  So they

25  call that -- a transportation craft would basically be those

17-cv-00844-WYD-SKC          Percival - Direct                V - 1240

 1  people that are actually involved with the operation of the

 2  train, say, a brakeman, a conductor, an engineer, a student

 3  engineer, um, probably dating myself, fireman which we don't

 4  have anymore, but basically it's -- generally it's those

 5  people that are actually involved in the actual operation of

 6  the train.

 7          Engineering people are those who are involved with

 8  maintenance, construction of the track, bridges, signals.

 9  Those are engineering employees.

10          And then support or administrative would be clerical

11  and administrative staff support.

12  Q.  So essentially you were in two different departments.

13  A.  Yes.

14  Q.  Okay.  Did the hearing officers typically come from the

15  same craft as the employee who was being charged?

16  A.  All I can speak from is my history, and I would say, you

17  know, I -- I guess a lot of the time they would, but it's not

18  a hard-and-fast rule.

19  Q.  Okay.  So do you know why you were asked to be the hearing

20  officer in this case, even though you were in a different

21  craft?

22  A.  Well, I believe it was because there were -- really

23  weren't that many officers available at that time, and

24  Mr. Carpenter, I don't know who he discussed it with, but knew

25  that I was going to be available or asked me if I was going to

17-cv-00844-WYD-SKC         Percival - Direct              V - 1241

1   be available in the next week, that there was an investigation

2   that he needed to conduct, and asked if I would hold it for

3   him.

4   Q.  Okay.  Did you ever supervise Mr. Fresquez?

5   A.  Mr. Fresquez?  No.

6   Q.  Do you independently recall a hearing in this case -- the

7   hearing in this case?  And let me clarify again.  I know this

8   is almost three years ago now, so I don't necessarily expect

9   that you remember it independently.  Do you remember it

10  independently, or do you remember it from reviewing the

11  transcript?

12  A.  That's a hard distinction to make, I guess, but basically

13  I would say the vast majority -- no, I would say from reading

14  the transcript, to be honest with you.

15  Q.  And you have reviewed the transcript recently?

16  A.  Yes.

17  Q.  And did you listen to the audio?

18  A.  Uh --

19  Q.  The audio recording that was an exhibit?

20  A.  The radio?

21  Q.  Yes.

22  A.  Yes, I did.  I reviewed that just last night.

23  Q.  Okay.  Did you notice any discrepancy between the

24  transcript and that audio?

25          MR. THOMPSON:  Your Honor, objection.  What

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC          Percival - Direct                V - 1242

1   Mr. Percival did last night has no bearing on the decision

2   back in 2016.  Moreover, the jury can listen to it itself for

3   the audio.  So it is impermissible lay witness opinion

4   testimony.

5            THE COURT:  Overruled.  He may answer.

6   A.  I'm sorry, ma'am.  Could you repeat the question?

7   BY MS. DALE:

8   Q.  Did you notice any discrepancies between the audio that

9   you listened to and the transcript?

10  A.  No, I don't believe so.

11  Q.  Okay.  So talk to the jury about the process for calling

12  witnesses at an investigation hearing.  How does that happen?

13  A.  The CliffsNotes version, I guess, would be anybody who has

14  firsthand relevant knowledge of whatever is being

15  investigated.

16  Q.  I guess -- so I'm really more asking about the process.

17  So is it you that calls witnesses?

18  A.  Um, I guess that depends.  It's a case-by-case basis.

19  If -- that's a hard question to answer.

20  Q.  Okay.  So would the company decide what their own

21  witnesses -- who their own witnesses were going to be?

22  A.  Yes, I would say so.

23  Q.  And they would make those arrangements?

24  A.  Yes.  I mean, I could be involved in that if -- as I'm

25  reviewing and determining whether I'm going to conduct it, I

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   may ask if this person or whatever and -- you know, see if

2   they could be available.  I may ask that.

3   Q.  So for scheduling purposes?

4   A.  Yes.

5   Q.  Okay.  So say the union wanted to call a scheduled

6   employee.  What would they do?

7   A.  Um, they would notify -- I believe the investigation

8   notice instructed them to -- I'm going from memory here.  I

9   could be wrong, but it said in there to contact Mark, Mark

10  Carpenter with questions regarding the investigation or

11  postponement or whatever.  But, I mean, if they would have

12  come to me and said, I want this witness, if they couldn't get

13  ahold of Mark or whatever, I would have -- I'd ask them what

14  firsthand relevant knowledge do they have available or, you

15  know, that would be pertinent to the investigation.  And if

16  they -- it was relevant, I would certainly have them -- I

17  would have them make sure that the witness was available.

18  Q.  Would that be a typical process where if the union or the

19  employee wanted to call a witness, they would ask you to call

20  them?

21  A.  Um, yes.  Some -- you know, me or it could have been

22  Mr. Carpenter or someone, sure.

23  Q.  Okay.  And so if they asked you to call a witness, and you

24  made arrangements for that witness to appear, if it was a

25  scheduled employee, would they be paid by the company?  Do you

1    know?

2    A.   Okay.  Yes, I would ensure they were paid if they -- if

3    they were requested to be there and provided firsthand -- they

4    had actual observation of the incident or information that

5    couldn't be obtained somewhere else, certainly.  I wouldn't

6    particularly -- like in the engineering craft or the

7    mechanical craft or whatever, some other craft, if the

8    employee was there and provided information that was really

9    relevant to the hearing, I couldn't pay him.  I would talk to

10   their supervisor and tell them that they needed to be paid.

11   Q.   Okay.  In this particular hearing, did Mr. Fresquez ask

12   you to have Mr. Herzog appear --

13   A.   No.

14   Q.   -- as a witness?

15   A.   No, he did not.

16   Q.   Did Mr. Fresquez's union rep ask you to have Mr. Herzog

17   appear as a witness?

18   A.   No, not to my recollection, no.

19   Q.   If either one of them had requested that Jay Herzog be at

20   the hearing as a witness, would you have made arrangements for

21   that?

22   A.   Oh, absolutely.

23   Q.   Okay.  So now explain to the jury what your process is

24   after the hearing is completed.

25   A.   Okay.  During -- the hearing is -- is recorded on a

1    digital audio device, and all the exhibits are numbered and

2    compiled.  In order to have that information transcribed, we

3    would go to a portal, an internal website, a portal, and -- at

4    some point we went to an outside -- went to an outside vendor

5    for a while called AcuTrans, and then there was a transition

6    to where it was all done to an internal website, but the

7    process was basically the same.  But we would enter all the

8    information from the investigation in a web page specific to

9    that investigation, and it would be the conducting officer,

10   the time, the place, witnesses, date, number of exhibits, and

11   enter all that information, and then would print out a fax

12   sheet or a cover sheet, and this fax sheet had a barcode on

13   it.

14           And you would send it in or fax it in to this number

15   with any paper exhibits that were going to be attached to the

16   investigation.  And what that did at that point was it

17   triggered either the EBTS system or whoever it was at that

18   point that there was an investigation coming and there would

19   be an audio file coming, along with it, and maybe other

20   exhibits that you could attach, like color exhibits you could

21   attach to that website, something that couldn't be faxed.  And

22   after that was done, you would upload any exhibits, color

23   exhibits or an audio file, such as I was speaking about, and

24   the radio recording, and then the digital recording of the

25   investigation would be uploaded.

 1      And you would receive a confirmation e-mail from, you

 2  know, it was a while ago, but EBTS or AcuTrans that said,

 3  okay, this -- we've received your audio file, and it will be

 4  processed or, um -- it's -- that's my recollection, but I'm,

 5  uh -- it made you aware that they had the file, they knew they

 6  had it, and in the form you would fill out when you needed the

 7  transcript by.  So . . .

 8  Q.  And then did they send a transcript back to you?

 9  A.  Yes, they did.  After the investigation was transcribed,

10  you would get a -- get an e-mail from either EBTS or AcuTrans,

11  whoever did it at the time, at that point in time stating that

12  a draft copy was available for your review.

13      So you would either go -- I would either go to the

14  EBTS file, file number I mentioned, or AcuTrans' external

15  website, go to the file, open up a folder in AcuTrans, and

16  there would be a draft PDF copy there.  I would download that

17  and print it and then review the transcript for accuracy.  And

18  then if there were errors -- I guess I'll give you a classic

19  example of reviewing it.  We were allowed to make certain

20  changes to the transcript, not me personally.  We could

21  request them through the vendor.  We would in a separate

22  e-mail or separate section of the website we could say --

23  there was a place for it to reply to transcriber.  And as I

24  went through the transcript, as I was reading -- a classic

25  example was one investigation I conducted a long time ago.  It

17-cv-00844-WYD-SKC          Percival - Direct                 V - 1247

 1    was on a drug and alcohol violation I believe, or I don't

 2    remember the violation, to be honest with you.  But I came to

 3    a page in a transcript, and it read yurinalysis,

 4    y-u-r-i-n-a-l-y-s-i-s, and it should have read your, y-o-u-r,

 5    analysis, a-n-a-l-y-s-i-s.  So obviously that needed to be

 6    corrected, so I would type in this little area, page 29, line

 7    26 reads yurinalysis, should read your analysis.

 8            Another thing you could get corrected would be, say,

 9    my name.  If they had my name spelled P-e-r-s-i-v-u-l, I could

10    request, say, page 30, line 29, Mr. Percival reads

11    P-e-r-s-i-v-u-l, should read P-e-r-c-i-v-a-l.

12            The one things -- the things that you could not

13    correct --

14            MR. THOMPSON:  Your Honor, I object.  It sounds like

15    he's about to testify to what AcuTrans told him what changes

16    he could make, so it's at least foundation I need to know.

17            THE COURT:  I don't know what he's about to testify

18    to.  All right.  Overruled.

19    A.  The thing that I couldn't -- the things that we could not

20    change or we could recommend is say if there -- in the

21    transcript it would say inaudible, a place where something

22    didn't come through on the audio file.  And you were not --

23    they would not change to my knowledge, um, an inaudible.  They

24    would not put a word in from the inaudible.  If they could not

25    hear it from the recorded -- the digitally recorded

Julie H. Thomas, RMR, CRR                            (303)296-3056

1   investigation, they would not enter that into the record.

2   BY MS. DALE:

3   Q.  So even if you remembered from the hearing what that word

4   was, they wouldn't put it in?

5   A.  No.

6   Q.  If you requested a change to a transcript that wasn't

7   supported by the record, would AcuTrans make that change?

8   A.  Could you --

9           MR. THOMPSON:  Objection, Your Honor:  hearsay.

10          THE COURT:  All right.  Sustained, talking about what

11  Acutrans would have done.

12  BY MS. DALE:

13  Q.  Did AcuTrans make any changes to the record that weren't

14  supported by the record?

15  A.  Not -- not that I'm ever aware of.  I don't know, but not

16  to my knowledge.

17  Q.  Would they add words that weren't there?

18  A.  No.

19  Q.  Do you recall making any or requesting any changes to the

20  transcript in this case?

21  A.  I -- I really don't know.  I don't remember.

22  Q.  Okay.  So then let's turn -- actually, let's look at

23  Exhibit 54, which is in evidence.  And I understand that you

24  are not a party to this correspondence, but it is in evidence,

25  and it has been discussed previously.  And you were just

1    talking about Acutrans.  Is this referring to the contract

2    between BNSF and AcuTrans?

3    A.  Okay.  This document generated --

4    Q.  Yes.

5    A.  -- here?

6    Q.  Yes.

7    A.  I believe this document --

8    Q.  I'm sorry.  No, sorry.  We're on the wrong one.

9          Okay.  I apologize, Mr. Percival.  We were on the

10   wrong document.

11   A.  Sure.

12   Q.  This is the one I was actually talking to.  Does this look

13   like a letter referencing the contract between AcuTrans and

14   BNSF?

15   A.  Can I have a minute to --

16   Q.  Of course.

17   A.  -- take a gander here?

18   A.  Is there a way I can go to the -- is there another page?

19   Q.  Yes.

20   A.  Okay.  I've reviewed it.

21   Q.  Okay.

22          MS. DALE:  So go back to the first page.

23   BY MS. DALE:

24   Q.  And do you see in paragraph 2, first sentence, where it

25   says, "Return all Confidential Information, materials, and

1   work in process that are related to a request from BNSF on or

2   after January 1, 2016 via an electronic push to the SFTP

3   folder completed by May 15, 2017"?  Do you see that?

4   A.  I do.

5   Q.  What did you understand -- what do you understand that to

6   mean?

7   A.  Um, I'll just tell you what I -- what I believe I know is

8   going on here.  During my previous role as director of

9   administration for BNSF between 2005 and 2014 in Minneapolis,

10  um, I know they -- they were migrating to bring all of this in

11  house.  So what I believe this is is the final -- it appears

12  to me to be the final phase in bringing all of the

13  transcription and everything back in house to BNSF.

14  Q.  Okay.  And this refers to materials from on or after

15  January 1st, 2016.

16  A.  Yes.

17  Q.  Was Mr. Fresquez's hearing after January 1st, 2016?

18  A.  Um, I -- I guess I'd like to look, but I believe it was in

19  May of 2016.

20  Q.  Okay.  Thank you.

21          Okay.  So once you have done the review of the

22  transcript, sent that back, what's your next step?

23  A.  The next step is AcuTrans would make the changes or the

24  modifications to the transcript, or EBTS or whoever it was at

25  that time.  And I would review it again, and then I would

1  release it as the final draft, and that would -- whoever

2  review -- it would be reviewed again to make sure the changes

3  were made, and then I would release it as the final draft.

4         At that point as -- me, as the conducting officer, my

5  process, because of the -- I believe Mr. Fresquez we had to

6  issue discipline, if it was going to be disciplined, within --

7  yeah, in a shorter time period than normal because he was

8  withheld from service.  So I rushed the processing of that and

9  got it forwarded to the -- the Labor Relations group with BNSF

10  has a small group within it called the PEPA review team.  And

11  I don't know how many are in it, but it's a small group of

12  Labor Relations officers that review all transcripts and

13  exhibits that are subject to, um -- I'm going from memory

14  here.  I know it's for dismissal, but also I believe for

15  actual suspensions or whatever.  But they have to review that

16  and provide -- and we request a recommendation as to whether

17  there should be no discipline, some type of discipline, or

18  dismissal.  They review that, return their recommendation.

19  And there are three people that are involved or three

20  entities, I should say, that make the determination as to

21  whether an employee should be dismissed.  And that would be

22  the PEPA review team that I mentioned within Labor Relations

23  group, um, a senior division, um -- a division is a section of

24  a railroad.  There's 13 divisions on BNSF.  This was Powder

25  River.  Would be the senior department officer on that

1    division, which would have been the general director of line

2    maintenance at that time, and then the region vice president

3    for -- at that time there were three regions, I believe.  Um,

4    the region department vice president.  Those three people had

5    to confer and determine whether the employee would be

6    dismissed.  And my role in that, as the investigating officer,

7    making sure that we get things done within the applicable time

8    limits, which was, as I see here from this exhibit, and I

9    remember it was 10 days, was to forward that to -- or get the

10   recommendation from PEPA, make sure that, um, senior division

11   officer knew what PEPA's recommendation was, and to confer

12   with the region vice president and come up with a decision

13   whether to dismiss or not and get it issued within the 10-day

14   time limit.

15   Q.  Okay.  So we have Exhibit A-52 up in front of you, and I

16   believe this has been admitted.

17   A.  Okay.

18   Q.  And if you will look at the e-mail at the bottom, is that

19   an e-mail from you to the PEPA team?

20   A.  Yes, it is.

21   Q.  And that's the process you just described where you send

22   the investigation hearing and the exhibits on to PEPA for

23   review; is that right?

24   A.  Yes, that's the first step.

25   Q.  Then above that you got a response from -- from

1   Ms. Detlefsen; is that correct?

2   A.  Yes.

3   Q.  And when you sent this information on to the PEPA team,

4   did you make any recommendation with respect to the

5   discipline?

6   A.  No.

7   Q.  And then you have already talked about the process after

8   you get this back from PEPA in terms of the other reviewers.

9   When you sent this file on to the other reviewers, did you

10  make any recommendation to them as to what the discipline

11  should be?

12  A.  I -- no, I don't have any recall of making any

13  recommendation as to dismissal to PEPA or division membership

14  or whatever.  And the reason being is I -- I have no influence

15  in the outcome.  I'm not involved in the decision.  So I don't

16  really concern myself with it.  The transcript of the

17  investigation and the exhibits are the entire basis -- need to

18  be the entire basis for the -- for a decision.

19  Q.  Mr. Fresquez has described this process, the investigation

20  hearing process, as a kangaroo court.  Do you agree with that?

21  A.  No, I don't.

22  Q.  Why not?

23  A.  I vehemently disagree based on my own experience.  I -- I

24  don't agree with that at all, and for a couple of reasons,

25  but -- I guess, first and foremost, the processes that BNSF

1   has in place to make sure that doesn't happen.  Typically for

2   a dismissal or a stand -- or a serious offense like this, the

3   decision is made at department level and with Labor Relations,

4   and it says they can confer with the law department also.  So

5   that takes away from any what I think -- it puts it in

6   people -- in the position of people who are not associated

7   with the case and don't -- probably don't even know

8   Mr. Fresquez.

9           And the second item is I mentioned to you -- I don't

10  know if I've mentioned -- if I was asked earlier, but about a

11  formal PEPA review.  I don't -- would you -- would you mind if

12  I explained that?

13  Q.  I believe you explained the PEPA review.

14  A.  Well, no, the -- I think -- I believe the PEPA review for

15  the transcript to get --

16  Q.  Oh.

17  A.  -- to get a recommendation as to whether a dismissal or

18  not.

19  Q.  Okay.  And I think we've heard from Ms. Detlefsen --

20  A.  Okay.

21  Q.  -- about the PEPA review process, so I don't think we need

22  to get into those details.

23  A.  But that -- that further level to me makes me believe that

24  I feel it's fair.

25  Q.  Okay.  Did you ever decline to hold a hearing after a

1    disciplinary charge was brought?

2    A.   Yes.

3    Q.   Why would you decline to do that?

4    A.   Well, after, say, specifically -- I mentioned earlier

5    about the SP&S engineers agreement where it had to be

6    scheduled and conducted within five days.  Well, normally

7    they're scrambling to get -- it would have to be notified and

8    then -- on the day that it happens and scheduled within five

9    days.  So a lot of times all the facts aren't available.  And

10   once you're asked to conduct and things start to come in,

11   other information comes in, it becomes obvious to me that I'm

12   not going to hold it because I don't believe there was a

13   violation based on what little I know at that time.

14          And not necessarily just with the small -- with the

15   SP&S agreement.  I've had it happen on others with time

16   limits, but not as stringent as the SP&S.  Sure, I've told

17   them, declined, that I would not hold it because I didn't

18   believe there was a basis.

19   Q.   Okay.  Have you ever seen a hearing cancelled after an

20   investigation notice was sent out --

21   A.   Yes.

22   Q.   -- because there was not enough evidence?

23   A.   I'm sorry I didn't let you finish, but yes, I have.

24   Q.   Have you ever cancelled a hearing in the middle of a

25   hearing?

1    A.  Yes.

2    Q.  Why would you do that?

3    A.  Because we -- I remember -- I remember one specifically

4    right now, but I know there were others.  I don't remember

5    specifically when, but one we got in and the company witness,

6    his testimony did not substantiate the charge, and I -- I

7    basically apologized to the local chairman and the

8    principal -- it was a transportation investigation -- and told

9    them that the hearing was cancelled and to submit for pay.

10   Q.  Okay.  Without getting into specific instances, have you

11   ever held a hearing where it went through the entire hearing

12   process and an employee was found not responsible for the

13   charged violation?  Did that ever happen, in other words?  I'm

14   not asking you for a specific instance.

15   A.  I believe it had, but I don't remember specific

16   incidences.  I'm sure it has.

17   Q.  Well, and I'm not allowed to, so I was not asking you for

18   specific instances.

19   A.  Okay.

20   Q.  But you're aware that that has happened in your

21   experience?

22   A.  Oh, I'm aware that that's happened.  I may not have been

23   the conducting officer, but I know where it's happened.

24   Q.  So has it happened when you were a conducting officer?

25   A.  Trying to -- I'm being honest with you.  I'm trying to

1    recall.

2                    THE COURT:  Are we about done?

3                    MS. DALE:  Yes.

4    A.  I don't remember.  That's my best answer.

5                    MS. DALE:  Okay.  Thank you.

6                    THE COURT:  All right.  Cross-examination.

7                    MR. THOMPSON:  Thank you, Your Honor.

8                              **CROSS-EXAMINATION**

9    Q.  Good morning, Mr. Percival.

10   A.  Good morning.

11   Q.  I think you told us a third party, in this case AcuTrans,

12   transcribes the hearing.

13   A.  Uh, AcuTrans did transcribe investigations.  I'm not sure

14   who transcribed this one, to be honest with you.

15   Q.  If BNSF told us in this case it was AcuTrans, you wouldn't

16   have reason to dispute that?

17   A.  No, I would not have reason.

18   Q.  And the transcript is then reviewed by a hearing officer.

19   A.  Excuse me?

20   Q.  Sure.  I'll try again to phrase it better.

21                    After AcuTrans, or whomever, transcribes the hearing,

22   they send it to the hearing officer for review?

23   A.  Correct.

24   Q.  The hearing officer can make changes?

25   A.  Uh, they can make changes to spelling or examples like I

1   mentioned earlier about "yurinalysis" and "your analysis."  To

2   my knowledge, they will not insert anything for an inaudible.

3   Q.  You can try and make whatever changes you want.  You just

4   don't know what the third party will do.

5       Let me put it differently.  There's nothing that

6   stops you from requesting that substantive changes be made.

7   A.  Me personal -- all I can tell you is what I personally

8   request and what I understood.  I understood they would not

9   insert words for inaudible if it couldn't be heard on the

10  actual audio of the transcript.

11  Q.  And my question --

12  A.  And I did not ever request any inaudibles be.

13  Q.  My question is different.

14  A.  Okay.

15  Q.  There's nothing that stops a hearing officer from

16  requesting that substantive changes be made.

17  A.  To -- requesting to AcuTrans?

18  Q.  Yeah.  You could make that request.

19  A.  Sure.  I believe they could probably type anything they

20  wanted in that.  There's no restriction on what they put in

21  there.

22  Q.  The charged employee doesn't have the same opportunity to

23  review the transcript and request changes; right?

24  A.  Before the final draft?

25  Q.  At any point.  Does the union get a copy of the transcript

17-cv-00844-WYD-SKC          Percival - Cross          V - 1259

1   and get --

2   A.  Yes.

3   Q.  -- to tell AcuTrans, hey, we'd like this or that changed?

4   A.  I -- their request would come, I suppose, when they

5   received the draft, and they could -- they could, uh -- I

6   don't believe I've ever had -- in my experience, I've never

7   had one come to me and say that the transcript is wrong.

8   Q.  Let me ask you it differently.  Hearing officers request

9   their changes through kind of a system linked between BNSF and

10  AcuTrans; right?

11  A.  Yes, there's a -- you go to the file, and there's an area

12  to request changes.

13  Q.  The union doesn't have access to that.

14  A.  No, they do not.

15  Q.  And the union doesn't get to object to whatever changes

16  you make.  And here's what I mean.  You don't first go to the

17  union and say:  Hey, I'm going to make these changes.  Is that

18  okay?

19  A.  No, they're not -- not asked that.

20  Q.  Indeed, the charged employee never knows what changes the

21  hearing officer requests.

22  A.  I -- I guess the only way I can answer that, sir, is they

23  are provided with a copy of the transcript and exhibits when

24  the discipline is issued, and during their appeal -- they have

25  a formal appeal process.  During the appeal letter they should

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    certainly note those items in their letter of appeal to, um,

2    whatever the first level of appeal is after the discipline is

3    assessed, according to whatever the agreement is.  They should

4    mention that.

5    Q.  All right.

6    A.  I would if I was the local chairman.

7    Q.  Sure.  Provided you remembered that the transcript didn't

8    match what you remembered being said; right?

9    A.  I -- if there was a glaring error, I would certainly

10   remember it.

11   Q.  So I'm glad you brought that up.  The union rep, Brandon,

12   really everyone on our side of this case thinks there is a

13   glaring error in this case.  Specifically, we think the audio

14   between Mike Paz and Brandon Fresquez, that a "ah," a-h, was

15   changed to a "nawh," n-a-w-h, and that a "no," n-o, was added

16   to the audio to make it look like Brandon was refusing.

17        That's what we think, and so in this case we asked

18   BNSF, Can we see what changes were made?  To which they

19   responded by giving us this letter, which is -- it looks like

20   BNSF sent this to AcuTrans about a month after we filed the

21   lawsuit.  So we thought, well, BNSF had the records destroyed

22   a month later.  But as I understand your testimony, it sounds

23   like BNSF did not destroy the records because this doesn't

24   apply to that time period.  Is that right?

25        MS. DALE:  Objection to relevance, Your Honor.  We

1    have the transcript, and we have the recording.  I don't

2    understand what the issue is.  We only brought this letter up

3    to try and clarify that the paragraph they were referring to

4    on page 3 has nothing to do with this case.  This case falls

5    under paragraph 2.

6         THE COURT:  I am utterly confused by the question, so

7    I don't know how to respond to your objection.  This document

8    on the screen, is it in evidence?

9         MR. THOMPSON:  Yes, Your Honor.

10        THE COURT:  Why don't you ask him about something

11   regarding this document.  Maybe I could better understand what

12   your question is, because I'm confused by your question.

13        MR. THOMPSON:  Sure.

14   BY MR. THOMPSON:

15   Q.  As I understand your testimony regarding this letter, you

16   think that BNSF did not tell AcuTrans to destroy whatever

17   changes you made to Brandon's transcript.  Right?

18   A.  I -- you know, I'm being honest with you.  I wasn't party

19   to any of this.  This was a year after I retired.  So I don't

20   know what conversation with them was.

21        But my answer to your question regarding whether it

22   was altered or not, if -- I mean, Mr. Fresquez and

23   Mr. Varner -- I believe was it Mr. Varner was the vice-chair,

24   general chairman, they were provided a copy of the recorded

25   audio on the radio.  So if they disagreed with what was in the

1  transcript and believed that the "no" was a "nawh," why didn't

2  they write that up in their appeal or come to notify somebody

3  that immediately after they had the transcript?

4  Q.  They did.  That's why we tried to get the records.

5  A.  I -- I don't know.

6  Q.  You don't know whether --

7  A.  It was -- all I can say is the audio -- I would say the

8  audio should stand for itself.

9  Q.  Do you know whether BNSF destroyed the records?

10  A.  I have no idea.

11  Q.  If BNSF still has the records, do you know why it hasn't

12  produced them to us?

13          MS. DALE:  Object to foundation.

14          THE COURT:  Overruled.  He can answer if he knows

15  anything.

16  A.  Sir, when I retired, when I left the property in November

17  of 2000 [sic], uh, I -- I retired.  I don't know.  I wasn't

18  privy to any of that information.

19  BY MR. THOMPSON:

20  Q.  If you were accused of surreptitiously making changes, and

21  you had records to show that you didn't, you would want to

22  produce those, wouldn't you?

23  A.  I don't understand the question.

24  Q.  Sure.  If you were accused of wrongdoing, and you had

25  evidence that showed you did no wrongdoing, you'd want to

17-cv-00844-WYD-SKC          Percival - Cross                V - 1263

1   provide those records; right?

2   A.  I -- I really don't understand your question, sir.

3   Q.  Fair enough.

4           MR. THOMPSON:  Thank you, Mr. Percival.

5           THE COURT:  Is there anything else from this witness?

6           MS. DALE:  Nothing else from us, Your Honor.

7           THE COURT:  All right.  You may step down.  You are

8   excused.

9           THE WITNESS:  Thank you.

10          THE COURT:  Call your next witness.

11          MR. GOMAN:  Your Honor, we next call Mr. Dane

12  Freshour.

13          THE COURT:  Who are you calling?

14          MR. GOMAN:  Dane Freshour.

15          THE COURT:  Okay.  How long will this last?  How long

16  will your direct examination last?

17          MR. GOMAN:  45 minutes.

18          THE COURT:  Okay.  What time did we start this round

19  of questioning?

20          COURTROOM DEPUTY:  We resumed at 10:10, Your Honor.

21          THE COURT:  Okay.  We need to take a break.  We are

22  going to take a 15-minute break, and then we'll go no more

23  than 30 minutes, and we'll take our lunch break.

24          How many more witnesses will the defendant call after

25  Mr. Freshour?

Julie H. Thomas, RMR, CRR                           (303)296-3056

17-cv-00844-WYD-SKC                Jury Trial                      V - 1264

1           MR. GOMAN:  We'll call Mr. Miller, and then we have

2   that deposition to read.

3           THE COURT:  Okay.  So you are looking at another

4   couple of hours probably.

5           MR. GOMAN:  I think that's probably right.

6           THE COURT:  Is there likely to be a rebuttal case at

7   this point?

8           MR. THOMPSON:  No, Your Honor.

9           THE COURT:  Okay.  I'll ask that again when we get

10  near the end.

11          All right.  We are going to take a 15-minute break,

12  and we will come back and start the direct examination of the

13  witness.

14      (Proceedings recessed 11:38 a.m. to 11:55 a.m.,

15      resuming outside the presence of the jury.)

16          THE COURT:  All right.  Before we resume,

17  Mr. Thompson, I ordered something to be filed in five minutes.

18  Has it been filed yet?

19          MR. STONE:  It's being filed.

20          MR. THOMPSON:  It's being filed right now.

21          THE COURT:  All right.  So my law clerk will look for

22  it within five minutes so that you will be on time.

23          All right.  Let's have the jury come in.  Let's have

24  the next witness come to the witness stand.

25      (Jury in at 11:57 a.m.)

Julie H. Thomas, RMR, CRR                              (303)296-3056

1          THE COURT:  All right, have a seat.  We will go not

2   later than 12:30, even if this witness's direct is not

3   finished, and then we'll take our lunch break.

4          All right.  I understand this witness's name is Dane

5   Freshour.

6          MR. GOMAN:  That's right.

7          THE COURT:  Let's swear him in.

8      (The witness was sworn.)

9          COURTROOM DEPUTY:  Please be seated.

10          Please state your full name, and spell your full name

11   for the record.

12          THE WITNESS:  Dane A. Freshour.  D-a-n-e, last name

13   Freshour, F-r-e-s-h-o-u-r.

14    **DANE A. FRESHOUR, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

15   BY MR. GOMAN:

16   Q.  Mr. Freshour, will you tell the jury what you do for a

17   living, sir.

18   A.  I'm the regional director of human resources for the north

19   region for BNSF railroad.

20   Q.  Where do you live?

21   A.  I live here in Denver, Colorado.

22   Q.  Just tell us -- give us a brief sketch.  What kind of work

23   did you do before coming to BNSF?

24   A.  Well, I've had a colorful career path.  I started out in

25   agriculture, have an agribusiness degree.  Grew up on a ranch

1  in Montana.  I went into the Nebraska State Patrol for a

2  number of years.  Then I went in -- got my graduate degree in

3  psychology, and practiced mental health and substance abuse

4  addiction treatment centers with the Valley Hope Association.

5  And then was employed in 1995 by the BN railroad at that time.

6  Q.  Why did you decide to make the switch to come work at the

7  BN?

8  A.  I had worked in Alliance, Nebraska, for several years with

9  many BN employees and managers, and I saw that as a good

10  opportunity to advance my career.

11  Q.  Have you been in human resources your whole time at BNSF?

12  A.  No.  My initial entry into BN was as an employee

13  assistance manager in Alliance, Nebraska.  I was there five

14  years and then transitioned to the HR department in 2000.

15  Q.  What is an employee assistance manager?

16  A.  Employee assistance manager is a licensed mental health

17  practitioner who works with employees, their families, their

18  children on an array of issues.  It could be anything from

19  financial issues to legal issues to mental health or substance

20  abuse issues.

21  Q.  It may be okay now.  Just kind of remember, sometimes if

22  you scoot a little bit too far back from that microphone, it

23  gets hard to hear.

24  A.  Okay.

25  Q.  All right.  Do you have any education or, I don't know,

1   formal training in human resources?

2   A.  I had my agribusiness degree, but most of my formal

3   education was before that profession evolved.

4   Q.  What about -- oh, before human resources, you mean?

5   A.  Right.  It was personnel management, I believe, at the

6   time.

7   Q.  What about any, I don't know, credentials or

8   certifications in human resources?

9   A.  Right.  I'm credentialed since 2000 with the SHRM

10   certification of S-P-H-R, and then this SHRM senior

11   professional, HR professional.

12   Q.  Do you have any family members that work for the BNSF?

13   A.  Actually, I have two.

14   Q.  What do they do?

15   A.  My one son is a dispatcher, came into the dispatching

16   service.  My other son is a mechanical foreman and is

17   currently working in Lincoln, Nebraska.

18   Q.  All right.  Regional director of human resources.  Just

19   briefly, what does that mean?  What do you do?  What are your

20   responsibilities?

21   A.  My role is to supervise HR professionals in the north

22   region.  So the north region would extend from Seattle to

23   Chicago on the north as far east as Birmingham, Alabama.  It

24   would include the states of Montana, Wyoming, Colorado, and

25   Nebraska, for example.

17-cv-00844-WYD-SKC          Freshour - Direct                V - 1268

1    Q.  Do you have any role or oversight over the hiring process

2    at BNSF?

3    A.  Yes, I do.

4    Q.  There's been some testimony about employees coming to BNSF

5    from a military background.  Can you tell me about that?

6    A.  Yes.  In fact, we do have a unique military recruiter who

7    works with the TAP Centers with our veterans across the

8    country identifying --

9            MR. THOMPSON:  I object.  This is 401, 403 evidence.

10           THE COURT:  I will allow some limited background.

11   Hopefully we will get to things that are more pertinent to

12   this case.  But, anyway, overruled.

13   BY MR. GOMAN:

14   Q.  Let me just ask you this.  As a company -- as a human

15   resources manager, have you found that employees that come

16   from a military background tend to have some success when

17   coming to work at BNSF?

18   A.  They have very good success.  There's a very good match

19   with our environment.

20   Q.  All right.  Do BNSF employees, do they have an obligation

21   to report unsafe conditions?

22   A.  Yes, they do.

23   Q.  Let's talk about the ways they can do that.

24           MR. GOMAN:  I'm going to show the witness

25   Exhibit A-67.

Julie H. Thomas, RMR, CRR                            (303)296-3056

1  BY MR. GOMAN:

2  Q.  All right.  What are we looking at here, sir?

3  A.  This is the annual notification about the BNSF hotline.

4       MR. GOMAN:  Your Honor, I'd move for admission of

5  A-67.

6       MR. THOMPSON:  No objection.

7       THE COURT:  A-67 is received.

8     (Defendant's Exhibit A-67 received.)

9  BY MR. GOMAN:

10  Q.  Mr. Freshour, we have heard about the hotline and how it

11  works, so let me just ask you this.  How does BNSF make

12  employees aware that there is a hotline and they can call it?

13  A.  The -- well, they publish it on the website, of course,

14  but in every locker room or site where employees are gathered

15  it is posted along with our other AAP requirements so that

16  employees know how to receive or get in touch with the

17  hotline.

18  Q.  Is the hotline anonymous?

19  A.  Yes, it is.

20  Q.  Does it have to be?  Can an employee choose to use their

21  name?

22  A.  Employees can use their name, yes.

23  Q.  All right.  How does BNSF's human resources department

24  investigate reports of misconduct by supervisors, say a

25  roadmaster?

1    A.  A call would come into the hotline.  It is a third-party

2    provider.  The administrator would determine what group would

3    investigate it.  At times it goes into resource protection,

4    fraud, or the HR department.  The administrator would then

5    send the hotline format to the HR director or individual

6    responsible for that territory.  They would then complete a

7    thorough investigation of the allegations included in the

8    hotline caller's complaint.

9    Q.  All right.  I will come back to that in just one second.

10            MR. GOMAN:  I'd like to show just the witness A-59.

11   BY MR. GOMAN:

12   Q.  Let me blow up the top part.  What is this, sir?

13   A.  A-59 would appear to be the Workplace Harassment,

14   Diversity and Discrimination description.

15            MR. GOMAN:  Your Honor, I move for admission of

16   Exhibit A-59.

17            MR. THOMPSON:  No objection.

18            THE COURT:  A-59 is received.

19       (Defendant's Exhibit A-59 received.)

20   BY MR. GOMAN:

21   Q.  Mr. Freshour, just explain to the jury -- well, first of

22   all, discrimination, is it tolerated in BNSF's workplace?

23   A.  No, it is not.

24   Q.  How are employees, supervisors in particular, made aware

25   of the expectations and the consequences for violating the

17-cv-00844-WYD-SKC          Freshour - Direct          V - 1271

1    antidiscrimination policy?

2    A.  Supervisors are required to certify every year on what we

3    call the Code of Conduct.  This is where they would read and

4    acknowledge and then answer questions regarding certain

5    aspects of proper conduct for supervisors.

6             They also attend Leading Others Successfully.  This

7    is a program designed to equip them with the tools to manage

8    their workforce.

9    Q.  All right.  Back, then, to A-67, this hotline.  All right.

10   Does your department follow up on reports of misconduct that

11   come through the hotline?

12   A.  Yes, we do.

13   Q.  Okay.  And I understand you to say sometimes you triage

14   them a little bit, send some to other departments.

15   A.  Correct.

16   Q.  What types of reports of misconduct does human resources

17   investigate?

18   A.  Reports of harassment, discrimination.  We have

19   investigated, along with the fraud department, um, allegations

20   of fraud or misconduct, other misconduct.

21   Q.  Does the human resources department take steps to ensure

22   that anonymous reports of misconduct are kept confidential?

23   A.  Yes.  The report -- an HR director only has access to the

24   calls that were within their purview.  For example, in the

25   Powder River Divison, the HR director would only be able to

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   review hotline calls that are called in within that territory.

2          Secondly, once the investigation complaint comes in,

3   we begin to put a strategy together to determine who are the

4   most appropriate individuals to involve in doing a thorough

5   and appropriate investigation.  Sometimes we work with union

6   local chairmen to identify individuals within a work group who

7   could provide testimony, but we narrow the scope.  And then

8   when we conduct interviews, we instruct interviewees not to

9   discuss the elements or the investigation with anyone other

10  than their local chairman, or they could contact the human

11  resources department if they had any further questions.

12  Q.  Do you do these investigations yourself, or do you have

13  people help you with them?

14  A.  I have done many, yes.

15  Q.  Do you receive training or do the people that work for you

16  receive training in how to do these investigations?

17  A.  Yes, we do.

18  Q.  Can you describe just a little bit about that.

19  A.  Well, we had a two-day training that just occurred in

20  December of 2018.  All HR professionals went through a two-day

21  training with an outside attorney who walked through the

22  elements, requirements of investigation processes.  Those are

23  the ones then that we follow.  And we have a protocol.  My

24  role is to oversee and ensure those protocols are followed and

25  complied with.

1   Q.  Will human resources investigate every report of

2   misconduct that comes to it either directly, someone picks up

3   the phone and calls human resources, or that comes to it

4   through the hotline?

5   A.  Every -- it depends on -- the ones we know about.

6   Q.  What if instead, though, someone doesn't call the hotline

7   or report the misconduct to someone in human resources, but

8   they wait until after they have filed a lawsuit to bring

9   allegations of misconduct?  Does human resources get involved

10  then?

11  A.  Well, once a lawsuit is filed, we -- that is the vehicle

12  by which the dispute is determined and settled.

13  Q.  All right.  Can there be consequences to BNSF managers if

14  they violate the antidiscrimination policies at BNSF?

15  A.  Yes.  There are employment actions up to and including

16  termination.

17  Q.  Have you been involved in allegations of misconduct that

18  resulted in a manager's dismissal from service?

19  A.  Yes, I have.

20  Q.  Specifically, have you been involved in cases where

21  there's been allegations that managers have discriminated

22  against or harassed scheduled employees?

23  A.  Yes, I have.

24  Q.  Has that resulted in managers' dismissal?

25  A.  Yes, it has.

1   Q.  You were the -- you are the human resources director over

2   Denver and the state of Colorado; is that right?

3   A.  Correct.  Right.

4   Q.  Did you become aware that in the fall of 2016 there were

5   some hotline calls made against a roadmaster named Michael

6   Paz?

7   A.  Yes, I'm familiar with that.

8   Q.  Did you personally investigate those complaints?

9   A.  No, I did not.

10  Q.  Who did?

11  A.  Uh, my HR director would have been MacKenzie Ostrander,

12  and she may have enlisted the assistance of Brook Owens, an HR

13  manager in Alliance, Nebraska.

14  Q.  Were you, though, kept up to date about what was going on

15  with their investigation, who they were talking to and what

16  the results were?

17  A.  Yes, that's standard practice with our directors.  Before

18  they submit the hotline for review, we will confer and look

19  over the allegation to ensure that all elements of the

20  complaint have been reviewed and investigated, and then it's

21  submitted.

22  Q.  Does your department keep records of both the complaints

23  themselves and then the outcome of that investigation?

24  A.  Yes, they do.

25  Q.  And have you reviewed those records to refresh your memory

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    in anticipation of your testimony here today?

2    A.  Yes, I have.

3            MR. GOMAN:  Let me show just the witness, if I

4    could -- if I could show an exhibit just to the witness.

5            THE COURT:  Mr. Keech, he's talking to you.

6            COURTROOM DEPUTY:  I'm sorry.

7            MR. GOMAN:  I just want to show an exhibit just to

8    the witness for a second.

9    BY MR. GOMAN:

10   Q.  All right.  This is page 1 of Exhibit 18 -- I'm sorry.

11   That's -- this is page 1 of Exhibit 18.  Do you see there's 63

12   pages here, if you look down at the bottom?

13   A.  Yes.

14   Q.  Is this the complete kind of human resources file about

15   the allegations against Mr. Paz and the outcome?

16   A.  Yes, to the best of my knowledge.

17           MR. GOMAN:  Your Honor, I'd move for admission of

18   Exhibit 18.

19           MR. THOMPSON:  Objection:  hearsay.

20           THE COURT:  I need to look at it.  It's 18?

21           MR. GOMAN:  It is, Your Honor.

22           THE COURT:  Hold on.  This is Plaintiff's Exhibit 18;

23   right?

24           MR. GOMAN:  Right.

25           THE COURT:  So you are objecting to your own exhibit,

 1  Mr. Thompson?

 2          MR. THOMPSON:  Yes, Your Honor.  We have chosen not

 3  to use it, and to the extent that we were going to use it, we

 4  would have called the person that actually investigated the

 5  complaints.

 6          THE COURT:  Well, let's -- let's move beyond this.  I

 7  will let you come back to it.  It's going to take me a few

 8  minutes to actually look at this because it's a long document.

 9  And so go to another area, and when I'm ready to have you come

10  back to it, I will say something.

11          MR. GOMAN:  Your Honor, this is the last area of my

12  examination.  Can I lay some more foundation for 803(6)?

13          THE COURT:  All right.  Yeah, I'm just looking at it.

14  It's got a lot of pages.  He says it's hearsay.  So are you --

15  see if you can establish a business records exception, if

16  that's what you're going with there.

17          MR. GOMAN:  That's right.  Okay.

18  BY MR. GOMAN:

19  Q.  Mr. Freshour, are you familiar with how the human

20  resources department at BNSF generates records of its

21  report -- of complaints?

22  A.  Yes, I am.

23  Q.  In reviewing this record, do you know whether or not it

24  was made at or near the time of the hotline complaints against

25  Mr. Paz?

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   A.  Yes, it would appear to be.

2   Q.  And was this record made by a MacKenzie Ostrander?

3   A.  The record was not made by MacKenzie Ostrander.  It was

4   assigned to MacKenzie.  It is generated from the EthicsPoint

5   hotline construct.  They send out a report that follows this

6   same format with all hotline calls.

7   Q.  And if we scroll down towards the end -- well, you have

8   seen it.  Do you see at the end there's a closeout summary?

9   Not on this page, but in the whole exhibit.

10  A.  Correct.

11  Q.  In that closeout summary --

12          THE COURT:  What page is that on?

13          MR. GOMAN:  That is on 56.

14  BY MR. GOMAN:

15  Q.  And I will show you, too, Mr. Freshour.

16          All right.  Was this part of the investigation into

17  this -- into these allegations authored by MacKenzie

18  Ostrander?

19  A.  Yes, this would be the first page of several pages on her

20  closeout.

21  Q.  All right.  As part of the regular practice of human

22  resources at BNSF, do you make and keep records like these?

23  A.  They are stored in the EthicsPoint, um, the application.

24  Q.  Is making records like these the regular practice of human

25  resources when it investigates reports of misconduct?

17-cv-00844-WYD-SKC            Freshour - Direct                V - 1278

1    A.  Yes, sir, it is.

2            MR. GOMAN:  Your Honor, I renew my motion for

3    admission.

4            MR. THOMPSON:  We renew our objection.  BNSF is not

5    in the business of investigating retaliation complaints.

6            THE COURT:  Well, this appears to be a compilation of

7    reports that were submitted through the hotline, and this

8    document appears to be a business record, so I'm going to

9    overrule the objection, and Exhibit 18 is received.

10           (Plaintiff's Exhibit 18 received.)

11           THE COURT:  Are you done?

12           MR. GOMAN:  No.  Sorry.

13           THE COURT:  Okay.

14           MR. GOMAN:  Wishful thinking maybe.

15   BY MR. GOMAN:

16   Q.  All right.  Mr. Freshour, I'm going to go back to the

17   start of this document, but let me just tell you -- let me

18   just ask you generally.  When these hotline complaints

19   initially came in, do you remember when the initial phone

20   calls were made?

21   A.  I do not.

22   Q.  If you would look at page 1, does it tell you when the

23   initial hotline calls were received?

24   A.  There at the very top it says opened 9/14/2016 at

25   6:26 p.m.  That would have been when the intake individual

Julie H. Thomas, RMR, CRR                          (303)296-3056

1  took in the call.

2  Q.  Are you -- were there a number of hotline complaints made

3  about Mr. Paz either the same night or over the course of a

4  day or so?

5  A.  I believe so, yes.

6  Q.  Do you remember approximately how many employees made

7  those complaints?

8  A.  I don't recall the exact number, but several.

9  Q.  Let me go to the closeout summary.  Would that help you

10  figure that piece of it out?

11       Let me ask you that.  Does human resources -- do they

12  assign a different case number to each individual caller?

13  A.  Yes, they do.

14  Q.  All right.  So if you -- looking at what's identified as

15  page 57 in front of you, does that give you some sense for the

16  number of calls that came in on September 14th of 2016?

17  A.  Yes.  That -- I can't see all of it, but I see eight here

18  right off on this page.

19  Q.  All right.  If you go to the next one, it looks like there

20  might be one more.

21  A.  It looks like there were a total of eight.

22  Q.  Okay.  Can you tell us, generally speaking, what were the

23  range of concerns that were expressed about Mr. Paz as a

24  manager?

25  A.  Well, there were many.  It ranged from belittling and

1    being rude, to having a device that was recording individuals,

2    to threatening to bring contract workers onto the property.

3    There was a spectrum of complaints.

4    Q.  Did some of these complaints or did most of these

5    complaints concern a meme?

6    A.  I --

7    Q.  Yeah, I don't think I said that -- a Kermit the Frog meme?

8    A.  Yes.  Yes, it did.

9    Q.  What was the concern there?  What was the complaint about?

10   A.  Generally, I can't see that off the top of my head, but it

11   was a cartoon character that, um, I believe belittled working

12   overtime or while brothers were being furloughed, something of

13   that nature.

14   Q.  All right.  I've showed you Exhibit 23.  Is that the meme

15   you were describing?

16   A.  Yes, that appears to be the meme, yes.

17   Q.  Okay.  What is your understanding of -- was this given to

18   the employees, handed out at a safety briefing?  What happened

19   here?

20   A.  To the best of my knowledge, it was handed out at a

21   briefing, in very poor taste.

22   Q.  Employees received it, were offended, and called the

23   hotline about that?

24   A.  Yes, they were.

25   Q.  Let's go back then to -- and just back up.  Why did you

1   say that meme was in poor taste?

2   A.  Well, in a union environment, we are our brother's keeper

3   in many fashions, and to make fun of that I think they would

4   find offensive.

5   Q.  All right.  So if the jury wanted to go back and look at

6   these pages when they have the case -- I'm showing you page

7   56.  Does that kind of sum up what the allegations were and

8   then, on the next page, what the findings were?

9   A.  Yes, that is correct.  There is a brief summary after each

10  number, and then the following subsequent pages would have

11  outcomes.

12  Q.  And I don't want you to read it to us, but can you sum up?

13  Were some of these allegations and complaints substantiated?

14  A.  I believe they were, um -- yes, they were all

15  substantiated.

16  Q.  Let me show you on the next page.  Again, all of those

17  complaints were substantiated?

18  A.  All except one.  They substantiated the recording device,

19  but the retaliation was not substantiated.

20  Q.  Okay.  The type of misconduct that was alleged -- well,

21  let me step back.

22        How does human resources go about substantiating

23  allegations?

24  A.  We would conduct interviews.  You would gather data.  Like

25  the cartoon, for example, we get a copy of that.  You would

1    substantiate by looking at the volume of individuals that

2    would support the complaints.  And where you get alignment,

3    then you most likely have a substantiated complaint.

4    Q.  How -- if the calls come in anonymously, and I understand

5    some did and some didn't, but if they come in anonymously, how

6    does human resources know who to follow up with?

7    A.  We don't determine who makes the call.  We don't really

8    care.  The key is to decide who -- if -- whether or not the

9    allegation is accurate or not.  The caller, if they wish to

10   remain anonymous, receives a number.  They can call back in

11   every two weeks to check on the progress on that hotline call.

12   All hotline calls are -- the standard is to get them completed

13   within 30 days.  Those hotline calls that are more complex may

14   take a little longer in order to establish fact-finding.

15   Q.  All right.  And then do you know how many employees were

16   interviewed, off the top of your head?

17   A.  Roughly, maybe nine.

18   Q.  Was Mr. Paz interviewed by human resources?

19   A.  Yes, he was.

20   Q.  And, again, I don't need you to read this to the jury, but

21   if they want to look at this later, this is page 58.  Is that

22   right?  Let me --

23   A.  Yes, it is.

24   Q.  Okay.  This portion here, does this contain a summary of

25   what Mr. Paz said about, uh --

1   A.  Yes, that would be a summary of his -- his statement.

2   Q.  Okay.  Fair to say he agreed he engaged in some of the

3   misconduct and disputed some of the others?

4   A.  Yes, he did.

5   Q.  And then were there some interviews conducted with

6   scheduled employees who -- let me -- I guess, didn't

7   corroborate the allegations of misconduct or didn't have

8   concerns about Mr. Paz's misconduct?

9   A.  Right.  There were a couple of the employees who stated,

10  um, that they had never had any issues or concerns with

11  Mr. Paz and several of their comments along those lines.

12  Q.  Okay.  BNSF's human resources department does its

13  investigations, takes all this into account.  What happened

14  next?

15  A.  Well, we looked at the weight of the evidence, and we

16  had -- more individuals gave us critical feedback about

17  Mr. Paz's leadership than the two individuals that did not.

18  As a result of that, employment actions were taken against

19  Mr. Paz.

20  Q.  All right.  Tell us specifically what those were, and then

21  I want you to describe what that means.

22  A.  Okay.  Every year every exempt employee goes through an

23  evaluation.  We are evaluated on two large buckets, if you

24  will.  One is called the leadership bucket, and underneath

25  that title it is how we lead; do we model the way with

1   individuals; are we respectful in our interactions with

2   individuals; do we communicate clearly, concisely and

3   precisely; do we make development a priority for the

4   individuals working with us.  So that would be under one

5   category.

6           The second category is made up of business

7   objectives.  These would be metrics, job metrics, or a

8   scorecard.  In the engineering department, they operate with a

9   scorecard to look at a variety of different engineering areas

10  that they would assess performance on.

11          So that let's you know -- every year we are assessed

12  on that, twice a year.  We have a face-to-face discussion with

13  your supervisor, and you are given a rating.  The ratings

14  range from what we call -- the lowest rating would be NI or

15  needs improvement, meets or achieves those targets would be

16  the middle section, exceeds expectations would be the third

17  area, and far exceeds would be the top area.  The higher you

18  go, the better the performance.  The lower you go, the lower

19  the performance.

20          As a result of this investigation, it looked like it

21  ended up at the tail end of the year, in the second review

22  period, Mr. Paz was assigned a needs improvement or the lowest

23  rating in his leadership, um, area.  His metrics appeared to

24  have been -- have been reasonable, and so he was rated on

25  target over all.

1   Q.  Does that matter?  I mean, is that a big deal?  So he gets

2   a needs improvement.  What are the consequences for him?

3   A.  Right.  Needs improvement would mean that Mr. Paz has to

4   correct that leadership quality before he can receive another

5   promotion or be considered for another role.  And he would be

6   required to work his way off from that for the next review

7   period, which would be assessed the midyear the following

8   year.

9   Q.  If he were to get another needs improvement, let's say

10  these issues are repeated, no corrective behavior is achieved,

11  what happens then?

12  A.  At that point other, um, employment action may be taken,

13  demotion.  Possibly he could lose his exempt status, which

14  means he could be terminated.

15  Q.  So is one needs improvement kind of like a probation or --

16  A.  No, it follows you your entire career.  It's always a mark

17  on your record.  So it's more stringent than probation.

18  Q.  I want to talk about two other hotline complaints that

19  were alleged against Mr. Paz.  These are some complaints that

20  were discussed with this jury by Mr. David Dunn.  Are you

21  familiar with those?

22  A.  I think I did see them in the material, yes.

23  Q.  I'm going to show you page 47.  Was there a concern raised

24  by an employee about some use of contaminated or toxic soil?

25  A.  Yes.  He brought up a soil complaint.  He routed it to

1    MacKenzie Ostrander, but it's really not an HR -- we are not

2    technically qualified to rule on this type of a complaint.  I

3    think, to the best of my memory, MacKenzie conferred with me,

4    and we referred it back into, um, the division engineer for

5    proper handling and technical expertise.

6    Q.  I see.  So Adam Miller and his team followed up on that?

7    A.  It would be Mr. Miller's team, yes.

8    Q.  Was there another complaint that Mr. Paz had not completed

9    annual safety interviews but he said that he had?

10   A.  Yes, there was that complaint.

11   Q.  All right.  What did human resources do to investigate

12   that?

13   A.  Okay.  At that point we would take his statement, and then

14   we would interview employees to determine whether or not the

15   statements were taken or the interviews were complete.

16   Q.  So let's go to page 38.  What are we looking at here?

17   A.  This would have been -- MacKenzie designed a series of

18   questions, and it looks like Marty Feighner completed some

19   interviews asking each individual whether or not they had

20   received twenty seven -- two thousand -- yeah, 2017 annual

21   review.  And so they answered to each one of her questions.

22   Q.  So what was the conclusion?  After human resources

23   investigated that allegation, what did you conclude about

24   whether Mr. Paz had, in fact, completed those annual safety

25   interviews?

17-cv-00844-WYD-SKC          Freshour - Direct               V - 1287

1   A.  The findings indicated that he had.  All but one

2   individual indicated that they recalled and remembered

3   completing their annual review.

4   Q.  Do you know what the story was with that one individual?

5   A.  Yes.  Marty indicated that sometimes employees are not

6   aware of what the review process -- the name -- the proper

7   name for the discussion.

8   Q.  Who is Marty?

9   A.  Mr. Feighner was the division engineer who would have

10  overseen this -- he would have been Mr. Paz's supervisor at

11  the time, and he would have reported to Mr. Miller.

12  Q.  So after receiving this hotline complaint or this human

13  resources complaint from Mr. Dunn about not having completed

14  safety reviews, what did human resources conclude?

15  A.  That that was unsubstantiated because overwhelmingly the

16  evidence indicated that they had been.

17  Q.  We have seen an e-mail or we have talked about an e-mail

18  where Mr. Paz says something like:  These allegations by

19  Mr. Dunn have been made against me, and they are

20  unsubstantiated.  Can't we do something about that?  Or does

21  he face any repercussions for bringing unsubstantiated claims?

22         Do you remember something like that?

23  A.  I do recall that e-mail.

24  Q.  What did human resources do in response to receiving that

25  from Mr. -- that e-mail from Mr. Paz?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   A.   Yeah, any employee can complain as many times as they want

2   about anybody.  So the discussion would have been to have a

3   discussion with his boss to say, Do the right things, let the

4   investigative process and let the facts fall where they fall,

5   and you will be exonerated.  That is the way we handle, um,

6   those types of concerns.

7   Q.   To your knowledge, did any BNSF employees face any

8   repercussions or any sort of retaliation for having raised

9   hotline complaints against Mr. Paz?

10  A.   Absolutely not.

11          MR. GOMAN:  Your Honor, I don't have any more

12  questions.

13          THE COURT:  Okay.  How long is your

14  cross-examination?

15          MR. THOMPSON:  Three minutes?  30 minutes?

16          THE COURT:  Okay.  We'll take our lunch break.  So

17  we'll start again -- let's figure out what we can get done

18  this afternoon, with the understanding we have got to stop

19  around quarter to 4:00 today.

20          So how much longer do we have with this witness?  30

21  minutes, and you don't have much more; right?

22          MR. GOMAN:  No, I don't.

23          THE COURT:  Who is your next witness?

24          MR. GOMAN:  We have the deposition to read.  My best

25  guess is that will take 10 minutes.  And then Adam Miller is

 1  our final witness.

 2          THE COURT:  How long will Mr. Miller testify?

 3          MR. GOMAN:  I think his direct examination will be 45

 4  minutes.

 5          THE COURT:  Okay.  And what about cross?

 6          MR. THOMPSON:  25 minutes.

 7          THE COURT:  Okay.  All right.  Well, my goal is -- we

 8  will just do our best.  If we can't finish this afternoon, we

 9  will have to continue into Tuesday.  Are you going to do

10  Mr. Miller before the deposition, or you want to read the

11  deposition first?

12          MR. GOMAN:  It doesn't make much difference.

13          THE COURT:  I would prefer if you can do Mr. Miller.

14  Then if we have to carry anything over to Tuesday, I would

15  prefer to have the deposition be what's carried over.

16          MR. GOMAN:  Okay.

17          THE COURT:  So let's see -- do you have any objection

18  to doing that?

19          MR. GOMAN:  No.

20          THE COURT:  All right.  So let's get the live

21  testimony done this afternoon within the time.

22          All right.  We are going to start in an hour and five

23  minutes.  So we are going to start at 1:35.  And I am ordering

24  all attorneys to be as efficient as they can with the

25  remaining questions and to avoid unnecessary repetition.  All

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Freshour - Cross              V - 1290

1  right.

2      (Jury out at 12:31 p.m.)

3          MR. THOMPSON:  Your Honor, we have our objections to

4  Mr. Royston's deposition in a more easily readable format for

5  you.

6          THE COURT:  All right.  And where is the deposition?

7  Was it left with me yesterday?  Yes.  All right.  Let me have

8  it.

9          MR. THOMPSON:  We have also now brought all

10  depositions.  We have also brought all the text messages.

11  However, they are in black and white.  We will bring color

12  copies when we return on Tuesday.

13          THE COURT:  All right.  Okay.

14      (Proceedings recessed 12:32 p.m. to 1:38 p.m.,

15      resuming outside the presence of the jury.)

16          THE COURT:  Okay, have a seat.  Let's bring the jury

17  in, and we'll start the cross-examination.

18      (Jury in at 1:40 p.m.)

19          THE COURT:  All right, have a seat.

20          Cross-examination may proceed.

21                      **CROSS-EXAMINATION**

22  BY MR. THOMPSON:

23  Q.  Good morning, Mr. Freshour.

24  A.  Good morning, sir.

25          THE COURT:  It's afternoon.

Julie H. Thomas, RMR, CRR                        (303)296-3056

1              MR. THOMPSON:  Afternoon now, isn't it?

2              THE WITNESS:  Right.

3    BY MR. THOMPSON:

4    Q.  I'm going to show you page 1 of Exhibit 18.  Why is

5    Berkshire Hathaway Incorporated listed under

6    Organization/Building Name?

7    A.  Could you repeat that question?

8    Q.  Yeah.  Why is Berkshire Hathaway Inc., listed after

9    Organization/Building Name?

10   A.  Yes, sir.  We have -- Berkshire Hathaway has adopted the

11   same EthicsPoint system that the entire BNSF uses.  Berkshire

12   Hathaway purchased BNSF as a whole company.

13   Q.  All right.  So that's who owns BNSF.  That's why it's on

14   there.

15   A.  Yes, sir.

16   Q.  Got it.  All right.  So I'd like to count the number of

17   complaints that were made against Michael Paz.  Okay?

18   A.  Okay.

19   Q.  This is one?  Do you agree with me?

20   A.  Uh, this is one --

21   Q.  One complaint.

22   A.  Correct.

23   Q.  All right.  We go to page 4, that's number two?

24   A.  Yes.

25   Q.  Go to page 7, that's number three?

17-cv-00844-WYD-SKC          Freshour - Cross                V - 1292

1   A.  Yes.

2   Q.  Go to number 10, page number 10, that's number four?

3   A.  Yes.

4   Q.  Go to page 13, that's number five?

5   A.  Yes.

6   Q.  Go to page 16, that's number seven?

7   A.  Five or six?  Did you go five to seven?

8   Q.  I think we are on seven.  So page 1 was one, page 4 was

9   two, page 7 was three, page 10 was four, page 13 was five,

10  page 16 is six.

11  A.  Six, yes.

12  Q.  Page 20 is seven?

13  A.  That is correct.

14  Q.  Page 23 is eight?

15  A.  Yes.

16  Q.  Page 28 is nine?

17  A.  Yes.

18  Q.  And there was also a manager who filed two complaints

19  against Mr. Paz.

20  A.  Yes.

21  Q.  I will represent to you that Mr. Paz has testified that he

22  supervises 20 people, give or take.  So about one-half --

23  nearly one-half of his employees have filed complaints against

24  him.

25  A.  Correct.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    Q.  HR's job is to protect the company; right?

2    A.  Wrong.

3    Q.  Okay.  What's HR's job?

4    A.  HR's job is to be, um -- they protect -- they are an

5    advocate for employees, and they are also to uphold the

6    policies and procedures that govern and, um, the laws that

7    apply to employment within the company.

8    Q.  So let's talk about they're protecting employees.  I want

9    to turn your attention to page 52.  Here is Michael Paz, the

10   alleged perpetrator of retaliation, given an opportunity to

11   respond in writing to, it looks like, one, two, three, four

12   pages that he is allowed to respond to in the allegations in

13   writing.  Is that right?

14   A.  Could we look at those again?  I don't think that's

15   accurate.

16   Q.  Absolutely.  Okay.

17   A.  All right.  So this would have been the follow-up

18   questions that MacKenzie asked Mr. Paz?

19   Q.  Yeah.

20   A.  Right?  So she probably asked each one of those topics.

21   Is that correct?

22   Q.  That's what I think.  That's what I'm asking.

23   A.  Correct.

24   Q.  So Mr. Paz is given those topics ahead of time?

25   A.  No.  He was questioned, and that's his response.

1   Q.  Well, how was he questioned?

2   A.  You'd have to ask MacKenzie, but I'm assuming she

3   questioned him -- the typical practice, if we are doing this

4   by telephone or in person, I would ask you a question, I would

5   then record your comments, and then I would return the

6   statement to you for verification to make sure that nothing

7   was lost in translation.

8   Q.  This is Michael Paz writing this e-mail; right?  Right up

9   here at the top?

10  A.  From, correct.

11  Q.  And it looks like he's doing one, two, three, four pages

12  of answers to questions or explanations.

13  A.  I see MacKenzie Ostrander listed at the bottom.  So she

14  sent -- she gave him questions, yes.

15  Q.  Yeah.  She sent him questions, and then Michael Paz writes

16  his answers.

17  A.  It could have been on -- on the line.  I'm not sure how

18  she did that.

19  Q.  Where are these e-mails with questions that the nine

20  charged employees and the one manager who filed the

21  complaints, where are those e-mails?

22  A.  State that one more time?

23  Q.  Sure.  Let me try a little differently.

24      So Michael Paz was sent questions, and he was allowed

25  to respond in writing.  That's what it looks like; right?

1  A.  Right.  It looks like, um -- I can't -- I don't know what

2  page that is, but it looks like she sent those e-mails to him

3  on the 4th.  I'm not sure what the top looks like when he

4  responded, but yes, in general, that is correct.

5  Q.  Where are those e-mails for the nine employees who filed

6  complaints and the one manager who filed a complaint?  In

7  other words, where are the e-mails giving the employees the

8  opportunity to respond in writing to what had happened?

9  A.  I'm not sure what MacKenzie came up with.  I don't know

10  whether she was in person when she took those statements.  I

11  know that on one of those occasions she had Mr., uh -- the DE

12  question and then write their responses on them.  They signed

13  those and turned those in.

14  Q.  Have you ever seen any e-mails allowing the employees to

15  in writing provide their account for what happened?

16  A.  Have I ever seen -- yes, I always do that.

17  Q.  For Michael Paz.  Have you seen any e-mails from the nine

18  employees who filed complaints?

19  A.  Not in this packet, no.

20  Q.  Are you aware of another packet about complaints to

21  Michael Paz?

22  A.  Not associated with this case, but my point was that it is

23  not unusual to e-mail employees, have them -- take their

24  response, they have a chance to look that over and return it

25  to us as their statement.

1    Q.  But that didn't happen in this case.

2    A.  I can't speak to that.

3    Q.  It's not in the HR file; right?

4    A.  It is not in the HR file.

5    Q.  Any reason that HR would deviate from normal practices for

6    this case?

7    A.  I didn't say that was normal practice.  That was a

8    practice.

9    Q.  I have another question for you about what's in the file.

10   So Derek Goodnight came in here and begrudgingly testified

11   that he had also filed a complaint, he had made notes, pretty

12   detailed notes we saw, and gave them to HR.  Why are they not

13   in the HR file?

14   A.  That I don't know.

15   Q.  All right.  So let's look at some of what is in the HR

16   file.  I'm going to turn your attention to page 17.  There's

17   two portions highlighted.  Read the first one to you.

18        "The caller said Michael has also bullied the

19   employees to do things against the safety policies.  The

20   caller said when the employees tell Michael his request are

21   safe, Michael response is 'the ability to do something and the

22   willingness to do something is two different things.'"

23        Did I read that correctly?

24   A.  You did.

25   Q.  The next part I've highlighted, it says:  "The caller said

1    the employees are concerned that Michael is starting a hostile

2    work environment and Michael has a history of firing the

3    people he doesn't get along with."

4           Did I read that correctly?

5    A.  You did.

6    Q.  Let's go to page 20.  I've highlighted a portion on

7    page 20.  It says:  "The caller stated Mr. Paz wore a

8    recording device and asked employees' who called the hot line.

9    The caller also stated Mr. Paz told Assistant Roadmaster David

10   Dunn he was looking to terminate employees for contacting the

11   hot line."

12          Did I read that correctly?

13   A.  You read that correctly.

14   Q.  Page 23, I've highlighted:  "The caller also stated

15   Mr. Paz pulled the caller aside and informed the caller to

16   avoid certain individuals.  Mr. Paz indicated that he has had

17   trouble with them before and has 'taken care of it.'  The

18   caller took this as a threat to the caller's job."

19          Did I read that correctly?

20   A.  You did.

21   Q.  If I understand your testimony correctly, as a result of

22   HR's investigation of these complaints, Mr. Paz received a bad

23   grade on one portion of his, for lack of a better word, report

24   card.  Is that right?

25   A.  He was rated an NI in his leadership model, correct.

1   Q.  As a result, he couldn't be promoted for a whole six

2   months.

3   A.  I don't believe he has ever been promoted since.

4   Q.  Mr. Fresquez in this case refused to violate federal law.

5   He, on the other hand, was fired.  Does that seem fair to you?

6            MR. GOMAN:  Objection to foundation.

7            THE COURT:  Overruled.

8   A.  I have no opinion.  I'm not familiar with his termination.

9            MR. THOMPSON:  I have nothing further.  Thank you,

10  Mr. Freshour.

11           THE COURT:  Redirect.

12           MR. GOMAN:  Just briefly.

13                    **REDIRECT EXAMINATION**

14  BY MR. GOMAN:

15  Q.  Mr. Freshour, we're trying to find the page for you.  Are

16  you aware -- are you aware whether Mr. Dunn was questioned

17  about whether Mr. Paz had ever said to him he would fire

18  employees that called the hotline?

19  A.  Yes, I believe so.

20  Q.  What was -- so to keep this straight, an employee had

21  reported that Dunn had told him that Paz had said that.  Is

22  that what you understood the allegation to be?

23  A.  A hearsay, yes.

24  Q.  And did HR follow up with Mr. Dunn about that allegation?

25  A.  I don't have anything to refresh my memory, but --

1    Q.  Sure.  Give me one second.  I believe I can find it.

2         Well, I can't find it offhand.

3         All right.  So page -- I'm going to show you page 58

4    of Exhibit 18.

5    A.  Yes.

6    Q.  All right.  What did Mr. Dunn say about whether Mr. Paz

7    had ever said something like that?

8    A.  "Mr. Dunn stated that Mr. Paz did not tell him that [sic]

9    he was looking to terminate or fire employees for calling the

10   hotline."

11   Q.  Okay.  So that particular allegation was deemed

12   unsubstantiated?

13   A.  She did not substantiate that he made that comment.

14        MR. GOMAN:  Thank you.  Nothing further.

15        THE COURT:  Recross?

16        MR. THOMPSON:  No, Your Honor.

17        THE COURT:  All right.  You may step down.  You are

18   excused.

19        Call your next witness.

20        MR. GOMAN:  We next call Adam Miller.

21        COURTROOM DEPUTY:  Please raise your right hand.

22     (The witness was sworn.)

23        COURTROOM DEPUTY:  Please be seated.

24        Please state your full name, and spell your full name

25   for the record.

1           THE WITNESS:  Adam Miller, A-d-a-m, M-i-l-l-e-r.

2     **ADAM MILLER, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

3  BY MR. GOMAN:

4  Q.  All right.  Good afternoon, Mr. Miller.  Tell us just a

5  little bit of background about you.  What do you do for a

6  living, sir?

7  A.  So I -- originally from Omaha, Nebraska.  When I graduated

8  from college at the University of Nebraska -- I do have a

9  bachelor's of science in civil engineering -- started with

10  BNSF in their management trainee program.  I do have a quite

11  long-moving career of moves and transitions between different

12  divisions.

13          So initially I moved out to Vancouver, Washington.

14  Then from Vancouver I did another move to Seattle.  In between

15  that time, I started as a assistant roadmaster overseeing our

16  production gangs, our production gangs, rail ties, ballasts,

17  execute the capital program for each year, travel the country

18  across the northern tier, parts of Oregon, California,

19  Montana, Minnesota, North Dakota, Washington proper.

20          2004 I was promoted to division roadmaster in

21  Alliance, Nebraska.  I had the west end of the Sand Hills, so

22  roadmaster position between Alliance and Thedford, Nebraska.

23          After that, a short job in Fort Worth, staff

24  position.  It was, on paper, the manager of engineering

25  standards.  I was a part of a team doing a rollout for our

1  maintenance and scheduling of our track work.

2        After that, moved to Gillette, Wyoming, in May of

3  2007 as an assistant division engineer.  At that point in time

4  I had responsibilities over the Oren subdivision.  We had a

5  very aggressive capital program being executed as far as new

6  track construction and capital maintenance, primarily driven

7  with the increased demand of our coal market for one of the

8  business units that we have within the rail industry.

9        May of 2008, I became division engineer in Vancouver,

10  Washington, up until October of 2009.  Then I was another

11  division engineer in Lincoln, Nebraska.

12        And April of 2012 became the general director for the

13  Powder River Divison out of Gillette, Wyoming.  And at that

14  point in time the territory had shifted a few different times

15  up until this point.

16        Currently, I'm general director of maintenance for

17  special projects.  I reside in Broomfield, Colorado, most

18  recently.

19  Q.  All right.  Thank you.

20        Has your entire career at BNSF been spent in the

21  maintenance of way department?

22  A.  Yes.

23  Q.  As part of really all the roles you have had up to and

24  including your job as a general director, are you required to

25  know and apply FRA track inspection regulations?

1   A.  Yes.

2   Q.  All right.  Let's dive right into it.  Let's talk about

3   2016 -- 2015 and 2016.  You are a general director then; is

4   that right?

5   A.  Of the Powder River, yes.

6   Q.  All right.  We don't need a whole lot of detail.  Give us

7   a sense, though.  What does a general director do?

8   A.  So a general director, I have about nine direct reports,

9   give or take a little bit, of exempt management.  So division

10  engineers, manager of signal, manager of structures, manager

11  of roadway planning, assistant directors maintenance

12  production.  We maintain the engineering assets across the

13  division for that particular division of the railroad.  We

14  have gone through different shifts or reorganization type

15  things, both with inheriting trackage from different railroads

16  like Union Pacific on joint territories.  I also interact with

17  a lot of the outside entities, whether it's the FRA, whether

18  it's the Union Pacific, City of Denver, major metropolitans,

19  states, and have others that I also report to out of the other

20  department heads, whether it be mechanical or our

21  transportation team, for making the division run.

22  Q.  All right.  So just so we can understand the chain of

23  command, the jury has heard about roadmasters, Ryan Akers,

24  Michael Paz.  A roadmaster reports to what job title?

25  A.  Division engineer.

1   Q.  So that would be like Mark Carpenter or Marty Feighner;

2   right?

3   A.  Yes.

4   Q.  All right.  Then who does the division engineer report to?

5   A.  Division engineer would report to me.

6   Q.  As a general director, and back in 2016, how many

7   employees did you supervise?

8   A.  So grand total under the umbrella, about give or take, so

9   it varies, but about 50, uh, what I would call exempt

10  officers, both frontline supervisors, managers; 550, give or

11  take a little bit, for scheduled employees in all the

12  different crafts.  With the work season it does vary depending

13  on workload, work program, what you have scheduled, but it can

14  be at times up to 850 scheduled employees on the division

15  under my umbrella.

16  Q.  Do you get involved in, well, for instance, the day-to-day

17  reporting of track defects or placing of slow orders?

18  A.  Not so much.  I don't really get involved with the

19  day-to-day operation.

20  Q.  We have talked a little bit about a TIMS system in this

21  case.  Just generally, are you familiar with the TIMS system?

22  A.  Yes.

23  Q.  Do you get into it and operate in it very often?

24  A.  No, not in this role.

25  Q.  Same question with EAM, that system that replaced TIMS.

17-cv-00844-WYD-SKC          Miller - Direct               V - 1304

1    Are you familiar with it?

2    A.  I'm familiar with it, but I wouldn't technically interface

3    with it on a day-to-day basis.

4    Q.  Okay.  So let's talk about BNSF and track inspection and

5    track maintenance.  Who builds and maintains BNSF's track?

6    A.  Was that who builds and maintains it?

7    Q.  Yeah.  Is it the government, or is it BNSF?

8    A.  BNSF builds and maintains its track.

9    Q.  We'll kind of start from the top down.  Can you give us a

10   sense for the amount of money BNSF spends to build and

11   maintain its track?  Let's say -- let's take 2015 as an

12   example.  In your division, how much money was spent by BNSF

13   to build and maintain railroad track?

14   A.  Well, as we -- we get an overall capital program that's

15   usually announced.  Um, 2015 I believe it was in the

16   $5 billion range.  I could be off.  I'm going off of memory

17   for the actual amount.  As that trickles down in the capital

18   buckets, I can range somewhere between, you know, 60 sometimes

19   million dollars up to 95 million dollars.  You start combining

20   that with some of the other spend for our operating expenses,

21   which is more the day-to-day stuff, that can go up to overall

22   around $130 million that I'm tasked with managing for the

23   division.

24   Q.  So the company in 2015 spent $5 billion overall.  You are

25   responsible for approximately a hundred million of that?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    A.  Give or take a bit, yes.

2    Q.  Okay.  So there was some discussion about budget, whether

3    there's enough in the budget for track inspection and

4    maintenance.  If a division engineer were to exceed his or her

5    budget for a given year for track inspection and maintenance,

6    are they reprimanded or disciplined somehow?

7    A.  No.  There's a explanation, um, do expect them to try to

8    report and record everything accurately as best they can, as

9    well as account for the expenses.  That way if they do

10   overspend, okay, what's driving the overspend?  Is it

11   mismanagement of resources?  Is it driving track defects.  As

12   we have those discussions, it's a measure.  It tells us, okay,

13   we're over or under.

14   Q.  Are track inspectors important to BNSF's inspection and

15   maintenance of its railroad tracks?

16   A.  Absolutely.

17          MR. GOMAN:  I'm going to show just the witness

18   Exhibit A-73.

19   BY MR. GOMAN:

20   Q.  Mr. Miller, this is the first page of a 15-page document.

21   Did you look at this to get ready for your testimony?

22   A.  Yes, I did review it.

23   Q.  What is this?

24   A.  It shows a profile of gang IDs, position numbers, which --

25   and then titles, which is track inspectors that we have

1  registered, positions for track inspectors on our manpower

2  website.  This would be total positions.  If I'm looking at

3  the numbers right, so 15 pages, I think you said around 600

4  and some-odd-plus people, give or take a little bit, is how

5  many positions we have.  Some of them will say track

6  supervisor versus track inspector.  Virtually it's the same

7  position.  It's just a different labor agreement on how they

8  transition between the two positions.

9  Q.  Does this exhibit show how many track inspectors BNSF

10 employed in 2015 and 2016?

11 A.  I believe so.

12         MR. GOMAN:  Your Honor, I move for admission of

13 Exhibit A-73.

14         MR. THOMPSON:  No objection.

15         THE COURT:  All right.  Exhibit A-73 is received.

16    (Defendant's Exhibit A-73 received.)

17 BY MR. GOMAN:

18 Q.  All right.  So you got the total count just by adding up

19 each of those positions; is that right?

20 A.  Yeah.  I think it was 40-some on each page, and the last

21 page had a handful.

22 Q.  Okay.  Does the FRA tell BNSF how many track inspectors it

23 has to employ?

24 A.  No.

25 Q.  So this number of 600 and whatever it is, BNSF chose that

1   number?

2   A.   BNSF landed on it and decided how many we'd have.

3   Q.   Okay.  Let's talk then just quickly about some of the

4   different ways BNSF assists track inspectors in inspecting its

5   track.

6          MR. GOMAN:  I'm going to show just the witness

7   Exhibit A-65.

8   BY MR. GOMAN:

9   Q.   This is just the cover page here.  It's a 90-page

10  document, but do you know what this is?

11  A.   Yes.

12  Q.   What is it?

13  A.   It's a Track Measurement Report Explanation Guide, and the

14  pictures on here are examples of the various different methods

15  we have to supplement track inspection.  We talked about

16  geometry cars.  We have three manned where people are staffed

17  to, uh, basically escort the car around the various divisions.

18  They have a schedule that's published.

19  Q.   Let me stop you right there, Mr. Miller.

20         MR. GOMAN:  I'm going to move for admission of

21  Exhibit A-65.

22         THE COURT:  It's received because the whole exhibit

23  is stipulated to.  So are you seeking to move one page or the

24  whole?

25         MR. GOMAN:  No, I'm moving the entire document.

1          THE COURT:  Exhibit A-65 is received as a stipulated

2  exhibit.

3          (Defendant's Exhibit A-65 received.)

4  BY MR. GOMAN:

5  Q.  All right.  You were explaining, Mr. Miller, about the

6  geometry car, I believe.

7  A.  Yes.

8  Q.  Which one of these is the geometry car?

9  A.  Geometry car example would be -- if you go from top left

10 to bottom right, those are three examples of a geometry car.

11 Q.  So you were explaining how does a geometry car assist in

12 finding and reporting track defects.

13 A.  So it has a bunch of different mechanisms and measuring

14 devices on it, lasers, accelerometers, other different types

15 of equipment which I'm not the most expert person to discuss,

16 but it measures the track in a continual effort as it

17 traverses over the various tracks, mainly on our main line

18 corridors all across the country.  They do get on a set

19 schedule.  We do bring them around.

20          We also have unmanned cars currently employed right

21 now where -- these are all pieces of equipment that are both

22 pulled by a locomotive and a train crew across our railroad.

23 They're measuring the track, they're providing data,

24 collecting data, and then loading that into our database to

25 help our inspection teams both with capital planning aspects

1    but also with some of the short-term day-to-day maintenance

2    items they would see or track issues that would come up.

3    Q.  As an aside, there's been some discussion in this case

4    about a geometry car reporting an alignment defect and then a

5    foreman and a roadmaster and a track inspector attempting to

6    verify that report of a defect.  Are you familiar with that?

7    A.  Yep.

8    Q.  Can you explain to the jury why if a geometry car, with

9    its equipment and its lasers, identifies a defect, why would

10   you need to use a GPS coordinate to go out and verify it?

11   A.  The GPS helps pinpoint the location.  There's always a

12   little bit of margin of error with the GPS device with where

13   it's at, but it does generate those locations where a defect

14   would be at with the GPS, milepost, track ID, those kind of

15   things.  And it's just another verification piece for the

16   inspector to have in order to go find and pinpoint the exact

17   location.

18   Q.  All right.

19   A.  We do have defects both that are what we would call

20   FRA-required defects or managed by that, but we also have a

21   lot of BNSF defects that aren't necessarily what we would call

22   FRA defects.  They're just defects BNSF manages to help us get

23   better, from our perspective, with our capital maintenance

24   program.

25   Q.  What are rail detectors?

1   A.   Rail detectors, we have -- they are going to be looking

2   similar to the vehicle that you would see in the upper-right

3   corner.  Even though that is not a rail detector, it's about

4   that size of a vehicle where they have ultrasonic equipment

5   that comes over the rail, scans the rail, looking for internal

6   defects within the rail itself.  It does have just the

7   limitations of being able to see just below the ball into the

8   web.

9           FRA does mandate us to have a ultrasonic testing

10  program.  We have been pushing our internal rail detection,

11  rail defect management over the years.  We usually base our

12  frequency of that on tonnage along with defect generation,

13  defect models.

14  Q.   All right.  Is there other equipment, other technology

15  that we haven't touched on today that BNSF uses to inspect and

16  find track defects?

17  A.   So we also have our locomotives.  Not all of them, some of

18  them are equipped with VTI, we call it, vehicle track

19  interaction.  It's accelerometers on the locomotive that

20  communicate via cell signal.  They have a threshold for how

21  quick the accelerometer goes up, goes down, goes side to side,

22  and pinpoints those again with, you know, GPS and reports that

23  out for another inspection.  There's different protocols and

24  escalations that happen with it.  VTIs aren't necessarily

25  going to even be generating a defect versus a track condition.

1    So it is a few more other steps, but that's one other avenue.

2            We have the geometry cars.  The other two vehicles

3    that you are seeing on the page here in the lower left and

4    upper right.  The one in the upper right I spoke about being

5    similar to a rail detector, that's what we would call a star

6    car.  I don't know -- it's managed or owned by a third-party

7    vendor.  We use star cars to help some of our other yard

8    tracks that we would deem as, quote/unquote, critical or

9    require a higher testing frequency, along with testing

10   crossovers, that puts a weighted load onto the track.  These

11   vehicles aren't as heavy -- the two high-rail vehicles that

12   you see aren't as heavy as what we would call as a train.  So

13   the star car does simulate a load by putting a force down on

14   the track and then creating its measurements.  The high-rail

15   car on the bottom left, used in a similar fashion.  It just

16   doesn't necessarily have the loaded capability of creating a

17   load that would simulate a train coming over the track at the

18   same time.  We use those to help supplement skips with the geo

19   car.  If the geo car had to run around something because

20   trains were parked, we were doing track work, missed a

21   frequency, we can use those to help supplement to catch up

22   those missed spots at a different point in time.

23   Q.  All right.  Back to track inspectors then.  Are track

24   inspectors at BNSF required to report track defects when they

25   find them?

Julie H. Thomas, RMR, CRR                            (303)296-3056

1    A.  Yep.

2           MR. GOMAN:  I'm going to show just the witness

3    Exhibit A-69.

4    BY MR. GOMAN:

5    Q.  What is Exhibit A-69?

6    A.  It's a reference to our Engineering Instructions,

7    Chapter 2, for track inspection.

8           THE COURT:  This is also stipulated to.

9           MR. GOMAN:  Then move for A-69.

10          THE COURT:  All right.  It is received.

11          COURTROOM DEPUTY:  My list does not show it as

12   stipulated, Your Honor.  I'm sorry.

13          THE COURT:  Oh, I'm sorry.  No, you're right.  Yeah,

14   it was the wrong column.

15          But is there any objection to it?

16          MR. THOMPSON:  If not the entirety, yes.  We want the

17   entire document.  Otherwise, no objection.

18          THE COURT:  Do you want to move for its admission?

19          MR. GOMAN:  I do.

20          THE COURT:  Yeah.  Okay, I misread this, but anyway

21   it's now in evidence.

22      (Defendant's Exhibit A-69 received.)

23   BY MR. GOMAN:

24   Q.  Mr. Miller, at the start of the Engineering -- what are

25   the Engineering Instructions?  Just give us two sentences so

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC          Miller - Direct          V - 1313

1   the jury can understand what they are.

2   A.  It's a supplemental guide -- or instructions that we have

3   for our employees to dive into different details, whether it

4   be track inspection, whether it be welding, all the different

5   asset -- or facets that we have in the engineering department.

6   It's a supplemental instruction with some more details on

7   day-to-day stuff.

8   Q.  In those two bullet points there, does that describe the

9   expectation and the requirement of track inspectors at BNSF?

10  In a very broad sense.

11  A.  Yes.

12  Q.  Let me go to -- all right.  This subsection here on

13  page 7, this describes FRA-qualified employees.  Are track

14  inspectors FRA-qualified employees?

15  A.  Yes.

16  Q.  Are roadmasters also?

17  A.  Yes.

18  Q.  What does this section -- or just generally, what does

19  this require of track inspectors when they find a defect?

20  A.  I think it just says they have the authority and

21  responsibility to make the determination and decide what to do

22  for track conditions.

23  Q.  And this lists out their options?

24  A.  Yes.

25  Q.  Track inspectors are required to do the things listed

1    here?

2    A.  Yes.

3    Q.  Okay.

4          All right.  We have heard some testimony about these

5    track inspection databases in this case, the TIMS system and

6    the EAM system.  Very generally, when was the TIMS system in

7    use?

8    A.  If I recall, it was approximately 2006 was the first

9    version when it was implemented within the railroad.

10   Q.  And how long was it in use?

11   A.  About 10 years.

12   Q.  Were there any, I don't know, limitations or shortcomings

13   with that database?

14   A.  Yes.  It was a completely in-house, BNSF-managed database

15   that was developed.  The database before TIMS was what we

16   called the green screen DOS-type program that was available

17   for inputting inspections, which was still electronic, but it

18   was more primitive.  And before that we had paper reports.

19   Q.  We heard Mr. Akers talk about defects, if they were

20   repaired but the repair wasn't noted, that defect would stay

21   in the system somehow.  Do you recall that testimony?

22   A.  I recall Ryan talking about it.

23   Q.  Okay.  Was that one of the limitations of the TIMS system?

24          MR. THOMPSON:  Objection, Your Honor:  leading.

25          THE COURT:  It is leading.  Sustained.

17-cv-00844-WYD-SKC                Miller - Direct                V - 1315

1    BY MR. GOMAN:

2    Q.  Tell us about some of the limitations of the TIMS system

3    that you experienced.

4    A.  Some of the limitations with TIMS, uh, one involved just

5    overall asset management and input.  There was database

6    synchronization errors that would happen and occur where we

7    would try to sync with some back tables.  If we had new tracks

8    get constructed or built, new industry come in and have a new

9    install with turnouts, we'd have to synchronize all that

10   information into our database with the asset.  There was

11   opportunities for glitches to happen, and things would fall

12   off.  We also tried to sync it with our reporting structure

13   system, with PARS that people talked about, and there would be

14   errors and things missed if misreporting occurred.

15   Q.  You now use a system called EAM?

16   A.  EAM was developed here recently.  It is a SAP-type backed

17   system.  As far as SAP goes, that's about all I can say.

18   That's the outside vendor that helped develop it.  And what we

19   were trying to pull in both with the track inspection

20   management system with the assets is connect our assets also

21   to the other crafts, for example, like our signal department,

22   our structures department, our work equipment group, and

23   create one database for all of it to come into, as well as

24   tied to reporting.

25   Q.  So let's turn then to non-class-specific defects.  Fair to

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC             Miller - Direct                V - 1316

1    say -- I know this is an oversimplification, but are there

2    three classes of defects in terms of severity?

3    A.   For three classes of defects there's class-specific,

4    non-class-specific, speed-specific.

5    Q.   For non-class-specific defects, is it the case no

6    immediate repair is required?

7    A.   That's correct.

8    Q.   So a track inspector finds a fouled ballast condition.

9    Does that track go out of service that day?

10   A.   No, not if it's just -- he's noting a fouled condition.

11   If he doesn't have another driver that would consider it, most

12   of them would not take it out of office Day One.

13   Q.   What is your understanding of what the FRA regulations

14   require in terms of what you do if a non-class-specific defect

15   is not repaired within 30 days?

16   A.   The guidelines say take it out of service.  I'll say, you

17   know, just has it happened where we missed the 30-day time

18   clock?  Yes, it's happened.

19   Q.   Did it happen in Denver in territories under

20   Mr. Carpenter's control?

21   A.   Yes.

22   Q.   Did it happen in other territories you supervised?

23   A.   Yes.

24   Q.   Why?  I mean, how would it happen that non-class-specific

25   defects would remain in service longer than 30 days?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  A.   There's been a variety of different reasons.  Some of them

2  can be what I would call reasonable, like weather.  So, for

3  example, if a fouled ballast is written in November and then

4  you freeze up and you are minus 20, the ground is frozen, the

5  ballast is frozen, you are not going to repair it in 30 days.

6  You physically can't.

7       Does that mean we take the track out of service?  No.

8  It turns into an evaluation.  So one of the evaluations is, is

9  it deemed safe to continue to run?  Yes.  Does it mean we

10  restrict the track?  At times, yes.  Does that mean, uh, we

11  have communication with others, whether it be the FRA within

12  the organization, absolutely.

13       We also have had other times where we take over new

14  lines, new subdivisions where BNSF or its entities were not

15  the prior owner slash maintainer of that through different

16  line swaps.  They have different maintenance standards.

17  Mergers and acquisitions go out, usually jointly with the FRA,

18  and make a very good evaluation.  And then, of course, there's

19  a dialogue where we discuss what is the plan, how are you

20  going to execute it, timelines.  And that's a lot of what I do

21  from my perspective in my job is communicate that up and also

22  communicate that with those entities so they understand where

23  we're at.

24       Ultimately, safety of the railroad, safe passage of

25  trains is the bottom line.  They don't want to have

1   derailments.  We don't want to have derailments either.  At

2   the end of the day, that's our main focus.

3   Q.  That line swap you were talking about, was that an

4   instance where you spoke with inspectors from the FRA about

5   the reality of you complying with the non-class-specific

6   defect rule in this case?

7   A.  Yes, and timed the FRA inspection with their inspectors on

8   Day One of when we swapped.

9   Q.  In that situation, was the FRA aware that there were going

10  to be tracks that weren't -- where the defects weren't removed

11  within 30 days?

12  A.  Not on Day One.  After they performed their evaluation and

13  inspected everything, we got together and looked at the

14  overall list.  They didn't inspect 100 percent of the entire

15  subdivision and line swap where it occurred.  Also published

16  to them a:  Hey, you guys didn't see this part.  This part we

17  have greater concerns, you know, and we did restrict the track

18  down to 10 mph for a lot of it, lots of overlapping 25s.

19  However, here's our plan on what we are doing to fix it, and

20  here's what we're working towards to make it better.

21          And we were keeping the safety of the employees,

22  communities, train operations of the utmost concern as we

23  communicated that.

24  Q.  Was it a secret at BNSF that there were some

25  non-class-specific defects that had expired?

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Miller - Direct          V - 1319

1   A.  Was it a secret?

2   Q.  Right.

3   A.  No.

4   Q.  Were you aware of it?

5   A.  Yes.

6   Q.  How were you aware of that?

7   A.  Mainly through reports, communication.  I can look at a

8   non-class-specific report for any roadmaster territory on the

9   system.  So can anybody within the railroad.  It's available.

10  It's there.  And it's communicated as such.

11  Q.  Did Mr. Fresquez ever complain to you or report to you

12  that he had a concern about non-class-specific defects being

13  left in service beyond 30 days?

14  A.  Not me directly.

15  Q.  Do you -- are you aware of any concerns or complaints that

16  he filed in that regard?

17  A.  Not from Brandon directly, no.

18  Q.  What do you mean not directly?

19  A.  I didn't know Brandon's name being filed for anything.  I

20  wouldn't have known if Brandon called the hotline.  Um,

21  talking with Staci Moody-Gilbert, she never mentioned names.

22  She's, you know, required to hold confidentiality, from my

23  understanding, from her perspective for employees.  Can she

24  elevate concerns to me?  Absolutely.

25  Q.  Do you recall Staci Moody-Gilbert ever coming to you with

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    a concern about these non-class-specific defects?

2    A.  Not specifically.  Staci and I talk a lot.  I'm not going

3    to deny that we have had to work through lots of challenging

4    issues.  Both collectively as, you know, two leaders of two

5    different organizations, ultimately we are trying to get this

6    whole organization to go the same direction.  So we have to

7    talk.  We also have to agree to disagree on items and part

8    ways.  There's a whole variety of issues we would communicate

9    on.  I'd say it's fair to say we communicated once a week on

10   the average.  Sometimes it was twice a week.  Phone calls,

11   e-mails.  She didn't text me a whole bunch, but we did have

12   discussions between each other on lots of items.

13          But as far as with the issue brought up earlier, I

14   couldn't recall.  If I recalled it, it would have been, under

15   my understanding, a personality issue between a supervisor and

16   an employee.  I would have probably called the local manager,

17   whoever that was at the time.  It was probably Mark.

18   Q.  Let me stop you there.  So you are talking about, I think,

19   there were some text messages that showed at the end of April

20   of 2015 Ms. Moody-Gilbert was going to contact you about an

21   issue that Mr. Fresquez reported?

22   A.  Yep.

23   Q.  Do you remember that happening?

24   A.  It would be hard for me to pinpoint it exactly for is this

25   that issue.  I don't recall.  I recall her calling and

1  discussing.  The takeaway I had with it was a supervisor and

2  an employee having a disagreement.

3  Q.  Did you take her concerns seriously?

4  A.  I take her concerns seriously, yes.

5  Q.  Did you get the impression she took your concerns

6  seriously?

7  A.  Yes.

8  Q.  Did Mr. Fresquez ever report to you that he was concerned

9  that Mike Paz, Ryan Akers, and Cason Cole were deleting

10  defects out of BNSF's database?

11  A.  Not directly.

12  Q.  What do you mean not directly?

13  A.  I didn't have any conversation with Brandon directly that

14  he had those concerns.

15  Q.  Did anyone, Staci Moody-Gilbert or anyone else, tell you

16  that Brandon Fresquez had those concerns?

17  A.  Not that I have any recollection of.

18  Q.  If Staci Moody-Gilbert or Mr. Fresquez or someone on their

19  behalf came to you and they said, I have a TIMS record, I have

20  an e-mail, and I have a text message, and when you read these

21  all together and look at these other reports, it shows that

22  defects are being reported -- deleted out of the system, what

23  would you have done with that information?

24  A.  With some hard evidence and examples to outline, uh, it

25  makes it easier to start.  So, one, I'd talk with our HR

1   department and say, I have an issue, this is what's being

2   raised, and look to them for guidance.  Now, they may tell me

3   different types of things for guidance, whether it be, We're

4   not experts in track stuff, so we don't understand this.  So

5   either you have to do it, or you are going to have to get

6   somebody else to do it that's got a background to help do the

7   investigation.

8            In prior roles has this happened?  Yes, it's

9   happened, and I have had to do investigations of this type of

10   stuff before.

11   Q.  So let me stop you right there.  So you are not aware of

12   any -- the allegations of misconduct we have heard in this

13   trial since you have been sitting here, the specifics about

14   the reports and those kind of things, is this the first time

15   you are hearing those?

16   A.  This is -- a lot of what I'm hearing for the first time

17   once the lawsuit was filed.  Of course, through depositions

18   and other types of things, it's a lot of times when the

19   information was being brought up.

20   Q.  Prior to that, when you were the division engineer in

21   Lincoln, did you have a concern that a roadmaster was

22   improperly reporting track defects?

23   A.  Yes.

24   Q.  What did you do about that?

25   A.  So I had a roadmaster in Sheridan, Iowa.  Can I mention

1    his name?

2    Q.  I don't think you have to.  I'll leave it to you.

3    A.  I will leave it at position.  If you need the name, then

4    ask.  But he was a -- had a FRA inspector come out and do a

5    report.  I had done some follow-up with him as a division

6    engineer asking him, you know, and we did a little bit of

7    high-railing.  We were down on our Ottumwa sub, is where it

8    was at.  He was showing progress for repairs and they were

9    being done, and then I asked him, Okay, you got this defect

10   list done?  It's done and over with?  He said, Yes.  I said,

11   Okay, you got them all done on the Des Moines branch as well?

12   Yes.  Found out later, through people contacting me, that no,

13   there was still exceptions on the Des Moines.

14          Employed one of my other roadmasters to come up and

15   take a look.  That roadmaster went on vacation, and part of

16   that, me doing the follow-up, was touching bases because he

17   was going to go on vacation for a week and a half and wanted

18   to ensure we had progress.  He reported to me saying he had

19   them done.  He said he verified them done.  Found out

20   afterwards he did not.  The other roadmaster reported all that

21   to me.  We had to go react, and we had to go fix.  And also

22   the FRA inspector lived close to the Des Moines sub, so I had

23   to talk to him.

24          After the conclusion, employee comes back, do sit him

25   down, get his side of the story on what he said, also with

1   what I said with a person in between.  At the end I didn't

2   have authority to dismiss him as an exempt, but recommended

3   dismissal through our process.

4   Q.  Is that what happened?

5   A.  Yes.

6   Q.  All right.  You supervised Mark Carpenter when you came to

7   the Powder River Divison; is that right?

8   A.  Yes.

9   Q.  Give the jury a sense for the number of track defects that

10  were being reported in Mark Carpenter's division as compared

11  to other people you supervised.

12  A.  They're higher.  I'd say they're higher just because of

13  the yards that he has in Denver and Pueblo.  Mark's

14  territories changed a couple times just because of me being

15  his supervisor, along with some different transitions with the

16  Union Pacific Railroad that we had with our acquisitions that

17  we took over through the railroad agreements.  But his defects

18  would be higher statistically compared to two other division

19  engineers on my north end which were out of Alliance and

20  Gillette.

21  Q.  And to be specific, that means the reports of defects were

22  higher in Mr. Carpenter's territory?

23  A.  The reports of defects were higher, yes.

24  Q.  We have heard a little bit about the scorecard.  I want to

25  skip ahead to that.  I'm going to show you Exhibit 11.  And

1   I'm going to look at -- I'll show you page 3.

2          Real quick, a scorecard is one of the ways in which

3   supervisors are evaluated?

4   A.  It's a tool to help us make a data point for performance

5   against various initiatives within the engineering department.

6   Q.  How important is the metric for train derailments to you

7   when evaluating a supervisor's performance?

8   A.  It's important to me.  It's classified.  I look at -- as

9   you look at metrics -- and a little background.  There's a

10  different weight for each one of these.  As you look at the

11  lightly blue colored part where it says Safety, Budget,

12  Service, then Final Score, if you look off to the right, it

13  will talk about score.  That's overall weight.  But you start

14  looking at the bottom on how that divides out of a hundred,

15  that kind of gives you an idea on weight for those type of

16  metrics.

17         So as I'm looking at this right now at this point in

18  time, for a year Powder -- as you look at Safety, Frequency is

19  our injury frequency ratio.  Very important, highly weighted.

20  It carries most of the points on the scorecard that we look

21  at.

22         And then as you step down to Reportable Rail

23  Incidents, Non-Reportable Rail Incidents, those two items

24  would be derailments that would be affected within the

25  engineering department on the track side, just because this is

 1    a track scorecard.  So all T-coded derailments, whether they

 2    are reportable to the FRA or non-reportable, they would

 3    reflect there.

 4    Q.  All right.  I am going to show you now Exhibit 13, and we

 5    are going to look at Mr. Carpenter's division again.

 6            All right.  Does this page here show how

 7    Mr. Carpenter's division performed in 2016?

 8    A.  It shows it, but the reportable/non-reportable incidents

 9    are blanked out.

10    Q.  All right.  What about -- the goal is blanked out; right?

11    A.  The goal is.  It's showing 1 and 4 on the scoring there.

12    A.  Okay.

13    Q.  In the bottom line, did you see improvement in

14    Mr. Carpenter's statistics from 2015 to 2016 in the number of

15    track-caused derailments?

16    A.  Yes.

17    Q.  Is that a positive for you?

18    A.  It was a positive.

19    Q.  Did you care whether there was a difference in the number

20    of defects reported from 2015 to 2016?

21    A.  I don't think the defect -- the defects and the

22    derailments aren't necessarily correlated.  They are a risk

23    factor, is what I would say, to understand, but they're not

24    always a direct correlation.  I will say Mark showed

25    improvement.

1        However, 2013, when I first started supervising Mark,

2   into 2014, give or take a little bit, I was not happy with the

3   derailment performance and asked him or made him make a plan

4   to make improvement and show it.  And as I look at this from

5   2015 to 2016, that's part of the performance increase that I

6   demanded out of him.

7   Q.  Have you ever been aware of a railroad, a railroad the

8   size of BNSF, that's been able to operate without any train

9   derailments?

10  A.  I have had other divisions go years for zero and zero,

11  similar positions as division engineers.

12  Q.  Is that always the goal?

13  A.  That's always the goal.

14  Q.  Are you aware of any Class 1 railroad that's ever had a

15  derailment-free year?

16  A.  Never.

17  Q.  Let me just ask the question this way.  The allegation in

18  this case, as I understand it, is supervisors wanted to remove

19  track defect reports and slow orders from the system in order

20  to increase velocity and get better -- get bigger bonuses, I

21  suppose.  Does that make sense to you?

22  A.  No.

23  Q.  Why not?

24  A.  It's, uh -- one, defects, looking at defect lists, they're

25  reporting defects, and they are at a high number.  The other

 1  part, if they are having ones expire, okay, that's a

 2  mismanagement part on scheduling.  They are making some

 3  decisions on that, working through it.  Maliciously deleting

 4  defects is unacceptable.  I'd rather have the position that if

 5  we missed a 30-day timeline, I can fall on that sword and

 6  explain it versus somebody deleting a defect and then having a

 7  bad event as an outcome and having to try to work through

 8  that, versus understanding that, okay, we have a problem,

 9  here's the problem, we need help to fix it or we need to

10  rethink what we are doing.

11  Q.  How significantly does a train derailment affect the

12  velocity of BNSF's trains?

13  A.  So if a train derails on the main line, uh, you know,

14  derailment is a wheel discontinuing from its path on the rail,

15  so that can mean one wheel, minor derailment, no big deal.  We

16  still have to pick that car up or pick that piece of equipment

17  up, put it back on the rail.  That requires heavy equipment

18  most of the time.  We do have our mechanical folks that can

19  frog a train on.  That does happen.  Sometimes that's easy.

20  But when we're looking at, you know, a derailment where

21  equipment comes off the rail and we have to restore the

22  service, put the track back together, we are talking major

23  outages, whether it be -- it can be as long as 8 to 12 hours.

24  It's tough to control that outcome because we usually have

25  third parties come and help with this type of equipment.  We

17-cv-00844-WYD-SKC                Miller - Direct                 V - 1329

1    have to notify all of our entities, whether it be FRA, whether

2    it be municipalities, the general public, and begin the

3    process.

4    Q.  Quick aside.  I want to cover one issue quickly and then

5    get to Mr. Fresquez.

6            In this trial you have heard about an allegation by

7    Mr. Dunn that Mr. Paz had allowed the use of contaminated

8    soil.  Do you recall that?

9    A.  I recall that, yes.

10   Q.  All right.  And as I understand it, the allegation

11   essentially was they were picking up some soil that was

12   supposedly contaminated and using it somewhere else on BNSF

13   property.  Is that right?

14   A.  That's my understanding.

15   Q.  That allegation was reported to human resources and a

16   division engineer that worked for you?

17   A.  Yes.

18           MR. THOMPSON:  Objection:  leading.

19           THE COURT:  Sustained.

20   BY MR. GOMAN:

21   Q.  Are you aware of -- well, was an investigation conducted

22   about that?

23   A.  There was a hotline call to it, and HR had discussed it

24   with me, you know, here's an allegation about soil

25   contamination.  Um, I asked Marty to follow up with it with HR

Julie H. Thomas, RMR, CRR                                (303)296-3056

1   and provide --

2   Q.  Remind us who Marty is.

3   A.  Marty was a division engineer that replaced Mark Carpenter

4   after he retired.

5   Q.  Okay.  Do you know how the allegation was investigated?

6   We don't need all the details, but just generally was it

7   tested?  What was the investigation?

8   A.  So Marty, being the division engineer -- one, there's a

9   location spelled out.

10          MR. THOMPSON:  Your Honor, I object.  This is

11   hearsay.  He didn't conduct the investigation.

12          THE COURT:  Overruled.

13   BY MR. GOMAN:

14   Q.  Go ahead.

15   A.  Okay.  So Marty went out.  There was a location spelled

16   out in the complaint where the soil was at.  The stockpile or

17   waste soil, we have waste that comes out of the track from

18   track maintenance or just through the course of normal

19   maintenance.  We make a pile of it.  The pile was

20   environmentally tested mainly looking for pollutants, whether

21   it be something like diesel fuel, creosote, variety of

22   different things.  Our environmental team that we have within

23   BNSF provides that service for us.  So they'll coordinate,

24   bring on a vendor that will come and test the soil and then

25   provide us a report.  And then within the guidelines of, you

1    know, regulations for storm water runoff, et cetera, which

2    none of us are an expert on, they provide that to us saying,

3    yes, you are okay to use this in your property or, no, you

4    have to dispose of it and treat it.

5    Q.  So what was the outcome of that investigation?

6    A.  My understanding from that outcome was the soil tested

7    fine for what we were using it for within our right-of-way.

8    Q.  So did you consider that allegation by Mr. Dunn to be

9    founded or unfounded?

10            MR. THOMPSON:  Objection:  leading.

11            THE COURT:  He can answer with a yes or no.

12   A.  Unfounded.

13   BY MR. GOMAN:

14   Q.  Did you take any -- I don't know.  Did you take any

15   actions with regard to Mr. Paz's employment status because of

16   that allegation?

17   A.  No.

18   Q.  Did you -- were you critical of or did you criticize

19   Mr. Dunn for having raised that concern?

20   A.  I didn't have any conversations with Mr. Dunn.

21   Q.  All right.  Turning to Mr. Fresquez.  Do you know

22   Mr. Fresquez?

23   A.  I know Brandon.  Probably more so with the lawsuit, but

24   initially, uh, very, very limited interaction.

25   Q.  Prior to hearing about this insubordination incident, do

1   you remember meeting Mr. Fresquez?

2   A.  It was -- I met Brandon in 2013.  We had a geo car or

3   geometry car coming into Denver.  We were going to park in

4   Denver and then the next day go test what we called the Pikes

5   Peak sub.  There was a defect that was generated, as we were

6   coming in to a close, on concrete ties just in front of the

7   track we were talking about.  It was a BNSF defect called base

8   gauge.  At the time it was a very what I would call new

9   geometry defect for lots of people.  One, you have to have

10  concrete ties versus wood ties.  But it kicked out, and so, me

11  being new to the territory, only having a handful of months,

12  wanted to go, well, let's go take a look, see what it looks

13  like.

14          Brandon had came up and, you know -- I can't remember

15  if he was called by the supervisor.  He wasn't contacted by

16  me.  But we were walking to try to see this, and, you know,

17  Brandon had made the comment, I don't think it's there.  I

18  said, Well, let's take --

19  Q.  Hold on a second.  I didn't understand that.  What did

20  Mr. Fresquez say to you?

21  A.  He said he didn't think it was there.  I said, Well, let's

22  take a look.

23  Q.  Didn't think what was there?

24  A.  The defect.

25  Q.  This is the first time you had ever met Mr. Fresquez?

1   A.   Yep.

2   Q.   Did you go and look at that defect?

3   A.   We went and looked at it.

4   Q.   In looking at it, did you conclude that there was a defect

5   in the track?

6   A.   I thought there was and explained it to the supervisors,

7   and Brandon as well, as the group huddled up there.  We

8   discussed what we were talking about with base gauge, how you

9   measure it.  It's a calculated defect from the geometry car,

10  so it's not something that you can physically measure and say,

11  okay, it's here.  However, with concrete ties I have a lot of

12  experience with them just because of my roles and past roles.

13  Q.   When you were explaining to the group, including

14  Mr. Fresquez, that there actually is a defect in the track

15  here, how did Mr. Fresquez respond?

16  A.   Uh, it was just odd.  I don't think he was too resistant.

17  It was just, you know, he thought it wasn't there.  I said,

18  Well, let's take a look.  I wanted to, one, educate

19  supervisors but also, two, opportunity to educate track

20  inspectors where things are at.  Lots of people contested it

21  when it first came out, and we had a lot of what I would

22  call -- we had to overcome some training with it with people

23  understanding what it looks like, where it's at, some other

24  deciding factors.  And so took it as an opportunity to say,

25  well, okay, here we go.

 1    Q.  All right.  When you explained that you believed there was

 2    a defect in the track, what did Mr. Fresquez say to you?

 3    A.  I can't remember.

 4    Q.  Anything unpleasant about that exchange?

 5    A.  I didn't take it as unpleasant.

 6    Q.  What did you find odd about it?

 7    A.  Just odd.  Never met a guy, and "it's not there."

 8    Q.  Okay.  Did you ever meet him another time prior to his

 9    dismissal?

10    A.  Uh, just went into a safety meeting in Denver or safety

11    briefing, and Brandon made a comment.  I didn't take any

12    offense to the comment, and I thought it was a normal comment.

13    You know, track inspectors, section folks, all of our union

14    employees when I do come around and try to give them a talk

15    about how the railroad is doing, I think a lot of them want to

16    know how it's doing, different things with the business units

17    from what I know.  So I try to prepare, get some research for

18    it, and also talk about safety, get a chance.  You know, and

19    then usually people say, Hey, what's on the program for next

20    year?  What are you guys thinking about?  Or, hey, you know,

21    different things, different issues.  You know, Brandon made a

22    comment about that, and that was about it.  It was --

23    Q.  Just to step off and get to the point of this interaction,

24    Mr. Fresquez was wanting to know are there going to be more

25    resources for track infrastructure coming up?

1  A.  Yeah.

2  Q.  That's the kind of feedback you want from track

3  inspectors?

4  A.  I think so, and I would consider it also a normal comment

5  in front of a group like that that I would get from anybody.

6  Q.  Those are the only two interactions you had had with

7  Mr. Fresquez before he was dismissed?

8  A.  Those are the only two I recall.

9  Q.  So let's go to, then, this insubordination event.  What's

10  the first you heard of Mr. Fresquez's insubordination on

11  May 5th of 2016?

12  A.  I got a e-mail notification from Mark saying he was

13  removing Brandon from service for insubordination near south

14  Denver.

15  Q.  Was it unusual or surprising to you that a division

16  engineer was -- withholding from service, first of all, what

17  does that mean?

18  A.  So when we schedule investigations, two key phrases.  One

19  just, hey, I'm scheduling an investigation for this employee

20  for this charge.  Okay.  That would give me the connotation

21  that he did not remove the employee from service.

22      When we remove an employee from service pending

23  results of the investigation, one, to me that means very

24  serious charge.  It also means -- the other part is is we have

25  a different timeline to oblige -- to be obligated to in order

17-cv-00844-WYD-SKC                  Miller - Direct                  V - 1336

1    to hold the hearing and as well as comply with as that part of

2    the clause of the collective bargaining agreement.

3    Q.  After under -- did you come to learn a little bit about,

4    at least at this point, the allegation that was being made

5    about insubordination?

6    A.  Yeah, I get the e-mail, and then I called Mark, talk to

7    him and say, Okay, well, what happened.

8    Q.  After Mr. Carpenter described the circumstances to you,

9    did it make sense to you that he was being withheld from

10   service?

11   A.  Yes.

12           MR. THOMPSON:  Objection:  leading again.

13           THE COURT:  It was leading.  Sustained.  And I will

14   instruct the jury to disregard the answer.  Let's let the

15   witness testify, if possible.

16   BY MR. GOMAN:

17   Q.  Were -- were you concerned or did you have a concern that

18   he was being withheld from service?

19   A.  I wanted to know more background on why he was being

20   withheld from service, uh, you know, what is the charge, uh.

21   You know, insubordination is a very serious charge, along with

22   theft, workplace violence, those type of things.

23   Q.  In your mind, is insubordination different than failing to

24   comply with instructions?

25   A.  Yes.

Julie H. Thomas, RMR, CRR                                    (303)296-3056

17-cv-00844-WYD-SKC            Miller - Direct            V - 1337

1   Q.  How so?

2   A.  So insubordination, to me, has intent or a malicious

3   intent as the underlying tone.  That's Adam's opinion of it.

4   Failure to comply with instructions is somebody who is still

5   with a good faith effort trying to comply with instructions or

6   expectation.  They failed or fell short, they missed

7   something, but there's not malicious intent.

8   Q.  Fast-forwarding a little bit, you eventually reviewed the

9   transcript of the investigation that was held for

10  Mr. Fresquez?

11  A.  Yes.

12  Q.  Knowing now what you know about what the testimony was, do

13  you take issue with this disciplinary investigation being

14  noticed for insubordination, as opposed to failure to comply

15  with instructions?

16  A.  I don't take exception to it.

17  Q.  Is it a close call, in your mind, or clear-cut?  Where do

18  you fall?

19  A.  I -- I take it as insubordination.  It's clear-cut.  The

20  merits of the case weigh, uh, the decision for me as I read

21  through it.  One, I'm going to say everybody was at south

22  Denver or within the vicinity.  The other part of it is is

23  there's a radio conversation.  There's also a discussion about

24  measuring a defect.  That all happened.  I don't think anybody

25  has contested that.  There's behavior items that are happening

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    within the transcript where people are having a conversation.

2    Okay.  In order to measure, you know, verify or validate a

3    defect, you have to measure it.  If you're the person that is

4    qualified to do that and you are instructed to do that, you

5    have to measure the defect.  If you drive away and you didn't

6    measure the defect, and you say you didn't measure the defect,

7    as you start adding up the testimony, it starts falling in

8    line that this is insubordination.

9    Q.  You have heard the allegation in this case that, as I

10   understand it, Mr. Fresquez believed that Mr. Paz was going to

11   remove the defect report from the system and, therefore,

12   Mr. Fresquez didn't want to inspect the track.  Is that a

13   convincing defense to you to allegations of insubordination?

14   A.  No.

15   Q.  Why not?

16   A.  Because if Paz wanted the defect removed and he was going

17   to maliciously delete it out, he didn't need to go measure it

18   with Brandon.  I felt that he was there trying to measure it

19   with Brandon.  He wanted Brandon to help him measure it.  They

20   had their reasons for all being there, whoever called them and

21   discussed it with them.  But at the end of the day, they are

22   going to measure it and determine is it there or not.

23   Q.   If Mr. Fresquez believed that that's what was going to

24   happen, that Mr. Paz was going to remove it from the system

25   eventually, and he's instructed to measure the track, what

1   should he do?

2   A.   Measure the track.  I believe Brandon's qualified, uh,

3   through the tier process that we had.  I'm not disputing that

4   he knew how to do it.  He could do it.  If he believes after

5   they measured it that the defect is still there, and then him

6   and Mike go through and debate a different scenario that they

7   are going to take it out or do something, Brandon has the

8   opportunity to say, No, this is what it is.  This is the

9   length.  This is the measurement.  This is what it is.  I'm

10  not deleting it.  I'm not removing it.  Or, yes, it has been

11  fixed.  We can remove it.  Here's where it says in the

12  instruction.

13           We have an escalation process that can happen with

14  that, whether it's through HR, whether it's through myself or

15  the division engineer.

16  Q.   Let's talk about that defect report real quick.  Give the

17  jury a sense, though.  How often are foremen and track

18  inspectors attempting to verify and measure defects?

19  A.   I'd say they can do it every day.  There's defects out

20  there that they can measure, reverify.  There's reporting for

21  that they do when they go out and perform track work and

22  maintenance within their windows, just depends on time of day.

23  They can close out, depending on the window, location, work

24  scope.  There can be, you know, at times even hundreds of

25  defects being closed in one day.

17-cv-00844-WYD-SKC                Miller - Direct                    V - 1340

1   Q.  Do you -- because of that, do you rely on people just to

2   remember which defects they have removed from the system?

3   A.  I can't.  I think there's a certain point that they do

4   remember different things depending how they correlated it in

5   their head individually, because I do the same thing when I

6   look at different things in moments in time.  But when I want

7   to double-check something, I'm going to back-check records,

8   I'm going to be looking at what was reported, all these

9   different types of things and systems that we have in place,

10  uh, so that there is a record, a paper trail that can say,

11  okay, the defect was closed, it was repaired, these are the

12  activities we did that day.

13  Q.  Mr. Miller, when you were reviewing this investigation

14  transcript to decide whether to dismiss Mr. Fresquez, was it a

15  concern of yours whether that defect was present or not?

16          MR. THOMPSON:  Objection:  leading.

17          THE COURT:  It is leading.  Sustained.

18  BY MR. GOMAN:

19  Q.  Were you concerned about whether -- did it matter to you

20  in evaluating potential insubordination whether that defect

21  was there or not?

22          MR. THOMPSON:  Objection.  Still leading.

23          THE COURT:  It is still leading.

24  BY MR. GOMAN:

25  Q.  Were you concerned about whether that defect was reported

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Miller - Direct          V - 1341

1   or not?

2   A.  In evaluating the investigation, no.

3   Q.  Let me show you Exhibit A-70.  Actually, let me show the

4   jury Exhibit A-70.

5              THE COURT:  A-70 is stipulated to, and mine says

6   received.

7              MR. GOMAN:  I was just waiting for it to be

8   published, Your Honor.

9              COURTROOM DEPUTY:  I had blanked the jury monitors,

10  Your Honor, when there wasn't any exhibit up.

11             THE COURT:  Okay.

12  BY MR. GOMAN:

13  Q.  You have seen this exhibit in this trial, Mr. Miller?

14  A.  Yes.

15  Q.  How is it that Mr. Herzog's name comes to appear in a

16  record like this?

17             MR. THOMPSON:  Objection:  foundation.

18             THE COURT:  Overruled.  He can answer.

19  A.  My opinion is Jay Herzog went into his reporting system

20  for May 5th and reported his work activities that day, and by

21  reviewing this report I would conclude that Jay Herzog closed

22  out the defect.

23  BY MR. GOMAN:

24  Q.  How can you say that?  This isn't a PARS report; right?

25  A.  This is an engineering --

Julie H. Thomas, RMR, CRR                        (303)296-3056

1          MR. THOMPSON:  Objection:  leading.

2          MR. GOMAN:  I'm trying to move this along.  I'm happy

3     to ask more open-ended questions.

4          THE COURT:  I will allow the last question.  It's

5     nonsubstantive.  Go ahead.

6     A.  It's an engineering defects page.  It synchronizes with

7     other databases, including PARS, for reporting out of defects.

8     In my opinion, Jay logged in with his credentials, with his

9     employee ID and password, reported his time, reported his work

10    activities for that day, and logged the defect as closed.

11    BY MR. GOMAN:

12    Q.  Can an employee like Mike Paz log in under Jay Herzog's

13    name and password to close out defects?

14    A.  No.

15    Q.  So short of Mr. Paz somehow obtaining Mr. Herzog's

16    password, do you see any way that he could have closed out

17    this defect in Mr. Herzog's name?

18    A.  I don't see how Paz could have closed this out in Herzog's

19    name.

20    Q.  A couple more questions about this defect.  It looks like

21    it was in the system for two years.

22    A.  Yes.

23    Q.  Is that unusual or concerning for you?

24    A.  It's a class, uh, specific defect.  As I look at this,

25    it's at a location of south Denver in a crossover track.  The

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   south Denver area, we go from three mains into two mains

2   coming into the Denver metro area.  South Denver is about four

3   miles outside of our beginning of the subdivision in this

4   case, give or take a little bit.  The speed through there, as

5   you analyze our timetable speed, we have permanent speeds the

6   trains can traverse over a territory.  You know, it's 30, 20,

7   different milepost ranges, but for the most part it's a,

8   coming into or out of, depending on direction, a very slow

9   track.

10          Crossovers, they are where we traverse from one main

11  to another, whether it's you are going from Main 3 to Main 2

12  or Main 2 to Main 1.  We have switches and turnouts that are

13  thrown and then diverge the route for the train to travel on

14  based on, you know, how the dispatcher lines them up.

15          For crossovers, you know, when we look at corridor

16  slow order delays, different things on the metrics on the

17  scorecards, they are looking at main lines.  It doesn't

18  analyze crossovers.  So in order to see a slow order on a

19  crossover, you know, whoever wants to see it has to go look.

20  Q.  So you, as a general director, would you have even known

21  that this defect was in place?

22  A.  No.

23  Q.  Would you expect Mr. Paz to have gotten an attaboy or a

24  special commendation for having removed this defect?

25  A.  No.

17-cv-00844-WYD-SKC          Miller - Direct              V - 1344

1   Q.  Would it have made any sort of difference to the velocity,

2   the velocity metric that we've been talking about?

3   A.  Not in my opinion.

4   Q.  All right.  You review the transcript, and you make your

5   conclusion about insubordination.  What's the next step for

6   you?

7   A.  Next step for me, um, is after the review, you know,

8   there's been some other discussions.  I've had discussions

9   with Ned Percival about, you know, format, procedure, things

10  getting submitted.  Also reviewing Stephanie's recommendation

11  from PEPA.  And then at the end, you know, send to Mark.  I

12  typically send to the division engineers if I'm going to be

13  the reviewer for discipline.  I'll send them an e-mail giving

14  them the authority -- or the recommendation, proceed or not

15  proceed with dismissal.

16  Q.  You called it a recommendation.  Who decided ultimately to

17  dismiss Mr. Fresquez?

18  A.  I did.

19  Q.  You reviewed the transcript and the exhibits, right, the

20  investigation transcript?

21  A.  Yes.

22  Q.  You reviewed Ms. Detlefsen's recommendation?

23  A.  Yes.

24  Q.  Did you talk to Mr. Percival about the merits of the case

25  or whether he thought it was proven or anything like that?

1    A.  Just asked Ned after the investigation, Did you get the

2    transcript submitted and exhibits and get them uploaded?  Just

3    because there is a time factor that we have to comply with in

4    order to issue discipline by the collective bargaining

5    agreement.

6    Q.  Did you call Mike Paz to ask his opinion on the matter?

7    A.  I didn't talk to Mike Paz about this.

8    Q.  Did you call Mark Carpenter to ask him his opinion?

9    A.  I called Mark, uh, and talked to him.  I had -- Mark had

10   expressed his opinion to me, what he thought after he

11   reviewed, but he wasn't going to be the deciding factor.  I

12   had to talk to Mark about some other stuff.  Um, reviewing

13   Brandon's employee transcript, there was a few other items

14   marked on his record that I wanted to get some background on

15   that I thought Mark may have had some information for.

16   Q.  What was Mark's opinion or recommendation to you?

17   A.  Mark had recommended he wanted him dismissed too.

18   Q.  Okay.  Let me show you Exhibit A-3 that is in evidence.

19   You said you had some questions about the disciplinary record?

20   A.  Yes.

21   Q.  Is that what we are looking at here?

22   A.  Is the first page Brandon's transcript?

23   Q.  This is the second page, but yes.

24   A.  Okay.  Yes, this looks like Brandon's discipline record.

25   Q.  Okay.  Are you familiar with the disciplinary policy, that

1   six-page PEPA policy we have talked about in this case?

2   A.  Yes.

3   Q.  What does it say about -- how does it classify

4   insubordination?

5   A.  Insubordination is classified as a one-time dismissible

6   offense.  It falls under conduct.

7   Q.  For application of the policy, does it matter what

8   Mr. Fresquez's disciplinary history was?

9   A.  For application of the policy, no.

10  Q.  Why did you look at it then?

11  A.  One, to get a whole picture, but, also, two is I was going

12  to consider leniency.

13  Q.  What do you -- meaning what?  Meaning you were considering

14  whether you should dismiss or do what?

15  A.  Or should I have a longer discussion about this case.

16  Leniency, as I define it with the PEPA policy, it's a

17  deviation.  So if PEPA comes back and recommends dismissal, we

18  are given abilities to grant leniency.  However, there has to

19  be a compelling reason.

20        As I was reviewing this, I'm not allowed to take, you

21  know, things into consideration outside the scope of the PEPA

22  policy or the investigation transcript, but in order to grant

23  leniency, I wanted a whole picture.

24  Q.  So we are looking at his transcript right now, and we have

25  talked about the 2010 insubordination.  Was that a factor for

17-cv-00844-WYD-SKC              Miller - Direct                V - 1347

1   you then in deciding not to grant leniency?

2   A.  It solidified the conclusion for dismissal.

3   Q.  The decision to dismiss an employee at BNSF, is that a

4   decision you take seriously?

5   A.  I take it very serious.

6   Q.  Why?

7   A.  It has a ripple effect.  It affects, one, and probably the

8   most, the employee.  Their lives are disrupted.  Their

9   dependents are disrupted that depend on them as well.  Take it

10  very serious.  The ultimate decision is is, you know, when an

11  employee is dismissed, it's for due cause.  And

12  insubordination does justify that.

13  Q.  When you made the decision to dismiss Mr. Fresquez, did

14  you know that he had called the FRA track inspector on May 5th

15  of 2016?

16  A.  I had no knowledge of Brandon calling the FRA.

17  Q.  Did you know that Mr. Fresquez had discussed and maybe --

18  maybe even argued with Mr. Paz about the proper classification

19  of a defect?

20  A.  Not that I'm aware of.

21  Q.  There is some -- is there discussion in the transcript,

22  the investigation transcript, about whether there should be a

23  slow order or out-of-service track condition the day of

24  May 5th of 2016?

25  A.  There was a discussion.  I can't remember if Brandon

 1   brought it up or Varner, but it was talked about in the

 2   transcript.

 3   Q.  Did that influence your decision in any way?

 4   A.  No.

 5   Q.  Was it significant or a big deal to you that a track

 6   inspector and a roadmaster would be talking about the proper

 7   classification of a defect?

 8   A.  I would consider it normal based on their discussions.

 9   Myself, as a roadmaster, if a track inspector called and said,

10   This is what I have, just ask some questions.  What is it?  If

11   you're managing large scale a lot of defects each day, you're

12   not going to be able to keep them all straight in your head.

13   And then just understand that, you know, having that through

14   discussion with your track inspectors.

15   Q.  All of the allegations that are being made in this case,

16   that Mr. Fresquez argued with Ryan Akers and Cason Cole about

17   track defects, that he is now alleging that supervisors were

18   improperly removing track defects from the system, were you

19   aware that any of those things had taken place when you made

20   the decision to dismiss?

21   A.  No.

22   Q.  If you had known that Mr. Fresquez -- or, I should say, if

23   Mr. Fresquez had, in fact, reported those things when he

24   worked at BNSF, would those have influenced your decision to

25   dismiss?

1    A.  Not in this case, no.

2    Q.  What is your understanding of BNSF's rules and policies

3    that apply to you in terms of whether you can consider an

4    employee's reporting of safety concerns or calling a hotline

5    or anything like that when it comes to making dismissal

6    decisions?

7    A.  Can you repeat that?

8    Q.  That was way too long.

9         Can you consider an employee's engaging in safety

10   behavior, that they reported safety concerns or they reported

11   misconduct, can you consider those things and hold it against

12   employees when you are making discipline decisions?

13   A.  We are not allowed to retaliate, so I can't consider those

14   when making those decisions.

15   Q.  What do you think would be the consequences for you if you

16   did that?

17   A.  I would be dismissed.

18   Q.  Tell this jury, why did you decide to dismiss Brandon

19   Fresquez?

20   A.  I decided to dismiss him for insubordination.  He refused

21   instruction from his supervisor.  Through the course of the

22   testimony, uh, Brandon had given the opportunity to measure

23   the defect.  Mike's testimony was credible.  Brandon's

24   testimony did not counter it.  So as I looked at all the

25   testimony, it was, one, he didn't measure it, two, he drove

1   off.  At the end of the day, when your supervisor instructs

2   you to perform a task that you are qualified to do, and it's

3   safe to do so, then you are required to perform that task.

4          MR. GOMAN:  I don't have any more questions, Your

5   Honor.

6          THE COURT:  Cross-examination.

7                    **CROSS-EXAMINATION**

8   BY MR. THOMPSON:

9   Q.  Good afternoon, Mr. Miller.

10  A.  Afternoon.

11  Q.  Prior to May 5th of 2016, you already believed Brandon

12  Fresquez was someone who could be argumentative.

13  A.  If I recall, uh, had a few examples from supervisors,

14  various supervisors that had mentioned that to me in passing.

15  Q.  You never witnessed that firsthand.

16  A.  I did not, no.

17  Q.  You heard it from people like Mark Carpenter.

18  A.  I heard it from supervisors, so some of them, Ryan, Cason.

19  Mark had mentioned it.  There's been some others that weren't

20  mentioned in the case that had mentioned it as well.

21  Q.  If Brandon was opposing a violation of federal law, you

22  would want him to be argumentative.

23  A.  I'd want him to disagree, yes.

24  Q.  You have been sitting here during trial.  You heard some

25  of the examples of Brandon being argumentative?

1   A.  I've heard some different examples.  I don't know if they

2   are correlated between the two.

3   Q.  What I'm saying is you have heard every example BNSF has

4   offered of Mr. Fresquez being argumentative.  Right?

5   A.  I have heard examples, yes.

6   Q.  Every one of those was about how to accurately report and

7   track defects; right?

8   A.  I don't know if all of them were.

9   Q.  All right.  So let's talk about the charging decision.

10  Mark Carpenter and Michael Paz made that decision; right?

11  A.  Between the two of them, yes.

12  Q.  You explained to the jury that -- the difference between

13  insubordination and failure to follow instructions; right?

14  A.  I did, yes.

15  Q.  There can be a gray area between those two things.

16  A.  There can be, yes.

17  Q.  The difference can be subjective.

18  A.  Yes, it can be.

19  Q.  And to the extent it was subjective in this case, it was

20  Mark Carpenter who made that decision.

21  A.  Mark was the charging officer.

22  Q.  So let's talk about the difference between being asked to

23  do something by your supervisor and being ordered to do

24  something by your supervisor.  For purposes of determining

25  whether someone is insubordinate, it matters whether a

17-cv-00844-WYD-SKC                 Miller - Cross                    V - 1352

1  supervisor asks or orders the employee to do something; right?

2  A.  Uh, correct.

3  Q.  And, again, there can be a gray area between those two

4  things sometimes.

5  A.  It can be, yes.

6  Q.  The difference can be subjective.

7  A.  Can be, yes.

8  Q.  And to the extent it was subjective in this case, Mark

9  Carpenter decided which one of the two it was.

10  A.  Mark provided the charge for refusal.

11  Q.  You made your decision based on reading the transcript

12  from Brandon's hearing; right?

13  A.  That's correct.

14  Q.  The gist of what Brandon said in the hearing is he didn't

15  want to participate in remeasuring the defect because he

16  believed Michael Paz was going to remove it from the system

17  anyway; right?

18  A.  Can you please repeat that one time?

19  Q.  Sure.  The gist of what Brandon said in the hearing and on

20  the radio is, I don't want to participate in remeasuring the

21  defect because you have already decided you are going to

22  remove it from the system anyway.

23  A.  I think he was, uh -- and I could be wrong.  I'm going off

24  of memory.  It was, You've made your mind up.

25  Q.  Yeah, and everybody understood him to mean, You have made

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1    your mind up the defect isn't there, so what's the point?

2    A.  And that's what I recall as Brandon saying on some of it,

3    yes.

4    Q.  What did you do to follow up on Brandon's allegation in

5    the transcript that Mike Paz was going to remove the defect

6    regardless of whether it was there?

7    A.  I didn't follow up with it.

8    Q.  You told the jury that when making the decision to

9    terminate Mr. Fresquez, you called Mark Carpenter?

10   A.  I spoke to him, yes.

11   Q.  He's the only manager from whom you sought input on

12   whether to fire Brandon; right?

13   A.  I had questions about the discipline record on Brandon

14   with Mark, yes.

15   Q.  And he's the only manager you called about that.

16   A.  Yes.

17   Q.  And he told you that Brandon should be fired?

18   A.  He gave me his thoughts, yes.

19   Q.  All right.  So I'd like to talk about the 30-day rule.

20   You have heard a lot of testimony about that?

21   A.  Yes.

22   Q.  And it sounds like you agree with our expert, Joe Lydick,

23   and really everybody except for Mark Carpenter, that if a

24   defect has not been repaired within 30 days, the rail must be

25   removed.

1    A.   I agree with Joe Lydick, yes.

2    Q.   And you gave us a couple of examples of whether that

3    doesn't happen, things like the ground is frozen or you took

4    over track that somebody else, some other company, had not

5    repaired the defects.  Correct?

6    A.   Correct.  And I had also said we have mismanaged it in the

7    past, yes.

8    Q.   Yeah.  Every once in a while, you are a big railroad, you

9    will miss one here or there or have some special instance that

10   causes that to happen; right?

11   A.   There's going to be exceptions, yes.

12   Q.   But that's not what happened here, is it?

13   A.   I'm not sure when example you are talking about.

14   Q.   Sure.  Mark Carpenter wasn't leaving rails in service with

15   old defects because of frozen ground, because he acquired the

16   rail from somebody else.  That's not what's going on here, was

17   it?

18   A.   Mark had some issues with reporting and reporting the

19   cleanup.  I think they have stepped through a few examples of

20   that.  Also, Mark's interpretation is Mark's interpretation.

21   I'm not going to deny that.  He's expressed that to me, and I

22   said, I disagree; I want you to, you know, tell your

23   supervisors this.  But if Mark shared his thoughts on that,

24   that's Mark's opinion.  That's his own free will to share his

25   opinion.

1   Q.  You think managers who are under you are allowed to share

2   their free will that people on their territory can violate

3   federal law?

4   A.  I didn't take it as that when Mark shared his opinion.  It

5   was Mark expressing his thoughts on how he interpreted it.

6   And they also all expressed what their thoughts were, and

7   then, uh, you know, they also said that he didn't push it on

8   them, his thoughts.

9   Q.  All right.  So I'd like to talk about the basis for

10  finding Brandon Fresquez guilty of insubordination.  Okay?

11  A.  All right.

12  Q.  In the hearing, Brandon said, more or less, he didn't want

13  to participate in remeasuring the defect because Michael Paz

14  had already made up his mind that the defect wasn't there, so

15  what's the point.  Right?

16  A.  Yeah.

17  Q.  When you made the discipline decision, you thought that

18  explanation was unreasonable.

19  A.  The explanation was not making sense.  I wanted -- I

20  would, uh -- the instruction from Mike's testimony was he

21  wanted him to string-line the defect.  So you have already

22  made your mind up, I'm not doing it, not going to measure

23  it --

24  Q.  Yeah.

25  A.  -- that doesn't make sense.

1    Q.  You thought Brandon's explanation didn't make a whole lot

2    of sense; right?

3    A.  No.

4    Q.  You've sat here for the last five days and heard numerous

5    people testify?

6    A.  Yes.

7    Q.  In the hearing, Mike Paz said that the defect was not

8    present; right?

9    A.  That's what I recall.

10   Q.  In here you heard him testify before lunch that the defect

11   was present and then after lunch that the defect was present

12   but that they had repaired it earlier in the day; right?

13   A.  There was lots of questions about when it was present,

14   when it was not present, and Mike was stepping through that as

15   far as from his perspective on his testimony.

16          From the investigation, when Mike was there

17   measuring, on the transcript I had the understanding that the

18   defect was not present or had been repaired and they were

19   verifying.

20   Q.  Is that trial the first time you ever heard that the

21   defect was, in fact, present that day at some point or

22   another?

23   A.  I would assume it would have been present in the morning

24   before they did work or whatever he was referencing.  However,

25   I didn't take that, his reference to moment in time, uh, for

1   when he was there to verify it.

2   Q.  You heard Mr. Paz testify that Jay Herzog repaired that

3   defect on May 5th, 2016; right?

4   A.  Correct.

5   Q.  Jay Herzog you heard testify the defect was present and he

6   not only didn't repair it that day, he never repaired that

7   defect.  Did you hear that?

8   A.  I heard it.

9   Q.  Did you think Jay Herzog was lying?

10  A.  I'm not going to make that determination.  He wasn't part

11  of the transcript when I evaluated it.  I'll just rest on, uh,

12  looking at what was reported out.

13  Q.  You don't get to do that here.  You have to answer my

14  questions.

15  A.  I do?  Okay.

16  Q.  Do you think that Jay Herzog was being dishonest to the

17  jury when he said, I didn't repair the defect that day, I've

18  never repaired the defect?

19  A.  I don't think Jay -- I don't think Jay was being truthful

20  in his answer.

21  Q.  You heard one of your current employees, Jason Snow,

22  testify the defect was present that day, it was not repaired

23  that day, in fact, it's never been repaired.  Right?

24  A.  I heard Jason testify, yes.

25  Q.  Do you think Jason was being dishonest?

17-cv-00844-WYD-SKC           Miller - Cross                    V - 1358

 1   A.  I don't know if he's dishonest or just ill informed.  He

 2   wasn't there.

 3   Q.  You heard him testify he was there that day.

 4   A.  He was in the area, but he wasn't there at the site.

 5   Q.  You heard Jacob Yancey testify that the defect was present

 6   that day, was not repaired that day, in fact, had never been

 7   repaired.  Do you think Mr. Yancey was being dishonest?

 8   A.  I think Jake was explaining his perspective.  So I don't

 9   know if he's being honest or dishonest, but Jake's expressing

10   his opinion, but he wasn't there at the site either.

11   Q.  Do you agree with all of those witnesses that repairing

12   that defect would have been a big undertaking?

13   A.  I wasn't there.  I think the change in scope or however

14   they interpreted the scope of where the defect was at, that

15   would determine their decision versus, uh, if they got there

16   and measured it and determined what it was.

17   Q.  You know a lot about repairing defects; right?

18   A.  Have been, yes.

19   Q.  Would repairing that defect be a big undertaking?

20   A.  Depends where it was at.

21   Q.  Well, you know where this defect was at; right?

22   A.  I just have where it was in the crossover.  I haven't been

23   there.

24   Q.  Even after this case was filed, you have never gone to

25   look if the defect is still there?

Julie H. Thomas, RMR, CRR                            (303)296-3056

1  A.  I have not, no.

2  Q.  You continue to believe Paz that the defect has been

3  fixed; right?

4  A.  I believe Mike's testimony, yes.

5  Q.  How many employees have to tell you a manager is violating

6  federal law before you will believe them?

7  A.  I only need one.

8  Q.  You mean like Jay Herzog?  Like Jason Snow?  Like Jacob

9  Yancey?  Like Brandon Fresquez?  Like Derek Goodnight?

10  A.  I think the ones that were there explained their side.

11  Um, after review of all the information and what I see, made

12  my determination.  I do think people have a different

13  perception depending on their vantage point, where they are

14  positioned at in relation to it.  So I can't say definitively

15  whether they are being dishonest or not, but I do think they

16  explained their perspective.

17  Q.  If the jury returns a verdict in the favor -- in the favor

18  of Brandon Fresquez, will you finally go look at the defect

19  and see whether it's there?

20  A.  I'll make that determination at the conclusion.

21  Q.  All right.  You've heard, whether you believe them or not,

22  a number of, for the railroad industry, fairly shocking

23  allegations throughout this trial; right?

24  A.  Yes.

25  Q.  When did you first learn that Brandon Fresquez was

17-cv-00844-WYD-SKC                Miller - Cross                      V - 1360

1    alleging that managers under you and, specifically, under Mark

2    Carpenter were violating federal regulations?

3    A.  When I was advised of Brandon filing the lawsuit.

4    Q.  Was that when you were deposed?

5    A.  No.  There was a time before that, I don't recall the

6    date, prior to that that Brandon had filed the lawsuit, and at

7    that point in time our legal team, uh, took over.

8    Q.  All right.  You were deposed in this case on October 12,

9    2017; right?

10   A.  Sounds about right, yes.

11   Q.  You swore to tell the truth, the whole truth, but nothing

12   but the truth?

13   A.  Yes.

14   Q.  And you did that?

15   A.  Yep.

16   Q.  That's closer in time to when this kind of all happened,

17   so your memory was probably better then?

18   A.  Some of it, yes.

19   Q.  I'd like to show you page 144 of your deposition.

20          COURTROOM DEPUTY:  I hand the witness the transcript

21   of his deposition taken October 12, 2017.

22   BY MR. THOMPSON:

23   Q.  I'm going to highlight a portion for you:

24          "Question:  Is this the first time -- today the first

25   time you're hearing these type of allegations about

Julie H. Thomas, RMR, CRR                                      (303)296-3056

1    supervisors under you?"

2            Your answer was:  "This?  Yes."

3            Did I read that correctly?

4    A.  Yes, you did.

5    Q.  Mr. Fresquez had filed a complaint with the Department of

6    Labor more than a year earlier than this deposition.  Nobody

7    had told you about the allegations then?

8    A.  The understanding I had was is Brandon had filed a

9    lawsuit.  Uh, they had done a review of that lawsuit and asked

10   me to provide documentation, e-mails, et cetera, that I had

11   concerning the case.

12   Q.  But they didn't tell you what the allegations about the

13   managers under you actually were, and that's something you

14   would have wanted to investigate; right?

15   A.  It's something that would be brought up.  However, as the

16   dispute was issued in a lawsuit, BNSF legal, I had the

17   understanding they were going to take over.

18   Q.  Did BNSF legal do an investigation as to whether Mark

19   Carpenter and the supervisors under him were violating federal

20   regulations?

21   A.  I don't have information if, uh, legal did that with Mark

22   or not.

23   Q.  I mean, you agree with us that deleting defects is or at

24   least can be hugely dangerous?

25   A.  Deleting maliciously, yes.

1  Q.  After the Department of Labor issued findings, did you do

2  anything to investigate them?

3  A.  That was still under the pretense with our legal team, so

4  I left it alone.

5  Q.  It's negligent, to say the least, not to tell you so you

6  could investigate; right?

7  A.  Can you repeat that?

8  Q.  Sure.  It's negligent by BNSF, to say the least, not to

9  tell you that managers under you were being accused of

10  deleting defects so that you could investigate it?

11            MR. GOMAN:  Objection:  argumentative and relevance.

12            THE COURT:  Well, overruled.  I will allow it.

13  A.  I'm going to stick with, uh, the process being followed

14  with the guidance that I was given, so . . .

15  BY MR. THOMPSON:

16  Q.  So let's see what you said during your deposition.  We

17  will go to page 146.  I will highlight starting at 21.

18            "Question:  It's negligent not to investigate if you

19  know this allegation, right?"

20            Mr. Goman objects.

21            You then answer:  "Correct."

22            Did I read that correctly?

23  A.  Yes, you did.

24  Q.  The kind of allegations Brandon is making is the type of

25  thing that could derail trains; right?

Julie H. Thomas, RMR, CRR                          (303)296-3056

17-cv-00844-WYD-SKC          Miller - Cross                V - 1363

1    A.  Potentially, yes.

2    Q.  In 2005 there were a high number of derails under Mark

3    Carpenter; right?

4    A.  In 2005?

5    Q.  I'm sorry.  Thank you.

6            In 2015 there were a high number of derails under

7    Mark Carpenter; right?

8    A.  I'd have to reference a document to tell you exactly.

9    Q.  We're in luck.  I have a document we can reference right

10   here.  I will bring you to page 45 of your deposition at line

11   22.

12   A.  Okay.  So --

13   Q.  Start right at 14.

14   A.  Okay.  So 2015, I believe, wasn't sure if that was '15 or

15   '14 in context.  I'd have to reference a scorecard metric or

16   something like that.

17   Q.  Well, here, how about I just read it, and we will see what

18   you said.

19           So I say:  "Question:  Tell me about that."

20           "Answer:  We had a high number of track-caused

21   derailments in 2015, I believe, and I asked Mark to put

22   together a derailment containment plan for the Powder River

23   South."

24           "Question:  Any other times that you reprimanded or

25   disciplined Mark Carpenter for defect-related or defect

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    reporting-related issues?"

2          "Answer:  That's the one I recall."

3          "Question:  Did track defects report to the high

4    number of track derailments?"

5          "Answer:  Missed defects, yes."

6          Did I read that correctly?

7    A.  Yeah, you did.

8          THE COURT:  How much longer do you estimate?

9          MR. THOMPSON:  I'm on half a page.  I'm through

10   three, so five minutes.

11         THE COURT:  Okay.  That's fine.  We need to stop by

12   no later than 10 to 4:00, so I'm --

13         MR. THOMPSON:  Understood.

14         THE COURT:  -- going to direct counsel to do their

15   best to complete this witness in the next 20 minutes plus.

16   BY MR. THOMPSON:

17   Q.  I'd like to talk about harassment under your watch.  Okay?

18   A.  Okay.

19   Q.  You saw Ms. Detlefsen talk about BNSF's antiretaliation

20   policies; right?

21   A.  Miss -- were you talking Ms. Detlefsen, or were you

22   talking Dane Freshour?

23   Q.  You pick.  I will take either.

24   A.  Okay.

25   Q.  You also heard employee after employee under you testify

17-cv-00844-WYD-SKC                Miller - Cross                V - 1365

1   that managers under Mark Carpenter, and specifically Michael

2   Paz, have retaliated against them; right?

3   A.   I have heard those allegations, yes.

4   Q.   And specifically they allege that Michael Paz was

5   retaliating against them for refusing to put productivity

6   ahead of safety; right?

7   A.   Just what was in the allegations that they read off.

8   Q.   Did you believe them?

9   A.   I think the ones where we had the hotline calls that you

10  reviewed with Mr. Freshour, um, showed the conclusion with

11  substantiated versus unsubstantiated.

12  Q.   I'm not asking about what HR did in their two-minute phone

13  call.  I want to know you, who sat here and listened to Jay

14  Herzog, Jacob Yancey, Jason Snow, and Derek Goodnight, who

15  didn't even want to be here, tell you that they are scared to

16  report safety concerns and that they are scared because

17  managers under you are retaliating against them when they do

18  that, you heard them; right?

19  A.   I heard them, yes.

20  Q.   Did you believe them?

21          MR. GOMAN:   Objection to relevance.

22          THE COURT:   Overruled.

23  A.   I think they have concerns, uh, that they have expressed

24  and vetted.  I also think they have also expressed that they

25  have been ones that have called hotlines and expressed those

Julie H. Thomas, RMR, CRR                            (303)296-3056

1    concerns and tried to follow the process by elevating those.

2    BY MR. THOMPSON:

3    Q.  If the jury returns a verdict in Mr. Fresquez' favor, will

4    you finally try and crack down on some of the retaliation

5    under you?

6          MR. GOMAN:  Objection.  That's improper and

7    argumentative.

8          THE COURT:  Sustained.

9    BY MR. THOMPSON:

10   Q.  All right.  The last thing I want to talk about is the

11   people who were involved in Mr. Fresquez's discipline.

12         Mr. Paz.  The only discipline he's received is a bad

13   grade on one section of his, for lack of a better word, report

14   card; right?

15   A.  Uh, yes.

16   Q.  Mr. Carpenter was never disciplined.

17   A.  Uh, I would say he was disciplined under a different time

18   frame for different events.

19   Q.  Fair enough.  Under your watch, Mr. Carpenter has never

20   been disciplined.

21   A.  Yes, he has.

22   Q.  Tell us about that.

23   A.  So back to the deposition about derailments, I rated Mark

24   as a needs improvement at one point in time with one of my

25   evaluations.

1   Q.  Got it.  Because he had derailments, you gave him a bad

2   grade on one section of his report card.

3   A.  I'd have to reference it.  It was either in the leadership

4   or the overall, but it was a needs improvement and asked him

5   to make -- or required him to make that plan to show

6   improvement.

7   Q.  Do you think Mr. Fresquez, who the only thing he did was

8   refuse to violate federal law, would have preferred a bad

9   report card grade than getting terminated?

10              MR. GOMAN:  Objection:  improper and argumentative.

11              THE COURT:  Overruled.  He can answer.

12  A.  I think Brandon's case is different or his investigation

13  was different, and we evaluate supervisors, managers

14  differently than scheduled employees based on those.

15  BY MR. THOMPSON:

16  Q.  I'm sorry.  Did you just say you treated managers

17  differently than union-level employees?

18  A.  I think Stephanie also spoke to the PEPA policy about, uh,

19  how that's administered, and we use our performance review

20  process with ratings on the exempts.

21              MR. THOMPSON:  I have nothing further.  Thank you.

22              THE COURT:  All right.  Redirect.

23                      **REDIRECT EXAMINATION**

24  BY MR. GOMAN:

25  Q.  Explain that last piece, Mr. Miller.  You, as a

17-cv-00844-WYD-SKC          Miller - Redirect                V - 1368

1  supervisor, or Mike Paz, as a supervisor, are you subject to

2  the same progressive disciplinary policy that applies to

3  scheduled employees?

4  A.  We are not subject to the same progressive discipline

5  policy.

6  Q.  Are you protected by a collective bargaining agreement as

7  a manager?

8  A.  No.

9  Q.  If you or Mike Paz or anyone else were to be accused of

10  doing something, do you have a right to a hearing and an

11  appeal?

12  A.  No.

13  Q.  So when you say -- I guess, when -- when you were asked a

14  question about whether they got a bad grade on their report

15  card, short of firing Mark Carpenter and Mike Paz, is there

16  another way for BNSF to express that they don't tolerate that

17  misconduct?

18  A.  It goes through the rating process.  And I think Dane

19  touched on about needs improvement, on target, exceeds, far

20  exceeds.  Those are different ratings.  Needs improvement is a

21  big deal, and it does affect your overall performance review

22  and evaluations as you progress, whether it be for promotions,

23  laterals, or different movements within the company.  It can

24  ultimately lead up to and including dismissal if needed.

25  Q.  These -- you were asked about whether Mark Carpenter ever

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1  received any sort of, I don't know, negative performance

 2  review for these allegations.  When Mr. Carpenter retired, did

 3  you have any idea that Mr. Fresquez would be making the

 4  allegations he is making in court this week?

 5  A.  I did not have those.

 6  Q.  If Mr. Fresquez had brought these allegations to your

 7  attention when he was a BNSF employee, would you have

 8  investigated them?

 9  A.  With hard evidence, yes.

10  Q.  Would you have taken him seriously?

11  A.  Yes.

12  Q.  If he or a union representative on his behalf or a group

13  of employees came to you with documents and inspection records

14  and photographs, would you have followed up on that?

15  A.  Yes.

16  Q.  Why now, though?  So now that these allegations surfaced

17  for the first time in a lawsuit, why have you not investigated

18  them?

19  A.  Just lawsuit was filed, and I was taking the stance that

20  the dispute and merits would be resolved through the court.

21  Q.  The allegations made by Mr. Goodnight and Mr. Yancey and

22  Mr. Snow, do you believe they reported those in the proper

23  way?

24  A.  The allegations that I heard from them discussing about,

25  uh, their conflicts with Mr. Paz, I don't know if they are the

17-cv-00844-WYD-SKC          Miller - Redirect          V - 1370

1   ones that called the hotline or not, but it seemed to

2   correlate to hotline calls.

3   Q.  If they did that, do you have any criticisms of them?

4   A.  No.

5   Q.  Are employees required to report misconduct like the type

6   they are describing, if they encounter it?

7   A.  Yes.

8   Q.  Has Mr. Goodnight or Mr. Yancey or Mr. Snow suffered any

9   sort of employment consequence for having brought those

10  concerns to BNSF's attention?

11  A.  Not that I'm aware of.

12  Q.  So the group of employees who reported to the hotline

13  complaints against Mr. Paz, do you know if any of them

14  received any discipline?

15  A.  I don't know who called the hotline or not.

16  Q.  Did you take the allegations against Mr. Paz that came out

17  of that hotline seriously?

18  A.  Yes.

19  Q.  Were you made aware of them?

20  A.  I was made aware and part of the findings, yes.

21  Q.  Do you know how high up in the company those allegations

22  went?

23  A.  I do know they are reviewed at the senior level.  I'm not

24  sure as far as how high.  I do know our vice president of

25  engineering had a review.  I don't know if it went above him

Julie H. Thomas, RMR, CRR                              (303)296-3056

 1    or not.

 2    Q.   That's someone you report to?

 3    A.   Indirectly, yes.

 4    Q.   How many vice presidents of engineering are there at BNSF?

 5    A.   One.

 6    Q.   All right.  Back to, real quick, the decision to notice

 7    the investigation here.  I understand you to say that the

 8    difference between failure to comply with instructions and

 9    insubordination can be subjective.  Did you think it was

10    subjective in this case?

11    A.   No.

12    Q.   Why not?

13    A.   Because of the refusal.  And as you look at the merits of

14    the case, there's a discussion.  Uh, there's a conversation

15    back and forth.  We've talked about Mike's testimony.  I look

16    at behaviors and actions.  What happened?  Somebody left the

17    scene and went away, and then also came back and said, I

18    didn't measure it.  So there is a refusal, and then there's a

19    discontinuity where they left the location.

20    Q.   Did -- you said you called Mark Carpenter after you

21    received the discipline transcript?

22    A.   Yeah.

23    Q.   The investigation transcript.  Why did you call

24    Mr. Carpenter?

25    A.   Just to solidify his -- there was a couple questions on

1   Brandon's discipline record that I had, and it was just

2   questions about what they were and why they were what they

3   were.

4   Q.  What do you mean by that?

5   A.  So when -- one of them with -- I think it was 2010, was a

6   waiver, you could see that on his transcript, that was issued

7   for conduct and failure to comply with instructions.  And

8   asked, Okay, why did we issue this?  He gave a little bit of

9   background on it.

10         The other one was the Drive Cam event with -- or not

11  the Drive Cam, but the electronic device event that was

12  registered that was showing him, uh -- typically the

13  electronic device was a serious rules violation, so it would

14  have been a Level S.  And I had a question about why that was

15  not a Level S.  It was showing another form of discipline as

16  minor.

17  Q.  There were some allegations about why you haven't, I

18  guess, gone back out to south Denver to verify whether this

19  defect is there or not.  Did that -- was that important to

20  your determination in Mr. Fresquez's case?

21  A.  It wasn't.

22  Q.  Why not?

23  A.  Because the allegation was insubordination.  I thought the

24  merits of the case were well enough that it was going to weigh

25  for stand-alone dismissal.

17-cv-00844-WYD-SKC          Miller - Redirect                V - 1373

1   Q.  This defect, an alignment defect, you know what that is

2   generally?

3   A.  Yes.

4   Q.  Where does it rank in terms of your prioritization of

5   defects across the system?

6   A.  Where it's at in a crossover I would say is not on a high

7   scale as far as speed and magnitude.  Just describing the

8   location and what's surrounding it, it's not a high-impact

9   location.

10  Q.  All right.  Let's see.  Mark Carpenter told you his

11  thoughts on whether Mr. Fresquez should be dismissed?

12  A.  Yes.

13  Q.  Did that affect or contribute to your decision to dismiss

14  Mr. Fresquez?

15  A.  No.

16  Q.  Whose decision was it?

17  A.  It was mine.

18  Q.  Has anything you have heard this week in trial or anything

19  you have learned since this lawsuit was filed caused you to

20  question that decision?

21  A.  No.

22  Q.  Knowing now what you have learned during this trial, if

23  you were to be sent this investigation transcript tomorrow to

24  review a case of potential dismissal, what would you do?

25  A.  Follow our same process.  Go through our same review

1    steps, weigh the merits of the individual case, and then make

2    a decision.

3                MR. GOMAN:  I don't have any more questions.

4                THE COURT:  All right.   Any recross?

5                MR. THOMPSON:  Thank you, Judge.

6                              **RECROSS-EXAMINATION**

7    BY MR. THOMPSON:

8    Q.   You told Mr. Goman that you haven't gone back out to the

9    defect to see if it's actually repaired because that had no

10   bearing on your decision in terms of terminating Mr. Fresquez;

11   right?

12   A.   That's correct.

13   Q.   If the defect was never repaired, Mike Paz lied in the

14   investigatory hearing; right?

15   A.   Mike had, uh, verified the defect.

16   Q.   My question is different.  If the defect was not repaired,

17   Mike Paz lied in the hearing, he lied in his deposition, and

18   he lied in court; right?

19   A.   I didn't arrive at that.

20   Q.   I'm not asking what you arrived at.  What I'm asking you

21   is a straightforward question.

22                If the defect was not repaired, Mr. Paz has been

23   lying to you, lying to you in the investigatory hearing, lying

24   in his deposition, and lying to the jury; right?

25   A.   I don't have any indication that Mike lied.

1      MR. THOMPSON:  Your Honor, can you please have the

2  witness answer my question.

3      THE COURT:  All right.  I want you to direct him to

4  answer that question with a yes or no.  It needs to come from

5  you, not me.

6      MR. THOMPSON:  Sure.

7  BY MR. THOMPSON:

8  Q.  Please answer me with a yes or no.  If that defect was

9  never repaired, Mike Paz lied in the investigatory hearing,

10  lied in his deposition, and lied to the jury; right?

11  A.  And are you speaking hypothetically, if Mike --

12  Q.  Yeah.

13  A.  So hypothetically -- Mike hasn't given me any indication

14  that he lied, so I'm going to say no.

15  Q.  You're still not answering my question.  I don't know how

16  to be clear about it.  Let me try and think.  Maybe I can come

17  up with a better question.

18      In the investigatory hearing, Mike Paz said the

19  defect was not present; right?

20  A.  Okay.  I agree with that.

21  Q.  In his deposition, Mike Paz said the defect was not

22  present; right?

23  A.  I will take your word for it it's in the deposition.  I

24  haven't read his deposition.

25  Q.  Fair enough.  Mike Paz in this case told the jury the

17-cv-00844-WYD-SKC          Miller - Recross                V - 1376

1   defect was there but he had repaired it earlier that day or,

2   rather, Jay Herzog had repaired it earlier that day; right?

3   A.  Mike had indicated the defect was repaired.

4   Q.  So if the defect was not repaired that day and was never

5   repaired, that means Mike is lying, doesn't it?

6   A.  Hypothetically, yes.

7   Q.  And so going back out to the defect and seeing if it was

8   still there would let you know, at least possibly, whether

9   Mike was lying.

10  A.  It could be in that moment in time.

11  Q.  And if Mike was lying, that would affect your decision as

12  to whether to fire Mr. Fresquez; right?

13  A.  If Mike was lying, I think that's a different outcome for

14  Mike.

15  Q.  You think it's a different outcome for Mr. Fresquez too;

16  right?

17  A.  I don't think it's a different outcome for what

18  Mr. Fresquez did at the time.

19  Q.  There was one witness who testified in the internal

20  hearing transcript against Mr. Fresquez; right?

21  A.  Uh, Mike Paz, yes.

22  Q.  And if Mike Paz is lying in that transcript, that doesn't

23  change your opinion as to whether Mr. Fresquez should be

24  fired?

25  A.  All other things being equal, no.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Q.  You told Mr. Goman that you have done nothing to

2   investigate Mr. Fresquez's allegations, which are now three

3   years old, because you are waiting for the court process; is

4   that right?

5   A.  Yes.

6   Q.  You are waiting for the jury to tell you what to do?

7          MR. GOMAN:  Objection:  argumentative and improper.

8          THE COURT:  Sustained.

9          MR. THOMPSON:  All right.  Let's go ahead and let the

10  jury decide then.

11         THE COURT:  All right.  That's a comment.  It's not

12  evidence.  So let's -- I direct counsel not to make comments.

13  We don't need that, and I don't like it in court trials.  So I

14  want it to stop.

15         And, by the way, just so you know this, I never care

16  about who wins or loses cases, but I do care that there is

17  respect, dignity, and appropriate solemnity in the courtroom

18  and that the jury is treated that way.

19         All right.  So here's what we are going to do.  We

20  are going to stop for today.  We only have a little bit left

21  to do before you will get the case, so I'm going to order

22  counsel to be here promptly at 8:30 on Tuesday, and we will

23  complete our work on jury instructions.

24         I am ordering the jurors to be here not later than

25  9:15, although it may be 9:30 before we start.  I just don't

1    know how long it's going to take us to finish, but I want you

2    here so we can start hopefully not later than 9:30.

3           And the one bit of evidence we have left to do is to

4    read a deposition transcript.  And how long will that take?

5           MR. GOMAN:  I don't think it will take long, maybe 10

6    minutes.  I also might talk to counsel, with the Court's

7    permission, about just tendering it as an exhibit, only the

8    designated questions, if the Court would allow.

9           THE COURT:  I don't know how the jury would hear it

10   if you don't read it.  It's up to you.  You can file it as an

11   exhibit, but if you want the --

12          MR. THOMPSON:  We have no objection to that.

13          THE COURT:  Okay.  So the jury can read it?  Is that

14   what you are saying?  All right.  We need to go through and

15   make sure that's a manageable thing to be done.  We can talk

16   about that Tuesday morning.  All right.

17          So we will either read the transcript, or it will be

18   received, and you can elect -- you can read it if you choose

19   to once you deliberate.  But then after we finish our work,

20   then I'm going to read the final instructions, and we will

21   have closing argument.

22          Now, Mr. Fresquez has an absolute right once the

23   defendant rests to present a rebuttal case.  And so I'm just

24   asking you for information purposes.  Is it likely -- what's

25   the probability of there being a rebuttal case?  And if so,

1   how long will it likely last?

2          MR. THOMPSON:  We have offered all the evidence that

3   we intend to offer, Your Honor.

4          THE COURT:  So it's unlikely there will be a rebuttal

5   case.

6          MR. THOMPSON:  The chances are slim to none.

7          THE COURT:  All right.  Well, I'm going to ask you

8   that again because I've got to make sure you know that at the

9   time end of the case you have the right.

10          So if there is no rebuttal case, we will have the

11   Court's reading of the instructions and closing argument.  So

12   all of that will be done Tuesday morning, after which you will

13   begin your deliberations.  And the Court will provide a lunch

14   to you Tuesday, so don't bring your lunch of because I have

15   reason to believe that during the lunch hour you will be

16   deliberating.  And how long the jury deliberates is up to you.

17          So you are excused until 9:15 Tuesday morning.

18   Remember to stay off the Internet and avoid doing anything

19   that would violate the instructions I gave you earlier.  And

20   don't show up Monday, because if you do the doors to the

21   courthouse will be locked because it's Presidents' Day.  All

22   right.  You are excused for the weekend.

23      (Jury out at 3:43 p.m.)

24          THE COURT:  Now, Mr. Thompson, I didn't like that

25   last remark.  I don't like snarky remarks in court.  You

17-cv-00844-WYD-SKC          Jury Trial                    V - 1380

1    shouldn't have said the jury will decide.  I want you to stop

2    that.  You have a tendency to get emotional.  I don't like

3    emotions in the courtroom.  It doesn't mean you can't be a

4    fair and zealous advocate, but I don't like anything that's

5    inappropriate.  It just bothers me.  So you are on notice to

6    restrain yourself.  Do you understand?

7              MR. THOMPSON:  I understand, Your Honor.

8              THE COURT:  All right.  Okay.  We are in recess until

9    8:30 Tuesday morning.

10        (Proceedings recessed 3:44 p.m.,

11        February 15, 2019.)

12

13                    REPORTER'S CERTIFICATE

14        I, JULIE H. THOMAS, Official Court Reporter for the
     United States District Court for the District of Colorado, a
     Registered Merit Reporter and Certified Realtime Reporter,
15   CA CSR No. 9162, do hereby certify that I reported by machine
     shorthand the proceedings contained herein at the time and
16   place aforementioned and that the foregoing pages constitute a
     full, true and correct transcript.
17        Dated this 8th day of April, 2019.

18

              _____/s/ Julie H. Thomas_____
19                 Official Court Reporter

20

21

22

23

24

25


Julie H. Thomas, RMR, CRR                              (303)296-3056