1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 17-cv-00844-WYD-SKC
4

5    BRANDON FRESQUEZ,                     Volume VI of VI

6          Plaintiff,                 (Pages 1381 - 1580)

7          vs.

8    BNSF RAILWAY CO.,

9          Defendant.

10   ----------------------------------------------------------

11                     REPORTER'S TRANSCRIPT
                        JURY TRIAL
12
   ----------------------------------------------------------

13
          Proceedings before the HONORABLE WILEY Y. DANIEL,
14   Judge, United States District Court for the District of
   Colorado, and a jury of ten, commencing at 8:42 a.m. on the
15   19th day of February, 2019, in Courtroom A1002, Alfred A.
   Arraj United States Courthouse, Denver, Colorado.

16

17
                          APPEARANCES
18
   For the Plaintiff:
19   NICHOLAS D. THOMPSON and JONATHAN L. STONE, THE MOODY LAW
   FIRM, 500 Crawford Street, Suite 200, Portsmouth, VA 23704
20
   For the Defendant:
21   KEITH M. GOMAN and GILLIAN DALE, HALL & EVANS, LLC,
   1001 17th Street, Suite 300, Denver, CO 80202
22

23

24
        JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25       Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

           Proceedings reported by mechanical stenography;
                transcription produced via computer.

17-cv-00844-WYD-SKC                Jury Trial                      VI - 1382

1                               I N D E X

2    JURY INSTRUCTIONS                                            PAGE

3    Instruction Conference                                       1385
     Instruction Conference                                       1438
4    Instructions of The Court                                    1472

5

     DEFENDANT'S WITNESS                                          PAGE
6
     DEPOSITION TESTIMONY OF THOMAS ROYSTON
7        Read to the Jury                                         1424

8
     MOTIONS                                                      PAGE
9
     BNSF's Motion for Judgment As a Matter of Law
10   Pursuant to Federal Rule of Civil Procedure 50
         Denied As Moot                                           1385
11
     BNSF's Renewed Motion for Judgment As a Matter of
12   Law Pursuant to Fed. R. Civ. P. 50
         Ms. Dale                                                 1448
13       Mr. Thompson                                             1453
         Ruling of The Court                                      1456
14
     Motion in Limine Regarding Claim of Retaliation
15   for Taking Tracks Out of Service
         Ruling of The Court                                      1562
16
     Motion in Limine to Exclude Improper Character
17   Evidence Regarding Alleged Unrelated Misconduct
         Ruling of The Court                                      1562
18
     Defendant's Motion for Mistrial
19       Mr. Goman                                                1579
         Ruling of The Court                                      1579
20

21   CLOSING ARGUMENTS                                           PAGE

22   Mr. Thompson                                                 1495
     Mr. Goman                                                    1530
23

24   JURY VERDICT                                                 PAGE

25   Jury Verdict                                                 1563
     Jury Verdict                                                 1573

Julie H. Thomas, RMR, CRR                            (303)296-3056

1      (Proceedings resumed 8:42 a.m.,

2      February 19, 2019, outside the presence

3      of the jury.)

4          THE COURT:  All right, have a seat.

5          So what we're going to do first is work on the jury

6   instructions.  And then when we finish the jury instructions,

7   we'll take up the Rule 50 motion.

8          Now, I have a question.  Apparently the defendant

9   filed a renewed motion for judgment as a matter of law.  I

10  only had a chance to peruse that this morning.  So does that

11  replace your first one, which means I should deny your first

12  one?

13         MS. DALE:  Yes.

14         THE COURT:  The reason is because this is a new

15  motion.

16         MS. DALE:  It's a new motion.

17         THE COURT:  So I'm going to deny the first one as

18  moot because you have refiled it.  Is that right?

19         MS. DALE:  Yes, Your Honor.

20         THE COURT:  Did the plaintiff get a copy of this

21  renewed motion?

22         MR. THOMPSON:  We haven't read it yet, Your Honor.

23         THE COURT:  No, I understand.  I'm not criticizing

24  whether you've read it.  I just want to know whether you have

25  received it.

1    MR. THOMPSON:  We will pull it off PACER, yes.

2    THE COURT:  That's fine.  I just wonder why -- let me

3    ask defendants.  How come you didn't -- I'm not concerned so

4    much about me.  I'm concerned about the plaintiff.  I mean,

5    you filed your initial motion.  They filed a long response.

6    Then you filed this renewed motion.  Why did you file the

7    renewed motion --

8    MS. DALE:  So, Your Honor --

9    THE COURT:  -- without giving them the courtesy of

10    getting it to them sooner?  That's what concerns me.

11    MS. DALE:  Your Honor, the first motion was at the

12    close of plaintiff's evidence, so it was based solely on their

13    case.  The renewed motion included evidence that we had put

14    on, so it was more of a posttrial motion even though we still

15    have one witness left.  And I was working on it this weekend.

16    There was a lot of information in their response that I had to

17    incorporate, and so, therefore, I just simply didn't get it

18    done as quickly as I wanted to.

19    THE COURT:  I would just note -- this is -- I'm not

20    criticizing the defendant necessarily.  Normally these motions

21    and supplements to them are presented verbally because it's a

22    moving target as the evidence changes.  And what happens is

23    when you file a written document, then the changes mean you

24    have to file a new written document.  You can do it any way

25    you want, but I'm just concerned that the plaintiff -- I can't

1   do anything about it -- hasn't had an opportunity to

2   thoroughly discuss it.

3          Now, I have looked at this, and I don't think it

4   necessarily changes some of my underlying thinking, but I --

5   anyway, enough of that.  So the first motion, which is -- let

6   me get it here, see if I can find it -- is BNSF's Motion for

7   Judgment as a Matter of Law Pursuant to Federal Rule of Civil

8   Procedure 50, filed as document number 135 -- wait -- document

9   number 135, filed on February 14, 2019, is denied as moot

10  because you -- defendant filed on February 18th, or yesterday,

11  document number 141, its renewed motion for judgment.  So this

12  is a new motion, and so, again, the underlying one is denied

13  as moot.  I would note yesterday was a holiday, and I didn't

14  read anything on this case yesterday.  So, anyway, we'll deal

15  with it as we need to.

16         All right.  Here's what we are going to do on jury

17  instructions.  You have got the draft set, and presumably you

18  also have the verdict form, but we are going to do the jury

19  instructions first.  So all we are going to do, we are going

20  to start with plaintiff, is tell me the number of any

21  instruction for which you have a comment.  Whether it's a

22  minor comment, major comment, tell me that number, and I'm

23  going to come back to it.  And we will do the same for the

24  defendant.

25         MR. THOMPSON:  Number 16 --

1          THE COURT:  Have a seat.  I want everybody to stay

2     seated.  Don't jump up and down.  Keep your seats during the

3     charge conference.

4          16?

5          MR. THOMPSON:  And 18.

6          THE COURT:  All right.  Same for the defendant.

7          MS. DALE:  Your Honor, 15 through 21, and 23.

8          THE COURT:  15 through 21, and 23.

9          All right.  So why don't we take these in sequential

10     order from both of you.  So what's the issue with Instruction

11     No. 15?

12          MS. DALE:  And, Your Honor, we also have some from

13     the disputed instructions that were not adopted that we wanted

14     to talk about.

15          THE COURT:  Well, when we finish these, I will give

16     both sides a chance to tender any instructions I didn't

17     include.  We are going to work on what I put together first

18     before we discuss any I didn't include.  If I didn't include

19     them, I didn't think they should be here, but I will give you

20     a chance to argue.

21          What's the issue on 15?

22          MS. DALE:  Under paragraph 1, we'd ask that you add

23     "in good faith" after "protected activity."

24          THE COURT:  And what's the basis for requesting that

25     be added?

Julie H. Thomas, RMR, CRR                              (303)296-3056

1           MS. DALE:  I don't think it's disputed that the

2    statute itself requires that the protected activity be

3    undertaken in good faith.

4           THE COURT:  Mr. Thompson, what's your response?

5           MR. THOMPSON:  Number 16, Your Honor, already

6    includes the definition of good faith, so --

7           THE COURT:  No, she is talking about 15.

8           MR. THOMPSON:  I understand, Your Honor.  What I'm

9    saying is you defined protected activity in Instruction No. 16

10   to include good faith.

11          THE COURT:  Why do we need it twice?

12          MR. THOMPSON:  You don't.  That's our point.

13          THE COURT:  Why do we need it twice?  Number 16 says:

14   "An employee engages in protected activity as defined by the

15   FRSA if the employee, in good faith" -- why would we put it in

16   twice?

17          MS. DALE:  Because Instruction 15 is the overall

18   claim, the elements of the claim, and one of the elements of

19   the claim is that he acted in good faith.

20          THE COURT:  Here's -- I don't like to -- let me say

21   this calmly.  I resist loading up instructions with words that

22   tend to favor one side or the other.  In Instruction No. 16 it

23   clearly says that an employee engages in protected activity as

24   defined by the FRSA if the employee, in good faith, and that's

25   the instruction that defines.  I don't want to put it in

1    number 1 because I've got it in 16.  I don't think we need it

2    twice.  So if that's what you are asking me to do, I'm not

3    going to do it.  If you want to tender one that has "good

4    faith," I will refuse it.  But I think if I do that, that I'm

5    overemphasizing good faith because in Instruction 16 I have

6    told the jury or will tell the jury, unless there's some

7    reason why I don't give it as it's drafted, an employee

8    engages in protected activity as defined by the FRSA if the

9    employee, in good faith -- and then 1, 2, and 3 cover the

10   things that are required.  So I think it's redundant and

11   unnecessary to also put it in 15.

12            All right.  Anything else on 15 from either side?

13            MS. DALE:  Yes.

14            THE COURT:  What else?

15            MS. DALE:  Under paragraph 2, instead of "Defendant"

16   we ask that the sentence say "The decisionmaker."  And that's

17   from the *Lincoln*, the Tenth Circuit case.  It's not that

18   anyone at BNSF knew that he engaged in protected activity, but

19   it's the decisionmaker.

20            THE COURT:  And maybe it should be "The Defendant's

21   decisionmaker."

22            MS. DALE:  And that's fine, Your Honor.

23            THE COURT:  It wouldn't be just the decisionmaker.

24   It would be -- the decisionmaker needs to be a representative

25   of the defendant.  What's your response to that?

1          MR. THOMPSON:  Your Honor, that would be a mistake of

2    law to change that.  Under the contributing factor standard,

3    it does not need to be the decisionmaker.  For example, let's

4    say that Mark Carpenter and Michael Paz conspired to lie

5    during the hearing and Adam Miller never knew it.  It still

6    contributed, and they still would not have taken the same

7    adverse action.  The decisionmaker knowledge piece that comes

8    from *Lincoln* is a totally different issue.  In *Lincoln* the

9    employees were applying for positions.  Therefore, the

10   decisionmaker's knowledge was relevant.  It's not a

11   retaliation case.  If you look at *BNSF Railway Co.*, which is a

12   retaliation case in the Tenth Circuit, the Court makes clear

13   it's the defendant's knowledge and whether it contributed, not

14   whether the decisionmaker knew.  This is essentially a new

15   element that no court has ever instructed in an FRSA case.

16          THE COURT:  Let me note here Instruction No. 18 says:

17   "A contributing factor is any factor, which alone or in

18   combination with other factors, tends to affect in any way the

19   outcome of the unfavorable action.  For protected activity to

20   be a contributing" -- that's not what we're talking about

21   here.  We are just talking about the test.  Let me just see

22   because I have got a chart here.  I just want to look at my

23   sources for 15, because I don't really want to -- I don't want

24   to -- I think 15 is just the overarching instruction that

25   talks about the key elements of the claim, but then the

1    instructions that follow clarify what some of these words

2    mean.  And I need to have a case, I guess, from the defendant

3    that says that what you want to propose is required under the

4    law.

5            MS. DALE:  And, Your Honor, I'm looking at *Lincoln*.

6    This is 900 F.3d 1166 at 1212, 1211.

7            THE COURT:  I've got the case.  Where in the case are

8    you referring?

9            MS. DALE:  Page 1212.  Under section 3 it says --

10           THE COURT:  Hold on.  1212.  All right.  You're

11   talking about "Decisionmaker's Knowledge and Retaliatory

12   Motive"?

13           MS. DALE:  Correct.  At the end of that first

14   paragraph it says:  "The district court correctly focused on

15   the decisionmaker's knowledge and motive when analyzing

16   Appellants' FRSA retaliation claims."

17           THE COURT:  All right.  So, Ms. Dale, I have a

18   question for you.  So when you go back to an earlier part of

19   the *Lincoln* case, and it's on page 1212, yeah, just before the

20   paragraph that is entitled "Decisionmaker's Knowledge and

21   Retaliatory Motive," it says:  "('Any action brought under the

22   enforcement section of the FRSA shall be governed by the legal

23   burdens of proof set forth in section 42121(b).')  This

24   burden-shifting framework places the initial burden on an

25   employee to establish a prima facie case by showing that '(1)

1    the employee engaged in a protected activity;" -- and the

2    first prong of the Instruction No. 15 says, "He engaged in a

3    protected activity as defined by the FRSA."

4           And then going back to the *Lincoln* case -- "(2) the

5    employer knew that the employee engaged in the protected

6    activity;" -- now, when they talk about the test, they don't

7    say the decisionmaker.  They say the employer.  And I

8    substituted the word "defendant" for the "employer" because I

9    think they are one and the same.  So the employer knew the

10   plaintiff engaged in the protected activity.

11          "(3) the employee suffered an unfavorable personnel

12   action; and (4) the protected activity was a contributing

13   factor in the unfavorable action.'"

14          I'm not going to expand number 15 any broader than

15   what is cited as the initial prima facie case.  So to the

16   extent you want me to sort of modify these words so that it

17   gives the defendant an advantage in Instruction 15, I think

18   that's wrong.  It moves this instruction from being a balanced

19   instruction.  So I'm going to follow what I believe to be is

20   the language in *Lincoln* that's operative for purposes of

21   Instruction 15.  So I don't agree with what you just

22   suggested, so I'm going to leave it the way it is because I'm

23   following what the case law says.

24          All right.  Anything else on 15?

25          MS. DALE:  Yes, Your Honor.  Under paragraph 3 where

1   it says "suffered an unfavorable personnel action," I

2   understand that's what *Lincoln* says, and I understand you want

3   to stick with *Lincoln*.  What we don't have anywhere else,

4   though, and maybe we put it somewhere else, is that the

5   personnel action at issue here is the termination.

6   Mr. Thompson has argued, both in opening and in his response

7   brief, that the unfavorable action is the charge, and we don't

8   think that's right as a matter of law.  It's the termination.

9          THE COURT:  Well, I don't know.  Some of this is

10  going to be covered when I make a ruling on this Rule 50

11  motion, but I'm going to -- I'm going to adhere to the

12  language of *Lincoln* because that's how I ensure that

13  instructions are only based on the law, as opposed to words

14  that a party wants to insert to make the instruction of law

15  more favorable.  Again, I've told you I don't care who wins

16  this case or any case, but I'm committed to following the law.

17  So I'm going to follow what *Lincoln* says as it relates to

18  Instruction No. 15.  All right.  So I'm not going to add that

19  either.

20         Do you have anything else you want to say,

21  Mr. Thompson?

22         MR. THOMPSON:  No, Your Honor.

23         THE COURT:  All right.  Anything else, Ms. Dale, on

24  Instruction No. 15?

25         MS. DALE:  No, Your Honor.

1      THE COURT:  Let's go to Instruction 16, which was

2   raised by both of you, and let me just talk about Instruction

3   16.  I slightly amended plaintiff's proposed instruction to

4   make it simpler.  Defendant's proposed instruction copies and

5   pastes from the statute, but I think the statute defines

6   protected activity in a complicated way.  Defendant's proposed

7   instruction adds a fourth definition of protected activity

8   based on a portion of the FRSA that plaintiff did not plead.

9   Defendants claim the instruction on the fourth definition is

10   necessary if plaintiff offers evidence that his refusal to

11   work on May 5th, 2016, is protected activity.  I think that

12   the instruction on the fourth definition is unnecessary

13   because it is not a protected activity that plaintiff is

14   trying to prove, and plaintiff can cannot, therefore, argue

15   taking tracks out of service is a protected activity to

16   support his retaliation claim.

17      We'll come back to all of that, but that's sort of my

18   summary for why it's worded.  Let me hear from both of you,

19   you going first, Mr. Thompson.  What is your issue with

20   Instruction 16?

21      MR. THOMPSON:  We'd like a small change after "in

22   good faith."  We'd like to add --

23      THE COURT:  Where?  In the first sentence?

24      MR. THOMPSON:  Yes, Your Honor.  In the first line

25   after "good faith" we would add "does any of the following,

1    was perceived to have done any of the following, or was

2    perceived to about to be doing the following."  The plain

3    language of the statute includes not only activity that was

4    done but also that was perceived to have been done or about to

5    be done.

6         THE COURT:  All right.  I've got the statute here.

7    Where are you referring to that language in the statute?  I've

8    got the statute right here in front of me.

9         MR. THOMPSON:  On 20109(a), the first part of the

10   language ends with "or perceived by the employer to have been

11   done or about to be done."

12        THE COURT:  Okay.  And this is 49 U.S.C. Section

13   20109(a) says:  "In general -- A railroad carrier engaged in

14   interstate or foreign commerce, a contractor or a

15   subcontractor of such a railroad carrier, or an officer or

16   employee of such a railroad carrier, may not discharge,

17   demote, suspend, reprimand, or in any other way discriminate

18   against an employee if such discrimination is due, in whole or

19   in part, to the employee's lawful, good faith act done, or

20   perceived by the employer to have been done or about to be

21   done."

22         Is that what you are talking about?

23        MR. THOMPSON:  Yeah.  We are just missing the

24   "perceived to have been done or about to be done" part.

25         THE COURT:  What's your response, Ms. Dale, to adding

 1   this language of the statute after "good faith" which I just

 2   read?

 3          MR. GOMAN:  Your Honor, the defendant's position is

 4   that there's no facts in this case that would support adding

 5   that language here.  I'm not sure what the theory would be as

 6   to what was about to be done or perceived to have been done

 7   that could make those clauses relevant in this case.

 8   Plaintiff has not, for instance, pled that BNSF thought he was

 9   about to engage in some sort of protected activity so they

10   peremptorily fired him.  So those words that are in the

11   statute, I don't think they apply in this case.

12          THE COURT:  So I asked Ms. Dale to speak, and the

13   record should reflect that Mr. Goman spoke, which is okay, but

14   I wanted to make sure that he didn't change his name before he

15   started talking.

16          What's your reply to what he's just said?

17          MR. THOMPSON:  Yes, Your Honor.  As I understand,

18   part of BNSF's defense is that Mr. Fresquez, in fact, did not

19   report Michael Paz to the FRA; he just called the FRA.

20   However, if Mr. Paz perceived Mr. Fresquez to be reporting him

21   to the FRA, that's sufficient.  Similarly, part of our

22   allegations is that BNSF essentially drew a line in the sand

23   and were concerned not only about what Brandon had done but,

24   given that he had now gone to the FRA, what he would continue

25   to do.

 1              THE COURT:  Hold on a second.

 2         All right.  I'm going to add this language because it

 3    comes from the statute.  We certainly can't be harmed by

 4    adding language from the statute.  And then it's up to the

 5    parties to argue whether or not it applies or doesn't apply.

 6         So the question is, in the statute it says -- the

 7    statute talks about "good faith act done," but I think we can

 8    just use the word "good faith" because of the way I've got

 9    this worded, and then we would add the language of the statute

10    "or perceived by the employer to have been done or about to be

11    done"?  Does that -- give me your proposed language --

12              MR. THOMPSON:  Sure.

13              THE COURT:  -- so that it paraphrases but doesn't

14    distort what the statute says.

15              MR. THOMPSON:  At the end of "good faith" in sentence

16    one we would put "does any of the following" --

17              THE COURT:  Say it again.

18              MR. THOMPSON:  "Does any of the following" --

19              THE COURT:  Wait a minute.  Does, D-o-e-s?

20              MR. THOMPSON:  Yes, sir.

21              THE COURT:  Does any of the following --

22              MR. THOMPSON:  -- "was perceived by the employer" --

23              THE COURT:  Does any of the following -- and that's

24    in relationship to what is noted in 1, 2, and 3?

25              MR. THOMPSON:  Yes, Your Honor.

1        THE COURT:  Does any of the following -- go ahead.

2        MR. THOMPSON:  -- "was perceived by the employer to

have done any of the following" --

4        THE COURT:  Was perceived by the employer?

5        MR. THOMPSON:  To have done any of the following.

6        THE COURT:  To have done any of the following.

7        MR. THOMPSON:  -- "or about to do any of the

following."

9        THE COURT:  Or -- this is too wordy.  All right.  Let

me just say this.  I'm not going to add -- that's almost

unintelligible the way it reads.  Here's what I think.  If we

are going to change this to make it conform to the statute,

then probably what we need to do is say:  "A railroad carrier

engaged in interstate or foreign commerce" -- we can take out

"a contractor or a subcontractor" because that's not what we

are talking about.  So it would be:  "A railroad carrier

engaged in interstate" -- maybe "in interstate commerce."  We

are not talking about foreign commerce, are we?

19       MR. GOMAN:  No.

20       THE COURT:  Okay.  So:  "A railroad carrier engaged

in interstate commerce" -- and we will put some ellipsis

there -- "may not discharge, demote, suspend" -- is the only

one here that really applies here reprimand -- I mean, not

reprimand, um -- well, maybe -- is discharge the only one that

applies?

17-cv-00844-WYD-SKC        Instruction Conference              VI - 1398

 1            MR. THOMPSON:  No, Your Honor.

 2            MR. GOMAN:  Yes.

 3            MR. THOMPSON:  Also "or in any other way discriminate

 4     against any employee."

 5            THE COURT:  All right.  Here's what I'll do.  I think

 6     I would put all these in just so the jury understands.

 7     "...may not discharge, demote, suspend, reprimand, or in any

 8     other way discriminate against an employee if such

 9     discrimination is due, in whole or in part, to the employee's

10     lawful, good faith act done, or perceived by the employer to

11     have been done or about to be done."  I think the only way

12     that I feel comfortable adding this other language is if I

13     quote it literally from the statute, because otherwise we are

14     doing something to benefit you that I said I wasn't going to

15     do for the defendant.

16            And then after we've quoted that, then we need a

17     lead-in for 1, 2, and 3.  So we need to play with this a

18     little bit.

19            Is there any objection to me quoting the statute by

20     deleting the things that don't apply, and then we can pick it

21     up with 1, 2, and 3?  And we may need another lead-in, so we

22     are going to rework this.

23            MR. GOMAN:  The defendant's -- and this is Mr. Goman

24     again.  The defendant's objection is if the Court --

25     Instruction No. 16 is just defining protected activity.

1           THE COURT:  Right.

2           MR. GOMAN:  If the Court includes in that definition

3    essentially the whole lead-in to the statute, I think it's

4    confusing, and I think it adds to our burden of proof that we

5    have to prove in addition to the four elements in the previous

6    instruction --

7           THE COURT:  Let's do this.  I want to rework this in

8    a way that incorporates "or perceived by the employer to have

9    been done or about to be done."  You will look at it again,

10   and then let's talk about it again.

11          MR. GOMAN:  Okay.

12          THE COURT:  It doesn't make sense to argue about

13   something that we haven't rewritten yet.  All right.  So I'm

14   going to come back to 16.  So I'm going to direct my law

15   clerk, who writes fast and thinks fast, to see if he can come

16   up with something, and then we can have you look at that in

17   the next several minutes.

18          What about 17?  What's the issue on 17?

19          MR. GOMAN:  We did have an additional comment on 16,

20   but if we are going to come back to it --

21          THE COURT:  I don't want to talk about 16 until I

22   give you a revised instruction.  That's what I just said.  I

23   think I'm talking in plain English, so listen to me, please.

24          What's the issue on 17?

25          MS. DALE:  Your Honor, on 17 we would ask that under

17-cv-00844-WYD-SKC        Instruction Conference              VI - 1400

1  the second and third prongs that are listed here --

2          THE COURT:  I can't hear what you're saying.  Second

3  and third prongs of what?

4          MS. DALE:  So there's three things listed here under

5  good faith.  Under the second and third prongs, under the

6  statute itself, under the plain language of the statute, we

7  believe it must say that the plaintiff must show an actual

8  violation of the law or an actual hazardous and safety

9  condition.

10          THE COURT:  So do you have a proposed instruction

11  that has your additional language, or are you just verbally

12  giving me this?

13          MS. DALE:  It would be in the originally submitted

14  instructions.

15          THE COURT:  Did you bring extra copies of those?  I

16  should have told you to, but show me what you -- I have it up

17  here.  My law clerk says I have it up here.  Which one is it?

18  Which of your proposed instructions are you talking about?

19          MS. DALE:  I apologize, Your Honor.  I'm looking.

20          THE COURT:  Okay.  It's your number 17.

21          MS. DALE:  So it's Disputed Instruction No. 3 on

22  filing 103-1.

23          THE COURT:  I rejected this.  That's why I rewrote it

24  the way I wrote it.  All right.  So I'm looking at your

25  Disputed Instruction No. 3.  What language are you asking me

Julie H. Thomas, RMR, CRR                        (303)296-3056

1    to include?  Everything that's in what you proposed?

2           MS. DALE:  So from "this requires" forward.  Well,

3    and I guess it would really be sections 1 and 2 under here,

4    because the instruction you have now does say was objectively

5    reasonable, this is subjective and objective components, but

6    what it's missing is that the plaintiff actually believed that

7    he was providing information to the FRA about violations of

8    federal law, he actually believed that he was refusing to

9    violate federal law, or he actually believed that he was

10   reporting hazardous safety or security condition and, under 3,

11   he was reporting actual violations of federal law or actual

12   hazardous safety and security conditions.  I don't mean

13   security.  That's not really the issue.

14          THE COURT:  Let me hear a response from you,

15   Mr. Thompson, on what the defendant proposes.

16          MR. THOMPSON:  Defendant seems to be asking for two

17   different things.  Regarding the actually believed, that's

18   what subjectively means, so it would be redundant.  Regarding

19   the actual violation, that is a misstatement of law that's

20   been rejected, as far as I know, by every court, including

21   most recently the Ninth Circuit.  That also makes sense given

22   the statute's nature.  It wouldn't make sense to require it to

23   be an actual violation of law.  For example, we don't want

24   track workers hesitating to avoid a dangerous order because

25   they are unsure if it's actually a violation of law.  So the

1    courts give them latitude.  As long as they subjectively

2    believe it and that belief is objectively reasonable, they

3    have a right to refuse.

4         THE COURT:  All right.  I would note that Instruction

5    No. 16, which we are going to rewrite to include that first

6    part, clearly says:  "An employee engages in protected

7    activity as defined by the FRSA if the employee, in good

8    faith, 1, lawfully provides information, directly causes

9    information to be provided, or directly assists in any

10   investigation regarding any conduct which the employee

11   reasonably believes constitutes a violation of any Federal

12   law, rule, or regulation relating to railroad safety if the

13   information is provided to an employee's supervisor or the

14   FRA."

15        I think it is redundant and slants this instruction

16   in favor, which I never do, of the defendant if we put that

17   "actual violation" language in there.  Plus, I don't think

18   that plaintiff, under the law, needs to prove an actual

19   violation of the FRSA with regard to 49 U.S.C. Section

20   20109(a)(1)(C) because that section only requires an employee

21   to have a, quote, reasonable belief, unquote, regarding a

22   violation of federal law.  So I'm not going to give this

23   instruction.  If you have a clean copy, because I don't have a

24   clean copy, I'll refuse it because I think that what you want

25   me to give is not consistent with the law, and it slants and

1   distorts this instruction in favor of the defendant, and I

2   never give such instructions in any case.  Do you have a clean

3   copy?  Give it to me, and I will refuse it with my stamp.

4         MS. DALE:  I don't have a clean copy, but just for

5   the record, we can refer to ECF 103-1, Disputed Instruction

6   No. 3.

7         THE COURT:  I meant to -- we got busy.  I meant to

8   tell both sides to bring their -- because I need to refuse

9   this.  I need to have -- my law clerk will print it off.

10  Mr. Keech, can you print it off?

11        COURTROOM DEPUTY:  I can, Your Honor.  103?

12        THE COURT:  Is it number 3?  Yeah, let me have it,

13  and I will refuse it.

14        COURTROOM DEPUTY:  Is it Instruction No. 3?

15        MS. DALE:  It's Disputed Instruction No. 3.

16        THE COURT:  So let me -- let me skip to something

17  here, because I want to -- the jury is here.  I want to go

18  ahead and read this deposition.  This is going to take us

19  longer because my sense is now that the defendant is going to,

20  instead of commenting on these, you are going to want to

21  substitute some of these instructions I have already objected.

22  And I can explain why I have done it, but -- oh, I see.  So

23  it's -- all right.  So this is confusing what you have filed.

24  This disputed instruction talks about what the plaintiff

25  proposed and what the defendant proposed, and the language

1    that you propose is what's on the first page -- what page

2    contains this language that you have suggested I include but

3    I'm not going to include because I think it slants the

4    instruction?

5          MS. DALE:  It's under Defendant's Proposal, and

6    really the focus is section 3 where it says "he was reporting

7    actual violations of federal law."

8          THE COURT:  Okay.  Well, I think that's covered by

9    the Court's prior instructions.  I'm not going to give it

10   twice.  All right.  I'm going to refuse this in the interest

11   of time here.

12         Does plaintiff have anything else you want to say

13   on --

14         MR. THOMPSON:  No, Your Honor.

15         THE COURT:  Okay.  Let me refuse this.  If this case

16   is appealed, the Court of Appeals can understand what I'm

17   refusing.  Let me sign this 2/19.  All right.  Let me put this

18   aside.

19         So let's then go to 18.  What's the issue on number

20   18, from the defendant's perspective?

21         MR. THOMPSON:  Your Honor, plaintiff takes issue with

22   this instruction as well.  Would you like us to go first, or

23   do you want defendant?

24         THE COURT:  I want you to go first.  You did say 18.

25         MS. DALE:  We don't have an issue with 18.

1        THE COURT:  Oh, you don't?  All right.

2        MR. THOMPSON:  We take issue with the second sentence

3    where "For protected activity to be a contributing factor in

4    an unfavorable action, the employee must prove the

5    decisionmakers had knowledge" -- and continues on.  We take

6    issue with that for two reasons.

7        Number one, the language that it comes from is

8    *Lincoln*.  *Lincoln* does not deal with a retaliation case.

9    *Lincoln*, while it's instructive, is dealing with essentially

10   an accommodation case.  And so there it does matter if the

11   supervisor knows because the supervisor is solely making the

12   decision to either give the job or not give the job.

13        A much more helpful case is *BNSF Railway Co.*, which

14   is 816 F.3d 628.  And if the Court looks at 638 --

15        THE COURT:  Hold on.  Do I have that case up here?

16   All right.  I've got the case.  So what are you focusing on in

17   that case?

18        MR. THOMPSON:  638 through 639 talks about the

19   plaintiff's burden in a retaliation case.  And the problem

20   with the instruction as under *Lincoln*'s understanding of the

21   law is this.  BNSF has a discipline process set up that

22   removes the decisionmaker, in this case Adam Miller and

23   Stephanie Detlefsen, from the process, and so they could never

24   retaliate.  There could never be retaliation because the

25   decisionmaker never knows.  That's why the law incorporates

1    contributing factor, so that if Michael Paz lies and Mark

2    Carpenter unfairly charges Brandon Fresquez, it can still

3    contribute.  Now, the defendant can show that Adam Miller

4    didn't know and would have taken the same actions and avoid

5    liability.  And so the decisionmakers' knowledge still

6    matters, but not at the contributing factor stage, Your Honor.

7            THE COURT:  What's the defendant's response to what

8    he's just saying?

9            MS. DALE:  Your Honor, Mr. Thompson said that *Lincoln*

10   was an accommodation case, not a retaliation case.  There was

11   an ADA claim in *Lincoln* as well, but that's a separate claim.

12   There is an entire section on the FRSA, and the court said:

13   "The district court correctly focused on the decisionmaker's

14   knowledge and motive when analyzing Appellant's FRSA

15   retaliation claims."  So it is a retaliation case.  The court

16   goes on to say:  "For how can decisionmakers retaliate against

17   an employee for taking protected activity if they do not know

18   about the protecting activity?"

19           I believe that *Lincoln* controls in this case.

20           Mr. Thompson also argued that due to BNSF's process

21   that they insulate the decisionmaker, they could never know

22   about protected activity.  And yet in this case they are

23   arguing and they have argued in their response to the Rule 50

24   motion that both the decisionmakers did know about the

25   protected activity, so I think that's inconsistent.

17-cv-00844-WYD-SKC      Instruction Conference          VI - 1407

1          THE COURT:  All right.  Let me just make a couple

2     observations.  The *BNSF Railway Company versus U.S. Department*

3     *of Labor* case was decided in 2016, and so it predates *Lincoln.*

4     So I think *Lincoln* is the controlling law that I've got to

5     follow, and that's what I'm going to do, but let me just talk

6     about what *Lincoln* says and it doesn't say.

7          All right.  Now, on page 1213 *Lincoln* says the

8     following:  "Similarly, as the FRSA protects employees from

9     retaliation for their engagement in protected activity" --

10    then it cites some cases from the Seventh Circuit and the

11    Eighth Circuit -- "it follows that the decisionmaker" or

12    makers "must have knowledge of the protected activity.  For

13    how can decisionmakers retaliate against an employee for

14    taking protected activity if they do not know about the

15    protected activity?"  Then it says "See *Koziara*," which is the

16    Seventh Circuit case noted above.  "Accordingly, we join those

17    courts that have concluded an FRSA plaintiff advancing a

18    retaliation claim" -- which is exactly what we are talking

19    about here -- "must demonstrate the decisionmaker had actual

20    knowledge of the protected activity."

21          Now, let's talk about what this instruction says.

22    "For protected activity to be a contributing factor in an

23    unfavorable action, the employee must prove the decisionmakers

24    had knowledge of the protected activity."  And this language,

25    then, "The decisionmaker's retaliation was prompted by the

1    employee engaging in protected activity" came actually from an

2    Eighth Circuit case.  I can give you that case if you need it.

3           So with the understanding that I'm going to follow

4    what's in *Lincoln,* is there still a continuing objection by

5    the plaintiff to Instruction No. 18?

6           MR. THOMPSON:  There is, Your Honor.

7           THE COURT:  Why?

8           MR. THOMPSON:  We think it's an incorrect statement

9    of the law, and we want to preserve the objection for appeal,

10   if necessary.

11          THE COURT:  All right.  We are going to leave 18 the

12   way it is.  And it's acceptable to the defendant; right?

13          MS. DALE:  Yes, Your Honor.

14          THE COURT:  All right.  So I'm going to leave 18 the

15   way it is for the reasons noted.

16          All right.  Let's go to Instruction 19.

17          MS. DALE:  Your Honor, the issue with Instruction 19

18   is the one we raised earlier about the unfavorable personnel

19   action.  I don't know that it necessarily needs to be in this

20   instruction, but somewhere we need some instruction clarifying

21   that the personnel action at issue here is the termination and

22   not the charge.

23          THE COURT:  Respond to that, Mr. Thompson.

24          MR. THOMPSON:  It's both, and the case law holds

25   clear that an adverse action under FRSA cases, because of the

1   language in the statute that the Court has already read, is

2   less than in Title VII cases.  Indeed, the ARB, the

3   administrative review board, which receives *Chevron* deference,

4   has explicitly said charging an employee with a rules

5   violation, even if he is exonerated in the process, is an

6   adverse action.

7       THE COURT:  All right.  For now I'm going to leave

8   Instruction 19 the way it is.  Plaintiff has no objection to

9   it, do you?

10      MR. THOMPSON:  No, Your Honor.

11      THE COURT:  All right.  What about Instruction 20?

12  One of you said 15 through 21, that's why I'm -- but then

13  Ms. Dale said she had no objection to 18.  What's the issue on

14  20?

15      MS. DALE:  The issue with 20 is in the last phrase

16  where it starts with "unless."  I think it's misleading

17  because it says, "unless you find that the Plaintiff's

18  protected activity was a contributing factor in the

19  unfavorable action."  I think what would be a better statement

20  after "personnel manager" is:  "Your function is to decide

21  whether the decision violated the law."  Because as it is, it

22  implies that the jury can, um, second-guess the defendant's

23  business decisions if it found the protected activity was a

24  contributing factor.  So I think the way I phrase it is more

25  clear.

1          THE COURT:  All right.  So give me your -- I'm just

2    going to write it on here.  Give me your revised language that

3    you propose to put in to replace the wording that starts with

4    the word "unless."  Just read it to me.

5          MS. DALE:  Okay.  "Your function" --

6          THE COURT:  Is this a new sentence or continuation?

7          MS. DALE:  Yeah.  So period after "manager."

8          THE COURT:  Okay.  So "Your function" --

9          MS. DALE:  Is to decide.

10          THE COURT:  "Your function is to decide" --

11          MS. DALE:  Whether the decision.

12          THE COURT:  -- "whether the decision" --

13          MS. DALE:  Violated the law.

14          THE COURT:  -- "violated the law."

15          Let me read this whole thing again silently.  Hold

16    on.

17          All right.  What's your position, Mr. Thompson, on

18    Ms. Dale's proposal to put a period after "manager" and add

19    the words:  "Your function is to decide whether the decision

20    violated the law"?

21          MR. THOMPSON:  We think Instruction No. 20 as written

22    is a correct statement of the law.  The business judgment

23    exception does not apply to FRSA cases.

24          THE COURT:  Does not apply to what?

25          MR. THOMPSON:  To FRSA cases, Federal Railway Safety

1    Act cases.

2           THE COURT:  No, I understand.  What case law says

3    that?

4           MR. THOMPSON:  There's an abundance, including the

5    ARB, which receives *Chevron* deference.  If you will bear with

6    me, I can pull it up.

7           THE COURT:  Well, there's case law that says the

8    Tenth Circuit and courts in this district regularly apply the

9    business judgment rule in employment cases in cases involving

10   alleged retaliation under Title VII.  So if you are saying

11   that the business judgment rule doesn't apply in FRSA cases, I

12   need a case from the Tenth Circuit that says that's true.

13          MR. THOMPSON:  It will not be a Tenth Circuit case,

14   Your Honor.  There's not one in the Tenth Circuit either way.

15          THE COURT:  Let me hear from the defendant.  What is

16   the case law you are relying on to say the business judgment

17   rule applies in FRSA cases?

18          MR. THOMPSON:  For example, *Elliot* --

19          THE COURT:  No, I'm asking Mr. Goman.  I want him to

20   tell me.

21          Go ahead.

22          MR. GOMAN:  Your Honor, Mr. Goman on behalf of the

23   defendant.  *Kuduk* is the Eighth Circuit case that was cited in

24   *Lincoln* with approval.  It specifically holds that the

25   business judgment rule is appropriate in FRSA cases.  I

1    believe, but I am going from memory, I believe *Koziara* in the

2    Seventh Circuit holds the same thing, although I think

3    Mr. Thompson was involved in that case, so I might defer to

4    him.

5              THE COURT:  All right.  Hold on.  I've got *Koziara*

6    here.  Also I have got *Kuduk*.  Can you me refer me to the

7    language?  Do you have those cases here with you?

8              MR. GOMAN:  I do.  I don't have the language

9    highlighted.  I'm looking for it now.

10             Your Honor, here's a quote from *Kuduk* that I think is

11   on point, 768 Federal 3d at 792.

12             THE COURT:  All right.  Let me get to 792.

13             MR. GOMAN:  "Kuduk argues that 'serious questions

14   exist as to whether he in fact committed the rule violation

15   Jaeb alleged,' in essence, that BNSF misapplied the

16   fouling-the-track rule and thus wrongfully discharged him.

17   However, 'federal courts do not sit as a super-personnel

18   department that re-examines' an employer's disciplinary

19   decisions."

20             THE COURT:  I'm looking at this, but I'm not

21   seeing -- I've got the case here.  I see 792.  Where did you

22   pick up what you were reading?

23             MR. GOMAN:  We have it quoted in our brief as 768

24   Federal 3d at 792.  I'm pulling it up on my computer here to

25   confirm that cite.

1       THE COURT:  Are the jurors here, Robb?

2       COURTROOM DEPUTY:  They are here.

3       MR. GOMAN:  It is on page 792, Your Honor.  There's a

4    paragraph that starts "In this case, it is particularly

5    significant..."

6       THE COURT:  I see.  "In this case, it is particularly

7    significant..."  Is that what you were just reading?

8       MR. GOMAN:  It is.  I was quoting from the third

9    sentence of that paragraph.

10       THE COURT:  All right.  Hold on.  And I would note

11    that in *Lincoln* the Tenth Circuit cited with approval to

12    *Koziara versus BNSF*, 840 F.3d 873, 878, Seventh Circuit 2016,

13    and *Kuduk*, the case we are now focusing on, *versus BNSF*, 768

14    F.3d 786, 787, Eighth Circuit 2014.

15       All right.  Hold on.  Let me reread this language.

16       No, I disagree with you, Mr. Thompson.  I think this

17    case, coupled with language from *Koziara,* say that the

18    business judgment rule does apply in FRSA cases.  Now, while

19    the Tenth Circuit didn't decide that squarely in *Lincoln*, it

20    cites with approval to these other two cases.

21       So I'm going to give this instruction.  So the only

22    question is whether or not I should change it to reflect what

23    Ms. Dale has requested or whether I should leave it the way it

24    is.  So give me your position on that, please.

25       MR. THOMPSON:  Your Honor, for preserving the record,

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   may I read one line out of *Elliot* and cite to the case?

2          THE COURT:  When you say *Elliot*, what -- sure.  Give

3   me the full cite.

4          MR. THOMPSON:  Sure.  It is *Elliot v BNSF Railway*

5   *Co.*, it is a Ninth Circuit opinion, and it is --

6          THE COURT:  What year?

7          MR. THOMPSON:  2018, Your Honor.

8          THE COURT:  All right.  Go ahead.

9          MR. THOMPSON:  It's Lexis 5434 or Westlaw 1127115.

10  To quote from that opinion, it says:  "The business judgment

11  rule is not a legal defense to an FRSA claim, and BNSF cites

12  no authority for the proposition that the trial court must

13  give such an instruction in FRSA retaliation cases."

14         THE COURT:  By the way, actually I was familiar with

15  that case.  The Ninth Circuit, however, does not discuss why

16  the business judgment rule is not a legal defense.  Further,

17  the court only held that the district court did not abuse its

18  discretion in not providing a business judgment rule

19  instruction.  Therefore, I think this Ninth Circuit case is

20  distinguishable, and it's not one that I believe should be

21  followed by this Court, given what's in *Lincoln*.  That isn't

22  directly on point, but it supports a contrary position from

23  these other cases.

24         All right.  So, yeah, I let you read that, but what

25  is your position on whether or not we should change it to

1    reflect what Ms. Dale is proposing or to leave it the way it

2    is?

3           MR. THOMPSON:  While preserving our objection, we are

4    indifferent between the two.

5           THE COURT:  All right.  Then I'm going to put a

6    period after "manager," and I'm going to go with what Ms. Dale

7    proposed.  So we are going to put a period after "manager" and

8    add these words:  "Your function is to decide whether the

9    decision violated the law."  All right.  And we will revise

10   number 20 to reflect that.

11          Let's go to Instruction 21.  What's the issue there?

12          MS. DALE:  I believe we both have issues, so does the

13   plaintiff --

14          THE COURT:  I can't hear what you're saying,

15   Ms. Dale.

16          MS. DALE:  I believe we both had cited that one,

17   so --

18          THE COURT:  So let's have the plaintiff go first.

19          MS. DALE:  No, I'm sorry.  I'm incorrect.  It was

20   just me.  So in the second paragraph talking about "In

21   calculating compensatory damages" --

22          THE COURT:  Right.

23          MS. DALE:  -- we would just ask that "or benefits" be

24   added after "front pay" both times it appears in this

25   paragraph.

1        THE COURT:  "In calculating compensatory damages, you

2   should not consider any back pay or front pay that the

3   Plaintiff lost.  The award of back pay and front pay, should

4   you find the Defendant liable on the Plaintiff's claim" -- why

5   isn't that sufficient?  I've used this before in other cases

6   where, in Title VII cases, I've determined, as I did here

7   that, that equitable -- I don't -- to me this is broad enough.

8   We are telling the jury that the only damage claims that they

9   can award on would be plaintiff's claims for any emotional

10  distress, pain, suffering.  I think it's clear.

11       What do you think, Mr. Thompson?

12       MR. THOMPSON:  We think it's clear, Your Honor.

13       THE COURT:  I'm not going to change 21.  That doesn't

14  make any sense.  Anything else you want to say on 21?

15       MS. DALE:  The other issue -- well, two other issues.

16  One is just a typo at the bottom.  It's "her" instead of

17  "his."

18       THE COURT:  I'm sorry?

19       MS. DALE:  There's a typo at the bottom.

20       THE COURT:  Where is the typo?  I always want to

21  change typos.

22       MS. DALE:  Third line from the bottom where it says

23  "her."

24       THE COURT:  Oh, yes.  "On the other hand, the law

25  does not require that the Plaintiff prove the amount of his

1    losses" -- I agree.  Mr. Fresquez, I'm not changing your

2    gender.  And to the extent that was in there, I apologize.

3    And your lawyer didn't even catch that, but the defendant's

4    lawyer caught it.  So we are going to change the pronoun from

5    "her" to "his."

6            MS. DALE:  Then just one other substantive concern

7    with the respect to the emotional distress damages.

8            THE COURT:  Yes.

9            MS. DALE:  We mentioned this in the original Rule 50

10   motion.  The plaintiff really has only claimed garden variety

11   emotional distress damages.  He's not sought any treatment.

12   He's not retained an expert to demonstrate that he has

13   anything beyond emotional -- garden variety emotional

14   distress.  But the testimony that he gave at trial we believe

15   is inconsistent with garden variety emotional distress, saying

16   that three years later he's still so distressed that he can't

17   coach a baseball team.

18           THE COURT:  Well, the jury will have to evaluate the

19   evidence.  I'm not going to change the instruction because I

20   think that there is sufficient evidence, viewing the evidence

21   in the light most favorable to plaintiff, to allow the jury to

22   consider damages.  I'm precursing I'm not going to strike

23   damages when we get to the Rule 50 motion.

24           All right.  So if that's your objection, it's

25   overruled, and Instruction 21 will be given as written, except

17-cv-00844-WYD-SKC      Instruction Conference             VI - 1418

1   we are changing the pronoun "her" to "his."

2           All right.  Anything else on the instructions from

3   either side --

4           MS. DALE:  We have one.

5           THE COURT:  -- regarding what the Court has proposed?

6           MS. DALE:  We have one more in 23, Your Honor.

7           THE COURT:  What's the issue on 23?

8           MS. DALE:  So the end of the second paragraph, it

9   says, "Pursuant to a provision of the FRSA, the amount of any

10  punitive damages cannot exceed $250,000."  Mr. Thompson and I

11  discussed this, and I believe we are both in agreement that

12  should not be included in the instruction.  Mr. Thompson

13  mentioned to me that he had seen a case finding it reversible

14  error to include that limit.

15          THE COURT:  If the parties do not want the limitation

16  to be cited, I don't have any reason to include it.

17          Is that your position, Mr. Thompson?

18          MR. THOMPSON:  No, Your Honor.  We prefer it.

19          THE COURT:  Oh, she just told me you didn't prefer

20  it.

21          MR. THOMPSON:  We haven't discussed it recently.

22  Having looked at the instructions, we prefer it in there.

23          THE COURT:  Hold on.  So when did you talk to

24  Mr. Thompson, Ms. Dale?

25          MS. DALE:  When we were preparing the original set of

 1   instructions.

 2          THE COURT:  All right.

 3          MS. DALE:  He didn't give me the cite, but he did

 4   tell me that he had seen a case holding it reversible error to

 5   include the cap.

 6          THE COURT:  Is that accurate, Mr. Thompson?

 7          MR. THOMPSON:  Yeah, I recall seeing a case

 8   somewhere, not from the Tenth Circuit.  I don't remember what

 9   case or when.

10          THE COURT:  Well, here's what I'm going to do.

11   There's no dispute that the statute, 49 U.S.C. Section

12   20109(e)(3), caps punitive damages at $250,000.  I don't

13   see -- unless you have law to the contrary, I don't understand

14   why it's problematic for the jury to be told that.  Now, if

15   you have a case that says that, then I want to know it, but

16   absent law, I don't see any reason why I shouldn't tell the

17   jury what the statute requires.

18          MS. DALE:  And, Your Honor, I will try to look for a

19   case.  I didn't bother because I assumed we were in agreement,

20   but I can do that.

21          THE COURT:  Yeah, I think you should.  Let me say,

22   when parties agree, that doesn't always mean I say yes if

23   there isn't law to support it.  So I want to make sure that we

24   know.  If there's a case, then I have no issue with taking it

25   out, but if there is no case, then I would prefer to leave it

1   in.

2           All right.  Anything else on 23?

3           MS. DALE:  One other issue.  We would request that

4   there is an addition probably towards the end saying that the

5   jury should assume that the plaintiff has been made whole by

6   the damages awarded in instruction -- the compensatory damages

7   instruction, to make clear that they are not considering the

8   amount of anything such as lost wages, lost benefits,

9   emotional distress.  Those have been taken care of.  This is

10  solely for the purpose of punitive damages.

11          THE COURT:  That's what it says at the beginning of

12  Instruction 23.  It says, "In addition to the damages

13  mentioned in other instructions, the law permits the jury

14  under certain circumstances to award punitive damages.  The

15  purpose of an award of punitive damages is to punish a

16  wrongdoer for misconduct, and also provide a warning to

17  others."

18          I'm not going to say that twice.  If you think that

19  should be emphasized, whoever does the closing ought to say

20  it, but I'm not going to add that because I don't think that

21  makes any sense either.  Again, I'm not going to tilt these

22  instructions to make it easier rather than harder for one

23  party or the other to get a verdict in their favor.

24          All right.  Anything else on 23?

25          MS. DALE:  No, Your Honor.

17-cv-00844-WYD-SKC        Instruction Conference              VI - 1421

1        THE COURT:  All right.  Is there any other -- we will

2   come back to the verdict form later, because I want to finish

3   some of this, and we will come back to the Rule 50 later

4   because we haven't finished the evidence yet.

5        So does the plaintiff have any further comments on

6   these instructions?

7        MR. THOMPSON:  No, Your Honor.

8        THE COURT:  Does the plaintiff have any further

9   instructions you wish to tender?

10       MR. THOMPSON:  No, Your Honor, preserving the two

11  objections we have made.

12       THE COURT:  Oh, I understand.  You have already said

13  it.  You don't need to repeat it.  Just like you-all repeat

14  stuff to the jury and jurors get tired of hearing it, I don't

15  like to have you repeat stuff to me.  I'm not stupid.  If you

16  said it once, then you have said it.  We are wasting time.

17       All right.  Does the defendant have any further

18  comments on the instructions the Court tendered?

19       MS. DALE:  We have some disputed instructions that we

20  would like to preserve the record for.

21       THE COURT:  All right.  I want to come back to those,

22  because we are going to finish the evidence, and then we are

23  going to take another break with the jury.  So why don't we

24  bring the jury in.

25       How long is it going to take to read this deposition?

 1          MS. DALE:  Depending on the objections, it should be

 2    only 10 to 15 minutes.

 3          THE COURT:  You still have all these objections that

 4    you gave me?  I haven't looked at them, but --

 5          MR. THOMPSON:  Yes, Your Honor.

 6          THE COURT:  All right.

 7          MR. THOMPSON:  Frankly, it boils down to one

 8    overarching objection.

 9          THE COURT:  What's that objection?

10          MR. THOMPSON:  The witness testified he works at the

11    help desk, not in the IT department.  He doesn't know what

12    caused the glitch, why there was a glitch, how long there was

13    a glitch, really anything about the glitch other than there

14    was a glitch, which makes all of his testimony lacking for

15    foundation.

16          THE COURT:  All right.  So let's bring the jury in,

17    and we'll deal with this deposition.

18          MS. DALE:  So, Your Honor, do you want us to argue

19    the foundation in front of the jury then?

20          THE COURT:  I haven't read this, so I think I need to

21    hear -- yes, you can argue it in front of the jury.

22          MS. DALE:  Okay.

23          THE COURT:  I mean, I've got to -- you're not going

24    to -- we're going to read some of this to figure out who this

25    person is.

1          Who is the reader?  And he's practiced.  Because I

2     told him to practice so that he wouldn't butcher any names and

3     he would read consistent with the record.  So please have a

4     seat.  And that's Mr. Atencio; right?

5          MR. ATENCIO:  That is correct.

6          THE COURT:  And you are the IT expert; right?

7          MR. ATENCIO:  Uh, yes.

8          THE COURT:  Or you're the IT representative.  If you

9     don't want to have me call you an expert, that's fine, but

10    anyway your area is IT.  Is that right?

11         MR. ATENCIO:  That's correct.

12         THE COURT:  All right, have a seat.

13         MR. THOMPSON:  Your Honor, if you want to read page

14    34, that really sums up the reason of our objection.

15         THE COURT:  Read page 34?

16         MR. THOMPSON:  Yes, Your Honor.

17      (Jury in at 9:43 a.m.)

18         THE COURT:  All right.  Good morning.  The Court

19    appreciates you being here on time.  We are still working on

20    the final wording of some of the jury instructions, although

21    we did make progress over the last hour or so.

22         So at this point -- have a seat, please.  Have a

23    seat.  We are going to complete the evidence portion of the

24    case, and then we are going to take another break because

25    during the next break we will finalize our work on the jury

1    instructions, the verdict form, and deal with another legal

2    matter.  But I'm hopeful we can move all that along with some

3    expedition.

4          So with that said, Ms. Dale, please call your next

5    witness.

6          MS. DALE:  The defense calls Thomas Royston.

7          THE COURT:  Let me explain.  This witness's testimony

8    will be read from a deposition that was previously taken.  You

9    should treat this deposition with the same care and attention

10   as if this witness were here live in court or if he were

11   testifying via video, as some of the other witnesses did.  All

12   right.

13        **(DEPOSITION TESTIMONY OF THOMAS ROYSTON,**

14        **DEFENDANT'S WITNESS, read to the jury as**

15        **follows:)**

16                          **EXAMINATION**

17   "Q.  Walk me through your career at BNSF.

18   "A.  Okay.  Starting in 1972, I started out as a trackman

19   for the Frisco Railway, moved up to track foreman in 1974.

20   Of course, we merged with BN after that.  I was a track

21   inspector for a short time.

22        All the way through my career, I helped with

23   software issues.  I went to college for computers.  Back

24   then computers were the size of this room, so I originally

25   went to college as a computer programmer.  I couldn't find

1    a job when I got out of college and started with the

2    railroad.  The only thing I had -- they had was track, so

3    I went to the track, helped budget through the years, and

4    in the late '90s.

5        "In the 2000s they had -- we had mainframe --

6    mainframes that were [sic] -- that we would enter our time

7    on.  Track inspection was in the mainframe.  So when they

8    had a program called PARS, that was our payroll system,

9    they needed somebody to help with that.  So I started that

10   in 2001, December of 2001.

11       "And it was such a big hit that [sic] there were --

12   and there were so many problems with it and so many calls

13   to Fort Worth, they needed somebody to man the help desk,

14   so I started the help desk in December of 2001.  We were

15   taking about -- at first we were taking about 150 calls a

16   day, me and one other guy, so we were working a lot of

17   hours.

18       "I moved in -- over the years from 2001 until I

19   retired I was still at the help desk.  So they would call

20   Fort Worth at an 1 [sic] 800 number.  And depending on

21   what kind of problem they were having, if it was

22   engineering, payroll, they would send it up to me.

23       "Also, they added TIMS in probably late -- I can't

24   remember if it was -- maybe early 2002.  It may have been.

25   It was probably mid-2002 when we added TIMS, the track

1    inspection program.  Because at first the track inspection

2    was done on books.

3         "When I used [sic] -- When I used to track inspect,

4    it was -- you actually did everything in books.

5    Everything [sic] would come in and look -- Everybody would

6    come in and look at your books monthly.  And then we went

7    to the mainframe.  And then we [sic] needed something" --

8         THE COURT:  No, it says "and then they needed."

9    "A.  And then they needed something a little bit more

10   involved so we went to the TIMS program.

11        "So I would help support TIMS and PARS.  Probably

12   95 percent of our calls were [sic] -- was on PARS,

13   5 percent TIMS, averaging about 100 a day, so we probably

14   took five calls a day maybe on TIMS.

15   "Q.  For what region did you assist on TIMS?

16   "A.  The whole system.

17   "Q.  Are you a member of management?

18   "A.  No.

19   "Q.  At any point in time did you come to believe that

20   anyone at BNSF was either taking defects out of the TIMS

21   system or showing defects as repaired in the TIMS system

22   when, in fact, the repairs had not been made or the

23   defects still existed?"

24        MR. THOMPSON:  Objection, Your Honor:  foundation for

25   the reasons on page 34; 401 and 403.

1            THE COURT:  Objection overruled.

2    "A.  No.

3    "Q.  If you wanted to take a defect out of the TIMS

4    system, is that something that could be done?

5    "A.  You had to be an inspector or roadmaster and go in

6    and run a clean inspection.  They [sic] would remove" --

7            THE COURT:  No, "that would remove."

8    "A.  That would remove the defect.  So if I put a defect

9    on a track today and tomorrow I go inspect the same

10   track -- if I inspect the same track and they [sic] say no

11   defects and it's a clean inspection, that's got to remove

12   the defect.

13   "Q.  And so when you're saying remove the defect, does it

14   actually come out of the TIMS system at that point?

15   "A.  It would.

16   "Q.  So is that --

17   "A.  If you had a clean inspection, it would -- yeah.  It

18   would actually remove it.

19   "Q.  Is that the only way to remove a defect from the TIMS

20   system is to show that it had been --

21   "A.  A clean inspection, a clean run.

22   "Q.  So when someone puts in a clean inspection, how do

23   they actually go about doing that?

24   "A.  They actually go inspect -- physically inspect the

25   track.  Once they run inspections from Point A to Point B,

1    if it's already got a defect on it that hasn't been

2    repaired yet, it's going to prepopulate that defect.

3    "Q.  The TIMS system is going to prepopulate?

4    "A.  Correct.

5    "Q.  So if I inspect an area of track, and I don't see a

6    defect that's in the TIMS system, then I want to show a

7    clean inspection; right?

8    "A.  Yeah.  If you have got an inspection and you don't

9    find a defect, you're going to run a clean inspection.  If

10   you have a defect, you're going to put the defect into

11   TIMS unless it prepopulates it.

12   "Q.  Walk me through how I put a clean inspection in TIMS.

13   What do I actually -- what do I physically do if I'm a

14   track inspector?

15   "A.  Once you inspect the track, you go into the TIMS

16   program on the computer.  Of course, you have to put

17   your -- your B number with password to get in the

18   computer.  And if you're authorized -- if you're a track

19   inspector -- a regular track guy can't go into the TIMS

20   because he's not authorized.  If you're a track inspector,

21   it will let you in the program.  You take -- I take my

22   mile post, put that in, whatever you inspect, you put that

23   in the TIMS.

24   "Q.  All right.  And then if I've entered that as a [sic]

25   cleared and there was a defect in there, it totally

1    deletes from the TIMS system?

2    "A.  It should prepopulate it to begin with.

3    "Q.  So it starts by prepopulating it?

4    "A.  Yeah.  That lets the track inspector know what

5    defects he's got.

6    "Q.  And if there's no defect there -- I need to do a

7    clean inspection -- it deletes from the system.

8    "A.  Well, if you -- if you had a defect in there to begin

9    with, and you had -- if I put a defect in today, it's

10   going to keep that defect.  Whether you see it or not,

11   it's going to keep it in the back of the program, so it's

12   going to be there.

13   "Q.  So if I show a clean inspection on a defect that

14   prepopulated, there's a way for you guys at BNSF to be

15   able to pull that to show who pulled the clean inspection?

16   "A.  Oh, yeah [sic], you bet.  Yeah.  Everything is

17   recorded.

18   "Q.  When I enter the TIMS system and I'm going to enter

19   at a -- we'll say a repair job -- I'm going to say a

20   repair, does it give me a drop down to say who's entering

21   as a repair or does it automatically enter that it's me

22   doing it?

23   "A.  It's all entered with a B number.  Yeah.  So whoever

24   is in there doing that, it's going to enter it with their

25   B number in there.

1     "Q.  Here's what I'm ultimately wondering.  In this case

2     we're accusing Mike Paz and Mark Carpenter of going into

3     the TIMS system and showing defects as not existing when

4     they did exist or as being repaired when they weren't

5     repaired.  Is there a way that I would be able to get

6     their records to see what they did in the TIMS system?

7     "A.  First of all, that would be nuts if they did that.

8     "Q.  We agree.

9     "A.  I can't imagine anybody doing that.  But there's

10    always a way.  I mean, all that stuff is all recorded.

11    You bet."

12         THE COURT:  What's your next page?

13         MS. DALE:  Page 14.

14         THE COURT:  Okay.  All right.

15    "Q.  When did you retire from BNSF?

16    "A.  October 2015.

17    "Q.  So going back to -- you referenced essentially some

18    communications with Brandon Fresquez.  Do you

19    independently recall those as you sit here today?

20    "A.  No.

21    "Q.  But you reviewed the e-mails, and it just looks like

22    something you probably would have done?

23    "A.  Correct.  I mean, that was done very often.  I sent

24    those e-mails out to other divisions, other roadmasters.

25    "Q.  Okay.  And so as I reviewed the e-mail, it looked

1   essentially like a roadmaster, Ryan Akers, had requested

2   35 defects to be removed?

3   "A.  Correct.

4   "Q.  Is that unusual for a manager to contact the IT desk

5   and ask for defects to be removed from the TIMS system?

6   "A.  No.  But there's a certain criteria that has to

7   be [sic] -- that he has to follow to do that.

8   "Q.  What do you mean by that?

9   "A.  So if he's got -- if he's got defects that need to be

10  removed because of, say, a glitch in TIMS, if they're not

11  prepopulating any longer mostly because of their age, the

12  only way that we can do that -- I can't do that.  He can't

13  do that.  So the only way it can be done is with IT.  IT

14  is the only ones that can do it.  So I sent him an e-mail

15  with the defects listed and what we have to have is what

16  kind of repair did you do to repair the defects and the

17  date repaired.  He will send that to me, and then I

18  forward it on to IT.

19  "Q.  Okay.  Break that down a little [sic].  I'm not

20  understanding.  Why would they -- why would a manager be

21  contacted with defects if they can't be in the TIMS

22  system?

23  "A.  Well, if they're over 30 days old --

24  "Q.  Yeah.

25  "A.  -- there's a glitch in TIMS that kept them from

1    prepopulating.  So, say, an inspector is inspecting a

2    track and he knows there's a defect that he put in, but

3    it's not prepopulating, a lot of times they would call and

4    say, hey, this is not prepopulating.  There's a program

5    out there that the roadmasters go into, can see a lot of

6    old defects, and say, hey, what are these defects doing in

7    there?  They're a year old.  How do I get them removed?

8    And that's the only way to remove them.  We have to know

9    when they were repaired and [sic] what the date repaired

10   was.

11   "Q.  So when we're talking about the defect

12   prepopulating -- I just want to make sure I'm

13   understanding you correctly.  So ordinarily when a track

14   inspector goes out and sees a defect, when he starts

15   entering the information for that defect -- if it's been

16   entered before, it's going to almost autofill; right?

17   "A.  You bet.  It's going to prepopulate, here's your

18   defects for this section of track.

19   "Q.  And so after 30 days, that no longer happened in the

20   TIMS system?

21   "A.  There was a glitch in TIMS.  Thinking back, you know,

22   I don't know if it [sic] was the way TIMS was programmed.

23   You know, assuming -- they probably only assumed the

24   defects are only going to be in [sic] there for 30 days,

25   so that's how they programmed the program.

1    "So if you had a defect in there that -- and someone

2    [sic] -- and some would and some wouldn't -- some would

3    prepopulate longer, some would remove themselves.  But

4    that's kind of how it worked.

5    "Q.  Would remove themselves completely from the system?

6    "A.  Not from the system, just from the view of whoever is

7    doing that inspection.  It would be in the background.  He

8    just wouldn't be able to see it.  It would be there with

9    the original date that it was found, that defect was

10   found.  That can't be undone.

11   "Q.  So there's a separate -- let me understand.  After a

12   certain time line, some defects would no longer show up in

13   the TIMS system?

14   "A.  Correct.

15   "Q.  That is because of the glitch?

16   "A.  Correct.

17   "Q.  Some would still show up in the TIMS system?

18   "A.  Correct.

19   "Q.  And it was just totally hit or miss as to which ones

20   would show up?

21   "A.  Correct.

22   "Q.  Do you have any understanding as to what percentage

23   were dropping out?

24   "A.  I don't.  It wasn't that many because, you know, if

25   it were, we would be getting hundreds and hundreds of

1    calls, but . . .

2    "Q.  There was a second system where you could still see

3    the defects that had [sic] -- that had dropped out of

4    TIMS?

5    "A.  Correct.

6    "Q.  What was the name of that system?

7    "A.  It was just the TIMS not class specific defect list

8    and it would -- it would list -- there was a link that

9    you'd go into.  It would list the divisions, regions --

10   divisions, division engineer, roadmaster level.  Click on

11   the roadmaster, see defects that were 30 days old, 90 days

12   old, yada, yada, yada, all the way up.

13   "Q.  Got it.  So I know you don't independently recall the

14   e-mail from Brandon or from Ryan Akers about those

15   defects; right?

16   "A.  Correct.  I don't recall that.

17   "Q.  Having reviewed them, do you find anything odd about

18   Ryan Akers asking to delete the 35 defects he had deleted?

19   "A.  No.

20   "Q.  The repair dates or the no defect found dates

21   submitted by Mr. Akers are all over the map and they range

22   from literally two years apart?

23   "A.  Correct.

24   "Q.  Do you find that unusual at all?

25   "A.  No.  Not for a defect that's one or two years old.

1    It's probably not a defect anymore.  I mean, reading

2    between the lines when I look at the [sic] -- that

3    spreadsheet, it's like the track inspector forgot they

4    were there.  You know, if you're going to have -- if I

5    have [sic] put out a defect on a track today, I would hope

6    that some [sic] -- that same defect isn't going to be

7    [sic] there a year or two from now.  I mean, the track has

8    had to be inspected a zillion times since then.

9    "Q.  Do you find anything unusual about the repair, no

10    defect date, being before the time that it would drop out

11    of the TIMS system?

12    "A.  That wasn't really my job.  My job wasn't to question

13    what the roadmaster sent back to him.  I just forwarded.

14    Most of the time I didn't look at it.  I just forwarded it

15    on to IT."

16          MS. DALE:  We are next on page 27, Your Honor.

17          THE COURT:  All right.  Go ahead.

18    "Q.  Is that what a manager was trained to keep, repairs

19    in the TIMS system?

20    "A.  A manager?

21    "Q.  Yeah.

22    "A.  Managers didn't go into TIMS that often.  Some of

23    them never went into TIMS.

24    "Q.  That's what the track inspectors would do?

25    "A.  Correct.

1    "Q.  Did you ever report the TIMS system not prepopulating

2    to anybody else at BNSF?

3    "A.  Yes.

4    "Q.  To whom?

5    "A.  Oh, that was common knowledge between us and IT.

6    "Q.  Was it ever reported to anyone in operations?

7    "A.  That, I couldn't tell you.  I mean, surely it was.

8    "Q.  How long was this glitch in the TIMS system?

9    "A.  Oh, gosh.  Probably -- I can't tell you for sure.

10   It's been so long.  Probably -- you know, I remember

11   working on it, but -- at least a year, I would say.

12   Probably two years.  I mean, I think -- I think that

13   glitch I'm talking about was actually programmed into the

14   TIMS when it was first introduced.

15   "Q.  So it's just always existed in TIMS?

16   "A.  Correct."

17            MS. DALE:  That was it, Your Honor.

18            THE COURT:  All right.  Is there anything else from

19   this deposition from either side?

20            MR. THOMPSON:  Not for plaintiff, Your Honor.

21            MS. DALE:  No, Your Honor.

22            THE COURT:  All right.  So does the defendant have

23   additional witnesses or evidence to present?

24            MR. GOMAN:  The defendant rests, Your Honor.

25            THE COURT:  Okay.  Is there a rebuttal case?

1        MR. THOMPSON:  No, Your Honor.

2        THE COURT:  All right.  So what that means, ladies

3   and gentlemen of the jury, is that the evidence portion of the

4   case is concluded.  Now, I'm going to send you back to the

5   jury room so we can complete our work on the jury instructions

6   and the verdict form, after which we will have closing

7   arguments.  So please keep your door open, and don't talk

8   about this case because you can't begin your deliberation

9   until you read the Court's or hear -- let me do it this way --

10  until you hear and then read the Court's instructions of law

11  and you hear the closing arguments.  So talk about the

12  weather, how warm you want it to be rather than how cold it

13  is, or anything else, and we'll resume with the jury

14  instruction reading as soon as we are ready to do that, to be

15  followed by closing argument.  All right.

16     (Jury out at 10:00 a.m.)

17        THE COURT:  All right, have a seat.  So I want to

18  raise this now while it's on my mind.  I'm going to put time

19  limits on closing arguments, but I want to hear how long you

20  think you want to talk.  Mr. Thompson, you first.

21        MR. THOMPSON:  One hour, Your Honor.

22        THE COURT:  Why do you need an hour?  That seems like

23  an awful long time.

24        MR. THOMPSON:  Because there are two stages of the

25  case, our contributing factor stage and their affirmative

1    defense stage, Your Honor, and when we timed it out, it takes

2    slightly less than that long for me to speak, especially if

3    I'm being slow and articulate.

4          THE COURT:  Well, you need to talk slow irrespective

5    of my time limits.

6          All right.  Let me hear from the defendant.

7          MR. GOMAN:  Your Honor, we talked about each side

8    asking for an hour on Friday.  I don't have a problem with

9    that.  As I went over my closing notes this morning, I think

10   40, 45 minutes is all I need.

11         THE COURT:  Here's what I'm going to do.  I'm going

12   to give each side not more than 50 minutes for closing

13   argument.  And the 50 minutes will be divided -- the plaintiff

14   has to divide it between your initial closing and any rebuttal

15   closing.  And I think that's more than enough.

16         So let's finish up quickly this work on jury

17   instructions.  So I want the defendant to tender any

18   instructions that we didn't cover when we did our work earlier

19   today on the base set.  And since I've already looked at

20   these, I'm probably going to refuse them, but I will obviously

21   let you argue as to why you think they should be included.  So

22   which ones are we talking about?

23         MS. DALE:  So going back to document 103-1, Disputed

24   Instruction No. 5.

25         THE COURT:  Hold on.  Hold on.

1        All right.  So what is it about this instruction

2   that's different from what the Court proposed and included in

3   the set that we have already reviewed?

4        MS. DALE:  So the emphasis here is -- well, first of

5   all, there needs to be intentional retaliation, which is what

6   *Lincoln* says, but also, "It is not enough on its own that two

7   events occurred close in time to one another; mere closeness

8   in time between protected activity and an unfavorable

9   personnel action does not necessarily mean the action was

10  taken out of intentional retaliation due, in whole or in part,

11  to the protected activity."

12       Because Mr. Fresquez is arguing some incidents that

13  occurred on the same date he was taken out of service, we want

14  it made clear to the jury that just timing alone doesn't

15  create a contributing factor.

16       THE COURT:  Your response, Mr. Thompson.

17       MR. THOMPSON:  Sounds like good argument for the

18  jury, Your Honor.

19       THE COURT:  I agree.  This point is covered by the

20  instructions the Court will give, and if I gave this

21  instruction, it would not be a neutral, balanced instruction,

22  would slant the case in favor of the defendant, and this Court

23  never intentionally, even unintentionally, gives instructions

24  that are slanted in favor of one party or the other.  So I

25  will refuse that.

1    My law clerk printed off all these disputed

2  instructions, and I'm going to just refuse them.  And I have a

3  stamp because my hand would get tired if I had, over the

4  years, to actually write this down that I refuse instructions.

5    All right.  So what I'm refusing now is Disputed

6  Instruction No. 5.  And let me staple this together.

7    COURTROOM DEPUTY:  Actually, you don't have to staple

8  it.  I've got to scan it.

9    THE COURT:  You've got to scan it?  Okay.  Oh, geez,

10  need some more ink here.  There we go.

11    All right.  What's your next one?

12    MS. DALE:  Disputed Instruction No. 7.

13    THE COURT:  All right, number 7.

14    MS. DALE:  "Where there is an independent event that

15  justifies disciplinary action, the causal link between the

16  protected activity and the disciplinary action is severed."

17    And we cited the *Kuduk* case which, again, we have

18  talked about the Tenth Circuit has approved as support for

19  that instruction.

20    THE COURT:  What's the factual basis for this

21  instruction?

22    MS. DALE:  The independent event would be the refusal

23  to measure or string-line the track.

24    THE COURT:  Yeah, but that's linked to all the things

25  that the plaintiff alleged that explain why he did what he did

1    had to do with the history of -- well, we are not arguing a

2    Rule 50.  All right.

3              What's your response?

4              MR. THOMPSON:  We agree with Your Honor.

5              THE COURT:  This is a slanted instruction, it's not

6    supported by the evidence, and it must be refused.

7              Let me see if I can get my stamp to work better this

8    time.  All right.  It's working better.  All right.

9              Okay.  Mr. Keech, you can come and get this.

10             What's your next one?

11             MS. DALE:  Number 8.  "You may find that Defendant

12   did not retaliate against Plaintiff for his alleged protected

13   activities if you determine that Plaintiff previously engaged

14   in the same or similarly protected activities numerous times

15   without consequence."

16             And the issue here is that Mr. Fresquez, although he

17   disclaimed any intent to argue taking out a track -- taking

18   tracks out of service was protected activity, has done just

19   that.  And so the fact that he has taken tracks out of service

20   throughout his entire career as a track inspector negates the

21   presumption or the inference that he was in this case

22   retaliated against for doing that same thing.  And we cited

23   the *Dafoe* case in Minnesota.

24             THE COURT:  These are all arguments you can make in

25   closing argument.  It's not the purpose of the Court to give

1    instructions that would help either side either make a claim

2    or make a counterargument or defense.  So I think that the

3    existing instructions cover adequately what is meant by

4    protected activity, what is meant by contributing factor.

5    And, again, to give this instruction would be improper and

6    would slant these instructions in favor of the defendant, and

7    I never do that.  I know I've said that over and over again,

8    but I want to make sure that everybody understands me.

9            Do you have anything else to say, Mr. Thompson?

10           MR. THOMPSON:  No, Your Honor.

11           THE COURT:  Then I will refuse this instruction.

12           All right.  What's next?

13           MS. DALE:  Disputed Instruction No. 10.

14           THE COURT:  All right.

15           MS. DALE:  "An employee does not engage in protected

16   activity (and thus, is not protected from retaliation) by

17   merely performing his job duties unless he steps outside his

18   normal job duties to take action adverse to his employer."

19           And we cited a Tenth Circuit case.  It's not an FRSA

20   case, but it is an employment case relating to retaliation.

21   And the point there being if this is just something that's

22   part of your normal job duties, like reporting track defects,

23   that really can't be protected activity or you'd be taking

24   protected activity literally every minute of every day.

25           THE COURT:  Mr. Thompson.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1          MR. THOMPSON:  It's a misstatement of the law.  The

2   FRSA makes clear that the job duties exception does not apply.

3   Every court to consider the matter has so ruled, and that

4   makes sense as clearly we want Brandon taking tracks out of

5   service and to be protected doing that.

6          THE COURT:  Mr. Thompson, I agree with what you have

7   just said.  Plus, I think the instructions the Court drafted

8   and which we reviewed earlier this morning adequately set

9   forth all of the legal tests and standards that the jury

10  should consider, and this isn't one of them.  So I refuse this

11  instruction as well.

12          All right.  Here you go, Mr. Keech.  I'll put these

13  up here.

14          All right.  What's next?

15          MS. DALE:  Disputed Instruction No. 12.

16          THE COURT:  How many more -- are you going to urge

17  all these or just --

18          MS. DALE:  I've got --

19          THE COURT:  All right.  All right.  Let's just keep

20  going.  Number 12, is that what you said?

21          MS. DALE:  Yes.  "BNSF cannot be found to have

22  retaliated against Plaintiff under the FRSA if you conclude

23  that BNSF disciplined the Plaintiff based only on its honestly

24  held belief that the Plaintiff violated the rules BNSF

25  contends he violated."

1    And there's been some discussion between -- or some

2  argument already about this.

3    THE COURT:  Don't we have the business judgment rule?

4  Why do you need this?  I'm allowing you to have the business

5  judgment rule.  Why would you need this instruction?

6    MS. DALE:  Your Honor, there's a Tenth Circuit case

7  from 2001, it's called *Medley versus Polk*, it's 260 F.3d 1202,

8  and it adopts the honest belief rule under the FMLA.

9    THE COURT:  But this is the FRSA.  It's not the FMLA.

10  That's the Family Medical Leave Act.

11    MS. DALE:  Right, and they have a retaliation

12  provision, and the concept is the same.  If you honestly

13  believed that the employee had committed the violation and

14  terminated them for that reason, then you weren't retaliating

15  against them, so --

16    THE COURT:  Do you have a case in the Tenth Circuit

17  applying that to an FRSA claim?

18    MS. DALE:  No, Your Honor.

19    THE COURT:  All right.  Then I'm not going to give

20  this again.  This is unnecessary, redundant, and a biased

21  instruction.  So, therefore, it is refused.

22    MS. DALE:  Instruction No. 18.

23    THE COURT:  All right.  Wait a minute.  You have a

24  Disputed Instruction 18?

25    MS. DALE:  Yes.  It's the last page of the combined

 1  set.

 2          THE COURT:  All right.  18.

 3          MS. DALE:  "If you find for the Plaintiff, you must

 4  not take into account any consideration of attorney fees or

 5  court costs in deciding the amount of the Plaintiff's damages.

 6  I will decide the matter of attorney fees and court costs, if

 7  any, later."

 8          This comes directly from Federal Jury Practice and

 9  Instructions, and it's consistent with what the Court did

10  previously with the lost wage instruction to tell the jury you

11  are not considering attorney's fees, that will be decided

12  later.

13          THE COURT:  What's your position on this instruction,

14  Mr. --

15          MR. THOMPSON:  It's unnecessary.  The jury

16  instructions tell the jury what they should consider.  If we

17  are going to identify everything they shouldn't consider, we

18  could be here all day.

19          THE COURT:  Yeah, I think this is unnecessary.  I'm

20  not saying it's an inaccurate proposition of the law, but I

21  think it's unnecessary in this case.

22          Is that it?

23          MS. DALE:  Well, the only other issue would be going

24  back to the issue of what the protected or what the adverse

25  action is.  Again, we think there needs to be an instruction

1    that says, "The adverse action in this case is termination.

2    It's not the charge."  We cited in our brief, both in the

3    original Rule 50 motion and in the renewed motion --

4           THE COURT:  Well, only your renewed motion is before

5    the Court.  Do you remember?  Because I denied the original

6    motion because you filed a substitute motion.

7           MS. DALE:  Fair enough.

8           THE COURT:  So let's just refer to the renewed

9    motion.

10          MS. DALE:  Okay.  Your Honor, in the renewed motion,

11   I believe it's page 13, we recited -- we cited a case,

12   *Brisbois versus Soo Line Railroad Company*, 124 F.Supp.3d 891.

13   It's from Minnesota, 2015.

14          THE COURT:  Let me make a strong suggestion.  I want

15   to segue now to the Rule 50 motion, and then we are going to

16   come back, because there may be some things that are decided

17   on the Rule 50 motion that may sort of make unnecessary what

18   you are now saying.

19          I want to give you a revised version of

20   Instruction 16 which my law clerk prepared, and I think this

21   in a more succinct way addresses how we want to incorporate

22   the balance of the statutory language.  So the beginning part

23   now reads as follows:  "An employee engages in protected

24   activity as defined by the FRSA if the employee, in good

25   faith, commits an act, or the employer perceives the employee

1    to have committed an act or to be about to commit an act" and

2    then it proceeds directly into 1, 2, and 3.  So just read

3    this, and I don't want you to make any new objections, but

4    tell me if this is sufficient given the Court's prior ruling.

5              MR. THOMPSON:  It is for plaintiff, Your Honor.

6              MS. DALE:  And, Your Honor, we would just stand on

7    the prior objection.

8              THE COURT:  All right.  Then your prior objection I

9    have ruled on it the same way.  So I'm going to give this as

10   Instruction 16, and it replaces what is in the original draft.

11             All right.  Let's talk about the Rule 50 motion, and

12   now it's the renewed motion.  I have read these, and I have

13   some thoughts.  So what I want to do is have you make some

14   high points.  I don't want you to go through and tell me all

15   the details of this because you would waste time.

16             So let me have the defendant go first.  And let me

17   just tell you this up front.  I see no basis to do anything

18   regarding 2016 or an award of the damages that the Court will

19   allow the jury to consider.  My focus is primarily on the 2015

20   events.  And there could be some merit to those not being

21   protected activity.  However, the evidence that's been

22   presented about the 2015 events will remain in front of the

23   jury.  It's just how it's designated.  And so that's what I

24   want you to focus on, and just stand on the record for

25   everything else if you would, please.

1    MS. DALE:  Understood, Your Honor.  With respect to

2  the 2015 events, I think what I want to do is address the

3  points that were raised in the response to the original

4  motion.  What Mr. Thompson has argued is that Mr. Fresquez

5  immediately after the last claimed protected activity in 2015

6  immediately went off to another job, only came back for a very

7  short period of time.  He's claiming that he was only in the

8  track inspector position for two months from the last

9  protected activity in 2015 to the termination, and I think

10  that's an inaccurate statement of the law.

11    THE COURT:  Give me the timeline, as you understand

12  it, when he was working as a track inspector after the three

13  events occurred in 2015.  I think one was in April, one was in

14  May, and one was in June, as identified through the evidence.

15  So I want to make sure I understand sort of when he was

16  working thereafter as a track inspector, with the

17  understanding that about 11 months elapsed between any events

18  in June 2015 and when he was terminated allegedly for

19  insubordination in May of 2016.

20    MS. DALE:  So, Your Honor, we are going to try and

21  pull up this if that's helpful, but -- pull up the exhibits.

22    THE COURT:  You should know this.  You wrote this

23  motion twice.  Give me the timeline.  I just want to know when

24  he worked thereafter as a track inspector, as opposed to

25  working other positions.

1           MS. DALE:  So the last claimed protected activity was

2     in June of 2015.

3           THE COURT:  Right.

4           MS. DALE:  He claimed that he left immediately after.

5     He did not leave until August.  August 10th, 2015 he went to

6     the gang section foreman.  He then came back again.

7           THE COURT:  Wait a minute.  He started working as an

8     inspection foreman -- a gang section foreman?

9           MS. DALE:  Gang section foreman, August 10th, 2015.

10    Then he comes back --

11          THE COURT:  How long did he work as a gang section

12    foreman, according to your information?

13          MS. DALE:  So it's about six months.

14          THE COURT:  Then when did he come back?

15          MS. DALE:  February 9th, 2016, comes back to the

16    inspector position.  Then goes back to the gang section

17    foreman position April 11th.

18          THE COURT:  4/11/16 as a gang -- did he work

19    continuously in the inspection position from February 9th to

20    April 11th?

21          MS. DALE:  Correct.

22          THE COURT:  Then he became a gang section foreman

23    from April 16, 2016, to what?

24          MS. DALE:  Then he returns April or, sorry, May 4th,

25    2016.

1      THE COURT:  All right.

2      MS. DALE:  So there's a period of about two, three

3  months from when he last engaged in protected activity in 2015

4  to when he left the position, and then there's another two

5  months in 2016.  So it's a total of five months, which is

6  longer than the three months that the Tenth Circuit says

7  it's -- you need more to establish causation than temporal

8  proximity if it's more than three months.

9      The other point I wanted to make on that is that the

10  entire time he's still in Denver.  He's still under Mark

11  Carpenter.  So if Mark Carpenter, in fact, were looking to

12  bird-dog him, he could have done so.  He could have done so in

13  his gang section foreman position or the track inspector

14  position.  It really makes no difference which position he is

15  in; he's still under Mark Carpenter.

16      The other point I wanted to make on that is with

17  respect to the June e-mail chain.  And it's between Cason

18  Cole, Ryan Akers, Mark Carpenter, and eventually goes up to

19  Adam Miller.  And the plaintiff has portrayed that in his

20  response as this is starting the process of insubordination.

21  First of all, it doesn't say anything about insubordination.

22  It says we need to think about initiating the disciplinary

23  process.  But they could have done so.  They could have done

24  so right then because Cason Cole, who is an assistant

25  roadmaster, said he was failing to follow instructions and I

1  think he should be investigated for this.  Mark Carpenter made

2  the decision not to investigate at that time.  There was no

3  investigation.  There was no write-up.  So if, in fact, they

4  were looking to investigate or discipline him for those three

5  events from 2015, they had the opportunity.  They could have

6  done it then.  They could have done it at any time that he was

7  there.  So it simply makes no sense that you have this

8  opportunity with a roadmaster saying, We should write this guy

9  up, to say, No, but I'll wait for a year, and then I'm going

10  to take my opportunity to retaliate against him for something

11  he did in 2015.  It's just not logical.

12          THE COURT:  All right.

13          MS. DALE:  That's the point I wanted to emphasize on

14  that.

15          THE COURT:  Do you then rest on everything else

16  that's stated in your renewed motion without argument?

17          MS. DALE:  May I consult with cocounsel?

18          THE COURT:  That's what I want you to do.

19          MS. DALE:  The other issue we had raised in the

20  Rule 50 motion that we were also trying to raise in the jury

21  instructions is the notion that termination is the adverse

22  action here.  We had cited a Minnesota case holding that a

23  disciplinary action -- the initiation of a disciplinary action

24  is not an adverse action under the FRSA.  Plaintiff responded

25  with a case from Oregon that didn't say that.  There was a

 1   series of things that were involved in that case, but it did

 2   not specifically hold, as the case we cited did, that just

 3   initiating discipline is not an adverse action under the FRSA.

 4        Our position is also supported by Tenth Circuit and

 5   Colorado cases dealing with retaliation under employment

 6   statutes.  In fact, in the Tenth Circuit, even a performance

 7   improvement plan is not an adverse action.  So simply noticing

 8   someone for discipline can't be an adverse action.

 9        THE COURT:  Well, but in this case a disciplinary

10   proceeding was started in May of 2016, and it culminated in

11   the plaintiff being terminated.

12        MS. DALE:  We don't dispute that the termination was

13   an adverse action.

14        THE COURT:  I think the whole sequence of events is

15   lumped together, and I'm not going to find that the only

16   adverse action is his termination.  If that's what you are

17   asking me to do, I'm not going to do it.  The jury will

18   consider all of that, and the parties can argue about what

19   they think it means or doesn't mean on this record.  That's

20   the only fair thing to do.

21        So, anyway, all right, I hear what you are saying.

22        All right.  Respond, Mr. Thompson.  Again, I want you

23   to focus only on the 2015 events because I have a strong,

24   strong predisposition that I'm going to let the jury decide

25   the 2016 events and damages.

1      MR. THOMPSON:  So there's two issues, Your Honor.

2 First is the nature of the contributing factor standard.

3 While it may be appropriate in a Title VII case to find that

4 three or four months is too long for there to be a nexus,

5 that's untrue under the contributing factor.  For example, if

6 Mr. Fresquez's protected activity at any time colored Mark

7 Carpenter's view of him and that caused Mark Carpenter to

8 treat him more harshly in the charging decision, that will by

9 its simple language have contributed.

10      Moreover, here the record --

11      THE COURT:  Let me ask this.

12      MR. THOMPSON:  Sure.

13      THE COURT:  It seems to me that the two

14 decisionmakers here are probably Adam Miller and this lady who

15 testified from Dallas.  What's her name?

16      MR. THOMPSON:  Stephanie Detlefsen.

17      THE COURT:  They probably are the decisionmakers,

18 even though it was Carpenter who started the disciplinary

19 proceeding.  So I don't understand how there's a nexus between

20 what happened in 2015, which never resulted in any discipline

21 ever being started against the plaintiff, and what transpired

22 in May of 2016, which involved Mr. Carpenter filing a request

23 for a hearing, and ultimately he was terminated.  So I don't

24 understand --

25      MR. THOMPSON:  Sure.

1      THE COURT:  -- how the two are really connected, so

2  help me understand that.

3      MR. THOMPSON:  Two different answers, Your Honor.

4  First, in 2015 Mr. Miller was twice notified of Mr. Fresquez's

5  protected activity, namely, by Staci Moody-Gilbert, and we saw

6  the texts to her, and then she called Adam Miller, and also

7  the e-mail from Carpenter.  So Mr. Miller's view of Brandon

8  Fresquez was colored by the 2015 events.  In fact, on the

9  stand he said he believed Brandon was argumentative not

10  because of anything that happened in 2016, rather because

11  things that Mr. Carpenter had told him in 2015.

12      Second --

13      THE COURT:  Was disciplinary action ever taken

14  against Mr. Fresquez for the events that occurred either in

15  April, May, or June of 2015?

16      MR. THOMPSON:  We believe that those actions

17  contributed to what ultimately happened to him.

18      THE COURT:  That's not what I'm asking.

19      MR. THOMPSON:  No, Your Honor.

20      THE COURT:  Were disciplinary actions ever

21  initiated --

22      MR. THOMPSON:  Initiated, yes.  Yes.  In the e-mail

23  Mark Carpenter sends he says in May -- sorry, June of 2015

24  that once Ryan Akers returns we are going to start the

25  process.

1        THE COURT:  Did they start disciplinary

2   proceedings --

3        MR. THOMPSON:  They did not, Your Honor.

4        THE COURT:  That's what I'm asking.

5        MR. THOMPSON:  No.

6        THE COURT:  No disciplinary proceedings --

7        MR. THOMPSON:  Correct.

8        THE COURT:  -- were ever started against Mr. Fresquez

9   in 2015.

10       MR. THOMPSON:  Correct, Your Honor.

11       THE COURT:  All right.

12       MR. THOMPSON:  The second way to answer your

13  question, and we are going to argue this to the jury, we don't

14  believe Mr. Miller and Ms. Detlefsen are the decisionmakers.

15  We think it's pro forma in these cases generally because they

16  always sign off.  Ms. Detlefsen said she has never exonerated

17  anybody.  So BNSF does this to essentially make this argument

18  to the jury that the decisionmakers are not Mr. Carpenter and

19  not Michael Paz, it's Adam Miller and Stephanie Detlefsen,

20  even though they are going to ratify whatever Mr. Carpenter

21  and Michael Paz said.

22       Moreover, Michael Paz's lies during the hearing

23  process are what they relied on, "they" being Ms. Detlefsen

24  and Mr. Miller.  And both Ms. Detlefsen and Mr. Miller were

25  stuck with Mr. Carpenter's charging decision.  Mr. Carpenter

```
 1   could have chosen to charge Brandon with nothing or charged

 2   him with failure to comply, which would not have been

 3   terminable.  Once he's charged, Mr. Miller and Ms. Detlefsen

 4   could not undo that charge even if they'd wanted to.  They

 5   could not read the transcript and say, Well, we don't think

 6   he's insubordinate; we do think he failed to comply, so we are

 7   going to suspend and not terminate him.

 8            Therefore, we believe the real decisionmakers for all

 9   intents and purposes are Michael Paz and Mark Carpenter.

10            THE COURT:  Anything else?

11            MR. THOMPSON:  No, Your Honor.

12            THE COURT:  All right.  Okay.  So I'm going to make a

13   ruling here on the Renewed Motion for Judgment as a Matter of

14   Law Pursuant to Federal Rule of Civil Procedure 50, document

15   number 141, which was filed yesterday on February 18, 2019.

16            So in this motion there's some arguments raised by

17   the defendant:  First, plaintiff has not demonstrated that his

18   alleged protected activity contributed to his termination;

19   plaintiff has not demonstrated the decisionmakers knew about

20   his alleged protected activity; a notice of investigation does

21   not constitute adverse action; 4, BNSF has demonstrated by

22   clear and convincing evidence that it would have fired

23   plaintiff absent any protected activity; and, finally,

24   plaintiff has not demonstrated any damages other than lost

25   wages -- other than lost wages should be awarded.
```

1    Now, as you know, under Rule 50 judgment as a matter

2    of law is appropriate only if the evidence points but one way

3    and is susceptible to no reasonable inferences which may

4    support the opposing party's position.  Stated differently, I

5    must view the evidence in the light most favorable to the

6    nonmoving party, in this case the plaintiff.  And if there's

7    any evidence to support a claim or request for damages, then

8    the Court must deny the Rule 50 motion and allow the jury to

9    decide the issues.

10    So let me just say this.  I agree in part with

11    defendant's arguments in favor of its motion for judgment as a

12    matter of law, but only related to the 2015 events asserted by

13    the plaintiff as alleged protected activity.  I'm referring to

14    what occurred and the evidence related to those occurrences

15    which transpired in April, May, and June of 2015.

16    So in regard to that issue, plaintiff has not

17    demonstrated that his alleged protected activity contributed

18    to his termination; 2, plaintiff has not demonstrated the

19    decisionmakers knew about his alleged protected activity; and,

20    3, a notice of investigation does not necessarily constitute

21    adverse action.  But there was really no investigation that

22    ever occurred regarding the 2015 events.

23    So -- and this is covered in the jury instructions

24    that we reviewed this morning, but I want to summarize it more

25    succinctly this way.  To establish a prima facie case of

1  retaliation under the FRSA, one of the elements a plaintiff

2  needs to establish is that the protected activity was a

3  contributing factor in the unfavorable action.  That comes

4  from *Lincoln versus BNSF Railway Company*, 900 F.3d 1166, 1220,

5  Tenth Circuit 2018.  A "contributing factor" is "any factor,

6  which alone or in combination with other factors, tends to

7  affect in any way the outcome of the decision."  And that's

8  *BNSF Railway Company versus U.S. Department of Labor*, 816 F.3d

9  628, 638, Tenth Circuit 2016.  A plaintiff may prove

10  retaliation through circumstantial evidence such as "the

11  temporal proximity between the protected activity and the

12  adverse action, indications of pretext such as inconsistent

13  application of policies and shifting explanations, antagonism

14  or hostility toward protected activity, the relation between

15  the discipline and the protected activity, and the presence of

16  intervening events that independently justify discharge."  And

17  that's *Loos versus BNSF Railway Company*, 865 F.3d 1106,

18  1112-1113, Eighth Circuit 2017.

19          As you know, the Tenth Circuit requires an FRSA

20  plaintiff advancing a retaliation claim to demonstrate the

21  decisionmaker had knowledge of the protected activity.  Again,

22  that goes back to the *Lincoln* case.  "For how can

23  decisionmakers retaliate against an employee for taking

24  protected activity if they do not know about the protected

25  activity?"  I noted that this morning when we had our first

1   charge conference, and that's found again at *Lincoln versus*

2   *BNSF*, 900 F.3d 1166, 1213, Tenth Circuit 2018.

3         Now, plaintiff argues that he participated in

4   protected activity in April, May, and June of 2015 and May of

5   2016.  Defendant argues that the 2015 actions cannot be the

6   basis for a retaliation claim because plaintiff was terminated

7   almost a year after the last 2015 event -- 2015 confrontation

8   or event.  Defendant argues that the 2016 incident cannot

9   serve as a basis of a retaliation claim because plaintiff was

10  insubordinate.  Defendant also argues that BNSF's

11  decisionmakers were not aware of any protected activity,

12  except that Adam Miller was aware of the April 2015 incident.

13        There is no evidence that Adam Miller and Stephanie

14  Detlefsen knew of any protected activity in May or June of

15  2015.  Ms. Detlefsen testified that she only reviewed

16  plaintiff's employment history, the hearing transcript, and

17  the exhibits to the hearing transcript related to the 2016

18  termination based on insubordination.  None of these documents

19  mentioned anything about plaintiff's protected activity in

20  2015.  Ms. Detlefsen, as you know, then recommended dismissal

21  to Adam Miller, which became the final course of action,

22  obviously subject to the appeals which occurred, all of which

23  ultimately ended in affirming the plaintiff's dismissal and/or

24  termination.  Further, there is no evidence that Mr. Miller

25  was aware of any of the plaintiff's alleged protected activity

1    in May or June of 2015.

2         Additionally, Mr. Miller and Ms. Detlefsen stated

3    that they arrived at their decision to terminate plaintiff by

4    reviewing the hearing transcript and the hearing exhibits

5    related solely to the May 2016 events.  Mr. Miller testified

6    that he made the final decision to terminate plaintiff.  And

7    even though he discussed his decision with Mr. Carpenter, he

8    testified that he asked Mr. Carpenter only about plaintiff's

9    discipline record, which could not have been used as a basis

10   to terminate plaintiff under the PEPA policy.  Mr. Miller also

11   testified that his conversation with Mr. Carpenter did not

12   influence his decision to fire plaintiff.

13        Although Mr. Miller may have been aware of

14   plaintiff's alleged protected activity in April 2015, that

15   conduct occurred more than a year before plaintiff's

16   termination.  And plaintiff testified that after Staci

17   Moody-Gilbert, the union representative who testified in

18   court, called Adam Miller, that was the end of that, and

19   there's no evidence from which it can be inferred that the

20   April 2015 incident contributed to plaintiff's termination in

21   2016.

22        Now, even accounting for several months during which

23   plaintiff had bid off the territory, and that was clarified

24   when Ms. Dale sort of talked about the time frame when he

25   worked as an inspector versus other positions, plaintiff still

1    worked for several months on the territory as an inspector

2    between April of 2015 and his termination in May 2016.

3    Plaintiff's alleged protected activity in April 2015 and his

4    termination in 2016, they're just too remote as a matter of

5    law to provide circumstantial evidence that the 2015 incidents

6    were a contributing factor to his termination.  Courts

7    considering FRSA claims have held that temporal proximity does

8    not exist when the protected activity occurs more than eleven

9    weeks before the adverse action.  And that's supported by *Lee*

10   *versus Norfolk Railway Company*, 187 F.Supp.3d 623, 634,

11   Western District of North Carolina, affirmed 670 F. Appendix

12   777, Fourth Circuit 2016; *Kuduk versus BNSF Railway Company*,

13   980 F.Supp.2d, 1092, 1101, District of Minnesota 2013,

14   affirmed 768 F.3d 786, Eighth Circuit 2014.

15          In other retaliation contexts, the Tenth Circuit has

16   also held that, "that a one-and-a-half-month period may

17   suffice to establish causation on a prima facie basis, but a

18   three-month period, standing alone, will not suffice."  And

19   that's *Hinds versus Sprint/United Management Company*, 523 F.3d

20   1187, 1204, Tenth Circuit 2008.

21          Plaintiff argues that the decision of Paz and

22   Carpenter to charge plaintiff with insubordination contributed

23   to his termination and Paz and Carpenter are decisionmakers

24   for purposes of the FRSA.  In this regard, I find *Logsdon*

25   *versus BNSF Railway Company*, 262 F.Supp.3d, 895, District of

1   Nebraska 2017, persuasive.  In that case, the court held that

2   the decisionmakers were the BNSF employees who reviewed the

3   hearing transcript and made the final decisions about the

4   employee's termination under the PEPA policy, rather than the

5   BNSF supervisor who allegedly tried to intimidate the

6   plaintiff into not filing an injury report.  For those

7   reasons, I find that Stephanie Detlefsen and Adam Miller were

8   the decisionmakers for purposes of plaintiff's termination in

9   May 2016.

10          I conclude that the only protected activity that

11  could be a contributing factor to plaintiff's termination is

12  the May 2016 incident.  And that's the incident that occurred

13  on or about May 5th, 2016.  The May 2016 incident with Paz

14  occurred on the same day plaintiff was removed from work, and

15  there is evidence to support plaintiff's claim that the

16  conflict with Paz led to his termination.  So I, therefore,

17  grant defendant's motion for judgment as a matter of law as to

18  the 2015 events not being protected activity, but deny it as

19  to the May 2016 incident.

20          I further order that the jury can consider the

21  2016 -- not 2016 -- 2015 events as background, but the

22  plaintiff cannot, through counsel, allege that they are

23  protected activity because that would run afoul of my ruling.

24          So, again, the only protected activity relates to the

25  events that occurred in May of 2016, and everybody knows what

1    they are because we spent a lot of time in this trial going

2    through facts.

3            Now, I'm going to deal with the second point, whether

4    or not there's clear and convincing evidence plaintiff would

5    have been dismissed absent protected activity.  Defendant

6    argues that it has proven by clear and convincing evidence

7    that plaintiff would have been fired even absent the protected

8    activity.  I disagree because both Mr. Miller and

9    Ms. Detlefsen testified that they relied on Mr. Paz's

10   testimony to support the insubordination charge, and plaintiff

11   has submitted evidence that Mr. Paz may have slanted his

12   hearing testimony against the plaintiff and may have been

13   dishonest and outright lied during the hearing.  And because

14   there's evidence to suggest that, obviously viewing that

15   evidence in the light most favorable to the plaintiff, there

16   is not clear and convincing evidence that plaintiff would have

17   been dismissed absent the protected activity.

18           In addition, Mr. Miller and Ms. Detlefsen acknowledge

19   the charging officer decides the level of punishment in the

20   first instance, and that decision influences the appropriate

21   level of discipline.  In this case, Mr. Carpenter made the

22   decision to charge plaintiff with insubordination, rather than

23   a lesser offense, and insubordination is a stand-alone ground

24   for termination at BNSF.  Because Mr. Paz and Mr. Carpenter

25   were involved in the hearing process and the initial charge of

1    insubordination, defendant has not established as a matter of

2    law that there is clear and convincing evidence plaintiff

3    would have been dismissed absent his protected activity in May

4    2016.

5            Accordingly, I deny defendant's motion for judgment

6    as a matter of law as to their argument that clear and

7    convincing evidence shows plaintiff would have been dismissed

8    absent his protected activity.

9            Now, finally, on damages defendant argues that no

10   damages should be awarded other than lost wages.  I find that

11   plaintiff has introduced sufficient evidence to submit the

12   issue of emotional damages and punitive damages to the jury.

13   He testified about the stress of losing his job, having to

14   stop coaching his son's baseball team, gaining weight, and

15   stress associated with being paid less now than he earned

16   while working for BNSF.  Several witnesses have also described

17   a culture at BNSF that disregards the railroad rules and

18   regulations and employee's rights, and there is other evidence

19   which could be interpreted as defendant acting with reckless

20   or callous disregard for plaintiff's rights and intentionally

21   violating federal law.  The evidence, if believed by the jury,

22   could support punitive damages.

23           Accordingly, then I deny defendant's motion for

24   judgment as a matter of law as to damages.

25           So the upshot of this, Mr. Thompson, is you can't

1   argue that the protected activity is anything other than the

2   May 2016 event.  All right.

3          All right.  So there's one other thing we need to do.

4   We need to look at the -- and we'll do this quickly.  We need

5   to look at the verdict form because we didn't cover that.  Is

6   there any objection from the plaintiff to the proposed verdict

7   form?

8          MR. THOMPSON:  No, Your Honor.

9          THE COURT:  Is there any objection from the defendant

10  to the proposed verdict form?

11         MR. GOMAN:  Your Honor, just for the record, to the

12  extent the elements in the verdict form don't track the

13  elements that we tendered in our disputed and refused

14  instruction, we object.

15         THE COURT:  Yeah, but I refused that because it

16  doesn't make any sense, it was wrong, it was slanted.  So

17  looking, though, at the verdict form, taking into account the

18  record you have made, do you have any objections to the way

19  the Court is phrasing things?  Because if you did, I want to

20  hear that.

21         MR. GOMAN:  No, not in addition to what we said

22  previously.

23         THE COURT:  All right.  So here's what I'm going to

24  do.  So it's my practice to give the jury both an original and

25  copies of the verdict form and the instructions.  And what I'm

1    going to do is we are going to take a break here.  We are

2    going to take a 15-minute break.  And I want to make sure --

3    my law clerk will make sure you have all of the corrected

4    instructions.  We corrected 16, and then we also corrected the

5    one where we attempted to change the plaintiff's gender and it

6    was caught by the defendant.  Which one was that?

7              MR. GOMAN:  21, Your Honor.

8              THE COURT:  21, yeah.  So we changed that.  Yeah.

9    And I don't think we changed anything else.

10             MS. DALE:  There was the one where we had the

11   "unless" and we changed --

12             THE COURT:  Yeah, that was -- which instruction was

13   that?

14             It's 20.  We changed 20 and 21.

15             MR. GOMAN:  Your Honor, there's an additional record

16   I'd like to make about the jury instructions in light of the

17   Court's rulings on the Rule 50 motion.

18             THE COURT:  Go ahead.

19             MR. GOMAN:  On Instruction No. 18, because the Court

20   has ruled as a matter of law that Stephanie Detlefsen and Adam

21   Miller are the decisionmakers, and because plaintiff's counsel

22   has said he's going to argue that that's not the case, I would

23   like the jury to be instructed that this Court has determined

24   as a matter of law that Adam Miller and Stephanie Detlefsen

25   are the decisionmakers.

17-cv-00844-WYD-SKC          Instruction Conference          VI - 1467

 1          THE COURT:  That's kind of what I did say.  What's

 2     your position on that, Mr. Thompson?

 3          MR. THOMPSON:  We think that is reversible error,

 4     Your Honor, to give that instruction.  Because of the

 5     pro forma nature of the hearing, we have a right and, in fact,

 6     an obligation to argue to the jury that what Mr. Miller did

 7     and what Ms. Detlefsen did were pro forma.  Indeed, the

 8     affirmative defense is would they have done the same thing,

 9     and we have a right to show them that Michael Paz's lying

10     prevented them from doing that, that Mark Carpenter's charge

11     prevented them from doing that, especially since the charge

12     itself is an adverse action.

13          THE COURT:  I need to think about that.  For purposes

14     of my Rule 50 motion I concluded, but I tend to think -- well,

15     I want to think about that during the recess, about whether or

16     not I want to affirmatively tell the jury that.  I understand

17     what you are saying, but I want to think about it.

18          MR. GOMAN:  The final thing, Your Honor -- and this

19     is just for purposes of the record.  I understand the Court's

20     rulings.  We have not tendered an instruction defining

21     "unfavorable personnel action" because we understood plaintiff

22     was arguing the termination is the unfavorable personnel

23     action, and we're not disputing that.  What we would tender

24     now, then, in light of the Court's ruling is an instruction

25     that says, consistent with the *Burlington versus White* Supreme

1    Court decision:  "An unfavorable personnel action is the type

2    of action that would discourage a reasonable person from

3    engaging in protected activity.  And in general, under the

4    FRSA, a notice of a disciplinary investigation is not an

5    adverse employment action."

6          THE COURT:  I don't think that's needed.  There's

7    only one unfavorable action here that I think plaintiff can

8    legitimately assert in light of my ruling, and that's his

9    termination, and the full record could be used to explain

10   that.  But you are not alleging any other unfavorable action,

11   are you, Mr. Thompson?

12         MR. THOMPSON:  We are going to say the charge itself

13   is an unfavorable action and everything that followed was a

14   consequence of that.

15         THE COURT:  But when you say "the charge," you're

16   talking about the charge that was filed in May of 2016.

17         MR. THOMPSON:  Yes, Your Honor.

18         THE COURT:  And as long as you clarify that that's

19   the charge you are talking about, I don't have any problem

20   with you doing that.

21         All right.  So I'm not going to change any

22   instruction.  What I do want to think about is whether or not

23   I want to agree or disagree with your request about

24   Instruction 18.

25         Okay.  We are going to take a break, and we are going

1   do to come back in 15 minutes, and I will read the

2   instructions.

3        (Proceedings recessed 10:45 a.m. to 11:08 a.m.,

4        resuming outside the presence of the jury.)

5        THE COURT:  Have a seat.  So, as you know, even

6   though I've found that Detlefsen and Miller were

7   decisionmakers for purposes of my Rule 50 ruling, the context

8   of that holding had to do more with whether or not there were

9   contributing factors regarding sort of who was involved in the

10  activities.  So -- but that doesn't mean that I made that

11  decision for all legal purposes.  So I think it would be

12  prejudicial, perhaps, to the plaintiff if we modified that

13  instruction to say that as a matter of law Miller and

14  Detlefsen are decisionmakers for all purposes.  Because,

15  again, I was looking at what may have contributed to things

16  that may or may not have been a protected activity.  So I

17  think my reference to Miller and Detlefsen as decisionmakers

18  was limited to the scope of what I was considering for

19  purposes of my Rule 50 relief.  And then to broaden it I think

20  would be inappropriate.  So, Mr. Goman, your request is

21  denied, and the instructions will remain as is.

22        All right.  So let's bring the jury in, and I will

23  read the instructions.

24        MS. DALE:  Your Honor, may I ask -- raise one more

25  issue?

1            THE COURT:  What?

2            MS. DALE:  You had asked if we had any authority on

3     the notion that punitive damages caps --

4            THE COURT:  Right.

5            MS. DALE:  We had limited time, but we did find one

6     case.  It's a Title VII case.  It's *EEOC versus Staffing*

7     *Network*, 2002 U.S. District, Lexus 21318.  And it says, "A

8     corporate defendant's financial information may be relevant

9     for purposes of Rule 26 regardless of the fact that punitive

10    damages are capped under Title VII.  Indeed, juries are not

11    permitted to know that the damages are capped."

12            And also by analogy to caps under Colorado law, I

13    believe this court and state courts generally do not let the

14    jury know that there is a damages cap.  By analogy, I believe

15    that would apply.

16            THE COURT:  What instruction is that again?  Just the

17    number.

18            And, Ms. Dale, the case you cited, what court decided

19    it?

20            MS. DALE:  I apologize.  It's Northern District of

21    Illinois.

22            THE COURT:  Do you have anything in Colorado that we

23    could find?

24            MS. DALE:  I don't, just the fact that the

25    noneconomic damages caps in Colorado are never told to the

1   jury, from my understanding.

2          THE COURT:  I'm not so sure that's analogous.  I

3   don't know.  What do you think?  I have no strong views on

4   whether or not we should tell the jury that or not tell them,

5   but what I don't want to do is violate if there's a legal

6   decision that says we shouldn't.

7          MS. DALE:  It's Instruction No. 23.

8          THE COURT:  Okay.

9          MR. THOMPSON:  We agree with the Court that the jury

10  should be told what the law is.  I don't know understand why

11  that should be violative.  With that being said, I have at

12  some point read some case somewhere that said that.

13         THE COURT:  What I'm going to do is I am going to

14  take it out.  Is there any objection to me taking out the

15  sentence in Instruction 23 that reads:  "Pursuant to a

16  provision of the FRSA, the amount of punitive damages cannot

17  exceed $250,000"?

18         MR. THOMPSON:  No, Your Honor.

19         THE COURT:  Ms. Dale, do you object?

20         MS. DALE:  No, Your Honor.  I apologize.

21         THE COURT:  All right.  What that means as a

22  practical matter, if the jury were to find for the plaintiff

23  on both compensatory and punitive damages, and if a punitive

24  damage award, for purposes of this comment, were to exceed the

25  statutory maximum, then by operation of law I would reduce it.

1          All right.  So we will take that out.  All right.

2    Let's bring the jury in.

3          MR. STONE:  One other issue, Your Honor.  Then that

4    would change the verdict form, Your Honor.

5          THE COURT:  It would.  I'm going to direct my law

6    clerk to make that change on the instructions and also delete

7    that from the verdict form.  And that specifically is Question

8    4.  I think it would just say "State the amount of punitive

9    damages" and put a period after.  Does everybody agree with

10   that?

11         MR. STONE:  Yes, Your Honor.

12         THE COURT:  Ms. Dale --

13         MS. DALE:  Yes, Your Honor.

14         THE COURT:  -- do you agree with that?

15         All right.  All right.  So we'll modify that.

16         All right.  Let's bring the jury in.

17      (Jury in at 11:14 a.m.)

18         THE COURT:  All right, please have a seat.

19         So I'm going to read the final instructions of the

20   law and summarize the verdict form.  I direct you not to take

21   notes because it's my practice to give jurors both an original

22   set of the instructions and verdict form and each of you will

23   have a draft set.  So you will have your own draft set of the

24   jury instructions and the verdict form.  All right.

25         Instruction No. 1.  Members of the jury, now that you

1   have heard the evidence and before hearing the closing

2   arguments, it is my duty to instruct you about the applicable

3   law.  It is your duty to follow the law as I will state it and

4   to apply it to the facts as you find them from the evidence in

5   the case.  Do not single out one instruction as stating the

6   law, but consider the instructions as a whole.  You are not to

7   be concerned about the wisdom of any rule of law stated by me.

8   You must follow and apply the law.

9        These instructions include both general instructions

10  and instructions specific to the claims and defenses in this

11  case.  You must consider all the general and specific

12  instructions together.  You must all agree on your verdict,

13  applying the law, as you are now instructed, to the facts as

14  you find them to be.

15       The lawyers may properly refer to some of the

16  governing rules of law in their arguments.  If there is any

17  difference between the law stated by the lawyers and as stated

18  in these instructions, you are governed by my instructions.

19       Nothing I say in these instructions indicates that I

20  have any opinion about the facts.  You, not I, have the duty

21  to determine the facts.

22       You must perform your duties as jurors without bias

23  or prejudice to any party.  The law does not permit you to be

24  controlled by sympathy, prejudice, or public opinion.  All

25  parties expect that you will carefully and impartially

consider all the evidence, follow the law as it is now being

given to you, and reach a just verdict, regardless of the

consequences.

Instruction No. 2.  This is a civil case brought by

the Plaintiff, Brandon Fresquez, against the Defendant, BNSF

Railway Company.  Fresquez was an employee of BNSF from

November of 2005 to May of 2016, when BNSF terminated him.

Fresquez alleges that BNSF terminated him in retaliation for

engaging in activity protected under the Federal Railway

Safety Act, 49 United States Code Section 20109, and referred

to herein as "FRSA."  BNSF denies Fresquez's claims and

alleges that it terminated him for legitimate reasons

unrelated to any FRSA-protected activity.

Instruction No. 3.  The parties have agreed to

certain facts as follows:

1.  Defendant is a corporation.

2.  Defendant is a railroad carrier engaged in

interstate commerce.

3.  Plaintiff began working for Defendant in the

Maintenance of Way Department on November 7, 2005.

4.  The Maintenance of Way Department is responsible

for constructing, inspecting, and maintaining BNSF's railroad

tracks.

5.  Plaintiff first worked as a track inspector in

2006, and he has spent much of his career as a track

1    inspector.

2          6.   A track inspector's job entails finding and

3    reporting track defects, which are deviations from Defendant's

4    or Federal Railroad Administration's ("FRA") track safety

5    standards.

6          7.   Working as a track inspector requires extensive

7    training and testing, including a week-long class at Johnson

8    County Community College in Overland Park, Kansas, a

9    certification test after the class, and multiple other tests

10   throughout one's career to become FRA tier I, II, and III

11   qualified, and a rules qualification test that every

12   Maintenance of Way employee is required to take and pass

13   annually.

14         8.   Track defects are usually reported by inputting

15   information about the defect into an electronic track

16   inspection database at Defendant called TIMS.  T-I-M-S, all

17   capitalized.

18         9.   Track inspectors report directly to Assistant

19   Roadmasters or Roadmasters.

20         10.  On May 27, 2016, Defendant dismissed Plaintiff.

21         You will therefore take these facts to be true for

22   purposes of this case.

23         Instruction No. 4.  You should consider and decide

24   this case as a dispute between persons of equal standing in

25   the community, of equal worth, and holding the same or similar

1   stations in life.  A corporation is entitled to the same fair

2   trial as a private individual.  All persons, including

3   corporations and other organizations, stand equal before the

4   law, and are to be treated as equals.

5         Instruction No. 5.  You must not be influenced by

6   sympathy, bias, or prejudice for or against any party in this

7   case.  Also, do not decide the case based on "implicit

8   biases."  As we discussed in jury selection, everyone,

9   including me, has feelings, assumptions, perceptions, fears

10  and stereotypes, that is, "implicit biases," that we may not

11  be aware of.  These hidden thoughts can impact what we see and

12  hear and how we make important decisions.  Because you are

13  making very important decisions in this case, I strongly

14  encourage you to evaluate the evidence carefully and to resist

15  jumping to conclusions based on personal likes or dislikes,

16  generalizations, gut feelings, prejudices, sympathies,

17  stereotypes, or biases.  The law demands that you return a

18  just verdict based solely on the evidence, your individual

19  evaluation of that evidence, your reason and common sense, and

20  these instructions.  Our system of justice is counting on you

21  to render a fair decision based on the evidence, not on

22  biases.

23        Instruction No. 6.  The parties have different

24  burdens to prove different things.

25        When I tell you that a party must "establish

1    something by a preponderance of the evidence," that means the

2    party must offer evidence, which as a whole, shows that the

3    fact sought to be proved is more probable than not.  In other

4    words, a preponderance of the evidence means such evidence as,

5    when considered and compared with the evidence opposed to it,

6    has more convincing force, and produces in your minds belief

7    that what is sought to be proved is more likely true than not

8    true.  This standard does not require proof to an absolute

9    certainty, since proof to an absolute certainty is seldom

10   possible in any case.

11          When I tell you that a party must "establish

12   something by clear and convincing evidence," that means the

13   party must offer -- that means that the party must offer --

14          It should be "as evidence"?  It says "is evidence."

15   Look at that, Counsel, Instruction No. 6.

16          MS. DALE:  Your Honor, I think if you just eliminate

17   the "is."

18          THE COURT:  It should be "is"?

19          MS. DALE:  No, I think just take out the "is."

20          THE COURT:  Yeah, I do too.  Let me read this again.

21   I will take out the word "is."  Do you agree with that,

22   Mr. Thompson?

23          MR. THOMPSON:  We do, Your Honor.

24          THE COURT:  Okay, and we will make that change.  Let

25   me just read to start this paragraph again.  By the way,

1   parenthetically, I never copy these instructions for the jury

2   until after I have read it because by experience I have

3   learned that despite the fact we have read it over and over

4   again, while it's not a substantive error, normally there's a

5   grammatical error.  That's what this is.

6          All right.  When I tell you that a party must

7   "establish something by clear and convincing evidence," that

8   means that the party must offer evidence that produces in your

9   mind a firm belief or conviction as to the matter at issue.

10  Clear and convincing evidence involves a greater degree of

11  persuasion than is necessary to meet the preponderance of the

12  evidence standard.  This standard does not require proof to an

13  absolute certainty, since proof to an absolute certainty is

14  seldom possible in any case.

15         You may have heard of the term "proof beyond a

16  reasonable doubt."  That is a stricter standard applicable in

17  criminal cases.  It does not apply in civil cases such as

18  this.  You should, therefore, put it out of your minds.

19         Instruction No. 7.  The evidence in the case consists

20  of the following:

21         1.  The sworn testimony of the witnesses, no matter

22  who called a witness.

23         2.  All exhibits received in evidence, regardless of

24  who may have produced the exhibits.

25         3.  Depositions received into evidence.  Depositions

1   contain sworn testimony, with the lawyers for each party being

2   entitled to ask questions.  Deposition testimony may be

3   accepted by you, subject to the same instructions that apply

4   to witnesses testifying in open court.

5          4.  Statements and arguments of the lawyers are not

6   evidence in the case, unless made as an admission or

7   stipulation of fact.  A "stipulation" is an agreement between

8   both sides that certain facts are true.  When the lawyers on

9   both sides stipulate or agree to the existence of a fact, you

10   must, unless otherwise instructed, accept the stipulation as

11   evidence, and regard that fact as proved.

12          If I sustained an objection to any evidence or if I

13   ordered evidence stricken, that evidence must be entirely

14   ignored.

15          Some evidence was admitted for a limited purpose

16   only.  If I instructed you that an item of evidence was

17   admitted for a limited purpose, you must consider it only for

18   that limited purpose and for no other purpose.

19          You are to consider only the evidence in the case.

20   But in your consideration of the evidence you are not limited

21   to the statements of the witnesses.  In other words, you are

22   not limited solely to what you see and hear as the witnesses

23   testified.  You may draw from the facts that you find have

24   been proved, such reasonable inferences or conclusions as you

25   feel are justified in light of your experience.

1         Instruction No. 8.  "Direct evidence" is direct proof

2 of a fact, such as testimony by a witness about what the

3 witness said or heard or did.  "Circumstantial evidence" is

4 proof of one or more facts from which you could find another

5 fact.  You should consider both kinds of evidence.  The law

6 makes no distinction between the weight to be given to either

7 direct or circumstantial evidence.  You are to decide how much

8 weight to give any evidence.

9         Instruction No. 9.  In deciding the facts, you may

10 decide -- strike that.

11         In deciding the facts, you may have to decide which

12 testimony to believe and which testimony not to believe.  You

13 may believe everything a witness says, part of it, or none of

14 it.  In considering the testimony of any witness, you may take

15 into account many factors, including the witness's opportunity

16 and ability to see or hear or know the things the witness

17 testified about; the quality of the witness's memory; the

18 witness's appearance and manner while testifying; the

19 witness's interest in the outcome of the case; any bias or

20 prejudice the witness may have; other evidence that may have

21 contradicted the witness's testimony; and the reasonableness

22 of the witness's testimony in light of all the evidence.  The

23 weight of the evidence does not necessarily depend upon the

24 number of witnesses who testify.

25         Instruction No. 10.  A witness may be discredited or

1    impeached by contradictory evidence or by evidence that at

2    some other time the witness has said or done something, or has

3    failed to say or do something that is inconsistent with the

4    witness's present testimony.  If you believe any witness has

5    been impeached and thus discredited, you may give the

6    testimony of that witness such credibility, if any, you think

7    it deserves.

8            If a witness is shown knowingly to have testified

9    falsely about any material matter, you have a right to

10   distrust such witness's other testimony, and you may reject

11   all the testimony of that witness or give it such credibility

12   as you think it deserves.

13           An act or omission is "knowingly" done if the act is

14   done voluntarily and intentionally, and not because of mistake

15   or accident or other innocent reason.

16           Instruction No. 11.  The weight of the evidence is

17   not necessarily determined by the number of witnesses

18   testifying to the existence or nonexistence of any fact.  You

19   may find the testimony of a small number of witnesses as to

20   any fact is more credible than the testimony of a larger

21   number of witnesses to the contrary.

22           You are not bound to decide any issue of fact in

23   accordance with the testimony of any number of witnesses that

24   does not produce in your minds belief in the likelihood of

25   truth as against the testimony of a lesser number of witnesses

1   or other evidence producing such belief in your minds.

2        The test is not which side brings the greater number

3   of witnesses or takes the most time to present its evidence,

4   but which witnesses and which evidence appeal to your minds as

5   being most accurate and otherwise trustworthy.

6        Instruction No. 12.  The Rules of Evidence ordinarily

7   do not permit witnesses to testify as to opinions or

8   conclusions.  There is an exception to this rule for "expert

9   witnesses."  An expert witness is a person who by education

10  and experience has become expert in some art, science,

11  profession, or calling.

12       Expert witnesses state their opinions as to matters

13  in which they profess to be expert, and may also state their

14  reasons for their opinions.

15       You should consider each expert opinion received in

16  evidence in this case, and give it such weight as you think it

17  deserves.  If you should decide the opinion of an expert

18  witness is not based upon sufficient education and experience,

19  or if you should conclude the reasons given in support of the

20  opinion are not sound, or if you feel the expert's is

21  outweighed by other evidence, you may disregard the opinion

22  entirely.

23       Instruction No. 13.  The law does not require any

24  party to call as witnesses all persons who may have been

25  present at any time or place involved in the case, or who may

1    appear to have some knowledge of the matters in issue at this

2    trial.  Nor does the law require any party to produce as

3    exhibits all papers and things mentioned in the evidence in

4    the case.

5          Instruction No. 14.  Certain documents have been

6    partially redacted to protect private or personally

7    identifiable information irrelevant to the issues in this case

8    or other irrelevant or inadmissible information.  You should

9    not speculate about what has been redacted, and the redactions

10   should not affect your decision in this case.

11         Instruction No. 15.  To prove the Defendant

12   retaliated against the Plaintiff in violation of the FRSA, the

13   Plaintiff must prove by a preponderance of the evidence that,

14   1, he engaged in a protected activity as defined by the FRSA;

15   2, the Defendant knew the Plaintiff engaged in the protected

16   activity; 3, the Plaintiff suffered an unfavorable personnel

17   action; and, 4, the protected activity was a contributing

18   factor in the unfavorable action.

19         Instruction No. 16.  An employee engages in protected

20   activity as defined by the FRSA if the employee, in good

21   faith, commits an act or the employer perceives the employee

22   to have committed an act or to be about to commit an act, 1,

23   to lawfully provide information, directly cause information to

24   be provided, or directly assist in any investigation regarding

25   any conduct which the employee reasonably believes constitutes

 1   a violation of any federal law, rule, or regulation relating

 2   to railway safety if the information is provided to an

 3   employee's supervisor or the FRA; or, 2, to lawfully refuse to

 4   violate or assist in violating any federal law, rule, or

 5   regulation relating to railroad safety or scrutiny [sic]; or,

 6   3, to report a hazardous safety or security condition.

 7          Instruction No. 17.  Protected activity is done in

 8   "good faith" if the employee had a subjectively and

 9   objectively reasonable belief that he was providing

10   information to a supervisor or the FRA about violations of any

11   federal law, rule, or regulation, that he was refusing to

12   violate or assist in violating any federal law, rule, or

13   regulation relating to railroad safety or security, or that he

14   was reporting a hazardous safety or security condition.

15          Instruction No. 18.  A contributing factor is any

16   factor, which alone or in combination with other factors,

17   tends to affect in any way the outcome of the unfavorable

18   action.  For protected activity to be a contributing factor in

19   an unfavorable action, the employee must prove the

20   decisionmakers had knowledge of the protected activity and the

21   decisionmaker's retaliation was prompted by the employee

22   engaging in protected activity.

23          Instruction No. 19.  Even if the Plaintiff proves the

24   elements of his claim in Instruction No. 15, the Defendant is

25   still not liable for wrongful retaliation if it has proven by

17-cv-00844-WYD-SKC          Jury Instructions                  VI - 1485

1   clear and convincing evidence that it would have taken the

2   same unfavorable personnel action against the Plaintiff even

3   if the Plaintiff had not engaged in any protected activity.

4           Instruction No. 20.   The law does not require an

5   employer's managerial personnel to use good judgment, to make

6   correct decisions, or even to treat its employees fairly.

7   Therefore, in deciding the Plaintiff's retaliation claim, it

8   is not your function to second-guess the Defendant's business

9   decisions or question whether the decision was wise, fair, or

10  even correct, or act as a personnel manager.   Your function is

11  to decide whether the decision violated the law.

12          Instruction No. 21.   If you find in favor of the

13  Plaintiff on his retaliation claim, then you must determine an

14  amount that is fair compensation for the Plaintiff's losses.

15  You may award compensatory damages for injuries that the

16  Plaintiff proved by a preponderance of the evidence were

17  caused by the Defendant's wrongful conduct.   The damages that

18  you award must be fair compensation, no more and no less.

19          In calculating compensatory damages, you should not

20  consider any back pay or front pay that the Plaintiff lost.

21  The award of back pay and front pay, should you find the

22  Defendant liable on the Plaintiff's claim, will be calculated

23  and determined by the Court.

24          The Plaintiff claims damages for any emotional

25  distress, pain, suffering, inconvenience, or mental anguish

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   that the Plaintiff experienced as a consequence of his

2   termination by the Defendant.  No evidence of monetary value

3   of such intangible things as pain and suffering has been, or

4   need be, introduced into evidence.  There is no exact standard

5   for setting the compensation to be awarded for these elements

6   of damages.  Any award you make should be fair in light of the

7   evidence presented at trial.

8          In determining the amount of any damages you decide

9   to award, you should be guided by common sense.  You must use

10  sound judgment in fixing an award of damages, drawing

11  reasonable inferences from the facts in evidence.  You may not

12  award damages based on sympathy, speculation, or guesswork.

13  On the other hand, the law does not require that the Plaintiff

14  prove the amount of his losses with mathematical precision,

15  but only with as much definiteness and accuracy as

16  circumstances permit.

17         Instruction No. 22.  You are not permitted to award

18  speculative damages.  You must not include in any verdict

19  compensation for any prospective loss that, although possible,

20  is not reasonably certain to occur in the future.

21         Instruction No. 23.  In addition to the damages

22  mentioned in other instructions, the law permits the jury

23  under certain circumstances to award punitive damages.  The

24  purpose of an award of punitive damages is to punish a

25  wrongdoer for misconduct, and also to provide a warning to

1   others.

2          You may award punitive damages if you find the

3   Plaintiff has proved by a preponderance of the evidence that

4   the Defendant acted with reckless and callous disregard of the

5   Plaintiff's right to be free from retaliation for engaging in

6   protected activity.  The Defendant acted with reckless or

7   callous disregard if the Plaintiff proved by a preponderance

8   of the evidence that the Defendant's employees who made the

9   decision to terminate the Plaintiff's employment knew that the

10  termination was in violation of the law prohibiting

11  retaliation, or acted with reckless or callous disregard of

12  that law.

13         In deciding the amount of punitive damages, you may

14  consider the following:

15         1.  The offensiveness of the conduct;

16         2.  The amount needed, considering the Defendant's

17  financial condition, to prevent the conduct from being

18  repeated; and

19         3.  Whether the amount of punitive damages bears a

20  reasonable relationship to the actual damages awarded.

21         However, you may not award punitive damages if the

22  Defendant has proved by a preponderance of the evidence that

23  the retaliatory actions by the Defendant's employees were

24  contrary to the Defendant's good faith efforts to comply with

25  the FRSA by implementing and enforcing policies and programs

1   designed to prevent unlawful retaliation.

2          Instruction No. 24.  The fact that I have instructed

3   you as to the proper measure of damages should not be

4   considered as indicating any view of mine as to which party is

5   entitled to your verdict in this case.

6          Instructions as to the measure of damages are given

7   for your guidance only in the event you should find in favor

8   of Plaintiff from a preponderance of the evidence in the case

9   in accordance with the other instructions.

10          Instruction 25.  The verdict must be unanimous and

11   represent the considered judgment of each juror.  To return a

12   verdict, it is necessary that each juror agrees.

13          It is your duty, as jurors, to consult with one

14   another, and to deliberate with a view to reaching an

15   agreement, if you can do so without violence to individual

16   judgment.  You must each decide the case for yourself, but

17   only after an impartial consideration of the evidence in the

18   case with your fellow jurors.  In the course of your

19   deliberations, do not hesitate to reexamine your own views,

20   and change your opinion, if convinced it is erroneous.  But do

21   not surrender your honest conviction as to the weight or

22   effect of evidence, solely because of the opinion of your

23   fellow jurors, or for the mere purpose of returning a verdict.

24          Remember at all times that you are not partisans.

25   You are judges, judges of the facts.  Your sole interest is to

1    seek the truth from the evidence in the case.

2            Instruction No. 26.  We have just a few more

3    instructions, the last one being Instruction 29.

4            Instruction 26.  Upon retiring to the jury room, you

5    will select one of your fellow jurors to act as your

6    foreperson.  The foreperson will preside over your

7    deliberations and be your spokesperson here in court.  A

8    verdict form has been provided for the jury to take to the

9    jury room.

10           You will note that the form includes a number of

11   interrogatories, or questions, which call for a "yes" or "no"

12   answer.  The answer to each question must be the unanimous

13   answer of the jury.  Your foreperson will write the unanimous

14   answer of the jury in the space provided for each response.

15   As you will note from the wording of the questions, it may not

16   be necessary to consider or answer every question.

17           When you have completed the verdict form, the

18   foreperson will sign and date the form, all of the jurors will

19   sign the form, and you will give the form to the Court

20   Security Officer, alerting him or her that you've reached a

21   verdict.

22           At this time I am just going to summarize the verdict

23   form.  It will be on a separate caption that says Jury Verdict

24   Form.

25           The first question is:  Has the Plaintiff Brandon

1  Fresquez proven the following four elements by a preponderance

2  of the evidence?  And this just repeats what is stated

3  in Instruction No. 15.  I'm not going to reread it.

4        You will answer that question "yes" or "no."

5        If your answer to Question 1 is "Yes," then you

6  should answer Question 2.  If your answer to Question 1 is

7  "No," you may skip Questions 2 through 4 as you have found for

8  the Defendant on the Plaintiff's retaliation claim and you may

9  sign the verdict form because you have completed your

10 deliberations.

11       If you get to Question 2, it reads:  Has the

12 Defendant proven by clear and convincing evidence that it

13 would have taken the same personnel action against the

14 Plaintiff even if the Plaintiff had not engaged in any

15 protected activity?

16       You answer that "yes" or "no" -- "yes" or "no" and

17 then follow the instruction below your answer.

18       Question 3.  Has the Plaintiff proven by a

19 preponderance of the evidence that he should be awarded

20 compensatory damages for emotional distress, pain, suffering,

21 inconvenience, or mental anguish?

22       You answer that question with a "yes" or "no."

23       If your answer to Question 3 is "Yes," state the

24 amount of damages.

25       Then there is a line below with a dollar sign where

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   you put in a number, if appropriate.

2          And Question 4 says:  Has the Plaintiff proven by a

3   preponderance of the evidence that the Defendant acted with

4   reckless or callous disregard of the Plaintiff's right to be

5   free from retaliation for engaging in a protected activity as

6   defined in Jury Instruction No. 23?

7          You will answer that one "yes" or "no."

8          If the answer were to be "yes," there is a line where

9   you can indicate the amount.

10         And the final page is just a page that has the date

11  and the lines for the foreperson and the other jurors to sign

12  the verdict form.

13         All right.  Now, returning to the balance of these

14  instructions, 27, 28, and 29.  27 is the one that I read to

15  you earlier, but I am going to read it again.

16         In your deliberations, your duty is to apply my

17  instructions of the law to the evidence that you have seen and

18  heard in the courtroom.  You are not allowed to look at, read,

19  consult, or use any material of any kind, including any

20  dictionaries or medical, scientific, technical, religious, or

21  law books, the Internet, or any material of any type or

22  description in connection with your jury service.  I want to

23  emphasize that you must not seek or receive any information

24  about this case from the Internet, which includes Google,

25  Wikipedia, blogs, and any other website.  You are not allowed

1    to do any research of any kind about this case.

2          During your deliberations, you must not communicate

3    with or provide any information to anyone about this case.

4    You may not use any electronic device or media, such as a

5    telephone, cell phone, smart phone, iPhone, Blackberry or

6    computer; the Internet; any Internet service; any text or

7    instant messaging service, or any Internet chat room, blog or

8    website such as Facebook, MySpace, LinkedIn, YouTube or

9    Twitter, to communicate to anyone any information about this

10   case or to conduct any research about this case until I accept

11   your verdict.  In other words, you cannot talk to anyone on

12   the phone, correspond with anyone, or electronically

13   communicate with anyone about this case.  You can only discuss

14   the case in the jury room with your fellow jurors during

15   deliberations.  I expect you will inform me as soon as you

16   become aware of another juror's violation of these

17   instructions.

18          You may not use these electronic means to investigate

19   or communicate about the case because it is important that you

20   decide this case based solely on the evidence presented in

21   this courtroom.  Information on the Internet or available

22   through social media might be wrong, incomplete, or

23   inaccurate.  You are only permitted to discuss the case with

24   your fellow jurors during deliberations because they have seen

25   and heard the same evidence you have.  In our judicial system,

17-cv-00844-WYD-SKC            Jury Instructions              VI - 1493

1    it is important that you are not influenced by anything or

2    anyone outside this courtroom.  Otherwise, your decision may

3    be based on information known only by you and not your fellow

4    jurors or the parties in the case.  This would unfairly and

5    adversely impact the judicial process.

6            Instruction No. 28.  I do not invite communications

7    from you, but if it becomes necessary during your

8    deliberations to communicate with the Court, you may send a

9    note by the Court Security Officer, signed by your foreperson

10   or by one or more members of the jury.

11           Now, let me just stop there.  Whoever the foreperson

12   is, if you send me a note, make sure your handwriting is

13   legible, because sometimes it isn't.  And please indicate the

14   date and the time.  And then print your name and then sign

15   your name, so I can read who is actually the foreperson.

16           Continuing on with Instruction 28.  No member of the

17   jury should ever attempt to communicate with the Court by any

18   means other than a signed writing, and the Court will never

19   communicate with any member of the jury on any subject

20   touching the merits of the case other than in writing or

21   orally here in open court.  Upon receipt of a note from you, I

22   will need to convene a meeting with counsel to discuss your

23   request -- your question or request.  It may well take

24   considerable time and effort to respond.

25           You will note from the oath about to be taken by the

1    Court Security Officer -- parenthetically, that will be after

2    the closing arguments -- that he or she, as well as all other

3    persons, are forbidden to communicate in any way or manner

4    with any member of the jury on any subject touching the merits

5    of the case.  Let me know immediately if anyone attempts any

6    such communication.

7          Bear in mind also that you are never to reveal to any

8    person -- not even to the Court -- how the jury stands,

9    numerically or otherwise, on the questions before you, until

10   after you have reached a unanimous verdict.

11         Instruction No. 29.  These instructions contain the

12   law that you must use in deciding this case.  No single

13   instruction states all the applicable law.  All the

14   instructions must be read and considered together.

15         Nothing said in these instructions and nothing in any

16   form of verdict prepared for your convenience is meant to

17   suggest or convey in any way or manner any suggestion or hint

18   as to what verdict I think you should find.  What the verdict

19   shall be is your sole and exclusive duty and responsibility.

20         Now, Counsel, do these jury instructions, as

21   modified, along with the verdict form, which was modified,

22   constitute the jury instructions and verdict form agreed to by

23   the Court and counsel, subject to the record previously made?

24         MR. THOMPSON:  They do, Your Honor.

25         MS. DALE:  Yes, Your Honor.

1          THE COURT:  All right.  So here's what we are going

2     to do.  I have allocated time limits for closing.  What we are

3     going to do is have the plaintiff's initial closing argument,

4     after which we will take a short break.  And then when we come

5     back, we will have the defendant's closing argument and any

6     rebuttal argument.

7          So, Mr. Thompson, you may proceed with your initial

8     closing argument.

9          MR. THOMPSON:  Thank you, Your Honor.

10          Good morning.  For closing we're simply going to

11     review the PowerPoint we first went over where we told you

12     what we were going to tell you.  We are then going to look at

13     how we showed you that, but we're not going to use quotes from

14     our witnesses.  Instead, every quote about evidence will be

15     from BNSF's own managers.  Then we are going to look at how

16     the law applies to that evidence.  And then we are going to

17     talk about Mr. Goman's PowerPoint, why he said what he said,

18     and what BNSF did not show you.

19          So, as you will recall, we started the case talking

20     about BNSF Railway Co., that they are one of the nation's

21     largest railroads.  All of their managers told you they haul

22     gas, oil, and ammonium hydroxide around the country, including

23     through downtown Denver.  And Staci Moody-Gilbert told you

24     that in 2016, the last year Brandon worked for them, they made

25     over 4 billion in profit, that's billion with a B, in profit,

17-cv-00844-WYD-SKC          Plaintiff's Closing          VI - 1496

1   not revenue.

2          We have talked about track defects.  Oh, boy, have we

3   talked about track defects.  In fact, I suspect outside of

4   someone who works for the railroad, you guys now know as much

5   about track defects as anyone.  Everyone admitted that they

6   can derail trains.  There is no such thing as a minor defect

7   because a minor one can derail a train, which is a major

8   issue.

9          You heard from Joe Lydick, who worked for the Federal

10  Railroad Administration.  He told you about the requirements

11  when BNSF is required to inspect track, how they are required

12  to inspect it, and how they are required to remediate the

13  defects.  And you heard about the three types of defects, the

14  ones that require tracks to be taken out of service

15  immediately, the ones that require slow orders, and the ones

16  that nothing needs to be done for 30 days, at which point

17  everyone except Mr. Carpenter agrees the track needs to be

18  taken out of service.

19         We talked about track inspectors, how they perform

20  the FRA-required inspection but they work for the railroad,

21  which puts them sometimes in a rock and a hard place.  As

22  Brandon explained it, they are food inspectors who work for

23  the restaurant they are fining.  Mr. Lydick and Mr. Gavalla

24  both talked to you about the railroad's history of retaliating

25  against these employees if they do too well of a job.  They

Julie H. Thomas, RMR, CRR                           (303)296-3056

1    need to do well enough but not too good.

2           You were introduced to Brandon Fresquez, who started

3    working for BNSF on November 7, 2005.  You heard that his son

4    Xavier was born two days later and that because of Xavier's

5    health conditions, benefits were very important to him.  Not

6    to mention, Brandon is the primary care provider for his son,

7    and so the wages were also important.

8           And you heard that he loved his job.  You heard how

9    he is the type of person this job was meant for, a rules

10   person.  And you heard from each of his coworkers, three of

11   whom still work there and have no skin in the game.  Indeed,

12   they were scared to testify.  They told you he was an

13   excellent track inspector.

14          You met Mark Carpenter, BNSF's division engineer, who

15   is Brandon's boss's boss.  He told you about the emphasis he

16   placed on scorecards, how it was important that velocity

17   measure that trains move over the track at a certain speed was

18   important to him, very important he said.  It didn't make a

19   whole lot of sense, though.

20          You also heard from David Dunn, one of his managers,

21   who said I never understood why Mark Carpenter placed a big

22   emphasis on scorecards because the only way to improve those

23   metrics is to repair defects, and what you need to repair

24   defects are capital and manpower, both of which come from

25   Fort Worth, BNSF's headquarters.  Mark Carpenter has no real

17-cv-00844-WYD-SKC          Plaintiff's Closing              VI - 1498

1    ability to improve his metrics unless you're willing to game

2    the system.

3           You heard Michael Paz admit that a dishonest manager,

4    if he wanted to, could game the system, could essentially

5    leave tracks in service when they should be taken out in order

6    to increase velocity, and this would increase a manager's

7    scorecards.

8           Brandon told you about his track inspections, that

9    sometime in 2014 or 2015 he started noticing that he was

10   reporting the same defects at the same locations for the same

11   issues.  And he, therefore, suspected, though he couldn't

12   prove it at that point in time, that BNSF managers were taking

13   defects out of the system, either outright deleting them or

14   marking them as repaired when no repair had been done.

15          You also heard about a couple specific instances of

16   pressure being put on him.  For example, back at the end of

17   2014 when they were at a petroleum track where they unload and

18   load oil, where he found a track defect which Mark

19   Carpenter -- excuse me -- which Michael Paz agreed was there

20   and said, Good job, let's take this track out of service,

21   until Michael Paz was called to Mark Carpenter's office, at

22   which point he returns and tells Brandon, Do not take this

23   track out of service.  I'm not being the bad guy.  This is

24   coming from somewhere else.  I'm your friend here, but if you

25   take this track out of service, you are going to be written up

Julie H. Thomas, RMR, CRR                        (303)296-3056

1   for insubordination.

2          Brandon told you how he went back and forth with

3   Michael Paz saying, Look, we have a gang right here.  We can

4   repair this.  There's no need to misreport this defect.  It's

5   a win/win.  Let's repair the defect, and we get to keep the

6   track in service.  And he told you how Michael Paz relented.

7          Brandon gave this as just an example of the kinds of

8   pressures he would get, but that until 2015 he had always been

9   able to resolve by talking with his manager, convincing his

10  manager to do the right thing.

11          That changed in April of 2015 with the ride-along

12  with Mark Carpenter.  Specifically, they found a defect that

13  Brandon had marked as being a hundred feet further away than

14  it actually was.  Now, you heard that being off a hundred feet

15  is not that big a deal because mileposts don't change even

16  though the track changes.  So they have long miles and short

17  miles.  And so Brandon told you how he tried to get Mark

18  Carpenter to just change the location of the defect, problem

19  solved, and how Mark Carpenter instead told him to take the

20  defect out of the system.  And Brandon told you how, much to

21  his shame, unprepared for this confrontation, he did exactly

22  what Mark Carpenter told him to do.  Brandon violated the law.

23          As a track inspector, he'd always walked the line,

24  and now he was being pushed over it.  For a rules person, this

25  ate at Brandon.  You heard him tell you how it bothered him

17-cv-00844-WYD-SKC          Plaintiff's Closing              VI - 1500

1    over the next month.  He thought about it, not wanting to

2    violate law again.  And so when the next three instances

3    happen in April 29th of 2015, June 4 of 2015, and then a week

4    later, June 11th, Brandon for the first time in his career

5    stood up to BNSF, refused to violate the law.

6           So let's talk about each of these as background

7    information.  First, there was the Akers order.  This is the

8    one where Ryan Akers at the end of the month needed a track

9    inspected, a grain track.  They have to be inspected every

10   month.  This track had loads of defects.  Yet Mr. Akers told

11   Brandon Fresquez, I want you to inspect this and show it as

12   having no defects.  Let's keep this track in service.

13          So Brandon for the first time reports the illegal

14   conduct.  Specifically, and you heard this from Staci

15   Moody-Gilbert, he got ahold of his union rep.  His union rep

16   told him, Look, BNSF's history of retaliation requires, now

17   that you have reported them, that you start taking notes, you

18   start taking pictures, you start printing off reports, because

19   she knew BNSF's history of retaliation could lead us here

20   someday, and we didn't want it to be Brandon's word versus

21   BNSF's word.  And she said she reached out to Adam Miller.

22          Now, Ryan Akers denies this incident.  He says it

23   never happened.  But let me ask you this.  Why then is Brandon

24   texting his union rep?  Why is his union rep texting him to

25   start keeping documents?  If Brandon is not reporting illegal

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   conduct, what is going on here?  Do we think that Brandon, a

2   year and a half before this lawsuit is started, is contriving

3   fake text messages?  Of course not.  The only thing that makes

4   sense is that Brandon is telling the truth.

5          Then we get to June 4th, 2015.  This is the one where

6   Cason Cole tells Brandon to leave a track in service.  Brandon

7   instead writes Main 2, M2, oos, out of service, between south

8   Denver walnut FRA for a non-class defect, In other words, a

9   defect that hadn't been repaired within 30 days.

10         Mr. Cole writes, Don't do it.  Now, Mr. Cole's

11  explanation for that, as he writes to Mark Carpenter, is that

12  we had done work, and I want to make sure I quote it here,

13  several weeks ago, which Akers can attest to.

14         Now, when on the stand, you will notice Mr. Cole

15  first said, I looked at the defect that day and it was fine.

16  Then we confronted him with a picture, which I apparently

17  deleted from my PowerPoint, but you guys remember the picture

18  with the ties so decrepit they were no longer even there.

19  Mr. Cole was confronted with that and said, Well, maybe it

20  wasn't that day I looked at it, but we did the repair several

21  weeks ago.  That's when it was repaired.  This must have

22  happened since then.

23         Of course, ties are soaked in creosote.  They don't

24  rot in a couple weeks.

25         Moreover, he said Mr. Akers was who could back up his

1    account.  Let's look at what Mr. Akers said.  This is one of

2    the ones that Mr. Akers had reported to IT to delete.  When

3    did Mr. Akers say it was repaired?  September 14th of 2014, a

4    year prior.  So first Mr. Cole's testimony doesn't line up

5    with his own testimony.  Then it doesn't line up with

6    Mr. Akers'.  That's because, as Brandon said, the defect

7    existed then and always existed, and he was right to remove it

8    from service.

9         Nevertheless, if you look back at this e-mail, Cason

10   Cole actually asked Mark Carpenter to write him up for

11   insubordination.  And Mark Carpenter says, We'll start the

12   steps once Ryan Akers returns.  They are going to start the

13   discipline process in 2015 once Mr. Akers gets back.

14        Before that can happen, there's a confrontation

15   between Brandon Fresquez and Mark Carpenter, the third strike

16   for Brandon.  Specifically, on May 1st, you can see the

17   e-mail, May 1st, so about a month prior, Brandon obtained

18   proof positive that BNSF was violating the law.  Specifically,

19   Ryan Akers had 35 defects deleted out of the system that he

20   said were repaired.  Brandon knew they weren't repaired

21   because he was looking at one of them.  Again, you saw the

22   picture of that, clearly not a repaired defect, which all of

23   them admitted.  Mr. Akers, Mr. Cole, Mr. Carpenter, Mr. Paz,

24   all of them admitted that that picture showed a defect.

25        Now, Ryan Akers' testimony is, Well, again, we made

17-cv-00844-WYD-SKC          Plaintiff's Closing          VI - 1503

1    the repair sometime prior, and this must have happened over

2    time.  Again, creosote ties don't wear like that in that short

3    a time period.  But let's even suppose we believe Mr. Akers.

4    Let's take him at his word.  What did Joe Lydick tell us about

5    keeping offsheet repairs?  The only expert in this case on

6    defect reporting, what did he say?  That itself is a

7    violation.  So even if you believe Mr. Akers, what he is

8    testifying to is a violation of the law.

9            Further, how convenient that these defects -- he kept

10   these track defects notes for two years.  And we saw them on

11   that spreadsheet; they go back to 2014.  He apparently kept

12   notes for two years.  We could see if the repairs were really

13   made by looking at those notes, except immediately after we

14   filed this case, he threw them away.  A little too convenient.

15           Now, during -- after Brandon gets these defect lists,

16   he now has proof positive, he confronts Mark Carpenter during

17   a safety briefing.  Now, Mark Carpenter and BNSF's witnesses

18   said the way he confronted Mark Carpenter was inappropriate.

19   I'm not sure of the appropriate way to accuse somebody of

20   violating federal law, but I know each of his coworkers, many

21   who still work there, testified there was nothing

22   inappropriate about what Brandon did.  Brandon was doing what

23   track inspectors should do, at the start of a meeting saying,

24   I'm taking these tracks out of service, and here's why.

25           How did Mark Carpenter respond?  He pulls him into a

Julie H. Thomas, RMR, CRR                                (303)296-3056

17-cv-00844-WYD-SKC          Plaintiff's Closing                VI - 1504

1   side room.  First, tells him he's a terrible track inspector.

2   Of course, Mark Carpenter had never moved to disqualify him.

3   There's no contemporaneous notes saying what a poor track

4   inspector Brandon is.

5          Second, Mark Carpenter threatens to fire him, says,

6   If you keep on taking tracks out of service like this, I'm

7   going to fire you.

8          Third, when Brandon asked for a union rep, he denies

9   him.  Now, Brandon has a right to a union rep.  Mark Carpenter

10  says no.

11         And, finally, when Brandon's child's doctor calls and

12  Brandon says, I need to take this, Mark Carpenter says --

13  refers to himself in the third person and says, You are

14  talking to Division Engineer Mark Carpenter.  You don't answer

15  that phone.

16         Because he's obtained proof positive and is now

17  objecting to their orders, not going along with what they

18  said, not trying to convince them to do the right thing, but

19  outright objecting and then confronting them on it, Brandon

20  has gone from a nuisance, which all track inspectors are, at

21  least if they're doing their job, to now a threat.  But don't

22  take it from me.  We heard from Cason Cole, their own manager.

23  Let's hear what they said.  Again, what we have said is in

24  2015 Brandon for the first time stands up to them about their

25  violations of law, and that's when this starts.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1        What did Cason Cole say?  Quote:  Early on he, being

2   Brandon, was somewhat reasonable, you know, in 2015.  In early

3   2015 it started to get difficult dealing with him.

4        Well, how did it get difficult?  Again, let's see

5   what Cason Cole had to say.  Quote:  He raised what he called

6   safety concerns.  He wasn't a team player.  He didn't want to

7   buy into the kind of vision that we tried to sell.

8        What kind of vision was BNSF selling?  Again, let's

9   listen to what Cole Cason [sic] had to say.  Quote:  We

10  certainly had tracks in service under our purview that had

11  defects that were past the 30-day, um, time period.

12       Brandon was no longer being a team player or buying

13  in to violations of federal law.

14       Brandon takes Mark Carpenter's threats seriously, and

15  so he bids off the track inspector position to somewhere where

16  he can keep a low profile.  He does it before, now he doesn't

17  know this, but it's before Mark Carpenter can follow through

18  on his threats.  There you see the highlighted texts from Mark

19  Carpenter or e-mail from Mark Carpenter saying they are going

20  to follow through on insubordination steps as soon as Ryan

21  Akers returns.

22       Brandon bids off before that happens.  He's now under

23  the radar, and wouldn't you know, no discipline.  The entire

24  time he's not under Mark Carpenter, both then and his whole

25  career, no discipline.

1    That works until February of 2016 when he's forced to

2   bump back.  Now, BNSF pointed out he could have bumped back to

3   some other position that would have made him drive 150 miles

4   away from home, but he bumps back to the only realistic

5   position that he can hold, the track inspector position.  He

6   noticed things are even worse.  And we don't have to go over

7   the litany of them.  You heard account after account of how

8   he's finding more defects that have been deleted, and he's

9   confronting Michael Paz about it.

10    So Brandon bids off again in March of 2016.  That

11   again works until May 2nd of 2016.  At this point he's bumped

12   back again.  The first day Paz tells him he wants to, quote,

13   get his house in order.  And they pay Brandon to do nothing

14   that day.  Michael Paz never explained to you what he meant by

15   getting his house in order or why they paid Brandon to do

16   nothing the first day, but Brandon figured it out on his own

17   the next day, his first day inspecting, May 3rd, 2016.

18    You saw the texts and the documents.  Brandon finds a

19   defect that Michael Paz reported as repaired the very night

20   before.  Brandon knows, okay, what you meant by get your house

21   in order was mark down that defects were repaired when they

22   weren't so that we don't start that 30-day clock, I can't pull

23   it out of service yet.

24    He confronts Michael Paz.  Michael Paz laughs at him,

25   much like BNSF has laughed throughout this trial at Brandon's

1    allegations.  They still haven't gone to look at the defects

2    Brandon has pointed out.

3         The second day inspecting track, May 4th, 2016, the

4    third day back, Brandon takes a track out of service for a

5    defect that he first reported in June, you saw the text of

6    that, that was rereported by him in March, and again you saw

7    the texts, and Paz responds by threatening him, telling him

8    that taking tracks out of service doesn't make friends.

9         Now we reach the crescendo, May 5th, 2016.  The day

10   starts with Michael Paz asking Brandon to reclassify a defect.

11   Specifically, Brandon had reported a defect back in March.

12   When he first reported it, Brandon wanted to mark it as a slow

13   order defect, and Michael Paz said no.  And again you saw the

14   text on this.  Michael Paz said, No, let's do it as a 30-day

15   defect.  Which Michael Paz was right, you can do that.

16   Nothing illegal about -- for that defect.  Brandon was just

17   trying to err on the side of caution.  It was in a curve, and

18   so he wanted to put a slow order on it.  Since Michael Paz was

19   not doing anything illegal, Brandon says okay.  And in March

20   marks it as a slow -- or, sorry -- as a 30-day defect.

21        Fast-forward to May 5th.  Brandon finds that same

22   defect not repaired.  Since it hasn't been repaired, it's now

23   been over 30 days, the track needs to be taken out of service.

24   Michael Paz now wants to change his mind back the other way.

25   You again saw the texts where he says, Can't this just be a

17-cv-00844-WYD-SKC          Plaintiff's Closing          VI - 1508

1  slow order defect?  I know, never mind I told you not to mark

2  it as a slow order the first time.  Can't we mark it as a slow

3  order now so we can continue to run trains?

4          Brandon, tired of confronting him and, frankly,

5  scared, calls the FRA to get the FRA on his side so he cannot

6  just say, Hey, it's me telling you this, Michael Paz; it's the

7  FRA.  So he calls the FRA.

8          He then calls Michael Paz back and says, I called my

9  friends in high places, which can only be the FRA.  There's

10 nobody else that would have been.  And Michael Paz responds, I

11 have friends in high places too.  I have Mark Carpenter, and

12 we don't lose.

13         Now, during his testimony what did Michael Paz say

14 about the FRA call?  He said, That was actually my idea.  I

15 texted Brandon to call the FRA.  Here we have the quote from

16 him where he told you -- actually, I'll read it.

17         Question:  My question is different.  Was it your

18 idea for Brandon to call the FRA?  Is that what your testimony

19 is?

20         Michael Paz's answer:  I think in a text message that

21 I did recommend that, yes.

22         Question:  You think you text messaged it?

23         Answer:  I think so, yes.

24         Question:  You produced your texts in this case, but

25 only with Brandon; right?

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1          Answer:  Yes.

2          Question:  Have you looked through those texts?

3          Answer:  Yes.

4          You think that text is in there?

5          Answer:  I know it is.

6          What happened when we looked at the text messages?

7    Here's the totality of the May 5th, 2016, text messages from

8    Michael Paz.  Not one word from the FRA.  One of the many

9    times Michael Paz has testified to whatever he wants when it

10   pleases him.

11         So now we return to May 5th, 2016.  Brandon does

12   exactly what he told Michael Paz he was going to do over

13   Michael Paz's objection, takes the track out of service.  Now

14   Brandon has gone from a nuisance to a threat to an enemy.  He

15   has called the FRA and told them he called the FRA, something

16   every single witness up there told you, I would never call the

17   FRA, or if I did, I certainly wouldn't tell BNSF because they

18   will retaliate against me.

19         What happens 20 minutes later?  Michael Paz calls

20   Brandon to a defect.  When Brandon arrives, Michael Paz tells

21   him, See, Brandon, trouble follows you everywhere you go.  And

22   they say, We can't find this defect.  And Brandon infers what

23   they are trying to do is, since they can't see it with their

24   naked eye, they are trying to justify taking it out of the

25   system.  So Brandon says, You can't do that.  You need to

1    measure it.  At which point Michael Paz says, All right, go

2    get your string-line and measure it.  Brandon responds, What's

3    the point?  You have already made up your mind, which

4    everybody recognizes means you have already made up your mind

5    to remove this from the system regardless of whether it's

6    there or not.

7          Now, let's talk about the reasonableness of Brandon's

8    belief, which is hugely important in this case.  First, let's

9    talk about the nature of the defect.  Actually, before we get

10   there, let's keep in mind he had just called the FRA on

11   Michael Paz who has a history of retaliating against his

12   employees.  You heard from employee after employee about that.

13         Now he's being called by Michael Paz to this defect

14   that had been present for years.  Geo cars had found it for

15   years.  The idea that this defect wasn't present is asinine.

16         Moreover, it couldn't be repaired that day even if

17   they had wanted to.  Even if they had found the defect, you

18   heard from every company witness, other than the managers,

19   that with the system -- with the machines they had and with

20   the personnel they had, they couldn't repair the defect

21   anyways.

22         Finally, you heard how Brandon was unneeded.  Both

23   Michael Paz and Jay Herzog had the equipment to measure the

24   defect, the GPS and the string-line, and the knowledge.  There

25   was no reason to call a third person there to string-line the

1    defect unless, as Brandon believed, what you want is to

2    involve him in measuring the defect, put his name as the

3    person who marked it as repaired, and then misreport the

4    defect.

5          Not wanting to participate in that, Brandon leaves.

6    That first involves him being involved -- or avoids him being

7    involved.  His name will no longer be on that defect.  Two, it

8    deescalates the situation.  You heard from Jay Herzog that

9    when Brandon showed up, that you could cut the tension with a

10   knife.  He had just called the FRA on Michael Paz.  Things

11   were very tense.  By leaving, that deescalates the situation.

12         Finally, it allows Brandon the chance to renegotiate

13   with Michael Paz later, a strategy that had worked in the

14   past.  Let things calm down.  Then rediscuss with him about

15   taking the defect illegally out of the system.  Get him to do

16   the right thing.

17         That's not what happens, though.  Michael Paz sees it

18   as an opportunity.  First, we know that because Jay Herzog

19   told you, I tried to call Brandon, and Michael Paz says,

20   Don't, this is just what I need.

21         Then we heard the radio call, the back and forth.

22   Now, for some reason, the audio BNSF produced you only hear

23   one end of it, Brandon Fresquez's.  They have said that's

24   because Michael Paz was not in a truck, Brandon was, truck

25   radios are stronger.  But what did the two other witnesses

1   who, again, had no skin in this game, what did they tell you?

2   They heard the entire call, and they saw Michael Paz in his

3   truck.  There's no reason we shouldn't be hearing both ends of

4   this conversation.

5          In any event, what we do hear is Brandon Fresquez

6   say, What's the point?  You've already made up your mind,

7   which every single witness told you they understood to mean

8   you have already determined to take the defect out of the

9   system.  Now, we can argue, as we have throughout this trial,

10  about whether that's accurate, but the salient point is

11  everyone understood Brandon's accusation.  Everyone understood

12  what Brandon believed Michael Paz was trying to make him do.

13         Brandon then gets called to another defect, an

14  emergency defect.  He goes out, remediates it, immediately

15  returns.  Upon returning, he offers to measure.  What does

16  Michael Paz tell him?  It's too late.  Don't bother.  Because

17  Michael Paz had already gotten what he needed, the chance to

18  fire Brandon Fresquez.

19         It's worth noting Brandon Fresquez was correct.  His

20  belief wasn't just reasonable.  It was right.  We know that

21  because the defect was present.  Every single witness

22  testified the defect was there that day.  The defect was

23  reported as repaired except -- every witness who testified

24  except for Michael Paz testified that the defect was not

25  repaired that day, was never repaired.  They couldn't have

1  repaired it that day with the machines they had, especially

2  with Jay Herzog's machines broken down.  And had they repaired

3  it later, everyone in Denver would have known because you had

4  to shut down the entire Denver main terminal.  Everyone would

5  have known.  Never happened.  The only person that says it

6  happened is Michael Paz.

7          And, by the way, whose name appears on that defect

8  repair sheet?  The person he convinced to measure it.  Right

9  here we see it.  Whose name do you think would have been on it

10  had Brandon agreed to remeasure it?  Of course, it would have

11  been Jay Herzog's.  I'm sorry.  Of course, it would have been

12  Brandon Fresquez's instead of Jay Herzog's.

13          Now, BNSF has offered evidence that, namely, this

14  sheet, this piece of evidence I'm showing you, could not have

15  been faked because it's user ID based.  Of course, they didn't

16  call anybody in from their IT department to say that, did

17  they?  They just had Michael Paz, whose credibility is

18  questionable at best.  That's who said it.

19          Also, let's look at this.  I want you guys to look

20  down there.  We didn't know this until after we had rested,

21  but I'm going to put my cursor down here where it has Jay

22  Herzog's name.  Notice how those columns don't line up?

23  Weird.  They line up everywhere else.  They don't line up

24  there.  "Reported By" is off.  The whole columns are off.  It

25  looks like somebody copied and pasted it, doesn't it?

1    Also odd, if you look down here at the bottom, it

2    says "Copyright 2017," after when this happened.  Somehow they

3    copyrighted this page, this defect report, a year and change

4    after they wrote it.

5    We submit to you this is a fake.  Michael Paz

6    inputted Jay Herzog's name.  Jay Herzog told you he didn't

7    repair it.  Every employee -- union-level employee told you

8    they didn't repair it.  It's never been repaired.

9    Now, you will get a verdict form that asks two

10   questions.  The first, the gist of it is this.  Has Fresquez

11   shown by a preponderance of the evidence that his protected

12   activity was a contributing factor in BNSF taking an adverse

13   action against him?  Let's talk about what some of that means,

14   how the law applies to these facts.

15   Preponderance of the evidence.  What is a

16   preponderance of the evidence?  It is more likely than not.

17   So 50.00001 percent, that much.  That's all Brandon has to

18   prove his case by.  If you believe that much, he's satisfied

19   his burden.

20   Protected activity.  What is protected activity under

21   the FRSA?  It's three things.  It's refusing to violate the

22   law, it's reporting a violation of law, and it's reporting a

23   safety concern regardless of whether it's a violation of law.

24   Now, importantly, it's done, perceived to have been

25   done, or about to be done.  What that means in this case is

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  the following.  One of the things BNSF has said is that, look,

2  Brandon called the FRA, but he didn't really report Michael

3  Paz.  He just asked for guidance.  The salient point is

4  Brandon told Michael Paz he called the FRA.  Michael Paz

5  perceived him as having called the FRA on him.  That's

6  sufficient, regardless of what Brandon Fresquez actually said

7  to the FRA.

8          Second, cause information to be reported.  What that

9  means is it's not just Brandon's report.  So, for example, him

10 notifying his union rep, who then notifies Adam Miller.  That

11 counts because Brandon Fresquez has caused that information to

12 be reported to Adam Miller.

13         MR. GOMAN:  May I pause?  I object to that.  This

14 Court has ruled as to whether that's protected activity or

15 not.

16         THE COURT:  Hold on a second.

17         MR. THOMPSON:  I'm not claiming it is, Your Honor.

18 I'm simply explaining how reporting works.

19         THE COURT:  Overruled.  I will allow it.

20         MR. THOMPSON:  That can be to the FRA or a

21 supervisor.  So it's not just calling the FRA or calling the

22 hotline or calling HR.  It's every time Brandon says to a

23 supervisor, What you are doing is illegal, that counts as a

24 report.  That counts as protected activity.

25         Finally, in good faith.  And this is very important.

1    What good faith means is that Brandon subjectively believed

2    it.  So he actually believes what he was reporting or refusing

3    was a violation of law or a safety concern.

4          And that it was objectively reasonable.  He doesn't

5    have to be right.  What that means is the following.

6    Regardless of whether Michael Paz was going to violate the law

7    on May 5th, 2016, what matters is if Brandon reasonably

8    believed it.  If Brandon reasonably believed what Michael Paz

9    was doing was asking him to violate the law, regardless of

10   whether Brandon is right, that's protected activity.  Brandon

11   doesn't have to be right.  He just has to genuinely believe it

12   and for that belief to be reasonable.  We have talked about

13   why that belief is reasonable.

14         So returning to the question, has Fresquez shown by a

15   preponderance of the evidence that his protected activity was

16   a contributing factor in BNSF taking adverse action against

17   him.  The answer to that -- oh, I'm sorry.  I forgot to talk

18   about contributing factor.  I got excited.

19         Contributing factor.  What does that mean?  It means

20   played any part.  So there's some laws that require it to be

21   the motivating or the substantial reason you did something.

22   Contributing factor means it played any part, even 1 percent

23   of the reason that BNSF treated him the way he did.  That's a

24   contributing factor.

25         Finally, adverse action.  What is an adverse action?

 1   It includes charging Brandon with the rule violation and then

 2   following up on that charge.  So it's not just the termination

 3   itself.  It's charging him with the rule violation and then

 4   terminating him.

 5          So now we return to the overarching question.  What

 6   is the answer to it?  It's yes.  And there's two ways we can

 7   get there.

 8          The first is the May 5th, 2016, refusal.  That, in

 9   and of itself, is protected activity.  You saw under the law

10   he has a right to refuse something he believes is illegal.  If

11   you find that Brandon Fresquez reasonably believed Michael Paz

12   was asking him to engage in illegal conduct or participate in

13   illegal conduct, you must find the answer is yes.

14          But you can find it even if it's not.  There's a

15   second way, the remainder of Brandon Fresquez's protected

16   activity in 2016.  For example, calling the FRA.  So let's say

17   you find, you know what, I don't think it was reasonable for

18   Brandon to believe that Michael Paz was asking him to violate

19   the law.  You can still find his FRA call and the tracks he

20   took out of service earlier that year in 2016 were the reason

21   that BNSF treated him the way it did.

22          How can we find that?  First, Paz lying.  In the

23   investigatory hearing, he said the defect was not present,

24   inarguably not present.  Never says it was present but fixed

25   and then not found.  Just says it wasn't present.  Then he

1   said the same thing in his deposition, not present.  But, of

2   course, when he testified here, he for the first time ever

3   says, Oh, yeah, that defect was present.  Now, the reason he

4   said that is because we knew, we got that exhibit earlier that

5   showed it being repaired that day.  He testifies for the first

6   time, Oh, yeah, it was present; it was just repaired earlier

7   that day.

8        Now, first of all, that means everyone else was

9   lying.  Every employee that got up here and told you the

10  defect was present, never repaired, it means they're lying.

11       Also means that the May 5, 2016, events don't make

12  sense.  Why would you call a third person to find a defect you

13  just repaired?  That makes no sense.  You'd know right where

14  it is.  You had just repaired it.

15       And BNSF's lack of proof would make no sense.  Don't

16  you think if that defect was actually repaired, Adam Miller

17  during this trial would have gone out to look at it and come

18  in and said, It's repaired; I looked at it.  Don't you think

19  they would have brought in pictures?  Don't you think they

20  would have brought in the geometry car measures since then?

21  The reason they didn't bring it in is because that defect was

22  never fixed.

23       So you can find that Brandon calling the FRA, things

24  like that in 2016 are why Paz lied.  And Paz's lies in turn,

25  because they were in the internal hearing, contributed to

1    Brandon being charged with a rule violation and terminated.

2            You can find that Brandon's other protected activity,

3    so not just the refusal to engage in measuring the track, but

4    also calling the FRA and things like that, contributed to

5    Carpenter charging Brandon with, instead of failure to comply,

6    insubordination.  We hear that often people who engage in

7    worse conduct are charged with failure to comply.  Why was

8    Brandon treated so much worse?

9            Finally, you can find that Brandon's protected

10   activity in 2016, other than refusing to measure the defect,

11   contributed to Carpenter involving himself.  Carpenter wrote

12   this e-mail to the hearing officer and the charging officer

13   telling them how to testify, what exhibits to offer, what

14   witnesses to call, because he didn't like Brandon because he

15   knew he called the FRA.  He knew he was taking tracks out of

16   service in 2016.

17           Once you find "yes" to the first question, BNSF can

18   still avoid liability.  How they do that is by showing even

19   had Brandon not engaged in protected activity, we would have

20   treated him the same.  So, for example, let's say that

21   somebody turns in a safety report, and while BNSF is

22   investigating it, they find out, well, he also used his phone

23   during the track.  You know, he took pictures.  That's how he

24   made the safety report.  There we have an independent

25   violation of the rule.  And so what we do is we do kind of a

1    hypothetical.  Suppose they had found out that person used

2    their phone out on the track through some other way than the

3    safety report.  Would they have still treated him the same?

4         The answer for Brandon is no, and we know that for

5    two reasons.  First, the May 5th, 2016, refusal.  Absent that,

6    if you find that is protected activity, that begins and ends

7    the analysis.  And here's why.  That was their sole reason for

8    disciplining him.  They have no other justification.  If you

9    find that his refusal to help Paz measure that defect is

10   protected activity, we're done.  Brandon wins the case,

11   period.

12        However, that's not the only way Brandon can win the

13   case.  If you find that Brandon was unreasonable, that it

14   wasn't reasonable to believe Michael Paz was asking him to

15   violate the law, you can still find that the remainder of his

16   activity is why BNSF treated him the way it did.  How can you

17   do that?  Again, we have Paz's lies.  Stephanie Detlefsen told

18   us she relied on him.  Right here we have the quote from

19   trial.  She said:  If things were reversed, if I thought that

20   Michael Paz was lying and Brandon was telling the truth, I

21   wouldn't have found the same way.  In other words, Stephanie

22   Detlefsen has told you that she relied on Michael Paz's lies,

23   and absent Brandon's protected activity, she might not have

24   fired him.

25        We also know from Carpenter's charging decision.  You

1    heard from Adam Miller how he was stuck with that decision.

2    Even if Adam Miller read the transcript and thought, You know

3    what, insubordination is overly harsh, we should have instead

4    charged him with failure to comply, they couldn't go back and

5    make the change.  Carpenter's charging decision is what

6    mattered.

7            Finally, Carpenter involving himself.  They relied

8    again on that hearing transcript.  They relied on Jay Herzog

9    not being called as a witness.  Now, BNSF has tried to tell

10   you, Ah, you know what, it wasn't that big a deal; this was a

11   routine e-mail.  But what did Darron Boltin tell you, their

12   own manager who heads up this program?  He said, and I quote,

13   I take exception to this e-mail.  They can go back and forth

14   all day about whether types of e-mails like that can be sent,

15   but their own witness told you it was important, they relied

16   on it.

17           Now, what has BNSF said?  First, they demeaned

18   Fresquez, they've talked about a glitch, and finally they

19   relied on Miller and Detlefsen not knowing anything

20   supposedly.  Let's talk about each one of those.

21           They've told you Brandon is a bad employee, that he's

22   argumentative.  They have made him out to be a conspiracy

23   theorist.  Let's talk about each of those.  Remember at the

24   start of trial this was Mr. Goman's slide, had a long timeline

25   of discipline that Brandon has suffered.  Let's actually look.

1    What did we talk about?  We talked about three of them.

2          One was that he bid off too early.  The manager never

3    came in and said that Brandon was disqualified for another

4    reason.  Everyone agrees it was because he bid off too early.

5          The second regarding that Brandon wanted to read a

6    document.  If that wasn't what happened, don't you think BNSF

7    would have called Alton Fry, the manager, in to say that's not

8    what happened?  The only testimony is what Brandon did was

9    say, I want to read a document, I'm going to get a union rep

10   before I sign it, which Brandon admitted to you he shouldn't

11   have done.  Said, I shouldn't have left the office, but that's

12   why I did it.

13         And, finally, we have the phone use, which Brandon

14   admitted.  He told you:  Yeah, I used the phone.  I think they

15   disciplined me too harshly, which an arbitrator agreed with,

16   but he did it.  Importantly, none of this had anything to do

17   with anything.  Under their own policy, their witnesses told

18   you, We couldn't consider any of this.

19         So why is Mr. Goman having this timeline of all these

20   supposedly bad events that they didn't even consider, couldn't

21   consider?  It's a tactic they use in defense school.  What you

22   do is you call the employee a bad employee, and you show

23   incident after incident hoping that the jury latches on to one

24   and thinks that Brandon is a bad employee, because if you

25   think that, you are not going to like him.  You are not going

1    to be on his side.  This doesn't have anything to do with

2    anything other than getting you not to like Brandon.  And it's

3    not true.

4          Similarly -- actually, that's also -- a brief

5    non sequitur.  It's what they did with his texts too.  He is

6    the only witness to produce the entirety of his cell phone,

7    1800 pages of texts.  The worse they could find going through

8    1800 pages was Brandon joking about pulling a track out of

9    service to get his buddies -- not even buddies -- coworkers

10   overtime, each of whom said that's not what happened, it was a

11   joke, an ongoing joke because we could always get overtime

12   there was so many defects.  And, again, no manager told you

13   that had any role in his discipline whatsoever.  If we'd

14   gotten Michael Paz's texts, Mark Carpenter, Cason Cole's, went

15   through 1800 pages of their texts, what do think they would

16   look like?  I imagine they would be far worse than that.

17         Second, they called Brandon argumentative, and they

18   brought up a couple of times he was argumentative supposedly

19   in safety briefings.  His coworkers told you he wasn't

20   argumentative.  He was raising safety concerns, and there was

21   nothing inappropriate about it.  And BNSF's own witnesses

22   couldn't identify a single time those arguments didn't concern

23   safety concerns.  Every single one of them was about safety,

24   which is exactly when Brandon is supposed to be argumentative.

25         Finally, they've called Brandon, not in so many

17-cv-00844-WYD-SKC          Plaintiff's Closing                VI - 1524

1   words, a conspiracy theorist.  Specifically, remember this

2   from Mr. Goman's PowerPoint at the start of trial?  One, two,

3   three, four, five, six, seven, eight people Brandon supposedly

4   said were violating the law.  We never talked about Damon Fry.

5   Now we're down to seven.  Never talked about Jeremy Holton.

6   Never talked about John Bennett.  Never talked about Darrell

7   Law, none of them.

8          MR. GOMAN:  I apologize.  I have to object.  The

9   Court ruled that evidence inadmissible after the plaintiff

10  changed their theory of what the protected activity here was.

11  So this is unfair and improper argument.

12         THE COURT:  I'm having trouble following what he

13  said.  I will overrule the objection.

14         MR. THOMPSON:  The only managers Brandon ever accused

15  of wrongdoing are Mark Carpenter and three managers under him,

16  and for a discrete time period.  That he is a conspiracy

17  theorist is something they dreamed up to make him, again, seem

18  unlikable, seem nuts, so you can't believe what he is saying,

19  even though we have mounds of evidence that show that exactly

20  what Brandon said happened is what was going on.

21         Finally -- sorry.  Next to finally, the glitch.

22  Number one, so what?  Whatever the reason, defects were

23  falling out of their system, whether being purposely deleted

24  or mistakenly falling out by their computer system.  That's

25  their problem, not Brandon's.  In fact, they violate the law

1    by having a computer system that conveniently drops defects.

2          Second, this wasn't just a mistake.  You saw the text

3    messages.  There were times Brandon's supervisors directly

4    ordered him to violate the law.  So this wasn't just a matter

5    of defects falling out of the system.  It was also his

6    managers ordering him to violate the law.  And we have that

7    admitted.  Mark Carpenter told you that he ordered people to

8    leave defects in service after 30 days, in violation of the

9    law.  Despite numerous of his managers confronting him, never

10   called the FRA.  By the way, he says Adam Miller knew about

11   this the entire time.

12          Finally, BNSF points to Miller and Detlefsen.  First

13   of all, what they say is Miller and Detlefsen didn't know

14   anything about this, and so even if Mark Carpenter and Michael

15   Paz were out to get Brandon Fresquez, that doesn't matter

16   because Miller and Detlefsen never knew anything about it.

17          First of all, that argument doesn't apply for the

18   refusal.  If you believe that Brandon Fresquez had a right to

19   refuse on May 5th, 2016, that he reasonably believed Michael

20   Paz was asking him to violate the law, Brandon had a right to

21   walk away, and that was their sole reason for disciplining

22   him.  If you believe that Brandon reasonably believed Michael

23   Paz was asking him to violate the law on May 5th, 2016, again,

24   that begins and ends the analysis.

25          But even for the other ones, Miller and Detlefsen's

1   knowledge is really not the question for two reasons.  Number

2   one, Ms. Detlefsen told you -- now, we have called it a

3   kangaroo court.  BNSF has mocked us for that.  However, look

4   what Ms. Detlefsen said.  She reviews up to 20 transcripts per

5   month, has done so for years, has never exonerated a person

6   for substantive reasons.  Mr. Miller and Ms. Detlefsen

7   checking the box on termination is pro forma.  It was what

8   naturally was going to happen once Brandon Fresquez was

9   charged with a rule violation.  It was inevitable.

10          So their decision -- five minutes?

11          COURTROOM DEPUTY:  Yes.

12          MR. THOMPSON:  All right.  Their decision based on

13   Carpenter's decision.  They are stuck with it, they are stuck

14   with Paz's lies, and they are stuck with Carpenter's

15   self-involvement.  The fact that all of that happened before

16   then doesn't matter because their decision is based on that.

17   Their decision is tainted.  The real decisionmakers in this

18   case are Mark Carpenter and Michael Paz because they got the

19   transcript the way they wanted, with their lies, with their

20   dishonesty, to Adam Miller.  Not to mention, Miller and

21   Detlefsen did know.  In the transcript hearing, in the radio,

22   Brandon says, You have already made up your mind.  He is

23   making the allegation right there, you are covering up

24   defects.  We have also seen and heard from managers who told

25   you Adam Miller knew.  To now put that out of mind and think

1   that in 2016 they somehow forgot that Brandon is a person that

2   engages in protected activity is unbelievable.

3           So now let's talk about Fresquez's damages.  Brandon

4   is entitled to wage loss, emotional distress, and punitive

5   damages.  His wage loss and benefit loss from now until --

6   from the time he was fired until the time he retires is

7   $1,522,527.

8           MR. GOMAN:  I object.  This evidence has been

9   specifically excluded.

10          THE COURT:  Yeah, I sustain the objection --

11          MR. THOMPSON:  Yep.

12          THE COURT:  -- and instruct the jury to disregard the

13  amount because any consideration of back pay or front pay

14  damages will be decided by the Court because of some legal

15  requirements.

16          MR. THOMPSON:  And I was just going to tell you the

17  same thing.  So you are wondering, Mr. Thompson, why are you

18  putting up his wage loss if the Court's going to decide that?

19  Here's why.  A good rule of thumb for emotional distress

20  damages is twice his wage and benefit loss.  And here's the

21  reason why.  The reason lawyers use this is as follows:

22  One-third of your life, eight hours a day, is spent at work.

23  And you work so that the other two-thirds of your life is

24  enjoyable.  So when you are fired, when you are treated the

25  way Brandon was treated, when you are deprived of benefits, it

1   bleeds over into those two-thirds.  So a rule of thumb is the

2   emotional distress damages should be double your wage loss,

3   two-thirds of the time compared to one-third of the time.  But

4   there's no science to this.  Maybe it's half that amount.

5   Maybe it's what his wage loss is.  Maybe it's half that

6   amount.  There's no real science to this.

7          You guys know what it's like to have to all of a

8   sudden worry about your seniority, whether you are going to

9   have a job, start a new career after a decade, to worry about

10  your son's benefits and whether you are going to be able to

11  afford his treatment, to tell your son you were fired for

12  doing the right thing, to be so stressed out and unable to

13  sleep at night.  You stop liking the things you used to enjoy,

14  like coaching baseball.  You guys know what it's like to tell

15  your son, Hey, you need to eat at Grandma's because I don't

16  know the next time I can afford food.

17          There's no science to this.  So the rule of thumb,

18  double wage loss.  Maybe it's equal to wage loss.  Maybe it's

19  half that amount.  You guys talk about it.  It's for you to

20  decide.

21          Finally, punitive damages.  This is an amount of

22  money to punish the railroad so it doesn't ever do this again.

23  We request $250,000 in punitive damages.  We think that is the

24  amount necessary to show BNSF, hey, retaliation is not okay.

25  It's enough to get Mr. Miller to finally investigate, to go

17-cv-00844-WYD-SKC                Jury Trial                       VI - 1529

1   out and look at that defect.  And I will have you note, even

2   if you added all of the wage loss that we have requested and

3   the punitive damages, that's less than 10 hours of BNSF's

4   profit, less than they will make today.  Thank you.

5           THE COURT:  All right.  We are going to take a

6   15-minute break.  Now, let me mention something to the jurors.

7   Mr. Keech was unable to intercept your food before it arrived

8   in the jury room, so your lunch is back there.  However, I

9   request that you not sit down and eat your full lunch because

10  we have to finish the closing arguments, after which then you

11  can deliberate.  So I can't stop you from eating on some

12  cookies or something, but don't sit down and expect to be able

13  to finish your full lunch.

14          All right.  And, finally, when you go back, do not

15  begin your deliberation because you need to hear the

16  defendant's closing argument, and then you will begin your

17  deliberation.  All right.  So go back to the jury room.  We

18  will start in 10 to 15 minutes.  It may even -- Julie, how

19  much time do you need?

20          COURT REPORTER:  10 minutes.

21          THE COURT:  Okay.  So why don't we say we'll start in

22  10 minutes.

23      (Jury out at 12:36 p.m.)

24          THE COURT:  All right, let's bring in the jury.

25          MR. THOMPSON:  Your Honor, before that, briefly, so

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC          Defendant's Closing                VI - 1530

1    when Mr. Goman objected, I was hitting my stopwatch.  I have

2    us still having 1 minute and 49 seconds left.

3             THE COURT:  No.  You used up all your time.

4             MR. THOMPSON:  Thank you, Your Honor.

5             THE COURT:  I set a reasonable time, and you chose

6    not to leave any of it for rebuttal, and that's on you, not

7    me.  So your time is up.

8         (Jury in at 12:49 p.m.)

9             THE COURT:  All right.  Let's proceed with the

10   defendant's closing argument.

11            MR. GOMAN:  Good afternoon.  At the very start of

12   this case Monday, I told you this case is going to be about

13   why Mr. Fresquez was fired by BNSF, meaning what did he do on

14   May 5th of 2016 and what did BNSF do in response.  And if you

15   find in your deliberations that BNSF had good reason to

16   believe he was insubordinate, and Adam Miller and Stephanie

17   Detlefsen decided to dismiss him because of that, then you

18   have to decide this case in BNSF's favor.

19            This could have been and should have been a short

20   trial, but I was wrong.  Looking back, I should have said:

21   You are going to hear during this trial about, for four days

22   really, about things that Joe Lydick is going to talk about,

23   history of track inspections.  You are going to hear about

24   things David Dunn is going to testify about, wrongdoing in

25   2017.  You are going to hear a lot about everything except

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC        Defendant's Closing              VI - 1531

1    what happened May 5th of 2016.  You are going to hear from

2    George Gavalla, who is going to tell you generally that

3    whistleblower laws are good and we need them.

4           Whistleblower laws are good, and we do need them, but

5    none of that matters.  I don't mean it doesn't matter because

6    these allegations aren't serious, these allegations that you

7    have heard this last week aren't serious.  I mean it doesn't

8    matter because it doesn't affect the outcome in this case

9    because Mr. Fresquez, unlike several of the witnesses that you

10   have heard from, Mr. Fresquez is not a whistleblower.  I want

11   to talk about exactly what I mean by that.

12          This is where we started this trial; right?  This was

13   the first slide I showed you in opening statement, and it's a

14   good place to start your deliberations.  What happened on

15   May 5th, 2016, and what does that tell us?

16          I believe it's clear, once we sift through everything

17   here, once we look at what matters and what doesn't, the

18   evidence shows that Mr. Fresquez was insubordinate, and the

19   evidence shows that that's the reason why he was dismissed.

20   That should be the focus of your deliberations.  That should

21   have been the focus of this case.

22          So how do we know that?  Let's take these step by

23   step.  How do we know that Mr. Fresquez was insubordinate

24   May 5th of 2016?  We can start and end, if you'd like, with

25   Jay Herzog.  This is his statement, his written statement

Julie H. Thomas, RMR, CRR                          (303)296-3056

 1   written that afternoon.  This is what he says.  I'm at the

 2   crossovers.  I'm there with Mike Paz, and I'm there with

 3   Brandon Fresquez, and I say -- I, Jay Herzog, say, I can't see

 4   this defect.  And Mike Paz says, Yeah, I can't see it either.

 5   That's not surprising or unusual.  They are looking for it,

 6   and they can't see it with their eyes.  You need a

 7   string-line.  But Mr. Fresquez says, See, you are making your

 8   decision, you two, without even measuring it.  He accuses Mike

 9   Paz and Jay Herzog of making their decision without even

10   measuring it.  So he says, What's the point?  And he says it

11   two or three times.  I, Jay Herzog, called Brandon Fresquez on

12   the phone after Mr. Paz contacted him on the radio to get him

13   to come back and do his job, he told us at trial, but he

14   didn't, so I went and did it myself.

15          That same afternoon, before listening to dispatch

16   tapes or looking at any of these records, Mike Paz wrote out a

17   statement, and he says the very same thing.  I received a call

18   from Jay Herzog.  Mr. Herzog needed help doing his job.  He

19   had tried to locate these defects, but they had taken him away

20   from the tracks.  So this happens.  This is Mike Paz's

21   statement from that day.  We're looking for the defect.  We

22   can't find it, so we need to measure it.  So I tell

23   Mr. Fresquez, Get your string-line, because he's the one who

24   has been trained to do it and he's the one whose job it is to

25   measure it.  But he doesn't.  I don't see the point.  I'm not

1    going to do it.

2          So we have an investigation hearing.  All Mike Paz

3    does is call his boss and say, Hey, this is what happened.

4    All Mark Carpenter does is say, That sounds like

5    insubordination; let's have a hearing to find out, to see what

6    Mr. Fresquez's explanation is.

7          So he says that.  It's not complicated.  It takes

8    about a paragraph.  I told him to string-line the track.  He

9    said, What's the point, and he left.  That's it.

10         Then they have the dispatch recording.  Mike Paz told

11   you his best guess as to why it's not in there is he was

12   talking on a PAC set, and it didn't get recorded.  Jay Herzog

13   told you the same thing.  They were trying to call him.  But

14   there's no dispute about what Mike Paz was saying.

15   Mr. Fresquez, Mr. Herzog, Mr. Yancey, all of them who heard

16   this recording said the same thing.  They were telling him,

17   Are you coming back to string-line?  And he says the same

18   thing he said on the track.  Nawh, you guys already made your

19   decision.  You got your foreman there.  You and Jay Herzog

20   have made your decision.

21         So we ask Jay Herzog at trial.  He comes in here, Jay

22   Herzog, who is probably -- I don't think "disgruntled former

23   employee" goes far enough to describe where Mr. Herzog is

24   coming from, and that's okay, but this is what he says.  He

25   who has no motivation to color his testimony for BNSF.

1    I'm trying to locate it.  I don't have a GPS.  I need

2    help.

3         So you asked Mike Paz and Brandon Fresquez for help?

4         Yeah.  I'm just trying to do my job.

5         So you say, I can't see this defect with my naked

6    eye?

7         Yeah.

8         Were you telling the truth?

9         Yeah.

10        He wasn't trying to trick Mr. Fresquez into

11   string-lining the track.  He wasn't trying to get him to

12   somehow violate federal law.  They just wanted him to do his

13   job.

14        So Mike Paz says, Go to your truck and get your

15   string-line?

16        Yeah.

17        He just wants to find out if it's detective?

18        Yes, Jay Herzog tells us.

19        Asking him to do it, that's pretty reasonable; right?

20        Yeah.  He's the track inspector.

21        If Mike Paz asked you to do it?

22        Well, of course I would measure it.  He's my boss.

23        You're not going to remove anything from a track

24   inspection database fraudulently?

25        No, of course not.

Julie H. Thomas, RMR, CRR                         (303)296-3056

1   So if that's the contention that Mr. Fresquez

2   refusing to measure the track is a refusal to violate federal

3   law, how do you account for Jay Herzog's testimony?  Measuring

4   a track is what a track inspector does.  If Mike Paz had said,

5   Brandon Fresquez, log into TIMS and report that this defect

6   isn't there, and they both know it is, that's a violation of

7   federal law.  That is something Brandon Fresquez and everyone

8   else absolutely should refuse.  But when he says, Will you

9   measure this track, that's him asking him to do his job.  Jay

10  Herzog knows it.  You can't spin this any other way.  That's

11  the kind of thing a track inspector has to do.

12  So let's pause here.  You've heard Mr. Fresquez's

13  explanation, kind of, from Mr. Thompson in this trial.  Now I

14  think the explanation is, Well, I thought he was going to try

15  to get me to measure it so that my name would be in that

16  report and it would be removed from the system later.  That's

17  what Mr. Thompson has said now two and a half years later.

18  This is A-48.  You have the whole thing.  You will

19  have the whole thing in your deliberations.  Look closely at

20  what Mr. Fresquez said during the investigation.  I didn't

21  string-line the location.  I wasn't instructed to string-line

22  the location.

23  Or I was called off on a safety issue.  I was going

24  to string-line it, but then I got called off.  And I came

25  back, and I was going to string-line it, but they didn't want

Julie H. Thomas, RMR, CRR                                (303)296-3056

1   me to at that point.

2          Or maybe I was defenseless.  He was tag-teaming me

3   with another employee.  Jay Herzog and Mike Paz were trying to

4   bully me into doing this, even though they hadn't given him

5   any sort of an instruction.

6          Or maybe see how he answers this question at the very

7   top there.  Did you string-line it?  So I'm perfectly clear,

8   did you ever string-line this track?  He says, Well, the

9   location was string-lined.  And then it takes a full page to

10  get him to admit, Okay, Jay Herzog and Mike Paz were the ones

11  who string-lined this location.

12         Then he says, I feel I was not being insubordinate.

13  This is his explanation to the company as to why he did what

14  he did at the time, not his after-the-fact explanation he's

15  come up with for purposes of this trial.  During the radio

16  conversation you can clearly hear me state I did not say no.

17         So now it's:  I wasn't instructed to do it.  I didn't

18  say no.  I was called off on a safety issue.  I was being

19  bullied by Mike Paz and Jay Herzog.  I didn't see the point.

20  And I didn't say no.  Five different explanations for why he

21  didn't measure the track on May 5th of 2016, and now he's come

22  up with a sixth during trial here.

23         So let's consider these.  Let's consider what he's

24  run with both back then and now.  He admits you need a

25  string-line, and he had one.  He could have done it.  He could

Julie H. Thomas, RMR, CRR                                    (303)296-3056

1    have just measured the track, and we wouldn't be here.

2            You didn't want to string-line the track?  Uh, no.

3    But he was asking me, not ordering me to do it.  He's repeated

4    this several times.  So let's talk about that, and let's think

5    about that.  Let's think about what he's saying when he says

6    that.

7            Well, he was asking me.  It wasn't an order.  Yeah,

8    he's my boss, and yes, it's my job to string-line, but he just

9    said three, four, five, six times, are you going to measure

10   this track?

11           Think about that.  Talk about that when you are

12   deliberating.  I mean, that's really just like this.  Okay?

13   So we are doing trial, and I have a witness on the stand.  And

14   so I turn to -- we'll pick on Anthony, how about.  Anthony,

15   will you pull up Exhibit No. 3.  I want to ask the witness

16   some questions about it.  And Anthony says, I don't see the

17   point.  You don't really want to see Exhibit No. 3.  I say,

18   Anthony, please, really, will you please show Exhibit number

19   3.  I think it's pointless.  You don't really want to see

20   Exhibit No. 3.  Anthony, please pull up Exhibit No. 3.  And he

21   gets up and walks out of the courtroom and then, I suppose,

22   pokes his head back inside and says, Well, I didn't say no, so

23   that's not insubordination.

24           That's one of the defenses to insubordination that

25   has been offered during this trial.  So when Ms. Detlefsen

17-cv-00844-WYD-SKC          Defendant's Closing                    VI - 1538

1    told you, I couldn't make sense of what he testified to at the

2    hearing, I couldn't make sense of Mr. Fresquez's testimony,

3    that's exactly what she's talking about because it doesn't

4    make sense because he was insubordinate, and he knows it.

5            So you could have done it?

6            Yeah.

7            But you chose not to?

8            Right.

9            You could have done that safely?

10           Yes.

11           So this whole idea that the second explanation we

12   have heard during trial, that he recognized on May 5th that

13   what Mike Paz really wanted to do was have Brandon Fresquez

14   measure the track so that Mike Paz could then later delete

15   that track defect to remove the slow order so trains could

16   move more quickly, that's the second explanation.  So let's

17   think about that and think about whether that's objective or

18   reasonable or in good faith.

19           So Mike Paz, he doesn't need anyone's help to remove

20   a defect from the system.  He's a roadmaster.  He has his own

21   login credentials.  He can from his computer in his office

22   delete that defect report from the system if he wants to and

23   just hope no one ever finds out about it.

24           So if what he wants to do is doctor a document and

25   invent a fake inspection, he can just do that without

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   Mr. Fresquez and Mr. Herzog looking at it.  But, instead, he

2   does this?  He waits for Jay Herzog to call him and ask him to

3   string-line, to help him find this defect.  He drives out

4   there, invites Mr. Fresquez to join him, and then tells

5   Mr. Fresquez to string-line it, knowing that he's going to

6   refuse, so that he can then fire him, or knowing that he would

7   measure it and delete it?  What is the explanation exactly?

8        But he does all of these things so that he doesn't

9   have to measure the track.  So I asked Mr. Fresquez, but,

10  wait, they are measuring the track when you get back there, so

11  that doesn't make sense.  He says, Well, he was going to

12  delete it later so he could take the slow order off.

13       You have Exhibit A-48 back there.  He didn't take the

14  slow order off.  And there's a reason why and an explanation

15  why, and we'll talk about it.  None of the allegations or the

16  explanations for why Mr. Fresquez was insubordinate make

17  sense.  Analyze them.  Ask these questions when you are back

18  there.  Talk as a group.  Decide for yourselves.  Is this

19  Mr. Fresquez just telling you what was in his mind, or is this

20  an explanation that has been come up with after two-and-a-half

21  years of litigation that sounds a lot like a whistleblower

22  allegation, but it doesn't hold up when you look at it.

23       He was insubordinate.  There is no other way to

24  understand the evidence in this case.

25       So what should BNSF do about that?  What did BNSF do

 1    about that?  This part of the case is just as straightforward.

 2    Insubordination is a stand-alone dismissible violation.

 3    Ms. Detlefsen looked at this hearing transcript, and she said,

 4    Yeah, he was insubordinate.  It's plain.  He was told to

 5    measure the track, and he didn't.  He drove away.  That's

 6    enough.  That's all she wanted to see.

 7            But Mr. Miller looked at it.  He looked at it, and he

 8    said, You know what, yeah, that's insubordination.  It's

 9    plain.  There's no other way to look at it, but I want to know

10    more.  What's going on with his history?  What kind of an

11    employee is Mr. Fresquez?

12            He's the type of employee that was told in 2010

13    walking away from your foreman or any supervisor will not be

14    tolerated and will result in disciplinary action if it ever

15    occurs again.  So he was an employee that knew that

16    insubordination was a fireable offense, and he was given a

17    chance to correct his behavior.  It's too bad that

18    Mr. Fresquez decided to do what he did, but at that point in

19    time BNSF's response was inevitable.

20            He knew it.  Right?  Every witness that we called to

21    the stand, whether it's Jake Yancey or Derek Goodnight or

22    Jason Snow or Mr. Fresquez, they all knew, yeah,

23    insubordination is a big deal at BNSF.  Joe Lydick, the first

24    paid expert they called here, every railroad has rules

25    prohibiting this.  Yeah.  You can't very well run a railroad

1    if employees are just free to ignore their boss's instructions

2    and then claim later that, oh, I didn't think that was a good

3    instruction so I didn't think I had to follow it, or, oh, no,

4    he was more asking than telling.  You can't run a railroad

5    that way, and that's certainly not how BNSF is run.

6          So who decided?  I didn't think this would be in

7    question, but apparently it is.  You heard two people tell

8    you.  Stephanie Detlefsen said, I look at this.  I'm a

9    decisionmaker because I look at this transcript, and my job is

10   to decide whether dismissal is appropriate under BNSF's rules.

11   And you can call it a kangaroo court if you'd like.  You can

12   call it whatever you want.  But it's a layer of review that

13   the collective bargaining agreement doesn't require.  She

14   doesn't have to do it.  BNSF doesn't have to employ Stephanie

15   Detlefsen if they don't want to.  But you heard her testify.

16   You saw her testify.  She takes her job very seriously.  And

17   she says, Yeah, I've absolutely reviewed cases and said I

18   don't think this employee should be dismissed or there's a

19   problem with this investigation here, we blew the timelines,

20   so that employee shouldn't be dismissed.  So she looks at this

21   and says, This is a pretty easy case.  It's unfortunate, but

22   it's pretty easy.  This is dismissal.

23          And Adam Miller, This is pretty easy.  It's

24   unfortunate.  I don't like having to fire employees, but this

25   is a dismissal case.  We can't have this sort of thing on the

1  railroad.

2          So why are they the decisionmakers?  Well, they told

3  you that, without contradiction, that they were the

4  decisionmakers, but now the argument I suppose is anyone

5  having anything to do with the investigation is also a

6  decisionmaker, so from Mike Paz to Mark Carpenter to Ned

7  Percival.  I suppose, if you take it further, to AcuTrans who

8  printed up this transcript.  Because they had something to do

9  with the investigation, they are now decisionmakers.

10          That's plainly not what happened.  Mike Paz told you

11  after he testified at that investigation hearing no one called

12  him to ask him his opinion.  No one asked him, What do you

13  think should have happened?  After he reported to Mark

14  Carpenter what happened, that was it for his involvement.  He

15  didn't make any decisions.  He came to the investigation

16  hearing, and he testified to what we just talked about.  That

17  does not make him a decisionmaker.

18          But it's important.  It's telling that they are

19  trying to make other people into decisionmakers in the closing

20  argument.  There's a reason why.  If you find that this is

21  what the evidence shows, and really how could you not, but if

22  you find that this is what the evidence shows, then your next

23  job in the deliberations is just to decide, What do I do with

24  that?  So what do I do with these facts as we have found them?

25          So the law tells you what exactly the FRSA is and

17-cv-00844-WYD-SKC          Defendant's Closing               VI - 1543

1   what exactly the questions are you have to answer.  So when I

2   said at the start of this case and at the start of my closing

3   this case is not about all of the allegations of misconduct

4   that have been made, this is exactly what I mean.  You have

5   very specific questions to answer under a very specific law,

6   and it's spelled out starting in Instruction No. 15.  This is

7   what the plaintiff has to prove in this case.

8          Protected activity is one of the first things that's

9   defined for you.  So protected activity here is laid out.  And

10  Mr. Thompson touched on a few of these things, but most

11  importantly, again, I didn't think this would be an issue, but

12  now you need to look at this and decide, is refusing to

13  measure track protected activity?  Was that an objectively

14  reasonable decision?  Meaning not did Mr. Fresquez think that

15  Mr. Paz was up to no good, but would a reasonable person in

16  Mr. Fresquez refuse to measure the track?

17          What about Jay Herzog?  Is he not reasonable?  He was

18  right there.  He was told to measure the track, and he did,

19  and he didn't violate any federal laws.  He didn't do anything

20  unsafe.

21          Refusing to do your job is not protected activity.

22  If that's the way we are going to interpret this, then any

23  time anyone does anything in the workplace, it's a protected

24  activity that they can later claim whistleblower protection

25  for.  That is not what this law is for.  That is not what this

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   law means.  This law is about people who report to the FRA

2   misconduct or people that report to their supervisors

3   misconduct and they are retaliated against because they have

4   done that.  So that's the question you have to decide.

5         In good faith.  Right?  They have to do it in good

6   faith.  Meaning they have to make the report in such a way

7   that they want it to be fixed.  So when they call the FRA and

8   they say, There's a problem here, and I want you to look into

9   it, that person deserves protection under the law.  Or if

10  Mr. Fresquez had come to Adam Miller and say, This is what I'm

11  seeing out there.  This is an e-mail I have, and a TIMS track

12  inspection record that I have.  I'm concerned about it.  I

13  want it to stop.  Then he would deserve protection under the

14  whistleblower law.  So when I say he's not a whistleblower,

15  this is exactly what I mean because he didn't do any of that.

16        This is the subjectively and objectively reasonable.

17  You will have all of these instructions.  Read them and talk

18  about them.

19        All right.  So back to what plaintiff has to prove.

20  This is that Instruction No. 15 we started with.  He has to

21  prove to you that the protected activity, the things he did

22  that deserved protection under the law, that is what led Adam

23  Miller and Stephanie Detlefsen to retaliate against him.

24  That's what his burden is to prove in this case.

25        And this instruction, I didn't make this up.  This is

1  from the Court.  This is Instruction No. 18.  You will have it

2  with you back there.  The focus is on what did the

3  decisionmakers know about, what did Adam Miller and Stephanie

4  Detlefsen know about, and why did they do what they did?  Not

5  what did Cason Cole know in 2015, or what did Ryan Akers know

6  in April of 2015.  That doesn't matter to this case.  It

7  doesn't affect the outcome in this case.  What matters is what

8  Adam Miller knew and what Stephanie Detlefsen knew.  Why did

9  they decide to dismiss him?  And at the risk of repeating

10 myself, because he was proven to be insubordinate.  That's it.

11 And that's not retaliation.

12         So this is what this all comes down to.  You kind of

13 have to string three instructions together, understand them

14 together and all the definitions.  This is the question.  This

15 is what Mr. Fresquez has to prove to you in this case.  That

16 the decisionmakers, Adam Miller and Stephanie Detlefsen, knew

17 he engaged in the protected activity they are claiming, and

18 they decided to dismiss him not because he was insubordinate

19 but because they wanted to retaliate against him for engaging

20 in protected activity.  That's what this case is about.

21 That's what Mr. Thompson needs to prove to meet his burden of

22 proof.

23         There's a defense here.  Right?  There's an

24 affirmative defense.  I don't think you should have to reach

25 it, but if you do, it says this.  Even if the plaintiff has

1    proven that to you, has convinced you that that's the case,

2    then you have to consider this.  All right.  Let's assume that

3    he never engaged in protected activity.  Let's assume that he

4    never disagreed with Mike Paz about a track defect.  Or let's

5    assume that he never placed a slow order in 2016.  Or whatever

6    it is he's claiming the protected activity in this case is,

7    let's assume that never happened.  So all Adam Miller and

8    Stephanie Detlefsen are reading is the transcript of the

9    investigation hearing and BNSF's rules.  And so what they have

10   to decide is, put all that out of mind, would they have done

11   the same thing?  Would they have still recommended

12   Mr. Fresquez's dismissal?  Or did this protected activity so

13   color their judgment that they couldn't possibly have fired

14   Brandon Fresquez?  The answer to that is just as plain as to

15   the first question.  Of course they wouldn't have done

16   anything differently.  The protected activity he is claiming

17   now, either they didn't know about or, B, they wouldn't have

18   cared about because it's just a track inspector doing his job.

19   That did not motivate them to dismiss Brandon Fresquez.

20          Real quick, you have one more instruction that bears

21   on the elements here, and it just says this.  It's not your

22   job, it's not the Judge's job, it's not my job, and it's not

23   Mr. Thompson's job to come in here and say, You know what, I

24   think dismissal is too harsh a remedy for insubordination.

25   Or, you know, I think those hotline complaints about Mike Paz

1    that other employees made, they should have done more.  They

2    should have fired him.  You can have those opinions; I can

3    have those opinions; the Judge can have those opinions.  It's

4    not our job to tell BNSF how to make personnel decisions.

5    Your job is to determine whether BNSF violated the law.

6          So this is how BNSF proves its affirmative defense,

7    and here too, plainly, we have.  Adam Miller and Stephanie

8    Detlefsen, the decisionmakers, they would have decided to

9    dismiss him even if he had not engaged in any of the protected

10   activity he is claiming.

11         So this is the case.  This is the whole case.  This

12   could have been and should have been a three-day trial to

13   decide this.

14         When you are thinking about the protected activity,

15   right, this is I think what it's boiled down to now.  Um,

16   well, they knew that he called the FRA on May 5th, and they

17   must have retaliated against him for having done that.  They

18   didn't know that.  He didn't testify to that in his

19   investigation hearing, and they would have had no idea because

20   he didn't tell anyone except for maybe Mike Paz in those

21   veiled terms.

22         So what protected activity did decisionmakers know

23   about?  They didn't know about that.  But if they had, if they

24   had known that he had done that?  This is Mr. Fresquez saying

25   exactly why he called the FRA and exactly what he said.  He

1    says, I have a defect, and I'm curious as to how to properly

2    report it.  What should I do about this?  And they tell him,

3    The way you are reporting it is how you should report it.

4            And, by the way, so this plays itself out in those

5    text messages.  Right?  This plays itself out in the

6    investigation hearing.  You hear Mr. Fresquez describe this.

7    And Mr. Paz says, Yeah, he called me and said he has this

8    defect.  I said, Can it be classified another way so we don't

9    have to take it out of service?  And he says no, so I say, all

10   right, let's get it fixed.  That?  That motivates someone to

11   retaliate against him?  But they didn't know about that FRA

12   call, so it couldn't possibly have influenced their

13   decisionmaking.  He disagreed about the proper classification

14   of a defect?  That is what he and the 615 other track

15   inspectors at BNSF are supposed to be doing every day.  So

16   why?  Why retaliate against him for that?

17           So what else?  What else is the protected activity

18   here?  And I don't mean the allegations of misconduct we have

19   heard about in this trial.  I want to talk about those for

20   just a minute, but what other protected activity did

21   Mr. Fresquez engage in at the time that motivated Adam Miller

22   to retaliate against him?  There isn't any.

23           So when you have this verdict form, the first

24   question is:  Has Plaintiff Brandon Fresquez proven this?  No,

25   he hasn't.  Well, the second question:  Has the defendant

1   proven by clear and convincing evidence it would have done the

2   same thing?  Yes.

3          Answer "no" to that first question or "yes" to the

4   second, both of those are consistent with the evidence, and

5   you have fulfilled your oath as jurors.

6          But, right, but there have been serious allegations

7   of wrongdoing in this case from start to finish.  You heard

8   Joe Lydick talk about what the 30-day defect rule means and

9   how it should be applied.  You heard allegations that Ryan

10  Akers in 2015 violated federal law.  You heard -- let's just

11  list them out.  And, by the way, we didn't talk about this one

12  a whole lot.

13         MR. THOMPSON:  I'm going to object, Your Honor.  This

14  shouldn't be shown to the jury.

15         MR. GOMAN:  Well, this is what the testimony was,

16  Your Honor.

17         THE COURT:  Overruled.

18         MR. THOMPSON:  The previous screen.  This screen,

19  Your Honor, right there.  You excluded this.

20         THE COURT:  Pardon?

21         MR. THOMPSON:  Your Honor has excluded this evidence.

22         THE COURT:  I did.  So I sustain the objection as I

23  look at that.

24         MR. GOMAN:  Your Honor --

25         THE COURT:  I instruct the jury to disregard what it

17-cv-00844-WYD-SKC          Defendant's Closing                    VI - 1550

1    last saw on the screen.

2            MR. GOMAN:  Your Honor, if I can respond briefly.

3            THE COURT:  Go ahead.

4            MR. GOMAN:  Mr. Fresquez testified to what is

5    contained in that box on your screen right there.  We didn't

6    go into it in any great detail, but it was made plain that

7    Mr. Fresquez believed that Damon Fry was retaliating against

8    him.  And this is just talking about the 2010 insubordination

9    incident, which is in his transcript and was talked about

10   several different points.

11           THE COURT:  Well, what you are saying is accurate.

12   So what I struck was that first thing that was on the screen,

13   and let's have you go forward with what you have there now.

14           MR. GOMAN:  Understood.  Okay.

15           All right.  Disregard the first one.  So what are the

16   other allegations; right?

17           THE COURT:  Well, take it off the screen first thing.

18   That's what I want you to do.

19           MR. GOMAN:  One second.

20           Okay.  You heard about plenty of allegations.  Ryan

21   Akers lied about a defect report in 2015.  Cason Cole lied

22   about a defect report and violated federal law in 2015.  Just

23   three weeks before he left the company altogether, he violated

24   federal law, Mr. Carpenter did, and threatened to fire him in

25   response.  Mike Paz violated federal law and threatened to

1   fire him.  Mike Paz lied about the existence of defects.  Mike

2   Paz lied about annual safety interviews.  Mike Paz used

3   contaminated soil.  We can add, I think, a couple other after

4   the closing argument.  BNSF, I suppose its lawyers, have now

5   presented a forged document in court.  We deleted a radio

6   recording, at least one-half of a radio recording.  And the

7   list goes on.

8           We could have made this a three-week trial, I

9   suppose.  We could have had little mini trials as to whether

10  Cason Cole lied or not or whether Ryan Akers lied or not.  I

11  could have called all those witnesses that I said I was going

12  to call in opening statement.  But at Thursday -- on Thursday

13  at 4 o'clock when the plaintiff rested, I thought we had heard

14  enough, because the questions you have in this case, the law

15  you have in this case is straightforward.  Every one of these

16  allegations is serious.  And if Mr. Fresquez had reported them

17  when he was working at BNSF, they would have been followed up

18  on.  Just like when other employees called the hotline in 2016

19  to complain about Mr. Paz, they were followed up on and

20  substantiated.  And he was given a needs improvement.  Let's

21  talk about that in a minute.

22          So these are the allegations that he's made during

23  trial.  Where is the evidence that he reported any of this

24  misconduct while he was working at BNSF?  You didn't hear it

25  because it's not there.  But let's talk about this one real

17-cv-00844-WYD-SKC          Defendant's Closing                    VI - 1552

1    quick.

2          So I know I shouldn't get frustrated.  This happens

3    in trials, but sometimes a piece of evidence comes in and

4    seems to take on a life of its own.  So here is a prime

5    example.  So this report that now the allegation is this has

6    been doctored entirely -- and, by the way, of course it says

7    2017 on it.  It was printed in 2017 in response to a request

8    for discovery and disclosed to the plaintiff.  It wasn't

9    created in 2014.  It wasn't created in 2016.  It was printed

10   for this case.

11         So this is a doctored document or it shows that Mike

12   Paz is lying.  Here, too, this doesn't matter.  None of this

13   was uncovered until this lawsuit was filed.  But let's stick

14   with it for a second.  So let's -- I think we have a tendency,

15   at least we had a tendency in this trial, to take a piece of

16   evidence and then jump to the most sinister conclusion when

17   the real explanation for the difference in the testimony here

18   was kind of boring and pretty mundane.

19         So Mr. Herzog reported it as repaired on May 5th of

20   2016.  He can only do that using his B number and his

21   password.  So apparently Mr. Paz hacked into the system using

22   his credentials.  This is not evidence of wrongdoing.

23   Sometimes when three years pass between when something happens

24   and we come into court, people forget.  And when someone's job

25   requires that they verify defects and report them as having

Julie H. Thomas, RMR, CRR                              (303)296-3056

1    been repaired every day, they can't remember every individual

2    one and the exact circumstances, especially when this wasn't

3    the only defect that they dealt with that day.  Mike Paz's

4    statement.  They're trying to locate the defects.  They're

5    trying to locate the defects that day.

6              What were the results of your string-lining?

7              At that first location, at the first defect we were

8    looking at, I don't think we found anything.

9              Did you remove the slow order?

10             No, that was left on.

11             Because they found some defects in the track and

12   verified they were there, and they couldn't find others and

13   verify they were repaired.  That's all that happened.  And now

14   Jay Herzog and Mike Paz, three years later, their testimony

15   doesn't jibe as to which is which.  It happens.  You hear

16   police officers say that if you ask four witnesses three years

17   after a traffic accident to describe what they saw, you are

18   going to get four very different stories because our memories

19   are imperfect.

20             So when I asked Jay Herzog in his deposition, Well,

21   are you sure that this A-70 is the one we are talking about?

22             MR. THOMPSON:  I object, Your Honor.  This isn't in

23   evidence.

24             MR. GOMAN:  Your Honor, this is his trial testimony

25   when I asked him about his deposition testimony.

1      MR. THOMPSON:  Oh, I'm sorry.  I thought you said

2  deposition testimony.  Withdrawn.

3      MR. GOMAN:  And you said:  I'm not sure if this is

4  the one or not.

5      And how could he be?  It happened two years prior to

6  his deposition.

7      Are you sure this is not the defect you and Mike and

8  Brandon were looking for?

9      No, I'm not sure.

10      He confirms, yeah, are you sure this is not the

11  defect.

12      I did report defects repaired that day, but not in

13  this engineering defects geometry format.

14      Because that's not how they are reported.  They

15  report them in PARS, and the defects format syncs the data

16  there.

17      You didn't give your password to anyone?

18      No, of course not.

19      The allegations of wrongdoing in this case are

20  serious.  And if we wanted to investigate every one of them

21  and have you-all decide whether there was wrongdoing or a good

22  faith mistake or something in between, we could have done

23  that, and this could have been a three-week trial, but it

24  doesn't matter.

25      Let's talk about damages real quickly, then I'll sit

17-cv-00844-WYD-SKC        Defendant's Closing            VI - 1555

1    down.  If you find BNSF violated the FRSA, now, if you answer

2    those questions differently than I suggest you should, then

3    you go to damages.  The damages you have to consider for

4    compensatory are emotional distress damages.  That's what's

5    being claimed here.  That's the one thing the Judge is not

6    going to decide after this trial.  So the one thing he latched

7    on to or the one thing he said, no, I haven't -- I haven't

8    gone and seen a therapist, I haven't gone and sought any

9    counseling.  Of course, he doesn't have to.  That's his

10   prerogative.  I haven't taken any medication or anything like

11   that, but this has really affected me because I can't coach

12   baseball anymore.  And that's what he said on direct

13   examination?  Did you enjoy coaching baseball?  After BNSF

14   fired you, did you quit doing that?  I no longer do that.

15          You might not have caught this.  It was right at the

16   end of his testimony.  I followed up.  Well, when exactly did

17   you decide that?  June of 2018 is when he decided to stop

18   coaching baseball.

19          So you are dismissed May of 2016.  You coached for

20   two years, and then you decided to stop?

21          Well, this is a lot of stress.  This lawsuit has been

22   going on for three years.

23          You weren't coaching in October, four months ago?

24          Well, I was the assistant coach, kinda sorta helping

25   out.

Julie H. Thomas, RMR, CRR                              (303)296-3056

1        Ladies and gentlemen, Mr. Thompson just asked you to

2   award Brandon Fresquez $3 million for this emotional distress,

3   $3 million, for emotional distress that has affected him in

4   really one way that he talked about.  He can't coach baseball,

5   meaning he's not the head coach for the baseball team.  Hasn't

6   sought counseling.  Hasn't gone and seen a therapist.  The

7   emotional distress hasn't been so bad that he's attempted to

8   do anything about it, but it's so bad that you-all should

9   award him $3 million?  So that's the damages case.

10        The second question.  Here, too, a question I don't

11  think you should have to reach, but if you do, let me just

12  briefly touch on punitive damages.  There's one thing that I

13  think merits an explanation.  This is right at the end of

14  Instruction No. 23.  What it says is if you find that BNSF has

15  made a good faith effort to comply with antiretaliation laws,

16  with the FRSA, then you cannot find punitive damages are

17  appropriate just because a manager does something contrary to

18  those policies.  Right?  They want to encourage companies to

19  have the right policies.  So you have to implement these

20  policies.  And, of course, BNSF has.  I think Mr. Thompson

21  said as much.  Their policies check all the right boxes.  They

22  have all the right policies.  They have a hotline.  BNSF

23  investigates, takes the good faith reporting of an actual or

24  apparent violation -- I'm sorry.  Retaliation for having done

25  that is prohibited.  Right on the front page of the anonymous

1   hotline, the hotline that Mr. Fresquez never called during his

2   career.  But it's not enough just to have the policy.  They

3   have to enforce it.

4        So I guess this brings me to an overall point.  You

5   heard from Derek Goodnight and Jake Yancey and Jason Snow, the

6   three people that Mr. Fresquez chose to call -- and, by the

7   way, they claimed that they were not friends with

8   Mr. Fresquez.  You have volumes of text messages back in the

9   deliberation room.  Read a sample of them, and you can decide

10  for yourselves whether you think they were friends or not.

11       But it doesn't matter.  I'm glad that he brought them

12  in here because they testified:  I called the hotline for the

13  first time in September of 2016.  Mike Paz showed a meme that

14  we took offense to.  He told us that if we are one minute late

15  he's going to take action, if our phone rings he's going to

16  take action.  We thought he was bullying us and threatening

17  us.

18       So they called the hotline and reported that.  BNSF

19  investigated that.  They found that the scheduled employees'

20  complaints were substantiated, and they decided, they meaning

21  the vice president of engineering at BNSF, decided, do we fire

22  Mike Paz for this, or should we do the next highest level of

23  discipline we can do to one of our managers, give him a needs

24  improvement, a mark that will stay with him forever?  And if

25  he doesn't shape up, if he gets two needs improvements in a

1    row, he gets fired.  So they did the latter.   They decided not

2    to fire him.  An employee who had never had a hotline

3    complaint against him before had nine in one day in September

4    of 2016.  And Jason Snow and Derek Goodnight and Jake Yancey,

5    who made those complaints, are still working at BNSF.  Derek

6    Goodnight got a promotion to a track inspector.  Jake Yancey

7    is holding the job now that he's held the last 10 years.  They

8    continue to work at BNSF and continue to report misconduct and

9    unsafe conditions when they see it because that's exactly what

10   is supposed to happen at BNSF.

11          David Dunn.  David Dunn.  What did he have to say

12   that bears on this case here?  He said, Well, Mike Paz, I

13   didn't think he'd completed his annual safety interviews in

14   2017, and I didn't think, uh, he was using some soil that

15   should be used in the yard.  So those complaints were

16   definitively shown to be unfounded, but it doesn't matter.

17   I'm glad they called David Dunn.  He's a manager.  He's an

18   at-will employee.  BNSF can fire him for no reason whatsoever.

19   They could fire him tomorrow if they wanted.  So he calls.  He

20   makes a hotline complaint about misconduct.  It's proven to be

21   false.  And what do they do to David Dunn for having been a

22   whistleblower?  Nothing.

23          You've heard from whistleblowers in this lawsuit.

24   Mr. Fresquez is not one of them.  And that's what it comes

25   down to.  That's why we are here asking you to resolve this

17-cv-00844-WYD-SKC          Defendant's Closing                VI - 1559

1    case.

2            Whistleblower laws are important.  No one would

3    disagree with that.  They're here for a reason.  They're here

4    to protect Jake Yancey and Derek Goodnight and Jason Snow and

5    David Dunn.  They're here to protect people that see something

6    that they think is wrong and report it so that something can

7    be done about it.  Individuals like that, they need laws like

8    this.  But we can't take a whistleblower law, we can't take

9    the FRSA and allow an employee who gets fired for cause to

10   turn around and take advantage of it, use it as a, I don't

11   know, curtain to hide behind to excuse misconduct when they

12   were working at BNSF.  These whistleblower laws are here for a

13   good reason.  Mr. Fresquez is not a whistleblower.

14           So on behalf of, well, of Adam Miller and of all the

15   employees you have heard from at BNSF, David Dunn and everyone

16   else, I ask that you find that BNSF did not violate the FRSA

17   when it dismissed Mr. Fresquez for insubordination.  And

18   respectfully, that is the only verdict that is consistent with

19   the evidence you heard, and that is the only verdict that

20   applies this law in the way it was intended.  Thank you,

21   ladies and gentlemen.

22           THE COURT:  All right.  So you, in a few minutes, can

23   go back to the jury room and deliberate and eat your lunch,

24   but what I want to tell you is that you can only deliberate

25   when all 10 of you are in the room.  So if you take a stretch

1    break, a bathroom break, suspend your deliberations until all

2    10 of you are back in the room.

3            Counsel will need to verify with Mr. Keech the

4    exhibits that have been received in evidence, and at some

5    point soon you will receive copies of all -- hard copies of

6    all of the exhibits.  We also have what is called the Jury

7    Evidence Recording System, or JERS, which will allow you to

8    pull up, if you choose to, on the computer exhibits that have

9    been received in evidence.  Mr. Keech at some point will

10   explain to you how to use it so that you will know how to use

11   it if you choose to.  And then, finally, you will receive the

12   original and copies of both the jury instructions and the

13   verdict form.  So each of you will have your individual set of

14   each, and the original verdict form should be kept aside,

15   along with the original jury instructions.

16           So with that understanding, let's have our CSO come

17   up to be administered an oath.  That's the Court Security

18   Officer who will sit outside your deliberation room.

19       (Court Security Officer sworn.)

20           THE COURT:  All right.  You may go to the jury room

21   to begin your deliberation.

22       (Jury out at 1:38 p.m.)

23           THE COURT:  Okay, have a seat.

24           So I will have Mr. Keech give the jurors, in a few

25   minutes, the jury instructions and verdict form.  And then at

1    least one person from each side needs to meet with Mr. Keech

2    to verify that the exhibits that we give them are the ones

3    that were received, and the same with the JERS system.

4              And I know you have given Mr. Keech your contact

5    information.  So if we don't hear anything this afternoon, be

6    it either a question or a verdict, then be back at 4:45, and I

7    will send the jury home with appropriate instructions at

8    5 o'clock.  Obviously, if we get a question or we get a

9    verdict, then you will be contacted, and I want you to come to

10   court as quickly as you can.  We just need one attorney per

11   side, but it's up to you how many folks show up per side.

12             All right.  So we'll be in recess.

13        (Proceedings recessed 1:39 p.m. to 4:34 p.m.,

14           resuming outside the presence of the jury.)

15             THE COURT:  Okay, have a seat.

16             Before we bring the jury in to get the verdict, I

17   want to, for the record, dispose of the two pending motions

18   that I haven't ruled on.  The Court's ruled on the first

19   motion for judgment of law and then the renewed one, but we

20   have a motion in limine regarding claim of retaliation for

21   taking tracks out of service.  Should I deny it as moot, grant

22   it?  I don't know.

23             MR. THOMPSON:  I understood the Court to be granting

24   that motion.

25             THE COURT:  Mr. Goman?

1      MR. GOMAN:  Well, I guess my memory is, over our

2  objection, the plaintiff was allowed to introduce evidence of

3  taking tracks out of service.

4      THE COURT:  So I should deny the motion, shouldn't I?

5  Whose motion was it?

6      MR. GOMAN:  It was our motion.

7      MR. THOMPSON:  Defense.

8      THE COURT:  I think I should deny it because the

9  evidence came in.  Right?

10      MR. GOMAN:  Yes.

11      THE COURT:  All right.  So docket number or ECF

12  number 90, Motion in Limine Regarding Claim of Retaliation for

13  Taking Tracks Out of Service is denied, for the record.

14      Then the next one is Motion in Limine to Exclude

15  Improper Character Evidence Regarding Alleged Unrelated

16  Misconduct.  That has to do with Mr. Paz, doesn't it?

17      MR. THOMPSON:  It does.

18      THE COURT:  That information came in too, didn't it?

19      MR. THOMPSON:  Yes.

20      MR. GOMAN:  Yes, Your Honor.

21      THE COURT:  So I am going to deny that motion as

22  well.  It's document number 91.  You know which motion it is,

23  Mr. Keech?

24      COURTROOM DEPUTY:  Yes.

25      THE COURT:  So the only thing I request, I have no

1   idea what the jury's verdict is, that there be no emotional or

2   other reaction to the verdict.

3           All right.  Let's bring the jury in.

4       (Jury in at 4:38 p.m.)

5           THE COURT:  All right, have a seat.

6           So, Miss Wright, you are the foreperson.  Has the

7   jury reached a verdict?

8           JUROR NO. 5:  Yes, Your Honor.

9           THE COURT:  All right.  Would you give the form of

10  verdict to the CSO, who in turn will give it to me.

11          All right.  In Civil Action No. 17-cv-00844-WYD-SKC,

12  Brandon Fresquez, Plaintiff, versus BNSF Railway Company,

13  Defendant.  Jury Verdict.

14          We, the Jury, being duly impaneled and sworn to try

15  to above-entitled case, unanimously find the following answers

16  to the questions submitted by the Court:

17          Number 1.  Has Plaintiff Brandon Fresquez proven the

18  following four elements by a preponderance of the evidence?

19          A.  He engaged in a protected activity as defined by

20  the Federal Railroad Safety Act;

21          B.  The Defendant knew the Plaintiff engaged in the

22  protected activity;

23          C.  The Plaintiff suffered an unfavorable personnel

24  action; and

25          D.  The protected activity was a contributing factor

17-cv-00844-WYD-SKC                    Jury Trial                    VI - 1564

1    in the unfavorable action.

2           The jury has answered that question:  "Yes."

3           And the instruction says:  If your answer to

4    Question 1 is "Yes," then you should answer Question 2.  I'm

5    not going to read the rest of it because since they answered

6    "Yes," they were directed to Question 2.

7           Question 2.

8           All right.  All right.  There is an incons- -- let me

9    read this, and I will explain what my observation is.

10          Number 2.  Has the Defendant proven by clear and

11   convincing evidence that it would have taken the same

12   personnel action against the Plaintiff even if the Plaintiff

13   had not engaged in any protected activity?

14          The answer to that question is:  "Yes."

15          All right.  Let me excuse the jury for a minute.  I

16   want to talk to counsel about this.  Just go out, and then

17   come back in.  I'll have you come back in.

18      (Jury out at 4:41 p.m.)

19          THE COURT:  Okay.  There's a problem with this

20   verdict.  None of us caught this.  All right.  So do you have

21   your draft verdicts with you?

22          MR. GOMAN:  I do not.

23          THE COURT:  All right.  Okay.  Well, anyway.

24          So Question number 1 was answered "Yes."

25          Question number 2 says:  "Has the Defendant proven by

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC              Jury Trial                    VI - 1565

 1   clear and convincing evidence that it would have taken the

 2   same personnel action against the Plaintiff even if the

 3   Plaintiff had not engaged in any protected activity?"  The

 4   answer says:  "Yes."

 5          Then it says:  If your answer to Question 2 is "Yes,"

 6   then you should go to Question 3.  But if the answer is yes,

 7   my question is, shouldn't they have been directed not to go to

 8   Question 3?

 9          MR. GOMAN:  Yes, that's right.

10          THE COURT:  And so there's a mistake here, because in

11   Question 3 they answer by a preponderance of the evidence that

12   there should be an award.  So they award money for

13   compensatory damages and for punitive damages.  I don't know

14   what to do about this.

15          Now, none of us caught this, and I will take

16   responsibility as well, my law clerk will, and all of you,

17   but -- so I don't know what to do about this.  I wanted to

18   talk to you about it before I said anything to them.

19          MR. THOMPSON:  Sure.  For plaintiff we actually had

20   the same issue during our mock, not that we missed a typo, but

21   they didn't understand Question 2.  We think we just explain

22   to them the discrepancy and have them continue debating.

23          THE COURT:  Mr. Keech, go ahead and make quick copies

24   of this and pass this out.

25          COURTROOM DEPUTY:  I have given it --

Julie H. Thomas, RMR, CRR                          (303)296-3056

1      THE COURT:  Oh, they've --

2      COURTROOM DEPUTY:  Oh, I have not given the verdict

3  form.

4      THE COURT:  The verdict as completed.

5      COURTROOM DEPUTY:  I was thinking of the note.

6      THE COURT:  I want you to look at this.

7      None of us caught that, unfortunately, because the

8  answer should have been no.  But I don't know what to say to

9  them because there's an error in the verdict form in terms of

10  the direction underneath number 2.

11      MR. THOMPSON:  Keith, do you think we can meet and

12  come up with a curative instruction to give them?

13      MR. GOMAN:  Well, I wonder, I mean, if we polled the

14  jury, Question 2 asked this, did you understand that if you

15  answered "yes" that means BNSF proved its affirmative

16  defense --

17      THE COURT:  Yeah, here's what I would prefer to do.

18  I would prefer us reach a uniform way to approach this so that

19  nobody is playing games.  Because there's an honest mistake.

20  So I share responsibility, but the two of you do as well, all

21  of you, for not catching that.

22      So what I want to do is -- we need to get an

23  understanding, because the jury instructions made it clear

24  that if the defendant proved by clear and convincing evidence

25  that it would have taken the same result but for the protected

1    activity, that that in effect would be a defense to a claim,

2    but the way it's worded -- just take a look at it.  We just

3    need to -- we need to talk about it.  Just take a minute and

4    look at this so we can figure out what to do with it.

5              So the mistake here is in number 2.  If your answer

6    to Question 2 is "Yes," then you, in effect, should skip

7    Questions 3 and 4, is what it should have said.  If your

8    answer to Question 2 is "No," then you should answer 3 and 4.

9    So we have the "Yes" and the "No" in the wrong places.

10             So you can see that they have awarded generously to

11   the plaintiff, but it's flawed because of how number 2 was

12   answered.  And if it was answered that way, that would

13   preclude them from entering an award.

14             This is the first time in my many years that I have

15   had this.  This is the first time I have had this mistake in a

16   verdict form where nobody caught it before it went to the

17   jury.

18             Bryan, come up here.

19             Why don't you-all talk, and just let me know when you

20   have some thoughts about what we should do.  You can talk to

21   each other too.

22             MR. THOMPSON:  That's what I'd like to do.

23             THE COURT:  I have a thought here.  One way we could

24   do this, without talking to them in any specific way, is to

25   tell them there was a mistake on the verdict form, and to give

 1    them a new verdict form that has this corrected, and tell them

 2    that they need to go back and deliberate.  And I think I

 3    probably need to read the change in the verdict form, I mean,

 4    I don't know what else to do, so they'll -- does that make

 5    sense?

 6            MR. THOMPSON:  That's exactly what Keith suggested.

 7    We think it makes sense.

 8            THE COURT:  Yeah.  And so I'm concerned about having

 9    any conversation with them at all because I think that's

10    inappropriate, but I think we have to tell them that the Court

11    and the parties didn't read this as carefully as we should

12    have, and we all signed off on it, and there's a mistake, and

13    the mistake is on our end and not theirs.

14            So, Bryan, can you immediately pull up the verdict

15    form and fix it?  Let's make copies for all of us, and let's

16    look at it before we bring the jury back in.

17            Direct me to the instruction that talks about the

18    clear and convincing evidence -- wait a minute.  I've got it

19    right here.

20            No, the clear and convincing evidence instruction.

21    Which one is that?  Do you have your --

22            MR. GOMAN:  I don't have a copy of the instructions.

23            THE COURT:  All right.  Hold on.  I'll find it.

24            Yeah, here it is.  Number 19.  "Even if the Plaintiff

25    proves the elements of his claim in Instruction No. 15, the

1   Defendant is still not liable for wrongful retaliation if it

2   has proven by clear and convincing evidence that it would have

3   taken the same unfavorable personnel action against the

4   Plaintiff even if the Plaintiff had not engaged in any

5   protected activity."

6           Normally I would never read one instruction.

7   However, I think I'm obligated to read this to them and tell

8   them that we made a mistake in the verdict form.

9           MR. THOMPSON:  Can we tell them what the mistake was,

10  namely, that we put "No" instead of "Yes"?

11          THE COURT:  Yes.  No, I'm going to tell them what the

12  mistake is, but I think I need -- these are interrelated, and

13  I think it would be unfair to them for me not to read this

14  because it relates directly to the change in the verdict form.

15          So I want to see if I have an agreement.  Do you

16  agree that I can bring the jury back in and tell them that

17  there was a mistake made by the Court and the parties on the

18  verdict form, that we have generated a new jury verdict form,

19  and we are going to give it to them?

20          Do you have one, Mr. Keech?  Because I'd like you to

21  stamp "Original" on it.

22          COURTROOM DEPUTY:  I do not.  I gave everything --

23          THE COURT:  Take Julie's back.  I want you to put an

24  "Original" on it, "Original" stamp.

25          So do both sides agree with what we are going to do?

1         MR. THOMPSON:  Plaintiff agrees.

2         MR. GOMAN:  Yes.

3         THE COURT:  Okay.

4         COURTROOM DEPUTY:  Do you want to give them 10 draft

5    sets as well, Your Honor?

6         THE COURT:  No, just one.  They just need one, an

7    original.  Don't worry about giving them 10 drafts, because I

8    think we will get their attention.

9         All right.  Go ahead and bring them back in,

10   Mr. Keech.

11        COURTROOM DEPUTY:  Do you want me to hold off giving

12   them this until they leave?

13        THE COURT:  Yeah, you can give it to them when they

14   leave.

15        COURTROOM DEPUTY:  Okay.

16        THE COURT:  Actually, why don't you do this.  I'm

17   going to direct you to give it to the foreperson so she will

18   have it when I read it.  I want her to follow along.

19        COURTROOM DEPUTY:  Okay.  So I will give it to her

20   when they come in.

21        THE COURT:  Yeah, give it to her.

22        Have both sides reviewed this revised, and do you

23   agree with it as to accuracy regarding Question Number 2?

24        MR. THOMPSON:  Yes, Your Honor.

25        MR. GOMAN:  I have.  I am hoping Ms. Dale can

17-cv-00844-WYD-SKC                 Jury Trial                     VI - 1571

1    double-check me.

2            MS. DALE:  Yeah, it looks fine.

3            THE COURT:  Do you agree, Ms. Dale?

4            MS. DALE:  Yes, Your Honor.

5            THE COURT:  All right.

6        (Jury in at 4:55 p.m.)

7            THE COURT:  All right, have a seat.

8            The reason I stopped reading the jury verdict form

9    was because I realized that there was a substantive error

10   below your answer to Question Number 2.  So the form, as you

11   received it, says:  If your answer to Question 2 is "Yes,"

12   then you should answer Question 3.  If your answer to

13   Question 2 is "No," you may skip Questions 3 and 4 as you have

14   found for the Defendant on the Plaintiff's retaliation claim

15   and you may sign the verdict form because you have completed

16   your deliberations.

17           The instruction below Question Number 2 was in error.

18   I missed it.  The parties missed it.  And so what we have

19   agreed is that the only thing we can do is to give you a new

20   verdict form which contains the instruction that should have

21   been given.

22           So for purposes of this, I'm going to ask you to go

23   back and answer Question 1, Question 2, with the

24   understanding -- and I've given your foreperson, Miss Wright,

25   the original verdict form because I didn't want to take the

1   time to make nine more copies.

2          So as revised it should read:  If your answer to

3   Question 2 is "No," then you should answer Questions 3-4.  If

4   your answer to Question 2 is "Yes," you may skip Questions 3-4

5   as you have found for the Defendant on the Plaintiff's

6   retaliation claim and you may sign the verdict form because

7   you have completed your deliberations.

8          Now, I'm not going to ask you to answer this in the

9   courtroom.  I am going to send you back to the jury room,

10  understanding that we made a mistake.

11         Now, the other thing you need to note is that

12  Instruction No. 19, which you have in your packet, reads as

13  follows:  Even if the Plaintiff proves the elements of his

14  claim in Instruction No. 15, the Defendant is still not liable

15  for wrongful retaliation if it has proven by clear and

16  convincing evidence that it would have taken the same

17  unfavorable personnel action against the Plaintiff even if the

18  Plaintiff had not engaged in any protected activity.

19         So that is what I have to say.  And I want to just

20  get counsel's affirmation that they agree with what the Court

21  has said under these circumstances.

22         MR. THOMPSON:  Plaintiff agrees, Your Honor.  We

23  apologize.

24         MR. GOMAN:  Yes, on behalf of Defendant, we agree.

25         THE COURT:  Okay.  So I'm going to send you back to

1    the jury room, please.

2         (Jury out at 4:58 p.m.)

3              THE COURT:  Off the record.

4         (Proceedings recessed 5:00 p.m. to 5:10 p.m.,

5         resuming outside the presence of the jury.)

6              THE COURT:  Okay.  Any change from the parties'

7    perspective on anything?

8              MR. THOMPSON:  No, Your Honor.

9              THE COURT:  All right.  Let's bring the jury back in.

10             One other thing, and I want this on the record.

11   Because of this, I'm going to direct Mr. Keech to poll the

12   jury whatever the verdict is.  So I just want to alert you to

13   that, that the jury will be polled.

14        (Jury in at 5:12 p.m.)

15             THE COURT:  All right, please have a seat.

16             Miss Wright, has the jury reached a verdict?

17             JUROR NO. 5:  Yes.

18             THE COURT:  Okay.  Would you give the form of verdict

19   to the CSO, who in turn will give it to me.

20             All right.  So I'm going to go directly to the meat

21   of this.  All right.  Let me read this.

22             Question Number 1.  Has Plaintiff Brandon Fresquez

23   proven the following four elements by a preponderance of the

24   evidence?

25             A.  He engaged in a protected activity as defined by

 1    the Federal Railroad Safety Act;

 2            B.  The Defendant knew the Plaintiff engaged in the

 3    protected activity;

 4            C.  The Plaintiff suffered an unfavorable personnel

 5    action; and

 6            D.  The protected activity was a contributing factor

 7    in the unfavorable action.

 8            The jury has answered:  "Yes."

 9            If your answer to Question 1 is "Yes," then you

10    should answer Question 2.  If your answer to Question 1 is

11    "No," you may skip Questions 2 through 4 as you have found for

12    the Defendant on the Plaintiff's retaliation claim and you may

13    sign the verdict form because you have completed your

14    deliberations.

15            Because the jury answered "Yes" to Question 1, they

16    went to Question 2.

17            Has the Defendant proven by clear and convincing

18    evidence that it would have taken the same personnel action

19    against the Plaintiff even if the Plaintiff had not engaged in

20    any protected activity?

21            The jury has answered this question:  "No."

22            If your answer to Question 2 is "No," then you should

23    answer Questions 3 and 4.  If your answer to Question 2 is

24    "Yes," you may skip Questions 3-4 as you have found for the

25    Defendant on Plaintiff's retaliation claim and you may sign

17-cv-00844-WYD-SKC                 Jury Trial                         VI - 1575

1    the verdict form because you have completed your

2    deliberations.

3           Since the jury answered Question 2 "No," then they

4    were allowed to proceed to Questions 3 and 4.

5           3.  Has the Plaintiff proven by a preponderance of

6    the evidence that he should be awarded compensatory damages

7    for emotional distress, pain, suffering, inconvenience, or

8    mental anguish?

9           The jury has answered:  "Yes."

10          If your answer to Question 3 is "Yes," state the

11   amount of damages.

12          And the amount is:  "$800,000.00."

13          Number 4.  Has the Plaintiff proven by a

14   preponderance of the evidence that the Defendant acted with

15   reckless or callous disregard of the Plaintiff's right to be

16   free from retaliation for engaging in a protected activity as

17   defined in Jury Instruction No. 23?

18          And the jury has answered that:  "Yes."

19          If your answer to Question 4 is "Yes," state the

20   amount of punitive damages.

21          "$250,000.00."

22          Please sign and date the verdict form.  Dated this

23   19th day of February, 2019.  It's signed by the foreperson and

24   the balance of the jurors.

25          Mr. Keech, I want the jury polled, so please poll the

Julie H. Thomas, RMR, CRR                              (303)296-3056

17-cv-00844-WYD-SKC                  Jury Trial                    VI - 1576

 1    jury at this time.

 2            COURTROOM DEPUTY:  Jose Soto, was this and is this

 3    your verdict?

 4            Jose Soto, was this and is this your verdict?

 5            JUROR NO. 1:  Yes.

 6            COURTROOM DEPUTY:  Bryan Mayer, was this and is this

 7    your verdict?

 8            JUROR NO. 2:  Yes, it is.

 9            COURTROOM DEPUTY:  Kathy Thyfault, was this and is

10    this your verdict?

11            JUROR NO. 3:  Yes.

12            COURTROOM DEPUTY:  Patrick Quinlan, was this and is

13    this your verdict?

14            JUROR NO. 4:  Yes.

15            COURTROOM DEPUTY:  Salvatore Martorano, Jr., was this

16    and is this your verdict?

17            JUROR NO. 6:  Yes.

18            COURTROOM DEPUTY:  Paula Walker, was this and is this

19    your verdict?

20            JUROR NO. 10:  Yes.

21            COURTROOM DEPUTY:  Valerie Hodgetts, was this and is

22    this your verdict?

23            JUROR NO. 9:  Yes.

24            COURTROOM DEPUTY:  Jana Sadar-Godfrey, was this and

25    is this your verdict?

17-cv-00844-WYD-SKC              Jury Trial                    VI - 1577

1            JUROR NO. 8:  Yes.

2            COURTROOM DEPUTY:  Bridget Johnson, was this and is

3    this your verdict?

4            JUROR NO. 7:  Yes.

5            COURTROOM DEPUTY:  Alicia Wright, was this and is

6    this your verdict?

7            JUROR NO. 5:  Yes.

8            COURTROOM DEPUTY:  The jury has been polled, Your

9    Honor.

10           THE COURT:  All right.  Thank you.

11           We have a rule in this court, it's D.C. Colorado

12   Local Civil Rule 47.2.  It's entitled "Communication With

13   Jurors."  Let me just read it.  It's a short rule.

14           A party or attorneys shall not communicate with or

15   cause another to communicate with a juror or prospective juror

16   before, during, or after a trial without order of the judicial

17   officer to whom the case is assigned.

18           It's my practice and policy, and it applies here, not

19   to waive the application of the rule.  So what that means is

20   neither the lawyers for the parties nor the parties themselves

21   should contact you about any aspect of your service as jurors.

22           All right.  So the Court, on behalf of the Court and

23   the parties, thanks you for your service.  You are discharged,

24   and you are free to go.

25           (Jury out at 5:16 p.m.)

Julie H. Thomas, RMR, CRR                          (303)296-3056

1    THE COURT:  All right.  A couple things.  In light of

2    this verdict, we will now have to sort of figure out exactly

3    what we are going to do about front pay and back pay damages.

4    So I want to give the parties an opportunity to see if they

5    can reach some sort of agreement on that.  If you can't reach

6    an agreement, then file something with the Court one way or

7    the other.  If you need a hearing, then we just need to set up

8    a hearing, and you may want to call my chambers and get some

9    dates when I'm available.

10       And then tell me in what you file whether or not you

11   agree with -- one of you had mentioned you would stipulate to

12   the report from the expert.  I haven't read it.  And I think

13   what I will do is I'm going to return all these exhibits to

14   you, and if we have a hearing, I'm going to order you to

15   produce exhibits that are relevant to that hearing so I don't

16   have to keep all these books.

17       All right.  Is there anything else?

18       MR. THOMPSON:  Do you want us to do the same with

19   attorney's fees, Your Honor, see if we can reach agreement

20   first?

21       THE COURT:  Yes.  You have a right to file a motion

22   for attorney's fees, but -- and who knows?  It's very rare

23   that the parties reach agreement on attorney's fees, but if

24   you file a motion for attorney's fees or when you file a

25   motion, I want you to meet and confer and agree on what you

Julie H. Thomas, RMR, CRR                           (303)296-3056

17-cv-00844-WYD-SKC            Jury Trial                    VI - 1579

1   can agree on and tell me what you disagree about.

2         MR. THOMPSON:  Will do, Your Honor.

3         THE COURT:  All right.

4         MR. GOMAN:  Your Honor, for the record, on the

5   grounds of juror confusion, we are going to move for a

6   mistrial in light of the jury's first verdict and the second

7   verdict for the reasons that have been discussed this

8   afternoon.

9         THE COURT:  Okay.  I'm going to deny that motion.  I

10  think the Court, with your permission, recognized the error,

11  and we gave the jury a new verdict form.  And they had one of

12  two options, and that was the option they picked.  I'm not

13  sure the jury was confused once it understood what the

14  corrected verdict form meant.  I think they were originally

15  confused because there was a mistake that all of us made in

16  the verdict form.  That includes the Court and the parties.

17        So I think on this record I believe that it's

18  appropriate to honor the jury's verdict.

19        All right.  We'll be in recess.

20     (Proceedings concluded 5:19 p.m.,

21     February 19, 2019.)

22

                      REPORTER'S CERTIFICATE
23

          I, JULIE H. THOMAS, Official Court Reporter for the
24  United States District Court for the District of Colorado, a
    Registered Merit Reporter and Certified Realtime Reporter,
25  CA CSR No. 9162, do hereby certify that I reported by machine
    shorthand the proceedings contained herein at the time and

Julie H. Thomas, RMR, CRR                        (303)296-3056

17-cv-00844-WYD-SKC                 Jury Trial                    VI - 1580

1   place aforementioned and that the foregoing pages constitute a
    full, true and correct transcript.
2           Dated this 12th day of April, 2019.

3

                        /s/ Julie H. Thomas
4                     Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                           (303)296-3056