**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-0844-WJM-SKC

BRANDON FRESQUEZ,

      Plaintiff,

v.

BNSF RAILWAY CO.,

      Defendant.

_____

**ORDER GRANTING IN PART AND DENYING IN PART, AND TAKING UNDER
ADVISEMENT IN PART, PLAINTIFF'S MOTION FOR BACK PAY AND
FRONT PAY, AND ORDERING FURTHER BRIEFING**
_____

      Plaintiff Brandon Fresquez ("Fresquez") sued his former employer, BNSF

Railway Co. ("BNSF"), for retaliating against him for engaging in protected activity by

terminating his employment, all in violation of the Federal Railroad Safety Act, 49

U.S.C. § 20109 ("FRSA").  On February 11, 2019, the case proceeded to a 6-day trial

before Senior U.S District Court Judge Wiley Y. Daniel.  On February 19, 2019, the jury

returned a verdict in favor of Fresquez, finding that BNSF retaliated against Fresquez in

violation of the FRSA.  (ECF No. 152.)  The jury awarded $800,000 to Fresquez as

compensatory damages for emotional distress, pain, suffering, inconvenience, and

mental anguish, and an additional $250,000 in punitive damages.  (*Id.* at 3–4.)  The

issue of back pay and front pay did not go to the jury because Judge Daniel decided,

and the parties did not dispute, that back pay and front pay are equitable remedies to

be decided by a judge.  (ECF No. 159 at 131–32.)

After the jury returned a verdict for Fresquez, Judge Daniel instructed the parties to attempt to reach an agreement on back pay and front pay, or request a hearing. (ECF No. 163 at 198.)  The parties did not reach an agreement, and Fresquez filed the instant Motion for Back and Front Pay (the "Motion") seeking damages.  (ECF Nos. 155 & 166.)  Judge Daniel set a hearing on the matter.  Unfortunately, prior to the hearing Judge Daniel passed away.  On May 16, 2019, the matter was drawn to the undersigned.  (ECF No. 171.)  Thereafter, BNSF moved for a hearing on the issues of back pay and front pay, as well as attorneys' fees, which the Court granted in part only as to the back pay and front pay issues.  (ECF Nos. 180 & 183.)

For the reasons discussed below, the Court grants in part and denies in part Fresquez's motion, and reserves ruling on the final amounts of back pay and front pay. The Court orders the parties to submit additional briefing and evidence from which the Court can determine the amount of back pay and front pay owed to Fresquez.  The Court also orders Fresquez to supplement his fee motion (ECF No. 165) to account for the hours expended on litigating post-verdict issues.

## I. BACKGROUND

### A.    Factual History

This summary is drawn from the Order Denying BNSF's Motion for Summary Judgment.

Fresquez began working for BNSF in 2005 in the Maintenance of Way Department.  (ECF No. 83 at 1.)  He worked mostly as a track inspector responsible for determining if railroad tracks complied with the Federal Railroad Administration ("FRA")

regulations and BNSF track safety standards.  (*Id.* at 1–2.)  Track inspectors are responsible for locating track defects that deviate from FRA or BNSF safety standards, remediating such defects by repairing or protecting them, and reporting any defects. (*Id.* at 2.)  A track inspector protects a defect by making a report, reducing the track speed limit, or removing the track from service.  (*Id.*)  Defects are normally reported by updating an electronic track inspection database called TIMS.  Track inspectors report to track supervisors called roadmasters, and are required to comply with instructions from roadmasters.  Roadmasters are authorized to instruct tract inspectors to measure a track for defects.  (*Id.* at 2.)

BNSF's employment policy, Policy for Employee Performance Accountability ("PEPA"), applies to all employees and has three categories of employee discipline. The most severe is "stand alone dismissible violations," which includes insubordination. Insubordination is also prohibited by BNSF's Maintenance of Way Operating Rule 1.6. Failure to follow a supervisor's instruction is not a stand-alone dismissible violation. The difference between failure-to-follow-instructions and insubordination is often subjective, but an employee can be charged with the former when he is asked to do something and does not do it, and an employee can be charged with the latter for refusing a direct order.  A collective bargaining agreement ("CBA") allows an employee to participate in an investigation to determine whether a violation occurred.  BNSF's 2016 Code of Conduct prohibits retaliation for reporting hazardous conditions, and BNSF maintains an anonymous hotline that allows employees to report behavior that conflicts with the Code of Conduct.

Fresquez became aware that Michael Paz (one of his roadmasters) and Mark

Carpenter (another supervisor) were inappropriately reporting repairs to tract defects when no repair had actually been made. (*Id.* at 4.) Fresquez claimed he confronted Paz about the false reports and that Paz admitted it. (*Id.*)

Subsequently, on May 5, 2016, Fresquez claims that he spoke with Paz about another track defect requiring removing a track from service, that Paz told him to falsify the report, and that Fresquez refused. (*Id.* at 5.) Plaintiff called an FRA field agent to ask whether the defect should be changed. (*Id.*) Later that afternoon, Paz and Fresquez met to discuss another alleged defect. They disagreed whether there was a defect, and whether Paz ordered Fresquez to measure the alignment of the track with a string-line. (*Id.* at 5–6.) Fresquez drove his truck away without measuring the possible defect, but later returned to find Paz and another employee measuring the track with a string-line. (*Id.* at 6.)

That same day, Paz reported to Carpenter that Fresquez had, at a minimum, refused an instruction, and perhaps stated that Fresquez was insubordinate. (*Id.* at 7.) Carpenter removed Fresquez from service pending an investigation, and later charged Fresquez with violating BNSF's policy prohibiting insubordination. At an investigatory hearing, Plaintiff testified that he believed he was taken out of service in retaliation for confronting Paz about the defect reports. (*Id.* at 7.) After the investigation, Fresquez was terminated on May 27, 2016. (*Id.* at 9.)

The case proceeded to trial, and the jury found that BNSF retaliated against Fresquez in violation of the FRSA. (ECF No. 152.)

**B.    Relevant Trial History**

At trial, Judge Daniel and the parties discussed the compensatory damages instruction, Instruction No. 21, multiple times.  (*See* ECF No. 150 at 22–23.)  Judge Daniel raised the issue on the first day of trial, suggesting that back pay—the "amount of lost wages and back pay"—is an equitable remedy.  (ECF No. 157 at 25–27.)  While Judge Daniel did not locate any cases analyzing whether back pay is an equitable remedy under the FRSA, he found that the Sarbanes-Oxley Act had the same burden-shifting framework as the FRSA, and the back pay remedy under Sarbanes-Oxley was an equitable remedy.  (*Id.*)  Judge Daniel also noted that in Title VII cases, back pay and front pay are both considered equitable remedies.  He thus asked the parties to consider the existing law, and bring any reasons to reconsider his decision to his attention.  (*Id.* at 27.)

The following day, Judge Daniel again raised the issue of back and front pay.  (ECF No. 159 at 130–36.)  The parties agreed that back pay was an equitable remedy to be decided by a judge.  (*Id.* at 131–32.)  Judge Daniel also proposed providing the jury with a limiting instruction that back pay or lost wages would be determined by the Court.  (*Id.* at 133–34.)  He also determined that, in the event of a plaintiff's verdict, he would hold an evidentiary hearing on the issue of mitigation and damages.  (*Id.* at 135–36.)

Later, during the charging conference, the parties did not raise any objection to the inclusion of the following language in the compensatory damages instruction: "In calculating compensatory damages, you should not consider any back pay or front pay

5

that the Plaintiff lost." (ECF No. 163 at 35–38.) During Fresquez's closing argument, counsel started to raise the issue of wage loss, and BNSF objected. (*Id.* at 147–48.) Judge Daniel sustained the objection and instructed the jury "to disregard the amount because any consideration of back pay or front pay damages will be decided by the Court because of some legal requirements." (*Id.*) The jury ultimately awarded Fresquez $800,000 in compensatory damages. (ECF No. 152 at 3.) The jury also awarded Fresquez $250,000 in punitive damages. (*Id.*)

**C.     Hearing on Back and Front Pay**

On September 6, 2019, the undersigned held a hearing on the issue of back and front pay. Fresquez testified himself, and called expert Jeffrey Opp to testify on how back pay and front pay should be calculated. BNSF called its vocational expert Cynthia Bartmann to testify on Fresquez's employability, estimated wages, and how long it should have taken Fresquez to find work.

## II. ANALYSIS

Under the FRSA, a prevailing plaintiff is "entitled to all relief necessary to make the employee whole," including:

> (A) reinstatement with the same seniority status that the employee would have had, but for the discrimination;
> (B) any backpay, with interest; and
> (C) compensatory damages, including compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

42 U.S.C. § 20109(e)(1) & (2). In addition, a prevailing plaintiff may receive up to $250,000 in punitive damages. *Id.* § 20109(e)(3).

Fresquez seeks a damages award of back pay of $183,821 and front pay of $1,338,706, for a total award of $1,522,527, plus prejudgment and postjudgment interest. (ECF No. 166 at 10.) BNSF asks that Fresquez's front pay be limited to, at most, four or five years of "wage differential based on the amount he could have made with reasonable efforts," and that various aspects of Fresquez's damages calculations for back pay and front pay should be rejected. (ECF No. 169 at 15.)

## A. Front Pay in Lieu of Reinstatement

In an adverse employment action, front pay is a form of equitable relief awarded by the court to make the plaintiff whole. *Whittington v. Nordam Group Inc.*, 429 F.3d 985, 1000 (10th Cir. 2005); *Hall v. Claussen*, 6 F. App'x 655, 679–80 (10th Cir. 2001). "Although reinstatement is the preferred remedy . . ., front pay may be awarded instead when appropriate." *Davoll v. Webb*, 194 F.3d 1116, 1143 n.19 (10th Cir. 1999); *see Wooten v. BNSF Ry. Co.*, 387 F. Supp. 3d 1078, 1100 (D. Mont. 2019) (FRSA context).

The parties agree that reinstatement is not a viable option. (*See* ECF No. 166 at 6; ECF No. 169 at 5.) Based on the parties' agreement and the Court's own review of the record, the Court agrees that reinstatement is not feasible. *See Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1553 (10th Cir. 1988) ("[T]he trial court must state why front pay is more appropriate than reinstatement."). Thus, the Court may consider an award of front pay in lieu of reinstatement. *See Goico v. Boeing Co.*, 347 F. Supp. 2d 986, 992 (D. Kan. 2004) (an award of front pay or future damages in lieu of reinstatement furthers the remedial purpose of anti-discrimination statutes by assuring that the aggrieved party is "returned as nearly as possible to the economic situation he

7

would have enjoyed but for the defendant's illegal conduct").

"'[D]etermining a front pay award requires the district court to predict future events and consider many complicated and interlocking factors.'" *Davoll*, 194 F.3d at 1143 (quoting *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1458 (10th Cir. 1997)). The Tenth Circuit has recognized that an "award of front pay is based on speculation." *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1246 (10th Cir. 2000). However, even though front pay awards are, by nature, somewhat speculative, "a defendant may not take advantage of the fact that its unlawful conduct was the cause of such uncertainty." *Barnett v. Bd. of Cnty. Comm'rs of Cnty. of Montrose*, 2015 WL 5074471, at *3 (D. Colo. Aug. 28, 2015). Ultimately, "the district court must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall." *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1176 (10th Cir. 2003).

To determine an appropriate award of front pay, the district court looks at the individualized circumstances of the plaintiff, including

> work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which a plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value.

*Davoll*, 194 F.3d at 1144; *see e.g., McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 725–26 (10th Cir. 2011) (district court did not abuse its discretion to deny front pay where the record contained "no reference to any attempt on [the plaintiff's] part to address life expectancy, continued term of employment with United, or a viable discount

8

rate that would have supported a calculable front pay amount"). "A court may also consider a plaintiff's future in the position from which he was terminated." *Davoll*, 194 F.3d at 1144.

The district court must also specify an end date for front pay and show that the end date is "based on more than 'mere guesswork.'" *Id.* at 1144–45. The appropriate cutoff is "the point at which the plaintiff finds employment comparable or superior to her old job." *Hayes v. SkyWest Airlines, Inc.*, 2018 WL 4561266, at *8 (D. Colo. Sept. 24, 2018). "The burden is on the plaintiff to produce evidence to support [his] damages claim." *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 39 F.3d 1482, 1493–94 (10th Cir. 1994).

The parties dispute the appropriate duration of a front pay award. This disagreement stems from their differing ideas about the purpose of front pay. Fresquez contends that union railroad jobs are well-paid, secure positions available without a college degree with good health insurance and retirement benefits, and that no comparable employment exists outside the railroad industry. (ECF No. 166 at 7.) He therefore requests a front pay award for the difference between his position at BNSF and his "best available alternative employment," including salary, health benefits, and retirement benefits, from the date of the verdict until August 17, 2045, when he will turn 60 years old and would have been eligible for full retirement at BNSF. (ECF No. 166 at 7; ECF No. 166-1 at 5.) Opp calculates the net present value of Fresquez's lost wages, lost benefits, and employee annuity pensions as $1,338,706.[1] (ECF No. 166 at 8.)

---

[1] The Motion has a typo: it lists Opp's calculation of Fresquez's Tier 1 regular employee annuity pension at $247,305, whereas Opp's report lists $247,355. (*Compare* ECF No. 166 at

9

BNSF does not directly address the argument that Fresquez cannot obtain comparable employment outside the railroad industry. Instead, BNSF argues that front pay until 2045 is inappropriate for several reasons: (1) Fresquez did not ask for an award of front pay; (2) Fresquez has failed to present sufficient expert testimony to support lost future earnings, and (3) an equitable award of front pay should be limited to two to four years. (ECF No. 169 at 5–10; Transcript of Sept. 6, 2019 Hearing ("Tr.")[2].) BNSF argues that front pay as a limited-term stopgap payment for Fresquez until he is able to secure a good job, not a long-term award for the remainder of Fresquez's career (as is common in personal injury cases, where the plaintiff's capacity to work is diminished as a result of a defendant's wrongful conduct). (ECF No. 169 at 6–7.) BNSF also argues that any award of front pay or back pay should be reduced because of Fresquez's failure to mitigate his damages.

1. Fresquez Asked For An Award of Front Pay

BNSF briefly suggests that Fresquez "did not ask the jury for such an award." (ECF No. 169 at 7.) Fresquez's complaint asked for lost income and benefits, and any relief deemed just and equitable by the Court. (ECF No. 1 ¶¶ 45.) The jury instructions did not include lost future wages as part of compensatory damages because, as discussed above, the Court determined that back pay and front pay were equitable remedies to be decided by the Court. (ECF No. 159 at 130–36; ECF No. 163 at

---

8 *with* ECF No. 166-1 at 1.) The Court will use the amount listed in Opp's report.

[2] An official transcript of the evidentiary hearing is not yet available. The Court will therefore cite the unofficial, rough transcript generated by the court reporter and made available for internal Court purposes.

147–48.)  Indeed, when Fresquez began to discuss wage loss in his closing argument, the Court sustained BNSF's objection because "any consideration of back pay or front pay damages" would be decided by the Court.  (ECF No. 163 at 147.)  The Court therefore finds that while Fresquez arguably did not "ask the jury" for an equitable award of front pay at trial, the issue of front pay was properly raised before the appropriate finder of fact.

### 2.    Opp's Testimony on Front Pay or Lost Future Earnings

BNSF distinguishes between an equitable award of front pay and lost future earnings.  (ECF No. 169 at 6.)  BNSF argues that the former provides a plaintiff who has suffered a short-term negative impact to get back on his feet and acquire comparable or superior employment, whereas the latter is often calculated for the duration of a plaintiff's career.  (*Id.*)  The Seventh Circuit makes a similar distinction between front pay and lost future earnings, recognizing that the latter compensates the plaintiff "for a lifetime of diminished earnings resulting from the reputational harms she suffered as a result of [the defendant's] discrimination."  *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953 (7th Cir. 1998); *see Hall*, 6 F. App'x at 679 (favorably citing *Williams*).  However, the Tenth Circuit has not always been so clear; in *James v. Sears, Roebuck & Co.*, the Tenth Circuit stated that "[f]ront pay refers to the award of money as compensation for the future loss of earnings."  21 F.3d 989, 997 (10th Cir. 1994).

Based on a distinction between future wage loss and front pay, BNSF argues that Fresquez has failed to present sufficient expert testimony to justify compensating Fresquez for lost future earnings because he "lacks the kind of expert testimony and other proof needed to support" such an award.  (ECF No. 169 at 7.)  Specifically, BNSF

contends that Fresquez has not presented an expert in labor-market dynamics to establish that its discharge of Fresquez will have a lasting negative effect on his future earnings or earnings capacity. It thus contends that Opp's opinions on future earning capacity should be disregarded because Opp fails to take into account actual market dynamics.

The Tenth Circuit has not distinguished between front pay and future wage loss in the way that BNSF proposes, and the Court declines to do so here. Awards of front pay or lost future wages and benefits are necessarily speculative by nature, and the courts have accounted for future uncertainty by determining a cutoff date for awards of front pay, and discounting to net present value. *E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1173 (10th Cir. 1985). The Court finds that Opp's testimony is sufficient to establish lost wages or front pay, and that a cut-off date with an appropriate discount rate is sufficient to account for future uncertainty.

      3.    <u>Duration of Front Pay</u>

It is manifest that in order to determine the amount of front pay the Court must first determine the appropriate front pay period. Fresquez asks for a front pay end date based on an anticipated retirement date in August 2045. BNSF argues that four or five years (maximum) is appropriate.

Many of the cases in which the court awards front pay until retirement involve older plaintiffs. As the Sixth Circuit observed,

> the award of front pay to a discriminatorily discharged 41 year old employee until such time as he qualifies for a pension might be unwarranted. On the other hand, the failure to make such an award for an employee age 63, likewise discriminatorily discharged, might be an abuse of

12

discretion.

*Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir. 1984).  The D.C. Circuit found that "[t]o award [the plaintiff] front pay based on the assumption that she will continue in an allegedly low-paying job (compared to a journeyman proofreader at GPO) for a full career, when she is only 34 years old and not incapacitated, is to give her a tremendous windfall rather than to make her whole."  *Peyton v. DiMario*, 287 F.3d 1121, 1130 (D.C. Cir. 2002).  Consistent with this view, the D.C. Circuit held that the district court had abused its discretion by basing its decision to award equitable relief until retirement "solely on the basis of [the plaintiff's] one month of experience at a private employer that may, or may not, be representative of the private sector, doing work that may, or may not, be comparable to the work of a journeyman proofreader at GPO."  *Id.*

In determining a front pay period, courts also consider the plaintiff's tenure with the organization.  For example, in *Huebner v. City of Roswell*, the U.S. District Court Judge William P. Johnson of the District of New Mexico awarded over seven years of front pay to a former police officer who had been with the department for sixteen years, calculated from the date of judgment until his projected retirement date.  2002 WL 35649508, at *4 (D.N.M. Dec. 10, 2002).  However, in *Payton-Huebner v. City of Roswell*, Judge Johnson awarded only two years of back pay and declined to award front pay because the plaintiff had only been employed by the defendant for two years. 2002 WL 35649526, at *3 (D.N.M. Dec. 10, 2002).  He found that assuming that the plaintiff would have worked for the defendant an additional 17 years until her retirement

was too speculative. *Id.*

Fresquez has presented credible evidence that he cannot reasonably expect to obtain employment comparable, in terms of his wages, fringe benefits, retirement income, and union job protection, to that which he enjoyed with BNSF. He testified that he was rejected from a position at Union Pacific immediately after he submitted his application. (Tr.) Moreover, it is his understanding that other railroads would not hire him because he would have to report to them his being fired by BNSF. (ECF No. 166 at 4.) BNSF did not present any evidence to dispute Fresquez's understanding, and indeed seems to agree that Fresquez's best alternative employment is in the building and construction inspection industry, rather than railroad inspection.

In support of his argument that front pay should last until his retirement, Fresquez cites *Hayes v. SkyWest Airlines*, in which the court found an award of front pay for thirteen years (until the plaintiff reached retirement age) was appropriate after the plaintiff "testified credibly that he has little prospect of finding comparable employment." 2018 WL 4561266, at *8. Here, the evidence present at the hearing supports Fresquez's claim that it is highly unlikely that he can ever find comparable employment. At the hearing, Fresquez testified that he intended to remain at BNSF until he retired. (Tr.) However, Fresquez admitted that he had been disciplined on several occasions, and BNSF argued that these personnel issues undercut Opp's assumption that Fresquez would remain with the company until 2045. (*Id.*)

BNSF argues that "front pay is generally not awarded for a lifetime" and is instead intended to provide a "financial cushion for a reasonable period during which a diligent claimant could secure reemployment." (ECF No. 169 at 7 (citing *Wilkerson v.*

*Martin Marietta Corp.*, 171 F.R.D. 273, 287 (D. Colo. 1997)).) It argues that courts within the Tenth Circuit "regularly award front pay for periods of two to three years." (*Id.* at 8 (citing cases).) It also attempts to factually distinguish *Hayes* on the grounds that the plaintiff in that case was 52 years old, suffered kidney disease, and had work restrictions that limited his ability to find alternate positions. (*Id.*) However, the *Hayes* court did not consider those factors in its decision to award front pay until retirement. *See* 2018 WL 4561266, at *5–6. Rather, the court relied on the plaintiff's testimony about his diligent efforts to obtain alternate employment. *Id.*[3]

BNSF's argument and evidence also has shortcomings. Ultimately, BNSF's argument focuses on the amount Fresquez would need as a cushion until he finds alternate employment. BNSF fails to address Fresquez's argument that comparable positions are simply not available because union railroad jobs are among "the best-paying jobs available to individuals with limited education," and that such jobs are now effectively unavailable to him. *See Wooten*, 387 F. Supp. 3d at 1102. Instead, BNSF's expert Bartmann contends that there is room for job and wage growth in the construction and building inspection industry, and that Fresquez can make a good salary with benefits in that industry. Bartmann's report states that "individuals in the 10th percentile for construction and building inspection have a wage of $44,730 . . . . The Bureau of Labor Statistics reports a median wage of $66,410 . . . and in the 90th

---

[3] Senior U.S. District Court Judge Robert E. Blackburn's order in *Hayes* suggests that the equitable award of front pay was also influenced by the egregiousness of the defendant's discriminatory conduct and offensive litigating positions. *See* 2018 WL 4561266, at *6 ("To insinuate, as [the defendant] does, that [the plaintiff] seeks to 'sit idly by and be compensated for doing nothing,' is not only insulting, but plainly contrary to all the evidence presented both at the trial and the front pay hearing." (citations omitted)).

percentile [it] report[s] a wage of $95,870." (ECF No. 182-1 at 6.) However, from the salary ranges presented in Bartmann's report and testimony the hearing, the Court notes that the top wages in the building inspection industry are lower than Fresquez's wages at BNSF. In addition, BNSF's other benefits (such as a rare defined benefit plan) are not prevalent in positions in the building inspection industry. (Tr.)

Ultimately, the Court must determine *some* future stop date for front pay and justify its decision. While front pay always has an element of speculation, the Court finds that it is far too speculative to find that Fresquez would have stayed with BNSF until August 2045, a front pay period of about 26 years. "[I]t would be a highly unusual case that would support a thirty-year award of front pay." *McBride v. Halliburton Energy Servs.*, 2004 WL 7338157, at *2 (D.N.M. Mar. 15, 2004); *see also United States v. Wyo. Military Dep't*, 2018 WL 3969555, at *16 (D. Wyo. Mar. 21, 2018) (finding that it was too speculative to assume that a wrongfully terminated employee who was approximately 30 years old at the time of termination would remain with her employer for the next 25 years); *Peyton*, 287 F.3d at 1130; *Payton-Huebner*, 2002 WL 35649526, at *3.

Moreover, granting front pay until 2045 would surely result in a windfall to Fresquez. He is young, healthy, has shown aptitude for learning, and seems to have established a good career in the building inspection industry in the three years since his termination. On the other hand, the Court concludes that granting front pay for only two or three years would result in an unwarranted and unmerited windfall to BNSF. Fresquez had been with BNSF for ten years at the time of his termination. Given his intent to stay with the company for the long term, but also factoring in his youth, his

opportunities for a significant, if not comparable, wage and benefits package as a building inspector, as well as his disciplinary history, the Court finds it reasonable on this record to conclude that Fresquez would likely have remained at BNSF for an additional ten years.

For these reasons the Court finds that Fresquez is entitled to ten years of front pay from the date of the jury verdict. This period of front pay will not result in a windfall to either Fresquez or BNSF, and is not, on these facts, unreasonably speculative. The Court further finds that this period of front pay takes into account the strengths and weaknesses of the arguments and evidence on both sides. Finally, it is instructive that appellate courts review decisions on the duration of front pay under a abuse of discretion standard, and the Court has endeavored mightily to exercise its discretion on this issue prudently and fairly. *See Davoll*, 194 F.3d at 1143.

### 4. Failure to Mitigate

BNSF also argues that Fresquez did not make reasonable efforts to mitigate his damages, and therefore an award of back pay and front pay should be reduced. (ECF No. 169 at 2–5.) "Unquestionably, wrongfully discharged claimants have an obligation to use reasonable efforts to mitigate their damages." *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980). BNSF bears the affirmative burden to prove a failure to mitigate on the part of Fresquez. *Hayes*, 2018 WL 4561266, at *5. To satisfy that burden, BNSF must establish (1) that Fresquez could have avoided the damage suffered, *i.e.*, "that there were suitable positions available which plaintiff could have discovered and for which he was qualified," and (2) that Fresquez "failed to use reasonable care and diligence in seeking such a position." *Sandia*, 639 F.2d at 627.

The duty to mitigate extends to both back pay and front pay. *Id.*; *Hughes v. Regents of Univ. of Colo.*, 967 F. Supp. 431, 434 (D. Colo. 1996) ("A plaintiff claiming front pay has the duty to take reasonable steps to mitigate such damages."). However, failure to mitigate does not preclude an award of back pay or front pay as a matter of law; rather, it may reduce the amount to which a plaintiff is entitled. *EEOC. v. RadioShack Corp.*, 2012 WL 6090283, at *4 (D. Colo. Dec. 6, 2012).

After Fresquez was terminated from BSNF, he was employed as follows:

- May 27, 2016 to August 25, 2016: unemployed

- August 26, 2016 to January 9, 2017: employed in a seasonal position with the Town of Castle Rock as a roof inspector (Tr.; BNSF Ex. J.);

- January 10, 2017 to August 6, 2017: unemployed;

- August 7, 2017 to October 2017: employed in a seasonal position with SAFEbuilt at $30 per hour (BNSF Ex. K; Tr.);

- October 2017 to November 2018: employed full-time at SAFEbuilt with annual wage of $48,000, or approximately $23 per hour (Tr.); and

- November 2018 to present: employed full-time by Charles Abbott at approximately $25 per hour (*id.*).

(ECF No. 169 at 3.) To summarize, Fresquez found seasonal employment within approximately three months. He was employed for a season, and then laid off. He was unable to find employment until the start of the following season. Fresquez was able to turn that seasonal employment into full-time work, albeit at a lower hourly wage. Fresquez then found another job in the same industry that paid slightly more per hour.

The evidence is uncontroverted that during the 67 weeks he was unemployed or

employed part-time, he applied for 54 jobs, exclusively or almost exclusively by online applications.  (ECF No. 182-1 at 3, 17; Tr..)  Bartmann opined that (a) Fresquez should have been able to find full-time work in the field of building inspection within one or two months of his termination, with a starting wage of approximately $62,400, and (b) applying for online only postings and submitting less than one application per week is not a "reasonable effort" to find full-time employment.  (*Id.* at 6, 21.)  Fresquez suggests that Bartmann's opinions are speculative and BNSF has not met its burden to prove that he failed to mitigate his damages.  (ECF No. 174 at 2.)

Bartmann testified that, at the time she did her market research in October 2017, Charles Abbott indicated they had a variety of openings for ongoing projects in Denver, and that not all positions required a license.  (Tr.)  Wages for those positions ranged from $48,000 to $70,000 per year.  (*Id.*)  Additionally, environmental building inspectors were hiring for positions that paid between $50,000 and $75,000 per year, and were willing to train new employees.  (*Id.*)  Using data from the Bureau of Labor Statistics, Bartmann determined that, as of October 2017, building inspectors with no experience could expect to make approximately $44,730 per year.  (*Id.*)  The median wage in the building inspection industry was $66,410, and the 90th percentile wage was $95,870.  (*Id.*)  Bartmann continued her market research in December 2017 and January 2018, contacting the Cities of Longmont, Aurora, and Brighton about building inspector positions and salaries.  (*Id.*)  She also reviewed job vacancies through the Railroad Retirement Board, and noted that Union Pacific was hiring for several positions in Denver.  (*Id.*)  She continued her market research through January 2019, and found

positions with various governmental entities and private companies in the construction inspection industry. As of January 20, 2019, the Colorado Department of Labor reported 24 job openings for building and construction inspectors in the Denver metro area with a mean wage just over $62,000, and top wage of $73,819 per year. (*Id.*)

Based on her market research, Bartmann concludes that Fresquez did not make a good faith effort to find full time work after he was terminated. She opined that if he had applied for five jobs a day over a two-week period, he would have found employment. (*Id.*) She also contends that, with reasonable effort, he should be making $62,400 annually. (ECF No. 182-1 at 6.)

Bartmann's expert testimony is of limited use. While Bartmann opines that Fresquez should have applied to five jobs a day, there is nothing in her report that indicates there were that many openings available during Fresquez's periods of unemployment. In addition, Bartmann's market research was conducted after Fresquez obtained full-time employment. She does not address the labor market prior to Fresquez finding full-time employment. Finally, Bartmann states that the reason Fresquez is, in her opinion, underemployed and earning less than $62,400 per year is that he failed to conduct a reasonable and diligent job search.

The Court finds that BNSF has failed to establish that there were suitable positions available to Fresquez prior to the time he obtained full-time employment. Moreover, from his testimony the Court finds that Fresquez appears to have used reasonable, good faith efforts to find new employment. Fresquez was not required to use the highest standard of diligence, such as applying to five jobs a day, but rather required to make a good faith effort. Fresquez found seasonal work after three months

of unemployment. When he was laid off, he did not regain employment until the next season. He was then hired full-time, though at a lower wage. He recently switched jobs to a higher-paying position. Under these circumstances, the Court finds that BNSF has not carried its burden to show that Fresquez failed to mitigate his damages.

BNSF also argues that Fresquez has not shown that he has mitigated damages by finding the "best available alternative employment" because he has not shown that he applied to other railroads who would not hire him. Thus, BNSF suggests that there "is not competent evidence that every railroad would exclude Plaintiff from consideration due to his history with BNSF." (ECF No. 169 at 4.) BNSF's argument inverts the burden of proof on mitigation, and improperly places it on Fresquez. At the hearing, Fresquez testified that he applied for a position with Union Pacific after his discharge from BNSF, but that he quickly received a rejection letter back from that company after he submitted his application. (Tr.) Fresquez also argues that, as a practical matter given the employment realities of the railroad industry, his dismissal from BNSF will prevent him from ever again working for another railroad. BNSF has not presented any credible evidence that another railroad will hire a candidate discharged from a class 1 railroad for insubordination (even if wrongfully terminated), and therefore has not shown that Fresquez could mitigate his damages by seeking employment in the railroad industry.

**B.     Court's Jurisdiction to Award Pay**

BNSF argues that the Court lacks jurisdiction to award a specific amount of back pay or front pay (as opposed to setting a length of time) because the Railway Labor Act ("RLA") precludes all claims that involve rights vested in a CBA. (ECF No. 169 at

21

10–11.)  Specifically, it argues that the process of calculating back pay and front pay requires an assessment of the terms of the CBA, and that such an assessment for lost wages would "normally occur between a union general chairman and a BNSF labor relations official about the correct calculation of lost wages."  (*Id.* at 11.)

In response, Fresquez argues that BNSF fails to cite any authority that the RLA precludes an FRSA claim for back pay or front pay.  (ECF No. 174 at 6.)  Fresquez cites to the plain language of the FRSA, which entitles a prevailing employee to back pay and all necessary relief to make the employee whole.  It contends that this does not require any interpretation of the CBA.

No Tenth Circuit case definitively resolves this matter.  However, it does not appear that any court has limited FRSA back pay and front pay awards in the manner suggested by BNSF.  The RLA mandates an arbitration scheme under which a railroad employee may pursue a grievance under a CBA.  *Norfolk S. Ry. Co. v. Perez* ("*Perez*"), 778 F.3d 507, 509 (6th Cir. 2015).  As one case has explained, however, claims independent of a CBA—including FRSA claims—are not subject to mandatory arbitration under the RLA.  *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 898 (D. Minn. 2015) ("[T]he CBA is not the source (or at least not the only source) of [the plaintiff's] right not to . . . [be] accused of rule violations in retaliation for engaging in conduct protected by the FRSA.").

Significantly, the 2007 amendments to the FRSA "permitted employees to file FRSA claims with the Secretary of Labor, rather than requiring them to proceed through the RLA arbitration process."  *Perez*, 778 F.3d at 510; *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 38 (D.D.C. 2013) ("The 2007 amendments to FRSA also specifically

eliminated the requirement that FRSA complaints proceed through the RLA arbitration process, instead transferring authority to investigate and adjudicate such complaints to the Secretary of Labor."). Thus, it appears contrary to the purpose of the FRSA to require that a remedy under that Act (namely, back pay or front pay) be exclusively reserved to a Public Law Board under the RLA for adjudication.

Finally, other federal courts and administrative bodies outside the RLA process have awarded back pay and front pay under the FRSA, instead of merely determining the length of time for a back pay or front pay award. *See, e.g.*, *Wooten*, 387 F. Supp. 3d at 1091, 1102 (awarding over $1.4 million in lost wages and benefits in the future and $500,000 for mental and emotional humiliation, pain, or anguish on FRSA claim), *appeal docketed*, No. 19-35431 (9th Cir. May 17, 2019); *Barati v. Metro-N. R.R. Commuter R.R. Co.*, 939 F. Supp. 2d 143, 145 (D. Conn. 2013) (jury awarded $1,428 in lost wages on an FRSA claim); *Koziara v. BNSF Ry. Co.*, 2016 WL 4435299, at *1 (W.D. Wis. Aug. 19, 2016) (jury award of $425,724.64 for lost wages, pain and suffering, and punitive damages on FRSA claim), *rev'd on other grounds*, 840 F.3d 873 (7th Cir. 2016); *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3d Cir. 2013) (noting that the Occupational Safety & Health Administration's Office of Whistleblower Protection awarded the plaintiff $569,587, including $40,271 in lost wages on a FRSA claim); *Port Auth. Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 160 (3d Cir. 2015) (ALJ awarded plaintiff over $1,000 in back pay for FRSA violation).

For these reasons the Court rejects BNSF's argument, and finds that it may

award a specific dollar amount for front pay, rather than simply determine the length of the front pay period.  Nonetheless, the Court finds that, on the record before it, it does not have the necessary information to calculate the front and back pay owed to Fresquez with any reasonable degree of accuracy.  The Court will therefore order the parties to submit simultaneous supplemental briefing, with such supporting additional evidence as the parties believe appropriate, on the issue of the correct amount of back pay and front pay to be awarded to Fresquez.  This supplemental briefing shall be based on the Court's determination that it will award front pay to Plaintiff for a period of ten years from the date of the verdict.  These supplemental briefs and supporting evidence must also be consistent with the Court's decisions on mitigation and the contested components of back pay and front pay discussed below in Part III.C.

**C.      Disputed Elements of Back Pay and Front Pay**

   1.      <u>Offset for Unemployment Benefits</u>

   Without any citation to cases to support its position, BNSF argues that Opp's calculation of the back pay owed to Fresquez should be reduced by $14,551.19 for unemployment benefits he received.  (ECF No. 169 at 11–12.)  Fresquez does not address the offset for unemployment benefits in his Reply, nor did he address the issue at the hearing.

   A review of Tenth Circuit case law explains BNSF's lack of citations: courts within the Tenth Circuit and the District of Colorado do not reduce back pay by the amount of unemployment insurance benefits received.  The Tenth Circuit has reasoned that "unemployment compensation is purely a collateral source and is peculiarly the property of the claimant.  It would be unfair to give [the party that wrongfully terminated an

employee] the benefit of it in these circumstances."  *Sandia Corp.*, 639 F.2d at 625.  It further explained that the "deduction or offsetting of employment benefits may well result in a windfall to the employer."  *Id.* at 626.

Thus, "[t]his Court follows the rule that [a wrongfully terminated party's] unemployment benefits should not be deducted from any back pay award."  *Cooper v. Cobe Labs., Inc.*, 743 F. Supp. 1422, 1435 (D. Colo. 1990); *see also Clawson v. Mountain Coal Co.*, 2007 WL 201253, at *12 (D. Colo. Jan. 24, 2007) ("[T]he more well-accepted trend in this Circuit is to decline to offset a damage award with unemployment benefits."); *Pickering v. USX Corp.*, 1995 WL 584372, at *44 (D. Utah May 8, 1995) ("either as a matter of law or a matter of discretion, unemployment compensation benefits are almost never offset against back pay awards"); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1493 (10th Cir. 1989) ("the amount of unemployment compensation [the plaintiff] received is not essential to ascertaining backpay because it is within the district court's discretion whether to discount a backpay award by the amount of unemployment compensation").

Accordingly, the Court rejects BNSF's request to reduce Fresquez's back pay by the amount Fresquez received in unemployment benefits.

### 2.    Actual Earnings at BNSF and Lost Wages

BNSF argues that Opp's calculation of Fresquez's lost future wages used "a complicated analysis of projected wages", and that what he should have done is use the amount Fresquez was actually making prior to his termination, and then factor in annual increases for future inflation.  (ECF No. 169 at 12.)  BNSF argues that "a more

appropriate method for calculating Plaintiff's projected wages post-termination would be to take the last three years of full employment . . . or to look at the actual wages of the six comparators." (*Id.*)

The Court finds that Fresquez's expert used a logical method for determining Fresquez's lost future wages. Significantly, BNSF did not present an expert who calculated Fresquez's damages using BNSF's suggested approach. At the hearing on back and front pay, Opp explained that his approach took into account three "discrete factors" that impact a "railroader's ability to earn," namely how much employees are paid under the union contracts, how much work is available, and how much Fresquez elected to work on a historical basis. (Tr.) Using those factors, Opp calculated how much Fresquez would likely earn going forward. The Court finds that Opp's method to calculate Fresquez's front pay has a reasonable factual basis and is legally sound, and it will therefore not be disturbed.

3.    Health Insurance

Opp's calculation of front pay (or lost future earnings) includes health insurance benefit amounts based on the premiums BNSF paid or would have paid absent unlawful discrimination. (ECF No. 169 at 13; ECF No. 174 at 6.) BNSF objects to this approach, arguing that any health insurance benefit should be based on actual out-of-pocket expenses of the former employee. (ECF No. 169 at 13.) Fresquez disagrees, arguing that the proper valuation is the amount the employer would have had to pay, consistent with Opp's calculations. (ECF No. 174 at 6.)

There is a circuit split on whether the value of lost health insurance should be measured by the cost of insurance premiums the employer would have had to pay

absent unlawful discrimination.  The Tenth Circuit has not addressed this issue.  The Fifth, Seventh, and Ninth Circuits measure recovery based on actual out-of-pocket expenses.  *Kossman v. Calumet Cnty.*, 800 F.2d 697, 703 (7th Cir. 1986), *overruled on other grounds by Coston v. Plitt Theatres, Inc.*, 860 F.2d 834 (7th Cir. 1988); *Galindo v. Stoody Co.*, 793 F.2d 1502, 1517–18 (9th Cir. 1986); *Pearce v. Carrier Corp.*, 966 F.2d 958, 959 (5th Cir. 1992) (per curium) (agreeing with the Seventh and Ninth Circuits).  The Fourth and Sixth Circuits measure recovery by the cost of premiums to the employer.  *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 966 (4th Cir. 1985); *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1185 (6th Cir. 1983).

District courts within the Tenth Circuit are also not consistent on their approach to this issue.  One decision from the Northern District of Oklahoma sided with the Fourth and Sixth Circuits, and held that the value of lost health benefits should be measured by the cost of premiums that the defendant would have paid for each employee.  *Millsap v. McDonnell Douglas Corp.*, 2002 WL 31386076, at *8 (N.D. Okla. Sept. 25, 2002), *rev'd in part on other grounds*, 368 F.3d 1246 (10th Cir. 2004).  However, decisions from the District of Kansas and the District of Utah have applied the Fifth, Seventh, and Ninth Circuits' approach and awarded only out-of-pocket expenses incurred for other insurance or actual medical expenses.  *Aguinaga v. United Food & Commercial Workers Int'l Union, AFL-CIO/CLC,* 1990 WL 163306, at *3 (D. Kan. Oct. 9, 1990); *Sanderson v. Leavitt Grp. Ins. Advisors*, 2015 WL 5254492, at *10 (D. Utah Sept. 9, 2015).

One decision from this district used the Fifth, Seventh, and Ninth Circuit

approach, awarding actual expenses for medical insurance as back pay. *Thornton v. Kaplan*, 961 F. Supp. 1433, 1441 (D. Colo. 1996). However, in calculating the health insurance benefit component of front pay, the court multiplied the estimated wage loss (the difference between estimated wages with the former employer and estimated wages in a new position) by 15% to calculate "fringe benefits lost." *Id.*

Further complicating matters here is the fact that neither party directly addresses whether the dispute is over including lost health benefits in back pay, front pay, or both. The approach adopted by the Fifth, Seventh, and Ninth Circuits—namely, the proper measure of lost medical benefits is actual out-of-pocket expenses—is more logically applied only to back pay. *Kossman*, 800 F.2d at 703–04 (discussing how to calculate the cost of insurance coverage in the context of a back pay award); *Galindo*, 793 F.2d 1517–18 (only back pay at issue). This makes intuitive sense, given the fact that the estimated cost of *future* health insurance premiums to an employer would at best be informed speculation. The Court will thus address how lost health insurance benefits should be calculated for both periods of damages.

        a.     *Back pay health insurance*

As it pertains to the period of back pay losses, the Court agrees with the approach adopted by the Fifth, Seventh, and Ninth Circuits that the proper measure of lost medical benefits is the out-of-pocket expenses incurred by the employee for purchasing replacement coverage or paying medical expenses that would have been covered by the employer's policy. This is the actual measure of damages, and easily calculable.

In this case, as discussed at the hearing, Fresquez has not put forth evidence of his actual out-of-pocket expenses for health insurance. There is credible evidence about amount Fresquez paid to insure himself and his son while at BNSF. After Fresquez's termination, he was covered by a BNSF health insurance policy for several months. (Tr.) After that time, his son moved onto the son's mother's health insurance plan. (*Id.*) Fresquez has not disclosed any evidence of out-of-pocket expenses for health insurance incurred after his termination. (*Id.*)

The Court therefore finds that Fresquez has failed to prove the amount he expended due to lack of health insurance, and thus he may not include any amount for health insurance in his back pay calculation. The parties must take this ruling into account when recalculating the amount of back pay owed to Fresquez.

b. *Front pay health insurance*

Neither party directly explains or argues how health insurance benefits should be calculated as a component of front pay. And as previously discussed, the approach adopted by the Fifth, Seventh, and Ninth Circuits for calculating health care related damages by looking to a plaintiff's "out-of-pocket" insurance expenses is logically inconsistent with an award of front pay, given that such expenses have not yet accrued.

The Court has located only a few examples of courts within the Tenth Circuit calculating health insurance benefits as part of front pay. In *Gomez v. Presbyterian Healthcare Servs., Inc.*, health benefits were calculated as the difference in cost to the employee between the old employer plan and new employer plan. 2006 WL 8443619, at *28 (D.N.M. Oct. 27, 2006). In *Townley v. Servicemaster Co., LLC*, the court

subtracted the plaintiff's yearly mitigation earnings from the plaintiff's estimated annual salary at the former employer (including the approximate value of benefits).   2017 WL 4843296, at *7 (D. Kan. Oct. 25, 2017).  In *Huebner v. City of Roswell*, the court simply estimated the employer-paid fringe benefits to be approximately 17.81% of the employee's salary, and included that amount as part of the employee's base pay for calculating back pay.  2002 WL 35649508 (Dec. 10, 2002 D.N.M.).  Finally, in *Thornton v. Kaplan*, the court multiplied the estimated future wage loss by 15% to calculate the fringe benefit lost.  961 F. Supp. at 1441.

Considering the various approaches used by district courts within the Tenth Circuit, the Court orders the parties to calculate the health benefit component of front pay by adding a multiplier to the straight front pay wage losses, as the court did in *Huebner.*  This will entail looking at the value of the health insurance benefits Fresquez received at BNSF, as compared to the value of such benefits at his alternate employment, and reducing same to present value.  This approach will address the relative loss in value of health benefits (recognizing that "health insurance benefits" are not fungible goods, but rather are of varying quality and benefit).  The parties are instructed to, in their supplemental briefing, justify the multiplier they each use in determining the value of the future health insurance benefits.

4.    Interest

Fresquez seeks both pre- and postjudgment interest.  (ECF No. 166 at 8–10.) The parties do not dispute the availability of postjudgment interest, and the Court finds that postjudgment interest at the federal statutory rate would be appropriate.

The FRSA provides for backpay with interest.  42 U.S.C. § 20109(e)(1) & (2).

The parties dispute what prejudgment interest rate should apply. Fresquez asks the Court to calculate interest according to 26 U.S.C. § 6621. That section provides the Internal Revenue Service underpayment interest rate, which is generally the Federal short-term rate plus three percent. 26 U.S.C. § 6621. Fresquez also asks that interest be compounded daily consistent with Department of Labor guidance. (ECF No. 166 at 9.) Fresquez does not cite any federal courts using § 6621 to calculate interest on back pay or front pay, but rather relies on the Secretary of Labor's guidance which states that using that section to calculate interest is appropriate in FRSA administrative actions. (ECF No. 166 at 9.) *See Procedures for the Handling of Retaliation Complaints under the National Transit Systems Security Act and the Federal Railroad Safety Act*. 80 Fed. Reg. 69115 (Nov. 9, 2015).

BNSF argues that prejudgment interest should be calculated using the postjudgment interest rate calculations set forth by 28 U.S.C. § 1961. Section 1961, which sets forth the guidelines for calculating postjudgment interest, mandates an interest rate "equal to the weekly average 1-year constant maturity Treasury yield" with interest usually computed daily and compounded annually. BNSF cites several cases from this District applying § 1961 to award prejudgment interest on federal claims. (ECF No. 169 at 15.)

A district court has discretion to determine an appropriate prejudgment interest rate. *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1287 (10th Cir. 2002). The Tenth Circuit has made it clear that the district courts may, but are by no means required to, use the postjudgment interest rate under § 1961 to calculate prejudgment interest. *See id.* ("Many circuits have held that courts are not required to use section

31

1961 in calculating prejudgment interest and that the calculation rests firmly within the sound discretion of the trial court. We now join them.").

Courts within this district have used various prejudgment interest rates including the Colorado statutory interest rate of 8%, the federal postjudgment interest rate of § 1961, and the IRS underpayment rate under § 6621. *See Barnett v. Bd. of Cnty. Comm'rs of Montrose*, 2015 WL 5315183 (D. Colo. Sept. 11, 2015); *EEOC v. W. Trading Co.*, 291 F.R.D. 615, 621 (D. Colo. 2013). In both *Western Trading* and *Barnett*, the court considered what prejudgment interest rate should apply to an award of back pay for an employee for disability and gender/pregnancy discrimination, respectively. In *Western Trading*, the court elected to apply the underpayment rate set forth in § 6621, finding that the rate "best reflects the economic reality of the backpay period . . . as interest rates were low but return on investment was high." 291 F.R.D. at 621. The court in *Barnett* followed suit. 2015 WL 5315183, at *2.

The Court here finds the reasoning in *Barnett* and *Western Trading* persuasive. The interest rate in § 6621 ensures that Fresquez is fully compensated for his damages without receiving a windfall. The short-term federal interest rate in February 2019 for amounts compounded monthly was 2.54%, and thus the applicable interest rate under § 6621 is 5.54%. Although the Internal Revenue Code allows for daily compounding of interest, *see* 26 U.S.C. § 6622(a), the court finds that monthly compounding better serves the purposes of the FRSA, more accurately reflects the plaintiff's losses, and balances the parties' competing requests for daily compounding (Fresquez) and annual compounding (BNSF). *Leidel v. Ameripride Servs., Inc.*, 276 F. Supp. 2d 1138, 1147 n.

37 (D. Kan. 2003) (finding that annual compounding more accurately reflects the plaintiff's losses than daily compounding of the § 6621 rate); *Wirtz v. Kan. Farm Bureau Servs., Inc.*, 274 F. Supp. 2d 1215, 1223 (D. Kan. 2003) (annual compounding better serves the purposes of the remedial statute).

In sum, the Court directs the parties to calculate prejudgment interest using a fixed interest rate of 5.54%, with such interest compounded monthly. The parties are further directed to use the formula approved by the Tenth Circuit in *Reed v. Mineta*, 438 F.3d 1063, 1067 n.4 (10th Cir. 2006) to calculate prejudgment interest.

## IV. CONCLUSION

For the reasons discussed above, the Court grants in part and denies in part Plaintiff's Motion for Back Pay and Front Pay, but the precise dollar amount of back pay and front pay to be awarded remains under advisement. Because the rulings in today's Order on the period of front pay, as well as the disputed components of back pay and front pay, will necessarily change the calculations already performed by the parties, the Court will order the parties to submit supplemental, simultaneous briefs and additional evidence that addresses the calculations for back pay and front pay in accordance with the Court's rulings above.

The Court emphasizes that the supplemental briefs are ***NOT*** an opportunity to relitigate the Court's rulings in this Order. Any argument which attempts to do so will be stricken and ignored. Moreover, the Court will not consider, and will similarly strike and ignore, any additional arguments that could have been raised in briefing on the instant Motion.

The Court therefore ORDERS as follows:

1.      Plaintiff's Motion for Back and Front Pay (ECF No. 166) is GRANTED IN PART, DENIED IN PART, and REMAINS UNDER ADVISEMENT IN PART, subject to the parties' supplemental briefing, as discussed above;

2.      Plaintiff and Defendant are each ordered to submit simultaneous, supplemental briefs, including such supporting additional evidence in the form of declaration(s) and/or affidavit(s), as the parties believe appropriate, by no later than **November 25, 2019** on the issue of the dollar amounts owed to Plaintiff as back pay and front pay, calculated in a manner consistent with the Court's rulings in this Order;

3.      Because the amount of prejudgment interest will depend on the precise day that judgment is entered, the parties are instructed to calculate prejudgment interest as of the following three dates: **December 17, December 18, and December 19, 2019**;

4.      No extension of the supplemental brief deadline will be granted, and no responses to the supplemental briefs will be allowed.  These supplemental briefs shall not exceed **7 pages in length**, exclusive of attorney signature blocks, certificate of service, and supporting declaration(s) and/or affidavits(s), if any; and

5.      Plaintiff is also ordered to supplement his Motion for Fees and Costs (ECF No. 165) by **December 2, 2019**.  Defendant may file a response to this supplement no later than **December 9, 2019.**  No reply will be allowed.

Dated this 4th day of November, 2019.

BY THE COURT:

_____
William J. Martínez
United States District Judge