IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-00844-WJM-SKC

BRANDON FRESQUEZ,

        Plaintiff,

vs.

BNSF RAILWAY CO.,

        Defendant

---

### DEFENDANT BNSF RAILWAY'S RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

---

Defendant BNSF Railway Company ("BNSF") moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).[1]

### INTRODUCTION[2]

This is a retaliation lawsuit by a former employee of BNSF under the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"). On May 27, 2016, BNSF dismissed Plaintiff for insubordination because he refused his supervisor's direction to measure a track as part of his regular job duties. Plaintiff alleges that BNSF dismissed him for engaging in three allegedly protected activities under the FRSA: providing information he reasonably believed constituted a violation of federal law related to railroad safety; refusing to violate a federal law related to railroad safety; and reporting a hazardous safety or security condition. On December 17, 2019, the Court

---

[1] Pursuant to D.C.COLO.LCivR 7.1(a), BNSF's counsel conferred with Nick Thompson, counsel for Plaintiff with respect to this motion, who indicated that Plaintiff opposes this Motion.

[2] BNSF relies on the trial transcript and exhibits. The trial transcript is at ECF 157 to 164. BNSF also cites to transcript of the Oct. 10, 2018 Trial Preparation Conference, which is at ECF 179.

entered a judgment for Plaintiff. The Court should grant BNSF judgment as a matter of law for the following reasons.[3]

## ARGUMENT[4]

### A.  FRSA Legal Standard

In an FRSA action, a plaintiff must prove that (1) he engaged in protected activity, (2) the relevant decisionmakers at the employer knew of the protected activity, (3) he was subjected to an unfavorable personnel action, and (4) the protected activity was a contributing factor in the unfavorable personnel action. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1212 (10th Cir. 2018); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014). Plaintiff did not meet his burden on each of those elements at trial. In addition, BNSF proved by clear and convincing evidence that it would have discharged Plaintiff in the absence of any protected activity, thus precluding liability.

### B.  This Court Should Enter Judgment in BNSF's Favor Due to a Lack of Evidence to Support the Jury's Verdict

#### i.  *Plaintiff Failed to Demonstrate That He Engaged in Protected Activity Under the FRSA*

Plaintiff claims that he engaged in protected activity under §§ 20109(a)(1), 20109(a)(2), and 20109(b)(1)(A). Those provisions prohibit retaliation for (A) providing information concerning conduct an employee reasonably believes violates a federal law concerning railroad

---

[3] BNSF previously sought judgment as a matter of law under Rule 50(a) during trial. [ECF 135, 141]. The Court granted BNSF's renewed motion in part, limiting most of Plaintiff's claimed protected activities. [ECF 145; Tr:6 at 1456:12-1463:2].
[4] BNSF will not belabor the legal standard as the Court no doubt is familiar with it. Generally, a judgment as a matter of law is appropriate if a reasonable jury lacks a legally sufficient evidentiary basis to find for the non-moving party. Fed. R. Civ. P. 50(a)(1).

safety; (B) refusing to violate or assist in the violation of a federal law concerning railroad safety; and (C) reporting, in good faith, a hazardous safety condition.

Significantly, Plaintiff did ***not*** invoke § 20109(b)(1)(B) or (b)(1)(C). Those provisions generally prohibit retaliation in certain situations where an employee refuses to perform work based on specified safety issues relating to the employee's duties. Plaintiff did not rely on those provisions because they are subject to special, more stringent requirements, set out in § 20109(b)(2). Plaintiff's counsel admitted he would be unable to prove these latter requirements and expressly disclaimed any intent to invoke these sections of the FRSA as protected activity. [Tr. Trial Prep. Conf. 10:13-12:4].[5]

The Court therefore ruled that Plaintiff's refusal to work on May 5, 2016, "is not a protected activity that plaintiff is trying to prove and plaintiff cannot, therefore, argue taking tracks out of service is a protected activity to support his retaliation claim." [Tr:6 at 1393:9-16]. However, Plaintiff's claims were in fact premised on taking tracks out of service and refusing to work, and the jury therefore erred in determining Plaintiff engaged in protected activity within the meaning of the FRSA provisions that were actually invoked.

At trial, at the direction of the Court, Plaintiff's attorney specified the six activities he claimed were protected under the FRSA and contributed to his termination.[6] The Court correctly

---

[5] Nor could Plaintiff legitimately invoke these sections of the FRSA at trial, given that he did not raise them in the agency proceeding and thus did not exhaust his administrative remedies for them. [*See* ECF 165-5 (Plaintiff's OSHA complaint)]. *See* ***Lincoln***, 900 F.3d at 1210-11; ***Foster v. BNSF Ry. Co.***, 866 F.3d 962, 966 (8th Cir. 2017) (administrative exhaustion is required).

[6] *See* Tr:3 at 652:19-653:3 ("So it is the 2015 May report to the union, which is forwarded to Adam Miller. It is the objection in 2015, I forget if it's April or May, to Ryan Akers having Mr. Fresquez remove track. It's the May 2015 objection by Mr. Fresquez to Cason Cole's ordering him to keep track in service. It is the May 2016 objection to Mr. Paz's orders and 2016 report to the FRA.").

rejected Plaintiff's attempted reliance on the alleged protected activities that took place in 2015, although the Court permitted Plaintiff to discuss those activities solely for purposes of providing background information. [Tr:6 at 1457:10-1463:2]. As a result, the only allegations of protected activity the jury was permitted to consider were the reported actions on May 5, 2016, the day of the insubordination incident.

The first of the claimed protected activities on May 5, 2016, occurred when Plaintiff notified his supervisor that a track needed to be taken out of service because a non-class-specific defect had been reported 30 days previously and had not been repaired. Plaintiff claims his supervisor attempted to convince him to change the defect to a class-specific defect so that it would not need to be taken out of service, but he refused. After conferring, they were able to arrange for repairs to be made that day. Those events, if protected, would fall under § 20109(b)(1)(C), relating to retaliation for refusing to allow the use of a track due to a safety concern by an employee responsible for the inspection or repair of the track.

The second of the claimed protected activities on May 5, 2016, occurred when Plaintiff reportedly called the FRA to determine whether the track mentioned in the previous paragraph did in fact have to be taken out of service. This was part of the interaction discussed above and again falls under § 20109(b)(1)(C), relating to retaliation for refusing to allow the use of a track due to a belief of a hazardous safety condition.

The third of the three claimed protected activities on May 5, 2016, occurred when Plaintiff refused to measure another track at the direction of his supervisor, instead getting in his truck and driving away. Plaintiff cannot rely on that activity. First, he did not rely on it during the OSHA proceeding and therefore did not exhaust his administrative remedies. *See **Lincoln***, 900 F.3d at

4

1210-11; *Foster*, 866 F.3d at 966. Second, he did not claim it as protected activity in the Complaint, [ECF 1], in the investigation hearing [*see* Tr. Ex. A-48], or at any time prior to the trial of this matter. Even if Plaintiff could permissibly raise that alleged activity, however, it falls, if anywhere, under § 20109(b)(1)(B), relating to retaliation for refusing to work when confronted by a hazardous safety condition related to the performance of the employee's job duties.

Where there are sections of the FRSA that are directly on point, a plaintiff cannot be allowed to avoid the specific proof requirements established by Congress for those sections by relying on a more general section that omits the specific proof requirements. *Cf. Foster v. BNSF Ry. Co.*, 866 F.3d 962, 967-68 (8th Cir. 2017) (plaintiffs could not prevail by relying on an inapplicable subsection when they expressly decided not to pursue a claim under subsection covering their claimed conduct); *see Bloate v. United States*, 559 U.S. 196, 207-08 (2010) ("There is no question that…general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."). Moreover, while Plaintiff took the position that he is entitled to invoke any section of the FRSA he thinks might apply, his approach renders the specific requirements of § 20109(b)(2) superfluous, as no complainant would ever invoke that section of the statute if he could simply avoid its requirements by pleading a more general section.[7] Plaintiff's approach also would undermine Congress's intent in imposing special requirements for certain activities.

Even if Plaintiff can be permitted to sidestep the statutory requirements of the provisions directly applicable to his claims, however, the evidence at trial failed to demonstrate protected

---

[7] *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

activities under the sections Plaintiff instead relies on. Under § 20109(a)(1), Plaintiff has never claimed he was providing information for or otherwise directly assisting in any *investigation* conducted by any of the listed entities. Under § 20109(b)(1)(A), Plaintiff does not claim that he reported a hazardous safety condition on the date in question. Under § 20109(a)(2), which requires Plaintiff to prove an actual violation of law,[8] Plaintiff cites no authority for the prospect that changing a non-class-specific defect to a class-specific defect violates any federal law if it was improperly characterized in the first place, which is what Plaintiff's supervisor asked him to consider. [Tr:6 at 696:4-698:15].

Further, refusing to measure a track to determine whether a defect exists, which is literally what Plaintiff was hired and paid to do, cannot possibly be considered a violation or potential violation of any federal law, rule, or regulation relating to railroad safety. During the trial, Plaintiff attempted to re-fashion his refusal to perform his job as protected activity by arguing that he refused to measure the track because he believed that Mr. Paz was going to remove the defect regardless of whether he measured it, and Mr. Paz "could attach his name to the defect's dangerous and illegal removal from the system." [ECF 137 at 3]. Even if correct, that description would not satisfy § 20109(a)(2).

Setting aside Plaintiff's constantly evolving and internally inconsistent explanations, which permeate the trial record, the bottom line is that there was nothing either unsafe or illegal about measuring the track at issue, and no one could reasonably or in good faith believe otherwise. It was indisputably a part of Plaintiff's job duties and a duty he was qualified to and able to perform,

---

[8] *See* 49 U.S.C. § 20109(a)(2) ("to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security")

and according to him it would have demonstrated a defect and required a repair (which he claims was the purpose of all his alleged protected activity). Even Mr. Herzog, who adjusted his story to comport with Plaintiff's theory of the case, was forced to admit that it was reasonable to ask Plaintiff to get his string-line and measure the track, that he could have done so safely, and that this was the type of instruction that a track inspector had to comply with. [Tr:3 at 841:7-843:21].[9] Thus, Plaintiff's refusal to measure the track at the direction of his supervisor could not rationally be considered protected activity under the FRSA. No reasonable jury could have found otherwise.

Because Plaintiff demonstrated no protected activity on the day in question, and because the Court already determined that all other claimed protected activity was too remote in time to support an inference of retaliation, the Court should rule that Plaintiff failed to establish that element of his claim and therefore grant judgment as a matter of law to BNSF. *Lincoln*, 900 F.3d at 1212 ("The absence of probative evidence as to any single element necessary to establish a *prima facie* claim terminates the action.") (citation omitted).

### ii. *Plaintiff Did Not Demonstrate the Decision Makers Knew About His Alleged Protected Activity*

To support his FRSA retaliation claim, Plaintiff must demonstrate that the decisionmakers had knowledge of his protected activity. *Lincoln*, 900 F.3d at 1213. This Court specifically determined, in ruling on BNSF's Rule 50 motion, that the two individuals who made the decision

---

[9] While Plaintiff's counsel tried to get Mr. Herzog to testify that Mr. Paz pressured him into writing a statement supporting Mr. Paz, what Mr. Herzog actually testified was that Mr. Paz told him "I need you to be honest and have integrity and write everything that happened right here." [Tr:3 at 809:17-810:16]. Mr. Herzog was also unable to reconcile his testimony that Mr. Paz told him not to call Plaintiff because "this is just what I need," [Tr:3 at 809:5-8], with the fact that Mr. Paz himself tried to call Plaintiff back and Mr. Herzog admitted to trying to call Plaintiff on both the radio and his cell phone. [Tr:3 at 846:3-849:5].

to terminate Plaintiff's employment were Adam Miller, General Director of Line Maintenance, and Stephanie Detlefsen of BNSF's Labor Relations department. [Tr:6 at 1461:21-1462:9].

Plaintiff alleged that Mr. Miller and Ms. Detlefsen were aware of Plaintiff engaging in protected activity because it was reflected in the investigation hearing transcript that they both reviewed. [ECF 137 at 19-20]. This assertion is plainly wrong with respect to the alleged call to the FRA, as Plaintiff never mentioned the call in the hearing. [Tr. Ex. A-48; Tr:2 at 498:19-24]. And both confirmed that they did not know about the call from another source. [Tr:4 at 1132:18-21; Tr:5 at 1347:13-16]. This assertion is also plainly false with respect to the refusal to string line the track. While the decisionmakers obviously knew that Plaintiff had refused to string line the track, neither of them could possibly have known that Plaintiff refused to measure the track *because* he believed Mr. Paz was going to remove the defect and attach Plaintiff's name to the removal, [ECF 137 at 3], given that Plaintiff never made that assertion in the investigation hearing. [Tr. Ex. A-48]

With respect to Plaintiff's conversation with Mr. Paz about whether a track needed to be taken out of service, all that Ms. Detlefsen knew about the exchange was that Plaintiff alerted Mr. Paz that he was going to take a track out of service due to a 30-day defect, they agreed the defect could be fixed that day, and it seemed to her the issue had been resolved. [Tr:4 at 1124:6-1125:14]. Mr. Miller testified that he viewed this interaction as normal communications between a roadmaster and a track inspector. [Tr:5 at 1347:21-1348:14].

As a result, there was no evidence that either Ms. Detlefsen or Mr. Miller had any knowledge that Plaintiff engaged in any of the protected activities actually invoked by Plaintiff in this lawsuit. To avoid the obvious conclusion that the decisionmakers were not aware of Plaintiff's

alleged protected activity, Plaintiff argued that the real decisionmakers were Mr. Paz, who reported the insubordination incident to his supervisor, and Division Engineer Mark Carpenter, who received the report and noticed the investigation on a charge of insubordination. [Tr:6 at 1526:17-20]. That argument was directly contrary to the Court's ruling on BNSF's Rule 50 motion, holding that the decisionmakers were Mr. Miller and Ms. Detlefsen. Plaintiff's attempted end run around the Court's ruling (and the Court's decision not to tell the jury of its ruling) may well have led the jury to decide the case based on Plaintiff's allegations of wrongdoing by Mr. Paz and Mr. Carpenter instead of based on the knowledge of the actual decisionmakers as required under *Lincoln*.

Another problem with Plaintiff's theory is that it relies on the mistaken assertion that the adverse action at issue was not just the dismissal but also the initiation of disciplinary proceedings. [Tr:1a at 49:23-50:3; Tr:6 at 1516:25-1517:4]. In addition to his attack on the disciplinary proceedings being precluded by the Railway Labor Act[10] a court has rejected his precise argument in an FRSA case:

> To hold that a rail worker suffers an adverse employment action any time a rail carrier attempts to determine whether she has violated a rule—typically by following an investigatory process mandated under a CBA—would have major implications for labor relations in the rail industry. In the absence of persuasive authority suggesting that an employee who has not been disciplined can nevertheless recover for retaliation under the FRSA because she was accused of violating a workplace rule, the Court is unwilling to stretch the FRSA so far. The Court therefore dismisses Brisbois's claim that CP retaliated against her by accusing her—and later exonerating her—of additional rule violations.

*Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 903 (D. Minn. 2015). Although neither this Court nor the Tenth Circuit have decided this issue in the context of an FRSA claim, both have rejected efforts to classify a workplace investigation as an adverse action in the parallel context of

---

[10] *See* **Brown v. Ill. Cent. R.R. Co.**, 254 F.3d 654, 664 (7th Cir. 2001).

employment claims.[11] This Court should rule that the only adverse action was Plaintiff's discharge.

Plaintiff premises his assertion that a charge constitutes adverse action in part on the argument that BNSF's disciplinary process, which was bargained for by the union, inevitably results in discipline. [Tr:1a at 49:13-22 (falsely describing hearing officer as "judge, jury, and executioner"); Tr:2 at 310:2-18; Tr:3 at 691:12-13]. Yet multiple employees testified they were aware of individuals who had been cleared through the investigation process. [Tr:3 at 691:15-694:15; Tr. Tran 4 at 921:20-923:6]. In fact, one of Plaintiff's own witnesses testified that he was cleared of a disciplinary charge through the hearing process, and Plaintiff was directly involved in that hearing. [Tr:4 at 993:7-998:25; Tr. Ex. A-79 at pp.116-121]. Plaintiff's theory also contradicts his position at the wage loss hearing that Plaintiff would have remained employed through retirement because of the protections they receive in that disciplinary process.[12] Accordingly, the investigation notice in this case does not constitute an adverse action and the sole decision makers were Mr. Miller and Ms. Detlefsen, as this Court explicitly held. [Tr:6 at 1461:21-1462:9].

Because there was no evidence that either of the actual decisionmakers were aware of any protected activity by Plaintiff when they reviewed the investigation file, they could not have been retaliating against him for such activity when they made the decision to terminate his employment, and the Court should also enter judgment in BNSF's favor on this basis. *Lincoln*, 900 F.3d at 1212.

---

[11] *See Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) ("A workplace investigation generally does not constitute an adverse employment action."); *Carrero v. Robinson*, 2007 U.S. Dist. LEXIS 40805, *62-63 (D. Colo. June 5, 2007) ("[T]he Court cannot say that, even under the relaxed standard of [*Burlington N. and Santa Fe Ry. Co. v. White*, 126 S.Ct 2405, 2414 (2006)], investigations, of themselves, can constitute adverse employment actions sufficient to support retaliation claims. An employer is obligated to investigate allegations of misconduct against its employees, whether those employees have previously engaged in protected activity or not.").

[12] BNSF has attached the hearing transcript to its Motion to Alter or Amend. *See* page 126:3-8.

### *iii.  Plaintiff Failed to Demonstrate That Any Protected*
### *Activity Contributed to His Termination*

Plaintiff also failed to offer sufficient evidence for a reasonable jury to find for him on the contributing factor element. Plaintiff did not prove which specific protected activities actually contributed to the dismissal; with three alleged protected activities, conceivably the jury could have only found one protected activity contributed to the dismissal. Plaintiff must prove, therefore, that each and every one of the protected activities contributed to the dismissal, or that sufficient evidence with respect to each protected activity rose to the level of intentional retaliation. With respect to the alleged report to the FRA, this was not part of the record before the decisionmakers and therefore could not have contributed to their decision. With respect to the refusal to string line the track, Plaintiff's newly-minted justification for his refusal was also not part of the record before the decisionmakers and therefore could not have contributed to their decision. With respect to taking the track out of service in the morning, the decisionmakers knew only that Plaintiff told Mr. Paz he planned to remove a track from service and they worked out a plan to get the track repaired the same day, a normal everyday exchange between a roadmaster and a track inspector. [Tr:4 at 1124:6-1125:14; Tr:5 at 1347:21-1348:14]. No reasonable jury could have concluded that that this innocuous exchange actually contributed to the decision to terminate Plaintiff's employment.

Moreover, the contributing factor element requires Plaintiff to prove that the decisionmakers acted with retaliatory motive. ***Lincoln***, 900 F.3d at 1212, 1214 (affirming summary judgment based on the absence of evidence "that permits an inference of a retaliatory motive"). With respect to the actual decisionmakers, there is a complete absence of any such motive. The decisionmakers reviewed the record from the investigation hearing and determined, without reference to any protected activity, that Plaintiff committed insubordination, a stand-alone

dismissible offense, a determination that finds ample support in the record they reviewed. It is not disputed that the disciplinary charge went through the investigation hearing process, at which Plaintiff was represented by a union official and had the opportunity to present evidence, call witnesses, and question the company's witness.[13] Other courts have noted that benefit as militating against a retaliation finding. *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017) (reviewing contributing factor standard and noting plaintiff was discharged after disciplinary proceedings at which he was represented by union counsel); *Dafoe v. BNSF Ry. Co.*, 164 F. Supp. 3d 1101, 1114 (D. Minn. 2016) (at investigation hearing plaintiff "enjoyed an array of rights, including the right to be represented by his union, the right to introduce evidence, the right to testify, and the right to cross-examine the witnesses against him") (citation omitted).

The termination decision was made by two individuals who were uninvolved in the insubordination incident and were not accused of violating FRA regulations relating to track maintenance. *Gunderson*, 850 F.3d at 969 (discharge decision was made by manager after consultation with his supervisors and human relations officers, not by lower level supervisors the plaintiff accused of safety-related bias); *Dafoe*, 164 F. Supp. 3d at 1114 (plaintiff did not show that anyone directly involved in decision-making process harbored any antagonism or hostility towards him for his protected activity). The dismissal decision was reviewed by BNSF's Labor Relations department and by a third-party arbitrator. BNSF determined that Plaintiff committed an act of insubordination, a stand-alone dismissible offense under the company's disciplinary policy, the Policy for Employee Performance Accountability ("PEPA") [Tr. Ex. A-60]. *Logsdon v. BNSF*

---

[13] Although Plaintiff attempted to attack the fairness of the disciplinary process, it is undisputed that the process is established in the collective bargaining agreement negotiated by his union, [Tr. Ex. A-68], and provides protections unavailable to any at-will employee in the State of Colorado.

*Ry. Co.*, 262 F. Supp. 3d 895, 904 (D. Neb. 2017) (investigation complied with PEPA policy); *Dafoe*, 164 F. Supp. 3d at 1112-13 (plaintiff committed two serious rules violations, constituting dismissible conduct under PEPA). BNSF has never wavered in its position that Plaintiff engaged in an act of insubordination, and Plaintiff has identified no other individual who engaged in an act of insubordination and was not dismissed.

Although the evidence plainly demonstrated that Plaintiff refused a reasonable and safe order to perform an action that fell squarely within his job duties, the jury may have found in Plaintiff's favor because it concluded that the decision to terminate him for this single incident was unduly harsh. However, the Court correctly instructed the jury that it is not its job to assess whether BNSF's disciplinary decision was wise, reasonable, or fair, and it was instead permitted only to determine whether the decision was illegal. *Gunderson*, 850 F.3d at 969; *Kuduk*, 768 F.3d at 792. More likely, however, the jury's verdict reflects that it bought into Plaintiff's repeated inflammatory allegations of failure to repair track defects and misreporting of repairs, which do nothing to demonstrate that Ms. Detlefsen or Mr. Miller retaliated against him.

Plaintiff asserted that Mr. Carpenter infected the disciplinary process when he charged Plaintiff with insubordination instead of failure to follow instructions and "conspired" with Mr. Paz and the hearing officer, Ned Percival, "to ensure the hearing resulted in Fresquez' termination." [ECF 137 at 14].[14] With respect to the first argument, multiple witnesses testified that failure to follow instructions applies where an employee fails to do something he is directed to do, but the failure is not willful, while insubordination is an intentional refusal to follow

---

[14] Plaintiff has falsely described this allegation as "undisputed." [ECF 137 at 18].

instructions. [Tr:4 at 1117:4-14; Tr:5 at 1336:23-1337:7].[15] Plaintiff has never argued that he mistakenly or negligently failed to string-line the defect, and it is undisputed that he made a conscious decision not to do so. As a result, insubordination was the correct charge, and a decision not to charge an employee with a less serious offense that does not reflect the actual facts does not demonstrate that an employee was improperly charged. Moreover, Plaintiff's argument is just a challenge to the correctness of BNSF's action, which is not the same as discrimination. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1317-1318 (10th Cir. 1999) (Title VII and ADEA) ("The relevant inquiry is not whether United's proffered reasons were wise, fair or correct, but whether United honestly believed those reasons and acted in good faith upon those beliefs.").

With respect to the second argument, Darron Boltin, a BNSF Director of Administration called by Plaintiff at the hearing, confirmed that it is appropriate for the company to coordinate its presentation in advance of a hearing. [Tr:3 at 769:13-770:4]. The same things occurs on the employee's side, as Plaintiff is well aware. [*See id.*; *see also* Tr:4 at 993:15-997:17]. Plaintiff offered no evidence to demonstrate Mr. Carpenter's email in any way affected how the hearing officer, who was not involved in the disciplinary decision, conducted the hearing. [*Compare* Tr:5 at 1253:3-18 (hearing officer explains that he is not involved in the disciplinary decision)]. In fact, Plaintiff's only substantive criticism of the hearing is the failure to call Jay Herzog, "the only unbiased witness," [ECF 137 at 14 n.2], but it is undisputed that *Plaintiff* could have asked the hearing officer to call Mr. Herzog or could have called Mr. Herzog himself, as he did when he was

---

[15] Plaintiff misleadingly proclaimed that BNSF's own witnesses have admitted that the difference between insubordination and failure to follow instructions is subjective. [ECF 137 at 7]. While BNSF's witnesses did acknowledge that in some cases there could be a gray area between the two rules, [Tr:5 at 1351:12-18], they also clarified that this was not such a case and the applicable violation was clearly insubordination. [Tr:5 at 1336:23-1338:8, 1371:6-19].

assisting Jason Snow with his disciplinary hearing. [Tr:4 at 993:15-997:17]. The reality is that Plaintiff decided not to call Mr. Herzog because he believed Mr. Herzog's testimony would implicate, not exonerate, him,[16] and it is entirely clear why Plaintiff continues to criticize BNSF for failing to call a witness he made a conscious decision not to request at the hearing.

Plaintiff also argues Mr. Paz infected the disciplinary process by lying at the hearing, but fails to explain how these alleged lies could have affected the result of the hearing. Plaintiff does not dispute that Mr. Paz asked him to string line the track and he refused to do so, and his effort to distinguish between "asking" someone to do something and "ordering" them to do something, [Tr:2 at 484:18-22, 514:12-14], falls flat — there is no question Mr. Paz directed Plaintiff that he was to string-line the track and Plaintiff responded by getting in his truck and driving away. [Tr:2 at 476:18-477:1; Tr:3 at 807:11-808:1]. There is likewise no question that Mr. Paz attempted to call Plaintiff back to the site to measure the track and he responded that there was no point. [Tr:2 at 478:2-7, 481:11-19; Tr. Ex. A-50 (audio)]. Regardless of whether the defect was there, or whether it was ever repaired, it does nothing to change the fact that Plaintiff flatly refused a direction from his supervisor, which on its face constitutes insubordination.

Moreover, even if the alleged lies by Mr. Paz went to the substance of the disciplinary charge, the disciplinary decision was based on the record before Mr. Miller and Ms. Detlefsen, and they had an honest belief that Plaintiff had committed the charged offense, belying any effort to prove intentional discrimination. *See **Gunderson***, 850 F.3d at 969 (critical inquiry is not whether employee actually engaged in conduct for which he was terminated, but whether the decisionmaker

---

[16] *See* Exhibit A-79 at BNSF 3652 ("But the statement from Jay is what's going to fuck me, determining what he said.").

in good faith believed the employee was guilty of the conduct justifying discharge).[17]

Finally, as to Plaintiff's efforts to point to Mr. Carpenter and Mr. Paz as influencing the termination decision made by others, he never invoked the "cat's paw" theory, but if that is his intention that theory required Plaintiff to show that they acted with retaliatory motive, they intended to cause his discharge, and they proximately caused his discharge. *See Kuduk*, 768 F.3d at 790 (citing *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194 (2011)). That other management officials participated in the decision and did not rely wholly on the alleged input of Mr. Carpenter and Mr. Paz defeats Plaintiff's attempt to rely on their alleged conduct. *See Singh v. Cordle*, 936 F.3d 1022, 1040 (10th Cir. 2019) ("cat's paw" theory requires proof that manager with discriminatory animus proximately caused the discharge, which does not occur when independent decisionmakers rely on more than just the manager's input).

Plaintiff failed to prove that his claimed protected activity contributed to his discharge. Instead, BNSF discharged Plaintiff only because of his insubordinate refusal to do his job in the face of a clear and reasonable directive from his supervisor. Accordingly, the Court should grant judgment as a matter of law to BNSF.

### iv.  BNSF Demonstrated by Clear and Convincing Evidence That It Would Have Fired Plaintiff Absent Any Protected Activity

Under the FRSA's burden-shifting approach, even if an employee proves his case, no relief

---

[17] *See also Foster*, 866 F.3d at 969 (erroneous company findings alone do not violate FRSA); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (if employer fired employee because it honestly believed he engaged in misconduct, it necessarily follows it did not retaliated against him for filing a good faith complaint); *see also Medley v. Polk Co.*, 260 F.3d 1202, 1208 (10th Cir. 2001) (reversible error to refuse honest belief jury instruction in FMLA case, where evidence supported that employer honestly believed employee was not using FMLA for intended purpose); *accord Bullington*, 186 F.3d at 1317-1318.

is available if the employer demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of any protected activity. 49 U.S.C. § 42121(b)(2)(B)(iv); *see id.* § 20109(d)(2)(A).

Here the evidence conclusively proves that BNSF would have dismissed Plaintiff regardless of his claimed protected activity. BNSF has a written rule prohibiting insubordination and making it a stand-alone dismissible offense. [Tr. Ex. A-64 at p.6]. BNSF followed the procedures in the collective bargaining agreement for Plaintiff's disciplinary procedure. [Tr. Ex. A-68]. The dismissal was decided by a senior manager and a corporate representative that were far removed from Plaintiff's alleged protected activities. [Tr:6 at 1461:21-1462:9]. A Public Law Board affirmed the decision on appeal.[18] There is a close temporal proximity between Plaintiff's non-protected activity and his termination, as he was notified of the disciplinary investigation just a few hours after the insubordination incident. [Tr. Ex. 48 at p.30].

Moreover, BNSF consistently enforces its rules relating to insubordination, and has discharged other employees for violating this rule. [Tr:4 at 1127:11-16].[19] Insubordination is a serious offense in any workplace, and it is especially important for a railroad operator like BNSF. If a track inspector is told to measure track to make sure trains can travel safely over it, and he refuses, the safety of railroad employees and the public is potentially compromised. Plaintiff's own

---

[18] The Court did not allow BNSF to introduce the Public Law Board's decision upholding the dismissal. [Tr:2 at 350:14-351:1; D.'s Refused Exhibit A-57 (Addressed in BNSF's Motion for New Trial)]. In any event there was evidence that Plaintiff appealed his dismissal and the Court acknowledged that the jury would therefore understand the dismissal was affirmed. [Tr:2 at 349:12-15; Tr:4 at 1136:15-18, 1137:7-8].

[19] Although insubordination is a stand-alone dismissible offense, a first-time offender may be treated leniently and offered a Level S, or serious, record suspension. This was afforded to Plaintiff in 2010, and he was only terminated after he committed the same stand-alone dismissible offense a second time. [Tr. Ex. A-3].

witnesses agreed that it is known by every employee at BNSF that insubordination will get you fired, [Tr:4 at 972:3-7, 992:24-993:2], and his own experts agreed that insubordination is and should be a serious offense in the railroad industry. [Tr:1a at 107:21-108:6; Tr:4 at 1051:20-22].

The foregoing evidence meets and exceeds the kind of proof courts have found sufficient to establish the defense as a matter of law. *See Kuduk v. BNSF Ry. Co.,* 768 F.3d 786, 792-93 (8th Cir. 2014) (affirmative defense satisfied by evidence company investigated rule violation and conducted formal investigation, and disinterested manager reviewed transcript to determine whether to assess discipline); *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 879 (7th Cir. 2016) (defense established when railroad provided unrebutted evidence that it believed that the plaintiff had stolen, and the plaintiff pointed to no evidence that the company would fail to fire an employee whom it discovered to have stolen from the company and no evidence that BNSF disbelieved witness's account of theft); *Epple v. BNSF Railway Co.*, 785 Fed. Appx. 219, 223-24 (5th Cir. Sept. 27, 2019) (holding that railroad established the defense at trial as a matter of law where it followed the same investigation process it followed here, company officials far removed from the plaintiff's claimed protected activity reviewed the findings and reached a decision, the discipline was appropriate under company policy, and the plaintiff had previously engaged in protected conduct but not been disciplined).[20]

---

[20] *See also Molder v. BNSF Ry. Co.*, 2019 WL 4061676, at *5 (E.D. Wash. 2019) (granting summary judgment on the defense based on consistent explanation for the discipline, clear violation by the plaintiff of the railroad's rules, and consistent application of its policies by the railroad); *Gunderson v. BNSF Ry. Co.*, 2015 U.S. Dist. LEXIS 99046, at *38-40, 2015 WL 4545390 (D. Minn. July 28, 2015), *aff'd* 850 F.3d 962 (8th Cir. 2017) (defense established by thorough investigation, clear disciplinary policies, unanimous view of management, and decisions of Public Law Board and OSHA favoring the railroad).

Because BNSF would have be dismissed Plaintiff regardless of any protected activity, judgment as a matter of law in BNSF's favor is appropriate on this issue as well.

### C.  Judgment as a Matter of Law is Appropriate on Compensatory Damages

Plaintiff's testimony was wholly insufficient to support the award of any compensatory damages for emotional distress, much less the $800,000 the jury awarded. His testimony was minimal and insufficient to support any amount. [Tr:2 at 398:24-399:10; 489:6-22; 489:23-490:10; 490:10-491:1; 594:6-595:18.] Moreover, an award of that amount surely goes beyond garden-variety emotional distress and thus required expert testimony.

### D.  The Court Should Enter Judgment as a Matter of Law as to Punitive Damages

Although the standard is not set forth in the statute, courts award punitive damages when an employer acts with reckless or callous disregard for the plaintiff's rights or intentionally violates federal law. *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 642 (10th Cir. 2016). Factors courts consider in assessing punitive damages include: (1) the degree of the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the respondent's actions; and (3) the sanctions imposed in other cases for comparable misconduct. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 523 U.S. 424, 434-35 (2001). For the reasons discussed above, Plaintiff's proof of an FRSA violation is scant, at best, and certainly does not rise to the level of a reckless or callous disregard for Plaintiff's rights. *See Murphy v. Norfolk S. Ry. Co.*, 2015 U.S. Dist. LEXIS 25631, at *25 (S.D. Ohio Mar. 3, 2015) (even if plaintiff could prove FRSA violation, he "failed to meet his Rule 56 burden to come forward with evidence demonstrating a material issue of fact on his claim for punitive damages").

Additionally, punitive damages are not awardable if the defendant shows it made good-faith efforts to comply with the FRSA. *See **BNSF Ry. Co. v. United States DOL Admin. Review Bd.**, 867 F.3d 942, 947 (8th Cir. 2017) (defendant can avoid punitive damages "by showing it made good-faith efforts to comply with the FRSA") (*citing **Kolstad v. Am. Dental Ass'n**, 527 U.S. 526, 536, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999)). BNSF has numerous rules and processes to encourage reporting of misconduct and prevent discrimination or retaliation for such reporting. For example, BNSF's Code of Conduct requires that all employees report actual or apparent violations of the law, the Code of Conduct, and any BNSF policy. [Ex. A-63 at pp.2, 3, 19, 23, 25, 26, 27, 28]. The Code specifically prohibits retaliation against whistleblowers, as do the Maintenance of Way Safety Rules. [Ex. 2 at Rule S-1.5.8; Ex. A-63 at pp.2, 23, 25, 28]. An employee who violates the anti-retaliation provisions of those policies faces disciplinary action, up to and including termination. [Ex. A-60]. BNSF's Human Resources representative, Dane Freshour, testified that managerial employees have been terminated for violating BNSF's Code of Conduct prohibiting retaliation, and multiple employees acknowledged that they expected to be terminated if they took such action. Employees have several avenues for reporting concerns, including reports to supervisors, reports to human resources, and anonymous calls to a 24-hour hotline managed by a third-party. Such policies demonstrate good faith compliance with the FRSA and defeat any claim for punitive damages. *See **BNSF Ry. Co. v. United States DOL Admin. Review Bd.**, 867 F.3d at 949 (identifying similar evidence and noting that it "is strong evidence of BNSF's good-faith efforts to prevent retaliation").

## CONCLUSION

For the reasons stated, BNSF asks the Court to grant BNSF's judgment as a matter of law.

Respectfully submitted this 14th day of January, 2020.

By: *_/s/ Bryan P. Neal*_

Keith M. Goman, Esq.
Gillian Dale, Esq.
Hall & Evans, L.L.C.
1001 Seventeenth St, Ste 300
Denver, Colorado 80202
Telephone:     (303) 628-3300
Facsimile:     (303) 628-3368
Email:  gomank@hallevans.com
          daleg@hallevans.com

Bryan P. Neal
Texas Bar No. 00788106
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Fax: (214) 969-1751
Email: bryan.neal@tklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of January, 2020, I served a true and correct copy of the foregoing **DEFENDANT BNSF RAILWAY'S RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW** through CM/ECF addressed to:

**Moody Law Firm**
Nicholas D. Thompson
nthompson@moodyrrlaw.com
500 Crawford Street
Portsmouth, VA 23704

/s/ Bryan P. Neal
_____

Hall & Evans, L.L.C.
Keith M. Goman, Esq.
Gillian Dale, Esq.
1001 Seventeenth ST, Suite 300
Denver, Colorado 80202
Telephone:     (303) 628-3300
Facsimile:     (303) 628-3368
Email:   gomank@hallevans.com
            daleg@hallevans.com

Bryan P. Neal
Texas Bar No. 00788106
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone:     (214) 969-1700
Facsimile:     (214) 969-1751
Email: bryan.neal@tklaw.com