**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 17-cv-0844-WJM-SKC

BRANDON FRESQUEZ,

     Plaintiff,

v.

BNSF RAILWAY CO.,

     Defendant.

---

**ORDER DENYING DEFENDANT BNSF RAILWAY'S RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL**

---

Plaintiff Brandon Fresquez sued his former employer, BNSF Railway Co. ("BNSF"), for retaliating against him for engaging in protected activity by terminating his employment, in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"). On February 11, 2019, the case proceeded to a 6-day trial before United States District Judge Wiley Y. Daniel of the District of Colorado. On February 19, 2019, the jury returned a verdict in favor of Fresquez. (ECF No. 152.) The jury awarded $800,000 to Fresquez in compensatory damages for emotional distress, pain, suffering, inconvenience, and mental anguish, and an additional $250,000 in punitive damages. (*Id.* at 3–4.) The issue of back pay and front pay did not go to the jury because Judge Daniel held that back pay and front pay are equitable remedies to be decided by a judge. (ECF No. 159 at 131–32.) Unfortunately, Judge Daniel passed away before

ruling on these issues; the matter was reassigned to the undersigned on May 16, 2019, and the Court held a hearing on the issues on September 6, 2019.  (ECF Nos. 171, 192.)

On December 17, 2019, the Court ordered that BNSF pay a tax-adjusted award of back pay, front pay, and prejudgment interest of $696,173.  (ECF No. 201 at 17.)  On the same day, Final Judgment was issued in favor of Fresquez and against BNSF in the amount of $1,746,173—comprised of $696,173 for back pay, front pay, and pre-judgment interest; $800,000 in compensatory damages; and $250,000 in punitive damages—with post-judgment interest at the federal statutory rate.  (*Id.*; ECF No. 202 at 2.)

Before the Court are BNSF's Rule 50(b) Renewed Motion for Judgment as a Matter of Law ("Rule 50(b) Motion") (ECF No. 209) and Motion for a New Trial (ECF No. 210).  The Court presumes familiarity with the facts and extensive history of this action.  For the reasons explained below, BNSF's Rule 50(b) Motion and Motion for a New Trial are denied.

## I.   RULE 50(b) MOTION

BNSF argues that it is entitled to judgment as a matter of law because: (1) Fresquez failed to demonstrate that he engaged in protected activity under the FRSA; (2) Fresquez did not demonstrate that decisionmakers knew about his alleged protected activity; (3) Fresquez failed to demonstrate that any protected activity contributed to his termination; (4) BNSF demonstrated by clear and convincing evidence that it would have fired Fresquez absent any protected activity; and (5) Fresquez's testimony was

insufficient to support the compensatory and punitive damages awarded.  (ECF No. 209.)

## A.   Legal Standards

Judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  Stated another way, "[a] directed verdict is justified only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion."  *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993).  In reviewing a Rule 50 motion, the Court must draw all reasonable inferences in favor of the nonmoving party.  *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009).

Where a party properly moves for judgment as a matter of law prior to the case being submitted to the jury, that party may renew the motion after the jury returns its verdict.  *See* Fed. R. Civ. P. 50(b); *Atchley v. Nordam Grp., Inc.*, 180 F.3d 1143, 1147–48 (10th Cir. 1999).  In resolving a Rule 50(b) motion, the Court "will not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury."  *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000).

## B.   Analysis

The FRSA adopts the burden-shifting framework found in 49 U.S.C. § 42121(b). 49 U.S.C. § 20109(d)(2)(A)(i).  This framework imposes the initial burden on the employee to establish a prima facie case by showing that "'(1) the employee engaged in

3

a protected activity; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1212 (10th Cir. 2018) (quoting *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016)).  If an employee meets his threshold burden, the burden shifts to the employer to demonstrate by "clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the employee's protected activity]."  49 U.S.C. § 42121(b)(2)(B)(iv).

      1.    <u>Whether Fresquez Demonstrated that He Engaged in Protected Activity</u>

BNSF argues that Fresquez failed to demonstrate that he engaged in protected activity under the FRSA.  (ECF No. 209 at 2.)  Specifically, BNSF argues that a jury could not legally find that Fresquez proved the elements of his claims, which were brought under 49 U.S.C. §§ 20109(a)(1), 20109(a)(2), and 20109(b)(1)(A), which prohibit retaliation for: (1) providing information concerning conduct an employee reasonably believes violates a federal law, rule, or regulation concerning railroad safety; (2) refusing to violate or assist in the violation of a federal law, rule, or regulation concerning railroad safety; and (3) reporting, in good faith, a hazardous safety or security condition.  (ECF No. 209 at 2–3.)  BNSF contends that Fresquez's refusing a dangerous order is covered under § 20109(b)(1)(B) or (b)(1)(C), which Fresquez did not invoke.  (*Id.* at 3.)  According to BNSF, because "Plaintiff's claims were in fact premised on taking tracks out of service and refusing to work, . . . the jury therefore erred in determining Plaintiff engaged in protected activity within the meaning of the FRSA

4

provisions that were actually invoked."  (*Id.*)

However, as Judge Daniel held on summary judgment, Fresquez alleged several activities that are protected activities under the subsections of the statute that he did invoke, including that he "refused to reclassify a defect on May 5."  (ECF No. 83 at 11 (citing 49 U.S.C. § 20109(a)(2) (protected activity includes 'refus[ing] to violate the law or assist in the violation of any Federal law, rule or regulation.')).)

The jury heard Fresquez's testimony that he tried, in his role as a track inspector, to take a track out of service on May 5, 2016 because a track defect originally reported in March 2016 had not been repaired within thirty days, as required by federal regulations.  (Trial Tr. II at 461.)[1]  His boss, Michael Paz, tried to get him to report the defect as a slow-order defect, which would allow BNSF to keep the track in service with a reduced speed limit.[2]  (*Id.* at 461–63.)  Fresquez called the Federal Railroad Administration ("FRA") to verify that BNSF cannot change the nature of a reported defect as it sees fit, which the FRA confirmed.  (*Id.* at 462.)  Thereafter, Fresquez alluded to the fact that he had called the FRA in a conversation with Paz.  (*Id.* at 463–64.)  In response, Paz told Fresquez that he had Mark Carpenter (his supervisor) on his side and that they do not lose.  (*Id.* at 464.)  Paz also referenced a different employee who was fired, stating, "I'll pull a Ryan Akers, walk behind you and find 8 missing paper

---

[1]  References to "Trial Tr. __" refer to the transcript of that trial day.  (*See* ECF Nos. 157, 159–163.)  For example, a reference to Trial Tr. II refers to the transcript of the second day of trial.

[2]  During trial, Fresquez's expert, Joe Lydick, testified that that Paz's order violates federal law.  (*See* Trial Tr. I at 102 ("Q. Would changing a class defect that you have reported as a 30-day defect to a slow order violate federal law?  A. Yes.").)

clips and fire you." (*Id.*)  Fresquez understood this to be a reference to following employees and waiting until they violate a rule to fire them.  (*Id.* at 465.)

Shortly thereafter, Paz called Fresquez to a location in south Denver to measure an alignment defect in the track that was first found in 2014.  (*Id.* at 472.)  When Fresquez arrived at the location, Paz and Jay Herzog were already there.  (*Id.* at 473.)  Paz asked Fresquez to measure the defect, even though the alignment defect is not the kind of defect that can be seen with the naked eye.  (*Id.* at 475.)  Fresquez believed that Paz was trying to get him to measure the defect and falsely mark the defect as repaired. (*Id.* at 476.)  Fresquez believed that the defect was "going to be removed from the system to matter what," but he did not want to participate in falsifying the defect because he could be personally fined.  (*Id.* at 476–77.)  Not wanting to participate in Paz's request, which he believed to be a setup, Fresquez left.  (*Id.* at 476–78.)  When Fresquez later went back to the alignment defect and offered to measure it, he was told it was too late.  (*Id.* at 483.)

BNSF argues that Fresquez has not proven a violation of § 20109(a)(2) because "Plaintiff cites no authority for the prospect that changing a non-class-specific defect to a class-specific defect violates any federal law if it was improperly characterized in the first place, which is what Plaintiff's supervisor asked him to consider."  (ECF No. 209 at 6 (citing Trial Tr. III at 696–98).)  However, in drawing all reasonable inferences in favor of Fresquez, a reasonable jury could conclude that: (1) Paz's request to Fresquez on May 5, 2016 to report the defect as a slow-order defect rather than taking the track out of service violated the law; and (2) Fresquez engaged in protected activity by refusing to

6

reclassify the defect.  *See Rookaird v. BNSF Ry. Co.*, 908 F.3d 451 (9th Cir. 2018) (there was sufficient evidence supporting finding that railroad conductor refused, in good faith, to violate railroad safety rule or regulation even though trainmaster did not explicitly direct conductor to stop performing air-brake test, in light of evidence that trainmaster questioned air-brake test's necessity while conductor and his crew were performing test).

Thus, the Court cannot conclude that the overwhelming weight of the evidence favors BNSF to such an extent that it can find that Fresquez did not engage in protected activity.  The Court therefore denies this portion of BNSF's Rule 50(b) Motion.

2.   Decisionmaker's Knowledge of Fresquez's Protected Activity

BNSF contends that Fresquez did not demonstrate that the decisionmakers who decided to terminate Fresquez's employment, namely, Adam Miller, General Director of Line Maintenance, and Stephanie Detlefsen of BNSF's Labor Relations department: (1) had knowledge of Fresquez's alleged protected activity, or (2) were "retaliating against him for such activity when they made the decision to terminate his employment."  (ECF No. 209 at 7–10 (citing *Lincoln*, 900 F.3d at 1212).)

However, despite BNSF's contention that Fresquez did not meet his burden on these elements of his prima facie claim, the jury concluded otherwise.  Judge Daniel gave the jury the following instruction:

> For protected activity to be a contributing factor in an
> unfavorable action, the employee must prove the
> decisionmakers had knowledge of the protected activity and
> the decisionmaker's retaliation was prompted by the
> employee engaging in protected activity.

7

(ECF No. 150 at 19.)  Consistent with Tenth Circuit case law, the Court "presume[s] the jury followed those instructions" in evaluating the evidence.  *Morgan v. Baker Hughes Inc.*, 947 F.3d 1251, 1260 (10th Cir. 2020).

Here, drawing all inferences in Fresquez's favor, there was sufficient evidence for a jury to conclude that the Detlefsen knew that Fresquez had engaged in protected activity.  During trial, Detlefsen testified that Fresquez's union representative said that Fresquez was being retaliated against for events related to his refusal to reclassify the 30-day track defect.  (Trial Tr. IV at 1124–2.)  In addition, the investigation transcript that both Detlefsen and Miller reviewed includes: (1) Fresquez's account that, on the morning of May 5, 2016, Paz had tried to get Fresquez to "falsify the report and change the report to read from a non-class defect to a class specific defect so [Fresquez] would not have to take the track out of service," and (2) Fresquez's belief that Paz was retaliating against him based on that conversation.  (ECF No. 219-6 at 27–29; Trial Tr. IV at 1117–19; Trial Tr. V at 1337.)

There is also sufficient circumstantial evidence for a jury to conclude that Fresquez's protected activity set off a chain of events that resulted in his termination such that the decisionmaker's retaliation was "prompted" by Fresquez's protected

activity.[3]  After Fresquez refused to reclassify the track defect on the morning of May 5, 2016 and alluded to the fact that he had called the FRA, Paz threatened that he would "find 8 missing paper clips and fire" Fresquez.  (Trial Tr. II at 464.)  Thereafter, Carpenter charged Fresquez with insubordination after Paz gave him his version about Fresquez's refusal to measure the track defect later that day.  (Trial Tr. III at 619–20.)  Carpenter did not ask Fresquez or Herzog for their sides of the story before charging Fresquez with insubordination.  (*Id.* at 620.)  Carpenter could have charged Fresquez with failure to follow instructions, but he chose to charge Fresquez with the more serious violation of insubordination, which is a dismissible offense.  (*Id.* at 621–22.)  Carpenter also spoke to Miller, one of the decisionmakers who terminated Fresquez, and gave Miller his "thoughts" regarding whether Fresquez should be fired.  (Trial Tr. V at 1354 (Q: And [Carpenter] told you that Brandon should be fired?  A. He gave me his thoughts, yes.").)  Thus, because the jury could have reasonably concluded that the decisionmakers knew of Fresquez's protected activity and that their decision to terminate Fresquez was prompted by Fresquez's protected activity, the Court denies this portion of BNSF's Rule 50(b) Motion.

Despite the foregoing evidence, there is not significant affirmative testimony from Detlefsen or Miller demonstrating that these decisionmakers terminated Fresquez

---

[3] BNSF contends that because "Plaintiff did not prove which [of various alleged] specific protected activities actually contributed to the dismissal," "Plaintiff must prove . . . that each and every one of the protected activities contributed to the dismissal, or that sufficient evidence with respect to each protected activity rose to the level of intentional retaliation."  (ECF No. 209 at 11.)  Not surprisingly, however, BNSF offers no authority that such a sweeping and onerous proposition is the appropriate standard of review.  Moreover, this proposed standard is

based on their own retaliatory motives.  Nonetheless, the jury could have reasonably drawn this conclusion from circumstantial evidence to the extent it determined that Detlefsen and/or Miller's testimony was not credible.  This is yet another reason to deny this portion of BNSF's Rule 50(b) Motion.

    3.    <u>Whether BNSF Demonstrated By Clear and Convincing Evidence That It Would Have Terminated Fresquez Absent Any Protected Activity</u>

BNSF contends that it is entitled to judgment as a matter of law because it would have dismissed Fresquez regardless of his claimed protected activity because "BNSF has a written rule prohibiting insubordination and making it stand-alone dismissible offense."  (ECF No. 209 at 17.)  BNSF argues that it "consistently enforces its rules relating to insubordination, and has discharged other employees for violating this rule." (*Id.*)  It further points out that Fresquez's "dismissal was decided by a senior manager and a corporate representative that were far removed from [Fresquez's] alleged protected activities."  (*Id.*)

In response, Fresquez argues that "BNSF did not prove, much less by clear and convincing evidence, that Fresquez was insubordinate" and that "[t]he jury could infer from the evidence that Paz did not order Fresquez to string-line the defect and instead asked Fresquez whether he wanted to remeasure the defect, a distinction which Miller conceded is dispositive on the issue of whether Fresquez was insubordinate."  (ECF No. 226 at 25.)  Fresquez likewise contends that BNSF "did not prove that it has terminated every other similar situated employee who has questioned a similar order in

_____

inconsistent with the requirement that the Court draw all reasonable inferences in favor of the

the manner Fresquez questioned Paz's order," whereas Fresquez "offered evidence of other employees not being fired despite engaging in objectively more insubordinate conduct."  (*Id.* at 26–27.)

After reviewing the evidence and drawing all inferences in Fresquez's favor, the Court finds that a reasonable jury could conclude that there was some ambiguity regarding whether Fresquez was truly insubordinate (or whether Paz was searching for a reason to terminate him) and whether BNSF would have charged a similarly situated employee with insubordination instead of a non-dismissible offense like failure to follow orders.  Accordingly, the evidence at trial does not require an unambiguous conclusion that BNSF has proved its affirmative defense by clear and convincing evidence.  The Court therefore also denies this portion of BNSF's Rule 50(b) Motion.

4.    <u>Whether the Jury's Award of Compensatory Damages is Supported by Evidence</u>[4]

A jury's findings with respect to damages must be supported by substantial evidence.  *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir. 1989).  However, "absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice, or another improper cause invaded the trial, the jury's determination of the amount of damages is inviolate." *Ketchum v. Nall*, 425 F.2d 242, 244 (10th Cir. 1970).  However, "[n]o judgment for a remittitur may be entered without the plaintiff's consent because the Seventh

---

nonmoving party on a Rule 50 motion.  *Wagner*, 586 F.3d at 1244.

Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact." *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1225 (10th Cir. 2004). "[I]f the plaintiff does not consent to the remittitur, the district court has no choice but to order a new trial on damages." *Id.*

BNSF argues that Fresquez's "testimony was wholly insufficient to support the award of any compensatory damages for emotional distress, much less the $800,000 the jury awarded." (ECF No. 209 at 19.) In response, Fresquez argues that the following testimony is sufficient to support the compensatory damages award:

> Q. Tell me about the stress on you and your family of earning [$]60,000 less per year in benefits and wages.
>
> A. It is, um -- it was really hard, and it's been really hard. Uh, I remember I had a conversation with my son, and I remember I was sitting outside his school right after, um -- shortly after I lost my job, and I remember I was sitting there, and I knew I had to tell him that I no longer had a job. And at the time I had to tell him, uh -- I call him Hijo. I said, Son, when we go to Grandma's house, you have to eat because I don't have money to buy you food. And that's hard, as a dad, to tell your son that you can't feed your son for doing your job correctly. That's really hard.
>
> . . .
>
> Q. Has it changed who you are as a person?
>
> . . .
>
> A. I don't sleep no more, I can tell you that much. My stress levels are out the door. I got fat. . . . Um, in '17, early -- like

---

[4] BNSF argues that the jury's compensatory and punitive damages awards are excessive in both its Rule 50(b) motion and its Motion for a New Trial. (ECF No. 209 at 19; ECF No. 210 at 15–18.) For the sake of judicial efficiency, the Court will analyze the arguments made in both motions in this section.

early '17 I was still putting on weight, but I was about 190.  I think I've ballooned up to like 245, 250.  It just -- I -- I gained a lot of weight, and I didn't change my diet much.  I think a lot of it just had to do with stress.  I really do.

Q. When you worked for BNSF, did you coach anything?

. . .

A. I coach, uh, competitive youth, um, sports.  I was working for a program that was considered one of the top in the western half of the United States.  We pride ourselves in -- I think 2017 we had 59 recruits.  We had 59 kids commit to college.  It was very competitive.

Q. Did you enjoy that?

A. I did.

Q. After BNSF fired you, did you quit doing that?

A. I no longer do that.

Q. Did stress play a role in why you quit doing that?

A. It does.  It absolutely does.

Q. Has the stress of this affected pretty much everything you enjoy doing?

A. It does.  It really does.

(Trial Tr. II at 398–99, 489–91.)

Although BNSF speculates that the jury's verdict "appears to be based on improper arguments of counsel and an intent to punish . . . rather than a reasoned consideration of the evidence" (ECF No. 210 at 17), BNSF offers scant evidence that the jury acted out of passion or prejudice against BNSF instead of based on Fresquez's testimony regarding his non-economic damages.  While the Court recognizes that

Fresquez did not describe his emotional distress in the most graphic or descriptive terms, he clearly described that the stress from his termination had affected him in significant ways.  The events giving rise to this litigation changed who he is as a person by causing him to feel stress about feeding his son, affecting his ability to sleep, causing him to gain weight, and causing him to quit taking part in activities that he loved.  The Court will not substitute its own judgment for that of the jury regarding the appropriate amount of compensatory damages, particularly absent any evidence that the jury acted with passion, prejudice, or another improper cause.  *See McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 723 (10th Cir. 2011) (affirming $300,000 award for compensatory damages where plaintiff testified that her discharge left her crying for weeks with bouts of depression, caused her to have trouble sleeping, had an effect on her home life and caused her to lose confidence).  Because the Court cannot conclude that the jury's award is unsupported by evidence or contrary to reason, BNSF's request to that the Court grant judgment as a matter of law or order a new trial as to compensatory damages is denied.

     5.    <u>Punitive Damages</u>

     Pursuant to a FRSA provision stating that "[r]elief . . . may include punitive damages in an amount not to exceed $250,000," 49 U.S.C. § 20109(e)(3), the jury awarded Fresquez $250,000 in punitive damages (Trial Tr. VI at 1575).

     BNSF argues that the jury's award of punitive damages is inappropriate because Fresquez's "proof of a FRSA violation is scant, at best, and certainly does not rise to the level of a reckless or callous disregard for [Fresquez's] rights."  (ECF No. 209 at 19.)

BNSF contends that "punitive damages are not awardable if the defendant shows it made good-faith efforts to comply with the FRSA," and it argues that it has "numerous rules and processes to encourage reporting of misconduct and prevent discrimination or retaliation for such reporting." (*Id.* at 20.)

BNSF is implicitly asking the Court to view the evidence in BNSF's favor, instead of Fresquez's favor, and determine that the jury erred by awarding punitive damages notwithstanding certain evidence regarding BNSF's efforts to comply with the FRSA. However, the jury also heard testimony that BNSF has a culture that disregards railroad safety rules and employee rights. *See BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 642 (10th Cir. 2016) (recognizing that an award for punitive damages under the FRSA is appropriate where the employer acted with a "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law"). For example, after learning that Fresquez called the FRA, Paz informed Fresquez that he and Carpenter do not lose and then threatened that he would "pull a Ryan Akers, walk behind you and find 8 missing paper clips and fire you." (Trial Tr. II at 464.) Paz then found such an opportunity to have Fresquez charged with insubordination later that day after Fresquez refused to measure a defect that cannot be seen with the naked eye, which Fresquez believed was setup to get him in trouble. (*Id.* at 483.) Moreover, even though Detlefsen reviewed the investigatory transcript, which contained Fresquez's complaint that he was being retaliated against, she did little to investigate Fresquez's claim. Because a reasonable jury could conclude that BNSF acted with reckless and callous disregard of Fresquez's right to be free from retaliation for engaging in protected activity and

15

terminated him anyway, BNSF's request to that the Court grant judgment as a matter of law or order a new trial as to punitive damages is denied.

## II. MOTION FOR NEW TRIAL

### A.    Legal Standards

Under Federal Rule of Civil Procedure 59(a), "The court may, on motion, grant a new trial on some or all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  However, motions for a new trial are "not regarded with favor" and should be granted "only with great caution, being addressed to the sound discretion of the trial court."  *United States v. Page*, 828 F.2d 1476, 1478 (10th Cir. 1987) (internal quotation marks omitted).  Nonetheless, a new trial may be granted if the Court "concludes the jury's verdict was so against the weight of the evidence as to be unsupportable."  *Bangert Bros. Const. Co., Inc. v. Kiewit W. Co.*, 310 F.3d 1278, 1299 (10th Cir. 2002).

BNSF raises several grounds which it contends necessitates a new trial: (1) Judge Daniel's passing prevents the Court from fulling considering BNSF's post-judgment motions; (2) a typographical error in the original verdict form resulted in inconsistent jury verdicts; (3) the jury's verdict was so against the weight of the evidence as to be unsupportable; (4) Judge Daniel gave erroneous jury instructions and evidentiary rulings that affected BNSF's substantial rights; (5) Fresquez's closing argument included improper argument; and (6) BNSF is entitled to a new trial or

16

remittitur on compensatory damages and punitive damages.[5]  (ECF No. 210.)

**B.     Analysis**

1.     Passing of Judge Daniel

Under Federal Rule of Civil Procedure 63,

> If a judge conducting a hearing or trial is unable to proceed,
> any other judge may proceed upon certifying familiarity with
> the record and determining that the case may be completed
> without prejudice to the parties.  In a hearing or a nonjury
> trial, the successor judge must, at a party's request, recall
> any witness whose testimony is material and disputed and
> who is available to testify again without undue burden.  The
> successor judge may also recall any other witness.

BNSF contends that it is entitled to a new trial "because the passing of Judge

Daniel after the verdict prevents full consideration of BNSF's motion for new trial based

on the sufficiency of the evidence" and because the Court's ruling on this motion turn on

witness credibility, which the undersigned did not have the opportunity to observe in the

context of the original trial.  (ECF No. 210 at 1–2.)  In response, Fresquez argues that

Judge Daniel's passing does not entitle BNSF to a new trial.  (ECF No. 226 at 31.)  The

Court agrees with Fresquez.

Neither party cites Tenth Circuit case law controlling this issue.  However, the

Second Circuit has held that

> [i]t is well established that if the trial judge dies after the jury
> returns a verdict but before a motion for judgment
> notwithstanding the verdict or a motion for a new trial is
> heard or decided, another judge may pass upon such
> applications.  * * * An exception arises only if the successor

---

[5]  The Court already addressed the parties' arguments regarding punitive and
compensatory damages in Part I, above.

> finds that he cannot satisfactorily perform such a function by
> reason of the fact that he did not preside at the trial, or for
> some other reason.

*Lever v. United States*, 443 F.2d 350, 351 (2d Cir. 1971) (quoting *Miller v. Penn. R.R. Co.*, 161 F. Supp. 633, 636 (D. D.C. 1958)); *see also* 11 Charles Alan Wright, *et al.*, Federal Practice & Procedure § 2922 (3d ed.) ("When the trial takes place before a judge and jury and the judge dies between the time of trial and the hearing of a motion for judgment notwithstanding the verdict or for a new trial, the rulings of the trial judge are presumed to be correct and the burden is on the defeated party to demonstrate the contrary.").

As Fresquez points out, BNSF's interpretation of Rule 63 would require a new jury trial in any case in which the presiding judge becomes unavailable—whether the presiding judge died, retired, or was elevated to a different court—before ruling on every post-judgment motion. Such an interpretation would create tremendous judicial inefficiencies, especially where, as is the case here, the Court's function in reviewing BNSF's Rule 50(b) Motion and Motion for a New Trial is to determine whether the jury's determinations were against the clear weight of the evidence. Because the Court is confident that it is able to discharge its duty in analyzing these motions without having presided over the jury trial, a new trial is unnecessary.

Accordingly, BNSF's Motion for a New Trial is denied to the extent it seeks a new trial because of Judge Daniel's passing.

2.    Jury Confusion Reflected by Jury's Inconsistent Verdicts

The original verdict form contained a typographical error that was not caught by

either the parties or Judge Daniel before it was given to the jury.  On the original verdict

form, Question One asked whether Fresquez proved his prima facie case by a

preponderance of the evidence.  (Trial Tr. VI at 1563–64.)  Question Two asked "Has

the Defendant proven by clear and convincing evidence that it would have taken the

same personnel action against the Plaintiff even if the Plaintiff had not engaged in any

protected activity?"  (*Id.* at 1564.)  To the extent the jury answered "Yes" to Question

Two (meaning that BNSF had proved its affirmative defense), the original verdict form

then directed the jury to go to Question Three to award damages in favor of Fresquez.

(*Id.* at 1565)  Using the original verdict form, the jury answered "Yes" to Questions One

and Two and then went on to award compensatory and punitive damages.  (*Id.*)

Judge Daniel recognized this problem after reading out the jury's verdict

regarding Questions One and Two.  (*Id.* at 1564.)  He then excused the jury and

discussed the issue with parties.  Judge Daniel concluded

> Yeah, here's what I would prefer to do.  I would prefer us to
> reach a uniform way to approach this so that nobody is
> playing games.  Because there's an honest mistake.  So I
> share responsibility, but the two of you do as well, all of you,
> for not catching that.
>
> . . .
>
> I have a thought here.  One way we could do this, without
> talking to them in any specific way, is to tell them there was
> a mistake on the verdict form, and to give them a new verdict
> form that has this corrected, and tell them that they need to
> go back and deliberate.

(*Id.* at 1566–68.)  Judge Daniel specifically asked counsel whether they agreed with his

approach of "bring[ing] the jury back in and tell[ing] them there was a mistake made by

the Court and the parties on the verdict form, that we have generated a new jury verdict

form, and we are going to give it to them." (*Id.* at 1569.)  Counsel for both sides agreed

with this approach.  (*Id.* at 1570.)  When the jury returned to the courtroom, Judge

Daniel explained the issue to the jury:

> The reason I stopped reading the jury verdict form was
> because I realized that there was a substantive error below
> your answer to Question Number 2.  So the form, as you
> received it, says: If your answer to Question 2 is "Yes," then
> you should answer Question 3.  If your answer to Question 2
> is "No," you may skip Questions 3 and 4 as you have found
> for the Defendant on the Plaintiff's retaliation claim and you
> may sign the verdict form because you have completed your
> deliberations.
>
> The instruction below Question Number 2 was in error.  I
> missed it.  The parties missed it.  And so what we have
> agreed is that the only thing we can do is to give you a new
> verdict form which contains the instruction that should have
> been given.
>
> So for purposes of this, I'm going to ask you to go back and
> answer Question 1, Question 2, with the understanding—
> and I've given your foreperson, Miss Wright, the original
> verdict form because I didn't want to take the time to make
> nine more copies.
>
> So as revised it should read: If your answer to Question 2 is
> "No," then you should answer Questions 3–4.  If your answer
> to Question 2 is "Yes," you may skip Questions 3–4 as you
> have found for the Defendant on the Plaintiff's retaliation
> claim and you may sign the verdict form because you have
> completed your deliberations.  Now, I'm not going to ask you
> to answer this in the courtroom.  I am going to send you
> back to the jury room, understanding that we made a
> mistake.
>
> Now, the other thing you need to note is that Instruction No.
> 19, which you have in your packet, reads as follows: Even if
> the Plaintiff proves the elements of his claim in Instruction

No. 15, the Defendant is still not liable for wrongful retaliation if it has proven by clear and convincing evidence that it would have taken the same unfavorable personnel action against the Plaintiff even if the Plaintiff had not engaged in any protected activity.

So that is what I have to say.  And I want to just get counsel's affirmation that they agree with what the Court has said under these circumstances.

MR. THOMPSON: Plaintiff agrees, Your Honor.  We apologize.

MR.  GOMAN: Yes, on behalf of Defendant, we agree.

(*Id.* 1571–72.)  The jury was then given the revised new verdict form, determined that BNSF had not proved its affirmative defense, and again awarded Fresquez damages. (*Id.* at 1573–77.)

BNSF now argues that it is "entitled to a new trial based on jury confusion reflected by the jury's inconsistent verdicts."  (ECF No. 210 at 3.)  In response, Fresquez argues that "[t]here is no basis to believe that the jury was confused or misled in any way" and that because BNSF's counsel did not object, there was no reversible error.  (ECF No. 226 at 35.)

The Court cannot conclude that the typographical error in the verdict form necessitates a new trial.  Significantly, counsel for both parties explicitly agreed with Judge Daniel's proposed correction, as well as the instruction that he gave to the jury. (Trial Tr. VI at 1570–72.)  Had BNSF genuinely believed that the inconsistent verdict forms confused the jury, it could have moved for a mistrial or requested that Judge Daniel take additional corrective action beyond the curative instructions to which it

agreed.  BNSF did not do so.  That the jury subsequently ruled against BNSF does not necessitate a new trial.  *See United States v. Taylor*, 514 F.3d 1092, 1096 (10th Cir. 2008) (denying appeal for prosecutorial misconduct where the court gave a curative instruction and defense counsel neither objected to the curative instruction nor move for a mistrial).

Accordingly, BNSF's Motion for a New Trial is denied to the extent it seeks a new trial based on the typographical error with the original verdict form.

3. Whether the Jury's Verdict Was Against the Weight of the Evidence

BNSF argues that it is entitled to a new trial because the "verdict was so against the weight of the evidence as to be unsupportable."  (ECF No. 210 at 4.)  Specifically, BNSF contends that: (1) "[Fresquez] did not offer sufficient evidence for a reasonable jury to conclude that he engaged in protected activity under the cited sections of the FRSA, that the BNSF decisionmakers knew that he engaged in protected activity, or that BNSF intentionally retaliated against [Fresquez] by terminating him in whole or in part due to his protected activity"; and (2) "BNSF demonstrated by clear and convincing evidence that it would have terminated [Fresquez] in the absence of any protected activity, based on the knowledge of the actual decisionmakers in this case."  (*Id.*)

This portion of BNSF's Motion for a New Trial is denied for the reasons set forth in Part I.

4. Purported Trial Errors

Where a party seeks a new trial based on a claim of the Court's error, the Court may grant such a motion if "the 'claimed error substantially and adversely' affected the

party's rights." *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008) (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998)).  However, Federal Rule of Civil Procedure 61 provides that "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial," and that "the court must disregard all errors and defects that do not affect any party's substantial rights."

In its Motion for a New Trial, BNSF raises several purportedly erroneous jury instructions and evidentiary rulings that it contends warrant a new trial.  (ECF No. 210 at 4–14.)  However, after reviewing the challenged jury instructions and evidentiary rulings, the Court concludes that BNSF has failed to establish that the tendered jury instructions and evidentiary rulings substantially and adversely affected its rights such that a new trial is necessary.  Those issues will not be revisited further in this order.

BNSF also argues that Fresquez's closing argument included improper argument.  (*Id.* at 14–15.)  During closing argument, Fresquez's attorney told the jury that Fresquez's "wage loss and benefit loss from now until—from the time he was fired until the time he retires is $1,522,527."  (Trial Tr. VI at 1527.)  BNSF's counsel objected, and the Court sustained the objection and instructed the jury to "disregard the amount because any consideration of back pay or front pay damages will be decided by the Court because of some legal requirements."  (*Id.*)  Fresquez's attorney then stated, "So you are wondering, Mr. Thompson, why are you putting up his wage loss if the Court [is] going to decide that?  Here's why.  A good rule of thumb for emotional distress damages is twice his wage and benefit loss."  (*Id.*)  Counsel did not object to this

23

statement.

After careful consideration, the Court concludes that neither statement warrants a new trial. Judge Daniel sustained the objection to Fresquez's attorney's first statement regarding the amount of Fresquez's claimed wage losses and instructed the jury to disregard the statement. This statement does not warrant a new trial because the Court presumes that the jury followed the Court's instruction. *See, e.g.*, *Taylor*, 514 F.3d at 1100 ("[W]e generally presume that juries follow courts' instructions."). Moreover, BNSF's counsel did not object to Fresquez's counsel's subsequent statement that "a good rule of thumb for emotional distress damages is twice his wage and benefit loss." The fact that BNSF did not object to this statement when it was made weighs heavily against granting a new trial. *See Glenn v. Cessna Aircraft Co.*, 32 F.3d 1462, 1465 (10th Cir. 1994) ("A party who waits until the jury returns an unfavorable verdict to complain about improper comments during opening statement and closing argument is bound by that risky decision and should not be granted relief."). Moreover, the Court declines to find that counsel's argument was so fundamentally improper that it mandates a new trial notwithstanding the lack of a contemporaneous objection.

### III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   BNSF's Rule 50(b) Renewed Motion for Judgment as a Matter of Law (ECF No. 209) is DENIED; and

2.   BNSF's Motion for a New Trial (ECF No. 210) is DENIED.

Dated this 8th day of March, 2021.

BY THE COURT:

_____
William J. Martinez
United States District Judge