1           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 17-cv-0844-WJM
3
   BRANDON FRESQUEZ,
4
   Plaintiff,
5
   vs.
6
   BNSF RAILWAY COMPANY,
7
   Defendant.
8
   ------------------------------------------------------------
9
                  REPORTER'S TRANSCRIPT
10                 (Evidentiary Hearing)

11 ------------------------------------------------------------

12      Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13 Judge, United States District Court for the District of

14 Colorado, commencing at 1:37 p.m., on the 6th day of

15 September, 2019, in Courtroom A810, United States

16 Courthouse, Denver, Colorado.

17
                      APPEARANCES
18
        JONATHAN L. STONE, Moody Law Firm, 500 Crawford
19 Sttreet, Portsmouth, Virginia 23704, and
        NICHOLAS D. THOMPSON, Moody Law Firm, 80 South 8th
20 Street, IDS Center, Suite 4600, Minneapolis, Minnesota
   55402, appearing for the plaintiff.
21
        GILLIAN DALE and KEITH M. GOMAN, Hall & Evans,
22 LLC-Denver, 1001 Seventeenth Street, Suite 300, Denver,
   Colorado 80202, appearing for the defendant.
23

24              MARY J. GEORGE, FCRR, CRR, RMR
            901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1              P R O C E E D I N G S

2        (Call to order of the court at 1:37 p.m.)

3             THE COURT:  All right, we're on the record in civil

4    action No. 17-cv-0844, Brandon Fresquez, plaintiff, versus

5    BNSF Railway Company, defendant.  I'll take appearances of

6    counsel.

7             MR. STONE:  Good afternoon, Your Honor.  Jonathan

8    Stone on behalf of Brandon Fresquez, with my cocounsel, Nick

9    Thompson.

10            THE COURT:  Good afternoon to the three of you.

11            MS. DALE:  Good afternoon, Your Honor.  Gillian

12   Dale and Keith Goman on behalf of BNSF.  Also at counsel

13   table with us is Sandra Farrell, our paralegal.

14            THE COURT:  All right.  Good afternoon to the three

15   of you.

16            All right.  We are here for a hearing on the

17   plaintiff's motion for back and front pay filed at ECF 166.

18   Before we go any further, I want to put a couple of matters

19   on the record to summarize what brings us here today and put

20   some context to this hearing.

21            All right.  The plaintiff sued his former employer

22   for retaliating against him for engaging in protected

23   activity by terminating his employment, all in violation of

24   the Federal Railway Safety Act.  On the 11th of February of

25   2019, the case proceeded to a six-day trial before Senior

1    Judge -- Senior District Judge Wiley Daniel of this

2    district.

3        On February 19th, a jury returned a verdict in

4    favor of the plaintiff, Mr. Fresquez, finding that BNSF

5    retaliated against the plaintiff in violation of the Federal

6    Railway Safety Act.  The jury awarded $800,000 to Mr.

7    Fresquez as compensatory damages for emotional distress,

8    pain, suffering, inconvenience, and mental anguish, and an

9    additional $250,000 in punitive damages.  The issue of back

10    pay and front pay did not go to the jury because Judge

11    Daniel held, and the parties did not dispute, that back pay

12    and front pay are equitable remedies to be decided by the

13    judge.

14        After the jury returned a verdict for Mr. Fresquez,

15    Judge Daniel instructed the parties to attempt to reach an

16    agreement on back pay and front pay or request a hearing.

17    The parties did not reach such an agreement and the

18    plaintiff filed the instant motion for back and front pay.

19        Judge Daniel set a hearing on the matter actually

20    both on the motion for back and front pay as well as a

21    hearing on plaintiff's motion for attorney's fees and cost.

22        Unfortunately, as we all know, however, Judge

23    Daniel passed away before that hearing could be held and the

24    chief judge reassigned this matter to me for all purposes.

25        Thereafter, the defendant moved for a hearing on

1    issues of back pay and front pay, as well as attorney's

2    fees.  I decided that I would hold a hearing only on back

3    pay and front pay and that I would decide the issue of

4    plaintiff's attorney's fees on the papers submitted.

5          One thing that I noticed in preparing for today is

6    that there's been a squabble between the parties with

7    respect to whether the expert witnesses can be -- can be

8    heard today, can testify, and how much of the testimony I

9    should consider and whether I should consider their expert

10   testimony.  And so I'm just going to cut through all that

11   and tell everybody I'm going to have -- both expert

12   witnesses are going to be allowed to testify today.  I'm

13   going to consider both of their reports.

14         I think it's important because -- especially

15   because I was not the trial judge.  For me to have that kind

16   of background and for my purposes I'm just going to cut

17   through that and let both experts testify.

18         I do have a time limitation today of 5:00.  We will

19   not go beyond 5:00, so I wanted to apprise counsel of that.

20   And before we get going, let me ask each side if there's

21   anything that we need to address before the plaintiff calls

22   his first witness.  He's going to go first because it is his

23   motion and he has the burden on the motion.

24         So, Mr. Stone, anything we need to address?

25              MR. STONE:  Perhaps, Your Honor.  To streamline

1    today's hearing, we've -- we'll stipulate to certain of the

2    defense exhibits; we have objections to others.  Counsel and

3    I spoke prior to this hearing.  It might make sense for me

4    to tell you what I'm stipulating to so he doesn't have to

5    lay that foundation, and then we will leave the objections

6    to if they become necessary to be argued.  He represented to

7    me he may not need all of the exhibits, so there's no point

8    in me taking the Court's time arguing over exhibits he may

9    not even try to introduce.

10                THE COURT:  All right.

11                MR. STONE:  So for the record I can tell you which

12   ones we stipulated to if that's convenient to the Court.

13                THE COURT:  All right.  Are we talking about

14   plaintiff's exhibits or the --

15                MR. STONE:  Just the defendant's exhibits, Your

16   Honor.

17                THE COURT:  All right.

18                MR. STONE:  There's only two plaintiff exhibits.

19                THE COURT:  Yeah, that's the expert report.

20                MR. STONE:  The two reports that you've already --

21                THE COURT:  Right.  So go ahead.

22                MR. STONE:  For the defendant's exhibits, Your

23   Honor, we'll stipulate to Exhibit A, B as in boy, F as in

24   Frank, G as in guy, I, J, K, L, and M.  And those have to do

25   with Mr. Fresquez's employment and salary and things of that

1    nature.  We stipulate to all those exhibits.

2              THE COURT:  So you're stipulating -- but you're not

3    moving them into evidence, you're just advising me that

4    you're stipulating to their admissibility.

5              MR. STONE:  I think we can jointly move them into

6    evidence.  What do you think, counsel?  I mean --

7              THE COURT:  Ms. Dale, do you want to move them into

8    evidence now?

9              MS. DALE:  We can go ahead and move, yes.

10             THE COURT:  Okay.  All right, given the stipulation

11   of the parties, Defendant's Exhibits A, B, F, G, I, J, K, L,

12   M, and N are admitted into evidence.

13        (Defendant's Exhibits A, B, F, G, I, J, K, L, M and N

14   received)

15             THE COURT:  Is there any -- are there stipulations

16   with respect to the -- where do we get Exhibit 60 and 61

17   from, Mr. Stone?

18             MR. STONE:  That's the plaintiff's exhibits, Your

19   Honor.

20             THE COURT:  I know, but where do we get this -- why

21   are you starting with 60?

22             MR. STONE:  Because those were the exhibits

23   introduced at the trial of this matter, Your Honor, as

24   Exhibit 60 and 61.

25             THE COURT:  Oh, I got it.

1          MR. STONE:  They're the two expert reports.

2          THE COURT:  You just retained --

3          MR. STONE:  We're just relying on what had

4     previously been introduced, Your Honor, as an exhibit in

5     this hearing, Your Honor.

6          THE COURT:  All right.  Is there a stipulation on

7     those exhibits?

8          MS. DALE:  Your Honor, as you already alluded to,

9     we did stipulate to Mr. Stein's report because he is not

10    testifying.  We did not object -- we stipulated originally

11    to Mr. Opp's report because we thought he was not

12    testifying, and then objected when it turned out he was

13    testifying.  But you've already ruled on that, so I don't

14    know that that's an issue anymore.

15         THE COURT:  Yeah.  All right.  I'll take that as a

16    stipulation to those two reports.  And based on the

17    stipulations, Plaintiff's Exhibits 60 and 61 are admitted

18    into evidence.

19         Beyond that, Mr. Stone, is there anything we need

20    to address before we start the evidence?

21         MR. STONE:  No, Your Honor.

22         THE COURT:  All right.  For the defendant, anything

23    we need to address?

24         MS. DALE:  Your Honor, just a related issue.  We

25    did not admit our expert's report in the trial -- at the

8

1   trial --

2              THE COURT:  Okay.

3              MS. DALE:  -- in this matter.

4              THE COURT:  Right.

5              MS. DALE:  We've attached it to a pleading, so you

6   do have it, but we also have copies here if you wanted us to

7   submit it here separately.

8              THE COURT:  You didn't make it an exhibit for this

9   hearing?

10             MS. DALE:  No, because we understood that it

11  would -- well, Judge Daniel's original ruling was that if

12  the expert is testifying, the report wouldn't be admitted.

13             THE COURT:  For his -- for the hearing he was going

14  to hold?

15             MS. DALE:  Correct.

16             THE COURT:  Huh, okay.  I mean, that's usually how

17  I'd approach it in a trial in front of a jury, but I don't

18  think it much matters --

19             MS. DALE:  Yes, sir.

20             MR. STONE:  That wasn't our understanding, Your

21  Honor, but we have no objection to stipulating to the entry

22  of Mrs. Bartmann's report if that would be convenient to the

23  Court.

24             THE COURT:  Yeah, I think it would be.  So for

25  purposes -- let us do this:  Since it's already part of the

1  record, we'll just say that -- can you give me the ECF

2  numbers?

3       MS. DALE:  It's 182, Exhibit 1.

4       THE COURT:  ECF 182, Exhibit 1.  And that is your

5  expert's report.

6       MS. DALE:  Correct.

7       THE COURT:  All right.  Given the -- that

8  discussion with counsel -- remind me, again, the name of

9  your expert.

10       MS. DALE:  Ms. Bartmann, Cynthia Bartmann.

11       THE COURT:  -- Ms. Bartmann's expert report that's

12  been filed at ECF 182, Exhibit 1, is admitted into evidence.

13       (Defendant's Exhibit 1 received)

14       THE COURT:  All right, beyond that, anything more

15  from the defendant --

16       MS. DALE:  No, Your Honor.

17       THE COURT:  -- before we start?  All right.

18       The plaintiff may call its first -- oh, let me say

19  one other thing.  Usually in a jury trial, as my practice

20  standards reflect, that witnesses get called once, so the

21  jury doesn't have to see them get -- go through all the

22  initial matters first, and -- but in this case, because both

23  sides have designated the plaintiff and both would be

24  calling him for fairly different motivations, I'm going to

25  allow -- and that there's also no confusion as to when

Direct - Opp

1    leading questions can be asked -- what I'm going to do, I'm

2    going to use my discretion under 611 and I'm going to allow

3    the plaintiff, should the defendant choose to, be called by

4    the defendant separately and then we will keep clean the

5    direct and cross scope, and who's leading and who's not

6    leading.

7             All right.  Plaintiff may call his first witness.

8             MR. STONE:  Thank you.  We'll call Mr. Opp.

9             COURTROOM DEPUTY:  Please raise your right hand.

10             JEFFREY OPP, PLAINTIFF'S WITNESS, SWORN

11            COURTROOM DEPUTY:  Please be seated.

12                        DIRECT EXAMINATION

13    BY MR. STONE:

14    Q.   Sir, state your name for the record.

15    A.   My name is Jeffrey B, as in bravo, Opp, O-p-p.

16    Q.   Where do you currently work?

17    A.   Castle Rock, Colorado.

18    Q.   Can you, for the Court's convenience, briefly take us

19    through your professional career, sir.

20    A.   Absolutely.  I graduated from the University of Denver

21    in 1987 with a bachelor's degree in economics.  Immediately

22    went on active duty in the Army.  I was in the infantry.

23    Certainly has nothing to do what we're talking about here.

24             I got off active duty in the Army.  Went to work

25    for a firm by the name of Caulson, Karraker & Taylor.  They

Direct - Opp

1    were a litigation support firm.  I worked for those folks

2    for three years.  Then in 1992, Mr. Caulson and I broke off

3    and formed the firm of Caulson Opp & Associates.  Mr.

4    Caulson then retired in 2015 and it has been Opp & Company

5    ever since then.

6            Over the 31 years that I've been doing litigation

7    support work, I have -- today is literally the 999th time

8    I've offered sworn testimony.  I have authored in excess of

9    6,000 reports, including over 1500 reports in FMLA cases.

10   I've testified in every state in the country except for

11   Alaska and a couple New England states.  And in 2007, I

12   co-authored a book entitled The Plaintiff and Defense

13   Attorney's Guide to Understanding Economic Damages.  The

14   chapter that I was specifically requested to write was

15   regarding FELA calculations.

16   Q.   And do you belong to any professional associations,

17   sir?

18   A.   I don't as a matter of rule, but I've been asked to

19   speak at various associations over the years and they want

20   you to become a member when they ask you to come speak.  So

21   that's the only reason I've joined them.  Variously it's the

22   National Association of Forensic Economists, the American

23   Academy of Forensic Economists, and Missouri Valley

24   Economics Association.

25   Q.   Did you prepare a report in this case, sir?

Direct - Opp

1    A.    I did.

2    Q.    And what material did you review and rely on in

3    preparing that report?

4    A.    Certainly.  I had Mr. Fresquez's income tax returns.

5    That is important in order to look at issues such as the

6    types of employee expenses, if any, he had.  I wanted to

7    make sure I understand the union that Mr. Fresquez was a

8    member of because that dictates the type of pay raises that

9    he would have.  I also wanted to look at the comparative

10   information as far as the earnings of the folks around Mr.

11   Fresquez on the seniority roster because that will tell me

12   the amount of work available, and the amount of available

13   work that Mr. Fresquez was choosing to work prior to his

14   injury.

15         I also received W-2s and pay statements from the

16   railroad, and then also the jobs that Mr. Fresquez had after

17   the railroad.

18         In addition, I had information as far as after the

19   railroad, the types of fringe benefits he was receiving.  I

20   had information concerning the types of fringe benefits that

21   the BNSF normally pays their employees.  Having done this

22   for 31 years, I understand how the Tier 1 and Tier 2 system

23   works with the Railroad Retirement Board.  And, as well, I

24   conducted two interviews over the telephone with Mr.

25   Fresquez.

13

Direct - Opp

1    Q.   And based on all that data information you reviewed,

2    did you come to a conclusion in this matter, sir?

3    A.   Yes, sir, I did.

4    Q.   And what was the nature of that conclusion?

5                THE COURT:   Hold on.  Hold on.

6                MR. STONE:   Yes, sir.

7                THE COURT:   You've not asked to qualify the witness

8    under Rule 702.  You're asking for an opinion.

9                MR. STONE:   Yes, sir.  We'll move to qualify Mr.

10   Opp as an expert economist in the field of calculating lost

11   earnings.

12               THE COURT:   Is there an objection?

13               MS. DALE:   No objection.

14               THE COURT:   All right.  There being no objection,

15   Mr. Opp is qualified under Federal Rule of Evidence 702 to

16   provide expert opinion testimony in the field of calculating

17   lost earnings.

18   BY MR. STONE:

19   Q.   I'll re-ask the question, Mr. Opp.  Did you come to a

20   conclusion as a result of your review of that material and

21   that data?

22   A.   I did, sir.

23   Q.   And what was that conclusion, sir?

24   A.   That as a result of his termination on May 27, 2016,

25   Mr. Fresquez had experienced both a loss of back pay, front

14

Direct - Opp

1  pay, and, as well, future Tier 1 and Tier 2 benefits, sir.

2  Q.   Okay.  And so you -- we'll break this down into the

3  four categories you just identified.

4        So in your report, did you determine Mr. Fresquez's

5  past loss railroad earnings?

6  A.   Yes, sir.  So -- and this is as of the trial date,

7  there would be some small changes, but they're not material.

8  From the date of his termination through the date of the

9  trial -- the original trial in this matter, the back pay

10  losses are $183,821.  And those amounts are based upon a

11  function of two different things:  One, what do we believe

12  Mr. Fresquez could have earned at the railroad in terms of

13  wages and benefits had he not been terminated?  And what has

14  he actually received since his termination in -- from the

15  other jobs that he held.

16        As far as the railroad wages, a railroader's

17  ability to earn are based upon three discrete factors:  One,

18  how much are they paid for that work?  We get that from the

19  union contracts.  Two, how much work is available?  We get

20  that from looking at what the folks around that individual

21  worked after the date of termination.  That determines the

22  amount of work that was available to those folks in that

23  seniority roster.  And, three, how much of the available

24  work did Mr. Fresquez choose to work on a historical basis?

25  Did he make -- did he choose to work exactly the average?

Direct - Opp

1    Was it below the average?  Was it above the average?

2         Frankly, a historical basis, Mr. Fresquez was

3    earning about $13,000 more than the average, choosing to

4    work more than the average of the folks around him on the

5    seniority roster.  So all I did with his railroad wages was

6    assume that whatever amounts the folks around him on the

7    seniority roster earned for the year '16, '17, and '18, Mr.

8    Fresquez would earn about 3- -- $13,000 more than that per

9    year based upon his actual history.

10        And then for 2019, I took that amount for 2018,

11   increased it by the contractual increase under the

12   collective bargaining agreement for that year.  And then

13   from that, I subtracted off all the amounts that Mr.

14   Fresquez's actually earned, both for his temporary job and

15   for the job that he got at SAFEBuilt working full-time.  And

16   then I've also included both the differences in health

17   insurance, because the railroad's health insurance is

18   collectively bargained, it's a really good plan, it pays for

19   a lot.  SAFEBuilt has a good plan, but doesn't pay as much.

20   And so we've taken that difference.

21        And we've also -- I've also subtracted off the

22   amounts that Mr. Fresquez would have paid for Tier 1, Tier 2

23   and Medicare at the railroad.  And from his post-railroad

24   jobs I've subtracted off Social Security and Medicare

25   deductions in order to arrive at a net number.  And that's

Direct - Opp

1    how I got the 183- -- pardon me -- -821 dollars, sir.

2    Q.    Did you have occasion in your report you prepared in

3    this matter to determine Mr. Fresquez's lost earnings from

4    February 11th, 2019, through his expected retirement date?

5    A.    I did, sir.  And those amounts are $927,606.  And that

6    is through the assumption that had he not been terminated,

7    Mr. Fresquez would have worked at the railroad through age

8    60.

9         Now, railroads are a bit different in that they

10   come under the Railroad Retirement Board rather than Social

11   Security.  As a result, the Railroad Retirement Board I'll

12   just refer to it as the acronym RRB, if I may -- has what

13   they call the 30/60 provision.  And what that means is if

14   you have 30 years of service and you're at least age 60, you

15   can retire without getting a reduction in your benefits.

16   And so I assumed that had he not been terminated, Mr.

17   Fresquez would have worked until the very first day he could

18   have gotten any retirement benefits at age 60.

19        Factually, given the date of his birth being after

20   1960, Mr. Fresquez's Social Security benefits won't come

21   into -- won't begin until age 67.  But on the railroad, they

22   would have begun at age 60, so I've used a lower retirement

23   age.  And then simply the calculation is taking the

24   differences that we talked about there on an annual basis

25   between what he could have earned at the railroad, less what

Direct - Opp

1    he's currently earning at SAFEBuilt, and then projecting

2    them into the future.  And the front pay amounts, unlike

3    back pay are discounted to present value.

4          And what we're talking about there is if we look

5    back over the last four BMWED or maintenance-away contracts,

6    the average contracts in the wages under those contracts is

7    4.12 percent.  If we look back over the last 20-odd years in

8    terms of the average increase in the national wage base,

9    that has been about 4 percent per year.

10         So in each case, what we're doing is we're

11   increasing the wages by 4 percent per year on both sides of

12   the equation.  But then we have to recognize the fact that

13   front-pay losses have not been lost yet, but will be lost

14   over the next 26 years between 2019 and August of 2045 when

15   Mr. Fresquez will reach age 60.  And so if we just simply

16   multiply the difference by the number of years, we will be

17   overpaying Mr. Fresquez because we wouldn't recognize the

18   fact that he can take that front-pay amount, invest it, earn

19   interest on it, such that if he uses all the principal and

20   all the interest together, he will have replaced his

21   earnings losses.

22         And the interest rate I used is 6 percent per year.

23   And that's because if we look back over the last 26 years,

24   the average rate of return of U.S. -- pardon me -- triple

25   tax free municipal government bonds has been about

Direct - Opp

1    6 percent.  And so what that means is if we're increasing

2    losses by 4 percent, but then applying at the 6 percent

3    interest rate, we're going to be reducing these losses by 2

4    percent per year compounded every single year in order to

5    make sure we're not overpaying him or underpaying him.

6         Now, be very clear, you can't go out today and get

7    a muni bond paying 6 percent.  Currently, municipal

8    government bonds are paying about 2.8 percent.  But we can't

9    use a temporary aberration in the marketplace and assume

10   it's going to go for 26 years, and so we've got to be

11   consistent.  We use the look-back approach when we're

12   talking about a 4 percent wage growth, the growth rate, over

13   the last 26 years and we're using a look-back approach for

14   the interest rate over the last 26 years so we're

15   consistent.  We have an apples-to-apples comparison in terms

16   of the discount rate we're looking at.

17   Q.   So that methodology you just explained in determining

18   the present discount value rate, is that routinely used in

19   your industry?

20   A.   It is, sir.

21   Q.   Okay.  So the numbers and the math that you have just

22   explained is routinely in your industry?

23   A.   It is.  I mean, the only difference, sir, is, quite

24   frankly, most -- what I'll call plaintiff-oriented

25   economists will have a lower discount rate, and a lower

Direct - Opp

1    discount rate means losses are higher.

2         Most defense-oriented economists probably will have

3    about my same rate.  Sometimes maybe a little higher.  But I

4    generally -- I try to make these calculations as

5    conservative as reasonable but making sure I am consistent

6    with my methodology, regardless of which side hires me on a

7    case.

8    Q.   And then based on those calculations, what were Mr.

9    Fresquez's lost future earnings discounted to present value?

10   A.   $927,606, sir.

11   Q.   Did you have occasion in your report prepared in this

12   matter to determine Mr. Fresquez's loss in value of Tier 1

13   regular employee annuity pension amounts?

14   A.   I did.  And those amounts are $247,345.

15   Q.   First, sir, explain to the Court, what is a Tier 1

16   regular employee annuity pension?

17   A.   Sure.  So Tier 1 is identical to Social Security with

18   one exception.  The way it's identical is that it's based

19   upon your high 35 years of earnings, indexed from your first

20   year of entry into the work force, through three years prior

21   to your exit from the work force.

22        And then the ultimate benefit is paid out based

23   upon what are called bend points -- spelled B-e-n-d -- which

24   has the effect of front-weighting earlier dollars.  So it's

25   a complex calculation, but in general, the more you earn,

Direct - Opp

1    the longer you earn it for, the higher your ultimate benefit

2    will be.

3              However, in this case, because of what we talked

4    about a moment ago, and that is, the differences between

5    Tier 1 and Social Security is that 30/60 provision.  So on

6    the railroad side, if Mr. Fresquez would have worked until

7    age 60, he could have gotten his full benefit on that day.

8    Now, because he's going to be under the Social Security

9    Administration, his benefit is going to be actuarially

10   reduced for each year between age 60 and age 67.

11             As a result, he's going to get quite a bit less on

12   an annual basis from date of retirement until ultimate date

13   of death.  And so taking those amounts, that difference,

14   discounting them to present value, as of today's dollars,

15   yields that $247,355 amount we spoke of.

16   Q.   What period of time does that calculation cover, sir?

17   A.   It covers from the date of his projected retirement as

18   of August 17th of 2045, and goes through his date of

19   anticipated natural death, which would have been 20.09 years

20   from that date, or just over age 80, sir.

21   Q.   Can you explain, sir, how you calculated the Tier 1

22   loss of value.

23   A.   Yeah, the Tier 1 loss is based upon the earnings Mr.

24   Fresquez could have had while working at the railroad,

25   taking the highest 35 years of indexed earnings through

Direct - Opp

1    three years prior to exit from the work force, paid out

2    based upon bend points, discounted to present value from

3    date of retirement through date of natural death, and then

4    further discounted to present value until today's date, or

5    until February of 2019, the original trial date.

6              I mean, for instance, the actual loss from date of

7    retirement through date of death in terms of what he could

8    have had had he not been terminated is $2,069,112.  But we

9    have 26 years -- or a little over 26 years to earn interest

10   on that amount.  So in order to get over $2 million 26 years

11   from now, we only have to put $441 into an account today --

12   441,000 into an account today.  So we're recognizing all of

13   that interest that can be earned from now until date of

14   retirement in order to calculate what the ultimate

15   difference is of that 257,000 we talked about.

16             So, again, we're not overpaying him, we're not

17   underpaying him; we've come up with the exact number he

18   needs today such that if he uses all the principal and all

19   the interest only with the -- some of those two will he

20   replace his earnings -- his losses in Tier 1.

21             THE COURT:  Let me ask you a question.  I'm going

22   to interject here, Mr. Stone, because this is the first time

23   I've dealt with a railroad employee case.

24             Does the Tier 1 annuity pension system, is that in

25   lieu of regular Social Security?

22

Direct - Opp

1          THE WITNESS:  It is.

2          THE COURT:  Okay.

3          THE WITNESS:  It is.  Exactly right, Your Honor.

4          THE COURT:  And so -- but because now he's no

5     longer covered by that annuity, given his year of birth,

6     he's not eligible for Social Security until 67, so there's a

7     loss of seven years?

8          THE DEFENDANT:  Well --

9          THE WITNESS:  Well, what happens, Your Honor, for

10    those seven years -- for the first three years it's reduced

11    by 1/180th for each month for the first three years and

12    1/240th for the remaining -- for each month of the remaining

13    four years.

14          So what happens is it's about a -- I'll do the math

15    here -- a 40 percent reduction at age 60 for the Social

16    Security he'll get now.  I'm not assuming that now he's

17    going to work past age 60.  I'm saying now in his

18    nonrailroad work he'll still only work to age 60, but his

19    benefits will be reduced by 40 percent because he's no

20    longer under the RRB system, but in the Social Security

21    system.

22          THE COURT:  Now how does the employer-employee

23    contribution to this annuity program compare to the roughly

24    7-1/2 percent employer and 7-1/2 employee payout or paying

25    into the Social Security system?

23

Direct - Opp

1          THE WITNESS:  For Tier 1, it's identical.  For Tier

2     1, it's 6.2 percent for the employee and employer.  The way

3     you're getting 7-1/2, sir, then, Your Honor, is then you

4     have to add 1.45 percent for Medicare.

5          THE COURT:  Medicare.  Okay.

6          THE WITNESS:  So Social Security and Tier 1, same,

7     6.2 percent for each party.

8          THE COURT:  So in terms of those contributions,

9     it's a wash for Tier 1.

10          THE WITNESS:  Well, not really.

11          THE COURT:  Oh, okay.

12          THE WITNESS:  Yeah, because obviously at no point

13     are we assuming that Mr. Fresquez is going to hit the caps.

14     And so it's 6.2 percent, but at the railroad he's making

15     more, so his contributions are higher.  So I've actually

16     subtracted those from losses, the fact that he now has to

17     pay 6.2 percent of a higher amount.  But ultimately he's

18     getting a higher benefit for those contributions.

19          THE COURT:  All right.  Mr. Stone, you may resume

20     your examination.

21          MR. STONE:  Thank you, Your Honor.

22     BY MR. STONE:

23     Q.   And you discussed discounting this to present value.

24     The methodology used, is it the same you previously

25     discussed?

24
Direct - Opp

1   A.   Yes, sir.

2   Q.   Frequently used in the industry, is that correct,

3   sir?

4   A.   It is, sir.

5   Q.   Did you have occasion to, in this matter, prepare a

6   report to determine the loss in value for Tier 2 regular

7   employee annuity methods?

8   A.   I did, sir.  And that amount is $163,745.  Now, Tier 2

9   is really simple.  It's based upon your high 60 months of

10  earnings, multiplied by your years of service, multiplied by

11  what's called a planned benefit factor of point 007.  And so

12  you can probably guess -- figure out in terms of that

13  equation, the single largest component is years of service.

14          And so obviously had he not been injured, Mr.

15  Fresquez would have had -- pardon me, had he not been

16  terminated, he would have had 39.62 years of service.  As a

17  result of his termination, he has 10.41 years of service.

18  And so we do the exact same math in terms of discounting and

19  we get the differential between the Tier 2 benefits he could

20  have had based upon those higher wages, based upon 39 years

21  of service versus -- 39 years of service, and we subtract

22  off what he earned prior to his termination, based upon

23  those 10 years of service.

24          But then we also, because Mr. Fresquez is not

25  hitting that 30/60 provision anymore because he wouldn't

Direct - Opp

1   have had 30 years of service, we have to also apply that

2   same 40 percent reduction because he's going to -- I would

3   assume he's going to be receiving those amounts as of age 60

4   rather than age 67.

5          So based upon the differences between what he could

6   have had had he worked at the railroad through age 60,

7   versus what he had earned prior to his termination, those

8   losses are $163,745 on a discounted-to-present-value basis.

9   Q.   And how does the Tier 2 benefits that you described for

10  Mr. Fresquez compare to outside of the railroad industry?

11  A.   You know, they -- it's few and far between these days.

12  We certainly used to have similar types of benefits for

13  folks who were in other types of union jobs in that it's

14  based upon your -- your usually high 60 months of earnings,

15  multiply it by years of service.  But, you know, starting

16  about 20, 25 years ago most employers went away from that

17  and started using what are called defined contribution plans

18  like a 401(k), rather than a defined benefit plan like Tier

19  2 is.  So not a lot of that stuff out there these days.

20  Q.   And for the Tier 2 calculations you've discussed, what

21  period of time did you cover, sir?

22  A.   Again, sir, that's from 2045 until the date of Mr.

23  Fresquez's natural death -- I'm not saying that right, sir,

24  when you reach 80, you're going to keel over -- but

25  statistically, it's about 20.09 years.

26
Cross - Opp

1    Q.   And you calculated this to present value, too, correct,

2    sir?

3    A.   I did.

4    Q.   And the methodology you used, is that similar to what

5    you previously discussed?

6    A.   It is, sir.

7    Q.   Routinely used in the industry?

8    A.   It is, sir.

9    Q.   Answer any questions of opposing counsel.

10        THE COURT:  All right.  Cross-examination.

11                        CROSS-EXAMINATION

12   BY MS. DALE:

13   Q.   Good afternoon, Mr. Opp.

14   A.   Good afternoon, ma'am.

15   Q.   What you did in this case was to calculate Mr.

16   Fresquez's lost future earning capacity; is that correct?

17   A.   No, ma'am.  I calculated his historical losses, which I

18   understand from a lay perspective for purposes of these --

19   for purposes of this action is back pay; his future losses,

20   which is front pay; and then also loss of Tier 1 and Tier 2.

21   So it's not just future earnings capacity, ma'am.

22   Q.   Okay.  And I was just referring to the future damages

23   component.  That future earnings capacity is what you were

24   calculating; is that correct?

25   A.   Well, I've actually calculated the actual loss.  I

Cross - Opp

1    mean, as I understand it from a lay -- my lay understanding,

2    capacity may not equal future loss.  I'm talking about the

3    actual losses based upon what he could have had at the

4    railroad versus what he's currently earning now at

5    SAFEBuilt.

6            So for my purposes, the "capacity" word doesn't

7    come in here.

8    Q.   Okay.  You described the comparison as impaired earning

9    versus unimpaired earnings; is that correct?

10   A.   That's correct.  With the impairment being the

11   termination, ma'am.

12   Q.   Okay.  So this is the same analysis that you would

13   perform if this were a personal injury case; is that

14   correct?

15   A.   Yes, with the exception of we -- we're talking about a

16   railroader, and so we're not talking about Social Security,

17   we're talking about Tier 1 and Tier 2.

18   Q.   Okay.  So let me be more specific.  This is the same

19   analysis you would perform in a FELA case specific to the

20   railroad?

21   A.   Yeah.  Except -- and FELA cases, I have to subtract out

22   federal and state taxes, and I use a different discount

23   rate, but beyond that, yes, ma'am.

24   Q.   Okay.  So, for example, if a railroad engineer injured

25   his knee and was no longer able to be an engineer, you would

28

Cross - Opp

1    perform the same type of analysis with respect to lost

2    earnings?

3    A.    That is correct.

4    Q.    Okay.  And in that case, you would have medical

5    evidence with respect to what the employee could do before

6    and could do afterwards; is that correct?

7    A.    It's possible, but in no way would I ever look at the

8    medical evidence, ma'am, because certainly I have no

9    expertise in that area and so can't form opinions on medical

10   records.

11         So in most cases, I will look at what they were --

12   what they should have been earning at the railroad.  And if

13   they have now gotten another job outside of the railroad

14   that fit with their injured situation, I would -- that would

15   be what I would subtract off from the railroad earnings.

16   Q.    Okay.  And in this case, there's no physical impairment

17   with respect to Mr. Fresquez that you are aware of,

18   correct?

19   A.    That I'm aware of, no, ma'am.

20   Q.    Okay.  And you've not seen any vocational opinions as

21   to how the termination by BNSF will impact his ability to

22   find work in the future.

23   A.    That is correct.

24   Q.    Okay.  Your analysis is based solely on the jobs that

25   he actually obtained after the termination.

29

Cross - Opp

1    A.   As far as his post-termination earnings, that's
2    absolutely correct.
3    Q.   Okay.  So let's talk about back pay.  You estimated
4    his -- Mr. Fresquez's wage loss from the date of termination
5    to the time of trial, correct?
6    A.   Yes, ma'am.
7    Q.   And that's based on the actual wages he made during
8    that period in his new job.  The -- only the back pay.
9    A.   Right.  Okay.  So you're saying -- well, I mean, the
10   calculations are based upon what he could have had at the
11   railroad had he not been terminated, and then from -- from
12   that, I subtracted what he actually earned, if that's what
13   your question is, yes.
14   Q.   Yes.  Okay.  And you understood that he was unemployed
15   from May to August of 2016?
16   A.   That is correct.
17   Q.   And that he worked only part-time from August 2016 to
18   January 2017?
19   A.   That is correct.
20   Q.   And then he was unemployed again from January 2017 to
21   August 2017?
22   A.   No, October 15th of '17, ma'am.
23   Q.   Okay.  And then he worked part-time from August of 2017
24   to October of 2017?
25   A.   Oh, I see what -- yes, that is correct.

Cross - Opp

1   Q.   Okay.  So he was unemployed from January 2017 to August

2   2017 and then part-time August to October; is that

3   correct?

4   A.   I mean, that I don't know.  I do know what he actually

5   earned in 2017 from both a part-time and full-time work.

6   Q.   Okay.  So bottom line is he took about a year and a

7   half to find full-time work after the termination.

8   A.   That is correct.

9   Q.   Okay.  And you did not calculate his wage loss if he

10  had been working full-time throughout that period.

11  A.   That is correct.

12  Q.   And you did not calculate his wage loss if he had found

13  a higher paying job during that time period.

14  A.   That is correct.  I used what he actually earned, yes,

15  ma'am.

16  Q.   Okay.  And you did not offset his back pay by the

17  amount he received in unemployment benefits from the

18  Railroad Retirement Board, correct?

19  A.   That is correct, because I have been told by previous

20  judges that I have no business doing so.  That is the --

21  their job, not mine.

22  Q.   Understood.  Okay.  So then let's talk a little bit

23  more specifically about the calculation of the lost wages.

24  You mentioned that the amount that you calculated he would

25  have made at BNSF is not what he was actually making, but

Cross - Opp

1    what the people around him on the seniority roster were

2    making, correct?

3    A.   No, ma'am.  I would -- I think that's not accurate.

4    What I did was I took how Mr. Fresquez compared to the folks

5    around him.  So it's based upon what he actually earned

6    during the years 2013, 2014, and '15, versus what the folks

7    around him on the seniority roster earned in 2013, '14, and

8    '15.  And so then it -- so that is an indicator of how he

9    performed against the average.  And then what did those

10   folks earn after that?  And in some years they earned less

11   and some years they earned more.

12          And I took all the additions and subtractions in

13   order to arrive at what Mr. Fresquez could have expected.

14   And, in fact, if we look at 2015 through 2019 average wage

15   growth, it's less than inflation because, simply put, as of

16   the year 2018, the folks around Mr. Fresquez's earnings

17   dropped by almost 4 percent.  So I have assumed his would

18   also drop by 4 percent during that year.

19   Q.   Okay.  And I guess I'm trying to ask this just a little

20   bit more generally.  In some cases, you would calculate lost

21   earnings based on what that person made at their job and

22   then calculate that going forward.  The future pay was not

23   calculated based on what he actually made but how -- what

24   he -- what the people around him made and how he compared to

25   that before his termination.

Cross - Opp

1    A.   Yeah, but -- I just want to make sure I'm super clear

2    here.  But that is based upon what he actually made, ma'am.

3    I mean, I guess the -- another way I could have done this is

4    ignore the fact that the folks around him -- their earnings

5    went down, and just took his actual 2015 wages and increased

6    it by the contracts --

7    Q.   And that's --

8    A.   -- and I'd have a higher number than what I have here.

9    Q.   That's what I'm trying to make clear.  It wasn't just

10   his number increasing by a certain amount going forward,

11   it's based on what other people were doing after his

12   termination.

13   A.   That is correct because --

14   Q.   Okay.

15   A.   -- I need to recognize the fact that one of the three

16   components of the railroader's ability to earn is the amount

17   of work available.

18   Q.   Okay.  So can we -- Keith, can we bring up schedule

19   6.1.

20        And, Mr. Opp, do you recognize this schedule from

21   your report?

22   A.   Yeah.  And this is exactly the schedule that we're

23   talking about, ma'am.

24   Q.   Okay.  So for the Court's -- to assist the Court with

25   sort of understanding how this works, the people at the top

Cross - Opp

1    are the comparators, the other BNSF employees that are

2    around him on the seniority roster, correct?

3    A.    That is correct.

4    Q.    And then in the box below that it's got the average of

5    what they made for those particular years, correct?

6    A.    That's correct.

7    Q.    And then in the blocks below that where it says B.K.

8    Fresquez, those are what he was actually making in 2013,

9    2014, and 2015, correct?

10   A.    Correct.

11   Q.    And then below that where it says, on the left-hand

12   side, number sign, difference, that's a difference between

13   the average of the comparators and what he made for 2013,

14   2014, and '15, correct?

15   A.    That's right.  The 13,954 rounded.

16   Q.    Okay.  But I'm actually talking in 2013, '14 and '15.

17   A.    Oh, okay.

18   Q.    Under each year, you've got the difference between what

19   he made in that year and what the comparators made.

20   A.    All right, that's correct.  That's correct.

21   Q.    All right.  So the 21,000 in 2013, he made 21,000 more

22   than the comparators.

23   A.    That's correct.

24   Q.    And then in 2014, he made about 14,000 more than the

25   comparators.

34

Cross - Opp

1    A.    That's correct.

2    Q.    And then in 2015, he made a little less than 7,000 than

3    the comparators.

4    A.    That is correct.

5    Q.    And then you took the average of those three and that's

6    where you got the 13,000.

7    A.    That's correct.

8    Q.    Okay.  So if this trend had continued, it's going down

9    by 7,000 per year, he actually could have been at the exact

10   same amount as the comparators in 2016.

11   A.    As of when?

12   Q.    As of 2016.

13   A.    You'd have to do a percentage basis, so no, it wouldn't

14   be the exact amount.  It would still be some amount higher,

15   but it would certainly be less than 13,000, ma'am.

16   Q.    And I'm just saying, if this trend continues.  So it

17   goes down by 7,000, it goes down by 7,000.  If it had gone

18   down by another 7,000, he would actually be a little bit

19   less than the comparators.

20   A.    Correct.  And it depends what we're using for our

21   trend.  Are we using a percentage or are we using a gross

22   number?  And that's why I answered the way I did.

23   Q.    Okay.  So then looking at the figure for 2015, he was

24   making -- he actually made -- so that's his last full year

25   of employment, correct?

Cross - Opp

1    A.    It is.

2    Q.    Okay.  So that year he made about 96,000 for the year,

3    correct?

4    A.    Correct.

5    Q.    And then your projection with the comparators and then

6    adding the difference between him and the comparators is

7    107,000, correct?

8    A.    That's right.

9    Q.    Okay.  So that's actually a 12 percent increase in that

10   one year?

11   A.    For that one year, yes, ma'am.

12   Q.    Okay.  And then for 2017 and 2018, the calculations

13   then are based on what the comparators are plus the

14   14,000 -- or 13,000, correct?

15   A.    Correct.

16   Q.    Okay.  And then from there forward, because we don't

17   have the numbers for the comparators yet, it's just going up

18   4 percent per year.

19   A.    No.  For 2019, ma'am, it goes up by 3 percent because

20   that's the last year of the contract.

21   Q.    Okay.

22   A.    So that's why I said if we look at the 96,000 that he

23   earned in 2015 and the 108,000 that we're projecting for

24   2019 based upon the contract, if we take those four years

25   and average the increase, we're at 2.97 percent per year, or

Cross - Opp

1    less than inflation.  And, quite frankly, less than what the

2    contractual increases would be, because the simple fact is

3    is that we have that -- as of 2018, that 3.79 percent

4    decrease.  And we're recognizing the increases and the

5    decreases because we need to recognize the fact that,

6    obviously, at least in this pool, 2018 there was less work

7    available.

8    Q.   Okay.  But at some point in time, it switches --

9    because you don't have the contract amounts, it switches to

10   just 4 percent per year?

11   A.   That's why I used 4 percent per year based upon what I

12   previously testified.  That's exactly correct.

13   Q.   Okay.  And with these predictions, you predict Mr.

14   Fresquez would be making 297,000 per year by the time he

15   retired; is that correct?  And this is Schedule I.

16   A.   $297,005, absolutely correct.

17   Q.   Okay.  So your front-pay calculations assume that Mr.

18   Fresquez would have stayed on full-time with BNSF until

19   retirement at 60.

20   A.   It does.

21   Q.   And that he would not have been terminated for any

22   other reason?

23   A.   That is correct.

24   Q.   And that he wouldn't have quit voluntarily for any

25   reason.

Cross - Opp

1    A.   That is correct.

2    Q.   And that he would not have become, for some reason,

3    unable to perform his job.

4    A.   That is correct.

5    Q.   Were you aware that his wages at BNSF through this

6    period you looked at included overtime pay?

7    A.   I wasn't, but that would certainly make sense to me.

8    Q.   Okay.  Well, if he was making 29.22 an hour, he would

9    have to be making -- working overtime to get to 95,000,

10   correct?

11   A.   Absolutely.

12   Q.   And there's no guarantee of overtime under the

13   collective bargaining agreement, correct?

14   A.   No.  But that's why we look at the comparators to see

15   what overtime those folks were making, because just like

16   in -- there's no way -- that's just like in 2016, the second

17   individual down who makes 127,000, that person's clearly

18   making a lot of overtime.  So that's why we use the

19   comparative data in order to reflect the amount of work

20   available.

21   Q.   Okay.  And so we have an idea through 2018 of whether

22   there was more work available, but we don't know for 2019

23   going forward.

24   A.   That's right.

25   Q.   And even if there is overtime available, he's not

Cross - Opp

1    required to take overtime, correct?

2    A.   No.  But that's why we use the comparative to how he

3    performed against the average, in order to figure out how

4    much overtime work he was choosing to perform.  And that's

5    why we just don't take the total amounts, we look at how Mr.

6    Fresquez performed against the average.

7    Q.   And the three years we have show him actually taking

8    less work each year.

9    A.   That is correct.

10   Q.   Okay.  So then let's turn to the front pay calculations

11   based on his wages at his current employer.  You listed

12   annual wages currently of 53,000; is that correct?

13   A.   Yes, ma'am.

14   Q.   Okay.  And if he's making 24.50 an hour, then that

15   would have very little, if any, overtime component; is that

16   correct?

17   A.   That is correct.

18   Q.   You haven't looked at any Bureau of Labor Statistics

19   related to Mr. Fresquez's current job, correct?

20   A.   No, ma'am, I have not.  I've looked at what he's

21   actually earning.

22   Q.   Okay.  Ms. Bartmann reports that the medium wage for

23   construction and building inspection jobs in 2017 was

24   66,410.  You haven't performed any calculations based upon

25   that amount, have you?

39

Cross - Opp

1    A.    No.

2    Q.    And she also reports -- sorry -- she also reports that

3    the 90th percentile for his job category was 95,870.  You

4    haven't performed any calculations based upon that wage,

5    correct?

6    A.    No, ma'am.

7    Q.    Under your calculations at his current wage, or at his

8    current job, he would not top 95,000 until 2037; is that

9    accurate?  That would be on the Schedule I again.

10   A.    You're right, it's halfway between '36 and '37.  2036

11   is 94,651; 2037 is 98,420, so midway between the year,

12   absolutely correct.

13   Q.    So Mr. Fresquez just started this job, the current job,

14   in November of 2018; is that correct?

15   A.    Sorry.  That is correct.

16   Q.    Okay.  And then you're assuming raises of 4 percent per

17   year going forward in that job.

18   A.    Correct.  I've assumed the same rate of increase on the

19   railroad job as the SAFEBuilt job.

20   Q.    Okay.  This assumes he's going to stay in the same

21   position at his new job, correct?

22   A.    Correct.

23   Q.    And it assumes he won't receive any promotions, become

24   a supervisor or manager or anything like that.

25   A.    Well, it assumes a 4 percent per year increase.  And

Cross - Opp

1   4 percent is about a 1 percent real-wage increase.  If we're

2   projecting inflation to be 3 percent, then it's a 1 percent

3   real-wage increase.  However that wage increase happens, be

4   it via promotion or something else, don't know, but it

5   assumes a 4 percent increase per year, ma'am.

6   Q.   Okay.  And it assumes he wouldn't go out and find

7   another higher paying job.

8   A.   That's correct.  It assumes that what he's currently

9   earning at SAFEBuilt he will continue to earn plus 4 percent

10   increases thereafter.

11   Q.   Okay.  So then let's turn to the benefits briefly.  The

12   calculation of the difference between his benefits at BNSF

13   and his benefits at his later job is based upon the premiums

14   paid by the employers; is that correct?

15   A.   Correct.

16   Q.   You did not calculate what he was out of pocket as a

17   result of the difference between the bel- -- the health

18   coverage.

19   A.   I did not, ma'am.

20   Q.   Okay.  And you assumed that he would have the same

21   benefits at his current job as he did at SAFEBuilt, which is

22   his previous job, correct?

23   A.   Correct.

24   Q.   Okay.  And we talked about it was November of 2018,

25   before the trial, that he actually obtained his new job at

Cross - Opp

1    Charles Abbott, but you didn't obtain information about what

2    benefits he actually received there, correct?

3    A.   Okay, say that again, ma'am.

4    Q.   So we talked about how he's -- he started his new job,

5    Charles Abbott, in November of 2018.

6    A.   Correct.

7    Q.   So before this trial.  And before the second report --

8    the supplemental report.  But you did not calculate his lost

9    benefits at Charles Abbott --

10   A.   Correct.

11   Q.   -- based on what he actually was getting there.

12   A.   Correct.  Because I did not have that information.  And

13   I do apologize, I've been talking about SAFEBuilt.  Yes, he

14   had SAFEBuilt for a period of time, then Charles Abbott.

15   And I did not have the Charles Abbott information.

16   Q.   Okay.  And then I wanted to talk about taxes very

17   briefly.  And you mentioned that this was one of the

18   distinctions between a FELA case and this type of case is

19   you're calculating the difference in paying taxes on a lump

20   sum versus paying it throughout his career as it gets paid

21   out, correct?  That's one of the calculations that you --

22   A.   Correct.  And obviously I have not talked -- I have

23   not -- did not testify regarding the additional amounts for

24   the income tax effect, the lump-sum effect.  I didn't

25   testify about that.

Cross - Opp

1    Q.   I apologize.  I thought that was mentioned.  But that

2    is in your report.

3    A.   It is in my report, yes, ma'am.

4    Q.   Okay.  So the difference that you listed of $253,301,

5    that's assuming that he is awarded the entire amount of lost

6    wages that you calculate, correct?

7    A.   Absolutely correct.

8    Q.   Okay.  And that none of it is reduced for either

9    attorney's fees or costs, correct?

10   A.   That is correct.

11   Q.   You did not perform an employability analysis for Mr.

12   Fresquez; is that correct?

13   A.   That's right, because it's beyond the scope of my

14   expertise.

15   Q.   You did not make any evaluation as to whether he made

16   reasonable efforts to find a job after his termination,

17   correct?

18   A.   That is correct.

19   Q.   And you made no evaluation of what he could be making

20   with reasonable efforts, correct?

21   A.   That's correct.

22   Q.   And you made no calculation of his lost wages based on

23   what he could have been making with reasonable efforts,

24   correct?

25   A.   That's correct.

43

Cross - Opp

1    Q.   Those are my questions.  Thank you.

2              THE WITNESS:  Thank you, ma'am.

3              THE COURT:  Redirect.

4              MR. STONE:  Nothing further, Your Honor.

5              THE COURT:  All right.  I have one question for

6    you, Mr. Opp.

7              You reference in your report a Method 1 and a

8    Method 2 of your calculations.  Can you explain to me the

9    difference.

10             THE WITNESS:  Yes, Your Honor.  So I initially

11   wrote a report on November 22d of 2017 that was based upon

12   the Bartmann report that we've talked about in my direct and

13   cross-examination.  Because at that time, Mr. Fresquez did

14   not have a SAFEBuilt -- the SAFEBuilt job, nor did he have

15   the Charles Abbott job.

16             And so -- but then when I wrote my report as of

17   January 23d of 2019, we knew what he was actually making,

18   and I based my report on that, and so it replaced the

19   calculations for those -- for the Bartmann report.

20             THE COURT:  So that would be your method 2?

21             THE WITNESS:  No.  No, Your Honor.  Method 1 and

22   Method 2 was only for the 2017 report.

23             THE COURT:  Oh, okay.  Got it.  All right.  All

24   right.

25             THE WITNESS:  Yeah.

44

Cross - Opp

1           THE COURT:  Because you were dealing with a lot
2      more unknowns than in January 2019 when you had -- you had
3      that -- that base data.
4           THE WITNESS:  That's exactly correct.
5           THE COURT:  Okay.  May this witness be excused for
6      the plaintiff?
7           MR. STONE:  He may.
8           THE COURT:  All right.  For the defendant.
9           MS. DALE:  Yes, Your Honor.
10          THE COURT:  All right.  Mr. Opp, thank you for your
11     testimony.  You're excused.  You may step down.
12          THE WITNESS:  Thank you, Your Honor.
13          MR. STONE:  We'll call --
14          THE COURT:  The plaintiff may call his next
15     witness.
16          MR. STONE:  Call Mr. Fresquez next, Your Honor.
17          THE COURT:  All right.
18          MR. STONE:  Mr. Thompson will take his
19     question-answer.
20          THE COURT:  All right.
21          COURTROOM DEPUTY:  Please raise your right hand.
22          BRANDON FRESQUEZ, PLAINTIFF'S WITNESS, SWORN
23          COURTROOM DEPUTY:  Okay.  Please be seated.  And
24     please state and spell your name for the record.
25          THE WITNESS:  Brandon Fresquez.  B-r-a-n-d-o-n,

Direct - Fresquez

1  Fresquez, F-r-e-s-q-u-e-z.

2                        DIRECT EXAMINATION

3  BY MR. THOMPSON:

4  Q.   Good afternoon, Mr. Fresquez.

5  A.   Good afternoon.

6  Q.   Did you enjoy working at BNSF?

7  A.   Yes.

8  Q.   What did you enjoy about it?

9  A.   You know, I enjoy working with the group of guys, I

10 enjoyed the benefits.  I -- they had some good benefits.  I

11 enjoyed the safety aspect of it.

12 Q.   Will you please tell the Court what you did for BNSF.

13 A.   Basically I was an eyes and ears for the railroad.  I

14 made sure that the railroad was complying with federal

15 guidelines, regulations, and I reported that information.

16 Q.   And is there anything in particular you liked about

17 that aspect of the job?

18 A.   I liked the safety aspect.  I enjoy providing safety to

19 people and . . .

20 Q.   At any time prior to your termination, did you consider

21 leaving BNSF?

22 A.   No.

23 Q.   Why not?

24 A.   I have really good benefits.  And at the time, you

25 know, I have a child, so I need the benefits for my son, and

46

1   has a good retirement, and insurance was really good.

2   Q.   Were you disciplined in retaliation for reporting

3   safety concerns?

4   A.   Yes.

5   Q.   Is that why you were fired?

6   A.   Yes.

7   Q.   Other than the discipline and termination at issue in

8   this case, was your job at BNSF ever in jeopardy?

9   A.   Not really, no.

10  Q.   Other than when you worked for Mark Carpenter, who is

11  the individual that retaliated against you, were you ever

12  disciplined by BNSF?

13  A.   No.

14  Q.   Did you ever get bad reviews prior to working for Mark

15  Carpenter?

16  A.   No.

17  Q.   Tell us about the benefits at BNSF.

18  A.   The benefits I -- as you kind of heard, they had the

19  railroad retirement, which I -- at the year -- age of 60 I

20  could retire with full benefits.  We also have a 401(k)

21  plan.  We also had where we could buy shares in the company.

22  We had really good health and -- health and medical

23  insurance --

24  Q.   Was the health and medical insurance important to you

25  for any particular reason?

47
Direct - Fresquez

1   A.   Yeah.  My son -- at the time all this was going on, my

2   son was sick and, you know, insurance is expensive and

3   hospital bills are expensive, and, you know, insurance

4   helped.

5   Q.   Can you tell -- can you tell the Court more about your

6   son's illness.

7   A.   At the time we were going through all this, my son was

8   in and out of the hospital.  It was because there was

9   something wrong with his blood.  There was a couple of other

10  issues going on, but he -- yeah.

11  Q.   Given what was going on with your son and his health

12  issues, would you have walked away voluntarily from the

13  benefits at BNSF?

14  A.   No.  I wouldn't have been able to -- I couldn't cover

15  the bills.

16  Q.   Even after everything that's gone on in this case, if

17  you could go back to work for BNSF today, would you work

18  there?

19  A.   Yes.

20          MR. THOMPSON:  Nothing further.  Thank you.

21          THE COURT:  Cross-examination.

22                      CROSS-EXAMINATION

23  BY MR. GOMAN:

24  Q.   All right.  Good afternoon, Mr. Fresquez.

25  A.   Good afternoon.

48

Cross - Fresquez

1    Q.    Let me just touch on the health insurance piece

2    briefly.  You don't have any evidence -- or at least you

3    haven't produced any evidence in this case of anything that

4    you had to pay out of pocket for -- since you were fired by

5    BNSF that you -- that would have been covered by their

6    insurance when you worked there.  Does that -- do you follow

7    that?

8    A.    No.

9    Q.    It was too wordy.  Let me try again.

10         You haven't disclosed any evidence in this case of

11   any out-of-pocket expenses, anything you've had to pay for,

12   that would have been covered by BNSF if you still worked

13   there.

14   A.    No, I have not.

15   Q.    Okay.  And, in fact, when you were dismissed by BNSF,

16   did your insurance continue for a period of time?

17   A.    Yes.

18   Q.    Your BNSF provided health insurance?

19   A.    Yeah, it was a couple of months.

20   Q.    Okay.  And then after that lapsed, your son was covered

21   by your wife -- by his mom's health insurance plan, right?

22   A.    That's correct.

23   Q.    Okay.  So there was never a period of time when your

24   son was not without health insurance.

25   A.    That's correct.

49
Cross - Fresquez

1    Q.   Let's go back to the beginning of your career at BNSF.

2    How old were you when you got hired?

3    A.   20.

4    Q.   You didn't have any experience as a track inspector

5    when you got hired by BNSF, right?

6    A.   That's correct.

7    Q.   Everything you have learned about inspecting track, you

8    learned from BNSF.

9    A.   That's correct.

10   Q.   And you worked your way up to being a track inspector,

11   which is one of many jobs within the maintenance-of-way

12   craft, right?

13   A.   Yes.

14   Q.   And maintenance of way, for the Court's benefit, is

15   just the men and women who repair railroad tracks, right?

16   A.   Yes.

17   Q.   Okay.  And inspect and construct --

18   A.   The maintenance side of it.

19   Q.   Okay.  By the time you were dismissed by BNSF, your

20   hourly rate of pay was $29.22, right?

21   A.   I don't remember exactly.

22   Q.   All right.  Fair enough.  I'm going to show you, to see

23   if it refreshes your memory -- let me see if I can find it

24   here -- a copy of the scheduling order that was entered in

25   this case.  And just to be clear on this last point, do you

50

Cross - Fresquez

1    see down where it says Computation of Damages?

2    A.    Yeah.

3    Q.    All right.  You see here where you're alleging you

4    earned approximately $29.22 per hour per 40-hour week when

5    you were terminated?

6    A.    Yes.

7    Q.    Okay.  And seeing that in there in this court file

8    pleading in this case, any reason to doubt that your rate of

9    pay was 29.22 when you left BNSF?

10   A.    No.

11   Q.    Okay.  You held -- you were working as a track

12   inspector when you were dismissed, right?

13   A.    Yes.

14   Q.    You also worked as a flagger at BNSF for a period of

15   time; is that right?

16   A.    Yes.

17   Q.    Essentially someone who makes sure that track is

18   protected while work is being done?

19   A.    Yes.

20   Q.    In a very general sense.

21   A.    Yes.

22   Q.    You also worked as a track foreman for a period of

23   time?

24   A.    Yes.

25   Q.    And each of those jobs carried different rates of pay,

51

Cross - Fresquez

1    right?

2    A.    I think there's a different rate of pay between an

3    inspector and a flagman.

4    Q.    Inspector makes more?

5    A.    I -- I don't remember exactly, but I think the foreman

6    and the flagman are the same title -- actually, all three of

7    them are technically the same seniority title, but I don't

8    know the difference in pay.  I can't remember that.

9    Q.    With your seniority when you left, you could, to some

10   extent, pick and choose the job you wanted to hold between

11   foreman, inspector, or flagman?

12   A.    If it's available.

13   Q.    And you could also pick where you wanted to inspect

14   track, right?

15   A.    If it -- I don't like the word "pick" because you have

16   to -- if it's available and then you bid on it and then you

17   hope no one else bids on it, and then it depends on where

18   you fall on the roster.

19   Q.    Right.  And sometimes you can get stuck bidding on a

20   job that carries very little, if any, overtime, right?

21   A.    Yeah, you can.

22   Q.    So, you know, you can choose to bid on a job that

23   carries a lot of overtime or choose to bid on a job that

24   doesn't carry very much.

25   A.    Yes.  Yes.

Cross - Fresquez

1   Q.   But sometimes you might get stuck on one or the other,
2   just depending on the seniority roster.
3   A.   Yes.
4   Q.   You heard Mr. Opp just testify overtime isn't
5   guaranteed at BNSF by the collective bargaining agreement;
6   is that right?
7   A.   Guaranteed?  I don't -- it's all based off what's
8   available to work.
9   Q.   Exactly.  There's nothing -- when you got hired, they
10  didn't say, We're going to give you 20 hours a week of
11  overtime; we promise you.
12  A.   That's correct.  They didn't do that.
13  Q.   I'm going to show you another exhibit.  It's Exhibit N.
14        And I'd like to offer it, just for now, as a
15  demonstrative, just as a timeline.
16        THE COURT:  It's already in evidence, so --
17        MR. GOMAN:  Fair enough.
18        THE COURT:  -- use it however you want.
19  BY MR. GOMAN:
20  Q.   All right.  I just want to walk through this timeline
21  with you, Mr. Fresquez.  May 27th, 2016, that's the date of
22  your dismissal from BNSF, right?
23  A.   Yes.
24  Q.   Okay.  You got hired almost exactly three months later
25  by the Town of Castle Rock as a roofing inspector; is that

Cross - Fresquez

1   right?

2   A.   Yeah.

3   Q.   Okay.  Do you remember how many jobs you applied to

4   before getting that job at Castle Rock offhand?

5   A.   No.

6   Q.   Do you remember if you applied to jobs other than this

7   Castle Rock one in this period of time?

8   A.   Yes.

9   Q.   You don't know how many or the details?

10  A.   No, I do not.

11  Q.   When you got hired at Castle Rock, your rate of pay was

12  $26.20; does that sound right?

13  A.   I don't remember.  That does sound high, but I don't

14  remember.

15  Q.   All right.  Well, let me show you Exhibit J.  This is a

16  page from your personnel action form.  Do you see --

17  A.   Yes.

18  Q.   -- right there, your rate of pay?

19  A.   Yes.

20  Q.   26.20.  It looks like 26.30 was your hourly rate of pay

21  at Castle Rock?

22  A.   Yes.

23  Q.   Any reason to disagree with what's written there?

24  A.   No.

25  Q.   This job, though, was part-time, right?

54

Cross - Fresquez

1   A.   In the construction field, they're called seasonal.

2   Q.   Okay.

3   A.   But they are -- they're called -- you can call them

4   part-time, but they're seasonal jobs.

5   Q.   While you're working from -- let's go back to Exhibit

6   N -- while you're working from August until you left

7   Castle Rock in January 2017, were you working 40 hours a

8   week?

9   A.   Yes, for the most part.  I was a roofing inspector, so

10  it was -- they hired me for hailstorms.  So if it was

11  snowing, you weren't inspecting any roofs, but for the most

12  part, I was 40 hours a week.

13  Q.   All right.  I'm going to show you Exhibit -- this is

14  Exhibit J, page 17.  Do you recognize this as the cover

15  letter to the resume you submitted to the Town of Castle

16  Rock?

17  A.   Yes.

18  Q.   All right.  You state in there, My education meets your

19  criteria, as does my management and leadership abilities.

20       You believed that to be true at the time, right?

21  A.   Yes.  This is a general cover letter I use.

22  Q.   Oh, I understand.  But, I mean, you weren't lying in

23  your cover letter, right?

24  A.   No.

25  Q.   You believed that you had those skills before you got

Cross - Fresquez

1    hired and while you were working on the job and when you

2    left, right?

3    A.  I -- yeah.  Simple yes.

4    Q.  You didn't have any reason to think you were not

5    capable of working as a roofing inspector for Castle Rock,

6    right?

7    A.  It was more than I thought, but -- I thought I could do

8    it, so yes.

9    Q.  I didn't catch you.  You said it was more than you

10    thought?

11    A.  I thought it was a little simpler, but it was a little

12    bit more.  But to answer your question in simple terms, I

13    believe I could do the job, so I applied for it.

14    Q.  Okay.  In that same application, you included a core

15    competency section, and we can see that there, regulatory

16    compliance documentation, record-keeping.  There again, you

17    believed you had the skills to work at Castle Rock, right?

18    A.  Yes.

19    Q.  Okay.  Did you try to stay on at the city of

20    Castle Rock --

21    A.  Yeah, I applied for a full-time job.

22    Q.  And what came of that?

23    A.  I didn't get it.

24    Q.  Okay.  When you applied initially at Castle Rock, you

25    told them you'd been terminated from BNSF, right?

Cross - Fresquez

1    A.    Yes.

2    Q.    And they hired you still, right?

3    A.    Yes.

4    Q.    Okay.  And, in fact, at SAFEBuilt, and then later at

5    Charles Abbott, you disclosed to each of those employers

6    that you had been fired from BNSF.

7    A.    Yes.

8    Q.    And each of those subsequent employers hired you

9    despite that, right?

10   A.    Yes.

11   Q.    All right.  Let's go back to the timeline, then.  You

12   leave Castle Rock in January of 2017 and start collecting

13   unemployment benefits, right?

14   A.    Yes.

15   Q.    And you collect those unemployment benefits through

16   July of 2017, right?

17   A.    Yes.

18   Q.    All right.  And those unemployment benefits take you

19   until you get hired at SAFEBuilt, right?

20   A.    Yes.

21   Q.    All right.  And that's, in fact, why you got the job in

22   SAFEBuilt because your unemployment benefits had lapsed,

23   right?

24   A.    I don't think they did.  I don't recall.

25   Q.    All right.  Let's -- you don't recall how long they

Cross - Fresquez

1   were --

2   A.   I do not.

3   Q.   -- set to last?

4        I'm going to show you Exhibit G.  This is from the

5   Railroad Retirement Board.  I'm going to show you the second

6   page here.  You're not disputing that you received

7   unemployment benefits from January to July of 2017?

8   A.   No.

9   Q.   And they totaled the amounts here on the third page?

10  A.   Yeah.

11  Q.   Okay.  Were you looking for work from January 2017

12  until August of 2017?

13  A.   Yes.

14  Q.   Did you have any interviews for jobs?

15  A.   Yes.

16  Q.   With who?

17  A.   One, for example, was the city of Centennial Code -- I

18  don't even know what they are, planning department, code

19  department.  I don't know what their actual title was.

20  That's one I know for sure I did.  And then -- I can't

21  remember offhand anybody else right now.

22  Q.   Okay.

23  A.   I believe I had -- oh, I did talk to a railroad company

24  that constantly hires.  They basically told me no.  I

25  interviewed for them.  I don't remember the exact time I

Cross - Fresquez

1    interviewed with them.

2    Q.   You don't remember when in this time period it was?

3    A.   No, not -- not offhand.  I couldn't tell you what month

4    it was.

5    Q.   Okay.  How did you get hired at SAFEBuilt?  What was

6    the process?

7    A.   It was a roofing inspector again.  It was for the

8    May -- May hailstorm that came through in '17, I think it

9    was.

10   Q.   Okay.  Did you know someone there or did you just --

11   A.   No, they needed a roofing inspector and since I did

12   roofs in Castle Rock, they hired me.

13   Q.   Okay.  All right.  Exhibit I, this is a copy of --

14   looks like a similar resume, but this is the one you

15   submitted to SAFEBuilt, right?  And I just say that because

16   we see the Town of Castle Rock listed as previous employer.

17   Okay.  Here, too, you list your employment skills?

18   A.   Yes.

19   Q.   And core competencies?

20   A.   Yes.

21   Q.   You didn't have any doubt in your mind that you could

22   work as a roofing inspector for SAFEBuilt, right?

23   A.   Say that --

24   Q.   You believed you could do the job.

25   A.   Yes.

59

Cross - Fresquez

1    Q.   All right. And, in fact, you did do the job

2    successfully for, what, a year?

3    A.   Yeah. I left in November of '18.

4    Q.   Okay. Do you remember your rate of pay at SAFEBuilt?

5    A.   I originally was hired at $30 an hour because I was

6    seasonal, again doing roofs. And then when I went full-time

7    they dropped it down to something like $23 an hour. 23 and

8    some cents.

9    Q.   Okay. Let me pause right there. Just for a second, on

10    Exhibit I, this is the second page here, those professional

11    certifications --

12    A.   Yeah.

13    Q.   -- you hold all of those professional certifications,

14    right?

15    A.   Yeah.

16    Q.   What's that?

17    A.   Yeah.

18    Q.   Okay. Member of the union and then that bottom one,

19    International High IQ Society. What do you have to do to be

20    a member of that organization?

21    A.   It's just a test. It's just something that I filled --

22    to fill out the form on a -- to church up the resume.

23    That's all it is.

24    Q.   I'm sorry?

25    A.   Something to make your resume look good. It was just

60

Cross - Fresquez

1   an online test you took and it said you're a high IQ.

2   Q.   Okay.  Let me show you Exhibit K, then.  We're going to

3   get back to talk about SAFEBuilt.  Hourly rate of pay was

4   $30 an hour at SAFEBuilt, right?

5   A.   When I started as seasonal.

6   Q.   I see.  Okay.  That was full-time work?

7   A.   No.  So as it says it right there in the first

8   sentence, it's a seasonal roofing inspector, so it was just,

9   basically -- again, when they had roofs to be inspected, you

10   could do the roofs.

11   Q.   Was this a 40-hour a week job?

12   A.   It -- yeah, it was pretty much just . . .

13   Q.   So you worked 40 hours a week making 30 bucks an hour.

14   Did it come with overtime ever?

15   A.   No.

16   Q.   Okay.  When did you get hired full-time --

17   A.   It was about October of '17.

18   Q.   All right.  So if we go back to the timeline, you then

19   work at SAFEBuilt from October of '17 until you leave

20   SAFEBuilt to start working at Charles Abbott; is that right?

21   A.   Say that again.

22   Q.   Yeah.  You worked for -- at SAFEBuilt from August 2017

23   until, it looks like, November of 2018, right?

24   A.   Yes.

25   Q.   Okay.  You leave SAFEBuilt because you get another job

61

Cross - Fresquez

1   at Charles Abbott.

2   A.   Correct.

3   Q.   What are you doing at Charles Abbott?

4   A.   Building inspector.

5   Q.   Is that still what you're doing?

6   A.   Yes.

7   Q.   Okay.  You've worked at Charles Abbott since November

8   of 2018?

9   A.   Yes.

10  Q.   Full-time work?

11  A.   Yes.

12  Q.   Have you taken any tests to be a building inspector?

13  A.   Yes.

14  Q.   What kind of tests have you had to take?

15  A.   So far I'm certified in residential building,

16  structural, residential energy, residential plumbing,

17  residential mechanical, commercial plumbing, commercial

18  mechanical, zoning, property maintenance.

19  Q.   You had to take and pass tests to get each of those

20  certifications, right?

21  A.   Yes.

22  Q.   You didn't know how to do those things before you

23  learned them on the job at SAFEBuilt, right?

24  A.   Say that again.

25  Q.   How did you learn the skills you needed to pass those

Cross - Fresquez

1    tests and get those certifications?

2    A.   You -- you study and on-the-job training as much as

3    possible.

4    Q.   Okay.  Every one of the certifications that you need to

5    do your job, you had been able to study, take the test,

6    pass, and get the certification, right?

7    A.   Yes.

8    Q.   Okay.  You plan to stay in the field of building

9    inspection?

10   A.   Yes.

11   Q.   Okay.  When did you receive those certifications you

12   just rattled off there?

13   A.   I -- my first one would have been in -- probably when I

14   started with Castle Rock because I needed that one.  And

15   then I have been getting them gradually ever since.  So I

16   then got my residential plumbing in December, commercial

17   plumbing maybe April this year.  And I just work on them

18   gradually.

19   Q.   Okay.  And that allows you to inspect more things and

20   be a better asset to your company, right?

21   A.   Correct.

22   Q.   Let me just put it to you this way because the judge is

23   going to have Exhibit 61 in this case.  It's a report by a

24   Mr. Stein.  Do you know who David Stein is?

25   A.   I believe my counsel has hired him.

63
Cross - Fresquez

1   Q.   Yeah.  And he has some criticisms of Cynthia Bartmann's

2   report.  Are you generally aware of that?  Let me just put

3   the question to you:  Mr. Stein questions whether you have

4   the aptitude -- the intellectual aptitude to work as a

5   building inspector.  If I were to ask you that question, do

6   you have the intellectual aptitude and capability to work

7   and be successful as a building inspector, what --

8         MR. THOMPSON:  Objection.  It's inappropriate to

9   have a lay witness commenting on an expert's opinion.

10         THE COURT:  I think he's asking him whether he

11   thinks he's competent to do the job.  Overruled.  He may

12   answer.

13         THE WITNESS:  Can you repeat, please?

14   BY MR. GOMAN:

15   Q.   Yes.  Can you work as a building inspector?  Are you

16   intellectually able, smart enough, to do it?

17   A.   That -- I'm not smart enough to do all of it.

18   Q.   Okay.

19   A.   It's a very complex job, and I -- a lot of online --

20   on-the-job training, you know.  For example, I can't do

21   electrical.  I don't know a single thing about electrical,

22   and that's part of the job.

23   Q.   Every one of the tests that you've taken to receive

24   your certifications, you've passed, right?

25   A.   Yes.

64

Cross - Fresquez

1    Q.   Okay.  And you have worked now for three different

2    employers doing building or roofing inspections, right?

3    A.   Yes.

4    Q.   You've not been asked to leave any of those positions?

5    A.   No.

6    Q.   They've not threatened to fire you or demote you or

7    anything like that?

8    A.   No.

9    Q.   All right.  Last topic, then.  You said in direct

10   examination you enjoyed working at BNSF and your job was

11   never in jeopardy; is that right?

12   A.   Not under -- under Mark Carpenter it was, but not --

13   when I wasn't under Mark Carpenter, it wasn't.

14   Q.   Okay.  So let's talk about that.  You got hired at BNSF

15   in 2006; is that right?

16   A.   Yes.

17   Q.   Okay.  You were supervised by a roadmaster named Keith

18   Samples back then.  Do you remember that?

19   A.   Yes, and we went through this during trial.

20   Q.   Right.  And -- yeah, His Honor wasn't there for the

21   trial, though, so let me make sure we're all on the same

22   page.

23        Mr. Samples didn't think you should work as a track

24   inspector, fair?

25   A.   No.

Cross - Fresquez

1    Q.   Not -- I want to show you Exhibit P.

2    A.   So let's talk about it and be honest.  What we talked

3    about in trial is I took a job in Wyoming, I found out it

4    was a headquarter, and I would have to pay for my own

5    lodging.  And so once I found that out, I left before 30

6    days, so they disqualified me from the position because I

7    left before 30 days because I had to pay for my own lodging.

8    Q.   We'll talk about Mr. Samples in a second, but let me

9    just ask you directly:  It's fair to say you butted heads

10   with a number of supervisors other than Mark Carpenter at

11   BNSF; isn't that right?

12   A.   Mark Carpenter was the big boss.  I butted heads with

13   some of those guys under him.

14   Q.   Okay.  Well, he wasn't Keith Samples' boss, was he?

15   A.   No.

16   Q.   Okay.  Mr. Samples writes in this letter, here in

17   Exhibit P, he was disqualifying you as a track inspector as

18   a result of your failure to make satisfactory progress.

19            MR. THOMPSON:  Objection.  This was not admitted at

20   trial, no foundation has been laid for it, it's not even

21   written by Mr. Fresquez.

22            THE COURT:  All right.  I don't see this being in

23   evidence, Mr. Goman.

24            MR. GOMAN:  It's not, Your Honor.  And I -- I -- I

25   am offering this as impeachment of what Mr. Fresquez

1   testified to in direct examination; I'm not offering the

2   exhibit into evidence.

3            THE COURT:  Okay.  And -- all right.  As

4   impeachment, then, I'll overrule the objection, but let me

5   ask you:  What is the relevance of the line of questions

6   having to do with what I -- seems to me to be questions that

7   go to liability -- which obviously the jury has already

8   determined -- and not damages?

9            MR. GOMAN:  So the -- this topic that I want to

10  cover, the questions will be focused on, No. 1, Mr. Opp's

11  assumption is Mr. Fresquez would have continued working at

12  BNSF, not been laid off, not been terminated for another

13  reason or not voluntarily left.

14           I think it's relevant that -- and as we'll see --

15  there were a number of instances of butting heads with a lot

16  of different managers at BNSF and instances of record

17  discipline that left him very close to being dismissed on

18  occasions that have nothing to do with the events that gave

19  rise to --

20           THE COURT:  All right.  So undercutting Mr. Opp's

21  opinion that, but for this one incident of retaliation, Mr.

22  Fresquez could have looked at a career through 2045.

23           MR. GOMAN:  That's right, Your Honor.

24           THE COURT:  All right.  Is there an objection --

25           MR. THOMPSON:  This is, at best, speculation, Your

Cross - Fresquez

1    Honor.

2              THE COURT:  Well, I think if there were a jury

3    here, I'd rule differently, but for now I'm going to allow

4    this given the specific purpose of this hearing.  So

5    objection overruled.

6              You may continue, Mr. Goman.

7              MR. GOMAN:  Thank you, Your Honor.

8    BY MR. GOMAN:

9    Q.   Mr. Fresquez, we see in this letter here Mr. Samples

10   writing that you're being disqualified due to failure to

11   make satisfactory progress.  I understand, and you did

12   testify at trial, you don't agree with that.  You don't

13   think that's at all what happened, right?

14   A.   No.  And it didn't happen because actually to be

15   disqualified I would have had to have a hearing and all

16   kinds of other stuff, and it didn't.  It was because I left

17   within 30 days because I would have had to pay for my own

18   lodging.

19   Q.   You believe what he -- Mr. Samples -- wrote in this

20   letter is a lie, it's not true, right?

21   A.   It's not true.

22   Q.   Okay.  Let's go to 2010.  I'm going to show you

23   Exhibit C.  You're working with a foreman named Steve Lyons;

24   is that right?

25              MR. THOMPSON:  Your Honor, we object.  This is,

68

Cross - Fresquez

1     again, evidence that was not allowed in the trial.

2     Moreover, all of this that's going to follow now was under

3     the bad actor in this case.  It's exactly what liability was

4     about.

5             To the extent that the defense is trying to say

6     that Mr. Fresquez would have, you know, been fired down the

7     road, these are all under the bad actor.

8             THE COURT:  Mr. Goman.

9             MR. GOMAN:  Yeah, so I want to talk about three

10    instances of employees.  One of whom is a foreman who's a

11    scheduled coworker, not a supervisor, of Mr. Fresquez.  One

12    who -- and then three other roadmasters.  They did, some of

13    them periodically, work under Mr. Carpenter.

14            The point of this testimony is what we just talked

15    about; Mr. Fresquez butted heads with a number of different

16    managers for a number of different reasons, having nothing

17    to do with his ultimate termination, so it bears on the --

18    it goes to what we just discussed.

19            THE COURT:  Well, how many of these other managers

20    are you planning on going into?

21            MR. GOMAN:  Three.

22            THE COURT:  How many -- this is in addition to this

23    Mr. Samples?

24            MR. GOMAN:  That's right.

25            THE COURT:  So four.

69

Cross - Fresquez

1          MR. GOMAN:  Four total.

2          THE COURT:  I'll let you do Mr. Samples and one

3     more.  I understand where you're going with this and I will

4     take it into account -- I do think that it's relevant and

5     probative to the issue of the validity of the assumption of

6     Mr. Opp that this plaintiff would have counted on but for

7     the retaliatory conduct, which the jury found in this case,

8     could have counted on staying at BNSF for another 26 years,

9     but I think with two -- with two examples, and one more in

10    addition to Mr. Samples, I will be able to make a decision

11    how much weight I'm going to give to that.  So I'll let you

12    do it with one more manager.

13         MR. GOMAN:  Fair enough.

14    BY MR. GOMAN:

15    Q.   So we're looking at Exhibit C.  Mr. Lyons was your

16    foreman in 2010, right?

17    A.   Yes.

18    Q.   And, again, that -- a foreman is more akin to a

19    coworker than it is a supervisor at BNSF.  A foreman, for

20    instance, can't fire you, right?

21    A.   Yes.

22    Q.   All right.  Mr. Lyons was reporting that you had failed

23    to comply with his instructions.  He'd instructed you to do

24    something and you didn't.  Do you recall that?

25    A.   Yes.

Cross - Fresquez

1    Q.   Okay.  You disagree with that.  You don't believe that

2    you failed to comply with Mr. Lyons' instructions, right?

3    A.   What events are you talking about?

4    Q.   The event that's described at the top of Exhibit C.

5    A.   Yes.  I -- can you repeat your question?

6    Q.   Yeah.  Mr. Lyons is reporting you failed to comply with

7    his instructions.  You disagree with that.  You think he was

8    mistaken.  You, in fact, did comply with his instructions,

9    right?

10   A.   I don't believe everything that was said in this is

11   accurate, but . . .

12   Q.   Okay.  You knew even back in 2010 that insubordination,

13   not doing what you're told, was a fireable offense at BNSF,

14   right?

15   A.   Yes.

16   Q.   Okay.  Mr. Thompson asked you whether your job was

17   in -- ever in jeopardy before this -- before your dismissal.

18   In fact, if we look at your employment transcript -- so

19   Exhibit B -- you were found in 2010 to have failed to comply

20   with instructions and engaged in an insubordinate conduct

21   through your behavior with a roadmaster named Damon Fry,

22   right?

23   A.   That's what it shows on the record.

24   Q.   That's what you admitted to when you signed that

25   waiver, right?

71

Cross - Fresquez

1    A.    No.

2    Q.    You didn't admit to that?

3    A.    No.

4    Q.    Okay.

5    A.    And you --

6    Q.    You agree that you did receive discipline for

7    insubordination in 2010, right?

8    A.    Yeah, I did.

9    Q.    Okay.

10   A.    From --

11   Q.    And do you understand that insubordination, just doing

12   it one time, is a fireable offense at BNSF, right?

13   A.    Yes.

14   Q.    Okay.  You are also aware that several supervisors

15   reported that you either failed to comply with their

16   instructions or were insubordinate over the course of your

17   career, right?

18   A.    No.

19   Q.    You dispute that?

20   A.    I don't understand your question when you say "several

21   supervisors."

22   Q.    Damon Fry, Mr. Lyons, Jeremy Holton, and Cason Cole, in

23   particular.

24   A.    The only one we talked about was Cason Cole.

25   Q.    Okay.  Are you disputing that those four managers

Cross - Fresquez

1    reported that you either failed to comply with their

2    instructions or were insubordinate?

3    A.    I don't even know what you're talking about with Jeremy

4    Holton.

5              THE COURT:  All right, I think I've heard enough on

6    this line of questioning.  I think this is also a good time

7    for our afternoon break.  We'll be in recess for 10 minutes.

8              (Recess taken 3:06 p.m. to 3:18 p.m.)

9              THE COURT:  All right, Mr. Fresquez, I remind you

10   you remain under oath.

11             Mr. Goman, you may resume your examination, but

12   let's move on to a new line of inquiry.

13             MR. GOMAN:  Sure.  And just in light of the Court's

14   ruling, I just want to make a brief record, an offer of

15   proof, if I might.

16             THE COURT:  Sure.

17             MR. GOMAN:  So as I understand, the Court has ruled

18   on relevancy grounds that further inquiry into instances of

19   disagreement or allegations of insubordination or failure to

20   comply with instructions is not -- more of that is not

21   relevant to this hearing.  And I just state in light of the

22   allegations made that there's no evidence that he would have

23   been dismissed for any other reason, or no reason to think

24   that he would not have been able to continue working at BNSF

25   for the rest of his career, that evidence is probative.

73

Cross - Fresquez

1        But by way of offer of proof, the evidence I would

2   have gone into was an instance where Damon Fry accused Mr.

3   Fresquez of failing to comply with his instructions and

4   being insubordinate.  Jeremy Holton, another roadmaster,

5   accused him of failing to comply with his instructions.

6   Cason Cole accused him of having failed to comply with his

7   instructions.  And Division Engineer Mark Carpenter

8   questioned whether he had the requisite skills to be a track

9   inspector.  That ends the offer of proof.

10        THE COURT:  All right.  Thank you.

11  BY MR. GOMAN:

12  Q.   Mr. Fresquez, just to -- let me just follow up two

13  quick things and then I am finished.  In your current job,

14  do you get paid time-and-a-half for overtime?

15  A.   I don't know.

16  Q.   Okay.  Have you ever worked any overtime at your

17  current job?

18  A.   I work like through lunch type of overtime from here

19  and there.  But I don't know how it's really paid.

20  Q.   I didn't understand the first half.

21  A.   I work through like lunch type overtime, but I don't

22  know if it's time and a half.  I really never paid attention

23  because it's only been a couple of times.

24  Q.   I see.  What about bonuses?  Do you get a bonus at your

25  current job?

Cross - Fresquez

1    A.    Yes.

2    Q.    What's the bonus --

3    A.    If I pass a test.

4    Q.    What is that bonus?

5    A.    If you pass -- basically it depends on the test, but

6    it's $300 for a basic test.

7    Q.    I see.

8    A.    But there's only so many tests, so --

9    Q.    The tests we talked about before, you got a

10   300-or-so-dollar bonus for each of those?

11   A.    Yeah.  And some of them you'll get 500 if it's certain

12   types.

13   Q.    Are there managers or bosses at your job?

14   A.    Yes.

15   Q.    Do those managers or bosses get paid more than the

16   employees they supervise?

17   A.    Of course.

18   Q.    Have you applied to be a manager or a supervisor at

19   your current job?

20   A.    No.

21   Q.    Do you have any reason to think you wouldn't be capable

22   of being a manager or supervisor at your current job?

23   A.    Not right now.

24   Q.    In --

25   A.    You first must be a student before you can be a

Redirect - Fresquez

1   teacher.

2   Q.   Okay.  So you don't believe you have the skills right

3   now to be a manager or boss at your -- at Charles Abbott.

4   A.   That's correct.

5   Q.   When you get the skills, you have more time on the job,

6   you think you could put -- progress towards being a manager

7   or a boss?

8   A.   I think that's everybody's end goal.

9   Q.   Do you think you have the ability to do that?

10  A.   I hope so one day.

11          MR. GOMAN:  Okay.  I have no more questions, Your

12  Honor.

13          THE COURT:  All right.  Redirect.

14                    REDIRECT EXAMINATION

15  BY MR. THOMPSON:

16  Q.   When you worked at BNSF, were you unionized?

17  A.   Yes.

18  Q.   Could you be terminated at will?

19  A.   No.

20  Q.   What would instead have to happen?

21  A.   You go to investigation, you have an internal hearing,

22  and then it goes to different steps from there.

23  Q.   So before the internal hearing, do you need to be

24  charged with a workplace rule violation?

25  A.   Yes.

Redirect - Fresquez

1    Q.   And then is there a hearing on that violation?

2    A.   Yes.

3    Q.   Is ultimately any termination decision or discipline

4    decision reviewed by an arbitrator?

5    A.   Yes.

6    Q.   For the disqualification that Mr. Goman asked you

7    about, were you charged with any workplace rule violation --

8    A.   No.

9    Q.   -- related to that?

10   A.   No.

11   Q.   Is that even discipline?

12   A.   No.

13   Q.   The incident with Mr. Lyons, were you charged with any

14   workplace rule violation as a result of that?

15   A.   No.

16   Q.   Were you not disciplined in any way?

17   A.   No.

18   Q.   When Mr. Goman brought your discipline history up on

19   the screen -- strike that.

20        Does BNSF have a progressive discipline policy?

21   A.   Repeat that.

22   Q.   Does BNSF have a progressive discipline policy.

23   A.   I don't understand what you mean by that.

24   Q.   Sure.  Can BNSF use old discipline to enhance new

25   discipline?

77
Redirect - Fresquez

1    A.   From my understanding, no.

2    Q.   Can -- can discipline that's a certain date be

3    considered or -- I'm asking this poorly.

4         There was testimony at trial that discipline could

5    be only used for three years to escalate future discipline.

6    Do you have any reason to dispute that?

7    A.   No.

8    Q.   Was any of the discipline that Mr. Goman showed you

9    within the last three years?

10   A.   No.

11   Q.   Mr. Goman also mentioned Mark Carpenter as an employee

12   with whom you had run-ins; remember that?

13   A.   Yes.

14   Q.   Is Mr. Carpenter the supervisor who you reported for

15   violating federal law?

16   A.   Yes.

17   Q.   Mr. Goman also mentioned three subordinates to Mr.

18   Carpenter:  Mr. Cole, Mr. Holden, and Mr. Fry.  Do you

19   recall that?

20   A.   Yes.

21   Q.   Are those subordinates of Mr. Carpenter who you

22   reported to the government for violating federal law?

23   A.   Did I directly report Fry, no.  But I reported Cole

24   and -- or how do I want to say this -- directly reported

25   them, no.  I would say no.

78
Examination - Fresquez

1   Q.   Were they violating federal law?

2   A.   Yes.

3   Q.   Were the confrontations you had with them about them

4   violating federal law?

5   A.   Yes.

6   Q.   Is that what this trial was about?

7   A.   Yes.

8         MR. THOMPSON:   Thank you.  Nothing further.

9                        EXAMINATION

10  BY THE COURT:

11  Q.   Mr. Fresquez, I have some questions for you, mainly

12  because I wasn't at the trial and I don't know the answers

13  to these questions.

14         I'm going to now first try to get a sense of

15  your -- the union you were in when you were at BNSF and

16  where you were in terms of seniority and those kind of

17  things.  So let's start with the -- what was the name of

18  your union?

19  A.   The Brotherhood of -- Brotherhood of Maintenance and

20  Way, Employee Division.

21  Q.   Can you pull the mic towards you?

22  A.   Brotherhood of Maintenance and Way, Employee

23  Division.

24  Q.   Okay.  What local were you?

25  A.   I believe the local was 1351.

79
Examination - Fresquez

1    Q.   How large is the local in terms of number of employees?

2    A.   107 -- 106 including me, if I remember correctly.

3    Q.   Is that -- is the local geographically-based?  In other

4    words, is it the Denver metro area, Colorado?  What is it?

5    A.   It's more like -- it's locally based, but because we

6    have employees throughout the entire system, they -- your

7    system could be nationwide.

8    Q.   Okay.  So in terms of your seniority for purposes of

9    bidding and for purposes, say, if there's a massive

10   slow-down in work and there's layoffs necessary, do you go

11   by your seniority within Local 1351 or is there a national

12   seniority?

13   A.   It's -- there's a couple of different ways they do it.

14   The first one is they call everybody 4.  I was part of 400,

15   which means I go from -- I think it goes all the way to

16   Illinois, all the way through -- up to Casper, down to

17   Palmer Lake, Monument.

18   Q.   So what is 400?

19   A.   It's just a way they title the areas.  So there's

20   seniority districts, so our district was 400.

21   Q.   So you were in Local 1351, District 400?

22   A.   Yeah.  So our districts are pretty large.

23   Q.   All right.  So -- but what I'm getting at here --

24   because this all goes to the issue of how secure your job

25   was -- are you one of -- how many CBU members were in the

Examination - Fresquez

1    District 400?

2    A.    Oh, I couldn't tell you offhand.

3    Q.    Obviously more than 107.

4    A.    Yes.

5    Q.    Is it 500?

6    A.    I think it might be in the thousands.

7    Q.    Thousands.  All right.  So let's say BNSF has a massive

8    layoff and has to lay off half its union employees.  It goes

9    by seniority, right?

10   A.    Yes, sir.

11   Q.    Is the seniority for layoff purposes based on your

12   local or on your district?

13   A.    So it's based off a couple of things.  So it's based

14   off your district, but it's also based off the type of job

15   you're holding.  So a foreman will have a different roster

16   than a laborer.  And they could all be in 400, but they have

17   different rosters.

18          So example, in my foreman district, my -- how I

19   was -- I was pretty highly ranked.  Laborer, I wasn't super

20   high because it was just a laborer, everybody gets a

21   laborer.  So it's based off your type of job and the type of

22   job you're actually doing, that's the roster.

23   Q.    Now, you -- if there are layoffs, can you bump less

24   senior --

25   A.    Yes.

81
Examination - Fresquez

1    Q.   -- CBU members?

2    A.   Yes.

3    Q.   How far from the bottom were you in terms of your risk

4    of layoff?

5    A.   I --

6    Q.   And the reason I ask you is that some unions, from my

7    experience as a lawyer and as a judge, there's, like, no

8    movement.  You can work in the local for 20 years and you're

9    still second from the bottom, and in some unions, in some

10   locals, after two years, you're near the top in seniority.

11   So I -- and I have no sense of how this works in your --

12   A.   I think technically speaking, I've only ever been laid

13   off for one day.

14   Q.   All right.  But you're not answering my question.  How

15   close to the bottom were you in terms of being at risk for

16   layoff?

17   A.   Not close at all, and it's because you hold different

18   positions.  To explain it -- so I was also -- I held a title

19   for welder helper, I held a title for a foreman.  There's

20   different titles you could hold.  So if they started laying

21   off foremans, I could go be a welder helper, and I could be

22   a laborer or I go be a machine operator.  There's different

23   titles you could actually hold.

24        I have only been laid off, I think, one day, if I

25   remember correctly.  I've really not been in any danger of

Examination - Fresquez

1    ever being laid off.  I was the second -- if I remember

2    right -- I don't want to say that because that would be

3    incorrect, but I was highly ranked in Denver.

4    Q.   You were highly what?

5    A.   Ranked, seniority-wise.

6    Q.   So you had high seniority in Denver?

7    A.   Yeah.

8    Q.   What's your estimate of how many employees you could

9    have bumped before you were opened -- or subject to layoff?

10   A.   Oh, that -- a lot.  I couldn't give you -- it will be a

11   lot.

12   Q.   Give me your best guess.

13   A.   It -- I don't -- a couple -- maybe hundreds.

14   Q.   Hundreds?

15   A.   Yeah.

16   Q.   All right.

17   A.   I wouldn't -- you know, that's my guess because it goes

18   off of laborers and --

19   Q.   All right.  So in 10 years, you really -- you really

20   made it fairly high up in the seniority --

21   A.   Yeah.  I got lucky because I got my -- what we would

22   call our dates.  I got my foreman date early right when I

23   hired on.

24   Q.   Okay.

25   A.   Because that put me on another roster, so I started my

83

Examination - Fresquez

1    track inspector stuff.

2    Q.   All right.  After your discharge in 2016 in this case,

3    did you apply for other positions with railroad companies?

4    A.   Yes.

5    Q.   And you were not -- I take it, not successful in --

6    A.   No.  And, actually, I applied for Union Pacific.  And

7    the minute I entered my application, I got a decline letter

8    back.

9    Q.   So it was -- is your local the collective bargaining

10   agent for -- or unit for more employers than just BNSF or is

11   it just a company-specific local?

12   A.   They have the Brotherhood Maintenance of Way, Employee

13   Division for the BNSF and then they have it also for the

14   Union Pacific, but the Brotherhood of Maintenance of Way,

15   Employee Division covers all railroads, if I'm correct.

16   Q.   So more -- it's a -- it's a union that organizes

17   employees beyond one company.

18   A.   Yes.

19   Q.   So you've not been successful in any application for

20   railroad --

21   A.   No.

22   Q.   -- employment?

23   A.   That's correct.

24   Q.   And how many have you applied for?

25   A.   There's only -- so I applied for Denver Transit

Examination - Fresquez

1    Partners, which runs the A line, the commuter line over
2    here.  I didn't get that.  And then the other -- the other
3    big one is Union Pacific, and that's the one I got declined
4    right away.  And then I applied for the shortline railroads,
5    and I didn't ever even heard nothing back.
6    Q.   All right.  Do you think you have skills from your
7    position in -- with BNSF that are transferable to other
8    kinds of industries?
9    A.   The railroad industry is very unique, you know.
10   Inspecting-wise, that's why I went to the building
11   inspectors, that's -- I was thinking what else can I do
12   because I've been inspecting for so long?  But with -- when
13   it comes to railroad, railroad is very unique in its own
14   sense.  You're not -- you know, there's only a couple of
15   companies out there.
16   Q.   Well, what's the name of this company -- SAFEBuilt,
17   what are -- what is that company?  What do they do?
18   A.   They -- so a lot of city building departments actually
19   ran by third-party companies.  A lot of people don't know
20   that, but the building departments are actually ran by
21   third-party company.  SAFEBuilt is one of them companies
22   that runs a lot of cities.
23         For example, they run -- SAFEBuilt runs Edgewater,
24   Northglenn, Centennial, they run different cities.  So they
25   are in-house building department for the governments.

Examination - Fresquez

1    Q.   So they operate and maintain different city-owned

2    buildings?

3    A.   Correct -- yeah.  They -- yeah, so when you see a

4    building going up downtown, for example, if it was a

5    SAFEBuilt town, they would be inspecting that building going

6    up.

7    Q.   All right.  So when you applied to that company, they

8    obviously thought that you had some skills from your BNSF

9    years that transferred over to their positions.

10   A.   Yes.

11   Q.   Now, what is Charles Abbott?  What kind of company is

12   that?

13   A.   Exact same thing.

14   Q.   Same thing?  What are you making there?

15   A.   I was hired at 51,000.  They gave me a cost of living

16   pay raise last month, just a couple of cents.  I don't know

17   exactly --

18   Q.   So are you on salary or wage?

19   A.   Hourly.

20   Q.   What's your hourly at Charles Abbott?

21   A.   I think I got hired off at -- it was -- whatever 51,000

22   was.  51,000 divided by 2,080.  24.  24-something.

23   Q.   So 5,000 -- so that's about -- sounds around $25 an

24   hour, right?

25   A.   Yeah.  Give or take.

Examination - Fresquez

1    Q.   Okay.  How long would it have taken you to get to $30

2    an hour?  Or you're still there?

3    A.   No.

4    Q.   How long do you think it will take you to get to $30 an

5    hour?

6    A.   It's all based off what they feel -- it's basically

7    what they want to give you.

8    Q.   It's not a unionized place?

9    A.   No.

10   Q.   All right.  What's your current health insurance

11   situation?

12   A.   I -- I think I have Aetna.  I haven't used it yet.

13   Q.   How does it compare to the health insurance you had at

14   BNSF?

15   A.   I know it's not as good.

16   Q.   In what way?

17   A.   I haven't used it with Charles Abbott.

18   Q.   In terms of the cost to you, is it -- how does it

19   compare?

20   A.   Cost-wise -- I don't have my son on it right now, he's

21   with his mom's insurance.  I think my cost is maybe 150 a

22   paycheck.  I couldn't tell you for sure.

23   Q.   Do you recall what it was at BNSF?

24   A.   207 a month off -- I think it was 207 off the last

25   paid -- off the last contract.

Examination - Fresquez

1    Q.   So was it 150 a month or 300 a month at your current --

2    A.   It might be 150 a month.  But then it skyrocketed to

3    put a family on there.

4    Q.   This Tier 2, I'm intrigued by it because Mr. Opp is

5    right, there are almost none -- defined benefit plans have

6    gone the way of the dinosaur in this country.  It's one of

7    the -- you have one of the few -- or had one of the few that

8    are left.  So generally the way it works is it's primarily

9    employer funded.  Sometimes, though, the employee has to

10   kick in a certain amount.

11          Did you have -- and for Tier 2 in your benefit --

12   defined benefit plan, was a portion of it employee funded?

13   In other words, you had -- on a either per paycheck or per

14   month basis had to contribute to that --

15   A.   For the railroads?

16   Q.   To the Tier 2 -- right, to your defined -- or was it

17   100 percent employer funded?

18   A.   I don't know.  They take it right out of your checks.

19   Q.   Okay.  But my question is:  Did -- for your Tier 2

20   benefit, which is this defined benefit plan -- so you

21   referenced it at the time at the railroad that you had a

22   401(k).  It's actually not a 401(k).

23   A.   No, we do also have 401(k).

24   Q.   You had a 401(k) plus a defined benefit plus Social

25   Security?

Examination - Fresquez

1    A.    And -- yeah, so we had Tier 1, Tier 2, we had a 401(k)

2    through Vanguard, and then we had a shares option -- we

3    bought shares -- employee share program.

4    Q.    All right.  Let's stick with the defined benefit plan.

5    What I'm getting at is:  Is it entirely employer funded or

6    was it partially employee funded and partially employer

7    funded?

8    A.    Can you repeat your question?

9    Q.    Your Tier 2 defined benefit plan, it's -- what used to

10   be known decades ago as a pension plan -- that almost no

11   employers offer anymore -- was that -- did you have to --

12   was the pension plan funded entirely by the employer or did

13   you have to pay a portion?

14   A.    I don't know, sir, to be honest.  I just know they take

15   it out of our checks.  So it shows up as a tax on our

16   checks, the Tier 1, Tier 2 tax.

17          THE COURT:  Mr. Stone, do you know, is the Tier 2

18   entirely employer funded?  Or who would know?

19          MR. THOMPSON:  The employee contributes as well.

20          THE COURT:  That's what I thought.

21          MR. GOMAN:  If I could draw your attention to Mr.

22   Opp's report.  Page 5 of Exhibit 60 explains how much the

23   employee pays into Tier 1 and Tier 2.  Your Honor is right,

24   though, Tier 2 is overwhelmingly funded by the railroad.

25   The employee kicks in 4.9 percent.

89

Examination - Fresquez

1        THE COURT:  Page 5 of Exhibit 60 of Mr. Opp's

2    report.  All right.

3        I'll allow very brief questions from counsel in

4    response to the Court's questioning, if you choose to make

5    any.  Mr. Thompson.

6        MR. THOMPSON:  Plaintiff does not have any

7    questions, Your Honor.

8        THE COURT:  Okay.  Mr. Goman.

9                      EXAMINATION

10   BY MR. GOMAN:

11   Q.   You were grieving, through your union, your dismissal

12   up until January of 2018, right?

13   A.   Yes.

14   Q.   Okay.  Did you apply to work at Union Pacific while

15   your grievance was still pending?

16   A.   I don't -- yeah, I believe yes.

17   Q.   I mean, the time it would make sense to me, right --

18   A.   Yes.

19   Q.   -- because you were working full-time for their

20   SAFEBuilt or Charles Abbott when your grievance was denied

21   by the Public Law Board, right?

22   A.   Yes.

23   Q.   Okay.  Have you applied to work at any railroads since

24   the Public Law Board upheld your dismissal?

25   A.   I -- not that I can recall offhand.

Examination - Fresquez

1    Q.   I -- it's in Exhibit N, so the Court will have it, but

2    off the top of my head, I believe the date for the Public

3    Law Board denial was January 18th of 2018.  You've been

4    employed full-time since then, right?

5    A.   Yes.

6    Q.   Since you've been employed full-time, have you been

7    applying for any jobs?

8    A.   No.

9    Q.   Okay.

10   A.   Let me rephrase that.  I have applied to, like, Abbott

11   and things like that to transfer jobs for higher pay,

12   but --

13   Q.   Yeah.  Understood.  So -- but aside from SAFEBuilt and

14   Abbott, you've not applied for any other jobs?

15   A.   No.

16   Q.   Okay.  Going back to the question of the progressive

17   discipline policy and those -- the prospects --

18             THE COURT:  I'm allowing you questions based on my

19   questions, not --

20             MR. GOMAN:  Okay.

21             THE COURT:  You don't get recross.

22             MR. GOMAN:  No further questions.

23             THE COURT:  Okay.  All right.  Mr. Fresquez, thank

24   you for your testimony.  You may step down.

25             Do you have any further questions?

Direct - Bartmann

1          MR. STONE:  That's all our evidence.

2          THE COURT:  The defendant may call its first

3     witness.

4          MS. DALE:  Your Honor, the defense calls Cynthia

5     Bartmann.

6          THE COURT:  All right.

7          COURTROOM DEPUTY:  If you could please stand behind

8     the witness stand and raise your right hand.  Over here.

9          THE WITNESS:  Oh, you're giving it to me -- I'm

10    sorry.

11          CYNTHIA BARTMANN, DEFENDANT'S WITNESS, SWORN

12          COURTROOM DEPUTY:  Okay.  Please be seated.  And

13    please state and spell your name for the record.

14          THE WITNESS:  My name is Cynthia Bartmann.  It's

15    B-a-r-t-m-a-n-n.

16                    DIRECT EXAMINATION

17    BY MS. DALE:

18    Q.   Good afternoon, Ms. Bartmann.

19    A.   Good afternoon.

20    Q.   Can I have you briefly walk the Court through your

21    education.

22    A.   I have a undergraduate degree from the University of

23    Iowa in social work, a BA degree.  I've completed two

24    national certifications and completed continuing education

25    in the area of vocational rehabilitation for the last, like,

Direct - Bartmann

1   28 years.

2           MS. DALE:  And, Your Honor, I'm going to be

3   referring to the Stein report, which is in evidence.  It is

4   the plaintiff's rebuttal report to Ms. Bartmann.

5           THE COURT:  Okay.

6           MS. DALE:  So just so you know what I'm referring

7   to.

8           THE COURT:  Why don't you refer to it by an exhibit

9   number.

10          MS. DALE:  Is it 61?  Thank you.  Okay.

11  BY MS. DALE:

12  Q.   And, Ms. Bartmann, with respect to your education, one

13  of the criticisms of Dr. Stein in Exhibit 61 was that you

14  only hold a bachelor's degree in social work, which he calls

15  an unrelated field.  How do you respond to that?

16  A.   I strongly disagree with that.  In order to obtain my

17  two national certifications, I had to complete a college

18  transcript and provide that to them.  I had to have so many

19  credit hours in the area of vocational rehabilitation.  In

20  addition, I needed to have five years of supervisory

21  experience in the area of vocational rehabilitation.  I've

22  had my qualifications reviewed by the CDMS, and I've been --

23  I was able to sit for the exam over 28 years ago.

24          In addition to that, I've been qualified as a

25  vocational expert in approximately 13 different district

Direct - Bartmann

1    courts in the state of Colorado.  I've also been qualified

2    as a vocational expert in federal court.  I've been

3    qualified as a vocational expert by the Division of Workers'

4    Compensation after they had a chance to review my

5    qualifications.  I also hold a contract with the Social

6    Security Administration indicating that I meet the

7    qualifications to be a vocational expert for people applying

8    for Social Security disability

9    Q.    Okay.  And you mentioned a national certification.  I

10   believe you said it was CDMS.  Can you explain what that is.

11   A.    Yes.  CDMS stands for Certified Disability Management

12   Specialist, and CCM stands for Certified Case Manager.

13   Q.    So is that two separate certifications?

14   A.    They're two separate certifications.  Both of them I

15   obtained in 1992.

16   Q.    Okay.  And then going back to Exhibit 61, Dr. Stein

17   says that your national certifications do not qualify you to

18   do vocational evaluation or vocational rehabilitation

19   counseling.  Would you agree with that?

20   A.    Again, I disagree with that.  Part of the testing

21   material and part of our -- or all of the ongoing education

22   has been in the area of vocational rehabilitation.  That has

23   been my specialty for over 32 years.

24   Q.    And have you had your credentials reviewed by any

25   government agency?

Direct - Bartmann

1    A.    I have.  And that was with the Social Security

2    Administration that reviewed my credentials, and provided me

3    a contract as a vocational expert.  And I've also had the

4    Colorado Department of Labor for the Workers' Compensation

5    Division also review my credentials and provided me a letter

6    indicating that I met the qualifications, and has designated

7    me as a QRC which stands for Qualified Rehabilitation

8    Consultant.

9    Q.    Okay.  Can you walk us through your background -- your

10   employment background.

11   A.    Yes.  I started in the industry in 1987 working for a

12   company providing vocational services and vocational

13   evaluations mainly to the injured worker.  I changed

14   companies in 1992 and began working for Bonnie Hooth and

15   Associates, basically solely -- I shouldn't say solely, but

16   doing vocational evaluations with a little bit of career

17   counseling in job placement.

18        I left that employment in 2005 and I started my own

19   company in 2005 and have continued to complete vocational

20   evaluations since that time in a variety of settings.

21   Q.    Okay.  And can you explain to the Court what it is that

22   you do in your current position.

23   A.    Well, a vocational evaluation is basically assessing

24   someone's employability.  Assessing and answering the

25   question on what kind of wage can they expect to earn in the

Direct - Bartmann

1    labor market, if they have any barriers to employment, how

2    their barriers may affect their employability, and how long

3    it should take individuals to find work.

4            MS. DALE:  Your Honor, at this point, I would move

5    to certify Ms. Bartmann as an expert in the field of

6    vocational evaluations and employability.

7            THE COURT:  Any objection?

8            MR. STONE:  Subject to Mr. Stein's report, no

9    further objections, Your Honor.

10           THE COURT:  All right.  To the extent that's an

11   objection, it's overruled.  Ms. Bartmann is qualified under

12   Federal Rule of Evidence 702 to provide expert opinion

13   testimony in the field of vocational evaluations and

14   employability.

15   BY MS. DALE:

16   Q.   Ms. Bartmann, as a vocational expert, do you work

17   primarily for plaintiffs or for defendants?

18   A.   I do about 50 percent claimant work and 50 percent

19   defense work on most cases, yes.  50-50.

20   Q.   Okay.  And what were you asked to do as an expert in

21   this particular case?

22   A.   I was asked to complete a vocational evaluation and to

23   assess Mr. Fresquez's skills and abilities and what kind of

24   wage could he expect to earn in the labor market.

25   Q.   And do you use any particular methodology when you do

Direct - Bartmann

1    these types of employability evaluations?

2    A.    I use the same -- I go through the same steps and the

3    same methods in completing all vocational evaluations.  I --

4    it's commonly referred to as the RAPEL method.  And that is

5    the methodology that I used in completing this vocational

6    evaluation.

7    Q.    And can you explain what the RAPEL methodology is.

8    A.    Yes.  The R stands for rehabilitation.  Basically under

9    this category the first step is to understand any barriers

10   to employment, any physical or mental limitation.  Also to

11   assess an individual's skill level, assess their education.

12          The next step is the A, which is the access to the

13   labor market; how those skills and abilities fit into the

14   labor market.  Basically some people may refer to this as

15   assessing their transferable skills if they have any

16   transferable skills.

17          The P of that stands for placeability.  And this is

18   assessing how placeable they are in the general labor

19   market.  This is assessing how often jobs come available,

20   how their skills fit with the openings and how likely they

21   are to find employment.

22          The E would be for the earning, their earning

23   capacity.  What their skills command in the local labor

24   market.

25          And then the L portion of that is the labor market

Direct - Bartmann

1    participation of that, which is basically assessing,

2    especially in cases that have physical disabilities, will

3    they have to take an earlier retirement, will they have to

4    miss work due to their injuries or for doctor's appointments

5    and those types of things.

6    Q.    Okay.  And Dr. Stein in Exhibit 1 in his report said

7    you did not follow any methodology in giving your opinions;

8    is that true?

9    A.    I don't believe that's true.  I believe that if you

10   look at my report, they -- they are labeled, you know,

11   barriers to employment, it goes through his education.  I've

12   gone through these same steps in my report.

13   Q.    And Dr. Stein also criticizes the RAPEL method as not

14   reliable and not valid.  Do you agree with that?

15   A.    I strongly disagree with that.  When I went for my

16   national certification back in 1992, there was a book called

17   "The Rehabilitation Consultant Handbook" by Timothy Fields

18   and Mr. Weed.  And I believe that Dr. Stein also quotes them

19   in his report.  And they indicated at that time the RAPEL

20   method was probably the most common used method.

21        A couple of years ago I did continuing education

22   and I got the 4th Edition of the book and it lists the RAPEL

23   method as the most comprehensive method to use in completing

24   vocational evaluation.  I believe this shows that the

25   methodologies that I use will withstand the test of time.

Direct - Bartmann

1    It has been published and it's very well-known to use this

2    methodology.

3    Q.   Okay.  So can you describe now for the Court what

4    documents you reviewed to formulate your opinions in this

5    case.

6    A.   I had the opportunity to review Mr. Fresquez's

7    deposition, his interrogatories, the complaint, the answers

8    to the complaints.  I had the opportunity to review his

9    personnel records from the railroad.  In addition, I had the

10   opportunity to review wage information.  I also reviewed

11   information from employment records from the City of

12   Castle Rock and also SAFEBuilt.  And I was also provided

13   information on his current position from Charles Abbott.

14          In addition to that, I had the opportunity to

15   review Dr. Stein's report and Jeffrey Opp's report.

16   Q.   Okay.  Are there standard reference materials that you

17   use in performing any analysis?

18   A.   I do.  I just indicated one earlier, the Colorado --

19   "The Rehabilitation Consultant Handbook" is a book that I do

20   rely on.  The -- also rehabilitation professional that was

21   written by Daniel Turner.  I also rely on information from

22   the Bureau of Labor Statistics, the Colorado Department of

23   Labor.  I will also utilize information from the COCIS,

24   which stands for Colorado Career Information system.

25          Those are probably the main sources that I use in

Direct - Bartmann

1   forming an opinion.

2   Q.   Okay.  In this case, you did not interview Mr.

3   Fresquez; is that correct?

4   A.   That is correct.

5   Q.   And why is that not a concern for you?

6   A.   I feel like I was provided sufficient information

7   through his deposition and interrogatories, and all the

8   other information that I was provided, to provide an

9   accurate -- or arrive at an accurate opinion.

10  Q.   Another criticism of Dr. Stein in Exhibit 61 was he

11  felt that there was a need for aptitude testing of Mr.

12  Fresquez.  Do you agree with that?

13  A.   I strongly disagree with that.  I think in completing a

14  vocational evaluation, that it's important to use their

15  demonstrated abilities and what they've demonstrated in

16  their work-life.  Typically you do not see aptitude tests in

17  completing a vocational evaluation when someone has

18  graduated from high school.

19  Q.   Just as a general overview, what's your understanding

20  of the labor market in Colorado for the past three years?

21  A.   It's excellent.  We've had our lowest unemployment

22  rate.  It has varied between about a 2.4 -- at one time it

23  actually went down to a 2.2.  The highest it's been was a

24  3.3.  Right now it's a 2.9 percent unemployment rate.

25         In doing labor market research, employers are

Direct - Bartmann

1    indicating that they are not getting many applicants for

2    openings.  I believe it's an excellent job market for

3    individuals looking for work.

4    Q.   And then a little bit more specifically, what's your

5    understanding of the job market in the construction industry

6    for the past three years?

7    A.   Again, I believe it's an excellent job market.

8    Everything that I've seen has indicated that construction is

9    definitely growing in Colorado.  If you want to look at the

10   Colorado Department of Labor labor market information, they

11   indicated that from 2016 to the year 2026, construction is

12   growing faster than the average jobs in Colorado, so that is

13   also a really good indication of an excellent job market.

14           Like I indicated earlier, I believe it was an

15   excellent job market because there's not a lot of people

16   applying for jobs.  And when I completed market research, I

17   found that to be true in the construction industry.

18   Q.   Okay.  So now let's walk through the methodology that

19   you used in this particular case.  So starting with barriers

20   to employment, did you find any of those?

21   A.   No, I did not.

22   Q.   And then what is your understanding of Mr. Fresquez's

23   educational background?

24   A.   Well, he has a high school diploma.  He also has --

25   when he was with the railroad, he was able to receive

Direct - Bartmann

1    training and pass tests to become an inspector.  Since that

2    time, he has passed additional tests to be an inspector.

3    It's my understanding from reviewing the documents that he

4    also has a certification as a project manager.  He also had

5    had additional training in OSHA.  So I believe that he, you

6    know, is highly skilled.

7    Q.   Okay.  And Dr. Stein expressed concern, and I believe

8    described this as a red flag, that Mr. Fresquez has attended

9    three different high schools and eventually graduated from

10   an alternative high school.  Is that a red flag for you?

11   A.   It's not.  He -- high school graduate is a high school

12   graduate.  And since graduating from high school, he has

13   continued to show that he has skills and ability in the

14   profession in which he has chosen.

15   Q.   Okay.  Another criticism of Dr. Stein is that you did

16   not review Mr. Fresquez's training history; is that true?

17   A.   That's not true.  I was provided information from his

18   personnel records that outlined that he did receive training

19   and was able to pass several tests in order to inspect the

20   railroads -- or the tracks.

21   Q.   Dr. Stein also expressed concern because Mr. Fresquez

22   had studied to become a real estate agent, but did not pass

23   that test.  Did -- did that concern you?

24   A.   It did not concern me.  I interview many individuals

25   who have attempted to pass the real estate test and have not

Direct - Bartmann

1      been successful and are able to go on and have successful

2      careers in other industries.

3      Q.   And then another criticism from Dr. Stein is that Mr.

4      Fresquez had only at the time passed one out of eight tests

5      to be a building inspector.  Why wasn't that a concern for

6      you?

7      A.   Well, it wasn't a concern.  He took a test and he

8      passed it.  It shows he has the aptitude for it.  His work

9      history certainly shows he has the aptitude for it.  And

10     he's proven that he's been able to find employment as a

11     building inspector.

12     Q.   Is it your understanding that you can obtain these

13     certifications after finding work?

14     A.   That is correct.  When I did market research, in fact

15     many companies indicated that every city, every company,

16     every type of job may require a little bit different

17     certification, so it's very common for people to obtain

18     their certifications after employment.

19          In addition, when I did my market research, there

20     were several counties that indicated that an individual

21     would have like a year or two years in order to obtain

22     certain certifications.  That seems to be common in the

23     industry.

24     Q.   Okay.  What is your understanding of Mr. Fresquez's

25     relevant work history prior to working with BNSF?

Direct - Bartmann

1    A.   Well, prior to working there, he worked as a dietary

2    aide, and then he worked for a short time in customer

3    service, which indicates that he has good communication

4    skills.  And then he worked for the City and County of

5    Denver and he did some light maintenance work and, according

6    to his personnel file, he also did some inspections at that

7    point before going on and working at the railroad.

8    Q.   And then what was your understanding of the work he did

9    at the railroad?

10   A.   At the railroad, his last job, and the most important

11   job, obviously, is that he was an inspector and he inspected

12   the rails.

13   Q.   And did you understand whether he needed certifications

14   or training to do that?

15   A.   Yes, he did.  He -- they did -- the railroad did send

16   him to training for that.  He did have to pass -- I don't

17   know how many tests, but he did have to pass tests in order

18   to be certified to have that job.

19   Q.   Okay.  And you understand that Mr. Fresquez was

20   terminated in May of 2016 from BNSF, correct?

21   A.   That is correct.

22   Q.   Okay.  And what's your understanding of his work

23   history after that?

24   A.   Well, it's my understanding that from May until August

25   of 2016, he was unemployed.  At that point, he obtained a

Direct - Bartmann

1    part-time seasonal position with the Castle Rock as a roof

2    inspector.  It's my understanding that he was laid off of

3    that position in January of 2017 and was unemployed until

4    approximately August of 2017.

5         At that time, he obtained employment at SAFEBuilt.

6    It's my understanding that that might have been part-time at

7    first and then in October it was my understanding that went

8    full-time.  Again he was doing building inspecting, and he

9    maintained that employment until he obtained his current

10   employment with Charles Abbott, which would have been, I

11   believe, in November of 2018.

12   Q.   Okay.  So then can you explain what the research you

13   did was to determine available opportunities for Mr.

14   Fresquez.

15   A.   I'd be more than happy to.  If possible, I would like

16   to be able to review -- or look at my reports.  Otherwise, I

17   can explain briefly what I did.  But to provide all the

18   details, I would like to be able to look at my reports.

19        MS. DALE:  Your Honor, is it okay if she reviews

20   her report?

21        THE COURT:  Yes.

22        THE WITNESS:  So my initial report in October 25th

23   of 2017, at that point I did market research.  And when I do

24   market research, I do it in a variety of ways.  Sometimes I

25   just call random companies, sometimes I may look on an

Direct - Bartmann

1    Indeed.com.  And I will also utilize information from the

2    Colorado Department of Labor.  But when I did market

3    research in October of 2017, Charles Abbott, actually the

4    company that he's working for now, indicated that they had a

5    variety of projects going on in Denver and that not all

6    positions required a license, and that they were hiring

7    because it was an excellent job market in Denver.

8         I talked to the City of Lakewood.  They had several

9    openings for building inspectors.  The wage on those were

10   between 48,005 to 70,229 a year depending on experience.  At

11   that point, Arapahoe County had similar openings.  Lakewood

12   had similar openings, all at similar wages.

13        I talked to Enviro Care.  And that individual was

14   looking for environmental building inspectors that he was

15   willing to provide all training for at a wage of 50- to

16   75,000 a year.

17        And in talking to these companies, I felt that Mr.

18   Fresquez had the skills and ability to obtain these jobs.  I

19   believed they were just examples of employment

20   opportunities.

21        I also contacted the Construction Exam Center to

22   get information on how difficult it would be to get

23   additional certifications.  They indicated that it basically

24   took about 38 hours of studying and then they had a pass

25   rate of about 92 to 98 percent.  And in talking to Pearson

Direct - Bartmann

1    Vue, who administered the test, they indicated that many

2    individuals would take many tests within a short period of

3    time.

4            At that point, I also utilized information from the

5    Bureau of Labor Statistics to provide wage information.  And

6    I compared that wage information to my market research and

7    it was consistent.  Building inspectors, according to the

8    Bureau of Labor statistics for the Denver/Aurora area had 10

9    percentile, which is basically no experience at 44,730.  The

10   25th percentile had a wage of $55,040 a year.  The medium

11   wage was 66,410, and a wage in the 75th percentile with

12   79,370.  And in the 90th percentile, they had a wage of

13   95,870.

14           So I also looked at the unemployment rate and we

15   had an unemployment rate at that point of 2.4 percent.  So

16   based on this information is how I formulated my opinion.  I

17   continued to do labor market research that is outlined in my

18   second report of January 23d.  And in that report, I outline

19   that in December of 2017, I contacted the City of Longmont

20   and they had several openings for building inspectors.  They

21   had entry level on up to about three years of experience at

22   a wage of 25.15 to 27.95 an hour.  However, she stated if

23   they had any experience or certifications, that wage would

24   be higher.

25           I did contact the City of Aurora.  They had a

Direct - Bartmann

1    current opening in the building -- it was a building

2    compliance specialist, so they reviewed building codes and

3    those types of things, but I felt he would be a good

4    candidate for that at a wage of 31.44 an hour.

5         There were several other companies, including

6    Charles Abbott, that had openings but I was not able to

7    contact them.  In January of 2018, I reviewed job vacancies

8    through the Railroad Retirement Board.  And at that time,

9    there were -- the Union Pacific was hiring in Denver for

10   several different positions and apprenticeships.

11        I also contacted the City of Brighton and they were

12   hiring on building inspectors and I was advised to review

13   their website on a weekly basis.  And she indicated they

14   only had 15 applicants for the opening, which is very low.

15        Contacted the City of Aurora.  She said they hire

16   frequently and recommended that someone check their website

17   at least weekly and make separate applications for each job.

18        I contacted Pillar to Post.  They were hiring for

19   home inspectors, which was a little bit different, but an

20   opportunity to utilize his skills.

21        And in looking on Indeed.com, there were eight

22   pages of inspector positions and seven openings on each

23   page.  In March of 2018, I contacted VIVID Engineering

24   Group.  They were looking at an inspector at $30 an hour and

25   they wanted to have someone with two years of inspection

Direct - Bartmann

1  experience as well as a high school diploma.

2      I also contacted Commerce City, who also had

3  openings for building inspectors.  The one they had open was

4  at 57,421 per year.

5      I talked to Build Safe -- or Build Safe was

6  advertising for field inspector.  And additional, the cities

7  of Thornton, Denver, and Aurora were also advertising for

8  inspectors at that time.  Indeed.com had five pages of

9  openings for inspectors and related jobs.  In July of 2018,

10  there were building inspectors opening in Adams County in

11  the City of Brighton and, according to the Colorado

12  Department of Labor labor market information, there were 18

13  job openings available on 7-23 of '18.

14      In November of 2018, I also checked the Colorado

15  Department of Labor labor market information.  They had 22

16  openings for construction and building inspectors that were

17  available on 11-7 of '18 with a mean wage of 62,533 a year.

18      In January of 2019, I spoke to a recruiter at an

19  employment agency who indicated that they did have -- they

20  occasionally had openings for inspectors at a wage of 20 to

21  $40 an hour with the average wage being $30 an hour.

22      I also talked to Blue Sky Solar and Roofing

23  Company.  They were hiring inspectors at a wage of 45- to

24  68,000 a year.  Additionally, I found openings in Adams

25  County, Denver County, which was Denver Water, were hiring.

Direct - Bartmann

1    Adams County had a wage of 54,786 a year to 60,704 a year

2    for that particular opening.

3            The Colorado Department of Labor indicated there

4    were 24 job openings for building and construction

5    inspectors in the Denver metro area on January 20th of '19

6    with a mean wage of 62,533 and a top wage of $73,819 per

7    year.  I also reviewed vacancies through the Railroad

8    Retirement Board and there were many -- actually, I think I

9    said hundreds of openings throughout the nation.  At that

10   point, the Colorado unemployment rate was 3.3 percent, which

11   was also a good indication that Colorado Department of Labor

12   indicated that inspectors were in the medium demand category

13   with a growing outlook, and they projected a 10 percent

14   growth from the year starting in 2016 to 2026.

15           The Colorado labor market information, which I will

16   probably keep referring to it as the LMI, indicated that

17   this was faster than average for all occupations.

18   Q.   Okay.  And based on your research and your review of

19   the existing documents, do you believe that Mr. Fresquez

20   made reasonable efforts to find full-time work after he was

21   terminated in May of 2016?

22   A.   I do not believe he made a good faith effort to find

23   full-time work after he was terminated.

24   Q.   Why not?

25   A.   I believe that in order to find full-time work, you

Direct - Bartmann

1    have to put in full-time effort.  Full-time effort, I would

2    indicate, is six to eight hours a day.  I believe that

3    full-time effort means that you are contacting at least five

4    companies a day, you are using recruiters, you are using the

5    work force center, you are going on individuals websites,

6    you are utilizing Indeed, you are networking.  There's just

7    so many resources now to use to look for jobs.

8         I believe my market research indicates that there

9    were lots of jobs that Mr. Fresquez did not apply for.  And,

10   in fact, in reviewing his documentation, he applied for less

11   than one job per week during the time that he was

12   unemployed.  I do not believe that's a good faith effort in

13   finding work.

14   Q.   Mr. Fresquez also indicated that all of the job

15   applications he submitted were online.  Do you think that's

16   a sufficient effort?

17   A.   You know, only about 20 to 30 percent of individuals

18   find work by just submitting applications online.  So,

19   again, that's why you utilize recruiters, that's why you

20   utilize the work force center, where you cold call

21   companies, where you go on the different websites for

22   companies directly.

23        And just going online and filling out one

24   application a week is definitely not a good faith effort.

25   Q.   In your opinion, if Mr. Fresquez had put in sufficient

Direct - Bartmann

1    effort into finding a job after he was terminated, how long

2    would it have taken him to find full-time employment?

3    A.    Well, I believe that most individuals are able to find

4    full-time employment with a good job in one to two months.

5    Q.    And is that consistent with the job research you did

6    for the particular industry he was looking at?

7    A.    I do.  And the other thing to factor into is he applied

8    for -- I can't remember if it was 52 or 57 jobs that he

9    applied for.  But if he would have applied for five jobs a

10   day, he would have applied for 50 jobs in a two-week period

11   of time.  I believe he would have had employment.

12   Q.    In your opinion, what wages could Mr. Fresquez have

13   been earning within that one to two period -- one- to

14   two-month period if he had put in sufficient effort?

15   A.    Based on my market research, I believe that $30 an

16   hour, which is approximately sixty-two-five a year is a wage

17   that his skills command in the local labor market.

18   Q.    And would that have been a starting wage?

19   A.    That would have been definitely a starting wage.  I

20   think the wage information outlined in my report that

21   indicated wage potential up to 95,000 is very doable.  Mr.

22   Fresquez is a younger individual.  I also do -- you know,

23   indicate that he could go into supervisory positions and

24   management positions that would even have a higher wage.  So

25   obviously the sixty-two-five a year is the wage that I

Direct - Bartmann

1    believe he would have started at.

2    Q.   Okay.  And then I want to address a couple of more of

3    the issues that Dr. Stein raised.  He says that you refer to

4    the Bureau of Labor Statistics wage data but you don't

5    specify whether it was a U.S. or Colorado.  Why didn't you

6    specify?

7    A.   Because there's only one Bureau of Labor Statistics.

8    The Bureau of Labor Statistics is the Bureau of Labor

9    Statistics, which is the statistical arm of our federal

10   government.  So I did not believe that needed clarification.

11   Q.   Okay.  Another issue he raised that you didn't specify

12   the date of the earnings, the BLS earnings.  Can you address

13   that.

14   A.   Yes.  They are updated on a yearly basis, so when I

15   went on in 2017, that was the wages listed.  I could have

16   put 2017 in my report.  I felt it was self-explanatory.

17   Q.   Okay.  He also notes that you didn't specify what labor

18   market area you were looking at.  What's your response to

19   that?

20   A.   Well, the only labor market to look at is the

21   individual's labor market where they live.  So Mr. Fresquez

22   lives in Denver, so I obviously looked at the Denver area.

23   The Colorado Department of Labor labor market information,

24   they're going to have it as the Denver/Aurora area because

25   that's how they have it listed for wages.  So, again, I felt

Direct - Bartmann

1    that was self-explanatory that I was looking in the local

2    labor market.

3    Q.   Okay.  Dr. Stein says that Mr. Fresquez was not

4    qualified by training or experience to be a building

5    inspector.  Do you agree with that?

6    A.   I strongly disagree with that.  That's what he's doing

7    now; that's what he has the skills to do.  I strongly

8    disagree with that statement.

9    Q.   And then, finally, one last issue that Dr. Stein

10   raised.  He says that both vocational evaluation standards

11   and professional code of ethics require both assessment of

12   client capabilities and job demands, Ms. Bartmann failed to

13   do either.  I assume you would agree that to do your

14   analysis you would need to assess client capabilities and

15   job demands?

16   A.   Yes.  And I firmly believe I did that.  I firmly

17   believe I outlined those in my report.  When you talk about

18   ethics, what my code of ethics indicates is that each client

19   deserves an objective and fair vocational evaluation and I

20   firmly believe I did that.

21          MS. DALE:  No more questions at this time.  Thank

22   you.

23          THE COURT:  All right.  Thank you, counsel.

24          Cross-examination.

25                          CROSS-EXAMINATION

114

Cross - Bartmann

1    BY MR. STONE:

2    Q.   Thank you, Ms. Bartmann.   In reviewing your opinion --

3    sorry, I have to adjust this -- is that Fresquez's skill set

4    is best suited to obtain alternative employment in the

5    construction and building industry.   Is that correct?

6    A.   As an inspector, correct.

7    Q.   Okay.   And your opinion contained in your report

8    prepared for this matter, the basis of your opinion is he

9    should have obtained employment sooner; is that correct?

10   A.   That is correct.

11   Q.   And the primary basis of that is he should have been

12   applying to five jobs a day; is that correct?

13   A.   That is correct.

14   Q.   And that basis is -- what's the industry standard

15   that's based on?

16   A.   Well, I believe that if you want to find publications,

17   Daniel Turner has a book called "The Rehabilitation

18   Professional" and outlines that individuals, to put

19   full-time work, needs to find employment 40 hours a week.

20   That is outlined in my report.   That is how I was trained.

21        I believe if you talk to most vocational evaluators

22   out there, we have the same training and the same

23   understanding of what it takes to find employment.

24   Q.   There was no citation within your report regarding the

25   five days -- a day, correct?

Cross - Bartmann

1   A.   Actually, in my second report, I do believe I

2   indicate -- I do indicate that.  I can check my second

3   report, if you --

4   Q.   Your general --

5   A.   -- if you'd like me to.

6   Q.   I'm sorry, go ahead.  Your general indication that it

7   requires full-time work to find full-time employment, right?

8   But there's -- but there's no authority or standard cited

9   within your report indicating that this is required; is

10  there?

11  A.   I believe in my second report, I do have documentation

12  to also support my opinion.  I can check my second report if

13  you'd like me to.

14  Q.   Do you recall being asked about that at your

15  deposition?

16  A.   I do.

17  Q.   Do you recall giving an answer that there is no

18  industry standard regarding the five days?

19  A.   There's --

20  Q.   Five jobs a day?

21  A.   There's nothing written saying that everybody is going

22  to agree with that; however --

23  Q.   So, therefore, my question being:  There's no industry

24  standard that requires that he apply to five jobs a day,

25  correct?

Cross - Bartmann

1    A.    I don't believe it's written down.  I believe that if

2    you ask, I would say every vocational evaluator that I have

3    come in contact with would agree with me that it requires

4    full-time effort.

5    Q.    But to answer my question, there's no industry

6    standard.

7    A.    There's no industry standard that is written down.

8    Q.    Thank you.  That's just the standard that you tell your

9    clients in order to get a job -- full-time work requires

10   full-time efforts to get in, correct?

11   A.    In addition to telling the clients, I tell them that

12   based on my training and based on the publications that I've

13   read that this is what it takes to find full-time work.  And

14   individuals who do that are able to find full-time work

15   within a very short period of time.

16   Q.    That's your personal preference, correct?

17   A.    It's my professional preference.

18   Q.    Okay.  Are you aware what, if any, job placement

19   services that the RRB provides to railroad workers who've

20   lost their job to find employment?

21   A.    I've been aware that they do have vocational services

22   for some employees.

23   Q.    Not aware of any of the specifics?

24   A.    No.

25   Q.    Okay.  Your opinion in your report does not perform a

Cross - Bartmann

1   calculation of Fresquez's lost wages or benefits.  That's

2   correct, right?

3   A.   That's correct.

4   Q.   Outside of the scope of your expertise, correct?

5   A.   I believe firmly that he is able to return to work at a

6   job with a wage that was what he was earning with the

7   railroad, and I believe he would have similar wage

8   potential.

9   Q.   To that of the railroad?

10  A.   That's correct.

11  Q.   Okay.  And what do you form that basis on?

12  A.   Well, basically looking at the information found in the

13  Bureau of Labor Statistics.  I don't have his wage potential

14  exactly with the railroad and I will indicate that, but I

15  believe that the job he's at now has a lot of growth

16  potential --

17  Q.   But nowhere in your written report prepared for this

18  matter do you indicate railroad wages; is that correct?

19  A.   That is correct.

20  Q.   All right.  It's in your opinion that there were job

21  openings in the building and construction trade during the

22  time period of 2016 to 2017 for which Fresquez was looking

23  for employment; is that a correct summary of your report?

24  A.   That is correct.

25  Q.   What data source did you use to determine what job

Cross - Bartmann

1  openings there were in 2016 to 2017?

2  A.   Well, if you look at my report with the Colorado

3  Department of Labor labor market information, that

4  information goes back to 2016 that indicates that jobs in

5  this industry is expected to have a faster than average

6  growth rate of about 10 percent.  That is consistent with

7  other market research that I have performed throughout the

8  years.

9  Q.   Do you recall being asked in your deposition about

10  whether you looked for data regarding job openings in 2016,

11  2017?

12  A.   I don't recall.

13          MR. STONE:  Your Honor, I have the official

14  transcript.  May I approach?

15          THE COURT:  Why don't you hand it to Ms. Frank and

16  she'll hand it to the witness.

17          THE WITNESS:  Thank you.

18  BY MR. STONE:

19  Q.   Can you turn to the tabbed page and refer to the

20  question that starts with:  And that was from 2018.  Did you

21  ever look to see what job openings there were in 2016 --

22          THE COURT:  Hold on.

23          MR. STONE:  I'm going too fast.

24          THE COURT:  Let her get there --

25          MR. STONE:  I'm just trying to confirm.  The tabbed

Cross - Bartmann

1    page --

2              THE COURT:  Hold on.

3              THE WITNESS:  I'm there.

4              THE COURT:  Let her confirm she's there.  All

5    right.

6    BY MR. STONE:

7    Q.   Yeah.  That's where I'm at.  You can confirm, ma'am,

8    that's --

9    A.   What --

10   Q.   -- that we're looking at the same thing.  I want to

11   make sure.

12   A.   Yes.

13   Q.   And the question is:  And that -- referring to you were

14   talking about data from 2018 in the previous question.

15             The question I'm reading from the record:  And that

16   was from 2018.  Did you ever look to see what job openings

17   were in 2016 through 2017?

18             What was your answer, ma'am?

19   A.   I -- my answer was:  I did not look at how many job

20   openings there were in 2016, 2017.  Based on my experience

21   and my market research, this has been consistent that

22   Denver's been booming for many years.

23   Q.   Thank you.

24             MR. STONE:  May I approach, Your Honor?

25             THE COURT:  Yeah.

Cross - Bartmann

1    BY MR. STONE:

2    Q.   So based on your report prepared in this matter,

3    although you give salary ranges, your opinion is that Mr.

4    Fresquez should earn an income of $62,500 annually; is that

5    correct?

6    A.   That is correct.

7    Q.   All right.  Do you think Mr. Fresquez would have --

8    based on your opinion in this matter and the data you've

9    reviewed and the materials you reviewed, do you think Mr.

10   Fresquez would have trouble staying employed?

11   A.   No.

12   Q.   Based on your data you reviewed and your material you

13   reviewed and your opinion in this matter, do you have any

14   belief -- reason to believe that Mr. Fresquez would have

15   trouble staying employed at BNSF?

16          MS. DALE:  Objection, Your Honor.  Beyond the scope

17   of her report or expertise.  She wasn't talking about BNSF.

18          MR. STONE:  She was talking about -- I'm sorry,

19   Your Honor, but I was going to address it.

20          THE COURT:  Address it, please.

21          MR. STONE:  She was going to -- talking about how

22   he can stay employed and there's not going to be any issues

23   with employment, I think that's certainly fair game to ask

24   if there's any issues with his employment, staying employed.

25          THE COURT:  No.  I agree with counsel that that's

Redirect - Bartmann

1   not what she was asked to look at in terms of looking back

2   at his ability to stay employed at the company where he was

3   discharged.  So sustained.

4          Next question.

5          MR. STONE:  Thank you, Your Honor.

6   BY MR. STONE:

7   Q.   Are you aware of what effect Mr. Fresquez being

8   terminated from the railroad had on him, based on your

9   evaluation and your opinion?  Did you look into that matter?

10  A.   Based on my professional opinion, I've had many, many

11  people who have been let go of a position and they -- it's

12  not a detriment to future employment.  I think being at the

13  railroad for 11 years speaks volumes to his stable work

14  history.  I believe that is more of an advantage than a

15  disadvantage.

16         MR. STONE:  No further questions, Your Honor.

17         THE COURT:  All right.  Redirect.

18         MS. DALE:  Your Honor, can I put the transcript

19  back in front of her?

20         THE COURT:  All right.

21                  REDIRECT EXAMINATION

22  BY MS. DALE:

23  Q.   And if you could go back to the portion of the

24  transcript that Mr. Stone was just asking you about.

25  A.   I am there.

Redirect - Bartmann

1    Q.   Okay.  And so he started at page 43.  And it says:  And

2    that was from 2018.

3         And explain what it was you were actually talking

4    about there.

5    A.   What -- it's my understanding -- and I can take a look

6    at it -- I did not start my market research in 2016;

7    however, the Colorado Department of Labor labor market

8    information provides information regarding what the labor --

9    what the job market was like starting clear back in 2016.

10   Q.   And why didn't you start your research in 2016?

11   A.   I did not have the referral in 2016.  And at that time,

12   Mr. Fresquez, at the beginning of 2016, was employed.

13   Q.   When were you hired?

14   A.   I was hired in 2017.

15        MS. DALE:  No further questions.  Thank you, Your

16   Honor.

17        THE COURT:  All right.  May this witness be excused

18   for the defendant?

19        MS. DALE:  Yes, Your Honor.

20        THE COURT:  For the plaintiff?

21        MR. STONE:  Yes, Your Honor.

22        THE COURT:  All right.  Ms. Bartmann, thank you so

23   much for your testimony.

24        THE WITNESS:  Thank you.

25        THE COURT:  You're excused.  You may step down.

1          MR. STONE:  May I approach to get the --

2          THE COURT:  Oh, sure.  Does the defendant have

3   another witness?

4          MS. DALE:  We do not, Your Honor.

5          THE COURT:  Okay.  I have questions for counsel

6   here.  Let me start with questions for the plaintiff.  So

7   who wants to be on the hot seat?

8          In the briefing that I was looking at, one of the

9   issues was whether I should be following some of the cases

10  that talk about a period of time for front pay that I should

11  determine as opposed to a specific damage amount.  So, just

12  hypothetically, just say that that -- that that's what I

13  would do.  If I decide that awarding front pay through

14  August of 2045 would be a unreasonable windfall for the

15  plaintiff, in your view, Mr. Thompson, what other length or

16  period of time should I use to decide how -- for what period

17  of time he should be awarded front pay?

18         MR. THOMPSON:  Your Honor, first, we don't think it

19  would be a windfall.  The issue here is not essentially

20  gratuitous wages to Mr. Fresquez.  The economist, the only

21  economist that testified, identified the difference in what

22  he would have made at BNSF and what he will make now.

23  Really the dispute should be what amount he would have made.

24  BNSF's expert thinks he would have made more money than our

25  economist.  That's where the fight is, not the length of

1    time.

2              THE COURT:  Well, you're not answering my question.

3              MR. THOMPSON:  I'm not, Your Honor.

4              THE COURT:  I'm not saying that I'm going to decide

5    that, I'm not prejudging this issue, I'm not going to make a

6    decision today, I'm going to take the motion under

7    advisement and rule later.  I'm trying to anticipate several

8    questions that I may have in my own mind depending on how I

9    go with this, and after reviewing the transcript of today's

10   hearing.

11             So hype -- again, I'll start with the word

12   "hypothetically."  If I were to decide that I am not going

13   to award front pay for another 26 years, does the plaintiff

14   have a fall-back position in terms of what would be the

15   reasonable period of time for front pay to be awarded?

16             I am assuming that you disagree with the

17   defendant's position that it should be limited to two to

18   three years.  That somehow the defendant believes -- or has

19   argued that there's some kind of custom or practice in this

20   district to award front pay for that period of time.  So

21   let's assume I don't accept that either.  Where in the

22   middle should I come in -- and not necessarily in the

23   middle -- where in between should I come out and what would

24   be a rational basis for that?

25             MR. THOMPSON:  Your Honor, my cocounsel has written

1   down 13 years, but the truth is, I have no idea.  Our

2   economist has calculated the -- what he's lost -- what Mr.

3   Fresquez has lost as a result.  It's a make-whole statute.

4   And so I don't know that there's any magic number of years

5   short of what our economist calculated that would make him

6   whole.

7           THE COURT:  Right.  But his -- but then a necessary

8   predicate for his opinion that your client -- let me get the

9   numbers here -- in terms of back pay, I don't -- I don't

10  think that there's much to dispute there, but in terms of

11  lost future earnings, $927,000 and change lost in Tier 1;

12  the annuity pension, $247,000 and change in lost Tier 2;

13  annuity pension income, 163,000 and change.

14          So to get to those numbers, a necessary -- an

15  absolutely necessary predicate is that he assumes that the

16  plaintiff -- but for what the jury has determined to be a

17  retaliatory discharge, that but for that event Mr. Opp

18  assumes that the plaintiff would remain employed at BNSF

19  through the month he turns 60.

20          So I don't -- I don't understand what you're

21  saying -- how you can argue that the length of time is not

22  part of the dispute here.  I think it's an integral part of

23  the dispute.

24          MR. THOMPSON:  I understand Your Honor's question.

25  To answer the question that wasn't asked, but is entailed in

1    it:  To do the opposite, to arbitrarily pick a number, would

2    be a windfall to the defendant who was in the wrong here.

3    And so it is fair in these circumstances to assume he worked

4    for -- to the end of his career, especially in the union

5    environment where they can't fire him willy-nilly.  He would

6    have had to violate a workplace rule violation that rose to

7    a certain level to warrant termination that would ultimately

8    be reviewed by an arbitrator.

9         And so it is far more speculative to pick an

10   arbitrary date where he would have been terminated.  That

11   being said, to answer the Court's question, frankly, I don't

12   have any faculties, nor does the defendant, that the Court

13   does not have if we are going to pick some arbitrary number

14   of years.  There's no industry standard, there's no formula,

15   it's simply what the Court deems is fair.

16        THE COURT:  The defendant has cited cases that --

17   circuit cases -- or at least one circuit case that talks

18   about the different situation that's presented to a judge in

19   this situation where the employee is close to retirement age

20   and an employee that's decades away from retirement age.

21   And that at least some courts have recognized that that is a

22   factor that the Court should consider in terms of the

23   reasonableness of a front pay award because they're

24   speculating -- there's necessary speculation in all this,

25   right?  We're talking 26 years.  No one in this room knows

1    what's going to happen in the next 26 years, for any of us

2    or for the plaintiff in the particular.

3            One could -- one could argue -- and I'm sure the

4    defendant would agree with this -- that there's no way for

5    us to know that, you know, in five years your client could

6    not get the training to become a journeyman electrician or

7    welder -- journeyman welder, which I think in this state

8    would get him pretty comparable, if not higher --

9    significantly higher wage.  Granted with the -- with this

10   railroad industry union bargained-for benefit package, that

11   is incredibly generous, far beyond what most employees get

12   in the private sector -- or nonunionized private sector.

13   But that at some point if journeymen and electricians are

14   making 100,000 in Colorado, that we don't know that your

15   client couldn't get there in five years if he wanted to, or

16   applied himself to.

17           So there's all these -- there's a whole host of

18   unknowns and speculation.  I'm just trying to get at what

19   would be a reasonable way for me to approach this if I

20   decide that it's unfair to the defendant to basically hand

21   your client the present value of what he would have earned

22   for the rest of his working life, and that it would be

23   unfair to the plaintiff to limit it to two years.  And I'm

24   struggling here to get to some point in between.

25           MR. THOMPSON:  I understand the Court's struggle.

1    And I don't think it's something that the defendant or the

2    plaintiff can resolve because, you know, we don't have any

3    faculties that the Court does not have when it comes to that

4    kind of future speculation.  What I will say is that context

5    matters.  And so certainly in a case where -- you know,

6    let's say it went to trial in a nonunion environment and Mr.

7    Fresquez was just sitting home.  Is it fair to award him 26

8    years future wage loss?  Of course not, because at some

9    point he's going to find a job, he's going to get back to

10   work, or a job where there's a high turnover rate.

11         Is it fair to award somebody 26 years in that

12   context?  Probably not, because there's probably going to be

13   turnover.  But in an industry like this, where, especially

14   after 10 years, the turnover rate is, you know, slim to none

15   because these guys become vested in their RRB retirement.

16   Once you hit 10 years, you work until you -- you hit your

17   30/60.

18         You know, frankly, I think it's more likely he

19   would pass away than he was going to leave BNSF and our

20   expert did include that.  He uses the -- you know, the

21   average age of death when calculating wage loss, and if it

22   had been before when Mr. Fresquez could have retired, the

23   wages would have been less.

24         THE COURT:  Do you think I should look at this

25   issue exactly the as same if your client were 24 instead of

1    34?

2           MR. THOMPSON:  No.  Context matters.  Before they

3    become vested in the RRB, the turnover is higher.  Before

4    they get to the point in the seniority roster where Mr.

5    Fresquez was and they can be furloughed, turnover is higher.

6    If BNSF had wanted to, and if the evidence supported, I'm

7    quite certain they would have shown evidence that, look,

8    after 10 years, people still quit at this rate.  It just

9    doesn't happen.  That's why you didn't hear that evidence.

10          Young guys quit because they get furloughed and

11   they find other work or they move or they get married,

12   things like that.  Mr. Fresquez was at a point in his life

13   where -- we are looking into the future, either way.  And

14   our best guess is what would happen in the future is that he

15   would have retired at BNSF.

16          THE COURT:  Do you know -- do you have information

17   that you can represent to me as an officer of the court that

18   historically speaking an employee of -- a CBU member of

19   BNSF, once they hit 10 years, the likelihood that they would

20   be laid off is slim to none?

21          MR. THOMPSON:  The chance of Mr. Fresquez being

22   laid off was slim to none.

23          THE COURT:  All right.  And you base that on your

24   knowledge of industry and company historical practices?

25          MR. THOMPSON:  Yes.

1          THE COURT:  All right.  One second.

2          What's your view -- defendant makes a view -- I'm

3     going to ask the defendant's counsel, of course, this

4     question, but I want to get your position -- future lost

5     earnings versus equitable front pay.  I don't know from my

6     experience that the Tenth Circuit really makes much of that

7     distinction.  What's your view?

8          MR. THOMPSON:  I don't know that it makes much of a

9     distinction either.  What I will say is none of case law

10    cited by defendant are FRSA cases.  The FRSA statute is a

11    make-whole statute that is more plaintiff friendly because

12    of a history of retaliation than any of the cases -- or,

13    rather, the laws under which the cases the defendant cited

14    are brought.

15         The only FRSA case cited was by the plaintiff,

16    which was the *Wooten* case, which a very similar wage loss to

17    which the plaintiff seeks in this case was sustained as

18    being reasonable in that context.

19         THE COURT:  How long of a front pay period was

20    that?

21         MR. THOMPSON:  I think it was 1.4 million.  I can

22    pull the brief --

23         THE COURT:  No, the period of time.

24         MR. THOMPSON:  It would have been similar, because

25    similar wages.

1           THE COURT:  30-some years?  20 --

2           MR. THOMPSON:  20-some years.  I don't want to

3    speak out of turn, but it's the *Wooten* case that was

4    sustained against the same defendant for wage loss.

5           THE COURT:  And so you think the statute under

6    which the claim was brought makes a material difference in

7    the analysis here?

8           MR. THOMPSON:  Yes.

9           THE COURT:  All right.  And beyond the reason that

10   you just stated, is there any other reason why you think it

11   does?

12          MR. THOMPSON:  If you read the legislative

13   history -- and this is really just expounding on what I

14   said -- the law is designed to err against the defendant and

15   on the side of the plaintiff.  Even the burden-shifting

16   framework is wholly unique, and that's because of a history

17   of retaliating against employees.  And so what Congress said

18   is, Look, you no longer get the benefit of the doubt.

19          It makes sense that would continue in looking at

20   wage loss.  BNSF should not get the benefit of the doubt.

21   When we're having to speculate as to when Mr. Fresquez would

22   have no longer worked at BNSF because of their history of

23   retaliating, Congress said they do not get the benefit of

24   the doubt.

25          THE COURT:  This is in the legislative history?

1          MR. THOMPSON:  Yes, Your Honor.

2          THE COURT:  That there's some kind of recognition

3    or acknowledgment of a history of retaliation by the

4    industry?

5          MR. THOMPSON:  Yes.

6          THE COURT:  Wow.

7          MR. THOMPSON:  Yup.  That's why they adopted the AR

8    21 burden-shifting framework.

9          THE COURT:  Say that again slower.

10         MR. THOMPSON:  It's why Congress adopted into the

11   FRSA the AR 21 burden-shifting framework.  Instead of

12   McDonnell Douglas where they can rebut and then we have to

13   prove, it's really the other way around.  Once we prove that

14   his protected activity in some way contributed to

15   termination any way whatsoever, 1 percent, it's really going

16   to assume at that point the defendant violated the law and

17   they have to disprove it.  It's because of a history of

18   retaliation that's well-documented in the Congressional

19   notes.

20         THE COURT:  So the plaintiff doesn't have to show,

21   under this statute, any kind of pretext.

22         MR. THOMPSON:  Does not.

23         THE COURT:  Interesting.  All right.  Thank you.

24         MR. THOMPSON:  Thank you, Judge.

25         THE COURT:  All right.  Who's going to -- all

1    right.

2         MS. DALE:  I will give it a shot, but I may to have

3    pass the buck if I don't know the answer.

4         THE COURT:  Okay.  One second.

5         So let me start with the same first question, Ms.

6    Dale, that I started with Mr. Thompson, which is:  I've not

7    made a decision, I'm taking this matter under advisement and

8    I'm not prejudging it, but if I decide that two years would

9    be a windfall for the defendant and 26 years would be a

10   windfall for the plaintiff, what can I rationally base a

11   front pay period in between those two numbers?

12        MS. DALE:  Well, Your Honor, we've cited cases in

13   our response that indicate two to three years is a fairly

14   common front-pay period.  The other thing I would note,

15   though, is that from the time of termination to now, we've

16   already got over three years.  So I don't think you can take

17   front pay completely isolated because when the total pay by

18   the time of judgment is going to be more than five years, I

19   think that's more than sufficient time for Mr. Fresquez to

20   find equivalent employment, especially when you're looking

21   at -- first of all, the lack of mitigation that Ms. Bartmann

22   testified to, but also when you look at the BLS statistics

23   that say in the 90 percentile, it's $95,000 per year is the

24   typical wage in the construction inspection industry.  He's

25   had five years to get there.  That's the wage he was making

1    when he left BNSF.

2         THE COURT:  Well, two things I want to unpack

3    there.  One is the five years -- part of it is back pay,

4    right?  Because back pay -- unless the statute defines it

5    differently than other employment context, back pay is from

6    the date of termination through the date of the jury

7    verdict.

8         MS. DALE:  That's true, but, Your Honor, if the

9    case took 10 years to get to trial, would you still get two

10   to three years front pay?  I mean, the whole thing is lost

11   wages.  So it's how much they should be compensated for from

12   the time of termination going forward, and whether part of

13   that's back pay or part of that's front pay.

14        THE COURT:  All right.  So you're arguing I should

15   take into account the fact that a portion of this period is

16   compensated via back pay --

17        MS. DALE:  Correct.

18        THE COURT:  -- and there's a certain amount of time

19   and I should -- okay, I think that's -- that's not something

20   I would disagree with.

21        In terms of Ms. Bartmann's testimony and your

22   second point about the 90th -- 95th percentile, 75th

23   percentile, I thought she was very careful to talk about

24   wage comparisons, and I didn't hear her talking about fringe

25   benefit comparisons.  And in my mind, an employee that's

1    making $30 -- you know, $30 an hour, 60-some thousand a

2    year, 62,000, which is roughly where the plaintiff was when

3    he was discharged, making at BNSF where you have a defined

4    benefit program, you have an employee stock option plan, and

5    a 401(k) plan, and what sounds like pretty strong health

6    insurance, compared to someone making 62,000 as a Kmart

7    store as a manager, those are not comparable positions.  And

8    we can't -- we can't just compare the salary, the wages.

9            MS. DALE:  And, Your Honor, I -- with respect to --

10   at least to the medical insurance part, I would refer Your

11   Honor to the briefing on that issue.  There is a split in

12   the circuits as to whether you should look at the value of

13   the premiums that were paid by the employer versus what

14   they're out of pocket.

15           It's our position, consistent with the

16   Ninth Circuit, that the actual value of the damages is

17   what's out of pocket, so --

18           THE COURT:  But, unfortunately, the Tenth Circuit

19   hasn't spoken on that.

20           MS. DALE:  Exactly.  So that's why we're cheering

21   for the Ninth Circuit.

22           THE COURT:  There's two -- all right.  Well, I

23   guess on your side of things that's probably a rare time --

24           MS. DALE:  That is exactly right.  But there's been

25   no evidence whatsoever that he was out of pocket anything,

1    so if he has coverage, the only concern he's really

2    expressed with respect to insurance coverage is his son, and

3    he did testify that his son went from his coverage to his --

4            THE COURT:  Okay.

5            MS. DALE:  -- mother's coverage.

6            THE COURT:  But as I recall, was -- it was

7    explained to me by plaintiff's counsel, in answer to the

8    question that Mr. Fresquez was not able to answer

9    specifically, which is it appears that the defined benefit

10   plan, the Tier 1 is, if not exclusively prime -- it's very

11   primarily or very much primarily funded by BNSF.  That is a

12   fringe benefit that almost no employee in this country --

13   not no, but I read an article recently that the number of

14   employers that still offer defined benefit plans are a

15   minuscule percentage of employers in this country.  So

16   that's a benefit -- that's a benefit that most other

17   companies would not offer the plaintiff.

18           So I'm -- my view of this is is that we can't just

19   look at the salary.  It has to be a more holistic view of

20   salary, benefits, in this case a defined benefit pension

21   plan, a Tier 2 plan.  And so -- and so while Ms. Bartmann

22   had some good points, and some fair points, correct me if

23   I'm wrong, she was just talking about how long it would take

24   for the plaintiff to make the same salary as opposed to

25   salary and fringe benefit package.

1          MS. DALE:   That's correct, Your Honor.   The point I

2    would make there is that Mr. Fresquez has been at a new job

3    since November of 2018.   Mr. Opp did a revised report since

4    then, talked to Mr. Fresquez, and just simply didn't get

5    information about what his benefits are.   So I don't think

6    there should be any argument for benefits going from this

7    change of job forward where they just simply didn't bother

8    to get the evidence.

9          He's just assumed that he has the same benefits at

10   Charles Abbott as he did at SAFEBuilt.   That may not be

11   true.   Charles Abbott could be one of the minuscule number

12   of employers that has a pension.   We just don't know.

13         THE COURT:   I would doubt it, but let me keep

14   pushing you to see if I can get an answer from you.   If I,

15   hypothetically, without prejudging it, if I decide that

16   two-year front pay period is a windfall for the defendant

17   and 26 is a windfall for the plaintiff, where in between

18   those two numbers can or should I go, and what would be a

19   basis for me to get there?

20         MS. DALE:   If Your Honor says that two is not

21   enough, then I would argue for a three to four.   That would

22   give a total of six to seven years to get from termination

23   to a comparable wage.   And, really, that's what lost wages

24   are supposed to be, something to get you back on your feet;

25   not supposed to be a pension or an annuity for the rest of

1    your life.

2          THE COURT:  Can you expound for me on your point

3    you made a lot in your briefing on this distinction between

4    future lost earnings and front pay -- future lost earning

5    capacity and front pay and why --

6          MS. DALE:  Yes.

7          THE COURT:  -- legally that is an issue that is of

8    any moment in this circuit?  Because I don't believe that --

9    apart from a personal injury context in which the issue --

10   you know, if someone is, you know, an astronaut and making

11   200,000 a year and then is in a serious car accident, surely

12   their future earnings capacity have been hugely reduced,

13   and -- but we're not in a personal injury situation, we're

14   in a employment context.  And I'm struggling to find out

15   what is the difference between lost future earnings capacity

16   and front pay.  And I don't know that the Tenth Circuit

17   recognizes any such distinction.

18         MS. DALE:  Well, I don't know that the Tenth

19   Circuit has ruled on it, but I also don't know that the

20   Tenth Circuit has rejected this distinction.  So I don't

21   know if it's even been in front of the Tenth Circuit.  I

22   haven't --

23         THE COURT:  I'm pretty sure that in the employment

24   context, it has not recognized it.  That's what our research

25   has shown.

1          MS. DALE:  Okay.  So I guess what I don't know,

2     though, is if somebody has actually made that argument.  It

3     just simply hasn't come in front of the Tenth Circuit, then

4     maybe if they considered this -- I mean, this was, quite

5     honestly, a new argument to me but if they --

6          THE COURT:  You raised it.

7          MS. DALE:  Well, right.  But it's not something I

8     had seen before or raised before.  This is the first time I

9     raised this argument.  But I think it just, as a logical

10    matter, it just makes a lot of sense.  And going back to the

11    cases that say two to three years of front pay, that's

12    enough, because it's not supposed to be a windfall, it's not

13    supposed to be an annuity, it's supposed to get the employee

14    back on their feet, get them back to where they would have

15    been, where they could have been making similar wages.

16    That's the point of lost wages; not just back pay, but front

17    pay.

18          This notion of lost earning capacity, it is -- it

19    comes up typically, and that's why I was asking Dr. -- Mr.

20    Opp about:  This is exactly the same analysis you perform

21    for a FELA case, for a personal injury case.

22          THE COURT:  Exactly.

23          MS. DALE:  In that case, you have medical evidence

24    and vocational evidence saying, This is how this is going to

25    affect this person.  This person will not be able to be an

1     engineer forever, they will be able to do these jobs.

2          They simply don't have that type of evidence to say

3     that because he was terminated, he will not be able to work

4     at these types of jobs, he will not be able to make this

5     type of earnings in the future.  There's just not that type

6     of evidence.

7          THE COURT:  But you're making effectively the same

8     point I'm making, which is I don't see the distinction

9     between the two concepts in the context of a case where

10    there is no personal injury, FELA or otherwise, where we're

11    talking about, in addition to how long, as a vocational

12    evaluation or vocational rehab issue, it should take someone

13    to get back to their former earnings capacity.

14         We have the added layer of someone having sustained

15    some type of serious personal injury where, as a matter of

16    their physical health, we have to factor in that in terms of

17    any front pay.

18         So would you agree with me that we don't have that

19    issue here?  There's no issue that the plaintiff has some

20    kind of personal physical, mental, impairment that I should

21    be factoring in to somehow -- as a further layer in this

22    issue of how long a front pay I should --

23         MS. DALE:  That's correct.

24         THE COURT:  All right.  Okay.

25         MS. DALE:  But if I could, Your Honor, point to the

1    language from the Seventh Circuit that discussed what a lost

2    earning capacity claim is.  I think that would be helpful.

3              THE COURT:  Sure.

4              MS. DALE:  So they said:  To recover for lost

5    earning capacity, a plaintiff must produce competent

6    evidence suggesting that his injuries have narrowed the

7    range of economic opportunities available to him.  A

8    plaintiff must show that his injury has caused a diminution

9    in his ability to earn a living.

10             And what we're missing here is any evidence -- so

11   where they -- where you see this come in, where they

12   actually allow it, in lost earning capacity claims, is where

13   they say there's an injury to his reputation.  So because he

14   was terminated, because he was allegedly retaliated against,

15   this carries forward.  And they would have expert testimony

16   saying, This is how it affects your ability to get a job

17   going forward.

18             We simply don't have that here.  He was able to go

19   out and get other jobs.  He's had three different jobs since

20   he worked there.  He told the employers that he was applying

21   for that he was fired from BNSF.  So there's no indication

22   that he wasn't able or couldn't be able to go out and get

23   more work --

24             THE COURT:  Right.  But if the plaintiff is not

25   claiming that his reputation has been harmed in such a way

1    that he can't get re-employed, why does he need an expert to

2    opine on that issue?

3              MS. DALE:  Because that's how you would support a

4    lost earning capacity claim --

5              THE COURT:  Right, but you're the one that's making

6    this point that I should be considering a lost future

7    earnings capacity in the plaintiff's failure to get an

8    expert opinion on that issue.  You're the one that's saying

9    that should be a factor I should be considering, and the --

10   and I don't hear the plaintiff making that claim.

11             MS. DALE:  Right.  So we're saying those are two

12   different claims.  There's a claim for lost future earning

13   capacity, there's a claim for lost front pay.  And we agree

14   that there's a claim for lost front pay.  We don't believe

15   that there should be a claim for lost earning capacity,

16   which is what Mr. Opp was talking about, because there's no

17   sort of evidence showing that there was an impact to his

18   ability to find a job based on the termination.

19             THE COURT:  All right.  And what I'm saying -- and

20   I think we'll leave it at that because it's 5:00 -- that I

21   don't think the Tenth Circuit makes that distinction in

22   nonpersonal injury cases.

23             MS. DALE:  Your Honor, can I make one quick point

24   about the --

25             THE COURT:  Very quickly.

1              MS. DALE:  Okay.  Mr. Thompson mentioned that this

2    is a make-whole statute that is distinguished from the other

3    statutes that apply to lost earning capacity.  Those cases

4    come up in Title VII cases.  So he's saying that this comes

5    up because there's a history of retaliation.  Title VII came

6    up because of a history of discrimination.  I don't think

7    there's a distinction.  And the fact that there --

8              THE COURT:  But if he's correct that the -- this

9    Federal -- the FRSA does not require the plaintiff to prove

10   pretext when -- after there's been some kind of

11   nondiscriminatory or nonretaliatory explanation put forward

12   from the defendant, that's a very different analysis --

13             MS. DALE:  It's --

14             THE COURT:  -- than what's present in the Title VII

15   context.

16             MS. DALE:  It's a different legal analysis and it's

17   a different burden of proof for liability.  There's nothing

18   in the FRSA that says you get more damages if you prove

19   liability.  It's maybe easier to prove liability, it doesn't

20   say you get more damages.

21             THE COURT:  All right.  I don't think I heard Mr.

22   Thompson argue that you get more damages just because

23   there's a different legal analysis.  I think his argument

24   was that that legislative history is an argument for why, if

25   there is some ambiguity or speculation or uncertainty in the

1    calculation of the front pay, the tie should go to the

2    plaintiff.  I think that was his argument.  I don't know

3    that I agree with that, but that's what I understood his

4    argument to be.

5              MS. DALE:  I believe he said that the lost earning

6    capacity claim cases arise in other contexts other than the

7    FRSA, and in those contexts, there's a higher burden of

8    proof.

9              THE COURT:  Okay.  All right.  All right.

10             Folks, thank you very much.  This has been a very

11   instructive hearing.  I've learned a lot from the testimony

12   and I appreciate your preparation and your answers to my

13   questions.  I will take the motion under advisement and wish

14   you all a good weekend.

15        (Proceedings concluded at 5:00 p.m.)

16                              **INDEX**

17   <u>Item</u>                                              <u>PAGE</u>

18                    <u>PLAINTIFF'S WITNESSES</u>

19        **JEFFREY OPP**
          Direct Examination by Mr. Stone            10
20        Cross-examination by Ms. Dale              26

21        **BRANDON FRESQUEZ**
          Direct Examination by Mr. Thompson         44
22        Cross-examination by Mr. Goman             47
          Redirect Examination by Mr. Thompson       75
23        Examination by the Court                   78
          Examination by Mr. Goman                   89

24

25

1
**INDEX**

2
Item                                                                     PAGE

3
DEFENDANT'S WITNESSES

4
**CYNTHIA BARTMANN**
Direct Examination by Ms. Dale                      91

5
Cross-examination by Mr. Stone                     114
Redirect Examination by Ms. Dale                  121

6

7
PLAINTIFF'S EXHIBITS

8
| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|

9
| 60 | | 7 | | 7 |

10
| 61 | | 7 | | 7 |

11

12
DEFENDANT'S EXHIBITS

13
| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|

14
| A | | 6 | | 6 |

15
| B | | 6 | | 6 |

16
| F | | 6 | | 6 |

17
| G | | 6 | | 6 |

18
| I | | 6 | | 6 |

19
| J | | 6 | | 6 |

20
| K | | 6 | | 6 |

21
| L | | 6 | | 6 |

22
| M | | 6 | | 6 |

23
| NN | | 6 | | 6 |

24
| 1 | | 9 | | 9 |

25

1                    *       *       *       *       *

2                        REPORTER'S CERTIFICATE

3

4        I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6        Dated at Denver, Colorado, this 21st day of November,

7   2018.

8

9

10

11

12                  MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25